IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT CINCINNATI


JASON DAVIS and          :
JENNIFER DAVIS,
                         :
        Plaintiffs,
vs.                      :  Case No. 1:24-cv:0202

CHARMAINE McGUFFEY, et al., :

        Defendants.       :



            * * * * * * * *

DEPONENT:        Jason Davis

DATE:            May 6, 2025

            * * * * * * * *



Kristina L. Laker

Court Reporter



        BARLOW REPORTING & VIDEO SERVICES, LLC
            620 Washington Street
            Covington, Kentucky 41011
                (859) 261-8440

1      The deposition of JASON DAVIS taken for the

2  purpose of discovery and/or use as evidence in the

3  within action, pursuant to notice, heretofore taken

4  at the office of Chris Wiest, Attorney at Law, PLLC,

5  50 East Rivercenter Boulevard, Suite 1275,

6  Covington, Kentucky, on May 6, 2025, at 9:00 a.m.,

7  upon oral examination, and to be used in accordance

8  with the Federal Rules of Civil Procedure.

9            * * * * * * * *

10            APPEARANCES

11  REPRESENTING THE PLAINTIFFS:

12  Christopher Wiest, Esq.
     CHRIS WIEST, ATTY AT LAW, PLLC
13  50 East Rivercenter Boulevard, Suite 1280
     Covington, KY 41011
14

     Zachary Gottesman, Esq.
15  GOTTESMAN & ASSOCIATES, LLC
     9200 Montgomery Road
16  Building E, Suite 18B
     Cincinnati, OH 45242
17

18  REPRESENTING THE DEFENDANTS:

19  Matt Miller-Novak, Esq.
     Andrew E. Prem, Esq.
20  HAMILTON COUNTY PROSECUTOR'S OFFICE
     230 East Ninth Street, Suite 4000
21  Cincinnati, OH 45202

22

     ALSO PRESENT:  Peter Stackpole, legal liaison
23

24

25

1                          I N D E X

2                                                    Page

3    Cross-Examination by Mr. Miller-Novak:          4

4

5

6                     E X H I B I T S

7    Defendants' Deposition Exhibit No. 1      20

8    Defendants' Deposition Exhibit No. 2      81

9    Defendants' Deposition Exhibit No. 3      88

10   Defendants' Deposition Exhibit No. 4      136

11   Defendants' Deposition Exhibit No. 5      159

12   Defendants' Deposition Exhibit No. 6      215

13   Defendants' Deposition Exhibit No. 7      244

14   Defendants' Deposition Exhibit No. 7-A    245

15   Defendants' Deposition Exhibit No. 8      247

16   Defendants' Deposition Exhibit No. 9      253

17   Defendants' Deposition Exhibit No. 10     259

18

19

20

21

22

23

24

25

```
 1                    JASON DAVIS,
 2   of lawful age, as having been duly sworn, as
 3   hereinafter certified, was examined and testified as
 4   follows:
 5                    CROSS-EXAMINATION
 6   BY MR. MILLER-NOVAK:
 7        Q.   All right.  Could you please state your
 8   name for the record and spell it.
 9        A.   My name is Jason Davis.  J-a-s-o-n
10   D-a-v-i-s.
11        Q.   Well, Jason, my name is Matt Miller-Novak.
12   I'm not going to spell it, because she knows how to
13   spell it.  And I represent all of the defendants.
14   And I work for the Hamilton County Prosecutor's
15   Office.
16             So during the deposition how would you
17   like me to refer to you, Mr. Davis, Jason; what
18   would be your preference?
19        A.   I don't have a preference.  I'm fine.
20        Q.   Okay.  You can call me Matt.  I'm a first
21   name guy.  My last name has two many syllables for
22   people to be required to say.  So Matt is fine.  If
23   you have any questions -- and then I'll probably
24   call you Jason, if that's okay?
25        A.   That's fine.
```

1    Q.    We'll just do first names --

2    A.    Okay.

3    Q.    -- all right?

4    A.    Uh-huh.

5    Q.    All right.  So I know that you've at least

6  witnessed a couple of depositions in this case,

7  correct?

8    A.    Yes, sir.

9    Q.    Okay.  So I won't kind of labor what a

10  deposition is here too much.  But as you know, you

11  are under oath, correct?

12    A.    Yes, sir.

13    Q.    And that I'm asking you questions and

14  you're going to answer those questions and she's

15  going to type out the answers, correct?

16    A.    Yes, sir.

17    Q.    So most of, you know, what we do in a

18  deposition kind of has to do with that aspect of the

19  record.  So when I'm asking a question, please let

20  me finish before you answer, okay?

21    A.    Yes.

22    Q.    And then I'll let you answer completely

23  before I ask another question.  And if I screw up

24  and I cut you off, let me know, okay?

25    A.    Yes.

1    Q.   Secondarily, if we're going to say yes or

2  no, we need to actually say yes or no, not uh-huhs

3  or nuh-uhs; do you understand?

4    A.   Yes.

5    Q.   All right.  You already passed the test.

6  Likewise, you know, a lot of these questions -- and

7  to be completely transparent, I kind of have an

8  outline here -- so a lot of these questions I'm

9  going to come up with on the spot.  They might not

10  be clear.  As much as I'd like to pretend I'm

11  perfect, I'm not, okay?

12    A.   Yes.

13    Q.   If there's any reason you don't understand

14  a question I've asked you, please let me know, okay;

15  because if you answer a question, I'm going to

16  assume that what you told me is the truth and

17  gospel, understood?

18    A.   Yes.

19    Q.   Okay.  If you need to take a break for any

20  reason today, that's fine, whatever the reason may

21  be.  I don't even really care.  You've got to go to

22  the bathroom, you want to talk to your attorney, you

23  want to call and check on your dry cleaning,

24  whatever it might be, just let me know, okay?

25    A.   Yes.

1          Q.    The only thing I ask if I have a question

2    on the table, that you answer that question before

3    we take a break, all right?

4          A.    Yes.

5          Q.    All right.  And I don't need to know what

6    kind of medicine it is or anything at this point in

7    time, but are you on any medication today or have

8    any physical condition that would make your memory

9    not functional or not exact?

10         A.    Just age.

11         Q.    Just age.  Fair enough.  But you don't

12   have any diagnosed condition related to age that

13   makes your memory -- or interferes with your memory?

14         A.    No, sir.

15         Q.    Just forgetting that you left your keys on

16   top of the cabinet?

17         A.    Yes.

18         Q.    Okay.  Understand.  Great.  Do you have

19   any initial questions for me, or are you ready?

20         A.    I am ready.

21         Q.    Okay.  So have you ever been deposed

22   before, Jason?

23         A.    Deposed as in -- can you define deposed,

24   like. . .

25         Q.    This is a deposition.

1       A.   I've never done a deposition.

2       Q.   Okay.  That's what deposed means.

3       A.   I gotcha.

4       Q.   Kind of like the verb version of what

5  we're doing today.

6       A.   Gotcha.

7       Q.   Deposition is a noun.  Depose is a verb.

8  So you've never been deposed before?

9       A.   No, sir.

10       Q.   Okay.  Have you ever testified in a trial?

11       A.   Yes, sir.

12       Q.   Okay.  That was your confusion?

13       A.   Yes.

14       Q.   So what type of trials have you testified

15  in?

16       A.   I've done criminal.  And I did one for --

17  I guess it was like a civil suit for a car crash

18  since I was the reporting officer.

19       Q.   Like a negligence claim?

20       A.   Yes.

21       Q.   And you were the reporting officer, so

22  they called you as a witness in a personal injury

23  case?

24       A.   Yes.

25       Q.   Okay.  So you just served as a witness

1   then?

2        A.    Yes.

3        Q.    Have you ever been a party in a civil

4   suit?

5        A.    No, sir.

6        Q.    Have you ever filed suit against anybody

7   before?

8        A.    No, sir.

9        Q.    Okay.  And then the criminal case, I'm

10  sure that happened -- has that happened more than

11  once in your career?

12       A.    Oh, absolutely.

13       Q.    Okay.  So you've testified a number of

14  times in court under oath as a witness as a deputy?

15       A.    Yes.

16       Q.    As an action of the State of Ohio versus a

17  defendant, correct?

18       A.    Yes, sir.

19       Q.    Okay.  All right.  So in this case you are

20  a plaintiff as a former deputy of Hamilton County

21  Sheriff's Department, correct?

22       A.    Yes, sir.

23       Q.    And your wife is also a plaintiff,

24  correct?

25       A.    Yes, sir.

1      Q.   And what is her name?

2      A.   Jennifer Patterson Davis.

3      Q.   Okay.  Does she go as Jenny or any other

4  alias?

5      A.   No.

6      Q.   Okay.  So she's called Jennifer?

7      A.   Jennifer.

8      Q.   Okay.  And how long have you been married?

9  I don't want to get you in trouble.  What year did

10  you get married?

11     A.   2003.

12     Q.   That's fine.  We'll just chalk it up to

13  not being good at math --

14     A.   Thank you.

15     Q.   -- not forgetting.

16     A.   That's going to be awkward.

17     Q.   Well, it's fine.  2003.  So that's 22

18  years roughly, correct?

19     A.   Yes.

20     Q.   Okay.  Do you have any children?

21     A.   I have one.

22     Q.   Okay.  And what is your child's name?

23     A.   Jayden Davis.

24     Q.   How old is Jayden?

25     A.   Nineteen.

1       Q.   What high school did he graduate from?

2       A.   He went to Harrison.

3       Q.   And where is he going now?

4       A.   UC.

5       Q.   What does he want to do?

6       A.   He is in engineering, trying to get with

7    the DOD for weapons development and designing.

8       Q.   Oh, okay.  And what is your educational

9    history?

10      A.   High school and associate's degree in

11   criminal justice.

12      Q.   Where did you get that?

13      A.   Cincinnati State.

14      Q.   What year?

15      A.   2011.

16      Q.   How old are you?

17      A.   49.

18      Q.   Is that your second career?

19      A.   My second career?

20      Q.   You got your associate's in 2011 in law

21   enforcement?

22      A.   Yes.

23      Q.   Okay.  What did you do before that?

24      A.   As in education or what?

25      Q.   Yeah.

1      A.   Education?

2      Q.   Yes.

3      A.   Just high school.

4      Q.   Just high school.  What year did you

5 graduate high school?

6      A.   '94.

7      Q.   '94.  Okay.  Where did you go to high

8 school?

9      A.   Oak Hills.  Diamond Oaks.

10      Q.   Diamond Oaks, was it law enforcement?

11      A.   No.  It was commercial art.

12      Q.   When did you start your career in law

13 enforcement?

14      A.   2002 with the Sheriff's Department.

15      Q.   What was your first position?

16      A.   Corrections officer.

17      Q.   How long were you in corrections?

18      A.   Twelve years.

19      Q.   What was your next position?

20      A.   I was promoted to road patrol in 2014.

21      Q.   What was your last position with the

22 County?

23      A.   Road patrol.

24      Q.   What location did you work out of?

25      A.   I was District 5, Anderson Township.

1      Q.   What are your responsibilities in road

2  patrol?

3      A.   Enforce -- enforce the laws, traffic.

4  Patrol functions is patrolling the neighborhoods,

5  crime prevention.

6      Q.   When did you start in corrections again?

7      A.   2002.

8      Q.   2002.  And when was your last day with the

9  County?

10      A.   January 30th, I believe, of 2023.

11      Q.   Okay.  So does 21 years sound correct?

12      A.   Yes, sir.

13      Q.   Okay.  So 12 years in corrections of those

14  21 years, that would be nine years as a patrol?

15      A.   Yes, sir.

16      Q.   Okay.

17      A.   Yeah, that's right -- no, was it '23 or

18  '24?  This is '25.

19      Q.   I believe it was January 30th of 2024.

20      A.   '24.  Okay.  I'm sorry.

21      Q.   Does that sound correct?  And you put

22  in --

23      A.   Yes.

24      Q.   -- your resignation --

25      A.   Yes.  I'm sorry.

1       Q.   That's okay.  You sent your resignation on

2    January 9th of 2024, correct?

3       A.   Okay.  Yes.  This is '25.  Sorry about

4    that.

5       Q.   It's okay.  It's only four months old.

6    Would you agree that law enforcement officers in

7    their course of employment with the government have

8    access to a lot of government property?

9                    MR. GOTTESMAN:  Objection.

10                   Go ahead.

11      A.   Yes.

12      Q.   And that you receive a lot of government

13   property, correct?

14      A.   Yes.

15      Q.   Items like radios, correct?

16      A.   Yes.

17      Q.   Would you agree that when an officer

18   leaves their government employment, they should

19   return their government property?

20      A.   Yes.

21      Q.   Do you believe when a government demands

22   that an officer returns his property, that it's

23   unlawful for an officer to refuse?

24      A.   Is the property issued to them?

25      Q.   Well, property that belongs to the

1    government --

2         A.   Oh, yes.

3         Q.   -- whether it was issued to them or it

4    just became in the officer's possession for one

5    reason or another.

6         A.   Yes.

7         Q.   Okay.  Would you agree that it reflects

8    poorly on officers to engage in hate speech?

9              MR. GOTTESMAN:  Objection.

10        A.   Yes.

11        Q.   Would you agree that it reflects poorly on

12   officers to associate with people who engage in hate

13   speech?

14             MR. GOTTESMAN:  Objection.

15        A.   Engage as in agreeing or arguing with

16   them?

17        Q.   Well, would you believe that it would

18   be -- reflect poorly on a law enforcement official

19   to be associated with a hate group, for instance?

20        A.   Associated, yes.

21        Q.   Do you believe that officers should

22   refrain from exhibiting prejudice generally?

23             MR. GOTTESMAN:  Objection.

24        A.   Yes.

25        Q.   So a word has come up a lot that I think

1  is departmental and certainly nothing that I had

2  been exposed to before called malcontent.  How do

3  you define malcontent?

4      A.  Somebody that just continuously complains

5  and just complains and just shows up for the

6  paycheck.

7      Q.  Is that a word that's been used in

8  Hamilton County since your like entire employment

9  there?

10     A.  Yes.  It's a word that's used.

11     Q.  Okay.  So it's kind of like a phrase that

12  is -- or a term, I guess, that's generally used to

13  describe certain deputies within the department?

14     A.  Yes, sir.

15     Q.  Have you ever used that word before?

16     A.  Yes, sir.

17     Q.  So you've described other people as a

18  malcontent at certain points in your career?

19     A.  Yes, sir.

20     Q.  Have you ever described yourself as a

21  malcontent?

22     A.  No, sir.

23     Q.  Have you ever admitted that at a certain

24  point in time that you acted as a malcontent?

25     A.  No, sir.

1       Q.   Have you ever made the statement that

2  said, quote/unquote, I was a malcontent?

3       A.   I was a malcontent?  I don't recall.

4       Q.   Do you use social media at all?

5       A.   Yes, sir.

6       Q.   What platforms do you use?

7       A.   Facebook, Instagram, and Twitter.  I

8  believe I have another one.  What's the other

9  called?  I don't think anybody in here is young

10 enough.  What's the other one?

11            MR. GOTTESMAN:  TikTok?

12      A.   I said TikTok, right?

13      Q.   No, you did not say TikTok.

14            MR. WIEST:  Myspace?

15            THE WITNESS:  Did you say Myspace?

16      Wow.

17      Q.   Do you think it is TikTok?

18      A.   Yes, I do have TikTok.

19      Q.   Well, you had not said that.

20      A.   Okay.

21      Q.   You had said previously Facebook,

22 Instagram, Twitter, which is now X -- it's the

23 artist formerly known as Twitter --

24      A.   Yes.

25      Q.   -- and then you think you use TikTok --

1       A.    Yes.

2       Q.    -- correct?

3       A.    Yes.

4       Q.    All right.

5       A.    But there's one more that the --

6       Q.    Feeds?

7       A.    No.  I didn't get on Feeds.  It will come

8    to me.

9       Q.    Is it Truth Media?

10      A.    No.  Because my son made fun of me for

11   having it, and I had no idea --

12      Q.    Discord?

13      A.    -- I had it.  No.

14              MR. PREM:  Snapchat?

15      A.    Snapchat.  Thank you.  I didn't even know

16   I had it.

17              MR. MILLER-NOVAK:  Okay.  The

18              youngest person in the room came to your

19              rescue.

20              THE WITNESS:  Thank you.

21              MR. PREM:  I'm not young.

22      Q.    Okay.  That's a lot.  Do you use all these

23   frequently or some more than others?

24      A.    Mostly Facebook.

25      Q.    Mostly Facebook.  And your Facebook

1    account, is it just your name, Jason Davis?

2         A.   Yes.

3         Q.   What about your Instagram; is there some

4    kind of user name or --

5         A.   I believe it's Coach Jason 73.

6         Q.   Coach Jason 73.  What about Snapchat?

7         A.   I don't have a clue.

8         Q.   Okay.  You know you have it.  You don't

9    use it much?

10        A.   I don't think I've -- I don't recall ever

11   logging -- actually like using it or even getting on

12   it.

13        Q.   What about X?

14        A.   I believe it's another one -- it might be

15   Coach Jason.

16        Q.   Okay.  Coach Jason is something you just

17   use often?

18        A.   73, yes.

19        Q.   And 73, that's your birth year?

20        A.   No, sir.  It was just a football number.

21        Q.   Oh, okay.  What position did you play?

22        A.   A center and guard.

23        Q.   Your wife, Jennifer, what platforms does

24   she use?

25        A.   Facebook.

1      Q.    Is that it?

2      A.    That and Instagram.

3      Q.    And Instagram.  And then how does she go

4  on Facebook?

5      A.    I believe it's -- that's horrible --

6  Jennifer Davis, I believe.

7      Q.    She doesn't use the Patterson?

8      A.    Maybe she does.  I don't pay attention.

9      Q.    Okay.  Do you know her Instagram whatever

10  you call it?

11      A.    Without looking -- I mean, I just see

12  Jennifer and, you know, I don't look to what the

13  name actually is.

14                 (Defendants' Deposition Exhibit No. 1

15                 was marked for identification.)

16      Q.    Okay.  Jason, I've just handed you what

17  we're going to mark as Defendants' Exhibit 1, which

18  is -- would you agree is a copy of your complaint

19  with jury demand?

20      A.    Yes, sir.

21      Q.    All right.  And you understand that a

22  complaint is a document that essentially initiates

23  your lawsuit?

24      A.    Yes, sir.

25      Q.    Did you review this before it was filed?

1      A.   Yes, sir.

2      Q.   Did you read the entire document before it

3  was filed?

4      A.   Yes, sir.

5      Q.   Did you agree with all the statements made

6  in this document?

7      A.   Yes, sir.

8      Q.   Do you agree that all the statements in

9  this document are accurate?

10     A.   Yes, sir.

11     Q.   At least to your understanding and belief?

12     A.   Yes.

13          MR. WIEST:  Just for the record, he's

14          not a lawyer or a legal expert.  I'm

15          assuming you're just talking about the

16          factual statements rather than the legal

17          conclusions or claims?

18          MR. MILLER-NOVAK:  Yeah.  I mean,

19          generally speaking I think that would be

20          correct.

21     Q.   When I'm referring to the factual

22  allegations made in this complaint, you agree that

23  they are accurate, correct?

24     A.   Yes.

25     Q.   Okay.  All right.  We're going to kind of

Page 22

1    go through this a little bit here for a while, okay?

2         A.   Okay.

3         Q.   All right.  So we'll start with paragraph

4    10, which is on page three, okay?

5         A.   Okay.

6         Q.   So I'm not going to refer to page numbers

7    very frequently, Jason.  So these numbers on the

8    left-hand side; do you see them?

9         A.   Yes, sir.

10        Q.   Even though a lot of them are just

11   sentences, we refer to these as paragraphs, okay?

12        A.   Okay.

13        Q.   So if I say paragraph 10, you can see how

14   it says 10 on the bottom?

15        A.   Yes, sir.

16        Q.   I'm referring to the whole paragraph

17   that's under that number, okay?

18        A.   Yes, sir.

19        Q.   All right.  Now you know the mechanics.

20   We'll get going.

21        A.   Sure.

22        Q.   So it says, Jason began employment with

23   the Hamilton County Sheriff's Office, initially as a

24   corrections officer, in 2002, correct?

25        A.   Yes, sir.

 1      Q.   And then in 2014 it says you transferred

 2   to the road/patrol unit, correct?

 3      A.   Yes, sir.

 4      Q.   All that is accurate?

 5      A.   Yes, sir.

 6      Q.   Okay.  In his 18 years on the job, it says

 7   that your performances consisted of meets

 8   expectations or exceeds expectations; do you see

 9   that?

10      A.   Yes, sir.

11      Q.   It says you were never subject to

12   discipline; do you see that?

13      A.   Yes, sir.

14      Q.   Okay.  Do you agree with that?

15      A.   Yes, sir.

16      Q.   Okay.  So paragraph 11 says that you were

17   married to Jennifer in 2003; do you see that?

18      A.   Yes.

19      Q.   Okay.  So earlier that's what you

20   testified?

21      A.   Yes, sir.

22      Q.   What is Jennifer's occupation?

23      A.   She doesn't work anymore.

24      Q.   She's currently unemployed?

25      A.   Yes.

1      Q.   When did she become unemployed?

2      A.   Two years ago.

3      Q.   Okay.  What did she do before that?

4      A.   She owned her own business.

5      Q.   What was that business?

6      A.   Ice cream.

7      Q.   Like she owned an ice cream shop?

8      A.   Yes, sir.

9      Q.   What was it called?

10     A.   Gold Top Dairy Bar.

11     Q.   Oh, I think I remember that.  That was off

12  of Colerain?

13     A.   Colerain and Blue Rock.  Uh-huh.

14     Q.   Okay.  It's like a dairy bar, correct?

15     A.   Yes, sir.

16     Q.   Soft serve, that kind of stuff?

17     A.   Yes, sir.

18     Q.   Okay.  When did she start that?

19     A.   She owned that for 19 years.  So 2004, I

20  believe.

21     Q.   Do you know if that was like an LLC or a

22  corporation?

23     A.   LLC.

24     Q.   Did she own it with anybody else or just

25  herself?

1      A.    Just herself.

2      Q.    Let's continue to paragraph 13 on the same

3  page -- or the next page.  It should be on page

4  four.

5      A.    Yes, sir.

6      Q.    It says in -- well, you would agree that

7  Sheriff McGuffey was elected sheriff in November of

8  2020, so she began on January 4 of 2021, correct?

9      A.    Yes, sir.

10      Q.    Okay.  Did you have any relationship or

11  any interactions with Sheriff McGuffey before she

12  was elected as sheriff?

13      A.    Yes, sir.

14      Q.    Okay.  When did those occur?

15      A.    Are you wanting from the time she was

16  running or even before that?

17      Q.    Was she ever your supervisor?

18      A.    Yes, sir.

19      Q.    Let's go with that.  Okay.  When was that?

20      A.    2003.

21      Q.    What was her rank at the time?

22      A.    Captain.

23      Q.    How would you describe your relationship

24  with her when she was captain?

25      A.    We had a great working relationship.

1       Q.   And that was in corrections, correct?

2       A.   Yes, sir.

3       Q.   Prior to her being elected sheriff, did

4  you have any disputes or disagreements with Sheriff

5  McGuffey?

6       A.   Yes, sir.

7       Q.   When did those occur?

8       A.   A year?

9       Q.   Yes.

10      A.   I believe 2014.

11      Q.   And what was that?

12      A.   I was the union president.

13      Q.   Okay.  And what happened?

14      A.   I would come to her with grievances, and

15  we would try to resolve them without going to -- any

16  further than her office.

17      Q.   And she was a major at that time?

18      A.   Yes, sir.

19      Q.   Okay.  So when you're talking about

20  disagreements, you're talking about grievances?

21      A.   Yes.

22      Q.   So you tried to work them out before they

23  were filed?

24      A.   Yes, sir.

25      Q.   Okay.  So if a deputy would come to you

1    with a concern, you would try to talk to her before

2    you initiated a grievance procedure?

3        A.   Yes, sir.

4        Q.   Okay.  So you're describing one event

5    maybe that didn't go so well?

6        A.   I mean, each grievance was always a back

7    and forth, you know.  We're saying you're violating

8    our contract and she's saying you're not.  So there

9    was always an argument in that aspect of it.

10       Q.   So that's what you're describing of maybe

11   past debates with Sheriff McGuffey before she was a

12   sheriff were these grievance conversations?

13       A.   Yes.

14       Q.   Okay.  So you were a union president when?

15       A.   I'm positive '14 -- 2014.  I would -- 2013

16   and '14, I believe.

17       Q.   Okay.

18       A.   That's my best knowledge.

19       Q.   So about two years?

20       A.   Yes, sir.

21       Q.   Did you ever serve in any other capacity

22   in the union?

23       A.   I was a union member -- or on the union

24   board for maybe -- years prior to that.  I was

25   always on the union board.

Page 28

```
 1        Q.   Okay.  So you're pretty familiar with

 2   grievance procedures then with any union contract,

 3   correct?

 4        A.   Yes, sir.

 5        Q.   Okay.  So to take a step back, the

 6   Sheriff's Department has a collective bargaining

 7   unit?

 8        A.   Yes, sir.

 9        Q.   And certain officers are not part of the

10   bargaining unit, correct?

11        A.   (No response.)

12        Q.   Like a major, for instance?

13        A.   Oh, yeah.  Yeah.  I'm sorry.  Yes.

14        Q.   Right?

15        A.   Yes.

16        Q.   Right.  But deputies are typically part of

17   the --

18        A.   Yes.

19        Q.   -- collective bargaining unit, correct?

20        A.   Yes, sir.

21        Q.   All right.  And a collective bargaining

22   agreement is a contract that the union negotiates

23   with the County, correct?

24        A.   Yes, sir.

25        Q.   Okay.  Because your collective bargaining
```

1   agreement is three years, correct?

2       A.   It's. . .

3       Q.   At a time?

4       A.   Yes.

5       Q.   Okay.

6       A.   Yeah, three years.  I'm sorry.

7       Q.   That's okay.  That's fine.  Don't worry.

8   I didn't mean to test you.

9       A.   No, you're fine.

10      Q.   I'm just seeing what you know.  So you

11  have a collective bargaining agreement.  And that

12  includes processes like grievances, correct?

13      A.   Yes, sir.

14      Q.   And things like predetermination hearings,

15  correct?

16      A.   Yes, sir.

17      Q.   And progressive discipline, correct?

18      A.   Yes, sir.

19      Q.   And I have looked at yours obviously, but

20  it has different pay grades for different steps,

21  correct?

22      A.   Yes, sir.

23      Q.   For different positions, correct?

24      A.   Yes, sir.

25      Q.   And there's different processes for

1    promotion contained within the agreement, correct?

2         A.    Yes, sir.

3         Q.    And if those are not followed by, let's

4    say, the administration or management for lack of

5    better wording, then a union member can file a

6    grievance, correct?

7         A.    Yes, sir.

8         Q.    So any time he feels that a procedure has

9    been violated or his rights under the agreement have

10   been violated, that deputy would have the option of

11   filing a grievance, correct?

12        A.    If it's something that could be proved,

13   yes, sir.

14        Q.    Okay.  And in addition to that you would

15   agree that discipline tends to have to follow a

16   certain procedure, correct?

17        A.    Yes, sir.

18        Q.    It's pretty unlikely for a deputy to just

19   be fired for one instance, correct?

20        A.    Correct.

21        Q.    Typically speaking there's a progressive

22   disciplinary process that's followed, correct?

23        A.    Yes, sir.

24        Q.    And it usually starts with some kind of

25   verbal counseling, correct?

Page 31

1      A.   Counseling, yes, sir.

2      Q.   And then it would go to maybe more of a

3  written reprimand, correct?

4      A.   Yes, sir.

5      Q.   And those things might end up in a

6  personnel file, correct?

7      A.   Yes.

8      Q.   And before it got to something like -- so

9  those tend to happen before it gets to something

10  like a suspension, correct?

11      A.   Yes.

12      Q.   Or it got to something like a demotion,

13  correct?

14      A.   Yes.  Yes.

15      Q.   And that before someone could be

16  suspended, they have a right to usually challenge

17  their suspension, correct?

18      A.   Yes.

19      Q.   And they could ask for a hearing, correct?

20      A.   Yes, sir.

21      Q.   And at that hearing they could present

22  evidence, correct?

23      A.   Yes.

24      Q.   And they could have some kind of

25  representation in that hearing, correct?

1    A.    Yes.

2    Q.    Okay.  And at any point they could file a

3  grievance if they feel their discipline is somehow

4  in violation of the spirit of the agreement,

5  correct?

6    A.    Correct.

7    Q.    So you're familiar with all of those

8  processes, correct?

9    A.    Yes, sir.

10    Q.    And you're familiar with all the options

11  available to a deputy who feels like his rights have

12  been violated, correct?

13    A.    My contract, yes, sir.

14    Q.    Okay.  And you're also aware of all the

15  protections a deputy has if the administration tries

16  to discipline a deputy, correct?

17              MR. GOTTESMAN:  Objection.

18              Go ahead.

19    A.    Yes.  If it violated the contract, yes,

20  sir.

21    Q.    Or if they were disciplining a deputy

22  without a just cause, correct?

23    A.    I would refer to an attorney at that

24  point.

25    Q.    Okay.  You would agree that a union

1   agreement requires that deputies are only terminated

2   with just cause, correct?

3        A.   Yes, sir.

4        Q.   Before they're terminated they have the

5   option of a predetermination hearing, correct?

6        A.   Yes.

7        Q.   We often call that a Loudermill hearing,

8   correct?

9        A.   I have no. . .

10       Q.   You're not familiar with that phrase?

11       A.   No, sir.

12            MR. GOTTESMAN:  Some of these

13            questions I need to interpose objections.

14            I need you to slow down and allow me to

15            give my objections, okay?

16            THE WITNESS:  Yes, sir.

17       Q.   So before you were terminated as a deputy,

18   you're allowed to ask for a hearing before the

19   termination, correct?

20            MR. GOTTESMAN:  Objection.

21       A.   I would not know.

22       Q.   Okay.  Well, maybe we'll look at the

23   agreement later.  But you do know that there are

24   certain stages where you are allowed to request

25   predetermination hearings before certain discipline

1    and certain termination, correct?

2              MR. GOTTESMAN:  Objection.

3    A.   Yes, sir.

4              MR. GOTTESMAN:  And, Counsel, I don't

5              think it's a matter of tremendous

6              significance, but part of my objection to

7              those questions was to the form in the

8              sense that he worked for the Sheriff's

9              Office for years.  There were multiple

10             bargaining agreements -- successive

11             bargaining agreements that would have

12             applied to that period of -- that

13             extensive period of employment.

14             And your question was a little vague

15             as to which particular bargaining

16             agreement you were referring to.  And I

17             know firsthand that they changed during

18             those time periods.  So my objection goes

19             to the form and it was vague as to time

20             and which contract you were referring to.

21   Q.   Do you remember any union agreement that

22   did not contain grievance procedures?

23   A.   No, sir.

24   Q.   Okay.  So all the union agreements at the

25   Sheriff's Department had some form of grievance

1    procedure, correct?

2        A.   I believe so.

3        Q.   And all the union agreements that you can

4    remember had some form of predetermination hearings

5    before someone is terminated, correct?

6                MR. GOTTESMAN:   Objection.

7                Go ahead.

8        A.   I believe so.  I never had to represent

9    somebody for termination.

10       Q.   And that all of the union agreements had

11   some type of progressive disciplinary policy,

12   correct?

13       A.   Yes.

14       Q.   Okay.  Your complaint alleges in paragraph

15   13 that when McGuffey was elected Sheriff in 2020

16   and took office about January 4, 2020 -- she took

17   office in 2021.  Sorry.  That's 12.

18           It says, She began her term as Sheriff

19   with a press conference; do you see that?

20       A.   Yes, sir.

21       Q.   Is that your recollection?

22       A.   Yes, sir.

23       Q.   All right.  It says in her press

24   conference -- this is the next paragraph 13, she

25   stated her number one priority as Sheriff was

1    responding to COVID-19; do you see that?

2        A.    Yes.

3        Q.    Okay.  Are you aware whether or not any

4    deputies became ill from COVID-19 working in the

5    Justice Department?

6                    MR. GOTTESMAN:  Objection.

7                    Go ahead.

8        A.    In the Sheriff's Department?

9        Q.    Yes.

10       A.    Yes, sir.

11       Q.    Okay.  Are you aware of any deputies that

12   lost their lives to COVID during that time period?

13       A.    I believe one from the jail.

14       Q.    Are you aware of whether or not any

15   inmates became ill from COVID in the jail?

16       A.    No, sir.  I didn't work the jail at that

17   time.

18       Q.    Okay.  Are you aware of whether or not any

19   inmates lost their lives because of COVID in the

20   jail during that time period?

21       A.    I do not know.

22       Q.    So in paragraph 14 it says, During that

23   press conference on or about January 4, 2021,

24   Jennifer posted on the Sheriff's social media page

25   that had been live streaming the press conference,

1    that the Sheriff's priorities were misaligned, and

2    that officer safety and suicides should be the

3    number one priority.  A true and accurate copy of

4    the post is attached as Exhibit 1; do you see that?

5         A.   Yes, sir.

6         Q.   Do you mind turning with me to Exhibit 1?

7         A.   Is it towards the back or. . .

8         Q.   Yep.  It's kind of past page 15.

9              MR. WIEST:  Page 16.

10        Q.   And this looks like a printout -- on

11   Exhibit 1, a printout of comments that were made

12   relating to this streamed press conference; do you

13   agree with that?

14        A.   Yes, sir.

15        Q.   Okay.  And one of them is from Jennifer

16   Patterson Davis.  Is that your wife?

17        A.   Yes.

18        Q.   And it says, What a shit show; do you see

19   that?

20        A.   Yes, sir.

21        Q.   Okay.  So you agree that that's your wife

22   that commented what a shit show?

23        A.   Yes, sir.

24        Q.   Okay.  And then the next comment is your

25   number one concern as sheriff is COVID?  Where is my

Page 38

1    eyeroll emoji.  Do you see that?

2         A.   Yes, sir.

3         Q.   Do you agree that was Jennifer's post?

4         A.   Yes, sir.

5         Q.   And a couple of posts down it says -- or

6    comments down -- I guess I should use the word

7    comment -- then maybe she should have run for a

8    public health position, not sheriff; do you see

9    that?

10        A.   Yes, sir.

11        Q.   Okay.  And then lower down it says Elaine

12   Moscovitz; do you see that?

13        A.   Yes.

14        Q.   Number one priority though?  I didn't say

15   it shouldn't be addressed, but my biggest health

16   priority would be officers coming home safe to their

17   families without a bullet in their head and not

18   coming home with the flu; do you see that?

19        A.   Yes.

20        Q.   What does she mean by the flu; do you

21   know?

22        A.   No.

23        Q.   Okay.  Do you agree that COVID-19 and the

24   flu are two different diseases?

25                  MR. GOTTESMAN:  Objection.

1      A.    My opinion?

2      Q.    Yes.

3      A.    No.

4      Q.    You don't think they're two different

5  diseases?

6                MR. GOTTESMAN:  Objection.

7      A.    No.

8                MR. GOTTESMAN:  You got to let me --

9                THE WITNESS:  Sorry.

10               MR. GOTTESMAN:  -- get my objections

11          out.

12     Q.    Okay.  So you don't believe that COVID is

13  something that exists?

14               MR. GOTTESMAN:  Objection.

15               Go ahead.

16     A.    I didn't say that.

17     Q.    So I don't understand.  So your opinion is

18  that the flu and COVID are the same thing?

19               MR. GOTTESMAN:  Objection.  Asked and

20          answered.

21     A.    My opinion.

22     Q.    Okay.  How did you formulate that opinion?

23               MR. GOTTESMAN:  Objection.

24     A.    I just believe it's another strain of the

25  flu.  It's just my opinion.

Page 40

1      Q.   Okay.  Have you ever attended any kind of

2  medical training?

3      A.   Nope.

4      Q.   Okay.  So is it your belief that Sheriff

5  McGuffey should not address or should not be

6  addressing at this point in time COVID-19 within the

7  Sheriff's Department?

8                MR. GOTTESMAN:  Objection.

9      A.   My opinion at this time?

10      Q.   Yes.

11      A.   Watching that I -- I agree with my wife.

12      Q.   Did you and your wife talk about it at all

13  while the streaming was occurring?

14      A.   I do not recall.

15      Q.   Have you ever talked to your wife about

16  the Sheriff's positions regarding COVID-19 at the

17  time?

18      A.   I -- yes.

19      Q.   Okay.  And were you critical of the

20  Sheriff's positions to your wife during that time

21  period?

22      A.   I don't recall.

23      Q.   Were you aware that your wife was

24  commenting during the streamed press conference?

25      A.   I do not recall.

Page 41

```
 1        Q.   When did you first become aware of these
 2   comments?
 3        A.   I don't remember.  I don't recall.
 4        Q.   Have you ever -- around this point in time
 5   after -- in the time leading up to Sheriff
 6   McGuffey's election, were you critical of her
 7   campaign at home?
 8        A.   Yes.
 9        Q.   Okay.  Why were you critical of her
10   campaign?
11        A.   Because she lied on her debate on TV with
12   Hoffbauer.
13        Q.   With who?
14        A.   When she debated Hoffbauer.
15        Q.   Okay.  Do you feel that she lied?
16        A.   Absolutely.
17        Q.   What do you feel that she lied about?
18        A.   When she stated she never cursed or
19   belittled any of her employees.
20        Q.   Okay.  So you feel like she has belittled
21   her employees in the past?
22        A.   I'm one of them.
23        Q.   Okay.  So she belittled you in your
24   opinion?
25        A.   Yes.
```

Page 42

1      Q.    How did she belittle you?

2      A.    When she was the major and we had a

3  disagreement on what was said about a policy, and

4  she accused me of lying and attacking my integrity.

5      Q.    How did she attack your integrity?

6      A.    Said that I was lying.

7      Q.    Okay.  When did that occur exactly?

8      A.    I don't remember the exact year.  I just

9  know she was the major.

10     Q.    Would it have been in the time that you

11  were the union president?

12     A.    Yes, sir.

13     Q.    Okay.

14     A.    I don't remember.  That was '13 or '14.

15     Q.    Okay.  We're going to kind of flip around

16  this complaint.

17     A.    Okay.  Just throw me a page number.

18     Q.    Yeah, get ready for some paper

19  calisthenics here, Jason.  So can you turn to --

20  we'll go to paragraph 15, which is on page four.

21     A.    All right.

22     Q.    So Jennifer followed that post with

23  another post to her private Facebook page on or

24  about January 4, 2021, again criticizing the

25  priorities and action of the Hamilton County

Page 43

1    Sheriff, a true and accurate copy of which is

2    attached as Exhibit 2, hereto.

3            So before we go to Exhibit 2, I can see

4    you're going -- that's fine.

5        A.    Sorry.

6        Q.    Your instincts are right.  We are going to

7    go.  But let me ask you a couple of questions before

8    we get there.

9        A.    Okay.

10       Q.    Thanks.  This is kind of just so we get

11   our Facebook language down together.  I always do

12   this.  This is like a thing I have to do in all

13   depositions now.

14           So my understanding is a post is when you

15   make the first thing, right -- you post it, correct?

16       A.    Yes.

17       Q.    Okay.  So on your Facebook News Feed,

18   let's just say you leave here, you have dinner, you

19   go to the bar, say this is me Jason, I'm at a bar,

20   just got out of a deposition, it totally sucked,

21   that would be a post, correct?

22       A.    Yes.

23       Q.    Okay.  And then if anybody made a comment

24   underneath that saying, whoa, that sounds terrible,

25   that would be a comment, correct?

1       A.   Yes.

2       Q.   Okay.  And then if anybody replied to that

3    comment underneath it, that's referred to as a

4    reply, correct?

5       A.   Yes.

6       Q.   All right.  So my understanding of

7    Facebook is it's somewhat like a tree, the trunk is

8    the post, correct?

9       A.   Uh-huh.

10      Q.   Right?

11      A.   Uh-huh.

12      Q.   And then you have like --

13      A.   Yes.

14      Q.   -- the main branches -- yes.

15      A.   Yes.

16      Q.   You have to say yes.  Okay.  And then you

17   have these main branches, which are comments,

18   correct?

19      A.   Yes.

20      Q.   And then you have these little twigs,

21   which are replies to the comments, right?

22      A.   Yes.

23      Q.   All right.  So we're on the same

24   understanding of Facebook now.  So the reason I say

25   that is because this refers to what we just read in

Page 45

1    Exhibit 1 as a post -- Jennifer's post.  I

2    understood them as Jennifer's comments on another

3    post; would you agree with that?

4        A.   Well, one more time.

5        Q.   We can go back to Exhibit 1.  That's fine.

6    Let's go back to Exhibit 1.  These are comments to

7    another post, correct?

8        A.   I don't know.  Sorry.

9             MR. MILLER-NOVAK:  It's okay.  All

10            right.  Well, we'll go to Exhibit 2.

11            MR. GOTTESMAN:  And, Counsel, I'm no

12            pro at Facebook, but I think that there

13            might be a third option where you have

14            streaming something and then there's like

15            rolling comments that are not really a

16            post and they're not a comment on a post.

17            MR. MILLER-NOVAK:  They're not a

18            comment on a post.  They're a comment on a

19            stream.

20            MR. GOTTESMAN:  Right.

21            MR. MILLER-NOVAK:  Which is what I

22            understood those to be.  They weren't

23            actually Jennifer's posts or her streams.

24            Those were her comments on another stream.

25            MR. GOTTESMAN:  On a rolling stream.

Page 46

1                    MR. MILLER-NOVAK:  I think on record

2          we agree to at least that.  It might be

3          the last thing we agree to, but we'll

4          agree to that.  All right.

5    BY MR. MILLER-NOVAK:

6        Q.   So Exhibit 2 is what paragraph 15 was

7    referring to, correct?

8        A.   Okay.

9        Q.   And this is a post made by Jennifer

10   Patterson Davis; do you agree?

11       A.   Yes.

12       Q.   Okay.  And it starts with, I really don't

13   like seeing political posts continuously on FB --

14   which I understand is Facebook, correct?

15       A.   Yes.

16       Q.   Because like they say, opinions and --

17   are -- it says and like assholes.  I'm assuming she

18   meant opinions are like assholes, correct?

19                   MR. GOTTESMAN:  Objection.

20       A.   Yes.

21       Q.   Everybody has one and they probably stink;

22   do you see that?

23       A.   Yes.

24       Q.   Okay.  That is unless you are one of those

25   weirdos that bleaches your asshole and does those

Page 47

1  colon cleanse things, but I digress; do you see

2  that?

3      A.  Yes.

4      Q.  Okay.  Do you agree that this is Jennifer

5  Davis's, your wife's post on January 4, 2021?

6      A.  Yes.

7      Q.  Okay.  And it continues as you see a

8  little bit down that our new -- and she put sheriff

9  in quotes -- says her number one issue she is going

10  to tackle her first weeks in office is COVID; do you

11  see that?

12      A.  Yes.

13      Q.  Okay.  Does she have a clue what actually

14  are the real health concerns in the law enforcement

15  community; do you see that?

16      A.  Yes.

17      Q.  Okay.  So during the campaign were you

18  discussing any of your misgivings or dissatisfaction

19  with Sheriff McGuffey with your wife?

20      A.  I don't recall.

21      Q.  Okay.  So did you discuss your happiness

22  or lack thereof at work with your wife prior to

23  Sheriff McGuffey's election?

24      A.  I don't recall.

25      Q.  Okay.  You don't recall whether or not

1   you've ever had conversations about your job with

2   your wife?

3         A.   Yes.

4         Q.   Okay.  You just don't recall when?

5         A.   I don't recall when and what exactly was

6   said.

7         Q.   Did you know that your wife made this post

8   after she made it?

9         A.   I don't recall.

10        Q.   When did you first become aware of this

11  post?

12        A.   I don't recall that either.

13        Q.   Okay.  Was it before this lawsuit was

14  filed?

15        A.   Yes.

16        Q.   Was it before your meeting with the

17  Sheriff and the Chief on October -- in October of

18  2023?

19        A.   I don't recall.

20        Q.   Was it before you applied for RENU?

21        A.   Yes.

22        Q.   Okay.  How did you find out about this

23  post before you applied to RENU?

24        A.   I believe she said she posted something on

25  her private page.

1      Q.   Okay.  So your wife told you that she

2   posted something on her private page?

3      A.   Yes.

4      Q.   Did she tell you what it was about?

5      A.   I don't recall.

6      Q.   Towards kind of like the middle end it

7   starts with this person is nothing more than a

8   politician; do you see that line?

9      A.   Yes.

10      Q.   It says, This person is nothing more than

11   a politician and is nowhere near qualified to be a

12   sheriff; do you see that?

13      A.   Yes.

14      Q.   Okay.  Did your wife tell you that she

15   wrote that?

16      A.   I don't recall.

17      Q.   If you voted for her because of her

18   qualifications, not being a certified peace

19   officer -- it says in a parenthetical -- being fired

20   from the department or being on the Brady list, then

21   you have the IQ of a kumquat; do you see that?

22      A.   Yes.

23      Q.   Did you know that your wife wrote that?

24      A.   I don't recall.

25      Q.   Did she tell you that she wrote that?

1     A.   I don't recall.

2     Q.   If you voted for her because of her

3 political party or thought it would be neat to see a

4 gay woman as a sheriff, then you are a twatwaffle;

5 do you see that?

6     A.   Yes.

7     Q.   Did she tell you that she wrote that?

8     A.   I don't recall.

9     Q.   Did you talk to your wife about Sheriff

10 McGuffey's sexual orientation at all?

11              MR. GOTTESMAN:  Objection.  It's

12              vague as to time.

13     A.   No.

14     Q.   Have you ever discussed Sheriff McGuffey's

15 sexual orientation with anybody?

16              MR. GOTTESMAN:  Same objection.

17     A.   I don't -- I don't recall.

18     Q.   Did your wife tell you that she talked

19 about the Sheriff's sexual orientation in this post?

20     A.   I don't recall that.

21     Q.   Has your wife ever talked to you about

22 Sheriff McGuffey's sexual orientation?

23     A.   I don't recall.  No.

24     Q.   Do you believe that there's something

25 wrong with voters wanting to see or thinking that it

1  would be neat to see a gay woman in charge?

2               MR. GOTTESMAN:  Objection.

3               Could you read that question back.

4               THE COURT REPORTER:  Yes, of course.

5               "Do you believe that there's

6          something wrong with voters wanting to see

7          or thinking that it would be neat to see a

8          gay woman in charge?"

9               MR. GOTTESMAN:  Object to form.

10              You can answer, if you can.

11      A.   No.

12      Q.   Do you know if there are other gay women

13 in the department aside from Sheriff McGuffey?

14              MR. GOTTESMAN:  Objection.

15      A.   Yes.

16      Q.   Do you agree that gay women have ever

17 suffered discrimination in police service?

18              MR. GOTTESMAN:  Objection.

19      A.   I'm sure.

20      Q.   Did your wife discuss with you why she

21 thinks people are twatwaffles if they consider it

22 neat to see a gay woman in charge?

23      A.   No.

24      Q.   Do you agree with that statement that your

25 wife made now that you're reading it?

1      MR. GOTTESMAN:  Objection.

2      A.   Well, she's referring to the political

3  party as well, so I think it's funny.

4      Q.   You think this statement is funny?

5      A.   Yes.

6      Q.   Okay.  She refers to the political, but it

7  does say or -- or thought it would be neat to see a

8  gay woman as sheriff, then you are a twatwaffle.

9  That's what you think is funny?

10      MR. GOTTESMAN:  Objection.

11      A.   I just think the word in general is funny.

12      Q.   Oh, the word twatwaffle is funny?

13      A.   Yes.

14      Q.   Okay.  What do you think twatwaffle means

15  in this context?

16      A.   Just -- I don't know.  I've actually never

17  Googled the word, so. . .

18      Q.   Do you think that she's basically

19  suggesting that people are an idiot?

20      MR. GOTTESMAN:  Objection.  Calls for

21      speculation.

22      A.   I don't know.  You'd have to ask her.

23      Q.   Okay.  Do you think it's a compliment of

24  someone's character?

25      MR. GOTTESMAN:  Objection.

1     A.   No.

2     Q.   Okay.  It's derogatory, correct?

3               MR. GOTTESMAN:  Objection.

4     A.   Yes.

5     Q.   I mean, does anything about the word

6  twatwaffle strike you as a compliment to somebody's

7  intellect?

8               MR. GOTTESMAN:  Objection.

9     A.   No.

10    Q.   Okay.  You'd agree that it's something

11 that is at least derogatory in nature about

12 somebody's intellect, correct?

13              MR. GOTTESMAN:  Objection.

14    A.   Yes.

15    Q.   And then when you read this sentence, what

16 she intends to say is that if you thought it would

17 be neat to see a gay woman as a sheriff, then you're

18 someone of questionable intellect?

19              MR. GOTTESMAN:  Objection.

20    A.   Are you asking what I think she's trying

21 to say or what I -- what I believe?

22    Q.   Well, I'm asking you what you think she

23 said in that sentence.

24    A.   You'd have to ask --

25              MR. GOTTESMAN:  Hold on.

Page 54

 1                  THE WITNESS:  Sorry.

 2                  MR. GOTTESMAN:  Objection.  Calls for

 3          speculation.

 4      A.    You'd have to ask her.

 5      Q.    Okay.  All right.  Because you can't

 6   read -- can you read?

 7                  MR. GOTTESMAN:  That's argumentative.

 8                  MR. MILLER-NOVAK:  No, it's not.

 9                  MR. GOTTESMAN:  You know he can read.

10      Q.    You can read, correct?

11      A.    Yes.

12      Q.    And that when you read, you can comprehend

13   what you read, correct?

14      A.    Yes.

15      Q.    And you can read a sentence and you can

16   take away your own understanding from it, correct?

17      A.    Yes.

18      Q.    Okay.  So when you read a book -- have you

19   ever read a book?

20      A.    Yes.

21      Q.    Have you ever read a novel?

22      A.    Yes.

23      Q.    Do you have to call the author to ask the

24   author what you think you understand when you read

25   the book?

1          MR. GOTTESMAN:   Objection.

2      A.   No.

3      Q.   Okay.  So you can read a book and you can

4  understand what you think someone meant when they

5  wrote, correct?

6      A.   Correct.

7      Q.   Okay.  So what do you think your wife

8  meant when she wrote this sentence?

9      A.   I'm not going to speculate what she

10  thinks.  I don't know what she was thinking.  You'd

11  have to ask her.

12      Q.   What do you understand it to mean?

13      A.   I understand it to mean that it's a funny

14  comment.

15      Q.   Okay.  Why do you think it's funny?

16      A.   I've answered that question already.

17      Q.   Well, you said the word twatwaffle is

18  funny.

19      A.   That's the funny part.

20      Q.   Okay.  That's the only thing you

21  understand in this whole entire sentence is the word

22  twatwaffle?

23      A.   No.  You were asking me what I thought it

24  meant -- what she meant by saying that.

25      Q.   Okay.  I'm asking about the sentence.

1    What do you think she meant?

2         A.    You'd have to ask her.

3         Q.    Okay.  What do you understand when you

4    read that sentence?

5              MR. GOTTESMAN:  Counsel, you've asked

6              him that now three or four times.  I'm

7              going to instruct him not to answer.  He's

8              given you his answer.

9              MR. MILLER-NOVAK:  I haven't asked --

10             MR. GOTTESMAN:  You're going back --

11             well, I'm instructing him to stop right

12             now.  And move on with your next question.

13             MR. MILLER-NOVAK:  Okay.  Is it

14             privileged?

15             MR. GOTTESMAN:  It's argumentative.

16             MR. MILLER-NOVAK:  No, it's not.

17             MR. GOTTESMAN:  Yeah, I believe it

18             is.  And I'm not going to debate it with

19             you.

20             MR. MILLER-NOVAK:  So is the

21             argumentative reason to instruct the

22             client not to answer under the Civil Rules

23             of --

24             MR. GOTTESMAN:  I think you're

25             harassing him.  And I think it's

1          argumentative.  And I think it's

2          unnecessary.  And I'm instructing him not

3          to answer you further.  And I'm asking you

4          to move on.  And if you care to take it

5          up, you can take it up.

6               MR. MILLER-NOVAK:  Okay.  Can you

7          please certify that?

8               THE COURT REPORTER:  Yes.

9               (The question was certified.)

10    BY MR. MILLER-NOVAK:

11         Q.    As a deputy at this time would you have

12    typed that sentence and put it on Facebook?

13         A.    That actual -- verbatim, that sentence?

14         Q.    Yes.

15         A.    No.

16         Q.    So this is not a post that you would have

17    made yourself as a deputy at that time?

18         A.    No.

19         Q.    Why not?

20         A.    Because my Facebook posts -- since I coach

21    kids, I have a lot of families that are on my -- and

22    my account is open to the public.  It's not a

23    private account.

24         Q.    Do people when they look at your Facebook

25    account -- do they know that you were a deputy at

Page 58

1    that point in time?

2               MR. GOTTESMAN:  Objection.  Calls for

3          speculation.

4    A.    I have no idea.

5    Q.    Did you hold yourself out as a deputy at

6    that point in time on Facebook?

7               MR. GOTTESMAN:  What point in time?

8    Q.    When was this post made?  January of 2021.

9    A.    I don't recall.

10   Q.    Okay.  Did you ever type anything where

11   you identified yourself as a deputy on Facebook

12   between the years 2021 and 2023?

13   A.    I -- I can't answer that.  I don't recall.

14   Q.    Okay.  Let's go back to Exhibit 6 --

15   sorry.  Paragraph 16.

16   A.    16.

17   Q.    I don't even know where I got that.  It

18   says, Caroline Adams is a particularly outspoken

19   critic of McGuffey, and has offered various

20   criticisms of McGuffey and Gramke via her pages Chaz

21   the Anti-Sheriff and Itsa Krakken; do you see that?

22   A.    Yes.

23   Q.    Do you know Caroline Adams?

24   A.    No.

25   Q.    Have you ever met Caroline Adams?

1      A.   No.

2      Q.   Have you ever talked to her?

3      A.   No.  Not that I know of.

4      Q.   Okay.

5      A.   I don't know.

6      Q.   Are you aware of her?

7      A.   Through this, yes.

8      Q.   Okay.  When you say through this, through

9  this sentence?

10      A.   Through the identity of Itsa Krakken

11  through the -- when it came out who -- through the

12  Sheriff when she said Caroline Adams, I didn't know

13  who -- who that account was associated to.

14      Q.   Okay.

15      A.   If that makes sense.

16      Q.   Did you know about the account before that

17  point in time?

18      A.   Yes.

19      Q.   Okay.  Well, let's take a step back.  So

20  you're saying -- well, which account, like Chaz the

21  Anti-Sheriff?

22      A.   No.  Itsa Krakken.

23      Q.   Itsa Krakken.  When did you first become

24  familiar with Itsa Krakken?

25      A.   I don't recall.

Page 60

1          Q.   Okay.   Was it prior to Sheriff McGuffey

2     getting elected?

3          A.   I don't recall.

4          Q.   What about Chaz the Anti-Sheriff; did you

5     have any familiarity with that?

6          A.   I don't recall.

7          Q.   Okay.   So what awareness or knowledge of

8     Itsa Krakken did you have?

9          A.   There was people just sharing the posts

10     that were posted on Facebook.

11          Q.   Okay.   Who was sharing them?

12          A.   Officers at work.

13          Q.   Okay.   Do you remember any of those

14     deputies?

15          A.   No, I don't recall.

16          Q.   And when they were sharing it, how were

17     they sharing it?

18          A.   Just by word of mouth.

19          Q.   So just kind of describing it?

20          A.   Yes.

21          Q.   Okay.   Were they generally supportive of

22     Itsa Krakken, or were they offended by Itsa Krakken;

23     what was the general nature of the discussions?

24                    MR. GOTTESMAN:   Objection.

25          A.   More of laughter, more of entertainment.

1      Q.   Are you aware that some of those comments

2  made derogatory statements about -- or whether or

3  not any of those comments made derogatory statements

4  about Sheriff McGuffey's sexual orientation?

5      A.   I don't recall.

6      Q.   Do you know if Jennifer has any

7  relationship with Caroline Adams?

8      A.   I have no idea.

9      Q.   Have you ever spoken to Caroline Adams

10 since this lawsuit has been filed?

11     A.   I have not.

12     Q.   Do you know if Jennifer has ever talked to

13 Caroline Adams since this lawsuit has been filed?

14     A.   I have no idea.

15     Q.   Do you know if Jennifer has ever talked to

16 Caroline Adams at all?

17     A.   I can't -- I have no idea.

18     Q.   Has Caroline Adams ever sent anything to

19 you?

20     A.   Yes.

21     Q.   What has she sent to you?

22     A.   She sent a message to me -- I don't

23 remember the year -- asking if she got me in

24 trouble.  And I thought it was our Internal Affairs

25 to see if I would answer her or not, so I never

Page 62

1    replied back.

2         Q.   So was that sent while you were still at

3    the Sheriff's Department?

4         A.   Yes.

5         Q.   Do you still have that message?

6         A.   I don't know.  I have no idea.

7         Q.   Okay.  All right.  What did she send it to

8    you on?

9         A.   Messenger.

10        Q.   Like Facebook Messenger?

11        A.   Yes.

12             MR. MILLER-NOVAK:  Well, I'm going to

13             ask that you look and that he produces it

14             if he still has it, please.

15             MR. GOTTESMAN:   Okay.

16        Q.   So you didn't reply, though?

17        A.   No.  I thought it was our Internal

18   Affairs.

19        Q.   Was it sent as Caroline Adams or like Itsa

20   Krakken?

21        A.   I don't recall.

22        Q.   Okay.  That's fair.  So that would have

23   been kind of in the 2023 time period, correct?

24        A.   Maybe -- I don't know.  I'm not positive.

25        Q.   Did anybody at the Sheriff's Department

Page 63

1    that was discussing Caroline Adams' post -- did any

2    of them discuss with you that they knew her?

3         A.   I don't recall.

4         Q.   Okay.  Did anybody ever discuss with you

5    sending her information?

6         A.   No.

7         Q.   Okay.  Do you know how she -- do you have

8    any idea why she was sending you a message asking if

9    she got you in trouble?

10        A.   Are you asking why she sent the message?

11        Q.   Yes.

12        A.   I have no idea.

13        Q.   Do you have any idea how she would get the

14   impression or would have any information while you

15   were there that you were in some kind of trouble?

16             MR. GOTTESMAN:  Objection.

17        A.   No clue.

18             THE WITNESS:  I'm sorry.

19             MR. GOTTESMAN:  Go ahead.

20        Q.   Your answer is no clue?

21        A.   I have no idea.

22        Q.   Okay.  Did you receive that Messenger

23   message before or after the meeting you had with

24   Sheriff McGuffey in October of 2023?

25        A.   I don't recall.

Page 64

1      Q.    Okay.

2      A.    I'm not positive.

3      Q.    Why would you think it was Internal

4  Affairs that sent you the message?

5      A.    Because the Sheriff came around and told

6  us not to have any contact with her.

7      Q.    Okay.  When was that?

8      A.    That was when they came around to our

9  briefings.

10      Q.    Okay.  Let's go to paragraph 18 on page

11  five.  It says, As a consequence of Adams' post and

12  criticism, McGuffey and Gramke engaged in meetings

13  with members of the Hamilton County Sheriff's Office

14  and informed deputies that if they, or their

15  spouses, associated in any way with Adams, including

16  by interacting with her on social media, there would

17  be consequences; do you see that?

18      A.    Yes, sir.

19      Q.    Okay.  Do you agree with this statement?

20      A.    As in that it was stated or. . .

21      Q.    Well, I mean, this statement was clearly

22  stated by -- your counsel wrote paragraph 18.  Do

23  you agree with the substance of paragraph 18?

24      A.    Oh, yes.  I'm sorry.  Okay.  I took that

25  the wrong way.

Page 65

1      Q.   So is it your testimony today that you met

2   with either McGuffey or Gramke to discuss Caroline

3   Adams as described in this paragraph?

4      A.   So that was the briefing meeting.

5      Q.   Okay.  What briefing meeting?

6      A.   When they came around to the districts.

7      Q.   Okay.  When did that occur?

8      A.   I don't recall.

9      Q.   Was it prior to your RENU application?

10     A.   It was after.

11     Q.   It was after you applied to RENU?

12     A.   Yes.

13     Q.   Was it before or after your RENU

14   application was rejected?

15               MR. GOTTESMAN:   Object to the form.

16     A.   It was after.

17     Q.   Okay.  So during that meeting your

18   allegation is during this briefing that Sheriff

19   McGuffey and Gramke told deputies to not associate

20   with Adams?

21     A.   In the briefing?

22     Q.   Yes.

23     A.   Yes.

24     Q.   What was their precise statement?

25     A.   I can't recall the exact wording.  I can't

Page 66

1    remember the exact wording.

2        Q.   Okay.  Did they tell deputies in that

3    briefing for their spouses to not associate with

4    Adams?

5        A.   The Sheriff did, yes.

6        Q.   Okay.  What was her statement?

7        A.   Not verbatim, but it was stay off social

8    media -- or, I'm sorry -- we're having -- we're

9    addressing this due to things being said on social

10   media by officers' wives.

11       Q.   And this alleges that someone made the

12   statement there would be consequences?

13       A.   Yes.

14       Q.   Okay.  And who do you allege made that

15   during this briefing?

16       A.   The Sheriff.

17       Q.   Okay.  Who else was at this briefing?

18       A.   District 5.

19       Q.   Every deputy in District 5?

20       A.   Mostly dayshift.

21       Q.   Was this briefing recorded?

22       A.   I do not know.

23       Q.   Did you record it?

24       A.   I did not.

25       Q.   Do you know if anybody else recorded it?

1        A.    I do not know.

2        Q.    Do you know if any recordings exist of it

3   whatsoever?

4        A.    I do not know.

5        Q.    At this point in time did anybody ever

6   mention anything to you about your wife making any

7   posts?

8        A.    No.  When that was said, everybody looked

9   at me.

10       Q.    Who is everybody?

11       A.    Everyone that was in the briefing room.

12       Q.    Okay.  At this point in time had either

13   Gramke or Sheriff McGuffey made any statements to

14   you about your wife making posts on Facebook?

15       A.    Prior to this?

16       Q.    Yes.

17       A.    Yes.

18       Q.    When?

19       A.    The meeting that I had in October.

20       Q.    So this occurred after the October 2023

21   meeting?

22       A.    Yes, sir.

23       Q.    Okay.  So this didn't occur before the

24   meeting you had in 2023?

25       A.    Correct.

1        Q.    Okay.  I just want to try to get the time
2    line here.
3        A.    Yeah.
4        Q.    Because you would agree this paragraph
5    doesn't give a date, correct?
6        A.    Correct.
7        Q.    Okay.  So your testimony is right now that
8    this briefing happened after you met with Gramke and
9    Sheriff McGuffey in October -- I think it was
10   October 10 of 2023, correct?
11       A.    Yes.
12       Q.    Okay.  So this happened sometime between
13   that point and your eventual resignation in January
14   of 2024, correct?
15       A.    Correct.
16       Q.    You don't remember exactly when?
17       A.    I do not recall.
18       Q.    Okay.  Because it could have been
19   November, December, or January; you don't remember
20   which month?
21       A.    No, sir.
22       Q.    Okay.  All right.  Let's go to the next
23   paragraph.  So we're shooting back in time now.  So
24   it says, In May 2022, Jason organized a "Remember
25   the Fallen" sporting event and fundraiser for fallen

1   law enforcement and firefighters in Hamilton County;

2   do you see that?

3        A.   Yes.

4        Q.   He asked for the support from Gramke --

5   I'm sorry -- McGuffey and Gramke by directing

6   communications about the event to their assistant.

7   He received no response; do you see that?

8        A.   Yes.

9        Q.   When it says directed communications about

10  the event to their assistant, who are you referring

11  to?

12       A.   Her -- I know her last name was Woods.

13  She was a social media person.

14               THE WITNESS:  Could we take a break

15          for a minute?

16               MR. GOTTESMAN:  Sure.

17               THE WITNESS:  I tried to catch you

18          before you started.

19               MR. MILLER-NOVAK:  Yes.  You answered

20          the question.

21               (A brief recess was taken.)

22               MR. GOTTESMAN:  Before we jump into

23          questions, he wants to clarify something

24          about the timing, that he thinks he may

25          have given inaccurate or confused

Page 70

1           testimony regarding the timing.

2                Go ahead, Jason.

3                MR. MILLER-NOVAK:  Oh, this meeting?

4                THE WITNESS:  Yes.

5                MR. MILLER-NOVAK:  Okay.  All right.

6                THE WITNESS:  So that -- the meeting

7           with -- the briefing meeting was before my

8           meeting with the Sheriff and Chief -- us

9           three, because that was in October.  The

10          briefings -- they came around in the

11          spring.

12               And I remember because I had that

13          meeting in October and then I ended up

14          leaving that January.  So that time

15          frame -- in my head, I was like wait,

16          that's wrong.  So that was my mistake.

17          That's why I asked for the pause.  I just

18          had to get a minute to put all that time

19          frame together.

20     BY MR. MILLER-NOVAK:

21          Q.   Spring of what, 2023?

22          A.   Yes.

23          Q.   What do you consider to be spring, March,

24     April?

25          A.   March or April.  Because then my meeting

1    with them was in October of '23, right?  Yes.  Yeah.

2         Q.   Okay.  And then at any time in that

3    meeting did anybody mention you by name?

4         A.   In the meeting?

5         Q.   In the briefing.

6         A.   Which one?  The briefing?  No.

7         Q.   Did anybody mention your wife by name?

8         A.   No.

9         Q.   Okay.  Were Sheriff McGuffey or Gramke

10   looking at you when they made any of these alleged

11   statements?

12        A.   Yes.

13        Q.   Okay.  Were they looking at anybody else?

14        A.   No.

15        Q.   Okay.  So you're saying that the whole

16   time they spoke they were staring at you?

17        A.   No.  Just the -- when she said the --

18   about the officers' wives.

19        Q.   Okay.  So before we went -- and I refound

20   my place --

21        A.   Uh-huh.

22        Q.   -- we were actually talking about

23   paragraph 19.

24        A.   Yes.  Yes, sir.

25        Q.   Okay.  All right.  Let's go back to 19,

1  sir.

2      A.   Yes, sir.

3      Q.   All right.  So we talked about the

4  assistant and you identified her.  I know this is

5  redundant.  But what was her name?

6      A.   Woods.

7      Q.   Woods.  That gets me back on track.  Thank

8  you.  All right.  So you sent just an email to

9  Woods?

10     A.   I reached out to her on social media.

11     Q.   So you reached out to Woods on social

12  media.  When you say you reached out to her on

13  social media, in what aspect?

14     A.   It was Messenger.

15     Q.   How many times?

16     A.   I don't recall.

17     Q.   Was it just once?

18     A.   I don't -- yes.

19     Q.   Okay.  Well, here it says by directing

20  communications.  It says plural.  So is there more

21  than one communication you had with her or only one?

22     A.   Messenger.  And I believe -- I remember

23  trying to contact her I thought on the actual

24  Facebook through the -- her -- the best I remember

25  was I know I did through Messenger through the

Page 73

1    County's Facebook, but I believe I messaged her

2    personally as well.  I remember trying to get a hold

3    of her personally as well.

4         Q.   Okay.  Did she ever reply to you?

5         A.   After -- after -- yes, she did.  I can't

6    remember if it was before or after the game.  I'm

7    sorry.  But she did.

8         Q.   Okay.  Do you have any knowledge whether

9    or not either Sheriff McGuffey or Gramke received

10   any notice of the Remember the Fallen event before

11   it happened?

12        A.   I didn't know that until my meeting with

13   the Sheriff and Chief.

14        Q.   Okay.  Do you have any reason to believe

15   they didn't tell you the truth when they said they

16   were unaware of it?

17        A.   I have -- no.

18        Q.   Okay.  So you only used Facebook, it

19   sounds like, to try to communicate with Ms. Woods.

20   So you didn't use like a company, you didn't like

21   use like -- I'm sorry, company -- you didn't use a

22   county email address?

23        A.   No.

24        Q.   Okay.  So you didn't use any official

25   communications, you only communicated with her

Page 74

1   through Facebook?

2       A.   Yes.

3       Q.   Okay.  And you never received any

4   statement from either McGuffey or Gramke that they

5   received that communication?

6       A.   No.

7       Q.   And they didn't tell you whether or not

8   they supported the event?

9       A.   No.  I didn't have any communication with

10  them till my meeting.

11      Q.   Okay.  So no one -- neither Gramke nor

12  Sheriff McGuffey said Jason, we do not support

13  Remember the Fallen?

14      A.   Correct.

15      Q.   Okay.  They just didn't mention it to you

16  at all?

17      A.   Correct.

18      Q.   Let's turn to the page and go to paragraph

19  21.  So after Remember the Fallen occurred, on your

20  Facebook page you made a post about the event; is

21  that correct?

22      A.   Yes.

23      Q.   And people made comments about your post,

24  correct?

25      A.   Yes.

1    Q.   Okay.   Paragraph 21 says, This was met

2  with a statement by another member of the Sheriff's

3  Department that the member would have liked to have

4  known in advance about the event; do you see that?

5    A.   Yes, sir.

6    Q.   In response, it says, Jason truthfully

7  posted, and not part of any official duties and on

8  his own time, quote, our department didn't support

9  it.  No county items were used to advertise this

10  game; do you see that?

11    A.   Yes.

12    Q.   Flyers were taken down from briefing

13  rooms; do you see that?

14    A.   Yes.

15    Q.   Okay.  How do you know that the County

16  didn't support it?

17    A.   Because all I received back from Ms. Woods

18  was thank you for honoring Corporal Adam McMillan.

19    Q.   Okay.  But that was after the event

20  already occurred?

21    A.   I don't recall.

22    Q.   Okay.  But you don't know -- you never

23  received any statement -- official statement from

24  either McGuffey or Gramke that they did not support

25  the event, correct?

1     A.    Correct.

2     Q.    Okay.  The statement about flyers were

3  taken down from briefing rooms, what are you

4  referring to in that statement?

5     A.    The flyers that were hanging in the

6  briefing rooms were taken down.

7     Q.    Okay.  How long were they up before they

8  were taken down?

9     A.    A minimum two weeks.

10    Q.    Okay.  So they weren't immediately torn

11 off the walls then?

12    A.    I do not know when they were taken down.

13 I know when they went up and then when I came back

14 two weeks later, they were already gone.

15    Q.    Do you know if anybody ordered that they

16 be removed?

17    A.    I do not know.

18    Q.    Okay.  My understanding of the bulletin

19 boards is that things are frequently removed from

20 the bulletin boards, correct?

21          MR. GOTTESMAN:  Objection.

22    A.    Yes.

23    Q.    Okay.  So it's not actually abnormal for

24 certain postings to be removed from the bulletin

25 boards in the briefing rooms, correct?

1      A.   Once it's -- sorry.

2               MR. GOTTESMAN:  Objection.

3      A.   Once it's expired.

4      Q.   Do you have any reason to believe that

5  either Gramke or Sheriff McGuffey instructed anybody

6  to tear down those flyers?

7      A.   I have no idea.

8      Q.   Do you have any idea who removed those

9  flyers from the briefing room?

10     A.   No.

11     Q.   So why did you include that statement in

12 your response to this other member of the Sheriff's

13 Department?

14     A.   Which statement?  There's three.

15     Q.   That flyers were taken from briefing

16 rooms.

17     A.   Because they were taken down.

18     Q.   Before you made this post about the

19 Sheriff Department not supporting the event, did you

20 ask anybody at the Sheriff's Department whether or

21 not you could make this statement about the

22 Department's position regarding Remember the Fallen?

23     A.   No.

24     Q.   Okay.  So at no time before making this

25 public statement did you contact the superior and

1    say may I post what the Department's position is

2    regarding Remember the Fallen?

3         A.   No.  That comment is to a superior,

4    though.

5         Q.   Okay.  Did you ask his permission before

6    responding what the Department's position was on

7    Remember the Fallen?

8         A.   Yes -- well, no.  I'm responding to his

9    question about it.

10        Q.   Did you ever try to directly contact

11   either Mr. Gramke or Sheriff McGuffey about Remember

12   the Fallen?

13        A.   No.

14        Q.   Do you know whether or not Sheriff

15   McGuffey would have supported it had you asked her?

16             MR. GOTTESMAN:  Objection.

17        A.   I have no idea.

18        Q.   Do you know whether or not Chief Gramke

19   would have supported the event had you asked him?

20             MR. GOTTESMAN:  Objection.

21        A.   I have no idea.

22        Q.   Do you know whether or not they have

23   supported any Remember the Fallen events that have

24   occurred after that year's Remember the Fallen

25   event?

1      A.   I -- one more time.

2      Q.   Well, this was a Remember the Fallen event

3   in the year 2022, correct?

4      A.   Correct.

5      Q.   Do you know whether or not they've

6   supported -- have you had a Remember the Fallen

7   event in 2023?

8      A.   I had a military tribute game.

9      Q.   Did the Sheriff's Department support that?

10      A.   The Department -- yes.

11      Q.   Okay.  What about 2024; was there any game

12   that was like a Remember the Fallen event?

13      A.   No.

14      Q.   Okay.

15      A.   No.  I don't think so.

16      Q.   Okay.  So in 2023 the Sheriff's Department

17   did support your event, correct?

18      A.   The Sheriff's Department, yes.

19      Q.   Okay.  And Sheriff McGuffey was the

20   Sheriff of the Department in the year 2023, correct?

21      A.   Yes.

22      Q.   And Gramke was still the Chief at that

23   time, correct?

24      A.   Yes.

25      Q.   When did that 2023 event occur?

Page 80

1      A.    June.

2      Q.    June of 2023?

3      A.    Yes.

4      Q.    Okay.  Which is before your meeting with

5   Sheriff McGuffey and Mr. Gramke, correct?

6      A.    Yes.

7      Q.    All right.  So they actually supported

8   that event that you --

9      A.    The department did.

10     Q.    Okay.  But they didn't stop it, correct?

11     A.    I didn't hear anything from either one of

12   them.

13     Q.    Okay.

14     A.    Major Ketteman headed that up.

15     Q.    Do you know whether or not he asked either

16   Sheriff McGuffey or Chief Gramke if it was okay to

17   support the event?

18              MR. GOTTESMAN:  Objection.

19     A.    You would have to ask him.

20     Q.    Okay.  So you don't know whether or not he

21   did ask?

22     A.    Correct.

23     Q.    Okay.  So it's possible that he did,

24   correct?

25              MR. GOTTESMAN:  Objection.

Page 81

1      A.    You'd have to ask him.

2                (Defendants' Deposition Exhibit No. 2

3                was marked for identification.)

4      Q.    All right.  So I'm going to hand you what

5   we're going to mark as Defendants' Exhibit 2.  I've

6   handed you what is the Hamilton County Sheriff's

7   Office General Order on Social Media; do you see

8   that?

9      A.    Yes, sir.

10     Q.    Have you ever seen this before today?

11     A.    Yes, sir.

12     Q.    Okay.  It looks like it was issued by Jim

13  Neil; do you see that?

14     A.    Yes, sir.

15     Q.    Do you have any reason to disagree that

16  this is the social media policy in place at the

17  Hamilton County Sheriff's Department during the year

18  2022?

19                MR. GOTTESMAN:  Objection.

20     A.    No, sir.

21     Q.    Okay.  Great.  I'm going to have you go to

22  page -- let me get there.  I think it's five.  It is

23  five.  Okay.  Do you see where it says 701.05 in the

24  middle of the page?

25     A.    Yes, sir.

Page 82

1      Q.   And it says Personal Use of Social Media;

2   do you see that?

3      A.   Yes.

4      Q.   Do you understand that this applies to a

5   deputy's personal use of social media?

6      A.   Yes.

7      Q.   Okay.  So in other words, what you do with

8   your own social media account, you understand that

9   this applies to that, correct?

10     A.   Correct.

11     Q.   If you turn to the next page, do you see

12  the big F there in the middle of the page?

13     A.   Yes, sir.

14     Q.   All right.  It says, When using social

15  media, Sheriff's Office personnel should be mindful

16  that their speech becomes part of the worldwide

17  electronic domain.  Therefore, adherence to the

18  department's code of conduct is required in the

19  personal use of social media; do you see that?

20     A.   Yes.

21     Q.   All right.  And in particular, Sheriff's

22  Office personnel are prohibited from the following.

23  One, Speech containing obscene or sexually explicit

24  language, images, or acts and statements or other

25  forms of speech that ridicule, malign, disparage, or

Page 83

1    otherwise express bias against any race, any

2    religion, or any protected class of individuals; do

3    you see that?

4         A.   Yes.

5         Q.   Okay.  Do you consider people who are

6    homosexual to be part of a protected class of

7    individuals?

8                   MR. GOTTESMAN:   Objection.

9         A.   Yes.

10        Q.   I'm going to have you go to subsection H.

11   Do you see a little bit down the page there?

12        A.   Yes.

13        Q.   It says, Sheriff's Office personnel may

14   not divulge information gained by reason of their

15   authority; make any statements, speeches,

16   appearances, and endorsements; or publish materials

17   that could reasonably be considered to represent the

18   views or positions of Hamilton County Sheriff's

19   Office without expressed authorization from the

20   Sheriff or his designee; do you see that?

21        A.   Yes.

22        Q.   Okay.  You would agree that this policy

23   was in place as of the year 2022, correct?

24        A.   Yes.

25                   MR. MILLER-NOVAK:   Okay.  You can

Page 84

1              give that to her and keep Exhibit 1 out.

2         Q.   I want to go to paragraph 23 in the

3    complaint.  It says, In 2022, Jason applied for a

4    position with the Regional Enforcement Narcotics

5    Unit, RENU.  He was narrowed down to three finalists

6    after a vetting and interview process; do you see

7    that?

8         A.   Yes.

9         Q.   So I think we talked about it yesterday,

10   but what is RENU?

11        A.   That's our Regional Enforcement Narcotics

12   Unit that does -- it's basically the OCD

13   organization -- Organized Crime Division -- that

14   does drugs, human trafficking.

15        Q.   And how many times have you applied for

16   RENU?

17        A.   Twice.

18        Q.   Okay.  When was the first time?

19        A.   I don't -- I don't recall the exact year.

20        Q.   Does 2018 sound correct?

21        A.   It would be in my personnel folder

22   probably, if that's where that came from.

23        Q.   Were you denied?

24        A.   Denied?

25        Q.   Was your application rejected or accepted?

1       A.    It was accepted.

2       Q.    In 2018, your first time?

3       A.    Yes.  Until there was an opening.

4       Q.    Okay.

5       A.    That was my understanding.

6       Q.    Did you receive the RENU position in 2018?

7       A.    No.

8       Q.    Okay.  Who made that decision?

9       A.    I believe whoever the lieutenants and the

10  captain was at that time.

11      Q.    Do you know who they were at that time?

12      A.    I don't recall.

13      Q.    Was one of them Chief Gramke?

14      A.    Yes.  Gramke was down there at that time,

15  I believe.

16      Q.    Do you know whether or not he played any

17  part in the decision making whether or not to assign

18  you to RENU in that first attempt?

19      A.    He -- was he on that board -- it was --

20  give me one second.  I'm trying to remember who was

21  all in that interview process.  Was it Guy?  Yes, I

22  believe so.

23      Q.    Okay.  Do you know if he made the decision

24  to reject your assignment to RENU at that point in

25  time?

Page 86

1      A.   I don't necessarily know that I was

2  rejected.  It was just there wasn't openings before

3  that list expired.

4      Q.   Okay.  So your testimony is today that no

5  one rejected or refused to appoint you in the first

6  application, that there was just no positions

7  available at that time?

8      A.   Correct.  Because my understanding is when

9  you submit the green letter to have your interview

10 process, they can say yes or no and they interview

11 you.

12     Q.   Okay.  So you don't know whether or not

13 someone said no specifically when you submitted your

14 green letter?

15     A.   Correct.  Well, wait a minute.  No.  The

16 green letter was to be either accepted or denied the

17 interview for RENU.

18     Q.   Okay.

19     A.   So the green letter is accepted.  I'm

20 sorry.  But then they put their own list together

21 that's not available to the officers.  And then they

22 pick from that list depending on the openings in

23 RENU at that time.

24     Q.   Okay.  So you didn't make that list, in

25 other words?

1      A.   No.  They just didn't have any openings.

2  They don't post the list.  So you don't know exactly

3  where you're at on that list.

4      Q.   Okay.  In paragraph 24 it says, Similarly,

5  in 2022, Jason tested for corporal, a promotion that

6  involved a seven percent raise in compensation.  He

7  placed 16 or 17 out of 30 on an eligibility list; do

8  you see that?

9      A.   Yes.

10      Q.   Under the union contract with the

11  Sheriff's Office was to stay in place for two years;

12  do you see that?

13      A.   Yes.

14      Q.   Okay.  Would you agree you actually placed

15  19th on that list?

16      A.   Yes.  If we have the list.

17      Q.   I can get it.

18      A.   Okay.

19           MR. MILLER-NOVAK:  That's fine.  I'm

20           handing you what's previously been marked

21           Plaintiffs' Exhibit -- sorry, that got a

22           little beat up there.  Will you mark that

23           as 3?

24           (Defendants' Deposition Exhibit No. 3

25           was marked for identification.)

Page 88

1    Q.   So you took the test in 2022, correct?

2    A.   Yes.

3    Q.   All right.  So the results came out in

4  January of 2023, correct?

5    A.   Correct.

6    Q.   Okay.  Your name, you would agree, is next

7  to No. 19 on Exhibit 3, correct?

8    A.   Correct.

9    Q.   And Exhibit 3 is the test results for

10 January of 2023, correct?

11   A.   The test and interview process, yes.

12   Q.   Okay.  So you would agree that your

13 placement is actually 19 on that list, correct?

14   A.   Yes and no.  Shannon Cunningham went out

15 on medical.  That would put me at 18.  And I thought

16 there was one more person that left, but I might be

17 mistaken.  That's why I said 16 or 17 when I did

18 that.

19   Q.   Okay.  But paragraph 14 says that you

20 placed 16 or 17, correct?

21   A.   Correct.

22   Q.   It doesn't mention anything about people

23 ahead of you no longer being eligible, correct?

24   A.   People -- I'm sorry, what?

25   Q.   It doesn't mention any of the things you

1    said about this one individual that left, correct?

2         A.   Correct.

3         Q.   Okay.  So you actually placed 19th,

4    though, correct?

5         A.   Correct.

6                   MR. MILLER-NOVAK:  Okay.  All right.

7              You can set that down.  I just wanted to

8              clarify that.

9         Q.   All right.  And then this paragraph says

10   that that list was supposed to stay in place for two

11   years, correct?

12        A.   Correct.

13        Q.   All right.  Did it stay in place for two

14   years as far as you know?

15        A.   Yes, as far as I know.

16        Q.   Okay.  So nothing happened to shorten --

17   we'll just call it the shelf life of this test

18   result, correct?

19        A.   That I'm aware of.

20        Q.   Okay.  Because my understanding is --

21   because it says it here -- under the union contract

22   it was supposed to stay in place for two years,

23   correct?

24        A.   Correct.

25        Q.   All right.  So to the best of your

Page 90

1    knowledge no one has ever filed a grievance or a

2    complaint that this list did not stay in place for

3    two years at any point in time, correct?

4                  MR. GOTTESMAN:   Objection.

5         A.    I wouldn't know.

6         Q.    Okay.  So in January or early February of

7    2023 it says, Jason -- we're on paragraph 25, by the

8    way.

9         A.    Okay.

10        Q.    Jason was informed that he was selected

11   for RENU, that everyone signed off on his selection,

12   and that he would begin working with RENU in March

13   of 2023; do you see that?

14        A.    Yes.

15        Q.    When it says everyone signed off on a

16   selection, who are you referring to?

17        A.    The chain of command through RENU up to

18   Gramke.

19        Q.    Okay.  Paragraph 26 says, Then,

20   approximately an hour after that notification, Jason

21   was called again by RENU supervision, and informed

22   that Gramke had overridden his selection to that

23   unit; do you see that?

24        A.    Yes.

25        Q.    Who called you and informed you of that?

1     A.   Lieutenant Matt Guy from RENU.

2     Q.   Okay.  Did he provide you any reason that

3  Gramke had overridden your selection to the unit?

4     A.   Because of my wife's social media posts.

5     Q.   Okay.  Who said that?

6     A.   Lieutenant Matt Guy.

7     Q.   How do you spell that name?

8     A.   G-u-y.

9     Q.   Just like it sounds?

10    A.   Yes.

11    Q.   Did he tell you that Sheriff McGuffey had

12  any involvement in that process?

13    A.   No.

14    Q.   Do you have any reason to know whether or

15  not Sheriff McGuffey had any involvement in

16  overriding your selection to RENU?

17    A.   I do not know.

18    Q.   Do you have any evidence in your

19  possession to suggest that Sheriff McGuffey had any

20  involvement whatsoever in overriding your selection

21  to RENU?

22             MR. GOTTESMAN:  Objection.

23    A.   I did not know.

24    Q.   All right.  Let's turn the page.  We're on

25  paragraph 27.  This says, In April 2023, Caroline

Page 92

1  Adams made a post to both her Chaz page and her

2  Krakken page about poor morale in the Hamilton

3  County Sheriff's Office.  A true and accurate -- it

4  says a true and accurate of this post is attached as

5  Exhibit 4 -- I think that's a typo.  I think it

6  means a true and accurate copy of this post is

7  attached as Exhibit 4.

8       A.   Okay.

9       Q.   Typos happen.  So going back to paragraph

10 25, if we can.

11      A.   Yeah.

12      Q.   It says, In late January or early February

13 2023, Jason was informed that he was selected for

14 RENU; do you see that?

15      A.   Yes.

16      Q.   Everybody signed off on his selection and

17 he would begin working for RENU in March of 2023; do

18 you see that?

19      A.   Yes.

20      Q.   Then, approximately an hour after that

21 notification, Jason was called again by RENU

22 supervision, and informed that Gramke had overridden

23 his selection to that unit; do you see that?

24      A.   Yes.

25      Q.   And earlier you said that Matt Guy told

1   you that it had something to do with your wife?

2        A.   Yes.

3        Q.   What about your wife did he say that that

4   had something to do with?

5        A.   That Gramke said that my wife posted

6   something on social media.

7        Q.   Okay.  Did that have anything to do with

8   Caroline Adams according to Matt Guy?

9        A.   He just said something that my wife posted

10  on social media.

11       Q.   Okay.  So on paragraph 27 it says, In

12  April of 2023, Caroline Adams made a post to both

13  her Chaz page and her Krakken page about poor

14  morale; do you see that?

15       A.   Yes.

16       Q.   In the Hamilton County Sheriff's Office.

17  A true and accurate copy of this post is attached as

18  Exhibit 4; do you see this?

19       A.   Yes.

20       Q.   It says that Jennifer liked that post,

21  correct?

22       A.   Yes.

23       Q.   You would agree that April 2023 comes

24  after March of 2023, correct?

25       A.   Correct.

1    Q.   Okay.  Just Gregorian calendar, right --

2  January, February, March, April, correct?

3    A.   Correct.

4    Q.   All right.  So you agree that nothing that

5  your wife could have done in terms of liking

6  Caroline Adams' post in April of 2023 could have any

7  relationship to your denial from RENU in March of

8  2023, correct?

9    A.   Correct.

10   Q.   Because the post in Exhibit 4, which if

11  you want to look at it, you can, it would have

12  occurred after Gramke overrode your --

13   A.   No.  You're wrong on that.

14   Q.   How so?

15   A.   So I was supposed to be assigned to RENU

16  in March.  He called me on February 23 at three

17  o'clock and informed me I was not going to RENU.

18   Q.   Okay.  But then April of 2023 would be two

19  months after that, correct?

20   A.   Correct.

21   Q.   Okay.  So let's go to Exhibit 4.

22   A.   Okay.

23   Q.   It was almost towards the very back; do

24  you see that?

25   A.   Exhibit 4?

1        Q.    Yes.

2        A.    Yes.

3        Q.    Okay.

4        A.    Okay.

5        Q.    Well, according to your complaint on

6    paragraph 27 this happened in April of 2023,

7    correct?

8        A.    Correct.

9        Q.    Okay.  Which is two months after February

10   of 2023, correct?

11       A.    Correct.

12       Q.    So you agree that Exhibit 4 couldn't have

13   any relationship to Gramke overriding your

14   appointment to RENU in February of 2023, correct?

15       A.    Right.

16       Q.    Because this post happened two months

17   after he overrode your appointment to RENU, correct?

18       A.    Correct.

19       Q.    So you would agree that Exhibit 4 and the

20   fact that your wife liked Caroline Adams' post in

21   April of 2023 could have no relationship to Gramke's

22   decision to override your RENU appointment, correct?

23       A.    No.

24       Q.    You don't agree with that?

25       A.    No.  Because it said that she posted

Page 96

1    something.  You stated liking is not posting.  And

2    she posted something -- he told Lieutenant Guy that

3    he did not like a post that my wife made on

4    Facebook.

5        Q.   I'm not talking about that.  I'm talking

6    about Caroline -- there's two different things that

7    occurred, correct?

8        A.   Correct.

9        Q.   So one of them is in April of 2023

10   Jennifer liked a post made by Caroline Adams,

11   correct?

12       A.   Uh-huh.

13       Q.   That happened two months after you were

14   called about RENU, correct?

15       A.   Correct.

16       Q.   So Exhibit 4, where your wife liked the

17   post of Caroline Adams, could have no relationship

18   to you not receiving your RENU position, correct?

19       A.   Yeah, I guess.

20       Q.   Okay.  The next paragraph, paragraph 28,

21   says, By July 2023, Jason was next on the corporal

22   promotion eligibility list; do you see that?

23       A.   Yes.

24       Q.   Okay.  Paragraph 29 says, Jason was

25   informed by other officers in August of 2023 that

1    regardless of vacancies, he would not be promoted,

2    even if that meant generally not promoting anyone

3    else; do you see that?

4          A.   Yes.

5          Q.   Who are these other officers?

6          A.   I don't recall.

7          Q.   So you can't identify a single human being

8    that you're referring to in paragraph 29?

9          A.   That's why I said I don't recall.

10         Q.   Do you recall exactly what they said?

11         A.   They said that they were going to pull the

12   rule -- how was it worded?  Since -- there was a K-9

13   below me.  And they were going to use the rule of

14   three to skip over me or something along them lines.

15         Q.   Okay.  But you don't know who told you

16   that?

17         A.   It was just a bunch of officers in the

18   briefing room.

19         Q.   Do you know if they said that they talked

20   to Sheriff McGuffey about that?

21         A.   I don't recall.

22         Q.   Do you know if they talked to Mr. Gramke

23   about that?

24         A.   It was brought up in one of their staff

25   meetings.  So it was either a sergeant or lieutenant

Page 98

1    or higher that said it.

2         Q.   But they didn't say where they got that

3    source of information?

4         A.   From the staff meeting.

5         Q.   What do you mean staff meeting?

6         A.   When the lieutenants and captains have

7    their monthly -- weekly or monthly, whenever they

8    have their staff meeting, it was brought up about

9    the next corporal being moved or promoted.

10        Q.   When did that staff meeting occur?

11        A.   I do not know.

12        Q.   Who would have been the lieutenant or the

13   corporal in that staff meeting?

14        A.   It would be -- I believe the staff

15   meetings are lieutenants and higher.  I'm not

16   positive.  So there might be a sergeant and higher.

17   I'm not positive.

18        Q.   So you don't know whether or not it was a

19   sergeant at that meeting or a lieutenant?

20        A.   Correct.

21        Q.   And you don't know where they allegedly

22   obtained this information?

23        A.   From the staff meeting.

24        Q.   Oh.  They said they heard it in a staff

25   meeting?

1       A.    Yes.

2       Q.    Did they say they heard Gramke say it in

3  the staff meeting?

4       A.    I don't recall.

5       Q.    And would only one person tell you this or

6  more than one person tell you this?

7       A.    It was just one person.

8       Q.    Okay.  And you don't remember who that one

9  person is?

10      A.    I can't remember if it was my sergeant or

11  lieutenant.

12      Q.    And who would they be?

13      A.    At that time it would be Lieutenant

14  McElroy, Lieutenant Downing.  And I can't remember

15  exactly who told me.

16      Q.    Okay.  So right now you're saying that the

17  allegation was or the statement made to this person

18  that they were going to promote someone underneath

19  you using the rule of three?

20      A.    That I -- I don't necessarily remember if

21  they said the rule of three, but that I was being

22  skipped.

23      Q.    Okay.  Did that ever occur before you

24  resigned?

25      A.    No.

1    Q.   So you were never skipped before you

2  resigned?

3    A.   They didn't promote anybody before I

4  resigned.

5    Q.   They didn't promote anybody before you

6  resigned?

7    A.   I was next to be promoted and then I left.

8    Q.   Okay.  But between August of 2023 and

9  January 30 of 2024, none of these allegations about

10 you being skipped over using the rule of three

11 actually occurred, correct?

12   A.   From August -- right.

13   Q.   So it turns out the story did not end up

14 coming true, correct?

15   A.   I do not know.

16   Q.   And it didn't happen; you would agree?

17   A.   I'll agree.  Yeah, it did not happen.

18   Q.   Okay.  So it's entirely true that it was

19 false then, right -- it's entirely possible that

20 that wasn't true?

21   A.   No, not necessarily.

22   Q.   Okay.  You didn't hear anybody say that,

23 correct?

24   A.   I was told that.

25   Q.   By one person?

1      A.   That was at the staff meeting.

2      Q.   Okay.  And they said that they were going

3   to use the rule of three to skip you over, correct?

4      A.   They heard I was going to be skipped on

5   the corporal -- the next corporal opening.

6      Q.   All right.  And between August of 2023 and

7   when you left in January of 2024 that never

8   occurred, correct?

9      A.   Correct.

10      Q.   So in five months after that conversation

11   none of that came true, correct?

12      A.   Correct.

13      Q.   Okay.  The paragraph continues, Not long

14   after that, Jason's junior leadership informed him

15   that McGuffey was attempting in collective

16   bargaining negotiations with the union, to get an

17   early termination of the eligibility list, but just

18   for corporal, to ensure that Jason would not be

19   promoted.  Who told you that?

20      A.   One of the union reps.

21      Q.   Okay.  So earlier we discussed what

22   your -- your knowledge of being a union president?

23      A.   Yes.

24      Q.   This couldn't happen unless the union

25   agreed to it, correct?

1      A.    Correct.

2      Q.    So it wouldn't be possible that Sheriff

3 McGuffey could just unilaterally do this, correct?

4      A.    Not necessarily.  It can be a MOU if she

5 wanted to exhaust the list and the union agreed upon

6 it.

7      Q.    Okay.  Was there any representation made

8 to you that she was threatening to do that?

9      A.    I have no idea.

10      Q.    Okay.  So all you heard is that she was

11 negotiating in bargainings with the union to change

12 the shelf life of the eligibility list from two

13 years to one year, correct?

14      A.    Correct.

15      Q.    Okay.  Would you agree that that

16 necessarily wouldn't even be retroactive to the

17 eligibility list that you were on?

18                MR. GOTTESMAN:  Objection.

19      A.    I would not know what they agreed upon.

20      Q.    Okay.  Do you know whether or not that was

21 even being discussed?

22      A.    I was told it was being discussed.

23      Q.    Okay.  But you don't know whether or not

24 it was being discussed?

25      A.    Just what I was told.

1      Q.   Okay.  But it's possible that you could

2   agree in a negotiation about the union contract that

3   going forward that list would only be one year,

4   correct?

5           MR. GOTTESMAN:  Objection.

6      A.   That they could agree upon that, you mean?

7      Q.   Yes.

8           MR. GOTTESMAN:  Objection.

9      A.   I mean, yeah, I guess they could agree

10  upon it.

11     Q.   Typically speaking when you renegotiate a

12  collective bargaining agreement, those things don't

13  necessarily apply retroactively all the time,

14  correct?

15          MR. GOTTESMAN:  Objection.

16     A.   It depends on what they want.

17     Q.   Okay.  But it's also possible that you

18  could renegotiate the list in the future and would

19  only have a two-year shelf life, correct?

20          MR. GOTTESMAN:  Objection.

21     A.   Yeah.

22     Q.   But that wouldn't apply retroactively to

23  the current list, correct?

24          MR. GOTTESMAN:  Objection.

25     A.   It's whatever they agree upon.

1    Q.   Okay.  So you don't actually know what was

2  going on at this point in time then, correct?

3            MR. GOTTESMAN:  Objection.

4    A.   Just what I just recited that I was told.

5    Q.   Okay.  So you weren't part of the

6  negotiations, correct?

7    A.   No.

8    Q.   And you have no personal knowledge whether

9  or not there was any talk about retroactively

10 reducing the length of your eligibility list?

11           MR. GOTTESMAN:  Objection.

12   A.   What I was told from the union rep.

13   Q.   Okay.  Who is the union rep?

14   A.   It was Alexander.

15   Q.   Okay.  If I were to represent to you that

16 they were not negotiating retroactively applying

17 that to the current list you were on, would you have

18 any reason to disagree with that?

19           MR. GOTTESMAN:  Objection.

20   A.   I wasn't there.

21   Q.   Okay.  So you have no personal knowledge

22 that that would be incorrect then?

23           MR. GOTTESMAN:  Objection.

24   A.   Correct.

25   Q.   Okay.  If that were the case and they

1    weren't trying to retroactively apply it to your

2    list, you would agree that it wouldn't actually

3    affect you personally at all to change the shelf

4    life of that list, correct?

5                    MR. GOTTESMAN:  Objection.

6        A.    Correct.

7        Q.    Because your list would have lasted the

8    two years, correct?

9        A.    Yes.

10       Q.    At that point, just like every other

11   person, you could retake the test, correct?

12       A.    Yes.

13       Q.    And that your list on the -- your place on

14   the eligibility list would last one year, correct?

15       A.    Yes.  If that's what they agreed upon.

16       Q.    Right.  And you wouldn't be treated any

17   different than any person on the eligibility list,

18   correct?

19                    MR. GOTTESMAN:  Objection.

20       A.    I would hope so, but obviously that's not

21   what happens.

22       Q.    Well, how did that not happen?

23       A.    That's why we're here.

24       Q.    No.  You never took the eligibility test

25   again, did you?

1      A.   No.

2      Q.   You never took the test again, correct?

3      A.   But we're here because I was treated

4  unfairly.  So you can't say that I would be treated

5  fairly on the next round of the test.  That's why I

6  had to leave.

7      Q.   I understand that's your allegation.  But

8  what I'm saying is that if you were to retake the

9  test, you would be on the eligibility list with your

10  placement for a year like everybody else, correct?

11            MR. GOTTESMAN:  Objection.

12     A.   As long as you say that I won't be -- that

13  I would be treated fairly, yeah, I'll agree with

14  that.

15     Q.   This part of the sentence says that he --

16  referring to you -- would not be promoted, even if

17  that generally meant not promoting anyone else.

18            Is it your allegation that it was Sheriff

19  McGuffey's plan to no longer promote people to

20  corporal as long as you were there?

21     A.   That was my understanding, yes.

22     Q.   Okay.  And you don't think that sounds a

23  little bit preposterous at all?

24     A.   With her, no.

25     Q.   Okay.  So it's your allegation that she

1  would not promote anybody to corporal ever again as

2  long as you were there?

3      A.   On that list.

4             MR. GOTTESMAN:  Objection.

5             THE WITNESS:  Oh, sorry.

6      A.   On that list, yeah.  Yes.

7      Q.   On what list?

8      A.   The eligibility list.

9      Q.   Okay.  So you believe that when you're

10  saying that, you're just referring to exhibit -- the

11  exhibit we just looked at, correct?

12     A.   Yes.

13            MR. GOTTESMAN:  For the record,

14         that's three.

15            MR. MILLER-NOVAK:  Three.  Thank you.

16     Q.   Plaintiffs' Exhibit 3.  So you're saying

17  for the remainder --

18            MR. GOTTESMAN:  Defendants' Exhibit

19         3.

20            MR. MILLER-NOVAK:  What's that?

21            MR. GOTTESMAN:  Defendants' Exhibit

22         3.

23            MR. MILLER-NOVAK:  Thanks.

24     Q.   That for the remainder of that two-year

25  shelf life, that they were not going to promote

1  anybody as long as you were on that list, correct?

2      A.   Correct.

3      Q.   Okay.  That's your allegation?

4      A.   Correct.

5      Q.   Okay.  But when that list has expired, had

6  you stayed, you would have the same opportunity to

7  retake the test, correct?

8      A.   Yes.

9      Q.   And you would, again, appear in some

10 placement on that list, correct?

11     A.   Correct.

12     Q.   For all you know you could have placed

13 first, correct?

14     A.   Correct.

15     Q.   Or you could have placed last, correct?

16     A.   Correct.

17     Q.   And if you placed in the top five, then

18 you would have higher priority on that list than

19 other people, correct?

20     A.   Correct.

21     Q.   And you don't know what would have

22 happened because you didn't take the test again,

23 correct?

24     A.   Correct.

25     Q.   Okay.

1      A.   But they still can apply the rule of three

2  and keep skipping me.  Just because I placed one

3  doesn't mean I definitely get that corporal's

4  position.

5      Q.   Okay.  Unless the union negotiated out the

6  rule of three, correct?

7      A.   Correct.

8      Q.   Because that's also within the power of

9  the bargaining unit, correct?

10     A.   I can't recall.  I think -- I can't

11  recall.

12     Q.   Well, the process to promote somebody to a

13  corporal is something referred to within the

14  collective bargaining agreement, correct?

15     A.   Correct.

16     Q.   And the collective bargaining unit is --

17  agreement -- sorry -- is a product of negotiations

18  between the union and the county, correct?

19     A.   Correct.

20     Q.   Okay.  So as part of the negotiations from

21  shortening the shelf list of the eligibility from

22  two years to one year, the union could counter,

23  that's fine, we want to outdo or get rid of the rule

24  of three, correct?

25     A.   Correct.

1      Q.   So at that point in time had the union

2   done that hypothetically and you placed number one

3   on the list, then you would be in the very first

4   position to get a promotion, correct?

5      A.   Hypothetically, yes, if the rule of three

6   was not in play, but it still is.

7      Q.   Okay.  So when you left, had that union

8   negotiation completed?

9      A.   I don't -- I do not know.

10      Q.   So you didn't actually know what the

11   outcome of that negotiation would be by the time you

12   resigned, correct?

13      A.   Correct.

14      Q.   So for all you know the rule of three

15   could have been abolished by the time you resigned,

16   correct?

17      A.   If it was being negotiated, correct.

18      Q.   Okay.  And for all you know they could

19   have extended the two years to three years, correct?

20      A.   Again, correct.

21      Q.   Because negotiation hadn't been completed

22   by the time you resigned, correct?

23      A.   Correct.

24      Q.   Okay.  So paragraph 30 says, Concerned

25   that he was being retaliated against, Jason asked

1   for a meeting with Gramke and McGuffey in early

2   September of 2023.  It continues, Jason was informed

3   that Gramke and McGuffey could meet with him in

4   October of 2023; do you see that?

5        A.   Yes.

6        Q.   As of September of 2023 had you received

7   any independent information that Sheriff McGuffey

8   had any involvement in Gramke overriding your RENU

9   placement?

10       A.   From September to October?

11       Q.   Before September.

12       A.   Yes.

13       Q.   Okay.  She was involved personally in

14  overriding?

15       A.   You said McGuffey and Gramke.

16       Q.   Okay.  If I did, then I apologize I asked

17  a terrible question.  What I meant to ask is, prior

18  to September of 2023 had you had any independent

19  information that Sheriff McGuffey was involved in

20  rejecting your RENU application?

21       A.   No.

22       Q.   Prior to September of 2023 had Sheriff

23  McGuffey said anything to you about naming your

24  wife, Jennifer Patterson Davis?

25       A.   No.

1    Q.   Had Sheriff McGuffey said anything to you

2  about your post involving the Remember the Fallen

3  football game?

4    A.   No.

5    Q.   Okay.  Do you have any knowledge whether

6  or not Sheriff McGuffey was even aware that you

7  applied for RENU before September of 2023?

8    A.   No.

9    Q.   Okay.  Any evidence at all, anybody make

10  any statements about whether or not she was aware

11  that you had applied for RENU in 20- -- before

12  September of 2023?

13            MR. GOTTESMAN:  Objection.

14    A.   No.

15    Q.   Okay.  So if I was to represent to you

16  that prior to September of 2023 she was completely

17  unaware that you had even applied or wanted a

18  position in RENU, you would have no reason to

19  disagree with that statement?

20            MR. GOTTESMAN:  Object to form.

21            Go ahead.

22    A.   No.  What -- would I have a reason to

23  believe that she had no knowledge?

24    Q.   Do you have any evidence that she had any

25  knowledge?

Page 113

1       A.   I have no evidence, no.

2       Q.   Do you have any knowledge that she had any

3  involvement with your being overridden to RENU prior

4  to September of 2023?

5       A.   No.

6       Q.   Do you have any evidence that she was

7  aware that you made the Remember the Fallen post on

8  Facebook prior to September of 2023?

9       A.   No.

10      Q.   Did she ever talk to you about your RENU

11  application prior to September of 2023?

12      A.   No.

13      Q.   Did she ever talk to you about your wife,

14  Jennifer Patterson Davis, prior to September of

15  2023?

16      A.   No.

17      Q.   So the next paragraph says, On October 10,

18  2023, at approximately 8:30 a.m., Jason met with

19  Gramke and McGuffey; do you see that?

20      A.   Yes.

21      Q.   Do you agree that that was the day and

22  time that you met?

23      A.   Yes.

24      Q.   Okay.  In paragraph 32 it said, McGuffey

25  began the meeting by stating that she had been

1    looking -- actually let me go back.  Scratch that.

2             On October 10, 2023, at approximately

3    8:30 a.m., Jason met with Gramke and McGuffey.  You

4    requested that meeting, correct?

5         A.   Correct.

6         Q.   Okay.  And why did you request that

7    meeting?

8         A.   Because of the way I was not -- I was

9    taken out of the RENU process and being skipped over

10   for corporal.

11        Q.   Okay.  You had not been skipped over for

12   corporal at that point in time, correct?

13        A.   I don't know.

14        Q.   I mean, earlier we just talked about how

15   between August of 2023 and when you resigned no K-9

16   officer behind you had skipped over you, correct?

17        A.   Correct.  I don't know if there was a

18   corporal's position they were holding out for or

19   not.  I mean, there's no way of knowing.

20        Q.   Okay.  So you don't know that anybody had

21   skipped over you at that point in time, correct?

22        A.   I didn't know if there was a corporal's

23   position open.

24        Q.   Okay.  Have you ever found out that you

25   were ever skipped over at that point in time?

1      A.   They promoted after I left.

2      Q.   Okay.  So you would agree that before you

3  resigned, you were never skipped?

4      A.   I -- no.  I don't know if they were

5  holding out or not.

6      Q.   Okay.  I understand that your allegation

7  is that you believed that they were holding out.

8      A.   Correct.

9      Q.   That's not what I asked.  What I asked

10  was, do you have any knowledge that you were

11  actually skipped before you resigned?

12      A.   It's just an assumption.

13      Q.   An assumption of what, that someone

14  skipped you?

15      A.   That there wasn't an opening for me to

16  fall into.  I don't know if they held that out or

17  not.  There's no proof either way.

18      Q.   Okay.  I didn't ask whether or not they

19  were holding out on an opening.

20      A.   Okay.

21      Q.   Okay.  I'm asking whether or not there was

22  an opening that someone behind you skipped to get?

23      A.   I don't know if there was an opening or

24  not, so I can't say yes or no.

25      Q.   Okay.  So you don't know whether or not

1    there was an opening?

2         A.   Correct.  That's. . .

3         Q.   Okay.  Well, you would agree if there was

4    not an opening, then you were not skipped?

5         A.   Yes.

6         Q.   So this almost seems like an introductory

7    question, but let's take a step back.  So a

8    sheriff's department is somewhat like a paramilitary

9    force, correct?

10        A.   Correct.

11        Q.   So there are ranks, correct?

12        A.   Yes.

13        Q.   And they have military type titles like

14   sergeant, corporal, et cetera, correct?

15        A.   Yes.

16        Q.   Okay.  So there is a ranking structure,

17   correct?

18        A.   Uh-huh.  Yes.

19        Q.   And you would agree that being -- I would

20   say any kind of law enforcement -- I would say

21   deputy, but now you're a police officer in

22   Springdale, correct?

23        A.   Yes.

24        Q.   And you would agree that it's a very

25   important job, correct?

1      A.   Yes.

2      Q.   And it's a very dangerous job, correct?

3      A.   Yes.

4      Q.   And that it's a job -- the old -- do you

5  ever watch Spider-Man?

6      A.   Uh-huh.

7      Q.   So with great power comes great

8  responsibility --

9      A.   Yes.

10     Q.   -- right?  Peter Parker?

11     A.   Yes.

12     Q.   All right.  So you would agree that when

13  you promote people in a department, it's a very

14  important task, correct?

15     A.   Correct.

16     Q.   And that reviewing people's character

17  matters, correct?

18     A.   Correct.

19     Q.   Reviewing the amount of responsibility

20  they have matters, correct?

21     A.   Correct.

22     Q.   Whether or not they're quite frankly

23  overly aggressive would be something that you would

24  be concerned about, correct?

25     A.   Correct.

1     Q.   All right.  Because Mel Gibson might be

2  cool in Lethal Weapon, but in real life he violates

3  people's constitutional rights like every five

4  minutes, correct?

5     A.   Correct.

6     Q.   Right.  You wouldn't really want Mel

7  Gibson to be in the Hamilton County Sheriff's

8  Department as a corporal, correct?

9     A.   Correct.

10     Q.   All right.  That's without commenting on

11  his personal life decisions.  But at any rate, you

12  would agree that one of the very important

13  activities of the Sheriff's Department is how it

14  promotes people, correct?

15     A.   Correct.

16     Q.   And the process that it uses to promote

17  people, correct?

18     A.   Correct.

19     Q.   And that those are activities of the

20  Sheriff's Department, correct?

21     A.   Correct.

22     Q.   So the entire process of promoting people

23  is something that could be an issue of public

24  concern, correct?

25     A.   Yes.

1      Q.   And you would agree that, you know, it's

2   important to preserve documents that record that

3   process, correct?

4      A.   Yes.

5      Q.   Such as your personnel file, correct?

6      A.   Correct.

7      Q.   Okay.  Or your application, correct?

8      A.   Correct.

9      Q.   Because the public might want to see your

10  application for a position, correct?

11     A.   Yes.

12     Q.   Okay.  So it's become knowledgeable -- or

13  become common knowledge, I guess, in this case that

14  you recorded the conversation between yourself and

15  Gramke and Sheriff McGuffey on October 10, 2023,

16  correct?

17     A.   Correct.

18     Q.   Okay.  When did you decide that you were

19  going to record that conversation?

20     A.   Probably back when I was a union president

21  and we recorded every meeting and every encounter

22  with administration.

23     Q.   When that occurred, did you inform the

24  administration that you were recording them, the

25  meeting?

1          A.    I don't recall.

2          Q.    I mean, it wasn't a secret that the

3   meeting between the administration and union leaders

4   was being recorded, correct?

5          A.    I don't -- I don't recall.

6          Q.    Okay.  I mean, it's pretty common when

7   union leaders are present and there's representation

8   for a member of the union that it can be recorded to

9   document that activity, correct?

10         A.    We would have somebody -- a secretary take

11  notes, but I always recorded them.

12         Q.    Okay.  You would have a secretary take

13  notes?

14         A.    Correct.

15         Q.    Okay.  So it was known that that meeting

16  was being recorded, correct?

17         A.    I can't say that.

18         Q.    Okay.  Well, a secretary was taking notes.

19  Was she hiding somewhere taking notes, or was she

20  taking notes out in the open?

21              MR. GOTTESMAN:   Objection.

22         A.    Well, I mean, she just -- just brief

23  notes.  I mean, it wasn't actually like recording

24  word for word.

25         Q.    Okay.  But it was at least known that

1    there was someone documenting the contents of that

2    meeting, correct?

3                    MR. GOTTESMAN:  Objection.

4         A.   Correct.

5         Q.   All right.  It wasn't secretively done,

6    correct?

7         A.   Correct.

8         Q.   In October of 2023 did you inform either

9    Sheriff McGuffey or Jay Gramke that you were going

10   to record that meeting?

11        A.   No.  It wasn't asked.

12        Q.   Okay.  But you didn't tell them, correct?

13        A.   Because it wasn't asked.

14        Q.   Okay.  You didn't tell them because it

15   wasn't asked?

16        A.   Correct.

17        Q.   Okay.  When did you decide to do that?

18        A.   Like I said before, I recorded all my

19   interactions with administration from being a union

20   president.

21        Q.   Okay.  So this is not the first time you

22   recorded your conversations with people in the

23   Sheriff's Department?

24        A.   With administration, with meetings, yes.

25        Q.   Okay.  So I understand that you did it

1  when you were the union president.  How about when

2  you were just acting in your own individual

3  capacity; had you ever recorded meetings with the

4  administration prior to this meeting?

5           MR. GOTTESMAN:  Objection.

6     A.    This was my first meeting with them.

7     Q.    Okay.  So this was your first meeting with

8  this administration, correct?

9     A.    Yes.

10    Q.    Did you ever meet as an individual with

11 the prior administration under Jim Neil?

12    A.    Yes.

13    Q.    Did you record those conversations?

14    A.    Yes.  Because I was asked if I was

15 recording or not by their assistant counsel.

16    Q.    Okay.  Because attorneys were there?

17    A.    No.  It's whatever Keith Clepper was at

18 the time, which is their union liaison or whatever

19 he was.

20    Q.    Okay.  So when those meetings happened,

21 they happened in your capacity as a union leader?

22    A.    Just going in for meetings he would ask,

23 yes.

24    Q.    Okay.  So when you met with Sheriff

25 McGuffey, you're not going in as a union leader,

1    correct?

2        A.    Correct.

3        Q.    Okay.  Did Jennifer know you were going to

4    record this meeting before it occurred?

5        A.    Yes.

6        Q.    Okay.  You discussed it with her

7    beforehand?

8        A.    Yes.

9        Q.    How did that come up?

10       A.    Just in our conversation that I have a

11   scheduled meeting with the Chief and the Sheriff and

12   I'm going to meet with them about my future with the

13   Department.

14       Q.    Okay.  And you told her that you were

15   going to record it?

16       A.    I think she asked are you going to record

17   that meeting as well, and I said absolutely.

18       Q.    Okay.  Did she tell you that she wanted

19   you to record that meeting?

20       A.    No.

21       Q.    Did she encourage you to record that

22   meeting?

23       A.    No.

24       Q.    Okay.  Did you tell her why you were going

25   to record that meeting?

Page 124

1       A.   No.  She asked if I was going to record

2    that meeting.

3       Q.   And you said yes?

4       A.   Yes.

5       Q.   Did you have any further conversations

6    about recording that meeting?

7       A.   I don't recall.

8       Q.   When you were talking about that meeting

9    before it occurred, what was your conversation

10   about?

11      A.   That I wanted to find out why I was

12   skipped over for corporal and removed from RENU.

13      Q.   Okay.  But we've just discussed that you

14   have no knowledge that you were skipped over for

15   corporal at that point?

16      A.   You asked me what I talked to my wife

17   about, and that's what I said to her.

18      Q.   Okay.  So at that time you believed you

19   were skipped over for corporal?

20      A.   Yes.

21      Q.   Okay.  Before you had this meeting had you

22   called -- you don't need to tell me what any

23   conversations were, but had you contacted any

24   employment counsel at that point in time?

25                MR. GOTTESMAN:  Objection.

1      A.    Yes.

2      Q.    Okay.  What employment counsel had you

3   talked to at that point in time?

4      A.    My union representation.

5      Q.    Union attorney or just president?

6      A.    Union attorney.

7      Q.    Okay.  And what's his name?

8      A.    At that time was Steve Lazarus.

9      Q.    Did you talk to anybody else about your

10   plan to record that meeting who is not an attorney?

11      A.    I don't recall.

12      Q.    Or Jennifer -- you didn't talk to anybody

13   else besides Jennifer and that attorney?

14      A.    I don't recall.

15      Q.    Okay.  What device did you use to record

16   that meeting?

17      A.    It's a -- it's a pen.

18      Q.    A pen?

19      A.    Uh-huh.

20            MR. GOTTESMAN:  That was a yes?

21            THE WITNESS:  Huh?

22            MR. GOTTESMAN:  That was a yes?

23            THE COURT REPORTER:  You said uh-huh.

24            THE WITNESS:  Oh, I'm sorry.  Yeah.

25            I didn't even catch that.

1       A.    Yes.

2              MR. MILLER-NOVAK:  I didn't catch it

3           either.

4       Q.    All right.  A pen?

5       A.    Yes.

6       Q.    Okay.  So I was expecting to hear a cell

7    phone.  So what type of pen?

8       A.    A recording one.

9       Q.    Okay.  I mean, what does it look like?

10      A.    A pen.

11      Q.    Does it function as a pen?

12      A.    Yes.

13      Q.    Did you get it from the Spy Museum?

14      A.    No.

15      Q.    Okay.  Do you have it on you now?

16      A.    No.

17      Q.    Okay.  Is this some equipment that you got

18   from the Sheriff's Department itself?

19      A.    No.

20      Q.    Is it something you bought on your own?

21      A.    Yes.

22      Q.    Okay.  So it's a recording device that

23   looks like a pen?

24      A.    Yes.

25      Q.    Do you still own the pen recording device?

 1      A.    Yes.

 2      Q.    Why did you buy the pen recording device?

 3      A.    To record our conversations.

 4      Q.    So you specifically went out and bought

 5   that pen to record this conversation?

 6                MR. GOTTESMAN:   Objection.

 7      A.    I don't recall if it was just for that

 8   meeting.  Did I already have that one?  I don't

 9   recall.

10      Q.    Where did you buy it?

11      A.    I got it online.  I don't recall exactly

12   where.

13      Q.    Where on online?

14      A.    I just -- I don't recall.

15      Q.    Do you still have some record of that

16   transaction?

17      A.    No.

18      Q.    Did you pay with your credit card?

19      A.    Yes.

20      Q.    Would it have been a check card?

21      A.    No.

22      Q.    Would it have been like your true credit

23   card -- for lack of a better wording -- like a

24   credit card as opposed to a bank card?

25      A.    Yeah.  It was like a Visa.

1      Q.   Okay.  So you have a Visa.  Through what

2   bank?

3      A.   I don't remember what card I used.

4      Q.   Okay.  Well, I'm going to ask you to look

5   for the receipt.  I didn't say it was going to be

6   fun, but -- I mean, you know, if you can find it, I

7   would ask you to look for it.

8      A.   All right.

9           MR. GOTTESMAN:  We'll deal with that.

10          THE WITNESS:  Yeah.  I was just

11          trying to think of what credit card it

12          was.

13     Q.   And you don't remember the name of the

14   company?

15     A.   No.  No.

16     Q.   Okay.  And so does the pen -- you said you

17   still have it?

18     A.   Yes.

19     Q.   Okay.  Does it work -- does it charge like

20   a USB device?

21     A.   Yes.

22     Q.   So it's like a USB storage in the pen

23   then, correct?

24     A.   Correct.

25     Q.   And then you would plug it into some

1   device to upload whatever recordings you have onto

2   another device, correct?

3       A.   Yes.

4       Q.   Whether a laptop or something like that?

5       A.   Yes.

6       Q.   Okay.  Does the pen -- I don't know, for

7   lack of a better word -- does it appear kind of

8   designer in nature as opposed to something like this

9   cheap Profile Paper Mate here?

10      A.   Yeah.  It's a nice -- a nice pen.

11      Q.   So it looks like a quality pen then,

12  correct?

13      A.   I would say so.

14           MR. GOTTESMAN:  Counsel, I think

15           that's a quality pen.

16           MR. MILLER-NOVAK:  These are smooth

17           compared to some that are a little bit

18           more coarse.  I do like the Profile.  But

19           I don't know that it's a designer pen

20           necessarily.  No one is buying this for

21           your graduation or something like that.

22      Q.   So the pen when you went into this

23  meeting, did you put it in your pocket?

24      A.   Yes.

25      Q.   Like your chest pocket or something like

Page 130

1    that?

2         A.    Yes.

3         Q.    Okay.

4         A.    Right where the pens go in.

5         Q.    Like a shirt pocket, correct?

6         A.    Correct.

7         Q.    This meeting, it occurred in -- you would

8    agree that it occurred in the workplace, correct?

9         A.    In the Chief's office, yes.

10        Q.    Yeah.  On like county property, correct?

11        A.    Yes.

12        Q.    In the county offices, correct?

13        A.    Correct.

14        Q.    Which is the Chief's workplace, correct?

15        A.    Correct.

16        Q.    And even though you were in Anderson, you

17   would agree that because it's a county sheriff's

18   office, it's also your workplace as well, correct?

19        A.    Correct.

20        Q.    Okay.  Had you ever used this pen

21   recording device before this meeting?

22        A.    To record or just use the pen in general?

23        Q.    To record a conversation.

24        A.    No.

25        Q.    Okay.  You tried it out when you bought

1    it?

2         A.   Yes.

3         Q.   Okay.  That's why I asked the follow-up

4    question.  I assume right now?

5         A.   And we use it in the kitchen, yes.

6         Q.   Okay.  So you've used it since?

7         A.   Yes.

8         Q.   Okay.  I'm sorry, I may have already

9    asked.  But you still own the pen, correct?

10        A.   Yes.

11        Q.   Okay.  So I kind of want to skip to the

12   end of the meeting and just keep -- since we're on

13   the topic, we'll just keep talking about the

14   recording.  So after you had the meeting you had

15   this recording, correct?

16        A.   Correct.

17        Q.   Okay.  Who did you let listen to this

18   recording?

19        A.   Just my wife.

20        Q.   Did you share it with anybody else in the

21   department?

22        A.   No.

23        Q.   Did you give it to anybody else in the

24   department?

25        A.   No.

1      Q.   Did you make any copies of the recording?

2      A.   I downloaded it to my -- or the wife's

3   laptop, I believe -- yes.

4      Q.   Jennifer's laptop?

5      A.   Yes.

6      Q.   Does she still have that laptop?

7      A.   I don't -- I don't know.  We've gone

8   through so many laptops.  They go obsolete so

9   quickly.

10      Q.   So you don't know if she currently still

11   has that laptop?

12      A.   Correct.

13      Q.   Do you still have the raw recording?

14      A.   I believe it's still in the pen, yes.

15      Q.   It's still in the pen?

16      A.   Yes.

17      Q.   But you don't know that Jennifer still has

18   that laptop?

19      A.   Again, I do not know.

20           MR. WIEST:  Just for the record, we

21           produced an accurate copy to the

22           Defendants yesterday of that and Counsel

23           was involved in the extraction of the

24           original, for whatever it's worth.

25      Q.   What was the date yesterday?

1           MR. GOTTESMAN:   May 5.  Cinco de

2      Mayo.

3      Q.   That's a busy time for road patrol, isn't

4  it?

5      A.   I was off.

6      Q.   Oh, that's good.  Did you have to work on

7  St. Patrick's Day?

8      A.   Yes.  That wasn't too bad.

9      Q.   Okay.  Those are amateur days, I guess, as

10  they're known, correct?

11      A.   Yes.

12      Q.   So yesterday was May the 5th, 2025,

13  correct?

14      A.   Yes.

15      Q.   All right.  And you had resigned in

16  January 30 of 2024, correct?

17      A.   Yes.

18      Q.   Okay.  So you agree that's about 15

19  months, correct?

20      A.   Correct.

21      Q.   Okay.  So that entire 15 months' time you

22  possessed the recording, correct?

23      A.   Correct.

24      Q.   Okay.  And are you aware in this

25  litigation your counsel refused to provide a copy of

Page 134

1    the recording or to give the recording to the County

2    until just yesterday?

3         A.   My understanding is that's what the judge

4    ordered.

5         Q.   Okay.  Well, you would agree that the

6    judge ordered your counsel didn't have to give it

7    over yesterday because they filed a motion to not

8    have to give it until yesterday?

9              MR. GOTTESMAN:  Objection.

10        A.   I have no idea.  I don't -- I'm not an

11   attorney.

12        Q.   Okay.  Why did you not give the recording

13   to the County when you left?

14        A.   When I left what?

15        Q.   The Sheriff's Department.  So when you

16   resigned and you left the Sheriff's Department in

17   January of 2024, why did you not give the recording

18   to the Sheriff's Department?

19        A.   I don't see a reason to.

20        Q.   At any time between October of 2023 when

21   you made the recording until you left did you inform

22   anybody at the Sheriff's Department that you had

23   made that recording?

24        A.   No.  No.  I'm sorry.  The exit interview

25   asked -- I wrote it on the exit interview that there

 1   was a recording.

 2        Q.   And when did you take the exit interview?

 3        A.   I don't recall.

 4        Q.   Would you agree that there's a policy

 5   against recording coworkers in the Department that

 6   was in place as of October of 2023?

 7        A.   Yes.

 8        Q.   Did you know about that before you went to

 9   the meeting?

10        A.   Yes.

11        Q.   So you knowingly violated that policy?

12        A.   No.

13        Q.   How not?

14        A.   I wasn't on duty.

15        Q.   Okay.  So it's your belief that that

16   policy only applies if you're on duty?

17        A.   That's what the policy states.

18             MR. MILLER-NOVAK:  Okay.  Well, let's

19             pull up the policy and take a look at it.

20             MR. WIEST:  And just for the record,

21             the union contract also makes clear that

22             it's only applicable -- policies are only

23             applicable when they're on duty under the

24             color of law or if it's --

25             MR. MILLER-NOVAK:  Hey, man, we don't

1          need to do that.  You're not testifying

2          today.

3               MR. WIEST:  Well, you're putting

4          legal conclusions in his mouth, and so

5          we're going to protect the record.

6               MR. MILLER-NOVAK:  No.  There's no

7          talking objections.  You know the rules.

8          Let's not pretend we don't.  I mean, I can

9          cite the rule and read it to you if you'd

10         like since -- okay.

11              Your objections will remain concise

12         today.  They will not be narrative in

13         order to affect the testimony of your

14         client, correct?  That's what the rules

15         say, so we're going to abide those today.

16              (Defendants' Deposition Exhibit No. 4

17              was marked for identification.)

18     Q.   I'll have you turn to -- it's kind of the

19     fourth page, Section 1.25.

20     A.   Gotcha.

21     Q.   It says, An employee may not record

22     another employee in the workplace; do you see that?

23     A.   Yes.

24     Q.   It says, including off duty details and

25     while working remotely; do you see that?

1        A.    Yes.

2        Q.    Without the consent of all parties

3   present, unless the recording occurs during the

4   course of an official investigation approved by the

5   Sheriff and/or the Chief Deputy.  This is inclusive

6   of video recording and audio recording; do you see

7   that?

8        A.    Yes.

9        Q.    Okay.  So this policy doesn't say anything

10  about being on duty or off duty; would you agree?

11       A.    Well, it says including off duty details.

12       Q.    Okay.  So it says off duty details?

13       A.    Correct.

14       Q.    But it doesn't mention whether or not the

15  person doing the recording is only forbidden from

16  recording if they are on duty, correct?

17            MR. GOTTESMAN:  Objection.

18       A.    Including off duty details and while

19  working remotely.  So as long as you're working,

20  correct.

21       Q.    Okay.  So in your mind it says while

22  you're working?

23       A.    My interpretation is while I'm working.

24  That's why it says including off duty duties -- the

25  off duty part -- and while working remotely.

Page 138

1      Q.   Okay.  You would agree that when you met

2  with Chief Gramke, that that occurred in the

3  workplace, correct?

4               MR. GOTTESMAN:  Objection to form.

5          Vague as to time.

6      A.   In his workplace, yes.

7      Q.   Okay.  You can set that aside for now.  So

8  are you aware of the Ohio Public Records Act?

9      A.   Yes.

10     Q.   And that when officials create records,

11  those records can become public records?

12     A.   Yes.

13     Q.   And that, generally speaking, documents,

14  anything tangible such as recordings that depict or

15  represent the activities of an office is a public

16  record?

17               MR. GOTTESMAN:  Objection.

18     A.   Are you asking me if I know that or I

19  agree with it?

20     Q.   I'm asking if you know that.

21     A.   I did not.

22     Q.   Okay.  Do you ever take body cam footage

23  in your official duties?

24     A.   Yes.

25     Q.   Are you aware that body cam footage is a

Page 139

1   public record?

2        A.   Yes.

3        Q.   So you would agree that when you record

4   certain activities that you engage in, that those

5   become public records?

6             MR. GOTTESMAN:  Objection.

7        A.   Eventually, yes.

8        Q.   Okay.  Are you aware that when you send

9   certain communications between yourself and other

10  deputies recording activities of your office, that

11  those can become public records?

12            MR. GOTTESMAN:  Objection.

13       A.   Yes.

14       Q.   Are you aware that they become public

15  records even if you use your private cell phone?

16            MR. GOTTESMAN:  Objection.

17       A.   Yes.

18       Q.   Are you aware that even if you send

19  official text messages, that those text messages can

20  become public records?

21            MR. GOTTESMAN:  Objection.

22       A.   Yeah.  Yes.

23       Q.   Okay.  So on October 10th of 2023 you

24  recorded your meeting with Mr. Gramke and Sheriff

25  McGuffey, correct?

Page 140

1    A.    Correct.

2    Q.    Okay.  And the purpose of that meeting was

3  to discuss your promotion or potential promotion to

4  corporal sometime in the future, correct?

5              MR. GOTTESMAN:   Objection.

6    A.    Why I was pulled out of RENU and skipped

7  over for corporal.

8    Q.    Right.  And earlier we discussed that the

9  promotion of people within a department is a

10 departmental activity, correct?

11   A.    Correct.

12   Q.    And that it's actually a very important

13 departmental activity, correct?

14   A.    Correct.

15   Q.    Okay.  And that it's one that the public

16 may want to know about, correct?

17   A.    Correct.

18   Q.    Okay.  So you recorded that activity that

19 day, correct?

20   A.    I recorded a meeting, not a promotion.

21   Q.    You recorded a meeting about a promotion,

22 correct?

23   A.    I recorded a meeting for disciplinary

24 reasons of being yanked out of RENU.

25   Q.    Okay.  Well, you weren't disciplined,

Page 141

1  correct?

2           MR. GOTTESMAN:  Objection.

3      A.  No.  That's a form of disciplinary.  I was

4  pulled from making more money, which is a form of

5  disciplinary.

6      Q.  Were you ever counseled?

7      A.  No.  That's why we have the lawsuit.

8      Q.  Okay.  So your allegation is that you

9  considered it a form of discipline?

10     A.  Yeah.  Yes.

11     Q.  Isn't an officer's discipline something

12  that's often a public record?

13     A.  Yeah.  Yes.

14     Q.  Okay.  So if something relates to your

15  discipline, it can be a public record, correct?

16     A.  I believe so, yes.

17     Q.  And you recorded a meeting that you just

18  said related to your discipline, correct?

19     A.  Correct.

20     Q.  So did it ever occur to you that you may

21  have created a public record that day?

22           MR. GOTTESMAN:  Objection.

23     A.  No.

24     Q.  So you never thought when I record this

25  meeting, that I might be creating a public record?

1           MR. GOTTESMAN:  Objection.  Asked and

2      answered.

3      A.   No.

4      Q.   Did you ever ask anybody whether or not

5  recording that meeting would create a public record?

6      A.   No.  Otherwise I would have just known and

7  said yes to the question before.

8      Q.   Well, you never asked anybody at all

9  because you never even told anybody you were

10 recording that meeting, correct?

11     A.   My wife.

12     Q.   Well, you told your wife, but she doesn't

13 work for the Sheriff's Department, correct?

14     A.   Correct.

15     Q.   Okay.  And you didn't just record that

16 meeting, you used a recorder that looked like a pen,

17 correct?

18     A.   Correct.

19     Q.   Okay.  So you hid the fact that you were

20 recording that meeting then, correct?

21           MR. GOTTESMAN:  Objection.

22     A.   I wouldn't necessarily say it was hidden.

23     Q.   It's a pen, correct?

24     A.   Correct.

25     Q.   It doesn't look like a recorder?

Page 143

1      A.    There's no difference between that or

2  turning my cell phone on.

3      Q.    Okay.  Do you know whether or not I'm

4  recording you with that highlighter sitting on the

5  table?

6      A.    My interaction with the public is always

7  assume that you're being recorded, so I have no

8  issues with you recording anything.

9      Q.    Okay.  Well, we know she's recording this

10  conversation, correct?

11      A.    Correct.

12              MR. GOTTESMAN:  Counsel, this is just

13          getting silly and argumentative.

14              MR. MILLER-NOVAK:  It's not.

15              MR. GOTTESMAN:  It is.

16              MR. MILLER-NOVAK:  It's not.

17              MR. GOTTESMAN:  Let me make my

18          record.  Let me make my record.

19              MR. MILLER-NOVAK:  No, no.  There's

20          no talking objections.

21              MR. GOTTESMAN:  If you want to ask

22          questions about facts in dispute in this

23          case, you're allowed to do that.  But to

24          sit here and have banter about the nature

25          of the recording device that's been

1          covered in detail, it's getting to be

2          oppressive and it's going too far.

3               MR. MILLER-NOVAK:  Okay.

4               MR. GOTTESMAN:  So if you want to ask

5          questions --

6               MR. MILLER-NOVAK:  I can guarantee

7          I'm going no further than your counsel did

8          yesterday.  I'm just asking his

9          understanding, what his impressions were.

10         It's not argumentative.

11              MR. GOTTESMAN:  We've covered it's a

12         pen.

13              MR. MILLER-NOVAK:  I get it.

14              MR. GOTTESMAN:  We've covered that he

15         recorded it.  We've covered they didn't

16         know.

17              MR. MILLER-NOVAK:  I'm asking my

18         questions.  If you want to tell him not to

19         answer a question, you can tell him not to

20         answer.

21              MR. GOTTESMAN:  Fine.

22              MR. MILLER-NOVAK:  Again, I'll review

23         the Rules of Civil Procedure.  Your

24         objections can be short.  They can be

25         concise.  They can't be narrative.  You

1           can't affect the testimony.  I'm fine.  We

2           can print out the rules.  You can read

3           them.

4                MR. GOTTESMAN:  I've read them.

5                MR. MILLER-NOVAK:  Okay.  Then you

6           understand them?

7                MR. GOTTESMAN:  I don't need a lesson

8           from you.

9                MR. MILLER-NOVAK:  Okay.  Well, then

10          I don't need the talking objections.

11               MR. GOTTESMAN:  It wasn't an

12          objection, Counselor.

13               MR. MILLER-NOVAK:  Okay.

14               MR. GOTTESMAN:  I'm asking you to

15          move to matters in dispute, questions

16          about facts, not bantering back and forth

17          --

18               MR. MILLER-NOVAK:  This is a matter

19          of dispute.

20               MR. GOTTESMAN:  -- with my client.

21               MR. MILLER-NOVAK:  He recorded the

22          meeting.  I'm asking his understanding

23          about public records information.  I'm

24          going to continue my line of questioning.

25          If you don't like it --

Page 146

1            MR. GOTTESMAN:  If you keep covering

2            the same ground again, I'm going to

3            instruct him not to answer.

4            MR. MILLER-NOVAK:  That's fine.  And

5            we'll file a motion to compel.

6            MR. GOTTESMAN:  Great.  Do it.

7            MR. MILLER-NOVAK:  And we'll do this

8            again.

9            MR. GOTTESMAN:  Do it.

10            MR. MILLER-NOVAK:  Okay.  That's

11            great.

12    BY MR. MILLER-NOVAK:

13        Q.   Anyways, it's a pen, correct?

14            MR. GOTTESMAN:  Don't answer that.

15        Q.   To you does it appear as a recording

16    device as a pen?

17            MR. GOTTESMAN:  Don't answer that.

18            MR. MILLER-NOVAK:  I didn't ask that

19            question before.

20            MR. GOTTESMAN:  It's in the record.

21            It's clear.

22            MR. MILLER-NOVAK:  Okay.  He never

23            answered it because you've interrupted.

24            MR. GOTTESMAN:  I've told him not to

25            answer.  Move on.

1          MR. MILLER-NOVAK:  So you're not

2          going to let him answer whether or not --

3          MR. GOTTESMAN:  I told him not to

4          answer.  Move on.

5          MR. MILLER-NOVAK:  -- he believes it

6          looks like a recording device?

7     Q.   In your opinion do you believe that it

8 looks like a recording device?

9          MR. GOTTESMAN:  Don't answer that.

10    Q.   Do you assume that every pen you see is a

11 recording device?

12         MR. GOTTESMAN:  Don't answer that.

13         MR. MILLER-NOVAK:  This is like one

14         of the most obstructive defenses of a

15         deposition I've ever had in my career.

16         Are you going to keep continuing to

17         tell him not to answer?

18         MR. GOTTESMAN:  Ask your questions,

19         Counselor, and I'll instruct my client as

20         I deem appropriate.

21         MR. MILLER-NOVAK:  Okay.  Well, we

22         are going to be filing a motion to compel

23         on this.

24         MR. GOTTESMAN:  Fantastic.

25         MR. MILLER-NOVAK:  Great.

1   BY MR. MILLER-NOVAK:

2      Q.   All right.  So why did you choose a pen as

3   opposed to just putting your cell phone out on the

4   table and recording it?

5      A.   Honestly, I don't have that much memory on

6   my cell phone.

7      Q.   So you're going to say you bought the pen

8   because your cell phone memory was out?

9      A.   Yes.

10     Q.   Okay.  You couldn't just delete recordings

11  that are on your cell phone?

12     A.   No.

13     Q.   You couldn't just buy a recording device

14  that looked like a recording device?

15     A.   You know honestly, I don't think they sell

16  those anymore.

17     Q.   Okay.  So the only recording device

18  available to you was a pen?

19     A.   Yes.

20     Q.   That's your only option on the market?

21     A.   Or another cell phone.

22     Q.   Okay.  So if I was to search recording

23  device in Google -- did you do that?

24     A.   I don't recall.

25     Q.   So you don't remember if you searched

Page 149

1    recording device in Google as opposed to looking for

2    a pen recording device?

3         A.   What was the question?

4              MR. MILLER-NOVAK:  Would you just

5              repeat the question.

6              THE COURT REPORTER:  "So you don't

7              remember if you searched recording device

8              in Google as opposed to looking for a pen

9              recording device?"

10        A.   I don't recall.  I didn't purposely look

11   for a pen recording device.

12        Q.   So it never occurred to you at any time

13   you may be creating a public record when you

14   recorded the conversation?

15             MR. GOTTESMAN:  Don't answer that.

16             You've answered that already.

17             MR. MILLER-NOVAK:  So you're

18             instructing him to not answer that

19             question?

20             MR. GOTTESMAN:  It's in the record.

21             You've already asked him.  And he's

22             answered it.  And I've told you, I'm not

23             going to sit here and tolerate repetitious

24             questions being asked and answered over

25             and over again.

1    Q.   Did you research online at all whether or

2   not you created a public record by recording that

3   conversation?

4    A.   No.

5    Q.   Did you talk to any other deputy about

6   whether or not you've created a public record when

7   you recorded that conversation?

8    A.   No.

9    Q.   Did you even think to consider whether or

10  not you were going to create a public record when

11  you recorded that conversation?

12            MR. GOTTESMAN:  Objection.  Don't

13            answer that.  He's answered that already.

14            MR. MILLER-NOVAK:  How many questions

15            is that that you refuse to answer, five,

16            six?

17            MR. GOTTESMAN:  It's a transcript.

18            It will show them.

19            MR. MILLER-NOVAK:  Yeah, it's been a

20            lot.  It's a record for me.

21    Q.   So did you do any research on how to

22  handle public records when you made that recording?

23    A.   No.

24    Q.   Did you look at the Sheriff's Department's

25  policy on public records before you made that

Page 151

1    recording?

2        A.    No.

3        Q.    Did you look at the Sheriff's Department's

4    handling of public records before you made that

5    recording?

6        A.    No.

7        Q.    Did you look at the Sheriff's policy about

8    handling public records after you made that

9    recording?

10       A.    No.

11       Q.    Did you look at Ohio statutory law at all

12   about recordings or handling public records after

13   making that recording?

14       A.    No.

15       Q.    Are you aware of whether or not that Ohio

16   statutory law requires that when you leave a public

17   office, that you return all public records to that

18   office?

19       A.    No.

20       Q.    Are you aware that it violates Ohio

21   statutory law to remove public records from a public

22   office when you leave?

23                MR. GOTTESMAN:    Objection.

24       A.    No.

25       Q.    Are you aware that it's unlawful to

Page 152

1    destroy a public record after you leave a public

2    office?

3                    MR. GOTTESMAN:   Objection.

4        A.   No.

5        Q.   Are you aware that public records includes

6    multiple copies of public records?

7        A.   No.

8        Q.   Are you aware that public records can

9    include drafts of public records?

10       A.   No.

11       Q.   Did you consider whether or not you were

12   putting a public record on Jennifer's laptop when

13   you copied the recording onto her laptop?

14       A.   No.

15       Q.   Did you consider whether or not you

16   destroyed a public record when you deleted or lost

17   that public record that was on her laptop?

18                   MR. GOTTESMAN:   Objection.  Assumes

19                   facts not in evidence.

20       A.   No.

21       Q.   Are you aware that the public records are

22   the property of a public office?

23       A.   Yes.

24       Q.   Do you agree that when you have property

25   of a public office, that you should return it to

1    that public office when you leave?

2              MR. GOTTESMAN:  Objection.  Don't

3              answer that.  You answered that at the

4              outset of this deposition.  I'm

5              instructing him not to answer.

6    Q.   If you had a public record of the office

7    and it was the property of the public office, would

8    you agree that it was your duty to return it to that

9    public office?

10   A.   Yes.

11   Q.   Would you agree that it would be

12   inappropriate to refuse to return a public record to

13   an office when it demands for that record's return?

14             MR. GOTTESMAN:  You answered that at

15             the outset of this deposition.  I'm

16             instructing you not to answer.

17             MR. MILLER-NOVAK:  I didn't ask about

18             a public record.  I did not.

19             Are you going to instruct him not to

20             answer a new question?

21             MR. GOTTESMAN:  I have instructed him

22             not to answer.

23             MR. MILLER-NOVAK:  So you're going to

24             instruct him not to answer a brand new

25             question?

Page 154

1              MR. GOTTESMAN:  That was my
2       instruction.
3              MR. MILLER-NOVAK:  That hasn't been
4       asked and answered.  I never asked it.
5              MR. GOTTESMAN:  I'll check the
6       transcript during a break perhaps.
7              Make a note for me.
8              MR. MILLER-NOVAK:  So you're going to
9       instruct him to not answer a brand new
10      question?
11             MR. GOTTESMAN:  I have instructed him
12      not to answer.
13             MR. MILLER-NOVAK:  It's relevant,
14      isn't it?
15             MR. WIEST:  Is there a question
16      pending?
17             MR. GOTTESMAN:  Yeah.  Next question.
18             MR. WIEST:  What's the pending
19      question?
20             THE COURT REPORTER:  The question
21      was, "Would you agree that it would be
22      inappropriate to refuse to return a public
23      record to an office when it demands for
24      that record's return?"
25             MR. MILLER-NOVAK:  I can guarantee I

```
 1              never mentioned public records at the

 2              onset of this deposition.

 3                   So are you going to instruct him to

 4              not answer that question?

 5                   MR. GOTTESMAN:  I already have,

 6              Counsel.  And I'm not going to keep

 7              answering you over and over again.  Ask

 8              your next question.

 9   BY MR. MILLER-NOVAK:

10       Q.   Why did you not return that recording to

11   the public office when you left?

12                   MR. GOTTESMAN:  Objection.

13                   Don't answer that.

14       Q.   You're not going to answer that question?

15                   MR. GOTTESMAN:  I've instructed him

16              not to.

17                   MR. MILLER-NOVAK:  On what grounds;

18              is it privileged?

19                   MR. GOTTESMAN:  I'm not going to

20              explain it to you, Counsel.  If you feel

21              the need to file a motion on it, we can

22              file a motion on it.

23                   MR. MILLER-NOVAK:  I guess we're

24              going to have to engage in motion

25              practice.
```

Page 156

1              MR. GOTTESMAN:  What's that?

2              MR. MILLER-NOVAK:  I guess we're

3         going to have to engage in motion practice

4         or have a conference with the judge at

5         some point.

6              MR. GOTTESMAN:  Okay.

7              MR. MILLER-NOVAK:  So you're

8         instructing him to not answer the question

9         why he did not return that recording to

10        the office after he left?

11             MR. GOTTESMAN:  There was a court

12        order frankly that authorized to keep it

13        from you, right?

14             MR. MILLER-NOVAK:  Well, you asked

15        for it.

16             MR. WIEST:  And we dispute that it's

17        a public record.

18             MR. GOTTESMAN:  And we don't accept

19        the premise of your question.

20             MR. MILLER-NOVAK:  All right.

21             MR. GOTTESMAN:  So that's where we

22        are.

23   BY MR. MILLER-NOVAK:

24        Q.   Why did you not return that recording to

25   Hamilton County after you left Hamilton County?

1          MR. GOTTESMAN:  Don't answer that

2          question.

3      Q.   When did you hire this law firm or this

4   counsel?

5      A.   I don't recall.

6      Q.   Was it the next day after you left

7   Hamilton County?

8      A.   No.

9      Q.   Was it a week after you left Hamilton

10  County?

11     A.   No.

12     Q.   Was it a month after you left Hamilton

13  County?

14     A.   I believe it was more than a month.

15     Q.   Okay.  So between the time you left

16  Hamilton County and you hired this counsel, why did

17  you not return the recording to the County?

18          MR. WIEST:  Objection to form.

19          MR. GOTTESMAN:  Jason -- excuse me.

20          I'm getting both sides.  I'm instructing

21          him not to answer.  We're covering the

22          same ground over and over again.

23          MR. MILLER-NOVAK:  I mean, we're only

24          covering -- I'm going to ask different

25          questions and see if there's one that

Page 158

1        you'll let him answer.  It can't be

2        privileged because he hadn't hired you

3        yet, so you can't possibly claim that it's

4        a privileged communication.

5            So I'm asking the period of one month

6        or whatever it was between the time he

7        left the employ of the County to the time

8        he hired you why he did not return the

9        recording to the --

10           MR. GOTTESMAN:  Because it wasn't a

11       public record.

12           MR. MILLER-NOVAK:  Well, you're

13       saying it wasn't a public record and

14       that's fine.

15           MR. GOTTESMAN:  And we're done

16       covering this.  So if you want to move on

17       to new territory, do so.  If you want to

18       sit here and talk about public records,

19       I'm done listening to the questions.  I'm

20       not letting him answer any more.  I think

21       you've exhausted the subject by now.

22           MR. MILLER-NOVAK:  Okay.  I've

23       exhausted the part that you've allowed him

24       to testify, not any of the part that you

25       refuse to let him testify.

1          So it's your statement right now

2          you're no longer going to allow him to

3          testify about public records questions?

4          MR. WIEST:  It's up to you.

5          MR. GOTTESMAN:  You know what, let's

6          take a break.  It's 12:16.  I think it's a

7          good time for lunch.

8          THE COURT REPORTER:  We're off the

9          record.

10          (A lunch recess was taken.)

11          (Defendants' Deposition Exhibit No. 5

12          was marked for identification.)

13  BY MR. MILLER-NOVAK:

14      Q.   All right.  We just handed you Defendants'

15  Exhibit 5.  I'm going to represent that this is

16  Section 149.351 of the Ohio Revised Code titled

17  Prohibiting Destruction or Damage of Records; do you

18  see that?

19      A.   Yes.

20      Q.   Do you see in subsection A it says, All

21  records are the property of the public office

22  concerned and shall not be removed, destroyed,

23  mutilated, transferred, or otherwise damaged or

24  disposed of, in whole or in part, except as provided

25  by law; do you see that?

Page 160

1        A.    Yes.

2        Q.    Okay.  Do you see the last sentence of

3   that paragraph where it says, Those records shall be

4   delivered by outgoing officials and employees to

5   their successors and shall not be otherwise removed,

6   destroyed, mutilated, or transferred unlawfully; do

7   you see that?

8        A.    Yes.

9        Q.    So regarding your recording that you took

10  on the pen --

11       A.    Yes.

12       Q.    -- you would agree that you did not

13  provide that or deliver it to any of the county

14  officials upon your departure?

15       A.    Correct.

16             MR. GOTTESMAN:  Objection.

17             THE WITNESS:  Oh, sorry.  I'll slow

18       down.

19       A.    Correct.  Because it's mine.  It's my

20  recording.

21       Q.    Okay.  And you did not deliver it to any

22  successor, correct?

23       A.    No.

24       Q.    Okay.  Do you agree that if that recording

25  constituted a public record, then you would have

1    violated that statute, wouldn't you?

2                MR. GOTTESMAN:  Objection.

3        A.   It wasn't public record.

4        Q.   If it constituted public record, then you

5    violated this statute by removing it, correct?

6        A.   Correct.  If it's a public record.

7        Q.   And you would agree that if it is a public

8    record, that this statute creates in you an

9    affirmative duty to deliver it back to the office,

10   correct?

11       A.   Correct.

12                MR. MILLER-NOVAK:  Okay.  You can

13            give that to her.

14       Q.   Earlier I believe your counsel testified

15   that something in the collective bargaining

16   agreement states that certain rules about officer

17   conduct only apply when you're on duty; do you

18   recall that?

19                MR. GOTTESMAN:  Objection to form.

20       A.   Yes.

21       Q.   Okay.  Do you know what part of the

22   collective bargaining agreement says that?

23       A.   No, not offhand.

24       Q.   Are you familiar with any part of the

25   collective bargaining agreement that says that

1    there's no rules about conduct that apply off duty?

2         A.    Not unless I had it in front of me, no.

3         Q.    Okay.  Well, we're going to talk about it

4    at some point today, but before we do that -- I

5    mean, you actually agree that there's a lot of rules

6    for officers that apply to their duty off -- their

7    conduct off duty, correct?

8                   MR. GOTTESMAN:  Objection.

9         A.    Yes.

10        Q.    I mean, it's pretty typical in police

11   handbooks that you have certain duties of moral

12   character, correct?

13                  MR. GOTTESMAN:  Objection.

14        Q.    And certain things you might do off duty

15   would violate government policy, correct?

16                  MR. GOTTESMAN:  Objection.

17        A.    If it's illegal, yes.

18        Q.    Okay.  Only if it's illegal or there are

19   other things that you can do off duty that could

20   violate policy?

21                  MR. GOTTESMAN:  Objection.

22        A.    I don't know any right offhand, no.

23        Q.    Okay.  Well, earlier we reviewed a social

24   media policy, didn't we?

25        A.    Yes.

Page 163

1      Q.   And there was some regulations about how

2  you can use personal social media accounts, correct?

3      A.   Correct.

4      Q.   Okay.  So that, for instance, would be a

5  policy that would regulate your personal use of

6  social media, correct?

7              MR. GOTTESMAN:  Objection.

8      A.   Correct.

9      Q.   Okay.  You would agree that an officer,

10 for instance, wouldn't be allowed -- there would be

11 a violation of policy to get on social media and say

12 things that are inadvertently racist, correct?

13             MR. GOTTESMAN:  Objection.

14     A.   I would disagree.  If it's on their

15 private page, that's their own opinion.

16     Q.   Okay.  So you believe that it's okay for

17 officers to make -- I don't know -- to post on

18 Facebook and maybe use the N-word?

19             MR. GOTTESMAN:  Objection.

20     A.   I mean, that's a hypothetical.  But I

21 have -- it's their own private page.  Who am I to

22 say what they can and can't do on their own private

23 page.

24     Q.   Okay.  So you believe that it's okay for

25 an officer in their personal time to engage in hate

1    speech?

2                    MR. GOTTESMAN:  Objection.

3        A.   It's not -- it's just a matter of opinion.

4    It's their private page.  So what they want to do

5    has no bearing on me.

6        Q.   Do you believe that officers could join

7    hate groups such as the KKK on their personal time?

8                    MR. GOTTESMAN:  Don't answer that.

9                    You've covered this this morning.

10               This is repetitious.  I'm instructing him

11               not to answer.

12                   MR. MILLER-NOVAK:  I'm just trying to

13               clarify his answers --

14                   MR. GOTTESMAN:  I've given him my

15               instruction, Counselor.  And I'm not going

16               to debate it with you.

17                   MR. MILLER-NOVAK:  I have never in my

18               life --

19                   MR. GOTTESMAN:  Okay.

20                   MR. MILLER-NOVAK:  -- seen people --

21                   MR. GOTTESMAN:  Next question.

22                   MR. MILLER-NOVAK:  You do realize the

23               Rules of Civil Procedure only allow you to

24               instruct him to not answer a question when

25               it is a matter of privilege?

Page 165

1                    MR. GOTTESMAN:  That's not true.

2                    MR. MILLER-NOVAK:  Okay.  So how is a

3          question that may have been asked in a

4          different context and now might have a

5          different meaning in this concurrent --

6                    MR. GOTTESMAN:  It's repetitious.

7          It's harassment.

8                    MR. MILLER-NOVAK:  It doesn't matter.

9          It's not harassment.

10                   MR. GOTTESMAN:  It's prohibited.

11         What you're doing is prohibited under

12         Federal Rule of Civil Procedure 26, okay?

13                   MR. MILLER-NOVAK:  What rule is --

14                   MR. GOTTESMAN:  I'm not going to

15         recite the rule to you, Counselor.  You're

16         responsible for knowing them yourself.

17              It's repetitious, it's harassment,

18         and I'm instructing him not to engage with

19         you on it.

20                   MR. MILLER-NOVAK:  You are absurd.

21    BY MR. MILLER-NOVAK:

22         Q.   Do you believe that a deputy in his off

23    time could join a terrorist organization?

24         A.   No.

25         Q.   Okay.  Do you believe as an officer you

1    could use your own personal Facebook page to engage

2    in statements that you use racial epithets such

3    as -- I don't know -- let's just say a derogatory

4    term aimed at someone's sexual orientation?

5                    MR. GOTTESMAN:  Objection.

6        A.   On their own personal page?

7        Q.   Yes.

8        A.   It's their opinion.

9        Q.   Okay.  And you don't believe that a

10   sheriff's department has the right to regulate

11   speech -- the hate speech of their officers?

12                   MR. GOTTESMAN:  Objection.

13       A.   I mean, it's on their own private page.

14   What they do privately is their -- their business.

15   It doesn't mean I have to agree with it.

16       Q.   Let's go to page seven and paragraph 32 of

17   your complaint.  Getting back to the October 10,

18   2023 meeting, your complaint states that McGuffey

19   began the meeting by stating that she had been

20   looking forward to talking with Jason, and what he

21   could expect in the future in the Sheriff's Office;

22   do you see that?

23       A.   Yes.

24       Q.   Okay.  So you would agree that she started

25   the meeting by talking about your future in the

1    office, correct?

2        A.   Correct.

3        Q.   It continues on paragraph 33, At that

4    point, Jason asked about the RENU position and his

5    promotion to corporal.  In response, Gramke and

6    McGuffey stated that they had issues with Jason's

7    social media post in May 2022; do you see that?

8        A.   Yes.

9        Q.   And then it continues that they also --

10   you allege that they had issues with Jennifer's

11   social media posts that were critical of the Sheriff

12   and had issues with Jennifer's social media post

13   related to Caroline Adams, including, most recently,

14   Jennifer liking Adams' post about morale; do you see

15   that?

16       A.   Yes.

17       Q.   Okay.  Regarding your RENU position,

18   earlier we went through the time line and you found

19   out that Gramke overrode your appointment to RENU in

20   March of 2023, correct?

21       A.   Correct.

22       Q.   And we also came to the conclusion that

23   Jennifer liked Adams' post about morale in April of

24   2023, correct?

25       A.   Correct.

Page 168

1       Q.   Okay.  Which was a month after the

2  override, correct?

3       A.   Correct.  Because that was the only -- at

4  that time the only post we found that she liked.  It

5  wasn't -- I think in the meeting he didn't specify

6  exactly what post she liked.

7       Q.   And that was Jay Gramke that said that?

8       A.   Yes.

9       Q.   At any point during the meeting did

10  Sheriff McGuffey tell you that it was her decision

11  to override your appointment to RENU?

12       A.   No.

13       Q.   At any point during the meeting did Jay

14  Gramke tell you that it was Sheriff McGuffey's

15  decision to override your appointment to RENU?

16       A.   No.

17       Q.   At any point during the meeting did Jay

18  Gramke tell you that Sheriff McGuffey had anything

19  to do with his decision to override your appointment

20  to RENU?

21       A.   She's the overall one that makes the

22  decision.  She's the last and final say-so.

23       Q.   Did she sign off on it?

24       A.   Neither one of them signed off on it.

25       Q.   Did Jay Gramke tell you that she made the

 1   decision?

 2             MR. GOTTESMAN:  Objection.  Asked and

 3         answered.

 4      A.   I don't recall if she actually -- because

 5   she would have to okay it or override it if she

 6   wanted.

 7      Q.   How do you know that?

 8      A.   Because she's the sheriff.  She makes the

 9   final say-so.

10      Q.   In that specific process?

11      A.   In pretty much any process.  She's the

12   sheriff.

13      Q.   Does she have to approve every decision

14   that's made in the Sheriff's Department?

15             MR. GOTTESMAN:  Objection.

16      A.   When it comes to promotions and movement,

17   yes.

18      Q.   Okay.

19      A.   She signs off on every one of them.

20      Q.   Do you know whether or not it was brought

21   to her attention?

22             MR. GOTTESMAN:  Objection.  Calls for

23         speculation.

24      A.   That I do not know.

25      Q.   I mean, just because someone should do

1    something doesn't necessarily mean that they do,

2    correct?

3                     MR. GOTTESMAN:   Objection.   Vague.

4        A.    Well, that would be violating policy then.

5        Q.    Well, is there a policy that specifically

6    says that she's required to make that decision?

7        A.    No.   But she's required to sign it to make

8    that decision if that decision is made.

9        Q.    Okay.   Where does it say that?

10       A.    I don't have it in front of me.

11       Q.    I mean, where would I find it?

12       A.    I would say under the Sheriff's duties and

13   responsibilities of the department she would be the

14   final say-so on what goes on with that department.

15       Q.    Okay.   Is that in a statute somewhere?

16       A.    I'm sure it's in our policy -- or the

17   Sheriff's policy.

18       Q.    What the Sheriff's policy?

19       A.    One of the sheriff policies that she has.

20       Q.    So she writes policies that orders herself

21   to do certain things?

22       A.    To have a movement or transfer it has to

23   go through the chain of command, and the last person

24   to sign off on it to be approved -- either

25   disciplinary or movement, transfers, or

1  promotions -- is the Sheriff.  It's probably under

2  promotions in the policy and procedure.

3       Q.   Okay.  To approve of a promotion?

4       A.   Yes.

5       Q.   Is there anything that says that she has

6  to approve of a rejection?

7       A.   I don't know.

8       Q.   Okay.  You do agree those are two

9  different things, right?

10       A.   Correct.

11       Q.   Okay.  One is all of her -- I don't

12  know -- her subordinates through the chain have

13  approved of your promotion to a rank, right?

14       A.   Correct.

15       Q.   Okay.  That's one thing.  And then you're

16  saying she has to sign off before it's official,

17  correct?

18       A.   Correct.

19       Q.   What if you never even get to that point;

20  do you know whether or not a rejection or denial of

21  someone's application has to be approved by her?

22       A.   If the lower subordinates want me in that

23  position, I'm assuming so, yes.

24       Q.   Okay.  You're assuming so?

25       A.   Correct.

1     Q.   There's a difference between assuming

2  something and knowing something, correct?

3     A.   Correct.  And I told you I couldn't prove

4  that.  But if the Chief doesn't want me there, he

5  has to go -- he'll have to get approval from the

6  Sheriff.  Because what if the Sheriff wanted me in

7  that position?

8     Q.   But at the same point in time --

9     A.   Or we can speculate back and forth with

10 it.

11    Q.   Let me ask my question.

12    A.   I'm sorry.

13    Q.   What if at the same point in time he's not

14 required to do that; would you agree that that's

15 possible?

16    A.   Yes, it's possible.

17    Q.   Okay.  Because there are a lot of things

18 that happen in the Sheriff's Department that the

19 Sheriff doesn't necessarily approve of, correct?

20    A.   I guess, yes.

21    Q.   All right.  So every time someone orders a

22 pack of paper, they have to go to the Sheriff and

23 say we need you to approve ordering this pack of

24 paper?

25    A.   No.  I specified movement, discipline, or

1    promotions.

2         Q.   Okay.  So do you think that she reviews

3    every single person that ever gets rejected from an

4    application to a position?

5         A.   If they are being moved or promoted, yes.

6         Q.   Okay.  If they're being moved or promoted,

7    correct?

8         A.   Or disciplined, yes.

9         Q.   Okay.  Well, you would agree that when you

10   applied for RENU, you were not moved, correct?

11        A.   I was in the process of being moved.  I

12   was already assigned there per RENU.

13        Q.   Okay.  But RENU had to ask Jay Gramke,

14   correct?

15        A.   It had to go up to the Sheriff for the

16   approval.

17        Q.   Okay.  Where do you know that it has to go

18   up to the Sheriff?  That's what I'm trying to get

19   to.

20        A.   Because she's in charge.  She has to sign

21   off on the transfer.

22        Q.   Okay.  But no transfer had been

23   recommended at that point beyond Jay Gramke,

24   correct?

25        A.   It stopped -- my name went up the chain of

1    command to be moved to RENU.  It stopped at Gramke.

2        Q.    Okay.  Well, how do you know that Gramke

3    ever informed Sheriff McGuffey that he overrode your

4    placement on RENU?

5        A.    Because he said it in the meeting.

6        Q.    Okay.  He said it in the meeting?

7        A.    Yes.

8        Q.    Did he talk to Sheriff McGuffey about it

9    before he overrode it?

10       A.    I have no idea.

11       Q.    Or after he overrode it?

12       A.    I have no idea when it was discussed.

13       Q.    Okay.  Do you know whether or not it was

14   discussed right before the meeting?

15       A.    Like I said, I have no idea when it was

16   discussed.

17       Q.    Okay.  I think yesterday her testimony was

18   that she just found out about it the day of the

19   meeting.  Do you have any evidence that that's not

20   true?

21       A.    No.

22       Q.    Okay.  So for all you know when she said I

23   had no idea that he applied for the RENU position as

24   of October 10, 2023 -- do you have any evidence that

25   what she said is not true?

1      A.   That she didn't know I applied for RENU?

2      Q.   Yes.

3      A.   Yes.  When she attended briefing back in

4  the spring, when she interviewed -- or asked each

5  and every one of us in briefing where you work and

6  what your goals are, and I have specifically told

7  her I'm still trying to get RENU.

8              MR. GOTTESMAN:  Before you ask

9              another question, I need to speak to him

10             for a second.

11             Go ahead, Counselor.  I'm sorry.

12     Q.   So during the briefing did you say that I

13 currently have filed an application for RENU?

14     A.   No.  I believe I said I was currently --

15 I'm currently still trying to get to RENU, I believe

16 is what was said.

17     Q.   Okay.  You said it was a goal of yours,

18 correct?

19     A.   Correct.

20     Q.   You didn't tell her you had a pending

21 application, though, did you?

22     A.   It wasn't pending.  It was already denied.

23     Q.   Okay.  So in other words, you didn't tell

24 her that you had -- even if you consider that to be

25 informing her you had filed it, the decision

1    overriding it already had been made, correct?

2         A.   Correct.

3         Q.   Okay.  So that's not any knowledge that

4    she had before Jay Gramke denied or overrode your

5    application to RENU, correct?

6         A.   She stated -- so it was brought up then.

7    And she stated in my sit-down meeting that she knows

8    everything that's going on in this department and

9    what everybody is doing.  And she clearly stated

10   that.  So she knew that it was denied.

11        Q.   Okay.  So she made a general statement

12   that she knows everything going on in the

13   department?

14              MR. GOTTESMAN:  Objection to

15              characterization.

16        A.   She stated she knows everything that's

17   going on.

18        Q.   Okay.  All right.  Do you agree that

19   that's an overgeneralized statement?

20              MR. GOTTESMAN:  Objection.

21        A.   I'm just quoting what she said.

22        Q.   Okay.  Well, earlier you told me a story

23   about deputies showing each other memes from

24   Caroline Adams, correct?

25        A.   Correct.

1        Q.    And laughing about it, correct?

2        A.    Correct.

3        Q.    Okay.  Do you think she knows exactly when

4   that happens?

5        A.    When what happens?

6        Q.    When that happens, when people are sharing

7   memes; do you know who is sharing memes -- do you

8   think she knows exactly who is sharing memes when

9   that's occurring?

10       A.    The Sheriff?

11       Q.    Yes.

12       A.    I'm sure she has a clue.

13       Q.    Okay.  When you recorded that meeting, do

14  you have any knowledge that she knew that you were

15  recording that meeting with your pen?

16       A.    Do I have any knowledge?

17       Q.    Yes.

18       A.    No.

19       Q.    Okay.

20       A.    But do I think she knew?  Yes.

21       Q.    Okay.  You believe she knew that you were

22  recording her?

23       A.    I believe so.

24       Q.    Okay.  And what do you base that knowledge

25  upon?

1    A.   Because of my past history with her with

2  recording our meetings and I thought she would know.

3  I mean, she's asked for a recording from me before

4  from a meeting.

5    Q.   When you were a union president, correct?

6    A.   Yes.

7    Q.   When you were a union president, were you

8  using a pen to record those conversations?

9    A.   Originally it was a -- it was a

10 tape-recorder.  That wasn't -- I didn't know how to

11 transfer that to a digital, because it didn't have a

12 cord.  So then I went to a little digital recording.

13   Q.   Okay.  But it wasn't a pen, correct?

14   A.   Was that last one a pen?  No.

15   Q.   Okay.  All right.  Let's continue to

16 paragraph 33 -- oh, we were on that one.  I meant

17 34.  During that meeting -- and, again, referencing

18 the RENU position and promotion to corporal, Gramke

19 made the statement that Jason's wife made a comment

20 on social media two years ago, and that there had to

21 be consequences for her post; do you see that?

22   A.   Yes.

23   Q.   Do you agree with that statement?

24   A.   Yes.

25   Q.   35, During that meeting, and again,

1    referencing the RENU position and promotion to

2    corporal, Gramke and McGuffey acknowledged that they

3    knew Jennifer had the right to say what she wanted

4    and associate with who she wanted on social media.

5    Do you agree that they said that?

6         A.   Yes.

7         Q.   At any time did they tell you that

8    Jennifer did not have a right to say what she

9    wanted?

10        A.   Just that there would be consequences.

11        Q.   Okay.  They said that there would be

12   consequences.  I understand that.  But my question

13   was, at any point in time did they ever make the

14   statement that Jennifer has no right to say what she

15   wants on Facebook?

16        A.   Unless -- you'll be held the consequences

17   for it.

18        Q.   Okay.  You're answering a question I

19   didn't ask.  The question I asked was, did they tell

20   you that she did not have the right to make the

21   statement she wants to make on Facebook?

22        A.    Not the right, but there will be

23   consequences if she continues to make statements on

24   social media.

25        Q.   Okay.  But she can make those statements,

1  correct?

2      A.   Unless -- right.  Unless I don't want to

3  get promoted.

4      Q.   Okay.  Did they say unless you don't want

5  to get promoted or just say consequences?

6      A.   There will be held consequences and I will

7  not be promoted.  Yes, Gramke said that.

8      Q.   Okay.  So at some point you're saying that

9  Gramke said you would not be promoted if she --

10     A.   We can't -- I'm sorry.

11     Q.   -- if she continued to make statements?

12     A.   We cannot promote you.

13     Q.   Did Sheriff McGuffey say that?

14     A.   I don't recall.

15     Q.   At any point did they tell you that your

16  wife is not permitted to associate with who she

17  wants to on social media?

18     A.   No.

19     Q.   Paragraph 26 --

20     A.   26 or 36?

21     Q.   36.

22     A.   Okay.

23     Q.   Thank you, sir.  McGuffey, and again,

24  referencing the RENU position and promotion to

25  corporal, then stated she wanted Jason to be

Page 181

1    successful, but to do so, he needed to cut loose the

2    people holding him back -- said another way, that he

3    needed to divorce his wife and end his 20-plus year

4    relationship with her -- if he was ever to be

5    promoted or receive any preferential assignment at

6    the Hamilton County Sheriff's Office; do you see

7    that?

8         A.   Yes.

9         Q.   Okay.  You would agree that that is a

10   paraphrase, correct?

11        A.   Yes.

12        Q.   She did not exactly ever tell you that you

13   needed to divorce your wife, did she?

14        A.   She absolutely meant that 100 percent.

15        Q.   Okay.  You're saying she meant that?

16        A.   Yes.

17        Q.   I didn't ask what you think she meant.

18   I'm asking you what words came out of her mouth

19   right now.

20        A.   I don't have that exactly in front of me.

21   But that's what she implied.

22        Q.   Okay.  And imply is not a statement; would

23   you agree with that?

24        A.   Right.

25        Q.   Okay.  At any point in time did she make

1   the expressed statement with words that you need to

2   divorce your wife?

3        A.   No.  Just implied.

4        Q.   Okay.  At any point in time did Jay Gramke

5   ever tell you that you needed to divorce your wife?

6        A.   No.  He agreed with what the Sheriff said.

7        Q.   Okay.  So right here it says that the

8   statement she made was you needed to cut loose the

9   people holding you back.

10       A.   Correct.

11       Q.   Okay.  Is that the statement you believe

12  means that you needed to divorce your wife?

13       A.   The way it was paraphrased, yes, it was.

14  After her story of her kicking out the person of her

15  house and then referring to this, yes, absolutely.

16       Q.   Was the person of her house her wife?

17       A.   It was somebody that lived with her.

18       Q.   Okay.  I didn't ask if it was somebody

19  that lived with her.

20       A.   I don't know if they were married or not.

21       Q.   Okay.  So if I were to tell you that was

22  not her wife, would you have any reason to disagree

23  with that?

24       A.   No.

25       Q.   Okay.  This says you need to cut loose the

Page 183

1    people that are holding you back.  Do you agree that

2    people is a word that is plural?

3        A.   Correct.

4        Q.   So it's not person, correct?

5        A.   Correct.

6        Q.   So when the word people is said, it could

7    refer to multiple people, correct?

8        A.   Correct.

9        Q.   So it could mean a group of people,

10   couldn't it?

11       A.   Yes.

12       Q.   Okay.  Did you ever ask her who else she

13   might have meant?

14       A.   No.  At that time -- it's amazing how much

15   runs through your head in a matter of seconds.  But

16   at that time I knew what she meant and what she was

17   referring to, that I was -- it took everything in me

18   not to walk out of that office at that time.

19       Q.   At any point did you ask her to confirm

20   whether or not she meant -- she wanted you to

21   divorce your wife?

22       A.   No.  Because I completely understood what

23   she meant by that phrase.

24       Q.   Okay.  You completely understood?

25       A.   Yes.  100 percent.

1      Q.   But she never made a statement saying you

2   must divorce your wife?

3      A.   She did not say wife.

4      Q.   Okay.

5      A.   But that was implied.

6      Q.   Okay.  Is it possible that she meant

7   something else?

8               MR. GOTTESMAN:  Objection.

9      A.   Absolutely not.

10              MR. GOTTESMAN:  Calls for

11              speculation.

12     A.   Absolutely not.  Not --

13              MR. MILLER-NOVAK:  His testimony is

14              speculation, but continue.

15     A.   Not the way it was being used.

16              MR. GOTTESMAN:  I mean, we have a

17              transcript.  We know what was said.

18     Q.   So when you believe something is implied,

19   don't you believe that you're speculating what

20   someone meant?

21     A.   I know exactly what she meant.

22     Q.   Okay.  Based on what?

23     A.   The way it was -- the way she used it in

24   that meeting.

25     Q.   Okay.  And you never asked for any

1    clarification?

2         A.    I did not need clarification.

3         Q.    Okay.  So when she says the phrase the

4    people holding you back, it could only possibly just

5    mean Jennifer Davis in your mind?

6         A.    The way the conversation was going, yes,

7    100 percent.

8         Q.    Okay.  Did they ever talk about people at

9    Anderson at that point during the conversation?

10        A.    Yes.

11        Q.    Okay.  There was a lot of conversation

12   about other deputies at Anderson and these beard

13   policies, correct?

14        A.    I don't recall if that was before or after

15   that comment.

16        Q.    Well, what if it was before; then couldn't

17   the people be referring to the deputies at Anderson

18   Township?

19        A.    But what if it was after, then it would be

20   my wife.

21        Q.    What if it was before?

22        A.    And what if it was after?

23        Q.    Well, I'm asking you.

24        A.    I told you I don't recall when it was.

25        Q.    Okay.  So it could have been before?

1    A.   Or it could have been after.

2    Q.   Okay.  What if it was before, isn't it

3  possible that the phrase "the people" is referring

4  to these folks in Anderson Township?

5    A.   Not the way it was used and the way she

6  described it to me when I was sitting there, no.

7    Q.   Okay.  Did you feel like this conversation

8  was scripted when it was happening?

9    A.   Scripted?

10    Q.   Yes.

11    A.   Like. . .

12    Q.   Was she reading --

13    A.   Like it was all prepped -- no.

14    Q.   Yeah.  It wasn't prepped, correct?

15    A.   Correct.

16    Q.   So this was an impromptu conversation,

17  correct?

18    A.   Correct.

19    Q.   She didn't have a teleprompter, correct?

20    A.   Correct.

21    Q.   She wasn't reading from a drafted

22  statement, correct?

23    A.   Correct.

24    Q.   Did you see any notecards in her hands?

25    A.   No.

1      Q.   Okay.  At that point in time had she also

2  discussed Caroline Adams?

3      A.   Yes.

4      Q.   Okay.  I think she was called a troll,

5  correct?

6      A.   Correct.

7      Q.   Well, couldn't "the people" also include

8  Caroline Adams?

9      A.   If I had contact with Caroline Adams, but

10  I didn't.  No.  So, again, she was referring to my

11  wife.

12      Q.   Okay.  So you're this sure that she was

13  referring to your wife?

14      A.   Absolutely.  Like I said, it took

15  everything in me not to walk out of that meeting at

16  that point.  I had a kid going to college.  We don't

17  have insurance.  Otherwise, I would have walked out.

18      Q.   Well, what does your kid and insurance

19  have anything to do with whether or not you asked

20  her if she's referring to your wife?

21      A.   I didn't have to ask her, because I knew

22  what she was referring to.

23      Q.   Okay.  Well, why didn't you just walk out?

24      A.   I just told you that.  I have a kid going

25  to college and I need the insurance.  My wife does

1    not work.

2         Q.   Well, what does that have to do with

3    whether or not you walked out?

4         A.   Because then I would face disciplinary.

5         Q.   What would be the disciplinary?

6         A.   I have no idea.

7         Q.   Okay.  Would you be terminated if you

8    walked out?

9         A.   You would have to ask the Sheriff.  I

10   mean, it might have been nothing.  But I was

11   literally about to walk out and end the meeting.

12        Q.   Okay.  I mean, there's -- we talked

13   earlier in the collective bargaining agreement

14   there's a disciplinary process, correct?

15        A.   Correct.

16        Q.   Okay.  And you'd be able to challenge your

17   termination if they tried to terminate you for

18   walking out, correct?

19        A.   Correct.  But you'll -- I'm sorry.

20        Q.   That's fine.  There's also a grievance

21   procedure, correct?

22        A.   Correct.  But that's not how they operate.

23   So if -- can we do a hypothetical?  If, say, you get

24   a five-day suspension, you get the five days.  Then

25   you have to fight that in arbitration.  And then

1   your hearing.  And then Columbus.  You've already

2   served the five days.  So depending on what the

3   discipline would have been, I just did not want to

4   go through that process.

5          Q.   At any point in this conversation, did

6   they ever threaten to fire you?

7          A.   No.

8          Q.   Did you think they were going to fire you?

9          A.   No.  I just thought they weren't going to

10  promote me.

11         Q.   Okay.  So your belief is that -- I mean,

12  kind of reading your complaint, I guess we can go

13  through it paragraph by paragraph, but my

14  understanding is that your allegation is that unless

15  you divorced your wife, they would never let you

16  advance?

17         A.   That was portrayed to me in that office.

18         Q.   Did you think they were going to fire you

19  if you stayed married?

20         A.   No.

21         Q.   Okay.  You just think that if you stayed

22  married, you wouldn't get any more favorable

23  positions?

24         A.   I would not be able to advance in the

25  Sheriff's Department.

1       Q.   Do you think that they were going to

2  demote you if you stayed married?

3       A.   There was no demotion at that point.

4       Q.   Well, I mean do you think that that was

5  going to happen in the future?

6       A.   No.  Because I wouldn't be able to get

7  promoted to be demoted.

8       Q.   I understand what you're saying.

9       A.   Okay.

10       Q.   Okay.

11       A.   There's no way for me to go down.

12            MR. GOTTESMAN:  You could go back to

13            corrections.

14            THE WITNESS:  No.  I was already gone

15            too long.

16            MR. GOTTESMAN:  Oh.

17            MR. MILLER-NOVAK:  Just to make sure

18            that that question is on the record since

19            you answered it.  I think I was probably

20            going to ask the same question.

21       Q.   So you're saying you wouldn't be able to

22  go back to corrections because you've been gone too

23  long, correct?

24       A.   Yes.

25            MR. GOTTESMAN:  Asked and answered.

1      Q.   So in other words, there's really no

2  possibility for you to be demoted, correct?

3      A.   Correct.

4      Q.   Okay.  And you don't think that you're

5  going to be fired because you're married?

6      A.   No.

7      Q.   All right.  And you don't think that

8  you're going to be disciplined because you're

9  married, correct?

10     A.   I was being disciplined.  I was being

11 denied promotions, which is a form of disciplinary,

12 so. . .

13     Q.   Okay.

14     A.   And Gramke said that there was

15 consequences and these were the consequences for my

16 wife's post.

17     Q.   Okay.  So when we have -- at least you

18 don't know that you ever were denied a promotion to

19 corporal; when you say you were denied something,

20 we're referring to the RENU?

21     A.   That's still corporal's pay and everything

22 else, yes.

23     Q.   Right.  You were denied an advancement

24 in -- to RENU you believe because of your wife's

25 statements?

1      A.   That's what Gramke told me, yes.

2      Q.   Yeah.  And then if your wife continued to

3   make statements, that you wouldn't get any more

4   advancement is your allegation?

5      A.   That's not an allegation.  Gramke states

6   it in there.

7      Q.   Okay.  So what if your wife never made --

8   what if you stayed married and your wife never made

9   any posts again or any critical statement, do you

10  believe that even then you would never get an

11  advancement?

12              MR. GOTTESMAN:  Objection.  Calls for

13          speculation.

14     A.   With that administration, with those two,

15  no.  No.

16     Q.   Okay.  So your belief is that with this

17  administration that you would never advance again,

18  period, so long as you were married to Jennifer

19  Davis?

20     A.   Absolutely.

21     Q.   Okay.  And you believe that if you

22  divorced her, then you would get advancement, I

23  guess would be the reverse of that, correct?

24     A.   Again, that would be speculation.  I don't

25  know.

1     Q.   All right.  Well, they never told you

2   expressly that you had to divorce her in order to

3   get a promotion, correct?

4     A.   No.  They just insinuated it, that you

5   need to separate yourself from her.

6     Q.   Okay.  They insinuated it or implied it?

7     A.   Implied it.

8     Q.   Okay.  I just want to make sure.  So your

9   testimony today is you believe that if you were to

10  walk in next week saying I filed for divorce, that

11  you would be allowed to advance?

12    A.   Honestly?

13    Q.   Yes.

14    A.   Yes.

15    Q.   Okay.  But no one expressly stated that?

16           MR. GOTTESMAN:  Asked and answered.

17           MR. MILLER-NOVAK:  I asked about the

18           divorce.

19    Q.   No one expressly stated that if you get

20  divorced, we're going to reward you?

21    A.   The comment that was made from the Sheriff

22  about separating myself indicated then you would be

23  promoted.

24    Q.   Okay.  It never occurred to you that maybe

25  Gramke's suggestion was that your wife needs to stop

1    being critical on Facebook?

2        A.    What's the question?

3        Q.    I mean, isn't it -- and it never occurred

4    to you that maybe the implication was you didn't

5    need to get divorced, maybe the implication was

6    possibly that your wife just needed to stop being

7    critical on Facebook?

8        A.    Wouldn't it have been just a lot easier to

9    say that in the meeting?  But it wasn't.

10       Q.    Well, wouldn't you agree that if they

11   wanted you to get divorced, it would be just as easy

12   to say that as it would to tell your wife to be

13   quiet, correct?

14       A.    You would think.

15       Q.    All right.  Because we are dealing with

16   what are your beliefs about implications, correct?

17       A.    Correct.

18       Q.    So when we believe about implications,

19   then sometimes we're wrong, correct?

20       A.    Correct.

21       Q.    You would agree that sometimes you believe

22   someone meant something when they said something and

23   you weren't correct in your belief, correct?

24       A.    Correct.

25       Q.    That does happen.  So isn't it possible

Page 195

1    that maybe you interpreted their implication

2    incorrectly?

3         A.   You're gathering all their -- all their

4    sayings, what was said in that precise moment

5    leading up to her saying separating myself from the

6    people that was holding me back was implied to my

7    wife 100 percent.

8         Q.   Okay.  But they also did talk about

9    Anderson people in that conversation at some point

10   in time, correct?

11        A.   Again, before or after, I don't recall.

12        Q.   You don't recall, but they did.  And they

13   also talked about Caroline Adams, correct?

14        A.   Again, I had no contact with Caroline

15   Adams.

16        Q.   Okay.  But they didn't know that, did

17   they?

18        A.   I don't know what they know.

19        Q.   Okay.  You don't know what they know,

20   right?

21        A.   Correct.

22        Q.   You would agree that you don't read minds,

23   correct?

24        A.   Correct.

25        Q.   Okay.  So when someone doesn't tell you

Page 196

1    what they know, then you don't necessarily know what

2    they know, correct?

3         A.   Okay.

4         Q.   Isn't that what speculation is?

5         A.   Correct.

6         Q.   Okay.  So 37.  Gramke then added that he

7    heard nothing but good things about Jason's

8    performance from his supervision, demonstrating that

9    the only reason for the RENU assignment denial and

10   failure to award him the promotion was the social

11   media activity, and specifically the social media

12   activity of Jennifer; do you see that?

13        A.   Yes.

14        Q.   Okay.  38.  In short, McGuffey and Gramke

15   admitted during the October 10, 2023, meeting that

16   the RENU reassignment and promotion to corporal were

17   only being denied to him solely because of his and,

18   more significantly, his wife's social media posts;

19   do you see that?

20        A.   Yes.

21        Q.   Okay.  Do you agree with that statement?

22        A.   Yes.

23        Q.   39, Jason was devastated when he left the

24   October 10, 2023, meeting; do you see that?

25        A.   Yes.

1          Q.    40, when he went home and he reported to

2     Jennifer what Defendants had just told him, and she

3     broke down in tears; do you see that?

4          A.    Yes.

5          Q.    So you went home and you reported what

6     happened to Jennifer, correct?

7          A.    Correct.

8          Q.    And did she immediately start to cry?

9          A.    Yes.

10         Q.    Okay.  Did you play the recording for her

11    at that point in time?

12         A.    No.

13         Q.    Okay.  So you just described what you

14    heard, correct?

15         A.    Correct.

16         Q.    And you told her that you believed the

17    implication was that they wanted you to divorce her,

18    or did you tell her that the implication was is you

19    were denied the appointment because of her speech?

20         A.    The speech -- the social media posts.

21         Q.    Okay.  So at that point in time you never

22    told her, hey, I was in this meeting and they just

23    told me I had to divorce you?

24         A.    Yes, I told her that.

25         Q.    When?

1      A.   I actually think it was before I told her

2   about the social media posts -- actually, yeah, it

3   was.  It was before I told her the social media

4   posts.

5      Q.   Okay.  So Jennifer told him that while she

6   had always supported his law enforcement career, she

7   can no longer support him if he stayed at the

8   Sheriff's Office; did she say that?

9      A.   Yes.

10      Q.   So she expressly told you she can no

11   longer support you if you stayed there?

12      A.   Correct.

13      Q.   Okay.  What did she tell you to do?

14      A.   She didn't tell me to do anything.  She

15   just said I can no longer support your career at

16   that department if they're telling me -- or telling

17   me I can't get promoted because I'm still married to

18   her and because of what she posted on social media.

19      Q.   So she told you to quit?

20      A.   No.  She didn't tell me to quit.  She just

21   said she won't support me working there.  She

22   supported me my entire career in everything I did.

23      Q.   And what did you tell her after that?

24      A.   I did not know what I was going to do at

25   that moment.

1     Q.   At any point during the meeting did Jay

2  Gramke tell you that he wanted you to quit?

3     A.   To quit, no.

4     Q.   At any point during the meeting did

5  Sheriff McGuffey tell you she wanted you to quit?

6     A.   No.  They both said great things about my

7  work performance and how well and how good of an

8  officer I am in my reviews and that they wanted me

9  to stay.  It's just that they could not promote me

10 due to my wife's social media posts.

11    Q.   Okay.  So you said -- in that statement

12 you said that your impression was they wanted you to

13 stay?

14    A.   They said that in the meeting.

15    Q.   Okay.  Did you have any reason to believe

16 otherwise?

17    A.   That they wanted me to stay or leave?

18    Q.   That they wanted you to stay.

19    A.   Well, they said it.

20    Q.   They invited you at the end of the

21 conversation to kind of like meet again, didn't

22 they?

23    A.   In a few months.

24    Q.   Okay.  And to see where you were,

25 correct -- kind of like where your performance was

Page 200

1    at that point in time?

2         A.   I took that as to see if my wife still

3    posted on social media.

4         Q.   Did you take it as to see whether or not

5    they wanted to check in in three months to see if

6    you got a divorce?

7         A.   I took it that way as well.

8         Q.   Okay.

9         A.   If my evals and everything in my

10   performance were fine, then why would you have to

11   check on my performance in three months?  It was

12   more to see if my wife continued to post on Facebook

13   or if we actually were separated.

14        Q.   When did you decide that you wanted to

15   leave the department?

16        A.   I -- honestly I can't recall.

17        Q.   Was it when Jennifer told you that she

18   couldn't support you any longer?

19        A.   That started the process.

20        Q.   So when she said that, you decided I

21   wanted to start looking for another position?

22        A.   I didn't know what I was going to do if my

23   wife didn't support my decisions and a career.  So I

24   really did not know what I was going to do.

25        Q.   41, Jason knew that his career in law

1    enforcement at the Sheriff's Office was over as a

2    consequence of that meeting and the outrageous and

3    intolerable statements that were made to him

4    regarding the need to divorce his wife and end their

5    20-year marriage if he wanted any sort of

6    preferential assignment or a promotion within the

7    Sheriff's Office; do you agree with that statement?

8         A.    Yes.

9         Q.    42, Jason loves Jennifer and was not

10   willing to divorce her just to further advance in

11   his employment with the Sheriff's Office; do you

12   agree with that statements?

13        A.    Agree.

14        Q.    So you didn't think you needed to divorce

15   her to continue to function as a patrol officer,

16   correct?

17        A.    Correct.

18        Q.    You just believed that you needed to

19   divorce her in order to advance in the department?

20        A.    Correct.  Well, yes and no.  I really did

21   not know how I was going to continue to work there

22   if my wife did not support me to work there.

23        Q.    Okay.  So it wasn't that you believed that

24   McGuffey or Gramke would fire you, you believed that

25   you couldn't continue to be a patrol officer because

1  you don't know how you could do that if your wife

2  wouldn't support you as a husband continuing to work

3  as a patrol officer, correct?

4      A.   Correct.  Because I did not want to stay

5  as a patrol officer my entire career.

6      Q.   Okay.  And you also wanted your wife's

7  support, correct?

8      A.   Absolutely.

9      Q.   Okay.  And she had told you she would not

10  support you any longer if you stayed there, correct?

11      A.   Correct.  Because they wanted us to

12  separate.

13      Q.   And at some point in time you said that

14  that started the process of you looking for other

15  employment, correct?

16      A.   No.  I was -- it started the process of

17  what I was going to do with my career.

18      Q.   Right.  But when you started looking -- I

19  mean, you have to -- I might be jumping a hair into

20  the future here, but when you start applying to

21  jobs, you kind of search for positions that are

22  available, correct?

23      A.   Correct.

24      Q.   And then you eventually have to fill out

25  an application, especially for police officers, you

1    guys have way more than the average bear to kind of

2    endure when you apply for a position, correct?

3         A.   Correct.

4         Q.   Okay.  So when you were hunting for a job,

5    was Jennifer aware that you were hunting for a job?

6         A.   Again, I wasn't hunting for a job.  I did

7    not know what I was going to do with my career at

8    that time.  I was recruited.

9         Q.   Oh, you were recruited by -- is it Butler?

10        A.   Yes.

11        Q.   Okay.  So you ended up working for -- and

12   how did he recruit you?

13        A.   By giving me a phone call because he heard

14   how my meeting went.

15        Q.   Okay.  So he called you and he offered you

16   a job?

17        A.   Correct.

18        Q.   Okay.  Did you accept it on the phone, or

19   did you talk to Jennifer first?

20        A.   I talked to Jennifer.  And I waited a

21   little while.

22        Q.   Okay.  That's smart.  You should never

23   accept a job without talking to your wife first,

24   correct?

25        A.   Absolutely.

Page 204

1        Q.    It's a big decision, right?

2        A.    Yes.

3        Q.    And did she encourage you to take that

4   position?

5        A.    Because of Butler, yes.

6        Q.    Okay.  So you talked to her about it and

7   she weighed her opinion in and her opinion was take

8   the Springdale position?

9        A.    Or continue to be miserable at the

10  Sheriff's Department and not get promoted, yes.

11       Q.    Okay.  And she said that she would support

12  you if you went to Springdale, correct?

13       A.    Correct.

14       Q.    And the previous statement was she would

15  not support you if you stayed with Hamilton County,

16  correct?

17       A.    Not at a place that would treat me like

18  that, correct.

19       Q.    Okay.  So at no point in your employment

20  then -- well, I think we discussed earlier there was

21  no possible demotion for you in October of 2023 from

22  patrol, correct?

23       A.    Correct.

24       Q.    Right.  So you were never demoted while

25  you were at -- you were never like demoted at the

1    Sheriff's Department your entire career there,

2    correct?

3         A.   Correct.

4         Q.   Right.

5         A.   When you talk about demotions, my

6    understanding was I was assigned to RENU.

7    Lieutenant Guy already said I was assigned to cases.

8    It was supposed to be me and Deputy Enderle doing

9    hotels.  So by being removed and placed back on the

10   regular patrol, that would be a demotion.

11        Q.   But Guy is not the sheriff, correct?

12        A.   No.

13        Q.   Okay.  And he's not the chief, correct?

14        A.   Correct.

15        Q.   Okay.  So earlier you said the process

16   actually requires for Jay Gramke to sign off on your

17   employment to RENU, correct?

18        A.   Correct.

19        Q.   So you would agree until he signs off on

20   it, you're actually not part of RENU, correct?

21        A.   They need -- correct.  They need the

22   approval.

23        Q.   Because earlier you assumed that Sheriff

24   McGuffey has to sign off on your appointment to RENU

25   before it's official, correct?

Page 206

1        A.    She's the last one.

2        Q.    Okay.  So how could you possibly according

3    to your own testimony have been part of RENU if

4    Gramke never signed off on your appointment to RENU?

5        A.    Because in practices in past, when they

6    submit the name through the chain of command, it's

7    signed off on because they go by what RENU wants and

8    who RENU requested.

9        Q.    Do you have any idea whether or not any

10   human being was ever rejected after RENU made a

11   recommendation?

12       A.    Not of one.

13       Q.    So you don't have any personal knowledge

14   whether or not this is the first time that's

15   happened or if it's happened another time in the

16   past?

17       A.    My understanding it's not happened before.

18       Q.    Okay.  You're basing that on an assumption

19   it's not happened before?

20       A.    I'm basing it off what Matt Guy told me

21   when he said this has not happened before.

22       Q.    Okay.  How long has Matt Guy been there?

23       A.    He's about to retire, I believe.

24       Q.    How long was he in that position?

25       A.    He was in RENU.  Then he came out for a

1   little bit.  And then he went back to RENU, so I --

2   I don't know the dates.  I'm sorry.

3          Q.    Okay.

4          A.    But he originally was down there for quite

5   a while.

6          Q.    Did you receive any discipline at any

7   point in time after your meeting with the Sheriff

8   and Jay Gramke?

9          A.    No.

10         Q.    Did they even talk to you after that

11  meeting?

12         A.    No.

13         Q.    Did they badger you in any way after that

14  meeting?

15         A.    No.

16         Q.    Were you demoted after that meeting?

17         A.    No.

18         Q.    Was your salary ever reduced after that

19  meeting?

20         A.    No.

21         Q.    At any time after that meeting before you

22  left the department did you apply for any other

23  positions?

24         A.    What was the question?  I just want to

25  make sure I get it right.

Page 208

1      Q.   Well, there's other special assignments
2   besides RENU, correct?
3      A.   Within the department?
4      Q.   Yes.
5      A.   No.
6      Q.   Okay.
7      A.   Okay.  Sorry.
8      Q.   I understand that you have an eligibility
9   list that was kind of still present or active,
10  correct -- so theoretically speaking, if a corporal
11  position came open, you would be --
12     A.   Correct.
13     Q.   -- in line for it, correct?
14     A.   Correct.
15     Q.   You don't know whether or not that
16  happened, correct?
17     A.   I have no idea if there was an opening or
18  not.
19     Q.   Okay.  After October 10, 2023, that
20  meeting, did you ever actively seek some kind of
21  appointment to any kind of special unit after that?
22     A.   No.
23     Q.   So you would agree that you weren't denied
24  any kind of appointment to any kind of special unit
25  after that meeting?

Page 209

 1      A.   Correct.

 2      Q.   Were you reassigned to work under a

 3   younger supervisor after that meeting?

 4      A.   I don't -- are you -- as in timing within

 5   the department?

 6      Q.   No.  I mean, I know that people might --

 7   there might be younger corporals.  I'm saying after

 8   you walked out on the meeting on October 10th of

 9   2023 were you assigned to a different supervisor at

10   all?

11      A.   I had the same sergeant.  I don't recall

12   when the younger corporal came over to our squad,

13   though.

14      Q.   Okay.  You weren't reassigned anywhere --

15      A.   I wasn't.

16      Q.   -- a younger corporal was reassigned?

17      A.   To our squad.

18      Q.   Okay.  But you were in the same squad

19   after that meeting?

20      A.   Yes.

21      Q.   Okay.  Until you resigned, correct?

22      A.   Yes.

23      Q.   So you were not reassigned at all,

24   correct?

25      A.   No.

Page 210

1      Q.   Were you in any way reassigned to
2   different job duties after that meeting?
3      A.   No.
4      Q.   Were you assigned to more menial tasks
5   after that meeting?
6      A.   No.
7      Q.   Did anybody threaten you in any way after
8   that meeting?
9      A.   No.
10      Q.   Did anybody in that meeting suggest that
11   you do quit?
12      A.   No.
13      Q.   Did either Sheriff McGuffey or Jay Gramke
14   at any time suggest to you to quit or retire early?
15      A.   No.
16      Q.   In your mind did you suffer any adverse
17   decision or action at all after you left the meeting
18   on October 10, 2023, until you resigned?
19      A.   Any what?
20      Q.   Adverse decisions.
21      A.   What do you mean by adverse?
22      Q.   Bad.  You think they stink.  Something
23   that you think bothered you or something harmful to
24   your career after October 9 -- or 10, 2023, until
25   you resigned.

Page 211

1      A.   Do I think they did anything?

2      Q.   Yes.

3      A.   No.  I don't think they did anything at

4  that point.

5      Q.   So no further action was taken that you

6  would consider to be adverse after the meeting on

7  October 10, 2023?

8      A.   Unless there was a corporal position that

9  they held out on, which I did not know.

10     Q.   Okay.  So you're not aware of them taking

11  any steps or having any intent to fire you before

12  you left?

13     A.   No.

14     Q.   Okay.  So a little bit about the

15  collective bargaining agreement.  You would agree

16  that if Sheriff McGuffey or Jay Gramke had any

17  intent to terminate you, they would have had to take

18  some active step, correct?

19     A.   Correct.

20     Q.   And if they took no step after this

21  October 2023 meeting to terminate you, you would

22  also agree that they didn't retaliate against you

23  for your comments during that meeting before you

24  resigned, correct?

25     A.   Correct.

1     Q.   Okay.  Because your belief it was their

2  intent to basically get you in some way to silence

3  your wife, correct?

4     A.   Yes.  The damage was already done at that

5  point.

6     Q.   Okay.  But essentially they had punished

7  you, is your allegation, because your wife made

8  comments on Facebook, correct?

9     A.   Gramke stated that, yes.

10     Q.   Okay.  You said that he said something

11  about consequences?

12     A.   Numerous times.

13     Q.   Okay.  At any time did you interpret that

14  consequence to be your termination as opposed to

15  just your inability to advance?

16     A.   Just my ability to advance to RENU or

17  corporal.

18     Q.   Okay.  And you believe that that's what

19  his intent was?

20     A.   He said that was the intent.

21     Q.   Okay.  At any time did you contact a union

22  rep about filing a grievance?

23     A.   I contacted Steve Lazarus.

24     Q.   Why did you not file a grievance?

25          MR. GOTTESMAN:  I'm going to instruct

1          you do not disclose the nature of the

2          attorney-client conversations you had in

3          that regard, okay?  That's privileged.

4     Q.   All right.  But you know that there is a

5    grievance procedure, correct?

6     A.   Yes.

7     Q.   And you did not file a grievance?

8     A.   Correct.

9     Q.   Okay.  Why not?

10              MR. GOTTESMAN:  Is it based on

11          conversations you had with Mr. Lazarus?

12              THE WITNESS:  Yes, we talked --

13              MR. GOTTESMAN:  Don't say it here.

14          But if you want to step out and tell me

15          and Chris about it and we can try and

16          decipher this for you how to answer these

17          questions.

18              MR. WIEST:  In a way that doesn't

19          waive the privilege.

20              THE WITNESS:  Okay.

21              MR. MILLER-NOVAK:  Well, before we do

22          that -- let's not bother with it right now

23          because -- let me ask a handful of other

24          questions first.  Because I'm assuming

25          that's the union attorney?

```
 1                    MR. GOTTESMAN:  He is.

 2                    MR. MILLER-NOVAK:  Okay.

 3                    MR. GOTTESMAN:  For the moment.

 4                    MR. MILLER-NOVAK:  Off the record.

 5                    (Off-the-record conversation.)

 6   BY MR. MILLER-NOVAK:

 7        Q.   Did you talk to anybody else in the union

 8   about filing a grievance?

 9        A.   No.  I called him directly.

10        Q.   Did you talk to anybody else about

11   potentially filing a grievance?

12        A.   No.

13        Q.   Did you talk to Jennifer about filing a

14   grievance?

15        A.   No.

16        Q.   Okay.

17        A.   I'm sorry.  I did tell Jennifer I was

18   calling Lazarus, though.

19        Q.   Okay.  Fair enough.  When you're done

20   talking to him, did you talk to Jennifer about the

21   conversations you had with him?

22        A.   I don't recall if I -- I don't recall.

23                    MR. MILLER-NOVAK:  Do you want to

24           take a break?

25                    MR. GOTTESMAN:  I need to run to the
```

Page 215

1           restroom.  So Chris can --

2                MR. WIEST:  I'll step in.  That's

3           fine.

4                MR. MILLER-NOVAK:  Let's move to a

5           different subject sort of.

6                THE WITNESS:  Okay.

7                MR. MILLER-NOVAK:  I guess it's all

8           kind of related.  All right.  You know

9           what, I think we're done with Exhibit 1.

10               THE WITNESS:  Okay.

11               MR. MILLER-NOVAK:  I'm going to hand

12          you this.  What number is this?

13               THE COURT REPORTER:  Six.

14               (Defendants' Deposition Exhibit No. 6

15               was marked for identification.)

16  BY MR. MILLER-NOVAK:

17       Q.   Have you seen this letter before?

18       A.   Yes.

19       Q.   And it looks like it's an email -- I guess

20  the word letter, we don't even -- it's almost gone

21  from our language nowadays, isn't it?

22       A.   Yes, it is.

23       Q.   This is an email from Jennifer Patterson.

24  You would agree that that's your wife, correct?

25       A.   Yes.

1    Q.   Okay.   To Chief Gramke sent on October 16,

2    2023; do you see that?

3    A.   Yes.

4    Q.   Okay.   And it was sent at 12:18 p.m.; do

5    you see that?

6    A.   Yes.

7    Q.   Okay.   When did you first see this email?

8    A.   I don't recall.   I don't remember.

9              (Mr. Gottesman returns.)

10   Q.   All right.   I don't want to read the whole

11   thing.   It's big.

12   A.   Yeah.

13   Q.   Did Jennifer discuss sending this email

14   with you before she sent it?

15   A.   She did.

16   Q.   Okay.   Did you read this email before she

17   sent it?

18   A.   No.

19   Q.   Did she tell you what the nature of the

20   email would be before she sent it?

21   A.   No.

22   Q.   Okay.   Would you agree that this email

23   kind of scolds Jay Gramke for what was discussed

24   during the meeting on October 10th?

25   A.   Just how my wife felt.

1    Q.   Okay.  So what did she tell you about this

2  email before she sent it?

3    A.   That she was going to email the Chief.

4    Q.   Did she tell you about what?

5    A.   She just said she was going to send an

6  email to the Chief and see if he'll reply.

7    Q.   Okay.  She didn't tell you what any of the

8  content would be about?

9    A.   She's her own person.

10    Q.   Okay.  And you didn't ask what it was

11  going to be?

12    A.   I assumed it was going to be about my

13  meeting.

14    Q.   Okay.  Did you assume it was going to be

15  critical?

16    A.   I mean, as upset as she was, yes.

17    Q.   Okay.  Did you tell her not to do it?

18    A.   I told her she's her own person, she can

19  do what she wants.

20    Q.   Okay.  Well, you weren't afraid that you

21  would be terminated if she sent this email, correct?

22    A.   I didn't give that any thought.

23    Q.   Okay.  Well, earlier you testified that

24  you knew you wouldn't walk out of the meeting

25  because you were worried that you have to have

1    health insurance and all those things, correct?

2         A.    Correct.

3         Q.    Okay.  So it didn't occur to you that

4    maybe that you should be afraid if she sent this

5    email, that you could lose your job and insurance?

6         A.    No.  That's two different scenarios now.

7         Q.    Okay.  So you thought if she sends this

8    email, I'll be fine?

9         A.    I didn't -- like I said, I didn't give it

10   any thought.

11        Q.    Okay.  Well, I want to go to the second

12   paragraph.  It says, You will never hear about the

13   real disconnect; do you see where it says that?

14        A.    Yes.

15        Q.    I'm going to go to the second sentence.

16   It says, With my husband's example, you have

17   solidified that officers will never tell you the

18   unpleasant truths for fear of retaliation; do you

19   see that?

20        A.    Yes.

21        Q.    You would rather not promote the best

22   candidate, as selected by the interview process from

23   RENU, because you got your feelings hurt because an

24   officer's wife criticized the sheriff's policies; do

25   you see that?

1      A.    Yes.

2      Q.    Okay.  It continues, You have confirmed

3  the incompetency of your leadership in thinking that

4  putting the best officer in the position is less

5  important than your ego and public image, correct?

6      A.    Correct.

7      Q.    Okay.  This set the tone to all other

8  officers that the administration is not concerned

9  with what is best for the department but only for

10  their public image; do you see that?

11      A.    Yes.

12      Q.    Okay.  How did other officers find out

13  about what happened in the meeting?

14      A.    Because I told them.

15      Q.    Okay.  Do you know whether or not Sheriff

16  McGuffey or Gramke told anybody what happened in

17  that meeting?

18      A.    I have no idea.

19      Q.    Okay.  So you don't know that if they were

20  spreading words and discussing you or criticizing

21  you after that meeting?

22      A.    Oh, I have no idea.  All I know is from my

23  major on down knew that this -- that by me not

24  getting promoted to RENU, there was something wrong.

25      Q.    Okay.  Something wrong.  Did any of them

1    tell you that they had discussed it with Gramke?

2         A.   Matt Guy when Gramke told him it was

3    because of my wife's social media posts.

4         Q.   Okay.  If I were to tell you that Matt Guy

5    never actually talked to Jay Gramke about his

6    decision to override your appointment, would you

7    have any reason to disagree with that?

8         A.   Absolutely.  He told me he did.

9         Q.   Okay.  The only thing you're going on that

10   is based on what Matt Guy told you, correct?

11        A.   Because he did not at first know why

12   Gramke would not allow me to come to RENU.  So he

13   had to call Gramke to ask him why I was not coming

14   down.

15        Q.   Do you have any reason to know whether or

16   not that's a true statement?

17        A.   I don't -- I have no other reason to

18   believe it wouldn't be or wasn't.

19        Q.   Okay.  But if it wasn't true, it's

20   possible it's not true?

21        A.   That doesn't make. . .

22        Q.   Well, let me ask another way.  Have you

23   heard any recording of this alleged conversation?

24        A.   Not unless it's public record.

25        Q.   Okay.  What do you mean not unless it's

 1   public record?

 2        A.   It was -- I cracked a joke to you.  I'm

 3   sorry.

 4        Q.   Oh.

 5        A.   I was trying to -- sorry.

 6        Q.   Because whether or not --

 7             MR. GOTTESMAN:  It fell flat.

 8        Q.   -- it was a recording --

 9             THE WITNESS:  It fell flat.  I'm

10             sorry.  I tried to lighten it up.  It's

11             warm in here.

12        Q.   The next paragraph says, Hypocrisy was

13   also at its finest during my husband's meeting.  How

14   could the sheriff lecture about my husband about

15   distancing himself from certain people while at the

16   very same time one of her biggest supports was being

17   sentenced to 16 months in federal prison; do you see

18   that?

19        A.   Uh-huh.

20             MR. GOTTESMAN:  That's a yes?

21        A.   Yes.  I'm sorry.

22        Q.   How could the sheriff lecture my husband

23   about distancing himself from certain people.  She

24   does not say herself there, does she?

25             MR. GOTTESMAN:  Objection.  The

Page 222

1              document speaks for itself.

2         A.    Correct.

3         Q.    Okay.  Who is she referring to about being

4    sentenced to 16 months in federal prison?

5         A.    I have no idea.

6         Q.    Okay.  At any point in this time does your

7    wife state anything about divorce?

8         A.    Can I read it real quick?  No.

9         Q.    Okay.  All right.  She refers to the

10   Sheriff and she says that the Sheriff lectured you

11   about distancing yourself from certain people,

12   correct -- that's what it says, right?

13        A.    Correct.

14        Q.    People is a plural word, correct?

15        A.    Correct.

16        Q.    It's not a singular noun, correct?

17        A.    Correct.

18        Q.    She doesn't say that you lectured my

19   husband about distancing himself from me, correct?

20        A.    Correct.

21        Q.    Okay.  And then the next paragraph it

22   says, If I were going to lecture my husband on who

23   he should distance himself from in his profession,

24   which I never would because he is a grown man with

25   his own thoughts, beliefs, and ideas, I would start

1   by telling him to distance himself from law

2   enforcement officials who have proven to be

3   dishonest, incompetent, and create a hostile work

4   environment; do you see that?

5        A.   Yes.

6        Q.   Okay.  So, again, she states if I were

7   going to lecture my husband on who he should

8   distance himself from in his profession; do you see

9   that?

10       A.   Yes.

11       Q.   She doesn't mention anything about your

12  romantic life or your marriage, correct?

13       A.   Correct.

14       Q.   Okay.  So not at any point in this does

15  she inquire whether or not their intent was to

16  threaten your marriage, correct?

17       A.   I don't know how she interpreted it.

18            MR. MILLER-NOVAK:  Okay.  All right.

19       You can give that back to her.

20       Q.   In this action you're suing the Defendants

21  for in part a failure to promote you, correct?

22       A.   Yes.

23       Q.   And a constructive discharge, correct?

24            MR. GOTTESMAN:  If you understand the

25       question.

 1      A.   Without having it in front of me, I don't
 2   know exactly, so I'll. . .
 3                MR. MILLER-NOVAK:  Well, we can pull
 4           it back out, I guess.  Can you hand him
 5           Exhibit 1?
 6                THE COURT REPORTER:  Yes.
 7                MR. GOTTESMAN:  Just wait for a
 8           question.
 9                THE WITNESS:  Okay.
10      Q.   Do you see anywhere in that complaint that
11   you're alleging that you were constructively
12   discharged?
13      A.   I don't -- no.  Am I missing it?
14      Q.   Well -- I don't mean to laugh at you.
15                MR. GOTTESMAN:  Paragraph 45.
16                MR. MILLER-NOVAK:  There you go.
17                THE WITNESS:  Thank you.
18                MR. MILLER-NOVAK:  Thank you.
19                THE WITNESS:  I thought it started
20           with No. 2.  That's why.
21                MR. MILLER-NOVAK:  There we go.
22                THE WITNESS:  Sorry.
23      Q.   So on page nine --
24      A.   There we go.
25      Q.   -- paragraph 45, on January 9, 2024, and

Page 225

1    due to the aforementioned constructive discharge

2    and -- and it also says in paragraph 43, that you

3    resigned.  So it's your allegation that you were

4    constructively discharged, correct?

5          A.   Correct.

6          Q.   And that part of your damages that you're

7    seeking in this action are as if you've been fired

8    from that position, correct?

9          A.   Correct.

10         Q.   Okay.  So part of the damages that you're

11   alleging is you would agree that you were -- your

12   position to RENU was overridden in October of -- I'm

13   sorry, March of 2023, correct?

14         A.   Yes.

15         Q.   But you left and there's -- I think you

16   testified earlier that there's some bump in pay for

17   that, correct?

18         A.   For RENU?

19         Q.   RENU, correct.

20         A.   The corporal's pay.

21         Q.   Okay.  So it's approximately $7,000; is

22   that correct?

23         A.   Whatever -- I don't know what the

24   contract -- seven percent.

25         Q.   Seven percent.  Okay.  Seven percent.  I

Page 226

 1   will not force you to do math.

 2        A.   Thank you.

 3        Q.   Seven percent bump in pay?

 4        A.   Yes.

 5        Q.   That would have only occurred from October

 6   -- I'm sorry -- March of 2023 until your resignation

 7   in January of 2024, correct?

 8        A.   Well, right, because -- well, if I would

 9   have gotten it, I wouldn't have resigned, correct.

10        Q.   Okay.  But you did resign, correct?

11        A.   Yes.

12        Q.   You'd agree that you were not fired,

13   correct?

14        A.   I was not fired.

15        Q.   Okay.  So you now have a different

16   position with Springfield Police Department?

17                  MR. GOTTESMAN:  Springdale.

18                  MR. MILLER-NOVAK:  Springdale.  Thank

19          you for correcting that.  It is a

20          different place.

21                  THE WITNESS:  We get it a lot.

22        Q.   Springdale --

23        A.   Yes.

24        Q.   -- correct?  So you never went through any

25   period of time unemployed --

Page 227

1      A.    Correct.

2      Q.    -- correct?  You would agree that your

3  constructive discharge theory is different than a

4  failure to promote theory, correct?

5              MR. GOTTESMAN:  Objection.

6      A.    I really don't know what the difference

7  is.

8      Q.    Okay.  Would you agree that being

9  terminated is being different than having a

10  promotion denied?

11              MR. GOTTESMAN:  Objection.

12      A.    Yes.

13      Q.    Okay.  Well, part of the things you're

14  suing the County for has to do with you not getting

15  this RENU position; would you agree with that?

16      A.    Correct.

17      Q.    Okay.  Couldn't you have stayed at the

18  Sheriff's Department and sued them for failing to

19  promote you to RENU?

20      A.    Yes.

21      Q.    You agree that you wouldn't have to quit

22  to sue them for that, correct?

23      A.    Yes.

24      Q.    So you had another option besides leaving

25  the department; you could have stayed there and

1    filed suit against them for denying your promotion,

2    correct?

3         A.   Correct.  But there's no reason -- there's

4    no way you could possibly stay there.  You're suing

5    your boss.  No.  It's -- no.  It just wasn't

6    feasible.

7         Q.   So your testimony is that no deputy in

8    Hamilton County has ever sued Hamilton County and

9    stayed there?

10        A.   I didn't say that.  I'm saying if I was

11   suing the Sheriff and Chief Deputy, there is no way

12   that I could continue working under them two with

13   that lawsuit.  You would be retaliated against 100

14   percent.

15        Q.   Okay.  You don't know that, you're

16   assuming that?

17        A.   My wife even says that in there about the

18   whole rule under threat and everything else.  That's

19   how it's always been ran.

20        Q.   Okay.

21        A.   Otherwise, I would -- like you said, I

22   wouldn't have a reason to leave.

23        Q.   Well, Sheriff McGuffey filed suit against

24   the Sheriff's Department, correct?

25        A.   Yes.

Page 229

1        Q.    Now she is the sheriff, correct?

2        A.    But she wasn't working there.

3        Q.    Yeah, but she did and she's now the

4    sheriff, correct?

5        A.    Right.  But she left -- or she wasn't

6    working for them.

7        Q.    Okay.  So if you file a suit and you're

8    retaliated against, wouldn't that just be another

9    lawsuit?

10       A.    If you could prove it, yes.

11       Q.    Okay.  But don't you have to prove any

12   lawsuit you file?

13       A.    Yes.  But there's also ways they retaliate

14   against you where you can't prove it.

15       Q.    Okay.  So your testimony is out of fear of

16   further retaliation you did not file suit?

17       A.    No.  I left for fear of retaliation if I

18   was going to file a suit.

19       Q.    Okay.  But you do agree that it is an

20   option to stay at the Sheriff's Department and file

21   suit?

22       A.    If you don't want to move and advance, why

23   would you want to stay?  I did not want to stay in a

24   department that was not going to have me advance.

25       Q.    Okay.  I'm not saying what you want or

1    what your beliefs are, okay?

2        A.   Okay.

3        Q.   Or what you think would happen or even

4    what you feared would happen.

5        A.   Okay.

6        Q.   My question is simple.  Is it an option

7    that you understand that was available to you,

8    something that you could mechanically do -- for lack

9    of better wording -- is stay in your position and

10   sue the Sheriff's Department for what occurred

11   regarding RENU?

12              MR. GOTTESMAN:  Objection.  Asked and

13              answered.  He's already said he could.

14       A.   Yeah.

15       Q.   You agree that's an option?

16              MR. GOTTESMAN:  Answer it one more

17              time.

18       A.   Yes.

19       Q.   Okay.  And you chose to not do that,

20   correct?

21              MR. GOTTESMAN:  You can answer that

22              one more time, too.

23       A.   Correct.

24       Q.   Okay.  Filing a grievance is an option,

25   correct?

1          MR. GOTTESMAN:  He's already answered

2     that.

3          MR. MILLER-NOVAK:  No.  I did not ask

4     that --

5          MR. GOTTESMAN:  You did and I'm

6     instructing him not to answer it.

7          MR. WIEST:  Wait a minute.  Let him

8     answer yes or no.

9          MR. GOTTESMAN:  Okay.

10         MR. MILLER-NOVAK:  You're overdoing

11    this, the instructions.

12         MR. GOTTESMAN:  Go ahead and ask

13    again about filing a grievance.

14         THE COURT REPORTER:  "Filing a

15    grievance is an option, correct?"

16    A.   Option for?

17    Q.   It was an option you had available?

18    A.   I discussed that with my attorney, so. . .

19    Q.   Okay.  When you were a union president,

20 had anybody filed grievances?

21    A.   Yeah.  Yeah.  Yes.  Yes.

22    Q.   Okay.  So you understand that that is an

23 option available to deputies who feel that they're

24 aggrieved?

25         MR. GOTTESMAN:  Don't go into

```
 1              attorney-client privilege.

 2                   MR. MILLER-NOVAK:  I'm not asking

 3              about that.  I'm just asking about --

 4                   MR. GOTTESMAN:  That question begs

 5              his conversation with Mr. Lazarus.

 6       Q.   Prior to discussing anything with that

 7   attorney, from your time as a union president are

 8   you aware that an option available to deputies who

 9   feel that they're been aggrieved is to initiate a

10   grievance procedure?

11       A.   Yes.

12                   MR. WIEST:  Just for the record, that

13              is not an option.  And I know -- I want

14              him to answer, because I didn't want to

15              draw your objection or whatever it is.  It

16              is not an option for a deputy.  It is the

17              union that files the grievance under the

18              contract, just for the record.

19                   MR. GOTTESMAN:  And you cannot grieve

20              something that is management rights to who

21              gets a position and who gets promoted or a

22              preferred assignment.  That is not subject

23              to a grievance.

24                   MR. MILLER-NOVAK:  All right, guys,

25              with the legal arguments.
```

1              MR. WIEST:  That's the problem with

2         the question.  It calls for it.

3              MR. MILLER-NOVAK:  Well, but it

4         doesn't.  And you can go off the record if

5         you even want to discuss that.  You're

6         putting legal arguments on the record.

7         You know it's inappropriate.  You know

8         what the rules are.  And I beg you to cite

9         me one that says that you're allowed to do

10        that.  Okay.

11             MR. GOTTESMAN:  I don't have to

12        explain myself.  I've given my

13        instructions.

14             MR. MILLER-NOVAK:  Well, you've given

15        a lot of instructions today.  And plenty

16        of them don't actually jibe with the

17        rules.  So we're going to move forward.

18   BY MR. MILLER-NOVAK:

19        Q.   So you are aware that it's an option to

20   approach the union about a grievance?

21        A.   Yes.

22        Q.   Okay.  And you never requested that the

23   union file a grievance on your behalf?

24             MR. GOTTESMAN:  Don't go into

25        attorney-client communications.

1       A.    I just spoke with Steve Lazarus.

2       Q.    Okay.  Well, I'm not asking you about

3    whether you spoke to him.  I'm asking you to confirm

4    that you never requested or otherwise filed any

5    paperwork requesting a grievance?

6              MR. GOTTESMAN:  So we need to go

7              outside and talk.

8              MR. WIEST:  For the record, the

9              problem with that question is if he asked

10             Lazarus to file it, it's going to call for

11             privilege.

12             MR. GOTTESMAN:  And he would file a

13             grievance for the union.  And that's

14             exactly where this is going.

15             So do you need to follow up on this

16             question?

17             MR. MILLER-NOVAK:  You're taking a

18             break.  You know what, if it's a privilege

19             concern, absolutely, talk to him.

20             THE COURT REPORTER:  All right.

21             We're off the record.

22             (A brief recess was taken.)

23             MR. GOTTESMAN:  I will put on the

24             record for you that my client without

25             waiving and preserving in all regards his

1          attorney-client privilege with all counsel

2          he consulted on this matter that he

3          discussed his options with Mr. Lazarus.

4          And the rule is this, there was -- it was

5          specific nature of what had happened with

6          regarding to being deprived of the

7          corporal promotion and being appointed to

8          RENU and then having that appointment

9          retracted was not something for which a

10         grievance could be filed.  And that was

11         the instruction.

12              MR. MILLER-NOVAK:  Well, then we're

13         going to need to strike it from the

14         record, because you can't have it both

15         ways.

16              MR. GOTTESMAN:  Well, then, look,

17         he's not answering.

18              MR. MILLER-NOVAK:  Okay.

19              MR. GOTTESMAN:  I've given you --

20              MR. MILLER-NOVAK:  Then he's not

21         answering.

22              MR. GOTTESMAN:  I'm making a

23         representation so you know what's there.

24              MR. MILLER-NOVAK:  That's fine.

25              MR. GOTTESMAN:  And if you want to

1          pursue it and argue that it's not a

2          privileged conversation, but that's the

3          only information he has was gained through

4          attorney-client communication.

5               MR. MILLER-NOVAK:  Right.  But if

6          you're telling me what the advice was, the

7          problem with that you cannot just waive

8          the privilege slightly for this thing --

9               MR. GOTTESMAN:  I'm not.

10              MR. MILLER-NOVAK:  -- because as soon

11         as you do that, you open the door to

12         everything else.

13              MR. GOTTESMAN:  I'm not waiving --

14              MR. MILLER-NOVAK:  It's all or none.

15              MR. GOTTESMAN:  -- in fact, I

16         expressly preserved it.  And I'm telling

17         you that if you want to go down that

18         path -- and it's a dry well for you, it's

19         not going to get you anywhere -- and I've

20         explained what would happen where that

21         discovery compelled, so --

22              MR. MILLER-NOVAK:  All right.  Well,

23         at any rate, I'm going to move on.

24              You can give the complaint back to

25         her for now.

1    BY MR. MILLER-NOVAK:

2         Q.   So you're alleging certain damages in this

3    case, correct?

4         A.   Correct.

5         Q.   How do you believe -- what do you believe

6    are your damages in this case?

7         A.   As in like. . .

8         Q.   You're asking for money in this case when

9    you filed suit, correct?

10        A.   Correct.

11        Q.   Okay.  Why do you believe you're entitled

12   to money?

13        A.   The promotion that was taken, the

14   seven percent, leaving and having to restart a new

15   job with the retirement.  Just the stress,

16   everything that was put on me and my wife, this

17   whole situation.  It was a lot.

18        Q.   Are you seeking any mental health

19   treatment right now?

20        A.   No.

21        Q.   Have you in the past?

22        A.   No.

23        Q.   Were you diagnosed with any mental health

24   condition by a professional?

25        A.   No.

1      Q.   Were you diagnosed about any mental health

2   condition that was held to be a causation of your

3   time at Hamilton County?

4      A.   No.

5      Q.   Have you ever taken anything for

6   depression, anxiety, or other mental health

7   illnesses?

8      A.   No.

9      Q.   Have you at any time been diagnosed with a

10  mental health condition?

11     A.   No.

12     Q.   Your complaint, I believe, alleges that

13  you have suffered loss of reputation?

14     A.   Yes.

15     Q.   Okay.  How do you believe you suffered a

16  loss of reputation?

17     A.   By leaving the Sheriff's Department.

18     Q.   Okay.  But you chose to do that, correct?

19     A.   Correct.

20     Q.   You weren't fired, correct?

21     A.   Correct.

22     Q.   Do you agree that you don't have to put on

23  any resume that you were ever terminated from the

24  Sheriff's Department, correct?

25     A.   Correct.

Page 239

1       Q.   As a matter of fact you would agree it

2   hasn't really harmed your profession at all,

3   correct?

4       A.   Not necessarily.

5       Q.   Well, you were recruited by Mr. Butler,

6   correct?

7       A.   Because Butler came from the Sheriff's

8   Office.

9       Q.   So he came from the Sheriff's Office?

10      A.   Uh-huh.

11      Q.   So he recruited you?

12      A.   Correct.

13      Q.   So you would agree that what happened to

14  you didn't affect his impressions of you, correct?

15                  MR. GOTTESMAN:   Objection.

16      A.   Not his, but other departments.

17      Q.   What other departments?

18      A.   Other departments that knew that I was in

19  line to go to RENU, asking why I didn't go.

20      Q.   Have you ever applied to any other

21  department?

22      A.   No.

23      Q.   Did you get denied any employment?

24      A.   No.

25      Q.   So you've never actually been denied any

1    employment?

2         A.    Correct.

3         Q.    Okay.  Can you site any consequence that

4    you suffered because you were denied the appointment

5    to RENU?

6         A.    Just other departments wanting to know why

7    I was not assigned down to RENU.

8         Q.    Did you tell them?

9         A.    They were asking other officers why I

10   didn't get to go down.

11        Q.    But you're the one that told other

12   officers, correct?

13        A.    Yeah.  I've told several other officers,

14   yes.

15        Q.    Okay.  Well, you chose to put that

16   information into the rumor mill then, correct?

17        A.    I don't know how it all started, but -- I

18   mean, other officers talk, yeah.

19        Q.    Okay.  But you knew that when you told

20   them, correct?

21        A.    Same with the officers down in RENU when

22   they didn't know I wasn't coming down.

23        Q.    Okay.  But you chose to tell people that

24   you were denied RENU, correct?

25        A.    And so did other officers, correct.

1      Q.   And you also chose to tell people about

2   what happened in the meeting with Sheriff McGuffey,

3   correct?

4      A.   Yes.

5      Q.   You don't know whether or not they told

6   anybody, do you?

7      A.   No idea.

8      Q.   Okay.  So you made the conscious decision

9   to tell people about what happened in that meeting,

10  correct?

11     A.   Correct.

12     Q.   Okay.  So if you were worried that it was

13  going to hurt your reputation, then why did you tell

14  people?

15     A.   Because they were wanting to know why I

16  didn't get to go down.  They thought it was because

17  of disciplinary reasons.

18     Q.   Okay.  You could just tell them no, I

19  wasn't disciplined, correct?

20     A.   And that's the point of me telling them.

21     Q.   Okay.  Do you know whether or not Sheriff

22  McGuffey ever told anybody that she disciplined you?

23     A.   I have no idea.

24     Q.   Do you know whether or not Jay Gramke ever

25  told anybody he disciplined you?

1        A.    I have no idea.

2        Q.    Was anything put into your personnel file

3   that you were ever disciplined?

4        A.    No idea.  No.

5        Q.    To the best of your knowledge if I was to

6   do a public records request asking for your

7   personnel file, including discipline, would anything

8   be in there?

9        A.    No.  That's you.  I'm talking about other

10  departments.  So, for example, another lieutenant

11  asking why I wasn't assigned to RENU when they know

12  I was going down.  That's why I explained to other

13  officers, no, it was because of my wife's social

14  media posts.

15       Q.    Okay.  Well, now you know that you told

16  them what you believe to be the truth, correct?

17       A.    Correct.

18       Q.    Okay.

19       A.    Because I was told by Gramke for that

20  reason.

21       Q.    Okay.  So don't you feel that you resolved

22  that issue?

23       A.    No.  Because I don't know who else knows

24  all that.

25       Q.    Okay.  So you have no knowledge that

1  anybody else besides the people you've talked to

2  know any of these things?

3      A.   That was the only way I could find out

4  that it was out there, yes.

5      Q.   Okay.  Has anything been reported on or

6  published in the media?

7      A.   I have no idea.

8      Q.   Okay.  You said that you had to leave is

9  what your testimony has been today.

10     A.   Yes.

11     Q.   How has that financially damaged you?

12     A.   Having to leave?

13     Q.   Yes.

14     A.   Having to -- going to another department

15  that paid less.  Not all my years of service

16  transferred over.

17     Q.   What's your hourly rate currently at

18  Springdale?

19     A.   I don't know offhand.

20     Q.   Is it over $40 an hour?

21     A.   Yes.

22     Q.   Wasn't your hourly rate when you were at

23  the County under $40 an hour?

24     A.   You're talking about right now.  When --

25  right now at Springdale, it's more.  But when I went

 1   to Springdale, it was less.

 2       Q.   But right now it's more?

 3       A.   Right now.

 4       Q.   So currently you're being paid more hourly

 5   at Springdale then you would be if you were at the

 6   County?

 7       A.   Well, I've been there over a year with a

 8   contractual raise.

 9       Q.   Okay.  Well, how does this year compare to

10   where you would be at Hamilton County?

11       A.   I have no idea.  I don't have the

12   contract.  And we hired somebody to take care of all

13   that.  So I don't -- I'm not going to sit here and

14   try to figure out the math.

15                 (Defendants' Deposition Exhibit No. 7

16                 was marked for identification.)

17                 MR. MILLER-NOVAK:  Okay.  I'm going

18             to hand you a collective bargaining

19             agreement.  And there's two -- can you do

20             7 and 7-A or something?  There's actually

21             two separate things, because there's like

22             an addendum.

23                 THE COURT REPORTER:  You're going to

24             have to show me that.

25                 MR. MILLER-NOVAK:  Well, it's

1          separated by a staple.

2                    THE COURT REPORTER:  Okay.

3                    (Defendants' Deposition Exhibit No.

4                    7-A was marked for identification.)

5                    MR. WIEST:  Did you say there were

6          two exhibits here?

7                    MR. MILLER-NOVAK:  Yes.  So it's --

8                    MR. WIEST:  Oh, I see.

9                    MR. MILLER-NOVAK:  Yeah.  You'll see

10          there's like an addendum.

11                    MR. WIEST:  Okay.

12    BY MR. MILLER-NOVAK:

13          Q.   So if you go to page 25 in the collective

14    bargaining agreement, which is seven, the big one,

15    do you see where it says Wages and Compensation on

16    the bottom; do you see that?

17          A.   You said 27, right?

18          Q.   I said 25.

19          A.   25.  I'm sorry.

20          Q.   No, it's okay.

21          A.   Yes.

22          Q.   Do you see where it starts with the Wages

23    and Compensation table?

24          A.   Yes.

25          Q.   Okay.  So effective the first full pay

1    period which includes, it says, January 21, 2021,

2    for all bargaining unit employees shall be as

3    follows; do you see that?

4         A.   Yes.

5         Q.   If you go to the second page, do you see

6    patrol officer, and that's what you were, correct?

7         A.   Correct.

8         Q.   So it says, Entry, one year, two year,

9    three year; do you see that?

10        A.   Yes.

11        Q.   You were at the four-year mark, correct?

12        A.   Yes.

13        Q.   All right.  And it says here that the

14   salary -- the hourly -- I'm sorry -- is $35.1261.  I

15   don't even know how they do that, right?  Obviously

16   they don't pay you in cash.  That would be some

17   weird things.  That's cutting pennies in half.

18             So you understand that it's a little over

19   $35.00 an hour according to this, correct?

20        A.   Correct.

21        Q.   Okay.  And then if you go to 7-A, which is

22   Appendix to Agreement, Article 20, Wages and

23   Compensation; do you see that?

24        A.   Yes.

25        Q.   It says, Effective the first full pay

1    period which includes January 1, 2023, the hourly

2    pay for all bargaining unit employees shall be as

3    follows.  Okay.  And if you go to patrol officer at

4    four years, and it says $38.36; do you see that?

5         A.   Yes.

6         Q.   So would you agree that as of January --

7    the first full paycheck in January, you were

8    receiving $38.36 an hour, correct?

9         A.   Correct.

10              MR. MILLER-NOVAK:  Okay.  You can

11              give that back to her.

12              I'm now going to hand you what is the

13              Agreement between the City of Springdale,

14              Ohio, and the Ohio Patrolmen's Benevolent

15              Association, 2023 to 2025, Patrol Officers

16              Union Agreement, it appears.  It's Exhibit

17              8.

18              (Defendants' Deposition Exhibit No. 8

19              was marked for identification.)

20         Q.   So if you will go to page -- well, have

21    you seen this union agreement at Springdale?

22         A.   Yes.

23         Q.   You would agree that you are now at

24    Springdale, correct?

25         A.   Correct.

Page 248

1        Q.   And that this is the 2023 to 2025 union

2   agreement at Springdale, correct?

3        A.   Correct.

4        Q.   So this is currently the union agreement

5   for your collective bargaining unit at Springdale,

6   correct?

7        A.   Correct.

8        Q.   So if you go to page 22, this is their

9   Wages and Compensation.  My understanding is I

10   believe I saw your application or hiring something

11   that you went in at Step 3, correct?

12        A.   Correct.

13        Q.   So in 2023 Step 3 was making $39.37 an

14   hour, correct?

15        A.   Correct.

16        Q.   Which you would agree is a little bit more

17   than a dollar more an hour than $38.1267 or whatever

18   that was, correct?

19        A.   Correct.

20        Q.   Okay.  And currently in the year 2024, you

21   were making $40.35 -- not currently.  Actually we're

22   in 2025.  We figured that out already.

23             So in 2024 you were making $40.35 an hour,

24   correct?

25        A.   Correct.

Page 249

1      Q.   Okay.  And 2025, which is now, you're

2    making $41.36 an hour, correct?

3      A.   Correct.

4      Q.   Okay.  So your hourly rate at Springdale

5    is actually higher in this collective bargaining

6    agreement than your hourly rate was at Hamilton

7    County, correct?

8                 MR. GOTTESMAN:  Objection.

9      A.   My -- the longevity is not on there, which

10   I thought brought the County up.  And I think the

11   difference was insurance.  Again, I don't recall.

12     Q.   Okay.  What insurance are you --

13     A.   I know there was a difference.

14     Q.   What insurance are you referring to?

15     A.   Our medical.

16     Q.   Your medical.  Do you know what you're

17   paying for medical insurance?

18     A.   I don't have any of that with me.  Right

19   off the top of my head, no.  Like I said, we have

20   somebody that's going to crunch the numbers, so. . .

21     Q.   Okay.  And who is that somebody?

22                 MR. GOTTESMAN:  Right now we have a

23              consulting expert, Sara Martin.  She

24              hasn't been identified as an expert yet.

25              But she is a certified financial planner

1          and is helping us put together a

2          complete -- a comprehensive analysis of

3          the financial loss.  We'll provide that as

4          soon as that information is available.

5     Q.   So as part of the financial loss that

6   you're alleging --

7     A.   I'm sorry.  Go ahead.

8     Q.   It's okay.  It's all right.

9     A.   I just know this -- the discrepancy is

10   somewhere, but I can't figure it out right there.

11              MR. MILLER-NOVAK:  It's okay.  You

12          can give it back to her.

13              THE WITNESS:  Okay.

14     Q.   Does part of the financial loss that

15   you're alleging have to do with your retirement?

16     A.   Yes.

17     Q.   Okay.  What financial loss do you believe

18   you suffered in terms of your retirement?

19     A.   I lost years of -- from switching over

20   into the retirements -- the two retirements.

21     Q.   How many years did you have in Hamilton

22   County?

23     A.   I could tell you -- all that I was getting

24   together for that -- I can't remember her name

25   now --

Page 251

 1                MR. GOTTESMAN:  The expert?

 2      A.    The expert.

 3      Q.    If you don't know, you don't know.

 4      A.    I don't know off the top of my head.

 5      Q.    Okay.  Well, you would agree that you

 6  started working there -- was it in 2003?

 7      A.    Two.

 8      Q.    2002.  And then that you left in 2024,

 9  correct?

10      A.    Correct.

11      Q.    So that would be approximately 21 years?

12      A.    Correct.

13      Q.    Okay.  Do you know when your retirement

14  with OPERS would have vested?

15      A.    It starts at ten.

16      Q.    Okay.  But there's an age requirement,

17  too, correct?

18      A.    In OPERS, yes -- well, in all of them, but

19  yeah.  Yes.

20      Q.    And how old are you?

21      A.    I am 49.

22      Q.    So you don't know what the vesting age is

23  at OPERS?

24                MR. GOTTESMAN:  Don't guess.

25      A.    No.

1    Q.   Okay.  That's fine.  I don't want you to

2  guess.  It's probably published somewhere.  But you

3  understand that people at OPERS -- they can actually

4  retire and then they're allowed to become part of

5  another retirement system --

6    A.   PRE.

7    Q.   -- correct?

8    A.   Yes.  Yes, sir.

9    Q.   You can double dip, correct?

10   A.   Yes.

11   Q.   So you could technically retire from the

12  Sheriff's Department and then kind of work for the

13  Sheriff's Department and you continue to get --

14  double dip on OPERS, correct?

15   A.   Correct.

16   Q.   Okay.  So that was an option available to

17  you, correct?

18   A.   Correct.

19   Q.   But you chose not to take that option,

20  correct -- you chose to quit, correct?

21   A.   Correct.

22   Q.   All right.  So you didn't stay and file

23  suit and you could have stayed until you got your

24  OPERS vested and you could have quit and not needed

25  to buy back any OPERS, correct?

     1       A.   Correct.

     2       Q.   Because if it got to the vesting point,

     3   you could have retired and not have to buy anything,

     4   correct?

     5       A.   Correct.

     6       Q.   At that point you could have gone to a

     7   different jurisdiction and you could have started a

     8   new retirement account while collecting retirement

     9   from OPERS, correct?

    10       A.   Yes.

    11       Q.   Okay.  So you made the decision to not do

    12   that?

    13       A.   Correct.

    14            MR. MILLER-NOVAK:  Could we have a

    15            break and some private time?

    16            MR. GOTTESMAN:  Sure.

    17            THE COURT REPORTER:  We're off the

    18            record.

    19            (A brief recess was taken.)

    20            (Defendants' Deposition Exhibit No. 9

    21            was marked for identification.)

    22   BY MR. MILLER-NOVAK:

    23       Q.   I've handed you what is marked as Exhibit

    24   9.  I've handed you what appears to be your W-2 for

    25   your time at Springdale for 2024.  Have you seen

1    this before?

2         A.   Yes.

3         Q.   Okay.  So at the top left-hand corner you

4    can see there's boxes.  And they've done well.  And

5    they have redacted your social security number, so

6    that's good.  It describes your Medicare wages; do

7    you see that -- where it says Medicare wages and

8    tips?

9         A.   Yes.

10        Q.   And there's $76,414.22 --

11        A.   Yes.

12        Q.   -- do you see that?

13        A.   Yes, sir.

14        Q.   Do you have any reason to believe that

15   that's inaccurate?

16        A.   No.

17        Q.   Okay.  If you go down to the -- like I'm

18   in that top left-hand box.

19        A.   Uh-huh.

20        Q.   Okay.  Do you see there's four boxes?  If

21   you go down --

22             MR. GOTTESMAN:  They're all the same,

23        aren't they, Counselor?

24             MR. MILLER-NOVAK:  I think so.  I

25        don't know.  Admittedly I pay someone to

Page 255

1          do my taxes, so I'm no pro.

2      Q.   You pointed at me.  Do you pay someone to

3   do your taxes, too?

4      A.   I'm not a plumber or electrician.  So,

5   yes, taxes -- there's a reason there's a

6   professional.

7      Q.   Okay.  Agreed.  We will stumble through

8   this together then.  So if you go to the bottom

9   left-hand corner at the top left-hand box, it says,

10  Local wages, tips, et cetera; do you see that?

11     A.   Yes.

12     Q.   Where it says $76,414.22; do you see that?

13     A.   Yes.

14     Q.   Local income tax is $1,528.28; do you see

15  that?  It's like right to the right of that.  So

16  it's -- I'll point it out.

17     A.   Oh, yeah.  Yeah.

18     Q.   Okay.  And the locality that you're paying

19  that local income tax to is Springdale, correct?

20     A.   Correct.

21     Q.   Okay.  Do you know what their local income

22  tax rate is?

23     A.   No.

24     Q.   Okay.  So you don't know if it's lower or

25  higher than Cincinnati's?

1      A.   I do not know.

2      Q.   When you were at Anderson, did you pay

3   income tax -- local income tax to Cincinnati still,

4   or was your local income tax -- did you not pay

5   local tax because you were in Anderson Township?

6      A.   I don't recall.

7      Q.   Okay.  We'll just move on.  If you don't

8   know, you don't know.  If you would have your -- so

9   you said you pay someone to do your taxes, correct?

10     A.   Correct.

11     Q.   Okay.  So does your tax preparer or do you

12  otherwise have like a copy of your income tax filing

13  for the year 2023?

14     A.   Yes.

15     Q.   Okay.  If you don't have it in your

16  possession, you could get it from your tax preparer,

17  correct?

18     A.   Correct.

19     Q.   Okay.  The same thing with your taxes for

20  2022; did you use the same tax preparer?

21     A.   Yes.

22          MR. MILLER-NOVAK:  Okay.  All right.

23          Well, we'll do a request.  We'd like to

24          get his tax filings for the years 2022 and

25          2023, please.

1          MR. WIEST:  I'd ask that you just

2          follow up by email just so we've got

3          something in writing on that.

4          MR. MILLER-NOVAK:  Yeah.  I mean, I

5          can just do a discovery request.

6     Q.   Do you know if you agree that your wife

7  was already unemployed when -- in 2023, correct?

8     A.   Correct.

9     Q.   Okay.  So you're not claiming that she

10  suffered any financial damage as a result of your

11  being terminated, correct?

12     A.   Correct.

13     Q.   Okay.  Well, what you allege is a

14  termination, a constructive discharge.  And you're

15  not alleging that she has suffered any financial

16  damage regarding your RENU placement, correct?

17     A.   I guess it depends on how you look it.  I

18  mean, we're married, so she would be suffering the

19  same as me.

20     Q.   Do you file your takes joint -- because

21  she doesn't have any income to report, correct?

22     A.   Yeah.  She has a little bit of income here

23  and there.

24     Q.   Well, what's her income?

25     A.   I don't recall.

1      Q.   Okay.  I'll ask her Friday.

2      A.   Yeah, I just submit everything to the

3   accountant.

4      Q.   Okay.  Is your wife seeing any mental

5   health professionals?

6      A.   No.

7      Q.   Are you aware whether or not she's seen

8   any mental health professionals in the past?

9      A.   No.

10      Q.   Are you aware if she has any diagnoses

11   about mental health?

12      A.   No.

13      Q.   Are you aware whether or not she takes any

14   medication for any mental health conditions,

15   something like Prozac or Zoloft or something of the

16   sort?

17      A.   No.

18      Q.   You're not aware or she doesn't?

19      A.   She doesn't.

20      Q.   Okay.  So in your entire time as a deputy

21   have you experienced anything that you would

22   consider to be traumatic?

23      A.   Yes.

24      Q.   Okay.  On more than one occasion do you

25   believe that you suffered anything that you would

1   consider to be traumatic to your mental health?

2        A.   Could be, yes.

3        Q.   Okay.  Did you ever seek any treatment,

4   counseling, or anything concerning those events?

5        A.   No.

6        Q.   Okay.  Now, I'm not going to ask you to

7   describe anything today, so don't worry about it,

8   but you've never in your entire career sought any

9   mental health treatment while you've been a deputy?

10       A.   Mental health, no.

11       Q.   Just physical treatment, since you've been

12  a deputy -- have you ever -- I mean, have you had

13  any military service?

14       A.   No.

15            MR. MILLER-NOVAK:  Okay.  You can

16            give that set of W-2s back to her.

17       Q.   So you've never had any mental health

18  counseling at all in your entire life?

19       A.   No.

20            (Defendants' Deposition Exhibit No.

21            10 was marked for identification.)

22       Q.   Okay.  I'm going to hand you Exhibit 10.

23  I was provided this record from Springdale Police

24  Department in response to a subpoena and I sent a

25  copy to your counsel.  And this is a payroll report

1    I received from Springdale between January 1, 2024,

2    to April 22, 2025; do you see that?

3        A.   Yes.

4        Q.   Do you have any reason to believe that any

5    of these numbers are incorrect?

6        A.   I would have -- I wouldn't have a clue.  I

7    have no idea.

8        Q.   Okay.  Do you know whether or not that

9    this payroll report is something that's done in the

10   normal course of business or only in response to a

11   records request?

12       A.   I have never seen this before.

13             MR. MILLER-NOVAK:  Okay.  That's

14             fair.  You can hand that to her.

15       Q.   So you referred to a Matt Guy earlier,

16   correct?

17       A.   Yes.

18       Q.   Was that Matt Guy?

19       A.   Yes, sir.

20       Q.   Okay.  And he's the one that you claim

21   told you that Jay Gramke overrode your appointment

22   to RENU, correct?

23       A.   Yes.

24       Q.   Okay.  Had you ever shown up at the job,

25   like did you ever start your position at RENU?

1      A.    No.

2      Q.    Okay.  So earlier you said you had an

3 assignment.  Did you ever actually do or perform any

4 tasks for RENU?

5      A.    No.

6      Q.    Okay.  So you never showed up to work on a

7 Tuesday and would have introduced yourself as a

8 member of the RENU unit?

9      A.    No.

10      Q.    Okay.  Had you announced to your friends

11 or family that you were promoted or given a position

12 at RENU before Jay Gramke overrode it?

13      A.    When I was told I was coming down in

14 March -- they always tell you not to say anything,

15 one, to see if you can keep it quiet and, two, they

16 don't know the exact date they're picking until the

17 last minute because of the way the payroll is.

18           But after I was told I wasn't going, yes,

19 I told -- because everybody knew that, you know,

20 eventually I was heading down there -- that I didn't

21 get it, if that makes sense.

22      Q.    Okay.  Did you ever get that exact date

23 you just described?

24      A.    I don't recall the exact date, what it

25 was.  The end of March is all I remember.

Page 262

1        Q.    Okay.  Was that in writing that you

2   received the exact date that you would start at

3   RENU?

4        A.    That was from Lieutenant Guy.

5        Q.    It was verbally?

6        A.    Yes.

7        Q.    Okay.  So you never actually started on

8   that date, though, correct?

9        A.    No.  Gramke squashed it beforehand.

10       Q.    Okay.  So you never actually hit the date

11  where you were supposed to start on RENU?

12       A.    Correct.  I got the phone call in

13  February.

14       Q.    Which is -- when were you supposed to

15  start according to a start date?

16       A.    March.

17       Q.    Okay.  So you got the phone call in March

18  before the date had come?

19       A.    I got the phone call in February --

20  February 23.

21       Q.    That you were -- that it was overridden?

22       A.    Yes, sir.

23       Q.    Okay.  And the date that was supposed to

24  be your start date was in March, correct?

25       A.    Yes, sir.

1      Q.   Okay.  So you got the phone call it was

2   overridden in February then, correct?

3      A.   Yes, sir.

4      Q.   All right.  So you didn't actually start

5   serving as a RENU officer because that date wasn't

6   until March, correct?

7      A.   Correct.

8              MR. MILLER-NOVAK:  Okay.  I'm done.

9              MR. GOTTESMAN:  We'll take signature

10          and review it.

11              (Witness excused.)

12          (Deposition concluded at 4:00 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 264

1                   A C K N O W L E D G E M E N T

2

3   STATE OF _____      :

4   COUNTY OF _____      :

5

6          I, JASON DAVIS, have read the transcript of

7   my testimony given under oath on May 6, 2025.

8          Having had the opportunity to note any

9   necessary corrections of my testimony on the errata

10  page, I hereby certify that the above-mentioned

11  transcript is a true and complete record of my

12  testimony.

13

14

15          _____

16                          JASON DAVIS

17

18

19

20

21

22

23

24

25

Page 265

1                        REPORTER'S CERTIFICATE

2              I, Kristina L. Laker, Court Reporter and

3    Notary Public, do hereby certify:

4              That the witness named in the deposition,

5    prior to being examined, was duly sworn;

6              That said deposition was taken before me

7    at the time and place therein set forth and was

8    taken down by me in shorthand and thereafter

9    transcribed into typewriting under my direction and

10   supervision;

11             That said deposition is a true record of

12   the testimony given by the witness and of all

13   objections made at the time of the examination.

14             I further certify that I am neither

15   counsel for nor related to any party to said action,

16   nor in any way interested in the outcome thereof.

17             IN WITNESS WHEREOF I have subscribed my

18   name and affixed my seal this 26th day of May, 2025.

19

                         /s/ Kristina L. Laker
20                       _____
                         Kristina L. Laker
21                       Notary ID 592345
                         My Commission expires: 12/21/25
22

23

24

25