Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT CINCINNATI


JASON DAVIS and             :
JENNIFER DAVIS,
                            :
        Plaintiffs,
vs.                         :   Case No. 1:24-cv:0202

CHARMAINE McGUFFEY, et al., :

        Defendants.         :



            * * * * * * * *

DEPONENT:        Jay Gramke

DATE:            February 21, 2025

            * * * * * * * *



Kristina L. Laker

Court Reporter



            BARLOW REPORTING & VIDEO SERVICES, LLC
                    620 Washington Street
                  Covington, Kentucky 41011
                      (859) 261-8440

```
 1          The videotaped deposition of JAY GRAMKE taken

 2     for the purpose of discovery and/or use as evidence

 3     in the within action, pursuant to notice, heretofore

 4     taken at the Hamilton County Prosecutor's Office, 230

 5     East Ninth Street, Suite 4000, Cincinnati, Ohio, on

 6     February 21, 2025, at 9:00 a.m., upon oral

 7     examination, and to be used in accordance with the

 8     Federal Rules of Civil Procedure.

 9                    * * * * * * * *

10                     APPEARANCES

11     REPRESENTING THE PLAINTIFFS:

12     Christopher Wiest, Esq.
       CHRIS WIEST, ATTY AT LAW, PLLC
13     50 East Rivercenter Boulevard, Suite 1280
       Covington, KY 41011
14
       Zachary Gottesman, Esq.
15     GOTTESMAN & ASSOCIATES, LLC
       9200 Montgomery Road
16     Building E, Suite 18B
       Cincinnati, OH 45242
17

18     REPRESENTING THE DEFENDANTS:

19     Steve Simon, Esq.
       HAMILTON COUNTY PROSECUTOR'S OFFICE
20     230 East Ninth Street, Suite 4000
       Cincinnati, OH 45202
21
       ALSO PRESENT:   Jason Davis
22                     Jennifer Davis
                       Peter Stackpole
23                     Andy Prem
                       Joe Overholser, CLVS
24

25
```

```
 1                        I N D E X

 2                                           Page

 3    Cross-Examination by Mr. Wiest:         6

 4    Direct Examination by Mr. Simon:        222

 5

 6

 7                   E X H I B I T S
```

```
 8    Plaintiffs' Deposition Exhibit No. 1    49

 9    Plaintiffs' Deposition Exhibit No. 2    50

10    Plaintiffs' Deposition Exhibit No. 3    52

11    Plaintiffs' Deposition Exhibit No. 4    55

12    Plaintiffs' Deposition Exhibit No. 5    59

13    Plaintiffs' Deposition Exhibit No. 6    59

14    Plaintiffs' Deposition Exhibit No. 7    73

15    Plaintiffs' Deposition Exhibit No. 8    75

16    Plaintiffs' Deposition Exhibit No. 9    76

17    Plaintiffs' Deposition Exhibit No. 10   78

18    Plaintiffs' Deposition Exhibit No. 11   100

19    Plaintiffs' Deposition Exhibit No. 12   103

20    Plaintiffs' Deposition Exhibit No. 13   107

21    Plaintiffs' Deposition Exhibit No. 14   116

22    Plaintiffs' Deposition Exhibit No. 15   124

23    Plaintiffs' Deposition Exhibit No. 16   128

24    Plaintiffs' Deposition Exhibit No. 17   131

25    Plaintiffs' Deposition Exhibit No. 18   150
```

1    Plaintiffs' Deposition Exhibit No. 19        163

2    Plaintiffs' Deposition Exhibit No. 20        170

3    Plaintiffs' Deposition Exhibit No. 21        171

4    Plaintiffs' Deposition Exhibit No. 22        206

5    Plaintiffs' Deposition Exhibit No. 23        210

6

7        (Exhibit No. 21 was retained by counsel.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE VIDEOGRAPHER:  We are now on the

2    record.  The time is approximately 9:16 on

3    February 21, 2025.

4          This is the video deposition of Jay

5    Gramke taken in the matter of Jason Davis

6    and Jennifer Davis versus Charmaine

7    McGuffey, et al., which is being held in

8    the United States District Court for the

9    Southern District of Ohio, Western

10   Division at Cincinnati.  The case number

11   is 1:24-cv:0202.  And our location today

12   is 230 East Ninth Street, Eighth Floor

13   conference room, in Cincinnati, Ohio.

14         Will counsel please introduce

15   yourselves for the record.

16         MR. WIEST:  Chris Wiest, here with

17   Zach Gottesman, for the plaintiffs.

18         MR. SIMON:  Steve Simon for the

19   defendants.

20         MR. PREM:  And Andy Prem for the

21   defendant.

22         MR. STACKPOLE:  Pete Stackpole for

23   the defendant.

24         THE VIDEOGRAPHER:  Will the court

25   reporter please swear the witness.

 1              THE COURT REPORTER:  All right.  Sir,

 2        would you please raise your right hand.

 3              THE WITNESS:  (Complies.)

 4              THE COURT REPORTER:  Do you solemnly

 5        swear that the testimony you're about to

 6        give will be the truth, the whole truth,

 7        and nothing but the truth?

 8              THE WITNESS:  I swear.

 9              THE COURT REPORTER:  Thank you.

10              MR. WIEST:  All right.  Before we get

11        going, I'm going to pursuant to the court

12        order hand over a transcript for the

13        purposes of today's deposition that is

14        going to -- it's of an audio recording

15        that my clients took.  We'll be talking

16        about that later.  We've got a bunch of

17        other stuff to get through on this

18        deposition first.  It is marked Attorney

19        Eyes Only pursuant to the Court's order.

20              JAY GRAMKE,

21  of lawful age, as having been duly sworn, as

22  hereinafter certified, was examined and testified as

23  follows:

24              CROSS-EXAMINATION

25  BY MR. WIEST:

1      Q.    Chief, can you state your name for the

2  record.

3      A.    Jay Gramke.  G-r-a-m-k-e.

4      Q.    Okay.  I've got a couple of ground rules.

5  I think you might have been through this before.

6  That's actually one of my questions.

7            If you can speak up for the court reporter

8  so that she can take down what you're saying.  She

9  can't take down head nods and things like that.  Do

10 you understand?

11     A.    Yes.

12     Q.    I promise that I'm going to do my best

13 today not to talk over you.  If you can make the

14 same promise to me and we'll -- I invariably violate

15 that, but we'll try --

16     A.    Okay.

17     Q.    -- fair?  Okay.  You understand you've

18 been sworn just like in the courtroom, correct?

19     A.    Correct.

20     Q.    As an aside, how many times do you think

21 that you have testified?

22     A.    In court?

23     Q.    Ever.  Right.  Court, deposition -- ever.

24     A.    Oh.  Hundreds.

25     Q.    How many times have you been deposed?

1       A.    Once.

2       Q.    Okay.

3       A.    Before this.

4       Q.    You've had training on how to testify,

5   correct?

6       A.    Informal training.

7       Q.    Okay.   Testifying in court is part of your

8   duties as a law enforcement officer, correct?

9       A.    Yes.

10      Q.    I'm here to find out everything that you

11  know about the events and facts that underlie this

12  lawsuit involving the Davises, and for that reason

13  I'm looking for full and complete answers to the

14  questions I ask.

15            In other words, I'm looking for the whole

16  truth that you just gave an oath to give; you

17  understand that, correct?

18      A.    Yes.

19      Q.    I guarantee you I am going to ask more

20  than one bad question today.   I always do.   I do my

21  best not to, but I always do.   If you don't

22  understand my question, let me know that and I will

23  do my best to fix it so that I'm communicating

24  clearly with you and you're communicating clearly

25  with me, okay?

1        A.    Okay.

2        Q.    If you do answer, I'm going to assume that

3   you understood, all right?

4        A.    Okay.

5        Q.    If you don't know an answer, let me know

6   that, okay?

7        A.    Yes.

8        Q.    In other words, I don't want you to guess.

9   But if you have a general recollection, I'm entitled

10  to your best memory, fair?

11       A.    Fair enough.

12       Q.    Okay.  If you need a break at any time,

13  just ask me or your counsel.  This is not a

14  marathon.  I will generally finish either my line of

15  questioning or if there's a question pending, we'll

16  certainly finish that, and then we'll go on a break.

17  And if you need water or anything else, we've got

18  that.

19            I'm sure your attorney has told you this,

20  but if you need to talk to your attorney today,

21  that's fine.  If there's a question pending, I'm

22  going to ask that you answer it with a caveat; if

23  you have a question about privilege, whether to

24  assert it, whether something is privileged, you

25  know, just say I need to talk to my attorney about a

1   privilege issue, and we'll go on a break even with a

2   pending question, okay?

3       A.   Okay.

4       Q.   All right.  Sometimes while you're

5   answering today you may think of some document that

6   may help you to remember an answer or it might help

7   to give you a more accurate answer.  And if that

8   happens, let me know.  I do want to know about your

9   memory, but if there is a document that helps you

10  give a full and complete answer, I'm happy to, you

11  know, usually put it in front of you, because I'm

12  looking for the truth, fair?

13      A.   Fair enough.

14      Q.   And finally, because it's important that I

15  do get your full, complete, and accurate answer, are

16  you on any medication or drugs of any kind that may

17  make it difficult for you to understand, remember,

18  or answer my questions today?

19      A.   No.

20      Q.   Are you feeling at all sick or unwell?

21      A.   No.

22      Q.   Are you currently under a doctor's care

23  for any illness?

24      A.   No.

25      Q.   Is there any reason that you cannot give

1    full, complete, and accurate testimony today?

2         A.    No.

3                   MR. WIEST:  All right.  I've got a

4              couple of questions that I'm going to ask

5              off the record, because I don't want them

6              in the public record, today.  Why don't we

7              go ahead, if we can do that.  And please

8              don't take this down, but I am going to

9              ask.

10                   THE VIDEOGRAPHER:  We're going off

11             the record at 9:21.

12                   (Off the record.)

13                   THE VIDEOGRAPHER:  We're going back

14             to the record at 9:22.

15                   MR. WIEST:  I'm going to tentatively

16             certify the issue of the social security

17             question that I asked.

18                   (The off-the-record question was

19                   certified.)

20                   MR. WIEST:  Obviously I don't want

21             that in the record, but I do want it for

22             the purpose that I stated off the record,

23             which is to perform a background check

24             with an investigator.

25    BY MR. WIEST:

1      Q.   Let's talk about some background issues.

2   Where did you go to high school?

3      A.   Elder High School.

4      Q.   What year did you graduate?

5      A.   1988.

6      Q.   Do you have any college?

7      A.   I went to UC for about two years.

8      Q.   Was that right after Elder?

9      A.   Yeah.

10     Q.   Okay.  What were you studying?

11     A.   Business.

12     Q.   Were you at the main campus?

13     A.   Yeah.

14     Q.   Okay.  All right.  That takes us to 1990,

15   right?

16     A.   1991.  I took a year off actually in

17   between high school and college.  I went and worked

18   for a guy and -- so, but yeah.  So I got to '91.  I

19   was in college when I started with the sheriff's

20   department.

21     Q.   Okay.  Have you had any college after

22   that?

23     A.   I went to SPI, which is. . .

24     Q.   Southern Police Institute?

25     A.   You got it.

Page 13

1        Q.   What year did you do that?

2        A.   I don't remember.  2008.

3        Q.   Was that the executive course that they

4   run?

5        A.   Yes.

6        Q.   Okay.  You successfully completed that

7   program?

8        A.   Yes.

9        Q.   All right.  Anything else that you've done

10  by way of formal education?

11        A.   Just police training.  I've been to a lot

12  of different schools, but no, no -- I don't think

13  anything that's college credits or anything like

14  that.

15        Q.   Okay.  Did you ever attend the FBI

16  National Academy?

17        A.   No.

18        Q.   Okay.

19        A.   I wanted to.

20        Q.   Okay.  Do you hold any licenses or

21  certifications?

22        A.   Other than my police certification?

23        Q.   Well, that's one.  What year did you get

24  that?

25        A.   1992.

Page 14

1        Q.   Okay.  Anything else?  I'm assuming a

2   driver's license, but I'm not counting that.

3        A.   Yeah, I don't -- nothing that I can think

4   of.

5        Q.   Okay.  Do you have any certifi- -- other

6   than the police certification, no other

7   certifications or licenses other than what we've

8   talked about, correct?

9        A.   I can't think of anything to that end.

10        Q.   Okay.  You talked about working for a guy

11   on that -- I'm going to call it that year between

12   college and high school.  What was your first job

13   after -- by the way, let me back up.

14             On the UC, did you get a degree from

15   there?

16        A.   No.

17        Q.   Okay.  What was your first job after that?

18        A.   After?

19        Q.   After you finished --

20        A.   High school?

21        Q.   Or not after -- no, after the two years at

22   UC.

23        A.   So I was working at Sears Paint &

24   Hardware.  I was assistant manager.

25        Q.   Okay.

Page 15

```
 1        A.   And going to college at the same time.
 2   And then I -- somebody came into Sears Paint &
 3   Hardware and said you should work for the sheriff's
 4   department.
 5        Q.   Okay.
 6        A.   So then I did that.
 7        Q.   When you say you did that, you applied for
 8   the sheriff's department?
 9        A.   I applied for the sheriff's department.
10   My plan was to work at night and go to school during
11   the day.
12        Q.   Did you try that for a while?
13        A.   It never happened.
14        Q.   Okay.  Did you start in the sheriff's
15   office in corrections?
16        A.   Yes.
17        Q.   Okay.  And so you were working the jail at
18   night shift?
19        A.   I did go to night shift.
20        Q.   Okay.  What training did you undertake
21   prior to beginning working shifts at the jail?
22        A.   I went through the corrections academy.
23        Q.   Okay.  Where was that at?
24        A.   In the north building, the justice center.
25        Q.   Okay.  So that was in-house to the
```

1    Hamilton County Sheriff's Office?

2         A.    Yes, sir.

3         Q.    How long was that program?

4         A.    You know, I don't -- I don't remember.

5    It -- I don't remember.  Five weeks, something --

6    it's a month -- more than a month, I think.

7         Q.    Okay.  How long did you work in the jail?

8         A.    One year, about five months.

9         Q.    And then what did you do next?

10        A.    I went to the patrol.

11        Q.    Okay.  Was that considered a promotion?

12        A.    Yes.

13        Q.    And when you went to the patrol, was there

14   any training that you undertook prior to beginning

15   duties as a patrol officer?

16        A.    Yeah.  I went to the police -- I went

17   to -- the sheriff's department had an in-house

18   police academy.  I went to that.

19        Q.    Okay.  And is that the consequence of that

20   where you got your law enforcement certificate?

21        A.    That's correct.

22        Q.    Okay.  How long was the academy for

23   patrol?

24        A.    I don't. . .

25        Q.    You don't know?

Page 17

```
 1        A.   I don't remember.  I think -- I'm going to
 2   say maybe four months.
 3        Q.   Okay.
 4        A.   I think now it's almost six.  But I'm not
 5   sure.
 6        Q.   Was it the case that when you were at the
 7   corrections -- in the jail, that officers wanted to
 8   move from corrections to patrol; was that generally
 9   what people wanted to do?
10        A.   Not everybody.  But, yeah, I think that
11   was I would say the majority.
12        Q.   Okay.  And when that occurred, was it ever
13   the case that somebody applied for patrol and was
14   not selected?
15        A.   Sure.
16        Q.   What was the selection rate approximately,
17   if you know?
18        A.   Selection rate?
19        Q.   Yeah.  Of the corrections officers that
20   had applied for patrol, can you give me a rough
21   estimate of the number of folks that were selected
22   for that?
23        A.   I wouldn't have a clue on that.
24        Q.   Okay.
25        A.   No.
```

1        Q.   All right.  When you applied for patrol,

2    was there some minimum time in corrections that you

3    had to have before they would look at you for

4    patrol?

5        A.   One year.

6        Q.   Okay.  And was it the case when you

7    applied that there had to be a vacancy for patrol

8    for that to get filled?

9        A.   You know, at that time I don't know.  I

10   don't know.

11       Q.   How did you know that it was time to apply

12   for patrol when you did that after a year and five

13   months in corrections; did somebody say that we have

14   an opening?

15       A.   Well, it wasn't that -- I left a year and

16   five months.  Once I was there for one year, I was

17   certified.  Then I was able to take the test.  So I

18   took a test sometime after my first year.  I don't

19   remember when.  So then I was interviewed and told

20   you're going out.  It took a couple of months.  And

21   then I went out.

22       Q.   Would that have been in approximately

23   1991?

24       A.   So I -- no.  I went -- I started in -- I

25   started in January of '92.

1      Q.   Okay.

2      A.   I got certified -- I think I was done with

3   the police academy by September.

4      Q.   Of '92?

5      A.   Of '92.

6      Q.   Okay.

7      A.   I would have then taken the test early of

8   '93 -- early of '93, I would think.

9      Q.   Early '93 for patrol?

10     A.   Yeah.  And then I think it was August of

11  '93 I went out to the patrol.

12     Q.   Okay.

13     A.   So maybe it was a year.  I was -- yeah, a

14  year and eight months before I went out or something

15  like that.

16     Q.   When you say out, you mean out on the

17  road?

18     A.   Out on the road, yeah.  I'm sorry.

19     Q.   Okay.  All right.  When you did that, were

20  you assigned to a certain beat?

21     A.   So I was assigned to a coach.

22     Q.   Okay.

23     A.   So you go through coach training.

24     Q.   What's coach training?

25     A.   Coach training is you're paired up with a

1    more senior officer.  And basically they show you

2    the ropes.  They show you how to do things.

3         Q.   Is that basically field training?

4         A.   Yes.

5         Q.   Okay.  FTO program for those of us that

6    know --

7         A.   Fielding training.

8         Q.   -- that from other officers?

9         A.   Yes.

10        Q.   Okay.  How long was the coach training?

11        A.   It's supposed to be three months.  I did

12   five weeks.

13        Q.   Why was that?

14        A.   After the first month the sergeant said I

15   was ready to go and. . .

16        Q.   Okay.  And was there a particular area of

17   the county that you were assigned to?

18        A.   I was in Anderson Township at the time of

19   my coach training.

20        Q.   Okay.  When you finished your coach

21   training after five months [sic], which takes us to

22   early 1994, correct?

23        A.   Uh-huh.  Yes.

24        Q.   Where did you go then?

25        A.   I went to our District 1, which is

Page 21

1    headquarters, on Hamilton Avenue on night shift.

2         Q.    Okay.  How long did you do that?

3         A.    So '94 into '95.

4         Q.    Okay.  And then what did you do?

5         A.    I was transferred to our District 2 on

6    second shift.

7         Q.    Is that afternoons?

8         A.    Yes, sir.

9         Q.    Okay.  Where is District 2?

10        A.    Green Township.

11        Q.    Okay.  How long did you do that?

12        A.    So I went over there in '95.  I left in

13   '96.

14        Q.    Okay.  What did you do next?

15        A.    I went to the Regional Narcotics Unit.

16        Q.    Did you apply for RENU?

17        A.    Yes.

18        Q.    And by the way, just for the record, RENU

19   is short for the Regional Narcotics Unit?

20        A.    Correct.

21        Q.    Okay.  Tell me about that process when you

22   applied for RENU.

23        A.    I applied.  And I received an interview

24   from -- at the time I don't know what his rank was

25   -- but Keith Groppe was the major -- or the captain

1   at the time, I think, of RENU.  And I had an

2   interview.

3       Q.   And what else; was that it, just the

4   interview?

5       A.   Interview.

6       Q.   Was there an eligibility list that was

7   generated from that, or was it just the major was

8   making the selections?

9       A.   The major was making the selections, I

10  believe.

11      Q.   Has that always been the case at the

12  sheriff's office?

13      A.   I wouldn't know.

14      Q.   Okay.  To your knowledge was that always

15  the process?

16      A.   I wouldn't -- I wouldn't know the past

17  process.

18      Q.   I had occasion to get on the Hamilton

19  County Sheriff's website.  And it had a description

20  of RENU.  And I just want to see if you agree with

21  the description on the website.  And what that

22  description was is that the RENU is a

23  multi-jurisdictional drug task force that is

24  comprised of narcotics agents from the Hamilton

25  County Sheriff's Office, Cheviot Police Department,

Page 23

1    Green Township Police Department, as well as

2    Sycamore and Anderson Townships.  The unit is

3    designed to investigate criminal organizations and

4    individuals primarily responsible for the illegal

5    trafficking of controlled substances in the Greater

6    Cincinnati area through the operation of

7    investigative programs including, but not limited

8    to, drug intelligence, drug interdiction, and

9    undercover operatives; do you agree with that

10   description?

11        A.    I think so, yes.

12        Q.    Okay.  And when you went to RENU, was it

13   the case that there were both road units and

14   investigative units within RENU; in other words,

15   were people -- people have cruisers and undercover

16   cars?

17        A.    That had just started was the Highway

18   Interdiction Team, yes.

19        Q.    Okay.

20        A.    So there was cruisers.  There was two

21   Cincinnati cruisers and three sheriff's cruisers.

22        Q.    Okay.  Were you -- did you have a cruiser

23   or did you have an undercover car?

24        A.    I was plainclothes.

25        Q.    Okay.  Was there any training when you

Page 24

1    began RENU?

2        A.    Informal.

3        Q.    Okay.

4        A.    The coach training.

5        Q.    Was there some time period that you had to

6    have served in the sheriff's office before you could

7    apply to RENU?

8        A.    No.

9        Q.    Okay.  All right.  How did you know that

10   there was a RENU opening?

11       A.    They posted for it.

12       Q.    Okay.  And we're going to talk today about

13   eligibility lists and what those are.  But was there

14   an eligibility list that was created for RENU, or

15   did they just select and said these are the guys

16   that are coming?

17       A.    I don't know how they selected it, but I

18   know there was no eligibility list.

19       Q.    Okay.

20       A.    I had no idea where I stood, if that makes

21   sense.

22       Q.    So when you found out you were selected,

23   did you just get a call and said you've been

24   selected for RENU, come on down?

25       A.    Yes.  I got a call and said are you still

Page 25

1    interested.  I said yes.  They said how about

2    Thursday.

3         Q.   Okay.  How long were you with RENU?

4         A.   About ten years.

5         Q.   And was that always plainclothes --

6         A.   Yes.

7         Q.   -- in that ten-year period?  Okay.  Did

8    you promote at all during that period?

9         A.   I went from -- I was a patrol officer at

10   that time.  I was made a corporal -- I don't

11   remember when.  But I was made sergeant in 2003.

12        Q.   While in RENU?

13        A.   While in RENU.

14        Q.   Okay.  Did you test for both corporal and

15   sergeant?

16        A.   I did.

17        Q.   And those are eligibility list --

18        A.   Those were, yes.

19        Q.   Okay.  Just for the record, an eligibility

20   list, when there's a promotional process, there's a

21   testing component to that, correct?

22        A.   Yes.

23        Q.   There's an interview component to that,

24   correct?

25        A.   We do that now.

Page 26

1      Q.   Okay.  Was that not the case then?

2      A.   The case then is you took -- it was a test

3  only.

4      Q.   Okay.

5      A.   And they stacked you on a list.

6      Q.   Okay.

7      A.   Now we -- we do now.  We have a -- we use

8  the National Testing Network.  We use an outside for

9  testing.  And then we do panel interviews and

10  combine the scores.  And that's how we get the list.

11      Q.   When did that change?

12      A.   I believe with this new sheriff.  So 2021.

13      Q.   Okay.  When McGuffey took office?

14      A.   Correct.

15      Q.   Okay.

16      A.   Now -- I'm sorry.  It might have taken us

17  a little time to change that parameter, but we

18  definitely -- I don't remember when we changed that.

19  In fact, I think the first test that we might have

20  done when we came in was just a continuation of

21  that, because it took us time to make changes

22  obviously.

23      Q.   Okay.  When there is an eligibility list

24  that's created at that time from the test rankings,

25  what happens is -- do you have to take the next

Page 27

1   person off the list; is that the way the promotions

2   worked?

3        A.   So we have what's called the rule of

4   three.

5        Q.   Okay.

6        A.   So people can't get passed over.

7        Q.   So can you explain that for me, like

8   one -- like you have to take out of like one, two,

9   and three, one of those; is that the way that works?

10       A.   Yes.

11       Q.   Okay.  And let's say you take two --

12       A.   Uh-huh.

13       Q.   -- does the next one then have to be

14  taken -- let's say you take number two out of one,

15  two, and three.  Does that leave one, three, and

16  four for the next selection?

17       A.   Yes.

18       Q.   Okay.  All right.  So there's discretion

19  on who within that eligibility list is taken?

20       A.   Yes.

21       Q.   Has that always been the case?

22       A.   That I can remember.

23       Q.   Okay.  All right.  Who actually makes the

24  selection if there's -- out of that three person

25  possibility on an eligibility list, who decides?

Page 28

1         A.    Usually that's going to come up to me and

2    the sheriff.

3         Q.    Okay.  So the chief deputy and the sheriff

4    make that decision?

5         A.    On a promotion?

6         Q.    Yes, sir.

7         A.    Yes.

8         Q.    Okay.  Has that always been the case

9    within the sheriff's department?

10        A.    To my knowledge.

11        Q.    Okay.  All right.  What do you and the

12   sheriff -- when you've been involved in the rule of

13   three -- look at in determining who is going to go

14   out of those three?

15        A.    We look at discipline.

16        Q.    Okay.

17        A.    Work history.  Things of that nature.

18        Q.    Anything else other than discipline and

19   work history?

20        A.    No.

21        Q.    Okay.

22        A.    I'm sure there's other things, but not off

23   the top of my head.

24        Q.    When you say work history, what do you

25   mean by that?

Page 29

1    A.   If they're active, they work, they're not

2  lazy, they're not --

3    Q.   Retired on duty?

4    A.   Retired on duty.  You know, they're

5  actually -- attitude, things of that nature.

6    Q.   Okay.  Does tenure matter; in other words,

7  how long somebody has been with the sheriff's

8  office?

9    A.   It could, but -- so right now we're

10  switching to every promotion to be three -- you'll

11  have to have three years before.  But at that point

12  tenure is really not too much of a point.

13    Q.   When you say three years, the sheriff's

14  office is currently moving or transitioning to a

15  time and grade requirement?

16    A.   Yeah.  It will be three years for -- in

17  between each grade.

18    Q.   Okay.  That was not the case, though, when

19  you made corporal and sergeant --

20    A.   No.

21    Q.   -- correct?

22    A.   No.

23    Q.   Okay.  You said you made sergeant in 2003.

24  What was the next assignment that you had?

25    A.   Well, I was still in RENU in 2003.

1        Q.   Okay.

2        A.   I left in 2005.  I came back to night

3   shift on -- as a sergeant.

4        Q.   Okay.  When you became a sergeant within

5   RENU, were you a supervisor?

6        A.   Yes.

7        Q.   Okay.  How many sergeants were on the RENU

8   unit?

9        A.   Maybe four.

10       Q.   And I think you told me there was a major

11  that commanded it?

12       A.   And a lieutenant.

13       Q.   And a lieutenant.  Okay.  No captain?

14       A.   No.

15       Q.   Okay.  And so the sergeants would report

16  directly to the lieutenant?

17       A.   Yes.

18       Q.   Okay.  Where did you go when you came back

19  on nights in 2005?

20       A.   Our District 3.

21       Q.   Where is that?

22       A.   At that time it was Symmes, Sycamore, and

23  Columbia Townships.

24       Q.   Okay.

25       A.   The district itself is in Symmes Township

Page 31

1    on Weekly Road.

2         Q.   Okay.  How long did you hold that

3    position?

4         A.   For about a year -- yeah.  Maybe a year.

5         Q.   So 2006?

6         A.   Well, no, I take that back.  About six

7    months.

8         Q.   Okay.

9         A.   And then I went to day shift, the same --

10   same district.

11        Q.   District 3 day shift?

12        A.   Yeah.

13        Q.   Okay.  What did you do next?

14        A.   I went to the Over-the-Rhine Task Force,

15   2006 and 2007.

16        Q.   Okay.  What was that?

17        A.   It was 19 deputies went to Over-the-Rhine

18   to assist with the crime in the area.

19        Q.   Okay.  That was following the riots in

20   2004?

21        A.   Yeah.

22        Q.   Okay.  Were you on day shift for that?

23        A.   I was.

24        Q.   Okay.  And then how long did -- what did

25   you do after that?

Page 32

1      A.   Let's see.  In 2008 I -- I can't remember.

2  I think I came back to District 1.  I think I was at

3  headquarters as sergeant on day shift.

4      Q.   Okay.  And how long were you --

5      A.   It was District 1 or District 3.  I can

6  tell you that.

7      Q.   Okay.

8      A.   It was one of those two.

9      Q.   And how long did you do that?

10     A.   I went back and forth between those two

11 until 2013.

12     Q.   Okay.  What happened in 2013?

13     A.   I was promoted to lieutenant.

14     Q.   Also tested eligibility list?

15     A.   Yes.

16     Q.   Okay.  Was there a -- what were you

17 assigned first as lieutenant?

18     A.   Night shift, headquarters.  I was the

19 night watch commander.

20     Q.   Was that downtown?

21     A.   No.

22     Q.   It was on Hamilton Avenue?

23     A.   Hamilton Avenue.

24     Q.   Okay.  All right.  How long did you do

25 that?

1      A.   I want to say maybe not quite a year.

2      Q.   So 2014?

3      A.   Yeah.

4      Q.   What did you do next?

5      A.   I became the -- our District 2 commander,

6  which is Green Township.

7      Q.   As a lieutenant?

8      A.   Right.

9      Q.   Okay.

10      A.   I also took over as the commander of the

11  K-9 units.

12      Q.   Okay.  So you had double duty?

13      A.   Double duty.

14      Q.   And how long did you do that for?

15      A.   I was the K-9 commander.  Actually I moved

16  from District 2 to Lincoln Heights in -- this has to

17  be around 2015, I'm guessing.

18      Q.   Okay.

19      A.   And I maintained as the K-9 commander as

20  well.

21      Q.   Okay.  What did you do next?

22      A.   I was there from 2015, '16.  I want to say

23  2017 I went to Internal Affairs.

24      Q.   As lieutenant in charge of IA?

25      A.   Yes.

Page 34

1    Q.   Okay.  And how long did you do that for?

2    A.   So I was TDY there.  I was temporarily

3  assigned there.  The commander of IA was going to --

4  through the UC managers program that we -- we have

5  partnered with them.  And that was about a six-month

6  program.  So I went down there to basically take his

7  place.

8    Q.   Fill in?

9    A.   Fill in.

10    Q.   Okay.  And what did you do after that?

11    A.   Then I went and took over RENU as the

12  commander.

13    Q.   Okay.  Were you promoted?

14    A.   No.  No.  As a lieutenant I was in charge.

15    Q.   Okay.  In 2017?

16    A.   2018.

17    Q.   2018.  Okay.  So there was no captain and

18  no major at RENU at that point?

19    A.   There was a major in charge of

20  investigations.

21    Q.   Okay.  Is that who was selecting the RENU

22  folks; the major would do the selections?

23    A.   No.  I did.

24    Q.   You did as a lieutenant?

25    A.   Yeah.

1      Q.   Okay.  Where did you go -- or how long

2  were you in that RENU post?

3      A.   2018, 2019, into 2020.  And then I

4  transferred out to CIS.

5      Q.   What is that?

6      A.   Criminal Investigation Section.

7      Q.   Okay.  And how long were you there?

8      A.   Until 2021, January 4th.

9      Q.   And I take it that coincides with Sheriff

10  McGuffey's election and taking office?

11      A.   Correct.

12      Q.   How did it come to be that you became the

13  chief deputy?

14      A.   At the time Candidate McGuffey reached out

15  to me -- no, I take that back.

16           A group of us reached out to her and Bruce

17  Hoffbauer, who -- they were running against each

18  other.  And they -- we -- a group of us met with

19  both of them.  After that Sheriff McGuffey called me

20  and asked me some questions.  And we met.  And after

21  she won the election, she called me and asked me to

22  be her chief deputy.

23      Q.   Do you recall the nature of the questions

24  she asked you?

25      A.   It was mostly just the patrol questions,

1    you know, what my ideas were and how we can do

2    things differently and things of that nature.

3         Q.   Okay.  Do you recall who else met with her

4    when you met with her?

5         A.   It was myself, Matt Guy.  Mike Steers I

6    think was there.  Tory Smith.  And Tony Orue

7    couldn't be there.  So I know he couldn't make it.

8    He was supposed to be there.  That's all I can

9    remember.

10        Q.   Okay.

11        A.   But there was a group.  And then we met

12   with Bruce as well.  And there was other people

13   there.

14        Q.   So the sheriff until that election was

15   who; who was the sheriff prior to Sheriff McGuffey?

16        A.   So she was my training lieutenant, I

17   believe, in corrections.

18        Q.   Okay.

19        A.   And then she eventually ran the jail under

20   Jim Neil in 20- -- I don't remember when he came in,

21   so -- in 2013.  And then she was fired by Jim Neil.

22        Q.   Right.

23        A.   And then she ran against him and. . .

24        Q.   When you started, was the Sheriff Simon

25   Leis?

1       A.    Yes.

2       Q.    So you are now under the third sheriff?

3       A.    Yes.

4       Q.    Okay.  All right.  And you're still the

5    chief deputy, correct?

6       A.    Correct.

7       Q.    Have you -- the scuttlebutt is you're

8    planning to retire next month; is that true?

9       A.    It is a fact.

10      Q.    Okay.  It is a fact, not scuttlebutt?

11      A.    It is not scuttlebutt.

12      Q.    Okay.  All right.  Has your replacement

13   been selected?

14      A.    Yes.

15      Q.    Who is that?

16      A.    Major Chris Ketteman.

17      Q.    Okay.  All right.  Do you have other

18   employment lined up?

19      A.    Yes.

20      Q.    Where are you going?

21      A.    I am starting a business with an

22   individual in the private sector.

23      Q.    Okay.  Law enforcement related?

24      A.    No.

25      Q.    Okay.  All right.  I've got to ask.  I

Page 38

1    know the answer I think is no.  You've never been

2    convicted of a felony or a crime of dishonesty,

3    correct?

4         A.   Uh-huh.

5         Q.   That's correct?

6         A.   I --

7         Q.   Let me ask it this way.  Have you ever

8    been convicted of a felony or a crime of dishonesty?

9         A.   No.

10        Q.   Thank you.  Have you ever -- prior to the

11   Davis lawsuit -- been sued for a civil rights

12   violation?

13        A.   I was part of a group that was sued after

14   an individual was Tased and died.  I'm guessing that

15   was -- I was -- I investigated it.  I wasn't there

16   when it occurred.

17        Q.   Okay.

18        A.   But that was the case I was deposed.

19        Q.   Okay.  You were deposed, but were you

20   named as a defendant?

21        A.   I don't remember.

22        Q.   Okay.  How long ago was that?

23        A.   About ten years ago.

24        Q.   Okay.  All right.  Have you ever had any

25   training on clearly established rights?

1      A.   Clearly established rights?

2      Q.   Right.  Clearly established constitutional

3  rights; have you ever had any training on that?

4      A.   Are you talking about -- I guess I'm. . .

5      Q.   So you have been with the sheriff's office

6  for -- I mean, I've not done the math on this, but I

7  guess I could.

8      A.   Thirty-three years.

9      Q.   Thirty-three years.  In any of that time

10 have you ever had training on clearly established

11 constitutional rights?

12     A.   Sure.

13     Q.   Okay.  How many times have you had such

14 training?

15     A.   I can tell you that when I was in RENU, we

16 had a training bulletin.  It was a Fourth Amendment

17 bulletin that would come out monthly.  So as far as

18 how many times, I couldn't tell you; but especially

19 on the Fourth Amendment, quite a few.

20     Q.   Okay.  Was that part of any academy

21 training that you went through?

22     A.   No.

23     Q.   Some departments, for instance, have had

24 legal advisers, prosecutors, et cetera, come in and

25 give legal updates on clearly established rights.

Page 40

1    Has that been the case with the Hamilton County

2    Sheriff's Office?

3         A.   So back under Simon Leis, we had an

4    attorney named Ed Boldt.

5         Q.   Okay.

6         A.   And when we'd get our paychecks, we'd get

7    "Nuts and Boldts."  And Ed Boldt would give us

8    updates on different legal issues and things of that

9    nature.  So, yeah, it's an ongoing education.

10        Q.   Okay.  In your capacity as chief deputy

11   for the Hamilton County Sheriff's Office, did you

12   take an oath to support and defend the Constitution

13   of the United States?

14        A.   I did.

15        Q.   Okay.  When you gave that oath, did you

16   mean it?

17        A.   Absolutely.

18        Q.   Okay.  When you gave that oath, did you

19   understand that oath to be binding on every aspect

20   of the performance of your duties as chief deputy of

21   the Hamilton County Sheriff's Office?

22        A.   I did.

23        Q.   Okay.  Are you familiar with the First

24   Amendment?

25        A.   I am.

Page 41

1      Q.   Have you read it before?

2      A.   Sure.

3      Q.   Okay.  Were you aware on or before

4  January 1st of 2020 that citizens had a clearly

5  established right under the First Amendment to

6  engage in free speech?

7            MR. SIMON:  Objection to the form.

8         Calls for a legal conclusion.

9            You can try to answer.

10     A.   I am aware.  I am not a lawyer.  I am not

11  an expert.  But I am aware of the First Amendment.

12     Q.   Okay.  Were you aware on or before

13  January 1st of 2021 that citizens had a clearly

14  established right under the First Amendment to

15  engage in free speech by publicly criticizing

16  elected officials?

17            MR. SIMON:  Same objection.

18            You can answer.

19     A.   Again, I understand that they have rights.

20  But, again, I'm not a lawyer.

21     Q.   Did you understand that they had rights to

22  publicly criticize elected officials?

23            MR. SIMON:  Same objection.

24            You can answer.

25     A.   Same answer.

1     Q.   Okay.

2     A.   I understand that.  But, again, I am not a

3  lawyer.

4     Q.   Yeah.  And I want to be clear.  I'm not

5  asking you as a lawyer what the law is.  I'm asking

6  for your understanding when I ask the questions that

7  we're discussing right now.

8          Do you have an understanding on or before

9  January 1st of 2021 that citizens had a clearly

10  established right under the First Amendment to

11  engage in free speech by publicly criticizing law

12  enforcement?

13          MR. SIMON:  Same objection.

14     A.   I do understand that.

15     Q.   Okay.  Did you have an awareness on or

16  before January 1st of 2021 that citizens had a

17  clearly established right under the First Amendment

18  to freely associate with others, including for

19  purposes of criticizing government officials?

20          MR. SIMON:  Same objection.

21     A.   Yes, I was aware of that.

22     Q.   Okay.  Were you aware on or before

23  January 1st of 2021 that there's a clearly

24  established right of citizens not to be retaliated

25  against for engaging in protected speech and

Page 43

1    association activities?

2              MR. SIMON:  Same objection.

3       A.   And, again, I understand the amendment.

4    But there are limitations.  And I am not a lawyer.

5       Q.   Okay.  Did you understand that there was a

6    right not to be retaliated against for engaging in

7    protected speech and association activities; were

8    you aware of that?

9       A.   Yes.

10      Q.   Okay.  Were you aware on or before

11   January 1st of 2021 that there was a clearly

12   established right not to have family members of

13   employees of government agencies -- to have them be

14   retaliated against because of their family members'

15   speech or associational activity?

16             MR. SIMON:  Same objection.

17      A.   Again, there's -- I understand what it

18   says and I understand there are limitations.  And

19   I'm -- again, I'm not an attorney.

20      Q.   Sure.  Were you aware on or before January

21   1st of 2021 that employees of government agencies

22   who were not on the clock had a clearly established

23   right to criticize their employer on matters of

24   public concern?

25             MR. SIMON:  Same objection.

Page 44

1          A.    Same answer.

2          Q.    Okay.  You're aware?

3          A.    Yes, I was aware.

4          Q.    All right.  Were you aware on or before

5     January 1st of 2021 that employees had clearly

6     established -- government agencies -- employees of

7     government agencies had clearly established rights

8     not to be retaliated against for engaging in

9     protected speech and associational activities to

10    include withholding assignments or promotions?

11                MR. SIMON:  Same objection.

12         A.    Yes, I was aware.

13         Q.    Were you aware on or before January 1st of

14    2021 of clearly established law that indicated that

15    just following orders is not a defense in a civil

16    rights lawsuit?

17                MR. SIMON:  Same objection.

18         A.    Yes, I was aware.

19         Q.    Okay.  To your knowledge have you ever

20    made any misrepresentations or false statements of

21    fact to the media?

22         A.    No, I have not.

23         Q.    To your knowledge have you ever made

24    misrepresentations or false statements of fact in

25    any interactions you've had with employees at the

 1   Hamilton County Sheriff's Office?

 2        A.   Can you repeat that, please?

 3        Q.   Yeah.  To your knowledge have you ever

 4   made misrepresentations or false statements of fact

 5   in any interactions that you've had with employees

 6   at the Hamilton County Sheriff's Office?

 7                  MR. SIMON:  Objection to the form of

 8             the question.  It's broad.

 9                  You can try to answer.

10        A.   So, you know, I can say I try to be as

11   honest as I can.  Have I ever -- you know, I would

12   say yes, I think so.

13        Q.   In what circumstances would it be

14   appropriate to make misrepresentations or false

15   statements of fact in interactions you've had with

16   employees at the Hamilton County Sheriff's Office?

17        A.   Well, what's making me think of this is

18   doing the investigations, because there are times

19   where we lie to people and -- to try to get them to

20   speak to us and -- so that's kind of where I'm

21   thinking.

22        Q.   Suspect interactions?

23        A.   Yeah.

24        Q.   Sure.

25        A.   When they're doing something wrong, we

Page 46

1    might throw something against the wall to see if it

2    sticks.  So there are times where I have not told

3    the truth, but it's in those kind of scenarios.

4         Q.   Where, for instance, you're investigating

5    an employee potentially for misconduct?

6         A.   Something of that nature, yeah.

7         Q.   Okay.  Other than suspect interactions or

8    investigative tools in evaluating or investigating

9    employees for misconduct, is there any other time

10   that you can recall when it would be appropriate to

11   make misrepresentations or false statements of fact

12   in interactions with other sheriff's office

13   employees?

14        A.   No, I don't think so.

15        Q.   Okay.  Do you agree with me that one of

16   the most important things a law enforcement officer

17   has is his or her integrity?

18        A.   Yeah, I believe that.

19        Q.   Okay.  We've talked about this before.

20   One of the things that law enforcement officers do

21   as part of their job duties is testifying under

22   oath, correct?

23        A.   Correct.

24        Q.   And would you agree with me that if an

25   officer is caught in committing a lie under oath,

Page 47

1    then it would be fair for a jury or fact finder to

2    disbelieve other aspects of their testimony?

3         A.   Yes.

4         Q.   Do you agree that Sheriff McGuffey, who is

5    an elected official and stands for election every

6    four years, is a public figure?

7         A.   Yes.

8         Q.   Are you familiar with someone named

9    Caroline Adams?

10        A.   I believe that's the woman known as Itsa

11   Krakken or -- she's got several Facebook handles, I

12   guess.

13        Q.   Okay.  And we're going to talk about some

14   of those handles.

15        A.   Okay.

16        Q.   I'm going to give you some of those, and

17   you can tell me if you remember them.  Are you

18   familiar with her regular criticism of Sheriff

19   McGuffey?

20        A.   So in the first two years I'd say it was a

21   flood.  I don't have any social media.  Oh, no, I

22   have LinkedIn.

23        Q.   Okay.

24        A.   So I have no social media.  But constantly

25   people were bringing it up.  So I definitely was

1    aware of it.

2         Q.   When they would bring it up, would they

3    bring you like copies of her posts?

4         A.   No.  Mainly just talking about it.  But I

5    would -- people would screenshot or show it to me,

6    things of that nature.  But I really -- I don't do

7    social media, so. . .

8         Q.   Did you have any awareness of her prior to

9    Sheriff McGuffey taking office?

10        A.   No.  I had no idea who she was.

11        Q.   Okay.  When did you first become familiar

12   with Caroline Adams?

13        A.    It was sometime that first year, so

14   sometime in '21.  But it was so, so busy.  It was --

15   really my head was spinning for the first year,

16   maybe even first two years.

17        Q.   Okay.  You're familiar and you named one

18   of her online handles as Itsa Krakken, correct?

19        A.   Yeah.

20        Q.   Are you familiar with another one that's

21   denoted as Signal 99?

22        A.   Yeah.  That's the -- I guess that's a

23   newer one.

24        Q.   Okay.  And she also has posted under Chaz

25   the Anti-Sheriff, correct?

Page 49

```
 1        A.   I know she calls her Chaz or something
 2   like that.
 3        Q.   Okay.  Have you seen or heard about her
 4   Chaz the Anti-Sheriff page?
 5        A.   Maybe.  I don't. . .
 6        Q.   All right.  Were you aware that Caroline
 7   Adams made a post on her Facebook critical of
 8   Sheriff McGuffey relative to the sheriff leaving a
 9   loaded firearm in her vehicle unattended in 2021?
10        A.   Yes.
11        Q.   Were you aware that Ms. Adams was -- all
12   right.  Were you aware that local news media,
13   including Fox 19, reported on this incident in 2021?
14        A.   Yes.
15             MR. WIEST:  Okay.  Just for the
16             record.  I'm handing you what I'm marking
17             as Exhibit 1.
18             (Plaintiffs' Deposition Exhibit No. 1
19             was marked for identification.)
20             MR. SIMON:  Chris, I am going to
21             object.  This wasn't disclosed as part of
22             your discovery.  We had an email exchange
23             about it.
24             I just want to note my objection that
25             I --
```

1          MR. WIEST:  Okay.

2          MR. SIMON:  -- think that all

3     exhibits should be served to opposing

4     counsel before depositions.

5          MR. WIEST:  Yeah.  We disagree with

6     that as a matter of work product.  But we

7     can take that up later.

8  BY MR. WIEST:

9     Q.   Are you familiar with the Fox News

10 reporting on the gun incident?

11    A.   I'm familiar with the gun incident.

12    Q.   Okay.

13    A.   I mean, I'm not. . .

14    Q.   Were you aware that there was another

15 round of press on this when the firearm was

16 recovered in 2023?

17    A.   Sure.  Yes.

18          MR. WIEST:  All right.  I'm marking

19     this as let me mark -- sorry.  One.  Two.

20          (Plaintiffs' Deposition Exhibit No. 2

21          was marked for identification.)

22    Q.   Do you know if you saw the Fox News

23 reporting on the recovery as well?

24    A.   Again, I know --

25    Q.   Generally about the incident?

Page 51

1    A.   Sure.  I don't know about Fox News or

2  any- -- you know, I don't know where I learned it

3  from.  I mean, I knew of the situation, so I don't

4  know that I even read any news on it.

5    Q.   Were you aware that the sheriff's office

6  actually issued a press release relative to the

7  recovery of the firearm?

8    A.   Sure.

9    Q.   Okay.  Were you aware that Caroline Adams

10  was critical again of Sheriff McGuffey in 2023 after

11  the firearm was recovered, made posts about it?

12    A.   I don't know.

13    Q.   Okay.  Do you think that the theft of the

14  firearm and its later recovery and reporting by the

15  news were issues of public concern?

16              MR. SIMON:  Objection.  Calls for a

17         legal conclusion.

18              You can answer.

19    A.   Can you repeat that question, please?

20    Q.   Yeah.  Do you think the loss of the

21  firearm and its later recovery were issues of public

22  concern?

23              MR. SIMON:  Objection.

24    A.   (No response.)

25    Q.   The public might have an interest in those

Page 52

1    things?

2        A.    Of course, yes.  And that's why we put a

3    press release out.

4                MR. WIEST:  Right.  I'll mark this as

5                Exhibit 3.

6                (Plaintiffs' Deposition Exhibit No. 3

7                was marked for identification.)

8                MR. SIMON:  Chris, same objection.

9                I'll just have a running objection to new

10               articles that weren't disclosed.  I know

11               we had an email exchange about it.  We

12               disagree.  But just to preserve the

13               record, we do object to these --

14               MR. WIEST:  Sure.

15               MR. SIMON:  -- undisclosed exhibits.

16       Q.    In 2010 were you aware that Sheriff

17   McGuffey was involved in an incident that ultimately

18   led to a five-day suspension with the sheriff's

19   office, an incident that occurred in Covington,

20   Kentucky?

21       A.    I was not aware of that.

22               MR. WIEST:  Okay.

23               MR. SIMON:  Off the record for a

24               second, Chris.

25               THE VIDEOGRAPHER:  Would you like to

1           go off the record?

2               MR. SIMON:  Oh, I forgot we had to do

3           that, too.

4               You gave me this one --

5               THE VIDEOGRAPHER:  Wait.  Would you

6           like to go off the record?

7               MR. SIMON:  Yes.  Well --

8               MR. WIEST:  Yes.

9               THE VIDEOGRAPHER:  Okay.  Hold on.

10          We're going off the record at 10:05.

11              (Off the record.)

12              THE VIDEOGRAPHER:  We're going back

13          on the record at 10:05.

14   BY MR. WIEST:

15       Q.   You were not aware of any reporting about

16   the incident in 2019 when she had announced her run

17   for sheriff -- the 2010 incident?

18       A.   So I learned of that -- yeah.  I had heard

19   about it, yes.

20       Q.   Okay.

21       A.   What had happened I don't think I -- I

22   don't think it was anything that I knew about.

23       Q.   Was involved in?

24       A.   Yeah.

25       Q.   Sure.  But it became an issue in 2019 as

Page 54

1    part of the campaign, correct?

2         A.   Yeah, I don't know.  I didn't follow

3    really that very much.

4         Q.   Okay.  Were you aware that Caroline Adams

5    has made Facebook posts about the sheriff relative

6    to that incident -- the 2010 incident as reported in

7    The Enquirer article in 2019?

8         A.   I'll be honest with you, she's done so

9    much.  I kind of lose track to be truthful.

10        Q.   Okay.

11        A.   There's so much.

12        Q.   Okay.  It would not surprise you to learn

13   that she was -- I mean, would it be fair to say that

14   anything the sheriff does or has alleged to have

15   done generally ends up on Ms. Adams' Facebook posts

16   one way or the other?

17        A.   I would say that would be fair.

18        Q.   Okay.  Obviously as a public figure this

19   incident in 2010 ended up as a story in The

20   Enquirer; you don't dispute that, correct?

21        A.   I do not.

22        Q.   Okay.  And would you agree that this

23   incident -- and I'm not here, by the way -- I'm not

24   offering any of this for the truth of what happened

25   or didn't happen.  I'm not interested in that in

1    this case.  But regardless, this was publicly

2    reported and therefore was an issue of public

3    concern?

4         A.   Well, yeah.  It was in the paper, so it

5    was -- somebody printed it.

6                   MR. WIEST:  Right.  Let's go ahead

7              and look at -- I'll mark this as four.

8              (Plaintiffs' Deposition Exhibit No. 4

9              was marked for identification.)

10        Q.   There's another Enquirer article in 2023

11   about the sheriff being pulled over for a 72 in a 55

12   by the Clermont County Sheriff; you see that, right

13   --

14        A.   I do.

15        Q.   -- Exhibit 4?  You're familiar with this

16   incident, correct?

17        A.   I am.

18        Q.   And for anyone else getting pulled over at

19   72 in a 55 -- I think I've done it, I think other

20   people have done it -- it's never ended up in the

21   paper, but because she's a public figure it ends up

22   as an article, correct?

23        A.   Uh-huh.

24        Q.   You agree with that, right?

25        A.   I believe that she's the only public

Page 56

1   figure that would have been on the news for this,

2   because she is a lightning rod.

3                   THE COURT REPORTER:  She is what?

4                   THE WITNESS:  A lightning rod.

5                   THE COURT REPORTER:  A lightning rod.

6           Thank you.

7       Q.   One of the first things that this article

8   reports having occurred in this traffic stop is her

9   identifying herself as the Hamilton County Sheriff;

10  were you aware of that?

11                  MR. SIMON:  Chris, are you asking if

12          this is what the article says?

13                  MR. WIEST:  Well, I'm asking if he

14          was aware of that interaction, and that

15          was the first thing that occurred in the

16          interaction.

17      Q.   If you look --

18      A.   Yeah.

19      Q.   -- it says, A body camera captured the

20  stop.  McGuffey was traveling east on Ohio 32

21  towards --

22      A.   Hold on.  I'm lost.  I'm lost.

23      Q.   Here, right there.  A body camera.  That's

24  what I'm reading from.

25      A.   Oh, okay.

1     Q.   A body camera captured the stop.  McGuffey

2  was traveling east on Ohio 32 towards Batavia Road

3  just before 1:00 p.m. on May 27 when she was pulled

4  over.  The Clermont County Deputy told her she was

5  doing 72 in a 55 mile per hour zone.  McGuffey

6  handed him her license and said she was the sheriff

7  of Hamilton County.

8     A.   Okay.

9     Q.   Okay.  So do you think that it was only

10  because she -- the sheriff is a lightning rod rather

11  than identifying her office in an immediate

12  interaction in a traffic stop is what generated the

13  article?

14          MR. SIMON:  Objection to the form.

15          It's argumentative.

16          You can answer.

17     A.   Identifying herself as the sheriff is what

18  she should have done.

19     Q.   Okay.  Why is that?

20     A.   Well, if I'm walking up on somebody, I

21  immediately know that I'm not dealing with somebody

22  that's going to harm me.

23     Q.   Okay.

24     A.   This person might be armed.  I don't know

25  what she had on her.  So identifying her is --

1    that's what she should have done.

2        Q.   Okay.  Do you know, did Caroline Adams --

3    do you know whether Caroline Adams posted about this

4    incident --

5        A.   I do --

6        Q.   -- as well?

7        A.   -- remember that.

8        Q.   Okay.  She did, correct?

9        A.   I do remember that.

10       Q.   Okay.  When you say you do remember, you

11   do remember her posting, correct?

12       A.   I -- again, I --

13       Q.   Right.

14       A.   -- don't get this from Facebook.  I

15   don't. . .

16       Q.   People reported it to you?

17       A.   People give me information, yes.

18       Q.   Okay.  Chief Gramke, what is the Brady

19   list?

20       A.   The Brady list is a list held by the

21   prosecutor's office which is for officers who have

22   lied, that their -- their credibility could be

23   impeached.

24       Q.   Is the Brady list something that has to be

25   disclosed to criminal defense attorneys in a

Page 59

```
 1    criminal case --

 2         A.   Yes.

 3         Q.   -- involving a law enforcement officer's

 4    background?

 5         A.   Yes.

 6              MR. WIEST:  Okay.  All right.  I have

 7         two exhibits to look at with you together.

 8         How about this, I'll mark this as five and

 9         six respectively.

10              (Plaintiffs' Deposition Exhibit Nos.

11              5 and 6 were marked for

12              identification.)

13              MR. SIMON:  I need to renew my --

14              MR. WIEST:  Sure.

15              MR. SIMON:  -- objection --

16              THE WITNESS:  Are you going to ask --

17              MR. SIMON:  So hold on one second.

18         You've marked Exhibit 5 and 6, Counselor.

19         You're about to identify them.  One of

20         them is a news article, which we've seen

21         in previous exhibits.  Exhibit 6 is

22         something more -- is different and it

23         should have been disclosed to us.

24              MR. WIEST:  So I'm going to tell you

25         this was actually embedded within the news
```

Page 60

1                article in Exhibit 5.  And if you were to

2                go to the Fox 19 page on this, you would

3                find an embedded link of the Hamilton

4                County Sheriff's Office -- or, I'm sorry,

5                the Hamilton County Prosecutor's Office

6                Brady List as of 5/22/19.

7                     And I will represent to you I did not

8                print out the entire 25-some pages.  I

9                just grabbed pages 1, 19, and 23 of that.

10               But it can be found via Google and it is

11               available online.

12   BY MR. WIEST:

13        Q.   Let me ask, Chief Gramke, were you aware

14   on October 10th of 2019 that Fox 19 reported -- gave

15   a general report about Brady list issues in the

16   Cincinnati area?

17        A.   I do remember that becoming a topic of

18   interest for law enforcement, because most officers

19   wanted to know where -- what was going to put them

20   on the Brady list.  People that had minor incursions

21   and things of that nature were worried they were

22   going to be put on the list, so -- yeah, I do

23   remember that.

24        Q.   Okay.

25        A.   I don't -- again, I don't know where that

Page 61

1    news came from, though.

2         Q.   Okay.  Were you aware that the Hamilton

3    County Prosecutor's Office actually provided to Fox

4    19 News the Brady list as of 5/22/19?

5         A.   I do remember that coming out, because it

6    was -- there was a lot of interest in the

7    department.

8         Q.   Okay.  Were you aware that there were two

9    separate entries on this list regarding Sheriff

10   McGuffey, No. 76 and 109?

11        A.   Yeah.  Do I remember that exactly?  I

12   don't know.  I see it now.

13        Q.   Were you generally aware that she was on

14   the Brady list?

15        A.   I was.

16        Q.   Okay.  The reason I bring this up, were

17   you aware that Caroline Adams has made Facebook

18   posts that were critical of Sheriff McGuffey for

19   being on the Brady list?

20        A.   Yes.

21        Q.   Okay.  Would you agree that having an

22   elected sheriff on the Brady list would be an issue

23   of public concern?

24              MR. SIMON:  Objection.  Legal

25              conclusion.

Page 62

1           You can answer.

2      A.   I understand why it would be a public

3 concern.

4      Q.   Okay.  There was an incident on

5 September 20th of 2023 involving Sheriff McGuffey.

6 And I've not been able to download it.  But Caroline

7 Adams posted it with dash cam footage involving the

8 sheriff with allegations that she had been drinking

9 and potentially driving; were you aware of that?

10     A.   No.

11     Q.   You haven't seen that before, the dash cam

12 footage?

13     A.   Is this the traffic stop in Clermont

14 County?

15     Q.   No.  It's a different traffic incident.

16 It's September 20th of 2023.

17     A.   I don't know -- I don't know that.

18     Q.   All right.  I have not been successful at

19 downloading it, although I could certainly play it

20 for you.  Were you aware that Caroline Adams had

21 posted dash camera footage with allegations that the

22 sheriff had been intoxicated?

23     A.   I don't think so.

24     Q.   Okay.  Are you aware of whether Caroline

25 Adams had made posts about inmates at the Hamilton

1    County Jail popping open the locks to the cells and

2    walking freely about the pods?

3         A.   I -- I don't recall.

4         Q.   Okay.  Was that an issue of public

5    concern?

6         A.   Oh, yeah.  We were very outspoken about

7    that, getting the locks fixed, yeah.

8         Q.   Okay.  In fact, you would agree that

9    Caroline Adams is generally a very frequent critic

10   of Sheriff McGuffey, particularly in the first two

11   years, correct?

12        A.   I -- yeah, I would say so.

13        Q.   Okay.  Would it be fair to say you do not

14   appreciate Caroline Adams' criticisms?

15        A.   That's very, very much safe to say.  Her

16   goal to me is to destroy the sheriff's department.

17   So, yes, I take that very seriously.

18        Q.   Okay.  Would it be fair to say that -- has

19   Sheriff McGuffey ever told you that she does not

20   welcome or appreciate Caroline Adams' criticisms?

21        A.   Yes.

22        Q.   Have you ever used the term "crazy lady"

23   to describe Caroline Adams?

24        A.   Yes.

25        Q.   Prior to September of 2023 did you and

Page 64

1    Sheriff McGuffey undertake meetings with sheriff

2    deputies in the --

3        A.   Repeat the dates on that.  I'm sorry.

4        Q.   Yeah.  Prior to September of 2023 -- in

5    other words, it could have been 2021, 2022 -- did

6    you and Sheriff McGuffey undertake, have meetings

7    within the sheriff's department with deputies to

8    address, among other things, Caroline Adams?

9        A.   No.

10       Q.   Okay.  Did you or Sheriff McGuffey to your

11   knowledge ever tell deputies that if they or their

12   spouses associated in any way with Caroline Adams,

13   including by interacting with her on social media,

14   that there would be consequences?

15       A.   No.

16            MR. WIEST:  All right.  Do you need a

17            break?  Now is -- because I'm about to get

18            in another line of questioning, so now is

19            a good time.

20            MR. SIMON:  Okay.

21            THE VIDEOGRAPHER:  We're going off

22            the record at 10:18.

23            (A brief recess was taken.)

24            THE VIDEOGRAPHER:  We're going back

25            on the record at 10:35.

 1   BY MR. WIEST:

 2        Q.   Chief, I've got follow-ups as we always do

 3   on breaks.  And I'm going to talk about the

 4   sheriff's office starting on January 4th of 2021 in

 5   terms of organization and size and things like that.

 6             And so I want to talk -- the top of the

 7   sheriff's office's organization as of January 4th of

 8   2021 was Sheriff McGuffey --

 9        A.   Correct.

10        Q.   -- correct?  You were right below her,

11   correct?

12        A.   That is correct.

13        Q.   And then who was reporting to you?

14        A.   We have -- let's see.  Major Ketteman.

15   Major Ems.  At that time Major Reed.  Chief Horn.  I

16   don't -- I think I'm missing somebody.  Then we had

17   our PIO -- yeah, just different people in the -- and

18   then, of course, everybody below that, too.

19        Q.   Okay.  When you say everybody below that,

20   everybody else below that that was reporting to the

21   majors who were then reporting to you --

22        A.   So --

23        Q.   -- correct?

24        A.   -- yeah, you know, all the way down the

25   line.

Page 66

1       Q.   And so generally who was reporting to the
2    majors; were the captains reporting to the majors?
3       A.   Captains report to majors.
4       Q.   Did lieutenants also report to majors
5    depending on --
6       A.   It depends on the -- sometimes I can get
7    where there could be a lieutenant directly reporting
8    to a major, like as Mike Gay when I was in RENU.
9       Q.   Okay.
10       A.   I was directly reporting.  But, yeah,
11    normally it's a major -- you know, a captain
12    reporting to a major, but. . .
13       Q.   And then lieutenant to the captain
14    generally?
15       A.   Generally, yeah.
16       Q.   And then the sergeants report to the
17    lieutenants?
18       A.   Generally.
19       Q.   And then there are corporals that report
20    to the sergeants?
21       A.   Yes.
22       Q.   And then are the patrol officers reporting
23    to the corporals?
24       A.   It kind of is weird there.  They're really
25    reporting to the sergeants.

Page 67

1      Q.   Okay.

2      A.   The corporals are kind of the commanders

3  in the field, if you would.

4      Q.   On-scene commander?

5      A.   Yeah.  If the situation arises, they're

6  going to take control until the sergeant gets there.

7      Q.   Okay.  Is there generally then a sergeant

8  on every shift?

9      A.   Generally, yes.

10      Q.   Obviously some of those people are on

11  vacation, some of those people are sick, but --

12      A.   There's always going to be a sergeant or a

13  lieutenant always.

14      Q.   Okay.  How many employees did the Hamilton

15  County Sheriff's Office have in, let's say, 2021?

16  You can give me a rough.

17      A.   900.

18      Q.   Okay.

19      A.   Yeah, roughly 900.

20      Q.   And was that true in 2022 also?

21      A.   I -- I don't know.

22      Q.   More or less?

23      A.   I. . .

24      Q.   You don't know?

25      A.   We've gone up and down here in the last

Page 68

1    four years.  I know we lost a bunch of people at one

2    point and gained a bunch of people.  So I don't know

3    what -- at what point in 2022.  I don't know where

4    we were.

5         Q.   Where is that -- where have those numbers

6    fluctuated from; I mean, can you give me a rough

7    range?

8         A.   Probably between 800 and 900.

9         Q.   Okay.

10        A.   820 and 900.  I don't know.

11        Q.   Okay.  All right.  True in 2024 also, 800

12   to 900?

13        A.   It depends on what part of '24.

14        Q.   Okay.

15        A.   We were closer to 900.  And I believe now

16   we're over 900.

17        Q.   Do you agree that the Hamilton County

18   Sheriff's Office is one of the largest law

19   enforcement agencies in southwest Ohio?

20        A.   Yes.

21        Q.   Do you agree that the Hamilton County

22   Sheriff's Office is, along with other major

23   metropolitan cities in -- or counties in Ohio, one

24   of the largest law enforcement agencies in Ohio?

25        A.   Well, I would say that we're the third

Page 69

1    largest sheriff's department, I guess.

2         Q.    Okay.  Is that after Cuyahoga?

3         A.    Cuyahoga and Franklin.

4         Q.    Which is Cleveland and Columbus?

5         A.    Correct.

6         Q.    Okay.  Do you know, what is Caroline

7    Adams' background or what's your understanding?

8         A.    I have no idea.

9         Q.    Okay.  Do you know what her fixation is

10   on -- and by the way, it's not just the sheriff's

11   office she's critical of.  I think she's also been

12   critical of Chief Theetge at Cincinnati Police and I

13   understand --

14        A.    I don't know her.  I don't know who she

15   is.  I don't know what her issues are.

16        Q.    Okay.  Fair enough.  I asked you before we

17   took a break whether you -- and I gave you a time

18   line -- of whether you and Sheriff McGuffey ever

19   took -- or undertook meetings with deputies to

20   address in briefings things that included Caroline

21   Adams.  Do you ever remember doing that?

22        A.    That was never any kind of intent of the

23   meetings or -- if that's what you're asking me.

24   There was one time I think she said something about

25   the troll or -- she called her a troll or something

Page 70

1    like that in one of the briefings.  We went out

2    there to talk about different things, but that was

3    never the focus.

4          Q.   Okay.

5          A.   And I think that only happened once.

6          Q.   Where did that happen?

7          A.   I don't know.  One of the districts.  I

8    don't remember which one.

9          Q.   And did she generally warn deputies not to

10   be associated with Caroline Adams?

11         A.   I never heard her say that.

12         Q.   Okay.  What did she say about -- during

13   this briefing about Caroline Adams and the troll?

14         A.   She was joking and she said I've got a

15   troll who lives in her basement that criticizes me,

16   something to that effect, that I can remember.

17         Q.   Okay.  All right.  I want to talk a little

18   bit about -- let me back up, one other sort of

19   generalized question.  Are there more opportunities

20   for specialized assignments within the Hamilton

21   County Sheriff's Office versus other agencies

22   because of the size of the department?

23         A.   Because of the size and that we're a

24   sheriff's department.

25         Q.   Sure.

1      A.   So there's more opportunities because we

2   have courts and the jail and all that.  So I think

3   that's very safe to say.

4      Q.   You've been involved in the recruitment

5   efforts within the sheriff's department for

6   officers, correct -- that's part of your duties?

7      A.   As chief deputy --

8      Q.   Yes.

9      A.   -- or before?

10      Q.   Well, certainly as chief deputy.

11      A.   Yeah, not before.  But, yeah, as chief

12   deputy -- of course, that's been my -- that was

13   number one on my list, you know, getting people in

14   the door, so yeah.

15      Q.   Okay.  Has it been the case that people

16   are willing to be paid less at the sheriff's office

17   than other departments because of the opportunities

18   and specialized assignments?

19      A.   I believe so, yes.

20      Q.   Okay.  All right.  Has that always been

21   the case?

22      A.   It was the case when I was an officer.

23      Q.   Okay.

24      A.   And it's the case now.  So I -- I don't

25   know about forever, but I think since Simon -- when

Page 72

1    Simon Leis was in office.

2         Q.   Okay.  All right.  Let's talk about Jason

3    Davis.  By the way, did you know Jason Davis prior

4    to becoming chief deputy?

5         A.   Sure.

6         Q.   How long had you known him for?

7         A.   Prior to chief deputy how do I know him?

8         Q.   Right.

9         A.   You know, I knew more of him than knowing

10   him personally.  I knew his brother pretty well.

11        Q.   His brother was at RENU?

12        A.   His brother is in RENU.  But I knew John

13   before that.

14        Q.   Okay.

15        A.   A really good officer.  And I had him out

16   on the streets and then in RENU as well.  As far as

17   how long I'd known Jason, probably -- again, knowing

18   him and knowing of him -- maybe seven, eight years

19   before I was chief deputy.

20        Q.   Before you became chief deputy what was

21   your sort of general understanding of Jason as an

22   officer?

23        A.   Jason was known as a malcontent.

24        Q.   What does that mean?

25        A.   Malcontents -- they complain, they know it

1    all, generally just bad attitude.

2         Q.    Okay.  Did you have any personal

3    experience with him?

4         A.    Before or --

5         Q.    Right.  Before you became chief deputy.

6         A.    Before he just -- the -- his reputation.

7         Q.    Okay.  Who had reported that to you; do

8    you remember?

9         A.    No, I don't remember.

10               (Plaintiffs' Deposition Exhibit No. 7

11               was marked for identification.)

12        Q.    Okay.  I'm handing you Exhibit 7.  We're

13   not going to talk about it very long, but we are

14   going to talk about it.

15        A.    $11.12.

16        Q.    By the way, do you have any specific

17   examples of -- I mean, you talked about his

18   reputation -- of Jason's malcontent or complaining

19   behavior prior to you becoming chief deputy?

20        A.    Not prior.

21        Q.    Okay.

22        A.    I take that back.  I believe he was in the

23   jail for a very long time, and I believe that was

24   the reason why.

25        Q.    Okay.  You thought that his tenure in the

Page 74

1   jail was because he was a malcontent?

2       A.   Yes.

3       Q.   Okay.

4       A.   And, again, that was -- that was the

5   opinion I had of him.

6       Q.   Okay.  Did that -- do you have any

7   specific examples of once he became a patrol officer

8   of that behavior?

9       A.   I don't remember when he became a patrol

10  officer, but up until being chief deputy, no.

11      Q.   With someone being a malcontent or a

12  know-it-all or having a bad attitude, would that be

13  reflected in performance reviews?

14      A.   It should be.

15      Q.   Okay.  We're going to talk about that in a

16  couple of minutes.  Jason -- you don't dispute

17  Exhibit 7 -- was appointed as a correction officer

18  beginning in January of 2002, correct?

19      A.   No.

20      Q.   All right.  And I think you commented

21  $11.12?

22      A.   Yeah.

23      Q.   That was the going rate then.

24      A.   Unbelievable.  Mine was $8.00 when I

25  started.

1      Q.   Okay.  So a decade of inflation was $11.12

2  an hour.  Okay.  And he had to take an oath.  We see

3  that on the second page of that --

4      A.   Yes, sir.

5      Q.   -- exhibit.

6           MR. WIEST:  Let's go ahead and look

7       at eight.

8           (Plaintiffs' Deposition Exhibit No. 8

9           was marked for identification.)

10     Q.   He takes another oath in January of '13.

11  And it looks like Major McGuffey at the time

12  witnessed it.

13     A.   Uh-huh.

14     Q.   And then there's an appointment that

15  follows, if you look.  It looks like Jim Neil signed

16  on January 7th of 2023 [sic] on the second page of

17  this.

18     A.   Yep.

19     Q.   Do you know why this particular entry

20  occurred with the Hamilton County Common Pleas

21  Court?

22     A.   I have no idea what this is.

23     Q.   Okay.  Fair enough.  All right.

24     A.   I mean, I know what an oath of office is.

25  I don't know appointment of deputy sheriffs.

Page 76

1      Q.   And why it was being entered in the court;
2  you don't know?
3      A.   I don't know.
4           MR. WIEST:  That's fair.  All right.
5      Let's go look at Exhibit 9.
6           (Plaintiffs' Deposition Exhibit No. 9
7           was marked for identification.)
8      Q.   Jason gets moved, it looks like, in
9  October of 2014 as reflected in Exhibit 9 to
10  enforcement officer, which is patrol, correct?
11      A.   Correct.
12      Q.   And I think you told me that there was an
13  application and appointment process that was part of
14  that, correct?
15      A.   I don't know what Jim Neil did.
16      Q.   Okay.
17      A.   That's how we do things.  This was
18  probably -- I have no idea, I should say that.  I
19  don't know how they came up with this list.
20      Q.   Let me ask, did the process -- did you and
21  Sheriff McGuffey change the process at all in terms
22  of corrections to enforcement officer starting in
23  2021 or after?
24      A.   It was after that.  It was after '21.
25  We -- it took us, like I said, there was -- the

Page  77

1    locks didn't work.  So, yes, then we came to the

2    National Testing Network and the panel interviews

3    after a time.

4         Q.   Was that true for movement from

5    corrections to enforcement also?

6         A.   I think we started with the testing

7    promotions and then we eventually got to

8    corrections, yes.

9         Q.   Okay.

10        A.   But that might have been the next year or

11   so.  I don't remember.

12        Q.   So what was the pro- -- well, let me ask,

13   you don't know whether the process had ever changed

14   under Jim Neil?

15        A.   I don't believe it did.

16        Q.   Okay.  So was there a test that was part

17   of that and was there an interview also?

18        A.   For Jason Davis?

19        Q.   Well, right, or for generally, movement

20   from corrections to enforcement.

21        A.   I have no -- I have no idea how they did

22   it.

23        Q.   Okay.  You knew -- and you already told me

24   what happened when you did it, correct?

25        A.   Yes.

1     Q.   Okay.  I want to talk about and I want to

2   look at evaluations.

3     A.   Okay.

4     Q.   And before I look at it, there were

5   numeric scores --

6     A.   Uh-huh.

7     Q.   -- that were provided.  Can you tell me

8   generally what those scores related -- like what was

9   the scale?  Let's start there.

10    A.   So the scale is from -- can I see the

11  exhibit?

12    Q.   Yeah, let's go do that.

13    A.   There's. . .

14             MR. WIEST:  I'm marking this as 10.

15             (Plaintiffs' Deposition Exhibit No.

16             10 was marked for identification.)

17    Q.   And we'll just talk about the first page

18  before we get into them all so I can get a sense of

19  how this worked.  I mean, you've seen these

20  evaluation forms, correct --

21    A.   Oh, yeah.

22    Q.   -- because you were a supervisor?

23    A.   Sure.

24    Q.   Can you tell me what the scale was?

25    A.   So the scale goes from zero to 25.

1        Q.    Okay.

2        A.    Twenty-five being unattainable is what we

3   were taught.  Now, we were taught this many, many

4   years before this arbitrary number evaluation and --

5   so 25 was not possible to get.  You couldn't get

6   that.

7        Q.    Okay.

8        A.    Any score over a 20 would have been where

9   you would have had to justify each line over a 20.

10  And we really got away from that.  But at this point

11  --

12       Q.    Right.  2016 is the first page of this.

13       A.    -- 2016 --

14       Q.    Yeah.  Although I think the rating period

15  on the first page -- and I'll tell you, I've got all

16  of his evals.

17       A.    Yeah.

18       Q.    We're going to go through them.

19       A.    Yeah.

20       Q.    But the first page is January 1st of

21  '15 to 12/31 of '15, if you look.

22       A.    Yeah.

23       Q.    And I guess my question is, you said

24  anything over 20 had to be specially justified?

25       A.    Yeah.

Page 80

1      Q.   What was kind of the bottom of the scale
2  in terms of -- I'm assuming at some point numbers
3  get below a meets expectations and it's problematic.
4  Do you know what that was?
5      A.   Single digits.
6      Q.   Okay.
7      A.   Single digits were where you were getting
8  -- that was very poor.
9      Q.   So nine or below you were not meeting
10 expectations, fair?
11     A.   So there's an entire book that I think I'm
12 the only one probably that has the -- or I had the
13 last remnant of this.  But we learned this so many
14 years ago.  This is so old.
15     Q.   Okay.
16     A.   But there was a book that had that rating
17 scale.  And none of these people that are in these
18 evaluations ever read that book.  This was kind of
19 not very -- it was a terrible system.  But go ahead.
20     Q.   Okay.  Well, let me --
21     A.   So -- but yeah.  I would say the single
22 digits were where people were really lacking.
23     Q.   Okay.  And then let's say you're in that
24 10 to 19 range -- or 10 to 20 range.  I think you
25 said anything over 20 required a special

1    classification.  In the 10 to 20 range -- like if

2    I'm reading, it looks like Jason, for instance, had

3    a 12 for job knowledge and performance --

4         A.   Uh-huh.

5         Q.   -- and I think he's got a 15 in there for

6    attendance and punctuality.

7         A.   Uh-huh.

8         Q.   What, if anything, can I discern from that

9    first page?

10        A.   I believe this was -- was this his

11   first -- I think this was his first --

12        Q.   Eval as an enforcement officer --

13        A.   -- eval.

14        Q.   -- yes, sir.

15        A.   And a 12 for this.  Let's see who the

16   sergeant was.  Brian Sovern.  So this would have

17   been a pretty solid first year.

18        Q.   Okay.

19        A.   Nothing spectacular, but it would be good.

20        Q.   And it looks like he got four letters of

21   appreciation.  There's a narrative --

22        A.   Uh-huh.

23        Q.   -- on the second page of this.  I think it

24   actually starts on the first.  It says Areas to

25   Improve, slash, Comments.  Enforcement Officer Jason

Page 82

1    Davis has been assigned to District 5, Squad B,

2    since his successful completion of field training in

3    February of 2015.  Enforcement Officer Davis

4    definitely hit the ground running.  He has good

5    enforcement numbers, including three felony arrests,

6    19 misdemeanor, and 14 minor misdemeanor arrests.

7    Enforcement Officer Davis has performed well in

8    self-initiated activity, not only in stopping and

9    searching cars, but stopping and searching the

10   correct cars, producing result.  Enforcement Officer

11   Davis has good numbers in citations and warrants

12   served at 77 and 82, respectively.  He also has one

13   recovered stolen vehicle and a good number of FIRs.

14   What's an FIR?

15        A.   Field interrogation reports.

16        Q.   Okay.  Is that where you --

17        A.   Suspicious person.

18        Q.   Okay.

19        A.   Who are you, what are you doing here?

20        Q.   Okay.  Weaknesses observed are lack of

21   PFOs --

22        A.   Property found open.

23        Q.   Okay.  With only four for the year, as

24   well as low OVI arrests.  Enforcement Officer Davis

25   also needs to be mindful of his detail cards; he has

Page 83

1  left off useful statistical information which would

2  show a higher monthly standard, more in line with

3  his good enforcement numbers.  What's a detail card?

4      A.   It's an activity log to show us what

5  you've done.  So they write down I made a traffic

6  stop or I went on a burglary run.

7      Q.   Okay.  Enforcement Officer Davis received

8  four citizens' letters of appreciation, including

9  one from a subject he arrested.  Enforcement Officer

10 Davis is off to a very good start in his new

11 position, and I encourage him to keep up the good

12 work.  Enforcement Officer Davis used no sick time

13 during this evaluation period.

14          So I think you told me this is -- the term

15 you used was solid rating?

16     A.   Yes.

17     Q.   Okay.  For a first-year enforcement

18 officer?

19     A.   Yes.

20     Q.   Let's look at the second year.  This is

21 1/1/16 to 12/31/16.  The overall score goes up two

22 --

23     A.   Uh-huh.

24     Q.   -- from 12 to 14.  And there's a

25 commentary there as well that talks about -- by the

Page 84

1    way, would this be consistent with expectations or a

2    solid report also --

3         A.   Yes.

4         Q.   -- for the second year?  Okay.  The

5    statement is made this is his second annual

6    evaluation, and he continues to shine as an

7    aggressive officer, making traffic stops of

8    suspicious vehicles and developing cause to search,

9    with his arrest numbers reflecting such.  And

10   there's some statistics there.

11        The statement is made Enforcement -- on

12   the second page, Enforcement Officer Davis's work is

13   commendable.  He is quick to assist others, and he

14   is a positive force on the morale of his squad with

15   his efforts to make the workplace enjoyable.

16        There's a comment about wanting his OVI

17   numbers to increase as well, correct?

18        A.   Correct.

19        Q.   Although, that says that given his

20   enforcement numbers, I do not believe this is a

21   reflection of his effort.  It says, The main area of

22   improvement should be in dependability.  Enforcement

23   Officer Davis performs his enforcement duties with

24   good street knowledge and desire to be effective,

25   but he often needs reminding to complete OHLEG and

Page 85

1    Police One training assignments.

2              What is that, OHLEG and then Police One;

3    do you know?

4         A.    It's just training through the state.

5         Q.    Is it like --

6         A.    Police One is a -- Police One is a company

7    that we purchase some -- you can get training from

8    them for a fee.

9         Q.    Okay.  Was that like OPOTA training?

10        A.    No.

11        Q.    Okay.  That's different?

12        A.    Yeah.

13        Q.    Okay.  With our ever-increasing demands in

14   hours for continued professional training, he will

15   be called upon to do more of these training blocks,

16   and I would like to know the assignments will be

17   done without prodding.  Enforcement Officer Davis is

18   a solid employee who takes his position and

19   enforcement duties to heart.  He received a

20   Divisional Commendation resulting from an incident

21   on June 23, 2016, when he responded to a residence

22   for a non-breather.

23              What's a Divisional Commendation?

24        A.    So we have two types of commendations.  We

25   have squad commendations and that's if you get a bad

Page 86

1    guy with a gun, you do something more on the lines

2    of your job, but do it well.  Saving someone's life

3    like what Jason did here, that would be a divisional

4    commendation.

5         Q.   How often were those issued within the

6    sheriff's department?

7         A.   We save a lot of lives, so -- it's not

8    rare.  But it's -- you know, there's a lot of squad

9    commendations.  And it's lesser for divisional.  But

10   we probably hand out, you know, maybe 15 a year.

11        Q.   Okay.  All right.  Where did these first

12   two evaluations put him in comparison to other

13   similarly situated first and second-year enforcement

14   officers; do you have a sense of that?

15        A.   I think that's probably about the norm,

16   the average.

17        Q.   Middle of the pack?

18        A.   Yeah, I would think so.

19        Q.   Okay.  All right.  The next evaluation

20   that we've got is January 1st of '17 to December

21   31st of '17; you see that, correct?

22        A.   Yes.

23        Q.   Two letters of appreciation.  It looks

24   like the overall score is 14.  As an aside, is that

25   just an average, like if I were to add these up and

Page 87

1    divide them by 20, is that where I would get that

2    14; do you know?

3         A.    Exactly that, yeah.

4         Q.    Okay.  The statement is made he continues

5    to be a proactive officer with five felony arrests,

6    11 misdemeanor arrests, 28 minor misdemeanor

7    arrests, and 95 warrants served.  He continues to

8    make traffic contacts, with 107 traffic citations

9    and 200 [sic] traffic warnings issued.  Enforcement

10   Officer Davis is always willing to assist his squad

11   members with arrests and report paperwork.  He has a

12   positive attitude which, in turn, creates an

13   easygoing yet professional working environment; do

14   you see that?

15        A.    Uh-huh.

16        Q.    I've looked at three evaluations so far,

17   and I don't see anything about a malcontent, instead

18   I see statements about positive attitude; do you

19   know why that would be the case?

20        A.    I don't know anything about what he was

21   doing during these times.

22        Q.    Okay.  All right.  Would you agree that in

23   terms of people with the best knowledge of what he's

24   doing or not doing or his attitude, his supervision

25   that's filling -- that is filling out these

Page 88

1   performance reports would have the best information?

2          A.    At that time?

3          Q.    Yes.

4          A.    Yes.

5          Q.    Okay.  All right.  Let's look at 2019.  By

6    the way, these reviews all go through the chain of

7    command, don't they?

8          A.    They do.

9          Q.    I mean, it goes -- it looks like it goes

10   up through the sergeant, the lieutenant, I think

11   that's a captain, division commander, chief deputy,

12   and the sheriff, correct?

13         A.    Correct.

14         Q.    Who was his division -- let's go back to

15   his division commander in 2019.  Is that -- do you

16   know whose signature that is?

17         A.    In '19?

18         Q.    Yeah.  It looks like it was signed

19   actually on March 11th of 2020.  This is the 2019 --

20         A.    Oh.

21         Q.    -- evaluation.

22         A.    Yeah, yeah, yeah, yeah.  Yeah.  Chris

23   Ketteman.

24         Q.    Okay.  Who is getting ready to take over

25   your position?

1      A.    Correct.

2      Q.    Do you trust Chris Ketteman's, you know,

3  work in evaluation of the assessment of officers?

4      A.    Sure.

5      Q.    Okay.  This is 2019 and Jason's overall

6  score is going up from a 14 to a 16, correct?

7      A.    Correct.

8      Q.    It says, Since being on day shift -- among

9  other things -- Enforcement Officer Davis's

10  knowledge has improved along with assisting his

11  co-workers.  And then on the additional comments,

12  During this rating period, Enforcement Officer Davis

13  received a Divisional Commendation for assisting

14  co-workers during an incident with a subject with

15  psychiatric issues and a gun, correct?

16      A.    Correct.

17      Q.    During this incident, Enforcement Officer

18  Davis used great restraint and patience and was able

19  to resolve the incident peacefully.  See attached

20  Divisional Commendation.  Enforcement Officer Davis

21  received an additional four letters of appreciation

22  from citizens.

23            And then there's a comment.  They would

24  like to see improvement across the board in

25  evaluation statistics, needs to improve his numbers

1    in vacation checks and other self-initiated comments

2    [sic], correct?

3        A.   Categories.

4        Q.   Categories.  Okay.  All right.  Let's look

5    at the 2021 -- actually it's part -- this was one of

6    the questions I had for you.  If you look -- and

7    maybe you know why this is and maybe you don't --

8    2019, I've got an evaluation from January 1st of

9    2019 to December 31st of '19.  And then the next

10   evaluation -- and by the way, I will represent to

11   you, all of this was produced to us in discovery by

12   you folks.

13       A.   Okay.

14       Q.   It wasn't anything we had.  And it looks

15   like the rating period then runs June of 2020

16   through June of 2021; do you see that?

17       A.   Uh-huh.

18       Q.   Do you know why there's that six-month

19   gap?

20       A.   I have no idea.

21       Q.   Okay.  Did evaluations continue after you

22   and Sheriff McGuffey took office?

23       A.   Like I said, we switched as soon as we

24   could to get out of these -- these are -- I need to

25   be honest with you, these are useless.

1      Q.    Why do you say that?

2      A.    It's an arbitrary number.  You can look at

3   Jason's rating period from 6/10/20 to 6/10/21.  Look

4   at the work that that sergeant did.  I don't know

5   who it is.  I can't even see their name.  But he got

6   an overall score of 17.  So what does he do, he

7   gives 17s all the way down.  They put no thought --

8   again, they don't have the book.  That book does not

9   exist that explains how to do this evaluation.

10         I did it in -- I believe it was before --

11   it might have been in the '90s that we learned how

12   to do these things.  So these guys had no idea what

13   they were doing on these evaluations.  And so you

14   could see he just writes 17, 17, 17.  And there's no

15   thought in that.  That is not a -- this is a

16   worthless evaluation.

17      Q.    Did these come up to you as the chief

18   deputy to review?

19      A.    So I stopped reviewing them.  I had the

20   majors review them.  What had happened was every --

21   every day I came in, as the chief deputy, I had

22   about a stack of paperwork that high.  I'm signing

23   evaluations for the maintenance guys and the guy

24   that works in commissary.  And I'm sitting there and

25   signing my name while the jail is falling down.  So

1    I -- there's no way I could -- I couldn't keep doing

2    it.

3         Q.   So you delegated it?

4         A.   I delegated it to a major.

5         Q.   Okay.

6         A.   The majors.

7         Q.   You talked about the numbers.  Would it be

8    fair to say, though, that the commentary would be

9    accurate?

10        A.   No.  Why would you think that if he didn't

11   have a -- he didn't have the -- he didn't bother

12   doing anything with the scores.  I would think that

13   he didn't really care about the areas of improvement

14   or comments.  It's a useless evaluation.  I would

15   throw it away.

16        Q.   Okay.  Do you have any personal knowledge

17   that the commentary is not accurate?

18        A.   I wouldn't know.  I mean, but I look at

19   that score and I'd, well, obviously he didn't put

20   anything into this.

21        Q.   Okay.

22        A.   I wouldn't think anything -- I mean, I

23   haven't even read it, but I would say I wouldn't --

24   I wouldn't have bothered looking at it.

25        Q.   Okay.  And the comment is Officer Davis is

Page 93

1    one of the more veteran officers on the squad and is

2    often relied upon by his co-workers for guidance and

3    assistance.  Do you have any reason to believe that

4    that's not true?

5         A.   I don't -- I have no idea.

6         Q.   Okay.  Officer Davis exhibits a high

7    proficiency in case, slash, suspect investigations

8    and information gathering.  Officer Davis has shown

9    to be a fair, yet firm officer whose personality and

10   work ethic has gained the respect of those who

11   reside in the community.

12          Do you have any reason to believe that

13   that's not true?

14        A.   I have no idea.

15        Q.   When the communities were shut down,

16   though, due to COVID-19 restrictions, Officer Davis

17   continued to patrol Anderson Township with the same

18   focus and desire to serve the public as he did prior

19   to the pandemic.  Do you have any reason to believe

20   that's not true?

21        A.   I have no idea.

22        Q.   There are statistics -- enforcement

23   statistics that are provided.  Do you believe that

24   that's not true?

25        A.    If they put it in there, I would assume

1    that they are true.

2         Q.   Okay.  Are those statistics problematic

3    from your perspective?

4         A.   Well, yes.

5         Q.   Why?

6         A.   Well, five traffic citations per month,

7    three -- well, ten traffic warnings.  Arrest

8    warrants, 91.  That's about eight a month.  It's

9    just -- it's not a whole lot.

10        Q.   Okay.  What would you expect?

11        A.   Well, nine felony arrests.  That means

12   he's not making -- he's not making any felony

13   arrests.  He's not even making one felony arrest a

14   month.  Nine misdemeanor arrests -- again, you're

15   not even getting a misdemeanor a month.  A minor

16   misdemeanor arrest.  That's any -- that's one and a

17   quarter per month.  So a person driving around with

18   marijuana, open containers -- I mean, that's pretty

19   easy stuff to get, so. . .

20        Q.   So he's in Anderson Township, correct?

21        A.   Uh-huh.  Correct.

22        Q.   Do you have a sense of what the other

23   officers assigned to Anderson Township are

24   generating in terms of activity?

25        A.   I don't.

1     Q.    Would it be important to compare him

2  compared to others to see --

3     A.    If I was doing this evaluation, yes.

4     Q.    Okay.  But you can't tell me what the

5  general statistics for that particular post were?

6     A.    No.

7     Q.    Okay.  All right.  You said that you

8  changed the evaluation system?

9     A.    Yes.

10    Q.    Would that be why I don't have anything

11 else in writing after -- or for periods that were

12 after June 10th of 2021?

13    A.    That would probably be it.  So we had a

14 period where we were transitioning.  And then we had

15 a difficult time kind of getting it off the ground,

16 so. . .

17    Q.    And so how did it -- what did it become?

18    A.    It's a self-assessment.  And then your

19 supervisor gets it.  Then they assess you.  And then

20 you sit down and you talk about it together.

21    Q.    Do you know when that was first

22 implemented?

23    A.    So I tried to implement it in '21.

24    Q.    Okay.

25    A.    But I think it didn't even get going until

1    '22.

2         Q.   Okay.  I don't have that and that wasn't

3    produced for Officer Davis.  I will represent to you

4    the last thing that we got in discovery in terms of

5    evaluations was the last page of this that we looked

6    at --

7         A.   Right.

8         Q.   -- for that 6/10/21, the period ending.

9    Do you know, does the sheriff's office have anything

10   else for Jason Davis --

11        A.   Everything that you've got is what you've

12   got.  Again, we have a system now.  We're -- we are

13   currently about to go to a new system that is

14   tracked.  It's a web-based program.  So my guess is

15   that several of these got through the cracks without

16   having evaluations.

17        Q.   Okay.  Let me ask generally about our

18   patrol officers -- or I think the exact job

19   description is enforcement officer.  Is that the

20   official term?

21        A.   It used to be patrol officer.  Jim Neil

22   made it enforcement officer, so -- yeah, you'll. . .

23        Q.   Okay.

24        A.   One or the other.

25        Q.   Okay.  Would you agree that Jason Davis

Page 97

1    never acted as any sort of official spokesperson for

2    the sheriff's office?

3         A.   I would agree to that.

4         Q.   Would you agree that none of his assigned

5    duties included acting as a spokesperson for the

6    sheriff's office?

7         A.   I don't believe so.

8         Q.   All right.  Do you agree that as a patrol

9    officer Jason Davis was not a direct report of the

10   sheriff or the policy making role for the sheriff's

11   office?

12        A.   I don't believe so.

13        Q.   That's correct, right -- I mean, he wasn't

14   doing that, right?

15        A.   I don't believe so.

16        Q.   Okay.

17        A.   Yeah, I don't -- I don't know that.

18        Q.   I mean, you and the sheriff are setting

19   policy, correct?

20        A.   Are you talking about before Sheriff

21   McGuffey and me or are you talking about during -- I

22   don't think he was doing anything under Jim Neil.

23   He definitely wasn't doing anything as far as that

24   under Sheriff McGuffey.

25        Q.   Yeah, let me be more specific.  From

Page 98

1    January 4th of 2021 until the date that Jason Davis

2    left, he was never acting as any sort of official

3    spokesperson for the sheriff's office, right?

4         A.   Correct.

5         Q.   That is correct, right?

6         A.   That is correct.

7         Q.   Okay.  His assigned duties from

8    January 4th of 2021 until the date that he left did

9    not include acting as a spokesperson for the

10   sheriff's office, correct?

11        A.   That is correct.

12        Q.   And as a patrol officer from January 4th

13   of 2021 until the date that he left, he was not a

14   direct report to the sheriff with any sort of policy

15   making role for the department, correct?

16        A.   That is correct.

17        Q.   Okay.  All right.  Did the employees have

18   the opportunity to make comments to their

19   evaluations during the period the written

20   evaluations in Exhibit 10 existed?

21        A.   I. . .

22        Q.   I'll tell you why I asked.

23        A.   I don't believe there was a place for it.

24        Q.   If you see on that first page -- and this

25   was in several of them -- there's a checked box.  It

Page 99

1    says, If checked, comments on reverse side.  Do you

2    see that on the first page?

3         A.   I do.

4         Q.   And I'll tell you, Chief Gramke, I do not

5    see any of Jason Davis's comments that were produced

6    to us; do you know why?

7         A.   This is if checked, there's comments on

8    the back.  So the comments, areas to improve

9    comments, Officer Jason Davis, this -- if that's

10   checked, that means that continues on the back.

11   It's for the employee.

12        Q.   Okay.  Those are referring to the

13   commentary that's on, for instance, the second page

14   of Exhibit 10?

15        A.   Yes.  So it would have been front and back

16   page.  So, no, they don't -- they do comment now.

17   Now we do have that where they're commenting.  But

18   if they wanted to comment back then, they could

19   have -- they had to write an interdepartmental

20   correspondence if they wanted to comment on their

21   evaluations.

22              MR. WIEST:  Okay.  I'm going to do 11

23              together.  Exhibit 11.  Let me mark this

24              for you.

25              (Plaintiffs' Deposition Exhibit No.

1                    11 was marked for identification.)

2        Q.   And I'll just let you page through this.

3        A.   Uh-huh.

4        Q.   These are a number of either thank you or

5    appreciation letters, in some cases there were

6    divisional commendations, I think there's letters

7    from a couple of judges in there all praising Jason

8    Davis and his work --

9        A.   Uh-huh.

10       Q.   -- correct?

11       A.   Yes.

12       Q.   There's one -- if you go towards the back,

13   there's one from Sheriff McGuffey in which Jason I

14   guess participated in an Operation Early Bird in

15   2021.

16       A.   I'm trying to find it.

17       Q.   Yeah.  It's easiest just to start at the

18   back.  It's the last three pages.

19       A.   Okay.  Okay.

20       Q.   And by the way, you signed this also --

21       A.   Okay.

22       Q.   -- if you look.  It says Chief.  And that

23   is your signature, right, amazing job by all?

24       A.   Yes.

25       Q.   Sheriff McGuffey makes the comment, So

1    very proud of all the deputies who did such a great

2    job.  This effort brings recognition to our office

3    throughout the state.  And there's a list of those

4    that participated including, if you look, Jason

5    Davis, correct?

6         A.    Correct.

7         Q.    You wouldn't have signed that if it wasn't

8    true, correct, you didn't think it was -- it

9    reflected an amazing job?

10        A.    No.  They do a good job.

11        Q.    Okay.  Are you aware sitting here of any

12   particular performance or job-related problems with

13   respect to Jason Davis while he was a patrol

14   officer -- and I understand there may have been some

15   issues while he was at the jail, you talked about

16   that --

17        A.    Uh-huh.

18        Q.    -- while he was a patrol officer with the

19   Hamilton County Sheriff's Office?

20        A.    No.

21        Q.    Okay.  Are there currently written

22   performance standards for sheriff's deputies within

23   the sheriff's office?

24        A.    Evaluations?

25        Q.    Right.

1      A.    Written standards?

2      Q.    Or objective metrics.

3      A.    Again, we're changing it as we speak.

4      Q.    Okay.

5      A.    There was -- the sheriff's department was

6  so antiquated when we came in.  It was almost

7  impossible to track these things.  So that's some of

8  the problem we had.  So now, again, we've got a new

9  system that we're purchasing -- we've already

10  purchased, I should say, and the new evaluations

11  will be coming out probably midyear, I would think.

12      Q.    Just to be fair, we're here in February of

13  2025, correct?

14      A.    Uh-huh.

15      Q.    Okay.  So the system is not currently

16  implemented, correct?

17      A.    So we implemented a new system.

18      Q.    Okay.  When did that happen?

19      A.    That was in '21 or '22.

20      Q.    Okay.  But you don't have any explanation

21  for me why I don't have any evaluations for Jason

22  Davis for that period?

23      A.    My guess is that there -- because of the

24  lack of a tracking system, my guess is his

25  supervisor didn't do it.

1      Q.   Okay.  Was there any consequences to the

2   supervisor for not doing it that you're aware of?

3      A.   Not that I'm aware of.

4           MR. WIEST:  Okay.  All right.  Let's

5           go ahead and mark that 12.

6           (Plaintiffs' Deposition Exhibit No.

7           12 was marked for identification.)

8           MR. WIEST:  We're not using those

9           again.  So you can put them face down.

10          THE WITNESS:  Yeah.  Can I just get

11          these out of the way?

12          MR. WIEST:  Yeah, put them over

13          there.  Don't take them with you, though,

14          because the court reporter is going to

15          want them.

16          THE COURT REPORTER:  I'll take them.

17          Thank you.

18          THE WITNESS:  There we go.  Can I

19          just hand these to you as I go?

20          THE COURT REPORTER:  Absolutely.

21          THE WITNESS:  All right.

22          MR. SIMON:  You can put them right

23          here when you're done.  When you're done.

24          THE WITNESS:  Gotcha.

25   BY MR. WIEST:

Page 104

1      Q.   I've handed you what I've marked as

2  Exhibit 12.

3      A.   Okay.

4      Q.   You've seen this before, correct?

5      A.   I have.

6      Q.   In fact, that's your signature on the

7  eligibility list, isn't it?

8      A.   Yes.

9      Q.   Okay.  This was an eligibility list that

10  was dated January 13th of 2023, correct?

11      A.   Correct.

12      Q.   And it looks like there were 33 people on

13  the list from what I can tell, correct?

14      A.   I think so, yeah.

15      Q.   Okay.  How long are these lists good for?

16      A.   I'm not positive.

17      Q.   Okay.  Do you have a general -- if I don't

18  hold you to it, do you have a general sense of --

19      A.   I believe it's two years.

20      Q.   Okay.  All right.  So this would have been

21  good for January -- until January -- if that's true,

22  two years -- January 13th of 2025?

23      A.   Correct.

24      Q.   Okay.  Do you know how many people had

25  been promoted off of this list, say, as of August of

1    2023?

2         A.    August of '23?

3         Q.    Yes, sir.

4         A.    I would not know.

5         Q.    All right.  Would somebody know if they

6    were next on the list -- would like an officer know

7    if they were next on the list?

8         A.    So these are posted in every briefing

9    room.

10        Q.    Okay.

11        A.    We actually post these on the intranet --

12   or in-house Internet.

13        Q.    Okay.

14        A.    So -- and what they do in the districts is

15   they strike as they go down the list.

16        Q.    So if people are made corporal --

17        A.    So they'll know.

18        Q.    -- they'll get striked --

19        A.    Yeah, yeah, yeah.

20        Q.    Okay.  Is that done at headquarters also

21   so that you folks know who is next on the list?

22        A.    No.

23        Q.    Okay.

24        A.    Headquarters is -- I'm downtown.

25        Q.    That's what I meant, downtown.

1       A.   No.  We don't have -- we don't keep a

2   list.

3       Q.   Who -- I think you told me this.  You and

4   Sheriff McGuffey would make the decision about who,

5   in fact, would receive a promotion off of this list,

6   correct -- as the vacancies arose?

7       A.   So as the vacancies come, you know, I

8   would just tell the sheriff, hey -- so the major

9   would say, hey, I need three corporals.

10      Q.   Okay.

11      A.   Two sergeants, whatever.  And then I go

12  okay.  And then I would kind of just let the sheriff

13  know, hey, this is what we're doing.  I mean, when

14  we -- I talked about skipping people.  I would go to

15  the sheriff for something like that.

16      Q.   Okay.

17      A.   But just promoting people like this, the

18  major says, hey, I need three people.  I promote

19  three people.

20      Q.   Okay.  Are you aware of -- and maybe it

21  wasn't produced to us and so I don't have it for

22  that reason -- of a 2022, 2023 evaluation by

23  Sergeant Viner for Jason Davis that indicated that

24  he should be transferred to RENU?

25      A.   I don't see that.

Page 107

1    Q.   Okay.

2    A.   I never saw that.

3    Q.   Okay.  All right.

4    A.   And it's an evaluation?

5    Q.   It was in an evaluation.

6    A.   No.

7              MR. WIEST:  All right.  Don't give

8         that to her.  We're going to come back to

9         that --

10             THE WITNESS:  Okay.

11             MR. WIEST:  -- one.  I am going to

12        mark this 13.

13             (Plaintiffs' Deposition Exhibit No.

14             13 was marked for identification.)

15   Q.   I will tell you, Chief, that this was a

16   Collective Bargaining Agreement and some amendments

17   to it that was produced to us in discovery that

18   governed -- I think this started in 2020 and it ran

19   through -- December of '23 was the initial contract

20   and then there were some amendments that I attached

21   to it also --

22   A.   Okay.

23   Q.   -- involving pay scale adjustments.  Would

24   you agree generally that a corporal was paid eight

25   percent more than the top scale of a patrol officer?

1      A.   Yes.

2      Q.   Okay.  Do you know when the enforcement

3  officers unit began their negotiations on the

4  contract that followed this contract to begin in

5  January of 2024?

6      A.   No, I wouldn't know.

7      Q.   Okay.  Did you know that Kevin Manos was

8  the bargaining unit president?

9      A.   At that time?

10      Q.   Well, presently and in 2024.

11      A.   He is presently.  And I don't know when --

12  yeah, I'm sure.

13      Q.   Okay.

14      A.   Yes.

15      Q.   Okay.  If you look -- and I want to kind

16  of get into 2023.  If you look, there's the -- kind

17  of go towards the back of this -- three pages from

18  the back.  The corporal pay was $86,176.28

19  annually --

20      A.   Yep.

21      Q.   -- correct?  Okay.  If you look at --

22  there's a section in this.  Go to page 27 at the

23  bottom.  It's not -- it's in the original contract.

24  It's not an addendum.  It's marked 27 at the bottom.

25                MR. SIMON:  Can I see that again?

1        A.    I don't know where you're at.

2        Q.    About halfway through.  Because there's

3   addendums that I attached to the adjustments.

4        A.    Court time call-in?  Okay.

5        Q.    Yeah, among other things.

6        A.    Yeah.

7        Q.    And what I wanted to look at were a couple

8   of things on this, one of which is section 20.4.

9   Any employee assigned to OCD, CIS, K-9, Execution

10  Officer, Law Enforcement Investigator, or Traffic

11  Unit [sic] shall, for the duration of the

12  assignment, be compensated at the corporal rate of

13  pay; you see that, right?

14       A.    I do.

15       Q.    Did that include RENU?

16       A.    It did.

17       Q.    Okay.  So people that were assigned to

18  RENU would get the corporal rate of pay, correct?

19       A.    Correct.

20       Q.    Okay.  And then there was also an

21  adjustment that was also on top of that base pay for

22  years of service, right?  Look at 20.5.

23       A.    Oh.  Oh.  The longevity pay.

24       Q.    Correct.

25       A.    Yes.

1        Q.    So, for instance, if someone had 20 years

2    of service or more, there would be a two percent

3    adjustment above that for longevity pay?

4        A.    Correct.

5        Q.    Okay.  All right.  How many officers does

6    the sheriff's department assign to RENU?

7        A.    It's approximately 30 people.  Now,

8    there's some investigation -- you know, the

9    investigators, supervisors, there's some -- a couple

10   of civilian, you know, folks, too.  But there's

11   about 30 people, though.

12       Q.    Does RENU involve a lot of overtime

13   opportunities?

14       A.    It depends on the year.  It depends on the

15   time.

16       Q.    The investigative activity?

17       A.    Yeah.  You know, if they're busy, yeah,

18   they get quite a bit of overtime.  Sometimes it

19   dries up and you don't get any.

20       Q.    Okay.  What is that paid at, time and a

21   half?

22       A.    Time and a half, yeah.

23       Q.    Okay.  In terms of corporal promotions and

24   whether there was a need for a promotion, did the

25   buck stop with you and Sheriff McGuffey on that; in

1    other words, was that decision made by you and the

2    sheriff on whether there was a need for a promotion?

3         A.   So the need for promotions comes from the

4    majors.

5         Q.   Okay.

6         A.   Which comes -- which could come from a

7    captain or -- somebody is going to say, hey, I have

8    an opening.  And then it would go to the major.  The

9    major would contact me and say, hey, I need a

10   lieutenant and two sergeants.  And so then we would

11   then -- and they would, of course, do a test and

12   then pick the person and they'd be promoted.

13        Q.   Okay.  When you say do a test, you meant

14   through the eligibility list?

15        A.   Or if there was an eligibility list.

16        Q.   Okay.

17        A.   So if he called me -- there was an active

18   list like this, he says, hey, I need three

19   corporals.  I say okay.  And he would tell me what

20   he wants.

21        Q.   Okay.

22        A.   Which usually would be straight down the

23   list.

24        Q.   Okay.  And then you and the sheriff would

25   be the final decision makers for the actual

1    promotions to corporal, correct?

2         A.   So, again, that wouldn't be -- I would --

3    if Major Ketteman called me and said, hey, I --

4    let's say on this first list he said I need three

5    corporals, so the first three there.  And I would

6    say okay, promote them.  And then we would get that

7    going.  I -- the sheriff would know about it after

8    the fact.  Now, if we were promoting captains,

9    obviously majors, the sheriff would get involved in

10   something like that.

11        Q.   Okay.  Did you ever overrule Major

12   Ketteman in terms of corporal promotions?

13        A.   Corporal promotions?

14        Q.   Yes, sir.

15        A.   You're not talking about RENU?

16        Q.   I'm not -- not RENU right now.  We're

17   going to talk about that in a minute.

18        A.   Corporal promotions I had -- I've done it

19   one time.

20        Q.   And when did you do that?

21        A.   Two or three years ago.

22        Q.   And why did you do it?

23        A.   We had an employee who was very vocal,

24   very disgruntled.  And so I advised Major Ketteman

25   that we were going to pass him up, and we did.  He

1  basically got on -- back on track and we promoted

2  him at a later date.

3       Q.   Who was that?

4       A.   Oh, God, what's his name?  I know his

5  nickname.  Ryan Matthews.

6       Q.   Okay.

7       A.   We call him Opie.

8       Q.   How was he vocal?

9       A.   How was he vocal?  So Ryan was very vocal

10  about the beards and -- the outer vest carrier.  He

11  was very -- at the time the officers wanted all to

12  have outer vest carriers and beards.  And there was

13  a lot of back and forth with that.  And Sheriff

14  McGuffey and I believed absolutely not supplying

15  outer vest carriers or letting these officers wear

16  beards.

17       Q.   Where was he expressing his disagreement

18  on that?

19       A.   He expressed it to me directly and to a

20  lot of other people and. . .

21       Q.   So this was an ongoing sort of beef that

22  he had for a period of time?

23       A.   There was a large group of them.

24       Q.   Okay.  And he was part of the group?

25       A.   He was part of that group.

1      Q.   Okay.  Did you ever warn him ahead of time

2    that he needed to stop or it would be a problem?

3      A.   I don't know that I did.

4      Q.   Okay.

5      A.   But I believe he was talked to about his

6    attitude.

7      Q.   By his supervision?

8      A.   I believe so, yeah.

9      Q.   Okay.  In terms of RENU assignments when

10   you were the chief deputy, did the buck stop with

11   you?

12     A.   So normally that was another one where

13   Major Ketteman would just advise me this is who is

14   going.

15     Q.   Okay.

16     A.   It really wasn't for my approval.  That

17   was low enough that, you know, he's making that

18   decision.

19     Q.   Did he ever tell you, you know, he had

20   selected Jason Davis for that position?

21     A.   He told me that RENU had selected Jason

22   Davis.

23     Q.   Okay.  Did he have an opinion on that?

24     A.   Not really.  He didn't -- he just said,

25   hey, Jason Davis is the pick -- who RENU picked.

1      Q.   And that was in early 2023?

2      A.   I assume so.

3      Q.   Okay.  And what did you do after that?

4      A.   I said, I don't think he's a good employee

5 -- or he's a good -- a good pick for that position.

6      Q.   Did you tell him why?

7      A.   I don't think so.  I just -- I think I

8 said no, who is next on the list.  He said whoever

9 that was.  I said go with him.

10     Q.   Okay.

11     A.   I don't think there was a whole lot of

12 conversation.  It was on the -- we were on the

13 phone, I remember that much.

14     Q.   Okay.  Did you tell the sheriff you had

15 done that?

16     A.   No.

17     Q.   Okay.  At least not prior to your -- at

18 least not prior to later on when Jason raised it as

19 an issue, fair?

20     A.   I believe I told the sheriff what happened

21 after Jason had sent the interdepartmental

22 correspondence to meet with the sheriff and I.

23     Q.   The green letter?

24     A.   Yes.

25     Q.   Okay.  We'll talk about that.

1       A.    Do we know what green letters are?

2       Q.    Right.

3       A.    Okay.

4       Q.    I'm going to ask you what they are for the

5  record in a couple of minutes.

6       A.    Okay.

7       Q.    Yeah.

8       A.    That's why I was. . .

9       Q.    Let's just do that now.  What is a green

10  letter?

11      A.    So a green letter is an interdepartmental

12  correspondence.

13      Q.    Okay.  And why are they called green

14  letters; did they used to be green?

15      A.    I don't know.  It was a Simon Leis thing.

16  I think it came out of the military.

17      Q.    And then those would basically be moved up

18  the chain of command?

19      A.    So -- yes.  So communications up and down

20  the chain of command.

21            MR. WIEST:  All right.  So let's go

22            ahead -- let's see what we're up to -- 14.

23            (Plaintiffs' Deposition Exhibit No.

24            14 was marked for identification.)

25      Q.    And I'm handing you what I've marked as

1    Exhibit 14.  There's a different copy of this

2    interaction actually that was attached to the

3    complaint, but I wanted to get the whole of it.

4            Have you seen Jason Davis's May 15, 2022,

5    post about the charity football game before today?

6        A.   I don't think I've ever seen this Fox 19

7    picture here.

8        Q.   Okay.  And there's some comments, though,

9    to it, one of who, by the way, was from our friend,

10   Caroline Adams --

11       A.   Yeah.

12       Q.   -- Itsa Krakken, where she writes, You got

13   to watch those smoke eating, second responders.

14   Very tricky.  You guys all did an outstanding job.

15   It's on the second page.

16           Were you aware that she had commented on

17   this post about the football game?

18       A.   No.  I didn't see that.

19       Q.   Okay.

20       A.   I did see Jason Davis's comment.

21       Q.   The interaction with Paul Naber?

22       A.   Yes.

23       Q.   Okay.

24       A.   So that was brought to my attention.

25       Q.   Who brought that to your attention?

Page 118

1      A.    I don't know.  Again, it was -- there was

2  so much of that going on at the time.  But I do

3  recall that.

4      Q.    Do you recall seeing Jason's segment on

5  Fox --

6      A.    No --

7      Q.    -- 19?

8      A.    -- I do not.

9      Q.    Okay.  Let me ask.  Jason is going to

10  testify that this post was made on his own time when

11  he was off the clock.  Do you have any evidence to

12  the contrary?

13      A.    No.

14      Q.    Would you agree this was made on Jason's

15  personal Facebook page, correct?

16      A.    I -- yes.

17      Q.    This is not an official sheriff's office

18  account or post, correct?

19      A.    Correct.

20      Q.    Okay.  By the way, who was Paul Naber?

21      A.    Paul Naber is now -- I don't know if he

22  was a lieutenant at this time.  He might have been a

23  sergeant or lieutenant.  He works for the Hamilton

24  -- for the sheriff's department and -- yeah.  He's a

25  supervisor.

1      Q.   And he writes, Needs more advertising

2    intradepartmental.  Never knew about the game until

3    now.

4      A.   Yeah.

5      Q.   Jason responded, Our department didn't

6    support it.  No county items were used to advertise

7    this game.  Flyers were taken down from briefing

8    rooms.  Let me start with this, do you know whether

9    flyers were taken from briefing rooms?

10     A.   I do not.

11            MR. SIMON:  Objection.  Form.  Lack

12         of foundation.

13            Go ahead and answer.

14     Q.   Do you know whether any county items were

15   used to advertise the game?

16     A.   I don't personally know, no.

17     Q.   Okay.  Are you aware of any official

18   support the Hamilton County Sheriff's Office offered

19   to Jason Davis relative to this football game in

20   2022?

21     A.   I do not know.

22     Q.   Okay.  Who brought this interaction with

23   Paul Naber to your attention; was it Paul?

24     A.   No.

25     Q.   Okay.

1       A.   No.

2       Q.   Do you know who did?

3       A.   I do not.

4       Q.   Did they like send you a screenshot of it?

5       A.   Or they showed me their phone.  That's how

6  things were kind of going at that time.

7       Q.   Okay.  How did you -- did you do anything

8  about it after you had become aware of it?

9       A.   No.

10       Q.   Okay.  Do you think or have any view on

11  whether the participation or lack of participation

12  by the sheriff's office in a fundraiser involving

13  fallen law enforcement officers and firefighters

14  football game in Hamilton County would be an issue

15  of public concern or not?

16            MR. SIMON:  Objection.  Calls for a

17            legal conclusion.

18       A.   Can you repeat that?

19       Q.   Yeah.  Would a post about whether or not

20  the sheriff's office had supported the football game

21  be an issue of public concern --

22            MR. SIMON:  Objection.

23       Q.   -- to your understanding?

24       A.   The fact that we didn't know about a

25  football game; is that what you're asking me?

1    Q.   No.  I'm just asking generally.  His post

2    indicating that the department wasn't involved in

3    supporting the game, no county items were used,

4    flyers were taken down --

5    A.   Well, you're saying we didn't support it

6    as if we knew about it.  So if -- I don't think it

7    would be a public concern that we didn't know about

8    a football game, then we couldn't have supported it

9    because we didn't know about it.  So I don't

10   see. . .

11   Q.   Does Jason say that whether or not you

12   knew about it; does he post that?

13   A.   But you're asking me if it's a public

14   concern, so I think the answer is --

15            MR. SIMON:  You're asking him to

16            confirm what the words say on the page; is

17            that the last question?

18            MR. WIEST:  Yeah.  Well, I'm starting

19            with that.  Sure.

20   A.   If you want to confirm what the words are,

21   we can read that.  But I can't say that it's a

22   public concern for the citizens to know that the

23   sheriff's office administration didn't know about a

24   football game, then they didn't support it, if

25   that's what you're asking.

```
 1       Q.   Okay.  You agree, though -- if we start
 2   with the start of this --
 3       A.   Uh-huh.
 4       Q.   -- that the news actually covered the
 5   existence of this game occurring, right?
 6       A.   If you're asking me if it's a public --
 7            MR. SIMON:  He's asking a different
 8       question.
 9            MR. WIEST:  Yeah, I'm asking a
10       different question.
11       Q.   If you look at the very first page of this
12   exhibit --
13       A.   Yeah.
14       Q.   -- you would agree that Fox 19 ran a story
15   on this particular football game, right?
16       A.   I would agree to that.
17       Q.   Okay.  Do you know when you first became
18   aware of this social media post by Jason Davis?
19       A.   I do not.
20       Q.   Do you remember who specifically told you
21   about the game?
22       A.   About the game?
23       Q.   Yeah.  Or Jason's post.
24       A.   No, I do not.
25       Q.   Okay.  Did you or Sheriff McGuffey have
```

Barlow Reporting & Video Services, LLC
(859) 261-8440

1    any day-to-day interactions with Jason Davis

2    regarding the performance of his job duties?

3         A.    No.

4         Q.    Do you agree he worked night shifts?

5         A.    Yes.

6         Q.    Would you agree his immediate interactions

7    would have been with his corporal and his sergeant

8    and his lieutenant?

9         A.    I agree.

10        Q.    Did Jason Davis' post, including his

11   original post about the Fox 19 and this later

12   post -- his response to Paul Naber about the

13   department not supporting it meaningfully interfere

14   to your knowledge with the performance of any of

15   Jason's job duties?

16        A.    Not to my knowledge.

17        Q.    Okay.  Do you believe his original post

18   and his reply to Paul Naber undermine any goals or

19   missions of the Hamilton County Sheriff's Office?

20        A.    I think that that's more established

21   malcontent type activity.  And I do believe that

22   malcontents are a detriment to the agency.

23        Q.    Okay.  Did Jason's post cause any

24   disruptions to the operations of the Hamilton County

25   Sheriff's Office?

1      A.   I do not know of any.

2      Q.   Okay.  Are you aware of Jason's posts

3   creating any disharmony amongst his fellow officers?

4      A.   I don't know of any.

5      Q.   Okay.  Are you aware of Jason's posts

6   impairing the ability of his supervisors to

7   discipline him?

8      A.   I am not aware.

9      Q.   Are you aware of any of Jason's posts

10  impairing any working relationships he had within

11  the Hamilton County Sheriff's Office?

12     A.   I'm not aware.

13     Q.   Okay.  Was there any particular violation

14  of any Hamilton County Sheriff's Office policy that

15  you're aware of for Jason's posts?

16     A.   Not to my knowledge.

17     Q.   Okay.  And that's why no discipline was

18  imposed for the football post, correct?

19     A.   Yeah, there was no discipline.

20              MR. WIEST:  Okay.  15.

21              (Plaintiffs' Deposition Exhibit No.

22              15 was marked for identification.)

23     Q.   As an aside, Chief, you've seen the

24  complaint that's been filed in this matter, correct?

25     A.   I have.

Page 125

1      Q.   Okay.  Let's look -- this was an exhibit

2  to the complaint.  I'm marking it now as Exhibit 15

3  to the deposition.

4                MR. SIMON:  Did you --

5                MR. WIEST:  What's that?

6                MR. SIMON:  I thought we may have

7           messed up which one I was supposed to get,

8           but if you're all set.

9                MR. WIEST:  15.  Yeah, I know.  15.

10          I copied it with the exhibit sticker.

11     Q.   Have you seen Jennifer Patterson's posts

12  on -- I think this was actually on the sheriff's

13  department's website -- or Facebook page rather

14  relative to a press conference that was issued I

15  think in 2021?

16     A.   Yeah, I don't -- I don't know anything

17  about this.

18     Q.   Okay.  Were you informed that Jennifer

19  Davis had made posts regarding the sheriff or the

20  sheriff's department?

21     A.   Not to my knowledge.

22     Q.   Never?

23     A.   I knew -- later on I did.

24     Q.   When did you first learn?

25     A.   So when the sheriff and I discussed Jason

1  coming in about his future, and I believe his -- the

2  sheriff had brought up that Jason's wife had made a

3  bunch of posts.  And I believe either she or

4  somebody sent me a post from -- I believe it was the

5  day we got sworn in from Jennifer.

6       Q.   Okay.

7       A.   So I read that.

8       Q.   Prior to the meeting with Jason?

9       A.   Prior to the meeting with Jason.  Yeah.

10      Q.   Okay.

11      A.   This stuff -- again, I. . .

12      Q.   Are these the comments you think you saw?

13      A.   I don't look at this stuff.  I don't think

14  so.

15      Q.   Okay.

16      A.   I don't know what these are.

17      Q.   Okay.

18      A.   I. . .

19      Q.   Okay.  What did the sheriff say about

20  Jennifer Davis, if anything, to you?

21      A.   Just that she had made some really vile

22  comments about -- and I don't remember what all it

23  was, but some vile comments, and that she wasn't a

24  fan of the sheriffs.  And then I think she showed me

25  the email or she had somebody show me the email.

1        Q.    When you say email --

2        A.    Or -- I'm sorry.

3        Q.    -- you mean Facebook posts?

4        A.    Facebook posts.

5        Q.    Okay.  But you don't think that was what

6    we see in Exhibit 15?

7        A.    I don't -- I don't remember.  I saw it --

8    I think I saw it once or twice, so I don't know.

9        Q.    Okay.

10        A.    This looks like these are comments on

11    something.  So I don't think that's what I saw.

12        Q.    I will represent --

13        A.    I saw a long -- I think it was a long

14    paragraph.

15        Q.    Okay.  I will represent to you these are

16    actually comments from the sheriff's department's

17    Facebook page.

18        A.    Okay.

19        Q.    There is an official Facebook page,

20    correct?

21        A.    We've turned off the comments because of

22    the insanity a couple of years ago.

23        Q.    Do you know when they were turned off?

24        A.    I don't.

25        Q.    Okay.  They would have been turned on,

Page 128

1    though, the day that you took office, correct?

2        A.    They were turned on when we took office.

3    Probably maybe a year into it we had to turn them

4    off.

5        Q.    Okay.  But the sheriff was aware of

6    Jennifer Davis's posts and told you about them,

7    correct?

8        A.    She told me about the one.  I don't know

9    about all of them.

10       Q.    But you don't know if Exhibit 15 is what

11   she was talking about?

12       A.    I don't.  I don't.

13             MR. WIEST:  Okay.  Let's look at

14             another one.

15             (Plaintiffs' Deposition Exhibit No.

16             16 was marked for identification.)

17       Q.    I'm handing you what is Exhibit 16.  This

18   was also an exhibit to the complaint.  This is a

19   post Jennifer made on her personal Facebook page.

20   Do you have any reason -- or let me strike that.

21             Was this what the sheriff had brought to

22   your attention?

23       A.    Yes.

24       Q.    Okay.  Do you know who told the sheriff

25   about it?

1       A.   There was so many people talking to so

2   many people at that point.  I couldn't tell you.

3       Q.   Okay.  And your testimony is you were

4   unaware prior to your discussion that occurred after

5   Jason had sent the green letter but before the

6   meeting with the sheriff; is that the timing of

7   Jason --

8       A.   Of seeing this?

9       Q.   Of Jennifer Davis's Facebook post.

10      A.   Yeah.  And I think I heard -- I might have

11  heard things, but I don't remember.

12      Q.   Okay.

13      A.   The -- what I remember is reading this

14  right before we met with Jason.

15      Q.   Okay.  All right.  Was this problematic

16  from your view?

17      A.   Well, problematic is -- it's just vile

18  and -- problematic in what way, though, you know.

19      Q.   The post is critical of the sheriff,

20  correct?

21      A.   Yeah.  And she, you know. . .

22      Q.   All right.

23      A.   She has her opinions.  She's allowed to

24  have that.

25      Q.   She's not directing any threats to the

1    sheriff or anyone within the department, correct?

2         A.    I don't believe so.

3         Q.    She's not calling for violence, correct?

4         A.    No.

5         Q.    Is there anything in Exhibit 16 that you

6    think is not an opinion?

7                    MR. SIMON:  Objection.  Calls for a

8              legal conclusion.

9                    You can answer.

10        A.    It says, If you voted for her because of

11   her qualifications, not being a certified peace

12   officer, that is correct.

13        Q.    Okay.

14        A.    Being on the Brady list at the time, she

15   was.  Then you have an IQ of a kumquat.

16        Q.    That's an opinion, right?

17        A.    Or a twatwaffle.  That's an opinion.

18        Q.    That's an opinion.  Do you know if Sheriff

19   McGuffey had maintained her peace officer

20   certification?

21        A.    So she had -- had to do a re-up course or

22   whatever.

23        Q.    Okay.

24        A.    But yeah.

25        Q.    Did she have to do that after she was

1    elected?

2         A.    Yes.

3         Q.    Okay.  Do you know when she completed that

4    course?

5         A.    I don't.

6         Q.    Could it have been true if she had not

7    completed it on or prior to January 4th that she

8    wasn't certified as of that date?

9         A.    I guess it's possible.

10        Q.    Okay.  So that might actually be a true

11   statement?

12        A.    It might be.

13                 MR. WIEST:  Okay.  Let's look at 17.

14                 (Plaintiffs' Deposition Exhibit No.

15                 17 was marked for identification.)

16        Q.    As an aside, Jennifer Davis never worked

17   for the Hamilton County Sheriff's Office, correct?

18        A.    Not to my knowledge.

19        Q.    She's a private citizen, correct?

20        A.    Correct.

21        Q.    Okay.  Let's look at 17.  This was I'll

22   represent to you Exhibit 4 to the complaint.  And

23   it's a printout from Ms. Adams' Facebook posts.

24        A.    I saw this one.

25        Q.    You've seen this one before?

1       A.    Yeah.

2       Q.    Let's talk about this.  This is dated

3    April 20 of 2023, correct?

4       A.    Can I read it?

5       Q.    Yeah, please.

6       A.    Am I missing part of this?

7       Q.    It should be two pages.  Is it not?

8       A.    It like -- I can't read -- oh, okay.  I

9    see it.

10      Q.    Yeah.

11      A.    Okay.

12      Q.    You were -- were you aware of Adams' post

13   in or around April 20th of 2023?

14      A.    I do remember something about this, yeah.

15      Q.    Okay.  Did you take tours of the districts

16   to address morale around that time?

17      A.    We took tours around -- when was this?

18      Q.    April '23.

19      A.    So we took tours around the districts just

20   to basically get out and see the troops.

21      Q.    Okay.

22      A.    That was the idea.  It wasn't for any kind

23   of morale thing or whatever.

24      Q.    Okay.

25      A.    Listen to the troops, see what they need,

1  see what they want, which was beards and vests.

2      Q.   Okay.  Exterior load carrying vests?

3      A.   Correct.

4      Q.   Or why transfers or promotions that had

5  been promised had not been approved; was that also

6  the subject of the discussion?  I'm on the second

7  paragraph of -- yeah.

8      A.   Had been promised to many of them were not

9  approved?

10     Q.   Right.

11     A.   Yeah, I don't know anything about that.

12     Q.   Okay.  Was comments of the sheriff's

13  office's page being turned off part of the --

14     A.   That was --

15     Q.   -- discussion?

16     A.   -- turned off.

17     Q.   Was that part of the discussion, though,

18  at these meetings; did anyone bring that up?

19     A.   No.

20     Q.   Okay.  There's a statement Adams makes, In

21  true Chaz fashion, she informed the peasants that

22  they were forbidden from having any contact with

23  Itsa Krakken.  Zero.  In addition, those or their

24  significant others that had the poor judgment to

25  like or comment on Itsa Krakken's posts would

Page 134

1    continue to be properly punished.

2              Your testimony is that was not ever a

3    message that was sent to any of the districts,

4    correct?

5         A.   That didn't happen.

6         Q.   Okay.  Did not happen, correct?

7         A.   That did not happen.

8         Q.   Okay.

9         A.   In my presence.

10        Q.   Okay.  All right.  Were you ever part --

11   or did you ever overhear a discussion where Sheriff

12   McGuffey made the statement Itsa Krakken is a fat

13   troll who sits naked in the dark and makes

14   derogatory comments, I do not read these comments, I

15   have people that read them for me, I got tired of

16   hearing about her comments, so I turned them all off

17   and I don't care that I'm not allowed to do that,

18   she can go ahead and sue me over it?

19        A.   There's parts of that that are true and

20   parts of it that she's fabricating.

21        Q.   Okay.  What parts of that are true?

22        A.   The fat troll lives in her basement.  I

23   believe that was verbatim.  She never said anything

24   about I'm turning off -- I turned them off and I

25   don't care I'm not allowed to do that.

1      Q.   Okay.  So a fat troll sits naked in the

2   dark and makes derogatory comments, was that part

3   of -- did she make that statement?

4      A.   In a general sense.

5      Q.   Okay.

6      A.   Again, I don't -- I'm not going to say

7   that's verbatim, but that's pretty close.

8      Q.   Okay.  All right.  Were you made aware

9   that Jennifer Davis had liked this particular post?

10     A.   No.

11     Q.   Okay.  Did the sheriff ever bring that up

12  to you?

13     A.   No.

14     Q.   Okay.  All right.  I think you did tell me

15  you were aware of this.  Jason Davis applied for a

16  position with RENU in 2022, correct?

17     A.   Yes.

18             MR. SIMON:  I'm sorry, I missed that.

19             MR. WIEST:  Jason Davis applied for a

20         position within RENU in 2022.

21             MR. SIMON:  Okay.

22             MR. WIEST:  And he said correct.

23     Q.   And there was a process for applying for

24  an assignment to RENU at the time, correct?

25     A.   Yes.

Page 136

1       Q.   What was that process?

2       A.   I don't know.

3       Q.   Was the process designed to select the

4  best person for the job who would best promote

5  public safety and the mission of RENU?

6       A.   Yes.  That's what they were trying to do.

7       Q.   Okay.  And you were aware Jason Davis went

8  through that process, correct?

9       A.   Yes.

10      Q.   I know we talked about RENU when you were

11 there.  Was it still the case in 2023 that RENU

12 involved overtime opportunities and either a

13 take-home cruiser or a car?

14      A.   Yes.

15      Q.   Okay.  All right.  And I think you told

16 me, you had overruled that decision to place him in

17 RENU --

18      A.   Uh-huh.

19      Q.   -- correct?

20      A.   That's correct.

21      Q.   Tell me every reason why you did that.

22      A.   Again, Jason Davis has a history of being

23 a malcontent.  That's why he spent the time that he

24 did down at the jail.  In 2018-ish, around that time

25 frame, I was running RENU.  I think we went through

1    that.  I had the opportunity to interview Jason for

2    that role.  I did not believe he's a good candidate,

3    and I still don't today.

4             The Facebook posts about the football game

5    like we just talked about, that was just another --

6    in my mind another action of a malcontent employee

7    and the -- at the time these beards and vests and

8    the wailing and gnashing of teeth in the Anderson

9    Township area, Jason's name came up within that.

10            I believe he was a subpar candidate.  I

11   did not want him in that unit.  That is the unit in

12   the sheriff's department that keeps secrets, that

13   relies on trust, that relies on teamwork and

14   camaraderie.  And in my opinion, Jason Davis has

15   very little of that.

16            Now, what he did in Anderson Township -- I

17   knew that he had been a worker.  And I told him that

18   in our interview.  I said I know you do a good job.

19   But that doesn't mean he's going to be good in RENU.

20   And I didn't think he was the right role in 2018.

21   And, again, I don't believe he's the right role

22   today.  And I made that decision.  And I believe I

23   made the right decision.

24        Q.   You agree that he had been advanced by the

25   RENU unit itself and the major, correct?

1        A.    So the major just told me that that was

2    who RENU picked.

3        Q.    Okay.

4        A.    So he didn't advance him.  And, again, I

5    made the decision right there and then.  I said who

6    is next.  And whoever that was, I said that's a

7    better candidate.

8        Q.    Okay.  Had you talked to any of Jason's

9    supervision to see if your theory about malcontent

10   was accurate?

11       A.    No.

12       Q.    Okay.  Did you go and pull any of Jason

13   Davis's performance reviews to see what his

14   supervision was writing about him to decide if the

15   malcontent opinion that you held was true?

16       A.    No.

17       Q.    All right.  Were you involved at all in

18   the union contract negotiations that had occurred

19   with respect to the 2024 contract with the

20   enforcement officers?

21       A.    Yes.

22       Q.    Did you or anyone else you're aware of

23   with the sheriff's office approach any of union

24   leadership and ask them as part of that contract to

25   agree to expire the corporal promotion list early so

1    that Jason Davis would not be promoted?

2         A.   Did I do that?

3         Q.   Or anyone else you're aware of.

4         A.   No.

5         Q.   Okay.  So if Kevin Manos were to testify

6    that such a conversation occurred, you'd dispute

7    that?

8         A.   I would.

9         Q.   Okay.  All right.  Let's go ahead and --

10   all right.  You said Jason was part of the

11   discussion about beards and vests.  Who told you

12   that?

13        A.   I don't know.

14        Q.   Were you part of that conversation

15   yourself?

16        A.   Was I part of the conversation?

17        Q.   Yeah.  Did Jason ever express to you that

18   he had an issue with beards or vests?

19        A.   No.

20        Q.   Okay.  All right.

21             MR. SIMON:  I know you're right in

22             the middle of things.

23             MR. WIEST:  No, now is fine if you

24             guys need a break.  We can do it --

25             MR. SIMON:  Well, are you finishing

Page 140

1            up this line of questioning?  I mean,

2            that's -- I don't mind.

3                  MR. WIEST:  Yeah.  No, we can --

4                  MR. SIMON:  I'm okay.

5                  MR. GOTTESMAN:  Let's take a break.

6                  MR. WIEST:  Yeah, we can go -- I

7            mean, I think we're almost at the lunch

8            hour anyway, so --

9                  MR. SIMON:  All right.  It's just if

10           you're in the middle --

11                 MR. WIEST:  It's noon, so I think

12           we're ready to, you know -- we can go off

13           the record.

14                 MR. SIMON:  Okay.

15                 THE VIDEOGRAPHER:  We're going off

16           the record at 11:59.

17                 (A lunch recess was taken.)

18                 THE VIDEOGRAPHER:  We're going back

19           on the record at 1:07.

20    BY MR. WIEST:

21       Q.   Chief, we talked before we took a lunch

22    break --

23       A.   Uh-huh.

24       Q.   -- about the reasons that you believed

25    that Jason Davis was unfit for RENU, and I've got a

1    list of them --

2          A.    Uh-huh.

3          Q.    -- that I took.  One of them was that you

4    believed that he was a malcontent; do you remember

5    that?

6          A.    Yes.

7          Q.    Can you tell me specifically any

8    particular behavior that Jason engaged in that

9    caused you to believe that he was a malcontent?

10         A.    Well, I think that that -- he had the

11   reputation.  We had heard from numerous people there

12   was a lot of complaining out of the Anderson

13   Township district.  Jason's name came up within

14   that.

15              That Facebook text that, you know, we

16   didn't support, you know, that's -- that's not

17   normal conduct from an employee that's positive

18   about the agency.  You know, that's -- that's an axe

19   to grind, malcontent.  And so based upon those

20   things I just -- I believe that that conduct would

21   continue.

22         Q.    Who -- you said you had heard from

23   numerous people.  Can you give me any particular

24   names?

25         A.    No.

Page 142

1      Q.   You can't give me one?

2      A.   I would guess maybe Ketteman, but I don't

3  remember.

4      Q.   Okay.  You indicated that there was

5  dissent within Anderson Township?

6      A.   Uh-huh.

7      Q.   About what?

8      A.   Beards and vests and other things, I

9  guess.  We had -- we had some weak leadership, which

10  was causing that.

11      Q.   Do you have any specific information that

12  Jason had made complaints about beards or vests?

13      A.   No.

14      Q.   You said Jason had a reputation as a

15  malcontent.  You -- had you had any personal

16  interaction with him on the job prior to becoming

17  chief deputy?

18      A.   Other than interviewing him for RENU, no.

19      Q.   Okay.  Tell me what you remember about

20  that interview from RENU.

21      A.   I remember Jason came in.  I believed that

22  Jason kind of thought he had the job, kind of came

23  in as a bit cocky.  And I just remember that I -- he

24  left and I thought that he would be a bad fit for

25  the unit.

1      Q.   Did you document that anywhere?

2      A.   We did at one time.  I don't know where it

3  would be.

4      Q.   Okay.  All right.  And you thought that

5  based on your personal interview of him.  And

6  approximately when was that?

7      A.   A year?

8      Q.   Yeah.  A year is fine.

9      A.   I think it was '18.

10     Q.   Okay.  All right.  Do you know prior to

11  that interview if you had spoken with any of his

12  leadership?

13     A.   No, I had not.

14          MR. SIMON:  We're talking about 2018?

15          MR. WIEST:  2018.  Yes.

16          THE WITNESS:  Uh-huh.

17     Q.   All right.  You indicated -- by the way,

18  why did you think that he was cocky?

19     A.   Well, based on his actions, based on his

20  demeanor.  I know his brother very well.  And he was

21  very different than his brother.  He -- and I

22  wondered then if he thought he -- he was going to

23  get the job due to his brother.

24     Q.   Okay.  Do you recall anything that he

25  specifically said in the interview --

1      A.   No.

2      Q.   -- that led you to believe that?

3      A.   No.  Again, that was at least six -- yeah,

4  six years ago.

5      Q.   Okay.  Anything specific about his

6  demeanor that you recall?

7      A.   (No response.)

8           THE COURT REPORTER:  Can you answer

9      out loud, please?

10          THE WITNESS:  I didn't answer.

11          THE COURT REPORTER:  Oh.

12     A.   Like I said, that -- it was six years ago.

13  I don't remember anything -- too many particulars.

14     Q.   Okay.  You indicated one of the reasons

15  that you did not want to select Jason for RENU in

16  2023 was that you thought he was untrustworthy.

17  That was the statement that you gave me.

18          That was one of the things you said,

19  right?  I mean --

20     A.   I don't believe I said he was

21  untrustworthy.

22     Q.   Okay.

23     A.   What I said, though, is very important --

24  trust is important in that unit.

25     Q.   Okay.  Did you have any reason to believe

1   that Jason was untrustworthy?

2        A.   Untrustworthy?

3        Q.   Right.

4        A.   Well, I think that -- I guess no, I don't

5   have any reason that he was untrustworthy.

6        Q.   One of the statements you made was you

7   thought Jason was subpar -- I think was the term you

8   used to describe him -- in 2023 for not being

9   selected to RENU.

10            In what way did you think that he was

11  subpar?

12       A.   Well, one of the big things in RENU is to

13  be able to communicate, to be able to talk, to be

14  able to be a team player.  In that interview I

15  basically believed that he wasn't a good fit for the

16  unit.  And as far as the exact reasoning, I -- you

17  know, it was six years ago.

18       Q.   Okay.

19       A.   I just can tell you that we rank each

20  person.  And Jason was pretty much towards the

21  bottom for me.

22       Q.   Okay.  Did you base your overriding the

23  RENU recommendation in 2023 on your experience with

24  him in 2018?

25       A.   Largely, yes.

1    Q.   Have you ever seen someone in the course

2  of five years undergo attitude or other changes

3  within their career?

4    A.   Sure.

5    Q.   Why did you think that that was not the

6  case -- or that Jason had not undergone changes in

7  his outlook in those five years?

8              MR. SIMON:  Objection.  Asked and

9         answered.

10             You can answer.

11   A.   Well, again, I'd go back to the other

12 things that I am hearing.

13   Q.   Okay.

14   A.   And I can only go based upon what I'm

15 being told.

16   Q.   Okay.

17   A.   And the -- again, that post, that's

18 perfectly indicative of somebody that just -- a

19 malcontent.  So that to me was, you know. . .

20   Q.   I want to talk about things other than the

21 post.  I understand the post is there.  And maybe

22 that is underpinning every one of these statements,

23 and you can confirm that.  I want to know other than

24 that post -- you said things you were hearing.

25             Can you point to anything specific that

1    anyone told you?

2                    MR. SIMON:  For 2023?

3                    MR. WIEST:  2023.

4                    MR. SIMON:  I'm going to object.

5            Asked and answered.

6                    You can try to answer again.

7                    MR. WIEST:  Yeah, on subpar -- your

8            opinion of him being subpar.

9        A.   Yeah.  Again, it -- these were things that

10   were being told to me.  There's a lot of complaining

11   going on out in Anderson.  Jason's name was amongst

12   those names.  That's pretty much what I've got.

13       Q.   But you can't tell me who told you that?

14       A.   No.

15       Q.   Okay.  Did you ever document -- as you

16   were receiving this intelligence about people

17   complaining, you know, did you ever write a memo, a

18   file to document who was doing or saying what?

19       A.   No.

20       Q.   Okay.  You indicated that in RENU secrets

21   are important in the drug interdiction business,

22   correct?

23       A.   Very correct.

24       Q.   Did you have any reason to believe that

25   Jason would spill the beans, for lack of a better

1    term, in terms of if he were to be granted a RENU

2    position?

3        A.   Well, at that point in making that

4    decision, no.  Later on I think yes.

5        Q.   Okay.  What do you base that on, later on?

6        A.   Well, the amount of Facebook, the things

7    that were being put out by his wife, you know, that

8    that information comes from him and. . .

9        Q.   How do you know that?

10       A.   Well, she has a lot of opinions about our

11   agency apparently, and that was relayed.  And it has

12   to come from him, you would think.

13       Q.   Did you ever talk to her about that or

14   confirm?

15       A.   Who is that?

16       Q.   Jennifer Davis.  The source of her --

17       A.   No.

18       Q.   -- information.

19       A.   I've never met her.

20       Q.   Okay.  I mean, you were aware other people

21   had opinions about the agency?  We went on for some

22   time talking about all of Caroline Adams' opinions

23   about the agency.

24       A.   Oh, yeah.  Oh, yeah.

25       Q.   All right.  Do you have any specific

1    information that Jason had ever shared anything

2    internal with the Hamilton County Sheriff's Office

3    with his wife in terms of, you know, sensitive

4    information?

5        A.   Sensitive information?

6        Q.   Yes, sir.

7        A.   No.

8        Q.   Okay.  You indicated that Jason was a

9    problem from a teamwork perspective in terms of the

10   RENU --

11       A.   Teamwork?

12       Q.   Teamwork perspective with respect to the

13   RENU position, right; do you remember that

14   testimony?

15       A.   I said that RENU -- it's a big part of it

16   and that's what you're looking for is somebody

17   that's -- you know, that pitches in and teamwork.

18   But I didn't say Jason was not a good teammate, I

19   guess.

20       Q.   Okay.  And you have no information to

21   believe he would not have been a good teammate on

22   RENU, correct?

23       A.   No.

24       Q.   Okay.  You said trust was important at

25   RENU and that was one of the concerns you had with

Page 150

1    Jason?

2         A.    Yes.

3         Q.    Other than the Facebook post that he made

4    about the game, do you have any specific information

5    about why you felt that Jason Davis was not

6    trustworthy?

7         A.    Well, again, I go back to the reputation

8    as a malcontent, you know.  And that's -- that's a

9    big part of it.  That was, you know, the biggest

10   part of my decision.

11        Q.    Okay.  The reputation that came from rumor

12   mills and things you were being told, but you can't

13   tell me who was saying it, fair?

14        A.    Fair.

15              MR. WIEST:  Okay.  All right.  Let's

16              go -- I'm cheating.  I'm trying to get the

17              next number.  18.

18              (Plaintiffs' Deposition Exhibit No.

19              18 was marked for identification.)

20        Q.    I'll hand you what I've marked as Exhibit

21   18.  On August 24, 2023, Jason had sent a green

22   letter -- we talked about what that was before --

23        A.    Uh-huh.

24        Q.    -- at Exhibit 18 -- and requesting a

25   meeting with both you and Sheriff McGuffey, correct?

Page 151

1      A.   Correct.

2      Q.   The subject of that was future status,

3  correct?

4      A.   Correct.

5      Q.   You had an understanding Jason wanted to

6  discuss his future status with respect to the

7  Hamilton County Sheriff's Office, correct?

8      A.   Correct.

9      Q.   What -- let me see.  Major Chris Ketteman

10  also signed off on that, right?

11      A.   He did.

12      Q.   And he has a note about RENU --

13      A.   Uh-huh.

14      Q.   -- do you see that?  Do you know why he

15  had that note about RENU?

16      A.   He believed -- well, I guess I'm -- he

17  believed that Jason was going to discuss his

18  opportunities at RENU, and that he was putting in

19  there that we're not going to have any more

20  movement -- projected movement until early 2024.

21      Q.   And he knew that you had indicated or

22  overruled the RENU selection earlier that year,

23  correct?

24      A.   Right.

25      Q.   Because you had told him that, right?

Page 152

1      A.    Right.

2      Q.    Okay.  It looks like this moves up the

3  chain.  It starts on August 24th.  And it looks like

4  it gets to -- from what I can tell -- the captain --

5  and I'm not sure who that is, maybe you know -- 964;

6  do you know who that is?

7      A.    Where are you at?

8      Q.    I'm looking at the chain --

9      A.    Oh.  Tory Smith.

10     Q.    Okay.

11     A.    964.  Badge 964.

12     Q.    Okay.  And who was he the captain over?

13     A.    Tory Smith at that point was the patrol

14  captain.

15     Q.    Okay.  So it goes to the patrol captain.

16  And then it looks like it then goes to --

17     A.    Major Ketteman.

18     Q.    -- Major Ketteman?  I'm assuming -- he

19  doesn't have a date on there -- either the 28th or

20  29th is the only thing I can figure out, because it

21  looks like you get it on the 29th, right?

22     A.    Yes.

23     Q.    Okay.  And then it gets routed to Sheriff

24  McGuffey on September 8th of 2023, correct?

25     A.    Correct.

1      Q.   Did you speak to her -- well, let me back

2  up.  As this is moving through the chain of command,

3  is there any discussion that's going on -- you know,

4  for instance, it looks like the sergeant was out on

5  leave, but -- like from the lieutenant to the

6  captain about what this was about, if you're aware?

7      A.   I believe they thought it was about RENU.

8      Q.   Okay.

9      A.   The RENU position.

10     Q.   Okay.  Did anyone speak to you about it,

11 Major Ketteman --

12     A.   I would think so, that we would have

13 discussed this.

14     Q.   What do you recall, if anything, in terms

15 of that discussion?

16     A.   That he wants to talk about the future

17 RENU openings if he's got a chance at it.

18     Q.   Okay.  And then it goes to the sheriff.

19 It looks like there's some delay between when it hit

20 you and when it hit the sheriff, correct?

21     A.   Yeah.

22     Q.   Do you recall discussing this with her

23 prior to her signing off on it on September 8?

24     A.   Not really.

25     Q.   Okay.  Do you recall any discussions with

1    her after September 8?

2          A.    I don't recall.

3          Q.    Okay.  You don't dispute that you and

4    Sheriff McGuffey met with Jason Davis on October 10

5    of 2023, correct?

6          A.    I don't.

7          Q.    Okay.  That was when you met with him,

8    right -- October 10th of '23?

9          A.    I suppose so.

10         Q.    Okay.  What did you do, if anything, in

11   advance of that meeting to prepare for it?

12         A.    So the sheriff asked me why were we

13   meeting with Jason Davis.

14         Q.    Okay.

15         A.    I relayed to her that he had been passed

16   up on the RENU list and that I passed him up due

17   to -- the same reasons why I told you, due to the

18   general disgruntledness and the things I was hearing

19   about Anderson Township and the Facebook posts on

20   the football game.  And the conversation then turned

21   towards the Davis -- Mrs. Davis and her Facebook

22   page -- or her Facebook posts and. . .

23         Q.    Okay.  Did you speak with anyone else

24   other than the sheriff in advance of the meeting

25   that you had with Jason on October 10th of 2023?

Page 155

1      A.   No.

2      Q.   Okay.  I forgot to ask this at the start

3  of the deposition, and normally I do.  What did you

4  do in advance of today to prepare for your

5  deposition?  And let me be clear about what I'm not

6  asking.  I don't want any specific communications

7  that you had with either of these gentlemen

8  sitting -- any three of these gentlemen sitting at

9  the table.

10          But other than that, what did you do, if

11  anything, to prepare to testify today?

12     A.   I read the complaint.

13     Q.   Okay.

14     A.   And -- what's the other thing we sent --

15  you sent over the -- where you asked the questions.

16  What's that called?

17     Q.   Interrogatories?

18     A.   Thank you.  Yeah, those two things.

19     Q.   Okay.  Anything else; did you review any

20  documents?

21     A.   No.

22     Q.   Okay.  I want a yes or no answer to this

23  because I'm not entitled to substance of

24  conversations, but did you meet with counsel prior

25  to today about your testimony here?

1      A.    Yes.

2      Q.    Okay.  How many times did you meet with

3   them?

4                 MR. SIMON:  About the deposition?

5                 MR. WIEST:  About the deposition.

6      A.    I can't remember.  Two.

7      Q.    Okay.

8      A.    Twice.

9      Q.    When were those meetings?

10     A.    I don't have my phone.  Let's see.  So

11  what's today's date?  Today is Friday.

12     Q.    It's the 21st of February.

13     A.    So we met Wednesday.

14     Q.    The 19th?

15     A.    Correct.  For this.  And then there was

16  one date earlier.  And I don't remember when it was.

17     Q.    Okay.  How long were those meetings?

18     A.    Wednesday was two hours.

19     Q.    Okay.

20     A.    And the first one was an hour maybe.

21     Q.    Okay.

22     A.    I don't even know if it was that long.

23     Q.    Okay.  Without getting into specific

24  conversations that you had, did anything occur in

25  those meetings that refreshed your recollection

1    about these events that happened in 2023?

2        A.   Not really.

3        Q.   Okay.  Would you agree that your memory

4    today about what happened on October 10, 2023, may

5    not be as good as it was that same day?

6        A.   Of course.

7        Q.   Okay.  Do you think -- I mean, Jason came

8    in and talked with you about why he did not get the

9    RENU assignment, correct?

10       A.   Correct.

11       Q.   He also talked with you and the sheriff

12   about his concerns about the corporal promotion,

13   correct?

14              MR. SIMON:  Sorry to do this at this

15              point, Chris.  I do want to just preserve

16              our objections.  I know that plaintiffs'

17              withholding of the recording was the

18              subject of a discovery motion before

19              Mr. Prem and I joined the case.  It

20              obviously resulted in an order by Judge

21              Barrett.

22              Notwithstanding that, we still object

23              to the fact that that recording wasn't

24              produced in advance of this deposition.

25              And, of course, the Chief can answer

1           your question over our object.

2               MR. WIEST:  Sure.  And I want to know

3           about his memory.

4      Q.   So you recall him -- Jason raising in that

5   meeting on October 10th concerns about promotion to

6   corporal?

7      A.   I don't.  I remember most of it was about

8   RENU, that I can remember.

9      Q.   Okay.

10     A.   I don't remember corporal.

11     Q.   Would you have told him in that meeting

12  every reason why he had not been selected for RENU?

13     A.    I remember that I did not.

14     Q.   And why did you choose not to do that?

15     A.    So the conversation went towards the

16  Facebook posts between -- what's her name --

17  Caroline Adams, Jennifer Patterson.  That's kind of

18  the direction it went in.  And it's -- you get

19  passionate about things.  And the amount of Facebook

20  and the posts and how terrible they were and

21  offensive and -- you get a little bit emotional

22  about it and -- so, yeah, I told Jason that it was

23  about the posts, when honestly I didn't even know

24  about the posts when I made the decision.

25     Q.   Okay.  Why didn't you tell him that it

1   wasn't about the posts?

2       A.   Well, at that point there was no reason

3   to.  We wanted to -- you know, he wanted to see us.

4   I don't think that anything was said that would make

5   him believe that he didn't have an opportunity to

6   move ahead.  Like I said, it kind of got a little

7   bit heated.  And I guess I just didn't really want

8   to make it any worse.

9       Q.   Can you tell me everything you recall and

10  your independent recollection about that October 10,

11  2023, meeting with Jason?

12              MR. SIMON:  And just -- Chris, is it

13          all right if I just have a continuing

14          objection to your line of questioning so I

15          don't have to keep feeling I have to

16          object?

17              MR. WIEST:  Yeah.

18              MR. SIMON:  Did you say yes?  I'm

19          asking for a continuing objection.  So

20          then I asked opposing counsel did you say

21          yes so I don't have to keep objecting.

22              MR. WIEST:  Yeah, I understand you've

23          got an ongoing objection --

24              MR. SIMON:  Thank you.

25              MR. WIEST:  -- you know,

```
 1              notwithstanding the judge's order.
 2                   MR. SIMON:  Thank you.
 3                   THE WITNESS:  Can you repeat that?
 4                   MR. WIEST:  Yeah.
 5     BY MR. WIEST:
 6         Q.  Can you tell me everything that you
 7     remember about the October 10, 2023, meeting with
 8     Jason Davis?
 9         A.  We met in my office.  The sheriff and
10     Jason sat in the chairs across from me.  We
11     discussed -- Jason wanted to know what his future
12     held.  And I really remember most of it being about
13     Facebook and Jason's wife's -- and her posts and
14     Caroline Adams.
15              And I remember the sheriff saying that --
16     oh, there was a part where Jason talked about an
17     incident that occurred between him and the sheriff
18     about something and that she questioned his
19     integrity or something to that -- I don't know.  And
20     I remember the sheriff talking about the different
21     posts and things of that nature.
22              I remember at one time I told Jason that I
23     was the reason that I squashed him going to RENU.
24         Q.  Okay.
25         A.  That I was the reason.  And I think I
```

1  remember him asking me if is the only reason I

2  didn't go to RENU is because of my wife's Facebook

3  page or something -- or posts, and I said something

4  to the effect that the guy -- the guy behind you's

5  wife didn't or something to that effect.  That's

6  what I remember.  And, again, I -- it was kind of a

7  heated moment thing.  It wasn't -- it wasn't true.

8       Q.   Okay.  Do you recall making any untrue

9  statements to employees other than this meeting with

10 Jason Davis, other than -- I think we talked about

11 investigations or employee discipline matters?

12      A.   Well, and, again, I didn't say anything

13 that wasn't untrue.  I said that -- that wasn't

14 the -- all of the reasons and -- yeah.  It was --

15 you know, we talked about it.  I even discussed it

16 with Jason.  I said, you know, how would you feel if

17 this was your wife, your daughter?  You know, these

18 people have families.  And the terrible things that

19 Caroline Adams has said and done on Facebook -- I

20 mean, this isn't -- this isn't just I disagree with

21 your politics or -- this is terrible, terrible

22 things that they put on Facebook.

23           And I wanted Jason to understand that --

24 that, you know, by your wife being a part -- not a

25 part of this, but being within that Facebook, liking

1    the things that this woman has said, that it's --

2    you know, it's just disappointing.

3         Q.   Okay.  If you had an expectation -- or you

4    knew Jason wanted to know what was holding him back,

5    correct?

6         A.   Uh-huh.

7         Q.   I mean, you knew that going into the

8    meeting --

9         A.   Uh-huh.

10        Q.   -- correct?  And Jason had brought that up

11   in the course of the meeting, correct?

12        A.   Uh-huh.

13        Q.   And if there were concerns other than

14   Facebook that you wanted him to address, why not

15   bring that up in the course of the meeting?

16        A.   Well, I think we would see his actions

17   after this and -- you know, those actions of -- I

18   think the sheriff said something about, you know,

19   getting away from negative people and stuff of that

20   nature.  And, again, that was -- there was a lot of

21   negativity out at district -- at Anderson Township.

22        Q.   Okay.

23        A.   And so I think his actions would have

24   showed us what it would have taken for him to move

25   on in the RENU.

1          MR. WIEST:  Okay.  Let me hand you

2      what I'm marking as 19.

3          (Plaintiffs' Deposition Exhibit No.

4          19 was marked for identification.)

5      Q.   If you can -- there's pages on the bottom.

6  If you can go back to 21.

7      A.   Okay.

8      Q.   That is your signature, correct?

9      A.   It is.

10     Q.   And you understood that you were swearing

11 that the answers you had given to the

12 interrogatories were true based on your knowledge,

13 right?

14     A.   Correct.

15     Q.   And it was notarized by Mr. Stackpole, who

16 is sitting here, correct?

17     A.   Correct.

18     Q.   Okay.  All right.  If you look on page 14,

19 Interrogatory No. 2, I asked about people that may

20 have knowledge about any of the allegations in the

21 complaint.

22     A.   Uh-huh.

23     Q.   And I know Sheriff McGuffey and you were

24 at the meeting with Jason on 10/10/23.

25     A.   Yeah.

Page 164

1      Q.   What knowledge would Chris Ketteman have,

2   do you think, about the claims in this case?

3      A.   I don't know.

4      Q.   Okay.  Matt Guy was the head of RENU; is

5   that --

6      A.   He was.

7      Q.   Okay.  And he recommended Jason Davis to

8   come down --

9      A.   He did.

10     Q.   -- correct?  Okay.  All right.  Who was

11  Dave Downing?

12     A.   Dave Downing was -- so they -- Dave

13  Downing replaced the lieutenant that was in Anderson

14  Township.

15     Q.   When did he do that?

16     A.   You know, I don't know.  But it was in

17  that time frame.

18     Q.   Okay.  Did you discuss with Dave Downing

19  any knowledge he had about Jason Davis or --

20     A.   No.

21     Q.   -- his work?  Okay.  And then Robert Viner

22  was his direct supervisor, correct?

23     A.   I think that one evaluation was, so yes.

24     Q.   Okay.  Other than being the attorney, are

25  you aware of any factual knowledge that Pete

Page 165

1    Stackpole has, because he's listed here?

2        A.    No.

3        Q.    Okay.

4        A.    No.

5        Q.    All right.  In Interrogatory No. 6 the

6    question was asked, Please state all reasons why you

7    prevented, or directed others to prevent, Jason

8    Davis' reassignment to RENU in 2023; you see that

9    interrogatory --

10       A.    I do.

11       Q.    -- correct?  And your answer was, I made

12   the decision to prevent Jason Davis's assignment to

13   RENU.  RENU is an elite unit within law enforcement

14   that requires those assigned to it to protect

15   sensitive information.  Trust, responsibility, and

16   secrecy are necessary for RENU officers.  Jason

17   Davis did not have the necessary qualities for RENU.

18   That was your answer, right?

19       A.    Correct.

20       Q.    Have we talked about all the specific

21   information that you had that underlied those

22   opinions?

23       A.    Say it again.

24       Q.    Have we talked about all of the specific

25   information that you had that drove your opinions

Page 166

1   that Jason Davis did not have the necessary

2   qualities for RENU?

3        A.   Yes.

4        Q.   Okay.  We asked about -- please state all

5   reasons why you prevented, or directed others to

6   prevent, Jason Davis' promotion to corporal in 2023.

7   This was No. 7.  It goes on to the next page, the

8   answer does.  And it says, Neither Sheriff McGuffey

9   nor I prevented Jason Davis from a promotion to

10  corporal.  He did not stick around long enough and

11  quit his employment with the Hamilton County

12  Sheriff's Office.  That was your answer, correct?

13       A.   Right.

14       Q.   When was the -- if you know, the next

15  promotion to corporal after October 10th of 2023; do

16  you know?

17       A.   I don't know.

18       Q.   Okay.  Who would know that within the

19  sheriff's department?

20       A.   Who would know?

21       Q.   When the next promotion was to corporal

22  after October 10th of 2023 -- to corporal.

23       A.   Who would know?  I'm trying to think of

24  who.  Major Ketteman.

25       Q.   Okay.

Page 167

1       A.    I mean, we could get that information to

2   you.

3       Q.    Okay.  All right.  Number 8, Please state

4   all reasons why you told Jason Davis that he needed

5   to disassociate himself with his spouse, Jennifer

6   Davis, in order to advance his career with the

7   Hamilton County Sheriff's Office.

8            Your testimony was that you did not say

9   that, you never named Jason Davis's wife; was that

10  true?

11      A.    I'm not sure what I never named Jason

12  Davis's wife means.  But I never said anything about

13  disassociating with his wife.  I'm not -- I think

14  that's either worded oddly or something like that.

15  I'm not sure what that means.

16      Q.    Okay.  Well, this is your answer.  What

17  did you mean by never named Jason Davis's wife?

18      A.    I don't understand that to be truthful.

19      Q.    Okay.  So you did name Jason Davis's wife

20  in the course of your conversation with him,

21  correct?

22      A.    I don't remember.

23      Q.    Okay.

24      A.    I'm not -- honestly I don't know what that

25  means.

1     Q.   Please -- No. 9 was please state all

2  reasons why you tried to get Jason Davis to regulate

3  or attempt to regulate the online speech of Jennifer

4  Davis.  And your answer was, I did not try to

5  regulate anyone's speech; was that true?

6     A.   Correct.  True.

7     Q.   So you never told Jason to -- that his

8  wife needed to cut her online activities out if he

9  wanted to get ahead in the organization?

10     A.   I think I said I might have liked him to

11  do that or that -- I don't -- I don't recall saying

12  that she's got to do that so that he can get ahead.

13     Q.   Okay.  Number 10, With respect to Jason

14  Davis's Facebook post about the football game,

15  please state all reasons why you punished him for

16  that post.  Your answer was, Jason Davis was not

17  punished for any post about a football game.  Was

18  that true?

19     A.   True.

20     Q.   You agree, though, that the post in

21  question, including his statement back to the other

22  officer, was a basis under which you chose not to

23  promote him to the RENU squad, correct?

24     A.   I didn't promote him to RENU because I

25  believed that he was a malcontent.  That post showed

Page 169

1    me that he had not changed.

2         Q.    Okay.

3         A.    But he was never written up for that.

4         Q.    Sure.  Well, you told me it wasn't a

5    violation of policy, correct?

6         A.    Right.

7         Q.    Okay.  Are you aware that the sheriff's

8    office gave a statement to the Cincinnati news

9    outlets following the reporting of this lawsuit;

10   there was reporting on this lawsuit that we're here

11   about?

12        A.    I saw it, but I didn't. . .

13        Q.    You didn't have anything to do with that

14   release?

15        A.    No.

16        Q.    Okay.  All right.  Have you talked to the

17   sheriff about this lawsuit?

18        A.    If we have, it's not very much -- not

19   in-depth.

20        Q.    Okay.  Do you recall any conversations you

21   had with the sheriff about this lawsuit?

22                  MR. SIMON:  I'm assuming you mean

23             outside the presence of attorneys?

24                  MR. WIEST:  Yeah, that's a fair

25             assumption.

1      A.   Well, because I was going to say I -- you

2   know, I don't -- I don't think so.

3                  MR. WIEST:  Okay.  I asked a question

4            -- there's Interrogatory No. 15 -- about

5            other lawsuits.  We're going to mark this.

6                  THE COURT REPORTER:  20.

7                  MR. WIEST:  20.  Thank you.  You were

8            saving me from myself.

9                  (Plaintiffs' Deposition Exhibit No.

10           20 was marked for identification.)

11     Q.   Chief, this was produced to us in

12   discovery and it was referenced in response to

13   Interrogatory No. 15 about a litigation report.

14     A.   Okay.

15     Q.   And my first question is, do you know how

16   this list was compiled?

17     A.   I do not.

18     Q.   Do you know who compiled it?

19     A.   I do not.

20     Q.   I'd like you to -- if you don't mind,

21   taking just a couple of minutes and going through

22   it.  And my question to you when you're done going

23   through it is going to be does this contain all the

24   litigation that you know of that's responsive to

25   Interrogatory No. 15?

1          MR. SIMON:  Note my objection to this

2     question.

3          You can answer.

4     A.   I guess I don't -- I don't know -- what is

5  your question?

6     Q.   So we sent an interrogatory to you --

7     A.   Uh-huh.

8     Q.   -- you answered it, No. 15, and you said

9  look at this report for all of the litigation that's

10  responsive to several categories of litigation.

11     A.   Uh-huh.

12     Q.   And my question is, are you aware of any

13  other lawsuits or matters that are responsive that

14  are not contained in Exhibit 20?

15          MR. SIMON:  Objection.

16     A.   Yeah, I don't -- I don't know of anything

17  else.

18          MR. WIEST:  Okay.  I am identifying

19          this and ultimately it will be produced as

20          Exhibit 21.  It is an audio recording.

21          (Plaintiffs' Deposition Exhibit No.

22          21 was marked for identification.)

23          MR. WIEST:  And we're going to spend

24          some time on this.  If you need a break,

25          now would be the time to do it because --

1                    THE WITNESS:  Go ahead.

2                    MR. WIEST:  -- I want to spend some

3          time going through this.

4                    THE WITNESS:  I'm fine.

5                    MR. WIEST:  Okay.  Chief, for some

6          reason if you can't hear this because I'm

7          playing it on my laptop, let me know.

8                    THE WITNESS:  Okay.

9                    MR. WIEST:  I am going to -- there's

10         about 14 minutes of this video where he's

11         walking in before the meeting starts.  And

12         so I'm going to forward this to the 14:21

13         minute mark -- 14:16, because it's as

14         close as my player will get -- allow me to

15         get.

16                   MR. SIMON:  Did you say video or

17         audio?

18                   MR. WIEST:  It's audio.

19                   MR. SIMON:  Audio?

20                   MR. WIEST:  It's audio.

21                   MR. SIMON:  Okay.

22                   (The audio recording was played.)

23                   MR. SIMON:  Chris, can you pause it

24         for a minute?

25                   MR. WIEST:  Yeah.

1           MR. SIMON:  Do you think it would be

2           helpful if you reviewed the transcript

3           while you're doing it, if you're going to

4           ask him questions, or --

5           MR. WIEST:  I'm going to play

6           whatever I want him to talk about for him.

7           MR. SIMON:  Okay.

8           MR. WIEST:  And I think the intention

9           of the judge in having you guys get the

10          transcript was to keep me honest.  So I

11          will do that.

12          (The audio recording was played.)

13  BY MR. WIEST:

14      Q.   So I wanted to start with, you recognize

15  the sheriff's voice and your voice, correct?

16      A.   Correct.

17          MR. WIEST:  Okay.  I'm going to

18          advance this to 16:58.  But just for

19          Counsel's reference, it starts at the

20          bottom of page five on the transcript.

21          MR. SIMON:  Thank you.

22          (The audio recording was played.)

23      Q.   So how did you know that he was next on

24  the list?

25      A.   I don't know.

Page 174

1          Q.   Would you have researched that beforehand?

2          A.   I don't know.  I might have just been

3     agreeing with Jason that he was telling the truth.

4          Q.   Okay.

5          A.   I don't know.

6                    (The audio recording was played.)

7          Q.   Okay.  So you said to get to somebody that

8     we have on the street with two stripes.  We usually

9     promote seven or eight people.  What did you mean by

10    that?

11         A.   Well, seven or eight is too much.  But

12    what I'm saying is -- so if you're in RENU and

13    you're not a corporal, if you're in our traffic

14    section and you're not a corporal and you're on the

15    list and we need a patrol corporal, what we'll do is

16    we'll promote those people that are already in

17    preferred assignments and then get down to a person

18    that's working a beat.  They become a corporal,

19    because we need -- we actually need the beat

20    corporal.  But we're not -- we're promoting the guys

21    that are already in specialty assignments.  So it --

22    it always works out that there's two or three RENU

23    guys and a traffic guy and a guy in CIS, then we'll

24    get to a patrol guy.  So five guys got promoted when

25    we needed one corporal on the street.

1      Q.   So if I understand what you're saying, you

2   know you need a beat cop for corporal?

3      A.   Uh-huh.

4      Q.   And so if there's three people ahead of

5   them that are in RENU, you'll promote them --

6      A.   Yeah.

7      Q.   -- because you know that you need that

8   beat cop to be a corporal; is that fair?

9      A.   That's fair.

10      Q.   And that's why I actually wanted you to

11   keep 12 out.  Do you know who on the Exhibit 12 was

12   -- had a specialty assignment at the time?

13      A.   From top to bottom?

14      Q.   Just to the best of your recollection.  If

15   you don't remember, that's fine.  I'm just trying to

16   get a sense of that.

17      A.   So the first person is Steve Von

18   Hertsenberg.  He's in RENU.  Mike Ritter is in RENU.

19   John Enderle is in RENU.  The fourth was Jonathan

20   Hoover, who is in Traffic Safety.  Matt Alexander is

21   a K-9, so he's also getting it.  Herman Oyler would

22   have been the first corporal we could have promoted.

23   It would have been a road corporal.

24      Q.   Okay.

25      A.   So we would have promoted six just to get

 1   to Herman Oyler.

 2        Q.   So just to understand, when the first

 3   vacancy opened which caused this testing and list to

 4   be created, because there were five specialties

 5   ahead of Herman Oyler --

 6        A.   Uh-huh.

 7        Q.   -- you would promote those five to then

 8   get to Herman to be able to promote Herman to be a

 9   road corporal?

10        A.   Correct.

11        Q.   Okay.  And so how about Jacob Partin; was

12   he specialty?

13        A.   RENU.

14        Q.   Okay.  Rick Haun?

15        A.   The same.

16        Q.   RENU -- Rick Haun was RENU?

17        A.   Yes.

18        Q.   Okay.

19        A.   Sorry.

20        Q.   David -- or Dayne --

21        A.   Dayne.

22        Q.   -- Friedhoff?

23        A.   So I don't know if -- Dayne is now a K-9.

24   I don't think he was a K-9 at that -- so I think

25   that was -- he was a patrol, I believe.

```
 1      Q.   Okay.  Ryan Matthews?

 2      A.   And Ryan Matthews is patrol.

 3      Q.   Okay.  Caroline Kotlas?

 4      A.   Traffic safety.

 5      Q.   Which is specialty, right?

 6      A.   Yep.

 7      Q.   Okay.  Dale Mikes?

 8      A.   RENU.

 9      Q.   Dan Grimes?

10      A.   I'm not -- patrol, I -- patrol, I believe.

11      Q.   Okay.  Ryan Braun?

12      A.   RENU.

13      Q.   Edward Zaczek?

14      A.   Zaczek.

15      Q.   Yeah.

16      A.   I believe patrol.

17      Q.   Okay.

18      A.   At the time.

19      Q.   Okay.  Jeffrey Scott?

20      A.   RENU.

21      Q.   All right.  Larry Powers?

22      A.   CIS.

23      Q.   That's specialty, too, right?

24      A.   Criminal Investigation Section, yes.

25      Q.   Shannon Cunningham?
```

1      A.    Shannon Cunningham -- after she took the

2  test, she resigned.  Medical resignation.

3      Q.    Do you know how long after she took the

4  test?

5      A.    I don't think we were very far down when

6  she resigned.

7      Q.    And then Jason would have been patrol?

8      A.    Yeah.

9      Q.    How about Shane Wiseman?

10      A.    So that was right in that time frame that

11  Shane was being a K-9, so I'm not sure.

12      Q.    Okay.  Howard Hochscheid?

13      A.    Hochscheid is a patrol.

14      Q.    Okay.  Gary -- Gregory Burke?

15      A.    By the time we promoted him, he was in

16  RENU.

17      Q.    Okay.  Casey Lyle?

18      A.    I'm not sure.  Patrol, I believe.

19      Q.    Andrew Caddell?

20      A.    RENU.

21      Q.    Okay.  Do you know when Howard Hochscheid

22  was promoted?

23      A.    No.

24          MR. WIEST:  Okay.  All right.  Okay.

25          We'll continue on on this recording.

Page 179

1                    (The audio recording was played.)

2        Q.    That was you telling Jason that you

3   squashed him going to RENU?

4        A.    That's correct.

5        Q.    I mean, there's no voices being raised so

6   far in this conversation.  It looks like it's fairly

7   amicable; would you agree?

8        A.    Yes.

9              MR. WIEST:  Okay.  And we're at 19:27

10             minutes into the recording.

11                   (The audio recording was played.)

12       Q.    So you told him that was due to some

13  Facebook things between you and your wife and things

14  you said and did some time ago?

15       A.    Yeah.

16       Q.    Okay.  What Facebook things did Jason do,

17  the football post?

18       A.    The football post.

19       Q.    Anything else?

20       A.    No.  And like I said, the sheriff and I

21  had just discussed the different things with the

22  Facebook with Jason's wife, and so that was fresh in

23  my head.

24       Q.    Okay.  How long before this meeting with

25  Jason had you and the sheriff discussed his wife's

1    Facebook post?

2         A.   It was either that day or the day before,

3    I think.

4         Q.   Okay.  And since this meeting was at 8:30

5    in the morning, when you say that day, it would have

6    been earlier that morning?

7         A.   It would have even probably been the

8    next -- the day before.

9         Q.   Okay.  What time do you typically come in

10   the office?

11        A.   Probably about 8:00.

12        Q.   Okay.  So this was almost near the start

13   of your workday?

14        A.   Yeah.

15             MR. WIEST:  Okay.  All right.

16             (The audio recording was played.)

17        Q.   So what you said back was you put

18   something about a football game, it would have been

19   nice if we would have been able to a football --

20   something about that.  Your wife has made numerous

21   comments to the crazy woman on Facebook.  There's

22   been -- and the sheriff interrupts and says Caroline

23   Adams.

24        A.   Uh-huh.

25        Q.   And you say, Whatever, you know, the crazy

1  person.  And she says, Yes.  Okay.  Go ahead.  And

2  you said, So, no, that was -- that was what it was,

3  that was why you didn't get it, correct?

4      A.   Yeah.

5      Q.   All right.  And now two years later after

6  you've been sued you're telling me there were more

7  things going on, that he was a malcontent, correct?

8      A.   Uh-huh.

9      Q.   Is that correct?

10     A.   That's correct.

11              MR. WIEST:  Okay.  All right.

12              (The audio recording was played.)

13     Q.   So did you know that Jason had reached out

14  to the PIO about the football game?

15     A.   No.

16     Q.   Okay.  When he told you that, was that the

17  first time that you had heard that?

18     A.   Yes.

19     Q.   After the meeting did you discuss with the

20  PIO whether or not he had reached out to her?

21     A.   I don't think so.

22              MR. WIEST:  Okay.  I'm going to

23              advance a little bit to 22 minutes.  It's

24              page 11 after Jason is done talking.

25              (The audio recording was played.)

1      Q.   So you mentioned that you felt that Jason

2   was challenging you on Facebook --

3      A.   Uh-huh.

4      Q.   -- is that correct?

5      A.   Sure.  Yes.

6      Q.   Okay.  And then his wife was conversing

7   with a crazy person that makes lies up; that's what

8   you told him?

9      A.   Yes.

10     Q.   Okay.  Who was tracking Caroline Adams'

11  Facebook activity within the sheriff's office?

12     A.   At first we did have -- our professional

13  standards folks were seeing it, because we had

14  employees that were making comments.  At a certain

15  point I told them to stop even looking at it.  But

16  as far as tracking it, they -- I think they were

17  just monitoring for if any of our employees would

18  say anything derogatory or anything like that.

19     Q.   Are you aware of any instance in which

20  Jason Davis had made any comments on Caroline Adams'

21  Facebook?

22     A.   I have no idea.

23     Q.   Okay.  You say you have no idea.  You

24  don't recall anything, correct?

25     A.   I don't recall anything, no.

Page 183

```
 1        Q.   Okay.  And then the sheriff is talking

 2   about being associated with people that live in the

 3   same household --

 4        A.   Yes.

 5        Q.   -- correct?

 6             MR. WIEST:  All right.  I want to

 7         advance to --

 8             THE WITNESS:  I'm getting -- I'm just

 9         going to grab a water real quick.

10             MR. WIEST:  You know what, if you

11         need a break, we can do that, too.

12             THE VIDEOGRAPHER:  Are we going off

13         the record?

14             MR. WIEST:  That's fine.

15             MR. SIMON:  Let's go off the record.

16             MR. WIEST:  Yeah, that's fine.

17             THE VIDEOGRAPHER:  We're going off

18         the record at 2:07.

19             (A brief recess was taken.)

20             THE VIDEOGRAPHER:  We're going back

21         on the record at 2:15.

22   BY MR. WIEST:

23        Q.   Chief, is anything that you've heard in

24   terms of your interactions with Jason Davis so

25   far -- have you misrepresented anything to him or
```

Page 184

1    lied to him so far in this meeting?

2         A.   Lied to him?  No.

3                   MR. WIEST:  Okay.  All right.  I'm

4              going to advance to page 19 on the

5              transcript, 29 minutes, 30 seconds into

6              the audio.  Maybe.  Close enough.

7                   (The audio recording was played.)

8         Q.   What did -- it was hard for me to see --

9    hear you.  I think you said give them something.

10   And I'll tell you the transcript says inaudible.

11   And I haven't been able to figure it out.

12        A.   Can you redo it?

13        Q.   I can do my best.

14        A.   I can't -- I can't hear it really.

15                  MR. WIEST:  Yeah.

16                  (The audio recording was played.)

17        Q.   I'll keep working on that if you don't --

18        A.   Yeah, I can't hear it.

19                  MR. WIEST:  Okay.  All right.  I'm

20             going to advance to 32:30 on page 21 of

21             the transcript.

22                  MR. SIMON:  I'm sorry, what page?

23                  MR. WIEST:  Page 21 at the bottom.

24                  MR. SIMON:  Thanks.

25                  MR. WIEST:  Actually I think it's

1          32:50.

2                    (The audio recording was played.)

3       Q.   So the sheriff tells Jason Davis that his

4   wife can have 100 opinions if she wants, the sheriff

5   doesn't care, but there will be consequences for

6   Jason, correct?

7       A.   Correct.

8       Q.   And that was the -- by the way, you agree,

9   when it comes to the sheriff's office, the buck

10  stops with the sheriff, correct?

11      A.   Ultimately, yes.

12                   MR. WIEST:  Okay.  I'm going to keep

13              going on this.

14                   (The audio recording was played.)

15      Q.   So the sheriff made the statement that she

16  always considered Jason Davis to be a good officer,

17  a really good officer.  Why didn't you correct her

18  about your views of him being a malcontent

19  individual?

20      A.   I don't correct the sheriff.

21      Q.   Okay.

22      A.   She's my boss.

23                   (The audio recording was played.)

24      Q.   Okay.  So the sheriff says, The chief I

25  think is being very honest and forthright with --

1   and we're going to be honest with you and I want you

2   to be honest with us, you know.  That was to Jason,

3   correct?

4        A.   Correct.

5        Q.   All right.  Did you disagree with her?

6        A.   Did I in that moment?

7        Q.   Right.

8        A.   No.

9              MR. WIEST:  Okay.

10             (The audio recording was played.)

11       Q.   So when Jason brings up this prospect of

12  being called a malcontent and he's got a reputation

13  about being untruthful, the sheriff's response is

14  that was in the past, it wasn't with this

15  administration, correct?

16       A.   Correct.

17             MR. SIMON:  Objection.

18       Q.   I mean, you heard it, right?

19       A.   I did.

20       Q.   You were in the meeting, correct?

21       A.   I did -- I was.

22       Q.   Did you tell the sheriff before this

23  meeting that Jason had a reputation in your view of

24  being a malcontent?

25       A.   No, I did not.

1            MR. WIEST:  All right.  I'm going to

2            advance to 37:40 in the recording.  This

3            starts halfway on page 37 -- or, I'm

4            sorry, 26 of the transcript.

5            MR. SIMON:  Give me the page that you

6            said.

7            MR. PREM:  37.

8            MR. WIEST:  26 of the transcript.  I

9            meant 37 minutes, 40 seconds of the audio.

10            Halfway down 26.

11            (The audio recording was played.)

12      Q.   So when Jason brings up the basis of him

13  being called a malcontent about being moved on the

14  overtime list, your response was I don't know

15  anything about that?

16      A.   Right.

17      Q.   Okay.  Was that true?

18      A.   Yeah.  I don't know anything about that.

19            MR. WIEST:  Okay.  All right.  I'm

20            going to advance to 38:45 in the audio at

21            page 27.  I'm not sure why that's not

22            playing.  Let me reopen it.

23            (The audio recording was played.)

24      Q.   So the sheriff tells Jason -- and you're

25  in the room and you respond to it -- that good men

1  are hard to find, correct?

2       A.   Correct.

3       Q.   Did you understand her to be referring to

4  Jason?

5       A.   I did.

6                 MR. WIEST:  I am moving forward,

7            Counsel, to page 35 of the transcript.  I

8            am at 44 minutes and 39 seconds into the

9            recording.  Maybe.  I'm going to back up.

10                (The audio recording was played.)

11      Q.   When you refer to crazy woman, you're

12  referring to Caroline Adams?

13      A.   Yes.

14      Q.   Okay.  And you told Jason to tell his wife

15  to stay off social media?

16      A.   I did.

17      Q.   Okay.  And you said, My wife would -- in a

18  million years would not put something negative

19  towards this agency, because you know what, it also

20  feeds her; that's what you said?

21      A.   It also feeds?

22      Q.   Her, your wife.  I wouldn't do -- my wife

23  would -- in a million years would not put something

24  negative towards this agency, because you know what,

25  it also feeds her.

1    A.    Yes.

2              MR. WIEST:  All right.  46:39 and I'm

3         on page 37 of the transcript.

4              (The audio recording was played.)

5    Q.    So did Caroline Adams make posts about you

6   that your daughter saw?

7    A.    Yeah.

8    Q.    And did your daughter bring that to your

9   attention?

10   A.    I think my wife told me.

11   Q.    So your daughter told your wife who told

12  you?

13   A.    I believe so.

14   Q.    Okay.  Did that upset you?

15   A.    Absolutely.

16   Q.    And when you make the statement about

17  Meatball, that's the nickname for Jason and

18  Jennifer's son?

19   A.    Correct.

20   Q.    How did you know that?

21   A.    My daughter and --

22   Q.    Meatball are friends?

23   A.    They're friends, yes.

24              (The audio recording was played.)

25   Q.    Okay.  So you, again, emphasize to Jason

1  that Jennifer Davis talking to Caroline Adams was

2  not okay?

3       A.   So understand that I am social media

4  illiterate.

5       Q.   Okay.

6       A.   So when I say talking to or posting, I

7  think I called it emailing once, so I'm very -- it

8  was brought to my attention that she liked -- I

9  guess they call it liking or something like that --

10 these posts from the Caroline Adams woman.

11          Again, I -- I'm going off of a lot of

12 people telling me things and a lot of it is stuff

13 that I don't understand, to be truthful, because I

14 don't have any of this stuff.

15      Q.   Let me ask, in the law enforcement

16 business generally, I'm assuming that rumors run

17 rampant within the sheriff's department?

18      A.   Uh-huh.

19      Q.   There's probably a lot of gossip, fair?

20      A.   Fair.

21      Q.   How do you sort out when you're receiving

22 information what's true or not true?

23      A.   Well, the people that I'm talking to are

24 normally going to be command staff level people.

25 I'm talking to our Internal Affairs and things of

1    that nature.  So the people that are gossips I'm not

2    talking to them.

3         Q.    Okay.

4         A.    I'm talking to majors and people of that

5    nature and the people that I know that are not

6    gossips.

7         Q.    And so the information that you had

8    received about Jason Davis and Jennifer Davis, you

9    can't give me specifics, but you think it was

10   someone within the command staff?

11        A.    I could tell you that I -- I saw the post

12   from January, but that wasn't anything to do with

13   Caroline Adams.  That was the post from January of

14   2021.  Somebody showed me that, because I -- when

15   you showed it to me, I remember seeing that.

16        Q.    Okay.

17        A.    And then there's other things that people

18   would send me or show me.  But I don't remember who

19   showed me, but. . .

20        Q.    Do you remember the content of any of

21   those?

22        A.    I think it was -- it was horrible things

23   said about the sheriff.  One was I think it was like

24   a Brokeback Mountain and it was the sheriff and

25   Chief Terri Theetge from the City or stuff like

1    that.  So I saw -- I mean, they're all -- the ones

2    I've seen, they're -- they're not sending me the

3    ones that are low -- or, you know, in the middle of

4    the road.  They're very vile, disgusting.

5         Q.   The more outrageous things?

6         A.   They're outrageous.  And I -- and that's

7    the part that we're talking to Jason that, you know,

8    your wife liking these things -- it's disappointing

9    that we have a deputy whose wife would be putting

10   that stuff down, because we would hope that Jason

11   would say, hey, they inherited a mess, they're

12   trying to turn it around, we're doing -- they're

13   doing everything they can, Gramke is working 70

14   hours a week, and that's where we're going with it.

15        Q.   Did you retain any of those outrageous

16   posts with respect to any deputies or their wives

17   liking them?

18        A.   No, I don't think so.

19        Q.   Were there any wives other than Jason

20   Davis's wife within the sheriff's department that

21   were brought to your attention in terms of

22   interacting with Caroline Adams?

23        A.   Anybody's wife?  Not that I can recall.

24        Q.   Okay.  Do you recall Jason Davis ever

25   interacting with Caroline Adams or intelligence to

1    that effect?

2         A.    Not that I recall.

3                   MR. WIEST:  Okay.  All right.  I want

4              to advance to 51 minutes and 55 seconds.

5              It's page 42.  I'm trying.  Okay.  I'm

6              going to back up ten seconds.

7                   (The audio recording was played.)

8         Q.    Do you recall having -- and I just played

9    it for you -- this interaction between you, the

10   sheriff, and Jason in which he brings up the

11   promotion to corporal and your response is there's

12   going to be consequences; I mean, you just heard

13   that --

14        A.    I do.

15        Q.    -- right?

16                  MR. WIEST:  Okay.  All right.  I'm

17             going to go forward to 52:52.  It's on

18             page 44 of the transcript.

19                  (The audio recording was played.)

20        Q.    Was it your understanding that the sheriff

21   knew exactly who was who and that she strategized

22   around it?

23        A.    I don't really understand what she was

24   referring to, to be truthful.

25                  MR. WIEST:  Okay.  All right.

1          Let's -- I'm going to advance to 54

2          minutes, 30 seconds.  It's also on page 45

3          of the transcript.  Maybe a little before

4          then because I'm technically deficient.

5          I'm going to back up a little.  Sorry.

6              (The audio recording was played.)

7      Q.   So not only did you not tell Jason that he

8  was malcontent, you actually told him that he did a

9  good job, correct?

10          MR. SIMON:  Objection to the form of

11          the question.  Lack of foundation.

12      A.   Yeah.  I told him he did a good job.  But

13  I said, yes, there was some bitching.

14      Q.   Okay.

15      A.   And, again, it's -- you can do a good job,

16  but if you're malcontent, you can also spoil the

17  entire batch.

18      Q.   Well, you told him that he was out there,

19  correct?

20      A.   He's out there working, yeah.

21      Q.   And you told him he hustled, correct?

22      A.   I did.

23      Q.   And you said you're not sitting around

24  bitching and whining -- well, there was some

25  bitching and whining, but you're not sitting around

1    doing nothing, you're a worker, and I've been told

2    that.

3           A.    Uh-huh.

4           Q.    That's what you told him, correct?

5           A.    Yes.

6           Q.    But I'm also not going to have somebody

7    who has badmouthed us and his wife has badmouthed

8    us.  That's what you told him?

9           A.    I did.

10          Q.    And by him badmouthing, you're referring

11   to the football post, correct?

12          A.    Yes.

13          Q.    There was nothing else that you were

14   referring to, correct?

15          A.    I was -- well, again, there was the

16   constant complaining that was going on out at

17   District 5 out in Anderson Township.

18          Q.    Okay.  If I were to tell you that we've

19   got a transcript and constant complaining in

20   Anderson Township is not anywhere in that

21   transcript, would that surprise you?

22          A.    What transcript are you talking about?

23          Q.    I've got a transcript of this audio

24   recording.

25          A.    No, it wouldn't.

1     Q.   Okay.  And you told him because he was

2  badmouthing and his wife was badmouthing there was

3  going to be consequences, right?

4     A.   Right.

5     Q.   Okay.  And when he brings up the football,

6  your response was I had no idea, none of us had any

7  idea?

8     A.   Yeah.  I had no idea that he had a game or

9  anything.  I didn't know anything about it, so how

10  could you expect me to support you.

11     Q.   Okay.  All right.  And those consequences

12  were no RENU assignment, right?

13              MR. SIMON:  Objection.

14     Q.   That was a consequence?

15              MR. SIMON:  Objection to the form of

16          the question.  Lack of foundation.

17          Misleading.

18     A.   The consequences for -- when I talk about

19  that, the football post -- again, what that did was

20  that cemented my opinion of Jason.  We went down

21  this road of talking about the Facebook things

22  because, like I said, that was what we talked about

23  coming up into this interview with Jason.  And it

24  kind of took center stage.

25     Q.   Okay.  When you said consequences -- we

1  just heard it.  I can play that again if you want me

2  to.  I'd be happy to.  The consequences you were

3  referring to was getting pulled from the RENU

4  assignment, correct?

5            MR. SIMON:  Objection to the form of

6            the question.  He doesn't have the

7            transcript in front of him.

8            MR. WIEST:  All right.  I'll play it

9            again for him.  That's fine.  I'll play it

10           a dozen times if we need to.  Let me go

11           ahead and do that.

12           (The audio recording was played.)

13      Q.   So when you said this is now going to have

14  consequences, you were talking about somebody who

15  has badmouthed us and his wife has badmouthed us,

16  correct -- that was what you heard?

17      A.   So that's what I stated.

18      Q.   And what were -- was one of those

19  consequences the getting pulled from the RENU

20  assignment?

21      A.   Well, those weren't the only reasons why

22  he was not getting the RENU assignment.  And, again,

23  I've already gone over the reasons why.  Again, this

24  is a conversation where we were trying to explain to

25  Jason why the comments and the likes and things of

1    that nature on social media were bad for the agency.

2         Q.    What consequences then were you referring

3    to?

4         A.    Well, the fact that he sent that post out

5    about the football game.  And, again, that

6    solidified my belief in who he was.  And that's why

7    he didn't get RENU.  So that was why -- that was the

8    consequence was that he didn't get that.

9         Q.    And another consequence was he was sitting

10   next on the promotion list to corporal.  That was

11   another potential consequence, correct?

12        A.    But we hadn't made that decision.

13        Q.    Okay.

14        A.    There was no --

15        Q.    Okay.

16        A.    -- that never came up.

17        Q.    All right.  But he was next, correct?

18        A.    And I told him that, I don't know what we

19   were going to do.  There was no decision made on

20   that at that point.

21        Q.    That would depend in part on his actions

22   as well as his wife's actions, fair?

23        A.    It would depend on his actions.

24        Q.    Then why would you mention his wife

25   badmouthing us -- and, by the way, Chief, I think

1   it's been mentioned by you at least four or five

2   times in this conversation, maybe more.  Why would

3   you bring that up if that wasn't something that he

4   needed to deal with?

5       A.   Well, I think it is something that it

6   became personal and it was an opportunity to address

7   it.  And that's what it was used as, but it. . .

8       Q.   If it wasn't a problem that was holding

9   him back, why would it be addressed at all?

10      A.   We talked about that meeting -- before

11  that meeting, and, again, this was brought up before

12  the meeting.  As I told the sheriff why I skipped

13  over him, she brought up the Facebook stuff.  That

14  was kind of on the -- it kind of led the meeting.

15  But it just wasn't really the -- those weren't the

16  reasons why he did not get RENU.

17              MR. WIEST:  Okay.  I want to advance

18          to page 60 of the transcript, 1:07:23.

19          (The audio recording was played.)

20      Q.   So, Chief, I want to talk about what you

21  said.  You began with -- one of the things you said

22  was well, how would you feel -- how would you feel

23  if some crazy person -- I mean, she's literally --

24  she's crazy.  And these city cops keep feeding her

25  stupid shit and they think it's funny because she's

1   crazy and then she does these memes about the

2   sheriff or me or anybody else.  But, again, if that

3   was your wife, flip the scenario here, okay; how

4   would that feel?

5          You were referring to his wife's

6   interactions with Caroline Adams, correct?

7      A.   Correct.

8      Q.   Okay.  And then you made the statement,

9   And do you think -- do you think that if we promoted

10  you after what your wife had done and said and what

11  you had done and said, do you think we'd open the

12  floodgates of hell to anybody that wants to be

13  critical of this administration?  I mean, Christ, we

14  have shut the comments off because of these crazy

15  people.  These people have no idea what -- they have

16  no idea what we're doing.  They have no idea.  They

17  just -- they believe that maybe we have a Star

18  Chamber down here and that we plan evil things.

19  We're too busy.  We're working.  We're rebuilding an

20  entire sheriff's department.  So there has to be

21  consequences, Jason.  There has to be.  We can't

22  promote you after what's been done.  Now, I'm not

23  saying that's forever, but I need to see a change.

24  We need to see a change in attitude.

25          Those were your words, correct?

Page 201

1      A.    Correct.

2      Q.    Were they true at the time?

3      A.    They were.

4            MR. WIEST:  Okay.  Yeah, I'm going to

5            move forward to 65 on the transcript.

6            It's getting near the end here.  And I'm

7            at one minute -- or, I'm sorry, one hour,

8            12 minutes, 50 seconds of the audio.

9            (The audio recording was played.)

10     Q.    So you indicate to Jason Davis that after

11  the sheriff asked you where do we go from here, you

12  said that you've said your peace and you think that

13  Jason understands and you think that he knows what

14  to do; you heard that, right?

15     A.    I did.

16     Q.    And you then say, I mean, I'm not telling

17  you that you're blackballed, you're not, but you --

18  again, there's consequences, correct?

19     A.    Uh-huh.

20     Q.    That's what --

21     A.    Yes.

22     Q.    -- you said?  Okay.

23     A.    Yes.

24     Q.    And then you make the point later that

25  there was a guy right behind him that didn't make a

1  comment about us not being at a football we didn't

2  know about and who didn't have a wife who was on

3  Facebook and talked to crazy people that had made

4  horrible memes about the sheriff, so just -- you're

5  not blackballed, you can go forward and be

6  successful, but we'll see where it goes and it needs

7  to change, correct?

8      A.   Correct.

9      Q.   Okay.  Had you heard the sheriff in the

10 context of this conversation indicate -- and I know

11 I've played some of it for you -- that Jason needed

12 to let people go in his life that were holding him

13 back?

14     A.   I believe I remember some of that, yes.

15     Q.   Okay.  Who did you think that she was

16 referring to?

17     A.   The other officers over in Anderson that

18 were complaining and griping and things of that

19 nature.

20     Q.   Okay.  And when she had the conversation

21 about somebody that was living with her and kicking

22 them out -- do you remember that at the start --

23     A.   I do.

24     Q.   -- of this deposition?  Do you think that

25 could be taken as somebody's spouse; that when she's

1    talking about getting rid of people, do you think

2    Jason might have understood that to be his spouse?

3                    MR. SIMON:  Objection.

4        A.    I don't know what Jason thought.

5        Q.    Do you think it would be unreasonable for

6    him to construe that as his spouse after all of

7    these conversations about his spouse's social media

8    activity?

9                    MR. SIMON:  Objection.  Form of the

10                   question.  Lack of foundation.

11                   Misleading.

12       A.    I think it's a pretty big stretch to think

13   that somebody is going to tell somebody to leave

14   their wife over things like this.

15       Q.    So right after the sheriff talks about

16   getting rid of this roommate that was living with

17   her for a period of time, the next statement she

18   makes is about her wife -- Jason's wife being her

19   own person and then there being accountability; do

20   you recall that exchange?

21       A.    Something like that, yes.

22       Q.    Okay.  And you don't -- it would be

23   unreasonable for Jason to assume that the person

24   that the sheriff is referring to getting rid of in

25   his life is his spouse; that's your testimony?

Page 204

1          MR. SIMON:  Note my objection.

2          Again, this is the first time he's heard

3          the recording.  He doesn't have the

4          transcript.

5          You can go ahead and try to answer.

6     A.   I don't think I can answer what Jason

7     thinks of this scenario.  I don't -- you know, I

8     just can't answer this question.

9     Q.   Did you come up across -- or away from

10    this conversation with Jason Davis at any point in

11    time with the suggestion that if Jennifer Davis did

12    not discontinue her social media activity, that

13    there was an expectation that Jason no longer have

14    her involved in his life; did that strike you at any

15    point in time?

16          MR. SIMON:  Objection to the form of

17          the question.  Compound.  Lack of

18          foundation.

19    A.   I don't -- I'm sorry.  I don't understand

20    the question.

21    Q.   Yeah.  As you were listening to the

22    sheriff talking about this person that had lived

23    with her and then transitioning immediately after

24    that into Jason's wife being her own person, it did

25    not strike you at any point in time that the sheriff

1    was talking about getting rid of people in Jason's

2    life that would include his spouse if she didn't

3    discontinue her social media activity?

4         A.   No.  I believe she was talking about the

5    Anderson -- the officers in Anderson Township.

6         Q.   Okay.  Did she ever say that, that she was

7    referring to the officers in Anderson Township?

8         A.   No.  But, again, we had that conversation

9    before the meeting.

10                   MR. WIEST:  Okay.  All right.

11                   MR. SIMON:  This may be wishful

12              thinking on my part.  Are you finished

13              with asking about the meeting or not?

14                   MR. WIEST:  I am done -- well, I

15              think so, unless we get into -- you know,

16              unless I have to reopen it.  But I think

17              I'm generally done.

18                   MR. SIMON:  I'm not being

19              provocative.  We just wanted to, you know,

20              preserve our objections, notwithstanding

21              the judge's order, and on that basis we do

22              move to strike the Chief's testimony on

23              that entire subject regarding the meeting.

24                   MR. WIEST:  Well, you can certainly

25              take that up with the Court.  I know

1           there's been an order already on this, I

2           guess, you know, so --

3                MR. SIMON:  No.  I understand.  I'm

4           preserving our objections --

5                MR. WIEST:  Sure.

6                MR. SIMON:  -- for the entire

7           proceedings.

8                MR. WIEST:  All right.  I'm going to

9           hand you what I've marked as Exhibit 22.

10               (Plaintiffs' Deposition Exhibit No.

11               22 was marked for identification.)

12               MR. SIMON:  Did we skip 21?

13               MR. WIEST:  I'm sorry, was 21 next?

14               MR. SIMON:  Oh, is 21 the recording?

15               MR. WIEST:  Yeah, 21 is the

16          recording.

17               MR. SIMON:  Sorry.

18               MR. WIEST:  22.

19     BY MR. WIEST:

20          Q.   Let me start here, Chief.  Did you receive

21     an email from Jennifer Davis following your meeting

22     with Jason on October 16, 2023?

23          A.   I did.

24          Q.   Let me start here.  Do you know why that

25     wasn't produced by defendants to us in discovery?

Page 207

1          MR. SIMON:  Well -- okay.  I'm going
2     to make an objection.  Obviously, you
3     know, Chris, I'm not -- I wasn't on the
4     case earlier.
5          Is this an email that you sat on and
6     didn't disclose to us?
7          MR. WIEST:  My clients gave this to
8     us I think in the last 24 hours.  But I
9     will say this --
10         MR. SIMON:  I mean --
11         MR. WIEST:  -- hold on -- the content
12    of it -- not in this form, the content of
13    it was disclosed in discovery to the
14    defendants.  In other words, the -- I can
15    show you what was produced was not in this
16    format.
17         We were aware that she had sent
18    correspondence that was produced in
19    discovery.  I was unaware that it was sent
20    by email.  And so she had provided us the
21    email.
22         But the actual subject of this had
23    been produced in discovery and is in our
24    discovery to you all.
25         MR. SIMON:  In some other form,

1          you're saying?

2               MR. GOTTESMAN:  It was a photograph.

3               MR. WIEST:  It was a photograph.

4               MR. GOTTESMAN:  Not the actual email.

5               MR. SIMON:  Okay.

6               MR. WIEST:  Right.

7    BY MR. WIEST:

8         Q.   Let me ask, does this Exhibit 22 reflect

9    accurately the email that Jennifer Davis had sent to

10   you?

11        A.   I believe so.

12        Q.   Do you think from reading this that

13   Jennifer Davis did not understand the message that

14   you and the sheriff had conveyed to Jason about

15   Jennifer stopping her criticism of Sheriff McGuffey

16   and her administration?

17        A.   Can you repeat that, please?

18        Q.   Yeah.  Do you think in reading this email

19   that Jennifer Davis plainly didn't understand the

20   message that you and Sheriff McGuffey had conveyed

21   to Jason in the meeting that Jennifer needed to stop

22   her criticism of Sheriff McGuffey and her

23   administration?

24        A.   No.  She criticizes us in this email, I

25   would guess.

1     Q.    Yeah.

2     A.    I would look at it, yeah.

3     Q.    Okay.  So the extent that Jason was given

4  some period to address in part his wife's behavior

5  and speech, he was not meeting your expectations in

6  that regard, fair?

7     A.    Well, he -- I should say Jennifer did not

8  stop criticizing us, so. . .

9     Q.    Okay.  Did you do anything when you

10 received this email?

11    A.    I might have forwarded it to someone.  I

12 don't know.  I thought maybe I forwarded it to Pete,

13 but maybe not.

14    Q.    Okay.

15    A.    I didn't want to -- probably not.  I don't

16 think I did anything with it.

17    Q.    Did you talk about it with the sheriff?

18    A.    I think I did.

19    Q.    What do you recall discussing with respect

20 to the sheriff?

21    A.    I just said that Jennifer I guess sent me

22 this email.  I guess Jason went home and told her

23 about what our meeting was about.

24    Q.    Anything else?

25    A.    Not that I can recall.

Page 210

1      Q.   Okay.  Did you learn prior to Jason Davis

2  tendering his resignation that he had begun looking

3  for other positions in law enforcement?

4      A.   No, I had not.

5      Q.   Okay.  All right.  In response to

6  Jennifer's email did you make any notes in Jason's

7  file or do anything, have any discussions with any

8  of his chain of command about expectations?

9      A.   No, I did not.

10               MR. WIEST:  Okay.  I'll hand you what

11          I've marked as Exhibit 23.

12               (Plaintiffs' Deposition Exhibit No.

13               23 was marked for identification.)

14      Q.   Backing up to Jennifer Davis's email, is

15  there any reason why you did -- strike that.

16          Is there any reason why you chose not to

17  respond to Jennifer's email?

18      A.   I just didn't see the point of it.

19      Q.   Okay.  You didn't think it would do any

20  good?

21      A.   No, I did not.

22      Q.   Okay.  Jason resigned after 22 years with

23  the Hamilton County Sheriff's Office on

24  January 30 -- I'm sorry, January 8th of 2024,

25  effective January 22 of 2024, correct?

1    A.   End of -- yes.

2    Q.   Okay.  When did you learn about Jason

3 Davis's resignation?

4    A.   I get these pretty quickly.  So my guess

5 is -- this was signed on the 8th.  I would say

6 sometime in, you know -- you know, I don't know.  I

7 don't know.

8             (Mrs. Davis exits the room.)

9    Q.   In any event, if you turn the page there's

10 a letter from the sheriff that she signs on

11 January 12th to Jason Davis; do you see that?

12    A.   Yes.

13    Q.   Would it be fair to say that you would

14 have seen this before January 12?

15    A.   No.  This goes out from our HR.  And

16 that's actually not even the sheriff's.

17    Q.   Not the sheriff's signature?

18    A.   No.  It's a digital thing that just goes

19 out from HR.

20    Q.   Okay.  All right.  Jason gave two weeks'

21 notice, correct?

22    A.   Yes.

23    Q.   Did you learn at some point that he had

24 obtained a position with the Springdale Police

25 Department?

Page 212

1      A.   I had.

2      Q.   When did you learn that?

3      A.   I don't know.

4      Q.   On the last page of this there's an

5  invitation to participate in the exit interview; do

6  you see that?

7      A.   I do.

8      Q.   Is that exit interview maintained at all

9  by the sheriff's office?

10     A.   It is -- well, it's maintained by the

11 company, but that's whatever that's called.

12     Q.   Okay.

13     A.   But, yeah, we do have access rights or

14 whatever, but -- yeah, we do have access to those.

15     Q.   Did you ever review the contents of that

16 exit interview with Jason Davis?

17     A.   Did I inter- -- with Jason or. . .

18     Q.   No, sir.  Did you ever review it?

19     A.   I did.  I did.

20     Q.   When did you do that?

21     A.   Again, I don't know.  After he had gone.

22 And it usually hits my computer a day or two later.

23     Q.   Okay.  What do you recall from that exit

24 interview?

25     A.   That he said something in the effect that

1    he was leaving because we wanted to -- him to leave

2    his wife.  That's really -- pretty much all I

3    remember.

4        Q.   Did you ever reach out to him, if that

5    wasn't the case, to disabuse him of that

6    understanding?

7        A.   No.  I believe at that point it was -- we

8    were past that.

9        Q.   Okay.  Have you made any statements to the

10   Chief of Springdale Police Department about Jason

11   Davis?

12       A.   The only thing I said to him -- and I know

13   Tom from going way back.  And he's stolen a couple

14   of our people.  And I have teased him saying, you

15   know, good luck with this one or something like that

16   maybe, but. . .

17       Q.   Okay.  How many times did you have a

18   conversation -- by the way, who is that chief?

19       A.   Tom Butler.

20       Q.   How many times did you have a conversation

21   with Tom Butler about Jason Davis?

22       A.   Maybe once.

23       Q.   Okay.

24       A.   And, again, it's usually we're -- it's a

25   joking type thing, because I think he has hired like

1    four or five people from us.

2         Q.   Okay.  All right.  Chief, I'm sure you're

3    aware there's a punitive damage claim that's part of

4    the remedies that are requested in this case.  And

5    I've got some questions about assets, but I'm

6    guessing your counsel -- because they objected in

7    the interrogatories about that -- may be telling you

8    not to answer.  I don't know.  But I'm going to ask

9    them anyways, and they can -- you guys can decide

10   what you want to do about it.

11                MR. SIMON:  Well, before we do

12                that -- I mean, obviously under the rules

13                we can object to questions that are

14                oppressive annoyance for the witness.

15                And honestly, Chris, my experience of

16                being on the plaintiff side for many

17                years, we can certainly work out some

18                agreement that if this case proceeds, you

19                know, past dispositive motions that the

20                judge is going to allow punitive damage

21                instruction, we can -- you know, you're

22                entitled to certain discovery.

23                So it's sort of a timing issue.  I

24                don't see the point of putting it -- each

25                on the record.  If that's your practice,

1              you do that, but that's been my practice.

2                   MR. WIEST:  I mean, I have litigated

3              this issue in motion to compel practice.

4              I think I'm entitled to sworn testimony

5              about it, you know.

6                   MR. SIMON:  I mean, I'm not -- I

7              don't think it's right.  I think some

8              lawyers -- and maybe we should just hash

9              this out off the record, but I don't think

10             it's right to tell the witness they can't

11             answer a question unless it's privileged.

12                  I think that the proper response is,

13             look, we can't continue the deposition if

14             you're going to ask questions that are not

15             proper to Rule 26.  And then, again, we

16             can have some agreement later to conduct

17             that discovery when it's more appropriate

18             in the stage of litigation.

19                  MR. WIEST:  I don't mind holding off

20             under the agreement with counsel that --

21             notwithstanding any discovery deadlines in

22             this case, that after dispositive motions

23             are ruled on -- frankly I can tell you

24             we're moving for partial summary on

25             liability in this case.  It's been our

1          intention all along to conduct the

2          discovery.  I don't mind waiting.  But I

3          do want an agreement on the record right

4          here that we can and will be allowed to

5          conduct that discovery after there's been

6          a dispositive motion ruling and maybe we

7          can do an agreed order to that effect for

8          60 or 90 days.  I've done that in other

9          cases.

10              MR. SIMON:  I'll agree to that with a

11         caveat that we might want to present a

12         punitive damages issue to the judge.  Now,

13         that's not usually part of a dispositive

14         motion.

15              But with that caveat, we'll come to

16         some agreement that if we get to that

17         state, that you can ask those questions, a

18         motion for protective order.

19              But, again, what I'm spelling out is

20         I'm not sure that if you get a dispositive

21         motion ruling in your favor, whether it's

22         denying our motion or granting yours in

23         part, I still would want to, as we talked

24         about, get a ruling from the judge on

25         whether he's going to give a punitive

1              damages instruction or the defendant has

2              to provide that sort of information.  But

3              I think we're very close to --

4                   MR. WIEST:  Here's what I'd like to

5              do.  I'd like to leave this deposition

6              open for the purposes of conducting

7              punitive damage related discovery,

8              including all financial assets subject to

9              any agreement or further order of the

10             court.

11                  And I think at this point -- let me

12             confer with Zach, if that's okay, and

13             then -- let me confer with Zach.  I may

14             have a couple of follow-ups.  And then I

15             think we're about done.

16                  THE VIDEOGRAPHER:  We're going off

17             the record at 3:16.

18                  (A brief recess was taken.)

19                  THE VIDEOGRAPHER:  We're going back

20             on the record at 3:26.

21    BY MR. WIEST:

22        Q.   Chief, it's going to seem like I'm jumping

23    around, but it's always that way at the end of a

24    deposition where I'm batting cleanup.  There was a

25    mention in the phone call about Andrew Caddell being

1   behind Jason Davis.  You recall seeing that,

2   correct -- or hearing that?

3        A.   Hearing that, yes.

4        Q.   So you knew that Andrew was after Jason on

5   the list, correct?

6        A.   I did.

7        Q.   Why would he be mentioned if he was at

8   RENU at the time, or were you referring to the RENU

9   position?

10       A.   You've got me confused.

11       Q.   So you told me when we went down the

12  eligibility list --

13       A.   Uh-huh.

14       Q.   -- that Andrew Caddell was at RENU.

15       A.   Uh-huh.

16       Q.   But you mentioned that he was sitting

17  behind Jason Davis and that his wife had not made

18  comments about the sheriff.  And my question was,

19  Jason was looking for a promotion to corporal within

20  the patrol division, but Caddell at the time was in

21  RENU.  So why would you have brought up Caddell as

22  the comparer?

23       A.   I passed over Jason to go to RENU and

24  Caddell got the job.

25       Q.   Okay.  So Caddell filled -- you were

1   referring not to the corporal promotion --

2       A.   No.

3       Q.   -- you were referring to the RENU

4   selection?

5       A.   Yes.

6       Q.   Okay.  All right.  And Caddell was lower

7   on the selection list from RENU than Jason was, and

8   so you passed Jason over to pick Caddell?

9       A.   Yes.

10      Q.   Okay.  Now I understand.  Thank you.  Are

11  you aware of any instance where -- we talked about

12  outrageous posts and memes that had appeared on

13  Caroline Adams' Facebook page --

14      A.   Yes.

15      Q.   -- with some degree of frequency.  Are you

16  aware of any instance where Jennifer Davis had made

17  such a meme or commented on such a meme -- and I'm

18  not talking about liking, because I'm going to --

19  you know, I'm aware that she had liked certain posts

20  --

21      A.   Yeah.

22      Q.   -- but where she had done anything other

23  than liking a post?

24      A.   No.  My -- my information that I had

25  gotten was that Jennifer had liked Caroline Adams's

Page 220

1   posts.

2          Q.   Okay.

3          A.   That was the information.

4          Q.   Did you have any specific posts that she

5   had liked that were particularly outrageous?

6          A.   There were -- they're all outrageous

7   practically.

8          Q.   Okay.

9          A.   So I don't know off the top of my head.

10         Q.   I mean, you had given us some examples, I

11  think, of pretty offensive ones earlier today.  And

12  my question was, do you know whether Jennifer had

13  liked the ones that you had referenced, that you had

14  mentioned?

15         A.   I don't know.

16         Q.   Okay.  All right.  Is Tom Butler a

17  reliable man in your opinion?

18         A.   Tom?

19         Q.   Yeah.

20         A.   Yeah, I believe Tom to be a reliable man.

21         Q.   Do you think he's truthful?

22         A.   I believe he's truthful.

23         Q.   I realize you -- we did not play the

24  entire hour and 15 minutes of the recording today,

25  but anything that we played that you recall making

1  anything -- any statement to Jason Davis that you

2  did not think was truthful on reflection sitting

3  here?

4           MR. SIMON:  Objection.  Asked and

5       answered.

6     A.   I did not tell him that due to him being a

7  malcontent.  That was my reasoning.

8     Q.   Okay.

9     A.   So I did not tell him that in that

10 meeting.

11    Q.   So that was an issue of omission; that was

12 something you withheld?

13    A.   Yes.

14    Q.   Anything that you affirmatively told him,

15 though, that was not true?

16    A.   Well --

17           MR. SIMON:  Objection.  Objection to

18       form.  Asked and answered.  It was a long

19       conversation.

20    A.   Again, the comments -- or his wife liking

21 those posts, I -- I had just learned about those in

22 the recent -- you know, after the fact.  And they

23 were -- it was upsetting.  And that was -- so when I

24 did tell him that that was part of the reasoning and

25 that there were consequences because of that, that

Page 222

1   was not completely accurate.

2       Q.   Okay.  Anything else?

3       A.   No, I don't think so.

4            MR. WIEST:  Okay.  Chief, I don't

5       have anything else for you.

6            MR. SIMON:  All right.  I do have

7       just a couple of questions.

8            MR. WIEST:  Sure.

9            MR. SIMON:  And it's on that subject.

10              DIRECT EXAMINATION

11  BY MR. SIMON:

12      Q.   You had said at some point today, Chief,

13  that you're not on social media, correct?

14      A.   No.

15      Q.   All right.  Are you comfortable with the

16  vernacular of social media, liking posts and memes

17  and so forth; is that language that you regularly

18  use?

19      A.   Not really.

20      Q.   All right.  A few times in your testimony

21  you referred to Jennifer Davis's Facebook posts,

22  plural --

23      A.   Correct.

24      Q.   -- do you recall that?  All right.  You

25  know that during the course of the deposition you

1    were shown a single Facebook post of hers that was

2    at the time that the sheriff started in 2021, right?

3                    MR. WIEST:  Objection.  Leading.

4              Mischaracterizes the testimony and the

5              exhibits.

6                    Go ahead.

7         A.   Yes.

8         Q.   All right.  You had been shown posts -- I

9    think it was a post on her Facebook page, as well as

10   a post on the Sheriff's Office Facebook page, right?

11        A.   Yes.

12        Q.   All right.  Other than -- and that post or

13   posts, did you become aware of them before you made

14   the RENU decision or after, to the best of your

15   recollection?

16        A.   After.

17        Q.   All right.  As you sit here are you aware

18   of any other Jennifer Davis posts regarding the

19   Hamilton County Sheriff's Office?

20        A.   No, I'm not.

21        Q.   All right.  When you -- you were saying

22   that before you went into the meeting, at some point

23   you were alerted to the fact that she had liked

24   Caroline Adams's Facebook posts, right?

25        A.   That's correct.

Q. All right. So when you were referring to Jennifer Davis's Facebook posts, plural, what were you referring to?

A. Likes.

Q. All right. You also were asked a very specific question about a portion of the meeting that was recorded. And I suppose just for the record, although I can't show you the transcript, it is page 26 of the transcript. Mr. Davis is describing that he had at some point objected to having, as I understand, too much overtime and he says -- according to the transcript -- well, I think it's okay that I read the transcript out loud. I don't want to violate the understanding.

Mr. Davis says, And I did -- and I did stir the pot a little bit. Emails started flying about being moved on the overtime list, and that's where the whole malcontent thing came in. I don't like that, but I'll tell you like that's a little bit unfair, you know.

And then you are saying in the transcript, I don't know anything about that. Do you recall talking about that with --

A. I do.

Q. -- opposing counsel? When you said I

1    don't know anything about that, what were you

2    referring to?

3           A.    That specific situation, not that Jason

4    Davis is not a malcontent.

5                      MR. SIMON:  All right.  I don't have

6           any further questions.

7                      MR. WIEST:  We don't either.

8                      THE VIDEOGRAPHER:  We're going off

9           the record at 3:34.

10                      (Witness excused.)

11           (Deposition concluded at 3:34 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 226

1              A C K N O W L E D G E M E N T

2

3    STATE OF _____     :

4    COUNTY OF _____     :

5

6         I, JAY GRAMKE, have read the transcript of my

7    testimony given under oath on February 21, 2025.

8         Having had the opportunity to note any

9    necessary corrections of my testimony on the errata

10   page, I hereby certify that the above-mentioned

11   transcript is a true and complete record of my

12   testimony.

13

14

15        _____

16                      JAY GRAMKE

17

18

19

20

21

22

23

24

25

Page 227

```
 1                 REPORTER'S CERTIFICATE

 2          I, Kristina L. Laker, Court Reporter and

 3   Notary Public, do hereby certify:

 4          That the witness named in the deposition,

 5   prior to being examined, was duly sworn;

 6          That said deposition was taken before me

 7   at the time and place therein set forth and was

 8   taken down by me in shorthand and thereafter

 9   transcribed into typewriting under my direction and

10   supervision;

11          That said deposition is a true record of

12   the testimony given by the witness and of all

13   objections made at the time of the examination.

14          I further certify that I am neither

15   counsel for nor related to any party to said action,

16   nor in any way interested in the outcome thereof.

17          IN WITNESS WHEREOF I have subscribed my

18   name and affixed my seal this 9th day of March,

19   2025.

20
                          /s/ Kristina L. Laker
21                        _____
                          Kristina L. Laker
22                        Notary ID 592345
                          My Commission expires: 12/21/25
23

24

25
```