IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT CINCINNATI


JASON DAVIS and            :
JENNIFER DAVIS,
                          :
        Plaintiffs,
vs.                        :   Case No. 1:24-cv:0202

CHARMAINE McGUFFEY, et al., :

        Defendants.        :


            * * * * * * * *

DEPONENT:        Jennifer Davis

DATE:            May 9, 2025

            * * * * * * * *



Kristina L. Laker

Court Reporter



BARLOW REPORTING & VIDEO SERVICES, LLC
620 Washington Street
Covington, Kentucky 41011
(859) 261-8440

1      The deposition of JENNIFER DAVIS taken for the

2  purpose of discovery and/or use as evidence in the

3  within action, pursuant to notice, heretofore taken

4  at the office of Chris Wiest, Attorney at Law, PLLC,

5  50 East Rivercenter Boulevard, Suite 1275,

6  Covington, Kentucky, on May 9, 2025, at 10:00 a.m.,

7  upon oral examination, and to be used in accordance

8  with the Federal Rules of Civil Procedure.

9                  * * * * * * * *

10                  APPEARANCES

11  REPRESENTING THE PLAINTIFFS:

12  Christopher Wiest, Esq.
    CHRIS WIEST, ATTY AT LAW, PLLC
13  50 East Rivercenter Boulevard, Suite 1280
    Covington, KY 41011
14
    Zachary Gottesman, Esq.
15  GOTTESMAN & ASSOCIATES, LLC
    9200 Montgomery Road
16  Building E, Suite 18B
    Cincinnati, OH 45242
17
18  REPRESENTING THE DEFENDANTS:

19  Matt Miller-Novak, Esq.
    Andrew E. Prem, Esq.
20  HAMILTON COUNTY PROSECUTOR'S OFFICE
    230 East Ninth Street, Suite 4000
21  Cincinnati, OH 45202

22
    ALSO PRESENT:  Peter Stackpole, legal liaison
23

24

25

1                        I N D E X

2                                          Page

3   Cross-Examination by Mr. Miller-Novak:     4

4   Direct Examination by Mr. Wiest:         111

5

6

7                   E X H I B I T S

8   Defendants' Deposition Exhibit No. 11     36

9   Plaintiffs' Deposition Exhibit No. 12    111

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              JENNIFER DAVIS,

2   of lawful age, as having been duly sworn, as

3   hereinafter certified, was examined and testified as

4   follows:

5              CROSS-EXAMINATION

6   BY MR. MILLER-NOVAK:

7       Q.   Can you state and spell your name for the

8   record, please.

9       A.   Sure.  Jennifer Nell Patterson-Davis.

10  J-e-n-n-i-f-e-r.  N-e-l-l.  P-a-t-t-e-r-s-o-n,

11  hyphen, D-a-v-i-s.

12      Q.   So Patterson is your --

13      A.   Maiden name.

14      Q.   -- maiden name?

15      A.   Correct.

16           MR. WIEST:  I don't know if we talked

17           about this.  You need to listen until he

18           finishes asking today and then you answer.

19           THE WITNESS:  Okay.

20           MR. WIEST:  And that way she can get

21           a clean transcript.

22           THE WITNESS:  Okay.

23           MR. MILLER-NOVAK:  That was my job --

24           MR. WIEST:  Sorry.

25           MR. MILLER-NOVAK:  -- to tell her the

1          instructions.

2     Q.   All right.  Well, I will go through a

3  little bit about -- my name is Matt Miller-Novak.  I

4  represent all the Defendants in this case.  And this

5  handsome young gentleman next to me is Andy Prem,

6  and he also represents the Defendant.  That's Pete

7  Stackpole, who is staff attorney for the Sheriff's

8  Department.

9          So today this is a deposition, which is an

10 oral examination.  It's part of the discovery

11 process.  So I'm going to ask you questions today,

12 okay?

13    A.   Okay.

14    Q.   All right.  So some of the instructions

15 I'm going to give you -- I know that you were at

16 least present during Sheriff McGuffey's deposition,

17 so you've seen -- you've at least seen a deposition

18 I'm aware of, but I'll just kind of run through just

19 some regular procedural stuff so we kind of

20 understand the process, okay?

21    A.   Okay.

22    Q.   So as your counsel pointed out, we have a

23 court reporter here today.  She's typing in

24 shorthand everything that comes out of our mouths;

25 do you understand that?

1      A.   Correct.

2      Q.   And because of that really the end

3  product, if you will, is going to be a written

4  record.  We don't have a videographer here.  So this

5  all will be a transcript.  Because of that some of

6  the things I'm about to say is just to make sure

7  that the record is clear and clean --

8      A.   Okay.

9      Q.   -- do you understand?

10     A.   Correct.  Yes.

11     Q.   Okay.  So one of the most important things

12  is that when I ask you a yes or no question, if

13  you're going to answer yes or no, you probably want

14  to say yes or no as opposed to uh-huhs or nuh-uhs;

15  do you understand?

16     A.   Yes.

17     Q.   And the reason for that is just to make

18  sure she doesn't accidentally record a negative as

19  an affirmative or vice versa.  The other thing,

20  which your counsel pointed out, is that because she

21  is typing, we want to make sure that we don't

22  interrupt one another; do you understand?

23     A.   Yes.

24     Q.   Because we just want to make sure she gets

25  all of my questions and all of your answers.  So

1    when I am asking a question, I do ask that you let

2    me finish before you answer.

3         A.   Okay.

4         Q.   It's human nature to kind of like know

5    what a question is going to be and tend to blurt out

6    answers.  It's going to probably happen.  That's not

7    a big deal.  Just do your best.

8         A.   I will do my best.

9         Q.   Yeah, you will not be shamed or anything

10   like that if you have an accident or two, so don't

11   worry about it.  Everybody does.  If you need to

12   take a break, just let me know.  You're not -- by no

13   means I'm a judge or anything like that.  You don't

14   even really need to ask permission.  Just let me

15   know you need to take a break.

16        A.   Okay.

17        Q.   The only thing I ask is that, you know, if

18   I have a question on the table, please answer it and

19   then just say I'd like to take a break, okay?

20             MR. WIEST:  And just for the record,

21             if there is a question pending and there's

22             a question of privilege, we reserve the

23             right without you answering to address

24             that.

25        Q.   Well, and he might object sometimes, too,

1    okay?

2         A.   Okay.

3         Q.   But you are -- you know, certainly if your

4    counsel gives you an instruction, you should

5    probably listen to your counsel, okay?

6         A.   Okay.

7         Q.   As I kind of move forward here, I'm going

8    to ask some questions that are not prepared by any

9    means and they might not be necessarily stellar and

10   they might be a little bit confusing.  So for some

11   reason if I ask a question that's not understandable

12   to you or you don't understand the question, please

13   do not feel that you cannot ask me for

14   clarification, okay?

15        A.   Okay.

16        Q.   I will not be offended or insulted in any

17   way, shape, or form.  I would prefer that you do

18   understand the question so I get your honest answers

19   today, okay?

20        A.   Okay.

21        Q.   All right.  So I'm going to ask you a

22   question, and this is always for me the more awkward

23   one.  Do you have -- and you don't need to tell me

24   what they are, but do you have any medical condition

25   that interferes with your memory or ability to

1    coherently remember events or describe events?

2        A.   No.

3        Q.   Are you on any -- again, you don't have to

4    tell me what they are.  I'm not asking about your

5    medical business -- at least not at this point in

6    time -- but are you on any medications that would

7    interfere with your ability to remember things or

8    testify clearly today?

9        A.   No.

10       Q.   Great.  We'll assume that you're in good

11   health then.  Congratulations.  So if you don't have

12   any questions for me, then we'll kind of get to the

13   meat of things --

14       A.   No questions.

15       Q.   -- okay?  None.  All right.  So have you

16   ever been deposed before?

17       A.   No, I have not.

18       Q.   Okay.  I always feel a little bad if I'm

19   someone's first deposition.  You deserve better.

20   All right.  Do you have -- can you describe your

21   educational background as briefly as you can?

22       A.   Sure.  I graduated high school from Oak

23   Hills in the west side of Cincinnati.  I attended

24   the University of Cincinnati.  I have a bachelor's

25   degree in community health education.  And I have a

Page 10

1  professional certification in entrepreneurship and

2  small business management.

3       Q.   When did you graduate from Oak Hills?

4       A.   1995.

5            MR. MILLER-NOVAK:  I'm a 1995

6       graduate.

7            MR. WIEST:  I am, too.

8            MR. MILLER-NOVAK:  Are you?

9            MR. WIEST:  Yes.

10            MR. MILLER-NOVAK:  How about that.

11       We've all got our 30th year anniversary

12       coming up --

13            THE WITNESS:  We do.

14            MR. MILLER-NOVAK:  -- this year,

15       don't we?  Bummer.

16       Q.   All right.  So if I remember right, Jason

17  graduated in 1994 from --

18       A.   Correct.

19       Q.   Yeah.  Were you guys high school

20  sweethearts?

21       A.   Well, we've been dating since I was 15 and

22  he was 16.

23       Q.   Oh wow.  Congratulations.  How old were

24  you when you got married?

25       A.   I believe I was 26.

Page 11

1          MR. WIEST:  For clarity, are you
2       saying you've been married 26 years?
3          THE WITNESS:  No.
4          MR. PREM:  She was 26.
5          THE WITNESS:  I believe it was in --
6          MR. WIEST:  Oh, you were 26?
7          THE WITNESS:  I was 26 years old.
8     Q.   Okay.  What year was that?
9     A.   Oh, good question.  It was 2003 or 2004.
10 I can't remember.
11    Q.   Okay.  So you said you started dating
12 Jason when you were 15?
13    A.   Correct.
14    Q.   So it took you 11 years to figure out
15 whether or not he was the right one?
16    A.   Actually it would have taken longer, but I
17 needed health insurance when my health insurance ran
18 out at 26.  I'm not going to lie.
19    Q.   That's all right.  So he's like your
20 health insurance sugar --
21    A.   I'm turning 26.
22    Q.   Yeah.
23    A.   We need to get this done.
24    Q.   Health insurance sugar daddy.
25    A.   That's right.

1       Q.    That's funny.  Were you kind of I guess

2   dating or a couple that whole 11-year --

3       A.    Yes.

4       Q.    -- period?  Okay.

5       A.    We had lived together as well.

6       Q.    Okay.  And he was already working for the

7   corrections department at that point in time --

8   Department of Corrections?

9       A.    At what age?  And not when we were 16.

10       Q.    No.  When you were 26.

11       A.    Correct.

12       Q.    Okay.

13       A.    Yes.

14       Q.    And you already had graduated from the

15   University of Cincinnati?

16       A.    Correct.

17       Q.    Okay.  And then Jason said on Tuesday that

18   you do not currently work?

19       A.    That's correct.

20       Q.    He mentioned that you had some income,

21   though; is that correct?

22       A.    I do some studies for P & G.  It's paid in

23   the form of a prepaid card, not a paycheck.  I'm not

24   on their payroll.

25       Q.    Is it like an independent contractor?

Page 13

1              MR. WIEST:  Objection.

2              You can answer.

3              THE WITNESS:  Okay.

4       A.   It's -- I don't even believe it's that.  I

5  will not get a 1099 from them.  It's just -- it's

6  not much.  It's a prepaid gift card is what they put

7  it on.  So if I test out a product for P & G like a

8  mop or something, then they will give me

9  compensation for testing a product or giving an

10 opinion on a product.

11      Q.   Oh.  So you almost do like consumer

12 reviews --

13      A.   Somewhat.

14      Q.   -- ish?

15      A.   Some of it is research, some of it is

16 reviewing.

17      Q.   When did you start doing that?

18      A.   I honestly don't remember.  It's -- well,

19 actually I can tell you when I started it.  It was

20 when -- after my son was born, I was originally

21 recruited by P & G to do diaper studies for my son.

22 So that had to have been 2004.  And once he was out

23 of the diaper studies, then they asked if I wanted

24 to do consumer studies.

25      Q.   Is this something that you ultimately have

1  to report on your tax returns?

2      A.  I believe there was a threshold if I made

3  it.  But I have not always had a tax form from P &

4  G.

5      Q.  So they don't always present you with

6  something that you have to give to --

7      A.  No.

8      Q.  -- your tax preparer?

9      A.  No.

10     Q.  Yeah, it's okay.  Let me finish.  I said

11  it would happen.  It's all right.  If it makes you

12  feel any better, I'll accidentally cut you off

13  later, too.  Jason had said that you were the owner

14  of Gold Roof?

15     A.  Gold Top Dairy Bar.

16     Q.  Gold Top Dairy Bar.  Thank you.  When did

17  you start that business?

18             MR. WIEST:  Objection to form.

19             You can answer.

20     A.  I believe I purchased it in 2003 or 2004.

21  I'm not sure of the exact date.

22     Q.  Right around the time you got married?

23     A.  That's correct.

24     Q.  So you didn't start that dairy bar -- for

25  lack of better word -- you purchased that business

Page 15

1    from somebody else?

2         A.    That's correct.

3         Q.    Okay.  And then my understanding is is

4    that -- did you sell it or just close it?

5         A.    I sold it in 2001.

6                   MR. WIEST:  2001?

7         Q.    '21?

8         A.    I mean -- I'm sorry.  2021, after COVID.

9    Sorry.

10        Q.    So it's still operating now?

11        A.    Correct.

12        Q.    Okay.  And why did you sell it?

13        A.    Maybe midlife crisis.  I have done it for

14   almost 20 years.  I took the business as far as I

15   could.  I owned the real estate.  Property values

16   were up.  My books were clean.  It was a good time

17   to sell according to my accountant.

18        Q.    How many employees did you have when you

19   owned Gold Roof [sic]?

20        A.    Approximately 25 a season.  We were a

21   seasonal business only open from March to October.

22        Q.    Okay.  I'm going to change the topic here

23   a little bit.  So do you recall what year Jason

24   began working as a patrol officer?

25        A.    I believe he was in the jail for about 12

Page 16

1    years.  So 12 years after he started.  I'm not sure

2    of the exact date he started.  I just know it was

3    about 12 years after he had worked in the jail.

4         Q.   And have you been supportive of his

5    career?

6              MR. WIEST:  Objection to form.

7         A.   I have.

8         Q.   So have you ever wanted him to do anything

9    else besides public safety?

10        A.   No.

11        Q.   Do you consider yourself supportive of

12   police officers in general?

13        A.   Yes.

14        Q.   Does Jason frequently talk to you about

15   his job?

16              MR. WIEST:  Objection to form.

17              You can answer.

18        A.   Can you clarify about what part of his

19   job?

20        Q.   Sure.  Does he ever talk to you about or

21   tell you stories about what occurred during the day?

22        A.   Yes.

23        Q.   Okay.  Does he tell you stories about

24   people he's arrested, for example?

25        A.   Yes, but never identifying people.

Page 17

1    Q.   So he might tell you about an event

2  without identifying a suspect's name or something

3  like that?

4    A.   Correct.

5    Q.   Okay.  So he might tell you about how he

6  pulled somebody over, maybe they were completely

7  wasted while they were driving or something like

8  that, but he wouldn't identify the human being,

9  correct?

10   A.   Can you say that one more time?

11   Q.   Yeah.  Like he might just tell you a story

12 like about the events, like describe a DUI or

13 something?

14   A.   No.  He wouldn't describe an event.  He

15 would say I had to sit on this accident for six

16 hours today or something.  He would not want to tell

17 me details of. . .

18   Q.   So sometimes he vents if he's had a bad

19 day, for lack of a better description?

20   A.   Yes.

21   Q.   And then maybe sometimes he kind of

22 celebrates if he's had a good day, correct?

23   A.   If there are good days, yes.

24   Q.   Does he talk to you about his coworkers at

25 all?

1          MR. WIEST:  Objection to form.

2     A.   Yes.

3     Q.   For lack of a better wording, does he ever

4  discuss like office drama with you?

5     A.   No.  It's usually personal.

6     Q.   By personal can you tell me what you mean

7  by that?

8     A.   Sure.  Like he plays football with some of

9  the officers.  So he would -- if we were at a game,

10  he would say that's so-and-so's wife.  They have

11  three kids together.  I work with him in this

12  department or he works for this department.

13     Q.   So he just keeps you kind of informed of

14  what's going on in his friends' lives?

15     A.   Yes.

16     Q.   Okay.  And who was the sheriff when Jason

17  first started in the Sheriff's Department?

18     A.   I believe it was Simon Leis.

19     Q.   Okay.  Who was the next sheriff; do you

20  recall?

21     A.   Jim Neil.

22     Q.   And then?

23     A.   Charmaine McGuffey.

24     Q.   Did Jason ever discuss Sheriff Leis with

25  you at all?

1           MR. WIEST:  Objection to form.

2      A.   I don't remember.  It's been so long ago.

3      Q.   What about Sheriff Neil?

4      A.   Possibly, yes, but I cannot remember any

5 specifics.

6      Q.   Was Jason generally positive about Sheriff

7 Neil?

8      A.   Yes.

9      Q.   Would you say that he liked Sheriff Neil?

10     A.   I couldn't tell you one way or the other

11 if he liked him or not.

12     Q.   And do you understand that Sheriff

13 McGuffey campaigned against Sheriff Neil?

14     A.   Yes.

15     Q.   Did Jason discuss that campaign with you

16 at all?

17     A.   I can't remember.

18     Q.   Was he supportive of Sheriff McGuffey's

19 campaign?

20     A.   I can't tell you what -- if he did or not.

21     Q.   Do you know if he was critical of Sheriff

22 McGuffey at all?

23     A.   I can't give you a specific instance.

24     Q.   So at no time did he discuss Sheriff

25 McGuffey's candidacy or character with you before

1    she was the sheriff?

2         A.    I don't remember.

3         Q.    Do you remember if he discussed Sheriff

4    McGuffey at all before she was the sheriff?

5         A.    Yes.

6         Q.    Okay.  And what would he say about Sheriff

7    McGuffey before she was the sheriff?

8              MR. WIEST:  Objection to form.

9         A.    I remember there was an incident where she

10   had tried to get him fired, and he explained that to

11   me and. . .

12        Q.    Was he upset by that?

13             MR. WIEST:  Objection to form.

14        A.    Yes.

15        Q.    What, if any, opinions did you have about

16   Sheriff McGuffey while she was campaigning?

17        A.    Well, I guess I could say it was already

18   unfavorable because of the interaction that my

19   husband had had with her previously.

20        Q.    Okay.  So you had unfavorable opinions

21   about Sheriff McGuffey -- well, then Candidate

22   McGuffey?

23        A.    Correct.

24        Q.    We're going back in time.  Are you

25   registered to vote as a republican or a democrat?

Page 21

1          MR. WIEST:  Objection to form.

2          You can answer.

3     A.   Honestly I don't remember, because I have

4   been registered as both.

5     Q.   You're not --

6     A.   I have voted in both primaries, so I know

7   I have been registered as a democrat and I have been

8   registered as a republican.  If I had to make a

9   guess, I would say it's currently republican.

10    Q.   In the most recent presidential primary

11  did you vote for the republican primary or the

12  democratic primary?

13    A.   I believe it was republican -- wait a

14  minute.  I'm sorry.  Was that the same primary where

15  Jim Neil was running against Sheriff McGuffey; was

16  that the same one?

17          MR. WIEST:  No.  It was before.

18          Because '24 he ran in the general as a

19          republican.

20          MR. MILLER-NOVAK:  Well, but --

21          THE WITNESS:  2020 is --

22          MR. MILLER-NOVAK:  We'll go off the

23          record for a second.

24          THE COURT REPORTER:  We're off the

25          record.

```
 1                    (Off-the-record discussion.)

 2              MR. MILLER-NOVAK:  So I think we're

 3         in general agreement, we're just not sure

 4         how you're registered to vote?

 5              THE WITNESS:  Yes.

 6              MR. MILLER-NOVAK:  Okay.  We had an

 7         off-the-record conversation and -- yes.

 8  BY MR. MILLER-NOVAK:

 9      Q.   All right.  Did you vote for Charmaine

10  McGuffey or did you vote for Jim Neil in 2020?

11      A.   Jim Neil.

12      Q.   Okay.

13      A.   Oh -- yes.  Jim Neil.

14      Q.   Okay.  What about in 2024?

15      A.   Jim Neil.

16      Q.   Do you know Jim Neil at all?

17      A.   I have met him at a campaign event.  I

18  have met him at my husband's football game.  And I

19  believe those are the only times that we have met in

20  person.

21      Q.   When Sheriff McGuffey won her election in

22  2020, did Jason have anything to say about it?

23      A.   Not to me.

24      Q.   I'm going to hand you what's marked

25  Defendants' Exhibit 1.
```

1    A.    Okay.

2    Q.    So this is the complaint that you filed --

3   well, counsel, I guess, filed in this case.  Have

4   you seen it before?

5    A.    Yes.

6    Q.    Okay.  Did you review this complaint

7   before it was filed?

8              MR. WIEST:  Objection.

9              You can answer yes or no.

10   A.    Honestly I don't remember if it was before

11  or after it was filed.

12   Q.    Okay.  But you have reviewed it?

13   A.    Correct.

14   Q.    Do you agree that the statements in here

15  are true to the best of your understanding?

16              MR. WIEST:  Objection.  She's not a

17              lawyer on any legal stance.  She can

18              answer to the factual allegations.

19   A.    Yes, I have an idea of what's in the case.

20   Q.    Well, regarding the factual allegations,

21  do you think any of them are untrue?

22   A.    No.  They're true.

23   Q.    Okay.  All right.  So I'm going to have

24  you actually turn to Exhibit 1.  So if you kind of

25  look at the page numbers, it would be technically

Page 24

1   page 16 even though it's not titled 16, but there's

2   15 pages in the complaint.  So it's the first page

3   afterward.

4          A.    Okay.

5          Q.    Okay.  You're there.  All right.  So have

6   you seen this before?

7          A.    I have.

8          Q.    Okay.  So my understanding is -- and

9   please correct me if I'm wrong -- is that these are

10  comments that were kind of rolling on a stream that

11  occurred on Facebook, which was Sheriff McGuffey's

12  kind of like press conference; do you agree with

13  that?

14         A.    Yes.

15         Q.    Okay.  And this Jennifer Patterson Davis

16  shown here, that's your Facebook name?

17         A.    That's correct.

18         Q.    Okay.  So I think these maybe -- I don't

19  know.  Do you know what these 21:04 is; do you

20  understand what that is?

21         A.    If I had to guess, it would be at what --

22  maybe what point in the broadcast, like what time of

23  the live feed that those comments appeared.

24         Q.    Okay.

25         A.    But that doesn't make sense, because

Page 25

1   there's three seconds.  So that would be incorrect.

2   I do not know that.

3        Q.   I don't either.  I was just seeing if you

4   did.

5        A.   That's what I would have guessed, but it

6   doesn't make sense when you look at the numbers.

7        Q.   Right.  Because they're out of order?

8        A.   Correct.

9        Q.   I agree.  All right.  We'll just chalk it

10  up as no one here knows.

11       A.   Okay.

12       Q.   All right.  But at the top it says, What a

13  shit show; do you see that?

14       A.   Yes.

15       Q.   Okay.  Did you post that?

16       A.   Yes.

17       Q.   So that is your comment?

18       A.   Yes.

19       Q.   And then below that it says, Your number

20  one concern as sheriff is COVID.  Where is my

21  eyeroll emoji; do you see that?

22       A.   Yes.

23       Q.   Okay.  Did you type that?

24       A.   Yes.

25       Q.   Why were you upset that she was concerned

Page 26

1    about COVID?

2                   MR. WIEST:  Objection to form.

3                   MR. MILLER-NOVAK:  She's looking at

4          you to see if she can answer.

5                   MR. WIEST:  You can answer.  Unless I

6          tell you not to answer, which I'm only

7          going to do if he raises a privilege

8          issue, you can answer everything today.

9                   THE WITNESS:  Okay.

10     A.   As a wife of a law enforcement

11   professional, I had other ideas of what were more

12   important issues than COVID, and I would expect the

13   top law enforcement professional to understand that

14   and have the same ideas.

15     Q.   Okay.  And what do you -- I don't want to

16   mischaracterize what you just said, but you said you

17   had other ideas as a wife of a law enforcement

18   official?

19     A.   Yes.

20     Q.   What were those ideas?

21     A.   Well, I had said, In a department which

22   has -- oh, wait a minute, sorry.

23                   My biggest health priority would be

24   officers coming home safe to their families without

25   a bullet in their head and not coming home with the

Page 27

1    flu.  And then I --

2         Q.   And -- oh, I'm sorry.  Go ahead.  I

3    thought you were done.

4         A.   And then I stated some facts about how

5    many officers had died in the line of duty, how many

6    officers had died from suicide that year, and that

7    the COVID deaths were not even close to those

8    numbers.  That's where I came up with my conclusion

9    that there were more pressing health concerns.

10        Q.   When you just said that, it looks like you

11   were kind of reading or referring to a post lower

12   down on the page where it says, Yes, a priority for

13   the entire community is to stay healthy; do you see

14   that?

15        A.   Yes.  That was not mine.

16        Q.   That was not yours?

17        A.   No.  That was Elaine Moscovitz.  The

18   reason why my name is highlighted is because she had

19   tagged my name.

20        Q.   Oh.  Oh, okay.  Yeah, I see that.  The

21   formatting is weird.  So it does say Elaine there.

22   And then it says Jennifer Patterson Davis.

23        A.   She was addressing me.

24        Q.   Because she was replying to you, so that

25   highlights your name?

Page 28

1        A.    Yes.

2        Q.    Okay.  So then underneath that you're

3   replying to her, so it starts with Elaine Moscovitz,

4   right?

5        A.    Correct.

6        Q.    And it says, number one priority, though?

7   I didn't say it shouldn't be addressed, but my

8   biggest health priority would be officers coming

9   home safe to their families without a bullet in

10  their head and not coming home with the flu; do you

11  see that?

12       A.    Yes.

13       Q.    Okay.  What do you mean by flu?

14       A.    Her -- she said her priority was COVID.

15  And I was equating COVID with a virus similar as the

16  flu.

17       Q.    Do you believe it's the same thing as the

18  flu?

19             MR. WIEST:  Objection to form.

20       A.    I believe it's similar, yes.

21       Q.    Okay.  And do you believe that COVID is a

22  separate disease?

23             MR. WIEST:  Objection to form.

24       A.    I believe that COVID and the flu are both

25  viruses that create similar symptoms, so I believe

Page 29

1    they're similar.

2         Q.   Okay.  You believe that they're similar,

3    but you believe they're distinct viruses?

4              MR. WIEST:  Objection to form.

5         A.   I'm not an epidemiologist, but I'm sure

6    there are differences in the way the virus is

7    constructed.

8         Q.   Okay.  Let's turn to the next page, which

9    is Exhibit 2 attached to the complaint.  Does this

10   look familiar to you?

11        A.   Yes.

12        Q.   Okay.  And what is it?

13        A.   It's a Facebook post that I posted on my

14   personal page on January 4, 2021.

15        Q.   And this was right after Sheriff McGuffey

16   took office, correct?

17        A.   It was the same day as the comments I

18   posted on her live feed, her -- from the previous

19   exhibit that we just went over.  It was the same

20   day.

21        Q.   Okay.  And did this happen after you were

22   interacting to the live feed?

23        A.   Yes.

24        Q.   Okay.  So not to try to get too much in

25   your headspace, but you were kind of engaged in this

Page 30

1   live feed conversation, correct?

2       A.   Yes.

3       Q.   And it kind of inspired this post to

4   occur?

5       A.   Yes.

6       Q.   Okay.  Do you know how much longer after

7   that live feed that you decided to do this post?

8       A.   I don't.

9       Q.   Okay.  Was it -- well, you know -- I mean,

10  was it like immediate or was it some time had

11  passed?

12      A.   Some time -- give me a time frame.  Hours,

13  minutes?

14      Q.   Yeah, I would say more than an hour is

15  some time.

16      A.   Probably more than an hour, but I'm not

17  sure.  I couldn't -- I just know it was the same

18  day.

19      Q.   Okay.  Did you discuss this post with

20  Jason at all?

21           MR. WIEST:  Objection to form.

22      A.   I didn't.  He might have asked me about

23  it.  But I never said anything to him before or. . .

24      Q.   What did he say to you about it?

25      A.   I don't remember.

1          Q.   Well, let's go through the post.

2          A.   Okay.

3          Q.   Okay.  It says, I really don't like seeing

4     political posts continuously on Facebook because

5     like they say, opinions are like assholes.

6     Everybody has one and they probably stink.  That is

7     unless you are one of those weirdos that bleaches

8     your asshole and does those colon cleanse things,

9     but I digress.  Are those your statements?

10         A.   Yes.

11         Q.   Okay.  It says, I have one political

12    opinion I need to get off my chest.  In today's

13    press conference our new -- and it says sheriff in

14    quotations -- says her number one issue is going --

15    that she is going to tackle in her first weeks in

16    office is COVID; do you see that?

17         A.   Yes.

18         Q.   Okay.  So it says in today's press

19    conference.  As you said earlier you're referring to

20    the live stream press conference, correct?

21         A.   That's correct.

22         Q.   All right.  Why did you put sheriff in

23    quotes here?

24         A.   I don't believe that she's acting as a top

25    law enforcement professional should and doesn't have

Page 32

1    a grasp on what the needs are that I would expect

2    from a real sheriff.

3         Q.   Okay.  Well, can you provide me a little

4    bit more detail why you think she didn't have a

5    grasp on the job?

6         A.   To state that COVID is a number one

7    priority as opposed to the other health concerns of

8    law enforcement officers, that's why.

9         Q.   I want to go a few sentences down.  It

10   says, This person is nothing more than a politician

11   and is nowhere near qualified to be the sheriff; do

12   you see that?

13        A.   Yes.

14        Q.   It says, If you voted for her because of

15   her qualifications -- and it has a parenthetical --

16   it says not being a certified peace officer -- being

17   fired from the department for being on the Brady

18   list, then you have the IQ of a kumquat.  Is that

19   your sentence?

20        A.   Yes.

21        Q.   Okay.  So in the parenthetical it says

22   being fired.  How did you know that she was fired?

23        A.   I heard about the internal investigation

24   on the news about her creating a hostile work

25   environment.

1     Q.   Were you aware if she had filed suit?

2     A.   At the time I learned of it, I'm not sure

3 if that's what the news -- if that was connected

4 with the news article or not.

5     Q.   Okay.  How did you know about her being on

6 the Brady list?

7     A.   I have heard that on the news multiple

8 times.  I believe I've heard it from other officers.

9     Q.   What other officers?

10    A.   I'm not sure.

11    Q.   When would you have heard it from other

12 officers?

13    A.   It could have been at a football game or

14 some type of social outing with other officers.

15    Q.   So sometimes when you're at social

16 gatherings with officers, they kind of talk to you

17 about things that are happening in the department?

18    A.   Not to me, just in general whoever --

19 usually we're in a group.  I'm never on a one-on-one

20 situation.

21    Q.   So these are group conversations when

22 you're with your husband at certain events?

23    A.   Well, usually I'm not with my husband at

24 football games, because he's on the field.

25    Q.   Okay.

1      A.   It could be spouses.

2      Q.   Okay.  To continue it says, or thought it

3  would be neat to see a gay woman as sheriff, then

4  you are a twatwaffle.  Did you type that?

5               MR. WIEST:  Objection to form.  That

6          wasn't the whole sentence.

7               You can answer.

8      A.   Yes.

9      Q.   Okay.  How do you define twatwaffle?

10     A.   An idiot.  There's a comment on that post

11  that's a screenshot of the definition and that's

12  what it says.  I know you can't see the comments on

13  here.

14     Q.   I can't see the definition.  But you -- I

15  don't know that -- that doesn't come from Webster's

16  Dictionary, does it?

17     A.   I'm not sure.  I don't know if it's

18  in. . .

19     Q.   Maybe Urban Dictionary?

20     A.   Maybe.  I'm not sure.  I didn't post the

21  definition.  Somebody else did.

22     Q.   Okay.

23     A.   So I don't know where they got that from.

24  But I would agree that's the definition.

25     Q.   So when you use the word twatwaffle,

Page 35

1    you're calling someone an idiot or a fool or a

2    moron --

3         A.   Yes.

4         Q.   -- right?  So to you the word twatwaffle

5    is a way to make a derogatory statement towards

6    someone's intelligence?

7         A.   Yes.

8         Q.   Okay.  So another way to read this part of

9    the sentence is if someone thought it would be neat

10   to see a gay woman as sheriff, then they are an

11   idiot?

12        A.   If that was their only reason.  Not just

13   because she was gay, but. . .

14        Q.   Okay.  Well, what would be wrong with

15   wanting to see a gay woman advance to a position of

16   leadership?

17        A.   Nothing.  As long as she had the

18   qualifications.

19        Q.   Why did you bring up her sexual

20   orientation?

21        A.   Because I believe she was voted in because

22   of identity politics and not her merit.

23        Q.   Do you think that's the only reason people

24   voted her in?

25        A.   I don't know what -- what other reasons.

Page 36

1       Q.   I mean, could it be her political party by

2    any chance?

3       A.   Her political party -- I know that

4    identity politics is important, so those two could

5    be connected possibly.

6       Q.   Are you aware that her lawsuit against the

7    County for her termination was successful?

8            MR. WIEST:  Objection to form.

9       A.   I believe it was settled.

10      Q.   After summary judgment, correct?

11           MR. WIEST:  Objection to form.

12      A.   I'm not sure.

13           MR. MILLER-NOVAK:  Okay.  Let's set

14           that aside.

15           (Defendants' Deposition Exhibit No.

16           11 was marked for identification.)

17      Q.   I've handed you what is now marked as

18   Defendants' Exhibit 11.  Are you familiar with

19   Donald Raymond Gilreath?

20      A.   I am not.  I do not know him personally.

21      Q.   Okay.  Are you aware that he died on

22   February 12, 2021?

23           MR. WIEST:  Objection to form and

24           foundation.

25           Go ahead.

Page 37

```
1         A.    No.   Because I don't know who he is.
2         Q.    Okay.   If I were to hold out that he was a
3    deputy who worked in the justice center, would you
4    have any reason to disagree with that?
5         A.    No.
6         Q.    Are you aware that he died because of
7    complications of COVID that he contracted while
8    working?
9              MR. WIEST:  Objection to form and
10             foundation.
11             You may answer.
12        A.    No.
13             MR. MILLER-NOVAK:  I wasn't done with
14             the question.
15             THE WITNESS:  Oh, I'm sorry.
16        Q.    That he died as a result of COVID-19 that
17   he contracted in the line of duty at the Hamilton
18   County Justice Center?
19             MR. WIEST:  Objection to form and
20             foundation.
21        A.    No, I did not.
22        Q.    Okay.  Do you know that he was the only
23   death of a deputy in the year 2021 regarding the
24   line of duty?
25             MR. WIEST:  Objection to form and
```

Page 38

1           foundation.

2      Q.    In Hamilton County.  Sorry.

3      A.    No, I did not.

4      Q.    So you're unaware that in the year 2021

5 the only deputy that died in the line of duty died

6 of COVID complications?

7                MR. WIEST:  Objection to form and

8           foundation.

9      A.    No, I did not know that.

10     Q.    Okay.  Does that affect your opinion at

11 all in your post that you typed a month earlier?

12     A.    No, it doesn't.

13     Q.    Okay.  Why not?

14     A.    One year of data doesn't make up for -- I

15 don't know for sure, but I would imagine that if you

16 looked at the other years, there would probably be

17 more suicides or in-line -- in-duty deaths than

18 COVID deaths; does that make sense?

19     Q.    Sure.  But COVID didn't exist in the year

20 2019, correct?

21     A.    Correct.

22     Q.    So that wouldn't be something that people

23 would be concerned with in the year 2019, correct?

24     A.    Correct.

25     Q.    Or the year 2018, correct?

1        A.    Correct.

2        Q.    But it was a concern in the year 2020,

3   correct?

4        A.    Correct.

5        Q.    It was a concern in the year 2021,

6   correct?

7        A.    Correct.

8        Q.    As a matter of fact in the year 2021 it

9   was 100 percent deputy deaths in Hamilton County,

10  correct?

11       A.    Correct.  Can I ask a question?

12       Q.    Yeah, sure.

13       A.    Do you have the number of duty deaths in

14  2020 as opposed to COVID since COVID was in 2020?

15       Q.    I don't.  I have 2021.

16       A.    I would -- I would be interested before

17  making a decision to hear 2020 when COVID was

18  introduced.

19       Q.    Well, I would be, too.  But I don't have

20  it with me today.

21       A.    Okay.

22       Q.    Sorry.

23       A.    It's okay.

24       Q.    Would you be concerned that deputies --

25  other deputies might see your post after Deputy

Page 40

1    Donald Raymond Gilreath died and be bothered by it?

2         A.    No.

3         Q.    Okay.  Why not?

4         A.    Well, I think that most people know that

5    you have a first amendment right to freedom of

6    speech to say what you want.  I don't expect most

7    people to be thin-skinned or to think that I'm

8    something special that my opinion would have any

9    bearing on them.

10        Q.    Does your husband ever get bothered by

11   public comments about police officers?

12        A.    I don't know.  You would have to ask him.

13        Q.    Do you ever get bothered concerning public

14   comments about police officers?

15        A.    That's a good question.  Give me a second

16   to think about that.

17        Q.    Sure.

18        A.    I'm trying to think of current events.

19   That's what immediately popped into my head.  I

20   guess it bothers me.  It doesn't make me feel good,

21   but it -- I believe they have a right to those

22   opinions.

23        Q.    Would you agree with this statement, just

24   because someone can say something doesn't mean they

25   should?

1          MR. WIEST:  Objection to form.

2          You may answer.

3     A.   No.  I think their rights outweigh any

4 negative consequences in most situations.

5          MR. MILLER-NOVAK:  You can hand me

6     that back.

7          THE WITNESS:  Absolutely.

8          MR. MILLER-NOVAK:  Thanks.  Are you

9     okay; do you need a break or anything?

10         THE WITNESS:  I'm great.

11         MR. MILLER-NOVAK:  Holding up?

12         THE WITNESS:  I'm doing fine.

13         MR. MILLER-NOVAK:  All right.

14         THE WITNESS:  Do you think we need a

15    break?

16         MR. WIEST:  I think -- no.  As long

17    as you're comfortable?

18         THE WITNESS:  I'm good.

19         MR. WIEST:  Okay.

20 BY MR. MILLER-NOVAK:

21    Q.   Has Jason ever talked to you about the

22 Facebook post that you have seen that are critical

23 of police officers?

24         MR. WIEST:  Objection to form.

25         You may answer.

1  A. I don't recall any.  Nothing specific.

2  Q. Do you know who Caroline Adams is?

3  A. Yes.

4  Q. Who is she?

5  A. She -- I have known her from Facebook to

6 the pages that she runs, meme pages, satirical

7 pages, all focusing on law enforcement, public

8 service.

9  Q. And the first word you used was meme?

10  A. Meme.  Sorry.

11  Q. Meme.

12  A. M-e-m-e, meme.

13  Q. M-e-m-e?

14  A. Correct.

15  Q. Okay.  And what's your opinion of Caroline

16 Adams?

17  A. Can you further elaborate on opinion of

18 what, like as a person or -- I'm not sure what

19 you're asking.

20  Q. Well, let's start with as a person.

21  A. Honestly I'm not sure.

22  Q. You don't know her personally?

23    MR. WIEST:  Objection to form.

24  A. I wouldn't say that I know her very well

25 personally.

1      Q.   Have you interacted with her?

2      A.   Yes.  On Facebook.  I do like her posts.

3   I will comment on her posts.

4      Q.   So you've liked her posts and commented on

5   them?

6      A.   Yes.

7      Q.   Has she ever responded to you?

8      A.   Oh, I'm sure she has, because I've

9   responded -- I've made many comments and likes on

10  her posts.

11     Q.   Has she ever sent you like any -- I'm not

12  always the best at language here -- like the private

13  messages like through the Messenger thing?

14     A.   I would say she has.

15     Q.   So she has -- in addition to just kind of

16  like on a feed, she's also like directly messaged

17  you?

18     A.   Yes.

19     Q.   Do you still have those messages?

20     A.   I can look.  I probably do, but I'm not

21  sure.

22     Q.   Do you usually delete Facebook messages?

23     A.   I have.

24          MR. MILLER-NOVAK:  Okay.  Well,

25          please don't delete any that you have of

Page 44

1              hers now.  And if you have any still --
2              well, I'll send a follow-up, but obviously
3              we're going to request those.
4                   MR. WIEST:  We reserve all
5              objections.
6                   MR. MILLER-NOVAK:  Naturally.
7         Q.   All right.  So you've interacted with a
8    few of her posts.  So do you tend to agree with her
9    political viewpoints?
10                  MR. WIEST:  Objection to form.
11        A.   Sometimes.
12        Q.   Okay.  Well, what type of posts has she
13   kind of had that you've liked or agreed with?
14        A.   A lot of the things that affect police
15   officers.
16        Q.   So you might not agree with all of her
17   political opinions, but her opinions about police
18   safety you generally agree with; is that fair?
19        A.   Yes.
20        Q.   Okay.  Would you agree that some of her
21   memes or humor or whatever you've described can be
22   rather edgy at times?
23        A.   Sure.
24        Q.   Have you ever seen any posts from her
25   about Sheriff McGuffey?

1      A.   Yes.

2      Q.   Have you ever seen any posts from her

3   about Sheriff McGuffey that kind of are degrading

4   about her sexual orientation?

5      A.   Yes.

6      Q.   What have you seen?

7      A.   I know she calls her Chaz the

8   Anti-Sheriff.  But I -- at this point I can't give

9   you any specific meme that she's made.  But I do

10   know there have been many.

11      Q.   And what does the phrase Chaz the

12   Anti-Sheriff mean to you?

13              MR. WIEST:  Objection to form and

14              foundation.

15              You may answer.

16      A.   I think she's criticizing her as a law

17   enforcement professional, that she is -- she does

18   the opposite of what you would expect a law

19   enforcement professional to be.

20      Q.   By any chance did you see a meme that

21   Caroline Adams had made that kind of was themed upon

22   Brokeback Mountain?

23              MR. WIEST:  Objection to form.

24      A.   Do you have a copy of it that I can see?

25      Q.   I don't.

Page 46

1      A.    I don't, but it wouldn't surprise me.

2      Q.    Okay.  Would you describe some of

3   Caroline's posts as homophobic in nature?

4              MR. WIEST:  Objection to form.

5      A.    Sure.  I can see that.

6      Q.    Have you ever liked any of her posts that

7   degraded Sheriff McGuffey's sexual orientation?

8      A.    Oh, I'm not sure.

9      Q.    You just don't recall?

10     A.    I don't recall.

11     Q.    I'm pretty sure the answer is no, but

12  you've never met Caroline Adams in person?

13     A.    I have.

14     Q.    You have?

15     A.    I have.

16     Q.    Okay.  And where have you met her in

17  person?

18     A.    At a bar on the west side of Cincinnati.

19     Q.    What bar?

20     A.    Fogarty's.

21     Q.    Where is that?

22     A.    Cheviot.

23     Q.    There's eight gazillion bars on Cheviot

24  Road, isn't there?

25     A.    Yes.

1     Q.   Which one is that by?

2     A.   It's -- I guess it would be close to Hail

3  Mary's.  They're owned by the same people right off

4  Harrison Avenue.

5     Q.   Okay.  And was there some kind of event

6  going on at Fogarty's that night?

7     A.   No.  She invited people out -- just any of

8  the west side people that were out, if they wanted

9  to come grab a drink.

10     Q.   And how did you know that the invite

11  was -- did she invite people through Facebook?

12     A.   Yes.

13     Q.   So you saw like a Facebook post from

14  Caroline Adams saying --

15     A.   Yeah.

16     Q.   I mean, was she just inviting like all of

17  her Facebook friends?

18     A.   Yes.

19     Q.   How many people showed up?

20     A.   Maybe four.

21     Q.   Only four?

22     A.   Yeah.

23     Q.   That's probably about all the following I

24  have, so I shouldn't really laugh at all.  So you

25  were --

Page 48

1        A.   I don't think a lot of people want to be
2    associated with her.  I think they would be afraid
3    to be retaliated against if they were seen with her.
4        Q.   By people you think would be afraid they
5    would be retaliated against, who are you talking
6    about?
7        A.   People in public safety that interact with
8    her.
9        Q.   Well, why do you think they would be
10   retaliated against?
11       A.   Because my husband was retaliated against
12   because I interact with her.
13       Q.   When was this bar event?
14       A.   It was in the winter.  I know it was cold.
15   So it was either end of 2024 or beginning of 2025.
16       Q.   Oh.  So this is after Jason had already
17   quit his job?
18       A.   Oh, yes.
19            MR. WIEST:  Objection to form.
20       A.   Yes.
21            THE WITNESS:  Sorry.
22            MR. MILLER-NOVAK:  That's okay.  Did
23        you get it?
24            THE COURT REPORTER:  Yes.
25       Q.   Okay.  Did Jason go?

1      A.    No.

2      Q.    Okay.  So you were there.  She was there.

3  How many other people -- two more people, I guess?

4      A.    Yeah, maybe three.  I think there was

5  three of us.

6      Q.    And who were those people?

7      A.    Honestly I've never met them before.

8  There was a female.  I think she was the sister of

9  an officer.  There was another older male there.  I

10 don't remember his name.  I just -- the only

11 conversation I had with him was he was telling me

12 about a podcast that he created.  And there was

13 another young male there.

14     Q.    Well, since you don't know any of their

15 names, I'll assume you didn't form relationships

16 with any of --

17     A.    No.

18     Q.    -- these people?

19            MR. WIEST:  You got to let him finish

20        asking.

21            THE WITNESS:  All right.  Sorry.

22            MR. WIEST:  It's okay.

23            MR. MILLER-NOVAK:  You're doing your

24        best.

25     Q.    All right.  And what was the conversation

1    about?

2              MR. WIEST:  Objection to form.

3        A.   Politics.  The female was involved in

4    politics in Price Hill, so there was conversations

5    about city issues.  The gentleman -- he was talking

6    about his podcast about city issues.

7              I had a conversation with Caroline about

8    her husband.  Since I didn't know her that well, I

9    didn't know that her husband had died.  He was in

10   law enforcement.  So that was the main conversation

11   we had.

12       Q.   What police force was -- what was his

13   name?

14       A.   I can't remember his first name.  He was a

15   ranger -- Hamilton County Park Ranger.

16       Q.   Did he die in the line of duty?

17       A.   No.  He had a long, drawn-out -- he had a

18   stroke and then he had a series of strokes after

19   that.  So it was a long, drawn-out illness.

20       Q.   Have you had any other personal

21   interactions with Caroline Adams besides that day?

22       A.   No.

23       Q.   Have you had any private interactions with

24   her whether through Messenger or text message,

25   email, or anything like that?

1            MR. WIEST:  Objection to form.

2       A.   When?  Well, I told you --

3       Q.   Yeah.  After that meeting.

4       A.   Oh, after that meeting.  I did.  I had --

5  the day that Larry Henderson died, I said, Is he --

6  you know, have you heard, is he gone?  And she said

7  Yes, he's passed.  And she said that -- I told her I

8  was sorry.  And that she was supposed to meet up

9  with him to celebrate his retirement at a pig roast

10 on Memorial Day.  And that was the last.

11      Q.   Have you talked to her at all about this

12 lawsuit in any form?

13      A.   Oh, yes.

14      Q.   When did you talk to her about this

15 lawsuit?

16      A.   I don't recall specifics.

17      Q.   Through written communications?

18      A.   It probably would have had to been, yeah,

19 through Messenger.

20      Q.   Through Messenger?

21      A.   Uh-huh.

22      Q.   Okay.  What did you discuss with her?

23      A.   I know she specifically wanted to know who

24 my attorneys were.

25      Q.   Who your attorneys were?

1      A.   Yes.

2      Q.   Sorry.  He coughed right when you said

3   that, so I missed that.  Anything else?

4      A.   I don't remember.

5      Q.   Okay.  Have you ever exchanged text

6   messages with her at any point in time?

7      A.   I don't remember.  I don't believe so.

8      Q.   Okay.  So aside from kind of like

9   interacting on her Facebook feed, the only other

10  written communications you've ever had with Caroline

11  Adams has been through Facebook Messenger?

12     A.   I have emailed her.  She asked for a copy

13  of our complaint when it was filed.

14              MR. MILLER-NOVAK:  Okay.  Well,

15          please preserve those.  And then, you

16          know, we'll follow up with requests for

17          that, Chris.

18          MR. WIEST:  We'll reserve all

19          objections.

20              MR. MILLER-NOVAK:  What's that?

21              MR. WIEST:  We'll reserve all

22          objections.

23              MR. MILLER-NOVAK:  Undoubtedly.

24     Q.   Have you communicated with -- off the

25  subject, have you communicated with anybody else

1   about this lawsuit?

2               MR. MILLER-NOVAK:  Not attorneys.

3               MR. WIEST:  Thank you.

4               MR. MILLER-NOVAK:  Yeah.  I know

5          that's what you were going to say.

6      A.   I know my father has asked.

7      Q.   Just kind of on the phone or verbally?

8      A.   Both.  How is it going.

9      Q.   Anything in writing?

10     A.   No.

11     Q.   So you're just giving him updates about

12  the lawsuit?

13     A.   Yes.

14     Q.   Anybody else besides your father?

15     A.   Not that I recall.

16               MR. WIEST:  And, again, except

17          counsel.  Thank you.  Not including

18          counsel.

19               MR. MILLER-NOVAK:  Not including

20          counsel.

21     Q.   As a going concern, you never need to tell

22  me about conversations you have with these guys,

23  okay?

24     A.   Okay.

25               MR. MILLER-NOVAK:  I would like to

1          take a break.  We're probably going to

2          change subjects.  I think this will be a

3          good time.

4               THE COURT REPORTER:  Okay.  We're off

5          the record.

6               (A brief recess was taken.)

7   BY MR. MILLER-NOVAK:

8      Q.   All right.  So are you familiar with what

9   RENU is?

10     A.   Yes.

11     Q.   Okay.  What do you understand RENU to be?

12     A.   It's a specialized unit of Hamilton County

13  Sheriff's Department focusing on narcotics

14  investigations.

15     Q.   And you're aware that Jason had applied

16  for RENU on two separate occasions?

17     A.   Yes.

18     Q.   Okay.  And do you recall when the first

19  was?

20     A.   I don't.

21     Q.   If I said 2018 roughly, would you disagree

22  with that?

23     A.   I wouldn't know.

24     Q.   Okay.  Do you know that he was denied the

25  first time he applied?

Page 55

1     A.   Yes.

2     Q.   Who was sheriff when that happened?

3     A.   What year did you say?

4     Q.   2018.

5     A.   Was that Jim Neil?  I'm not sure.

6     Q.   I believe so.

7     A.   Was Charmaine elected in 2020?

8     Q.   Yes.

9     A.   So yes, Jim Neil.

10    Q.   Okay.  Do you think that Charmaine
11  McGuffey had anything to do with Jason not receiving
12  his RENU promotion in 2018?

13    A.   I wouldn't know.

14    Q.   Okay.  Did Jason tell you that his
15  application was denied?

16    A.   Yes.

17    Q.   Did he tell you why he believed it
18  happened?

19    A.   No.

20    Q.   Okay.  Are you aware that in 20- -- at the
21  end of 2022 -- or is it early 2023 -- that Jason had
22  taken a test in terms of placement for promotion?

23    A.   For RENU or for corporal?

24    Q.   For corporal.

25    A.   Yes.

Page 56

1    Q.   Okay.  So you're aware of the last time he

2  took a test for corporal?

3    A.   Yes.

4    Q.   Are you aware of what his placement was on

5  that test?

6    A.   Not exactly.  I know it was in the teens.

7  But I do not know exactly.

8    Q.   Okay.  Did he talk to you about those

9  results at all?

10    A.   The only thing that sticks out is that

11  some of the people -- some of the people on the list

12  had already made corporal's pay, so that -- all

13  those people on the list were not going to be road

14  corporals.

15    Q.   Okay.  So he talked to you about that?

16    A.   Yes.

17    Q.   Okay.  What you're referring to is some of

18  those people would get different positions that

19  would result in a bump in pay so they wouldn't

20  necessarily get a promotion to corporal, correct?

21         MR. WIEST:  Objection to form and

22         foundation.

23    A.   No.  My understanding is that those people

24  were already at corporal level pay.  They just

25  didn't have the stripes.

Page 57

1      Q.    Okay.  So you understood that there was no

2   longer being ahead of him on the list, correct?

3                  MR. WIEST:  Objection to form and

4              foundation.

5      A.    Yeah.  I'm sorry.  Can you ask that in a

6   different way?  I'm not sure.

7      Q.    Well, I'm trying to understand what your

8   testimony is.  So you're saying that some of these

9   people already had corporal pay without getting a

10  bump to road corporal; is that --

11     A.    Just the -- just the designation as a

12  corporal.

13     Q.    Okay.

14     A.    They were still at the same pay rate.

15  They just didn't have a designation as a corporal.

16     Q.    Okay.

17     A.    Because they weren't all patrol.

18     Q.    And Jason told you that?

19     A.    Yes.

20     Q.    Okay.  And what significance does that

21  have to you?

22     A.    I think it has to do with how many people

23  they can promote till they need to get to someone

24  that will be a road patrolman is what they're

25  looking for -- I mean, a corporal -- a road corporal

1    is what they're looking for.

2         So sometimes they have to promote people

3    because they're already at that level to get to the

4    person they need for -- to get a road corporal.

5    Q.   Okay.  So Jason was kind of talking about

6    when it might become his turn then, in other words?

7    A.   No, not necessarily.  Just how -- that

8    there were different needs on the list.

9    Q.   Okay.  At any time while he was still

10   employed at Hamilton County did Jason tell you that

11   a corporal position had become available to him?

12   A.   That he was offered a position as

13   corporal; is that what you're saying?

14   Q.   That one was available for his placement.

15   A.   I'm not sure.  I'm not sure if he knew

16   everybody on the list and who was who and who was

17   able to be a road corporal or who was just getting

18   the official title since they were already at that

19   pay rate.  I don't know if he knew all of that.

20   Q.   Okay.  Well, you understand that the

21   placement list -- the way it works is that as

22   corporal positions come available, people higher up

23   on the list have the priority for that promotion --

24   A.   Yes.

25   Q.   -- correct?

Page 59

1     A.   Yes.

2     Q.   Okay.  So if I were to represent to you

3   that Jason's placement was 19, do you have any

4   reason to agree with that?

5     A.   No.  I believe it was in the teens.

6     Q.   Okay.  So essentially there's 18 people

7   ahead of him, correct?

8     A.   Correct.

9     Q.   All right.  So as corporal positions

10  become available, the 18 people ahead of him would

11  essentially have priority over Jason then, correct?

12              MR. WIEST:  Objection to form.

13    A.   As far as being promoted to a road

14  corporal?

15    Q.   Yes.

16    A.   No.  I think a lot of -- it could be

17  possible that a lot of those people before him could

18  get promoted to corporal but not have to go to road

19  patrol.  They could stay in their -- whatever

20  division they're in that was at corporal's pay.  So

21  if you were in RENU, you could get promoted to

22  corporal and still be in RENU and not be a road

23  corporal.

24    Q.   Okay.  But you would understand that

25  people ahead of him would get corporal promotions

1    before him most likely, correct?

2          A.   It would depend.

3          Q.   On what do you think it depends?

4          A.   What I heard in a deposition was the rule

5    of three.  So they do have some discrepancy on how

6    many they can skip.  They don't have to go in order.

7    So if you're number one, you could get passed up and

8    they could pick number two, number three, or number

9    four.  That would be my understanding.

10         Q.   Well, if you're number one, it would be

11   number two and number three potentially, correct?

12         A.   Sure.

13         Q.   So essentially the rule of three still

14   applies to the next three people on the list; do you

15   understand that?

16                   MR. WIEST:  Objection to form.

17         A.   Yes.

18         Q.   Okay.  Because it wouldn't be like number

19   one, number 10, and number 12, correct?

20         A.   Correct.

21         Q.   It would be like number one, number two,

22   and number three, correct?

23         A.   But it wouldn't have to be in order of

24   one, two, three.  It could be one, two, four.  One,

25   two, four, six.  I guess what I'm saying is it

Page 61

1    doesn't have to be exactly chronologic order.

2        Q.   Okay.  But do you know at any time before

3    Jason quit whether or not a position had come

4    available to him that he would even be one of the

5    three people in line?

6             MR. WIEST:  Objection.

7        A.   Oh, I'm not sure.

8             MR. WIEST:  Go ahead.

9        A.   I'm not sure.

10       Q.   You're not sure?

11       A.   No.

12       Q.   Okay.  So we did talk a little bit ago

13   about Jason applying for RENU in the year 2018 and

14   not receiving it, correct?

15       A.   Yes.

16       Q.   All right.  So then he applied again in

17   the year 2023, correct?

18             MR. WIEST:  Objection to form.

19       A.   I do not know the specific time he

20   applied.

21       Q.   Okay.  Does January of 2023 sound correct

22   to you?

23       A.   I would take your word on it.

24       Q.   Okay.  Did he talk to you about applying

25   before he applied?

1  A. Yes.

2  Q. Okay.  And what did he tell you?

3  A. Just that he knew -- or he told me you

4 know this is my dream, this is where I want to end

5 my career.  He had -- since the first time he

6 took -- or had applied for RENU, he took classes on

7 his own.  He took classes that were paid for by the

8 County.  Classes on his own that he paid for on his

9 own.  And I knew that he was working towards this

10 goal.  I knew that he was eventually going to apply

11 for this again.

12  Q. Is that all he told you about his

13 application before it occurred?

14  A. I can't recall.

15  Q. Okay.  After he applied did he discuss his

16 application for RENU with you anymore?

17    MR. WIEST:  Objection to form.

18  A. Yes.  I would say the only thing I

19 remember him saying he thought he did well.

20  Q. Okay.  And eventually did you learn that

21 his application was rejected by Jay Gramke?

22  A. Yes.  But I was also told that he had the

23 position.  So I was told that after he was told he

24 had the position that it was taken away by Jay

25 Gramke.

Page 63

1      Q.   Okay.  And what did he tell you about

2  that?

3      A.   He had gotten a phone call.  And when the

4  phone call ended, he said they just told me that

5  they pulled me out of RENU because of your social

6  media.  And the same person had called him back a

7  few minutes later I guess to clarify what it was,

8  and he said yes, it was indeed because of your

9  wife's social media.

10     Q.   Okay.  Do you know who that person was?

11     A.   I believe it was Lieutenant Guy.

12     Q.   Did you know Lieutenant Guy at all before

13  this phone call?

14     A.   No.

15     Q.   Okay.  Have you ever talked to Lieutenant

16  Guy?

17     A.   No.

18     Q.   Have you ever talked to Lieutenant Guy

19  since?

20     A.   No.

21     Q.   Do you know if Jason has talked to

22  Lieutenant Guy since this lawsuit has been filed?

23     A.   I don't know.

24     Q.   So what social media post was -- do you

25  understand they were referring to?

Page 64

1      A.   I assumed it was the one in the exhibits

2  you showed me about her press conference when she

3  was elected talking about COVID.  And then my

4  personal post that same day.  I believe it was about

5  those two.

6      Q.   Did Jason tell you why or how Lieutenant

7  Guy supposedly knew that that was the reason?

8      A.   No.

9      Q.   When he told you that, what was your

10 response to him?

11     A.   Honestly at first I didn't believe it was

12 a possibility.  Yeah, I didn't believe it at first.

13 I soon learned when he had the meeting with the

14 Sheriff and Chief Deputy that that was in fact the

15 case.

16     Q.   Did it affect -- when you heard that, did

17 it affect your social media behavior at all?

18     A.   I don't believe so.

19     Q.   When you heard that, did you come to the

20 conclusion that you wouldn't post any more critical

21 things any longer?

22     A.   No.  My husband knows I'm too stubborn.

23     Q.   Did you continue to like Caroline Adams'

24 posts after that?

25     A.   I'm not sure, but I would have.

Page 65

1       Q.   Did you continue to interact with Caroline

2   Adams after that?

3       A.   Yes.

4       Q.   So it didn't affect your speech at all

5   after you learned that, correct?

6               MR. WIEST:  Objection.

7       A.   Speech in which way, just social media?

8       Q.   Yes.

9       A.   I would say no.

10      Q.   Okay.  And it didn't affect your

11  willingness to associate with Caroline Adams then,

12  correct?

13      A.   Correct.

14      Q.   Did Jason tell you to stop posting online?

15      A.   No.

16      Q.   Did he talk to you about your online

17  speech at all when he told you that?

18      A.   He said, I know you're going to do what

19  you want to do, so I'm not going to tell you to not

20  do something.

21      Q.   And you didn't offer or suggest that maybe

22  you should not engage in the type of speech in the

23  future?

24      A.   No, because I did nothing wrong.

25      Q.   Okay.  So at some point Jason decides that

Page 66

1    he wanted to have -- you know, going back to his own

2    testimony, he wanted to have a meeting with Sheriff

3    McGuffey and Jay Gramke; do you understand that?

4         A.   Yes.

5         Q.   Okay.  Did he talk to you about his desire

6    to have that meeting at all?

7         A.   Yes.

8         Q.   Okay.  What did he say to you?

9         A.   He said I'm going to request a meeting

10   with the Sheriff and Chief Deputy to find out if

11   the -- if it is in fact true what they told me the

12   reason why I was kicked off of the RENU assignment.

13        Q.   Okay.  In terms of being kicked off the

14   RENU assignment, to the best of your understanding

15   did he ever officially start serving as a RENU

16   officer?

17        A.   No.  He told me that someone in RENU had

18   said you're the pick, we already have cases that are

19   going to be assigned to you.

20        Q.   That were going to be assigned to him in

21   the future?

22        A.   Yes.

23        Q.   Okay.  So they kind of decided some cases

24   that they would assign to him is your understanding,

25   correct?

Page 67

1      A.    Yes.

2      Q.    But he didn't start working on any cases

3  yet, correct?

4      A.    That's correct.

5      Q.    Because they gave him a start date,

6  correct?

7      A.    I'm not sure.

8      Q.    Okay.  But at no time did he tell you that

9  he was in fact a RENU officer yet, correct?

10     A.    I don't remember if he said that exact

11  phrase.

12     Q.    So he said he wanted to request a meeting.

13  Did he come to that conclusion the same day that he

14  found out?

15     A.    No.

16     Q.    Okay.  When did he come to that

17  conclusion?

18     A.    I'm not sure.

19     Q.    Was it very soon thereafter or weeks

20  thereafter?

21     A.    I'm not sure.

22     Q.    Okay.  So he told you that he wanted to

23  have a meeting with the Sheriff, correct?

24     A.    Correct.

25     Q.    And that he was requesting one?

1      A.    Correct.

2      Q.    Okay.  Do you know the process that he

3  used to do that?

4      A.    I believe it was a green letter, it's

5  called.

6      Q.    Okay.

7      A.    That has to go up the chain of command to

8  get an appointment to meet with them.

9      Q.    Okay.  So he told you he sent that green

10 letter?

11     A.    Yes.

12     Q.    Okay.  Did he tell you when the meeting

13 was scheduled?

14     A.    I'm sure he did.  The only thing I

15 remember is him saying it was quite a ways away.  It

16 wasn't going to be soon.

17     Q.    Okay.  If I were to tell you that the

18 meeting happened on October 10, 2023, does that

19 sound correct?

20     A.    That sounds correct, yes.

21     Q.    Okay.  So do you know how long in advance

22 roughly that you were aware that meeting was going

23 to occur in October?

24     A.    Not exactly.  If I had to give an answer,

25 I would say at least a month.

Page 69

1      Q.   Okay.  So it was scheduled a long time

2   before it occurred?

3      A.   Yes, I believe so.

4      Q.   Okay.  Are you aware that Jason planned on

5   recording that meeting?

6      A.   Yes.

7      Q.   Did he discuss with you his intent to

8   record that meeting?

9      A.   Can you rephrase that or clarify that

10  question?  I'm sorry.

11     Q.   Well, you're aware that he planned to

12  record it, correct?

13     A.   Yes.

14     Q.   Okay.  Did he discuss with you why he

15  wanted to record it?

16     A.   Yes.

17     Q.   What did he say?

18     A.   That she has had a history of dishonesty

19  and she had tried to get him fired before.  And if

20  he wouldn't have recorded that previous

21  conversation, he probably would have been fired.  It

22  saved him.  So from past experience that's why he

23  wanted to record it.

24     Q.   Okay.  Did you encourage him to record the

25  meeting?

Page 70

1      A.   Yes.

2      Q.   Okay.  What did you say?

3      A.   That's a good idea.

4      Q.   Okay.  Just like that?

5      A.   Yeah.  I mean, you know, because he said

6   about the past history.  And I'm like, well, that

7   makes sense.  If she's been dishonest once, I would

8   assume she would be dishonest again.

9      Q.   Do you know that he ordered a recorder

10   that was shaped like a pen?

11      A.   Yes.

12      Q.   Did that happen before or after this

13   conversation?

14      A.   I don't recall.

15      Q.   Did you help him order that pen?

16      A.   No.

17      Q.   Do you know where he ordered it from?

18      A.   I did not see an invoice or anything.  If

19   I had to guess, it was probably online.

20      Q.   You don't know what site he ordered it

21   from?

22      A.   If I would guess, it would be Amazon.  But

23   I couldn't be 100 percent sure.

24      Q.   Do you know how much it cost?

25      A.   No.

Page 71

1     Q.   Did he tell you why he wanted to get a
2   recorder that looked like a pen?
3     A.   No.
4     Q.   Did you see the recording device?
5     A.   Yes.
6     Q.   Did you see it before it was used?
7     A.   I don't recall.
8     Q.   Okay.  Do you still have the recorder pen?
9     A.   I don't know.
10         MR. WIEST:  Just objection to form
11         and foundation.
12    Q.   Have you ever used that recorder at all?
13    A.   No.
14    Q.   Okay.  Well, let's fast-forward to
15   October 10, 2023.  So right before he had the
16   meeting, did you discuss what he would talk about
17   during that meeting?
18    A.   No.
19    Q.   He didn't tell you any of the questions he
20   had planned or prepared?
21    A.   No.
22    Q.   Well, you weren't in the meeting, correct?
23    A.   Correct.
24    Q.   All right.  So he came home and reported
25   to you what happened in the meeting, correct?

1       A.    Correct.

2       Q.    Okay.  My understanding is is that he was

3  not -- it was not a workday for him; is that

4  correct?

5       A.    That's correct.

6       Q.    Okay.  Do you remember roughly what time

7  he came home?

8       A.    I do not.

9       Q.    Was it in the morning?

10      A.    I don't know.

11      Q.    Okay.  You don't even have a general idea,

12  like morning or after?

13      A.    I just remember I think his meeting was

14  around eight o'clock-ish in the morning when people

15  come in, you know, normal first-shifter people.

16      Q.    Okay.  To the best of your recollection

17  did he come straight home after the meeting?

18      A.    I have no idea.

19      Q.    So when he got home after the meeting,

20  what did he tell you?

21      A.    He -- in a shocked voice he said, It was

22  because of you.

23      Q.    Okay.  Well, I'd imagine the conversation

24  went on from there.  Can you do your best to

25  recollect it?

1       A.    Sure.  What would you like to know?

2       Q.    Well, you said that -- whatever you just

3   said.  What was your response?

4       A.    That's bullshit.

5       Q.    Okay.  And what was his response to that?

6       A.    I don't believe it either.

7       Q.    Okay.  Did you listen to the recording

8   that day?

9       A.    No.

10      Q.    Did he tell you what the conversation was?

11      A.    Yes.

12      Q.    Okay.  What did he tell you?

13      A.    He said one of the first things Gramke

14  said when I came in is I squashed you going to RENU,

15  how did you not think there would be consequences

16  for your wife's social media posts.  He said that

17  the -- that multiple times in the conversation.  It

18  was brought up about you, your social media, even

19  the Sheriff agreed, you know.  She said, I don't

20  care if your wife has a hundred opinions, but how do

21  you think there's not going to be consequences for

22  you.

23            Can I elaborate?  I did not listen to the

24  recording until the next day when he told me that

25  the Sheriff said that he needs to separate or cut

1    ties with me.

2          Q.   Okay.

3          A.   That's when I decided to listen to the

4    tape the following day.

5          Q.   Did he say that the Sheriff used those

6    exact words?

7          A.   Yes.

8          Q.   Okay.  Did you listen to the tape?

9          A.   I did.

10         Q.   Did the Sheriff use those exact words?

11         A.   Can I see a copy of it -- of the

12   transcript?

13         Q.   I don't have it.

14         A.   It's not word for word, but after she told

15   him the story about someone cohabitating with her,

16   that she told her she had to leave because she was

17   making her look bad, she then said, If I were you, I

18   would cut ties with the people in my life that were

19   hurting my career.

20         Q.   You agree people is a plural word,

21   correct?

22         A.   Correct.

23         Q.   So that means more than one person,

24   doesn't it?

25         A.   Correct.

Page 75

```
 1        Q.   Okay.  Do you have any idea who those
 2   other people might be?
 3        A.   No.  Because I was the only one named in
 4   the meeting.
 5        Q.   Well, didn't they also discuss folks at
 6   Anderson?
 7        A.   I'm not sure.
 8        Q.   Didn't they also discuss Caroline Adams in
 9   that meeting?
10        A.   Yes.
11        Q.   Okay.  Well, then you weren't the only
12   person discussed in the meeting?
13        A.   But Caroline Adams doesn't cohabitate with
14   my husband.
15        Q.   Well, neither do the folks at Anderson,
16   correct?
17        A.   Correct.  That's why I believe it was
18   about me; otherwise, why would she preface a story
19   about people cohabitating with her making her look
20   bad.
21        Q.   Okay.  Was the person she was discussing
22   in that story her wife?
23        A.   I don't know.
24        Q.   Okay.  Didn't she say that it wasn't her
25   wife?
```

Page 76

1      A.   Possibly.

2      Q.   It was not even someone that she was in a

3   relationship with?

4      A.   We don't know that.

5      Q.   Well, that's what she said in the

6   conversation, correct?

7      A.   Well, she's also known for lying, so we

8   don't know that.

9      Q.   Okay.  Do you have any reason to know that

10  that was not true?

11     A.   I don't.

12     Q.   Okay.  I want to give you Exhibit 1

13  again --

14     A.   Okay.

15     Q.   -- which is the complaint.  Okay.  Go to

16  page eight.  Sorry.  It took me a minute there.

17     A.   Okay.

18     Q.   All right.  See the little numbers on the

19  left?

20     A.   Yes.

21     Q.   Okay.  All right.  So I want to go to

22  paragraph 40.  Okay.  So it says, He went home and

23  reported to Jennifer what Defendants had just told

24  him, and she broke down in tears.  Jennifer told him

25  that while she had always supported his law

1    enforcement career, she can no longer support him if

2    he stayed at the Sheriff's Office; do you see that?

3         A.   Yes.

4         Q.   Okay.  Is that a true statement?

5         A.   Yes.

6         Q.   Did you say that?

7         A.   Yes.

8              MR. MILLER-NOVAK:  Okay.  I can take

9         that back.  Thank you.

10        Q.   So after -- well, first, is it true, did

11   you cry --

12        A.   Yes.

13        Q.   -- when he told you?  So you were upset?

14        A.   Yes.

15        Q.   Were you angry?

16        A.   Yes.

17        Q.   And you told him you couldn't support him

18   any longer if he stayed there.  Did you want him to

19   leave at that point?

20        A.   Yes.

21        Q.   Okay.  Why?

22        A.   It wouldn't be healthy for him to work in

23   an environment where leadership is willing to punish

24   you for your spouse's or your first amendment right

25   to free speech.  That's not a culture that I want my

1    husband to work in.

2        Q.   Did you tell him at that point you wanted

3    him to find another job?

4        A.   No.  I said I don't support you working

5    there.

6        Q.   When did he tell you that he wanted to get

7    another job?

8                MR. WIEST:  Objection to form.

9        A.   He didn't.

10        Q.   Okay.  Are you aware of whether or not

11   Jason was ever disciplined after that meeting?

12        A.   I'm not aware.

13        Q.   Okay.  At any time after that meeting did

14   he tell you that he thought he was about to be

15   fired?

16        A.   No.

17        Q.   Did he ever discuss with you the

18   possibility that he was going to be terminated?

19        A.   No.

20        Q.   Did he discuss with you any beliefs that

21   he would never receive a promotion?

22        A.   Yes.

23        Q.   Okay.  What did he say about that?

24        A.   He said this was my -- I believe this was

25   my last chance to go to RENU and that's never going

Page 79

1    to happen now.

2         Q.   Okay.  So he was concerned that he would

3    never advance after that?

4         A.   Correct.

5         Q.   Did he think he would just not advance to

6    RENU?

7         A.   Or corporal.

8         Q.   Or corporal.  So he thought essentially

9    he'd be stuck as a patrol officer for the rest of

10   his time with the County?

11        A.   Yes.

12                   MR. MILLER-NOVAK:  Okay.  I actually

13              think this would be a good time to break

14              for lunch.  Is that okay, guys?  It's

15              noon.

16                   (A lunch recess was taken.)

17   BY MR. MILLER-NOVAK:

18        Q.   All right.  So earlier we talked -- like

19   before the break we did talk a little bit about you

20   saying something along the lines of not supporting

21   Jason being there any longer and that you wanted him

22   to leave.  Your --

23        A.   Can I clarify something?

24        Q.   Sure.

25        A.   I believe I told him that I do not support

Page 80

1    him working there anymore, but I could not make that

2    decision for him.

3         Q.   Okay.  You knew that if he -- I mean, you

4    said you had a business degree; is that right or --

5         A.   My degree is in education.

6         Q.   Education.  Okay.  But you would have

7    known that, you know, if he would leave and take

8    employment somewhere else, that that could affect

9    his income, correct?

10        A.   Yes.

11        Q.   All right.  So it's possible that if he

12   left and he got a job somewhere else, that he could

13   end up making less money?

14        A.   Yes.

15        Q.   And he could end up having to maybe pay

16   more for health insurance, correct?

17        A.   Yes.

18        Q.   And that it might even affect his

19   retirement, correct?

20        A.   Yes.

21        Q.   But you still wanted him to leave?

22        A.   No.  I wanted him to make that decision.

23   I would never tell him to leave.  I told him I

24   didn't support him working at the Sheriff's

25   Department.

Page 81

1        Q.    Okay.  I'm going to hand you what was

2   marked as Defendants' Exhibit 6.  Have you seen this

3   before?

4        A.    Yes.  I wrote it.

5        Q.    Okay.  And when did you write that?

6        A.    Monday, October 16, 2023.

7        Q.    Okay.  So that would have been

8   approximately six days after Jason met with the

9   Chief and the Sheriff, correct?

10       A.    Correct.

11       Q.    Okay.  Why did you write this?

12       A.    Well, it was devastating that I was the

13  reason why my husband had his promotion taken away.

14  And I wanted some answers as to why they thought it

15  was okay to do this to my husband when he did

16  nothing wrong and why they were trying to suppress

17  my speech and my views and threaten my husband to

18  continue his career with the department, that he

19  would have to censor me or tell me to censor myself,

20  I wanted some answers.

21            I guess one of the questions in there

22  was -- you know, I am interested to know why my

23  criticisms have such an important impact on the

24  department and if they were so important, why wasn't

25  this brought to his attention two years ago when the

1   comments were made.

2        Q.   Did you ever get a response?

3        A.   No.

4        Q.   Would you agree that this letter doesn't

5   ask anything about divorce or them wanting you to

6   get divorced from your husband?

7                  MR. WIEST:  Objection to form.

8        A.   I wouldn't have written a letter if it

9   didn't involve that.  I didn't state it in here, but

10  that's why I wrote the letter.

11       Q.   Well, you asked about your speech, but you

12  didn't ask anything about why they wanted you to get

13  divorced; would you agree with that?

14       A.   I would agree with that, yes.

15       Q.   Okay.  Well, why didn't you ask whether or

16  not -- why they wanted you to get divorced?

17       A.   Well, it was obvious.  Charmaine McGuffey

18  said if you want to further your career in this

19  department, I would suggest cutting ties with the

20  people that are holding you back.

21       Q.   But she said people, right?

22       A.   I believe so.

23       Q.   Okay.  She never said I suggest you

24  divorce your wife; would you agree with that?

25       A.   Yes.

Page 83

1    Q.   Okay.  If you go to -- well, it's towards
2  the bottom of the page.  It says, If I were going to
3  lecture my husband; do you see that?
4    A.   Yes.
5    Q.   On who he should distance himself from in
6  his profession, which I never would because he's a
7  grown man -- you didn't mention anything about him
8  distancing himself from you in that paragraph,
9  correct?
10             MR. WIEST:  Objection to form.
11    A.   I'm sorry.  Could you state that question
12  again?  I think I'm confused on who he is.
13    Q.   Jason would be the he.
14    A.   Okay.  Could you ask it again?  Sorry.
15    Q.   You don't mention anything about her
16  suggesting that you should distance yourself from
17  your husband or your husband should distance himself
18  from you, correct?
19    A.   Correct.
20    Q.   You talk about him distancing himself on
21  who he should distance himself from in his
22  profession, correct?
23    A.   Correct.
24    Q.   You're not part of his profession,
25  correct?

Page 84

1        A.    Correct.  But that's not what I was -- I
2    didn't say that in the sentence that she had told
3    him in his profession.  I was just making that as a
4    general.  She didn't say in his -- to separate
5    himself in his profession.  She had given a story
6    about people cohabitating with her.  And then you
7    said you need to separate yourself from the -- or
8    cut ties with the people holding you back.  There
9    was never -- she never said anything about
10   profession.  I just said that.
11       Q.    Okay.  Well, let's go to the paragraph
12   above it.
13       A.    Okay.
14       Q.    It says, Hypocrisy was also at its finest
15   during my husband's meeting.  How could the sheriff
16   lecture my husband about distancing himself from
17   certain people while at the very same time one of
18   her biggest supporters was being sentenced to 16
19   months in federal prison; do you see that?
20       A.    Yes.
21       Q.    Who are you referring to there?
22       A.    It was the city councilman that had been
23   found guilty and sentenced.
24       Q.    How did you know that he was one of her
25   biggest supporters?

Page 85

1      A.    There were pictures of them campaigning

2   together and then holding -- him holding a sign for

3   her and then posing for pictures together.

4      Q.    Okay.

5      A.    And I guess I correlated that, because I'm

6   my husband's biggest supporter, you know, in our

7   relationship.  So I guess I was correlating that

8   with people that supported her.

9              MR. MILLER-NOVAK:  Okay.  Can you

10           give me that back?

11             THE WITNESS:  Absolutely.

12     Q.    So you consider yourself your husband's

13  biggest supporter?

14     A.    Maybe his momma, but I would say second.

15     Q.    Second to his mother?

16     A.    Uh-huh.

17     Q.    Okay.  So in terms of his profession you

18  consider yourself one of his biggest supporters?

19     A.    Yes.

20     Q.    Next to his momma?

21     A.    Yes.

22     Q.    Okay.  So do you think that your support

23  for his profession is extremely important to him?

24     A.    Yes.

25     Q.    So you wrote this letter.  It's fair to

Page 86

1    say that you weren't really afraid to write this

2    letter to Jay Gramke, correct?

3          A.    Correct.

4          Q.    I mean, you would agree that you didn't

5    really hold back much in this letter, correct?

6          A.    Correct.

7          Q.    You stated your mind, correct?

8          A.    Correct.

9          Q.    It's rather critical?

10         A.    Correct.

11         Q.    Were you not concerned that Jason could be

12   retaliated against further?

13         A.    He was already retaliated against.  I

14   mean, it's already been done.

15         Q.    Okay.  You didn't think that this would

16   result in him getting fired or something extreme

17   like that, though?

18         A.    I would have no idea.

19         Q.    Okay.

20         A.    I just knew that he was already retaliated

21   against.

22         Q.    So you didn't think this would make things

23   worse?

24         A.    I wasn't sure.

25         Q.    Okay.  Did you care?

Page 87

1      A.   Did I care?

2      Q.   How this might impact things.

3      A.   No.

4      Q.   So you didn't consider at all what the

5  consequences of this letter would be before you

6  wrote it?

7      A.   No.  Because he's already faced the

8  consequences of my speech.

9      Q.   Okay.  After you wrote this to the best of

10  your knowledge, because he -- well, you know what,

11  before I get there, just to create the time frame.

12           He resigned -- at least he turned in his

13  resignation on January 9, 2024, correct?

14      A.   Yes.

15      Q.   Okay.  But he didn't actually -- it was

16  like the end of that month, like January 30th or

17  something in 2024 is when he --

18      A.   Yes.

19      Q.   -- actually left?

20      A.   Yes.

21      Q.   Okay.

22      A.   I think so.

23           MR. WIEST:  Let him finish asking.

24           THE WITNESS:  Sorry.

25           MR. MILLER-NOVAK:  It's okay.  We

Page 88

1          took lunch.  We forgot the rules a little

2          bit.  That's okay.  Getting a little bit

3          rebellious now.

4     Q.    So between October 16, 2023, and he left

5  finally -- we just said January 30, 2024 -- trying

6  to do math -- a little over three months then,

7  correct?

8     A.    Correct.

9     Q.    Okay.  Thank you.  In that entire time was

10 he ever retaliated against?

11               MR. WIEST:  Objection to form.

12    A.    I don't know.

13    Q.    Okay.  Were you aware of him ever being

14 disciplined after you wrote this letter?

15    A.    I was not aware.

16    Q.    Okay.  Were you aware -- did he tell you

17 he was ever disciplined because of this letter?

18    A.    I don't believe so.

19    Q.    Did he ever tell you he was disciplined at

20 all after you wrote this letter?

21    A.    No.

22    Q.    Okay.  Were you ever threatened or

23 anything like that after you wrote this letter?

24    A.    No.

25    Q.    Did anybody ever -- did you ever talk to

Page 89

1    Jay Gramke at all?

2         A.    No.

3         Q.    Have you ever talked to Jay Gramke ever?

4         A.    No.

5         Q.    So Jay Gramke has never contacted you?

6         A.    No.  He has only spoken about me to other

7    people.

8         Q.    Okay.  So he didn't respond to this

9    letter?

10        A.    No.

11        Q.    Has Sheriff McGuffey ever responded to

12   this letter?

13        A.    Not to me.

14        Q.    Okay.  Did she ever threaten you?

15        A.    No.

16        Q.    Have you ever felt like you had suffered

17   some consequence for your speech?

18        A.    I did suffer consequences because of my

19   speech.

20        Q.    What consequence?

21        A.    My husband got denied promotions, both

22   RENU and corporal.  They stated it many times in the

23   recording.

24        Q.    What corporal position was he denied?

25        A.    The corporal's list that he was on, that

Page 90

1    he was eligible on, where you said he was number 19.

2        Q.   Do you know if they ever had a corporal

3    position open before he left?

4        A.   I do not know.

5        Q.   Okay.  Well, you would agree that he

6    couldn't have been refused the corporal position if

7    one was not open that he was qualified for, correct?

8        A.   That is correct.  The reason why I believe

9    that he was skipped is because Jay Gramke told him,

10   you know I've done this before for the same reason.

11       Q.   Okay.  But you don't know whether or not

12   that had happened yet?

13       A.   I do not.

14       Q.   Okay.  Have you suffered any employment

15   consequences of any of your speech?

16       A.   Because he switched jobs, I haven't looked

17   for full-time employment so that I can take care of

18   things at home.  Because he's now 11 to 11 --

19   11 a.m. to 11:00 p.m., which means I couldn't work

20   first shift.  We have a dog that has cancer, so I

21   need to be home.  So I think that is probably

22   preventing me from getting full-time employment

23   currently.

24       Q.   When did you sell the Gold Roof?

25       A.   Gold Top Dairy Bar was sold in the fall of

1 2021.

2     Q.   So you hadn't been employed since fall of

3 2021?

4     A.   No.  I did work -- I did have employment

5 at Harrison High School for two school years until

6 my son graduated in 2024.  That was part-time.

7     Q.   What were you doing at Harrison part-time?

8     A.   Working in the kitchen.  It was a

9 three-hour-a-day position.

10     Q.   And when did you stop doing that?

11     A.   May of 2024 when my son graduated.  I took

12 that job so that I could be available for all my

13 son's events until he graduated.

14     Q.   But Jason started at Springfield -- no,

15 Springdale, right -- is that where he works now,

16 Springdale Police Department?

17     A.   Springdale, yes.  City of Springdale.

18     Q.   But he started there in February of 2024?

19     A.   Yes.

20     Q.   So for three months you still worked at

21 Anderson, correct --

22               MR. WIEST:  Objection.

23     Q.   -- or Harrison?

24     A.   Yes.  Part-time during school hours, three

25 hours a day.  I was never full-time.

Page 92

1     Q.   Okay.  So when he started at Springdale,
2  you were still able to do the same job that you were
3  doing before he went to Springdale?
4     A.   The part-time, correct.
5     Q.   Why haven't you just continued to work at
6  Harrison?
7     A.   That's a good question.  I think I just
8  wanted the extra time to support him.  He has -- you
9  know, when he worked for the Sheriff's Department,
10  he was top of seniority.  He could get off any day
11  he needed for all of his events, he coaches, things
12  like that.  And at Springdale he's low man on the
13  totem pole, so it's hard for him to get off days for
14  whatever.  So I just feel like it's easier if I hold
15  down the fort at home by not working full-time.
16     Q.   But it's possible that you could have
17  continued to work at Harrison?
18     A.   Sure.  Part-time.
19     Q.   Okay.
20     A.   It's possible.
21     Q.   So you just chose to no longer do it?
22     A.   Correct.
23     Q.   Okay.  And you blame that on Hamilton
24  County?
25     A.   No.  I blame that on my husband's schedule

Page 93

1    that I needed to be home.

2         Q.   Had he gotten the RENU promotion, how

3    would you know what his schedule would have been if

4    he went to RENU?

5         A.   Well, his brother is in RENU, so maybe his

6    schedule would have been similar to his brother's.

7         Q.   Well, isn't part of your allegations that

8    he would have had more overtime if he went to RENU?

9         A.   Can I see it in the. . .

10              MR. MILLER-NOVAK:  Sorry.  You can.

11              I don't mean to ignore you.  I'm just

12              seeing if I could find a place where it's

13              talked about so you're not hunting for it.

14              Andy found it for us.

15              THE WITNESS:  Thank you.

16              MR. PREM:  It was just already open.

17              MR. MILLER-NOVAK:  He got lucky.

18         Q.   All right.  It looks around 46, 47?

19         A.   Yes.

20         Q.   All right.  So it's possible his schedule

21    would have changed in ways that would have affected

22    your employment decisions anyways then, correct?

23         A.   Sure.

24         Q.   Okay.  So I'm not asking how you believe

25    Jason was financially harmed.  I'm asking you.  How

Page 94

1   do you believe you were financially harmed?

2       A.   Well, we share -- our incomes are shared,

3   so anything that would have been damaging to him

4   would have been damaging to me.

5       Q.   But I think you said that he's a grown man

6   and he can kind of make his own decisions, correct?

7       A.   Correct.

8       Q.   Okay.  So he can make whatever income

9   decision he wants, correct?

10      A.   Correct.

11      Q.   And he can make any employment decision he

12  wants, correct?

13      A.   Correct.

14      Q.   Okay.  In addition, he could have also

15  chosen to not quit his job at the Sheriff's

16  Department, correct?

17      A.   I don't believe it was a choice because of

18  the environment.  I don't think his health would

19  have -- his mental health would have allowed him to

20  stay.

21      Q.   But no one at the Sheriff's Department

22  told him he had to quit, correct -- that you know

23  of?

24      A.   No.  They did not tell him that he had to

25  quit.

Page 95

1       Q.    Okay.  And you would agree that he had

2   other options available to him besides quitting,

3   correct?

4       A.    No.

5       Q.    Okay.  So he couldn't -- you realize that

6   part of what your suit is about is the failure to

7   promote Jason, correct?

8       A.    Correct.

9       Q.    Okay.  So you've said that you've been

10  damaged because they didn't give him the RENU

11  position, correct?

12      A.    Correct.

13      Q.    And you've alleged that they failed to

14  promote him to corporal, correct?

15      A.    Correct.

16      Q.    Well, he could have stayed there and filed

17  suit and brought the same lawsuit -- he could have

18  sued the County, he could have sued Sheriff

19  McGuffey, and he could have sued Jay Gramke for the

20  failure to promote him and continued to be employed

21  there, couldn't he have?

22      A.    But in the meantime his mental health

23  could have been so bad that he could have offed

24  himself.  So in my mind, no, it wasn't an option for

25  him to stay.

Page 96

1       Q.    Okay.  You said could have.  Do you know
2   that those things would have happened?
3       A.    No, I don't.
4       Q.    Okay.  So I'm not asking you to speculate
5   right now.
6       A.    Okay.
7       Q.    I'm asking you to tell me what is possible
8   mechanically, if you will.  Are you aware that an
9   option is to file suit while you continue to work at
10  a place?
11      A.    I agree.
12      Q.    Okay.  So that would have been an option
13  to him?
14      A.    Not a healthy option.
15      Q.    Okay.  You don't believe it would have
16  been a healthy option.  But it would have been a
17  legal option available to you, correct?
18      A.    Correct.
19      Q.    Okay.  Do you know whether or not he could
20  have filed a grievance?
21      A.    I'm not sure what his policies are on
22  grievances.
23      Q.    Did he ever talk to you about the
24  possibility of filing a grievance?
25      A.    I do not recall.

1      Q.   Are you aware that he has a union

2  contract?

3      A.   Yes.

4      Q.   Are you aware that sometimes in union

5  contracts you have the ability to file grievances?

6      A.   No.  I've never been in a union, so I

7  don't understand.

8      Q.   Do you know if you ever met with somebody

9  from the union?

10     A.   I do not know.

11     Q.   So earlier you said you could not support

12 him staying at the County, correct?

13     A.   Correct.

14     Q.   Okay.  Did you ever threaten to divorce

15 him?

16     A.   No.

17     Q.   Did he ever threaten to divorce you?

18     A.   No.

19     Q.   You guys have been married for a very long

20 time, correct?

21     A.   Yes.

22     Q.   And I think earlier we uncovered you were

23 high school sweethearts, correct?

24     A.   Yes.

25     Q.   Been together since -- I'm trying to do

1    the math -- sounds like 1993?

2        A.   Yes.

3        Q.   When the universe still meant something,

4    correct?

5        A.   Yes.

6        Q.   All right.  So at any point in time did

7    you feel like your marriage was in danger of a

8    divorce?  I'm talking about after the meeting with

9    Sheriff McGuffey.

10       A.   I can't speak for him.  I would -- the

11   divorce wouldn't be an option for me, but I can't

12   speak for him.

13       Q.   Okay.  So you had no intention of

14   divorcing him?

15       A.   Not at that time, no.

16       Q.   Okay.  At any other time in your marriage

17   did you have an intention of divorcing him?

18       A.   There were definitely days I would have

19   liked to, but no.

20       Q.   Well, that was two different answers to

21   the same question.

22       A.   Well, what wife doesn't think about that,

23   this guy is on my nerves today.

24       Q.   Okay.

25       A.   Nothing serious, no.

Page 99

1        Q.    Okay.  Do you want to take a minute to

2    clarify the record?  I mean, I'll give it to you.

3        A.    Just ask it again and I'll. . .

4        Q.    Okay.  You've been frustrated with him

5    sometimes, right?

6        A.    Yes.

7        Q.    And maybe wanted to hit him over the head

8    with a frying pan or something like that?

9        A.    Yes.

10        Q.    Okay.  But you never contacted, let's say,

11    a family attorney?

12        A.    No, I've never.

13        Q.    You've never seriously contemplated

14    divorce?

15        A.    No.

16        Q.    Okay.  And for the record, you were just

17    kind of being a little sarcastic then?

18        A.    Yes.

19        Q.    Okay.  There you go.  I helped you out.

20    And has he ever threatened a divorce at any time in

21    your relationship?

22        A.    No.

23        Q.    Okay.  So you don't know of or don't feel

24    that your marriage was actually threatened by the

25    actions of either Sheriff McGuffey or Jay Gramke

 1   then, correct?

 2              MR. WIEST:  Objection to form.

 3        A.   I couldn't say that.  It's still an

 4   ongoing tension in our household, so I couldn't tell

 5   you in the future.

 6        Q.   Okay.  What do you mean by it's an ongoing

 7   tension in your household?

 8        A.   He still has resentment towards me because

 9   he lost out on his dream job.

10        Q.   Have you seen any counselor?

11        A.   No.

12        Q.   Okay.  How do you know that he has

13   resentment towards you?

14        A.   Because he had told me that the reason why

15   he lost his job was because of me.

16        Q.   Has he said that since he initially told

17   you that?

18        A.   We've had conversations that he doesn't --

19   in his head he knows, you know, that I did -- I

20   didn't do anything wrong to harm him, but it's still

21   because of me that he has some resentment that he's

22   never going to have his job.

23        Q.   I'm trying to think how to word this, but

24   do you believe that Sheriff McGuffey has any

25   power -- and what I mean by power, I mean

1    governmental power -- to interfere with your

2    marriage?

3                MR. WIEST:  Objection to form.

4        A.   She did interfere.  Her actions did

5    interfere with our marriage.

6        Q.   I'm talking about does she have any police

7    power, any governmental power to do anything that

8    affects your legal relationship to your husband?

9                MR. WIEST:  Objection to form.

10       A.   I'm sorry.  I don't understand the

11   question.  Can you rephrase?

12       Q.   Well, she doesn't have any power to force

13   you to get divorced, correct?

14       A.   To force, no.

15       Q.   Okay.  So you could only get divorced if

16   you choose to get divorced, correct?

17       A.   Correct.  But she did threaten my

18   husband -- illegally she threatened him.

19       Q.   Does Jay Gramke have any ability to force

20   you to get divorced?

21       A.   He shouldn't, no.

22       Q.   So not long after Jason's meeting with the

23   Sheriff and the Chief, he began employment at

24   Springdale, correct?

25                MR. WIEST:  Objection to form.

1      A.   Correct.

2      Q.   Okay.  I keep wanting to say Springfield.

3  Are you aware that he was contacted by Chief Butler?

4      A.   Yes.

5      Q.   And that he didn't have to apply?

6      A.   Yes.

7           MR. WIEST:  Objection to form.

8      Q.   Well, he did have to apply, but Chief

9  Butler contacted him first, correct?

10     A.   Correct.

11     Q.   Okay.  Do you know when that occurred?

12     A.   I do not.

13     Q.   But you would agree that finding new

14  employment came rather easily to Jason, correct?

15     A.   No.  I think it was a very lucky

16  circumstance that Tom Butler was the chief of that

17  police department, because with the stigma that he

18  had against him, I don't know if any -- who else

19  would have hired him, except for somebody that knew

20  his character like Tom Butler.  Tom Butler knew that

21  Jason wasn't a malcontent.  He didn't do any of

22  these -- you know, that I wasn't a problem.  So I

23  don't know if rumors and reputation would have --

24  anybody else would have wanted to hire him.

25     Q.   You don't know whether or not that's the

1    case, do you?

2         A.   I do not.  It's my opinion.

3         Q.   So it's just pure speculation then?

4         A.   Yes.

5         Q.   Okay.  You've not actually had anybody

6    tell you that they wouldn't hire Jason?

7         A.   No.

8         Q.   And Jason never applied anywhere and had

9    his application denied?

10        A.   No.

11        Q.   Has anybody ever come up to you and said

12   anything negative about Jason because of you?

13        A.   Can you ask that one more time?

14        Q.   Well, I mean, you know, you said something

15   about his reputation.  I mean, has anybody said

16   anything to you about his reputation?

17        A.   No.

18        Q.   Okay.  Has anybody come up to you

19   unsolicited and talked to you about your

20   relationship with Caroline Adams?

21        A.   No.

22        Q.   Has anybody come up to you unsolicited and

23   talked to you about how you caused your husband to

24   lose his promotion?

25        A.   Yes.

1      Q.    Who?

2      A.    I believe there were some police wives

3   that had made comments about how unfair it was.  And

4   my friends, my family.

5      Q.    Okay.  So all these folks said how unfair

6   it was?

7      A.    Yes.

8      Q.    So it's safe to say that they were on your

9   side?

10     A.    Yes.

11     Q.    Okay.  So they didn't say anything

12  negative about Jason, correct?

13     A.    Correct.

14     Q.    Okay.  So they didn't say anything that

15  would suggest some sort of stigma then, correct?

16             MR. WIEST:  Objection.

17     A.    Correct.

18     Q.    Kind of like the opposite, correct?

19     A.    And you're just talking about my

20  supporters?

21     Q.    People that have talked to you about it.

22     A.    My supporters.  Correct.  They were on

23  Jason's side.

24     Q.    Okay.  Has anybody said anything terrible

25  about Jason related to it?

1      A.   On social media there were comments on the

2  news article when the lawsuit came out that, you

3  know, he should have kept his wife's mouth shut, he

4  should have known that she couldn't have, shouldn't

5  have said that, he deserves to be punished.  So

6  there have been comments on social media, but I do

7  not know who they are.

8      Q.   Okay.  But those only happened, if you

9  will, because you filed the suit, correct?

10      A.   I don't know if they would say that if we

11  didn't file the suit or not.  I don't know.

12      Q.   Okay.  Have you seen anything on social

13  media talking about it before you filed the lawsuit?

14      A.   No.

15      Q.   Okay.  Do you know, did either of you

16  contact the media when you filed the lawsuit?

17      A.   No.

18      Q.   Do you know if your counsel contacted the

19  media after you filed the lawsuit?

20           MR. WIEST:  Objection.  Don't discuss

21           anything that you've discussed with

22           counsel.

23           If you can answer otherwise, fine.

24      If not --

25      A.   I don't know.

 1                   MR. WIEST:  -- you're not going to

 2          answer.

 3      Q.   Do you know how the media found out about

 4  the lawsuit?

 5      A.   I don't know.

 6      Q.   Did anybody from any media company contact

 7  you for any comments after you filed the lawsuit?

 8      A.   No.

 9      Q.   Are you aware if anybody from the media

10  contacted Jason about the lawsuit after it was

11  filed?

12      A.   I don't know.

13      Q.   So other than these Facebook comments that

14  you've seen that were related to the lawsuit, are

15  you aware of any online comments at all about

16  yourself or Jason related to your Facebook posts?

17      A.   No.

18      Q.   Have you been denied any employment as a

19  result of your posts or negative criticisms of

20  Sheriff McGuffey?

21      A.   No.

22      Q.   Are you aware of any relationships you've

23  lost because of your post about Sheriff McGuffey?

24                   MR. WIEST:  Objection to form.

25      A.   Relationships that aren't there anymore as

1   a result of him not working for the department.

2   Like for an example would be other sheriff deputies'

3   wives at social events, work events that I don't see

4   anymore or keep in contact with, but -- only because

5   he doesn't work there anymore.

6        Q.   Work friends that are no longer work

7   friends?

8        A.   Correct.

9        Q.   Okay.  But they're kind of more -- but

10  they weren't your friends, I guess, outside of work

11  events; is that --

12       A.   Some were.  Some weren't.

13       Q.   Okay.

14       A.   But not seeing each other in, I guess,

15  organized events or things make it less likely that

16  we would communicate.

17       Q.   Have you ever seen any mental health

18  counselors or mental health therapists in your life?

19       A.   Not mental health, no.

20       Q.   It seemed like you were qualifying

21  something.  Is there someone you would see that you

22  think is close to a mental health therapist?

23       A.   Would a marriage counselor count as mental

24  health?

25       Q.   Yeah, I think so.

1       A.    Okay.

2       Q.    So you have seen a marriage counselor?

3       A.    Yes.

4       Q.    When?

5       A.    My son was probably three years old.  So

6    16 years ago.

7       Q.    Was this Jason and yourself that saw a

8    marriage counselor?

9       A.    Correct.

10       Q.    Okay.  Why did you start seeing a marriage

11    counselor?

12       A.    To try to make our marriage stronger.

13    With a young child things got stressful, and we

14    wanted to make sure there were no serious issues in

15    the marriage.  We just wanted to make sure that we

16    were taking care of any small problems before they

17    became big problems.

18       Q.    When you mentioned big problems, is there

19    ever a time in your marriage where you had had big

20    problems?

21            MR. WIEST:  Objection to form.

22       A.    I believe this issue is the biggest issue

23    we've faced in our marriage so far.

24       Q.    Okay.  So no other what you would consider

25    in your marriage any -- nothing like infidelity?

1      A.    Absolutely not.

2      Q.    And no physical separation for some period

3  of time or anything like that?

4      A.    None.

5      Q.    Okay.  And what was the name of the

6  marriage counselor you saw; do you recall?

7      A.    I don't.  It was 16 years ago.

8      Q.    Do you remember where it was; was it like

9  some kind of organization?

10     A.    I can tell you where it was located.  I

11  know they're not there anymore.  But I do not

12  remember the name.  I don't even remember the

13  counselor's name.  It was in Harrison, Ohio.

14     Q.    Okay.  So other than this marriage

15  counseling 16 years ago, you've never seen -- as an

16  individual you've never seen any counselor?

17     A.    No.

18     Q.    Okay.  Have you ever taken any medication

19  for anxiety or depression or anything like that?

20     A.    No.

21     Q.    Have you ever talked to your doctor about

22  receiving medication for mental health at all?

23     A.    No.

24     Q.    Since the meeting with Gramke and McGuffey

25  have you sought out any mental health therapy at all

1  since then?

2       A.   No.

3       Q.   Okay.  And you haven't begun taking

4  anything for anxiety or depression or anything like

5  that?

6       A.   No.

7       Q.   Okay.  Do you have any chronic physical

8  conditions that you have to deal with?

9       A.   Arthritis.  I'm -- this week I'm going to

10  be seen by a rheumatologist from -- sent from my

11  primary doctor.  I've recently had back surgery.

12  And that's it.

13       Q.   Okay.  Nothing that's become worse --

14       A.   No.

15       Q.   -- since the meeting or anything like

16  that?

17       A.   No.

18       Q.   Okay.  Just normal joys of middle age --

19       A.   Knocking on 50s, yes.

20       Q.   Yeah.  I'm sure everybody in this room,

21  except for Andy, feels it.  How old is your child?

22       A.   He's 19.

23       Q.   Okay.  Is that your only son?

24       A.   Only son, yes.  Only child.

25       Q.   And he has kind of a goofy nickname; is

1   that right -- like Meatball or something like that?

2        A.   Yes.  Meatball.

3        Q.   Okay.  All right.  When did he get that

4   name?  I just got to know.

5        A.   When he was born, he had this little round

6   head and he was bald and I said he looks like my

7   little meatball, so that just stuck.

8        Q.   It just stuck.  Now he's Meatball.  Is he

9   okay with that?

10       A.   Yes.

11       Q.   Okay.

12       A.   He embraces it.

13            MR. MILLER-NOVAK:  Okay.  Good for

14            him.  All right.  Could we get a break so

15            we can talk?

16            THE COURT REPORTER:  We're off the

17            record.

18            (A brief recess was taken.)

19            MR. MILLER-NOVAK:  We're done.

20            (Plaintiffs' Deposition Exhibit No.

21            12 was marked for identification.)

22                DIRECT EXAMINATION

23   BY MR. WIEST:

24       Q.   Ma'am, have you seen the transcript of the

25   audio recording that your husband had with Sheriff

1   McGuffey and Chief Gramke?

2        A.    Yes.

3        Q.    Is that what Exhibit 12 is?

4        A.    Yes.

5                    MR. WIEST:  That's all I got.

6                    (Witness excused.)

7            (Deposition concluded at 2:27 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 113

1            A C K N O W L E D G E M E N T

2

3    STATE OF _____    :

4    COUNTY OF _____    :

5

6         I, JENNIFER DAVIS, have read the transcript

7    of my testimony given under oath on May 9, 2025.

8            Having had the opportunity to note any

9    necessary corrections of my testimony on the errata

10   page, I hereby certify that the above-mentioned

11   transcript is a true and complete record of my

12   testimony.

13

14

15         _____

16                    JENNIFER DAVIS

17

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2            I, Kristina L. Laker, Court Reporter and

3    Notary Public, do hereby certify:

4            That the witness named in the deposition,

5    prior to being examined, was duly sworn;

6            That said deposition was taken before me

7    at the time and place therein set forth and was

8    taken down by me in shorthand and thereafter

9    transcribed into typewriting under my direction and

10   supervision;

11           That said deposition is a true record of

12   the testimony given by the witness and of all

13   objections made at the time of the examination.

14           I further certify that I am neither

15   counsel for nor related to any party to said action,

16   nor in any way interested in the outcome thereof.

17           IN WITNESS WHEREOF I have subscribed my

18   name and affixed my seal this 26th day of May, 2025.

19

                        /s/ Kristina L. Laker
20                      _____
                        Kristina L. Laker
21                      Notary ID 592345
                        My Commission expires: 12/21/25
22

23

24

25