IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT CINCINNATI


JASON DAVIS and                 :
JENNIFER DAVIS,
                                :
          Plaintiffs,
vs.                             :  Case No. 1:24-cv:0202

CHARMAINE McGUFFEY, et al., :

          Defendants.           :


\* \* \* \* \* \* \* \*

DEPONENT:          Charmaine McGuffey

DATE:              May 5, 2025

\* \* \* \* \* \* \* \*


Kristina L. Laker

Court Reporter


BARLOW REPORTING & VIDEO SERVICES, LLC
620 Washington Street
Covington, Kentucky 41011
(859) 261-8440

1     The videotaped deposition of CHARMAINE McGUFFEY

2    taken for the purpose of discovery and/or use as

3    evidence in the within action, pursuant to notice,

4    heretofore taken at the Hamilton County Prosecutor's

5    Office, 230 East Ninth Street, Suite 4000,

6    Cincinnati, Ohio, on May 5, 2025, at 9:00 a.m., upon

7    oral examination, and to be used in accordance with

8    the Federal Rules of Civil Procedure.

9            * * * * * * * *

10           APPEARANCES

11   REPRESENTING THE PLAINTIFFS:

12   Christopher Wiest, Esq.
       CHRIS WIEST, ATTY AT LAW, PLLC
13   50 East Rivercenter Boulevard, Suite 1280
       Covington, KY 41011
14

       Thomas B. Bruns, Esq.
15   BRUNS, CONNELL, VOLLMAR & ARMSTRONG LLC
       40 North Main Street, Suite 2010
16   Dayton, OH 45423

17

       REPRESENTING THE DEFENDANTS:
18

       Stephen A. Simon, Esq.
19   Matt Miller-Novak, Esq.
       Andrew E. Prem, Esq.
20   HAMILTON COUNTY PROSECUTOR'S OFFICE
       230 East Ninth Street, Suite 4000
21   Cincinnati, OH 45202

22

       ALSO PRESENT:  Jason Davis, plaintiff
23               Jennifer Davis, plaintiff
                 Peter Stackpole, legal liaison
24               Connie Adkins-Ihle, videographer

25

```
 1                    I N D E X

 2                                        Page

 3  Cross-Examination by Mr. Bruns:          5

 4

 5

 6               E X H I B I T S

 7  Plaintiffs' Deposition Exhibit No. 24    23

 8  Plaintiffs' Deposition Exhibit No. 27    102

 9  Plaintiffs' Deposition Exhibit No. 26    112

10  Plaintiffs' Deposition Exhibit No. 25    126

11  Plaintiffs' Deposition Exhibit No. 28    187

12  Plaintiffs' Deposition Exhibit No. 29    270

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE VIDEOGRAPHER:  We are on

2     videotape record.  Today is Monday,

3     May the 5th, 2025.  The time is 9:08 a.m.

4          We're here today to take the

5     deposition of Charmaine McGuffey in the

6     case styled Jason Davis and Jennifer Davis

7     versus Charmaine McGuffey, et al., in the

8     United States District Court for the

9     Southern District of Ohio, Western

10    Division at Cincinnati, Case No.

11    1:24-cv-0202.

12         Would the attorneys now introduce

13    themselves and state whom they represent.

14         MR. BRUNS:  Tom Bruns on behalf of

15    Plaintiffs Jason and Jennifer Davis.

16         MR. WIEST:  Chris Wiest on behalf of

17    the Davises.

18         MR. SIMON:  Steve Simon on behalf of

19    the Defendants.

20         MR. MILLER-NOVAK:  Matt Miller-Novak

21    on behalf of Defendants.

22         MR. STACKPOLE:  Peter Stackpole on

23    behalf of the Sheriff.

24         MR. PREM:  Andy Prem on behalf of the

25    Defendants.

1           THE VIDEOGRAPHER:  Would the court

2       reporter please swear in the witness.

3           THE COURT REPORTER:  All right.

4       Would you please raise your right hand.

5           THE WITNESS:  (Complies.)

6           THE COURT REPORTER:  Do you solemnly

7       swear that the testimony you're about to

8       give will be the truth, the whole truth,

9       and nothing but the truth?

10          THE WITNESS:  I do.

11          THE COURT REPORTER:  Thank you.

12           CHARMAINE McGUFFEY,

13  of lawful age, as having been duly sworn, as

14  hereinafter certified, was examined and testified as

15  follows:

16           CROSS-EXAMINATION

17  BY MR. BRUNS:

18      Q.   Sheriff, I introduced myself to you a

19  minute ago.

20      A.   Uh-huh.

21      Q.   My name is Tom Bruns.  I have the pleasure

22  of representing Jason and Jennifer Davis in the

23  lawsuit against you.  And we're here today because

24  this is our opportunity to take your deposition.  I

25  assume you've given a deposition before?

1       A.    I have.

2       Q.    All right.  So I won't go through all the

3    ground rules.  As you know, attorneys like to kind

4    of educate witnesses on how to give a deposition.  I

5    assume you've talked to your counsel about what --

6    you know, how to do this, so I won't go into it.

7              But have you ever testified in court

8    before?

9       A.    I have.  It's been quite a while, so I

10   couldn't tell you exactly the year.  But, yes, I

11   have.

12      Q.    Okay.  And when you went into court, you

13   were sworn in to tell the truth, you were under

14   oath, correct?

15      A.    Correct.

16      Q.    And you understand you're under oath here

17   today?

18      A.    Yes, I do.

19      Q.    All right.  And you understand you're

20   being recorded today?

21      A.    Yes, I do.

22      Q.    All right.  Is there any reason that

23   you're aware of as you sit here that you're unable

24   to testify truthfully today?

25      A.    No.  No reason at all.

1       Q.   All right.  And, you know, there's

2   different reasons, somebody could be on medication

3   that would affect their ability to recall or

4   perceive or things like that.

5            As you sit here you're unaware of any

6   issue like that?

7       A.   Absolutely.

8       Q.   Great.  My purpose today is to end up when

9   we're done --

10      A.   Uh-huh.

11      Q.   -- knowing what you know.  And I will tell

12  you, that is an impossible task.  I've never

13  achieved it, okay?

14      A.   Okay.

15      Q.   But I'm going to do my best and I -- and

16  what that means is -- I'm going to apologize in

17  advance, I'm not trying to be nosy --

18      A.   Uh-huh.

19      Q.   -- but I have to make sure I understand

20  your testimony and --

21      A.   Of course.

22      Q.   -- I understand the extent of your

23  knowledge about the events we're here to discuss,

24  all right?

25      A.   Yes, sir.

1      Q.   All right.  Great.  What's your full name?

2      A.   My full name is Sheriff Charmaine

3  McGuffey.

4      Q.   And what's your business address?

5      A.   My business address is 900 -- 900 Sycamore

6  Street.  ZIP code 45202.

7      Q.   And what's your business phone?

8      A.   My business phone is going to be my

9  personal phone as well.  So it's 513-404-5424.

10      Q.   All right.  And you're the elected Sheriff

11  of Hamilton County?

12      A.   I am.

13      Q.   And that means you are the top elected

14  official in that department?

15      A.   Yes, sir.

16      Q.   Okay.  Is it fair to say the buck stops

17  with you in the Hamilton County Sheriff's

18  Department?

19      A.   Yes, sir.

20      Q.   All right.  When did you first get

21  elected?

22      A.   I was first elected in November of 2020.

23  I took office January 4th, 2021.

24      Q.   All right.  And how long have you been an

25  employee of the Hamilton County Sheriff's

 1    Department?

 2        A.    I have been an employee 40 years.

 3        Q.    All right.

 4        A.    Give or take a month.

 5        Q.    All right.

 6        A.    Okay.

 7        Q.    And that was all continuous except for a

 8    year or so?  Just tell me about that.

 9        A.    So in 2009, on February 17, I was laid off

10    with a number of people because of the 2008 crash --

11    economic crash.  And I was brought back on.  My

12    first day was April 5, 2010.

13        Q.    Okay.  And then was there any other period

14    of separation?

15        A.    I'm sorry.  April 1, 2010.

16        Q.    All right.  Was there any other period of

17    separation from the Hamilton County Sheriff's

18    Department in that 40-year period other than that?

19        A.    No, sir.

20        Q.    What did you do to -- what did you review

21    to prepare today?

22        A.    So I read the complaint and -- I reviewed

23    the complaint at various times.  I spoke to my

24    representation.

25                    MR. SIMON:  He doesn't want to know

1           that you spoke to us --

2                   MR. BRUNS:  Yeah.

3                   MR. SIMON:  -- or your attorneys.

4                   MR. BRUNS:  So we're clear --

5                   MR. SIMON:  He was asking you a

6           different question.

7                   MR. BRUNS:  Yeah.

8     BY MR. BRUNS:

9        Q.   So we're clear --

10       A.   Oh.

11       Q.   -- I specifically said what did you review

12    to prepare --

13       A.   Okay.

14       Q.   -- all right?

15       A.   So I reviewed the complaint.

16       Q.   All right.  And just so you know, any

17    question I ask you today --

18       A.   Uh-huh.

19       Q.   -- I'm not asking you to tell me something

20    that your counsel told you.

21       A.   Oh, certainly.  Yes.

22       Q.   Okay.  All right.  So you read the

23    complaint.  Did you read all of it, including the

24    exhibits?

25       A.   I did, sir.

1      Q.   Great.  And you had read it before --

2   before prepping for your deposition; is that fair?

3      A.   Yes, that's correct.

4      Q.   Did you read it when it was initially

5   filed?

6      A.   When it was initially filed, it was given

7   to me and I read it.

8      Q.   All right.  Did you review Deputy -- I'm

9   going to call him Deputy Chief Gramke.  How should I

10   --

11      A.   Chief Gramke is good.

12      Q.   Okay.

13      A.   It's a good title.

14      Q.   All right.  Did you review Chief Gramke's

15   deposition transcript or any part of it?

16      A.   No.

17      Q.   All right.  Other than your lawyers did

18   you talk to anybody about his testimony, including

19   Chief Gramke?

20      A.   No, I did not.

21      Q.   So you don't know -- you don't have an

22   opinion on whether any or part of his testimony was

23   truthful or untruthful?

24      A.   I would have no idea.

25      Q.   Okay.  Other than your lawyer did you

1    communicate with any of your lawyers, your team

2    here -- did you communicate with anyone regarding

3    your deposition today?

4        A.   No.

5        Q.   You acknowledged previously that you

6    understand you're under oath, correct?

7        A.   Yes, sir.

8        Q.   And you also testified that you understand

9    that's no different than being in a courtroom, fair?

10       A.   Of course.

11       Q.   All right.  And is it your understanding

12   that being under oath means you're required to tell

13   the truth, the whole truth, and nothing but the

14   truth?

15       A.   That's correct.

16       Q.   All right.  And you are a sworn law

17   enforcement officer?

18       A.   Yes, I am.

19       Q.   All right.  And I know you said you

20   testified in court.  How many times in your career

21   do you think you testified in court?

22       A.   Oh, man.  You know, I would say in my

23   recollection two -- I'd say two -- two is a pretty

24   solid number, I'd say.

25       Q.   Okay.  You're sure about that; it might be

1   more?

2        A.   It may be more.  But I -- you know, I --

3   yeah.  It may be more.

4        Q.   Okay.  And as far as at least two times

5   you recall testifying in court, was it part of a

6   criminal trial where there was a criminal defendant

7   being charged?

8        A.   In my recollection it more had to do with

9   issues surrounding use of force.  I was a use of

10  force instructor in the academy, a trainer for many

11  years.  So my role in any court proceeding would

12  have been in that to testify in that training arena

13  of what we train, how we train.

14       Q.   Okay.  So you were there more as a fact

15  witness about training methods, techniques, things

16  like that, what was appropriate --

17       A.   Absolutely.

18       Q.   -- training on use of force?

19       A.   Yes, sir.

20       Q.   All right.  And you're jumping on the end

21  of my question.  And I do that, too.  So just let me

22  get it out --

23       A.   Oh, certainly.

24       Q.   -- just so --

25       A.   Okay.  Sure.

1       Q.   I'm sure your lawyers will be happy that

2   you don't answer yes to something unless you fully

3   know the question, all right?

4       A.   Sure.

5       Q.   All right.  So you don't recall testifying

6   in court as like an arresting officer?

7       A.   No, sir.

8       Q.   Okay.  But that's something that Hamilton

9   County Sheriff's Deputies do all the time, fair?

10      A.   Yes.

11      Q.   Okay.  And you would agree that whether

12  you're testifying as a use of force fact witness or

13  even an expert in a case --

14      A.   Uh-huh.

15      Q.   -- or you're testifying as an arresting

16  officer --

17      A.   Uh-huh.

18      Q.   -- that the most important character trait

19  for an employee of the Hamilton County Sheriff's

20  Department is being honest and telling the truth;

21  would you agree with that?

22      A.   Yes, sir, I would.

23      Q.   Okay.  And that doesn't just apply to you

24  as the sheriff, but all your employees; is that

25  fair?

1       A.   Yes.

2       Q.   All right.  And you would agree that our

3  entire system of justice is dependent upon sworn law

4  enforcement officers telling the truth when they're

5  under oath?

6       A.   Yes, sir.

7       Q.   All right.  Would you agree that if a law

8  enforcement officer is proven to have lied under

9  oath, that's fair for a jury not to believe any

10 other of the officer's testimony?

11      A.   Makes sense.

12      Q.   All right.  Have you ever lied when you

13 were under oath?

14      A.   No, sir.

15      Q.   Is it fair to say you understand that --

16 or do you have a recollection that you and Chief

17 Gramke met with Jason Davis on October 10 of 2023 to

18 discuss his career with him?

19      A.   Yes, sir, I do.

20      Q.   Okay.  And I could show you an exhibit,

21 but there was a green card that Jason Davis had to

22 fill out to request a meeting with you; is that

23 fair?

24      A.   Yes, sir.

25      Q.   Okay.  And the copy that's been provided

1    to us has a signature of Charmaine McGuffey; do you

2    recall signing that?

3         A.   Yes, sir.

4         Q.   All right.  And did it have to go through

5    a chain of command to get to you in terms of getting

6    that meeting?

7         A.   Yes, it does.

8         Q.   Okay.  And what was the point of that,

9    going up that chain of command?  Because the green

10   card has signatures of various officers of the

11   Hamilton County --

12        A.   Sure.

13        Q.   -- Sheriff's Department on it.

14        A.   So the purpose of chain of command in

15   general is that it gives an officer a remedy for

16   something that they have not gotten a satisfactory

17   answer for or something that they don't still

18   understand after talking to their immediate

19   supervisor.  And then the supervisor -- as the

20   employee expresses I want to go higher, that is what

21   the chain of command is for.  And that is what that

22   memo represents and documents.

23        Q.   Okay.  So does that memo with the

24   signatures on it -- and it was marked previously as

25   Exhibit 18 in Chief Gramke's deposition --

1          A.     Uh-huh.

2          Q.     -- does that memo reflect a series of

3    meetings before it gets to you on October 10 of

4    2023?

5          A.     My understanding through chain of command

6    and policy and procedure is that that employee who

7    requested that meeting would have met with a series

8    of supervisors leading up to a chief deputy and then

9    the sheriff.

10         Q.     Okay.  All right.  And it's your belief

11   that that happened with Jason Davis before you and

12   Chief Gramke having the meeting on October 10?

13         A.     Absolutely.

14         Q.     Okay.  And so if it gets to you, it's your

15   understanding that this is a -- this deputy has a

16   significant serious concern, so serious and so

17   significant he actually wants to talk to the boss

18   about it?

19         A.     Yes.  Correct.

20         Q.     Okay.  And it was your understanding that

21   the point of this meeting was Jason Davis's concerns

22   about his future with the Hamilton County Sheriff's

23   Department?

24         A.     I had no idea what Jason Davis had, you

25   know, requested the meeting about in general.  But I

1  knew there was a memo requesting the meeting and so

2  therefore we had the meeting.

3      Q.   All right.  Your counsel has a copy of

4  Exhibit 18.  I'll just ask a question about that.

5      A.   Sure.

6          THE VIDEOGRAPHER:  We need to go off

7      the record for a second.

8          MR. BRUNS:  Sure.

9          THE COURT REPORTER:  We are off the

10     record.

11         (Off the record.)

12         THE VIDEOGRAPHER:  Back on the

13     record, 9:21.

14 BY MR. BRUNS:

15     Q.   Sheriff, I'm going to hand you what's been

16 marked as Exhibit 18 --

17     A.   Uh-huh.

18     Q.   -- Plaintiffs' Exhibit 18.

19     A.   Yes, sir.

20     Q.   And can you tell me, is that your

21 signature on that document?

22     A.   Yes, it is.

23     Q.   Among others?

24     A.   Yes, it is.

25     Q.   Who all signed that document?

1        A.    So it appears Sergeant Viner, Lieutenant

2   Downing.  I cannot read the other signature, but

3   it's a Captain.  Major Chris Kettman.  Chief Jay

4   Gramke.  And then myself.

5        Q.    All right.  And so with your signature on

6   that document, it means you had the original of it

7   and reviewed it before you signed it; is that fair?

8        A.    Yes.

9        Q.    Okay.  And then if you look at what the

10  purpose of the meeting that you would have reviewed,

11  what did it say?

12       A.    This was not on the document that was

13  shown to me, this particular -- this is a Stick-Em

14  note that someone put on there.  And when I was

15  reviewing this, this was not on there.

16       Q.    Okay.  When you say this, you're talking

17  about the note about RENU, correct?

18       A.    Yes.  Correct.

19       Q.    I'm not -- I apologize.  That's not my

20  question.

21       A.    Sorry.

22       Q.    I'm talking about the preprinted --

23       A.    I'm sorry.

24       Q.    -- typed information from Jason --

25       A.    Oh, yes.

1    Q.    -- as to --

2    A.    Oh, here.

3    Q.    Hold on.

4    A.    Okay.

5    Q.    Let me just finish.  What Jason said,

6  which is what you would have reviewed, the

7  purpose --

8    A.    Uh-huh.

9    Q.    -- of this meeting.  Go ahead and read

10  that.

11    A.    So the purpose of the meeting appears to

12  be in regards to my future status with the

13  department.

14    Q.    Okay.  So you understood that he had

15  persisted through the entire chain of command to get

16  to you because he had serious and significant

17  concerns about his future status with the

18  department; is that fair?

19    A.    It doesn't say anything about concerns.

20  It says at your earliest convenience in regards to

21  my future status with the department.

22    Q.    Is it fair to say that he had concerns

23  about his future status, that's why he --

24    A.    I've met with many people with a letter

25  that's worded very similar to this who simply want

1   to say, you know, how am I doing, you know, where

2   can I go from here, I have an interest in this

3   particular thing, how do I get there.  There's lots

4   of questions that people have when they request it.

5         Sometimes there are people that come and

6   discuss prior discipline.  There are people that

7   come and discuss their personal lives and, you know,

8   how they're moving forward.  I mean, it's a whole

9   array of things.  I've met with many people with

10  this similar wording.

11     Q.   Okay.  Regardless, when you did have the

12  meeting, you learned pretty quickly that he had

13  concerns -- serious and significant concerns about

14  his future with the department; is that fair?

15     A.   At that meeting pretty immediately that's

16  what I understood.

17     Q.   Thank you.  Did you -- before actually

18  having the meeting, did you discuss the meeting with

19  anyone else in the department, like Chief Gramke,

20  anybody?

21     A.   No.  In fact, I asked Chief Gramke because

22  I was curious -- I said, What is this about?  And

23  his comment was about officers who were out at a

24  district that Jason was assigned to that were

25  malcontents -- and that's a phrase that goes way

1   back to Simon Leis that we're all familiar with --

2   and that he felt that the malcontents were

3   influencing Jason.  That's what he said.

4        Q.   Okay.  Did he tell you anything else?

5        A.   No, sir.

6        Q.   Okay.  You've read the complaint.  You

7   have -- is it fair to say you understand that what

8   you and Chief Gramke said in that October 10 meeting

9   forms a basis of this lawsuit -- allegedly said,

10  fair?

11       A.   Yes, sir.

12       Q.   Okay.  As sheriff have you ever lied to

13  any of your officers when you met with them to

14  discuss their careers or their future --

15       A.   Absolutely not.

16       Q.   -- with the department?  All right.  So

17  you've always told the truth to them when you've met

18  in those circumstances?

19       A.   I tell the truth, yes, sir.

20       Q.   Okay.  Including when you met with Jason

21  Davis on October 10 of 2023?

22       A.   Yes, sir.

23       Q.   Okay.  Did Chief Gramke when you went

24  through that meeting on October 10, 2023, with Jason

25  Davis and you --

1      A.    Uh-huh.

2      Q.    -- did Chief Gramke ever lie to Jason

3   Davis?

4      A.    I would have no idea, sir.

5      Q.    From what you recall do you have any

6   recollection that he said --

7      A.    I have no --

8      Q.    Let me just finish.

9      A.    Sorry.

10      Q.    Do you have any recollection that he said

11   anything that you knew to be untrue?

12      A.    No, I don't.

13                  (Plaintiffs' Deposition Exhibit No.

14                  24 was marked for identification.)

15      Q.    Sheriff, I'm going to hand you what's been

16   marked as Exhibit 24 -- Plaintiffs' Exhibit 24.

17      A.    Yes, sir.

18      Q.    And take a moment -- we can even go off

19   the record while you do it -- I'm going to have a

20   couple of questions for you initially.  And those

21   questions initially are can you answer the question

22   as to whether this is a true and accurate copy of

23   your answers to my clients' discovery requests,

24   minus the documents that were attached to it, and

25   then also is all the information -- not the

Page 24

1  objections, but the information you provided true

2  and accurate.

3        So I want you to have a moment to review

4  it so you're comfortable answering those questions,

5  and then I'm going to have substantive questions

6  about it as well, all right?

7      A.   All right.

8            MR. BRUNS:  So we can go off the

9            record while you review it.

10           THE VIDEOGRAPHER:  Off the record,

11           9:27.

12           (Off the record.)

13           THE VIDEOGRAPHER:  Back on the

14           record, 9:35.

15  BY MR. BRUNS:

16      Q.   Sheriff, you had a moment to -- we were

17  off camera, off record -- you had a moment to review

18  the document, Exhibit 24.  Are you able now to say

19  that that -- with the exception of the documents

20  that were attached to it and produced with it, are

21  you able --

22      A.   Uh-huh.

23      Q.   -- to say that that is a true and accurate

24  copy of your answers to my clients' interrogatories

25  and requests for production of documents?

Page 25

1       A.   I am able to say that my recollection is

2  very similar to what is stated in this document.  It

3  was a long time ago now -- years, in fact.  And, you

4  know, I don't know that I can say that word for word

5  I remember each and every thing.

6       Q.   Okay.  Maybe you misunderstand my

7  question.

8       A.   Okay.

9       Q.   My question simply was, is Exhibit 24 a

10 true and accurate copy of your answers to my

11 clients' interrogatories and document requests,

12 not -- I'll get to the substance of what's in there.

13      A.   Okay.

14      Q.   I'm simply asking is that a true and

15 accurate copy of the original?

16      A.   Oh, yes.  Absolutely.

17      Q.   Okay.

18      A.   Sure.

19      Q.   Thank you.

20      A.   Thank you.

21      Q.   And if you go to page 22 of that document

22 --

23      A.   Uh-huh.

24      Q.   -- there's a verification that it purports

25 to have your signature.

1        A.   Yes, sir.

2        Q.   All right.  Would you read that?

3        A.   It says, I, Charmaine McGuffey, swear that

4   the answers I have given to the above

5   interrogatories are true and based upon my personal

6   knowledge.

7        Q.   All right.  And then whose signature is

8   that?

9        A.   And then that is my signature dated

10  9/25/24.

11       Q.   Thank you.  All right.  And is it fair to

12  say that we can rely upon the substance of the

13  answers in here in terms of their truthfulness, just

14  like the substance of your testimony today?

15       A.   I would say that's factual, yes.

16       Q.   All right.  And I know attorneys do the

17  objections, so my questions aren't about objections,

18  all right, but I'm going to have some questions

19  about the substance.  So if you go to page 10.

20       A.   Yes.

21       Q.   All right.  What is RENU?

22       A.   So RENU is our regional narcotics unit.

23       Q.   And would you agree that making an officer

24  who gets appointed or gets assigned to RENU, that

25  would be, for instance, a promotion for a patrol

1    officer?

2         A.   Well, it would be by virtue of the fact

3    that our RENU officers make a -- they are now --

4    they're -- let me say it this way.  Their pay grade

5    is that of a corporal.

6         Q.   Okay.  And was that true back in 2023?

7         A.   Yes, sir.

8         Q.   Okay.  If you go to Interrogatory -- or,

9    I'm sorry, Request to Admit No. 3 on that page.

10        A.   Okay.  Yes.

11        Q.   It says, Admit that during the October 10,

12   2023, meeting Chief Deputy Gramke told Jason Davis

13   in your presence that, quote, I can tell you that I

14   squashed you going to RENU, closed quotes.  Did I

15   read that accurately?

16        A.   You read it accurately.

17        Q.   Okay.  And then your response was, I

18   cannot admit or deny due to insufficient

19   recollection.

20        A.   That is correct, because --

21        Q.   All right.

22        A.   -- yeah.

23        Q.   I'll get a question, I promise.

24        A.   Okay.  I know.

25        Q.   I promise, Sheriff.  All right.  My

1    question to you is, do you recall Chief Deputy

2    Gramke saying anything like that, similar to that,

3    along those lines in that meeting?

4              MR. SIMON:  Note my objection for the

5              record.  At the beginning of this lawsuit

6              the Plaintiffs indicated they had a

7              recording of this meeting.  On behalf of

8              the Defendants we sought that.

9              That issue was litigated before Judge

10             Barrett.  He issued a decision whereby we

11             at the moment of your deposition --

12             Sheriff McGuffey's deposition we still

13             don't have that recording.  We object to

14             questions asked about her recollection

15             about that.  I mean, obviously if she

16             heard the recording, that would answer

17             that.

18             But you can go ahead and answer the

19             question.

20             MR. BRUNS:  And just for the record,

21             I'll give you a continuing objection on

22             that basis to any questions that call for

23             her recollection about the meeting.

24             MR. SIMON:  Fair enough.  Thank you.

25             MR. BRUNS:  All right.  So read my

Page 29

 1                question back, if you would.

 2                     THE COURT REPORTER:  Sure.

 3                     "My question to you is do you recall

 4                Chief Deputy Gramke saying anything like

 5                that, similar to that, along those lines

 6                in that meeting?"

 7        A.    Yes, I do.

 8        Q.    Okay.  And what do you recall Chief Gramke

 9   saying about -- along the lines of him squashing

10   Jason Davis going to RENU?

11        A.    I remember him addressing the fact that he

12   did not approve an assignment for Jason Davis going

13   to RENU.

14        Q.    Okay.  And do you recall his reasoning for

15   saying so?

16        A.    Again, I don't have any recollection of

17   his exact wording or how he -- you know, how he put

18   that.  I do know that he said I -- I -- you're not

19   going to go to RENU in part.  I mean, that's what I

20   remember him saying.

21        Q.    Okay.  And just so you know, that wasn't

22   my question, so I'm going to repeat my question.

23   And I wasn't asking --

24        A.    Of course.

25        Q.    -- exactly what he did.  My question was,

1    do you have any recollection -- and I mean any --

2         A.   Uh-huh.

3         Q.   -- when I use those words -- so do you

4    have any recollection of Chief Gramke telling Jason

5    Davis why Chief Gramke pulled or squashed --

6         A.   I remember.

7         Q.   -- Jason Davis going to RENU?

8         A.   Thank you.  I remember Chief Gramke

9    referencing Facebook and Facebook posts.

10        Q.   Okay.  Do you recall anything else?

11        A.   That's what he said, Facebook and Facebook

12   posts that were negative.

13        Q.   Do you recall anything else that he said?

14        A.   That's it.

15        Q.   And did he discuss negative in what sense?

16        A.   Well, and I'm trying to recall, he -- what

17   I understood is that he felt that the Facebook posts

18   that he was referencing had negative effects on the

19   Sheriff's Office at large.

20        Q.   Okay.  So it was multiple posts that had

21   some sort of negative effect on the Sheriff's

22   Office; that's what he referenced as far as your

23   recollection?

24        A.   Yes, sir.

25        Q.   Do you recall anything else about his

1  comments?

2      A.   That's what I recall.

3      Q.   Okay.  Did he have any discussion or say

4  anything regarding whose Facebook posts were

5  supposedly negative?

6      A.   He referenced a -- I think he referred to

7  her as the crazy lady --

8      Q.   Okay.

9      A.   -- Facebook posts and talked about

10 responses to that Facebook post.

11     Q.   Okay.  And did you -- when he used the

12 word crazy lady, did you have an understanding of

13 who he was referring to?

14     A.   Well, I thought that he was referring to a

15 woman whose name has been told to me is Caroline

16 Adams.

17     Q.   Okay.  And why did you think that?

18     A.   Because she is a person who people have

19 related to me at various times throughout my, you

20 know, interactions with a number of people in the

21 department that there's lots of negative posts out

22 there related to her posting them.

23     Q.   Okay.  Negative posts related to what?

24     A.   To our department in general.

25     Q.   Okay.  To your department in general or to

 1   you?

 2        A.   The department in general and disparaging

 3   remarks about me.

 4        Q.   Okay.  And give me an example of one of

 5   those people and what they said.

 6        A.   I -- first of all, I cannot -- so many

 7   people talk to me.  You're talking about 2023 here

 8   and beyond that, of course, before that.  And I --

 9   you know, we talked about telling the truth here.  I

10   can't honestly tell you someone's name if I'm not

11   sure.  And I'm really not sure.

12        Q.   Did Chief Gramke before October 10, 2023,

13   ever discuss with you posts by Caroline Adams

14   regarding you?

15        A.   Not to my recollection.

16        Q.   Okay.  You said people, meaning plural.

17   Do you recall the name of a single person who

18   discussed negative posts about you that were posted

19   by Caroline Adams?

20        A.   No.

21        Q.   You don't remember anybody?

22        A.   There were so many general discussions

23   surrounding this.  And quite honestly, sir, I -- I

24   just don't listen to that.  I mean, it's not -- it's

25   not something that affects my day to day.  It's not

1    something I'm interested in.  It's not something I

2    need to know.  And quite frankly, I generally just

3    block it out.  I don't even pay attention to it.

4         Q.   All right.  So if Chief Gramke brought up

5    posts by the crazy lady in a meeting with Jason

6    Davis about the future of his career with the

7    department, were you wondering in your mind why the

8    Chief is bringing up posts by Caroline Adams when

9    Jason Davis is there to talk about his future?

10        A.   No.  No, I'm not.  Because I'm listening.

11   I'm not there to evaluate what the Chief knows or

12   doesn't know.  I take him at his -- at his word,

13   which was what he said and he mentioned crazy lady.

14   I assumed that it's the person everybody talks

15   about.

16        Q.   Okay.

17        A.   So I said her name.

18        Q.   All right.  Let's assume he was talking

19   about Caroline Adams, okay?

20        A.   Okay.

21        Q.   What connection could any post by Caroline

22   Adams have to the future of Jason Davis with the

23   Hamilton County Sheriff's Department; what

24   connection could there possibly be?

25        A.   I have no idea.

Page 34

1      Q.   Okay.  Would you agree with me that if

2    Caroline Adams is posting negative things about you

3    or negative things about the department, that that

4    should not have any impact on Jason Davis's career

5    within the Hamilton County Sheriff's Department?

6      A.   It wouldn't occur to me at all that it

7    would have an effect on anyone's career in the

8    Sheriff's Department honestly.

9      Q.   And is it fair to say it shouldn't have an

10   impact on his career; is that -- in other words,

11   there shouldn't be any consequences to Jason Davis's

12   career because of something Caroline Adams is

13   posting on Facebook; is that fair?

14     A.   Jason Davis's career is based on our

15   policy and procedure, our assessment of how officers

16   follow policy and procedure, what their work

17   histories are, and those are the things that we

18   consider, yes, sir.

19              MR. BRUNS:  Would you read my

20          question back.

21              THE COURT REPORTER:  Sure.

22              MR. BRUNS:  I want to make sure you

23          answered my question.

24              THE WITNESS:  Sure.

25              THE COURT REPORTER:  "And is it fair

1          to say it shouldn't have an impact on his

2          career; is that -- in other words, there

3          shouldn't be any consequences to Jason

4          Davis's career because of something

5          Caroline Adams is posting on Facebook; is

6          that fair?"

7     A.   I would say that any Facebook posts -- of

8  which I'm unaware of anything, you know, specific --

9  should not influence our decisions as the Hamilton

10 County Sheriff's Office.

11     Q.   Right.  There shouldn't be any

12 consequences to Jason Davis's career because of

13 something Caroline Adams is posting, fair?

14     A.   I can tell you that I can't -- I can't

15 answer that appropriately because I have no idea

16 what she said, I have no idea what the post was, I

17 -- at that moment in time I am first learning that

18 the Chief Deputy said that he did not select Jason

19 Davis for that post.

20     Q.   That wasn't my question.

21     A.   Okay.

22     Q.   Caroline Adams is not and never has been

23 an employee of the Hamilton County Sheriff's

24 Department; is that correct?

25     A.   To my knowledge.

1      Q.   Okay.  So Jason Davis, his career at the

2    Hamilton County Sheriff's Department and his future

3    at the department -- there's no connection between

4    something as you call her the crazy lady posts on

5    Facebook and Jason Davis's career; is that fair?

6      A.   I'm not going to say that, because I have

7    no idea what she posted.  And if it were something

8    about information, for instance, of a crime or

9    something like that, that we would have to by due

10   process investigate and so forth.

11          So it's just not accurate for me to say in

12   general that we -- you know, that a Facebook post

13   would apply in such a far-reaching way.

14     Q.   So let me give you -- I'm going to give

15   you a predicate to my question and assume for

16   purposes of my question it's true, so I want you to

17   accept it.  Assuming for purposes of my question

18   that Caroline Adams did not post any confidential

19   information, okay, she didn't post anything that

20   would have been some sort of, you know, disclosure

21   of confidential information by someone in the

22   Hamilton County Sheriff's Department, all right,

23   what she posted was merely negative comments,

24   criticism of you, okay -- none of those types of

25   posts could impact -- would have any consequence to

Page 37

1    Jason Davis's career; isn't that fair?

2              MR. SIMON:  Objection to form of the

3         question.  Lack of foundation.  You're

4         asking the witness to speculate.

5              You can try to answer.

6              MR. BRUNS:  Go ahead.

7         A.   So, yes, hypothetically -- as you're

8    speaking hypothetically, I would say the answer to

9    that is it should -- it should not have any bearing

10   on any deputy.

11        Q.   Okay.  And certainly shouldn't be a reason

12   for any consequences to that person's career,

13   correct?

14        A.   As I stated, hypothetically it should not

15   have any consequence or any bearing on any deputy's

16   career.

17        Q.   Thank you.  All right.  If you go to

18   Request to Admit No. 5.

19        A.   Uh-huh.

20        Q.   That request says, Admit that after making

21   the statement in Request for Admission No. 3, Chief

22   Deputy Gramke then said the reason for squashing the

23   RENU appointment was, quote, And that was due to

24   some Facebook things between you and your wife and

25   things that you said and did some time ago, closed

Page 38

1    quote; do you see that?

2         A.    I do.

3         Q.    Do you recall anything like that being

4    said -- I understand you don't remember that

5    specifically, but do you recall anything like that

6    being said in that meeting?

7         A.    I don't.

8         Q.    Okay.   The same questions for Request to

9    Admit No. 6.   It says, Admit that after making the

10   statement in Request for Admission No. 5, Chief

11   Deputy Grampke then said, You put something about a

12   football game.   It would have been nice if we would

13   have been to a football, something about that your

14   wife has made numerous comments to the crazy woman

15   on Facebook.   There's been -- and then it's cut off.

16        A.    Uh-huh.

17        Q.    And your response was you couldn't admit

18   or deny that due to insufficient recollection,

19   correct?

20        A.    That's correct.   Yes.

21        Q.    All right.   And that was a truthful

22   answer, fair?

23        A.    Yes, it is.

24        Q.    Okay.

25        A.    Uh-huh.

Page 39

1      Q.   Do you recall anything like that where
2  Chief Deputy Gramke brought up the fact that
3  Mr. Davis's -- Jason Davis's wife had made numerous
4  comments to the crazy woman on Facebook; do you
5  recall Chief Gramke bringing that up in any way?
6      A.   What I recall that really sticks out in my
7  memory is the football game reference, because when
8  he mentioned that, I had no knowledge of that and
9  that kind of seemed to me to come out of the blue,
10 like what football game.
11     Q.   Yeah, my question was about the comments
12 about your wife has made numerous comments to the
13 crazy woman on Facebook.  Do you recall anything
14 like that in terms of Chief --
15     A.   Other --
16     Q.   -- Gramke saying anything like that?
17     A.   Other than the football reference, I
18 don't.
19     Q.   Okay.  You would agree with me that --
20 just like you said before about the crazy lady and
21 her postings --
22     A.   Uh-huh.
23     Q.   -- that if Jason Davis's wife is
24 commenting on Caroline Adams' Facebook page or
25 liking a post or something along those lines and it

1   doesn't involve any sort of confidential information

2   or, you know, information that can't be disclosed

3   from the Hamilton County Sheriff's Department --

4       A.   Uh-huh.

5       Q.   -- if it just involves criticism or

6   opinions of people like such as yourself, the

7   Sheriff, you would agree that Jason Davis's wife's

8   social media activity should have no bearing, no

9   consequence to Jason Davis's career; is that fair?

10                  MR. SIMON:  Objection to the form.

11                  Lack of foundation.  Calls for

12                  speculation.

13                  You can try to answer.

14      A.   So, as I stated, hypothetically anyone who

15  has made -- anyone who is making Facebook posts that

16  are speculative or regarding someone in the

17  Sheriff's Office, you know, in general should not,

18  as I said, have any bearing on someone who --

19  someone's career per policy, procedure, et cetera.

20      Q.   And obviously shouldn't have a

21  consequence -- any sort of negative consequence to

22  their career, correct?

23      A.   Again, they should -- it should have no

24  bearing on anything that -- any -- anything

25  regarding decisions made upon someone's career.

Page 41

1      Q.   All right.  And certainly those would be

2  consequences; decisions about someone's career are

3  consequences, fair?

4      A.   Well, not really, no.  I don't agree with

5  that.  I think a consequence is very different than

6  decision making about someone's career.

7      Q.   If someone doesn't get a promotion because

8  of a certain reason, then a consequence of that

9  reason is they didn't get the promotion, fair?

10  That's how I'm using it.

11      A.   Well, the way that I understand

12  consequence is like as a punishment.  And we do not

13  promote -- would not promote based upon that.  We

14  promote based upon the qualifications of that

15  person, our policy and procedure, tests.  There's a

16  lot of results that are internal that someone

17  submits to.  And that is the way we promote and we

18  choose the best candidate, period.

19      Q.   All right.  So when you use the word

20  consequence, in your mind you think punishment, you

21  equate those two; is that fair?

22      A.   That's correct.

23      Q.   All right.  Thank you.  If you could go to

24  Request No. 8.

25      A.   Uh-huh.

Page 42

1      Q.   I'm sorry, Request No. 7.  It says, Admit
2  that after Chief Deputy Gramke made the statement in
3  Request for Admission No. 6, you interjected, quote,
4  Caroline Adams.  And you said, I cannot admit or
5  deny due to insufficient recollection.
6           My question to you is -- you've testified
7  that in your mind when he talked about the crazy
8  lady, you immediately thought of Caroline Adams.
9      A.   Uh-huh.
10     Q.   Do you recall ever mentioning her name in
11 that conversation with Jason Davis?
12     A.   I remember mentioning her name.  I already
13 stated that, yes.
14     Q.   You did say her name out loud?
15     A.   I said her name out loud, yes, sir.
16     Q.   Okay.  If you go to No. 8, it says, Admit
17 after the interjection by you in Request for
18 Admission No. 7, Chief Deputy Gramke then made the
19 following statement.  Well, challenging us --
20 challenging us on Facebook -- challenging the
21 administration on Facebook and then having your wife
22 converse with a crazy person that makes lies up --
23 have you looked at the stuff that she writes about
24 her?  Have you seen the crazy stuff that she writes,
25 the terrible things, the vicious -- if that was your

1   mom, if that was your wife, if that was your sister,

2   how would you feel about that?

3          Your response was you couldn't admit or

4   deny that because you had insufficient recollection,

5   correct?

6       A.   Correct.

7       Q.   And that was a truthful answer?

8       A.   Yes, sir.

9       Q.   All right.  But what I read, I read that

10  accurately, correct -- from that request?

11      A.   I have no idea if it's accurate.

12      Q.   No, no, no.  I read it --

13      A.   Oh, you mean --

14      Q.   -- verbatim?

15      A.   -- what's printed here?

16      Q.   Yes.

17      A.   The words printed here, sure.

18      Q.   Okay.  Do you have any recollection about

19  Chief Gramke saying anything like that in the

20  meeting?

21      A.   I know that he referenced obviously the

22  Facebook because of the football game.  It was

23  something about a football game reference and the

24  fact that that wasn't accurate and that these -- and

25  I believe he -- in my recollection what he was

Page 44

1    referencing is how damaging things can be to this

2    department to individual people within the

3    department when people post negative things on

4    Facebook.

5        Q.   Okay.  Assuming for purposes of my

6    question that Chief Gramke used the words terrible,

7    vicious, or crazy things, okay, as it's stated in

8    that quote -- and I think I have your answer for

9    this, but I want to make it clear -- you would agree

10   with me that even if Caroline Adams posted terrible,

11   vicious, or crazy things about you on Facebook, that

12   would have no impact, no consequence to Jason

13   Davis's career, fair?

14       A.   If hypothetically she did, I would have to

15   say hypothetically it shouldn't make a difference to

16   anyone's career.

17       Q.   Thank you.  And as you sit here today --

18       A.   Uh-huh.

19       Q.   -- do you have any personal knowledge that

20   Jason Davis ever said anything that the Hamilton

21   County Sheriff's Department would consider

22   confidential, you know, information Jason Davis

23   learned in the course of his working with the

24   Hamilton County Sheriff's Department -- do you have

25   any personal knowledge that he communicated any

1  confidential information ever to Caroline Adams?

2      A.   Oh, I would have no idea of that.

3      Q.   All right.  And as you sit here today do

4  you have any personal knowledge that Jason Davis

5  communicated any such confidential information ever

6  to his wife?

7      A.   Again, I would have no -- no idea.

8      Q.   And as you sit here today do you have any

9  personal knowledge that Jennifer Davis, Jason's

10  wife, ever communicated any sort of confidential

11  information from the Hamilton County Sheriff's

12  Department to Caroline Adams?

13     A.   I have no idea.

14     Q.   Have you ever reviewed any posts that were

15  purported to be from Caroline Adams whether you

16  looked at the Facebook page itself or someone

17  printed one and showed you; have you ever seen one?

18     A.   No.

19          MR. SIMON:  Okay.  Tom, we've been

20          going about an hour; is this a good time?

21          MR. BRUNS:  It's a great time.

22          THE VIDEOGRAPHER:  We are off the

23          record.

24          (A brief recess was taken.)

25          THE VIDEOGRAPHER:  We are back on the

1           record.  This is Media 2 of today's

2           deposition.  The time is 10:17.

3    BY MR. BRUNS:

4        Q.   Sheriff, we're back on the record.  Do you

5    understand that any time we take a break, you're

6    still under oath?

7        A.   Yes, sir.

8        Q.   Okay.  Great.  When we took a break, I was

9    going to go on to another question, but I wanted to

10   follow up on two things.  When you -- you told me

11   that when you had that meeting on October 10, 2023,

12   there was this process with a green card.  Did

13   you -- and you talked to Chief Gramke very briefly

14   about it.

15           Did you do anything other than have the

16   one conversation with Chief Gramke in advance of the

17   October 10, 2023, meeting; did you do anything, talk

18   to anyone else, review any documentation of anything

19   before that meeting in terms of Jason Davis?

20       A.   No, I did not.

21       Q.   Okay.  So in terms of, you know, where he

22   was on the promotion list for corporal or why -- or

23   that he had applied to RENU and was -- you know, had

24   a position but then it got pulled, like did you have

25   any information like that in advance of the meeting?

1    A.   No.

2    Q.   Okay.  And then before we took a break,

3  you had talked about consequences in your mind being

4  the equivalent of punishment.  In my mind when I

5  use -- if I use the word consequences or

6  accountability, I would liken them the same way.  Do

7  you liken them the same way, consequences and

8  accountability?

9              MR. SIMON:  Objection to the form.

10   Q.   Do they generally -- do you use those

11 words interchangeably?

12             MR. SIMON:  Objection to the form.

13             Vague and ambiguous.

14             You can try to answer.

15   A.   No, I don't.

16   Q.   When you use the word accountability, what

17 do you mean?

18    A.   When I use the word accountability, I

19 mean -- you know, oftentimes we coach employees to

20 reflect on things that they may or may not have done

21 regarding, you know, policy and procedure.  And

22 things that -- there are lots of nuances in this

23 business.  And when we talk about accountability,

24 that simply means that an employee is coachable in

25 that way, that you're able to coach an employee that

1    these are things that you didn't do according to

2    policy, et cetera, and that employee -- it's

3    important that they hear the message.  That's the

4    part of accountability that they hear it and that

5    they can then say to themselves, oh, yes, I see that

6    and then in the future, you know, react differently

7    or do things differently in the way of policy and

8    procedure.

9         Q.    Okay.  I had asked you a number of

10   questions about Caroline Adams' postings and --

11        A.    Sure.

12        Q.    -- any postings Jennifer Davis may have

13   done --

14        A.    Uh-huh.

15        Q.    -- herself.  And, again, with the same

16   caveat that assuming that what Jennifer Davis posted

17   had no confidential or private information from the

18   Hamilton County Sheriff's Department in it, right,

19   it was just things --

20        A.    I have no idea what she posted.

21        Q.    I understand that.  For purposes of my

22   question I want you to assume that whatever she did

23   post had no confidential or secret information from

24   the Hamilton County Sheriff's Department in it,

25   okay -- assuming any of her posts didn't contain

Page 49

1    that kind of information, then there would -- there

2    wouldn't be any accountability to Jason Davis for

3    anything his wife posted; is that fair?

4             MR. SIMON:  Objection to the

5             question.  Lack of foundation.  Calls for

6             speculation.

7             You can try to answer.

8    A.    I can't answer that because, you know,

9    there's so many different nuances and circumstances

10   regarding hypotheticals.  Like I can't -- I can't

11   answer that.

12   Q.    Okay.  Well, give me a hypothetical as to

13   how there can be an accountability to Jason Davis at

14   work -- there could be an accountability to him at

15   work for something his wife posted if her postings

16   did not contain anything confidential or secret or,

17   you know, things that can't be disclosed from the

18   Hamilton County Sheriff's Department if it was just

19   her opinion?

20            MR. SIMON:  Objection to the form of

21            the question.

22            You can try to answer.

23   A.    I can't do that.  I wouldn't even know

24   where to start on creating a hypothetical for

25   anybody.  A hypothetical is inserting things that

Page 50

1   aren't factual potentially.  It's not taking into

2   account that, you know -- again, there are lots of

3   nuances to every situation.  So, no, I can't do

4   that.

5        Q.   Okay.  That wasn't my question.  My

6   question was, how could you as the sheriff hold

7   Jason Davis accountable for something his wife

8   posted?

9        A.   Again, I would have no idea.  I can't even

10  imagine what circumstances you're talking about.  I

11  can't imagine what, you know, some made up for this

12  purpose reason that I would have.  I can't answer

13  that, sir.

14       Q.   So as you sit here today you can't think

15  of any scenario, nothing can come to your mind where

16  it would be appropriate for you as the sheriff to

17  hold Jason Davis accountable for something his wife

18  posted; is that fair?

19            MR. SIMON:  Objection to the form of

20       the question.  It's argumentative.

21            You can try to answer.

22       A.   It wouldn't be factual.  It wouldn't be

23  fair to me to try to make up something that he did

24  or didn't do.  That wouldn't be fair to anybody.

25       Q.   I'm not asking you to make anything up.

Page 51

1    I'm saying you as the sheriff, you would agree with

2    me that as you sit here you can't think of any

3    reason you would ever hold Jason Davis accountable

4    for something his wife would have posted, assuming

5    what she posted didn't contain confidential

6    information of the Hamilton County Sheriff's

7    Department?

8                    MR. SIMON:  Objection to the form of

9              the question.  Lacks foundation.

10    A.    Again --

11                   MR. SIMON:  Calls for speculation.

12    A.    -- I don't deal in hypotheticals, sir.  I

13    just don't.  And it's not appropriate.  It's not

14    proper policy and procedure.  And, no, I -- you're

15    asking me a question.  No, I cannot.

16    Q.    You can't think of anything, fair?

17                   MR. SIMON:  Objection to the form.

18    Q.    Is that fair?

19    A.    No, I can't.

20    Q.    So it's fair as you sit here you cannot

21    think of any, correct?

22                   MR. SIMON:  Objection to the form of

23              the question.  Asked and answered.

24              Argumentative.

25                   You can try to answer, Sheriff.

1      A.   I can't think of any hypothetical reason I

2    would -- I just -- no, I can't make things up.  No.

3      Q.   What, if any, understanding did you have

4    or knowledge of Jason Davis and his career before

5    that meeting?

6      A.   I knew that Jason Davis had started his

7    career inside the jail as a jail service officer.  I

8    knew that at some point during that tenure of being

9    a jail service officer he was connected to the

10   union -- the jail service deputy union.

11           I was unaware that he had been promoted to

12   road patrol, but, you know, obviously, you know, I

13   -- yeah.  I just -- I didn't -- I'm looking at that

14   green memo, because I'm like -- yeah, I had no idea

15   what his status was after that.  I lost complete

16   track of -- the things I knew is that he was still

17   embedded in the jail.

18      Q.   Okay.  Did you know anything else other

19   than what you've just testified to in advance --

20   about Jason Davis in advance of the October 10,

21   2023, meeting?

22      A.   What do you mean anything else?

23      Q.   About his -- who he was, his career with

24   the Hamilton County Sheriff's Department.  I mean,

25   the point of the meeting is -- as you've testified

1    to and as Exhibit 18 confirms, it was about his

2    future with the department.  And so I want to know

3    what did you know about him in advance of that

4    meeting.  And you said I knew that he was an

5    employee who had been in the jail for a period of

6    time.  He was a union rep of some sort.  He was

7    associated with the union.

8         A.   Uh-huh.

9         Q.   You said you didn't know that he had been

10   promoted to patrol officer.  Did you know anything

11   else about him in advance of that meeting?

12                  MR. SIMON:  Object to the form.

13                  Tom, are you saying in advance of the

14             meeting before she talked to anybody or

15             literally when the meeting started?

16                  MR. BRUNS:  Literally when the

17             meeting started.

18        Q.   Because I -- in addition -- you talked --

19        A.   So when the meeting started --

20        Q.   Let me just finish.  Let me just finish.

21   Because you've testified to something Chief Gramke

22   told you in advance of the meeting --

23        A.   Uh-huh.

24        Q.   -- correct?

25        A.   Uh-huh.

1      Q.   I'm including that in what you allegedly

2  knew, so --

3      A.   So yeah.  When -- when I spoke to the

4  Chief is when, you know, literally I found out he

5  had been promoted to road patrol.  I mean, until

6  that moment I had no idea where -- you know, that he

7  was even outside of the jail.

8      Q.   Okay.  Did you know anything else in

9  advance of the meeting other than what you've

10 testified to, as you recall?

11     A.   Specifically anything, can you reference

12 that?  I mean, as far as like what I knew of -- like

13 in my mind Jason Davis was a -- when he worked in

14 the jail, he was a good employee.

15     Q.   Okay.  That's what I'm asking.  Anything

16 --

17     A.   Yeah.

18     Q.   -- you knew.

19     A.   I mean, I -- I recollect that he was a

20 good employee, that he was very, you know,

21 passionate about his job and did a good job.  That's

22 my recollection.

23     Q.   All right.  Do you recall any other

24 information you had about Jason Davis, whether it

25 was from something somebody told you or you just had

Page 55

1    from personal knowledge before that meeting;

2    anything else about him that you recall as you sit

3    here today?

4         A.   Before that meeting, those are the things

5    that I would recall if you asked me about Jason

6    Davis.

7         Q.   Okay.  Thank you.  If you could turn to

8    page 12 of the Exhibit 24.

9         A.   Sure.

10        Q.   And Request to Admit No. 10 --

11        A.   Uh-huh.

12        Q.   -- says that after -- admit that after

13   Jason Davis made the statement in Request for

14   Admission No. 9 you then made the following

15   statement.  And there's a lengthy statement that's

16   there.  And your answer was I cannot admit or deny

17   due to insufficient recollection.

18             And I would like for you to read the quote

19   in that question, in that Request No. 10 -- read

20   that out loud and then I have some questions for

21   you.

22        A.   The quote?

23        Q.   The long -- the body.

24        A.   Oh, the entire thing?

25        Q.   Yes, please.

1        A.    I was looking for specific --

2        Q.    That's okay.

3        A.    -- quotes.

4        Q.    Yeah, go ahead and read it out loud.

5        A.    Sure.  Well, let me just put it in

6    perspective for you.  And the Chief used the example

7    of wife, sister, et cetera.  I'm the boss.  I'm the

8    Sheriff.  And I've got to tell you, you know, when I

9    came up under Sheriff Leis, around 26 years, and I

10   worked very closely with him.  I ran some of his

11   most prized programs.  Okay.  And, you know, if

12   there was any kind of Facebook thing going around

13   like that about Simon Leis when I worked for him, I

14   would have done my best to squash it.  I would have

15   done my best to kill it.  I would have certainly

16   never participated in it.  Because you respect the

17   boss, you know.  I mean, I wouldn't have done it

18   under Jim Neil.

19          Now, here's the thing, you know, I get

20   that your wife is -- you know, she's her own person.

21   She has every right to say or do whatever she likes.

22   I don't hold it personally against her.  And I'll

23   give you an example.  When I was working for Sheriff

24   Leis, there was an officer who worked here who had

25   been, you know, a long-time kind of family friend,

1   et cetera, and she needed a place to stay and so I

2   said, well, you know, I have a full basement and

3   everything, you can stay there for a while.  Well,

4   she stopped coming to work.  And I said, you know

5   what, you can't live here if you don't go to work.

6   You just can't.  She wasn't even -- I wasn't married

7   to her.  She wasn't related to me.  I just said,

8   look, I am not going to be associated with someone

9   who doesn't do their job.  You can't be that closely

10  associated with me and not come to work.  And, you

11  know, I hope you have a good life and everything,

12  but you can't live here if you're going to do that.

13  And because -- and the reason I did that is because

14  that reflects upon me, you know.  She's in my house.

15  She's just a roommate.  I mean, she's nobody close

16  to me, but I was going -- I was not going to let

17  someone be around me who would reflect negatively on

18  me in any way because that's not the way I run my

19  life.

20          And, you know, I think as much as your

21  wife is -- she wants to be her own person, hey, I

22  applaud that, you know.  Then there is an

23  accountability, because you guys are associated.

24      Q.   And then your response to that request

25  was, I cannot admit or deny due to insufficient

1  recollection.  And was that response a truthful

2  statement by you?

3       A.   I would say yes.

4       Q.   Okay.  And just a quick question.  You

5  read it, the statement about an anecdote from your

6  life about a person who was living in your house.

7  Is the information in the body of that, that you

8  just read about you, is that true?

9       A.   About me?

10       Q.   Yes.  That there was a person who you

11  worked with who was living in your house, they

12  didn't come to work, the whole --

13       A.   Yes.

14       Q.   -- narrative?

15       A.   Yes.

16       Q.   That's all true, correct?

17       A.   That's correct.

18       Q.   Okay.  And do you recall saying anything

19  like what you just read in Request to Admit No.

20  10 -- do you recall saying anything like that in the

21  meeting on October 10, 2023?

22       A.   My answer here of I cannot admit or deny

23  due to insufficient recollection simply -- and that

24  is true.  I recall the circumstance that I lived

25  here.  I cannot say for certain this is word for

Page 59

1  word exactly what I said, but yes, I -- you know, as

2  far as if you're asking me if the things I just

3  related here are true to me, yes.

4      Q.  My question was, do you recall saying

5  anything like the substance of what's in Request to

6  Admit No. 10; do you recall saying something like

7  that, that substance in that meeting on October 10,

8  2023?

9      A.  I recall using examples, yes.

10     Q.  Okay.  Do you recall saying anything else

11 from that meeting other than what we've discussed so

12 far?

13     A.  No.  I recall using examples.  I recall,

14 you know, attempting to explain to an employee

15 perspectives of what we are all in there talking

16 about.  That's all I -- yeah.  That's what I recall.

17     Q.  Okay.  Why would you bring up an

18 anecdote -- I'm going to call it an anecdote, the

19 story --

20     A.  Sure.

21     Q.  -- you relate here -- why would you bring

22 up an anecdote about forcing someone out of your

23 house because it reflected negatively on you at

24 work -- why would you bring that up and then

25 immediately talk about Jason Davis's wife and say

1    something along the lines that there's an

2    accountability because you guys -- meaning he and

3    his wife -- are associated; why would you do that?

4                  MR. SIMON:  I'm going to note my

5             objection again that you're asking her why

6             did you say certain things at the meeting.

7             Well, play her the recording and I'm sure

8             she can better explain.

9                  MR. BRUNS:  You have a continuing

10            objection.

11                 MR. SIMON:  And I want to make -- and

12            I understand that, but based on that

13            specific question.

14                 If you can try to answer the

15            question, go ahead.

16                 MR. BRUNS:  I want the court reporter

17            to read it back, please.

18                 THE COURT REPORTER:  "Why would you

19            bring up an anecdote about forcing someone

20            out of your house because it reflected

21            negatively on you at work -- why would you

22            bring that up and then immediately talk

23            about Jason Davis's wife and say something

24            along the lines that there's an

25            accountability because you guys -- meaning

1          he and his wife -- are associated; why

2          would you do that?"

3     Q.   Go ahead and answer the question.

4     A.   Again, I would have to understand the

5  entire context and flow of the conversation, which I

6  do not.  This is a piece of what's represented here

7  about what was said.  And if I were looking at the

8  entire conversation verbatim, then I may be able to

9  answer that question.  But I -- this is the example

10 apparently that I used.  And that's what I meant.

11    Q.   What did you mean?

12    A.   That these are examples of things that --

13 that can influence your life.  I mean, you know,

14 it's very hard for me to understand without seeing

15 the entire -- the entire conversation prior to and

16 after.  This is a small snapshot as I see it.

17          I can tell you in my mind that my goal in

18 any conversation is to talk about the job and what

19 the job actually means, what it means to work a

20 particular position or job, and I'm focused entirely

21 on the work at hand and what -- what might influence

22 our ability to follow policy and procedure and the

23 fact that we all are bound to policy and procedure.

24 And that -- in my mind, this is all about work and

25 the work that we do.

Page 62

1        Q.   All right.  So when you talked about an

2   accountability because Jason and his wife are

3   associated, you were equating that to his work?

4        A.   I was -- I'm sorry.  Can you ask me that

5   again?

6                   MR. BRUNS:  Please read that back.

7                   THE COURT REPORTER:  Sure.  "So when

8             you talked about an accountability because

9             Jason and his wife are associated, you

10            were equating that to his work?"

11       A.   I was equating that statement to Jason

12   Davis, period.

13       Q.   And his work at the Hamilton County

14   Sheriff's Department, correct?

15       A.   I can't say that factually.  I can say

16   that I was addressing Jason Davis and I was talking

17   about Jason Davis in the context that he worked for

18   us.

19       Q.   Thank you.  And do you have any personal

20   knowledge that Jason Davis violated any policy or

21   procedure of the Hamilton County Sheriff's

22   Department on or before October 10, 2023?

23       A.   Prior to this?

24       Q.   Yes.

25       A.   Or hindsight?

Page 63

1      Q.    No.  Prior.

2      A.    Prior to this, I do not.

3      Q.    Okay.  And in hindsight what policy or

4  procedure do you believe Jason Davis violated?

5      A.    I don't have the policies and procedure in

6  front of me, so it wouldn't be fair for me to

7  factually state what that is, because there are lots

8  of policies and procedures that I would need to be

9  looking at and referencing the exact wording of.

10     Q.    As you sit here today you don't know of

11  any; is that fair?

12     A.    Again, unless I had the policy and

13  procedure in front of me, I would not be able to

14  answer that question.

15     Q.    Because you don't know of any as you sit

16  here, fair?  I mean, if you know of one, tell me.

17  That's the implication of my question.  If you know

18  of a specific policy or procedure violation in

19  hindsight that you believe Jason Davis committed

20  while he was an employee of the Hamilton County

21  Sheriff's Department, I want to know.

22     A.    Without looking at the policies and

23  procedures I cannot answer that.

24     Q.    All right.  And you've never seen any

25  documentation as far as you're aware of Jason Davis

Page 64

1    violating any policy or procedure of the Hamilton

2    County Sheriff's Department, correct?

3              MR. SIMON:  Objection.  Are you

4              continuing through the time of this

5              meeting?

6              MR. BRUNS:  Up to the time of the

7              meeting.

8              MR. SIMON:  His conduct through the

9              time of the meeting?

10             MR. BRUNS:  Yeah.  Correct.

11   A.    Through to the time of the meeting?

12   Q.    Including in the meeting itself.

13   A.    In the meeting itself?

14   Q.    Yes.

15   A.    I was not aware in the meeting itself of

16   him violating any policy and procedure.

17   Q.    Before that, correct?

18   A.    Or before that.

19   Q.    All right.

20   A.    Correct.

21   Q.    All right.  And, in fact, if someone had

22   knowledge that an officer in the Hamilton County

23   Sheriff's Department violated a policy or procedure,

24   they're supposed to document that, fair?

25   A.    Well, again, that's -- that lends itself

1   to situations.  And when you're saying someone had

2   knowledge --

3        Q.   A supervisor.  Someone higher up than

4   Jason Davis.  If they had knowledge that he violated

5   a policy or procedure, they're supposed to document

6   it, correct?

7        A.   Supervisors are supposed to document

8   policy and procedure violations, yes.

9        Q.   All right.  And to go back to one of my

10  earlier questions, other than you equating this

11  anecdote that you told and forcing someone out of

12  your house and equating it to Jason Davis's work

13  because he's associated with her, his wife, and

14  there has to be accountability, do you recall any

15  other reason why you brought up that anecdote about

16  someone living in your house and you literally

17  forced them out of your house because it was

18  reflecting negatively on you at work; do you recall

19  any other reason why you brought that up?

20       A.   First of all, I would just like to

21  stipulate here, I don't see in my statement written

22  here that I forced someone out of my house.

23  Secondly, my example here is related to work and

24  work only.

25       Q.   Okay.  So the answer to my question, you

Page 66

1    can't think of anything else, fair -- any other

2    reason why you brought it up?

3        A.   Other than -- other than work and

4    work-related example, no.

5        Q.   All right.  And assuming -- you in your

6    example from the meeting that you gave, assuming you

7    actually used the words talking about this person

8    who had been living with you, but you can't live

9    here if you're going to do that, that's the sense I

10   was using in forcing them out of your house, did you

11   in fact ask the person to leave?

12       A.   No, I did not.

13       Q.   Okay.  How did that turn out; did they

14   start coming to work and then you were okay with it?

15       A.   She lived there for another eight years,

16   sir.

17       Q.   Okay.  Because she started coming to work?

18       A.   Yes.  That's correct.

19       Q.   All right.  Could you go to page 13 of the

20   request to -- of the discovery responses, Exhibit

21   24.

22       A.   Oh, page 18?

23       Q.   Page 13.

24       A.   Oh.  13.

25       Q.   Yeah.

Page 67

1       A.   Okay.  Sure.

2       Q.   All right.  The request to Admit No. 11

3  says, Admit that, at all times relevant to the

4  meeting held between you, Chief Deputy Gramke, and

5  Jason Davis on or about October 10, 2023, Chief

6  Deputy Gramke was acting pursuant to authority

7  conferred to him by law.  And your response says, I

8  admit Chief Deputy Gramke was acting as Chief Deputy

9  to the Hamilton County Sheriff.  Did I read that

10  accurately?

11       A.   Yes.

12       Q.   All right.

13       A.   Uh-huh.

14       Q.   And when you say you admit he was acting

15  as Chief Deputy, you would agree with me that he was

16  acting pursuant to the legal authority conferred on

17  him as Chief Deputy to the Hamilton County Sheriff,

18  right?

19       A.   He was sworn as a Hamilton County Deputy,

20  yes.

21       Q.   And he's in that meeting because he has

22  authority conferred on him as Chief Deputy, fair?

23       A.   Yes.  Correct.

24       Q.   All right.  I just want to make sure.  And

25  then the same thing with Request to Admit No. 13.

Page 68

1   It was the same question relative to you.  You made

2   the same answer relative to you that you did to

3   Chief Gramke, but I want to make sure I understand

4   your testimony.

5           Is it fair to say you admit that you were

6   acting pursuant to the legal authority conferred on

7   you as the elected Sheriff of Hamilton County?

8       A.   Yes.  I would say that's correct.

9       Q.   All right.  And then if you go to Request

10  to Admit No. 15.

11      A.   Yes.

12      Q.   It says, Admit that you are, for purposes

13  of employment, including assignments to RENU and

14  promotions to corporal within the Sheriff's

15  Department, the ultimate policy-making official for

16  such actions pursuant to law.

17          And your answer was, I admit I am the

18  elected Sheriff of Hamilton County.

19          Are you -- do you admit that for purposes

20  of employment, including assignments to RENU and

21  promotions to corporal within the Sheriff's

22  Department that you are the ultimate authority on

23  that, you're the ultimate policy-making official,

24  the buck stops with you?

25                  MR. SIMON:  Objection to the form of

Page 69

1           the question.  Calls for a legal

2           conclusion.

3                You can answer.

4      A.   I would say the word ultimate there is a

5  very nuanced word because, again, there are people

6  assigned in our organization, and they are given

7  authority to make particular decisions, judgments,

8  sign off on policies and so forth regarding those

9  things.

10          So am I the Sheriff of Hamilton County?

11  Yes.  Am I elected?  Yes.  Did I swear an oath to

12  act as the Sheriff of Hamilton County duly elected?

13  Yes.

14      Q.   Okay.  But in terms of, for instance,

15  assignments to RENU and promotions to corporal,

16  other people below you are involved in that

17  decision-making process, correct?

18      A.   They are.

19      Q.   All right.  But the ultimate decision

20  maker is you, you have the authority to say no, that

21  person is not going to be promoted or yes, they are

22  going to be promoted; the buck ultimately stops with

23  you on the promotions issue, correct?

24      A.   As the Sheriff I am the -- I am the final

25  decision maker for decisions that affect the

1   Sheriff's Office.

2       Q.   All right.  And that includes promotions

3   to RENU and promotions to corporal, fair?

4       A.   So it would include anyone that is

5   employed with the Hamilton County Sheriff's Office

6   and any of their tenure, be it -- yeah.  Be it

7   continuing a tenure or anything that would affect or

8   be in effect of their employment, yes.

9       Q.   Assignments, promotions?

10      A.   Yes.

11      Q.   All right.

12      A.   Uh-huh.

13      Q.   And if you disagreed with the decision of

14  someone below you on the chain of command who was

15  involved in the decision-making process, you could

16  ultimately overrule it because you have the last

17  word on it, fair?

18      A.   I could, yes.

19      Q.   Could you go to page 14?

20      A.   Uh-huh.

21      Q.   These are just some housekeeping questions

22  I wanted to know.

23      A.   Uh-huh.

24      Q.   Page 14, where it says -- the No. 1 that's

25  there, the first interrogatory, Excluding attorneys,

Page 71

1    identify each person who provided information or

2    documents; do you see that question?

3         A.   Yes, I do.

4         Q.   All right.

5         A.   Uh-huh.

6         Q.   Then there's an answer here about people

7    who provided assistance with certain of the document

8    requests and also Interrogatory No. 15; do you see

9    that?

10        A.   Yes, sir.

11        Q.   Okay.

12        A.   Uh-huh.

13        Q.   Did you before verifying the answers to

14   interrogatories -- did you also review the documents

15   that you supplied as part of your answers to the

16   document requests; did you review those?

17        A.   I don't recall.

18        Q.   Okay.

19        A.   I don't recall whether I did or not.  I

20   just simply don't recall.

21        Q.   All right.  How do you know that what you

22   provided in response to document requests was

23   accurate?

24        A.   So, again, I would have reviewed material

25   that of which I -- honestly I don't recall

Page 72

1   specifically what I might have looked at.  But I

2   answered the questions to the best of my ability

3   truthfully, and that's what I can recall other than

4   I -- I can't recall whether I did or didn't.  I may

5   have.  I may have looked at these documents.  I

6   don't -- I simply don't recall.

7        Q.   Okay.  How do you know -- since you swore

8   that the information in these interrogatories -- and

9   this is the very first one --

10       A.   Uh-huh.

11       Q.   -- you swore that the substantive

12  information is true and accurate --

13       A.   Uh-huh.

14       Q.   -- how do you know that Jessica Kober, for

15  instance, Administrative Manager -- how do you know

16  she provided assistance with response to

17  Interrogatory No. 15 and then those various requests

18  for production of documents; how do you know that?

19       A.   Because Jessica Kober is the

20  administrative manager.  And those are her job

21  duties.  And she's been doing that job for almost 30

22  years now.  And Jessica provides this type of

23  documentation routinely for lots of different

24  reasons in the Sheriff's Office.  And I certainly

25  trust that she has produced every document that has

1   been asked.

2        Q.   Okay.  And so you know her, that's her job

3   duty to assemble those documents, and you trust that

4   she does it accurately?

5        A.   It's one of her job duties, yes.

6        Q.   Okay.  Thank you.  I want to ask some

7   questions about Interrogatory No. 2, but before we

8   get on to that, I want to make sure I understand.  I

9   think you've answered this question, so I'm going to

10  apologize if I've belabored the point.

11           Do you recall saying anything else in that

12  October 10, 2023, meeting with Jason Davis and Chief

13  Gramke other than what you've testified to here

14  today?

15       A.   I simply can't -- I can't recall -- I

16  cannot recall or recall because I -- I mean, again,

17  it was 2023.  It was a conversation that the three

18  of us were having.  And it was a conversation.  So I

19  can't answer that question that there were more

20  things I said or didn't say.

21       Q.   Because you don't know?

22       A.   Because I don't know.  Yes, sir.

23       Q.   Thank you.  In answer to Interrogatory No.

24  2 it asked about witnesses.  One of the people

25  disclosed was Jay Gramke.

1        A.    Uh-huh.

2        Q.    And it says knowledge of the meeting that

3    is the subject of the Plaintiffs' complaint.  He was

4    there, so obviously he has personal knowledge of

5    what happened, fair?

6        A.    I would say yes, that's fair.

7        Q.    Okay.  Other than his knowledge of what

8    transpired in the meeting, do you know of any other

9    information he has relative to the subject of the

10   complaint or your defenses or anything else?

11   Because that was the question.

12       A.    So if I understand it, you're asking me if

13   he has knowledge of anything other than what's

14   printed here?

15       Q.    Yeah.  Other than what you answered, the

16   question was -- let me just be clear.  The question

17   was identify, right -- we wanted you to identify --

18       A.    Uh-huh.

19       Q.    -- anyone with knowledge of any of the

20   allegations contained in the complaint and/or

21   knowledge of any of the defenses alleged in your

22   answer, including generally the subject matter of

23   which they have knowledge, and your response was Jay

24   Gramke, knowledge of the meeting that is the subject

25   of Plaintiffs' complaint.

1          And so my question to you is, are you

2    aware if he has any other knowledge beyond that?

3          A.   I would have no idea.

4          Q.   Okay.  Chris Kettman.  It says knowledge

5    of the underlying reasons that Plaintiff Jason Davis

6    was not promoted to corporal or given an assignment

7    to RENU.

8          Did you ever talk to Chris Kettman about

9    either of those issues?

10         A.   No, I did not.

11         Q.   All right.  How do you know that Chris

12   Kettman has knowledge of the underlying reasons with

13   Plaintiff Jason Davis why he was not promoted to

14   corporal or given an assignment to RENU?

15         A.   Because any records request would have

16   come through those chains of command.  So Chris

17   Kettman is the commander.  He is the -- he was at

18   the time the major who was in charge of those areas

19   of road patrol.

20         Q.   Okay.

21         A.   So he would have knowledge.

22         Q.   Okay.  That's an assumption on your part,

23   you didn't quiz him about his knowledge or --

24         A.   No, sir.

25         Q.   Is that correct?

1      A.    That's correct.

2      Q.    Okay.  And just I should -- just so we're

3   clear and I don't forget to ask you --

4      A.    Uh-huh.

5      Q.    -- the RENU process, just from your

6   knowledge give me the process of someone applying

7   who is an employee of the Hamilton County Sheriff's

8   Department when they want to go to RENU, what's the

9   process they go through?

10     A.    Well, every process we have is very

11  structured.  So that process would be you apply

12  generally in writing.  It's posted that there is a

13  -- some type of opening.  Deputies will apply.  And

14  then those deputies will go through either for, you

15  know, promotions of rank and so forth.

16          We have testing -- testing that's written

17  by outside, you know, agencies who bring the test in

18  to us.  And if it is sometimes like a preferred

19  assignment, there will be interviews.  There will be

20  an interview process.

21     Q.    RENU has that?

22     A.    To my knowledge they do.

23     Q.    Okay.

24     A.    And then the -- any employee who is

25  applying for anything like that, their work history

Page 77

1    would be assessed and selection would be -- I'm

2    going to use the word suggested, because I can't

3    think of any other word.  But their selection would

4    be suggested by those people in the chain who had

5    responsibility for that.

6        Q.   And who is in that chain -- at least back

7    in, you know, when Jason Davis was an employee of

8    the Hamilton County Sheriff's Department, who was in

9    that chain?

10       A.   I would have no idea, sir.

11       Q.   I apologize.  Whether you have a name or

12   just a rank, like a position, that's what I'm

13   asking.

14       A.   Well, our ranks -- our ranks are

15   structured as corporal, sergeant, lieutenant,

16   captain, major, chief deputy, and then myself.  So

17   people that were in the chain of command who held

18   those ranks is who I would think would be in that

19   process of interview.

20       Q.   Okay.  And how high does it get up to

21   before someone actually recommends a candidate for

22   RENU before there's a final decision; who

23   actually -- how high does it go in the chain where

24   there's a recommendation?

25       A.   Well, I would say that the captain and --

Page 78

1    the captain who is -- who has purview over that

2    unit.  And also then, of course, the major, who is

3    -- who is command of that unit and many others would

4    be the path that that would come through.

5          Q.    Okay.  And this process that you talked

6    about for RENU --

7          A.    Uh-huh.

8          Q.    -- it's pretty formalized, structured,

9    right?

10         A.    I wouldn't be able to answer that question

11   accurately, because RENU is a very specific -- it's

12   a very specific unit.  It has -- there's lots of

13   different nuances to RENU because of the fact that

14   it is also a unit that collaborates with Cincinnati

15   Police Department.  Some of their members are also

16   there.  There is a lot of collaboration with other

17   agencies.

18              So it -- I can't say that to take RENU and

19   compare it to a very standard, you know, structured

20   unit inside the jail, let's say, because RENU is so

21   very different in the way that they're conducting

22   business, being on that first line of drug

23   enforcement and so forth.

24         Q.    Well, let me ask you this then.  Who would

25   know the answer to my question; would Chris Kettman

Page 79

1    know the answer to my question?

2         A.   I would -- Chris Kettman is a major.  So

3    logically he would be apprised of what's going on in

4    that unit.

5         Q.   Sure.  My question was about the -- how

6    this process to vet candidates for RENU -- what the

7    process entails and how structured it is and formal

8    and that kind of thing and the reasons behind it.

9         A.   Uh-huh.

10        Q.   Would Chris Kettman likely know the

11   answers to those questions?

12        A.   I would assume that he would.

13        Q.   How about Matt Guy?

14        A.    It says here Matt Guy was an official

15   within RENU.  So I would again assume yes.

16        Q.   Okay.  And in terms of this vetting

17   process for candidates, it also includes officials

18   from other law enforcement agencies; they're part of

19   the vetting process?

20        A.   I would have no idea what part they take.

21        Q.   I thought you said that, but I

22   misunderstood you.  So it's possible they're part of

23   it, you don't know?

24        A.   I would have no idea.

25        Q.   You listed Dave Downing.  It says as

Page 80

1     someone who has knowledge of Plaintiff Jason Davis

2     and Plaintiff Jason Davis's employment with the

3     Hamilton County Sheriff within Anderson Township.

4             What's your understanding of Dave

5     Downing's role there?

6        A.   Just what it says here, that he's employed

7     at the Anderson Township location for the Hamilton

8     County Sheriff's Office.  I don't -- I would have no

9     idea what process he would be involved in there.

10       Q.   Okay.  With the exception of Pete

11    Stackpole, one of the attorneys who is involved in

12    this case --

13       A.   Uh-huh.

14       Q.   -- did you talk to any of these folks at

15    any time about the complaint, Jason Davis, any of

16    his allegations, the October 10 meeting, any of

17    that?

18       A.   No.  No, sir.

19       Q.   Okay.  So these responses are you're

20    simply saying these are people -- other than Pete

21    Stackpole -- these are people who might have some

22    knowledge of the issues involved, fair -- because

23    you didn't talk to them, so you don't really know

24    what they know?

25       A.   Correct.

Page 81

1      Q.   Okay.  You listed Tom Butler.  Did you --

2  who is Tom Butler?

3      A.   So Tom Butler was formerly at road patrol.

4  He was a captain assigned to road patrol.  He --

5  when I came on, when I began as sheriff, my

6  recollection is that we asked Tom Butler to be the

7  commander -- the captain of court services.  So he

8  moved to the court service location, served as

9  captain of our court service division.

10     Q.   Okay.  And then it says he has knowledge

11  of Plaintiff Jason Davis's current employment with

12  Springdale Police Department.  How do you know that?

13     A.   Well, Tom Butler -- ultimately he was

14  retired and was working on what we call PRE.  And

15  during that tenure, which is a three-year window, he

16  resigned and assumed the position of Chief of Police

17  of Springdale Police Department.

18     Q.   All right.  And to your knowledge what is

19  his reputation within the law enforcement community;

20  is it good?

21     A.   I haven't heard anything to the negative

22  about Tom Butler.

23     Q.   Okay.  As far as you're aware does he have

24  a reputation for honesty?

25     A.   We all have a reputation for honesty.

Page 82

1        Q.    Okay.  You've never heard anything

2   negative about his reputation for honesty; is that

3   fair?

4        A.    Not in my knowledge.

5        Q.    Okay.  You said on this list you didn't

6   speak with anyone about any of these issues before

7   disclosing them in this interrogatory.  You don't

8   know what they know.

9              My question about Pete Stackpole -- and I

10  know he's one of your attorneys in this case --

11  before -- at any time before the decision on Jason

12  Davis was made about not getting the RENU spot --

13       A.    Uh-huh.

14       Q.    -- okay, did you consult with any

15  lawyer -- in-house lawyer about that at any time?

16       A.    No, sir.

17       Q.    And Pete Stackpole is down the hall from

18  you; you could -- there are lawyers available to you

19  within the Hamilton County Sheriff's Department if

20  you wanted to consult; is that fair?

21       A.    That's fair.

22       Q.    Could you go to page 17 of Exhibit 24.

23       A.    Uh-huh.

24       Q.    Interrogatory No. 6 says, Please state all

25  reasons why you prevented, or permitted Chief Deputy

Page 83

1   Gramke to prevent Jason Davis's reassignment to RENU

2   in 2023.  And then the answer that you gave was,

3   Chief Deputy Gramke made the decision to prevent

4   Jason Davis's assignment to RENU.  I agreed with his

5   decision.  And let me just stop there.

6           Ultimately if you had disagreed with his

7   decision, you could have overruled Chief Deputy

8   Gramke, correct?

9               MR. SIMON:  Objection.  Hypothetical.

10          Lacks foundation.

11              You can try to answer.

12      A.   I would have the authority to, yes.

13      Q.   All right.  I'll continue reading.  You

14  say, RENU is an elite unit within law enforcement

15  that requires those assigned to it to protect

16  sensitive information.  Trust, responsibility, and

17  secrecy are necessary for RENU officers.  Jason

18  Davis did not have the necessary qualities for RENU.

19  Did I read that -- did I read your answer correctly?

20      A.   That is correct.

21      Q.   All right.  And when you say the final

22  sentence there, Jason Davis did not have the

23  necessary qualities for RENU, are you referring to

24  the sentence beforehand, which is trust,

25  responsibility, and secrecy?

Page 84

1      A.   What I'm referring to is the Chief

2  Deputy's decision and his assertion that Jason Davis

3  didn't have the necessary qualities for RENU.  What

4  we noted there with trust, responsibility, and

5  secrecy are things that are unique to the unit of

6  RENU.  And that applies to their day-to-day

7  operations.

8      Q.   Okay.  My question was very simple.  When

9  you wrote or stated and agreed with the statement

10  that Jason Davis did not have the necessary

11  qualities for RENU, what were the necessary

12  qualities, if not trust, responsibility, and

13  secrecy?

14      A.   Well, there are many different qualities

15  that can be assessed in any type of interview or

16  selection process.  So what we -- what I noted there

17  is what I know personally to be parts of necessary,

18  you know, qualifications for RENU.

19           But, again, that's not a complete list.

20  So I would say that Jason Davis did not have the

21  necessary qualities for RENU and, as I stated, Chief

22  Gramke made the decision.

23      Q.   What necessary qualities for RENU did

24  Jason Davis not have in terms of what you were

25  referencing under oath in your response to

Page 85

1    Interrogatory No. 6; what necessary qualities are

2    you saying I swear under oath I have personal

3    knowledge he didn't have those necessary

4    qualities -- what were you referring to?

5         A.   I was referring to the Chief Deputy's

6    decision, that the Chief Deputy had made a decision

7    that Jason Davis did not meet the requirements for

8    RENU and that's what I was referring to.

9         Q.   So you don't have any -- other than

10   something Chief Deputy Gramke told you, you don't

11   have any personal knowledge that Jason Davis did not

12   have the necessary qualities for RENU, fair?

13        A.   I would say that's a fair statement.

14        Q.   Okay.  And what did Chief Deputy Gramke

15   tell you were the reasons or the substance to

16   support your statement that Jason Davis did not have

17   the necessary qualities for RENU; what did he tell

18   you?

19              MR. SIMON:  Objection.  Asked and

20          answered.

21              You can go ahead and answer again.

22        A.   Again, I honestly don't recall.  I don't

23   recall exactly what the Chief told me regarding

24   this -- Jason Davis's assignment to RENU.  I don't

25   recall a specific list or anything specific that the

Page 86

1  Chief Deputy told me as to why.

2      Q.   Okay.  Are you aware of any documents that

3  support that conclusion that Jason Davis did not

4  have the necessary qualities for RENU; are you aware

5  of any documentation -- an email, a personnel record

6  in a personnel file, you know, a summary of an

7  interview -- any document, any writing that existed

8  on or before October 10, 2023, that supports that

9  conclusion; are you aware?

10     A.   I'm not, no.

11     Q.   Okay.  If someone -- going back to this

12  vetting process for RENU --

13     A.   Uh-huh.

14     Q.   -- if someone goes through that process,

15  documents are generated as part of that process,

16  correct -- there's different steps people --

17  candidates take to go through the process, correct?

18     A.   There should be.

19     Q.   Okay.  And who would retain those

20  documents; who within the Sheriff's Department

21  should have copies of the documents that are

22  generated as part of someone going through the

23  process of applying for RENU?

24     A.   I would not be able to answer that

25  question, because one of the reasons is because it

1    is RENU and I do know that it's a very secretive

2    situation there regarding who joins, the identities,

3    things like that.  So I really would have no idea

4    how they --

5         Q.   Sure.

6         A.   -- how they keep those.

7         Q.   So you don't know.  So my next question is

8    who within the Hamilton County Sheriff's Department

9    would know where such records are maintained?

10        A.   Well, I would think that -- I would think

11   that the major who is in command of that unit --

12        Q.   Would know the answer to that?

13        A.   -- would know the answer to that.

14        Q.   Thank you.  And then in terms of the basis

15   for your agreeing with Chief Gramke's decision,

16   because you said I agreed with his decision --

17        A.   Uh-huh.

18        Q.   -- and of course the decision was to

19   prevent Jason Davis's assignment to RENU -- in terms

20   of you agreeing with him he told you that Jason

21   Davis did not have the necessary qualities for RENU,

22   correct?

23        A.   Well, I don't specifically recall him

24   saying that, but I -- I trust the Chief Deputy.  The

25   Chief Deputy is making a decision based on his

1    experience, the fact that he was actually a

2    lieutenant in that unit or thereabouts, a sergeant,

3    held rank in that unit, had worked in that unit for

4    many years.  So when he says something like that to

5    me, I certainly believe him.

6         Q.    You assume it's true?

7         A.    Well, I believe that it is true, yes.

8         Q.    Okay.  So in that sense he told you

9    something, right -- he communicated some information

10   to you, correct -- whether you recall the specifics

11   of it or not, he communicated some information to

12   you about preventing Jason Davis's assignment to

13   RENU, right?

14        A.    He did.  That's right.

15        Q.    Okay.  And because you say I agreed with

16   his decision, so he had -- he communicated --

17        A.    Uh-huh.

18        Q.    -- it to you in some way, right?

19        A.    And exactly the way he said it to me I do

20   not recall, but what I do recall is his assertion

21   that Jason Davis was not a good candidate for RENU.

22        Q.    Okay.  And based on that alone you agreed

23   with him because of your knowledge of who Chief

24   Gramke is and his experience; is that --

25        A.    I did --

Page 89

1      Q.    -- correct?

2      A.    -- agree with him.  Yes.

3      Q.    Okay.

4      A.    Uh-huh.

5      Q.    In that sense you rubber stamped Chief

6  Grampke's decision; is that fair?

7                MR. SIMON:  Objection to the form of

8           the question.  Argumentative.

9      Q.    You didn't do any due diligence on your

10  own to look into it, you just accepted his decision,

11  correct?

12     A.    My due diligence was to vet Chief Deputy

13  Jay Gramke before I selected him as my Chief Deputy.

14  And I did so in great detail.  And what I understood

15  and the reason Chief Deputy Jay Gramke was selected

16  was because of his tenure, his record, his

17  expertise, his ability to act as a commander in that

18  high-level position with the Hamilton County

19  Sheriff's Office.

20                So, yes, because of my diligence and

21  homework in selecting my command staff I do have a

22  great deal of confidence in their decisions.

23     Q.    Are you aware of any document that exists

24  involving Chief Gramke's communication regarding why

25  he prevented Jason Davis's assignment to RENU -- are

1   you aware of any document -- an email, a note,

2   anything -- that discussed or concerned that issue?

3        A.   Not in my memory, no.

4        Q.   Who would know that?

5        A.   If there were an email or --

6        Q.   Such a thing.

7        A.   Whoever he sent it to.  And I would have

8   no knowledge of who that would be.

9        Q.   All right.  Obviously Chief Gramke had the

10  opinion that Jason Davis did not have the necessary

11  qualities for RENU and you agreed, as you say, with

12  his decision.

13           Do you know of anyone else within the

14  Hamilton County Sheriff's Department who agreed with

15  that decision?

16       A.   I didn't discuss it with anyone else.

17       Q.   That wasn't my question.  Do you know --

18           MR. SIMON:  She was still answering.

19           MR. BRUNS:  I know.  But just for the

20           record, Sheriff, I apologize --

21           THE WITNESS:  Uh-huh.

22           MR. BRUNS:  -- but I think this is

23           taking longer.  When I ask do you know of

24           anyone, that's what I'm looking for.  So I

25           just want --

1         THE WITNESS:  Uh-huh.

2         MR. BRUNS:  -- I didn't mean to cut

3     you off, and I apologize, but --

4         THE WITNESS:  Yeah.

5         MR. BRUNS:  -- that's why I'm asking

6     a specific question.

7     Q.   Do you know of anyone within -- either

8  today or back in October of '23 -- anyone within the

9  Hamilton County Sheriff's Department who agreed or

10 agrees with your and Chief Gramke's decision

11 regarding Jason Davis?

12    A.   And I'd just like to state that when I do

13 expand on my answer, it's simply because I'm trying

14 to jog my memory as to -- to make sure that I answer

15 that correctly to my recollection.  So the answer to

16 that is no.

17    Q.   Thank you.  You made a point of saying

18 trust, responsibility, and secrecy are necessary for

19 RENU officers, correct?

20    A.   Yes, I did.

21    Q.   You would agree with me that trust,

22 responsibility, and secrecy are necessary qualities

23 for Hamilton County Sheriff's deputies in general?

24    A.   That's a fair statement, yes.

25    Q.   All right.  And patrol officers on up,

Page 92

1    corporal, all the way up, trust, responsibility, and

2    secrecy are necessary to be employed at the Hamilton

3    County Sheriff's Department, fair?

4         A.   I'd say that's fair.

5         Q.   All right.  And before October 10 of 2023,

6    including that date --

7         A.   Uh-huh.

8         Q.   -- were you aware of any -- did you have

9    any knowledge that Jason Davis lacked the ability to

10   be trusted, lacked the ability to be responsible, or

11   he lacked the ability to maintain a secret; were you

12   aware of any information like that?

13        A.   No, I was not.

14        Q.   Okay.  And even including that day,

15   October 10 of 2023?

16        A.   Well, I was made aware of it there by the

17   fact that the Chief Deputy stated that he didn't

18   have the necessary qualities.  So that is when I

19   became aware that there was obviously some issues

20   with this assignment.

21        Q.   But as you've testified, Chief Gramke

22   didn't elaborate, so you don't know if he was

23   referring to trust, responsibility, and secrecy; you

24   don't know --

25        A.   Correct.

1      Q.    -- if that's --

2      A.    No.

3      Q.    -- what he's referring to?

4      A.    Right.  No, I do not.

5      Q.    Okay.  So including that day, even after

6   that meeting, you don't know if Jason Davis lacked

7   the ability to be trusted, to be responsible, or to

8   maintain secrets, correct?

9      A.    Just let me understand the question.  Even

10   after that day?

11      Q.    Sure.

12      A.    Would that be when I became aware that he

13   taped the meeting; is that. . .

14      Q.    Let's start with just that day --

15      A.    Okay.

16      Q.    -- okay?

17      A.    Okay.

18      Q.    Through that day, through October 10,

19   2023, you had no knowledge that he lacked any

20   ability to be trusted, to be responsible, or to

21   maintain secrets, correct?

22      A.    Not to my knowledge.

23      Q.    Okay.  And then you say subsequent to that

24   day --

25      A.    Uh-huh.

Page 94

1      Q.    -- you learned that he taped that meeting,
2  correct?
3      A.    Yes.
4      Q.    All right.  And what did that information
5  tell you?
6      A.    Well. . .
7      Q.    About Jason Davis.  Because I think that's
8  where you were going, so that's why I'm asking.
9      A.    It's certainly a policy violation.  It is
10 indicative of someone who is willing to violate
11 policy.
12     Q.    Okay.  What policy exists -- existed on
13 October 10, 2023, that was violated?
14     A.    So we specifically inserted in the policy
15 that we were going to do away with the practice,
16 which was pretty prevalent in the prior
17 administration, of deputies secretly taping each
18 other, you know, audiotape-taping each other.
19     Q.    Okay.
20     A.    I should say recording each other.
21     Q.    Okay.  During your tenure of the Hamilton
22 County -- in the Hamilton County Sheriff's
23 Department did you ever secretly record anyone else
24 who was a member of the Hamilton County Sheriff's
25 Department?

1      A.    Never.

2      Q.    Okay.  Had anyone ever done that where you

3  were one of the participants speaking but were

4  unaware that you were being recorded?

5      A.    Multiple times.

6      Q.    Okay.  And you said we made the policy.

7  Who is we?

8      A.    Myself and the Chief Deputy discussed

9  changing that policy.  And we both agreed that for

10  the betterment of the department to allow officers

11  to -- really to just get along better and trust each

12  other, we decided to insert that in the policy.

13      Q.    Okay.  If someone who didn't know they

14  were being taped --

15      A.    Uh-huh.

16      Q.    -- was -- in fact was taped --

17      A.    Uh-huh.

18      Q.    -- and then denied that they said

19  something that turns out they're lying because it's

20  on the tape or they misremembered because regardless

21  it's on the tape --

22      A.    Uh-huh.

23      Q.    -- then do you fault someone for taping?

24             MR. SIMON:  Objection to the form of

25             the question.  Vague and ambiguous.

1                You can try to answer.

2        A.   There was no policy against it.  So people

3   could do it if they wanted to and they did.

4        Q.   Okay.  When did you find out that Jason

5   Davis taped that October 10, 2023, meeting?

6        A.    To my recollection he did an exit

7   interview with -- then probably would have been

8   maybe Marviette Johnson, who was our new HR person.

9   And as I recall there was a mention in his exit

10  interview that he had taped the meeting.

11       Q.   All right.  How did you find out that

12  there was a mention in the exit interview?

13       A.    It was in -- it was -- I review the exit

14  interviews and it was in writing there.

15       Q.   Okay.  Go to Interrogatory -- the policy

16  that you say was violated, when was that enacted?

17       A.    We placed that in policy, as I recall,

18  very early on.  I mean, it was one of our first

19  discussions.

20       Q.   Do you know what policy number?

21       A.    I couldn't say.

22       Q.   Is it still the policy of Hamilton County

23  Sheriff's Department?

24       A.    Oh, yes.

25       Q.   Okay.

1     A.   Uh-huh.

2     Q.   Is it something that you could look for

3 and put your hands on?

4     A.   I assume.  Sure.

5     Q.   Okay.  If you go to Interrogatory No. 7 --

6     A.   Uh-huh.

7     Q.   -- it says, Please state all reasons why

8 you prevented, or permitted Chief Deputy Gramke to

9 prevent Jason Davis's promotion to corporal in 2023.

10 And your answer, Neither Chief Deputy Gramke nor I

11 prevented Jason Davis from a promotion to corporal.

12 He did not stick around long enough and quit his

13 employment with the Hamilton County Sheriff's

14 Office.  Did I read that accurately?

15     A.   Yes.

16     Q.   Okay.  Is it your testimony that he was

17 never prevented from a promotion to corporal and, in

18 fact, it was just a matter of time that he would

19 have been promoted?

20     A.   Yes.  He was on the list to be promoted to

21 corporal.  And I don't know all the exact time

22 frames of how much longer that list was in fact in

23 effect.  I assume it was some time.  So yes, I would

24 say that he was eligible to be promoted.

25     Q.   Okay.  Well, if he was the next one man up

1    on the promotion list --

2         A.    Uh-huh.

3         Q.    -- at the time of this meeting on

4    October 10 of 2023, it's your testimony that as long

5    as that list was active --

6         A.    Uh-huh.

7         Q.    -- as soon as there was another spot that

8    was open, Jason Davis would have gotten it but for

9    the fact that he ended his employment?

10        A.    Well, he would have been able to compete

11   for it.  We don't promise positions to people prior

12   to the process.

13        Q.    Okay.

14        A.    I mean, we don't.

15        Q.    What else would he have had to have done

16   other than pass the test, be on the promotion list,

17   and then be the next man up for an available

18   opening?

19        A.    So we have a rule of three that I -- that

20   I instated -- initiated when I came on.  And the

21   rule of three is you take the top three that are

22   next on the list.  They -- they are then going

23   through the process, interviews, et cetera, whatever

24   that process is deemed to be.  And then that

25   recommendation of who is next to be promoted out of

1   that three, the recommendation of the top performers

2   would be given to the Chief Deputy and, you know --

3   and then the selection would be made.  So that would

4   be the process of getting to that next person on the

5   list.

6         Q.   All right.  So if Jason Davis was the next

7   man up, he already would have been part of that

8   process in your rule of three, correct?

9         A.   Correct.  Yes.

10        Q.   Who would have records of his interviews

11  and things like that for potentially being promoted

12  to corporal?

13        A.   So that would be the selection committee.

14  And, again, I don't, you know, have day-to-day

15  knowledge of that level of who is exactly doing

16  what, but I can tell you that our process is to, of

17  course, do some due diligence and interview people

18  and allow people to compete for the position.

19        Q.   Who was in charge of the selection

20  committee back then?

21        A.   I could not tell you, sir.

22        Q.   Was it Jay Gramke?

23        A.   When you say the committee, he would not

24  have been sitting in on the committee.

25        Q.   Well, who was --

1       A.   He would have gotten -- he -- in his

2   position the procedure is he would have gotten the

3   recommendation from the committee --

4       Q.   Okay.

5       A.   -- as to who they -- and they would have

6   ranked --

7       Q.   Sure.

8       A.   -- those three people.

9       Q.   Who maintains those records?

10      A.   Again, I'm not sure.  Someone in that --

11  someone in that process, likely the ranking person

12  that's in the selection process.

13              MR. SIMON:  Tom, is this a good time

14          for a break?  We've been going about an

15          hour.

16              MR. BRUNS:  Yeah.  Yeah.  That works.

17              THE VIDEOGRAPHER:  Off the record,

18          11:24.

19              (A brief recess was taken.)

20              THE VIDEOGRAPHER:  We are back on the

21          record.  This is Media 3 of today's

22          deposition.  The time is 11:51 a.m.

23  BY MR. BRUNS:

24      Q.   Sheriff, we took another break and we're

25  back on the record.  When we left off, you were

1  testifying about corporal promotions, even if you're

2  at the top of the list, if an opening comes up --

3      A.   Uh-huh.

4      Q.   -- then you have a rule of three and the

5  top three people on the list have to go through

6  interviews and that kind of thing, right?

7      A.   Correct.  Yes, sir.

8      Q.   Okay.  And then the final decision maker

9  or makers for who is selected from the three

10  candidates --

11      A.   Uh-huh.

12      Q.   -- are you the final decision maker?

13      A.   Typically I get the recommendation from

14  the chief deputy.  And unless there's any -- any

15  issues brought to my attention as to why this

16  wouldn't be a good selection, I say yes, that's

17  good.

18      Q.   Okay.  So Chief Gramke is the final step

19  in the chain below you --

20      A.   Uh-huh.

21      Q.   -- and you accept his recommendation

22  unless you have some reason not to?

23      A.   Correct.  Yes.

24      Q.   Okay.  And when we left off last time, you

25  were talking about a policy of the Hamilton County

1    Sheriff's Department about not recording

2    conversations among Sheriff's Office personnel.

3         A.   Sure.

4         Q.   Is that contained in the rules and

5    regulations and disciplinary process of the Hamilton

6    County Sheriff's Office?

7         A.   I -- unless I read through that, I

8    couldn't. . .

9                   (Plaintiffs' Deposition Exhibit No.

10                  27 was marked for identification.)

11        Q.   I'm going to give you what's now been

12   marked Exhibit 27.

13        A.   Uh-huh.

14        Q.   Can you identify that document for the

15   record?

16        A.   Yes.  Yes.  It's Rules, Regulations, and

17   Disciplinary Process.  It names me as the current

18   Sheriff of Hamilton County.  Yes.

19        Q.   Okay.  And is there anything in that

20   document anywhere in there that specifically says

21   that employees aren't supposed to record

22   interactions with other employees?

23        A.   I need to go through it, so. . .

24        Q.   All right.  Do we need to go off the

25   record; do you want to --

1      A.   Yeah.  Because I'm going to have to read

2   through this whole thing if you're asking me what's

3   in it.

4              MR. SIMON:  I mean, do you want me to

5         point it out where it is?

6              MR. BRUNS:  Why don't -- I'll do it

7         at -- if she wants to do it at a lunch

8         break.  She's identified the document.

9              MR. SIMON:  Okay.

10             MR. BRUNS:  I'll come back to it.

11             MR. SIMON:  Okay.

12             MR. BRUNS:  All right.

13     Q.   And then Sheriff --

14     A.   Okay.

15             MR. WIEST:  I mean, if Counsel knows

16        where it's at --

17             MR. BRUNS:  Sheriff, if you want to

18        speed this process up, I'm okay with that.

19             MR. SIMON:  Section 1.25.

20             THE WITNESS:  Okay.  I found it.

21     Q.   Okay.  And that policy says, An employee

22   may not record another employee in the workplace,

23   including off duty details and while working

24   remotely, without the consent of all parties

25   present, unless the recording occurs during the

1    course of an official investigation approved by the

2    Sheriff and/or the Chief Deputy.  This is inclusive

3    of video recording and audio recording.  Did I read

4    that correctly?

5         A.   Yes.

6         Q.   All right.

7         A.   Uh-huh.

8         Q.   And you and/or the chief deputy can give a

9    waiver from this rule, correct?

10        A.   We could.

11        Q.   Okay.  So you and/or the chief deputy

12   could record someone underneath you and not tell

13   them because you've given yourself a waiver from the

14   rule; is that fair?

15        A.   No.  No, we could not.  No.  That's not

16   accurate.

17        Q.   Okay.

18        A.   We're bound by this policy as well.  And

19   if we were going to record someone, we would need to

20   set the recorder on the table, explain to the

21   employee that they would be -- that they're being

22   recorded so that, again, just as this states,

23   everyone understands.

24        Q.   All right.  You had mentioned that in your

25   career this was a somewhat frequent thing in the

1    Sheriff's Department, that employees would do that.

2    Had you ever had occasion where someone told you

3    something and it turned out they weren't being

4    truthful to you because somebody else had a

5    recording proving that what they told you wasn't

6    true; do you get what I'm saying?

7         A.    I think I do.  And not to my memory.

8         Q.    You don't recall any?

9         A.    State it again.

10        Q.    Sure.  Do you recall any situation where

11   someone in the Sheriff's Department told you

12   something --

13        A.    Uh-huh.

14        Q.    -- and it turns out that what they told

15   you had actually been recorded by another employee

16   and based on the recording what that person told you

17   wasn't true, they had actually said the opposite in

18   the recording?

19        A.    You know, as you ask that, I think -- yes.

20   I think that there was a -- back when I was the

21   major of the jail, I'm pretty sure that was a

22   situation that occurred.

23        Q.    Sure.  Do you recall a situation where you

24   were upset at Jason Davis for something that you

25   believed he was saying inaccurately because another

1    employee you told -- another employee told you that

2    he did not tell Jason Davis X and then Jason Davis

3    was able to prove that yes, that employee actually

4    had said it because Jason Davis had a recording of

5    that other employee; do you recall anything like

6    that?

7         A.    Yeah.  I wasn't upset at Jason Davis.  I

8    do recall the incident.  It was regarding the

9    weight, height, and fitness policy for the Hamilton

10   County Sheriff's Office.

11        Q.    Right.

12        A.    And as I understand, it was -- it actually

13   linked back to a Deputy Pritchard -- I think I have

14   his last name correct -- who was the person that it

15   originated with.

16        Q.    Right.

17        A.    It was not Jason Davis.

18        Q.    Right.

19        A.    So. . .

20        Q.    But I guess my question to you is, do you

21   recall that because Jason Davis had a recording, you

22   were able to conclude that he had been truthful all

23   along about what he was saying?

24        A.    I never heard the recording.  I was told

25   there was one.

1      Q.   Okay.

2      A.   But I never listened to it.  No.

3      Q.   But is your recollection of that whole

4  incident that Jason Davis had been truthful the

5  whole -- through the whole process?

6      A.   I didn't doubt that he was truthful, which

7  is why I didn't have to listen to the recording.

8      Q.   Okay.  Thank you.  During the course of

9  your career as sheriff are you aware of anyone who

10  has been disciplined for a violation of the no

11  recording policy?  I'm going to call it the no

12  recording policy.

13      A.   During my tenure as sheriff I'm not --

14      Q.   Yes.

15      A.   -- I don't recall that anyone was.

16      Q.   All right.  And are you aware of anyone

17  ever having been disciplined by the Sheriff's

18  Department as a result of a violation of that

19  policy?

20      A.   Not while I was tenured and not while it

21  was in policy that you can't do it.

22      Q.   Who would have knowledge of that?

23      A.   Of someone being disciplined for a

24  recording?

25      Q.   Sure.  And the consequences.

1      A.   Well, ultimately I would think I would.

2  It would be something that was disciplinary, so it

3  would come through the chain of command.

4           And, again, I'm going to, you know, remind

5  you that I don't have an explicit memory of

6  everything that comes across my desk regarding years

7  of, you know, memos and so forth.

8      Q.   Okay.  In terms of any discipline for a

9  violation of that policy, what would you expect the

10  discipline would be for someone with no disciplinary

11  history, first-time offender?

12     A.   Oh, it would be severe.  Yes, it would.

13     Q.   What's your basis for saying that?

14     A.   My basis for saying that is because we

15  have witnessed -- I have and many others have

16  witnessed the chaos that it -- that it begins and

17  starts within the ranks.  You know, in a -- in any

18  department or really any large organization you're

19  always battling, you know, gossip and rumors and

20  things that people -- you know, it destroys other

21  people's lives, particularly when deputies, you

22  know, record each other and then could possibly

23  share that on Facebook.  And I do know that there

24  were a number of disagreements among the staff.  And

25  when I say disagreements, I mean like hurt feelings,

1    things like that.

2              And perhaps I'll just say it like this, it

3    is extremely detrimental to morale of your

4    organization.  That's really the crux of it as I

5    talk about it.  It's extremely detrimental to the

6    morale of your organization.

7         Q.   Okay.  And as you sit here today you don't

8    recall ever disciplining anyone for such a

9    violation?

10        A.   I don't know that a violation occurred,

11   except for the one that I became aware of with Jason

12   Davis.

13        Q.   My question was you don't recall ever

14   disciplining anyone for a violation?

15        A.   No, I don't.  I don't.

16        Q.   All right.  In terms of any discipline,

17   what's your understanding of what the collective

18   bargaining agreement requires in terms of any

19   progressive discipline or anything like that?

20        A.   Yeah.  And that's outlined.  Progressive

21   discipline is a Level 1, Level 2, Level 3, and Level

22   4.  And Level 4 being the most severe in the

23   simplest ways to describe it.  Level 4 being the

24   most severe and that will restrict you from

25   promotions, special assignments, road patrol

1  academies, things like that.  And Level 4 is

2  certainly suspensions from work without pay.  That's

3  also encapsulated with Level 4.  People can be

4  demoted because they've reached a Level 4

5  discipline.

6      Q.   Okay.  But go back to my question, a

7  violation of the no recording policy, an officer who

8  has no prior history of discipline, what limits your

9  ability to discipline under the collective

10 bargaining agreement; would you have to start with a

11 Level 1 discipline?

12     A.   No.  Discipline -- discipline at -- you

13 know, choosing what level of discipline of a

14 particular employee may be at -- you know,

15 administration also has to take into account the

16 severity of the action.  As I stated, the -- you

17 know, the -- you know, the fallout from whatever it

18 is they did, how serious it is, what they did, what

19 it can do to your organization, the way that it can

20 seriously affect morale, or really even someone's

21 personal decision to take their own life, and I

22 think that because of that it's a very, very serious

23 violation.

24     Q.   Okay.  So to you it would be a Level 4?

25     A.   Yes, sir, it would.

1      Q.    Okay.   In terms of officers in the

2   Hamilton County Sheriff's Department who are members

3   of the union, they have a right to grieve a decision

4   like that?

5      A.    Oh, they would.

6      Q.    Okay.   And ultimately who would have the

7   last say on that?

8      A.    Well, I'm certain it would go to

9   arbitration and so an arbitrator would really have

10   the last say.

11      Q.    Okay.   Thank you.   In your experience has

12   an arbitrator ever reduced the level of punishment

13   that you imposed -- the level of discipline that you

14   imposed?

15      A.    That I imposed?

16      Q.    Yeah.   Do you recall?

17      A.    Not to my knowledge.

18      Q.    All right.   But they can?

19      A.    Yeah.   They certainly have the authority

20   to do that.

21      Q.    Okay.   Go to Interrogatory No. 9, page 17.

22   Yeah, back on Exhibit 24.   Sorry.

23      A.    Okay.   Sure.

24              MR. BRUNS:  Oh, and just for

25              housekeeping, let's do one more exhibit

Page 112

1              here.

2                   (Plaintiffs' Deposition Exhibit No.

3                   26 was marked for identification.)

4       Q.   I'm handing you what's been marked as

5  Exhibit 26.   What is that?

6       A.   So this is a social media policy signed by

7  Jim Neil.   And it says it's -- the effective date --

8  it went into effect February 4, 2014.

9       Q.   Okay.   That doesn't have anything to do

10 with recording or not recording, that's just

11 strictly about social media?

12      A.   Correct.

13      Q.   All right.   Thank you.   Go to Exhibit 24,

14 page 17.

15      A.   Yes.

16      Q.   Interrogatory No. 9.   It says, Please

17 state all reasons why you tried to get Jason Davis

18 to regulate or attempt to regulate the online speech

19 of Jennifer Davis.   And your answer to that was, I

20 did not try to regulate anyone's speech.   I said she

21 can do whatever she wants.   Did I read that

22 correctly?

23      A.   That's right.

24      Q.   All right.   And putting aside the precise

25 words about trying to regulate anyone's speech, did

1  you in any way suggest to Jason Davis that he should

2  talk to his wife about her online social media

3  activity?

4      A.   We had a very far-reaching conversation,

5  as I recall.  And I do believe there were times in

6  that conversation where his wife was referenced.

7  And as I recall, referencing his wife to assess how

8  happy he was on the job, you know, if he was

9  satisfied with working for the Sheriff's Office, if

10 he was happy there.

11     Q.   I don't understand your answer.  Ask his

12 wife to assess --

13            MR. SIMON:  I'm sorry, Mr. Bruns.  I

14        think she was still answering.

15            MR. BRUNS:  Oh, I apologize.  I

16        didn't mean to cut you off.

17     A.   So in that way, you know, if my memory

18 serves me correctly, you know, I did state she can

19 do whatever she wants.  Now, that may not be the

20 exact wording.  But obviously she can -- you know,

21 anybody's wife can do whatever they want.  They're

22 not an employee of the Hamilton County Sheriff's

23 Office.

24            I do believe that his wife came up in the

25 conversation regarding speech just because I said

1    are you happy -- I mean, are you happy here, does

2    your wife support your employment -- I mean,

3    because, you know, we run across guys that, you

4    know, their wives are -- they don't want them

5    working there because of third shift or lots of

6    different reasons and, you know, they're never home

7    and things like that.  So I was assessing -- yeah.

8    And in that conversation I'm certain I did say your

9    wife has the ability to do whatever she likes.

10        Q.   Okay.  Maybe you misunderstood my

11   question.  I'm asking you specifically --

12        A.   Yes.

13        Q.   -- did you say anything along the lines of

14   you need to talk to your wife or you need to have

15   your wife tone down or not communicate on social

16   media in the way she's been?

17        A.   I have no recollection.  I have no

18   recollection of that because I don't recall.  I

19   don't recall.

20        Q.   And there's no reason you would have said

21   anything like that; is that fair?

22        A.   Again, I don't recall.  So I can't even

23   speak to any reason I would have said or did not say

24   that, so I don't recall.

25        Q.   Okay.  Let's go back to our conversation

1    that we had before.  What reason as Sheriff of the

2    Hamilton County Sheriff's Department -- what reason

3    would you ever have to tell a deputy tell your wife

4    to stop posting on social media?

5        A.   First of all, again, I don't -- you know,

6    I'm not going to make something up out of the air.

7    I'm answering questions on a factual basis of what I

8    said or didn't say, what my memory is of what I said

9    or didn't say.  I cannot, you know, pick some

10   hypothetical out of the air and say this is why or

11   what.

12       Q.   Again, with the caveat that she's not

13   posting anything confidential, learned in secrecy

14   from the Hamilton County Sheriff's Department, you

15   would have no reason to ever tell a deputy to be

16   concerned about what their wife is posting on social

17   media, fair?

18              MR. SIMON:  Object to the form of the

19              question.  Asked and answered.

20       A.   You're asking me to hypothesize and I

21   can't.  I simply can't.  I can't say what could be,

22   what should be, what -- you know, in a hypothetical

23   situation.  That's not something that I can -- that

24   I can truthfully answer.

25       Q.   As you sit here today you cannot think of

1   a single situation, excluding the disclosure of

2   confidential or secret information from the Hamilton

3   County Sheriff's Department -- excluding that, you

4   can't think of a single situation where you would

5   tell a deputy you need to be concerned about what

6   your wife is posting on social media, fair?

7               MR. SIMON:  Objection to the form.

8          Asked and answered.

9       A.   There may be a situation where I could say

10  that.  But at this point in time I'm not going to

11  make something up.  I mean, there may be a

12  situation.  But what that situation is, who it

13  involves, when it would happen -- I mean, you know,

14  you're asking me to state my opinion on a complete

15  hypothetical, and I honestly cannot do that.

16      Q.   All right.  Go to Interrogatory No. 10 on

17  page 18.

18      A.   Yes.

19      Q.   It says, With respect to Jason Davis's

20  Facebook post about the football game, please state

21  all reasons why you punished him for that post.

22  Answer, Jason Davis was not punished for any post

23  about a football game, true?

24      A.   To my recollection, yes, that's true.

25      Q.   And that's because nothing he said or did

1   about that football game merited him being punished;

2   is that fair?

3        A.   So I didn't even understand what he was

4   talking about about the football game.  I didn't

5   have any idea.  I couldn't even understand why a

6   football game would be an issue, what football game,

7   where, when.  I mean, honestly that just hit me out

8   of the blue.  I have no idea.

9             I recall him saying that obviously in the

10  meeting being very adamant about it.  But I was

11  completely surprised and unaware.  I didn't even

12  know what he was talking about.

13            MR. BRUNS:  Read my question back.

14            THE COURT REPORTER:  Sure.

15            "And that's because nothing he said

16            or did about that football game merited

17            him being punished; is that fair?"

18            MR. SIMON:  Object to the form of the

19            question.  You can show her the post.

20            MR. BRUNS:  I can ask the question as

21            well and I did.

22        Q.   Sheriff, could you answer my question?

23        A.   Okay.  So. . .

24        Q.   As far as you're aware -- I'm only asking

25   about your knowledge, right?

1      A.    Okay.   Right.

2      Q.    You swore to tell the truth, fair?

3      A.    Yes.   Correct.

4      Q.    And you're only to give me answers based

5    on your personal knowledge, fair?

6      A.    Correct.

7      Q.    Okay.   Based on your personal knowledge

8    are you aware of anything Jason Davis said or did

9    about that football game that merited punishment?

10     A.    I didn't even know there was a football

11   game, sir.   So the answer to that would be not to my

12   knowledge.

13     Q.    Thank you.   And in terms of the football

14   game, is it your understanding that it was a charity

15   event to raise money for families of fallen officers

16   --

17              MR. SIMON:   Objection to form.

18     Q.    -- if you know?

19              MR. SIMON:   Lack of foundation.

20              You can answer.

21     A.    I had no knowledge of the football game.

22   No knowledge surrounding it.   I learned after the

23   fact -- long after the fact of it being brought up

24   in this meeting of what the football game was even

25   about.

1      Q.    And do you now have an understanding of --

2      A.    No, I don't.  I still don't.

3      Q.    Okay.  Could you go to page 23 of --

4      A.    Sure.

5      Q.    -- that document, Exhibit 24.  And do you

6  see -- Document Request No. 3 says, Produce all

7  documents that constitute evidence, tend to

8  evidence, support, refute, tend to refute, refer to,

9  or relate in any way to the claims made in the

10  complaint or your answer or defenses raised thereto.

11  And then the response was, See file entitled

12  McGuffey Interrogatories and Request to Produce.

13  Did I read that correctly?

14      A.    Yes.

15      Q.    All right.  And I'll represent to you that

16  Exhibits 26 and 27 were not provided as a response

17  to that, okay?  They were just provided to us just

18  now --

19      A.    Oh, okay.

20      Q.    -- all right?

21      A.    All right.

22      Q.    Do you know if Exhibits 26 or 27 -- if

23  either of those exhibits are documents that evidence

24  or support any defense of the defendants in this

25  case; do you know?

 1                    MR. SIMON:  Objection to form.  That
 2             calls for a legal conclusion.  She's not a
 3             lawyer.
 4                    Go ahead and answer.
 5        A.   Yeah, I really would have no idea.  No, I
 6   do not know.
 7        Q.   All right.  Thank you.  Could you go to
 8   page 26 --
 9        A.   Yes.
10        Q.   -- or actually 25 is the question.
11        A.   Sure.
12        Q.   It says, With the exception of
13   communications with counsel covered by the
14   attorney-client privilege, produce a copy of any
15   text message, email, or other document that in any
16   way reflects or relates to either of the Plaintiffs,
17   the October 10, 2023, interaction between Plaintiff
18   Jason Davis and Defendants McGuffey and Gramke,
19   Jason Davis's RENU transfer in 2023, and/or Jason
20   Davis's promotion to corporal in 2023.  Did I read
21   that accurately?
22        A.   Yes.
23        Q.   All right.  And then in response you say,
24   I do not have any text messages, emails, or other
25   document that reflect or relate to either of the

1   Plaintiffs, the October 10, 2023, interaction

2   between Plaintiff Jason Davis and Defendants

3   McGuffey and Gramke, Jason Davis's RENU transfer in

4   2023, and/or Jason Davis's promotion to corporal in

5   2023.  Did I read your answer correctly?

6       A.   That's correct.

7       Q.   All right.  And what I noticed in the

8   other answers to the other document requests, it

9   generally says no document exists or no document was

10  located, all right?

11      A.   Uh-huh.

12      Q.   And my question to you is, as I read your

13  answer to Document Request No. 11 you personally

14  don't possess any document responsive to that

15  request; is that a fair characterization?

16      A.   That would be correct, yes.

17      Q.   All right.  What did you do to have the

18  proper person within the Hamilton County Sheriff's

19  Department search in order to answer Document

20  Request No. 11; what, if anything, did you do --

21  because you can answer for your own communications.

22          What did you have -- what did you do to

23  have someone within Hamilton County Sheriff's

24  Department search to see if any such documents

25  exist, could be located?

1      A.   Well, what I do know of Jessica Kober's

2   job -- again, that she has been long tenured in

3   collecting documents and answering, you know, legal

4   discovery things like this -- is that she -- and

5   this is my knowledge, she can in emails -- you know,

6   you can search by typing up particular words.

7           Then any emails that connect throughout

8   the department would be -- you know, would be

9   collected as far as text messages -- I mean, I did

10  not work with Jessica personally on collecting these

11  documents.  If I'm asked to produce, if I have a

12  document, I would produce it.  If I don't, then I

13  state just what I apparently stated here, which is I

14  don't have anything like that.

15     Q.   All right.  So you didn't talk to Jessica

16  about what she should do in order to locate

17  documents responsive to Document Request No. 11; is

18  that fair?

19     A.   Right.  No.  Yeah.

20     Q.   Okay.

21     A.   I would have no reason to do that.

22     Q.   And you didn't talk to anyone within the

23  department about what they needed to do to attempt

24  to locate documents responsive to Document Request

25  No. 11; is that true?

1        A.    To my knowledge I -- that's my memory.

2        Q.    All right.  And then your response was

3   specific.  In other answers it says no document

4   was -- no documents were located, right?  Here it's

5   I do not have.  You made it very specific.

6             Did you take any steps to ensure the

7   accuracy of that statement, that you personally do

8   not have any text messages, emails, or other

9   document that reflect or relate to any of the

10  categories that are listed?

11       A.    So I'm just -- if I may just go back to

12  the actual question --

13       Q.    Sure.  Please do.

14       A.    -- on page 25.  With the exception of

15  communications with counsel covered by the

16  attorney-client privilege, produce a copy of any

17  text message, email, or other document that in any

18  way reflects or relates to either the Plaintiffs,

19  the October 10, 2023, interaction between the

20  Plaintiff Jason Davis and Defendants McGuffey and

21  Gramke, Jason Davis' RENU transfer, or Jason Davis'

22  promotion to corporal.

23            So it's asking me the question of -- it's

24  asking me to produce that and --

25       Q.    Anything related --

1      A.    -- I didn't have anything to produce.

2      Q.    And my question was, what did you do to

3  make that determination?

4      A.    Well, I would have checked my text

5  messages of which there are none that refer to Jason

6  Davis.  I know absolutely that I did not write any

7  emails regarding Jason Davis.  Any document

8  regarding Jason Davis that I read or had possession

9  of is the -- after the fact with the exit interview,

10  the -- and the complaint as I recall.

11      Q.    Okay.  Did you run a search on your email?

12      A.    No, I did not.  I don't know how to do

13  that quite frankly.

14      Q.    Did you ask someone to do it for you?

15      A.    Jessica Kober would be doing the searches

16  for the email.

17      Q.    Do you know -- well, number one, you told

18  me you didn't talk to her about it.  So you didn't

19  ask her to run the search appropriate to elicit

20  documents responsive to Document Request No. 11; you

21  did not ask her to do that on your email, fair?

22      A.    I don't manage Jessica Kober's day-to-day

23  activity.  I'm not her direct supervisor.  We have

24  an organization that's 900 strong.  My job is to

25  communicate through the chain of command, through

1    the in-house attorney, Pete Stackpole, as to the

2    collection of any inquiry --

3                    MR. SIMON:  Let me stop there.  You

4            mentioned Mr. Stackpole.  I don't want you

5            to disclose any attorney-client

6            communication.

7                    THE WITNESS:  Thank you.

8                    MR. SIMON:  And I'd point out,

9            Counselor, that is specifically excluded

10           in No. 11.  And you've repeatedly asked

11           her if she talked to --

12                   MR. BRUNS:  Jessica.

13                   MR. SIMON:  She's identified Jessica,

14           but then you've said have you talked to

15           anybody --

16                   MR. BRUNS:  Again, I make -- for the

17           record, so I'm clear, I'm not asking about

18           conversations with counsel ever in any of

19           my questions.

20                   MR. SIMON:  I understand.  But you've

21           repeatedly asked her, well, have you

22           talked to anybody.

23                   MR. BRUNS:  Well, that wasn't even my

24           question.

25    BY MR. BRUNS:

1      Q.   My question was, did you have a

2  discussion -- did you instruct Jessica to search

3  your email for documents responsive to Document

4  Request No. 11?

5      A.   I personally did not, no.

6      Q.   Okay.  And so you don't know if she did

7  that?

8      A.   I can answer that question with a no, I do

9  not know.

10      Q.   All right.  And in terms of any other

11  document that might reflect or relate to the

12  categories in Document Request No. 11, what efforts

13  did you make to search for such documents?

14      A.   As I said, I checked my text messages and,

15  you know, that -- I didn't -- I know I didn't have

16  any emails because I didn't -- I know I didn't.  I

17  didn't -- I would remember writing an email and

18  having sent it off to someone had I done that, so --

19  but text messages referencing, et cetera, I don't

20  have any.

21           MR. BRUNS:  All right.  This is just

22      copies of the complaint.

23           (Plaintiffs' Deposition Exhibit No.

24           25 was marked for identification.)

25      Q.   Sheriff, I'm going to hand you what's now

1    been marked as Exhibit 25 -- Plaintiffs' Exhibit 25.

2         A.    Uh-huh.

3         Q.    Take a moment and look in that and is that

4    a copy of the complaint you reviewed?

5         A.    It appears to be.

6         Q.    All right.  And I'm going to go through

7    this complaint with you, because I want to know your

8    personal knowledge, all right?

9         A.    Uh-huh.

10        Q.    And so in paragraph No. 1 I'm not talking

11   about any sort of conclusions.  I'm talking about a

12   factual statement, for instance, where it says his

13   wife, referring to Jason Davis -- his wife, Jennifer

14   Davis, Jennifer, made public posts to social media

15   critical of certain policies of Sheriff Charmaine

16   McGuffey and liked certain social media posts made

17   by Caroline Adams that were pro-law enforcement, but

18   critical of certain policies of Sheriff McGuffey.

19   Do you see where I read that in paragraph 1?

20        A.    I do.

21        Q.    Okay.  I'm talking about statements like

22   that.  Do you have any personal knowledge that any

23   of those factual statements in paragraph 1 are

24   false?  And I'm not asking about things you say,

25   well, I don't know one way or the other.  I'm saying

1   that you have personal knowledge that they're false.

2       A.   I don't have any personal knowledge --

3       Q.   Okay.

4       A.   -- that they're -- that they're false.

5       Q.   All right.  Go to paragraph 2.

6       A.   Okay.

7       Q.   It says, Jason then had a meeting with

8   Gramke and McGuffey in October 2023 to address this

9   retaliation.  Now, I'm going to assume that, again,

10  retaliation is a conclusion.  You would disagree

11  that there was any retaliation, fair?

12      A.   I would say that's fair.

13      Q.   Okay.  In terms of any factual statements

14  in there, are you -- do you have any personal

15  knowledge that any of those factual statements are

16  false?

17      A.   Okay.  So you're asking me to review?

18      Q.   Paragraph 2.

19      A.   Paragraph 2.  Okay.  So give me a moment,

20  please.

21      Q.   Sure.  Please take a moment.

22           MR. SIMON:  You might give her a

23           chance to review paragraph 1 as well.

24      A.   Yeah, I did not realize that paragraph 1

25  extended, by the way, to page two.  I just thought

1    it was completed there on page one.

2         Q.   All right.  Take your time.

3         A.   Okay.  I've read two.  I have not

4    completed one.  Can we just address two and then I'm

5    happy --

6         Q.   Sure.

7         A.   -- to go back to one?

8         Q.   Go ahead and address two.

9         A.   Okay.  So I've read it.

10        Q.   And is there any statement in paragraph

11   two that you say I have personal knowledge that's

12   false?

13        A.   Oh.  It's absolutely false that I

14   specifically told Jason he needed to end his

15   20-year-plus marriage.  That's completely false.

16        Q.   Okay.  Anything else?

17        A.   And I did not tell Jason that the actions

18   were solely based on some protected speech

19   activities, you know, in specific, you know, mostly

20   directed to his wife's media post.  I referenced

21   them, I'm sure.  But I certainly did not tell Jason

22   that because of his wife's -- which is what I

23   gleaned from this, because of his wife's social

24   media posts, I told him to specifically end his

25   marriage.

1       Q.    Okay.

2       A.    I absolutely did not say that.

3       Q.    All right.  Did you say anything that

4    would have implied that you -- he needed to consider

5    cutting ties with his wife, dissociating himself

6    from his wife; did you say anything like that or

7    imply that?

8                    MR. SIMON:  Object to the form of the

9              question.  Vague and ambiguous.

10                   You can try to answer.

11      A.    I absolutely did not intend to imply that

12   he end his marriage, no.  I absolutely did not.

13      Q.    Or cut ties with his wife?

14      A.    Or cut ties with his wife.

15      Q.    All right.

16      A.    Correct.

17      Q.    If you could go to --

18                   MR. SIMON:  Are we going back to

19              paragraph one, Tom?

20      Q.    Oh, yeah.

21      A.    Yeah.  I didn't realize that there was a

22   second page on that.

23      Q.    Sure.

24      A.    So give me a moment, please.

25      Q.    Yeah.  Take a moment.

1      A.   Okay.  What's the question about No. 1

2   then?

3      Q.   Sure.  I understand, you know, the

4   conclusion of retaliation, you disagree with that,

5   all right, but is there any factually false

6   statement in paragraph two that you say I have

7   personal knowledge and I know that is not a true

8   statement as a factual matter?

9      A.   So it is factual that I took no

10  retaliatory measures against Jason because of a post

11  that he would have made regarding the Remember the

12  Fallen.  It is a fact that I did not deny a

13  promotion to him in retaliation for that post or

14  anything surrounding that post.

15          And, in fact, I -- the -- I take issue

16  with the -- it's not stated here, but the assumption

17  that we were trying to create an early expiration

18  date for the promotion list that he was currently

19  on.  So I take issue with that as well.

20     Q.   You're saying factually that's not a true

21  statement?

22     A.   It's not a true statement.

23     Q.   Okay.  And just so we're clear, is it your

24  testimony that at no time did you ever discuss with

25  anyone in the Hamilton County Sheriff's Department

1  any sort of early termination of the promotion list

2  that Jason Davis was on for the corporal position?

3      A.   The current promotion list stood.  The

4  time frame that the current promotion list had been

5  granted could not be changed and, in fact, should

6  not be changed.  What happened subsequent to this,

7  to my knowledge, that I have knowledge of, is that

8  we determined as an administration that we would

9  negotiate with the union to reduce that list

10  expiration date to one year is my knowledge, maybe a

11  year and some months, but I believe it was like one

12  year.

13          And the purpose of that had absolutely

14  nothing to do with Jason Davis.  His list was not

15  considered a part of that.  It wasn't a part of that

16  negotiation.  We negotiated that for reasons that

17  our administration felt were important for the

18  betterment of the organization.

19      Q.   So at no point did you ever talk to anyone

20  in the Hamilton County Sheriff's Department or the

21  union -- anyone about shortening the lifespan for

22  lack of a better word of the promotion list for

23  corporal that Jason Davis was on?

24              MR. SIMON:  Objection to the form of

25          the question.  I think it's vague and

1          ambiguous.

2                   You can try to answer.

3        A.   I don't recall having any conversation

4   about shortening a promotion list for Jason Davis.

5        Q.   Or a list that he was on?

6        A.   Or any -- or a list that he -- that I knew

7   he was currently on, which was the promotion list

8   for corporal.

9        Q.   Could you go to paragraph 10.

10       A.   Uh-huh.

11       Q.   Is there any statement in paragraph 10

12  that you say factually that's false?

13       A.   Oh, not page 10.  I'm sorry.

14       Q.   No.  Paragraph 10.

15       A.   Sorry.

16       Q.   I apologize if I said page 10.

17       A.   No, no, you didn't.  I just misunderstood.

18  There's nothing in paragraph 10 that I would say is

19  false.

20       Q.   Okay.

21       A.   So, yeah, to my knowledge, yes, these are

22  things that are true.

23       Q.   All right.  Same question for paragraph

24  11.  I'm going to ask you the same question about

25  the paragraphs we're going to go through.  So --

1  A. Sure.

2  Q. -- if you have personal knowledge that

3 something is false, that's what I want you to tell

4 me.

5  A. Of course.

6  Q. Because that means you could be a witness

7 to testify about it.

8  A. Yes.  Yes.  Okay.  So I don't have any

9 personal knowledge of No. 11.

10  Q. All right.  How about No. 12?

11  A. Factual?

12  Q. Yes.

13  A. Yes.  Yes.

14  Q. All right.  I'm only asking is there

15 anything that you would say is not a true statement,

16 that's factually false.  So there isn't anything

17 that you can say I don't see anything that I would

18 say is false.

19  A. Okay.

20  Q. All right.  How about 13?

21  A. I don't see anything that is factually

22 false.

23  Q. All right.  How about paragraph 14?

24  A. I don't have any knowledge of it to say

25 whether it's factual or not, so. . .

1      Q.    Okay.  Same for 15?

2      A.    I don't have any knowledge whether that's

3  factual or not.

4      Q.    All right.  Paragraph 16, same question?

5      A.    So let me just qualify this answer,

6  because I wouldn't know Caroline Adams if I bumped

7  into her on the street, so -- but that is the name

8  that has -- that I do know has been associated with

9  criticism of me.  This direct criticism here that's

10  quoted, I have no knowledge of that.

11      Q.    And you don't know -- you don't have any

12  personal knowledge to say that it's not true, she

13  doesn't go by Chaz the Anti-Sheriff or Itsa Krakken;

14  as far as you know that's accurate, you don't know

15  one way or the other?

16      A.    I don't.

17      Q.    Okay.  And that's what I'm looking for --

18      A.    Yeah.

19      Q.    -- if you can say nope, that's false, I

20  know it's false, here's what's false --

21      A.    Right.

22      Q.    -- about it.  That's what I'm looking for.

23      A.    Okay.

24      Q.    Paragraph 17, same question, is there

25  anything in here that you would say is absolutely

1    false and I know that because I have personal

2    knowledge about it?

3         A.   So there's a number of false things in

4    this paragraph.

5         Q.   Let's take them one by one.

6         A.   Sure.

7         Q.   What's the first false thing?

8         A.   So the first false thing is I object to

9    her or whoever wrote this, the statement of

10   irresponsibly.  I object to that statement.  It's

11   false.

12        Q.   Okay.

13        A.   The next is --

14        Q.   Well, let's take them one by one.

15        A.   Okay.

16        Q.   Yeah, I'll move on.  But I have some

17   questions since you say it's false, all right?

18        A.   Yes.

19        Q.   All right.  Do you agree that you left a

20   loaded firearm in your car in 2021?

21        A.   I did.

22        Q.   All right.  And your firearm was stolen

23   along with your county vehicle, correct?

24        A.   Correct.

25        Q.   All right.  And your firearm was left in

1    your glove compartment locked; is that true?

2         A.    Correct.

3         Q.    All right.  And it was in your driveway at

4    home when it was stolen; is that true?

5         A.    That's correct.

6         Q.    All right.  So what do you -- what's your

7    disagreement in terms of irresponsibly leaving your

8    loaded firearm in your car; where do you say it

9    was -- it's false, it was not irresponsible of me?

10        A.    First of all, there are policies that do

11   allow people who carry firearms, particularly long

12   guns and things like that, to have them locked in

13   their vehicles, you know, stored in their vehicles

14   in a locked way.  I was not irresponsible given the

15   fact that it is my responsibility to make sure that

16   no one, including children, would accidentally in

17   some way get my firearm, put their hands on it.

18             So we -- I had had a call out just that

19   evening.  I got home from my call out late.  My

20   house -- we had -- we were moving literally.  It was

21   like the second day of the move.  And my house was

22   filled with family members and kids and people

23   coming and going.  And I think even one or two of

24   the moving people were still left doing a few

25   things.  And I did not feel comfortable at all

1   bringing my firearm into that house.  Of course

2   things were set all about.  My safe that I normally

3   would, you know, put my firearm in is -- I'd have to

4   find it, first of all.  There's boxes and everything

5   stacked all around.

6          So I determined that the best place to

7   keep my firearm safe was to lock it inside my

8   vehicle, and that is why I did that, because I just

9   couldn't count on the fact that -- you know, I

10  didn't want to walk into all that chaos and somehow

11  set my firearm down or think I had put it up on

12  something that the kids couldn't get to.  It just

13  was -- it just was not in the question.  I could not

14  bring it in the house.

15      Q.   Well, let me ask you this.  When you went

16  to bed that night, were the movers still there?

17      A.   The kids were still there.

18      Q.   Okay.  Were the movers still there?

19      A.   No.  They had left.

20      Q.   Okay.  And when you went to bed that

21  night, you could have taken the time to locate your

22  safe and put your loaded firearm in your safe; is

23  that fair?

24      A.   No.  That's not fair at all.

25      Q.   Why?

Page 139

1    A.    Because there was boxes and boxes of

2  things piled around.  Obviously I took my long

3  guns -- my long guns, I took those and secured those

4  at my nephew's house so there would literally be no

5  weapons moved around in that house.  So I emptied my

6  gun safe that I have, which was the weapon I was

7  wearing, and that got moved along with everything

8  else.  And I have no idea until I have some hours to

9  go through and find it to make sure that I have it

10  and it's secured and so forth.

11        So I was not going to sleep with my

12  firearm under my pillow or strapped to my side.  I

13  was going to secure it in my car in the locked glove

14  compartment as is allowed by policy.

15    Q.    How big was your gun safe back then, the

16  one that had the long guns?

17    A.    Oh, the one for the long guns?  I did not

18  have those in a safe.  That's why I took them to my

19  nephew's house.

20    Q.    Okay.  Well, after this incident did you

21  ever keep your loaded firearm locked in your glove

22  compartment overnight?

23    A.    No.

24    Q.    You always made sure that it was put in a

25  safe inside?

Page 140

1      A.   Well, because it's just myself and my

2   wife, I typically don't have to lock it up.  I'll

3   put it on the bed stand next to me.  That's the way

4   I sleep.

5      Q.   Okay.  But you stopped leaving it in the

6   locked glove compartment of your car after this

7   incident; is that fair?

8      A.   Well, I never did do that.  That was a

9   very unusual thing for me to do.  I never stored my

10  weapon in my car, in my vehicle ever.  And I did it

11  that night because, as I said, the circumstances

12  were I felt that was the safest place for it and I

13  knew that policy allowed it.

14     Q.   So the one time in your life you did it,

15  it was just bad luck, your car got stolen; is that

16  your testimony?

17     A.   Absolutely, sir.

18     Q.   What was the next thing you said you

19  disagreed with factually, because you have personal

20  knowledge that it's not true?

21     A.   So the reference to my spending time at a

22  bar and -- not that, that was factual -- that I

23  directed a statement you can suck my D at a

24  Covington Police Officer.  That is absolutely not

25  factual.  That is a lie.

1     Q.   Okay.  You never said anything like

2   that -- those words?

3               MR. SIMON:  Let me just object to the

4               line of questioning.  It's relevant -- not

5               relevant.

6               You can go ahead and answer.

7     A.   I absolutely did not say it.

8     Q.   Okay.  Are you aware --

9               MR. SIMON:  Tom, can I just have a

10              continuing objection if you're going to

11              probe --

12              MR. BRUNS:  On relevance, you may,

13              yes.

14              MR. SIMON:  -- on each of these

15              incidents it sounds like you're going to

16              ask her about in No. 17, yes.  Thank you.

17    Q.   Are you aware -- at any point did you

18   become aware that it was alleged by the Covington

19   Police Officer that you said words to that effect?

20    A.   Oh, I know it was alleged.  I understand

21   it was alleged.  It doesn't make it true.  It didn't

22   happen.

23    Q.   Okay.  So the officer was lying about you?

24    A.   Absolutely.  He lied about a number of

25   things.

1    Q.   Okay.  All right.  Was there anything else

2   in that paragraph that you say is factually false,

3   not true?

4    A.   So the reference to a September 20th

5   incident in which I was alleged to have been drunk

6   driving, that is a lie.  Video supposedly I guess

7   posted by this person -- and I don't know if it's --

8   if it's saying that the video posted is me alleged

9   to have been drunk driving, but it's absolutely

10  false.

11   Q.   Okay.  Do you know -- you're saying it's

12  absolutely false I was not drunk driving; is that

13  your testimony?

14   A.   That's absolutely correct.

15   Q.   But you're not disputing that body cam

16  video of you was posted by Adams?

17   A.   There was a body cam video that was posted

18  because I got pulled over for speeding.

19   Q.   All right.  And you're not disputing that

20  there were allegations -- you weren't charged in

21  that incident, but people were saying you appeared

22  drunk on the video?

23   A.   That's absolutely ridiculous.  I have to

24  say it.  It's absolutely false.  It's a lie.  There

25  was never a dispute as to whether I was driving

1  drunk.  That's -- it's a lie.  It's an absolute lie.

2       Q.   And no one alleged that?

3       A.   No one alleged that.

4       Q.   Okay.  All right.  What else, if anything?

5       A.   So there's a reference here to some prior

6  acts of dishonesty and my being on the Brady list.

7  Those are false.  And I guess we can take those.

8       Q.   Sure.  So first of all, a prior act of

9  dishonesty.

10      A.   Uh-huh.

11      Q.   Is it your testimony that you never acted

12  dishonestly in any way during your career with the

13  Sheriff's Department?

14      A.   That's 100 percent correct.

15      Q.   Okay.  And has anyone in the Sheriff's

16  Department ever conducted any investigation where it

17  was in fact determined that you had been dishonest?

18      A.   It was never determined that I was

19  dishonest.  It was alleged.

20      Q.   Well, I'm going to -- let's be specific.

21  Was there ever a finding of you being dishonest -- a

22  finding that was sustained?

23      A.   No, there wasn't.

24      Q.   Okay.

25      A.   There was no hearing.  There was no -- no

Page 144

1    evidentiary, no fact-finding, no anything.

2         Q.   Okay.

3         A.   It was an allegation that was included

4    among many allegations, and it is false.

5         Q.   And no unit, agency, department of the

6    Hamilton County Sheriff's Department, including

7    Internal Affairs -- no one ever sustained a finding

8    that you had been dishonest?

9         A.   It was not sustained, because I was not

10   given any due process.  There was never any -- there

11   was never any, you know, finding of that in any

12   factual way.  It was an assertion.  It was a -- it

13   was alleged.  It was an allegation.

14        Q.   And the allegation was based on interviews

15   with a number of Hamilton County Sheriff employees

16   who contradicted you and said that you were not

17   being truthful, fair?

18        A.   No, that's not fair.  It was -- that

19   allegation was made simply because the investigator

20   that interviewed me made that assertion from an

21   answer that I had regarding a conversation I had

22   with a captain regarding -- hang on, I'll think of

23   it -- oh, regarding a question I asked him.  When I

24   said he agreed, when I asked him is this okay, and

25   he was recording me.  He didn't state yes.  He shook

1  his head yes.  And that's what I testified to.  I

2  said he shook his head yes.  He said yes.  But the

3  investigator took issue with the fact that there was

4  no yes from him on the recording.

5       Q.   Okay.  So as you recall it, the finding of

6  dishonesty was never sustained by Internal Affairs

7  and it was solely based on a dispute as to what you

8  said to one other employee?

9       A.   Correct.

10      Q.   All right.  And then you said that it's

11 also false that you were placed on the Brady list.

12 You were never placed on the Brady list?

13      A.    My name appeared on the Brady list.  It

14 was illegal.  It was unlawful.  And that was proven

15 in my lawsuit subsequently.  There was no -- I met

16 not one of the requirements.  There's a list of

17 federal requirements to be on that Brady list, and

18 not one of them applied to me.

19      Q.   Okay.  But it doesn't -- this allegation

20 in paragraph 17 of the complaint doesn't say that

21 you qualified for the Brady list, it just says there

22 were posts about the fact that you were placed on

23 the Brady list.  You, in fact, were placed on the

24 Brady list for Hamilton County, correct?

25      A.   For political purposes, yes, I was.

1      Q.   Okay.  And then you say it was determined

2   that you shouldn't have been put on the Brady list.

3   Who made that determination?  Because when I hear

4   that as a lawyer, I think a jury verdict or a judge.

5           Who made the determination that your

6   inclusion on the Brady list for Hamilton County was

7   improper?

8      A.   Joe Deters, the Prosecutor of Hamilton

9   County.

10     Q.   Okay.  What did -- so he's not a judge or

11  a jury, but what did he say that supports your

12  testimony that you were improperly included on the

13  Brady list?

14     A.   So I had filed suit.  There was a summary

15  judgment by Judge Dlott -- in fact, a very

16  significant one.  I believe it was 19 pages.  And

17  Joe Deters, based on that finding, told my attorney

18  that, one, they wanted to settle and, two, that I

19  would be removed from the Brady list for lack of

20  cause.

21     Q.   Okay.  So you said there was a

22  determination.  Was it Judge Dlott's decision that

23  determined it?

24     A.   Judge Dlott determined that there was --

25  that I had -- well, I won summary judgment on all

Page 147

```
 1    three counts, that I was targeted because I was a

 2    lesbian, that I -- that I -- I have to go back in my

 3    memory, but that I was similarly dismissed without

 4    just cause, and that I was falsely accused of the

 5    wrongdoing.  It had to do with the substance of the

 6    internal investigation that was done.

 7         Q.   All right.  And your testimony is that

 8    Judge Susan Dlott of the Southern District of Ohio

 9    made that determination in your favor as a matter of

10    law, not that she said there's a question of fact

11    about all that, she actually -- let me finish -- she

12    actually determined it as a matter of law; is that

13    your testimony?

14              MR. SIMON:  I have multiple

15              objections.  First, we're asking a

16              non-lawyer to interpret a decision by

17              Judge Dlott many years ago.  She's not

18              qualified to do that.

19              And, Counselor, we are far afield

20              from the allegations in your complaint and

21              in your clients' claims.  I would ask you

22              just to move on.

23              MR. BRUNS:  No.  I want to know what

24              her personal knowledge is.  And if she has

25              personal knowledge, I'm entitled to know.
```

1          This is my opportunity.

2              MR. SIMON:  Her personal knowledge

3          about what Judge Dlott said --

4              MR. BRUNS:  If that's what her basis

5          is, then she's repeating hearsay.  I'm

6          entitled to test what she actually has

7          personal knowledge of.  I am.

8      A.   I can tell you that, again, I'm not an

9  attorney.  I didn't go through the decision and

10 parse every piece of it and understand all of the

11 different legal jargon that's in there.

12         What I can tell you is I prevailed on

13 three of the allegations that I had regarding my

14 unjust being fired and so forth.  And after that the

15 -- I can tell you the prosecutor's office approached

16 us to settle.  That's what I can tell you factually.

17     Q.   Is there any other false statement of fact

18 in paragraph 17?

19     A.   So we already broached the alleged drunk

20 driving.  I want to make very, very sure that we all

21 know that that is a lie in 17.

22     Q.   My question is, again --

23     A.   And I'm going through it.  I want to make

24 sure that I have been very, very clear that the

25 alleged drunk driving is a lie.  The acts of

1    dishonesty are a lie.  The my being placed on the

2    Brady list is based on a lie.  Posts critical of

3    jail safety where inmates regularly popped the locks

4    on the cells -- inmates were popping locks on the

5    cells, that's a fact.  Other assorted criticisms, I

6    don't -- I don't know what that entails.

7         Q.   All right.  Let's move on then.  Paragraph

8    18.

9         A.   Okay.

10        Q.   Is there any factually false statement

11   there?

12        A.   Yes.

13        Q.   What?

14        A.   First of all, we did not -- myself and

15   Chief Gramke -- did not engage with meetings of

16   members of the Hamilton County Sheriff's Office in

17   any way, shape, or form because of posts or

18   criticism, particularly that were apparently posted

19   by this Adams person.  That's number one.  Do you

20   want to talk about that?

21        Q.   Yeah.  No -- just so we're clear --

22        A.   Uh-huh.

23        Q.   -- no such meeting ever occurred where

24   either you or Chief Gramke in your presence or at

25   your direction told any deputy, any Hamilton County

1    employee that -- not to associate in any way with

2    Caroline Adams?

3          A.   Well, that doesn't address what I just

4    said.  I want it known that we did not go out to

5    each district, which we did do -- we went out to

6    each district and we addressed the briefing, which

7    is where deputies are, you know, coming on to shift,

8    going off shift, et cetera, and we did that to talk

9    about lots of things regarding the Sheriff's Office

10   and how we were going to proceed on policy and

11   procedure.  We were answering questions regarding

12   vests and beards, things like that, that deputies

13   were asking.

14          It certainly was in no way, not even any

15   way we went out there because of these posts and

16   criticisms.  That was not the reason that we

17   addressed deputies at the briefings.

18          And then to be clear about the rest of the

19   paragraph, I did not tell the deputies that they or

20   their spouses were to not associate with this person

21   or there would be consequences.  I absolutely -- and

22   I understand from rumor that this was somehow

23   audiotaped.  I absolutely did not say that.

24          Q.   And you didn't say it or imply it that

25   they shouldn't interact with her on social media

1    or -- you didn't say anything like that?

2         A.   Well, you're asking me say or imply, so I

3    did not say that.

4         Q.   Okay.  And you didn't imply that they

5    shouldn't interact with her on social media or there

6    would be consequences?

7         A.   I don't know what -- the way they took

8    what I said.  What I'm telling you is I did not say

9    that.

10        Q.   Okay.  Did you mention Caroline Adams in

11   any of those meetings?

12        A.   I believe I mentioned her as a troll.  I

13   don't believe -- I referred to her as a troll in my

14   mind.  I don't know that I actually said her name.

15   I may have.

16        Q.   Okay.  Why would you have brought her up

17   in one of those meetings?

18        A.   Because I was talking about the fact that

19   we are here to improve morale, you know.  And we

20   want deputies to get along with each other.  And we

21   want deputies to have a certain cohesion about the

22   way they work together.

23             And we understand with the stress and

24   strife of COVID and the change in leadership, which

25   was pretty close to after I had gotten elected,

1    that -- you know, that there are negative things out

2    there, that people do post negative things about the

3    department, about people in the department.  And I

4    encouraged those officers not to pay attention to

5    that.  I encouraged them to look forward, to do

6    their best.

7            And I certainly told them that I have

8    absolutely no interest in what this person is

9    posting personally, other than the fact that it is

10   detrimental to morale and I'm asking them to

11   consider that when they are interacting with each

12   other, because I want our department to become the

13   best department in the state of Ohio.  That's what I

14   said.

15   Q.   Sure.  But what -- you talked about them

16   interacting with each other.  Did you bring up them

17   interacting with Caroline Adams?

18   A.   No.  No.

19   Q.   Okay.

20   A.   I did not.

21   Q.   I just wanted to make sure.  All right.

22   Go to paragraph 19.

23            MR. SIMON:  And on that note, I think

24            we're a little late for a lunch break.

25            MR. BRUNS:  All right.  That's fine.

1          MR. SIMON:  Thank you.

2          THE VIDEOGRAPHER:  We're off the

3     record.  The time is 12:57.

4          (A lunch recess was taken.)

5          THE VIDEOGRAPHER:  We are back on the

6     record.  This is Media 4 of today's

7     deposition.  The time is 2:07.

8  BY MR. BRUNS:

9     Q.   Sheriff, we're back on the record.  And

10 when we took a break, we had been talking about the

11 complaint.  I do have a follow-up about that.  I

12 won't continue to go through the complaint, though.

13       Let me ask you this.  You said you read

14 the complaint when you first received it.  Were you

15 caught off guard or surprised by the lawsuit?

16    A.   I was actually, yes.

17    Q.   Okay.  Something else we talked about

18 before about policies and procedures.  Let me ask

19 you this.  You agree that Jason Davis was covered by

20 the collective bargaining agreement for the

21 enforcement unit at the time of your meeting on

22 October 10, 2023?

23    A.   I do.

24    Q.   All right.  And do you know whether he was

25 on duty during that meeting with you?

1        A.    I really would have no idea, because I

2   don't -- I wouldn't know his schedule.

3        Q.    All right.  If he were to testify he was

4   not on duty, you don't have any reason to dispute

5   that?

6        A.    I wouldn't know if he was on duty or not.

7        Q.    All right.  What are general infraction

8   guides?

9        A.    On our road patrol I think you're

10  referring to the -- what they call GIG cards; is

11  that right?

12       Q.    Okay.  Yes.

13       A.    Okay.  So they are things that supervisors

14  use to, you know, enhance their memory and also

15  coach employees.

16       Q.    Okay.  Are there any sort of disciplinary

17  guidelines that are part of the collective

18  bargaining agreement?

19       A.    There are lots of disciplinary guidelines

20  in the collective bargaining agreement.

21       Q.    Okay.  All right.  Are they merely

22  guidelines or are they mandatory?

23       A.    Well, you must follow them or you will

24  lose in arbitration or the case could get thrown

25  out.  I mean, there's time frames.

1    Q.   All right.  Thank you.  I had asked you

2 earlier today during the questioning that -- about

3 being trustworthy, being able to keep secrets, being

4 responsible, and being a good team player.

5    A.   Uh-huh.

6    Q.   We were talking about RENU.  But that --

7 those are important attributes for any Hamilton

8 County Sheriff's Department employee, fair?

9    A.   Yes.

10    Q.   All right.  And you would agree that it's

11 a good employment practice if -- that the lack of

12 any of those qualities on the job should be

13 documented in an officer's annual employment

14 evaluation?

15    A.   That's our policy.

16    Q.   All right.  And likewise, if someone was

17 complimented for any of those qualities or those

18 qualities were essential to their performance as

19 part of a complex law enforcement operation, you

20 wouldn't be surprised that there would be some

21 recognition of that that ended up in the officer's

22 personnel file?

23    A.   Correct.

24         MR. BRUNS:  All right.  Do you have

25         Exhibit 11?

Page 156

1            THE COURT REPORTER:  Here, I've got

2        it.

3            MR. BRUNS:  We have it now.

4            MR. SIMON:  Oh, good.

5            THE COURT REPORTER:  Right here.

6            MR. BRUNS:  I guess we solved that.

7            MR. SIMON:  Nice.

8            MR. BRUNS:  Thank you.

9            THE COURT REPORTER:  You're welcome.

10      Q.   Sheriff, I'm going to hand you what was

11   previously marked as Plaintiffs' Exhibit 11 --

12      A.   Uh-huh.

13      Q.   -- and represent to you that this document

14   was produced in discovery as part of Jason Davis's

15   employment file.  All right.  And I want to turn

16   your attention to the third to last page of that

17   document.

18      A.   Okay.  The one that's Operation Early

19   Bird?

20      Q.   Yes.

21      A.   Okay.

22      Q.   It's a document addressed to you, Sheriff

23   McGuffey.

24      A.   Uh-huh.

25      Q.   Take a moment to review that -- those last

Page 157

1    three pages, because I have some questions about it.

2        A.    Okay.

3        Q.    Just so you're familiar with it.

4        A.    Sure.

5        Q.    And just tell me when you're ready.

6        A.    Okay.  I'm ready.

7        Q.    Do you recognize this document as an

8    interdepartmental correspondence directed to you?

9        A.    Yes.

10       Q.    All right.  And then you would have

11   received this in the normal course of business?

12       A.    Yes.  Correct.

13       Q.    All right.  And it's dated November 18,

14   2021, from Captain Stapleton, right?

15       A.    Correct.

16       Q.    And what's your understanding of Captain

17   Stapleton's reputation for honesty?

18       A.    I think Captain Stapleton is an excellent

19   supervisor and employee.

20       Q.    All right.  And he's honest?

21       A.    Yes.  That's my knowledge.

22       Q.    All right.  And it says, Subject,

23   Operation Early Bird.  Generally speaking, what was

24   Operation Early Bird?

25       A.    Well, it appears to be a joint effort

Page 158

1    where some individuals were targeted so that we

2    could seize drugs, specifically fentanyl, firearms,

3    et cetera.

4         Q.    Okay.  And it was a coordination between

5    the Sheriff's Department, the FBI, the DEA,

6    Cincinnati Police Department, and the United States

7    Attorney's Office, right?

8         A.    That's correct.

9         Q.    All right.  So that was a pretty complex

10   high-level operation, right?

11        A.    Yes.

12        Q.    Okay.  And you would agree with me that

13   any time you're engaged in something like that,

14   trust and secrecy are critical components for the

15   folks who are involved in that?

16        A.    Yes.

17        Q.    And here the captain is writing to you to

18   let you know how well the officers of the Hamilton

19   County Sheriff's Department who were involved in

20   this operation -- how well they performed and how

21   critical they were to the success of the operation,

22   fair?

23        A.    Yes.

24        Q.    Okay.  And, in fact, he noticed that your

25   marked units and detectives were a huge value added

Page 159

1    to our element this morning.  Please pass along our

2    gratitude as appropriate.

3         A.   Yes.  Uh-huh.

4         Q.   He also said, I will personally tell you

5    that this operation would not have been possible or

6    successful without the deputies that operated the

7    forward command center at patrol headquarters,

8    right?

9         A.   Yes.

10        Q.   Okay.  And your understanding based on

11   certainly that the third to the last page is that

12   Jason Davis was one of the patrol officers who took

13   part in this operation, correct?

14        A.   His name appears, yes.

15        Q.   All right.

16        A.   Uh-huh.

17        Q.   All right.  And you're unaware of any

18   information that he wasn't a part of the secrecy,

19   trustworthiness, comradery that helped this become a

20   successful operation, fair?

21        A.   That's right.

22        Q.   All right.  And this operation is actually

23   as sophisticated or even more sophisticated than

24   what RENU does, fair?

25        A.   It involves a lot of moving parts.

1      Q.   All right.  And if you go to the second

2   page of that document --

3      A.   Uh-huh.

4      Q.   -- Captain Stapleton told you this was an

5   extremely successful operation that involved many

6   assets that your agency brought forward, including

7   from patrol, right?

8      A.   Yes.

9      Q.   All right.  And you don't have any

10  information to contradict that, right?

11     A.   No.  No, I don't.

12     Q.   Okay.  And he said, It was a proud day to

13  wear the Black and Gold, meaning to be a part of the

14  Hamilton County Sheriff's Department, right?

15     A.   Yes.

16     Q.   All right.  And then the folks who signed

17  off on this in the chain of command included Chief

18  Jay Gramke, correct?

19     A.   Correct.

20     Q.   And he -- do you recognize his handwriting

21  on there, where it says -- his signature and it says

22  amazing job by all and there's a date?

23     A.   Yes.

24     Q.   Okay.

25     A.   Uh-huh.

Page 161

1       Q.   And then you signed off on it as well,

2   right?

3       A.   Yes, I did.

4       Q.   And you wrote, So very proud of all of the

5   deputies who did such a great job.  This effort

6   brings recognition to our office throughout the

7   state.  And is that a truthful statement?

8       A.   Yes.  That's correct.

9       Q.   And did you mean that?

10      A.   Of course.

11      Q.   All right.  Do you have any personal

12  knowledge that Jason Davis did anything less than

13  this excellent work in any other similar operation

14  that he was a part of?

15            MR. SIMON:  Objection to form.  Vague

16            and ambiguous.

17      A.   Yeah, I --

18            MR. SIMON:  Try to answer.

19      Q.   If you don't know, you can say I don't

20  know.

21      A.   I don't know.

22      Q.   All right.

23      A.   I don't know.

24      Q.   And it says on here a photocopy of this

25  document has been placed in your personnel file.  So

1  everyone involved got a copy of this document in

2  their personnel file, right?

3       A.   Yes.

4       Q.   And that included Jason Davis, correct?

5       A.   Yes.

6       Q.   You testified earlier that you recall that

7  Chief Gramke called Jay -- called the officer --

8  some of the officers at the Anderson Township Office

9  malcontents, right?

10      A.   Correct.

11      Q.   Okay.  And do you recall that he used that

12 word in the meeting against Officer Jason Davis; did

13 he call Jason Davis a malcontent?

14      A.   I have no memory of that.

15      Q.   Okay.  What does the word malcontent mean

16 to you when it's used to label an officer of the

17 Hamilton County Sheriff's Department?

18      A.   As I said, it's a historic term that's

19 been used in the Sheriff's Department for decades.

20 It typically means someone who is very, very unhappy

21 at work.

22      Q.   Okay.  Does it have any other connotation

23 to you?

24      A.   No.

25      Q.   All right.  Would you agree with me that a

Page 163

1    malcontented officer is not a good officer?

2         A.    No.

3         Q.    So a malcontented officer can be very,

4    very unhappy at work and still be a good officer?

5         A.    I think an officer can still produce and

6    be very, very unhappy at their job.

7         Q.    Okay.   That wasn't my question.   My

8    question was, is a malcontented officer a good

9    officer?

10        A.    I can't answer that question.   First of

11   all, it has no context as to who the officer is.

12   There are many ways that officers are good officers

13   and yet struggle with certain things about happiness

14   and whether they like their job.

15        Q.    Okay.   What do you mean if you call

16   someone a good officer; what does that mean to you?

17        A.    Somebody that follows policy and

18   procedure.

19        Q.    Okay.   What do you mean if you call

20   someone a very good officer?

21        A.    Somebody that follows policy and

22   procedure.

23        Q.    Okay.   So you use them interchangeably, a

24   good officer is also a very good officer?

25        A.    Yeah.

Page 164

1        Q.    A very good officer doesn't mean any more

2     to you, just merely that they follow policy and

3     procedure?

4        A.    Well, the nuances of the word.  They're

5     interchangeable for me.  It's an officer who follows

6     policy and procedure.

7        Q.    Okay.  Would you agree with me that if

8     someone was a malcontented officer, that that's

9     something that should come up in their yearly

10    evaluation, particularly if -- if it was affecting

11    their job performance?

12                 MR. SIMON:  Objection to the form.

13              Lacks foundation.  Calls for speculation.

14       A.    And let me understand, are you saying the

15    actual term --

16       Q.    Yes.

17       A.    -- malcontent?

18       Q.    Yeah.  If you -- if you or Chief Gramke

19    labeled someone a malcontented officer --

20       A.    Uh-huh.

21       Q.    -- and you've told me what your

22    understanding of that word is --

23       A.    Uh-huh.

24       Q.    -- if that actually was affecting that

25    officer's work performance, then that's something

1    that should come up in their yearly evaluation,

2    fair?

3                  MR. SIMON:  Same objection.

4         A.   I would expect a supervisor to note that,

5    yes.

6         Q.   Okay.  Do you have any personal knowledge

7    that Jason Davis was ever a malcontented officer?

8         A.   I don't.

9         Q.   Sheriff, have you ever been convicted of a

10   felony or a crime involving dishonesty?

11        A.   No, sir.

12        Q.   All right.  Generally speaking, what's

13   your educational background?

14        A.   I have a bachelor's degree with the

15   University of Cincinnati.

16        Q.   When did you obtain that?

17        A.   I obtained that in the early '80s, I

18   believe.  I don't recall the exact date.

19        Q.   What was your major; what did you graduate

20   with?

21        A.   Criminal justice.

22        Q.   Okay.  Do you have any higher education

23   beyond that?

24        A.   No, sir.

25        Q.   What was your first job in law

1    enforcement?

2         A.    Hamilton County Sheriff's Office.

3         Q.    Okay.  What year did you first become

4    employed?

5         A.    So I was hired on April 7, 1983.

6         Q.    All right.  And did you have to go through

7    formal training as part of that?

8         A.    We had two weeks of training, yes.

9         Q.    Okay.  You did not go through the police

10   academy?

11        A.    Not at that time, no.

12        Q.    All right.  So you had two weeks of

13   training.  And that was for your entry level job in

14   the department, fair?

15        A.    Yes.  Yes, sir.

16        Q.    And what was your first job?

17        A.    I was a jail service officer.

18        Q.    Okay.  And then at some point did you go

19   through academy training -- police academy training

20   to become a --

21        A.    Uh-huh.

22        Q.    -- sworn law enforcement officer?

23        A.    I did.  In 1982 -- or 1992.  I'm so sorry.

24        Q.    Okay.  And how did that come about?

25        A.    Well, we were allowed to request to go to

1   a peace officer academy that was run by the

2   Sheriff's Office.  And if the Sheriff approved your

3   request, then you could enroll.

4        Q.   How long did that training last?

5        A.   At the time I believe that training was

6   six months.

7        Q.   Okay.  Whether it was that period of time

8   or in some other training that you've had -- have

9   you had other training in addition to those two

10  periods?

11       A.   Oh, yes.  I've attended other training.

12       Q.   Sure.  Whether it was that peace officer

13  academy training or other training that you had --

14       A.   Uh-huh.

15       Q.   -- have you had training on clearly

16  established rights -- constitutional rights?

17       A.   No.  I would not say I have.

18       Q.   In other words, what the law would

19  acknowledge as certain rights that are clearly

20  established under the law, you've not had any

21  training on that?

22       A.   The only thing that I have had

23  certification to teach would have been legal issues

24  inside the jail, and that was very broad.  We were

25  just very much concerned about inmate rights.

Page 168

1    That's what we learned about.  You know, protection

2    against cruel and unusual punishment.  That's the

3    extent of it.

4         Q.   Okay.  Well, you do have some knowledge

5    and understanding of what the Constitution requires

6    of law enforcement, correct?

7         A.   Generally, I'd say.

8         Q.   Okay.  And requires of government

9    employees in general, fair?

10        A.   In general.

11        Q.   All right.  In other words, for example,

12   if you -- you're aware that if you violate someone's

13   clearly established constitutional rights, that you

14   could be personally held liable as a government

15   employee?

16                   MR. SIMON:  Objection --

17        A.   I --

18                   MR. SIMON:  -- to the form of the

19             question.  Calls for a legal conclusion.

20        A.   Yeah, I'm not an attorney.  I would not be

21   able to speak to the nuances of what that means, no.

22        Q.   In your capacity as Sheriff of Hamilton

23   County did you take an oath to support and defend

24   the Constitution of the United States?

25        A.   It's in the oath, yes.

1     Q.   All right.  And when you took the oath,

2  did you mean it?

3     A.   Of course I did.

4     Q.   All right.  And when you took the oath,

5  did you promise to support and defend all of the

6  Constitution or just parts of it?

7     A.   The oath does not stipulate parts of.  It

8  says the Constitution, so yes.

9     Q.   Okay.  And so when you took that oath, did

10  you understand it to be binding on every aspect of

11  your performance and duties as Sheriff of Hamilton

12  County?

13     A.   In whatever way it applies to me as a

14  deputy, yes.

15     Q.   Well, and applies to you as the top

16  decision maker, policy maker in the Hamilton County

17  Sheriff's Department, right?

18     A.   I'm bound to -- as the elected Sheriff to

19  -- yes, to swear to uphold the Constitution.

20     Q.   Including upholding the rights of

21  employees of the Hamilton County Sheriff's

22  Department and employees such as Jason Davis when he

23  worked there?

24     A.   Well, that's not stipulated.  But, yes, I

25  assume.

1    Q.   That's some of the rights you swore to

2  uphold, that --

3    A.   Well, it's not in writing.  It says the

4  Constitution, but yes.

5    Q.   Okay.  And that was your understanding

6  when you took that oath?

7    A.   When I took the oath, it was the

8  Constitution, my general knowledge of the

9  Constitution, and I swore to that.

10    Q.   Okay.  Including upholding, not violating,

11  the rights of government employees who you are

12  responsible for in terms of their ultimate boss,

13  fair?

14         MR. SIMON:  Objection.  Asked and

15         answered.

16    A.   It doesn't say that.  It doesn't say that.

17  So I'm not going to say that I have specific

18  knowledge about what the entire -- entirety of the

19  Constitution is, but to withhold the -- uphold the

20  Constitution as I know it in the terms that -- in

21  general terms, and that's what's in my mind.

22    Q.   Okay.  And as a government -- an agent of

23  government you understand that the Constitution

24  applied to you?

25    A.   I think it applies to everyone.  I'm not

1    an attorney.  But I believe if you are a citizen of

2    the United States, the Constitution applies.

3         Q.   All right.  And you were aware that in

4    that -- at the time of that October 10, 2023,

5    meeting and before that Jason Davis was a citizen of

6    the United States; you knew that?

7         A.   I assumed that, yes.

8         Q.   All right.  And you knew that he was a

9    government employee, correct?

10        A.   I knew he was an employee of the Hamilton

11   County Sheriff's Office.

12        Q.   All right.  Were you aware on or before

13   January 1, 2020, that all citizens have a First

14   Amendment right to engage in free speech?

15        A.   Again, I have a very general knowledge of

16   the Constitution.  If breaking it down in specifics

17   is -- it's not my expertise, it's not what I was

18   trained for, so I don't feel comfortable answering

19   that question.

20        Q.   You didn't know that citizens of the

21   United States had a right to engage in free speech

22   under the First Amendment?

23             MR. SIMON:  Objection.

24             Argumentative.

25        A.   It's a generality that I know of.  But to

1  say that I know specifics about that, no, I don't.

2      Q.   Okay.  Did you know that all citizens have

3  a clearly established right under the First

4  Amendment to engage in free speech by publicly

5  criticizing elected officials?

6                MR. SIMON:  Objection.  Calls for a

7                legal conclusion.

8      A.   Again, I know of generalities in the

9  Constitution that address that.  Specifically I

10  could not tell you what that says.

11      Q.   What are the generalities that you know?

12      A.   I know that the Constitution protects

13  people's rights to a fair trial, to due process.  I

14  know that the amendment applies -- the amendment of

15  cruel and unusual punishment applies when someone is

16  incarcerated.  You cannot, you know, abuse them.  I

17  know those things.

18      Q.   Okay.  Well, in particular with respect to

19  the First Amendment, what do you generally know?

20      A.   I just explained it.  You cannot use cruel

21  and unusual punishment for anyone who is

22  incarcerated, no matter what they may say to you or

23  actually do in the environment.  Those are things I

24  was trained in and I was trained specifically for

25  incarceration.

1      Q.   Okay.  Were you aware -- and I'm going to

2   keep asking these questions.  You can tell me you

3   don't know, okay?

4      A.   Uh-huh.

5      Q.   Were you aware on or before January 1,

6   2020, that all citizens have a clearly established

7   right under the First Amendment to freely associate

8   with others, including for purposes of criticizing

9   government officials?

10     A.   I have no --

11          MR. SIMON:  Objection.  Calls for a

12          legal conclusion.

13     A.   -- no knowledge.

14     Q.   All right.  Were you aware on or before

15   January 1, 2020, that all citizens have a clearly

16   established right to not be retaliated against for

17   engaging in protected speech and association

18   activities?

19          MR. SIMON:  Same objection.

20     A.   No specific knowledge.

21     Q.   Were you aware on or before January 1,

22   2020, that government employees have a clearly

23   established right to not be retaliated against at

24   work because of a family member's speech or

25   associational activity?

Page 174

1              MR. SIMON:  Same objection.

2       A.    Again, no clear understanding of that.

3       Q.    Well, what is your understanding of that,

4  if any -- what understanding, if any, do you have?

5       A.    I don't.

6       Q.    Okay.  Were you aware on or before

7  January 1, 2020, that government employees who are

8  not on the clock have a clearly established right to

9  criticize their employer regarding matters of public

10 concern?

11             MR. SIMON:  Same objection.

12      A.    Again, I have no knowledge of that.

13      Q.    All right.  Were you aware on or before

14 January 1, 2020, that government employees have a

15 clearly established right to not be retaliated

16 against for engaging in protected speech and

17 association activities?

18             MR. SIMON:  Same objection.

19      A.    I have no clear knowledge of that.

20      Q.    All right.  Do you have any knowledge of

21 that?

22      A.    Not in regards to the Constitution, sir.

23      Q.    All right.  Were you aware on or before

24 January 1, 2020, that unlawful retaliation included

25 withholding favorable assignments or withholding

1  promotions if it's in retaliation for protected

2  speech?

3             MR. SIMON:  Same objection.

4      A.   Again, I'm not an attorney.  I don't

5  intend to espouse an opinion on that because I don't

6  know.

7      Q.   All right.  As Sheriff of Hamilton County

8  have you ever made any false statement of fact to

9  the media?

10     A.   Not to my knowledge.

11     Q.   All right.  In your opinion as Sheriff in

12  the interactions that law enforcement supervision at

13  the Hamilton County Sheriff's Department has with

14  employees under them --

15     A.   Uh-huh.

16     Q.   -- is it ever appropriate to lie to

17  employees?

18     A.   Again, our policy states that you will be

19  truthful.  And it's documented in many places that

20  deputies -- anyone who is wearing this uniform and

21  is taking the oath will be truthful.

22     Q.   So the answer to my question is no, it's

23  never appropriate for law enforcement supervision to

24  lie to employees in their interactions with those

25  employees?

1       A.   That sounds like the exact right answer.

2       Q.   Okay.  You would agree that you are an

3  elected official who stands for election every four

4  years, right?

5       A.   That's correct.

6       Q.   All right.  And that makes you a public

7  figure, correct?

8       A.   Yes, it does.

9       Q.   All right.  And you talked about

10  briefly -- or maybe not briefly, we talked about

11  Caroline Adams and her criticisms of you.  And did

12  you ever suggest directly, indirectly to any

13  employee of the Hamilton County Sheriff's Department

14  to monitor Caroline Adams' social media posts

15  regarding you, regarding the Sheriff's Department,

16  or for any reason?

17      A.   I told my staff that I wanted them to be

18  mindful of social media in any way that I am

19  physically threatened.  If someone threatens to

20  shoot me, if someone threatens to harm me in that

21  way, I would like to know about it immediately.

22  That's what I asked of them.

23      Q.   Okay.  Did you mention Caroline Adams by

24  name when you had any such discussion with any of

25  your staff?

1       A.    No.

2       Q.    Okay.  Or whether it was Caroline Adams,

3  did you ever mention any of the names that Caroline

4  Adams goes by on social media such as Itsa Krakken?

5       A.    I don't -- I don't recall that

6  specifically how I -- I know that I asked my staff

7  to monitor social media, period, if there was a

8  specific threat to my safety.

9       Q.    Sure.  But you didn't tell them to monitor

10 any specific person on social media or the name of

11 anyone posting?

12      A.    Not that I am -- have a memory of, no.

13      Q.    Okay.  So you never told them to monitor

14 Chaz the Anti-Sheriff posts?

15      A.    I didn't even know that existed, but no.

16      Q.    All right.  Or Signal 99?

17      A.    No.

18      Q.    All right.  Setting aside Caroline Adams'

19 personal criticisms of you, are you -- do you have

20 any personal knowledge that she is not supportive of

21 law enforcement generally?

22      A.    I don't have any personal knowledge of

23 her, period.

24      Q.    Okay.  And certainly you don't have any

25 personal knowledge that she's not supportive of the

1    Hamilton County Sheriff's Department?

2         A.   I have no personal knowledge of her.

3         Q.   And I think you might have said this, but

4    I want to make sure I understand.  When did you

5    first become aware that this person named Caroline

6    Adams or any of her handles was critical of you?

7         A.   I have no real memory of dates or times.

8    As I stated, I don't even pay attention to that.

9    And, in fact, I frequently tell people don't tell

10   me.  They know what to tell me about.  That's why I

11   stipulated that.  The only reason you need to tell

12   me what's on social media is if there's a threat to

13   my personal safety.

14        Q.   Okay.  Did you ever become aware of any

15   posts from Caroline Adams or any -- under of the

16   various names she posted under where she criticized

17   you because of the incident where your loaded

18   firearm was stolen and your vehicle was stolen?

19        A.   No.  I mean, no.

20        Q.   Okay.  Would you agree that that incident

21   was -- caused public embarrassment for the Hamilton

22   County Sheriff's Department?

23        A.   No, I would not.

24        Q.   Okay.  Would you agree that that incident

25   created a threat to public safety?

1       A.   No, I would not.

2       Q.   Okay.  Why not?

3       A.   I was in my -- my absolute policy rights.

4    I explained the situation as to why I secured my

5    weapon.  And I was within my -- I was acting within

6    my duties under the codes of what I was allowed to

7    do policy and procedure-wise.  I was a victim of a

8    crime.

9       Q.   Okay.  Sheriff, I'm going to hand you

10   what's been marked as Exhibit 1 -- Plaintiffs'

11   Exhibit 1.

12      A.   Uh-huh.

13      Q.   And I have some questions about that.

14      A.   Okay.

15      Q.   Take a moment to review it.

16      A.   All right.  Yes.  Okay.

17      Q.   For the record, this is a story by Channel

18   19 published June 20, 2021, regarding this incident

19   where your car and the gun were stolen from your

20   driveway, right -- is that correct?

21      A.   That's correct.

22      Q.   Okay.  And it says Sheriff McGuffey told

23   Fox19, so you were interviewed as part of this

24   story, correct?

25                MR. SIMON:  Note my objection to this

Page 180

1          line of questioning.  Can I have a

2          continuing objection to relevance?

3                MR. BRUNS:  Sure.

4                MR. SIMON:  Thanks.

5      Q.    You spoke -- you were interviewed by

6  Fox19, correct?

7      A.    I talked to multiple media interviews,

8  yes.

9      Q.    Okay.  And then as a result of this

10  interview, did you ever see the story?

11      A.    No.

12      Q.    You didn't -- you never followed up to see

13  the coverage that came about it?

14      A.    No.  No, I didn't.

15      Q.    Okay.  And it says, Sheriff McGuffey told

16  Fox19 that her car stolen from Columbia -- her

17  Columbia Tusculum home was found near Kings Run

18  Drive and Winnestee Avenue.  Did I read that

19  correctly?

20      A.    You did, sir.

21      Q.    All right.  Is that a true statement?

22      A.    That's what the police told me.

23      Q.    Oh, no, but is -- did you tell Fox19 that?

24      A.    They -- I said Kings Run Drive.  I don't

25  know anything about Winnestee Avenue.  It's not in

1   my -- I remember saying Kings Run Drive because I

2   know where that is, but the -- I may have said

3   Winnestee Avenue, sure.

4       Q.   All right.  And then it says that the gun,

5   however, was not found.  Did you tell them that,

6   that the gun wasn't found?

7       A.   Correct.  That's factual.

8       Q.   That's factual.  All right.  And then it

9   says, She says she responded to an incident

10  involving a man barricading himself Friday night.

11  When she got home, she parked her unmarked car in

12  the driveway; is that a true statement?

13      A.   Yes.  That's correct.

14      Q.   All right.  And then it says, Sheriff

15  McGuffey says, as is normal for her, she left her

16  gun in a secured compartment in her locked car.  Is

17  that a true statement?

18      A.   It's not accurate.

19      Q.   Okay.  Well, first of all, did you say

20  that?

21      A.   I don't recall saying that, no.

22      Q.   Okay.  If the article claims you said it,

23  do you have a memory one way or the other whether

24  you said it?

25      A.   I said I don't recall saying it.

Page 182

1      Q.   Okay.  It says in here that you left your

2 gun in a secured compartment in your locked car and

3 you -- that was the glove compartment; is that

4 correct?

5      A.   Correct, sir.

6      Q.   Okay.  And is it your understanding that

7 the thieves who stole your car were later on -- at

8 some point they were able to remove that gun from

9 your locked glove compartment?

10      A.   Obviously.

11      Q.   Okay.  All right.  There was a follow-up

12 story by Channel 19 in 2023 when your gun was

13 recovered by law enforcement; is that true?

14      A.   That's correct.

15      Q.   All right.  And it was recovered at a

16 crime scene where the gun had been used to shoot

17 someone during an armed robbery?

18      A.   No.  My knowledge is it was recovered from

19 a traffic stop.

20      Q.   Okay.  And the gun ultimately was

21 determined to have been used in an armed robbery,

22 correct?

23      A.   That's correct.

24      Q.   And someone was shot with it, correct?

25      A.   Correct.  Well, that's what they report.

1   They have no -- the person refused to testify.

2       Q.   All right.  Exhibit 2.  Sheriff, take a

3   look at Exhibit -- Plaintiffs' Exhibit 2 --

4       A.   Uh-huh.

5       Q.   -- and review that for a moment, because I

6   have some questions.

7       A.   Sure.

8              MR. SIMON:  Counselor, this is part

9           of my continuing objection; is that

10          understood?

11             MR. BRUNS:  Sure.

12             MR. SIMON:  Thanks.

13      A.   Yes, I read it.

14      Q.   Okay.  Do you remember issuing a press

15  release that this story is based on about the fact

16  that your gun -- your stolen gun was found?

17      A.   My information officer likely was the

18  person who released this.  She -- her

19  responsibilities are to communicate with the press,

20  so yes.

21      Q.   Okay.  And you would have approved any

22  statement she issued on this?

23      A.   Of course.

24      Q.   All right.  And the statement was that

25  Hamilton County Sheriff announces her stolen gun was

1    found, used in a robbery; that's accurate -- that

2    actually happened, right?

3         A.   Is that -- oh, this here at the top --

4         Q.   Yeah.

5         A.   -- of the page?  Yes.  Uh-huh.  Yes.

6         Q.   All right.  And you would agree with me

7    that this story is an incident of public concern,

8    right -- an issue of public concern?

9                   MR. SIMON:  Objection.  Calls for a

10               legal conclusion.

11        A.   I think it's of interest to the public

12   certainly.

13        Q.   Sure.  And the public could be concerned

14   about a sheriff who had a loaded weapon in her

15   unmarked car at home, it got stolen, and then that

16   weapon got used in various crimes; the public could

17   be concerned about this, fair?

18        A.   I don't pretend to know what the public

19   thinks.  I know that this would be a story of

20   interest.

21        Q.   All right.  Well, this wasn't the only

22   news story, there were other news stories about it,

23   right?

24        A.   Of course.

25        Q.   Okay.  All right.  And things like this

1   that hit the media and there's stories about, the

2   public have a right to be concerned about things

3   that they -- are addressed by the media, fair?

4           MR. SIMON:  Objection to the form of

5           the question.  Vague and ambiguous.

6           You can answer.

7       A.   It's a story of interest.

8       Q.   Okay.  Were you personally embarrassed by

9   any of these incidents?

10      A.   As I said, I followed policy and

11  procedure.  I did exactly what I should do.  I used

12  good judgment in keeping my weapon away from an

13  environment where children might have access to it

14  and -- so that is how I feel about it.

15      Q.   Okay.  That didn't answer my question.

16  Were you embarrassed by this incident getting out

17  and people knowing what happened?

18          MR. SIMON:  Objection.

19          Argumentative.

20      A.   I'm the one that reported it.  So I don't

21  have any feeling about it one way or another, sir.

22      Q.   All right.

23      A.   It's a story.  It happened.  I don't have

24  one feeling about it one way or the other.

25      Q.   Okay.  Part of what was discovered and

1  part of your statement from the Sheriff's Office

2  explained that spent shell casings were recovered at

3  three different locations, not including the

4  robbery, right?

5      A.   That's what it documents here, yes.

6      Q.   All right.  So that would indicate that

7  your gun was fired at least in four different

8  locations, fair?

9      A.   That's how it reads, yes.

10     Q.   All right.  Did you believe you would be

11 criticized for these incidents once it became public

12 and got out in the media; did you think you would

13 get some public criticism about this?

14     A.   I knew that I would get -- that there

15 would be publicity surrounding it.  I knew there

16 would be articles written about it.  And I knew

17 people would ask me for an explanation.

18     Q.   Okay.  If you weren't the sheriff but were

19 a patrol officer, would what occurred here have been

20 a reason not to promote you?

21     A.   Again, I can't answer to hypotheticals.  I

22 just can't.

23     Q.   Okay.

24     A.   I can't answer to hypotheticals.

25     Q.   All right.  Did you as sheriff discipline

Page 187

1    yourself over this?

2              MR. SIMON:  Objection.

3              Argumentative.

4       A.    There was no discipline that occurred in

5    this situation.

6       Q.    Okay.  We talked about it briefly before,

7    but you were involved in an incident when you

8    weren't sheriff, you were an officer with the

9    Hamilton County Sheriff's Department in 2010, you

10   were involved in an incident in Covington, Kentucky

11   correct?

12      A.    That's correct.

13      Q.    All right.  And as a result of that

14   incident it led to a five-day suspension from the

15   department; is that accurate?

16      A.    That's correct.

17              MR. SIMON:  It looks like my

18              continuing objection is continuing.

19              MR. BRUNS:  It is continuing.

20              THE WITNESS:  Could you get me some

21              water?

22              MR. SIMON:  Sure.

23              (Plaintiffs' Deposition Exhibit No.

24              28 was marked for identification.)

25      Q.    Sheriff, take a moment to look at that.

1    That's Plaintiffs' Exhibit 28.

2         A.    Uh-huh.

3         Q.    Take a moment to review it, because I have

4    some questions about it for you.

5         A.    I'm almost ready.

6         Q.    Yeah, tell me when you're ready.

7         A.    Close.   Okay.

8         Q.    Exhibit 28 is the summary of the

9    disciplinary proceedings against you as a result of

10   the Covington -- the incident with the Covington

11   Police, correct?

12        A.    Correct.   Yes, sir.

13        Q.    All right.   And it says that you were --

14   that you have been guilty of conduct unbecoming a

15   deputy sheriff, correct?

16        A.    That's what it states, yes.

17        Q.    All right.   And it specifically states

18   that you, referring to Officer McGuffey -- you

19   proceeded to explain how this event unfolded.

20   That's what it states, correct?

21        A.    Yes.

22        Q.    And it says, After leaving a Covington

23   sports bar, your friend, who had a beer in her hand,

24   was approached by a police officer indicating he was

25   going to arrest her.   You were instructed to go to

1    your car.  As you did so you yelled an obscenity at

2    the officers accusing them of targeting gay bars.

3    The officers warned you about your behavior and

4    consequences if you did not stop.  After your car

5    pulled away, and stopping at a stop sign, you rolled

6    down -- you rolled your window down and became loud

7    and accused the officers of harassment.  At this

8    time, the officer ordered the car to stop.  Thinking

9    he wanted to speak to you, you attempted to get out

10   of the car, but the officers quickly grabbed your

11   hands, placed you on the ground, and were

12   handcuffed.  You were then cited with disorderly

13   conduct, public intoxication, and because you

14   attempted to get out of the car, menacing.  Did I

15   read that accurately?

16        A.    Yes, you did.

17        Q.    All right.  And is that something that you

18   told Internal Affairs?

19        A.    This was 2010.  I cannot tell you that

20   this is exactly what I said.  I can't.  I simply

21   can't.  I know what happened.  I was there.  And

22   obviously I was interviewed here by Major Bruce

23   Taylor.  I couldn't testify to exactly these are my

24   exact words or how he wrote this up.  I can't -- I

25   don't know.

1   Q. Okay. You had a right to a hearing over

2 this, correct?

3   A. I did, sir. Yes.

4   Q. Yes.

5   A. Uh-huh.

6   Q. And it also says, And if so -- if you

7 wanted to present your side of the story --

8   A. Uh-huh.

9   Q. -- because people were saying things that

10 weren't true, you had a right to go to a hearing on

11 it --

12   A. I did.

13   Q. -- true? All right. And it says you

14 waived your right to a hearing, true?

15   A. I did.

16   Q. All right. And if you go to the fourth

17 page of this document --

18   A. Oh, sorry.

19   Q. Yeah. Fourth page of the document.

20   A. Yes.

21   Q. Fifth paragraph down where it says Officer

22 McGuffey was interviewed.

23   A. These aren't numbered. So is this the

24 page you're talking about?

25   Q. Yes, I am.

1        A.    Okay.

2        Q.    If you just count down --

3        A.    So --

4        Q.    -- the paragraph that says Officer

5    McGuffey was interviewed; do you see that?

6        A.    That's how the paragraph starts?  I'm on

7    April 7.  The next paragraph is Chief Russo, Chief

8    Russo.  Next paragraph.  Chief Russo.

9        Q.    Oh, I see.

10       A.    And then it says, The information --

11       Q.    The fourth page of the document.  Let me

12   show you.

13       A.    You're calling each one of these --

14       Q.    Yeah, sorry.  This page.

15       A.    Oh, that's my fifth page.

16       Q.    Okay.  Go to the fifth page.  I apologize.

17       A.    Okay.

18       Q.    Go to the fifth page.

19       A.    All right.

20       Q.    Officer -- with a paragraph that says

21   Officer McGuffey was interviewed.

22       A.    Oh, here.  Okay.  Officer McGuffey was

23   interviewed in reference to how she felt, yes.

24       Q.    About her actions --

25       A.    Yes.

Page 192

1      Q.   -- at which time she accepted

2  responsibility for her actions.  Do you recall that

3  you did, in fact, accept responsibility for your

4  actions?

5      A.   I did.

6      Q.   All right.  Indicating that during the

7  incident she became angry that the officers were,

8  quote, targeting the bar, closed quote, and although

9  she denied directing any comments toward the

10 Covington Police Officers, admitted she was loud and

11 was cursing.

12     A.   Correct.

13     Q.   Okay.  And you would agree with me that

14 the standards of personal conduct and the general

15 rules and regulations that are listed there, your

16 conduct violated those?

17     A.   That's what I signed off on.

18     Q.   Okay.  And that was my next question.  You

19 signed off on it.  You could have taken further

20 steps if you disagreed with this, but you accepted

21 it?

22     A.   I did disagree with it, but I accepted it.

23     Q.   Well, you agreed that you violated those

24 standards by cursing, right?

25     A.   I did accept it.  I disagree with it.

Page 193

1      Q.   Okay.  If you disagreed with it, you had

2  steps you could have taken to undue this; is that

3  fair?

4      A.   I could not undo it.  It happened.  But I

5  disagreed with it and I chose not to take it to a

6  hearing.

7      Q.   Okay.  Why did you not take it to a

8  hearing?

9      A.   Because it involved other women that were

10  with me who were also lesbians and I did not wish to

11  out them.

12      Q.   Okay.  Well, would you at a hearing have

13  to bring other people; you could simply testify

14  yourself, right?

15      A.   I could be asked at the hearing who was

16  with you.  There were other police officers with me

17  in that group.  I could be asked that.  And I did

18  not want to out other women.

19      Q.   But you agreed that you were yelling at

20  these officers and, in fact, also cursing, using

21  swear words, true?

22      A.   If I can be specific, I did use curse

23  words.  I can tell you exactly what they were.  And,

24  yes, I yelled over at the officers because they were

25  some 40 feet away from us the entire incident.  They

Page 194

1    were never, never in any proximity to myself or the

2    women they targeted.

3         Q.   Okay.  And you understand that one of the

4    officers alleged that you used the words you can

5    suck my --

6         A.   And it's a lie.

7         Q.   Okay.  Did you use that phrase or some

8    version of that phrase at all that night?

9         A.   Absolutely not.

10        Q.   All right.

11        A.   Women don't talk like that.  I'm sorry.

12   But we just don't.

13        Q.   All right.  So you've never used any

14   version --

15                  MR. SIMON:  Objection.

16        A.   -- of that phrase; is that fair?

17                  MR. SIMON:  Counselor, that question

18             goes far beyond the scope of any relevance

19             to something that happened 15 years ago.

20                  MR. BRUNS:  I'm asking at any time.

21             So it's not 15 years ago.

22                  MR. SIMON:  Well --

23        A.   I don't use that phrase.

24        Q.   All right.  Okay.  Thank you.  I'm going

25   to hand you what's been marked as Plaintiffs'

1  Exhibit 3.  Take a moment to look at that.  Tell me

2  when you're ready.

3      A.   Just give me one more second here.  Okay.

4  Yes.

5      Q.   All right.  This is a story from The

6  Enquirer in 2019 that in part covers that 2010

7  incident, correct?

8      A.   Yes, it does.

9      Q.   All right.

10     A.   Uh-huh.

11     Q.   And this story resurfaced when you had

12  announced you would run for sheriff, right?

13     A.   Correct.

14     Q.   So you would agree that this is an issue

15  of public concern?

16     A.   It's an issue of public interest, of

17  course.

18     Q.   Yeah.  And The Enquirer was reporting on

19  it because people were going to consider details

20  about this and whether to vote for you or not, fair?

21           MR. SIMON:  Objection.  Calls for

22           speculation.

23     A.   People can read it and decide what they

24  like.

25     Q.   All right.  There were social media posts

1    about this incident, including a follow-up to The

2    Enquirer article; are you aware of that?

3         A.    No, sir.

4         Q.    Okay.  Did anybody ever tell you that

5    there were critical social media posts?

6         A.    It was mentioned to stay off social media.

7    That's all that -- that's all that I was advised to

8    do.  And I'm old.  I never got on social media

9    anyway.

10        Q.    Sheriff, I'm handing you what's been

11   marked as Plaintiffs' Exhibit 6.  If you could take

12   a moment to look at that.

13        A.    Sure.  Yes, I see it.

14        Q.    Okay.  And I will tell you this was

15   produced as the Brady list for Hamilton County for

16   2019 -- May of 2019.  Have you seen --

17        A.    Uh-huh.  I see it.

18        Q.    -- this document before?

19        A.    I see the date, yes.

20        Q.    And it's not the entire list, but if you

21   look at page 19 and page 23, which are copied as

22   part of that exhibit --

23        A.    Uh-huh.

24        Q.    -- do you recognize your name being on

25   there twice?

Page 197

1       A.   Oh, it's on here twice?

2       Q.   Yeah.

3       A.   Hang on.  I see it on page 23.

4       Q.   And then look at page 19.

5       A.   Oh, there it is.  Okay.  Yeah, page 19 as

6  well.

7       Q.   And you would agree that the Brady list

8  contains the identity of particular law enforcement

9  officers and certain derogatory information about

10  that officer's background that must be disclosed to

11  defense attorneys in cases where that law

12  enforcement officer is potentially going to testify,

13  correct?

14       A.   That's the purpose of the Brady list, yes.

15       Q.   All right.  And would you agree with me

16  that if an officer is on the Brady list and has to

17  testify against a criminal defendant, it makes it

18  less likely the defendant will be convicted based on

19  that particular officer's testimony?

20       A.   That's my general understanding of the

21  Brady list.

22       Q.   All right.  And you would agree with me

23  that landing on the Brady list raises questions

24  about an officer's trustworthiness?

25            MR. SIMON:  Objection.  Calls for a

1    legal conclusion.  Speculation.

2    A.    That's the purpose of the Brady list.

3    Q.    All right.  And you would agree that it

4  raises question about the officer's honesty?

5    A.    That's the purpose of the Brady list.

6    Q.    And you would agree that it raises

7  questions about the officer not being a responsible

8  officer, correct?

9    A.    That's the purpose of the Brady list.

10    Q.    All right.  And if you go to page 23

11  where -- Entry No. 109, it says Charmaine McGuffey,

12  No. 549.  What is 549; is that your badge number?

13    A.    Yes, sir.

14    Q.    Okay.  HCS is Hamilton County Sheriff,

15  correct?

16    A.    Yes, sir.

17    Q.    And then 4/26/17, that's the date of the

18  determination in your Internal Affairs Case No.

19  0617; is that correct?

20    A.    That's when they placed me on the Brady

21  list.

22    Q.    Okay.

23    A.    Yes.  That -- no.  I'm sorry.  I was just

24  thinking of the dates in my mind.  Yes, that's

25  correct.

Page 199

1      Q.   All right.  And that specific entry has to

2  do with dishonesty, correct?

3      A.   That's what it states.

4      Q.   All right.  And that was the -- what was

5  the -- from that Internal Affairs investigation,

6  correct?

7      A.   Correct.

8      Q.   All right.  Sheriff, I'm going to hand you

9  what's been marked as Plaintiffs' Exhibit 5.  If you

10  can take a moment to take a look at that.

11      A.   Sure.

12      Q.   I don't have many questions about this.

13      A.   Well, I want to read the entirety of it.

14           MR. BRUNS:  Yeah, why don't we take a

15           break.  We've been going for a little bit.

16           THE VIDEOGRAPHER:  Off the record,

17           3:11.

18           (A brief recess was taken.)

19           THE VIDEOGRAPHER:  Back on the

20           record.  Media 5 of today's deposition.

21           The time is 3:25.

22  BY MR. BRUNS:

23      Q.   Sheriff, we're back on the record.  And

24  you had time to review Plaintiffs' Exhibit 5.  Did

25  you do so?

Page 200

1        A.    Yes, sir, I did.

2        Q.    All right.  Just a couple of brief

3   questions.  This was a Fox19 article in October of

4   2019, correct?

5        A.    Yes.

6        Q.    Okay.  And this was about who is on the

7   Brady list in the Tri-State and what's the Brady

8   list, right?

9        A.    Yes.

10        Q.    All right.  And it says, A more than

11   50-year-old Supreme Court ruling requires

12   prosecutors to seek and disclose evidence to defense

13   attorneys and the accused that is material to his or

14   her guilt or punishment.  This includes evidence

15   about their untruthfulness.

16             Is that a true statement, that that's what

17   the Brady list is about?

18        A.    I have no idea.  I don't -- I mean,

19   there's a lot of nuances to the Brady list.  This is

20   somebody who is summing it up, it appears.  So I

21   wouldn't be able to comment on the truthfulness of

22   that or accuracy of that statement.

23        Q.    Do you believe that an officer -- their

24   background or history for truthful or untruthfulness

25   is material to evidence in a criminal trial against

1    the criminal defendants?

2              MR. SIMON:   Objection.   That

3         definitely calls for a legal conclusion.

4    A.   Again, I wouldn't be able to comment on

5    that.   That's like a -- that's a legality that

6    attorneys deal with and work with and so forth.

7    Q.   Okay.   If Joe Deters gave a statement to

8    the media that removed -- he removed you from the

9    Brady list as a courtesy, was that a true statement?

10   A.   It's not.

11   Q.   Okay.   Are you aware that Caroline Adams

12   posted criticism of you on social media as a result

13   of the fact that you were on the Brady list and had

14   two entries on it?

15   A.   I -- I don't know.

16   Q.   Do you --

17   A.   I mean, I really don't know.

18   Q.   Do you recall anyone telling you about

19   that?

20   A.   People told me lots of things about

21   different posts.   And as I told you, when people

22   began to tell me things, I oftentimes would say

23   don't tell me, I'm not interested in it, I don't

24   care.

25   Q.   Why did you call Caroline Adams a troll;

1   what did you mean by that?

2        A.   So what I meant by that is when people

3   were coming up to me after I was elected is when I

4   became actually aware that there were things on

5   social media, because people were telling me things.

6   And I know that the common verbiage for someone like

7   that is a troll.  That's what the -- whatever the

8   phrase we use now.  And so, yeah, I referred to a

9   troll.

10       Q.   Okay.  You would agree that having an

11  employee end up on the Brady list would be publicly

12  embarrassing to the Hamilton County Sheriff's

13  Department?

14       A.   I can't comment on that.  I have -- I have

15  no idea what's embarrassing to the Sheriff's

16  Department.  I mean. . .

17       Q.   Let me ask you this.  If -- as Sheriff of

18  the Hamilton County Sheriff's Department, you're the

19  sheriff --

20       A.   Uh-huh.

21       Q.   -- if one of your deputies ended up on the

22  Brady list because of dishonesty --

23       A.   Uh-huh.

24       Q.   -- would you think that would reflect well

25  on the Hamilton County Sheriff's Department?

Page 203

1       A.   I think there would be questions regarding

2    that deputy, that deputy's tenure, what that deputy

3    did.  I think most people, in my opinion, understand

4    that one deputy doesn't represent an entire

5    sheriff's office.

6       Q.   Would you agree that having an elected

7    sheriff appear on the Brady list is an issue of

8    public concern?

9       A.   Again, I can't comment because that's a

10   hypothetical.  It didn't happen.

11      Q.   Well, you did appear on the Brady list,

12   correct?

13      A.   Not when I was sheriff.

14      Q.   Okay.  So at no point -- when did you get

15   elected -- first get elected?

16      A.   2020.

17      Q.   Okay.  So at no point from 2020 to the

18   present have you ever been on the Brady list?

19      A.   No, sir.

20      Q.   Okay.  In June of 2023 you were pulled

21   over by a Clermont County Sheriff's Deputy going 72

22   in a 55; is that correct?

23              MR. SIMON:  Can I have --

24              MR. BRUNS:  Yes.

25              MR. SIMON:  -- a continuing objection

1          continuing to the line of questioning?

2               MR. BRUNS:  Go ahead.

3     A.    Yes, I was.

4     Q.    All right.  Does going 17 miles per hour

5  over the legal limit involve an issue of public

6  safety?

7     A.    I think there are speed limits for a

8  reason.  And that is the deputy's job.  And those

9  are the jobs of law enforcement to enforce those

10  speed limits.

11     Q.    All right.  My question was, does going

12  17 miles per hour over the legal limit involve an

13  issue of public safety?

14     A.    Again, it's a broad question.  I'm telling

15  you that I -- it's a violation, I know that.  And,

16  yes, I violated the speed limit law.

17     Q.    And that involved an issue of public

18  safety, fair?

19     A.    Again, you're asking me to -- to make

20  broad statements that I cannot factually make.  I

21  can tell you that it's a law.  I can tell you I

22  violated that law clearly.  And how the law was

23  written, why it was written, and all of those

24  things, I'm -- I can't comment on.

25     Q.    All right.  When that happened, that issue

1    was covered by local media, correct?

2         A.    It was.

3         Q.    All right.  I'm handing you what's been

4    marked as Plaintiffs' Exhibit 4.

5         A.    Uh-huh.

6         Q.    Take a moment to read that and I have some

7    questions for you.

8         A.    Uh-huh.  Okay.

9         Q.    All right.  Do you recall that The

10   Enquirer reported on that incident when it happened?

11        A.    I hadn't read this.  But, yes, it appears

12   to be The Enquirer reported on it.

13        Q.    Okay.  Well, the article actually quotes

14   you, so --

15        A.    Oh, yes.  I was interviewed for it.

16        Q.    All right.  And the article reflects that

17   you were traveling east on Ohio 32 toward Batavia

18   Road just before 1:00 p.m.  You were pulled over

19   doing 72 in a 55.  Is that all accurate?

20        A.    That's accurate.

21        Q.    Okay.  And then it says, McGuffey handed

22   him her license and said she was the Sheriff of

23   Hamilton County.  Is that accurate; did you do that?

24        A.    That's accurate.

25        Q.    All right.  And why did you tell him as

Page 206

1    you were handing over your license for getting

2    pulled over for 72 in a 55 mile per hour zone -- why

3    did you tell him that you were the Sheriff of

4    Hamilton County?

5         A.   Because I was armed.  I was carrying a

6    firearm.

7         Q.   Okay.  You weren't telling him that in any

8    way, shape, or form to try and get out of the

9    ticket?

10        A.   No.  I was armed.

11        Q.   All right.  And then in the article it

12   says, quote, I'm not a superhero.  I'm a person just

13   like everyone else, closed quote, McGuffey said.  Do

14   you see that?

15        A.   I do see that.

16        Q.   Why did you say that to The Enquirer?

17        A.   Because it's true.  That's why.

18        Q.   Why did you bring up the context of I'm

19   not a superhero?

20        A.   I think that there are people who make

21   judgments about police officers in general.  And I

22   oftentimes like to remind people that police

23   officers are human just like everybody.

24        Q.   All right.  If this was perceived as an

25   issue of you breaking the law and then identifying

1    yourself as the sheriff in an effort to get out of

2    the speeding ticket, you would agree that would be

3    an issue of public concern?

4        A.   Again, a hypothetical I cannot answer.

5        Q.   All right.  So you don't think the public

6    should be concerned if their sheriff goes 72 in a 55

7    and then tries to get out of the ticket by telling

8    the officer she happens to be the sheriff?

9              MR. SIMON:  Objection.  Lack of

10             foundation.  Argumentative.  Totally

11             irrelevant.

12             You can try to answer.

13       A.   It's what you're saying.

14       Q.   I'm saying you're -- I'm asking you, if

15   that's the perception, you would -- that you were

16   trying to get out of that ticket by telling the

17   officer as you handed him your license I'm the

18   Hamilton County Sheriff, if that's the public

19   perception of you, then you would agree that is an

20   issue of public concern?

21             MR. SIMON:  Same objection.

22       A.   If you're making up a hypothetical, which

23   you are, I can't comment on that.

24       Q.   Okay.  So you have no opinion as to

25   whether it would be appropriate for a sheriff to do

1    what I just said?

2                   MR. SIMON:  Same objection.

3         A.   Your hypothetical example I have no

4    opinion on because it didn't happen.

5         Q.   I didn't ask whether it happened.  I just

6    asked, you have no opinion; is that true?

7                   MR. SIMON:  Objection.  Let's move

8              on, Counselor.

9         Q.   Is that true?

10        A.   Can you repeat it again?

11        Q.   Sure.  You have no opinion whether it

12   would be appropriate for an elected sheriff who got

13   pulled over doing 55 -- or 72 miles per hour in a

14   55 mile per hour zone to then tell the officer, hey,

15   I'm a sheriff in an effort to get out of the ticket

16   --

17                   MR. SIMON:  Objection.

18        Q.   -- you have no opinion whether that's

19   appropriate or not appropriate?

20        A.   Because it's not based in reality, no, I

21   don't have an opinion.

22        Q.   All right.  Have you ever communicated to

23   anyone at the Hamilton County Sheriff's Department

24   that you dislike Caroline Adams' criticisms of you?

25        A.   Not to my knowledge.

1      Q.   All right.  Let me ask you generally just

2   about Jason Davis.  We talked about your interaction

3   with him in his career.  Other than what we talked

4   about earlier today --

5      A.   Uh-huh.

6      Q.   -- do you have any recollection of

7   interactions with him?

8      A.   When I first became the major, he came

9   down to my office.  We were just, you know, talking

10   about union business, things like that.  I noticed

11   he -- his attendance pin, some of the stars had

12   fallen off of it or whatever.  It seemed to be -- it

13   was like in broken repair.  So I mentioned it to

14   him.  And he said that the prior administration

15   wouldn't give him a new one.  And I said, well,

16   let's make sure we get you a new one.  And that's

17   what we did.

18      Q.   Okay.  Do you remember any other

19   interactions?

20      A.   No.

21      Q.   All right.  Sheriff, I'm handing you

22   what's marked as Plaintiffs' Exhibit 9.

23      A.   Uh-huh.

24      Q.   And I just have a couple of questions

25   about this.

 1          A.   Okay.  Okay.

 2          Q.   All right.  I'll represent to you that

 3     this was produced in discovery with your responses.

 4     And it's something from the personnel file of Jason

 5     Davis's or in the County's responses.  And it

 6     reflects a promotion to the enforcement division in

 7     October of 2014.

 8               And just generally speaking, that is a

 9     promotion, correct?

10          A.   Uh-huh.  Yes.

11          Q.   Okay.  And then if you turn to the second

12     page of that document --

13          A.   Uh-huh.  Okay.

14          Q.   -- it talks about job duties --

15          A.   Yes.

16          Q.   -- and then also minimum acceptable

17     characteristics, right?

18          A.   Yes.

19          Q.   And then under the column for

20     characteristics, the second paragraph, it says,

21     Ability to develop and maintain a working

22     relationship with associates, superiors, and general

23     public.  Did I read that correctly?

24          A.   Yes.  Uh-huh.

25          Q.   It also says in there to exercise sound

1    judgment.  Did I read that accurately?

2         A.    Yes.

3         Q.    Okay.  And then at the bottom it also

4    talks about prepare and present testimony in court,

5    right?

6         A.    Yes.

7         Q.    Okay.  And you would agree with me that

8    collectively these job responsibilities involve

9    issues of comradery and teamwork, fair?

10        A.    Correct.  I would think, yeah.

11        Q.    Trustworthiness and honesty, fair?

12        A.    That's implied, yes.

13        Q.    And if an officer is lacking in any of

14   those issues -- in any of those areas, I should say,

15   that should be documented in his yearly evaluation,

16   correct?

17        A.    That would be my assumption, yes.

18        Q.    Okay.  And if you go to the next page --

19        A.    Uh-huh.

20        Q.    And was that your experience, that --

21   coming up through the Sheriff's Department, that's

22   the kind of stuff that got covered in yearly

23   evaluations, if you were lacking in those areas?

24        A.    I mean, we have evaluations for a reason.

25   And that is to document your ability to do these and

1    meet the standard or you're not doing them, quite

2    frankly.

3         Q.   Right.  And that includes things like

4    comradery, team work, responsibility,

5    trustworthiness, and honesty?

6         A.   I don't know that we measure comradery,

7    but yes.

8         Q.   Okay.  And then if you go to that next

9    page --

10        A.   Okay.

11        Q.   -- Jason Davis was on a 12-month

12   probationary period, right, with his promotion?

13        A.   Yes.

14        Q.   Okay.  And the purpose of that

15   probationary period is to determine if he actually

16   has the qualities that we discussed, those ones that

17   are required for successful completion of the job?

18        A.   Yes.

19        Q.   Okay.  And if he doesn't have those

20   qualities after that 12-month probationary period,

21   he should not be a Hamilton County Sheriff's Deputy,

22   right?

23        A.   Well, then the -- you know, at the time

24   the sheriff can decide what he'd like to do about

25   that.

1      Q.   Okay.  But if they don't have those

2  qualities, that's not someone you would want working

3  for you; is that fair?

4      A.   Well, that's a very vague question.  I'm

5  just saying that if they don't pass their

6  probationary period, there are options that the

7  sheriff can take to retrain them up, extend their

8  probation, send them back to their previous

9  classification, so. . .

10     Q.   All right.  Ultimately Jason Davis was --

11  as we discussed, he was promoted to patrol, right --

12  that's the law enforcement --

13     A.   Yes.

14     Q.   -- promotion --

15     A.   Here.  It documents it, right.  Yes.

16     Q.   All right.  And not everyone who comes

17  from corrections and applies to patrol gets that

18  promotion, correct?

19     A.   Right.  That's correct.

20     Q.   All right.  As a patrol officer Jason

21  Davis did not act as any sort of official

22  spokesperson for the Hamilton County Sheriff's

23  Office?

24     A.   Not to my knowledge.

25     Q.   All right.  And his assigned duties did

Page 214

1    not include acting as a spokesperson, correct?

2         A.    Not to my knowledge.

3         Q.    All right.  And as a patrol officer he was

4    not a direct report to you, correct?

5         A.    Right.  That's correct.

6         Q.    And he didn't have a policy-making role

7    for Hamilton County?

8         A.    No.  That's correct.

9         Q.    Okay.  Approximately how many employees

10   does the Hamilton County Sheriff's Office employ?

11        A.    Approximately 900.

12        Q.    Okay.  How has that changed over the last

13   three years?

14        A.    Well, we've had some -- I guess I'll call

15   it, you know, fluctuating numbers.

16        Q.    Sure.  What's the range?

17        A.    The -- oh, I wouldn't be able to tell you

18   number-wise, but I can tell you that we've improved

19   our recruiting, we've worked on those numbers.  Law

20   enforcement across the nation is having trouble

21   recruiting, and we have -- we've really focused on

22   that and worked on that, and our recruiting levels

23   are very high.

24        Q.    Sheriff, I'm going to hand you what's been

25   marked as Plaintiffs' Exhibit 10.

1    A.   Okay.

2    Q.   And take a moment to look at that.

3    A.   Okay.  Okay.  It's an evaluation, yes.

4    Q.   All right.  And I had a couple of

5  questions for you about that.

6    A.   Okay.

7    Q.   Did you play any role in his evaluations

8  during -- at any time he was employed by the

9  Hamilton County Sheriff's Department -- Jason Davis?

10    A.   When he was a jail service officer, I

11  would have signed off on the final evaluations.

12    Q.   Okay.

13    A.   I mean, as they moved up the chain.

14    Q.   Okay.  So after 2014 you would have been

15  uninvolved?  We just documented that's when he went

16  to patrol.

17    A.   Oh, yeah.  Once he went to patrol, yeah, I

18  would have no -- yeah.

19    Q.   All right.

20    A.   No.

21    Q.   And in the evaluations there's a scale or

22  a score that's given.

23    A.   Uh-huh.

24    Q.   Is there any sort of rating scale in

25  writing that documents the numerical score and what

1    it means?

2         A.   On this particular style of evaluation, I

3    don't think -- you know what, there is a booklet

4    that is a companion -- that was a companion to this

5    when we very first moved to this type of evaluation

6    that outlined, you know, each of these categories

7    and what that meant.

8         Q.   Sure.  And then did the booklet also cover

9    the range in terms of the scoring?

10        A.   Oh, you mean shooting -- shooting range?

11        Q.   No.

12        A.   Oh.

13        Q.   The range of scores in the sense of --

14        A.   Oh, the -- yes, it did.

15        Q.   Okay.

16        A.   Uh-huh.  Sure.

17        Q.   And to your understanding what was that

18   range of scores that someone could get?  If you

19   don't remember --

20        A.   Yeah, I couldn't -- you know, I couldn't

21   tell you what the highest score was.

22        Q.   All right.  Do you recall what --

23   generally speaking, what would be a good score

24   versus a bad score?

25        A.   In general I'd say -- you know, I've seen

1    scores as low as like nine, you know, ten.  I mean,

2    that's a super low score.  That's my memory.

3        Q.   Okay.

4        A.   So. . .

5        Q.   Beyond that -- who would know at the

6    Hamilton County Sheriff's Department what those

7    questions -- right, the -- what the categories

8    entail, what the range of scores mean, why you would

9    give a particular score versus another score; who

10   would have that knowledge?

11       A.   Well, I would think the evaluators, the

12   sergeant, the first-line supervisors for sure, and

13   likely the lieutenants would need to have the

14   knowledge of that.

15       Q.   All right.  We were not provided all of

16   the rating periods --

17       A.   Okay.

18       Q.   -- for his tenure.  Do you have any idea

19   why we didn't get them all?

20       A.   I would not know.

21       Q.   All right.  Are you personally aware of

22   any time period when Jason Davis did not meet or

23   exceed expectations for his job?

24       A.   I have no knowledge of that.

25       Q.   All right.  In Exhibit 10 --

1       A.    Uh-huh.

2       Q.    -- okay, if you go to the eighth page in

3   and at the top it should say Additional Comments.

4       A.    What does it begin with in the Comments;

5   during this rating period?

6       Q.    During this rating period.

7       A.    Yes, I have it.

8       Q.    Okay.  You're there.  And it says, During

9   this rating period, Enforcement Officer Davis

10  received a divisional commendation for assisting

11  coworkers during an incident with a subject with

12  psychiatric issues and a gun.  Did I read that

13  accurately?

14      A.    Correct.

15      Q.    What is a divisional commendation?

16      A.    So a divisional commendation is some --

17  well, we have two.  Squad commendation and

18  divisional commendation.  So divisional commendation

19  is a very high level commendation, because it means

20  that for that entire division you have acted

21  exceptionally.

22      Q.    Okay.  And here he got a divisional

23  commendation.  It says, During this incident

24  enforcement Officer Davis used great restraint and

25  patience and was able to resolve the incident

1   peacefully.  And it was an incident involving

2   someone with psychiatric issues and a gun, right?

3       A.   Uh-huh.  Yes.

4       Q.   Okay.  Do you know how many of those

5   divisional commendations are awarded annually?

6       A.   Oh.  I wouldn't -- I wouldn't even be able

7   to guess, because it fluctuates year to year.  I'm

8   sorry.

9       Q.   Okay.  Do you know?

10      A.   No, I don't know.

11      Q.   All right.  Who might know that within the

12  Hamilton County Sheriff's Department?

13      A.   Well, someone who researches and goes back

14  through everyone's file to find out who got a

15  divisional commendation.

16      Q.   Okay.  Who is the decision maker on

17  divisional commendations?

18      A.   That is signed off by the sheriff

19  ultimately.

20      Q.   Okay.  So the -- whoever the sheriff in

21  2019, that's when this one was --

22      A.   Uh-huh.

23      Q.   -- that's who signs off on it?

24      A.   Yes.  That's who ultimately signs off on

25  it, yeah.

Page 220

1      Q.   If Jay Gramke testified that there were

2   approximately 15 per year over the entire

3   department, do you have any reason to dispute that?

4      A.   Fifteen divisionals over --

5      Q.   No.

6      A.   -- the entire department?

7      Q.   Yeah.

8      A.   I would have -- I cannot verify that

9   information.

10     Q.   Okay.  And then if you turn the page --

11     A.   Uh-huh.

12     Q.   -- from the page you were just at, the

13  next page --

14     A.   Okay.  Yeah.  All right.  Got it.

15  Additional Comments, right -- or no.  Wait a minute.

16     Q.   We were on Additional Comments.

17     A.   Yes.

18     Q.   Go to the next --

19     A.   Hold on.

20     Q.   -- page.

21     A.   That is an evaluation.

22     Q.   That's right.

23     A.   Okay.

24     Q.   And the date on that is 6/17/21; do you

25  see that?

1      A.    I do see that.

2      Q.    All right.  And if you go down to the

3   comments section --

4      A.    Uh-huh.

5      Q.    Well, first of all, his overall score is

6   17.

7      A.    Okay.

8      Q.    And would you agree with me that 17 is a

9   pretty good score?

10      A.    I'd say it's -- you know, it's definitely

11   not low.

12      Q.    Okay.  And in there, in the comments

13   section, second sentence --

14      A.    Uh-huh.

15      Q.    -- Officer Davis is one of the more

16   veteran officers on the squad and is often relied

17   upon by his coworkers for guidance and assistance.

18   Did I read that correctly?

19      A.    Yes.  Yes.

20      Q.    Who is responsible for that -- putting

21   that in the comments?

22      A.    The sergeant here who graded this

23   evaluation.  I can't read his name.  But that's a

24   sergeant's signature.

25      Q.    Okay.

Page 222

1     A.   I would assume.

2     Q.   And would you expect that's the person who

3 knows Jason Davis best in terms of his work?

4     A.   His first-line supervisor, yes.

5     Q.   All right.  And then did you sign off on

6 this?

7     A.   I did not.

8     Q.   Okay.  There is a line for a Chief Deputy

9 and Sheriff on this form, and I don't see either

10 signature.  Do you know why you didn't sign off on

11 this one?

12     A.   I do.  So the Chief Deputy -- when we came

13 on, he and I were in conversation regarding the flow

14 of documents and paperwork and all the things that

15 he signed and so forth.  And we decided to -- the

16 Chief requested for me that he create a new model

17 for that so that we were not bogged down with

18 hundreds of these and not able to pay attention to

19 all the other heavy lifting we did.

20        So what he explained to me is that he was

21 going to put more of the responsibility on the

22 division commanders for signing off on these evals.

23 Now, I'm not sure why he didn't sign it, if that was

24 a part of his reorganization.  I assume that is or

25 if it just somehow didn't get to him.  I don't know.

Page 223

1       Q.   Okay.  Do you have any personal knowledge

2   of any performance or job-related problems with

3   respect to Jason Davis while he was a patrol officer

4   with the Hamilton County Sheriff's Office?

5       A.   No, I do not.

6       Q.   Okay.  All right.  Sheriff, I'm handing

7   you what's been marked as Exhibit 12 -- Plaintiffs'

8   Exhibit 12.

9       A.   Uh-huh.

10      Q.   Do you recognize this as a personnel order

11  issued by Jay Gramke?

12      A.   Yes.  Effective January 13, 2023.

13      Q.   All right.  And is this the promotional

14  list for corporal that Jason Davis was on?

15      A.   It's a promotional list for corporal.  I

16  -- it's the results of a corporal's test, it

17  appears.

18      Q.   Sure.

19      A.   Yes.

20      Q.   And look at Rank No. 19.

21      A.   Oh.  Okay.  Jason Davis's name does

22  appear.

23      Q.   Okay.  And does this list only come out

24  when there are vacancies for corporal?

25      A.   Yes.  When we're anticipating vacancies,

1   we can give a test because, you know, all that stuff

2   takes a long time, so yes.

3        Q.   How long does this -- when this list was

4   issued, it says effective date January 13, 2023.

5        A.   Uh-huh.

6        Q.   How long was this list effective for?

7        A.   Two years is what I understand is our --

8   you know, our list -- our exam list.

9        Q.   All right.

10       A.   Promotion list, I meant to say.

11       Q.   Was this list, in fact, kept for two

12   years?

13       A.   To my knowledge, yes.

14       Q.   Okay.  Do you personally -- do you have

15  personal knowledge as to how many people off this

16  list were promoted to corporal; in other words, who

17  you recognize on this list?

18       A.   Well, what I recognize on this list is --

19  are men and women who were already making corporals

20  pay and working in assignments that were

21  technically -- technically corporal assignments

22  without carrying the actual rank.

23       Q.   That wasn't my question.  My question

24  simply was, do you know who actually -- which of

25  these folks were promoted to corporal?

1       A.   Many of them were by -- because we had a

2    promotion ceremony.  And we did promote many of

3    these people.  And as I said, the reason being they

4    were already making the pay, et cetera.  We wanted

5    them to have the chevrons, to have the rank to go

6    with it.

7       Q.   And who do you see on this list who had

8    already been promoted to corporal?

9       A.   So Caroline Kotlas I recall.  And, again,

10   my memory -- I know I promoted a number of these

11   people.  If not -- let's see.  When was this, '23.

12   So. . .

13      Q.   Let me ask you this way.

14      A.   I mean, I would say some of them I

15   recognize, yeah.

16      Q.   Sure.  Let me ask you this way.  Do you

17   recognize any names below 19; do you recognize any

18   names below 19 -- so 20 down to 33, do you recognize

19   any of those names who got promoted to corporal?

20      A.    I really -- I couldn't say.  I don't

21   recall the actual events for any of these people.

22   So I'd have to look at a promotional list or -- you

23   know, but I can't recall.

24      Q.   All right.  I'm going to hand you what's

25   been marked as Exhibit 14 -- Plaintiffs' Exhibit 14.

1       A.    Okay.

2       Q.    Take a moment and look at that.

3       A.    Uh-huh.  Okay.  Yes.  Hang on.  It appears

to be Facebook remarks and so forth.  And then this

looks like a HCSO press conference Facebook, so --

okay.

7       Q.    So my question to you is, have you ever

seen this Facebook post that was done by Jason Davis

on May 15 of 2022?  I just handed it to you.  Have

you ever seen it before?

11      A.    This one?

12      Q.    Yes.

13      A.    No, I have not seen this.

14      Q.    All right.  And the post reflects that

Fox19 covered the charity football game that helped

out families of first responders that Jason Davis

organized, correct?

18      A.    Okay.  Yes.  It appears, yeah.

19      Q.    All right.  And you would agree that media

coverage around this game and participation of it

was an issue of public concern, people were --

22      A.    Again, I think --

23            MR. SIMON:  Objection.

24      A.    -- the public would be interested in it.

25      Sure.

1    Q.   All right.  And if Jason Davis contends or

2  states that this post was made on his own time when

3  he was off the clock, do you have any personal

4  knowledge that that's not true?

5    A.   I would have no idea.

6    Q.   All right.  And you would agree that this

7  post is not an official Sheriff's Office account or

8  post, correct?

9    A.   Correct.

10    Q.   All right.  And if you look at the

11  comments that were made on this post, one of the

12  comments -- if you turn to the next page --

13    A.   Uh-huh.

14    Q.   -- it's a comment from Itsa Krakken; do

15  you see that?

16    A.   Hang on.  Let me -- it's on the second

17  page, you say?

18    Q.   Yeah.

19    A.   Oh.  Yeah.  Here it is.

20    Q.   Okay.

21    A.   Uh-huh.

22    Q.   And part of that post says you guys all

23  did an outstanding job, exclamation point, correct?

24    A.   Yes.  That's right.

25    Q.   You would agree that that fundraiser

1    brought good will to the Hamilton County Sheriff's

2    Department?

3         A.   It appears so.

4         Q.   In fact, the next comment was awesome

5    event, great job to all involved, right?

6         A.   Yeah.  There's a lot of good comments

7    about it.

8         Q.   Okay.  And then one of the comments was

9    from someone named Paul Nabers, if you turn to the

10   next page --

11        A.   Okay.

12        Q.   -- or Paul Naber.  Do you know --

13        A.   Yeah.

14        Q.   -- Paul Naber?

15        A.   I do.

16        Q.   Okay.  Who is Paul Naber?

17        A.   He is now a lieutenant with our

18   department.

19        Q.   All right.  And Paul Naber's comment was,

20   Needs more advertising intradepartmental.  Never

21   knew about this game until now.  Do you see that?

22        A.   Yes.

23        Q.   All right.  And then do you see where

24   lower down on that same page Jason Davis responded

25   to Paul Naber?

Page 229

1          A.    I do, yes.

2          Q.    And the post was, Our department didn't

3     support it.  No county items were used to advertise

4     this game.  Flyers were taken down from briefing

5     room.  Do you see that?

6          A.    I do see that.

7          Q.    Okay.  Do you have any personal knowledge

8     that that isn't a true statement, what is posted

9     there?

10         A.    I have no knowledge that that's factual at

11    all.

12         Q.    Okay.  You don't know one way or the

13    other?

14         A.    Right.

15         Q.    All right.  And then it says, Flyers were

16    taken down from briefing rooms.  That's part of what

17    you don't -- you don't have any knowledge whether

18    that ever happened or didn't happen?

19         A.    No, I don't know.

20         Q.    All right.  If you had known that someone

21    had taken down the flyers advertising that game from

22    briefing rooms, would that -- would you have had a

23    problem with that?

24         A.    Again, hypothetical, I have no idea where

25    the flyers would have been posted in the briefing

1  room, if they were actually on the bulletin board,

2  if they were taped to people's doors, if they were

3  in the bathrooms.  I have no idea.

4       Q.   Okay.  I mean, do you have any problem

5  with flyers being put up in the briefing room

6  advertising intradepartmentally something like a

7  Remember the Fallen charity football game?

8       A.   Well, what I can tell you is a very, very

9  long time ago there was concern about managing

10  bulletin boards in briefing rooms.  And I know --

11  and, again, I'm going back decades -- it was

12  assigned to the sergeants to make sure that the

13  bulletin boards were appropriate, to make sure that

14  things were actually in line, and that sort of

15  thing.  And that's really all I know about bulletin

16  boards or the briefing room.

17       Q.   Once you found out about the charity

18  football game and it was a fundraiser, why and who

19  it was raising funds for, were you proud that Jason

20  Davis had pulled that off?

21       A.   Well, I found out about the charity

22  football game, but honestly I never understood it.

23  I didn't -- I got bits and pieces of what it was

24  mainly because Jay explained it to me, because I

25  asked questions, what was it, when was it, why

1   didn't we -- did we participate.  I knew nothing

2   about it.  And then the answers I got were kind of,

3   you know, sparse.  So I still am not real clear

4   except for what you tell me as to how that went.

5       Q.   Okay.  Well, if you look at the screenshot

6   from Fox19 --

7       A.   Uh-huh.

8       Q.   -- it says, Charity Football Game Helping

9   Out Families of First Responders.  Let's assume

10  that's true.  If Jason Davis organized it, helped

11  raise the funds for it, got the word out, pulled it

12  off, right, the game happened and then got media

13  coverage of it --

14      A.   Uh-huh.

15      Q.   -- wouldn't -- you as the Hamilton County

16  Sheriff, would that make you proud that he did that?

17      A.   I think it's a very good thing.  I think

18  it reflects -- I think it reflects well on our

19  department.  I'm proud of everything our deputies do

20  that is in the positive.

21      Q.   Okay.  And in terms of the posts and

22  particularly Jason Davis's post on his Facebook page

23  in response to Paul Naber --

24      A.   Uh-huh.

25      Q.   -- you would agree that he wasn't airing

1   any sort of grievance about job -- his job

2   conditions?

3              MR. SIMON:  Objection.  Vague and

4         ambiguous.

5              You can answer.

6        A.   It appears what he is saying is is

7   complaining about job conditions here, it appears.

8        Q.   Okay.  Sure.  So you don't like to

9   speculate, so what are you saying that is about his

10  job condition?

11       A.   Well, he is -- he states here our

12  department didn't support it.

13       Q.   Okay.

14       A.   So. . .

15       Q.   And it's referring to a charity football

16  game that he did on his own time?

17       A.   I assume.

18       Q.   Right.  So what job condition --

19       A.   Well, he then reflects that flyers were

20  taken down from the briefing rooms.

21       Q.   Okay.

22       A.   So I -- those are -- that's a job

23  condition that -- you're asking my opinion.  It

24  sounds like he is very dissatisfied with the fact

25  that at work we -- someone isn't -- isn't supporting

1    this -- this thing, this event that he's doing.

2        Q.    Okay.  But that wasn't a condition imposed

3    by his employer, right?

4        A.    That he do that?

5        Q.    That any of that occur.

6        A.    Well, that he organized it.

7                MR. SIMON:  Objection.  Objection

8                calls for a legal conclusion.  Vague and

9                ambiguous.

10       A.    Yeah, we didn't --

11               MR. SIMON:  You can answer.

12       A.    We didn't tell him he had to organize it

13   certainly.

14       Q.    Right.  And it wasn't a job condition that

15   flyers be taken down, right?

16               MR. SIMON:  Objection.

17       Q.    Is that correct -- it wasn't a condition

18   of his employment that any flyer he put up in a

19   briefing room about a charity football game had to

20   be taken down, right?

21       A.    Well, he -- he's complaining about it, so

22   I don't know what you mean.  I mean, it's not -- we

23   don't -- it's not in the policy and procedures that

24   if there's a flyer up, we have to take it down from

25   the briefing room, no.

1      Q.   Right.  That's not a condition of his job.

2   And likewise, it's not a condition of his job that

3   the department doesn't support charity functions

4   that he engages in on his own time; that's not a

5   condition of his job, right?

6      A.   We are not -- yeah.  We're not asking him

7   to do that.

8      Q.   All right.  Is it fair to say that

9   generally speaking Jason Davis's working

10  relationships would have been with his immediate

11  corporal and sergeant?

12     A.   Yes.  I'd say that's right.

13     Q.   All right.  And then other officers he

14  encountered on shift?

15     A.   Correct.

16     Q.   Are you aware of anyone else Jason Davis

17  had a working relationship with during his career at

18  the Hamilton County Sheriff's Department as a patrol

19  officer?

20     A.   No, I'm not.

21     Q.   Do you have any personal knowledge -- and

22  I'm talking about this Facebook post by Jason

23  Davis --

24     A.   Uh-huh.

25     Q.   -- do you have any personal knowledge that

1    his Facebook post meaningfully interfered with the

2    performance of his duties at the Hamilton County

3    Sheriff's Office?

4                    MR. SIMON:  Objection.  Calls for a

5              legal conclusion.

6         A.   I don't think it interfered with his

7    duties.  It cast a -- it cast, you know, a negative

8    light on the department in that.  When I read this,

9    that's what I would think.

10        Q.   Do you know if anyone else drew that

11   conclusion?

12        A.   I have no idea.

13        Q.   All right.  So you don't know how it would

14   have been perceived departmentally?

15        A.   I don't.  Uh-uh.

16        Q.   Do you have any personal knowledge that

17   Jason Davis's post -- his Facebook post undermined a

18   legitimate goal or a mission of the Hamilton County

19   Sheriff's Department?

20                    MR. SIMON:  Objection.

21        A.   No, I don't have any knowledge of that.

22        Q.   All right.  Do you have any personal

23   knowledge that Jason Davis's post caused any

24   disruption in the operations of the Hamilton County

25   Sheriff's Department?

1      A.   I have no knowledge of that.

2      Q.   All right.  Do you have any personal

3  knowledge that Jason Davis's post created any

4  disharmony amongst his fellow officers?

5      A.   I have no knowledge of that.

6      Q.   Do you have any personal knowledge that

7  Jason Davis's post impaired the ability of his

8  supervisors to discipline him?

9      A.   No knowledge of that.

10      Q.   All right.  Do you have any personal

11  knowledge that Jason Davis's post impaired any

12  working relationships within the Hamilton County

13  Sheriff's Office?

14      A.   No knowledge of that.

15      Q.   All right.  And do you have any personal

16  knowledge that Jason Davis's post impaired

17  discipline and harmony?

18      A.   No knowledge of that.

19      Q.   Assuming Itsa Krakken is Caroline Adams

20  and she posted on his Facebook page --

21      A.   Yes.

22      Q.   -- you're not saying that Jason Davis was

23  associating with her because Itsa Krakken posted on

24  his Facebook page, are you?

25      A.   I'm not saying anything about it, because

Page 237

1    I didn't know about it until just now here looking

2    at it.

3         Q.   All right.  And even knowing about it now,

4    that doesn't mean he's somehow associated with her

5    because she posted on his Facebook page?

6         A.   Anybody, as I understand, can post on

7    someone's Facebook page.  So I think that stands to

8    reason.

9         Q.   All right.  In fact, do you have any

10   personal knowledge whether Jason Davis has ever

11   communicated, interacted, associated with in any way

12   Caroline Davis -- or Caroline Adams?

13        A.   I have no knowledge of that.

14        Q.   Take a moment to take a look at that.

15        A.   Okay.  Yes.  All right.

16        Q.   All right.  And you -- at some point you

17   had posted on the Hamilton County Sheriff's Office

18   Facebook that the number one priority for the

19   Sheriff's Office was COVID-19; is that -- do you

20   recall that?

21        A.   Yes.  I believe that was -- we posted that

22   after I actually had a press conference and said

23   that.

24        Q.   Okay.  And the Facebook page was open to

25   the public for comments --

Page 238

1        A.    It was.

2        Q.    -- correct?

3        A.    Uh-huh.

4        Q.    All right.  Is that a yes?

5        A.    Yes.  Yes, it was.

6        Q.    Is it still open?

7        A.    No, it is not.

8        Q.    When was the decision -- when was it --

9    that changed, when?

10        A.    I made the decision to change that --

11    gosh, I'm going to say about two years ago, it might

12    have been, somewhere in that ballpark.

13        Q.    And why; why did you make that decision?

14        A.    Because I think that there are lots of

15    people out there who when they can hide behind, you

16    know, the keyboard, they make lots of disparaging

17    comments.  And sometimes they named deputies.  They

18    make disparaging comments about them.  They'll --

19    you know, and it's very difficult for the people

20    that work at our agency as police officers to work

21    under that duress.  I think it creates -- I know it

22    creates a great deal of angst.  And I think it

23    affects morale.  So I stopped -- I stopped -- I

24    stopped it.

25        Q.    Okay.  Assuming this is a screenshot of

Page 239

1    comments from Jennifer Patterson Davis about

2    COVID-19 being the number one priority of the

3    Sheriff's Office, are you aware of any other posts

4    by Jennifer Patterson Davis on the Hamilton County

5    Sheriff's Facebook page?

6         A.   I would have no knowledge.

7         Q.   Did you even know about these?

8         A.   No, I did not.

9         Q.   Okay.  Assuming Jennifer Patterson Davis

10   is my client, Jennifer Davis --

11        A.   Uh-huh.

12        Q.   -- and she's married and was married to

13   Jason Davis --

14        A.   Yes.

15        Q.   -- you would agree with me that the

16   comments that you see under that name --

17        A.   Uh-huh.

18        Q.   -- on this Exhibit 15 --

19        A.   Uh-huh.

20        Q.   -- she's entitled to voice those opinions?

21        A.   Yes.  I think anyone is entitled to their

22   opinion.

23        Q.   Okay.  And you would agree with me that

24   the priorities of the Hamilton County Sheriff's

25   Department are an issue of public concern?

Page 240

1     A.    I think they are of interest to the

2   public.

3     Q.    All right.  And certainly officer safety

4   and the priority of officer safety in terms of gun

5   deaths, suicide, exposure to COVID-19, that's all an

6   issue for public concern, fair?

7     A.    Oh.  They're very high-ranking issues.

8   Yes.

9     Q.    All right.  And certainly how the

10  Sheriff's Department ranked them in terms of

11  priority, that's a matter of public concern if the

12  sheriff is prioritizing them appropriately or

13  correctly or not in the public's opinion?

14    A.    I think the public is interested, yes.

15    Q.    All right.  And one of the comments in

16  here it says, In 2020, 304 officers died in the line

17  of duty and 228 from suicide.

18    A.    Uh-huh.

19    Q.    That is not a higher health priority than

20  the number of officers who died from COVID or a

21  complication listed at 153.  Did I read that right?

22    A.    So hang on.  Let me find that.

23    Q.    Sure.

24    A.    2020, died in the line of duty, from

25  suicide.  That is not a higher health priority than

1    the number of officers who died from COVID or

2    complications.  Oh, and then there's a question

3    mark.  So that's not a statement.  Okay.  Listed at

4    153.  Okay.

5         Q.   Do you know if those stats are true,

6    accurate; do you have any idea?

7         A.   I would have no idea.

8         Q.   Jennifer Davis, to your knowledge, was

9    never an employee of the Hamilton County Sheriff's

10   Department, correct?

11        A.   Not that I know of.

12        Q.   All right.  And you would agree that

13   nothing on Plaintiffs' Exhibit 15 involves directing

14   any threats or calls for violence against the

15   sheriff, correct?

16        A.   Against me personally, no.

17        Q.   All right.  All right.  Sheriff, I'm

18   handing you what's been marked as Exhibit 17.  Take

19   a moment to review that.  It's a two-page document.

20        A.   Uh-huh.  Okay.

21        Q.   All right.  When you're ready, I have just

22   a couple of questions.

23        A.   Sure.

24        Q.   Have you ever seen this document or the

25   original, any posts like this before?

1       A.   I reviewed it as an exhibit, I think.

2   Isn't it an exhibit that's included in our. . .

3       Q.   All right.  But that was the first time

4   you saw it?

5       A.   Yes.  Uh-huh.

6       Q.   All right.  And then it says,

7   Apparently -- do you see where -- take a look at --

8       A.   Uh-huh.

9       Q.   -- the first paragraph.

10      A.   Yes.

11      Q.   It says, Apparently, there was a morale

12  survey that went out through the Hamilton County

13  Sheriff's Office and the results were so terribly

14  horrific that Sheriff Chaz and her trusty Chief

15  Deputy decided to tour the netherworlds that we all

16  call the districts to see if they could try and get

17  a handle on the awful morale issue plaguing the

18  Hamilton County Sheriff's Office.  Did I read that

19  correctly?

20      A.   Yeah.  That's correct.

21      Q.   Was there ever any sort of morale survey

22  that went out through the Hamilton County Sheriff's

23  Office?

24      A.   There was a survey.  And I believe it was

25  Captain Tony Orue had put a survey out to kind of

Page 243

1    get -- it was early, early on in our tenure -- to

2    kind of get a temperature of where we were starting

3    from with deputies' opinions, et cetera.

4        Q.   What was the form of the survey?

5        A.   I have no -- I didn't take it.  I didn't

6    see it.  I just know that it went out.

7        Q.   Who sent it out or who prepared it?

8        A.    Well, I think, again, that it was

9    administered by Captain Tony Orue, I think.

10       Q.   Okay.  And did you ever see the results of

11   the survey?

12       A.   No, I did not.

13       Q.   All right.  Do you know if he got the

14   results?

15       A.    I assume he did.

16       Q.   Okay.  The comment that is on this

17   Facebook post is that the results -- I'm

18   paraphrasing here -- were terrible, okay?

19       A.    Uh-huh.

20       Q.   Did you ever get any feedback that the

21   results from the survey weren't good, they were bad?

22       A.    No.  In fact, what I was told by the Chief

23   Deputy is it was just as we thought.  Under the past

24   administration many things had deteriorated.  The

25   deputies were very unhappy with the way things had

1    been run in the last -- what was that -- eight

2    years, and that we had a good base to start from

3    now.

4         Q.   Okay.  Who at the Hamilton County

5    Sheriff's Department would have the results of this

6    survey?

7         A.   I assume Captain Orue, who is now a major.

8         Q.   Okay.  If you go down in that post, third

9    paragraph, In true Chaz fashion; do you see --

10        A.   Uh-huh.

11        Q.   -- where it says that?

12        A.   I do.

13        Q.   It says, She informed the peasants that

14   they were forbidden from having any contact with

15   Itsa Krakken.  Zero.  In addition, those or their

16   significant others that had the poor judgment to

17   like or comment on Itsa Krakken's posts would

18   continue to be properly punished.  Do you see that?

19        A.   I do.

20        Q.   All right.  First of all, I think we

21   covered this, but you never said anything in --

22   Chief Gramke never said anything like that at any of

23   the meetings in any of the districts?

24        A.   I don't have any memory of that

25   particular -- you know, what is said there being

Page 245

1    said.  None.

2         Q.   So it never happened; you never said it?

3         A.   No.

4         Q.   All right.  And then it says, Allow me to

5    quote a part of Sheriff Chaz's speech given at one

6    of the districts.  Quote, Itsa Krakken is a fat

7    troll who sits naked in the dark and makes

8    derogatory comments.  I do not read these comments.

9    I have people that read them for me.  I get tired of

10   hearing about her comments, so I turned them all off

11   and I don't care that I'm not allowed to do that.

12   She can go ahead and sue me over it, closed quotes.

13           First of all, did I read that statement

14   accurately?

15        A.   Yes, you did.

16        Q.   All right.  Did you say -- since it's a

17   quote that allegedly is attributed to you in one of

18   these meetings -- did you say -- ever say anything

19   like that?

20        A.   I said exactly that.

21        Q.   Okay.  And you remember it?

22        A.   Oh, I do.

23        Q.   Okay.  Do you know if any -- these

24   meetings that are out in the districts, were they

25   mandatory meetings, like was there some -- any kind

1   of notice that, hey, we want all the patrol officers

2   present because the sheriff is coming?

3        A.   No.  We decided to go out to the

4   districts.  So whenever you do that, you're really

5   going to kind of get a hit or miss when you're going

6   to get the guys on duty.  I don't want to make guys

7   get up and come in for a briefing when they're off.

8             So, you know -- I mean, that's just a --

9   it's just the way it is, try to -- you know, we try

10  to get as many people there, letting them know we're

11  coming so that they in -- you know, in case they are

12  going to skip a briefing, that that might be one

13  they want to attend.  But we don't certainly go

14  around and ask who is there or who is not.

15       Q.   Yeah, was it like at a shift change so

16  you'd have --

17       A.   Yeah.  Yeah.  There were shift changes.

18  Uh-huh.

19       Q.   Okay.  And that was by design so you'd get

20  the most amount of people there?

21       A.   Yeah.

22       Q.   All right.

23       A.   Uh-huh.

24       Q.   Sheriff, I'm handing you what's been

25  marked as Plaintiffs' Exhibit 16.

1       A.    Uh-huh.

2       Q.    Take a moment to read that.

3       A.    Okay.

4       Q.    And the same questions as before.  First

5    of all, had you ever seen this post before?

6       A.    Just when I reviewed the exhibits.

7       Q.    Okay.  And in terms of Jennifer Patterson

8    Davis making this post, she's entitled to her

9    opinions, correct?

10      A.    Uh-huh.  Of course.

11      Q.    Okay.  And there's no consequence or

12   accountability to Jason Davis because his wife made

13   a post, fair?

14      A.    I'd say that's a fair statement.

15      Q.    And, of course, the post is over things

16   involving the priorities of the Sheriff's Department

17   in 2021, correct?

18      A.    Yes, it appears so.

19      Q.    All right.  Did anyone ever inform you

20   that Jason Davis's wife had been posting?

21      A.    No.

22      Q.    Chief Gramke never told you that?

23      A.    No.  I had no -- I had no knowledge of

24   that.  If somebody told me, I don't remember it.

25      Q.    The Hamilton County Sheriff's Department

1  social media policy does not apply to spouses of

2  employees, correct?

3      A.   Correct.

4      Q.   And it only applied to official accounts,

5  not personal accounts, correct?

6      A.   Official, personal -- I'm a little

7  confused there.

8      Q.   Well, let me ask you this.  To your

9  knowledge Jason Davis never violated the social

10  media policy of the Hamilton County Sheriff's

11  Department while --

12      A.   I had no knowledge --

13      Q.   -- he was employed there?

14      A.   -- of it, no.

15      Q.   All right.  I'm jumping around here a

16  little bit, because we've talked about a lot --

17      A.   Uh-huh.

18      Q.   -- already.

19      A.   Sure.

20      Q.   The RENU position, are you aware of

21  whether or not it involves significant overtime?

22      A.   I know there was some overtime.  I don't

23  know what -- how much of that is --

24      Q.   Okay.  Were you --

25      A.   I'm sorry.  That's okay.  I just don't

Page 249

1    know.

2         Q.   Were you aware that it involved a

3    take-home cruiser or a car?

4         A.   I don't know what positions are associated

5    with that, that policy.  I don't -- I mean, there

6    may be positions there where guys do that.  I

7    think -- I know there are.  But I don't know if that

8    applies to everybody.

9         Q.   Okay.  Who is Kevin Manos?

10        A.   Oh, Kevin Manos is an employee.  He's a

11   deputy.  In my memory I -- he may be a supervisor as

12   well.

13        Q.   All right.  Do you know whether Kevin

14   Manos is a credible and honest officer?

15        A.   I would assume so.

16        Q.   You don't have any reason to say

17   otherwise, fair?

18        A.   No.  Correct.

19        Q.   Okay.  We have discussed everything you

20   remember about the October 10, 2023, meeting with

21   Jason Davis; is that fair?

22        A.   So far.

23        Q.   All right.  And you have given me every

24   reason why Jason Davis wasn't promoted to RENU,

25   correct?

Page 250

1      A.   Well. . .

2      Q.   That you're aware of?

3      A.   I've given you my opinion as to how I

4  determined that, yes.

5      Q.   Yeah.  You don't have any personal

6  knowledge other than what you've told me?

7      A.   Correct.

8      Q.   All right.  And then your only personal

9  knowledge about corporal is he was never denied a

10  promotion to corporal, he just -- if he had stayed,

11  he would have been available --

12      A.   Yeah.

13      Q.   -- for the next promotion?

14      A.   I believe so.  Uh-huh.

15      Q.   All right.  Do you agree that Jason Davis

16  always worked really hard in the Hamilton County

17  Sheriff's Department?

18      A.   To my knowledge, yes.

19      Q.   All right.  Do you agree that as of

20  October 10, 2023, you always considered him a really

21  good officer?

22      A.   Yes.  I'd say that's true.

23      Q.   All right.  And did you ever tell Jason

24  Davis that I think you do a great job?

25      A.   That's very possible.

1       Q.   All right.  And do you agree that you

2   always have a purpose for everything you do as

3   sheriff?

4       A.   Certainly.

5       Q.   All right.  I understand your knowledge

6   of -- is limited regarding the Constitution and

7   things like that.  We talked about some of it.

8       A.   Yes, we did.

9       Q.   But is it fair to say that you knew as

10  Hamilton County Sheriff that you could not retaliate

11  against one of your employees in terms of promotions

12  or job positions, things like that; you could not

13  retaliate against your employees for things that

14  their spouse posted on Facebook?

15      A.   What I know is we can't retaliate, period.

16      Q.   Okay.  And that's not something you would

17  ever do, correct?

18      A.   No.  Correct.

19      Q.   All right.  And if you knew that someone

20  under you, such as your chief deputy --

21      A.   Uh-huh.

22      Q.   -- was retaliating against one of your

23  officers because of something that officer's wife

24  put on Facebook, you would stop that from

25  happening --

Page 252

1              MR. SIMON:  Objection.

2      Q.   -- is that fair?

3              MR. SIMON:  Objection.  Lack of

4          foundation.  Hypothetical.

5      A.   Again, it's a hypothetical.  So I -- I

6  don't feel comfortable answering that.

7      Q.   Well, I'm going to -- as part of your

8  responsibility as sheriff, if you -- you just said

9  that you would never retaliate against one of your

10  officers for something their spouse put on Face- --

11  on social media and you said you can't do that, so

12  my question is very simple.

13              If you know you can't do it and you

14  wouldn't do it, if you were aware that one of your

15  officers underneath you, such as your chief

16  deputy -- if he was doing that, you would put a stop

17  to it; is that fair?

18              MR. SIMON:  Same objection.

19      A.   Again, you're talking in hypotheticals of

20  that I -- it's not factual.  I can't answer that.

21  There's so many nuances to if, if, if.

22      Q.   Okay.  Was it your -- as sheriff you set

23  policy, correct, ultimately?

24              MR. SIMON:  Objection.  Calls for a

25          legal conclusion.

```
 1        A.    I sign policy.  Policy is written in --
 2   you know, in various ways with -- conjunction with
 3   different experts of various subject matter, so yes.
 4        Q.    Right.  The buck stops with you in terms
 5   of --
 6        A.    Yes.
 7        Q.    -- approving the --
 8        A.    I sign off on the policy.
 9        Q.    All right.  And do you have a policy at
10   the Hamilton County -- and did you have a policy at
11   the Hamilton County Sheriff's Department of
12   preventing or stopping violations of the
13   Constitution if they're being carried out by folks
14   underneath you, or do you have a policy of allowing
15   them to violate the Constitution; is there a policy
16   one way or the other?
17              MR. SIMON:  Objection.
18        A.    Policies --
19              MR. SIMON:  Objection to the form --
20        A.    -- are designed --
21              MR. SIMON:  -- of the question.  Go
22              ahead and answer.
23        A.    Policies are signed to prevent people from
24   acting outside of their scope and outside of what
25   the law says, the Constitution.  And, again, those
```

1  policies are written by attorneys.  They're written

2  by people with expert knowledge of those things.

3       Q.   And you approve those policies?

4       A.   I sign off on them, yes.

5       Q.   All right.  And so you had a policy that

6  if someone was, for instance, retaliating --

7       A.   Uh-huh.

8       Q.   -- against Hamilton County Sheriff's

9  Deputy for something that the Sheriff's Deputy's

10 wife posted -- if they -- if one of your supervisors

11 or officers was retaliating against an underling for

12 that, that would violate your policy?

13            MR. SIMON:  Same objection.

14      A.   Once again, I do not have the policy in

15 front of me.  I don't know exactly how it reads.  I

16 don't know what circumstance it is you're applying

17 to, who the supervisor would be, who the employee

18 would be.  So, no, I can't answer that.

19      Q.   I'm not asking a specific anyone.  I'm

20 saying you have a policy that your folks in the

21 Hamilton County Sheriff's Department do not have

22 authority to violate the First Amendment; is that

23 fair?

24      A.   There's so many nuances.  I will point to

25 anything in the policy that applies to that, and

1    that's how I would answer that question if I had the

2    policy in front of me.

3        Q.   So you simply can't answer that question

4    without the policy in front of you?

5        A.   I need the policy in front of me.

6        Q.   All right.  Would you ever tell Officer

7    Davis -- Jason Davis -- when he was an officer with

8    the Hamilton County Sheriff's Department, would you

9    ever tell him that his wife can have a hundred

10   opinions if that's what she wants, but there will be

11   consequences to Jason Davis if she does?

12            MR. SIMON:  Objection.  Let me note

13            my objection.  This may be a quote from

14            the recording.  Again, same objection as

15            before.

16            MR. BRUNS:  I'm going to object to

17            the speaking objections.  You can object

18            to form and that's it.  That's it.

19            MR. SIMON:  Well, I'm objecting --

20            I'm repeating an objection I gave earlier

21            in the deposition.

22            MR. BRUNS:  And I've told you you

23            have a continuing objection.  So I'm going

24            to -- I object to that characterization.

25            But go ahead.

Page 256

1       A.   So without the recording in front of me or

2    the transcript of the recording, I can't with

3    certainty say that's exactly what I said.

4       Q.   I'm not asking if -- I said you would

5    never tell Officer Davis that his wife can have a

6    hundred opinions if she wants, but there will be

7    consequences to Jason Davis if she does; you would

8    never say anything that like, fair?

9                MR. SIMON:   Same objection.

10      A.   I don't even understand that question.

11      Q.   Sure.

12      A.   I -- because, again, you're asking me to

13   answer a question that is hypothetical.  I mean,

14   I -- you know, I just -- I don't understand the

15   question.  My answer to the question is just what I

16   said, I -- if I had the transcript in front of me of

17   the recording, then I could perhaps remember what I

18   said.  But to comment on whether I would never,

19   always, sometimes do things, I don't feel

20   comfortable saying yes or no to any of that.

21      Q.   Did you tell Jason Davis ever that his

22   wife can have a hundred opinions if she wants,

23   but -- quote, but there will be consequences,

24   unquote, to him if she does; did you ever tell him

25   anything like that ever?

Page 257

1              MR. SIMON:  Same objection.

2       A.   I don't recall.

3       Q.   Okay.  Why would you ever say something

4   like that to him?

5       A.   I don't recall saying it.

6       Q.   I understand that.  And my question is in

7   follow up.  Why would you ever say anything like

8   that to him?

9              MR. SIMON:  Objection.  Lack of

10             foundation.  You're asking the witness to

11             speculate.

12             Go ahead and try to answer.

13      A.   You're asking me to affirm something that

14  I have no idea if it was said or not said.  So,

15  again, dealing in the what-ifs, the hypotheticals, I

16  can't answer that.

17      Q.   As you sit here today can you think of any

18  legitimate reason why you as the Sheriff of the

19  Hamilton County Sheriff's Department would say --

20  ever say anything like that to Jason Davis; can you

21  think of any legitimate reason for you to do that?

22      A.   I can't even comment --

23             MR. SIMON:  Same objection.

24      A.   -- because it's hypothetical and I would

25  have to have factual parameters to comment.

Page 258

1        Q.    So the answer to my question is no, as you

2   sit here you can't think of a single legitimate

3   reason for doing that?

4              MR. SIMON:   Objection.

5              Argumentative.

6        A.    The answer to your question is you're

7   asking me to apply my imagination to a situation,

8   and I simply don't feel comfortable doing that.  And

9   so the answer is I can't answer that question.

10       Q.    Okay.  Did you ever tell Jason Davis that

11   he needed to tell someone in his life he's close to

12   who doesn't like you, the sheriff, to, quote, get in

13   line, unquote, because they're hurting his career --

14              MR. SIMON:   Same objection.

15       Q.    -- did you ever say anything like that to

16   Jason Davis?

17       A.    No memory --

18              MR. SIMON:   Same objection.

19       A.    I have no memory of that.

20       Q.    What legitimate purpose would you ever

21   have as the Hamilton County Sheriff to say something

22   like that to Jason Davis?

23       A.    Again --

24              MR. SIMON:   Objection.  Lack of

25              foundation.  Calls for speculation.

Page 259

1     A.   Again, I don't know that I said it or

2     didn't say it.  And I'm not going to comment on

3     something that is someone's imagination.  I can't do

4     that.

5     Q.   I'm not asking you to comment on anyone's

6     imagination.  I'm asking you as the sheriff what

7     reason would you ever have to tell one of your

8     officers that?

9               MR. SIMON:  Same objection.  Asked

10              and answered.

11              MR. BRUNS:  And if you refuse to

12              answer, you can refuse.

13    A.   I'm --

14              MR. SIMON:  Hold on a second.  She's

15              not refusing to answer.

16              MR. BRUNS:  She is.

17              MR. SIMON:  She's telling you that

18              she can't answer because it's a

19              hypothetical and doesn't know how to

20              formulate an answer.  That's not a

21              refusal.

22              Go ahead, Sheriff.

23    A.   So I can't answer, because it's a

24    hypothetical situation.  And I am not comfortable

25    trying to apply some factual answer to a

1  hypothetical situation that I don't know occurred or

2  didn't occur.

3      Q.   Did you ever tell Jason Davis that such a

4  person, someone who is close to him who doesn't like

5  you, has got to go, bye, that's how it is?

6           MR. SIMON:  Same objection.

7      A.   No idea.  Can't remember.

8      Q.   Okay.  Would you ever allow your chief

9  deputy to impose consequences against a Hamilton

10 County Officer for something that the officer's wife

11 posted on Facebook?

12     A.   Again, I don't know that that happened.

13 And, again, it's a hypothetical.  And I cannot

14 answer that question.

15     Q.   Okay.  Did you ever in your presence hear

16 your chief deputy tell Jason Davis that if Jason

17 Davis's wife was going to, quote, bad mouth us, then

18 does Officer Davis think, quote, we're going to

19 promote you.

20           Did you ever hear Chief Gramke say

21 anything like that?

22           MR. SIMON:  Same objection.

23     A.   I don't recall.

24     Q.   If Chief Gramke said that to Jason Davis,

25 would you correct Officer -- or Chief Gramke and

1    tell him no, that we don't withhold promotions

2    because someone's wife says things on Facebook?

3              MR. SIMON:  Objection.  Lack of

4          foundation.  Calls for speculation.

5        A.   I don't know that Chief Jay Gramke said

6    that.  So, again --

7        Q.   Assume for purposes of my question he did.

8              MR. SIMON:  Well, that's the problem.

9          But lack of foundation.  Calls for

10         speculation.

11       Q.   Assume for purposes of my question that

12   Chief Gramke said that.

13       A.   Assuming is not a factual situation for

14   me, and I do not feel comfortable assuming things

15   that I don't know are real.

16       Q.   Did you ever hear Chief Gramke say

17   anything like that to Jason Davis?

18       A.   I don't recall.

19       Q.   Did you ever hear Chief Gramke say

20   anything along these lines to Jason Davis, does she

21   realize her actions are hurting you; did you ever

22   hear Chief Gramke say anything like that?

23       A.   I don't recall.

24       Q.   Okay.  And if you did hear Chief Gramke

25   say something like that, would you have corrected

1  him to say no, what your wife posts -- what his wife

2  posts on Facebook is not going to hurt him at his

3  career in terms of promotions or assignments?

4          MR. SIMON:  Same objection.

5      A.   Again, the word if speaks to a

6  hypothetical, and I don't feel comfortable answering

7  that.

8      Q.   Okay.  Did you ever ask Officer Davis if

9  he understood that his wife was hurting him with her

10  behavior of posting on Facebook?

11      A.   I don't recall.

12      Q.   Why would you ever say that to him?

13      A.   I don't know that I did or didn't.

14      Q.   Assume you did; why would you ever say it?

15      A.   Again --

16          MR. SIMON:  Same objection.

17      A.   Again, hypothetical, I don't feel

18  comfortable answering that.

19      Q.   Because as you sit here today you cannot

20  think of a legitimate reason, a lawful reason why

21  you would ever say that; is that fair?

22          MR. SIMON:  Objection.

23      A.   I don't even understand that question.

24  It's a hypothetical.  As I sit here today I told you

25  I don't recall.

1      Q.   Did you ever hear Chief Gramke tell Jason

2   Davis, quote, if we promoted you after what your

3   wife had done and said and what you had done and

4   said, do you think we'd open the floodgates of hell

5   to anybody that wants to be critical over this

6   administration; did you ever hear him say anything

7   like that?

8      A.   I don't recall.

9      Q.   Have you ever publicly criticized the

10  Hamilton County Sheriff's Department at any time in

11  your career?

12     A.   I don't recall.

13     Q.   Sheriff, I'm going to hand you what's been

14  marked as Exhibit 22 -- Plaintiffs' Exhibit 22 --

15     A.   Sure.

16     Q.   -- and ask -- take a moment --

17     A.   Uh-huh.

18     Q.   -- to read that.

19     A.   Okay.

20          MR. SIMON:  I think we're getting

21          pretty close, aren't we?

22          MR. BRUNS:  That's fine.  I

23          probably -- I don't have a whole lot, but,

24          yeah, we can take a short break.

25          MR. SIMON:  Okay.

Page 264

1              MR. BRUNS:  And she can review

2        that -- no, no, take it with you.

3              MR. SIMON:  Take it with us?

4              MR. BRUNS:  Yes.

5              MR. SIMON:  Okay.

6              THE VIDEOGRAPHER:  Off the record,

7        4:40.

8              (A brief recess was taken.)

9              THE VIDEOGRAPHER:  We are back on the

10        record.  This is Media 6 of today's

11        deposition.  The time is 4:48.

12   BY MR. BRUNS:

13        Q.   Sheriff, you've had a moment to -- off

14   camera to review Exhibit 22.

15        A.   I have.

16        Q.   Had you ever seen that before?

17        A.   No.

18        Q.   Did Chief Gramke ever speak to you about

19   this letter?

20        A.   No.

21        Q.   And obviously he never showed it to you,

22   fair?

23        A.   No, he didn't.  Uh-uh.

24        Q.   Okay.  You understand Jason Davis resigned

25   from his employment at the Hamilton County Sheriff's

1    Department, correct?

2         A.   I do understand that, yes.

3         Q.   Did you ever learn that prior to his

4    resignation he had been looking for another position

5    in law enforcement?

6         A.   No.

7         Q.   No one talked to you further about him --

8         A.   No.

9         Q.   -- is that correct?

10        A.   Yeah, that's correct.

11        Q.   Okay.  When Jason Davis resigned, he gave

12   two weeks' notice, correct?

13        A.   I don't know --

14        Q.   You don't have any reason to dispute

15   that --

16        A.   -- because I don't know -- yeah, I

17   don't -- I don't know the dates, but. . .

18        Q.   All right.  If he resigned on January 8,

19   2024, with an effective date of January 22, 2024,

20   you don't dispute that?

21        A.   I don't have any knowledge of it, but I

22   don't have any reason to dispute it.

23        Q.   All right.  If he claimed that his

24   resignation, as he does in the lawsuit, was because

25   he had been retaliated against for in violation of

1  his First Amendment rights because his promotions

2  were squashed and denied because of things his wife

3  had posted, okay, and he was told that -- if that's

4  his position, I'm saying, all right, which the

5  complaint makes clear it is, was he simply mistaken

6  about that; was it just a misunderstanding?

7      A.   I do.  I do think that -- well, what I can

8  comment on is this.  Jason Davis left the department

9  prior to that corporal list expiring.  And it is my

10 assertion that had he stayed to see that out, it's

11 my opinion that there could have been a good outcome

12 for him on that corporals list.

13     Q.   And what do you mean by a good outcome; he

14 would have been promoted?

15     A.   Yeah.  Yes.

16     Q.   Okay.  But clearly his understanding is

17 reflected in the allegations of the complaint was

18 that was a dead letter, RENU, the corporal

19 promotion, both of them got pulled because of posts

20 that other people had made and one post he made on

21 Facebook, that there was retaliation for that.

22          And my question to you is -- and you

23 agree -- that that's just a misunderstanding; he is

24 wrong about that, fair?

25     A.   I think that -- again, I can't speak to

Page 267

1    what Jason Davis thought, said after he walked out

2    of that office.  What I can speak to is his name

3    stayed current on that list, and because it was

4    current on that list there was absolutely an

5    opportunity for him to be promoted to corporal.

6          Q.   Well, you read his exit interview.  You

7    told me that.  You reviewed his exit interview?

8          A.   It was like three lines.

9          Q.   Okay.  But you had an understanding that

10   he was just mistaken about his future with the

11   department?

12         A.   He didn't say that in the exit interview.

13   The thing I remember from the exit interview is just

14   that he had recorded the conversation.  He made a

15   remark about -- if I remember correctly -- that how

16   badly supervised officers were or something like

17   that.  That's what I remember reading.

18         Q.   Okay.  You were -- Chief Gramke retired

19   recently, correct?

20         A.   Yes, he did.  Uh-huh.

21         Q.   Okay.  And you were a part of his

22   retirement party?

23         A.   I was.  Yes, sir.

24         Q.   Was that special for you to be there to

25   watch someone you had worked with for many years in

Page 268

1    the Hamilton County Sheriff's Department achieve

2    retirement from the department?

3          A.   I think it's special for all of us, yes.

4          Q.   Okay.  And you would agree that a full

5    career at the Hamilton County Sheriff's Department

6    has deep meaning?

7          A.   Of course, yes.

8          Q.   All right.  And what does it mean to you

9    to have worked at the Hamilton County Sheriff's

10   Department your whole life; what does it mean to

11   you?

12         A.   Well, I always tell people when they reach

13   retirement, it's -- you know, it's no small effort,

14   you know.  I like to use the example that we've all

15   -- all of us like to stick around that long, to stay

16   healthy for retirement, which we can never predict.

17   We've all put our blood, sweat, and tears into this

18   business.  And we've all experienced things that

19   were challenging and, you know, sometimes emotional

20   and so forth, but we soldiered through, and now you

21   have made it healthy, thank God, to retirement.

22         Q.   Okay.  Could you ever put a price on a

23   full career at the Hamilton County Sheriff's

24   Department?

25         A.   I don't think in terms of a -- when you

1   say a price, I don't know what that means.

2        Q.   Okay.  What I mean is that someone hands

3   you a sum of money and you would forego the career

4   you've had as a member of the Hamilton County

5   Sheriff's Department.

6        A.   I couldn't put a price on someone's tenure

7   at the department.

8        Q.   And certainly not your career?

9        A.   I -- still, again, I don't understand the

10  question.

11       Q.   I just explained it.

12       A.   I don't understand the whole notion of

13  money.  That's not what I referred to.  It's not

14  what I think about.  It's not what I have knowledge

15  of regarding how people retire and what their

16  financial situations are.

17       Q.   So to you the value of your career at the

18  Hamilton County Sheriff's Department has been

19  priceless; is that fair?

20       A.   That's your terminology.  I would use a

21  different one.  I think it's been rewarding.  I

22  think it's something that I can remember and that I

23  have a very heartfelt connection to.

24       Q.   All right.  And nobody can give you any

25  sum of money that you would trade for the career

Page 270

1    you've had at the Hamilton County Sheriff's Office;

2    is that fair?

3        A.   Well, I don't know.  Tell me what the sum

4    of money is.

5        Q.   Five million dollars.

6             MR. SIMON:  Objection.

7             MR. BRUNS:  Well, she asked and I'm

8             answering.

9        Q.   Five million dollars.

10       A.   I mean, I might consider that, you know.

11   I don't know.  I might consider that.

12       Q.   Okay.

13       A.   That's a pretty large sum of money.

14             (Plaintiffs' Deposition Exhibit No.

15             29 was marked for identification.)

16       Q.   All right.  I'm going to represent to you

17   that this was produced in discovery in this case.

18       A.   Okay.

19       Q.   Yeah.  And it was represented to us that

20   this is the file from the Internal Affairs

21   investigation --

22             MR. WIEST:  Tom, can you identify the

23             number, please?

24             MR. BRUNS:  Yeah.  Exhibit 29.

25             Sorry.

1      Q.   That this is the file from the Internal

2   Affairs investigation of you when you were -- when

3   you were Major Charmaine McGuffey.  And we talked

4   about the incident that Internal Affairs

5   investigated, right -- the matter they investigated?

6      A.   Yes.  Yes.  This represents that

7   certainly.

8      Q.   Okay.  And this was produced as the file

9   from that investigation --

10     A.   Uh-huh.

11     Q.   -- and a lot of it was redacted.  And my

12  question to you is, why were things redacted; do you

13  know?

14              MR. SIMON:  Objection.  You can

15          answer.

16     A.   It's interesting.  That was my same

17  question when they gave me the first copy of it and

18  it was redacted.  And then, in fact, they gave me

19  the unredacted copy, so. . .

20     Q.   So you've seen both?

21     A.   I have the unredacted copy, yes, sir.

22     Q.   Yeah.  My question to you is, do you know

23  why the copy that was produced in discovery has all

24  these redactions; do you know why?

25     A.   I believe it was a strategy from the

Page 272

1    prosecutor's office, if I was going to guess.

2         Q.    Okay.  You don't know why?

3         A.    No.

4                MR. SIMON:  Are you talking --

5         A.    I mean. . .

6                MR. SIMON:  He's asking about -- this

7          was produced in this case.

8                MR. BRUNS:  Yes.

9                THE WITNESS:  Oh, you mean redacted

10         for this case?

11               MR. BRUNS:  Yeah.

12               THE WITNESS:  Oh.

13        Q.    Why are all these redactions in here?

14        A.    There were redactions throughout.  And

15   these look very similar to what they were to the

16   original.  So I would imagine they gave you the

17   original redacted copy.

18        Q.    Well, no, the original doesn't have

19   redactions.  Redactions are added; you would agree?

20        A.    Well, they were added when they handed it

21   to me the very first time.

22        Q.    Right.  But you've also -- you just

23   testified you saw an unredacted version --

24        A.    And then I --

25        Q.    -- which is the original, right?

1      A.    Right.   And then I insisted they give me

2    the original.   They at first denied it to me, et

3    cetera, et cetera.   But they gave it to me.   And I

4    would assume what you got is what they would give

5    out to the public at large, whoever would ask for

6    this document.

7      Q.    I understand.   I'm simply asking, do you

8    know why --

9      A.    I'm telling you why --

10     Q.    -- these redactions --

11     A.    -- because -- well, and then you asked me

12   why the redactions occurred.   And I'm going to

13   say --

14     Q.    If you don't know, you can tell me I don't

15   know.

16     A.    Well, I'm telling you to the best of my

17   knowledge it had to be a strategy by the

18   prosecutor's office.

19     Q.    Okay.   Thank you.

20     A.    Because I -- they wouldn't -- they

21   certainly wouldn't make me privy as to why they did

22   all the things they did.

23     Q.    Okay.   Thank you.   And then could you go

24   to page 107 of this document.

25     A.    Sure.   Yes.

Page 274

1      Q.   And read that page because I'm going to

2   have some questions for you about it.

3      A.   Okay.  Go ahead.

4      Q.   All right.  So at the top of the page, the

5   first full paragraph, it says, This investigation

6   clearly shows that Major McGuffey created a hostile

7   work environment within the Sheriff's Office by

8   abusing her power as a major.  Major McGuffey used

9   bullying techniques such as belittling, cursing,

10  yelling, and screaming at employees.  Did I read

11  that correctly?

12     A.   Yes.  That is what it says.

13     Q.   All right.  Do you disagree with all of

14  that, you never did any of that?

15     A.   Of course I disagree with that.

16     Q.   And you never did any of it; is that

17  correct?

18     A.   No, I did not.

19     Q.   Is that correct?

20     A.   Yes.  That's correct.

21     Q.   Okay.  And it says, There is evidence that

22  she used her position to retaliate against

23  employees, as well as engaged in favoritism.  Did I

24  read that correctly?

25     A.   Yes, you did.

Page 275

1        Q.   Do you disagree with that, that's a false

2   statement, that never happened?

3        A.   That is a false statement.

4        Q.   All right.  And then it says, Through the

5   course of this investigation, Major McGuffey was

6   dishonest when answering many questions during the

7   Internal Affairs interview.  Did I read that

8   correctly?

9        A.   You did.

10        Q.   Okay.  Is that a false statement; none of

11   that --

12        A.   It's a lie.

13        Q.   -- is true?  It's a lie?

14        A.   Yes, sir.

15        Q.   And then it says, The allegations of

16   creating a hostile work environment and dishonesty

17   are sustained, in bold; do you see that?

18        A.   I see that.

19        Q.   Okay.  Did the Internal Affairs

20   investigators sustain the findings of hostile work

21   environment and dishonesty -- to sustain those

22   findings against you?

23        A.   I will give you that they believe what

24   they wrote here.  To have a sustained judgment you

25   need a hearing.  You need due process.  And I was

Page 276

1    not given that.

2        Q.   Okay.  Do you see the next page, 108,

3    where it says, I request that this case be closed as

4    sustained; did you see that?

5        A.   Yes, I did.  I see it.

6        Q.   And is it your understanding that that's

7    what happened, it was closed as sustained?

8        A.   They made the opinion that it was

9    sustained.  That was someone's opinion.  I believe

10   Lieutenant Steve Minnich at the time.

11       Q.   Okay.  And ultimately the sustained

12   finding of being dishonest was what allegedly landed

13   you on the Brady list, correct?

14       A.   That is the excuse they used.  You're

15   right.  Yes.

16            MR. BRUNS:  All right.  We'll just

17            take a quick break and see if there's

18            more.  There might be just a couple.  I

19            apologize.

20            MR. SIMON:  Okay.

21            MR. BRUNS:  But let's have that

22            discussion.

23            THE VIDEOGRAPHER:  Off the record,

24            5:02.

25            (A brief recess was taken.)

Page 277

1           THE VIDEOGRAPHER:  We are back on the

2           record, 5:09.

3    BY MR. BRUNS:

4        Q.   Sheriff, we took another break.

5        A.   Uh-huh.

6        Q.   Just some wrap-up questions.  We were

7    talking about the Internal Affairs investigation

8    where there was a sustained finding against you in

9    part for dishonesty.  You disagree with the merits

10   of that.

11       A.   Uh-huh.

12       Q.   What was the consequence to you as a

13   result of that sustained finding of dishonesty by

14   Internal Affairs?

15       A.   I received a constructive firing by

16   Sheriff Jim Neil.

17       Q.   What do you mean by constructive firing;

18   what happened?

19       A.   Jim Neil called me in on May 5th,

20   9:00 a.m., 2017, and presented me with this report

21   that I had never laid eyes on, seen -- ever.  He

22   didn't hand it to me.  He just showed it to me.  And

23   he said, If you want to stay with this department,

24   you can work as an inmate liaison, I think they

25   called it.  And they didn't have any parameters for

Page 278

1    what that would be, simply I think saying you'll

2    communicate with inmates and then communicate with

3    security.

4         Q.   Okay.

5         A.   So that's what I was told.

6         Q.   All right.  And you rejected that offer to

7    stay with the Hamilton County Sheriff's Department?

8         A.   I refused that offer, yes.

9         Q.   Okay.  And then you resigned.  And in your

10   mind you call that a constructive firing; is that

11   fair?

12        A.   I didn't resign.

13        Q.   What happened?

14        A.   No, sir.  I never signed a resignation.  I

15   did not resign.  I was fired.  Jim Neil gave me

16   approximately -- he said, Well, I love to hear you

17   speak and you're scheduled to speak at Xavier, so I

18   don't want to fire you -- he said, so I don't want

19   you to do anything until after this date that's on

20   this flyer advertising you are the presenter,

21   because I would like to attend.  Therefore, I will

22   give you till June to make a decision.

23            And my decision was the same exact

24   decision that I just said when I was sitting there

25   in front of him.

Page 279

1      Q.   Okay.  That was nine -- approximately nine

2 years ago, correct?

3      A.   I think that's probably correct.

4      Q.   All right.  And I could be wrong, but it

5 sounds like you remember that conversation pretty

6 clearly, correct?

7      A.   Oh, yes, sir, I do.

8      Q.   All right.

9      A.   Uh-huh.

10      Q.   Do you remember that conversation so

11 clearly because it affected your career?

12      A.   I remember it clearly because it

13 absolutely blind-sided me and I really couldn't

14 believe what I was hearing.  And I certainly

15 couldn't believe that a report like this would be

16 created and verified as sustained without any due

17 process.  That's why I remember the conversation.

18      Q.   And it obviously -- it affected your

19 career, correct -- drastically?

20      A.   Well, I'm the Sheriff of Hamilton County.

21      Q.   At the time it drastically affected your

22 career, correct?

23      A.   I was fired, yes.

24      Q.   And that's part of the reason why you

25 remember those conversations so clearly, fair?

Page 280

```
 1        A.    Well, I would say anybody that's fired
 2   remembers the conversation.
 3        Q.    All right.  You filed a lawsuit over that,
 4   correct?
 5        A.    I certainly did.
 6        Q.    All right.  And you filed a lawsuit for
 7   retaliation, correct?
 8        A.    I'm trying to think if that was one of my
 9   points.  Yes, it -- yes.  I -- we had three -- three
10   points that Judge Dlott ruled on.  And I'd have to
11   actually look at them to know, but I believe it was
12   -- it was surrounding discrimination.
13        Q.    Okay.
14        A.    Not retaliation.
15        Q.    One of the claims was for retaliation,
16   correct?
17        A.    I don't know that, sir.
18        Q.    Regardless, when you filed that lawsuit
19   eventually, did you make a demand on the County to
20   settle -- asked them for something to settle?
21        A.    They approached --
22              MR. SIMON:  Objection to this line of
23         questioning.
24              MR. BRUNS:  Go ahead.  You can
25         object.  I'm going to ask.
```

1              MR. SIMON:  All right.

2       A.   So we --

3              MR. SIMON:  Just continuing objection

4         so I don't have to keep saying it.

5              MR. BRUNS:  Sure.

6              MR. SIMON:  Thank you.

7       A.   We won summary judgment on each point that

8  we -- that we made allegations regarding.  The -- to

9  my knowledge, the prosecutor's office approached us.

10      Q.   Okay.  And did you make a demand; did you

11 tell them what it would take to settle?

12      A.   My attorneys negotiated with them and then

13 talked to me.  And through those conversations we

14 eventually landed on a number.

15      Q.   Okay.  What did you want to settle?  I

16 don't -- I'm not talking about what you told your

17 attorneys.  I just want to know what you wanted to

18 settle with the County.

19      A.   What I wanted?

20      Q.   Yes.

21      A.   I wanted to be exonerated.

22      Q.   Okay.

23      A.   That's what I wanted.  100 percent

24 exonerated.

25      Q.   All right.  And you wanted money as well,

1    correct?

2         A.   Well, I agreed to take money and I

3    certainly think I was owed money, so yes.  But if

4    you're asking me what I -- my main thing that I

5    absolutely wanted was to be exonerated.

6         Q.   That wasn't my question.  My question was,

7    you wanted money, correct?

8         A.   Well, yes.  If you ask it in the simplest

9    of terms --

10        Q.   I am.

11        A.   -- sure, I wanted to be compensated for --

12   for having been fired unjustly.

13        Q.   All right.  And how much money did you

14   want?

15        A.   I don't remember.  I couldn't even tell

16   you what the settlement was for now honestly.

17        Q.   Okay.  All right.  You were then sued as

18   Sheriff by Mark Schoonover; is that correct?

19        A.   Yes, I was.

20        Q.   All right.  And that suit -- the case

21   number we have is 1:22-cv-6- -- or 767 filed in the

22   Southern District of Ohio.  Do you recall that you

23   were sued in 2022?

24        A.   Yes, I do.

25        Q.   All right.

1        A.    Uh-huh.

2        Q.    And that case involves claims of First

3    Amendment retaliation, correct?

4        A.    My knowledge was that he said he was

5    discriminated against because he was an older white

6    man.

7        Q.    If that lawsuit specifically includes

8    claims of First Amendment retaliation, you don't

9    dispute that?

10        A.    I have no idea what you're talking about

11    there, sir.  I can tell you what I was told about

12    the lawsuit was that he was --

13                MR. SIMON:  Hold on one second.

14                MR. BRUNS:  I'm not asking what any

15            attorney told you.

16                MR. SIMON:  Yeah.  But she just said

17            what I was told about it.  And I -- if

18            she's about to say what her -- what the

19            attorneys told her, then I don't want her

20            to answer that question.

21                THE WITNESS:  Thank you.

22        A.    So what I knew is that he was suing

23    because he was discriminated against because he was

24    an older white male.

25        Q.    Okay.

1       A.    That's what I knew.

2       Q.    Did you read that lawsuit when you

3   received it?

4       A.    I don't recall reading it.  I may have

5   read it.  I really don't recall.

6       Q.    All right.  You agree that lawsuit was

7   pending -- it was an existing lawsuit as of

8   October 10, 2023, correct?

9       A.    I don't have any real knowledge of it, but

10  I'll -- I think it's still pending.

11      Q.    Yeah.  Once it got filed, it's never been

12  dismissed, it's still existing --

13      A.    Okay.  So --

14      Q.    -- fair?

15      A.    -- yeah.  So I would agree with that.  I

16  don't -- nobody has told me otherwise.

17      Q.    All right.  Once you got sued in 2022 did

18  you do anything to educate yourself on the legal

19  claims that were made against you?

20      A.    By Mark Schoonover?

21      Q.    Those legal claims in that lawsuit by Mark

22  Schoonover --

23      A.    Uh-huh.

24      Q.    -- did you do anything to educate yourself

25  on the law?

Page 285

1      A.    No.

2            MR. SIMON:  I'm just going to object.

3            I don't want you to answer anything that

4            involves attorney-client communication.

5            MR. BRUNS:  She answered it, so. . .

6      Q.    If there's a public record that you

7   settled with the County for $475,000, does that

8   refresh your recollection?

9      A.    It sounds about right.

10           MR. BRUNS:  Okay.  That's all.

11           THE WITNESS:   Okay.

12           MR. SIMON:  We have no questions.  We

13           will not waive signature.

14           THE VIDEOGRAPHER:  We are off the

15           record.  The time is 5:18.

16              (Witness excused.)

17        (Deposition concluded at 5:18 p.m.)

18

19

20

21

22

23

24

25

Page 286

1                A C K N O W L E D G E M E N T

2

3   STATE OF _____    :

4   COUNTY OF _____    :

5

6        I, CHARMAINE McGUFFEY, have read the

7   transcript of my testimony given under oath on May

8   5, 2025.

9        Having had the opportunity to note any

10  necessary corrections of my testimony on the errata

11  page, I hereby certify that the above-mentioned

12  transcript is a true and complete record of my

13  testimony.

14

15

16        _____

17                     CHARMAINE McGUFFEY

18

19

20

21

22

23

24

25

Page 287

1                    REPORTER'S CERTIFICATE

2            I, Kristina L. Laker, Court Reporter and

3    Notary Public, do hereby certify:

4            That the witness named in the deposition,

5    prior to being examined, was duly sworn;

6            That said deposition was taken before me

7    at the time and place therein set forth and was

8    taken down by me in shorthand and thereafter

9    transcribed into typewriting under my direction and

10   supervision;

11           That said deposition is a true record of

12   the testimony given by the witness and of all

13   objections made at the time of the examination.

14           I further certify that I am neither

15   counsel for nor related to any party to said action,

16   nor in any way interested in the outcome thereof.

17           IN WITNESS WHEREOF I have subscribed my

18   name and affixed my seal this 20th day of May, 2025.

19

                         /s/ Kristina L. Laker
20                   _____
                         Kristina L. Laker
21                       Notary ID 592345
                         My Commission expires: 12/21/25
22

23

24

25