Page 222

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT CINCINNATI


JASON DAVIS and          :
JENNIFER DAVIS,
                         :
        Plaintiffs,
vs.                      :  Case No. 1:24-cv:0202

CHARMAINE McGUFFEY, et al., :

        Defendants.      :




* * * * * * * *

DEPONENT:          Hamilton County, Ohio

                   Volume III

DATE:              August 28, 2025

* * * * * * * *




Kristina L. Laker

Court Reporter




BARLOW REPORTING & VIDEO SERVICES, LLC
620 Washington Street
Covington, Kentucky 41011
(859) 261-8440

1        The deposition of HAMILTON COUNTY, OHIO, taken

2   for the purpose of discovery and/or use as evidence

3   in the within action, pursuant to notice, heretofore

4   taken at the Hamilton County Prosecutor's Office,

5   230 East Ninth Street, Suite 4000, Cincinnati, Ohio,

6   on August 28, 2025, at 10:37 a.m., upon oral

7   examination, and to be used in accordance with the

8   Federal Rules of Civil Procedure.

9                  * * * * * * * *

10                  APPEARANCES

11  REPRESENTING THE PLAINTIFFS:

12  Christopher Wiest, Esq.
    CHRIS WIEST, ATTY AT LAW, PLLC
13  50 East Rivercenter Boulevard, Suite 1280
    Covington, KY 41011
14
    Thomas B. Bruns, Esq.
15  BRUNS, CONNELL, VOLLMAR & ARMSTRONG LLC
    40 North Main Street, Suite 2010
16  Dayton, OH 45423

17  Zachary Gottesman, Esq.
    GOTTESMAN & ASSOCIATES, LLC
18  9200 Montgomery Road
    Building E, Suite 18B
19  Cincinnati, OH 45242

20  REPRESENTING THE DEFENDANTS:

21  Matt Miller-Novak, Esq.
    Andrew E. Prem, Esq.
22  HAMILTON COUNTY PROSECUTOR'S OFFICE
    230 East Ninth Street, Suite 4000
23  Cincinnati, OH 45202

24  ALSO PRESENT:  Jason Davis, plaintiff
                   Jennifer Davis, plaintiff
25

Page 224

1                            I N D E X

2                                                      Page

3    Cross-Examination by Mr. Wiest:              225

4    Direct Examination by Mr. Miller-Novak:      263

5    Recross-Examination by Mr. Wiest:            265

6    Redirect Examination by Mr. Miller-Novak:    267

7    Further Recross-Examination by Mr. Wiest     272

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 225

1                    PETER J. STACKPOLE,

2     of lawful age, as having been duly sworn, as

3     hereinafter certified, was examined and testified as

4     follows:

5                    CROSS-EXAMINATION

6     BY MR. WIEST:

7          Q.   I know we've already been through all

8     this, it's a continuation deposition, but can you

9     state your name for the record.

10         A.   Sure.  It's Peter Stackpole.  I work for

11    the sheriff.  I'm in-house counsel.

12         Q.   Thanks, Pete.  We are here to talk about

13    some letters, three of them.  And I wanted to start

14    with 72.

15         A.   Okay.

16         Q.   You've seen this before?

17         A.   I have.

18         Q.   Let me start with, why was this letter

19    sent on August 15, 2025?

20         A.   I don't know that there's any particular

21    significance to the date, but the letter was sent

22    because we wanted to offer Mr. Davis an opportunity

23    to be reinstated with the sheriff's department.  Our

24    staffing is not optimal.  And we could use someone

25    who is a productive worker and who is known to have

1   been effective in the district.

2       Q.   Jason Davis left in January of 2024,

3   correct?

4       A.   Yes.

5       Q.   Why was Jason Davis -- why was this letter

6   not sent, let's say, February 2024 through the end

7   of 2024; was the sheriff not understaffed then?

8                   MR. MILLER-NOVAK:  Well, those are

9           two questions.

10                  MR. WIEST:  Yeah.  Let me take it one

11          by one.

12      Q.   Was the sheriff's office understaffed from

13  February of 2024 through the end of 2024?

14      A.   From February of 2024 to the end of 2024 I

15  don't -- I don't actually know the staffing.  But we

16  have -- we have been, as you know -- as you probably

17  know, staffing fluctuates.  It ebbs and flows.  We

18  have had -- been down in staffing and then we were

19  brought back up.  We've had patrol academies

20  graduate.  And when that happens, our ranks are

21  better, but we also have turnover.

22              So I can't pinpoint for you like, you

23  know, where were we in that process in that time

24  frame.  I just know that it has fluctuated.  There

25  are times when we've had the lateral MOU in place,

1    because bringing jail officers through the patrol

2    academy and into the patrol enforcement ranks hasn't

3    been enough to satisfy our vacancies.

4            And so I don't -- we had a lateral MOU in

5    place in '23, I know.  I don't know if we had one in

6    place in '24.  We did recently just introduce

7    another lateral MOU, because our staffing has

8    decreased, so -- but to answer your specific

9    question, I'm not precisely sure where we were on

10   the staffing of the patrol enforcement division.

11       Q.   When has the most recent lateral MOU been

12   executed?

13       A.   The most recent lateral MOU was executed

14   on -- I believe it's effective August 19.

15       Q.   And generally -- I mean, I'm sure the

16   document speaks for itself, but --

17       A.   Let me clarify.  August 19, 2025.

18       Q.   Thank you.

19       A.   Sorry.

20       Q.   What generally -- what's the 30,000-foot

21   overview of that MOU; what does it do?

22       A.   It allows the sheriff's office to seek

23   lateral enforcement officers, people who are already

24   OPOTA certified.  It provides that they can come to

25   this office.  And it -- you know, they can come and

1  import their -- what -- their years of service and

2  so forth.  But it also identifies through agreement

3  with the union that they will come in with no

4  seniority because, you know, the existing members of

5  that bargaining unit wanted to make sure that they

6  get, you know, top choice on vacation picks and

7  things of that nature.

8      Q.   In the absence of such an MOU, are you not

9  allowed to bring in laterals at all?

10     A.   I think we could.  I think under

11 management rights we could, but -- I think Article V

12 of the collective bargaining agreement.  But we

13 would I'm sure run into a dispute with the union.

14     Q.   Get a grievance, have to maybe arbitrate?

15     A.   I'm sure that's possible.

16     Q.   Okay.  Given that the MOU occurred after

17 the -- by the way, was the MOU a work in progress on

18 August 15?

19     A.   Not on August 15, no.

20     Q.   When did the MOU -- when did those

21 discussions begin?

22     A.   Very shortly after.  We started thinking

23 about our staffing and, you know -- I mean, the fact

24 that we wanted to bring in Jason Davis made me think

25 like our staffing isn't where it needs to be.  This

1   is one of the things that we have done in the past

2   to get ourselves where we want to be, closer to that

3   point.

4        Q.   In the absence -- well, let's back up.

5   August 15, Exhibit 72 gets sent to Jason.  How many

6   days in advance of that being sent was it

7   contemplated to send the letter in question in

8   Exhibit 72?

9        A.   I couldn't tell you.  I know it was, you

10  know, within the previous four weeks, but I don't

11  really know.

12       Q.   What steps were made to determine that the

13  department was understaffed?

14       A.   Well, you heard from Chief Ketteman

15  yesterday.  Chief Ketteman is the former major of

16  patrol.  And probably you could tell, but he keeps a

17  pretty close eye on the numbers.  And so he's aware

18  of what we need.

19            I think also -- I don't know that this is

20  public knowledge, but the Hamilton County Sheriff's

21  Office was asked by the City of Cincinnati to have

22  some enhanced patrols around the County campus.  As

23  a consequence of that, we have been patrolling in a

24  larger footprint in the downtown area.  And because

25  of that, we've had to -- we've been using overtime

Page 230

1   in the footprint that we're patrolling.  And we have

2   been backfilling other areas with overtime, so -- I

3   mean, we have a clear need for more people.

4        Q.    When did that begin?

5        A.    That began recently.  It's not been a

6   long-term thing.  We were -- obviously since the,

7   quote/unquote, Cincinnati brawl.  Shortly after that

8   we were asked to help out, and we did.  Very

9   successfully, I might add.

10       Q.    Who was involved in making the decision to

11  send the Exhibit 72 letter to Jason Davis?

12       A.    Who was involved in -- which letter?

13       Q.    The Exhibit 72 letter to Jason Davis.

14       A.    Okay.  Well, counsel was involved.  I was

15  involved.  Chief Ketteman was involved.

16       Q.    When you say counsel, are you referring to

17  the Hamilton County Prosecutor's Office counsel?

18       A.    That's correct.

19       Q.    Was the Sheriff informed prior to Exhibit

20  72 letter being sent that it was going to be sent?

21       A.    Yes.

22       Q.    When was the Sheriff so informed?

23       A.    Probably that day.

24       Q.    August 15, 2025?

25       A.    I mean, I don't have a specific memory,

1   but I think it might have been that day.

2        Q.   Was there a meeting in which she was

3   informed?

4        A.   No.  Nothing like calendared or anything;

5   more of an informal, hey, we're doing this.

6        Q.   Who was present for that conversation?

7        A.   Me, Chief Ketteman, Sheriff.

8        Q.   Was that in the sheriff's office?

9        A.   Yes.

10       Q.   Why was the Sheriff informed?

11            MR. MILLER-NOVAK:  That's privileged.

12       Q.   Who made the decision to inform the

13  Sheriff?

14            MR. MILLER-NOVAK:  That's privileged.

15       Q.   Are you refusing to answer the who

16  question on the advice of counsel?

17       A.   I am.

18            MR. WIEST:  Okay.  Certify the

19            question.

20            (The question was certified.)

21       Q.   And are you refusing to answer the why the

22  Sheriff was informed on the advice of counsel?

23       A.   I am.

24            MR. MILLER-NOVAK:  If it was all part

25            of a conversation with counsel, that makes

1          it privileged, yes.

2                (The question was certified.)

3      Q.   Okay.  How many conversations occurred in

4   advance of the August 15, 2025, letter prior to it

5   being sent regarding the letter?

6      A.   With whom?

7      Q.   Well, with anyone.

8      A.   With anyone?  I don't know.  More than

9   one.

10     Q.   Okay.  More than ten?

11     A.   No.  A handful.

12     Q.   Okay.  Do you recall when the first

13  conversation occurred?

14     A.   I don't.

15     Q.   Do you recall who was involved in the

16  first conversation?

17     A.   Chief Ketteman and myself.  Probably I

18  think possibly my counsel as well.  I don't -- we've

19  had more than one conversation.  It's hard for me to

20  identify with specifics over the past four weeks

21  which conversation happened with which people when.

22  But it has been kind of an evolving thought that

23  this is something that we wanted to do.

24     Q.   Can you tell me why Jason Davis was given

25  less than a week to respond to the August 15, 2025,

 1   letter?

 2        A.   Well, I disagree.

 3             MR. MILLER-NOVAK:  I mean, see how

 4             you can answer the question, but

 5             obviously -- guys, I don't know how to be

 6             clear about this.  Why is mostly going to

 7             be privileged.  You can't ask why we do

 8             things when we've done it in a product of

 9             counsel in a client meeting.  You can ask

10             whats.  You can ask hows.  You can ask

11             whens.  You can ask wheres.

12             When you get into whys, it's a major

13             problem.

14        A.   Let me --

15             MR. MILLER-NOVAK:  Having said that,

16             if you can answer the question without

17             divulging privilege, I'm fine with that.

18        A.   I'll just say that the letter provides

19   five days for acceptance.  And then the way that I

20   looked at it we had put into the letter that there

21   would be a mutually agreed upon start date 60 days

22   from the date of the letter.

23             So to my mind the initial step is yea or

24   nay; is this something that you want to do?  We want

25   you to come unconditionally to the Hamilton County

1  Sheriff's Office.  Are you in it?  If you are, you

2  got 60 days to work it out.

3          So that's kind of what I envisioned this

4  as is kind of an unconditional offer, you're going

5  to decide if this is something you want, do you want

6  to be a corporal in the sheriff's office, according

7  to your complaint that was -- you know, I don't

8  think I'm ever going to make corporal because I'm

9  married to my wife, I'm upset about this, and so I'm

10  leaving.  We wanted to alleviate that concern.  We

11  are going to immediately make you corporal.  We're

12  going to give you this offer.  We're going to give

13  you 60 days to like work out the details.  That's

14  how I looked at it.

15      Q.   So it was not simply an understaffing

16  issue; you also wanted to address the complaint?

17      A.   No.  It is entirely because of -- number

18  one, we have the staffing issue.  We have a need --

19  we had a clear need based upon what we were doing

20  within the downtown area of Cincinnati.  And, number

21  two, we thought it was the right thing to do,

22  because this is where Jason Davis would have been

23  had he stayed.

24      Q.   You agree that Jason had five days to

25  decide whether to accept or not, correct?

1      A.    I agree.

2      Q.    And there was a firm deadline.  And if

3 Jason failed to accept within that deadline, then

4 the letter indicates that it was going to be deemed

5 rejected, correct?

6      A.    That's correct.

7      Q.    Okay.  Can you tell me why the decision

8 was made to only provide Jason five days to accept?

9           MR. MILLER-NOVAK:  Objection.  We

10          already objected to that was privileged.

11          Like that's the same exact question.

12     Q.    So I want to be clear, Pete.  You on the

13 basis of privilege are unable or unwilling to tell

14 me why Jason Davis was only given five days to

15 accept the offer in Exhibit 72?

16     A.    On advice of counsel I'm unable to answer

17 that question.

18           (The question was certified.)

19     Q.    Okay.  The terms of the Exhibit 72 letter

20 were backpay, correct?

21     A.    Yes.

22     Q.    Reinstatement at corporal?

23     A.    Yes.

24     Q.    It did not include a RENU assignment,

25 correct?

1      A.    That's correct.

2      Q.    Can you tell me how Jason was going to be

3   made a corporal without violating the collective

4   bargaining agreement with the union?

5      A.    Article V provides for management rights,

6   which include the right of the employer to hire,

7   organize the department, decide operational

8   efficiency.  We had a clear need for additional

9   personnel.  So I believe that we would be well

10  within our rights to decide that we need whatever

11  our existing corporal FTE was plus one.  So that was

12  -- we absolutely could have brought him on as a

13  corporal without question.

14         Would the union have objected to it, would

15  the union have filed a grievance -- I don't know,

16  but we took that risk.  Because ultimately had an

17  arbitrator disagreed, believed that what we did was

18  improper, Jason Davis would have been a corporal,

19  and we probably would have had to promote someone

20  else.  But we were willing to do that, because we

21  thought it was the right thing to do to bring Jason

22  Davis back where he was -- or would have been.

23     Q.    You agree that there is a provision that

24  governs promotions within the collective bargaining

25  agreement, correct?

1      A.   I agree.

2      Q.   And we're going to talk about it.  Section

3 14 -- and I'm looking at Exhibit -- I think it was

4 marked Exhibit 7 by the Defendants in Jason's

5 deposition, Exhibit 43 by the Plaintiffs in our

6 deposition.  Section 14.4 of the CBA indicates that

7 promotions will be determined through an eligibility

8 list process, correct?

9      A.   What did you ask me?

10      Q.   Whether Section 14.4 required for

11 promotions an eligibility list process?

12      A.   I mean, no.  I don't think that's correct.

13 It requires an examination.  It doesn't talk about

14 the -- I mean, I will grant you that it's part of

15 it, but it's not -- I don't think it's actually in

16 14.4.

17      Q.   Okay.  14.4 requires -- it says, All

18 promotions in rank which result in an increase in

19 pay or assignment to a higher pay range shall be

20 based upon merit and fitness as determined by

21 promotional examination, correct?

22      A.   Agreed.

23      Q.   Was putting Jason in as a corporal in the

24 Exhibit 72 letter a determination by promotional

25 examination?

1        A.    No.   I would have relied upon Article 5.1

2   -- or, excuse me, Article V, Section 5.1.B.2 that

3   management has the inherent right to direct,

4   supervise, evaluate, or hire employees.  I would

5   have relied on probably A, that we are also -- have

6   the inherent managerial right to determine

7   organizational structure.  I would have argued that

8   we have the right to E, suspend, discipline, demote,

9   discharge for just cause, lay off, transfer -- I

10  apologize, I'll slow down -- assign, schedule,

11  promote, asterisk, asterisk, or retain employees.

12  As well as F, to determine the adequacy of the

13  workforce.

14           So I wouldn't have relied on Section 14.4.

15  I would have relied on management rights to make

16  that call.

17       Q.   If you'll look at page 18.

18       A.   Sure.

19       Q.   Section 14.1 states that the parties agree

20  that all appointments to positions covered by this

21  agreement other than original appointments or

22  preferred assignments shall be filled in accordance

23  with this article and with bargaining unit members,

24  unless there are no qualified bargaining unit

25  members for a position.  That's what it reads,

1  correct?

2      A.   That is what it reads.

3      Q.   Were there no qualified bargaining unit

4  members for the position of corporal on August 15th

5  when the position was extended to Jason Davis?

6      A.   On August 15th of 2025 there was not an

7  existing corporal list.  So there were -- we did not

8  have a promotional list pending.  And my feeling is

9  management had the right to do what it did.  And if

10 the union took issue with it, there's a process for

11 them to grieve it, ultimately take it to

12 arbitration, and an arbitrator could determine

13 whether or not management made the wrong decision.

14         In my experience -- as you know, I've

15 worked at the City of Cincinnati for many years --

16 when management makes an incorrect decision and

17 promotes someone that it shouldn't, they don't

18 demote that person.  They force the entity to

19 promote another person.  We took on that risk.  We

20 were willing to take on that risk because we felt it

21 was the right thing to do.

22     Q.   Why did you think it was the right thing

23 to do, because you were short-staffed?

24     A.   Because we were short-staffed.  Because

25 Jason was a good worker.  And because I think that

Page 240

1    there was a lot of misunderstanding on -- I think

2    that that meeting could have gone a lot better.  I

3    think the language used was suboptimal.  So I wanted

4    to. . .

5         Q.   When you say that meeting, you're

6    referring to the meeting in October of 2023 between

7    Chief --

8         A.   Sure.

9         Q.   -- Deputy Gramke and Sheriff McGuffey and

10   Jason Davis?

11        A.   Yes.

12        Q.   And by suboptimal, you mean statements

13   such as cutting people loose in his life that are

14   holding him back?

15        A.   I think Jason Davis misunderstood a lot of

16   what was said and took it in a way that wasn't

17   intended.  And so, you know, I think by all accounts

18   Jason Davis was a good worker.  And we have need of

19   good workers, so. . .

20        Q.   Well, Pete, you would agree with me not

21   all accounts, because I think Chief Deputy Gramke

22   has taken the position that he was a malcontent,

23   correct?

24        A.   Jay Gramke also said that he was a

25   productive member of the workforce.  He thought he

Page 241

1  was a malcontent.  I mean, he has an opinion.  We

2  all have opinions.

3      Q.   What other language was suboptimal in that

4  October 20, 2023, meeting?

5      A.   Yeah, I'm not -- I don't know.  I don't

6  remember the transcript perfectly.  But at the end

7  of the day, I think we can all agree that sometimes

8  conversations can be had, especially when they're

9  that lengthy, and people can take things the wrong

10 way.  That's all I'm saying.

11     Q.   Was making the statement that there had to

12 be consequences for Jennifer Davis's speech a

13 suboptimal statement?

14     A.   I don't know.

15     Q.   You were aware of the contents of that

16 conversation at the time that you were involved in

17 the decisions that led to the issuance of Exhibit

18 72, correct?

19     A.   Yes.

20     Q.   As an aside, Jason was also offered --

21 reinstated with seniority as part of Exhibit 72,

22 correct?

23     A.   Correct.  This was an excellent offer.

24     Q.   Jason responded back at Exhibit 73.

25     A.   Yes.

1      Q.   And he responded back -- I don't actually
2  think it was on August 19.  I know it's dated that.
3  It may have been when it was printed.  I think he
4  actually responded -- because we've got the email
5  traffic -- on August 17, that Sunday, correct?
6      A.   I don't know.  I didn't see it then.
7      Q.   Okay.  If I've got an email from him to
8  the Sheriff that date, you wouldn't dispute that,
9  though, correct?
10     A.   I'm not disputing when it was sent.  I can
11 only tell you I didn't see it then.
12     Q.   Okay.  What date did you see it?
13     A.   I would have seen it on a workday,
14 probably Monday.
15     Q.   The 18th?
16     A.   I assume so.
17     Q.   Okay.  Jason raises some concerns in the
18 Exhibit 73 letter back from him, correct?
19     A.   No.  I don't think that's correct.  I
20 think these are conditions that he's bringing
21 forward in opposition to our unconditional offer.  I
22 considered it a rejection immediately.
23     Q.   Did he say he wasn't going to come back in
24 the August 19th letter -- or the Exhibit 73 letter?
25     A.   The conditions tell me that he's not going

1   to come back.  The fact that he's asking for the

2   union to -- for us to get written assurance from the

3   union that there won't be a grievance tells me that

4   this is essentially a rejection, because that's not

5   something I'm going to be able to get from the

6   union.

7          Q.   Okay.  So his conditions you were not

8   going to be able to meet, correct, and that's why

9   you took it as a rejection?

10         A.   I took it as a rejection because he didn't

11  say yes.

12         Q.   Okay.  He asked for, among other things,

13  25 to 30 days to assess the financial implications

14  because of the retirement switch, right; that was

15  one thing that he asked?

16         A.   He did ask for that.

17         Q.   He asked that there be no interference

18  with his family relationships, that he won't have to

19  divorce his wife or sever ties with family members

20  or the people that was holding back his career; he

21  asked for that, too, right?

22         A.   He did.

23         Q.   He asked that there be no retaliation for

24  spousal speech, correct?

25         A.   Yep.

Page 244

1      Q.   He asked that his spouse's First Amendment

2  rights be honored, correct?

3      A.   Yes.

4      Q.   He took questions posed to him in

5  discovery and discovery responses as a threat of

6  criminal action, and he asked that that not be, you

7  know -- or that the County refrain from such actions

8  as part of this, correct?

9      A.   Well, I don't know how he took those

10  interrogatories.

11     Q.   Well, he says that.

12     A.   I know he -- it's in the letter, but --

13  okay.  It's in the letter.  I agree to that.

14     Q.   Okay.  He asked for a RENU assignment?

15     A.   Yeah.

16     Q.   And he asked --

17     A.   Well, actually I don't know that he

18  actually -- I think he's asking -- I don't know if

19  he's saying I want to be in RENU.  He's saying if

20  the RENU position is offered.  It clearly wasn't,

21  but. . .

22     Q.   Okay.  He was wanting to know -- he was

23  wanting clarification on that point?

24     A.   Sure.

25     Q.   And he was asking for -- he said it's not

1  clear to me as a former union representative whether

2  your offer is legal or is enforceable.  He wants

3  assurance in writing from the union there will not

4  be a grievance if he were to accept your offer.  He

5  asked for that, too, correct?

6      A.   He did.

7      Q.   The next communication that he gets is the

8  Exhibit 74 letter dated August 22, 2025, correct?

9      A.   Yes.

10     Q.   You would agree with me that the letter --

11 Exhibit 74 letter does not address whether or not

12 there would be any of the six points other than No.

13 6, correct?  And No. 6 was the contractual

14 bargaining issue.

15     A.   Well, so here's what I think.  I think

16 that the complaint is essentially that Jason

17 believed he'd never be promoted because of his

18 wife's social media posts and so he quit.

19          We offered him a corporal position first.

20 He rejected that with his many conditions.  We

21 considered it a rejection, but we still want to make

22 an offer.  We still want to see if we can bring him

23 back.  We need people, so -- and I have the lateral

24 MOU in place, so I -- I -- I wrote the letter -- and

25 I wrote it in tiers.  You know, we're going to make

1  an offer for a deputy position.  I can't offer the

2  seniority at this time because it's pursuant to the

3  MOU.  And then he would have an opportunity to

4  become a corporal through union approval.  And that

5  would be a process and we understand that.  But that

6  seemed to be what he wanted, so we tried to

7  accommodate.  It's not -- I don't think it's as good

8  as the first offer.  I would have taken the first

9  offer if I were him.

10      Q.   There was a discussion and directive on

11  October 20, 2022 [sic], by the Sheriff to Jason

12  Davis regarding his wife's social media.  In the

13  context of the transcript, the transcript says what

14  it says.

15           Are you aware at any time where the

16  Sheriff communicated rescission of her directive

17  regarding his wife's social media?

18      A.   So --

19               MR. MILLER-NOVAK:  Objection as to

20           form.  Foundation.

21               You may answer.

22      A.   I really don't know what you're talking

23  about, so I would have to say I'm not aware.  I

24  don't know if this is something that was a topic I

25  was prepared for on the 30(b)(6).

1      Q.   Well, Jason asked that there be an

2   agreement not to interfere with family

3   relationships, no retaliation for spousal speech,

4   and preservation of spouse's First Amendment rights.

5   Those were the first three -- you called them

6   conditions.  I might call them concerns.  He wanted

7   enforceable guarantees in writing, in any event, as

8   to those points.

9           If we or a jury were to conclude that the

10  Sheriff issued directives regarding his wife's

11  social media, are you aware at any time including in

12  these offer letters where those conditions were

13  rescinded?

14      A.   I can't answer this question, because I

15  don't know what you're talking about.  What

16  directives are you talking about?

17      Q.   Yeah.  There was discussion at 63 and 64

18  of the transcript where the Sheriff said, quote, So

19  I hope your wife will support your career.  I don't

20  care if she likes me or not.  If she's holding a

21  grudge on that incident, just let her know I don't

22  even remember it.  It's just a lot of baggage she's

23  carrying around.  I'm not carrying it.  It makes no

24  difference to me.  You know, whatever happened, I

25  did what I thought at the time.  And if somebody

1    lied to create that, that's who I would be mad at.

2    But, you know, the issue is, hey, I want you to do

3    well, Jason.  That's the message I'm leaving you

4    with honestly.  In past administrations -- you lived

5    through it -- once you got a black mark on you, you

6    were done.

7            And later the Sheriff indicates and makes

8    a statement -- let me find it.  Chief Deputy Gramke

9    prior to that indicated if we promoted you after

10   what your wife had done and said and what you had

11   done and said, do you think we'd open up the

12   floodgates of hell to anybody that wants to be

13   critical of this administration.  That's part of the

14   discussion.

15           There's the discussion about Jason's wife

16   benefiting from having the job and there's got to be

17   consequences for her action.  That's at page 60 of

18   the transcript.

19           I mean, just going through this transcript

20   you don't think that there was a directive to Jason

21   to -- for his wife to be silenced?

22       A.   No, I don't.  I think this is part of the

23   misunderstanding of the whole conversation.  I think

24   that they were trying to say we want the best for

25   you, we want you to be successful.  And I think

1    there is the perception that there was more to it

2    than that.  And I don't think that that was in their

3    heads.  I really don't.

4              But I wasn't in the meeting.  I'm just

5    telling you -- I've read the transcript -- that was

6    my interpretation.

7         Q.   Okay.

8         A.   People can differ.

9                   MR. MILLER-NOVAK:  Why don't we take

10                  a break.

11                  (A brief recess was taken.)

12   BY MR. WIEST:

13        Q.   Pete, again, we talked about the

14   transcript and Jason's requests for no interference

15   with family relationships, no retaliation for

16   spousal speech.  You would agree that one of the

17   things that occurred in that transcript was the

18   Sheriff's statement that, quote, things need to

19   change on page 66.  Are you aware of that?

20        A.   I don't have the transcript memorized, but

21   I'm sure if you're saying it's on page 66, it is.

22        Q.   And there's a discussion about Jason's --

23   I'm sorry, about Jennifer's social media activity

24   throughout that transcript, correct?

25        A.   It's a lengthy transcript.  It was

1    wide-ranging.  I haven't memorized the transcript.

2    I know that there was discussion about it, but -- I

3    mean, the overall tenor of the message that, you

4    know, I believe was trying to be imparted by the

5    Sheriff and the Chief was you're a valued

6    employee -- because obviously the green letter was

7    what's going on with my career.  So they want to

8    impart the message of you're a valued employee,

9    there are things that, you know, we're trying to do

10   in this organization, and we want you on board.

11           I think there is misperception in the

12   meeting.  I think the message could have been

13   delivered in a better way.  But ultimately I think

14   that there was an attempt to coach Jason up, let him

15   know that he's valued, and let him know that he has

16   a future in the organization.  And, you know, that's

17   what I believe.

18       Q.   And you think that that's consistent with

19   the Sheriff's statements, for instance, on page 51

20   when she asked Jason does your wife support your

21   position here, does she support you being a deputy

22   sheriff, and later she asks -- about four lines down

23   on Line 15 of that page -- does she realize her

24   actions are hurting you, that that's coaching Jason

25   up?

1              MR. MILLER-NOVAK:  All right.  I'm

2         going to object on the grounds that we're

3         here on 30(b)(6).  And the topic that

4         we're supposed to be on is on the letter.

5              I think this thread has gotten so

6         loose to the relationship of that letter

7         you're now asking almost legal analysis to

8         some degree on whether it's a directive or

9         not coming out of a conversation that has

10        no relationship to the actual letter.

11             I'm not saying I'm not going to let

12        him answer.  But I'm putting on the

13        record --

14             MR. WIEST:  Then why the speaking --

15        improper speaking objection?

16             MR. MILLER-NOVAK:  No.  It's not an

17        improper speaking objection.

18             MR. WIEST:  It is.

19             MR. MILLER-NOVAK:  I'm allowed to put

20        on the record what is a 30(b)(6) topic and

21        what is not.

22             MR. WIEST:  Sure.

23             MR. MILLER-NOVAK:  And I'm allowed to

24        put that on the record, because we're here

25        on a 30(b)(6).  And I'm allowed to put on

Page 252

1       the record that we don't believe that this

2       binds the County in his County -- his

3       County stance.

4           That's an objection I'm allowed to

5       make and I have to articulate that

6       objection because it's very important,

7       because there's a legal implication of

8       whether or not he's here talking about the

9       County on a question or whether he's here

10      talking about Pete Stackpole.

11          So I'm going to let him answer the

12      question.  But I think this has no

13      relationship to the topic that he was --

14      he is set here for today.

15          MR. WIEST:  It does have to do with

16      these letters.  And I just -- you know,

17      I'm going to put on the record very

18      quickly, just Pete has given us answers

19      about the meaning and import of this

20      conversation and how it formulated the

21      content of these letters.

22          And I'm entitled to cross-examine him

23      to demonstrate that the positions that are

24      being taken are inconsistent completely

25      with the contents of the transcript and

1          the Sheriff's directive to Jason to

2          basically ball gag his wife's free speech

3          as a condition of employment and the fact

4          that that has never been lifted, not to

5          date, and not in any of these letters.

6          And that's the point that we intend to

7          make and I am making.

8               MR. MILLER-NOVAK:  You just

9          mischaracterized his testimony by acting

10         like your question is his testimony.  And

11         the nature -- and the argumentative nature

12         of your question is somehow his testimony.

13         It is not.  His testimony was about the

14         contents of that letter, how it

15         functioned.  As a matter of fact, when you

16         asked why many times, it was privileged.

17              So the reality is you can ask him

18         questions in his 30(b) -- as a 30(b)(6)

19         representative about whether or not this

20         letter functions in any given way, what

21         the contents of this letter is, how it

22         works, things like that, 30(b)(6),

23         absolutely fine.

24              When you're asking him to do a legal

25         analysis about the contents or whether or

Page 254

1          not this is retaliation or all this, it

2          has nothing to do with the topic today.

3          And if you wanted to talk to him about

4          that as a 30(b)(6), then you should have

5          noticed that as a topic.

6     Q.    Pete, is there anything in Exhibit 74 that

7  lifts the directive the Sheriff gave regarding

8  Jennifer Davis and her speech in the October 20,

9  2023, meeting?

10    A.    Well --

11          MR. MILLER-NOVAK:  Objection as to

12          form.

13          You can answer if you know.

14    A.    I don't know how to respond to your

15  question.  But what I can offer as the County's

16  representative, as the Sheriff's lawyer, is that,

17  you know, if this is being recorded, I can

18  absolutely assure and guarantee that there will be

19  no retaliation if he takes this offer obviously

20  because doing so would be problematic for the

21  sheriff's office and it's not something that we

22  condone and it's not something that is good for the

23  agency.  It's not good for morale.  So I'm here to

24  say there would be no retaliation.

25          Obviously his wife can do whatever she

1    wants on social media.  She always has.  And she

2    indicated in her deposition testimony that she was

3    never chilled.  So I don't think there's a concern

4    there.  We're not -- no one at the County has any

5    intent to interfere with their marriage,

6    relationship.  No one has any intent to control

7    their social media posting, other than Officer Davis

8    if he comes back to the sheriff's office.  He would

9    have to live within our social media policy.  But

10   every concern that he raised or every condition that

11   he placed upon us -- interference with family

12   relationships, the sheriff's office is not going to

13   interfere with his family relationships if he

14   accepts this offer.

15          Retaliation for spousal speech.  That will

16   not happen.  Part of the reason why this offer was

17   made without prejudice is so you know that if

18   something happens that is untoward -- well, number

19   one, I would hope that I would be told about it so I

20   could address it immediately, but secondly, it's

21   without prejudice because, you know, he can still be

22   within the sheriff's office and sue.  So if he is

23   retaliated against -- I mean, that would happen, I

24   would expect.

25          Similarly, preservation of spousal First

1    Amendment rights.  I covered that.

2            No baseless -- I mean, I never -- never --

3    no one -- I've already explained that I -- that that

4    was certainly in my head when I was providing the

5    responses.  So I don't believe that that's something

6    that is even contemplated.  But having said that,

7    yes, I can assure that that will not happen.

8            With RENU assignment, that is something

9    that is dependent on the actual availability of

10   RENU.  I think that Chief Ketteman always would have

11   supported him going to RENU and I think that we

12   would in the future, assuming, you know, that's

13   something he still wants.

14        Q.   So I need to ask the question, because I

15   think -- we appreciate the representations you just

16   made, but why not put it in writing in the second

17   offer letter in Exhibit 74?

18        A.   I think that's privileged.

19             MR. MILLER-NOVAK:  Well, hang on.

20        A.   All right.  So it didn't even occur to me

21   to put those things in, because I think it's almost

22   like -- to me this is like saying I want written

23   assurance that nobody is going to murder me.  Like,

24   no, that's not -- we're not going to do that to you.

25        Q.   Except that it had already occurred in

1   October of 2023.

2        A.    Well, I disagree with you.  Okay.  I

3   disagree with you that that occurred.  I don't

4   believe that that was the intent.  I don't think

5   anyone had it -- I think that was the farthest thing

6   from their minds was -- I mean, they told him we

7   want to grow you.  We want you to be successful.  I

8   don't think anyone had an intent to retaliate.  But

9   you've -- obviously that was his perception.  I

10  grant you that.  And you're pursuing this on his

11  behalf, as you're welcome to do.  And as you would

12  be welcome to do, if he accepted this position and

13  somebody set a foot wrong -- okay.

14           So the assurance that I'm providing you is

15  that, you know -- number one, I don't believe it

16  happened.  I don't believe it will happen.  I

17  believe that he is, you know, going to be doing good

18  work for the Hamilton County Sheriff's Office in a

19  district.  He will have supervisors that value him.

20           You know, I don't agree that there was

21  retaliation, but I think that -- Jay Gramke has

22  retired, so there's not a concern there.  Chief

23  Ketteman obviously thinks that Jason Davis is a good

24  member of the department or was.

25           So, yeah, I just think that it's -- I

1  think it's a shame that this misunderstanding has

2  come to where we are, but we are trying to remedy

3  the situation.

4       Q.   What's there to remedy?

5       A.   Well, had he stayed, had he not -- had he

6  not just like, you know, colloquially taken his ball

7  and gone home, he would have been a corporal, okay?

8  So the misunderstanding that was going on in his

9  head, in my opinion, led to him just abandoning his

10  position with the sheriff's office, which is a shame

11  because he's got a long tenure with the sheriff's

12  office.

13       I mean, if we thought that there was

14  something that he was doing that was in violation of

15  our policies or that he was doing something

16  inappropriate in the workplace, we would have

17  brought discipline against him for just cause.  And

18  he would have had appeal rights and so forth.  None

19  of that happened.  He abandoned his position and

20  went to Springdale, which is his right.  He's

21  allowed to do that if he doesn't like the position.

22       But my understanding is he liked the

23  position, that he valued his time at the sheriff's

24  office, he liked the people he worked with.  We

25  would like to see him back.  We think that he is a

1  good worker.  And, you know, I think we made him an

2  excellent offer on August 15.  And we made him --

3  because of some of the conditions he had, we made

4  him a good offer on August 22nd.

5      Q.   You would agree that Exhibit 74 does not

6  contain anything about family relationships, spousal

7  speech, or anything of that sort, correct?

8      A.   I don't think it needed it.

9      Q.   Well, that wasn't my question.  My

10 question was did it contain anything that addressed

11 those issues?

12     A.   So, no, it doesn't contain it.  But I

13 think it's implicit.

14     Q.   Is there anything in Exhibit 74 that if a

15 jury were to conclude contrary to your position that

16 the Sheriff did issue directives regarding

17 Jennifer's speech -- is there anything in Exhibit 74

18 that indicates that those directives have been

19 lifted as part of his ongoing employment -- Jason's

20 employment and return to the sheriff's office?

21     A.   Yeah, I just don't think that's going to

22 happen.  I don't know what you're asking me.

23     Q.   You don't think that the extent that a

24 jury were to conclude that that were directives

25 given to Jason in that meeting regarding his

1    spouse's speech -- you don't think those directives

2    being lifted are ever going to happen?

3         A.    I don't think there were any directives

4    given at the meeting.  I've read that transcript.

5    I'm not like -- don't have it memorized, but I don't

6    believe there were any directives given.

7         Q.    Okay.  In any event, to the extent there

8    were, none of them are lifted in the Exhibit 74

9    letter, correct?

10        A.    There were no directives given.

11                   MR. MILLER-NOVAK:  Objection as to

12             form.  Slow down a little bit.

13                   MR. WIEST:  Can you repeat the

14             question, please?

15                   THE COURT REPORTER:  "In any event,

16             to the extent there were, none of them are

17             lifted in the Exhibit 74 letter, correct?"

18        Q.    In any event, to the extent there were any

19    directives given regarding Jason's spouse's speech,

20    there's nothing that addresses lifting any such

21    directives in Exhibit 74, correct?

22        A.    Your question says to the extent that

23    there were any directives given --

24        Q.    Sure.

25        A.    There were no directives given.

1           MR. WIEST:  Okay.  Why don't we take

2       a break.

3           (A brief recess was taken.)

4  BY MR. WIEST:

5       Q.   If it was the right thing to do to bring

6  Jason Davis back to where he would have been had he

7  stayed, what wrong was committed that you were

8  righting?

9       A.   I think him quitting was the wrong.  I

10  mean, I think that he never should have done that.

11      Q.   What misunderstanding did Jason make

12  regarding being the top candidate for RENU and

13  having that preferred assignment rejected because of

14  his wife's social media posts?

15          MR. MILLER-NOVAK:  Objection as to

16      form.

17          You can answer if you know.

18      A.   Yeah, I don't -- I'm not inside Jason's

19  head, so I don't know.

20      Q.   Well, you made a number of statements

21  today that Jason -- that there were, quote,

22  misunderstandings.  What misunderstandings do you

23  think Jason had?

24      A.   When I say that there were

25  misunderstandings, I think he took statements that

Page 262

1  were said in a way that they weren't intended.  I

2  think that the intent of that meeting was to build

3  him up.

4       Q.   What testimony in this case supports that

5  contention given that you weren't present at that

6  meeting?

7       A.   Well, I wasn't present at the meeting, but

8  I recall the Sheriff saying things positively, like,

9  you know, we want to build you up, we want to -- you

10  know, we want you to be successful.

11           MR. MILLER-NOVAK:  I'm just going to

12           throw the objection back on the record.

13           It certainly has nothing to do with the

14           letter at this point.

15       Q.   Pete, if a jury concludes that there was

16  First Amendment retaliation in this case, which you

17  contend there was not, do you believe that Jason's

18  requests for assurances in Exhibit 73 were

19  reasonable?

20       A.   I think that if an employee believes that

21  they were retaliated against and the employer made

22  them an offer of reinstatement and they took that

23  offer, they would be in a fantastic position and

24  they don't need assurances because if something

25  happens that would be retaliatory, they would just

1   bring a lawsuit.

2              MR. WIEST:  That wasn't the question.

3         Can you read it again?

4              THE COURT REPORTER:  "Pete, if a jury

5         concludes that there was First Amendment

6         retaliation in this case, which you

7         contend there was not, do you believe that

8         Jason's requests for assurances in Exhibit

9         73 were reasonable?"

10             MR. MILLER-NOVAK:  Objection as to

11        form.  Calls for speculation.

12             Answer if you know.

13       A.   Yeah, I don't know if it's reasonable or

14   not.  I don't believe -- I don't believe that there

15   was retaliation, so it's hard for me to figure this

16   out.

17             MR. WIEST:  Okay.  We're done.

18             MR. MILLER-NOVAK:  I'm going to have

19        some -- a handful of follow-up questions.

20                  DIRECT EXAMINATION

21   BY MR. MILLER-NOVAK:

22       Q.   There's been a lot of questions about

23   Exhibit 74 and why or why not there's no, I guess,

24   assurances in this offer letter.  And I'm not going

25   to ask you a direct question on that.

1          But off of that there was some allegation

2    that there was some directive and they asked you

3    about a directive.  Your testimony was you didn't

4    agree with that.

5          But the question I'm going to ask is how

6    often, if at all, is county policy created in

7    employment offer letters?

8          A.   Never.

9          Q.   How often, if at all, does the county -- I

10   don't know -- make alterations to its employment

11   policies in offer of employment letters?

12         A.   It doesn't happen that way.

13         Q.   What's the function of an offer of

14   employment letter?

15         A.   To offer employment to someone that we

16   would like to hire.

17         Q.   Okay.  And when -- again, there was some

18   questions about the conversation or the transcript.

19   Was Sheriff McGuffey talking to the entire county

20   during that conversation?

21         A.   No, she was not.  She was only talking to

22   Jason Davis.

23         Q.   Okay.  And how often, if at all, has --

24   how are county directives even created typically?

25         A.   I'm not even familiar with the term county

1    directive.  We have general orders, personnel

2    orders.  I mean, it's -- there's a process.  It's

3    used by the chief deputy typically.

4         Q.   Okay.  So Jason Davis -- I guess in

5    Exhibit 73 -- is asking for assurances, and you

6    responded to those requests for assurances today,

7    correct?

8         A.   Yes.

9         Q.   Okay.  How, if at all, do you believe that

10   that was -- does that constitute an assurance?

11        A.   I'm the county's representative.  And I

12   believe that I'm able to make those assurances.  And

13   I have done so with respect to each concern.

14                   MR. MILLER-NOVAK:  Okay.  No further

15             questions.

16                   MR. WIEST:  I've got a couple of

17             follow-ups.

18                   RECROSS-EXAMINATION

19   BY MR. WIEST:

20        Q.   Has there been any change in official or

21   unofficial policy of the Hamilton County Sheriff's

22   Office as respects to First Amendment rights, First

23   Amendment retaliation from October 20, 2023, to the

24   present?

25        A.   Yes, there has.  We went to Lexipol, so --

1    I think that was March 15 of 2024.  So we have a new

2    policy.  It's -- I mean, I don't think it's

3    substantively very different.  I think it's more

4    robust, provides stronger protections.  But it kind

5    of expanded what existed under the old policy.

6         Q.   Okay.  And are any of those specific to

7    First Amendment retaliation for employees --

8         A.   Yes.

9         Q.   -- or their spouses?

10        A.   Yes.

11        Q.   Which of those?

12        A.   I don't remember the number.  But there is

13   an anti-retaliation policy.  And it's more than like

14   one page.  I think it's a couple of pages.

15        Q.   Does it cover First Amendment retaliation?

16        A.   I believe so, yes.

17        Q.   Do you know that for sure?

18        A.   Yes.

19        Q.   Can the county change its policy as a

20   consequence of your testimony here at this

21   deposition or the sheriff's office?

22        A.   Well, I am here to bind the county, so

23   yes.

24        Q.   Okay.  And your response is that if Jason

25   were to take the job offer and get rehired and he is

1  retaliated against, he can just sue again, correct?

2       A.   Yes.

3       Q.   Okay.

4       A.   Or amend the complaint, I suppose.

5                 MR. WIEST:  Okay.  I think that's it.

6                 MR. MILLER-NOVAK:  I have a

7       follow-up.

8                     REDIRECT EXAMINATION

9  BY MR. MILLER-NOVAK:

10      Q.   Regarding Jason Davis's -- and, again, I'm

11 going to be clear.  Jason Davis is -- how do I put

12 this -- Jason Davis when he was in the sheriff's

13 department was a patrol deputy, correct?

14      A.   He was.

15      Q.   Okay.  And patrol deputy is a class of

16 employee, correct?

17      A.   That is correct.

18      Q.   Okay.  And that class of employee falls

19 underneath a collective bargaining agreement?

20      A.   It does.

21      Q.   Okay.  And then how about a corporal?

22      A.   Corporal is under the same collective

23 bargaining agreement.

24      Q.   Okay.  And the collective bargaining

25 agreement how, if at all, does it address employee

1  concerns that they feel that they're being punished

2  or retaliated against, et cetera, et cetera?

3       A.   They have the ability to file grievances

4  through the union.

5       Q.   Okay.  So if Jason Davis was to accept any

6  offer of reinstatement or employment, what tools

7  would he have at his disposal -- I know we just

8  talked about that he could file suit -- and I think

9  anybody can certainly file suit, but -- I mean, what

10  other tools would he have available for protection,

11  if any?

12       A.   Union tools would be to file a grievance,

13  to talk to his union representatives.  He could also

14  file, I suppose, an EEOC complaint, if that's

15  relevant.

16       Q.   Okay.  And we're using the word

17  retaliation a lot today.  But what about the word

18  discipline; what does that mean regarding the

19  collective bargaining agreement?

20            MR. WIEST:  Standing objection to

21            outside the scope of the remaining cross.

22            MR. MILLER-NOVAK:  It totally is.

23            But he also testified today as --

24            MR. WIEST:  I don't want to argue

25            with you.  I made the objection.  Go

1          ahead.

2                    MR. MILLER-NOVAK:  That's fine.

3          Great.

4      Q.   So what, if any, tools are there in a

5  collective bargaining agreement to -- actually I

6  forget my question because of the objection.  Let me

7  go back.  Can you repeat my original question?

8                    THE COURT REPORTER:  "And we're using

9                the word retaliation a lot today.  But

10                what about the word discipline; what does

11                that mean regarding the collective

12                bargaining agreement?"

13      Q.   Yeah.  Okay.  So how does the collective

14  bargaining agreement address actions that management

15  takes regarding employees?

16      A.   That would be in Article IX, discipline.

17  And there's a series of -- there's a process for

18  when discipline is initiated against an employee.

19  It has to be progressive in nature, unless it's

20  egregious.  It has to be only for just cause.

21  There's various protections.  And it goes up in step

22  from Level 1 to Level 2 to Level 3 to Level 4 and so

23  forth.

24      Q.   Okay.  And you pulled out this.  I guess

25  we're on Exhibit 43.  And you pulled out Article IX?

1     A.    Correct.

2     Q.    So Level 1 is a warning, correct?

3     A.    Yes.  That's what we consider a counseling

4  letter.

5     Q.    And what's Level 2?

6     A.    That's a written reprimand.

7     Q.    What's Level 3?

8     A.    That would be a suspension of 24 hours or

9  less.

10    Q.    And what's D here?

11    A.    More than 24 hours suspension, possibly a

12 demotion.

13    Q.    Okay.  So if I'm understanding this

14 correct, how many employer actions does one need to

15 take before you can move to a demotion from a

16 promotion?

17    A.    At least three.  But it would usually be

18 much more than that.  We -- with progressive

19 discipline we can do a Level 1, a Level 1, a Level

20 2 -- you know, you can have multiple levels.  The

21 whole goal of discipline is to correct, mold, and

22 strengthen.

23    Q.    So when you said earlier that it was

24 implicit in this letter that there is certain

25 assurances that existed, if he were to accept any of

1    these offers, I guess, if they were accepted or are

2    accepted, what system is in place regarding his

3    security for his position if he accepts?

4        A.    The collective bargaining agreement and

5    everything else that we've discussed.

6        Q.    Okay.  And the everything else we

7    discussed, just for review, is that he always has

8    the ability to file suit, correct?

9        A.    That's correct.

10       Q.    And he also has the ability to file a

11   grievance, correct?

12       A.    Yes.

13       Q.    And who would represent him in any kind of

14   grievance?

15       A.    His union counsel.

16       Q.    And if he was ever disciplined, what would

17   his options be if he was disciplined?

18       A.    The same process.  He could grieve it and

19   possibly go to arbitration.

20       Q.    Okay.  So when you said it was implicit in

21   that letter, part of the implicit assurance is the

22   collective bargaining agreement?

23       A.    That's correct.

24                  MR. MILLER-NOVAK:  Okay.  Great.

25                  MR. WIEST:  Do you have anything

1          else?

2                    MR. MILLER-NOVAK:  Oh, I do.

3      Q.   How often when you offer letters of

4  employment do you include a list of every option

5  under the collective bargaining agreement?

6      A.   We don't do that.

7      Q.   Okay.  So how, if at all, did this letter

8  of reinstatement treat Jason Davis different in

9  terms of language in the offer letter?

10     A.   It's essentially the same way we would

11 treat anybody who is a lateral or who we want to

12 hire.

13                   MR. WIEST:  A couple of follow-ups.

14                   FURTHER RECROSS-EXAMINATION

15 BY MR. WIEST:

16     Q.   How can Jason Davis be assured that his

17 rights are going to be acknowledged or followed when

18 the Sheriff and Chief Deputy were generally ignorant

19 of what those rights are?

20     A.   I just made the assurance as the county's

21 representative.

22     Q.   Okay.  You agree you work for the Sheriff,

23 correct?

24     A.   That is correct.

25     Q.   You are aware that the Sheriff has already

Page 273

1    characterized Jason's recording of the

2    October 2023 meeting as a serious offense that would

3    allow her to blow through the entirety of the

4    progressive discipline, correct?

5         A.   No, I disagree with that.  I'm not aware

6    of that.  Did she say that at her deposition?

7         Q.   Yes, sir.

8         A.   Okay.  She may have felt that way, but I

9    disagree with that.

10        Q.   Okay.  Ultimately you work for her?

11        A.   I work for her.  That's correct.

12                  MR. WIEST:  Okay.  Nothing further.

13                  (Witness excused.)

14            (Deposition concluded at 12:00 p.m.)

15

16

17

18

19

20

21

22

23

24

25

Page 274

1          A C K N O W L E D G E M E N T

2

3   STATE OF _____     :

4   COUNTY OF _____     :

5

6          I, PETER J. STACKPOLE, have read the

7   transcript of my testimony given under oath on

8   August 28, 2025.

9          Having had the opportunity to note any

10  necessary corrections of my testimony on the errata

11  page, I hereby certify that the above-mentioned

12  transcript is a true and complete record of my

13  testimony.

14

15

16          _____

17                  PETER J. STACKPOLE

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2              I, Kristina L. Laker, Court Reporter and

3     Notary Public, do hereby certify:

4              That the witness named in the deposition,

5     prior to being examined, was duly sworn;

6              That said deposition was taken before me

7     at the time and place therein set forth and was

8     taken down by me in shorthand and thereafter

9     transcribed into typewriting under my direction and

10    supervision;

11             That said deposition is a true record of

12    the testimony given by the witness and of all

13    objections made at the time of the examination.

14             I further certify that I am neither

15    counsel for nor related to any party to said action,

16    nor in any way interested in the outcome thereof.

17             IN WITNESS WHEREOF I have subscribed my

18    name and affixed my seal this 8th day of September,

19    2025.

20

21                    /s/ Kristina L. Laker
                      _____
22                    Kristina L. Laker
                      Notary ID 592345
23                    My Commission expires: 12/21/25

24

25



# CHARMAINE MCGUFFEY
## SHERIFF
## HAMILTON COUNTY, OHIO

JUSTICE CENTER
ROOM 110
1000 SYCAMORE STREET
CINCINNATI, OHIO 45202-1336
(513) 946-6400
FAX: (513) 946-6402

**CHRIS M. KETTEMAN**
CHIEF DEPUTY



**KEVIN M. HORN**
CHIEF OF STAFF

August 15, 2025

Dear Mr. Davis,

The Hamilton County Sheriff's Office is pleased to extend to you an unconditional formal offer of employment for the position of Corporal, effective on a mutually agreed upon start date, not to exceed sixty (60) days from the date of this letter.

As part of this offer:

- You will be reinstated with full seniority status, reflecting your prior tenure with the department.

- You will receive back pay, subject to offset by any interim earnings received from the City of Springdale or any other employer since your resignation from our office on January 22, 2024.

This offer shall remain valid until 4:00 PM on Tuesday, August 19, 2025. If we do not receive written acceptance by that deadline, we will consider the offer declined.

We look forward to the opportunity to welcome you back to our team and remain committed to supporting your continued growth and service within our department.

Sincerely,

Chris Ketteman, Chief Deputy
Hamilton County Sheriff's Office



PLAINTIFF'S
EXHIBIT
P2
8/20/25 30(6)(

| | | | | |
|---|---|---|---|---|
| **ANDREW BECKMAN** | **MAJOR DANIEL E. EMS, JR.** | **MARVIETTE JOHNSON** | **MAJOR TONY ORUE** | **MAJOR JACQUELINE REED** |
| CHIEF TECHNOLOGY OFFICER | JAIL SERVICES DIVISION | DIRECTOR OF HUMAN RESOURCES | INVESTIGATIONS & INTELLIGENCE DIVISION | COMMUNITY AFFAIRS DIVISION |
| PHONE: 513-946-6400 | PHONE: 513-946-6600 | PHONE: 513-946-6600 | PHONE: 513-825-1500 | PHONE: 513-946-6400 |
| FAX: 513-946-6402 | FAX: 513-946-6616 | FAX: 513-946-6616 | FAX: 513-595-8517 | FAX: 513-946-6402 |

| | | | |
|---|---|---|---|
| **MAJOR LAETITIA M. SCHULER** | **PETER J. STACKPOLE** | **CAPTAIN BRIAN STAPLETON** | **KYLA S. WOODS** |
| PROFESSIONAL STANDARDS DIVISION | LEGAL LIAISON | ENFORCEMENT DIVISION | DIRECTOR OF PUBLIC ENGAGEMENT |
| PHONE: 513-946-6650 | PHONE: 513-946-6400 | PHONE: 513-825-1500 | PHONE: 513-946-6400 |
| FAX: 513-945-6655 | FAX: 513-946-6402 | FAX: 513-595-8517 | FAX: 513-946-6402 |

**Jason Davis**
6811 Knox Lane
Harrison, Ohio 45030

August 19, 2025

*Via email only (CMcGuffey@HCSO.org;*
*CKetteman@HCSO.org)*
Sheriff Charmaine McGuffey
Chief Deputy Chris Ketteman
Hamilton County Sheriff's Office
1000 Sycamore Street, Room 110
Cincinnati, Ohio 45202

*Re: Conditional Response to Offer of Corporal Position*

Sheriff McGuffey and Chief Deputy Ketteman:

I am in receipt of your August 15, 2025, letter containing an offer of reinstatement to the rank of Corporal. Given where we find ourselves, and the past events that led us here, it would be foolish of me to accept this offer on blind faith. I was forced to choose between my marriage and any advancement in my career, and, more recently, have been threatened, through your attorneys (who happen to be the County prosecuting attorneys), with criminal consequences for having privately recording a conversation on a private device when I was not on the clock. Thank God I had the good sense to do that. As those most recent threats demonstrate, I recognized then that my job would have been terminated when I filed suit to redress the unlawful denials of transfer and promotion opportunities in retaliation for my wife's protected speech. Therefore, it is essential that any purported "unconditional" offer be reduced to enforceable, written guarantees, which are set forth below.

In addition, the very short timeframe you have given me to assess your offer is unreasonable. One of the issues with my return to the Hamilton County Sheriff's Office (HCSO) is that my pension/retirement was transferred from OPERS to OP&F. My understanding is that there is no way to undo that transfer, or to transfer the OP&F retirement back to OPERS. Therefore, if I accept your offer, I will have to completely restart in the OPERS system from day one to be eligible to retire, which will require me to work until age 64 (in order to accrue 15 more years towards retirement). In light of this and other issues, I would need to fully assess the financial scenario from switching back now, but I am unable to do so in the four days you have given me to respond. I believe that the financial issues can be assessed in 25-30 days.

In light of the above issues, and others, I will require a written agreement containing court enforceable guarantees regarding the following:

1. **No Interference with Family Relationships** – My employment will not in any way be conditioned upon, or adversely affected by, any demand—explicit or implied—that I divorce my wife, or sever ties with family members deemed by the Sheriff or her command staff to be "holding back my career." I already was placed in the position of choosing between my marriage and my career at the HCSO, and I cannot be put in that position again.

2. **No Retaliation for Spousal Speech** – As Judge Barrett recognized when reinstatement was addressed at our recent mediation (and the legitimate concerns that would come with it), my wife has informed opinions, including involving the Sheriff, that she has

1



PLAINTIFF'S EXHIBIT 73 KL

expressed online and that she continues to express. I respect that she is her own person. And I require a commitment, in writing, that my wife's constitutionally protected speech on social media shall have no bearing on any current or future assignment, promotional opportunities, or professional treatment.

3. **Preservation of Spousal First Amendment Rights** – My wife will retain her full right to speak freely on matters of public concern and to engage in free association, and I will not be subject to coercion or retaliation designed to silence her or to pressure me to silence her.

4. **No Baseless Prosecution and agreement to take no further retaliatory action** – Neither the HCSO nor Hamilton County will attempt to pursue criminal or administrative charges against me under the absurd theory that by keeping a private recording of the Sheriff and Chief Deputy Gramke admitting to First Amendment retaliation somehow amounted to "misappropriation of a public record," or violated the recording policy. The recording was made on a privately owned device while I was not on the clock. One of the concerns that I have in accepting your offer is that it promptly would be followed by retaliatory disciplinary action and/or termination, including for filing the lawsuit at issue. My concern is bolstered by questions posed to me by your lawyer in my deposition, as well as written discovery sent to me that suggested to me further retaliation against me. I am concerned that acceptance of your offer would be followed, after a period of time, by additional retaliatory actions, which can take a wide variety of forms. I require an enforceable agreement to refrain from any such actions.

5. **RENU assignment** – the letter does not indicate whether or not your offer includes an assignment to RENU. As you know, the denial of that assignment based on unconstitutional reasons is one of the bases of my lawsuit. If a RENU position is being offered, I will want written assurance, for a specific, minimum period, that I can remain in that assignment.

6. **Existing contractual bargaining rights** – It is not clear to me, as a former union representative, whether your offer is legal or enforceable. As you know, promotion to corporal is subject to testing and collective bargaining agreement rights. It seems to me that accepting your offer may cause a grievance to be filed on behalf of the next corporal on the current eligibility list, especially as it does not come in the form of a court order directing reinstatement. I would hate to accept your offer only to have it be taken away in short order because of a union grievance. As such, I would want assurance, in writing, from the union, that there would not be a grievance issued if I were to accept your offer.

Absent an agreement containing these guarantees, I must conclude that your offer does not constitute a legitimate offer of reinstatement, but rather an empty gesture/legal maneuver designed to attempt to limit your exposure to damages in the pending litigation. If the HCSO is sincere about remedying its past constitutional violations, then these proposed guarantees should present no problem. However, if the HCSO is unwilling to commit, in writing, to these guarantees, then it is clear to me that I should expect further retaliation if I were foolish enough to accept an unconditional offer. In other words, retaliation remains the policy of the administration of the HCSO.

2

Please provide your agreement to these guarantees on or before the deadline stated in your letter so that I may evaluate whether your offer is genuine. Please also provide a legitimate period of time to meaningfully evaluate the significant retirement issues my return to the HCSO will present.

Respectfully,

Jason Davis



# CHARMAINE McGUFFEY
## SHERIFF
## HAMILTON COUNTY, OHIO



**JUSTICE CENTER**
**ROOM 110**
**1000 SYCAMORE STREET**
**CINCINNATI, OHIO 45202-1336**
**(513) 946-6400**
**FAX: (513) 946-6402**

CHRIS M. KETTEMAN
CHIEF DEPUTY

KEVIN M. HORN
CHIEF OF STAFF

August 22, 2025

EXHIBIT
74 KL
8/27/25 Ketteman
PENGAD 800-831-6989

Jason Davis
6811 Knox Lane
Harrison, Ohio 45030
*Via email only*: coachjason73@gmail.com

Dear Mr. Davis,

We are pleased to extend to you an unconditional offer of reinstatement to the position of Deputy Sheriff within the Patrol Enforcement Division of the Hamilton County Sheriff's Office, effective immediately.

This offer is made without prejudice and without any conditions attached. You will be reinstated with the same rank, duties, compensation, and benefits you held at the time of your separation. However, pursuant to the applicable Memorandum of Understanding with the HCSA (MOU), your seniority status will not be reinstated. You have 14 days to accept this offer.

In addition, we are also offering you the opportunity to be promoted to the rank of Corporal. If you accept reinstatement as outlined above, immediately after your acceptance, you may pursue this promotion, which will be contingent upon union approval. You must inform us if you wish to pursue this Corporal rank when informing us of your acceptance of reinstatement.

Should you accept reinstatement to Deputy Sheriff within the Patrol Division, with the terms outlined above, we will confirm a mutually agreed start date within 60 days after your acceptance.

If you choose to also submit a request for Corporal approval from the Union, we will immediately seek Union approval after your acceptance. If the Union approves, we will start your reinstatement as a Corporal. If the Union rejects your promotion to Corporal, you may choose to return with the County as a Deputy Sheriff in the Patrol Division as outlined above, or you may revoke your acceptance of the Deputy Sheriff's position within 14 days of the

**ANDREW BECKMAN**
CHIEF TECHNOLOGY OFFICER
PHONE: 513-946-6400
FAX: 513-946-6402

**MAJOR DANIEL E. EMS, JR.**
JAIL SERVICES DIVISION
PHONE: 513-946-6600
FAX: 513-946-6616

**MARVIETTE JOHNSON**
DIRECTOR OF HUMAN RESOURCES
PHONE: 513-946-6600
FAX: 513-946-6616

**MAJOR TONY ORUE**
INVESTIGATIONS & INTELLIGENCE DIVISION
PHONE: 513-825-1500
FAX: 513-595-8517

**MAJOR JACQUELINE REED**
COMMUNITY AFFAIRS DIVISION
PHONE: 513-946-6400
FAX: 513-946-6402

**MAJOR LAETITIA M. SCHULER**
PROFESSIONAL STANDARDS DIVISION
PHONE: 513-946-6650
FAX: 513-945-6655

**PETER J. STACKPOLE**
LEGAL LIAISON
PHONE: 513-946-6400
FAX: 513-946-6402

**CAPTAIN BRIAN STAPLETON**
ENFORCEMENT DIVISION
PHONE: 513-825-1500
FAX: 513-595-8517

**KYLA S. WOODS**
DIRECTOR OF PUBLIC ENGAGEMENT
PHONE: 513-946-6400
FAX: 513-946-6402

Union's decision to reject your promotion. If you choose to revoke, you may elect to remain in your current position as an officer with the Springdale Police Department. If you have concerns about providing proper notice to Springdale in the event of your acceptance, please inform us, so we may consider how to accommodate providing proper notice to Springdale.

You have fourteen (14) calendar days from the date of this letter to accept the reinstatement offer and to indicate whether you wish to be considered for the Corporal promotion.

If no response is received within that timeframe, the offer will be considered declined. Please inform us if you have any questions, we look forward to your response and hope to welcome you back to the department.

Sincerely,

Chris Ketteman, Chief Deputy
Hamilton County Sheriff's Office