**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT CINCINNATI**

| | |
|---|---|
| **JASON DAVIS** and<br>**JENNIFER DAVIS,** | : Case No. 1:24-cv:0202 |
| | : Judge: Barrett |
| Plaintiffs | |
| | : |
| v. | |
| | : |
| **CHARMAINE McGUFFEY**, et. al. | |
| | : |
| Defendants, | |

**DEFENDANTS' PARTIAL MOTION FOR SUMMARY JUDGMENT WITH THE
AFFIDAVITS OF MATT GUY AND CHRIS KETTEMAN**

Defendants Hamilton County and Jay Gramke move this Court for partial summary

judgment under FRCP 56 because most of Plaintiffs' claims fail as a matter of law.  A

Memorandum in Support is attached to this Motion.

Respectfully submitted,

CONNIE PILLICH
PROSECUTING ATTORNEY
HAMILTON COUNTY, OHIO

/s/*Matt Miller-Novak*
Matt Miller-Novak, 0091402
Stephen A. Simon, 0068268
Andrew E. Prem, 100861
Assistant Prosecuting Attorneys
Hamilton County, Ohio
230 E. Ninth Street, Suite 4000
Cincinnati, OH 45202
DDN:  (513) 946-3219 (Miller-Novak)
DDN:  (513) 946-3289 (Simon)
DDN:  (513) 946-3285 (Prem)
FAX:  (513) 946-3018
TRIAL ATTORNEYS FOR DEFENDANTS

i

## <u>MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT</u>

## <u>TABLE OF CONTENTS</u>

**I. INTRODUCTION** ...................................................................................................1

**II. SUMMARY OF THE ARGUMENT** ....................................................................1

**III. BACKGROUND INFORMATION** .....................................................................5

**IV. LAW AND ARGUMENT** ...................................................................................15

    **A. Defendants are immune from the Plaintiffs' alleged economic damages after Davis's resignation** ...........................................................16

    **B. Plaintiffs' claims for constructive discharge against all Defendants fail as a matter of law, so Defendants are immune** ...............................18

        1. <u>Plaintiffs cannot establish that Jason Davis suffered any of the Sixth Circuit's factors to establish intolerable working conditions</u>.............................20

        2. <u>A failure to promote argument cannot support a claim for constructive discharge</u>.........................................................................21

        3. <u>Plaintiffs cannot present any evidence that Defendants took any action with the intent of forcing Jason Davis to quit</u> .........................22

        4. <u>There is no evidence that Defendants were about to terminate Jason Davis</u> ....................................................................................................23

    **C. Plaintiffs' claims for First Amendment Association against all Defendants fail as a matter of law, so all Defendants are immune from those claims** .................................................................................25

    **D. Plaintiff Jennifer Davis lacks standing for her claims** ..........................26

**V. CONCLUSION** .....................................................................................................27

## I.     INTRODUCTION

Plaintiff Jason Davis ("Davis") decided to quit his job, and he now wants the taxpayers to foot the bill for his own economic decisions. Davis quit his job because his wife, Plaintiff Jennifer Davis, threatened to "no longer support him if he stayed."[1] Defendants Hamilton County ("County") and Jay Gramke ("Gramke") (collectively "Defendants") are entitled to partial summary judgment against Plaintiffs Jason Davis and Jennifer Davis (collectively "Plaintiffs"). Defendant Hamilton County, Jay Gramke, and Sheriff Charmaine McGuffey ("Sheriff McGuffey") (collectively "Defendants") did not constructively discharge Jason Davis, and Defendants did not interfere with Plaintiffs' marriage. Plaintiffs caused their own economic damage as a matter of law because Jason Davis quit his job.

## II.     SUMMARY OF THE ARGUMENT

Plaintiffs' claims for economic damages were cut off as a matter of law when Jason Davis quit his job to mollify his wife on January 30, 2024. Therefore, Defendants are immune from any of Davis's claims for back pay, pension benefits, and front pay after Jason Davis quit. There are no issues of material facts regarding Plaintiffs' claims for alleged economic damage after Davis's resignation.

Jennifer Davis made an online post where she called Hamilton County voters "twatwaffle(s)" because they voted for a homosexual sheriff.[2] Jason Davis later applied for a special assignment on the County's Regional Enforcement Narcotics Unit ("RENU"). RENU supervisors initially chose Jason Davis for placement on RENU. Defendant Jay Gramke overrode Jason Davis's selection to RENU in early 2023. Sheriff McGuffey was not involved in that process

---

[1] Complaint at ¶40

[2] The facts recited in the Summary of the Argument rely upon the citations to the Record in Part III of this Motion. See Infra, Part III.

or decision.  Jason Davis asked to meet with Gramke and Sheriff McGuffey.  Jason Davis planned to record that meeting, and he used a recording device that looked like a pen to effectuate his plan. Jason Davis expressed his concerns in the meeting.

Sheriff McGuffey told a vague anecdotal story about a former, lazy roommate, and she vaguely suggested that Davis rid himself of others who may hold him back in life. Jason Davis argues that Sheriff McGuffey's story was meant to imply that Jason Davis needed to divorce his wife.  Sheriff McGuffey testified she did not intend to imply that Jason Davis should divorce his wife, and she was instead referring to malcontents within the County.   Regardless of that disagreement, Jason Davis does agree that the Defendants told him that he did good work, and that they wanted him to stay with the County at the end of the meeting.  Jason Davis also testified that he did not believe that the Defendants intended to make him quit.

Jason Davis told his wife, Jennifer Davis, about the meeting when he returned home. Jennifer Davis told Davis that she could "no longer support" him if he stayed with the County. Davis admitted that it was Jennifer Davis's threat to withhold her marital support that "started the process" of Jason Davis beginning to look for employment elsewhere.  Jennifer Davis then wrote a confrontational email to the Defendants immediately after the meeting in which she called Jay Gramke and Sheriff McGuffey incompetent.  Jennifer Davis never felt that she could not continue to criticize the Defendants at any time, and she had no intent to stop.  Indeed, in Jennifer Davis's own words "my husband knows I'm too stubborn."

Jason Davis's work conditions were never altered after his meeting with the Defendants. Jason Davis was never disciplined.  Jason Davis was not reassigned to menial work.  The Defendants never told Jason Davis to leave.  The Defendants never bothered Jason Davis at all.  In fact, Jason Davis admits that he knew he was in no danger of losing his job, Defendants were not

trying to fire him, and the Defendants wanted him to stay. Jason Davis is right. The Defendants did want him to stay.

Nonetheless, Jason Davis resigned on January 30, 2024. It is common sense that Defendants had no power to end Plaintiffs' marriage or force them to divorce. Thus, behind the melodramatic accusations, Jason Davis quit because: (1) he believed he did not receive the RENU position because of Plaintiffs' online speech; and (2) his wife told him she would not support him if he stayed with the County.

The Defendants' potential liability was terminated as a matter of law the day Jason Davis quit his job to maintain Jennifer Davis's emotional support because employees cut off their economic damage when they resign from their positions. *King v. Lazer Spot, Inc*., No. 2:22-cv-2924, 2024 U.S. Dist. LEXIS 130708, at *31 (S.D. Ohio July 24, 2024). Further, employees are not constructively discharged merely because they did not get a promotion that they believe they were entitled to even when the denial of the promotion occurred for unlawful reasons. *O'Donnell v. Genzyme Corp*., No. 1:14-CV-01767, 2015 U.S. Dist. LEXIS 30036, *16 (N.D. Ohio Mar. 11, 2015); *Hall v. Associated Doctors Health & Life Ins. Co*., Nos. 92-5353, 92-5411, 92-5458, 1993 U.S. App. LEXIS 7568, at *11 (6th Cir. Mar. 29, 1993). Moreover, the Sixth Circuit has held that an employee must either prove that the employer intended to cause an employee to quit to support a constructive discharge claim, or that the employer was about to fire the employee. *Funk v. City of Lansing,* 821 F. App'x 574, 580-581 (6th Cir. 2020).

Here, Jason Davis testified under oath that he did not believe that Defendants had any intent to drive him away. Other than sensational interpretations of a vague story Jason Davis secretly recorded, Plaintiff only cites the denial of the RENU placement as an adverse employment action, as well as his own wife's pressure to leave the County. Davis cannot cite a single condition of his

employment that was abusive or oppressive after his meeting. Nothing changed about his job after he met with Jay Gramke and Sheriff McGuffey. Even after Jennifer Davis sent her email where she calls the Defendants incompetent, the Defendants did not take one single employment action against Jason Davis to punish him in the three months he remained with the County. If Jason Davis felt his loss of the RENU position was unlawful, he had the option to stay with Hamilton County and file this Action while still protected under his collective bargaining agreement. No reasonable person would quit a job and walk away from a pension when he knew he was in absolutely no danger of losing that job or that pension.

Jason Davis wanted to quit, and Jennifer Davis wanted him to quit, so Jason Davis quit. Consequently, the Defendants' potential liability ended the day Jason Davis quit, and all Defendants are immune from all the Plaintiffs' alleged economic damages after January 30, 2024. This Partial Motion for Summary Judgment will establish the following:

1. Defendants are immune from liability for Plaintiffs' claims for economic damages after Jason Davis resigned on January 30, 2024, because Jason Davis is the actual cause of all his alleged economic damage. *Lazer Spot*, Inc., 2024 U.S. Dist. LEXIS 130708, at *31.

2. Defendants are entitled to summary judgment against Plaintiffs' constructive discharge claims under Count I because Plaintiffs: (a) have no evidence that Defendants took any action against Jason Davis with the *intent* to cause him to quit; (b) Jason Davis admitted that Defendants were not trying to terminate him; and (c) failures to promote an employee are not a "constructive discharge" as a matter of law. *Laster v. City of Kalamazoo*, 746 F.3d 714, 728 (6th Cir. 2014).

4

3. Defendants are entitled to summary judgment against Plaintiffs' First Amendment association claims under Count I because their association claims are duplicative of their First Amendment retaliation claims. *Henley v. Tullahoma City Sch. Sys.,* 84 F. App'x 534, 543-4 (6th Cir. 2003).

4. Plaintiff Jennifer Davis lacks standing because she suffered no adverse actions, her alleged damages claims are collateral, her speech was never chilled, and her association claims are duplicative of Plaintiffs' First Amendment retaliation claims. *Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 416, 133 S. Ct. 1138, 1151 (2013).

This Court should grant Defendants' Partial Motion for Summary Judgment because Plaintiffs' claims fail as a matter of law.

## III.     BACKGROUND INFORMATION

### A.  Gramke denied Jason Davis's advancement in the past because he believed Jason Davis did not exhibit proper character.

Jason Davis began working for the County in 2002 as a corrections officer. (Doc#23, Jason Davis Depo. at 12).  Davis then moved to his position as a patrol deputy in 2014. (Id.)  Deputies in the Hamilton County Sheriff's Department are part of a collective bargaining unit, and their terms and conditions of employment are dictated under a collective bargaining agreement ("Union Agreement") (Id. at 28; Exhibit 1).

Davis first applied for assignment to the Regional Enforcement Narcotics Unit ("RENU") in 2018. (Doc#23, Jason Depo. at 84). RENU's qualifications demand that agents exhibit responsibility and trustworthiness because of the highly sensitive nature of its operation.  During 2018, Chief Gramke was leading the RENU unit, and he interviewed Jason Davis. (Doc#24,

Gramke Depo. at 142). Gramke considered Davis as a malcontent in the Department, [3] and Gramke believed that Davis conducted himself in a manner that was overly cocky. (Id.) Gramke did not consider Davis to possess the requisite characteristics of a RENU applicant because Gramke did not consider Davis as a team player. (Id. at 145:6-21). Gramke decided to reject Davis's first application in 2018.

### B. Jennifer Davis engaged in online speech that degraded Hamilton County citizens.

Jennifer Davis is Jason Davis's wife. (Doc# 23, Jason Depo. at 10). When Sheriff McGuffey won her election, Jennifer Davis took offense with Sheriff McGuffey's Covid-19 safety policies and Sheriff McGuffey's sexual orientation. Jennifer Davis posted about Sheriff McGuffey in January of 2021 to express this discontent. (Exhibit 2). Jennifer Davis began her post stating that opinions are like "assholes," and that they "probably stink" unless "you are one of those weirdos that bleaches your asshole and does that colon cleanse thing." (Id.) Jennifer Davis then suggested that Sheriff McGuffey's priority of addressing Covid 19 safety to protect her deputies was somehow irresponsible. (Id.) Jennifer Davis claimed in the post that she was complaining because she was supportive of officer safety. (Id.) However, a deputy passed away from Covid only weeks later in February of 2021. (Exhibit 3). That deputy was the only County officer to die in the line of duty that year. Therefore, Jennifer Davis publicly chastised Sheriff McGuffey for prioritizing the only cause of death among deputies in 2021. Jennifer Davis did not delete this post after the deputy's death, and she is not concerned whether it upsets other deputies at the County. (Doc# 25, Jennifer Davis Depo. at 40).

---

[3] A "malcontent" is a term the Sheriff's Office used to describe a deputy who frequently complains and is generally negative in the department. All Parties agree the term has existed within the County for a long time, and its historical roots predate Sheriff McGuffey's leadership by many years.

Jennifer Davis also suggested people only elected Sheriff McGuffey because they wanted to see a "gay woman" advance to Sheriff. (Exhibit 2). Jennifer Davis referred to any person who supports advancing a gay woman in this manner as a "twatwaffle." (Id.) Jennifer Davis defines as "twatwaffle" as an "idiot." (Doc#25, Jennifer Depo. at 34: 9-10). Thus, Jennifer Davis publicly stated that Hamilton County citizens who desire seeing gay women advance to positions of leadership are idiots.

### C. Jason Davis made inaccurate public statements on Facebook about the Department.

In 2021, Davis was organizing a football event called, "Remember the Fallen" (the "Event"). Davis did not discuss the Event with Sheriff McGuffey or Chief Gramke to see if the County would support the Event. Instead, Davis only sent an administrative assistant a single message through Facebook Messenger. (Doc# 23, Jason Depo at 72: 10-18). McGuffey never received the message from the assistant, so she had no knowledge of the event, and did not have the opportunity to choose whether to support the Event. (Doc #26, McGuffey Depo. at 118-9). Davis was never told that Sheriff McGuffey or Gramke received the message, so he was never told they refused to support the Event. (Doc#23, Jason Depo. at 74). Jason Davis put flyers for the Event on bulletin boards. Jason Davis had no information that the Defendants ever instructed anyone to remove his flyers from those boards. (Id. at 76: 15-22). Nonetheless, Jason Davis later publicly claimed that the Defendants did not support his Event, and the Defendants tore his flyers down from briefing rooms. (Exhibit 4). These statements were not true. The County's leadership was never aware of the Event, so the County did not reject supporting the Event.

### D. Gramke rejected Davis's second application for RENU because he still believed Davis was a malcontent.

Jason Davis again sought placement on RENU in the beginning of 2023. Lt. Matt Guy ("Guy") was the RENU operations commander in 2022 and 2023. (Matt Guy Affidavit ¶4). After

Jason Davis applied for RENU placement, Guy attended a supervisor's retreat at Hard Rock Casino. (Id. at ¶7). When he was there, Gramke asked Guy how the RENU process was proceeding. (Id.). Guy told Gramke that it looked like Jason Davis "would be" the top choice. (Id. at ¶8). Jason Davis's appointment to RENU was not final at this time, he was never assigned any cases, and he never became part of RENU. (Id. at ¶¶12-13). Gramke told Guy that he did not want Jason Davis on RENU because Gramke believed Jason Davis was a malcontent. (Id. at ¶9). Gramke largely based his decision to reject Jason Davis's RENU placement based on his experiences with Jason Davis that occurred years earlier in 2018. (Doc# 24, Gramke Depo. at 145:22-25). Because Gramke still believed Davis was a malcontent, and Davis was not excited about the department, he did not want Davis appointed to RENU. (Id. at 150:7-10).

### E. Sheriff McGuffey was not involved in Davis's RENU rejection.

There is no evidence that Sheriff McGuffey denied Davis's application for RENU to retaliate against any of Plaintiffs' speech. Instead, the record reflects that Sheriff McGuffey did not even know that Jason Davis applied for a RENU position until many months afterwards. (Id. at 115:14-24). Current Chief Deputy Chris Ketteman ("Ketteman") was the Patrol Division Commander during 2023, so he oversaw RENU in that capacity.[4] (Ketteman Affidavit at ¶4). Ketteman was involved in Jason Davis's RENU application process. (Id. at ¶¶4-5). Ketteman has testified that Sheriff McGuffey was not involved in the RENU application process or the decision to reject Jason Davis's RENU application. (Id. at ¶13). Gramke testified that he did not tell Sheriff McGuffey that he decided to reject Davis's RENU placement until long after it had already happened. (Doc# 24, Gramke 154: 15-22). Additionally, Sheriff McGuffey had no personal

---

[4] Defendant Jay Gramke is retired from the County. Chris Kettemen has replaced Gramke as the Chief Deputy.

knowledge about Jennifer Davis's posts online before Gramke rejected Davis's RENU application. (Doc #26, McGuffey Depo. at 239: 7-9; 247: 19-24). Jason Davis's testimony shows he has no knowledge that Sheriff McGuffey had any actual involvement in his RENU rejection other than his own speculation. (Doc# 23, Jason Depo. at 174).

### F. Jason Davis met Sheriff McGuffey and Gramke in October of 2023, so he could secretly record them.

Jason Davis requested a meeting with Sheriff McGuffey and Gramke in October of 2023, so he could secretly record the Defendants. Jason Davis did not inform Sheriff McGuffey or Jay Gramke he was going to record them. (Id. at 121: 8-16). Both Plaintiffs were aware Jason Davis planned to record the meeting. (Id. at 123: 3-5). Before the meeting, Jason Davis bought a recording device that looked like a pen to record his conversations with the Defendants. (Id. at 126-127). Up until the day of the meeting, Sheriff McGuffey was not aware of Jason Davis's RENU rejection or involved in the rejection. (Doc#24, Gramke Depo. at 115:14-24; 154: 15-22; Ketteman Affidavit at ¶13). During the meeting, Gramke talked to Jason Davis about the RENU position. Although there was some discussion about Jennifer Davis's posts, Jason Davis was informed that Jennifer Davis was entitled to say what she wanted to say. (Complaint at ¶35). During this meeting, McGuffey and Gramke never threatened to terminate Jason Davis. (Doc# 23, Jason Depo. at 189:5-7).

### G. Defendants did not want Plaintiffs to divorce.

The Defendants never desired Jason Davis to divorce his wife, and Plaintiffs are simply misconstruing vague anecdotes. During the October meeting, Sheriff McGuffey merely told an off-the-cuff story about a lazy "roommate." (Doc# 24, Gramke Depo. at 202:20-23). Sheriff McGuffey was not even in a romantic relationship with the roommate in the story, let alone married to the roommate. (Doc #26, McGuffey Depo. at 57). Sheriff McGuffey suggested that Jason

Davis cut loose "people" who were holding him back in life. (Doc# 23, Jason Depo. at 182:7-9). "People" is a plural noun that could theoretically mean a lot of individuals, but it does not in any way refer to a *single* individual because "people" is not a singular noun. Sheriff McGuffey was referring to Jason Davis's involvement with deputies in the Anderson office, who were complaining about the County's beard and vest policies. (Doc# 24, Gramke Depo. at 202: 17-19; 205:4-9). Sheriff McGuffey was not referring to Jennifer Davis, and she never intended to imply that Jason Davis should divorce his wife. (Doc# 26, McGuffey Depo. at 130).

Indeed, nobody ever expressly told Jason Davis that he needed to divorce his wife in the meeting. (Doc# 23, Jason Depo. at 183-185). Jason Davis never bothered to ask Sheriff McGuffey to clarify what she meant by her vague statements or whether she intended to instruct him to divorce his wife. (Id.) Instead, Jason Davis admitted in deposition that he is basing his allegations merely on his interpretation of potential implications. (Id. at 194:15-20). Plaintiffs just assumed the worst potential interpretation about a vague, impromptu story from Sheriff McGuffey because of Plaintiffs' animosity towards Sheriff McGuffey.

### H. Davis resigned on January 9, 2024, before a corporal position was available for him.

Jason Davis resigned on January 9, 2024. To qualify for a corporal position, deputies need to take a test. (Exhibit 1 at 19-20). After deputies take the test, a ranking list is released. These test results lasted for two years. When a corporal position opens during that period, the next three deputies on the list are then considered for that corporal position. (Id.) When Jason Davis's test results came out in January of 2023, he placed nineteenth, which was in the lower half of rankings. (Ketteman Affidavit at ¶¶6-7). When Jason Davis quit the County, his nineteenth ranking was never in contention for a promotion. (Id. at ¶8). Consequently, it was never Jason Davis's turn to receive a corporal promotion while he was still employed in the County. (Id.) Moreover, current

10

Chief Deputy Ketteman has testified that if Jason Davis had remained with the County, he likely would have received the next open corporal position. (Id. at ¶9). Therefore, Defendants never actually denied Jason Davis a promotion to corporal, and it is Jason Davis's fault that he was not a corporal in Hamilton County when he filed this suit.

## I. Defendants did not intend for Jason Davis to quit.

Jennifer Davis made her degrading online comments in January of 2021. Jason Davis made his comments about the Football Event in May of 2022. Jason Davis met with McGuffey and Gramke on October 10, 2023. After the meeting, Jason Davis was never demoted. (Guy Affidavit at ¶12). Jason Davis was not reassigned to a worse position. (Doc#23, Jason Depo. at 208-210). Nobody badgered Jason Davis. (Id. at 207: 13-15). The terms and conditions of Jason Davis's employment were not altered. (Id. at 208-210). Nobody told Jason Davis they wanted him to leave, yet he resigned on January 30, 2024. (Id. at 210: 10-15).

The Union Agreement requires that Defendants follow a progressive disciplinary process to terminate any deputy. (Id. at 188: 12-15). Specifically, Defendants would have needed to begin using warning procedures to take steps to eventually terminate Davis. Before Defendants could terminate Jason Davis, Defendants would have to provide Jason Davis with a hearing to challenge any termination. (Id. at 188: 16-19). Defendants did not take a single step towards engaging in any termination process.

In his deposition, Jason Davis expressly admitted that he had no fear that he was facing termination, and he did not have any feeling that Defendants intended to fire him.

> **Q**. Did you think that they were going to fire you?
>
> **Jason Davis**. No. I just thought they weren't going to promote me.
>
> (Id. at 189: 8-10).

***

11

**Q**. Did you think they were going to fire you if you stayed married?

**Jason Davis**. No.

       (Id. at 189: 18-20).

***

**Q**. Okay. And you don't think that you're going to be fired because you're married?

**Jason Davis**. No.

       (Id. at 191:4-6).

***

**Q**. Okay. So you're not aware of them taking any steps or having any intent to fire you before you left?

**Jason Davis**. No.

       (Id. at 211:10-13) (Emphasis added).

***

**Q**. At any point during the meeting did Jay Gramke tell you that he wanted you to quit?

**Jason Davis**. To quit, no.

**Q**. At any point during the meeting did Sheriff McGuffey tell you she wanted you to quit?

**Jason Davis**. No. They both said great things about my work performance and how well and how good of an officer I am in my reviews and that ***_they wanted me to stay_***.

       (Id. at 199: 1-9) (Emphasis added).

Therefore, the record exhibits that: (1) Defendants did not want Jason Davis to quit; (2) Defendants did not take a single step to fire Jason Davis; (3) Jason Davis did not believe Defendants were trying to fire him; and (4) Jason understood that Defendants wanted him to stay with the County. In reality, the only person who wanted Jason Davis to quit was Jennifer Davis.

12

**J. Jennifer Davis is the only person who conditioned Plaintiffs' marriage upon Jason Davis's employment decisions.**

Plaintiffs' Complaint expressly states that Jennifer Davis told Jason Davis that she "**could no longer support him if he stayed at the Sheriff's Office**." (Complaint at ¶40) (emphasis added). In deposition, Jason Davis confirmed Jennifer Davis's statements.

> **Q**. So she expressly told you she can no longer support you if you stayed there?
>
> **Jason Davis**. Correct.
>
> (Doc# 23, Jason Depo. at 198:10-12).

> \*\*\*

> **Q**. When did you decide that you wanted to leave the department?
>
> **Jason Davis**. I -- honestly I can't recall.
>
> **Q**. Was it when Jennifer told you that she couldn't support you any longer?
>
> **Jason Davis**. That started the process.
>
> (Id. at 200: 14-19)

> \*\*\*

> **Jason Davis**. Correct. Well, yes and no. I really did not know how I was going to continue to work there if my wife did not support me to work there.
>
> **Q**. Okay. So it wasn't that you believed that McGuffey or Gramke would fire you, you believed that you couldn't continue to be a patrol officer because you don't know how you could do that if your wife wouldn't support you as a husband continuing to work as a patrol officer, correct?
>
> **Jason Davis**. Correct. . .
>
> (Id. at 201: 20-25 – 202: 1-4).

Therefore, Jennifer Davis threatened to no longer support Jason Davis's employment with the County, and it was Jennifer Davis's ultimatum that led to his eventual resignation. In contrast,

13

Jason Davis understood that Sheriff McGuffey and Jay Gramke wanted him to stay and had no intention of firing him. (Id. at 199: 1-9).

### K. Jennifer Davis suffered no damage, and Defendants never intruded in Plaintiffs' marriage.

Plaintiffs are still married. Defendants have no legal authority to end Plaintiffs' marriage. The Plaintiffs' entire association claim is based upon allegations that Defendants retaliated against Jennifer Davis's online speech. (See Complaint, *generally*). Plaintiffs do not suggest that Defendants otherwise wanted to intrude on their marriage or even cared about the nature of their marriage. (Id.) Simply stated, Plaintiffs' association complaints are little more than duplicative allegations of retaliation against their online speech. (Id.)

In addition, Jennifer Davis suffered no personal employment actions according to Plaintiffs' own Complaint. (Id.). Jennifer Davis has made her own decisions not to work full-time, so she cannot claim that Defendants have caused her to lose any employment opportunities.[5]

None of the Defendants' actions or statements in the October meeting interfered with Jennifer Davis's ability to speak freely. Jennifer Davis admitted that she was too "stubborn" to stop criticizing the Defendants and engaging in online speech.

> **Q**. Did it affect -- when you heard that, did it affect your social media behavior at all?
>
> **Jennifer Davis**. I don't believe so.
>
> **Q**. When you heard that, did you come to the conclusion that you wouldn't post any more critical things any longer?

---

[5] Jennifer Davis Depo at 90-91. Jennifer Davis attempted to claim she could not seek full-time employment because of the Defendants. However, Jennifer Davis was already not employed full-time for quite some time before Jason Davis left the County. Jennifer Davis admitted that the real reason she did not seek full-time employment was because she needed to care for Plaintiffs' dog, which has cancer. Defendants are not the reason Jennifer Davis is not seeking full-time employment. Jennifer Davis's claims concerning her own financial damages are simply not actionable.

14

**Jennifer Davis**. No. My husband knows I'm too stubborn.

(Doc# 25, Jennifer Depo. at 64: 16-22).

Immediately after the October 2023 meeting, Jennifer Davis sent a scathing email to Gramke, where she aggressively scolded both Gramke and Sheriff McGuffey. (Exhibit 5).  After receiving Jennifer Davis's angry email, Defendants did not mention Jennifer Davis's email to Jason Davis, and they took no adverse action against Jason Davis. (Doc. #24, Gramke Depo. at 209-210).  Jennifer Davis was never silent because of the Defendants' actions.

## IV.    LAW AND ARGUMENT

Summary judgment is appropriate when the record reveals that there is no genuine issue as to any material fact, and the moving party is entitled to a judgment as a matter of law.  *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014).  The question is whether there is a factual dispute appropriate for a jury, or if the case is so one-sided that the moving party should prevail as a matter of law.  *Id.*  The moving party bears the burden of showing the absence of material of fact for at least one essential element of the plaintiff's claim.  *Id.*  Once a defendant meets its burden, the plaintiff must "show specific facts that reveal a genuine issue for trial."  *Id.*

A prima facie case of First Amendment retaliation requires that an employee establish that: "(1) he engaged in constitutionally protected speech or conduct; (2) the employer took an adverse action against him that would deter an ordinary person from engaging in that conduct; and (3) the protected speech was a substantial or motivating factor in the adverse action."  *Funk v. City of Lansing*, 821 F. App'x 574, 581 (6th Cir. 2020).  If the employee establishes a prima facie case, the burden then shifts to the employer to demonstrate that the employer would have made the same employment decision absent the protected conduct.  *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012).

A district court considering a claim of qualified immunity "must first determine whether the individual claiming the immunity committed a constitutional violation." *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004). If an individual officer has not committed a constitutional violation through her actions, then there is no need for further inquiry regarding qualified immunity. *Id.* A plaintiff must also establish that the claimed constitutional violation was based upon "active unconstitutional behavior." *Id.* Thus, public officials are not liable for the actions of other officials within the government. *Id.*

Defendants are entitled to partial summary judgment because (1) Plaintiffs' economic damages against all Defendants are tolled and cutoff as a matter if law; (2) Plaintiffs' constructive discharge claim fails against all Defendants as a matter of law; (3) Plaintiffs' association claim fails as a matter of law against all Defendants; and (4) Jennifer Davis has no standing.

## A. Defendants are immune from Plaintiffs' alleged economic damage after Davis's resignation.[6]

Employers are only potentially liable for economic damage resulting from their employment decisions. *Lulaj v. Wackenhut Corp.*, 512 F.3d 760, 767 (6th Cir. 2008). However, employers are not liable for the economic damage an employee causes himself. *Id.* Therefore, as a matter of law, an employer is not liable for an employee's economic damages after he voluntarily quits his job. *Id.*

In a First Amendment retaliation case in the Southern District of Ohio, Judge Barrett held that "**if an employee voluntarily quits her job, her back pay is tolled as a matter of law.**" *Edelstein v. Stephens*, 2024 U.S. Dist. LEXIS 35217, *12 (S.D. Ohio 2024). In *Edelstein*, a Jewish public employee sued a judge in Butler County for First Amendment retaliation, and she alleged

---

[6] Because Count I and II both rely on the same transaction and events, Plaintiffs cannot recover any economic damages for backpay, benefits, or front pay after Jason Davis's resignation

that the judge retaliated against because she requested off for the High Holidays. *Id.* After a trial, the jury awarded the employee back pay for her First Amendment retaliation. This Court reduced the employee's back-pay damages because it determined the employee caused her own economic loss when she resigned from her subsequent position in another county. *Id.* Thus, as a matter of law, the judge was not liable for the employee's own self-inflicted economic damages related to her First Amendment retaliation claim. This holding is consistent with other cases in the Sixth Circuit, where courts have cut off economic damages as a matter of law when employees quit.

For example, in *Lujaj*, the trial court reduced the jury award because it determined that the employee's resignation terminated her front pay, and it tolled her back pay as a matter of law. *Lulaj*, 512 F.3d at 767. On appeal, the Sixth Circuit held that for an employee to recover back pay for lost wages beyond the date of her resignation, she must establish that she was constructively discharged. *Id.* The employee in *Lujai* failed to establish she was constructively discharged, so the Sixth Circuit determined that the "district court was correct to reduce, as a matter of law, the jury award for front pay to zero to conform to its finding of no constructive discharge." *Id. See also*, *King v. Lazer Spot, Inc.*, No. 2:22-cv-2924, 2024 U.S. Dist. LEXIS 130708, at *31 (S.D. Ohio July 24, 2024) (where this Court held that an employer was not liable for the employee's damages as a matter of law because the employee quit and was not constructively discharged); *Funk v. City of Lansing*, No. 1:17-cv-514, 2021 U.S. Dist. LEXIS 232090, at *6 (W.D. Mich. Sep. 24, 2021) (granting a motion in limine foreclosing economic damages beyond the date of the employee's resignation); *Mitchell v. Runyon*, Case No. 94-CV-70084-DT, 1996 U.S. Dist. LEXIS 7984, at *24-25 (E.D. Mich. Apr. 30, 1996) (holding that an employee was not entitled to any damages because she voluntarily resigned from her position); *Parish v. Consol. Freightways Corp.*, Civil No. 3:01-CV-0269-H, 2002 U.S. Dist. LEXIS 1908, at *4-5 (N.D. Tex. Feb. 6, 2002) (holding

an employee was not entitled to "post-resignation" damages because he could not establish a constructive discharge). Furthermore, other circuits have held that employees cannot recover economic damages after the date of their resignations. See *Derr v. Gulf Oil Corp.*, 796 F.2d 340, 343 (10th Cir. 1986) (permitting the plaintiff to recover damages prior to, but not after, resignation); *Boehms v. Crowell*, 139 F.3d 452, 461 (5th Cir. 1998) (the plaintiff could not recover back pay "beyond the date of his retirement").

Simply stated, it is blackletter law that an employee cuts off his post-termination back-pay damages, front pay damages, and other employment economic damages when he voluntarily quits his job. Here, Jason Davis did precisely that. He quit on January 30, 2024, so he is responsible for his own economic damage after that point as a matter of law under both Counts I and II. Jason Davis severed all his backpay claims when he resigned. Jason Davis cut off his front pay claims when he resigned. Jason Davis cut off his claims for retirement benefits and his pension when he resigned.

**B. Plaintiffs' claims for constructive discharge against all Defendants fail as a matter of law, so all Defendants are immune from those claims.**

Defendants did not terminate Jason Davis. Jason Davis quit. A constructive discharge only occurs where an employer makes working conditions so unbearable that an employee is forced to resign. *Funk*, 821 F. App'x at 580. To prove a constructive discharge, an employee must establish both of the following: (1) that the employer deliberately created what a reasonable person would consider intolerable working conditions; and (2) that "**the employer did so with the intention of forcing the employee to quit**." *Id.* (emphasis added). Consequently, it is not enough to show that conditions were intolerable. The employee must also establish that the employer acted "with the specific intention" of forcing the employee to leave. *Id.* An employee can also attempt to establish

18

that the employer communicated that it was about to terminate him, and the "writing was on the wall that the axe was about to fall." *Id.* at 581.

In determining whether a reasonable employee would have felt compelled to quit his job, the Sixth Circuit has provided seven factors for courts to evaluate. *Laster*, 746 F.3d at 728. Courts should consider whether the employee: (1) was demoted; (2) suffered a reduced salary; (3) had his current duties reduced; (4) was reassigned to degrading or menial work; (5) was reassigned to work under a younger supervisor; (6) was badgered or harassed in a manner calculated to force him to quit; or (7) was offered early retirement. *Id.* Even when an employee presents some evidence consistent with these factors, he must still establish "this behavior was undertaken with the specific intention of forcing" the employee to quit. *Id.*

For example, in *Laster*, an emergency officer sued the City of Kalamazoo for race discrimination. *Id.* at 719. While still employed with the city, the employee was facing a pre-determination hearing concerning his potential termination. *Id.* at 724. The employee believed his termination was imminent, and he mistakenly believed he would not continue receiving health insurance during the union grievance process. *Id.* The employee quit before his hearing based on these beliefs. *Id.* The employee claimed constructive discharge, and the trial court dismissed his claim on summary judgment. *Id.* at 725. On review, the Sixth Circuit affirmed.

The court held that the employee presented "some evidence he was subjected to heightened scrutiny and treated differently than his non-minority peers." *Id.* at 728. However, the court still determined that the employee failed to present evidence that he suffered intolerable conditions, or that the employer took any action "with the specific intention" of making the employee quit. *Id.* Instead, the employee quit, relying on "bad information." *Id.* Moreover, the employee could not establish that it was apparent the "axe was about to fall." *Id.* The city never told the employee it

would terminate him before the hearing occurred. *Id.* at 728-9. Therefore, in the Sixth Circuit, harsh conditions alone are inadequate to show constructive discharge unless the employee establishes either the employer's intent to cause an employee to quit, or that the employer was about to fire the employee. *See also*, *Funk*, 821 F. App'x at 581-2 (where an employee's constructive discharge claim failed because he could not show that the employer had any intention of causing him to quit, and it never informed the employee it would terminate him before the employee quit).

Here, Plaintiffs have no evidence establishing a constructive discharge. Defendants never intended to force Jason Davis to quit, and Jason Davis admitted in his deposition that he did not even believe Defendants wanted him to quit.

1. Plaintiffs cannot establish that Jason Davis suffered any of the Sixth Circuit's factors to establish intolerable working conditions.

The record confirms the following: (1) Defendants did not demote Davis (Guy Affidavit at ¶12); (2) Defendants did not reduce Jason Davis's salary (Doc# 23, Jason Depo. at 207: 18-20); (3) Davis's duties were not reduced (Id. at 209); (4) Defendants did not reassign Davis to degrading or menial work (Id. at 210: 4-6); (5) Davis was not reassigned to work under a different supervisor after his meeting with Defendants (Id. at 209); (6) McGuffey and Gramke did not interact with Davis or badger him (Id. at 207: 13-15); and (7) Defendants did not suggest that Davis should retire early or otherwise leave the County (Id. at 210: 10-15). Plaintiffs cannot even establish one of the seven factors exhibiting intolerable working conditions as articulated under *Laster*, 746 F.3d at 728.

2. A failure to promote argument cannot support a claim for constructive discharge.

Courts within the Sixth Circuit have held that failures to promote employees do not support a claim for constructive discharge. For example, in *O'Donnell v. Genzyme Corp.*, No. 1:14-CV-

01767, 2015 U.S. Dist. LEXIS 30036, at *16 (N.D. Ohio Mar. 11, 2015), the court applied a constructive discharge analysis to an employment claim for violation of public policy under common law. The court there held that other alleged forms of retaliation, such as "nonpromotion, do not suffice" to establish constructive discharge. *Id.* The court reasoned that part of an employee's "obligation to be reasonable is an obligation **not to assume the worst**, and **not to jump to conclusions too fast**." *Id.* (emphasis added). *See also*, *Hall v. Associated Doctors Health & Life Ins. Co*., Nos. 92-5353, 92-5411, 92-5458, 1993 U.S. App. LEXIS 7568, at *11 (6th Cir. Mar. 29, 1993) (holding that while a denial of a promotion is disappointing, it is not "grounds for a reasonable person to resign or something which an employer reasonably should have foreseen would lead the employee to that point."); *Davis v. Pioneer Screw & Nut Co*., 706 F. Supp. 547, 549 (E.D. Mich. 1989) (holding that the denial of promotions cannot support a constructive discharge claim even when the employee alleged the promotions were previously promised to her); *Harris v. Postmaster Gen.,* No. 5:05-cv-1611, 2006 U.S. Dist. LEXIS 41038, at *13 (N.D. Ohio June 20, 2006) (holding that claims that an employee was rejected for promotions could not support a claim for constructive discharge when an employee cannot show a material change in her working environment).

In this case, Jason Davis claims that he quit because he believed he would not receive a promotion so long as he was married to Jennifer Davis. Clearly, Defendants have no power to end Plaintiffs' marriage. This is not a matter Plaintiffs can contest. Defendants only had the power to either provide or deny Jason Davis a promotion. Because Jason Davis's fears of future rejection cannot support a constructive discharge, his claim fails as a matter of law.

21

3. <u>Plaintiffs cannot present any evidence that Defendants took any action with the intent of forcing Jason Davis to quit.</u>

As stated above, a plaintiff must establish it was the employer's intent to force the employee to **quit**, not to get "divorced." *Laster, 746 F.3d at 728, see also*, *Funk*, 821 F. App'x at 580 (holding that an employer must act with the specific intent to cause an employee to quit to establish a constructive discharge claim). According to the far-fetched allegations in Plaintiffs' Complaint, they only really argue that Defendants wanted Jason Davis to divorce his wife in exchange for advancement. However, it would not matter if the Defendants signed a confession that they wished Jason Davis would divorce his wife. Plaintiffs here *must* establish that Defendants "intended" to cause Jason Davis to "quit." Jason Davis admitted in his deposition that Defendants had no such intent. Instead, Jason Davis testified that he was fully aware that Defendants were not trying to terminate him, and that they actually wanted him to stay with the County.

**Q**. Did you think they were going to fire you if you stayed married?

**Jason Davis**. No.

(Doc# 23, Jason Depo. at 189: 18-20).

\*\*\*

**Q**. Okay. So you're not aware of them taking any steps or having any intent to fire you before you left?

**Jason Davis**. No.

(Id. at 211:10-13) (Emphasis added).

\*\*\*

**Jason Davis**. No. They both said great things about my work performance and how well and how good of an officer I am in my reviews and that ***they wanted me to stay***.

(Id. at 199: 1-9) (Emphasis added).

Conversely, Jennifer Davis expressly told Jason Davis that she "**could no longer support him if he stayed at the Sheriff's Office**."  (Complaint at ¶40) (Emphasis added).

> **Q**. So she [Plaintiff Jennifer Davis] expressly told you she can no longer support you if you stayed there?
>
> **Jason Davis**. Correct.
>
> (Id. at 198:10-12).

***

> **Q**. Okay. So it wasn't that you believed that McGuffey or Gramke would fire you, you believed that you couldn't continue to be a patrol officer because you don't know how you could do that if your wife wouldn't support you as a husband continuing to work as a patrol officer, correct?
>
> **Jason Davis**. Correct. . .
>
> (Id. at 201: 20-25 – 202: 1-4).

Because Jason Davis expressly admitted that he believed the Defendants had no intent to make him quit, his constructive discharge claim fails according to his own testimony.

    4.  <u>There is no evidence that Defendants were about to terminate Jason Davis.</u>

Jason Davis knew his job was in no danger of termination.  An employee can attempt to establish a constructive discharge claim when he can exhibit that his termination was imminent. *Funk*, 821 F. App'x at 581. However, the Plaintiff must show that the "axe was about to fall." *Id.* Here, the axe was not about to fall.  The Defendants did not even walk to the tool shed. Defendants are required to follow a detailed progressive discipline process under the Union Agreement. Defendants never engaged in a single step of the progressive discipline process, and Jason Davis testified that he knew he was not facing termination before he quit.

> **Q**. Okay. So you're not aware of them taking any steps or having any intent to fire you before you left?
>
> **Jason Davis**. No.

23

**Q.** Okay. So a little bit about the collective bargaining agreement. You would agree that if Sheriff McGuffey or Jay Gramke had any intent to terminate you, they would have had to take some active step, correct?

**Jason Davis**. Correct.

(Jason Davis Depo. at 211: 10-19).

Plaintiff cannot convincingly avail himself of a constructive discharge claim when no steps were taken to terminate him, and he had ample protection from a structured progressive discipline process. *See Silverman v. City of N.Y.*, 216 F. Supp. 2d 108, 116 (E.D.N.Y. 2002) (concluding that the fact an employee "could have sought a hearing before being terminated eviscerates his claim that threats of termination created an "intolerable" situation which left him with no other choice than resignation); *Stembridge v. City of N.Y.*, 88 F. Supp. 2d 276, 285 (S.D.N.Y. 2000) (holding that there was no constructive discharge when an employee did not pursue a hearing available under a union agreement).

Sheriff McGuffey and Jay Gramke are immune to Plaintiffs' constructive discharge claims because there is no evidence that Defendants intended to cause Jason Davis to quit or that Defendants were about to terminate him. The record merely reflects that Jason Davis quit because his wife wanted him to quit.

**C. Plaintiffs' claims for First Amendment Association against all Defendants fail as a matter of law, so all Defendants are immune from those claims.**

Plaintiffs cannot maintain a First Amendment Association claim when it is duplicative of a First Amendment retaliation claim. *Ward v. Athens City Bd. of Educ.*, 1999 U.S. App. LEXIS 22766, No. 97-5967, 1999 WL 623730 (6th Cir. Aug. 11, 1999) (unpublished). In *Ward*, two sisters claimed they were denied re-admission to their elementary school because of their mother's complaints about the school. *Id.* The sisters alleged a First Amendment retaliation claim, and they alleged a freedom of association claim. *Id.* The Sixth Circuit reasoned that the freedom of

association claim required a showing that the school board's actions were an "undue intrusion" into the relationship between sisters and their mother. *Id.* Like the allegations in this case, the sisters' claims were not truly based on the school's interference with their family relationships, but their claims were instead based on the school's alleged "penalization of the blameless Ward girls on grounds of their association with their mother." *Id.* The Sixth Circuit concluded this claim was duplicative of the First Amendment retaliation claim. *Id.* The court further held that to maintain a separate claim based on freedom of association, the plaintiffs needed to show that the adverse action "would have been constitutionally impermissible even if the action" alleged "was itself warranted (that is, even if all motives were pure)." *Id.* Thus, the association claim must exist independently of the theory that the defendants' actions were intended to retaliate against speech.

The Sixth Circuit again came to this result in *Henley,* 84 F. App'x at 543-4. There, the Sixth Circuit held that students' association claims based on speech were unsupportable because the students could not show that "the alleged adverse actions they suffered would have been constitutionally impermissible even if Defendants had not had a retaliatory motive." *Id.* The court held that the alleged actions did not constitute a "direct and substantial" limitation on the students' associations. Instead, the students' allegations were only "collateral effects" of the defendants' "alleged intent to retaliate against protected speech." *Id.*, *citing*, *Lyng v. Castillo*, 477 U.S. 635, 638, 91 L. Ed. 2d 527, 106 S. Ct. 2727 (1986) (state action must "'directly and substantially' interfere" with familial associations to violate freedom of association).

Recently, the Sixth Circuit again held that this same standard applied to an employee's association claims against a county sheriff in *Harris v. Butler Cnty.*, 344 F. App'x 195, 200-01 (6th Cir. 2009). In *Harris*, when an employee argued that he was unlawfully retaliated against for his association with a sheriff's political critics, the Sixth Circuit struck down that argument. The court

wrote that the employee's "right of intimate association claim is properly characterized as duplicative of his retaliation claim rather than as a separate claim." *Id*., *citing*, *Henley*, 84 F. App'x at 543.

Here, the Plaintiffs only argue that their association was attacked because Defendants punished Jason's employment due to Jennifer Davis's speech. Plaintiffs' association claim is entirely duplicative of their claims concerning First Amendment speech retaliation. Plaintiffs do not advance that Defendants had any interest in Plaintiffs' marriage beyond their social media speech. Consequently, Plaintiffs' First Amendment Association claim fails as a matter of law.

**D**. **Plaintiff Jennifer Davis lacks standing for her claims.**

Jennifer Davis has not suffered a single concrete harm, whether actual or imminent, providing her standing in this action. A plaintiff only has standing when she has "suffered an injury in fact that is concrete, particularized, and actual or imminent." *Shelby Advocates for Valid Elections v. Hargett*, 947 F.3d 977, 980 (6th Cir. 2020). When a plaintiff cannot show that she has suffered actual harm, she must at least show that there is an imminent risk of harm. *Id.* Parties cannot "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper,* 568 U.S. 398 at 416. A plaintiff does not properly claim a substantial interference with association under the First Amendment when she bases her allegations on speech retaliation. *Henley*, 84 F. App'x at 543-44. Under those circumstances, her alleged damages are merely "collateral" and not actionable. *Id.*

Jennifer Davis's marriage was never disrupted. Plaintiffs are still married. Defendants do not even have governmental authority to invalidate Plaintiffs' marriage. Therefore, an actual interference in Plaintiffs' marriage was neither actual nor imminent, and Plaintiff Jennifer Davis's association claims fail because she merely duplicated Plaintiffs' speech retaliation claims.

Regarding Jennifer Davis's speech retaliation claims, she suffered no concrete harms.  Jennifer Davis did not work for the Defendants.  Jennifer Davis was not denied a promotion.  Jennifer Davis was not terminated from Defendants' employment.  Defendants also did not deny Plaintiff Jennifer Davis the ability to speak.  Indeed, just several days after Jason Davis met with Sheriff McGuffey and Jay Gramke in October of 2023, Jennifer Davis sent Jay Gramke a very aggressive email. (Exhibit 5).  Jennifer Davis's speech was never chilled.

Additionally, Jason Davis had already quit before Plaintiffs filed this Action, so Defendants had no power to chill Jennifer Davis's speech at all when this Action was filed, so those claims were already moot.  *Resurrection Sch. v. Hertel*, 35 F.4th 524, 528 (6th Cir. 2022).

## V.    CONCLUSION

Defendants Hamilton County and Jay Gramke are entitled to partial summary judgment because (1) Plaintiffs caused their own economic damage; (2) Plaintiffs' constructive discharge claim fails against all Defendants as a matter of law; (3) Plaintiffs' association claim fails as a matter of law against all Defendants; and (6) Jennifer Davis has no standing.  Accordingly, Defendants Hamilton County and Jay Gramke respectfully request that this Court grants their Partial Motion for Summary Judgment.

Respectfully submitted,

CONNIE PILLICH
PROSECUTING ATTORNEY
HAMILTON COUNTY, OHIO

/s/*Matt Miller-Novak*
Matt Miller-Novak, 0091402
Stephen A. Simon, 0068268
Andrew E. Prem, 100861
Assistant Prosecuting Attorneys
Hamilton County, Ohio
230 E. Ninth Street, Suite 4000
Cincinnati, OH 45202
DDN:  (513) 946-3219 (Miller-Novak)
DDN:  (513) 946-3289 (Simon)
DDN:  (513) 946-3285 (Prem)
FAX:  (513) 946-3018
*TRIAL ATTORNEYS FOR DEFENDANTS*

## CERTIFICATE OF SERVICE

I certify that this Motion for Summary Judgment was served on Plaintiffs' Counsel using this Court's electronic filing system on this 20th day of October 2025.

*/s/ Matt Miller-Novak*

28