IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT CINCINNATI

JASON DAVIS and            :
JENNIFER DAVIS,
                           :
        Plaintiffs,
vs.                        :   Case No. 1:24-cv:0202

CHARMAINE McGUFFEY, et al., :

        Defendants.        :

* * * * * * * *

DEPONENT:          Jason Davis

DATE:              May 6, 2025

* * * * * * * *

Kristina L. Laker

Court Reporter

BARLOW REPORTING & VIDEO SERVICES, LLC
620 Washington Street
Covington, Kentucky 41011
(859) 261-8440

The deposition of JASON DAVIS taken for the purpose of discovery and/or use as evidence in the within action, pursuant to notice, heretofore taken at the office of Chris Wiest, Attorney at Law, PLLC, 50 East Rivercenter Boulevard, Suite 1275, Covington, Kentucky, on May 6, 2025, at 9:00 a.m., upon oral examination, and to be used in accordance with the Federal Rules of Civil Procedure.

* * * * * * * *

APPEARANCES

REPRESENTING THE PLAINTIFFS:

Christopher Wiest, Esq.
CHRIS WIEST, ATTY AT LAW, PLLC
50 East Rivercenter Boulevard, Suite 1280
Covington, KY 41011

Zachary Gottesman, Esq.
GOTTESMAN & ASSOCIATES, LLC
9200 Montgomery Road
Building E, Suite 18B
Cincinnati, OH 45242

REPRESENTING THE DEFENDANTS:

Matt Miller-Novak, Esq.
Andrew E. Prem, Esq.
HAMILTON COUNTY PROSECUTOR'S OFFICE
230 East Ninth Street, Suite 4000
Cincinnati, OH 45202

ALSO PRESENT:  Peter Stackpole, legal liaison

Page 3

INDEX

Page

Cross-Examination by Mr. Miller-Novak:          4

EXHIBITS

Defendants' Deposition Exhibit No. 1          20

Defendants' Deposition Exhibit No. 2          81

Defendants' Deposition Exhibit No. 3          88

Defendants' Deposition Exhibit No. 4          136

Defendants' Deposition Exhibit No. 5          159

Defendants' Deposition Exhibit No. 6          215

Defendants' Deposition Exhibit No. 7          244

Defendants' Deposition Exhibit No. 7-A          245

Defendants' Deposition Exhibit No. 8          247

Defendants' Deposition Exhibit No. 9          253

Defendants' Deposition Exhibit No. 10          259

JASON DAVIS, of lawful age, as having been duly sworn, as hereinafter certified, was examined and testified as follows:

CROSS-EXAMINATION

BY MR. MILLER-NOVAK:

Q. All right. Could you please state your name for the record and spell it.

A. My name is Jason Davis. J-a-s-o-n D-a-v-i-s.

Q. Well, Jason, my name is Matt Miller-Novak. I'm not going to spell it, because she knows how to spell it. And I represent all of the defendants. And I work for the Hamilton County Prosecutor's Office.

So during the deposition how would you like me to refer to you, Mr. Davis, Jason; what would be your preference?

A. I don't have a preference. I'm fine.

Q. Okay. You can call me Matt. I'm a first name guy. My last name has two many syllables for people to be required to say. So Matt is fine. If you have any questions -- and then I'll probably call you Jason, if that's okay?

A. That's fine.

Q. We'll just do first names --

A. Okay.

Q. -- all right?

A. Uh-huh.

Q. All right. So I know that you've at least witnessed a couple of depositions in this case, correct?

A. Yes, sir.

Q. Okay. So I won't kind of labor what a deposition is here too much. But as you know, you are under oath, correct?

A. Yes, sir.

Q. And that I'm asking you questions and you're going to answer those questions and she's going to type out the answers, correct?

A. Yes, sir.

Q. So most of, you know, what we do in a deposition kind of has to do with that aspect of the record. So when I'm asking a question, please let me finish before you answer, okay?

A. Yes.

Q. And then I'll let you answer completely before I ask another question. And if I screw up and I cut you off, let me know, okay?

A. Yes.

Page 6

Q.   Secondarily, if we're going to say yes or no, we need to actually say yes or no, not uh-huhs or nuh-uhs; do you understand?

A.   Yes.

Q.   All right.  You already passed the test. Likewise, you know, a lot of these questions -- and to be completely transparent, I kind of have an outline here -- so a lot of these questions I'm going to come up with on the spot.  They might not be clear.  As much as I'd like to pretend I'm perfect, I'm not, okay?

A.   Yes.

Q.   If there's any reason you don't understand a question I've asked you, please let me know, okay; because if you answer a question, I'm going to assume that what you told me is the truth and gospel, understood?

A.   Yes.

Q.   Okay.  If you need to take a break for any reason today, that's fine, whatever the reason may be.  I don't even really care.  You've got to go to the bathroom, you want to talk to your attorney, you want to call and check on your dry cleaning, whatever it might be, just let me know, okay?

A.   Yes.

Q.   The only thing I ask if I have a question on the table, that you answer that question before we take a break, all right?

A.   Yes.

Q.   All right.  And I don't need to know what kind of medicine it is or anything at this point in time, but are you on any medication today or have any physical condition that would make your memory not functional or not exact?

A.   Just age.

Q.   Just age.  Fair enough.  But you don't have any diagnosed condition related to age that makes your memory -- or interferes with your memory?

A.   No, sir.

Q.   Just forgetting that you left your keys on top of the cabinet?

A.   Yes.

Q.   Okay.  Understand.  Great.  Do you have any initial questions for me, or are you ready?

A.   I am ready.

Q.   Okay.  So have you ever been deposed before, Jason?

A.   Deposed as in -- can you define deposed, like. . .

Q.   This is a deposition.

A.   I've never done a deposition.

Q.   Okay.  That's what deposed means.

A.   I gotcha.

Q.   Kind of like the verb version of what we're doing today.

A.   Gotcha.

Q.   Deposition is a noun.  Depose is a verb. So you've never been deposed before?

A.   No, sir.

Q.   Okay.  Have you ever testified in a trial?

A.   Yes, sir.

Q.   Okay.  That was your confusion?

A.   Yes.

Q.   So what type of trials have you testified in?

A.   I've done criminal.  And I did one for -- I guess it was like a civil suit for a car crash since I was the reporting officer.

Q.   Like a negligence claim?

A.   Yes.

Q.   And you were the reporting officer, so they called you as a witness in a personal injury case?

A.   Yes.

Q.   Okay.  So you just served as a witness

then?

A.    Yes.

Q.    Have you ever been a party in a civil suit?

A.    No, sir.

Q.    Have you ever filed suit against anybody before?

A.    No, sir.

Q.    Okay.  And then the criminal case, I'm sure that happened -- has that happened more than once in your career?

A.    Oh, absolutely.

Q.    Okay.  So you've testified a number of times in court under oath as a witness as a deputy?

A.    Yes.

Q.    As an action of the State of Ohio versus a defendant, correct?

A.    Yes, sir.

Q.    Okay.  All right.  So in this case you are a plaintiff as a former deputy of Hamilton County Sheriff's Department, correct?

A.    Yes, sir.

Q.    And your wife is also a plaintiff, correct?

A.    Yes, sir.

Page 10

Q. And what is her name?

A. Jennifer Patterson Davis.

Q. Okay. Does she go as Jenny or any other alias?

A. No.

Q. Okay. So she's called Jennifer?

A. Jennifer.

Q. Okay. And how long have you been married? I don't want to get you in trouble. What year did you get married?

A. 2003.

Q. That's fine. We'll just chalk it up to not being good at math --

A. Thank you.

Q. -- not forgetting.

A. That's going to be awkward.

Q. Well, it's fine. 2003. So that's 22 years roughly, correct?

A. Yes.

Q. Okay. Do you have any children?

A. I have one.

Q. Okay. And what is your child's name?

A. Jayden Davis.

Q. How old is Jayden?

A. Nineteen.

Q.    What high school did he graduate from?

A.    He went to Harrison.

Q.    And where is he going now?

A.    UC.

Q.    What does he want to do?

A.    He is in engineering, trying to get with the DOD for weapons development and designing.

Q.    Oh, okay.  And what is your educational history?

A.    High school and associate's degree in criminal justice.

Q.    Where did you get that?

A.    Cincinnati State.

Q.    What year?

A.    2011.

Q.    How old are you?

A.    49.

Q.    Is that your second career?

A.    My second career?

Q.    You got your associate's in 2011 in law enforcement?

A.    Yes.

Q.    Okay.  What did you do before that?

A.    As in education or what?

Q.    Yeah.

A. Education?

Q. Yes.

A. Just high school.

Q. Just high school. What year did you graduate high school?

A. '94.

Q. '94. Okay. Where did you go to high school?

A. Oak Hills. Diamond Oaks.

Q. Diamond Oaks, was it law enforcement?

A. No. It was commercial art.

Q. When did you start your career in law enforcement?

A. 2002 with the Sheriff's Department.

Q. What was your first position?

A. Corrections officer.

Q. How long were you in corrections?

A. Twelve years.

Q. What was your next position?

A. I was promoted to road patrol in 2014.

Q. What was your last position with the County?

A. Road patrol.

Q. What location did you work out of?

A. I was District 5, Anderson Township.

Q.    What are your responsibilities in road patrol?

A.    Enforce -- enforce the laws, traffic. Patrol functions is patrolling the neighborhoods, crime prevention.

Q.    When did you start in corrections again?

A.    2002.

Q.    2002.  And when was your last day with the County?

A.    January 30th, I believe, of 2023.

Q.    Okay.  So does 21 years sound correct?

A.    Yes, sir.

Q.    Okay.  So 12 years in corrections of those 21 years, that would be nine years as a patrol?

A.    Yes, sir.

Q.    Okay.

A.    Yeah, that's right -- no, was it '23 or '24?  This is '25.

Q.    I believe it was January 30th of 2024.

A.    '24.  Okay.  I'm sorry.

Q.    Does that sound correct?  And you put in --

A.    Yes.

Q.    -- your resignation --

A.    Yes.  I'm sorry.

Q. That's okay. You sent your resignation on January 9th of 2024, correct?

A. Okay. Yes. This is '25. Sorry about that.

Q. It's okay. It's only four months old. Would you agree that law enforcement officers in their course of employment with the government have access to a lot of government property?

MR. GOTTESMAN: Objection.

Go ahead.

A. Yes.

Q. And that you receive a lot of government property, correct?

A. Yes.

Q. Items like radios, correct?

A. Yes.

Q. Would you agree that when an officer leaves their government employment, they should return their government property?

A. Yes.

Q. Do you believe when a government demands that an officer returns his property, that it's unlawful for an officer to refuse?

A. Is the property issued to them?

Q. Well, property that belongs to the

government --

A. Oh, yes.

Q. -- whether it was issued to them or it just became in the officer's possession for one reason or another.

A. Yes.

Q. Okay. Would you agree that it reflects poorly on officers to engage in hate speech?

MR. GOTTESMAN: Objection.

A. Yes.

Q. Would you agree that it reflects poorly on officers to associate with people who engage in hate speech?

MR. GOTTESMAN: Objection.

A. Engage as in agreeing or arguing with them?

Q. Well, would you believe that it would be -- reflect poorly on a law enforcement official to be associated with a hate group, for instance?

A. Associated, yes.

Q. Do you believe that officers should refrain from exhibiting prejudice generally?

MR. GOTTESMAN: Objection.

A. Yes.

Q. So a word has come up a lot that I think

is departmental and certainly nothing that I had been exposed to before called malcontent. How do you define malcontent?

A. Somebody that just continuously complains and just complains and just shows up for the paycheck.

Q. Is that a word that's been used in Hamilton County since your like entire employment there?

A. Yes. It's a word that's used.

Q. Okay. So it's kind of like a phrase that is -- or a term, I guess, that's generally used to describe certain deputies within the department?

A. Yes, sir.

Q. Have you ever used that word before?

A. Yes, sir.

Q. So you've described other people as a malcontent at certain points in your career?

A. Yes, sir.

Q. Have you ever described yourself as a malcontent?

A. No, sir.

Q. Have you ever admitted that at a certain point in time that you acted as a malcontent?

A. No, sir.

Page 17

Q.   Have you ever made the statement that said, quote/unquote, I was a malcontent?

A.   I was a malcontent?  I don't recall.

Q.   Do you use social media at all?

A.   Yes, sir.

Q.   What platforms do you use?

A.   Facebook, Instagram, and Twitter.  I believe I have another one.  What's the other called?  I don't think anybody in here is young enough.  What's the other one?

MR. GOTTESMAN:  TikTok?

A.   I said TikTok, right?

Q.   No, you did not say TikTok.

MR. WIEST:  Myspace?

THE WITNESS:  Did you say Myspace? Wow.

Q.   Do you think it is TikTok?

A.   Yes, I do have TikTok.

Q.   Well, you had not said that.

A.   Okay.

Q.   You had said previously Facebook, Instagram, Twitter, which is now X -- it's the artist formerly known as Twitter --

A.   Yes.

Q.   -- and then you think you use TikTok --

A.   Yes.

Q.   -- correct?

A.   Yes.

Q.   All right.

A.   But there's one more that the --

Q.   Feeds?

A.   No.  I didn't get on Feeds.  It will come to me.

Q.   Is it Truth Media?

A.   No.  Because my son made fun of me for having it, and I had no idea --

Q.   Discord?

A.   -- I had it.  No.

         MR. PREM:  Snapchat?

A.   Snapchat.  Thank you.  I didn't even know I had it.

         MR. MILLER-NOVAK:  Okay.  The youngest person in the room came to your rescue.

         THE WITNESS:  Thank you.

         MR. PREM:  I'm not young.

Q.   Okay.  That's a lot.  Do you use all these frequently or some more than others?

A.   Mostly Facebook.

Q.   Mostly Facebook.  And your Facebook

Page 19

account, is it just your name, Jason Davis?

A.  Yes.

Q.  What about your Instagram; is there some kind of user name or --

A.  I believe it's Coach Jason 73.

Q.  Coach Jason 73.  What about Snapchat?

A.  I don't have a clue.

Q.  Okay.  You know you have it.  You don't use it much?

A.  I don't think I've -- I don't recall ever logging -- actually like using it or even getting on it.

Q.  What about X?

A.  I believe it's another one -- it might be Coach Jason.

Q.  Okay.  Coach Jason is something you just use often?

A.  73, yes.

Q.  And 73, that's your birth year?

A.  No, sir.  It was just a football number.

Q.  Oh, okay.  What position did you play?

A.  A center and guard.

Q.  Your wife, Jennifer, what platforms does she use?

A.  Facebook.

Q.   Is that it?

A.   That and Instagram.

Q.   And Instagram.  And then how does she go on Facebook?

A.   I believe it's -- that's horrible -- Jennifer Davis, I believe.

Q.   She doesn't use the Patterson?

A.   Maybe she does.  I don't pay attention.

Q.   Okay.  Do you know her Instagram whatever you call it?

A.   Without looking -- I mean, I just see Jennifer and, you know, I don't look to what the name actually is.

                   (Defendants' Deposition Exhibit No. 1
                    was marked for identification.)

Q.   Okay.  Jason, I've just handed you what we're going to mark as Defendants' Exhibit 1, which is -- would you agree is a copy of your complaint with jury demand?

A.   Yes, sir.

Q.   All right.  And you understand that a complaint is a document that essentially initiates your lawsuit?

A.   Yes, sir.

Q.   Did you review this before it was filed?

A.   Yes, sir.

Q.   Did you read the entire document before it was filed?

A.   Yes, sir.

Q.   Did you agree with all the statements made in this document?

A.   Yes, sir.

Q.   Do you agree that all the statements in this document are accurate?

A.   Yes, sir.

Q.   At least to your understanding and belief?

A.   Yes.

MR. WIEST:  Just for the record, he's not a lawyer or a legal expert.  I'm assuming you're just talking about the factual statements rather than the legal conclusions or claims?

MR. MILLER-NOVAK:  Yeah.  I mean, generally speaking I think that would be correct.

Q.   When I'm referring to the factual allegations made in this complaint, you agree that they are accurate, correct?

A.   Yes.

Q.   Okay.  All right.  We're going to kind of

Page 22

go through this a little bit here for a while, okay?

A.    Okay.

Q.    All right.  So we'll start with paragraph 10, which is on page three, okay?

A.    Okay.

Q.    So I'm not going to refer to page numbers very frequently, Jason.  So these numbers on the left-hand side; do you see them?

A.    Yes, sir.

Q.    Even though a lot of them are just sentences, we refer to these as paragraphs, okay?

A.    Okay.

Q.    So if I say paragraph 10, you can see how it says 10 on the bottom?

A.    Yes, sir.

Q.    I'm referring to the whole paragraph that's under that number, okay?

A.    Yes, sir.

Q.    All right.  Now you know the mechanics. We'll get going.

A.    Sure.

Q.    So it says, Jason began employment with the Hamilton County Sheriff's Office, initially as a corrections officer, in 2002, correct?

A.    Yes, sir.

Q. And then in 2014 it says you transferred to the road/patrol unit, correct?

A. Yes, sir.

Q. All that is accurate?

A. Yes, sir.

Q. Okay. In his 18 years on the job, it says that your performances consisted of meets expectations or exceeds expectations; do you see that?

A. Yes, sir.

Q. It says you were never subject to discipline; do you see that?

A. Yes, sir.

Q. Okay. Do you agree with that?

A. Yes, sir.

Q. Okay. So paragraph 11 says that you were married to Jennifer in 2003; do you see that?

A. Yes.

Q. Okay. So earlier that's what you testified?

A. Yes, sir.

Q. What is Jennifer's occupation?

A. She doesn't work anymore.

Q. She's currently unemployed?

A. Yes.

Q. When did she become unemployed?

A. Two years ago.

Q. Okay. What did she do before that?

A. She owned her own business.

Q. What was that business?

A. Ice cream.

Q. Like she owned an ice cream shop?

A. Yes, sir.

Q. What was it called?

A. Gold Top Dairy Bar.

Q. Oh, I think I remember that. That was off of Colerain?

A. Colerain and Blue Rock. Uh-huh.

Q. Okay. It's like a dairy bar, correct?

A. Yes, sir.

Q. Soft serve, that kind of stuff?

A. Yes, sir.

Q. Okay. When did she start that?

A. She owned that for 19 years. So 2004, I believe.

Q. Do you know if that was like an LLC or a corporation?

A. LLC.

Q. Did she own it with anybody else or just herself?

A.    Just herself.

Q.    Let's continue to paragraph 13 on the same page -- or the next page.  It should be on page four.

A.    Yes, sir.

Q.    It says in -- well, you would agree that Sheriff McGuffey was elected sheriff in November of 2020, so she began on January 4 of 2021, correct?

A.    Yes, sir.

Q.    Okay.  Did you have any relationship or any interactions with Sheriff McGuffey before she was elected as sheriff?

A.    Yes, sir.

Q.    Okay.  When did those occur?

A.    Are you wanting from the time she was running or even before that?

Q.    Was she ever your supervisor?

A.    Yes, sir.

Q.    Let's go with that.  Okay.  When was that?

A.    2003.

Q.    What was her rank at the time?

A.    Captain.

Q.    How would you describe your relationship with her when she was captain?

A.    We had a great working relationship.

Page 26

Q. And that was in corrections, correct?

A. Yes, sir.

Q. Prior to her being elected sheriff, did you have any disputes or disagreements with Sheriff McGuffey?

A. Yes, sir.

Q. When did those occur?

A. A year?

Q. Yes.

A. I believe 2014.

Q. And what was that?

A. I was the union president.

Q. Okay. And what happened?

A. I would come to her with grievances, and we would try to resolve them without going to -- any further than her office.

Q. And she was a major at that time?

A. Yes, sir.

Q. Okay. So when you're talking about disagreements, you're talking about grievances?

A. Yes.

Q. So you tried to work them out before they were filed?

A. Yes, sir.

Q. Okay. So if a deputy would come to you

with a concern, you would try to talk to her before you initiated a grievance procedure?

A.   Yes, sir.

Q.   Okay.  So you're describing one event maybe that didn't go so well?

A.   I mean, each grievance was always a back and forth, you know.  We're saying you're violating our contract and she's saying you're not.  So there was always an argument in that aspect of it.

Q.   So that's what you're describing of maybe past debates with Sheriff McGuffey before she was a sheriff were these grievance conversations?

A.   Yes.

Q.   Okay.  So you were a union president when?

A.   I'm positive '14 -- 2014.  I would -- 2013 and '14, I believe.

Q.   Okay.

A.   That's my best knowledge.

Q.   So about two years?

A.   Yes, sir.

Q.   Did you ever serve in any other capacity in the union?

A.   I was a union member -- or on the union board for maybe -- years prior to that.  I was always on the union board.

Q. Okay. So you're pretty familiar with grievance procedures then with any union contract, correct?

A. Yes, sir.

Q. Okay. So to take a step back, the Sheriff's Department has a collective bargaining unit?

A. Yes, sir.

Q. And certain officers are not part of the bargaining unit, correct?

A. (No response.)

Q. Like a major, for instance?

A. Oh, yeah. Yeah. I'm sorry. Yes.

Q. Right?

A. Yes.

Q. Right. But deputies are typically part of the --

A. Yes.

Q. -- collective bargaining unit, correct?

A. Yes, sir.

Q. All right. And a collective bargaining agreement is a contract that the union negotiates with the County, correct?

A. Yes, sir.

Q. Okay. Because your collective bargaining

agreement is three years, correct?

A. It's. . .

Q. At a time?

A. Yes.

Q. Okay.

A. Yeah, three years.  I'm sorry.

Q. That's okay.  That's fine.  Don't worry. I didn't mean to test you.

A. No, you're fine.

Q. I'm just seeing what you know.  So you have a collective bargaining agreement.  And that includes processes like grievances, correct?

A. Yes, sir.

Q. And things like predetermination hearings, correct?

A. Yes, sir.

Q. And progressive discipline, correct?

A. Yes, sir.

Q. And I have looked at yours obviously, but it has different pay grades for different steps, correct?

A. Yes, sir.

Q. For different positions, correct?

A. Yes, sir.

Q. And there's different processes for

promotion contained within the agreement, correct?

A.   Yes, sir.

Q.   And if those are not followed by, let's say, the administration or management for lack of better wording, then a union member can file a grievance, correct?

A.   Yes, sir.

Q.   So any time he feels that a procedure has been violated or his rights under the agreement have been violated, that deputy would have the option of filing a grievance, correct?

A.   If it's something that could be proved, yes, sir.

Q.   Okay.  And in addition to that you would agree that discipline tends to have to follow a certain procedure, correct?

A.   Yes, sir.

Q.   It's pretty unlikely for a deputy to just be fired for one instance, correct?

A.   Correct.

Q.   Typically speaking there's a progressive disciplinary process that's followed, correct?

A.   Yes, sir.

Q.   And it usually starts with some kind of verbal counseling, correct?

A.    Counseling, yes, sir.

Q.    And then it would go to maybe more of a written reprimand, correct?

A.    Yes, sir.

Q.    And those things might end up in a personnel file, correct?

A.    Yes.

Q.    And before it got to something like -- so those tend to happen before it gets to something like a suspension, correct?

A.    Yes.

Q.    Or it got to something like a demotion, correct?

A.    Yes.  Yes.

Q.    And that before someone could be suspended, they have a right to usually challenge their suspension, correct?

A.    Yes.

Q.    And they could ask for a hearing, correct?

A.    Yes, sir.

Q.    And at that hearing they could present evidence, correct?

A.    Yes.

Q.    And they could have some kind of representation in that hearing, correct?

A.    Yes.

Q.    Okay.  And at any point they could file a grievance if they feel their discipline is somehow in violation of the spirit of the agreement, correct?

A.    Correct.

Q.    So you're familiar with all of those processes, correct?

A.    Yes, sir.

Q.    And you're familiar with all the options available to a deputy who feels like his rights have been violated, correct?

A.    My contract, yes, sir.

Q.    Okay.  And you're also aware of all the protections a deputy has if the administration tries to discipline a deputy, correct?

            MR. GOTTESMAN:  Objection.

            Go ahead.

A.    Yes.  If it violated the contract, yes, sir.

Q.    Or if they were disciplining a deputy without a just cause, correct?

A.    I would refer to an attorney at that point.

Q.    Okay.  You would agree that a union

Page 33

agreement requires that deputies are only terminated with just cause, correct?

A. Yes, sir.

Q. Before they're terminated they have the option of a predetermination hearing, correct?

A. Yes.

Q. We often call that a Loudermill hearing, correct?

A. I have no. . .

Q. You're not familiar with that phrase?

A. No, sir.

MR. GOTTESMAN: Some of these questions I need to interpose objections. I need you to slow down and allow me to give my objections, okay?

THE WITNESS: Yes, sir.

Q. So before you were terminated as a deputy, you're allowed to ask for a hearing before the termination, correct?

MR. GOTTESMAN: Objection.

A. I would not know.

Q. Okay. Well, maybe we'll look at the agreement later. But you do know that there are certain stages where you are allowed to request predetermination hearings before certain discipline

and certain termination, correct?

MR. GOTTESMAN:  Objection.

A.   Yes, sir.

MR. GOTTESMAN:  And, Counsel, I don't think it's a matter of tremendous significance, but part of my objection to those questions was to the form in the sense that he worked for the Sheriff's Office for years.  There were multiple bargaining agreements -- successive bargaining agreements that would have applied to that period of -- that extensive period of employment.

And your question was a little vague as to which particular bargaining agreement you were referring to.  And I know firsthand that they changed during those time periods.  So my objection goes to the form and it was vague as to time and which contract you were referring to.

Q.   Do you remember any union agreement that did not contain grievance procedures?

A.   No, sir.

Q.   Okay.  So all the union agreements at the Sheriff's Department had some form of grievance

procedure, correct?

A.   I believe so.

Q.   And all the union agreements that you can remember had some form of predetermination hearings before someone is terminated, correct?

MR. GOTTESMAN:   Objection.

Go ahead.

A.   I believe so.  I never had to represent somebody for termination.

Q.   And that all of the union agreements had some type of progressive disciplinary policy, correct?

A.   Yes.

Q.   Okay.  Your complaint alleges in paragraph 13 that when McGuffey was elected Sheriff in 2020 and took office about January 4, 2020 -- she took office in 2021.  Sorry.  That's 12.

It says, She began her term as Sheriff with a press conference; do you see that?

A.   Yes, sir.

Q.   Is that your recollection?

A.   Yes, sir.

Q.   All right.  It says in her press conference -- this is the next paragraph 13, she stated her number one priority as Sheriff was

responding to COVID-19; do you see that?

A.   Yes.

Q.   Okay.  Are you aware whether or not any deputies became ill from COVID-19 working in the Justice Department?

MR. GOTTESMAN:  Objection.

Go ahead.

A.   In the Sheriff's Department?

Q.   Yes.

A.   Yes, sir.

Q.   Okay.  Are you aware of any deputies that lost their lives to COVID during that time period?

A.   I believe one from the jail.

Q.   Are you aware of whether or not any inmates became ill from COVID in the jail?

A.   No, sir.  I didn't work the jail at that time.

Q.   Okay.  Are you aware of whether or not any inmates lost their lives because of COVID in the jail during that time period?

A.   I do not know.

Q.   So in paragraph 14 it says, During that press conference on or about January 4, 2021, Jennifer posted on the Sheriff's social media page that had been live streaming the press conference,

Page 37

that the Sheriff's priorities were misaligned, and that officer safety and suicides should be the number one priority.  A true and accurate copy of the post is attached as Exhibit 1; do you see that?

A.   Yes, sir.

Q.   Do you mind turning with me to Exhibit 1?

A.   Is it towards the back or. . .

Q.   Yep.  It's kind of past page 15.

MR. WIEST:  Page 16.

Q.   And this looks like a printout -- on Exhibit 1, a printout of comments that were made relating to this streamed press conference; do you agree with that?

A.   Yes, sir.

Q.   Okay.  And one of them is from Jennifer Patterson Davis.  Is that your wife?

A.   Yes.

Q.   And it says, What a shit show; do you see that?

A.   Yes, sir.

Q.   Okay.  So you agree that that's your wife that commented what a shit show?

A.   Yes, sir.

Q.   Okay.  And then the next comment is your number one concern as sheriff is COVID?  Where is my

eyeroll emoji.  Do you see that?

A.   Yes, sir.

Q.   Do you agree that was Jennifer's post?

A.   Yes, sir.

Q.   And a couple of posts down it says -- or comments down -- I guess I should use the word comment -- then maybe she should have run for a public health position, not sheriff; do you see that?

A.   Yes, sir.

Q.   Okay.  And then lower down it says Elaine Moscovitz; do you see that?

A.   Yes.

Q.   Number one priority though?  I didn't say it shouldn't be addressed, but my biggest health priority would be officers coming home safe to their families without a bullet in their head and not coming home with the flu; do you see that?

A.   Yes.

Q.   What does she mean by the flu; do you know?

A.   No.

Q.   Okay.  Do you agree that COVID-19 and the flu are two different diseases?

MR. GOTTESMAN:  Objection.

Page 39

A.   My opinion?

Q.   Yes.

A.   No.

Q.   You don't think they're two different diseases?

MR. GOTTESMAN:  Objection.

A.   No.

MR. GOTTESMAN:  You got to let me --

THE WITNESS:  Sorry.

MR. GOTTESMAN:  -- get my objections out.

Q.   Okay.  So you don't believe that COVID is something that exists?

MR. GOTTESMAN:  Objection.

Go ahead.

A.   I didn't say that.

Q.   So I don't understand.  So your opinion is that the flu and COVID are the same thing?

MR. GOTTESMAN:  Objection.  Asked and answered.

A.   My opinion.

Q.   Okay.  How did you formulate that opinion?

MR. GOTTESMAN:  Objection.

A.   I just believe it's another strain of the flu.  It's just my opinion.

Q. Okay. Have you ever attended any kind of medical training?

A. Nope.

Q. Okay. So is it your belief that Sheriff McGuffey should not address or should not be addressing at this point in time COVID-19 within the Sheriff's Department?

MR. GOTTESMAN: Objection.

A. My opinion at this time?

Q. Yes.

A. Watching that I -- I agree with my wife.

Q. Did you and your wife talk about it at all while the streaming was occurring?

A. I do not recall.

Q. Have you ever talked to your wife about the Sheriff's positions regarding COVID-19 at the time?

A. I -- yes.

Q. Okay. And were you critical of the Sheriff's positions to your wife during that time period?

A. I don't recall.

Q. Were you aware that your wife was commenting during the streamed press conference?

A. I do not recall.

Q. When did you first become aware of these comments?

A. I don't remember. I don't recall.

Q. Have you ever -- around this point in time after -- in the time leading up to Sheriff McGuffey's election, were you critical of her campaign at home?

A. Yes.

Q. Okay. Why were you critical of her campaign?

A. Because she lied on her debate on TV with Hoffbauer.

Q. With who?

A. When she debated Hoffbauer.

Q. Okay. Do you feel that she lied?

A. Absolutely.

Q. What do you feel that she lied about?

A. When she stated she never cursed or belittled any of her employees.

Q. Okay. So you feel like she has belittled her employees in the past?

A. I'm one of them.

Q. Okay. So she belittled you in your opinion?

A. Yes.

Page 42

Q. How did she belittle you?

A. When she was the major and we had a disagreement on what was said about a policy, and she accused me of lying and attacking my integrity.

Q. How did she attack your integrity?

A. Said that I was lying.

Q. Okay. When did that occur exactly?

A. I don't remember the exact year. I just know she was the major.

Q. Would it have been in the time that you were the union president?

A. Yes, sir.

Q. Okay.

A. I don't remember. That was '13 or '14.

Q. Okay. We're going to kind of flip around this complaint.

A. Okay. Just throw me a page number.

Q. Yeah, get ready for some paper calisthenics here, Jason. So can you turn to -- we'll go to paragraph 15, which is on page four.

A. All right.

Q. So Jennifer followed that post with another post to her private Facebook page on or about January 4, 2021, again criticizing the priorities and action of the Hamilton County

Sheriff, a true and accurate copy of which is attached as Exhibit 2, hereto.

So before we go to Exhibit 2, I can see you're going -- that's fine.

A.   Sorry.

Q.   Your instincts are right.  We are going to go.  But let me ask you a couple of questions before we get there.

A.   Okay.

Q.   Thanks.  This is kind of just so we get our Facebook language down together.  I always do this.  This is like a thing I have to do in all depositions now.

So my understanding is a post is when you make the first thing, right -- you post it, correct?

A.   Yes.

Q.   Okay.  So on your Facebook News Feed, let's just say you leave here, you have dinner, you go to the bar, say this is me Jason, I'm at a bar, just got out of a deposition, it totally sucked, that would be a post, correct?

A.   Yes.

Q.   Okay.  And then if anybody made a comment underneath that saying, whoa, that sounds terrible, that would be a comment, correct?

A.    Yes.

Q.    Okay.  And then if anybody replied to that comment underneath it, that's referred to as a reply, correct?

A.    Yes.

Q.    All right.  So my understanding of Facebook is it's somewhat like a tree, the trunk is the post, correct?

A.    Uh-huh.

Q.    Right?

A.    Uh-huh.

Q.    And then you have like --

A.    Yes.

Q.    -- the main branches -- yes.

A.    Yes.

Q.    You have to say yes.  Okay.  And then you have these main branches, which are comments, correct?

A.    Yes.

Q.    And then you have these little twigs, which are replies to the comments, right?

A.    Yes.

Q.    All right.  So we're on the same understanding of Facebook now.  So the reason I say that is because this refers to what we just read in

Page 45

Exhibit 1 as a post -- Jennifer's post.  I understood them as Jennifer's comments on another post; would you agree with that?

A.   Well, one more time.

Q.   We can go back to Exhibit 1.  That's fine. Let's go back to Exhibit 1.  These are comments to another post, correct?

A.   I don't know.  Sorry.

MR. MILLER-NOVAK:  It's okay.  All right.  Well, we'll go to Exhibit 2.

MR. GOTTESMAN:  And, Counsel, I'm no pro at Facebook, but I think that there might be a third option where you have streaming something and then there's like rolling comments that are not really a post and they're not a comment on a post.

MR. MILLER-NOVAK:  They're not a comment on a post.  They're a comment on a stream.

MR. GOTTESMAN:  Right.

MR. MILLER-NOVAK:  Which is what I understood those to be.  They weren't actually Jennifer's posts or her streams. Those were her comments on another stream.

MR. GOTTESMAN:  On a rolling stream.

Page 46

MR. MILLER-NOVAK: I think on record we agree to at least that. It might be the last thing we agree to, but we'll agree to that. All right.

BY MR. MILLER-NOVAK:

Q. So Exhibit 2 is what paragraph 15 was referring to, correct?

A. Okay.

Q. And this is a post made by Jennifer Patterson Davis; do you agree?

A. Yes.

Q. Okay. And it starts with, I really don't like seeing political posts continuously on FB -- which I understand is Facebook, correct?

A. Yes.

Q. Because like they say, opinions and -- are -- it says and like assholes. I'm assuming she meant opinions are like assholes, correct?

MR. GOTTESMAN: Objection.

A. Yes.

Q. Everybody has one and they probably stink; do you see that?

A. Yes.

Q. Okay. That is unless you are one of those weirdos that bleaches your asshole and does those

colon cleanse things, but I digress; do you see that?

A. Yes.

Q. Okay. Do you agree that this is Jennifer Davis's, your wife's post on January 4, 2021?

A. Yes.

Q. Okay. And it continues as you see a little bit down that our new -- and she put sheriff in quotes -- says her number one issue she is going to tackle her first weeks in office is COVID; do you see that?

A. Yes.

Q. Okay. Does she have a clue what actually are the real health concerns in the law enforcement community; do you see that?

A. Yes.

Q. Okay. So during the campaign were you discussing any of your misgivings or dissatisfaction with Sheriff McGuffey with your wife?

A. I don't recall.

Q. Okay. So did you discuss your happiness or lack thereof at work with your wife prior to Sheriff McGuffey's election?

A. I don't recall.

Q. Okay. You don't recall whether or not

you've ever had conversations about your job with your wife?

A. Yes.

Q. Okay. You just don't recall when?

A. I don't recall when and what exactly was said.

Q. Did you know that your wife made this post after she made it?

A. I don't recall.

Q. When did you first become aware of this post?

A. I don't recall that either.

Q. Okay. Was it before this lawsuit was filed?

A. Yes.

Q. Was it before your meeting with the Sheriff and the Chief on October -- in October of 2023?

A. I don't recall.

Q. Was it before you applied for RENU?

A. Yes.

Q. Okay. How did you find out about this post before you applied to RENU?

A. I believe she said she posted something on her private page.

Q.   Okay.  So your wife told you that she posted something on her private page?

A.   Yes.

Q.   Did she tell you what it was about?

A.   I don't recall.

Q.   Towards kind of like the middle end it starts with this person is nothing more than a politician; do you see that line?

A.   Yes.

Q.   It says, This person is nothing more than a politician and is nowhere near qualified to be a sheriff; do you see that?

A.   Yes.

Q.   Okay.  Did your wife tell you that she wrote that?

A.   I don't recall.

Q.   If you voted for her because of her qualifications, not being a certified peace officer -- it says in a parenthetical -- being fired from the department or being on the Brady list, then you have the IQ of a kumquat; do you see that?

A.   Yes.

Q.   Did you know that your wife wrote that?

A.   I don't recall.

Q.   Did she tell you that she wrote that?

A.    I don't recall.

Q.    If you voted for her because of her political party or thought it would be neat to see a gay woman as a sheriff, then you are a twatwaffle; do you see that?

A.    Yes.

Q.    Did she tell you that she wrote that?

A.    I don't recall.

Q.    Did you talk to your wife about Sheriff McGuffey's sexual orientation at all?

        MR. GOTTESMAN:  Objection.  It's vague as to time.

A.    No.

Q.    Have you ever discussed Sheriff McGuffey's sexual orientation with anybody?

        MR. GOTTESMAN:  Same objection.

A.    I don't -- I don't recall.

Q.    Did your wife tell you that she talked about the Sheriff's sexual orientation in this post?

A.    I don't recall that.

Q.    Has your wife ever talked to you about Sheriff McGuffey's sexual orientation?

A.    I don't recall.  No.

Q.    Do you believe that there's something wrong with voters wanting to see or thinking that it

Case: 1:24-cv-00202-MRB Doc #: 49 Filed: 11/19/25 Page: 51 of 265  PAGEID #: 1934

Page 51

would be neat to see a gay woman in charge?

MR. GOTTESMAN:  Objection.

Could you read that question back.

THE COURT REPORTER:  Yes, of course.

"Do you believe that there's something wrong with voters wanting to see or thinking that it would be neat to see a gay woman in charge?"

MR. GOTTESMAN:  Object to form.

You can answer, if you can.

A.    No.

Q.    Do you know if there are other gay women in the department aside from Sheriff McGuffey?

MR. GOTTESMAN:  Objection.

A.    Yes.

Q.    Do you agree that gay women have ever suffered discrimination in police service?

MR. GOTTESMAN:  Objection.

A.    I'm sure.

Q.    Did your wife discuss with you why she thinks people are twatwaffles if they consider it neat to see a gay woman in charge?

A.    No.

Q.    Do you agree with that statement that your wife made now that you're reading it?

Barlow Reporting & Video Services, LLC
(859) 261-8440

MR. GOTTESMAN: Objection.

A. Well, she's referring to the political party as well, so I think it's funny.

Q. You think this statement is funny?

A. Yes.

Q. Okay. She refers to the political, but it does say or -- or thought it would be neat to see a gay woman as sheriff, then you are a twatwaffle. That's what you think is funny?

MR. GOTTESMAN: Objection.

A. I just think the word in general is funny.

Q. Oh, the word twatwaffle is funny?

A. Yes.

Q. Okay. What do you think twatwaffle means in this context?

A. Just -- I don't know. I've actually never Googled the word, so. . .

Q. Do you think that she's basically suggesting that people are an idiot?

MR. GOTTESMAN: Objection. Calls for speculation.

A. I don't know. You'd have to ask her.

Q. Okay. Do you think it's a compliment of someone's character?

MR. GOTTESMAN: Objection.

A.   No.

Q.   Okay.  It's derogatory, correct?

          MR. GOTTESMAN:  Objection.

A.   Yes.

Q.   I mean, does anything about the word twatwaffle strike you as a compliment to somebody's intellect?

          MR. GOTTESMAN:  Objection.

A.   No.

Q.   Okay.  You'd agree that it's something that is at least derogatory in nature about somebody's intellect, correct?

          MR. GOTTESMAN:  Objection.

A.   Yes.

Q.   And then when you read this sentence, what she intends to say is that if you thought it would be neat to see a gay woman as a sheriff, then you're someone of questionable intellect?

          MR. GOTTESMAN:  Objection.

A.   Are you asking what I think she's trying to say or what I -- what I believe?

Q.   Well, I'm asking you what you think she said in that sentence.

A.   You'd have to ask --

          MR. GOTTESMAN:  Hold on.

Page 54

THE WITNESS:  Sorry.

MR. GOTTESMAN:  Objection.  Calls for speculation.

A.   You'd have to ask her.

Q.   Okay.  All right.  Because you can't read -- can you read?

MR. GOTTESMAN:  That's argumentative.

MR. MILLER-NOVAK:  No, it's not.

MR. GOTTESMAN:  You know he can read.

Q.   You can read, correct?

A.   Yes.

Q.   And that when you read, you can comprehend what you read, correct?

A.   Yes.

Q.   And you can read a sentence and you can take away your own understanding from it, correct?

A.   Yes.

Q.   Okay.  So when you read a book -- have you ever read a book?

A.   Yes.

Q.   Have you ever read a novel?

A.   Yes.

Q.   Do you have to call the author to ask the author what you think you understand when you read the book?

Page 55

MR. GOTTESMAN: Objection.

A. No.

Q. Okay. So you can read a book and you can understand what you think someone meant when they wrote, correct?

A. Correct.

Q. Okay. So what do you think your wife meant when she wrote this sentence?

A. I'm not going to speculate what she thinks. I don't know what she was thinking. You'd have to ask her.

Q. What do you understand it to mean?

A. I understand it to mean that it's a funny comment.

Q. Okay. Why do you think it's funny?

A. I've answered that question already.

Q. Well, you said the word twatwaffle is funny.

A. That's the funny part.

Q. Okay. That's the only thing you understand in this whole entire sentence is the word twatwaffle?

A. No. You were asking me what I thought it meant -- what she meant by saying that.

Q. Okay. I'm asking about the sentence.

What do you think she meant?

        A.   You'd have to ask her.

        Q.   Okay.  What do you understand when you read that sentence?

                MR. GOTTESMAN:  Counsel, you've asked him that now three or four times.  I'm going to instruct him not to answer.  He's given you his answer.

                MR. MILLER-NOVAK:  I haven't asked --

                MR. GOTTESMAN:  You're going back -- well, I'm instructing him to stop right now.  And move on with your next question.

                MR. MILLER-NOVAK:  Okay.  Is it privileged?

                MR. GOTTESMAN:  It's argumentative.

                MR. MILLER-NOVAK:  No, it's not.

                MR. GOTTESMAN:  Yeah, I believe it is.  And I'm not going to debate it with you.

                MR. MILLER-NOVAK:  So is the argumentative reason to instruct the client not to answer under the Civil Rules of --

                MR. GOTTESMAN:  I think you're harassing him.  And I think it's

argumentative. And I think it's unnecessary. And I'm instructing him not to answer you further. And I'm asking you to move on. And if you care to take it up, you can take it up.

MR. MILLER-NOVAK: Okay. Can you please certify that?

THE COURT REPORTER: Yes.

(The question was certified.)

BY MR. MILLER-NOVAK:

Q. As a deputy at this time would you have typed that sentence and put it on Facebook?

A. That actual -- verbatim, that sentence?

Q. Yes.

A. No.

Q. So this is not a post that you would have made yourself as a deputy at that time?

A. No.

Q. Why not?

A. Because my Facebook posts -- since I coach kids, I have a lot of families that are on my -- and my account is open to the public. It's not a private account.

Q. Do people when they look at your Facebook account -- do they know that you were a deputy at

Page 58

that point in time?

MR. GOTTESMAN:  Objection.  Calls for speculation.

A.   I have no idea.

Q.   Did you hold yourself out as a deputy at that point in time on Facebook?

MR. GOTTESMAN:  What point in time?

Q.   When was this post made?  January of 2021.

A.   I don't recall.

Q.   Okay.  Did you ever type anything where you identified yourself as a deputy on Facebook between the years 2021 and 2023?

A.   I -- I can't answer that.  I don't recall.

Q.   Okay.  Let's go back to Exhibit 6 -- sorry.  Paragraph 16.

A.   16.

Q.   I don't even know where I got that.  It says, Caroline Adams is a particularly outspoken critic of McGuffey, and has offered various criticisms of McGuffey and Gramke via her pages Chaz the Anti-Sheriff and Itsa Krakken; do you see that?

A.   Yes.

Q.   Do you know Caroline Adams?

A.   No.

Q.   Have you ever met Caroline Adams?

Page 59

A.   No.

Q.   Have you ever talked to her?

A.   No.  Not that I know of.

Q.   Okay.

A.   I don't know.

Q.   Are you aware of her?

A.   Through this, yes.

Q.   Okay.  When you say through this, through this sentence?

A.   Through the identity of Itsa Krakken through the -- when it came out who -- through the Sheriff when she said Caroline Adams, I didn't know who -- who that account was associated to.

Q.   Okay.

A.   If that makes sense.

Q.   Did you know about the account before that point in time?

A.   Yes.

Q.   Okay.  Well, let's take a step back.  So you're saying -- well, which account, like Chaz the Anti-Sheriff?

A.   No.  Itsa Krakken.

Q.   Itsa Krakken.  When did you first become familiar with Itsa Krakken?

A.   I don't recall.

Q.   Okay.  Was it prior to Sheriff McGuffey getting elected?

A.   I don't recall.

Q.   What about Chaz the Anti-Sheriff; did you have any familiarity with that?

A.   I don't recall.

Q.   Okay.  So what awareness or knowledge of Itsa Krakken did you have?

A.   There was people just sharing the posts that were posted on Facebook.

Q.   Okay.  Who was sharing them?

A.   Officers at work.

Q.   Okay.  Do you remember any of those deputies?

A.   No, I don't recall.

Q.   And when they were sharing it, how were they sharing it?

A.   Just by word of mouth.

Q.   So just kind of describing it?

A.   Yes.

Q.   Okay.  Were they generally supportive of Itsa Krakken, or were they offended by Itsa Krakken; what was the general nature of the discussions?

MR. GOTTESMAN:  Objection.

A.   More of laughter, more of entertainment.

Q. Are you aware that some of those comments made derogatory statements about -- or whether or not any of those comments made derogatory statements about Sheriff McGuffey's sexual orientation?

A. I don't recall.

Q. Do you know if Jennifer has any relationship with Caroline Adams?

A. I have no idea.

Q. Have you ever spoken to Caroline Adams since this lawsuit has been filed?

A. I have not.

Q. Do you know if Jennifer has ever talked to Caroline Adams since this lawsuit has been filed?

A. I have no idea.

Q. Do you know if Jennifer has ever talked to Caroline Adams at all?

A. I can't -- I have no idea.

Q. Has Caroline Adams ever sent anything to you?

A. Yes.

Q. What has she sent to you?

A. She sent a message to me -- I don't remember the year -- asking if she got me in trouble. And I thought it was our Internal Affairs to see if I would answer her or not, so I never

replied back.

Q.   So was that sent while you were still at the Sheriff's Department?

A.   Yes.

Q.   Do you still have that message?

A.   I don't know.  I have no idea.

Q.   Okay.  All right.  What did she send it to you on?

A.   Messenger.

Q.   Like Facebook Messenger?

A.   Yes.

MR. MILLER-NOVAK:  Well, I'm going to ask that you look and that he produces it if he still has it, please.

MR. GOTTESMAN:  Okay.

Q.   So you didn't reply, though?

A.   No.  I thought it was our Internal Affairs.

Q.   Was it sent as Caroline Adams or like Itsa Krakken?

A.   I don't recall.

Q.   Okay.  That's fair.  So that would have been kind of in the 2023 time period, correct?

A.   Maybe -- I don't know.  I'm not positive.

Q.   Did anybody at the Sheriff's Department

Page 63

that was discussing Caroline Adams' post -- did any of them discuss with you that they knew her?

A.   I don't recall.

Q.   Okay.  Did anybody ever discuss with you sending her information?

A.   No.

Q.   Okay.  Do you know how she -- do you have any idea why she was sending you a message asking if she got you in trouble?

A.   Are you asking why she sent the message?

Q.   Yes.

A.   I have no idea.

Q.   Do you have any idea how she would get the impression or would have any information while you were there that you were in some kind of trouble?

MR. GOTTESMAN:  Objection.

A.   No clue.

THE WITNESS:  I'm sorry.

MR. GOTTESMAN:  Go ahead.

Q.   Your answer is no clue?

A.   I have no idea.

Q.   Okay.  Did you receive that Messenger message before or after the meeting you had with Sheriff McGuffey in October of 2023?

A.   I don't recall.

Q. Okay.

A. I'm not positive.

Q. Why would you think it was Internal Affairs that sent you the message?

A. Because the Sheriff came around and told us not to have any contact with her.

Q. Okay. When was that?

A. That was when they came around to our briefings.

Q. Okay. Let's go to paragraph 18 on page five. It says, As a consequence of Adams' post and criticism, McGuffey and Gramke engaged in meetings with members of the Hamilton County Sheriff's Office and informed deputies that if they, or their spouses, associated in any way with Adams, including by interacting with her on social media, there would be consequences; do you see that?

A. Yes, sir.

Q. Okay. Do you agree with this statement?

A. As in that it was stated or. . .

Q. Well, I mean, this statement was clearly stated by -- your counsel wrote paragraph 18. Do you agree with the substance of paragraph 18?

A. Oh, yes. I'm sorry. Okay. I took that the wrong way.

Page 65

Q.   So is it your testimony today that you met with either McGuffey or Gramke to discuss Caroline Adams as described in this paragraph?

A.   So that was the briefing meeting.

Q.   Okay.  What briefing meeting?

A.   When they came around to the districts.

Q.   Okay.  When did that occur?

A.   I don't recall.

Q.   Was it prior to your RENU application?

A.   It was after.

Q.   It was after you applied to RENU?

A.   Yes.

Q.   Was it before or after your RENU application was rejected?

MR. GOTTESMAN:  Object to the form.

A.   It was after.

Q.   Okay.  So during that meeting your allegation is during this briefing that Sheriff McGuffey and Gramke told deputies to not associate with Adams?

A.   In the briefing?

Q.   Yes.

A.   Yes.

Q.   What was their precise statement?

A.   I can't recall the exact wording.  I can't

remember the exact wording.

Q. Okay. Did they tell deputies in that briefing for their spouses to not associate with Adams?

A. The Sheriff did, yes.

Q. Okay. What was her statement?

A. Not verbatim, but it was stay off social media -- or, I'm sorry -- we're having -- we're addressing this due to things being said on social media by officers' wives.

Q. And this alleges that someone made the statement there would be consequences?

A. Yes.

Q. Okay. And who do you allege made that during this briefing?

A. The Sheriff.

Q. Okay. Who else was at this briefing?

A. District 5.

Q. Every deputy in District 5?

A. Mostly dayshift.

Q. Was this briefing recorded?

A. I do not know.

Q. Did you record it?

A. I did not.

Q. Do you know if anybody else recorded it?

A.   I do not know.

Q.   Do you know if any recordings exist of it whatsoever?

A.   I do not know.

Q.   At this point in time did anybody ever mention anything to you about your wife making any posts?

A.   No.  When that was said, everybody looked at me.

Q.   Who is everybody?

A.   Everyone that was in the briefing room.

Q.   Okay.  At this point in time had either Gramke or Sheriff McGuffey made any statements to you about your wife making posts on Facebook?

A.   Prior to this?

Q.   Yes.

A.   Yes.

Q.   When?

A.   The meeting that I had in October.

Q.   So this occurred after the October 2023 meeting?

A.   Yes, sir.

Q.   Okay.  So this didn't occur before the meeting you had in 2023?

A.   Correct.

Page 68

Q. Okay. I just want to try to get the time line here.

A. Yeah.

Q. Because you would agree this paragraph doesn't give a date, correct?

A. Correct.

Q. Okay. So your testimony is right now that this briefing happened after you met with Gramke and Sheriff McGuffey in October -- I think it was October 10 of 2023, correct?

A. Yes.

Q. Okay. So this happened sometime between that point and your eventual resignation in January of 2024, correct?

A. Correct.

Q. You don't remember exactly when?

A. I do not recall.

Q. Okay. Because it could have been November, December, or January; you don't remember which month?

A. No, sir.

Q. Okay. All right. Let's go to the next paragraph. So we're shooting back in time now. So it says, In May 2022, Jason organized a "Remember the Fallen" sporting event and fundraiser for fallen

law enforcement and firefighters in Hamilton County; do you see that?

A.    Yes.

Q.    He asked for the support from Gramke -- I'm sorry -- McGuffey and Gramke by directing communications about the event to their assistant. He received no response; do you see that?

A.    Yes.

Q.    When it says directed communications about the event to their assistant, who are you referring to?

A.    Her -- I know her last name was Woods. She was a social media person.

THE WITNESS:  Could we take a break for a minute?

MR. GOTTESMAN:  Sure.

THE WITNESS:  I tried to catch you before you started.

MR. MILLER-NOVAK:  Yes.  You answered the question.

(A brief recess was taken.)

MR. GOTTESMAN:  Before we jump into questions, he wants to clarify something about the timing, that he thinks he may have given inaccurate or confused

testimony regarding the timing.

Go ahead, Jason.

MR. MILLER-NOVAK: Oh, this meeting?

THE WITNESS: Yes.

MR. MILLER-NOVAK: Okay. All right.

THE WITNESS: So that -- the meeting with -- the briefing meeting was before my meeting with the Sheriff and Chief -- us three, because that was in October. The briefings -- they came around in the spring.

And I remember because I had that meeting in October and then I ended up leaving that January. So that time frame -- in my head, I was like wait, that's wrong. So that was my mistake. That's why I asked for the pause. I just had to get a minute to put all that time frame together.

BY MR. MILLER-NOVAK:

Q. Spring of what, 2023?

A. Yes.

Q. What do you consider to be spring, March, April?

A. March or April. Because then my meeting

with them was in October of '23, right?  Yes.  Yeah.

Q.   Okay.  And then at any time in that meeting did anybody mention you by name?

A.   In the meeting?

Q.   In the briefing.

A.   Which one?  The briefing?  No.

Q.   Did anybody mention your wife by name?

A.   No.

Q.   Okay.  Were Sheriff McGuffey or Gramke looking at you when they made any of these alleged statements?

A.   Yes.

Q.   Okay.  Were they looking at anybody else?

A.   No.

Q.   Okay.  So you're saying that the whole time they spoke they were staring at you?

A.   No.  Just the -- when she said the -- about the officers' wives.

Q.   Okay.  So before we went -- and I refound my place --

A.   Uh-huh.

Q.   -- we were actually talking about paragraph 19.

A.   Yes.  Yes, sir.

Q.   Okay.  All right.  Let's go back to 19,

sir.

A.   Yes, sir.

Q.   All right.  So we talked about the assistant and you identified her.  I know this is redundant.  But what was her name?

A.   Woods.

Q.   Woods.  That gets me back on track.  Thank you.  All right.  So you sent just an email to Woods?

A.   I reached out to her on social media.

Q.   So you reached out to Woods on social media.  When you say you reached out to her on social media, in what aspect?

A.   It was Messenger.

Q.   How many times?

A.   I don't recall.

Q.   Was it just once?

A.   I don't -- yes.

Q.   Okay.  Well, here it says by directing communications.  It says plural.  So is there more than one communication you had with her or only one?

A.   Messenger.  And I believe -- I remember trying to contact her I thought on the actual Facebook through the -- her -- the best I remember was I know I did through Messenger through the

County's Facebook, but I believe I messaged her personally as well.  I remember trying to get a hold of her personally as well.

Q.   Okay.  Did she ever reply to you?

A.   After -- after -- yes, she did.  I can't remember if it was before or after the game.  I'm sorry.  But she did.

Q.   Okay.  Do you have any knowledge whether or not either Sheriff McGuffey or Gramke received any notice of the Remember the Fallen event before it happened?

A.   I didn't know that until my meeting with the Sheriff and Chief.

Q.   Okay.  Do you have any reason to believe they didn't tell you the truth when they said they were unaware of it?

A.   I have -- no.

Q.   Okay.  So you only used Facebook, it sounds like, to try to communicate with Ms. Woods.  So you didn't use like a company, you didn't like use like -- I'm sorry, company -- you didn't use a county email address?

A.   No.

Q.   Okay.  So you didn't use any official communications, you only communicated with her

through Facebook?

A. Yes.

Q. Okay. And you never received any statement from either McGuffey or Gramke that they received that communication?

A. No.

Q. And they didn't tell you whether or not they supported the event?

A. No. I didn't have any communication with them till my meeting.

Q. Okay. So no one -- neither Gramke nor Sheriff McGuffey said Jason, we do not support Remember the Fallen?

A. Correct.

Q. Okay. They just didn't mention it to you at all?

A. Correct.

Q. Let's turn to the page and go to paragraph 21. So after Remember the Fallen occurred, on your Facebook page you made a post about the event; is that correct?

A. Yes.

Q. And people made comments about your post, correct?

A. Yes.

Page 75

Q. Okay. Paragraph 21 says, This was met with a statement by another member of the Sheriff's Department that the member would have liked to have known in advance about the event; do you see that?

A. Yes, sir.

Q. In response, it says, Jason truthfully posted, and not part of any official duties and on his own time, quote, our department didn't support it. No county items were used to advertise this game; do you see that?

A. Yes.

Q. Flyers were taken down from briefing rooms; do you see that?

A. Yes.

Q. Okay. How do you know that the County didn't support it?

A. Because all I received back from Ms. Woods was thank you for honoring Corporal Adam McMillan.

Q. Okay. But that was after the event already occurred?

A. I don't recall.

Q. Okay. But you don't know -- you never received any statement -- official statement from either McGuffey or Gramke that they did not support the event, correct?

A.    Correct.

Q.    Okay.  The statement about flyers were taken down from briefing rooms, what are you referring to in that statement?

A.    The flyers that were hanging in the briefing rooms were taken down.

Q.    Okay.  How long were they up before they were taken down?

A.    A minimum two weeks.

Q.    Okay.  So they weren't immediately torn off the walls then?

A.    I do not know when they were taken down. I know when they went up and then when I came back two weeks later, they were already gone.

Q.    Do you know if anybody ordered that they be removed?

A.    I do not know.

Q.    Okay.  My understanding of the bulletin boards is that things are frequently removed from the bulletin boards, correct?

MR. GOTTESMAN:  Objection.

A.    Yes.

Q.    Okay.  So it's not actually abnormal for certain postings to be removed from the bulletin boards in the briefing rooms, correct?

A.    Once it's -- sorry.

MR. GOTTESMAN:  Objection.

A.    Once it's expired.

Q.    Do you have any reason to believe that either Gramke or Sheriff McGuffey instructed anybody to tear down those flyers?

A.    I have no idea.

Q.    Do you have any idea who removed those flyers from the briefing room?

A.    No.

Q.    So why did you include that statement in your response to this other member of the Sheriff's Department?

A.    Which statement?  There's three.

Q.    That flyers were taken from briefing rooms.

A.    Because they were taken down.

Q.    Before you made this post about the Sheriff Department not supporting the event, did you ask anybody at the Sheriff's Department whether or not you could make this statement about the Department's position regarding Remember the Fallen?

A.    No.

Q.    Okay.  So at no time before making this public statement did you contact the superior and

say may I post what the Department's position is regarding Remember the Fallen?

A. No. That comment is to a superior, though.

Q. Okay. Did you ask his permission before responding what the Department's position was on Remember the Fallen?

A. Yes -- well, no. I'm responding to his question about it.

Q. Did you ever try to directly contact either Mr. Gramke or Sheriff McGuffey about Remember the Fallen?

A. No.

Q. Do you know whether or not Sheriff McGuffey would have supported it had you asked her?

MR. GOTTESMAN: Objection.

A. I have no idea.

Q. Do you know whether or not Chief Gramke would have supported the event had you asked him?

MR. GOTTESMAN: Objection.

A. I have no idea.

Q. Do you know whether or not they have supported any Remember the Fallen events that have occurred after that year's Remember the Fallen event?

A.   I -- one more time.

Q.   Well, this was a Remember the Fallen event in the year 2022, correct?

A.   Correct.

Q.   Do you know whether or not they've supported -- have you had a Remember the Fallen event in 2023?

A.   I had a military tribute game.

Q.   Did the Sheriff's Department support that?

A.   The Department -- yes.

Q.   Okay.  What about 2024; was there any game that was like a Remember the Fallen event?

A.   No.

Q.   Okay.

A.   No.  I don't think so.

Q.   Okay.  So in 2023 the Sheriff's Department did support your event, correct?

A.   The Sheriff's Department, yes.

Q.   Okay.  And Sheriff McGuffey was the Sheriff of the Department in the year 2023, correct?

A.   Yes.

Q.   And Gramke was still the Chief at that time, correct?

A.   Yes.

Q.   When did that 2023 event occur?

Page 80

A.    June.

Q.    June of 2023?

A.    Yes.

Q.    Okay.  Which is before your meeting with Sheriff McGuffey and Mr. Gramke, correct?

A.    Yes.

Q.    All right.  So they actually supported that event that you --

A.    The department did.

Q.    Okay.  But they didn't stop it, correct?

A.    I didn't hear anything from either one of them.

Q.    Okay.

A.    Major Ketteman headed that up.

Q.    Do you know whether or not he asked either Sheriff McGuffey or Chief Gramke if it was okay to support the event?

MR. GOTTESMAN:  Objection.

A.    You would have to ask him.

Q.    Okay.  So you don't know whether or not he did ask?

A.    Correct.

Q.    Okay.  So it's possible that he did, correct?

MR. GOTTESMAN:  Objection.

Page 81

A.   You'd have to ask him.

(Defendants' Deposition Exhibit No. 2 was marked for identification.)

Q.   All right.  So I'm going to hand you what we're going to mark as Defendants' Exhibit 2.  I've handed you what is the Hamilton County Sheriff's Office General Order on Social Media; do you see that?

A.   Yes, sir.

Q.   Have you ever seen this before today?

A.   Yes, sir.

Q.   Okay.  It looks like it was issued by Jim Neil; do you see that?

A.   Yes, sir.

Q.   Do you have any reason to disagree that this is the social media policy in place at the Hamilton County Sheriff's Department during the year 2022?

MR. GOTTESMAN:  Objection.

A.   No, sir.

Q.   Okay.  Great.  I'm going to have you go to page -- let me get there.  I think it's five.  It is five.  Okay.  Do you see where it says 701.05 in the middle of the page?

A.   Yes, sir.

Page 82

Q.   And it says Personal Use of Social Media; do you see that?

A.   Yes.

Q.   Do you understand that this applies to a deputy's personal use of social media?

A.   Yes.

Q.   Okay.  So in other words, what you do with your own social media account, you understand that this applies to that, correct?

A.   Correct.

Q.   If you turn to the next page, do you see the big F there in the middle of the page?

A.   Yes, sir.

Q.   All right.  It says, When using social media, Sheriff's Office personnel should be mindful that their speech becomes part of the worldwide electronic domain.  Therefore, adherence to the department's code of conduct is required in the personal use of social media; do you see that?

A.   Yes.

Q.   All right.  And in particular, Sheriff's Office personnel are prohibited from the following. One, Speech containing obscene or sexually explicit language, images, or acts and statements or other forms of speech that ridicule, malign, disparage, or

otherwise express bias against any race, any religion, or any protected class of individuals; do you see that?

A.   Yes.

Q.   Okay.  Do you consider people who are homosexual to be part of a protected class of individuals?

MR. GOTTESMAN:  Objection.

A.   Yes.

Q.   I'm going to have you go to subsection H. Do you see a little bit down the page there?

A.   Yes.

Q.   It says, Sheriff's Office personnel may not divulge information gained by reason of their authority; make any statements, speeches, appearances, and endorsements; or publish materials that could reasonably be considered to represent the views or positions of Hamilton County Sheriff's Office without expressed authorization from the Sheriff or his designee; do you see that?

A.   Yes.

Q.   Okay.  You would agree that this policy was in place as of the year 2022, correct?

A.   Yes.

MR. MILLER-NOVAK:  Okay.  You can

Page 84

give that to her and keep Exhibit 1 out.

Q.   I want to go to paragraph 23 in the complaint.  It says, In 2022, Jason applied for a position with the Regional Enforcement Narcotics Unit, RENU.  He was narrowed down to three finalists after a vetting and interview process; do you see that?

A.   Yes.

Q.   So I think we talked about it yesterday, but what is RENU?

A.   That's our Regional Enforcement Narcotics Unit that does -- it's basically the OCD organization -- Organized Crime Division -- that does drugs, human trafficking.

Q.   And how many times have you applied for RENU?

A.   Twice.

Q.   Okay.  When was the first time?

A.   I don't -- I don't recall the exact year.

Q.   Does 2018 sound correct?

A.   It would be in my personnel folder probably, if that's where that came from.

Q.   Were you denied?

A.   Denied?

Q.   Was your application rejected or accepted?

A.   It was accepted.

Q.   In 2018, your first time?

A.   Yes.  Until there was an opening.

Q.   Okay.

A.   That was my understanding.

Q.   Did you receive the RENU position in 2018?

A.   No.

Q.   Okay.  Who made that decision?

A.   I believe whoever the lieutenants and the captain was at that time.

Q.   Do you know who they were at that time?

A.   I don't recall.

Q.   Was one of them Chief Gramke?

A.   Yes.  Gramke was down there at that time, I believe.

Q.   Do you know whether or not he played any part in the decision making whether or not to assign you to RENU in that first attempt?

A.   He -- was he on that board -- it was -- give me one second.  I'm trying to remember who was all in that interview process.  Was it Guy?  Yes, I believe so.

Q.   Okay.  Do you know if he made the decision to reject your assignment to RENU at that point in time?

Page 86

A. I don't necessarily know that I was rejected. It was just there wasn't openings before that list expired.

Q. Okay. So your testimony is today that no one rejected or refused to appoint you in the first application, that there was just no positions available at that time?

A. Correct. Because my understanding is when you submit the green letter to have your interview process, they can say yes or no and they interview you.

Q. Okay. So you don't know whether or not someone said no specifically when you submitted your green letter?

A. Correct. Well, wait a minute. No. The green letter was to be either accepted or denied the interview for RENU.

Q. Okay.

A. So the green letter is accepted. I'm sorry. But then they put their own list together that's not available to the officers. And then they pick from that list depending on the openings in RENU at that time.

Q. Okay. So you didn't make that list, in other words?

Page 87

A.   No.   They just didn't have any openings. They don't post the list.   So you don't know exactly where you're at on that list.

Q.   Okay.   In paragraph 24 it says, Similarly, in 2022, Jason tested for corporal, a promotion that involved a seven percent raise in compensation.   He placed 16 or 17 out of 30 on an eligibility list; do you see that?

A.   Yes.

Q.   Under the union contract with the Sheriff's Office was to stay in place for two years; do you see that?

A.   Yes.

Q.   Okay.   Would you agree you actually placed 19th on that list?

A.   Yes.   If we have the list.

Q.   I can get it.

A.   Okay.

MR. MILLER-NOVAK:   That's fine.   I'm handing you what's previously been marked Plaintiffs' Exhibit -- sorry, that got a little beat up there.   Will you mark that as 3?

(Defendants' Deposition Exhibit No. 3 was marked for identification.)

Barlow Reporting & Video Services, LLC
(859) 261-8440

Page 88

Q. So you took the test in 2022, correct?

A. Yes.

Q. All right. So the results came out in January of 2023, correct?

A. Correct.

Q. Okay. Your name, you would agree, is next to No. 19 on Exhibit 3, correct?

A. Correct.

Q. And Exhibit 3 is the test results for January of 2023, correct?

A. The test and interview process, yes.

Q. Okay. So you would agree that your placement is actually 19 on that list, correct?

A. Yes and no. Shannon Cunningham went out on medical. That would put me at 18. And I thought there was one more person that left, but I might be mistaken. That's why I said 16 or 17 when I did that.

Q. Okay. But paragraph 14 says that you placed 16 or 17, correct?

A. Correct.

Q. It doesn't mention anything about people ahead of you no longer being eligible, correct?

A. People -- I'm sorry, what?

Q. It doesn't mention any of the things you

said about this one individual that left, correct?

A.   Correct.

Q.   Okay.  So you actually placed 19th, though, correct?

A.   Correct.

MR. MILLER-NOVAK:  Okay.  All right. You can set that down.  I just wanted to clarify that.

Q.   All right.  And then this paragraph says that that list was supposed to stay in place for two years, correct?

A.   Correct.

Q.   All right.  Did it stay in place for two years as far as you know?

A.   Yes, as far as I know.

Q.   Okay.  So nothing happened to shorten -- we'll just call it the shelf life of this test result, correct?

A.   That I'm aware of.

Q.   Okay.  Because my understanding is -- because it says it here -- under the union contract it was supposed to stay in place for two years, correct?

A.   Correct.

Q.   All right.  So to the best of your

Page 90

knowledge no one has ever filed a grievance or a complaint that this list did not stay in place for two years at any point in time, correct?

MR. GOTTESMAN: Objection.

A. I wouldn't know.

Q. Okay. So in January or early February of 2023 it says, Jason -- we're on paragraph 25, by the way.

A. Okay.

Q. Jason was informed that he was selected for RENU, that everyone signed off on his selection, and that he would begin working with RENU in March of 2023; do you see that?

A. Yes.

Q. When it says everyone signed off on a selection, who are you referring to?

A. The chain of command through RENU up to Gramke.

Q. Okay. Paragraph 26 says, Then, approximately an hour after that notification, Jason was called again by RENU supervision, and informed that Gramke had overridden his selection to that unit; do you see that?

A. Yes.

Q. Who called you and informed you of that?

A.    Lieutenant Matt Guy from RENU.

Q.    Okay.  Did he provide you any reason that Gramke had overridden your selection to the unit?

A.    Because of my wife's social media posts.

Q.    Okay.  Who said that?

A.    Lieutenant Matt Guy.

Q.    How do you spell that name?

A.    G-u-y.

Q.    Just like it sounds?

A.    Yes.

Q.    Did he tell you that Sheriff McGuffey had any involvement in that process?

A.    No.

Q.    Do you have any reason to know whether or not Sheriff McGuffey had any involvement in overriding your selection to RENU?

A.    I do not know.

Q.    Do you have any evidence in your possession to suggest that Sheriff McGuffey had any involvement whatsoever in overriding your selection to RENU?

MR. GOTTESMAN:  Objection.

A.    I did not know.

Q.    All right.  Let's turn the page.  We're on paragraph 27.  This says, In April 2023, Caroline

Page 92

Adams made a post to both her Chaz page and her Krakken page about poor morale in the Hamilton County Sheriff's Office.  A true and accurate -- it says a true and accurate of this post is attached as Exhibit 4 -- I think that's a typo.  I think it means a true and accurate copy of this post is attached as Exhibit 4.

A.    Okay.

Q.    Typos happen.  So going back to paragraph 25, if we can.

A.    Yeah.

Q.    It says, In late January or early February 2023, Jason was informed that he was selected for RENU; do you see that?

A.    Yes.

Q.    Everybody signed off on his selection and he would begin working for RENU in March of 2023; do you see that?

A.    Yes.

Q.    Then, approximately an hour after that notification, Jason was called again by RENU supervision, and informed that Gramke had overridden his selection to that unit; do you see that?

A.    Yes.

Q.    And earlier you said that Matt Guy told

you that it had something to do with your wife?

A.   Yes.

Q.   What about your wife did he say that that had something to do with?

A.   That Gramke said that my wife posted something on social media.

Q.   Okay.  Did that have anything to do with Caroline Adams according to Matt Guy?

A.   He just said something that my wife posted on social media.

Q.   Okay.  So on paragraph 27 it says, In April of 2023, Caroline Adams made a post to both her Chaz page and her Krakken page about poor morale; do you see that?

A.   Yes.

Q.   In the Hamilton County Sheriff's Office. A true and accurate copy of this post is attached as Exhibit 4; do you see this?

A.   Yes.

Q.   It says that Jennifer liked that post, correct?

A.   Yes.

Q.   You would agree that April 2023 comes after March of 2023, correct?

A.   Correct.

Page 94

Q.   Okay.  Just Gregorian calendar, right --
January, February, March, April, correct?

A.   Correct.

Q.   All right.  So you agree that nothing that
your wife could have done in terms of liking
Caroline Adams' post in April of 2023 could have any
relationship to your denial from RENU in March of
2023, correct?

A.   Correct.

Q.   Because the post in Exhibit 4, which if
you want to look at it, you can, it would have
occurred after Gramke overrode your --

A.   No.  You're wrong on that.

Q.   How so?

A.   So I was supposed to be assigned to RENU
in March.  He called me on February 23 at three
o'clock and informed me I was not going to RENU.

Q.   Okay.  But then April of 2023 would be two
months after that, correct?

A.   Correct.

Q.   Okay.  So let's go to Exhibit 4.

A.   Okay.

Q.   It was almost towards the very back; do
you see that?

A.   Exhibit 4?

Q.   Yes.

A.   Yes.

Q.   Okay.

A.   Okay.

Q.   Well, according to your complaint on paragraph 27 this happened in April of 2023, correct?

A.   Correct.

Q.   Okay.  Which is two months after February of 2023, correct?

A.   Correct.

Q.   So you agree that Exhibit 4 couldn't have any relationship to Gramke overriding your appointment to RENU in February of 2023, correct?

A.   Right.

Q.   Because this post happened two months after he overrode your appointment to RENU, correct?

A.   Correct.

Q.   So you would agree that Exhibit 4 and the fact that your wife liked Caroline Adams' post in April of 2023 could have no relationship to Gramke's decision to override your RENU appointment, correct?

A.   No.

Q.   You don't agree with that?

A.   No.  Because it said that she posted

something.  You stated liking is not posting.  And she posted something -- he told Lieutenant Guy that he did not like a post that my wife made on Facebook.

Q.   I'm not talking about that.  I'm talking about Caroline -- there's two different things that occurred, correct?

A.   Correct.

Q.   So one of them is in April of 2023 Jennifer liked a post made by Caroline Adams, correct?

A.   Uh-huh.

Q.   That happened two months after you were called about RENU, correct?

A.   Correct.

Q.   So Exhibit 4, where your wife liked the post of Caroline Adams, could have no relationship to you not receiving your RENU position, correct?

A.   Yeah, I guess.

Q.   Okay.  The next paragraph, paragraph 28, says, By July 2023, Jason was next on the corporal promotion eligibility list; do you see that?

A.   Yes.

Q.   Okay.  Paragraph 29 says, Jason was informed by other officers in August of 2023 that

regardless of vacancies, he would not be promoted, even if that meant generally not promoting anyone else; do you see that?

A. Yes.

Q. Who are these other officers?

A. I don't recall.

Q. So you can't identify a single human being that you're referring to in paragraph 29?

A. That's why I said I don't recall.

Q. Do you recall exactly what they said?

A. They said that they were going to pull the rule -- how was it worded? Since -- there was a K-9 below me. And they were going to use the rule of three to skip over me or something along them lines.

Q. Okay. But you don't know who told you that?

A. It was just a bunch of officers in the briefing room.

Q. Do you know if they said that they talked to Sheriff McGuffey about that?

A. I don't recall.

Q. Do you know if they talked to Mr. Gramke about that?

A. It was brought up in one of their staff meetings. So it was either a sergeant or lieutenant

or higher that said it.

Q.    But they didn't say where they got that source of information?

A.    From the staff meeting.

Q.    What do you mean staff meeting?

A.    When the lieutenants and captains have their monthly -- weekly or monthly, whenever they have their staff meeting, it was brought up about the next corporal being moved or promoted.

Q.    When did that staff meeting occur?

A.    I do not know.

Q.    Who would have been the lieutenant or the corporal in that staff meeting?

A.    It would be -- I believe the staff meetings are lieutenants and higher.  I'm not positive.  So there might be a sergeant and higher. I'm not positive.

Q.    So you don't know whether or not it was a sergeant at that meeting or a lieutenant?

A.    Correct.

Q.    And you don't know where they allegedly obtained this information?

A.    From the staff meeting.

Q.    Oh.  They said they heard it in a staff meeting?

A.    Yes.

Q.    Did they say they heard Gramke say it in the staff meeting?

A.    I don't recall.

Q.    And would only one person tell you this or more than one person tell you this?

A.    It was just one person.

Q.    Okay.  And you don't remember who that one person is?

A.    I can't remember if it was my sergeant or lieutenant.

Q.    And who would they be?

A.    At that time it would be Lieutenant McElroy, Lieutenant Downing.  And I can't remember exactly who told me.

Q.    Okay.  So right now you're saying that the allegation was or the statement made to this person that they were going to promote someone underneath you using the rule of three?

A.    That I -- I don't necessarily remember if they said the rule of three, but that I was being skipped.

Q.    Okay.  Did that ever occur before you resigned?

A.    No.

Q.   So you were never skipped before you resigned?

A.   They didn't promote anybody before I resigned.

Q.   They didn't promote anybody before you resigned?

A.   I was next to be promoted and then I left.

Q.   Okay.  But between August of 2023 and January 30 of 2024, none of these allegations about you being skipped over using the rule of three actually occurred, correct?

A.   From August -- right.

Q.   So it turns out the story did not end up coming true, correct?

A.   I do not know.

Q.   And it didn't happen; you would agree?

A.   I'll agree.  Yeah, it did not happen.

Q.   Okay.  So it's entirely true that it was false then, right -- it's entirely possible that that wasn't true?

A.   No, not necessarily.

Q.   Okay.  You didn't hear anybody say that, correct?

A.   I was told that.

Q.   By one person?

A.   That was at the staff meeting.

Q.   Okay.  And they said that they were going to use the rule of three to skip you over, correct?

A.   They heard I was going to be skipped on the corporal -- the next corporal opening.

Q.   All right.  And between August of 2023 and when you left in January of 2024 that never occurred, correct?

A.   Correct.

Q.   So in five months after that conversation none of that came true, correct?

A.   Correct.

Q.   Okay.  The paragraph continues, Not long after that, Jason's junior leadership informed him that McGuffey was attempting in collective bargaining negotiations with the union, to get an early termination of the eligibility list, but just for corporal, to ensure that Jason would not be promoted.  Who told you that?

A.   One of the union reps.

Q.   Okay.  So earlier we discussed what your -- your knowledge of being a union president?

A.   Yes.

Q.   This couldn't happen unless the union agreed to it, correct?

A. Correct.

Q. So it wouldn't be possible that Sheriff McGuffey could just unilaterally do this, correct?

A. Not necessarily. It can be a MOU if she wanted to exhaust the list and the union agreed upon it.

Q. Okay. Was there any representation made to you that she was threatening to do that?

A. I have no idea.

Q. Okay. So all you heard is that she was negotiating in bargainings with the union to change the shelf life of the eligibility list from two years to one year, correct?

A. Correct.

Q. Okay. Would you agree that that necessarily wouldn't even be retroactive to the eligibility list that you were on?

MR. GOTTESMAN: Objection.

A. I would not know what they agreed upon.

Q. Okay. Do you know whether or not that was even being discussed?

A. I was told it was being discussed.

Q. Okay. But you don't know whether or not it was being discussed?

A. Just what I was told.

Q. Okay. But it's possible that you could agree in a negotiation about the union contract that going forward that list would only be one year, correct?

MR. GOTTESMAN: Objection.

A. That they could agree upon that, you mean?

Q. Yes.

MR. GOTTESMAN: Objection.

A. I mean, yeah, I guess they could agree upon it.

Q. Typically speaking when you renegotiate a collective bargaining agreement, those things don't necessarily apply retroactively all the time, correct?

MR. GOTTESMAN: Objection.

A. It depends on what they want.

Q. Okay. But it's also possible that you could renegotiate the list in the future and would only have a two-year shelf life, correct?

MR. GOTTESMAN: Objection.

A. Yeah.

Q. But that wouldn't apply retroactively to the current list, correct?

MR. GOTTESMAN: Objection.

A. It's whatever they agree upon.

Page 104

Q. Okay. So you don't actually know what was going on at this point in time then, correct?

MR. GOTTESMAN: Objection.

A. Just what I just recited that I was told.

Q. Okay. So you weren't part of the negotiations, correct?

A. No.

Q. And you have no personal knowledge whether or not there was any talk about retroactively reducing the length of your eligibility list?

MR. GOTTESMAN: Objection.

A. What I was told from the union rep.

Q. Okay. Who is the union rep?

A. It was Alexander.

Q. Okay. If I were to represent to you that they were not negotiating retroactively applying that to the current list you were on, would you have any reason to disagree with that?

MR. GOTTESMAN: Objection.

A. I wasn't there.

Q. Okay. So you have no personal knowledge that that would be incorrect then?

MR. GOTTESMAN: Objection.

A. Correct.

Q. Okay. If that were the case and they

weren't trying to retroactively apply it to your list, you would agree that it wouldn't actually affect you personally at all to change the shelf life of that list, correct?

MR. GOTTESMAN: Objection.

A. Correct.

Q. Because your list would have lasted the two years, correct?

A. Yes.

Q. At that point, just like every other person, you could retake the test, correct?

A. Yes.

Q. And that your list on the -- your place on the eligibility list would last one year, correct?

A. Yes. If that's what they agreed upon.

Q. Right. And you wouldn't be treated any different than any person on the eligibility list, correct?

MR. GOTTESMAN: Objection.

A. I would hope so, but obviously that's not what happens.

Q. Well, how did that not happen?

A. That's why we're here.

Q. No. You never took the eligibility test again, did you?

A. No.

Q. You never took the test again, correct?

A. But we're here because I was treated unfairly. So you can't say that I would be treated fairly on the next round of the test. That's why I had to leave.

Q. I understand that's your allegation. But what I'm saying is that if you were to retake the test, you would be on the eligibility list with your placement for a year like everybody else, correct?

MR. GOTTESMAN: Objection.

A. As long as you say that I won't be -- that I would be treated fairly, yeah, I'll agree with that.

Q. This part of the sentence says that he -- referring to you -- would not be promoted, even if that generally meant not promoting anyone else.

Is it your allegation that it was Sheriff McGuffey's plan to no longer promote people to corporal as long as you were there?

A. That was my understanding, yes.

Q. Okay. And you don't think that sounds a little bit preposterous at all?

A. With her, no.

Q. Okay. So it's your allegation that she

would not promote anybody to corporal ever again as long as you were there?

A.   On that list.

MR. GOTTESMAN:  Objection.

THE WITNESS:  Oh, sorry.

A.   On that list, yeah.  Yes.

Q.   On what list?

A.   The eligibility list.

Q.   Okay.  So you believe that when you're saying that, you're just referring to exhibit -- the exhibit we just looked at, correct?

A.   Yes.

MR. GOTTESMAN:  For the record, that's three.

MR. MILLER-NOVAK:  Three.  Thank you.

Q.   Plaintiffs' Exhibit 3.  So you're saying for the remainder --

MR. GOTTESMAN:  Defendants' Exhibit 3.

MR. MILLER-NOVAK:  What's that?

MR. GOTTESMAN:  Defendants' Exhibit 3.

MR. MILLER-NOVAK:  Thanks.

Q.   That for the remainder of that two-year shelf life, that they were not going to promote

anybody as long as you were on that list, correct?

A.   Correct.

Q.   Okay.  That's your allegation?

A.   Correct.

Q.   Okay.  But when that list has expired, had you stayed, you would have the same opportunity to retake the test, correct?

A.   Yes.

Q.   And you would, again, appear in some placement on that list, correct?

A.   Correct.

Q.   For all you know you could have placed first, correct?

A.   Correct.

Q.   Or you could have placed last, correct?

A.   Correct.

Q.   And if you placed in the top five, then you would have higher priority on that list than other people, correct?

A.   Correct.

Q.   And you don't know what would have happened because you didn't take the test again, correct?

A.   Correct.

Q.   Okay.

A.   But they still can apply the rule of three and keep skipping me.  Just because I placed one doesn't mean I definitely get that corporal's position.

Q.   Okay.  Unless the union negotiated out the rule of three, correct?

A.   Correct.

Q.   Because that's also within the power of the bargaining unit, correct?

A.   I can't recall.  I think -- I can't recall.

Q.   Well, the process to promote somebody to a corporal is something referred to within the collective bargaining agreement, correct?

A.   Correct.

Q.   And the collective bargaining unit is -- agreement -- sorry -- is a product of negotiations between the union and the county, correct?

A.   Correct.

Q.   Okay.  So as part of the negotiations from shortening the shelf list of the eligibility from two years to one year, the union could counter, that's fine, we want to outdo or get rid of the rule of three, correct?

A.   Correct.

Q.   So at that point in time had the union done that hypothetically and you placed number one on the list, then you would be in the very first position to get a promotion, correct?

A.   Hypothetically, yes, if the rule of three was not in play, but it still is.

Q.   Okay.  So when you left, had that union negotiation completed?

A.   I don't -- I do not know.

Q.   So you didn't actually know what the outcome of that negotiation would be by the time you resigned, correct?

A.   Correct.

Q.   So for all you know the rule of three could have been abolished by the time you resigned, correct?

A.   If it was being negotiated, correct.

Q.   Okay.  And for all you know they could have extended the two years to three years, correct?

A.   Again, correct.

Q.   Because negotiation hadn't been completed by the time you resigned, correct?

A.   Correct.

Q.   Okay.  So paragraph 30 says, Concerned that he was being retaliated against, Jason asked

for a meeting with Gramke and McGuffey in early September of 2023. It continues, Jason was informed that Gramke and McGuffey could meet with him in October of 2023; do you see that?

A. Yes.

Q. As of September of 2023 had you received any independent information that Sheriff McGuffey had any involvement in Gramke overriding your RENU placement?

A. From September to October?

Q. Before September.

A. Yes.

Q. Okay. She was involved personally in overriding?

A. You said McGuffey and Gramke.

Q. Okay. If I did, then I apologize I asked a terrible question. What I meant to ask is, prior to September of 2023 had you had any independent information that Sheriff McGuffey was involved in rejecting your RENU application?

A. No.

Q. Prior to September of 2023 had Sheriff McGuffey said anything to you about naming your wife, Jennifer Patterson Davis?

A. No.

Q.   Had Sheriff McGuffey said anything to you about your post involving the Remember the Fallen football game?

A.   No.

Q.   Okay.  Do you have any knowledge whether or not Sheriff McGuffey was even aware that you applied for RENU before September of 2023?

A.   No.

Q.   Okay.  Any evidence at all, anybody make any statements about whether or not she was aware that you had applied for RENU in 20- -- before September of 2023?

MR. GOTTESMAN:  Objection.

A.   No.

Q.   Okay.  So if I was to represent to you that prior to September of 2023 she was completely unaware that you had even applied or wanted a position in RENU, you would have no reason to disagree with that statement?

MR. GOTTESMAN:  Object to form.

Go ahead.

A.   No.  What -- would I have a reason to believe that she had no knowledge?

Q.   Do you have any evidence that she had any knowledge?

Page 113

A.   I have no evidence, no.

Q.   Do you have any knowledge that she had any involvement with your being overridden to RENU prior to September of 2023?

A.   No.

Q.   Do you have any evidence that she was aware that you made the Remember the Fallen post on Facebook prior to September of 2023?

A.   No.

Q.   Did she ever talk to you about your RENU application prior to September of 2023?

A.   No.

Q.   Did she ever talk to you about your wife, Jennifer Patterson Davis, prior to September of 2023?

A.   No.

Q.   So the next paragraph says, On October 10, 2023, at approximately 8:30 a.m., Jason met with Gramke and McGuffey; do you see that?

A.   Yes.

Q.   Do you agree that that was the day and time that you met?

A.   Yes.

Q.   Okay.  In paragraph 32 it said, McGuffey began the meeting by stating that she had been

looking -- actually let me go back.  Scratch that.

On October 10, 2023, at approximately 8:30 a.m., Jason met with Gramke and McGuffey.  You requested that meeting, correct?

A.   Correct.

Q.   Okay.  And why did you request that meeting?

A.   Because of the way I was not -- I was taken out of the RENU process and being skipped over for corporal.

Q.   Okay.  You had not been skipped over for corporal at that point in time, correct?

A.   I don't know.

Q.   I mean, earlier we just talked about how between August of 2023 and when you resigned no K-9 officer behind you had skipped over you, correct?

A.   Correct.  I don't know if there was a corporal's position they were holding out for or not.  I mean, there's no way of knowing.

Q.   Okay.  So you don't know that anybody had skipped over you at that point in time, correct?

A.   I didn't know if there was a corporal's position open.

Q.   Okay.  Have you ever found out that you were ever skipped over at that point in time?

A.   They promoted after I left.

Q.   Okay.  So you would agree that before you resigned, you were never skipped?

A.   I -- no.  I don't know if they were holding out or not.

Q.   Okay.  I understand that your allegation is that you believed that they were holding out.

A.   Correct.

Q.   That's not what I asked.  What I asked was, do you have any knowledge that you were actually skipped before you resigned?

A.   It's just an assumption.

Q.   An assumption of what, that someone skipped you?

A.   That there wasn't an opening for me to fall into.  I don't know if they held that out or not.  There's no proof either way.

Q.   Okay.  I didn't ask whether or not they were holding out on an opening.

A.   Okay.

Q.   Okay.  I'm asking whether or not there was an opening that someone behind you skipped to get?

A.   I don't know if there was an opening or not, so I can't say yes or no.

Q.   Okay.  So you don't know whether or not

there was an opening?

A.   Correct.   That's. . .

Q.   Okay.   Well, you would agree if there was not an opening, then you were not skipped?

A.   Yes.

Q.   So this almost seems like an introductory question, but let's take a step back.  So a sheriff's department is somewhat like a paramilitary force, correct?

A.   Correct.

Q.   So there are ranks, correct?

A.   Yes.

Q.   And they have military type titles like sergeant, corporal, et cetera, correct?

A.   Yes.

Q.   Okay.  So there is a ranking structure, correct?

A.   Uh-huh.  Yes.

Q.   And you would agree that being -- I would say any kind of law enforcement -- I would say deputy, but now you're a police officer in Springdale, correct?

A.   Yes.

Q.   And you would agree that it's a very important job, correct?

A. Yes.

Q. And it's a very dangerous job, correct?

A. Yes.

Q. And that it's a job -- the old -- do you ever watch Spider-Man?

A. Uh-huh.

Q. So with great power comes great responsibility --

A. Yes.

Q. -- right? Peter Parker?

A. Yes.

Q. All right. So you would agree that when you promote people in a department, it's a very important task, correct?

A. Correct.

Q. And that reviewing people's character matters, correct?

A. Correct.

Q. Reviewing the amount of responsibility they have matters, correct?

A. Correct.

Q. Whether or not they're quite frankly overly aggressive would be something that you would be concerned about, correct?

A. Correct.

Q. All right. Because Mel Gibson might be cool in Lethal Weapon, but in real life he violates people's constitutional rights like every five minutes, correct?

A. Correct.

Q. Right. You wouldn't really want Mel Gibson to be in the Hamilton County Sheriff's Department as a corporal, correct?

A. Correct.

Q. All right. That's without commenting on his personal life decisions. But at any rate, you would agree that one of the very important activities of the Sheriff's Department is how it promotes people, correct?

A. Correct.

Q. And the process that it uses to promote people, correct?

A. Correct.

Q. And that those are activities of the Sheriff's Department, correct?

A. Correct.

Q. So the entire process of promoting people is something that could be an issue of public concern, correct?

A. Yes.

Page 119

Q.   And you would agree that, you know, it's important to preserve documents that record that process, correct?

A.   Yes.

Q.   Such as your personnel file, correct?

A.   Correct.

Q.   Okay.  Or your application, correct?

A.   Correct.

Q.   Because the public might want to see your application for a position, correct?

A.   Yes.

Q.   Okay.  So it's become knowledgeable -- or become common knowledge, I guess, in this case that you recorded the conversation between yourself and Gramke and Sheriff McGuffey on October 10, 2023, correct?

A.   Correct.

Q.   Okay.  When did you decide that you were going to record that conversation?

A.   Probably back when I was a union president and we recorded every meeting and every encounter with administration.

Q.   When that occurred, did you inform the administration that you were recording them, the meeting?

A.   I don't recall.

Q.   I mean, it wasn't a secret that the meeting between the administration and union leaders was being recorded, correct?

A.   I don't -- I don't recall.

Q.   Okay.  I mean, it's pretty common when union leaders are present and there's representation for a member of the union that it can be recorded to document that activity, correct?

A.   We would have somebody -- a secretary take notes, but I always recorded them.

Q.   Okay.  You would have a secretary take notes?

A.   Correct.

Q.   Okay.  So it was known that that meeting was being recorded, correct?

A.   I can't say that.

Q.   Okay.  Well, a secretary was taking notes. Was she hiding somewhere taking notes, or was she taking notes out in the open?

MR. GOTTESMAN:  Objection.

A.   Well, I mean, she just -- just brief notes.  I mean, it wasn't actually like recording word for word.

Q.   Okay.  But it was at least known that

there was someone documenting the contents of that meeting, correct?

MR. GOTTESMAN:  Objection.

A.    Correct.

Q.    All right.  It wasn't secretively done, correct?

A.    Correct.

Q.    In October of 2023 did you inform either Sheriff McGuffey or Jay Gramke that you were going to record that meeting?

A.    No.  It wasn't asked.

Q.    Okay.  But you didn't tell them, correct?

A.    Because it wasn't asked.

Q.    Okay.  You didn't tell them because it wasn't asked?

A.    Correct.

Q.    Okay.  When did you decide to do that?

A.    Like I said before, I recorded all my interactions with administration from being a union president.

Q.    Okay.  So this is not the first time you recorded your conversations with people in the Sheriff's Department?

A.    With administration, with meetings, yes.

Q.    Okay.  So I understand that you did it

when you were the union president.  How about when you were just acting in your own individual capacity; had you ever recorded meetings with the administration prior to this meeting?

MR. GOTTESMAN:  Objection.

A.    This was my first meeting with them.

Q.    Okay.  So this was your first meeting with this administration, correct?

A.    Yes.

Q.    Did you ever meet as an individual with the prior administration under Jim Neil?

A.    Yes.

Q.    Did you record those conversations?

A.    Yes.  Because I was asked if I was recording or not by their assistant counsel.

Q.    Okay.  Because attorneys were there?

A.    No.  It's whatever Keith Clepper was at the time, which is their union liaison or whatever he was.

Q.    Okay.  So when those meetings happened, they happened in your capacity as a union leader?

A.    Just going in for meetings he would ask, yes.

Q.    Okay.  So when you met with Sheriff McGuffey, you're not going in as a union leader,

correct?

A.   Correct.

Q.   Okay.  Did Jennifer know you were going to record this meeting before it occurred?

A.   Yes.

Q.   Okay.  You discussed it with her beforehand?

A.   Yes.

Q.   How did that come up?

A.   Just in our conversation that I have a scheduled meeting with the Chief and the Sheriff and I'm going to meet with them about my future with the Department.

Q.   Okay.  And you told her that you were going to record it?

A.   I think she asked are you going to record that meeting as well, and I said absolutely.

Q.   Okay.  Did she tell you that she wanted you to record that meeting?

A.   No.

Q.   Did she encourage you to record that meeting?

A.   No.

Q.   Okay.  Did you tell her why you were going to record that meeting?

A.   No.   She asked if I was going to record that meeting.

Q.   And you said yes?

A.   Yes.

Q.   Did you have any further conversations about recording that meeting?

A.   I don't recall.

Q.   When you were talking about that meeting before it occurred, what was your conversation about?

A.   That I wanted to find out why I was skipped over for corporal and removed from RENU.

Q.   Okay.  But we've just discussed that you have no knowledge that you were skipped over for corporal at that point?

A.   You asked me what I talked to my wife about, and that's what I said to her.

Q.   Okay.  So at that time you believed you were skipped over for corporal?

A.   Yes.

Q.   Okay.  Before you had this meeting had you called -- you don't need to tell me what any conversations were, but had you contacted any employment counsel at that point in time?

MR. GOTTESMAN:  Objection.

A.   Yes.

Q.   Okay.  What employment counsel had you talked to at that point in time?

A.   My union representation.

Q.   Union attorney or just president?

A.   Union attorney.

Q.   Okay.  And what's his name?

A.   At that time was Steve Lazarus.

Q.   Did you talk to anybody else about your plan to record that meeting who is not an attorney?

A.   I don't recall.

Q.   Or Jennifer -- you didn't talk to anybody else besides Jennifer and that attorney?

A.   I don't recall.

Q.   Okay.  What device did you use to record that meeting?

A.   It's a -- it's a pen.

Q.   A pen?

A.   Uh-huh.

            MR. GOTTESMAN:  That was a yes?

            THE WITNESS:  Huh?

            MR. GOTTESMAN:  That was a yes?

            THE COURT REPORTER:  You said uh-huh.

            THE WITNESS:  Oh, I'm sorry.  Yeah.

        I didn't even catch that.

A.    Yes.

MR. MILLER-NOVAK:  I didn't catch it either.

Q.    All right.  A pen?

A.    Yes.

Q.    Okay.  So I was expecting to hear a cell phone.  So what type of pen?

A.    A recording one.

Q.    Okay.  I mean, what does it look like?

A.    A pen.

Q.    Does it function as a pen?

A.    Yes.

Q.    Did you get it from the Spy Museum?

A.    No.

Q.    Okay.  Do you have it on you now?

A.    No.

Q.    Okay.  Is this some equipment that you got from the Sheriff's Department itself?

A.    No.

Q.    Is it something you bought on your own?

A.    Yes.

Q.    Okay.  So it's a recording device that looks like a pen?

A.    Yes.

Q.    Do you still own the pen recording device?

A.   Yes.

Q.   Why did you buy the pen recording device?

A.   To record our conversations.

Q.   So you specifically went out and bought that pen to record this conversation?

MR. GOTTESMAN:  Objection.

A.   I don't recall if it was just for that meeting.  Did I already have that one?  I don't recall.

Q.   Where did you buy it?

A.   I got it online.  I don't recall exactly where.

Q.   Where on online?

A.   I just -- I don't recall.

Q.   Do you still have some record of that transaction?

A.   No.

Q.   Did you pay with your credit card?

A.   Yes.

Q.   Would it have been a check card?

A.   No.

Q.   Would it have been like your true credit card -- for lack of a better wording -- like a credit card as opposed to a bank card?

A.   Yeah.  It was like a Visa.

Page 128

Q. Okay. So you have a Visa. Through what bank?

A. I don't remember what card I used.

Q. Okay. Well, I'm going to ask you to look for the receipt. I didn't say it was going to be fun, but -- I mean, you know, if you can find it, I would ask you to look for it.

A. All right.

MR. GOTTESMAN: We'll deal with that.

THE WITNESS: Yeah. I was just trying to think of what credit card it was.

Q. And you don't remember the name of the company?

A. No. No.

Q. Okay. And so does the pen -- you said you still have it?

A. Yes.

Q. Okay. Does it work -- does it charge like a USB device?

A. Yes.

Q. So it's like a USB storage in the pen then, correct?

A. Correct.

Q. And then you would plug it into some

device to upload whatever recordings you have onto another device, correct?

A. Yes.

Q. Whether a laptop or something like that?

A. Yes.

Q. Okay. Does the pen -- I don't know, for lack of a better word -- does it appear kind of designer in nature as opposed to something like this cheap Profile Paper Mate here?

A. Yeah. It's a nice -- a nice pen.

Q. So it looks like a quality pen then, correct?

A. I would say so.

MR. GOTTESMAN: Counsel, I think that's a quality pen.

MR. MILLER-NOVAK: These are smooth compared to some that are a little bit more coarse. I do like the Profile. But I don't know that it's a designer pen necessarily. No one is buying this for your graduation or something like that.

Q. So the pen when you went into this meeting, did you put it in your pocket?

A. Yes.

Q. Like your chest pocket or something like

that?

A.   Yes.

Q.   Okay.

A.   Right where the pens go in.

Q.   Like a shirt pocket, correct?

A.   Correct.

Q.   This meeting, it occurred in -- you would agree that it occurred in the workplace, correct?

A.   In the Chief's office, yes.

Q.   Yeah.  On like county property, correct?

A.   Yes.

Q.   In the county offices, correct?

A.   Correct.

Q.   Which is the Chief's workplace, correct?

A.   Correct.

Q.   And even though you were in Anderson, you would agree that because it's a county sheriff's office, it's also your workplace as well, correct?

A.   Correct.

Q.   Okay.  Had you ever used this pen recording device before this meeting?

A.   To record or just use the pen in general?

Q.   To record a conversation.

A.   No.

Q.   Okay.  You tried it out when you bought

it?

A.   Yes.

Q.   Okay.  That's why I asked the follow-up question.  I assume right now?

A.   And we use it in the kitchen, yes.

Q.   Okay.  So you've used it since?

A.   Yes.

Q.   Okay.  I'm sorry, I may have already asked.  But you still own the pen, correct?

A.   Yes.

Q.   Okay.  So I kind of want to skip to the end of the meeting and just keep -- since we're on the topic, we'll just keep talking about the recording.  So after you had the meeting you had this recording, correct?

A.   Correct.

Q.   Okay.  Who did you let listen to this recording?

A.   Just my wife.

Q.   Did you share it with anybody else in the department?

A.   No.

Q.   Did you give it to anybody else in the department?

A.   No.

Q. Did you make any copies of the recording?

A. I downloaded it to my -- or the wife's laptop, I believe -- yes.

Q. Jennifer's laptop?

A. Yes.

Q. Does she still have that laptop?

A. I don't -- I don't know. We've gone through so many laptops. They go obsolete so quickly.

Q. So you don't know if she currently still has that laptop?

A. Correct.

Q. Do you still have the raw recording?

A. I believe it's still in the pen, yes.

Q. It's still in the pen?

A. Yes.

Q. But you don't know that Jennifer still has that laptop?

A. Again, I do not know.

MR. WIEST: Just for the record, we produced an accurate copy to the Defendants yesterday of that and Counsel was involved in the extraction of the original, for whatever it's worth.

Q. What was the date yesterday?

MR. GOTTESMAN: May 5. Cinco de Mayo.

Q. That's a busy time for road patrol, isn't it?

A. I was off.

Q. Oh, that's good. Did you have to work on St. Patrick's Day?

A. Yes. That wasn't too bad.

Q. Okay. Those are amateur days, I guess, as they're known, correct?

A. Yes.

Q. So yesterday was May the 5th, 2025, correct?

A. Yes.

Q. All right. And you had resigned in January 30 of 2024, correct?

A. Yes.

Q. Okay. So you agree that's about 15 months, correct?

A. Correct.

Q. Okay. So that entire 15 months' time you possessed the recording, correct?

A. Correct.

Q. Okay. And are you aware in this litigation your counsel refused to provide a copy of

the recording or to give the recording to the County until just yesterday?

A. My understanding is that's what the judge ordered.

Q. Okay. Well, you would agree that the judge ordered your counsel didn't have to give it over yesterday because they filed a motion to not have to give it until yesterday?

MR. GOTTESMAN: Objection.

A. I have no idea. I don't -- I'm not an attorney.

Q. Okay. Why did you not give the recording to the County when you left?

A. When I left what?

Q. The Sheriff's Department. So when you resigned and you left the Sheriff's Department in January of 2024, why did you not give the recording to the Sheriff's Department?

A. I don't see a reason to.

Q. At any time between October of 2023 when you made the recording until you left did you inform anybody at the Sheriff's Department that you had made that recording?

A. No. No. I'm sorry. The exit interview asked -- I wrote it on the exit interview that there

was a recording.

Q.   And when did you take the exit interview?

A.   I don't recall.

Q.   Would you agree that there's a policy against recording coworkers in the Department that was in place as of October of 2023?

A.   Yes.

Q.   Did you know about that before you went to the meeting?

A.   Yes.

Q.   So you knowingly violated that policy?

A.   No.

Q.   How not?

A.   I wasn't on duty.

Q.   Okay.  So it's your belief that that policy only applies if you're on duty?

A.   That's what the policy states.

MR. MILLER-NOVAK:  Okay.  Well, let's pull up the policy and take a look at it.

MR. WIEST:  And just for the record, the union contract also makes clear that it's only applicable -- policies are only applicable when they're on duty under the color of law or if it's --

MR. MILLER-NOVAK:  Hey, man, we don't

need to do that.  You're not testifying today.

MR. WIEST:  Well, you're putting legal conclusions in his mouth, and so we're going to protect the record.

MR. MILLER-NOVAK:  No.  There's no talking objections.  You know the rules.  Let's not pretend we don't.  I mean, I can cite the rule and read it to you if you'd like since -- okay.

Your objections will remain concise today.  They will not be narrative in order to affect the testimony of your client, correct?  That's what the rules say, so we're going to abide those today.

(Defendants' Deposition Exhibit No. 4 was marked for identification.)

Q.   I'll have you turn to -- it's kind of the fourth page, Section 1.25.

A.   Gotcha.

Q.   It says, An employee may not record another employee in the workplace; do you see that?

A.   Yes.

Q.   It says, including off duty details and while working remotely; do you see that?

A.    Yes.

Q.    Without the consent of all parties present, unless the recording occurs during the course of an official investigation approved by the Sheriff and/or the Chief Deputy.  This is inclusive of video recording and audio recording; do you see that?

A.    Yes.

Q.    Okay.  So this policy doesn't say anything about being on duty or off duty; would you agree?

A.    Well, it says including off duty details.

Q.    Okay.  So it says off duty details?

A.    Correct.

Q.    But it doesn't mention whether or not the person doing the recording is only forbidden from recording if they are on duty, correct?

MR. GOTTESMAN:  Objection.

A.    Including off duty details and while working remotely.  So as long as you're working, correct.

Q.    Okay.  So in your mind it says while you're working?

A.    My interpretation is while I'm working. That's why it says including off duty duties -- the off duty part -- and while working remotely.

Page 138

Q.   Okay.  You would agree that when you met with Chief Gramke, that that occurred in the workplace, correct?

MR. GOTTESMAN:  Objection to form. Vague as to time.

A.   In his workplace, yes.

Q.   Okay.  You can set that aside for now.  So are you aware of the Ohio Public Records Act?

A.   Yes.

Q.   And that when officials create records, those records can become public records?

A.   Yes.

Q.   And that, generally speaking, documents, anything tangible such as recordings that depict or represent the activities of an office is a public record?

MR. GOTTESMAN:  Objection.

A.   Are you asking me if I know that or I agree with it?

Q.   I'm asking if you know that.

A.   I did not.

Q.   Okay.  Do you ever take body cam footage in your official duties?

A.   Yes.

Q.   Are you aware that body cam footage is a

public record?

A.   Yes.

Q.   So you would agree that when you record certain activities that you engage in, that those become public records?

MR. GOTTESMAN:  Objection.

A.   Eventually, yes.

Q.   Okay.  Are you aware that when you send certain communications between yourself and other deputies recording activities of your office, that those can become public records?

MR. GOTTESMAN:  Objection.

A.   Yes.

Q.   Are you aware that they become public records even if you use your private cell phone?

MR. GOTTESMAN:  Objection.

A.   Yes.

Q.   Are you aware that even if you send official text messages, that those text messages can become public records?

MR. GOTTESMAN:  Objection.

A.   Yeah.  Yes.

Q.   Okay.  So on October 10th of 2023 you recorded your meeting with Mr. Gramke and Sheriff McGuffey, correct?

A.   Correct.

Q.   Okay.  And the purpose of that meeting was to discuss your promotion or potential promotion to corporal sometime in the future, correct?

MR. GOTTESMAN:  Objection.

A.   Why I was pulled out of RENU and skipped over for corporal.

Q.   Right.  And earlier we discussed that the promotion of people within a department is a departmental activity, correct?

A.   Correct.

Q.   And that it's actually a very important departmental activity, correct?

A.   Correct.

Q.   Okay.  And that it's one that the public may want to know about, correct?

A.   Correct.

Q.   Okay.  So you recorded that activity that day, correct?

A.   I recorded a meeting, not a promotion.

Q.   You recorded a meeting about a promotion, correct?

A.   I recorded a meeting for disciplinary reasons of being yanked out of RENU.

Q.   Okay.  Well, you weren't disciplined,

correct?

MR. GOTTESMAN: Objection.

A. No. That's a form of disciplinary. I was pulled from making more money, which is a form of disciplinary.

Q. Were you ever counseled?

A. No. That's why we have the lawsuit.

Q. Okay. So your allegation is that you considered it a form of discipline?

A. Yeah. Yes.

Q. Isn't an officer's discipline something that's often a public record?

A. Yeah. Yes.

Q. Okay. So if something relates to your discipline, it can be a public record, correct?

A. I believe so, yes.

Q. And you recorded a meeting that you just said related to your discipline, correct?

A. Correct.

Q. So did it ever occur to you that you may have created a public record that day?

MR. GOTTESMAN: Objection.

A. No.

Q. So you never thought when I record this meeting, that I might be creating a public record?

Page 142

MR. GOTTESMAN: Objection. Asked and answered.

A. No.

Q. Did you ever ask anybody whether or not recording that meeting would create a public record?

A. No. Otherwise I would have just known and said yes to the question before.

Q. Well, you never asked anybody at all because you never even told anybody you were recording that meeting, correct?

A. My wife.

Q. Well, you told your wife, but she doesn't work for the Sheriff's Department, correct?

A. Correct.

Q. Okay. And you didn't just record that meeting, you used a recorder that looked like a pen, correct?

A. Correct.

Q. Okay. So you hid the fact that you were recording that meeting then, correct?

MR. GOTTESMAN: Objection.

A. I wouldn't necessarily say it was hidden.

Q. It's a pen, correct?

A. Correct.

Q. It doesn't look like a recorder?

A.   There's no difference between that or turning my cell phone on.

Q.   Okay.  Do you know whether or not I'm recording you with that highlighter sitting on the table?

A.   My interaction with the public is always assume that you're being recorded, so I have no issues with you recording anything.

Q.   Okay.  Well, we know she's recording this conversation, correct?

A.   Correct.

MR. GOTTESMAN:  Counsel, this is just getting silly and argumentative.

MR. MILLER-NOVAK:  It's not.

MR. GOTTESMAN:  It is.

MR. MILLER-NOVAK:  It's not.

MR. GOTTESMAN:  Let me make my record.  Let me make my record.

MR. MILLER-NOVAK:  No, no.  There's no talking objections.

MR. GOTTESMAN:  If you want to ask questions about facts in dispute in this case, you're allowed to do that.  But to sit here and have banter about the nature of the recording device that's been

covered in detail, it's getting to be oppressive and it's going too far.

MR. MILLER-NOVAK: Okay.

MR. GOTTESMAN: So if you want to ask questions --

MR. MILLER-NOVAK: I can guarantee I'm going no further than your counsel did yesterday. I'm just asking his understanding, what his impressions were. It's not argumentative.

MR. GOTTESMAN: We've covered it's a pen.

MR. MILLER-NOVAK: I get it.

MR. GOTTESMAN: We've covered that he recorded it. We've covered they didn't know.

MR. MILLER-NOVAK: I'm asking my questions. If you want to tell him not to answer a question, you can tell him not to answer.

MR. GOTTESMAN: Fine.

MR. MILLER-NOVAK: Again, I'll review the Rules of Civil Procedure. Your objections can be short. They can be concise. They can't be narrative. You

can't affect the testimony.  I'm fine.  We can print out the rules.  You can read them.

MR. GOTTESMAN:  I've read them.

MR. MILLER-NOVAK:  Okay.  Then you understand them?

MR. GOTTESMAN:  I don't need a lesson from you.

MR. MILLER-NOVAK:  Okay.  Well, then I don't need the talking objections.

MR. GOTTESMAN:  It wasn't an objection, Counselor.

MR. MILLER-NOVAK:  Okay.

MR. GOTTESMAN:  I'm asking you to move to matters in dispute, questions about facts, not bantering back and forth --

MR. MILLER-NOVAK:  This is a matter of dispute.

MR. GOTTESMAN:  -- with my client.

MR. MILLER-NOVAK:  He recorded the meeting.  I'm asking his understanding about public records information.  I'm going to continue my line of questioning. If you don't like it --

MR. GOTTESMAN: If you keep covering the same ground again, I'm going to instruct him not to answer.

MR. MILLER-NOVAK: That's fine. And we'll file a motion to compel.

MR. GOTTESMAN: Great. Do it.

MR. MILLER-NOVAK: And we'll do this again.

MR. GOTTESMAN: Do it.

MR. MILLER-NOVAK: Okay. That's great.

BY MR. MILLER-NOVAK:

Q. Anyways, it's a pen, correct?

MR. GOTTESMAN: Don't answer that.

Q. To you does it appear as a recording device as a pen?

MR. GOTTESMAN: Don't answer that.

MR. MILLER-NOVAK: I didn't ask that question before.

MR. GOTTESMAN: It's in the record. It's clear.

MR. MILLER-NOVAK: Okay. He never answered it because you've interrupted.

MR. GOTTESMAN: I've told him not to answer. Move on.

MR. MILLER-NOVAK:  So you're not going to let him answer whether or not --

MR. GOTTESMAN:  I told him not to answer.  Move on.

MR. MILLER-NOVAK:  -- he believes it looks like a recording device?

Q.   In your opinion do you believe that it looks like a recording device?

MR. GOTTESMAN:  Don't answer that.

Q.   Do you assume that every pen you see is a recording device?

MR. GOTTESMAN:  Don't answer that.

MR. MILLER-NOVAK:  This is like one of the most obstructive defenses of a deposition I've ever had in my career.

Are you going to keep continuing to tell him not to answer?

MR. GOTTESMAN:  Ask your questions, Counselor, and I'll instruct my client as I deem appropriate.

MR. MILLER-NOVAK:  Okay.  Well, we are going to be filing a motion to compel on this.

MR. GOTTESMAN:  Fantastic.

MR. MILLER-NOVAK:  Great.

Page 148

BY MR. MILLER-NOVAK:

Q. All right. So why did you choose a pen as opposed to just putting your cell phone out on the table and recording it?

A. Honestly, I don't have that much memory on my cell phone.

Q. So you're going to say you bought the pen because your cell phone memory was out?

A. Yes.

Q. Okay. You couldn't just delete recordings that are on your cell phone?

A. No.

Q. You couldn't just buy a recording device that looked like a recording device?

A. You know honestly, I don't think they sell those anymore.

Q. Okay. So the only recording device available to you was a pen?

A. Yes.

Q. That's your only option on the market?

A. Or another cell phone.

Q. Okay. So if I was to search recording device in Google -- did you do that?

A. I don't recall.

Q. So you don't remember if you searched

recording device in Google as opposed to looking for a pen recording device?

A.   What was the question?

MR. MILLER-NOVAK:  Would you just repeat the question.

THE COURT REPORTER:  "So you don't remember if you searched recording device in Google as opposed to looking for a pen recording device?"

A.   I don't recall.  I didn't purposely look for a pen recording device.

Q.   So it never occurred to you at any time you may be creating a public record when you recorded the conversation?

MR. GOTTESMAN:  Don't answer that. You've answered that already.

MR. MILLER-NOVAK:  So you're instructing him to not answer that question?

MR. GOTTESMAN:  It's in the record. You've already asked him.  And he's answered it.  And I've told you, I'm not going to sit here and tolerate repetitious questions being asked and answered over and over again.

Q.   Did you research online at all whether or not you created a public record by recording that conversation?

A.   No.

Q.   Did you talk to any other deputy about whether or not you've created a public record when you recorded that conversation?

A.   No.

Q.   Did you even think to consider whether or not you were going to create a public record when you recorded that conversation?

MR. GOTTESMAN:  Objection.  Don't answer that.  He's answered that already.

MR. MILLER-NOVAK:  How many questions is that that you refuse to answer, five, six?

MR. GOTTESMAN:  It's a transcript. It will show them.

MR. MILLER-NOVAK:  Yeah, it's been a lot.  It's a record for me.

Q.   So did you do any research on how to handle public records when you made that recording?

A.   No.

Q.   Did you look at the Sheriff's Department's policy on public records before you made that

Page 151

recording?

A. No.

Q. Did you look at the Sheriff's Department's handling of public records before you made that recording?

A. No.

Q. Did you look at the Sheriff's policy about handling public records after you made that recording?

A. No.

Q. Did you look at Ohio statutory law at all about recordings or handling public records after making that recording?

A. No.

Q. Are you aware of whether or not that Ohio statutory law requires that when you leave a public office, that you return all public records to that office?

A. No.

Q. Are you aware that it violates Ohio statutory law to remove public records from a public office when you leave?

MR. GOTTESMAN: Objection.

A. No.

Q. Are you aware that it's unlawful to

destroy a public record after you leave a public office?

MR. GOTTESMAN: Objection.

A. No.

Q. Are you aware that public records includes multiple copies of public records?

A. No.

Q. Are you aware that public records can include drafts of public records?

A. No.

Q. Did you consider whether or not you were putting a public record on Jennifer's laptop when you copied the recording onto her laptop?

A. No.

Q. Did you consider whether or not you destroyed a public record when you deleted or lost that public record that was on her laptop?

MR. GOTTESMAN: Objection. Assumes facts not in evidence.

A. No.

Q. Are you aware that the public records are the property of a public office?

A. Yes.

Q. Do you agree that when you have property of a public office, that you should return it to

that public office when you leave?

MR. GOTTESMAN: Objection. Don't answer that. You answered that at the outset of this deposition. I'm instructing him not to answer.

Q. If you had a public record of the office and it was the property of the public office, would you agree that it was your duty to return it to that public office?

A. Yes.

Q. Would you agree that it would be inappropriate to refuse to return a public record to an office when it demands for that record's return?

MR. GOTTESMAN: You answered that at the outset of this deposition. I'm instructing you not to answer.

MR. MILLER-NOVAK: I didn't ask about a public record. I did not.

Are you going to instruct him not to answer a new question?

MR. GOTTESMAN: I have instructed him not to answer.

MR. MILLER-NOVAK: So you're going to instruct him not to answer a brand new question?

MR. GOTTESMAN:  That was my instruction.

MR. MILLER-NOVAK:  That hasn't been asked and answered.  I never asked it.

MR. GOTTESMAN:  I'll check the transcript during a break perhaps.

Make a note for me.

MR. MILLER-NOVAK:  So you're going to instruct him to not answer a brand new question?

MR. GOTTESMAN:  I have instructed him not to answer.

MR. MILLER-NOVAK:  It's relevant, isn't it?

MR. WIEST:  Is there a question pending?

MR. GOTTESMAN:  Yeah.  Next question.

MR. WIEST:  What's the pending question?

THE COURT REPORTER:  The question was, "Would you agree that it would be inappropriate to refuse to return a public record to an office when it demands for that record's return?"

MR. MILLER-NOVAK:  I can guarantee I

never mentioned public records at the onset of this deposition.

So are you going to instruct him to not answer that question?

MR. GOTTESMAN: I already have, Counsel. And I'm not going to keep answering you over and over again. Ask your next question.

BY MR. MILLER-NOVAK:

Q. Why did you not return that recording to the public office when you left?

MR. GOTTESMAN: Objection.

Don't answer that.

Q. You're not going to answer that question?

MR. GOTTESMAN: I've instructed him not to.

MR. MILLER-NOVAK: On what grounds; is it privileged?

MR. GOTTESMAN: I'm not going to explain it to you, Counsel. If you feel the need to file a motion on it, we can file a motion on it.

MR. MILLER-NOVAK: I guess we're going to have to engage in motion practice.

MR. GOTTESMAN: What's that?

MR. MILLER-NOVAK: I guess we're going to have to engage in motion practice or have a conference with the judge at some point.

MR. GOTTESMAN: Okay.

MR. MILLER-NOVAK: So you're instructing him to not answer the question why he did not return that recording to the office after he left?

MR. GOTTESMAN: There was a court order frankly that authorized to keep it from you, right?

MR. MILLER-NOVAK: Well, you asked for it.

MR. WIEST: And we dispute that it's a public record.

MR. GOTTESMAN: And we don't accept the premise of your question.

MR. MILLER-NOVAK: All right.

MR. GOTTESMAN: So that's where we are.

BY MR. MILLER-NOVAK:

Q. Why did you not return that recording to Hamilton County after you left Hamilton County?

MR. GOTTESMAN: Don't answer that question.

Q. When did you hire this law firm or this counsel?

A. I don't recall.

Q. Was it the next day after you left Hamilton County?

A. No.

Q. Was it a week after you left Hamilton County?

A. No.

Q. Was it a month after you left Hamilton County?

A. I believe it was more than a month.

Q. Okay. So between the time you left Hamilton County and you hired this counsel, why did you not return the recording to the County?

MR. WIEST: Objection to form.

MR. GOTTESMAN: Jason -- excuse me. I'm getting both sides. I'm instructing him not to answer. We're covering the same ground over and over again.

MR. MILLER-NOVAK: I mean, we're only covering -- I'm going to ask different questions and see if there's one that

Page 158

you'll let him answer. It can't be privileged because he hadn't hired you yet, so you can't possibly claim that it's a privileged communication.

So I'm asking the period of one month or whatever it was between the time he left the employ of the County to the time he hired you why he did not return the recording to the --

MR. GOTTESMAN: Because it wasn't a public record.

MR. MILLER-NOVAK: Well, you're saying it wasn't a public record and that's fine.

MR. GOTTESMAN: And we're done covering this. So if you want to move on to new territory, do so. If you want to sit here and talk about public records, I'm done listening to the questions. I'm not letting him answer any more. I think you've exhausted the subject by now.

MR. MILLER-NOVAK: Okay. I've exhausted the part that you've allowed him to testify, not any of the part that you refuse to let him testify.

So it's your statement right now you're no longer going to allow him to testify about public records questions?

MR. WIEST: It's up to you.

MR. GOTTESMAN: You know what, let's take a break. It's 12:16. I think it's a good time for lunch.

THE COURT REPORTER: We're off the record.

(A lunch recess was taken.)

(Defendants' Deposition Exhibit No. 5 was marked for identification.)

BY MR. MILLER-NOVAK:

Q. All right. We just handed you Defendants' Exhibit 5. I'm going to represent that this is Section 149.351 of the Ohio Revised Code titled Prohibiting Destruction or Damage of Records; do you see that?

A. Yes.

Q. Do you see in subsection A it says, All records are the property of the public office concerned and shall not be removed, destroyed, mutilated, transferred, or otherwise damaged or disposed of, in whole or in part, except as provided by law; do you see that?

A. Yes.

Q. Okay. Do you see the last sentence of that paragraph where it says, Those records shall be delivered by outgoing officials and employees to their successors and shall not be otherwise removed, destroyed, mutilated, or transferred unlawfully; do you see that?

A. Yes.

Q. So regarding your recording that you took on the pen --

A. Yes.

Q. -- you would agree that you did not provide that or deliver it to any of the county officials upon your departure?

A. Correct.

MR. GOTTESMAN: Objection.

THE WITNESS: Oh, sorry. I'll slow down.

A. Correct. Because it's mine. It's my recording.

Q. Okay. And you did not deliver it to any successor, correct?

A. No.

Q. Okay. Do you agree that if that recording constituted a public record, then you would have

Page 161

violated that statute, wouldn't you?

MR. GOTTESMAN: Objection.

A. It wasn't public record.

Q. If it constituted public record, then you violated this statute by removing it, correct?

A. Correct. If it's a public record.

Q. And you would agree that if it is a public record, that this statute creates in you an affirmative duty to deliver it back to the office, correct?

A. Correct.

MR. MILLER-NOVAK: Okay. You can give that to her.

Q. Earlier I believe your counsel testified that something in the collective bargaining agreement states that certain rules about officer conduct only apply when you're on duty; do you recall that?

MR. GOTTESMAN: Objection to form.

A. Yes.

Q. Okay. Do you know what part of the collective bargaining agreement says that?

A. No, not offhand.

Q. Are you familiar with any part of the collective bargaining agreement that says that

there's no rules about conduct that apply off duty?

A. Not unless I had it in front of me, no.

Q. Okay. Well, we're going to talk about it at some point today, but before we do that -- I mean, you actually agree that there's a lot of rules for officers that apply to their duty off -- their conduct off duty, correct?

MR. GOTTESMAN: Objection.

A. Yes.

Q. I mean, it's pretty typical in police handbooks that you have certain duties of moral character, correct?

MR. GOTTESMAN: Objection.

Q. And certain things you might do off duty would violate government policy, correct?

MR. GOTTESMAN: Objection.

A. If it's illegal, yes.

Q. Okay. Only if it's illegal or there are other things that you can do off duty that could violate policy?

MR. GOTTESMAN: Objection.

A. I don't know any right offhand, no.

Q. Okay. Well, earlier we reviewed a social media policy, didn't we?

A. Yes.

Page 163

Q.   And there was some regulations about how you can use personal social media accounts, correct?

A.   Correct.

Q.   Okay.  So that, for instance, would be a policy that would regulate your personal use of social media, correct?

MR. GOTTESMAN:  Objection.

A.   Correct.

Q.   Okay.  You would agree that an officer, for instance, wouldn't be allowed -- there would be a violation of policy to get on social media and say things that are inadvertently racist, correct?

MR. GOTTESMAN:  Objection.

A.   I would disagree.  If it's on their private page, that's their own opinion.

Q.   Okay.  So you believe that it's okay for officers to make -- I don't know -- to post on Facebook and maybe use the N-word?

MR. GOTTESMAN:  Objection.

A.   I mean, that's a hypothetical.  But I have -- it's their own private page.  Who am I to say what they can and can't do on their own private page.

Q.   Okay.  So you believe that it's okay for an officer in their personal time to engage in hate

speech?

MR. GOTTESMAN: Objection.

A. It's not -- it's just a matter of opinion. It's their private page. So what they want to do has no bearing on me.

Q. Do you believe that officers could join hate groups such as the KKK on their personal time?

MR. GOTTESMAN: Don't answer that.

You've covered this this morning.

This is repetitious. I'm instructing him not to answer.

MR. MILLER-NOVAK: I'm just trying to clarify his answers --

MR. GOTTESMAN: I've given him my instruction, Counselor. And I'm not going to debate it with you.

MR. MILLER-NOVAK: I have never in my life --

MR. GOTTESMAN: Okay.

MR. MILLER-NOVAK: -- seen people --

MR. GOTTESMAN: Next question.

MR. MILLER-NOVAK: You do realize the Rules of Civil Procedure only allow you to instruct him to not answer a question when it is a matter of privilege?

MR. GOTTESMAN: That's not true.

MR. MILLER-NOVAK: Okay. So how is a question that may have been asked in a different context and now might have a different meaning in this concurrent --

MR. GOTTESMAN: It's repetitious. It's harassment.

MR. MILLER-NOVAK: It doesn't matter. It's not harassment.

MR. GOTTESMAN: It's prohibited. What you're doing is prohibited under Federal Rule of Civil Procedure 26, okay?

MR. MILLER-NOVAK: What rule is --

MR. GOTTESMAN: I'm not going to recite the rule to you, Counselor. You're responsible for knowing them yourself.

It's repetitious, it's harassment, and I'm instructing him not to engage with you on it.

MR. MILLER-NOVAK: You are absurd.

BY MR. MILLER-NOVAK:

Q. Do you believe that a deputy in his off time could join a terrorist organization?

A. No.

Q. Okay. Do you believe as an officer you

could use your own personal Facebook page to engage in statements that you use racial epithets such as -- I don't know -- let's just say a derogatory term aimed at someone's sexual orientation?

MR. GOTTESMAN:  Objection.

A.    On their own personal page?

Q.    Yes.

A.    It's their opinion.

Q.    Okay.  And you don't believe that a sheriff's department has the right to regulate speech -- the hate speech of their officers?

MR. GOTTESMAN:  Objection.

A.    I mean, it's on their own private page. What they do privately is their -- their business. It doesn't mean I have to agree with it.

Q.    Let's go to page seven and paragraph 32 of your complaint.  Getting back to the October 10, 2023 meeting, your complaint states that McGuffey began the meeting by stating that she had been looking forward to talking with Jason, and what he could expect in the future in the Sheriff's Office; do you see that?

A.    Yes.

Q.    Okay.  So you would agree that she started the meeting by talking about your future in the

office, correct?

A.    Correct.

Q.    It continues on paragraph 33, At that point, Jason asked about the RENU position and his promotion to corporal.  In response, Gramke and McGuffey stated that they had issues with Jason's social media post in May 2022; do you see that?

A.    Yes.

Q.    And then it continues that they also -- you allege that they had issues with Jennifer's social media posts that were critical of the Sheriff and had issues with Jennifer's social media post related to Caroline Adams, including, most recently, Jennifer liking Adams' post about morale; do you see that?

A.    Yes.

Q.    Okay.  Regarding your RENU position, earlier we went through the time line and you found out that Gramke overrode your appointment to RENU in March of 2023, correct?

A.    Correct.

Q.    And we also came to the conclusion that Jennifer liked Adams' post about morale in April of 2023, correct?

A.    Correct.

Q. Okay. Which was a month after the override, correct?

A. Correct. Because that was the only -- at that time the only post we found that she liked. It wasn't -- I think in the meeting he didn't specify exactly what post she liked.

Q. And that was Jay Gramke that said that?

A. Yes.

Q. At any point during the meeting did Sheriff McGuffey tell you that it was her decision to override your appointment to RENU?

A. No.

Q. At any point during the meeting did Jay Gramke tell you that it was Sheriff McGuffey's decision to override your appointment to RENU?

A. No.

Q. At any point during the meeting did Jay Gramke tell you that Sheriff McGuffey had anything to do with his decision to override your appointment to RENU?

A. She's the overall one that makes the decision. She's the last and final say-so.

Q. Did she sign off on it?

A. Neither one of them signed off on it.

Q. Did Jay Gramke tell you that she made the

decision?

MR. GOTTESMAN: Objection. Asked and answered.

A. I don't recall if she actually -- because she would have to okay it or override it if she wanted.

Q. How do you know that?

A. Because she's the sheriff. She makes the final say-so.

Q. In that specific process?

A. In pretty much any process. She's the sheriff.

Q. Does she have to approve every decision that's made in the Sheriff's Department?

MR. GOTTESMAN: Objection.

A. When it comes to promotions and movement, yes.

Q. Okay.

A. She signs off on every one of them.

Q. Do you know whether or not it was brought to her attention?

MR. GOTTESMAN: Objection. Calls for speculation.

A. That I do not know.

Q. I mean, just because someone should do

something doesn't necessarily mean that they do, correct?

MR. GOTTESMAN: Objection. Vague.

A. Well, that would be violating policy then.

Q. Well, is there a policy that specifically says that she's required to make that decision?

A. No. But she's required to sign it to make that decision if that decision is made.

Q. Okay. Where does it say that?

A. I don't have it in front of me.

Q. I mean, where would I find it?

A. I would say under the Sheriff's duties and responsibilities of the department she would be the final say-so on what goes on with that department.

Q. Okay. Is that in a statute somewhere?

A. I'm sure it's in our policy -- or the Sheriff's policy.

Q. What the Sheriff's policy?

A. One of the sheriff policies that she has.

Q. So she writes policies that orders herself to do certain things?

A. To have a movement or transfer it has to go through the chain of command, and the last person to sign off on it to be approved -- either disciplinary or movement, transfers, or

promotions -- is the Sheriff.  It's probably under promotions in the policy and procedure.

Q.   Okay.  To approve of a promotion?

A.   Yes.

Q.   Is there anything that says that she has to approve of a rejection?

A.   I don't know.

Q.   Okay.  You do agree those are two different things, right?

A.   Correct.

Q.   Okay.  One is all of her -- I don't know -- her subordinates through the chain have approved of your promotion to a rank, right?

A.   Correct.

Q.   Okay.  That's one thing.  And then you're saying she has to sign off before it's official, correct?

A.   Correct.

Q.   What if you never even get to that point; do you know whether or not a rejection or denial of someone's application has to be approved by her?

A.   If the lower subordinates want me in that position, I'm assuming so, yes.

Q.   Okay.  You're assuming so?

A.   Correct.

Q. There's a difference between assuming something and knowing something, correct?

A. Correct. And I told you I couldn't prove that. But if the Chief doesn't want me there, he has to go -- he'll have to get approval from the Sheriff. Because what if the Sheriff wanted me in that position?

Q. But at the same point in time --

A. Or we can speculate back and forth with it.

Q. Let me ask my question.

A. I'm sorry.

Q. What if at the same point in time he's not required to do that; would you agree that that's possible?

A. Yes, it's possible.

Q. Okay. Because there are a lot of things that happen in the Sheriff's Department that the Sheriff doesn't necessarily approve of, correct?

A. I guess, yes.

Q. All right. So every time someone orders a pack of paper, they have to go to the Sheriff and say we need you to approve ordering this pack of paper?

A. No. I specified movement, discipline, or

promotions.

Q. Okay. So do you think that she reviews every single person that ever gets rejected from an application to a position?

A. If they are being moved or promoted, yes.

Q. Okay. If they're being moved or promoted, correct?

A. Or disciplined, yes.

Q. Okay. Well, you would agree that when you applied for RENU, you were not moved, correct?

A. I was in the process of being moved. I was already assigned there per RENU.

Q. Okay. But RENU had to ask Jay Gramke, correct?

A. It had to go up to the Sheriff for the approval.

Q. Okay. Where do you know that it has to go up to the Sheriff? That's what I'm trying to get to.

A. Because she's in charge. She has to sign off on the transfer.

Q. Okay. But no transfer had been recommended at that point beyond Jay Gramke, correct?

A. It stopped -- my name went up the chain of

Page 174

command to be moved to RENU.  It stopped at Gramke.

Q.    Okay.  Well, how do you know that Gramke ever informed Sheriff McGuffey that he overrode your placement on RENU?

A.    Because he said it in the meeting.

Q.    Okay.  He said it in the meeting?

A.    Yes.

Q.    Did he talk to Sheriff McGuffey about it before he overrode it?

A.    I have no idea.

Q.    Or after he overrode it?

A.    I have no idea when it was discussed.

Q.    Okay.  Do you know whether or not it was discussed right before the meeting?

A.    Like I said, I have no idea when it was discussed.

Q.    Okay.  I think yesterday her testimony was that she just found out about it the day of the meeting.  Do you have any evidence that that's not true?

A.    No.

Q.    Okay.  So for all you know when she said I had no idea that he applied for the RENU position as of October 10, 2023 -- do you have any evidence that what she said is not true?

A.    That she didn't know I applied for RENU?

Q.    Yes.

A.    Yes.  When she attended briefing back in the spring, when she interviewed -- or asked each and every one of us in briefing where you work and what your goals are, and I have specifically told her I'm still trying to get RENU.

MR. GOTTESMAN:  Before you ask another question, I need to speak to him for a second.

Go ahead, Counselor.  I'm sorry.

Q.    So during the briefing did you say that I currently have filed an application for RENU?

A.    No.  I believe I said I was currently -- I'm currently still trying to get to RENU, I believe is what was said.

Q.    Okay.  You said it was a goal of yours, correct?

A.    Correct.

Q.    You didn't tell her you had a pending application, though, did you?

A.    It wasn't pending.  It was already denied.

Q.    Okay.  So in other words, you didn't tell her that you had -- even if you consider that to be informing her you had filed it, the decision

overriding it already had been made, correct?

A. Correct.

Q. Okay. So that's not any knowledge that she had before Jay Gramke denied or overrode your application to RENU, correct?

A. She stated -- so it was brought up then. And she stated in my sit-down meeting that she knows everything that's going on in this department and what everybody is doing. And she clearly stated that. So she knew that it was denied.

Q. Okay. So she made a general statement that she knows everything going on in the department?

MR. GOTTESMAN: Objection to characterization.

A. She stated she knows everything that's going on.

Q. Okay. All right. Do you agree that that's an overgeneralized statement?

MR. GOTTESMAN: Objection.

A. I'm just quoting what she said.

Q. Okay. Well, earlier you told me a story about deputies showing each other memes from Caroline Adams, correct?

A. Correct.

Q. And laughing about it, correct?

A. Correct.

Q. Okay. Do you think she knows exactly when that happens?

A. When what happens?

Q. When that happens, when people are sharing memes; do you know who is sharing memes -- do you think she knows exactly who is sharing memes when that's occurring?

A. The Sheriff?

Q. Yes.

A. I'm sure she has a clue.

Q. Okay. When you recorded that meeting, do you have any knowledge that she knew that you were recording that meeting with your pen?

A. Do I have any knowledge?

Q. Yes.

A. No.

Q. Okay.

A. But do I think she knew? Yes.

Q. Okay. You believe she knew that you were recording her?

A. I believe so.

Q. Okay. And what do you base that knowledge upon?

A.   Because of my past history with her with recording our meetings and I thought she would know. I mean, she's asked for a recording from me before from a meeting.

Q.   When you were a union president, correct?

A.   Yes.

Q.   When you were a union president, were you using a pen to record those conversations?

A.   Originally it was a -- it was a tape-recorder.  That wasn't -- I didn't know how to transfer that to a digital, because it didn't have a cord.  So then I went to a little digital recording.

Q.   Okay.  But it wasn't a pen, correct?

A.   Was that last one a pen?  No.

Q.   Okay.  All right.  Let's continue to paragraph 33 -- oh, we were on that one.  I meant 34.  During that meeting -- and, again, referencing the RENU position and promotion to corporal, Gramke made the statement that Jason's wife made a comment on social media two years ago, and that there had to be consequences for her post; do you see that?

A.   Yes.

Q.   Do you agree with that statement?

A.   Yes.

Q.   35, During that meeting, and again,

referencing the RENU position and promotion to corporal, Gramke and McGuffey acknowledged that they knew Jennifer had the right to say what she wanted and associate with who she wanted on social media. Do you agree that they said that?

A. Yes.

Q. At any time did they tell you that Jennifer did not have a right to say what she wanted?

A. Just that there would be consequences.

Q. Okay. They said that there would be consequences. I understand that. But my question was, at any point in time did they ever make the statement that Jennifer has no right to say what she wants on Facebook?

A. Unless -- you'll be held the consequences for it.

Q. Okay. You're answering a question I didn't ask. The question I asked was, did they tell you that she did not have the right to make the statement she wants to make on Facebook?

A. Not the right, but there will be consequences if she continues to make statements on social media.

Q. Okay. But she can make those statements,

Page 180

correct?

A.    Unless -- right.  Unless I don't want to get promoted.

Q.    Okay.  Did they say unless you don't want to get promoted or just say consequences?

A.    There will be held consequences and I will not be promoted.  Yes, Gramke said that.

Q.    Okay.  So at some point you're saying that Gramke said you would not be promoted if she --

A.    We can't -- I'm sorry.

Q.    -- if she continued to make statements?

A.    We cannot promote you.

Q.    Did Sheriff McGuffey say that?

A.    I don't recall.

Q.    At any point did they tell you that your wife is not permitted to associate with who she wants to on social media?

A.    No.

Q.    Paragraph 26 --

A.    26 or 36?

Q.    36.

A.    Okay.

Q.    Thank you, sir.  McGuffey, and again, referencing the RENU position and promotion to corporal, then stated she wanted Jason to be

successful, but to do so, he needed to cut loose the people holding him back -- said another way, that he needed to divorce his wife and end his 20-plus year relationship with her -- if he was ever to be promoted or receive any preferential assignment at the Hamilton County Sheriff's Office; do you see that?

A.  Yes.

Q.  Okay.  You would agree that that is a paraphrase, correct?

A.  Yes.

Q.  She did not exactly ever tell you that you needed to divorce your wife, did she?

A.  She absolutely meant that 100 percent.

Q.  Okay.  You're saying she meant that?

A.  Yes.

Q.  I didn't ask what you think she meant. I'm asking you what words came out of her mouth right now.

A.  I don't have that exactly in front of me. But that's what she implied.

Q.  Okay.  And imply is not a statement; would you agree with that?

A.  Right.

Q.  Okay.  At any point in time did she make

the expressed statement with words that you need to divorce your wife?

A.   No.  Just implied.

Q.   Okay.  At any point in time did Jay Gramke ever tell you that you needed to divorce your wife?

A.   No.  He agreed with what the Sheriff said.

Q.   Okay.  So right here it says that the statement she made was you needed to cut loose the people holding you back.

A.   Correct.

Q.   Okay.  Is that the statement you believe means that you needed to divorce your wife?

A.   The way it was paraphrased, yes, it was. After her story of her kicking out the person of her house and then referring to this, yes, absolutely.

Q.   Was the person of her house her wife?

A.   It was somebody that lived with her.

Q.   Okay.  I didn't ask if it was somebody that lived with her.

A.   I don't know if they were married or not.

Q.   Okay.  So if I were to tell you that was not her wife, would you have any reason to disagree with that?

A.   No.

Q.   Okay.  This says you need to cut loose the

people that are holding you back.  Do you agree that people is a word that is plural?

A.    Correct.

Q.    So it's not person, correct?

A.    Correct.

Q.    So when the word people is said, it could refer to multiple people, correct?

A.    Correct.

Q.    So it could mean a group of people, couldn't it?

A.    Yes.

Q.    Okay.  Did you ever ask her who else she might have meant?

A.    No.  At that time -- it's amazing how much runs through your head in a matter of seconds.  But at that time I knew what she meant and what she was referring to, that I was -- it took everything in me not to walk out of that office at that time.

Q.    At any point did you ask her to confirm whether or not she meant -- she wanted you to divorce your wife?

A.    No.  Because I completely understood what she meant by that phrase.

Q.    Okay.  You completely understood?

A.    Yes.  100 percent.

Q.    But she never made a statement saying you must divorce your wife?

A.    She did not say wife.

Q.    Okay.

A.    But that was implied.

Q.    Okay.  Is it possible that she meant something else?

MR. GOTTESMAN:  Objection.

A.    Absolutely not.

MR. GOTTESMAN:  Calls for speculation.

A.    Absolutely not.  Not --

MR. MILLER-NOVAK:  His testimony is speculation, but continue.

A.    Not the way it was being used.

MR. GOTTESMAN:  I mean, we have a transcript.  We know what was said.

Q.    So when you believe something is implied, don't you believe that you're speculating what someone meant?

A.    I know exactly what she meant.

Q.    Okay.  Based on what?

A.    The way it was -- the way she used it in that meeting.

Q.    Okay.  And you never asked for any

clarification?

A.    I did not need clarification.

Q.    Okay.  So when she says the phrase the people holding you back, it could only possibly just mean Jennifer Davis in your mind?

A.    The way the conversation was going, yes, 100 percent.

Q.    Okay.  Did they ever talk about people at Anderson at that point during the conversation?

A.    Yes.

Q.    Okay.  There was a lot of conversation about other deputies at Anderson and these beard policies, correct?

A.    I don't recall if that was before or after that comment.

Q.    Well, what if it was before; then couldn't the people be referring to the deputies at Anderson Township?

A.    But what if it was after, then it would be my wife.

Q.    What if it was before?

A.    And what if it was after?

Q.    Well, I'm asking you.

A.    I told you I don't recall when it was.

Q.    Okay.  So it could have been before?

A.    Or it could have been after.

Q.    Okay.  What if it was before, isn't it possible that the phrase "the people" is referring to these folks in Anderson Township?

A.    Not the way it was used and the way she described it to me when I was sitting there, no.

Q.    Okay.  Did you feel like this conversation was scripted when it was happening?

A.    Scripted?

Q.    Yes.

A.    Like. . .

Q.    Was she reading --

A.    Like it was all prepped -- no.

Q.    Yeah.  It wasn't prepped, correct?

A.    Correct.

Q.    So this was an impromptu conversation, correct?

A.    Correct.

Q.    She didn't have a teleprompter, correct?

A.    Correct.

Q.    She wasn't reading from a drafted statement, correct?

A.    Correct.

Q.    Did you see any notecards in her hands?

A.    No.

Q. Okay. At that point in time had she also discussed Caroline Adams?

A. Yes.

Q. Okay. I think she was called a troll, correct?

A. Correct.

Q. Well, couldn't "the people" also include Caroline Adams?

A. If I had contact with Caroline Adams, but I didn't. No. So, again, she was referring to my wife.

Q. Okay. So you're this sure that she was referring to your wife?

A. Absolutely. Like I said, it took everything in me not to walk out of that meeting at that point. I had a kid going to college. We don't have insurance. Otherwise, I would have walked out.

Q. Well, what does your kid and insurance have anything to do with whether or not you asked her if she's referring to your wife?

A. I didn't have to ask her, because I knew what she was referring to.

Q. Okay. Well, why didn't you just walk out?

A. I just told you that. I have a kid going to college and I need the insurance. My wife does

not work.

Q. Well, what does that have to do with whether or not you walked out?

A. Because then I would face disciplinary.

Q. What would be the disciplinary?

A. I have no idea.

Q. Okay. Would you be terminated if you walked out?

A. You would have to ask the Sheriff. I mean, it might have been nothing. But I was literally about to walk out and end the meeting.

Q. Okay. I mean, there's -- we talked earlier in the collective bargaining agreement there's a disciplinary process, correct?

A. Correct.

Q. Okay. And you'd be able to challenge your termination if they tried to terminate you for walking out, correct?

A. Correct. But you'll -- I'm sorry.

Q. That's fine. There's also a grievance procedure, correct?

A. Correct. But that's not how they operate. So if -- can we do a hypothetical? If, say, you get a five-day suspension, you get the five days. Then you have to fight that in arbitration. And then

your hearing. And then Columbus. You've already served the five days. So depending on what the discipline would have been, I just did not want to go through that process.

Q. At any point in this conversation, did they ever threaten to fire you?

A. No.

Q. Did you think they were going to fire you?

A. No. I just thought they weren't going to promote me.

Q. Okay. So your belief is that -- I mean, kind of reading your complaint, I guess we can go through it paragraph by paragraph, but my understanding is that your allegation is that unless you divorced your wife, they would never let you advance?

A. That was portrayed to me in that office.

Q. Did you think they were going to fire you if you stayed married?

A. No.

Q. Okay. You just think that if you stayed married, you wouldn't get any more favorable positions?

A. I would not be able to advance in the Sheriff's Department.

Q. Do you think that they were going to demote you if you stayed married?

A. There was no demotion at that point.

Q. Well, I mean do you think that that was going to happen in the future?

A. No. Because I wouldn't be able to get promoted to be demoted.

Q. I understand what you're saying.

A. Okay.

Q. Okay.

A. There's no way for me to go down.

MR. GOTTESMAN: You could go back to corrections.

THE WITNESS: No. I was already gone too long.

MR. GOTTESMAN: Oh.

MR. MILLER-NOVAK: Just to make sure that that question is on the record since you answered it. I think I was probably going to ask the same question.

Q. So you're saying you wouldn't be able to go back to corrections because you've been gone too long, correct?

A. Yes.

MR. GOTTESMAN: Asked and answered.

Q.    So in other words, there's really no possibility for you to be demoted, correct?

A.    Correct.

Q.    Okay.  And you don't think that you're going to be fired because you're married?

A.    No.

Q.    All right.  And you don't think that you're going to be disciplined because you're married, correct?

A.    I was being disciplined.  I was being denied promotions, which is a form of disciplinary, so. . .

Q.    Okay.

A.    And Gramke said that there was consequences and these were the consequences for my wife's post.

Q.    Okay.  So when we have -- at least you don't know that you ever were denied a promotion to corporal; when you say you were denied something, we're referring to the RENU?

A.    That's still corporal's pay and everything else, yes.

Q.    Right.  You were denied an advancement in -- to RENU you believe because of your wife's statements?

A.   That's what Gramke told me, yes.

Q.   Yeah.  And then if your wife continued to make statements, that you wouldn't get any more advancement is your allegation?

A.   That's not an allegation.  Gramke states it in there.

Q.   Okay.  So what if your wife never made -- what if you stayed married and your wife never made any posts again or any critical statement, do you believe that even then you would never get an advancement?

MR. GOTTESMAN:  Objection.  Calls for speculation.

A.   With that administration, with those two, no.  No.

Q.   Okay.  So your belief is that with this administration that you would never advance again, period, so long as you were married to Jennifer Davis?

A.   Absolutely.

Q.   Okay.  And you believe that if you divorced her, then you would get advancement, I guess would be the reverse of that, correct?

A.   Again, that would be speculation.  I don't know.

Q.    All right.  Well, they never told you expressly that you had to divorce her in order to get a promotion, correct?

A.    No.  They just insinuated it, that you need to separate yourself from her.

Q.    Okay.  They insinuated it or implied it?

A.    Implied it.

Q.    Okay.  I just want to make sure.  So your testimony today is you believe that if you were to walk in next week saying I filed for divorce, that you would be allowed to advance?

A.    Honestly?

Q.    Yes.

A.    Yes.

Q.    Okay.  But no one expressly stated that?

MR. GOTTESMAN:  Asked and answered.

MR. MILLER-NOVAK:  I asked about the divorce.

Q.    No one expressly stated that if you get divorced, we're going to reward you?

A.    The comment that was made from the Sheriff about separating myself indicated then you would be promoted.

Q.    Okay.  It never occurred to you that maybe Gramke's suggestion was that your wife needs to stop

being critical on Facebook?

A.   What's the question?

Q.   I mean, isn't it -- and it never occurred to you that maybe the implication was you didn't need to get divorced, maybe the implication was possibly that your wife just needed to stop being critical on Facebook?

A.   Wouldn't it have been just a lot easier to say that in the meeting?  But it wasn't.

Q.   Well, wouldn't you agree that if they wanted you to get divorced, it would be just as easy to say that as it would to tell your wife to be quiet, correct?

A.   You would think.

Q.   All right.  Because we are dealing with what are your beliefs about implications, correct?

A.   Correct.

Q.   So when we believe about implications, then sometimes we're wrong, correct?

A.   Correct.

Q.   You would agree that sometimes you believe someone meant something when they said something and you weren't correct in your belief, correct?

A.   Correct.

Q.   That does happen.  So isn't it possible

that maybe you interpreted their implication incorrectly?

A. You're gathering all their -- all their sayings, what was said in that precise moment leading up to her saying separating myself from the people that was holding me back was implied to my wife 100 percent.

Q. Okay. But they also did talk about Anderson people in that conversation at some point in time, correct?

A. Again, before or after, I don't recall.

Q. You don't recall, but they did. And they also talked about Caroline Adams, correct?

A. Again, I had no contact with Caroline Adams.

Q. Okay. But they didn't know that, did they?

A. I don't know what they know.

Q. Okay. You don't know what they know, right?

A. Correct.

Q. You would agree that you don't read minds, correct?

A. Correct.

Q. Okay. So when someone doesn't tell you

what they know, then you don't necessarily know what they know, correct?

A.    Okay.

Q.    Isn't that what speculation is?

A.    Correct.

Q.    Okay.  So 37.  Gramke then added that he heard nothing but good things about Jason's performance from his supervision, demonstrating that the only reason for the RENU assignment denial and failure to award him the promotion was the social media activity, and specifically the social media activity of Jennifer; do you see that?

A.    Yes.

Q.    Okay.  38.  In short, McGuffey and Gramke admitted during the October 10, 2023, meeting that the RENU reassignment and promotion to corporal were only being denied to him solely because of his and, more significantly, his wife's social media posts; do you see that?

A.    Yes.

Q.    Okay.  Do you agree with that statement?

A.    Yes.

Q.    39, Jason was devastated when he left the October 10, 2023, meeting; do you see that?

A.    Yes.

Q.    40, when he went home and he reported to Jennifer what Defendants had just told him, and she broke down in tears; do you see that?

A.    Yes.

Q.    So you went home and you reported what happened to Jennifer, correct?

A.    Correct.

Q.    And did she immediately start to cry?

A.    Yes.

Q.    Okay.  Did you play the recording for her at that point in time?

A.    No.

Q.    Okay.  So you just described what you heard, correct?

A.    Correct.

Q.    And you told her that you believed the implication was that they wanted you to divorce her, or did you tell her that the implication was is you were denied the appointment because of her speech?

A.    The speech -- the social media posts.

Q.    Okay.  So at that point in time you never told her, hey, I was in this meeting and they just told me I had to divorce you?

A.    Yes, I told her that.

Q.    When?

A.   I actually think it was before I told her about the social media posts -- actually, yeah, it was.  It was before I told her the social media posts.

Q.   Okay.  So Jennifer told him that while she had always supported his law enforcement career, she can no longer support him if he stayed at the Sheriff's Office; did she say that?

A.   Yes.

Q.   So she expressly told you she can no longer support you if you stayed there?

A.   Correct.

Q.   Okay.  What did she tell you to do?

A.   She didn't tell me to do anything.  She just said I can no longer support your career at that department if they're telling me -- or telling me I can't get promoted because I'm still married to her and because of what she posted on social media.

Q.   So she told you to quit?

A.   No.  She didn't tell me to quit.  She just said she won't support me working there.  She supported me my entire career in everything I did.

Q.   And what did you tell her after that?

A.   I did not know what I was going to do at that moment.

Q.   At any point during the meeting did Jay Gramke tell you that he wanted you to quit?

A.   To quit, no.

Q.   At any point during the meeting did Sheriff McGuffey tell you she wanted you to quit?

A.   No.  They both said great things about my work performance and how well and how good of an officer I am in my reviews and that they wanted me to stay.  It's just that they could not promote me due to my wife's social media posts.

Q.   Okay.  So you said -- in that statement you said that your impression was they wanted you to stay?

A.   They said that in the meeting.

Q.   Okay.  Did you have any reason to believe otherwise?

A.   That they wanted me to stay or leave?

Q.   That they wanted you to stay.

A.   Well, they said it.

Q.   They invited you at the end of the conversation to kind of like meet again, didn't they?

A.   In a few months.

Q.   Okay.  And to see where you were, correct -- kind of like where your performance was

at that point in time?

A. I took that as to see if my wife still posted on social media.

Q. Did you take it as to see whether or not they wanted to check in in three months to see if you got a divorce?

A. I took it that way as well.

Q. Okay.

A. If my evals and everything in my performance were fine, then why would you have to check on my performance in three months? It was more to see if my wife continued to post on Facebook or if we actually were separated.

Q. When did you decide that you wanted to leave the department?

A. I -- honestly I can't recall.

Q. Was it when Jennifer told you that she couldn't support you any longer?

A. That started the process.

Q. So when she said that, you decided I wanted to start looking for another position?

A. I didn't know what I was going to do if my wife didn't support my decisions and a career. So I really did not know what I was going to do.

Q. 41, Jason knew that his career in law

enforcement at the Sheriff's Office was over as a consequence of that meeting and the outrageous and intolerable statements that were made to him regarding the need to divorce his wife and end their 20-year marriage if he wanted any sort of preferential assignment or a promotion within the Sheriff's Office; do you agree with that statement?

A.   Yes.

Q.   42, Jason loves Jennifer and was not willing to divorce her just to further advance in his employment with the Sheriff's Office; do you agree with that statements?

A.   Agree.

Q.   So you didn't think you needed to divorce her to continue to function as a patrol officer, correct?

A.   Correct.

Q.   You just believed that you needed to divorce her in order to advance in the department?

A.   Correct.  Well, yes and no.  I really did not know how I was going to continue to work there if my wife did not support me to work there.

Q.   Okay.  So it wasn't that you believed that McGuffey or Gramke would fire you, you believed that you couldn't continue to be a patrol officer because

you don't know how you could do that if your wife wouldn't support you as a husband continuing to work as a patrol officer, correct?

A. Correct. Because I did not want to stay as a patrol officer my entire career.

Q. Okay. And you also wanted your wife's support, correct?

A. Absolutely.

Q. Okay. And she had told you she would not support you any longer if you stayed there, correct?

A. Correct. Because they wanted us to separate.

Q. And at some point in time you said that that started the process of you looking for other employment, correct?

A. No. I was -- it started the process of what I was going to do with my career.

Q. Right. But when you started looking -- I mean, you have to -- I might be jumping a hair into the future here, but when you start applying to jobs, you kind of search for positions that are available, correct?

A. Correct.

Q. And then you eventually have to fill out an application, especially for police officers, you

guys have way more than the average bear to kind of endure when you apply for a position, correct?

A. Correct.

Q. Okay. So when you were hunting for a job, was Jennifer aware that you were hunting for a job?

A. Again, I wasn't hunting for a job. I did not know what I was going to do with my career at that time. I was recruited.

Q. Oh, you were recruited by -- is it Butler?

A. Yes.

Q. Okay. So you ended up working for -- and how did he recruit you?

A. By giving me a phone call because he heard how my meeting went.

Q. Okay. So he called you and he offered you a job?

A. Correct.

Q. Okay. Did you accept it on the phone, or did you talk to Jennifer first?

A. I talked to Jennifer. And I waited a little while.

Q. Okay. That's smart. You should never accept a job without talking to your wife first, correct?

A. Absolutely.

Q.   It's a big decision, right?

A.   Yes.

Q.   And did she encourage you to take that position?

A.   Because of Butler, yes.

Q.   Okay.  So you talked to her about it and she weighed her opinion in and her opinion was take the Springdale position?

A.   Or continue to be miserable at the Sheriff's Department and not get promoted, yes.

Q.   Okay.  And she said that she would support you if you went to Springdale, correct?

A.   Correct.

Q.   And the previous statement was she would not support you if you stayed with Hamilton County, correct?

A.   Not at a place that would treat me like that, correct.

Q.   Okay.  So at no point in your employment then -- well, I think we discussed earlier there was no possible demotion for you in October of 2023 from patrol, correct?

A.   Correct.

Q.   Right.  So you were never demoted while you were at -- you were never like demoted at the

Sheriff's Department your entire career there, correct?

A.    Correct.

Q.    Right.

A.    When you talk about demotions, my understanding was I was assigned to RENU. Lieutenant Guy already said I was assigned to cases. It was supposed to be me and Deputy Enderle doing hotels.  So by being removed and placed back on the regular patrol, that would be a demotion.

Q.    But Guy is not the sheriff, correct?

A.    No.

Q.    Okay.  And he's not the chief, correct?

A.    Correct.

Q.    Okay.  So earlier you said the process actually requires for Jay Gramke to sign off on your employment to RENU, correct?

A.    Correct.

Q.    So you would agree until he signs off on it, you're actually not part of RENU, correct?

A.    They need -- correct.  They need the approval.

Q.    Because earlier you assumed that Sheriff McGuffey has to sign off on your appointment to RENU before it's official, correct?

A.   She's the last one.

Q.   Okay.  So how could you possibly according to your own testimony have been part of RENU if Gramke never signed off on your appointment to RENU?

A.   Because in practices in past, when they submit the name through the chain of command, it's signed off on because they go by what RENU wants and who RENU requested.

Q.   Do you have any idea whether or not any human being was ever rejected after RENU made a recommendation?

A.   Not of one.

Q.   So you don't have any personal knowledge whether or not this is the first time that's happened or if it's happened another time in the past?

A.   My understanding it's not happened before.

Q.   Okay.  You're basing that on an assumption it's not happened before?

A.   I'm basing it off what Matt Guy told me when he said this has not happened before.

Q.   Okay.  How long has Matt Guy been there?

A.   He's about to retire, I believe.

Q.   How long was he in that position?

A.   He was in RENU.  Then he came out for a

little bit. And then he went back to RENU, so I -- I don't know the dates. I'm sorry.

Q. Okay.

A. But he originally was down there for quite a while.

Q. Did you receive any discipline at any point in time after your meeting with the Sheriff and Jay Gramke?

A. No.

Q. Did they even talk to you after that meeting?

A. No.

Q. Did they badger you in any way after that meeting?

A. No.

Q. Were you demoted after that meeting?

A. No.

Q. Was your salary ever reduced after that meeting?

A. No.

Q. At any time after that meeting before you left the department did you apply for any other positions?

A. What was the question? I just want to make sure I get it right.

Q. Well, there's other special assignments besides RENU, correct?

A. Within the department?

Q. Yes.

A. No.

Q. Okay.

A. Okay. Sorry.

Q. I understand that you have an eligibility list that was kind of still present or active, correct -- so theoretically speaking, if a corporal position came open, you would be --

A. Correct.

Q. -- in line for it, correct?

A. Correct.

Q. You don't know whether or not that happened, correct?

A. I have no idea if there was an opening or not.

Q. Okay. After October 10, 2023, that meeting, did you ever actively seek some kind of appointment to any kind of special unit after that?

A. No.

Q. So you would agree that you weren't denied any kind of appointment to any kind of special unit after that meeting?

Page 209

A. Correct.

Q. Were you reassigned to work under a younger supervisor after that meeting?

A. I don't -- are you -- as in timing within the department?

Q. No. I mean, I know that people might -- there might be younger corporals. I'm saying after you walked out on the meeting on October 10th of 2023 were you assigned to a different supervisor at all?

A. I had the same sergeant. I don't recall when the younger corporal came over to our squad, though.

Q. Okay. You weren't reassigned anywhere --

A. I wasn't.

Q. -- a younger corporal was reassigned?

A. To our squad.

Q. Okay. But you were in the same squad after that meeting?

A. Yes.

Q. Okay. Until you resigned, correct?

A. Yes.

Q. So you were not reassigned at all, correct?

A. No.

Q.   Were you in any way reassigned to different job duties after that meeting?

A.   No.

Q.   Were you assigned to more menial tasks after that meeting?

A.   No.

Q.   Did anybody threaten you in any way after that meeting?

A.   No.

Q.   Did anybody in that meeting suggest that you do quit?

A.   No.

Q.   Did either Sheriff McGuffey or Jay Gramke at any time suggest to you to quit or retire early?

A.   No.

Q.   In your mind did you suffer any adverse decision or action at all after you left the meeting on October 10, 2023, until you resigned?

A.   Any what?

Q.   Adverse decisions.

A.   What do you mean by adverse?

Q.   Bad.  You think they stink.  Something that you think bothered you or something harmful to your career after October 9 -- or 10, 2023, until you resigned.

A.    Do I think they did anything?

Q.    Yes.

A.    No.  I don't think they did anything at that point.

Q.    So no further action was taken that you would consider to be adverse after the meeting on October 10, 2023?

A.    Unless there was a corporal position that they held out on, which I did not know.

Q.    Okay.  So you're not aware of them taking any steps or having any intent to fire you before you left?

A.    No.

Q.    Okay.  So a little bit about the collective bargaining agreement.  You would agree that if Sheriff McGuffey or Jay Gramke had any intent to terminate you, they would have had to take some active step, correct?

A.    Correct.

Q.    And if they took no step after this October 2023 meeting to terminate you, you would also agree that they didn't retaliate against you for your comments during that meeting before you resigned, correct?

A.    Correct.

Q. Okay. Because your belief it was their intent to basically get you in some way to silence your wife, correct?

A. Yes. The damage was already done at that point.

Q. Okay. But essentially they had punished you, is your allegation, because your wife made comments on Facebook, correct?

A. Gramke stated that, yes.

Q. Okay. You said that he said something about consequences?

A. Numerous times.

Q. Okay. At any time did you interpret that consequence to be your termination as opposed to just your inability to advance?

A. Just my ability to advance to RENU or corporal.

Q. Okay. And you believe that that's what his intent was?

A. He said that was the intent.

Q. Okay. At any time did you contact a union rep about filing a grievance?

A. I contacted Steve Lazarus.

Q. Why did you not file a grievance?

MR. GOTTESMAN: I'm going to instruct

you do not disclose the nature of the attorney-client conversations you had in that regard, okay? That's privileged.

Q. All right. But you know that there is a grievance procedure, correct?

A. Yes.

Q. And you did not file a grievance?

A. Correct.

Q. Okay. Why not?

MR. GOTTESMAN: Is it based on conversations you had with Mr. Lazarus?

THE WITNESS: Yes, we talked --

MR. GOTTESMAN: Don't say it here. But if you want to step out and tell me and Chris about it and we can try and decipher this for you how to answer these questions.

MR. WIEST: In a way that doesn't waive the privilege.

THE WITNESS: Okay.

MR. MILLER-NOVAK: Well, before we do that -- let's not bother with it right now because -- let me ask a handful of other questions first. Because I'm assuming that's the union attorney?

MR. GOTTESMAN: He is.

MR. MILLER-NOVAK: Okay.

MR. GOTTESMAN: For the moment.

MR. MILLER-NOVAK: Off the record.

(Off-the-record conversation.)

BY MR. MILLER-NOVAK:

Q. Did you talk to anybody else in the union about filing a grievance?

A. No. I called him directly.

Q. Did you talk to anybody else about potentially filing a grievance?

A. No.

Q. Did you talk to Jennifer about filing a grievance?

A. No.

Q. Okay.

A. I'm sorry. I did tell Jennifer I was calling Lazarus, though.

Q. Okay. Fair enough. When you're done talking to him, did you talk to Jennifer about the conversations you had with him?

A. I don't recall if I -- I don't recall.

MR. MILLER-NOVAK: Do you want to take a break?

MR. GOTTESMAN: I need to run to the

restroom. So Chris can --

MR. WIEST: I'll step in. That's fine.

MR. MILLER-NOVAK: Let's move to a different subject sort of.

THE WITNESS: Okay.

MR. MILLER-NOVAK: I guess it's all kind of related. All right. You know what, I think we're done with Exhibit 1.

THE WITNESS: Okay.

MR. MILLER-NOVAK: I'm going to hand you this. What number is this?

THE COURT REPORTER: Six.

(Defendants' Deposition Exhibit No. 6 was marked for identification.)

BY MR. MILLER-NOVAK:

Q. Have you seen this letter before?

A. Yes.

Q. And it looks like it's an email -- I guess the word letter, we don't even -- it's almost gone from our language nowadays, isn't it?

A. Yes, it is.

Q. This is an email from Jennifer Patterson. You would agree that that's your wife, correct?

A. Yes.

Page 216

Q. Okay. To Chief Gramke sent on October 16, 2023; do you see that?

A. Yes.

Q. Okay. And it was sent at 12:18 p.m.; do you see that?

A. Yes.

Q. Okay. When did you first see this email?

A. I don't recall. I don't remember.

(Mr. Gottesman returns.)

Q. All right. I don't want to read the whole thing. It's big.

A. Yeah.

Q. Did Jennifer discuss sending this email with you before she sent it?

A. She did.

Q. Okay. Did you read this email before she sent it?

A. No.

Q. Did she tell you what the nature of the email would be before she sent it?

A. No.

Q. Okay. Would you agree that this email kind of scolds Jay Gramke for what was discussed during the meeting on October 10th?

A. Just how my wife felt.

Q.   Okay.  So what did she tell you about this email before she sent it?

A.   That she was going to email the Chief.

Q.   Did she tell you about what?

A.   She just said she was going to send an email to the Chief and see if he'll reply.

Q.   Okay.  She didn't tell you what any of the content would be about?

A.   She's her own person.

Q.   Okay.  And you didn't ask what it was going to be?

A.   I assumed it was going to be about my meeting.

Q.   Okay.  Did you assume it was going to be critical?

A.   I mean, as upset as she was, yes.

Q.   Okay.  Did you tell her not to do it?

A.   I told her she's her own person, she can do what she wants.

Q.   Okay.  Well, you weren't afraid that you would be terminated if she sent this email, correct?

A.   I didn't give that any thought.

Q.   Okay.  Well, earlier you testified that you knew you wouldn't walk out of the meeting because you were worried that you have to have

health insurance and all those things, correct?

A. Correct.

Q. Okay. So it didn't occur to you that maybe that you should be afraid if she sent this email, that you could lose your job and insurance?

A. No. That's two different scenarios now.

Q. Okay. So you thought if she sends this email, I'll be fine?

A. I didn't -- like I said, I didn't give it any thought.

Q. Okay. Well, I want to go to the second paragraph. It says, You will never hear about the real disconnect; do you see where it says that?

A. Yes.

Q. I'm going to go to the second sentence. It says, With my husband's example, you have solidified that officers will never tell you the unpleasant truths for fear of retaliation; do you see that?

A. Yes.

Q. You would rather not promote the best candidate, as selected by the interview process from RENU, because you got your feelings hurt because an officer's wife criticized the sheriff's policies; do you see that?

A.    Yes.

Q.    Okay.  It continues, You have confirmed the incompetency of your leadership in thinking that putting the best officer in the position is less important than your ego and public image, correct?

A.    Correct.

Q.    Okay.  This set the tone to all other officers that the administration is not concerned with what is best for the department but only for their public image; do you see that?

A.    Yes.

Q.    Okay.  How did other officers find out about what happened in the meeting?

A.    Because I told them.

Q.    Okay.  Do you know whether or not Sheriff McGuffey or Gramke told anybody what happened in that meeting?

A.    I have no idea.

Q.    Okay.  So you don't know that if they were spreading words and discussing you or criticizing you after that meeting?

A.    Oh, I have no idea.  All I know is from my major on down knew that this -- that by me not getting promoted to RENU, there was something wrong.

Q.    Okay.  Something wrong.  Did any of them

tell you that they had discussed it with Gramke?

A.   Matt Guy when Gramke told him it was because of my wife's social media posts.

Q.   Okay.  If I were to tell you that Matt Guy never actually talked to Jay Gramke about his decision to override your appointment, would you have any reason to disagree with that?

A.   Absolutely.  He told me he did.

Q.   Okay.  The only thing you're going on that is based on what Matt Guy told you, correct?

A.   Because he did not at first know why Gramke would not allow me to come to RENU.  So he had to call Gramke to ask him why I was not coming down.

Q.   Do you have any reason to know whether or not that's a true statement?

A.   I don't -- I have no other reason to believe it wouldn't be or wasn't.

Q.   Okay.  But if it wasn't true, it's possible it's not true?

A.   That doesn't make. . .

Q.   Well, let me ask another way.  Have you heard any recording of this alleged conversation?

A.   Not unless it's public record.

Q.   Okay.  What do you mean not unless it's

public record?

A.    It was -- I cracked a joke to you.  I'm sorry.

Q.    Oh.

A.    I was trying to -- sorry.

Q.    Because whether or not --

MR. GOTTESMAN:  It fell flat.

Q.    -- it was a recording --

THE WITNESS:  It fell flat.  I'm sorry.  I tried to lighten it up.  It's warm in here.

Q.    The next paragraph says, Hypocrisy was also at its finest during my husband's meeting.  How could the sheriff lecture about my husband about distancing himself from certain people while at the very same time one of her biggest supports was being sentenced to 16 months in federal prison; do you see that?

A.    Uh-huh.

MR. GOTTESMAN:  That's a yes?

A.    Yes.  I'm sorry.

Q.    How could the sheriff lecture my husband about distancing himself from certain people.  She does not say herself there, does she?

MR. GOTTESMAN:  Objection.  The

document speaks for itself.

A.   Correct.

Q.   Okay.  Who is she referring to about being sentenced to 16 months in federal prison?

A.   I have no idea.

Q.   Okay.  At any point in this time does your wife state anything about divorce?

A.   Can I read it real quick?  No.

Q.   Okay.  All right.  She refers to the Sheriff and she says that the Sheriff lectured you about distancing yourself from certain people, correct -- that's what it says, right?

A.   Correct.

Q.   People is a plural word, correct?

A.   Correct.

Q.   It's not a singular noun, correct?

A.   Correct.

Q.   She doesn't say that you lectured my husband about distancing himself from me, correct?

A.   Correct.

Q.   Okay.  And then the next paragraph it says, If I were going to lecture my husband on who he should distance himself from in his profession, which I never would because he is a grown man with his own thoughts, beliefs, and ideas, I would start

by telling him to distance himself from law enforcement officials who have proven to be dishonest, incompetent, and create a hostile work environment; do you see that?

A.   Yes.

Q.   Okay.  So, again, she states if I were going to lecture my husband on who he should distance himself from in his profession; do you see that?

A.   Yes.

Q.   She doesn't mention anything about your romantic life or your marriage, correct?

A.   Correct.

Q.   Okay.  So not at any point in this does she inquire whether or not their intent was to threaten your marriage, correct?

A.   I don't know how she interpreted it.

MR. MILLER-NOVAK:  Okay.  All right.
You can give that back to her.

Q.   In this action you're suing the Defendants for in part a failure to promote you, correct?

A.   Yes.

Q.   And a constructive discharge, correct?

MR. GOTTESMAN:  If you understand the question.

Page 224

A.   Without having it in front of me, I don't know exactly, so I'll. . .

MR. MILLER-NOVAK:  Well, we can pull it back out, I guess.  Can you hand him Exhibit 1?

THE COURT REPORTER:  Yes.

MR. GOTTESMAN:  Just wait for a question.

THE WITNESS:  Okay.

Q.   Do you see anywhere in that complaint that you're alleging that you were constructively discharged?

A.   I don't -- no.  Am I missing it?

Q.   Well -- I don't mean to laugh at you.

MR. GOTTESMAN:  Paragraph 45.

MR. MILLER-NOVAK:  There you go.

THE WITNESS:  Thank you.

MR. MILLER-NOVAK:  Thank you.

THE WITNESS:  I thought it started with No. 2.  That's why.

MR. MILLER-NOVAK:  There we go.

THE WITNESS:  Sorry.

Q.   So on page nine --

A.   There we go.

Q.   -- paragraph 45, on January 9, 2024, and

due to the aforementioned constructive discharge and -- and it also says in paragraph 43, that you resigned. So it's your allegation that you were constructively discharged, correct?

A. Correct.

Q. And that part of your damages that you're seeking in this action are as if you've been fired from that position, correct?

A. Correct.

Q. Okay. So part of the damages that you're alleging is you would agree that you were -- your position to RENU was overridden in October of -- I'm sorry, March of 2023, correct?

A. Yes.

Q. But you left and there's -- I think you testified earlier that there's some bump in pay for that, correct?

A. For RENU?

Q. RENU, correct.

A. The corporal's pay.

Q. Okay. So it's approximately $7,000; is that correct?

A. Whatever -- I don't know what the contract -- seven percent.

Q. Seven percent. Okay. Seven percent. I

will not force you to do math.

A.   Thank you.

Q.   Seven percent bump in pay?

A.   Yes.

Q.   That would have only occurred from October -- I'm sorry -- March of 2023 until your resignation in January of 2024, correct?

A.   Well, right, because -- well, if I would have gotten it, I wouldn't have resigned, correct.

Q.   Okay.  But you did resign, correct?

A.   Yes.

Q.   You'd agree that you were not fired, correct?

A.   I was not fired.

Q.   Okay.  So you now have a different position with Springfield Police Department?

MR. GOTTESMAN:  Springdale.

MR. MILLER-NOVAK:  Springdale.  Thank you for correcting that.  It is a different place.

THE WITNESS:  We get it a lot.

Q.   Springdale --

A.   Yes.

Q.   -- correct?  So you never went through any period of time unemployed --

A.   Correct.

Q.   -- correct?  You would agree that your constructive discharge theory is different than a failure to promote theory, correct?

MR. GOTTESMAN:  Objection.

A.   I really don't know what the difference is.

Q.   Okay.  Would you agree that being terminated is being different than having a promotion denied?

MR. GOTTESMAN:  Objection.

A.   Yes.

Q.   Okay.  Well, part of the things you're suing the County for has to do with you not getting this RENU position; would you agree with that?

A.   Correct.

Q.   Okay.  Couldn't you have stayed at the Sheriff's Department and sued them for failing to promote you to RENU?

A.   Yes.

Q.   You agree that you wouldn't have to quit to sue them for that, correct?

A.   Yes.

Q.   So you had another option besides leaving the department; you could have stayed there and

filed suit against them for denying your promotion, correct?

A. Correct. But there's no reason -- there's no way you could possibly stay there. You're suing your boss. No. It's -- no. It just wasn't feasible.

Q. So your testimony is that no deputy in Hamilton County has ever sued Hamilton County and stayed there?

A. I didn't say that. I'm saying if I was suing the Sheriff and Chief Deputy, there is no way that I could continue working under them two with that lawsuit. You would be retaliated against 100 percent.

Q. Okay. You don't know that, you're assuming that?

A. My wife even says that in there about the whole rule under threat and everything else. That's how it's always been ran.

Q. Okay.

A. Otherwise, I would -- like you said, I wouldn't have a reason to leave.

Q. Well, Sheriff McGuffey filed suit against the Sheriff's Department, correct?

A. Yes.

Q.   Now she is the sheriff, correct?

A.   But she wasn't working there.

Q.   Yeah, but she did and she's now the sheriff, correct?

A.   Right.  But she left -- or she wasn't working for them.

Q.   Okay.  So if you file a suit and you're retaliated against, wouldn't that just be another lawsuit?

A.   If you could prove it, yes.

Q.   Okay.  But don't you have to prove any lawsuit you file?

A.   Yes.  But there's also ways they retaliate against you where you can't prove it.

Q.   Okay.  So your testimony is out of fear of further retaliation you did not file suit?

A.   No.  I left for fear of retaliation if I was going to file a suit.

Q.   Okay.  But you do agree that it is an option to stay at the Sheriff's Department and file suit?

A.   If you don't want to move and advance, why would you want to stay?  I did not want to stay in a department that was not going to have me advance.

Q.   Okay.  I'm not saying what you want or

Page 230

what your beliefs are, okay?

A. Okay.

Q. Or what you think would happen or even what you feared would happen.

A. Okay.

Q. My question is simple. Is it an option that you understand that was available to you, something that you could mechanically do -- for lack of better wording -- is stay in your position and sue the Sheriff's Department for what occurred regarding RENU?

MR. GOTTESMAN: Objection. Asked and answered. He's already said he could.

A. Yeah.

Q. You agree that's an option?

MR. GOTTESMAN: Answer it one more time.

A. Yes.

Q. Okay. And you chose to not do that, correct?

MR. GOTTESMAN: You can answer that one more time, too.

A. Correct.

Q. Okay. Filing a grievance is an option, correct?

MR. GOTTESMAN:  He's already answered that.

MR. MILLER-NOVAK:  No.  I did not ask that --

MR. GOTTESMAN:  You did and I'm instructing him not to answer it.

MR. WIEST:  Wait a minute.  Let him answer yes or no.

MR. GOTTESMAN:  Okay.

MR. MILLER-NOVAK:  You're overdoing this, the instructions.

MR. GOTTESMAN:  Go ahead and ask again about filing a grievance.

THE COURT REPORTER:  "Filing a grievance is an option, correct?"

A.   Option for?

Q.   It was an option you had available?

A.   I discussed that with my attorney, so. . .

Q.   Okay.  When you were a union president, had anybody filed grievances?

A.   Yeah.  Yeah.  Yes.  Yes.

Q.   Okay.  So you understand that that is an option available to deputies who feel that they're aggrieved?

MR. GOTTESMAN:  Don't go into

attorney-client privilege.

MR. MILLER-NOVAK: I'm not asking about that. I'm just asking about --

MR. GOTTESMAN: That question begs his conversation with Mr. Lazarus.

Q. Prior to discussing anything with that attorney, from your time as a union president are you aware that an option available to deputies who feel that they're been aggrieved is to initiate a grievance procedure?

A. Yes.

MR. WIEST: Just for the record, that is not an option. And I know -- I want him to answer, because I didn't want to draw your objection or whatever it is. It is not an option for a deputy. It is the union that files the grievance under the contract, just for the record.

MR. GOTTESMAN: And you cannot grieve something that is management rights to who gets a position and who gets promoted or a preferred assignment. That is not subject to a grievance.

MR. MILLER-NOVAK: All right, guys, with the legal arguments.

Barlow Reporting & Video Services, LLC
(859) 261-8440

MR. WIEST: That's the problem with the question. It calls for it.

MR. MILLER-NOVAK: Well, but it doesn't. And you can go off the record if you even want to discuss that. You're putting legal arguments on the record. You know it's inappropriate. You know what the rules are. And I beg you to cite me one that says that you're allowed to do that. Okay.

MR. GOTTESMAN: I don't have to explain myself. I've given my instructions.

MR. MILLER-NOVAK: Well, you've given a lot of instructions today. And plenty of them don't actually jibe with the rules. So we're going to move forward.

BY MR. MILLER-NOVAK:

Q. So you are aware that it's an option to approach the union about a grievance?

A. Yes.

Q. Okay. And you never requested that the union file a grievance on your behalf?

MR. GOTTESMAN: Don't go into attorney-client communications.

A.   I just spoke with Steve Lazarus.

Q.   Okay.  Well, I'm not asking you about whether you spoke to him.  I'm asking you to confirm that you never requested or otherwise filed any paperwork requesting a grievance?

MR. GOTTESMAN:  So we need to go outside and talk.

MR. WIEST:  For the record, the problem with that question is if he asked Lazarus to file it, it's going to call for privilege.

MR. GOTTESMAN:  And he would file a grievance for the union.  And that's exactly where this is going.

So do you need to follow up on this question?

MR. MILLER-NOVAK:  You're taking a break.  You know what, if it's a privilege concern, absolutely, talk to him.

THE COURT REPORTER:  All right. We're off the record.

(A brief recess was taken.)

MR. GOTTESMAN:  I will put on the record for you that my client without waiving and preserving in all regards his

attorney-client privilege with all counsel he consulted on this matter that he discussed his options with Mr. Lazarus. And the rule is this, there was -- it was specific nature of what had happened with regarding to being deprived of the corporal promotion and being appointed to RENU and then having that appointment retracted was not something for which a grievance could be filed. And that was the instruction.

MR. MILLER-NOVAK: Well, then we're going to need to strike it from the record, because you can't have it both ways.

MR. GOTTESMAN: Well, then, look, he's not answering.

MR. MILLER-NOVAK: Okay.

MR. GOTTESMAN: I've given you --

MR. MILLER-NOVAK: Then he's not answering.

MR. GOTTESMAN: I'm making a representation so you know what's there.

MR. MILLER-NOVAK: That's fine.

MR. GOTTESMAN: And if you want to

pursue it and argue that it's not a privileged conversation, but that's the only information he has was gained through attorney-client communication.

MR. MILLER-NOVAK: Right. But if you're telling me what the advice was, the problem with that you cannot just waive the privilege slightly for this thing --

MR. GOTTESMAN: I'm not.

MR. MILLER-NOVAK: -- because as soon as you do that, you open the door to everything else.

MR. GOTTESMAN: I'm not waiving --

MR. MILLER-NOVAK: It's all or none.

MR. GOTTESMAN: -- in fact, I expressly preserved it. And I'm telling you that if you want to go down that path -- and it's a dry well for you, it's not going to get you anywhere -- and I've explained what would happen where that discovery compelled, so --

MR. MILLER-NOVAK: All right. Well, at any rate, I'm going to move on.

You can give the complaint back to her for now.

Page 237

BY MR. MILLER-NOVAK:

Q. So you're alleging certain damages in this case, correct?

A. Correct.

Q. How do you believe -- what do you believe are your damages in this case?

A. As in like. . .

Q. You're asking for money in this case when you filed suit, correct?

A. Correct.

Q. Okay. Why do you believe you're entitled to money?

A. The promotion that was taken, the seven percent, leaving and having to restart a new job with the retirement. Just the stress, everything that was put on me and my wife, this whole situation. It was a lot.

Q. Are you seeking any mental health treatment right now?

A. No.

Q. Have you in the past?

A. No.

Q. Were you diagnosed with any mental health condition by a professional?

A. No.

Q.   Were you diagnosed about any mental health condition that was held to be a causation of your time at Hamilton County?

A.   No.

Q.   Have you ever taken anything for depression, anxiety, or other mental health illnesses?

A.   No.

Q.   Have you at any time been diagnosed with a mental health condition?

A.   No.

Q.   Your complaint, I believe, alleges that you have suffered loss of reputation?

A.   Yes.

Q.   Okay.  How do you believe you suffered a loss of reputation?

A.   By leaving the Sheriff's Department.

Q.   Okay.  But you chose to do that, correct?

A.   Correct.

Q.   You weren't fired, correct?

A.   Correct.

Q.   Do you agree that you don't have to put on any resume that you were ever terminated from the Sheriff's Department, correct?

A.   Correct.

Page 239

Q.   As a matter of fact you would agree it hasn't really harmed your profession at all, correct?

A.   Not necessarily.

Q.   Well, you were recruited by Mr. Butler, correct?

A.   Because Butler came from the Sheriff's Office.

Q.   So he came from the Sheriff's Office?

A.   Uh-huh.

Q.   So he recruited you?

A.   Correct.

Q.   So you would agree that what happened to you didn't affect his impressions of you, correct?

          MR. GOTTESMAN:  Objection.

A.   Not his, but other departments.

Q.   What other departments?

A.   Other departments that knew that I was in line to go to RENU, asking why I didn't go.

Q.   Have you ever applied to any other department?

A.   No.

Q.   Did you get denied any employment?

A.   No.

Q.   So you've never actually been denied any

employment?

A.   Correct.

Q.   Okay.  Can you site any consequence that you suffered because you were denied the appointment to RENU?

A.   Just other departments wanting to know why I was not assigned down to RENU.

Q.   Did you tell them?

A.   They were asking other officers why I didn't get to go down.

Q.   But you're the one that told other officers, correct?

A.   Yeah.  I've told several other officers, yes.

Q.   Okay.  Well, you chose to put that information into the rumor mill then, correct?

A.   I don't know how it all started, but -- I mean, other officers talk, yeah.

Q.   Okay.  But you knew that when you told them, correct?

A.   Same with the officers down in RENU when they didn't know I wasn't coming down.

Q.   Okay.  But you chose to tell people that you were denied RENU, correct?

A.   And so did other officers, correct.

Q. And you also chose to tell people about what happened in the meeting with Sheriff McGuffey, correct?

A. Yes.

Q. You don't know whether or not they told anybody, do you?

A. No idea.

Q. Okay. So you made the conscious decision to tell people about what happened in that meeting, correct?

A. Correct.

Q. Okay. So if you were worried that it was going to hurt your reputation, then why did you tell people?

A. Because they were wanting to know why I didn't get to go down. They thought it was because of disciplinary reasons.

Q. Okay. You could just tell them no, I wasn't disciplined, correct?

A. And that's the point of me telling them.

Q. Okay. Do you know whether or not Sheriff McGuffey ever told anybody that she disciplined you?

A. I have no idea.

Q. Do you know whether or not Jay Gramke ever told anybody he disciplined you?

A.   I have no idea.

Q.   Was anything put into your personnel file that you were ever disciplined?

A.   No idea.  No.

Q.   To the best of your knowledge if I was to do a public records request asking for your personnel file, including discipline, would anything be in there?

A.   No.  That's you.  I'm talking about other departments.  So, for example, another lieutenant asking why I wasn't assigned to RENU when they know I was going down.  That's why I explained to other officers, no, it was because of my wife's social media posts.

Q.   Okay.  Well, now you know that you told them what you believe to be the truth, correct?

A.   Correct.

Q.   Okay.

A.   Because I was told by Gramke for that reason.

Q.   Okay.  So don't you feel that you resolved that issue?

A.   No.  Because I don't know who else knows all that.

Q.   Okay.  So you have no knowledge that

anybody else besides the people you've talked to know any of these things?

A.    That was the only way I could find out that it was out there, yes.

Q.    Okay.  Has anything been reported on or published in the media?

A.    I have no idea.

Q.    Okay.  You said that you had to leave is what your testimony has been today.

A.    Yes.

Q.    How has that financially damaged you?

A.    Having to leave?

Q.    Yes.

A.    Having to -- going to another department that paid less.  Not all my years of service transferred over.

Q.    What's your hourly rate currently at Springdale?

A.    I don't know offhand.

Q.    Is it over $40 an hour?

A.    Yes.

Q.    Wasn't your hourly rate when you were at the County under $40 an hour?

A.    You're talking about right now.  When -- right now at Springdale, it's more.  But when I went

Page 244

to Springdale, it was less.

Q.   But right now it's more?

A.   Right now.

Q.   So currently you're being paid more hourly at Springdale then you would be if you were at the County?

A.   Well, I've been there over a year with a contractual raise.

Q.   Okay.  Well, how does this year compare to where you would be at Hamilton County?

A.   I have no idea.  I don't have the contract.  And we hired somebody to take care of all that.  So I don't -- I'm not going to sit here and try to figure out the math.

(Defendants' Deposition Exhibit No. 7 was marked for identification.)

MR. MILLER-NOVAK:  Okay.  I'm going to hand you a collective bargaining agreement.  And there's two -- can you do 7 and 7-A or something?  There's actually two separate things, because there's like an addendum.

THE COURT REPORTER:  You're going to have to show me that.

MR. MILLER-NOVAK:  Well, it's

separated by a staple.

THE COURT REPORTER:  Okay.

(Defendants' Deposition Exhibit No. 7-A was marked for identification.)

MR. WIEST:  Did you say there were two exhibits here?

MR. MILLER-NOVAK:  Yes.  So it's --

MR. WIEST:  Oh, I see.

MR. MILLER-NOVAK:  Yeah.  You'll see there's like an addendum.

MR. WIEST:  Okay.

BY MR. MILLER-NOVAK:

Q.  So if you go to page 25 in the collective bargaining agreement, which is seven, the big one, do you see where it says Wages and Compensation on the bottom; do you see that?

A.  You said 27, right?

Q.  I said 25.

A.  25.  I'm sorry.

Q.  No, it's okay.

A.  Yes.

Q.  Do you see where it starts with the Wages and Compensation table?

A.  Yes.

Q.  Okay.  So effective the first full pay

Page 246

period which includes, it says, January 21, 2021,
for all bargaining unit employees shall be as
follows; do you see that?

A. Yes.

Q. If you go to the second page, do you see
patrol officer, and that's what you were, correct?

A. Correct.

Q. So it says, Entry, one year, two year,
three year; do you see that?

A. Yes.

Q. You were at the four-year mark, correct?

A. Yes.

Q. All right. And it says here that the
salary -- the hourly -- I'm sorry -- is $35.1261. I
don't even know how they do that, right? Obviously
they don't pay you in cash. That would be some
weird things. That's cutting pennies in half.

So you understand that it's a little over
$35.00 an hour according to this, correct?

A. Correct.

Q. Okay. And then if you go to 7-A, which is
Appendix to Agreement, Article 20, Wages and
Compensation; do you see that?

A. Yes.

Q. It says, Effective the first full pay

period which includes January 1, 2023, the hourly pay for all bargaining unit employees shall be as follows.  Okay.  And if you go to patrol officer at four years, and it says $38.36; do you see that?

A.   Yes.

Q.   So would you agree that as of January -- the first full paycheck in January, you were receiving $38.36 an hour, correct?

A.   Correct.

MR. MILLER-NOVAK:  Okay.  You can give that back to her.

I'm now going to hand you what is the Agreement between the City of Springdale, Ohio, and the Ohio Patrolmen's Benevolent Association, 2023 to 2025, Patrol Officers Union Agreement, it appears.  It's Exhibit 8.

(Defendants' Deposition Exhibit No. 8 was marked for identification.)

Q.   So if you will go to page -- well, have you seen this union agreement at Springdale?

A.   Yes.

Q.   You would agree that you are now at Springdale, correct?

A.   Correct.

Page 248

Q. And that this is the 2023 to 2025 union agreement at Springdale, correct?

A. Correct.

Q. So this is currently the union agreement for your collective bargaining unit at Springdale, correct?

A. Correct.

Q. So if you go to page 22, this is their Wages and Compensation. My understanding is I believe I saw your application or hiring something that you went in at Step 3, correct?

A. Correct.

Q. So in 2023 Step 3 was making $39.37 an hour, correct?

A. Correct.

Q. Which you would agree is a little bit more than a dollar more an hour than $38.1267 or whatever that was, correct?

A. Correct.

Q. Okay. And currently in the year 2024, you were making $40.35 -- not currently. Actually we're in 2025. We figured that out already.

So in 2024 you were making $40.35 an hour, correct?

A. Correct.

Page 249

Q. Okay. And 2025, which is now, you're making $41.36 an hour, correct?

A. Correct.

Q. Okay. So your hourly rate at Springdale is actually higher in this collective bargaining agreement than your hourly rate was at Hamilton County, correct?

MR. GOTTESMAN: Objection.

A. My -- the longevity is not on there, which I thought brought the County up. And I think the difference was insurance. Again, I don't recall.

Q. Okay. What insurance are you --

A. I know there was a difference.

Q. What insurance are you referring to?

A. Our medical.

Q. Your medical. Do you know what you're paying for medical insurance?

A. I don't have any of that with me. Right off the top of my head, no. Like I said, we have somebody that's going to crunch the numbers, so. . .

Q. Okay. And who is that somebody?

MR. GOTTESMAN: Right now we have a consulting expert, Sara Martin. She hasn't been identified as an expert yet. But she is a certified financial planner

and is helping us put together a complete -- a comprehensive analysis of the financial loss.  We'll provide that as soon as that information is available.

Q.   So as part of the financial loss that you're alleging --

A.   I'm sorry.  Go ahead.

Q.   It's okay.  It's all right.

A.   I just know this -- the discrepancy is somewhere, but I can't figure it out right there.

MR. MILLER-NOVAK:  It's okay.  You can give it back to her.

THE WITNESS:  Okay.

Q.   Does part of the financial loss that you're alleging have to do with your retirement?

A.   Yes.

Q.   Okay.  What financial loss do you believe you suffered in terms of your retirement?

A.   I lost years of -- from switching over into the retirements -- the two retirements.

Q.   How many years did you have in Hamilton County?

A.   I could tell you -- all that I was getting together for that -- I can't remember her name now --

Page 251

MR. GOTTESMAN: The expert?

A. The expert.

Q. If you don't know, you don't know.

A. I don't know off the top of my head.

Q. Okay. Well, you would agree that you started working there -- was it in 2003?

A. Two.

Q. 2002. And then that you left in 2024, correct?

A. Correct.

Q. So that would be approximately 21 years?

A. Correct.

Q. Okay. Do you know when your retirement with OPERS would have vested?

A. It starts at ten.

Q. Okay. But there's an age requirement, too, correct?

A. In OPERS, yes -- well, in all of them, but yeah. Yes.

Q. And how old are you?

A. I am 49.

Q. So you don't know what the vesting age is at OPERS?

MR. GOTTESMAN: Don't guess.

A. No.

Q.   Okay.  That's fine.  I don't want you to guess.  It's probably published somewhere.  But you understand that people at OPERS -- they can actually retire and then they're allowed to become part of another retirement system --

A.   PRE.

Q.   -- correct?

A.   Yes.  Yes, sir.

Q.   You can double dip, correct?

A.   Yes.

Q.   So you could technically retire from the Sheriff's Department and then kind of work for the Sheriff's Department and you continue to get -- double dip on OPERS, correct?

A.   Correct.

Q.   Okay.  So that was an option available to you, correct?

A.   Correct.

Q.   But you chose not to take that option, correct -- you chose to quit, correct?

A.   Correct.

Q.   All right.  So you didn't stay and file suit and you could have stayed until you got your OPERS vested and you could have quit and not needed to buy back any OPERS, correct?

A.    Correct.

Q.    Because if it got to the vesting point, you could have retired and not have to buy anything, correct?

A.    Correct.

Q.    At that point you could have gone to a different jurisdiction and you could have started a new retirement account while collecting retirement from OPERS, correct?

A.    Yes.

Q.    Okay.  So you made the decision to not do that?

A.    Correct.

MR. MILLER-NOVAK:  Could we have a break and some private time?

MR. GOTTESMAN:  Sure.

THE COURT REPORTER:  We're off the record.

(A brief recess was taken.)

(Defendants' Deposition Exhibit No. 9 was marked for identification.)

BY MR. MILLER-NOVAK:

Q.    I've handed you what is marked as Exhibit 9.  I've handed you what appears to be your W-2 for your time at Springdale for 2024.  Have you seen

this before?

A. Yes.

Q. Okay. So at the top left-hand corner you can see there's boxes. And they've done well. And they have redacted your social security number, so that's good. It describes your Medicare wages; do you see that -- where it says Medicare wages and tips?

A. Yes.

Q. And there's $76,414.22 --

A. Yes.

Q. -- do you see that?

A. Yes, sir.

Q. Do you have any reason to believe that that's inaccurate?

A. No.

Q. Okay. If you go down to the -- like I'm in that top left-hand box.

A. Uh-huh.

Q. Okay. Do you see there's four boxes? If you go down --

MR. GOTTESMAN: They're all the same, aren't they, Counselor?

MR. MILLER-NOVAK: I think so. I don't know. Admittedly I pay someone to

do my taxes, so I'm no pro.

Q. You pointed at me. Do you pay someone to do your taxes, too?

A. I'm not a plumber or electrician. So, yes, taxes -- there's a reason there's a professional.

Q. Okay. Agreed. We will stumble through this together then. So if you go to the bottom left-hand corner at the top left-hand box, it says, Local wages, tips, et cetera; do you see that?

A. Yes.

Q. Where it says $76,414.22; do you see that?

A. Yes.

Q. Local income tax is $1,528.28; do you see that? It's like right to the right of that. So it's -- I'll point it out.

A. Oh, yeah. Yeah.

Q. Okay. And the locality that you're paying that local income tax to is Springdale, correct?

A. Correct.

Q. Okay. Do you know what their local income tax rate is?

A. No.

Q. Okay. So you don't know if it's lower or higher than Cincinnati's?

A.   I do not know.

Q.   When you were at Anderson, did you pay income tax -- local income tax to Cincinnati still, or was your local income tax -- did you not pay local tax because you were in Anderson Township?

A.   I don't recall.

Q.   Okay.  We'll just move on.  If you don't know, you don't know.  If you would have your -- so you said you pay someone to do your taxes, correct?

A.   Correct.

Q.   Okay.  So does your tax preparer or do you otherwise have like a copy of your income tax filing for the year 2023?

A.   Yes.

Q.   Okay.  If you don't have it in your possession, you could get it from your tax preparer, correct?

A.   Correct.

Q.   Okay.  The same thing with your taxes for 2022; did you use the same tax preparer?

A.   Yes.

MR. MILLER-NOVAK:  Okay.  All right.
Well, we'll do a request.  We'd like to
get his tax filings for the years 2022 and
2023, please.

MR. WIEST: I'd ask that you just follow up by email just so we've got something in writing on that.

MR. MILLER-NOVAK: Yeah. I mean, I can just do a discovery request.

Q. Do you know if you agree that your wife was already unemployed when -- in 2023, correct?

A. Correct.

Q. Okay. So you're not claiming that she suffered any financial damage as a result of your being terminated, correct?

A. Correct.

Q. Okay. Well, what you allege is a termination, a constructive discharge. And you're not alleging that she has suffered any financial damage regarding your RENU placement, correct?

A. I guess it depends on how you look it. I mean, we're married, so she would be suffering the same as me.

Q. Do you file your takes joint -- because she doesn't have any income to report, correct?

A. Yeah. She has a little bit of income here and there.

Q. Well, what's her income?

A. I don't recall.

Q. Okay. I'll ask her Friday.

A. Yeah, I just submit everything to the accountant.

Q. Okay. Is your wife seeing any mental health professionals?

A. No.

Q. Are you aware whether or not she's seen any mental health professionals in the past?

A. No.

Q. Are you aware if she has any diagnoses about mental health?

A. No.

Q. Are you aware whether or not she takes any medication for any mental health conditions, something like Prozac or Zoloft or something of the sort?

A. No.

Q. You're not aware or she doesn't?

A. She doesn't.

Q. Okay. So in your entire time as a deputy have you experienced anything that you would consider to be traumatic?

A. Yes.

Q. Okay. On more than one occasion do you believe that you suffered anything that you would

consider to be traumatic to your mental health?

A. Could be, yes.

Q. Okay. Did you ever seek any treatment, counseling, or anything concerning those events?

A. No.

Q. Okay. Now, I'm not going to ask you to describe anything today, so don't worry about it, but you've never in your entire career sought any mental health treatment while you've been a deputy?

A. Mental health, no.

Q. Just physical treatment, since you've been a deputy -- have you ever -- I mean, have you had any military service?

A. No.

MR. MILLER-NOVAK: Okay. You can give that set of W-2s back to her.

Q. So you've never had any mental health counseling at all in your entire life?

A. No.

(Defendants' Deposition Exhibit No. 10 was marked for identification.)

Q. Okay. I'm going to hand you Exhibit 10. I was provided this record from Springdale Police Department in response to a subpoena and I sent a copy to your counsel. And this is a payroll report

Page 260

I received from Springdale between January 1, 2024, to April 22, 2025; do you see that?

A. Yes.

Q. Do you have any reason to believe that any of these numbers are incorrect?

A. I would have -- I wouldn't have a clue. I have no idea.

Q. Okay. Do you know whether or not that this payroll report is something that's done in the normal course of business or only in response to a records request?

A. I have never seen this before.

MR. MILLER-NOVAK: Okay. That's fair. You can hand that to her.

Q. So you referred to a Matt Guy earlier, correct?

A. Yes.

Q. Was that Matt Guy?

A. Yes, sir.

Q. Okay. And he's the one that you claim told you that Jay Gramke overrode your appointment to RENU, correct?

A. Yes.

Q. Okay. Had you ever shown up at the job, like did you ever start your position at RENU?

A.   No.

Q.   Okay.  So earlier you said you had an assignment.  Did you ever actually do or perform any tasks for RENU?

A.   No.

Q.   Okay.  So you never showed up to work on a Tuesday and would have introduced yourself as a member of the RENU unit?

A.   No.

Q.   Okay.  Had you announced to your friends or family that you were promoted or given a position at RENU before Jay Gramke overrode it?

A.   When I was told I was coming down in March -- they always tell you not to say anything, one, to see if you can keep it quiet and, two, they don't know the exact date they're picking until the last minute because of the way the payroll is.

But after I was told I wasn't going, yes, I told -- because everybody knew that, you know, eventually I was heading down there -- that I didn't get it, if that makes sense.

Q.   Okay.  Did you ever get that exact date you just described?

A.   I don't recall the exact date, what it was.  The end of March is all I remember.

Page 262

Q.   Okay.  Was that in writing that you received the exact date that you would start at RENU?

A.   That was from Lieutenant Guy.

Q.   It was verbally?

A.   Yes.

Q.   Okay.  So you never actually started on that date, though, correct?

A.   No.  Gramke squashed it beforehand.

Q.   Okay.  So you never actually hit the date where you were supposed to start on RENU?

A.   Correct.  I got the phone call in February.

Q.   Which is -- when were you supposed to start according to a start date?

A.   March.

Q.   Okay.  So you got the phone call in March before the date had come?

A.   I got the phone call in February -- February 23.

Q.   That you were -- that it was overridden?

A.   Yes, sir.

Q.   Okay.  And the date that was supposed to be your start date was in March, correct?

A.   Yes, sir.

Page 263

Q.    Okay.  So you got the phone call it was overridden in February then, correct?

A.    Yes, sir.

Q.    All right.  So you didn't actually start serving as a RENU officer because that date wasn't until March, correct?

A.    Correct.

MR. MILLER-NOVAK:  Okay.  I'm done.

MR. GOTTESMAN:  We'll take signature and review it.

(Witness excused.)

(Deposition concluded at 4:00 p.m.)

Page 264

A C K N O W L E D G E M E N T

STATE OF _____   :

COUNTY OF _____   :

I, JASON DAVIS, have read the transcript of my testimony given under oath on May 6, 2025.

Having had the opportunity to note any necessary corrections of my testimony on the errata page, I hereby certify that the above-mentioned transcript is a true and complete record of my testimony.

_____

JASON DAVIS

REPORTER'S CERTIFICATE

I, Kristina L. Laker, Court Reporter and Notary Public, do hereby certify:

That the witness named in the deposition, prior to being examined, was duly sworn;

That said deposition was taken before me at the time and place therein set forth and was taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

That said deposition is a true record of the testimony given by the witness and of all objections made at the time of the examination.

I further certify that I am neither counsel for nor related to any party to said action, nor in any way interested in the outcome thereof.

IN WITNESS WHEREOF I have subscribed my name and affixed my seal this 26th day of May, 2025.

/s/ Kristina L. Laker
_____
Kristina L. Laker
Notary ID 592345
My Commission expires: 12/21/25