Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT CINCINNATI

JASON DAVIS and            :
JENNIFER DAVIS,
                           :
        Plaintiffs,
vs.                        :   Case No. 1:24-cv:0202

CHARMAINE McGUFFEY, et al., :

        Defendants.        :

* * * * * * * *

DEPONENT:          Jennifer Davis

DATE:              May 9, 2025

* * * * * * * *

Kristina L. Laker

Court Reporter

BARLOW REPORTING & VIDEO SERVICES, LLC
620 Washington Street
Covington, Kentucky 41011
(859) 261-8440

The deposition of JENNIFER DAVIS taken for the purpose of discovery and/or use as evidence in the within action, pursuant to notice, heretofore taken at the office of Chris Wiest, Attorney at Law, PLLC, 50 East Rivercenter Boulevard, Suite 1275, Covington, Kentucky, on May 9, 2025, at 10:00 a.m., upon oral examination, and to be used in accordance with the Federal Rules of Civil Procedure.

* * * * * * * *

APPEARANCES

REPRESENTING THE PLAINTIFFS:

Christopher Wiest, Esq.
CHRIS WIEST, ATTY AT LAW, PLLC
50 East Rivercenter Boulevard, Suite 1280
Covington, KY 41011

Zachary Gottesman, Esq.
GOTTESMAN & ASSOCIATES, LLC
9200 Montgomery Road
Building E, Suite 18B
Cincinnati, OH 45242

REPRESENTING THE DEFENDANTS:

Matt Miller-Novak, Esq.
Andrew E. Prem, Esq.
HAMILTON COUNTY PROSECUTOR'S OFFICE
230 East Ninth Street, Suite 4000
Cincinnati, OH 45202

ALSO PRESENT:  Peter Stackpole, legal liaison

                          I N D E X

                                                    Page

Cross-Examination by Mr. Miller-Novak:          4

Direct Examination by Mr. Wiest:              111




                      E X H I B I T S

Defendants' Deposition Exhibit No. 11            36

Plaintiffs' Deposition Exhibit No. 12           111

JENNIFER DAVIS, of lawful age, as having been duly sworn, as hereinafter certified, was examined and testified as follows:

CROSS-EXAMINATION

BY MR. MILLER-NOVAK:

Q.   Can you state and spell your name for the record, please.

A.   Sure.  Jennifer Nell Patterson-Davis. J-e-n-n-i-f-e-r.  N-e-l-l.  P-a-t-t-e-r-s-o-n, hyphen, D-a-v-i-s.

Q.   So Patterson is your --

A.   Maiden name.

Q.   -- maiden name?

A.   Correct.

MR. WIEST:  I don't know if we talked about this.  You need to listen until he finishes asking today and then you answer.

THE WITNESS:  Okay.

MR. WIEST:  And that way she can get a clean transcript.

THE WITNESS:  Okay.

MR. MILLER-NOVAK:  That was my job --

MR. WIEST:  Sorry.

MR. MILLER-NOVAK:  -- to tell her the

instructions.

Q. All right. Well, I will go through a little bit about -- my name is Matt Miller-Novak. I represent all the Defendants in this case. And this handsome young gentleman next to me is Andy Prem, and he also represents the Defendant. That's Pete Stackpole, who is staff attorney for the Sheriff's Department.

So today this is a deposition, which is an oral examination. It's part of the discovery process. So I'm going to ask you questions today, okay?

A. Okay.

Q. All right. So some of the instructions I'm going to give you -- I know that you were at least present during Sheriff McGuffey's deposition, so you've seen -- you've at least seen a deposition I'm aware of, but I'll just kind of run through just some regular procedural stuff so we kind of understand the process, okay?

A. Okay.

Q. So as your counsel pointed out, we have a court reporter here today. She's typing in shorthand everything that comes out of our mouths; do you understand that?

A.   Correct.

Q.   And because of that really the end product, if you will, is going to be a written record.  We don't have a videographer here.  So this all will be a transcript.  Because of that some of the things I'm about to say is just to make sure that the record is clear and clean --

A.   Okay.

Q.   -- do you understand?

A.   Correct.  Yes.

Q.   Okay.  So one of the most important things is that when I ask you a yes or no question, if you're going to answer yes or no, you probably want to say yes or no as opposed to uh-huhs or nuh-uhs; do you understand?

A.   Yes.

Q.   And the reason for that is just to make sure she doesn't accidentally record a negative as an affirmative or vice versa.  The other thing, which your counsel pointed out, is that because she is typing, we want to make sure that we don't interrupt one another; do you understand?

A.   Yes.

Q.   Because we just want to make sure she gets all of my questions and all of your answers.  So

when I am asking a question, I do ask that you let me finish before you answer.

A. Okay.

Q. It's human nature to kind of like know what a question is going to be and tend to blurt out answers. It's going to probably happen. That's not a big deal. Just do your best.

A. I will do my best.

Q. Yeah, you will not be shamed or anything like that if you have an accident or two, so don't worry about it. Everybody does. If you need to take a break, just let me know. You're not -- by no means I'm a judge or anything like that. You don't even really need to ask permission. Just let me know you need to take a break.

A. Okay.

Q. The only thing I ask is that, you know, if I have a question on the table, please answer it and then just say I'd like to take a break, okay?

MR. WIEST: And just for the record, if there is a question pending and there's a question of privilege, we reserve the right without you answering to address that.

Q. Well, and he might object sometimes, too,

okay?

A.   Okay.

Q.   But you are -- you know, certainly if your counsel gives you an instruction, you should probably listen to your counsel, okay?

A.   Okay.

Q.   As I kind of move forward here, I'm going to ask some questions that are not prepared by any means and they might not be necessarily stellar and they might be a little bit confusing.  So for some reason if I ask a question that's not understandable to you or you don't understand the question, please do not feel that you cannot ask me for clarification, okay?

A.   Okay.

Q.   I will not be offended or insulted in any way, shape, or form.  I would prefer that you do understand the question so I get your honest answers today, okay?

A.   Okay.

Q.   All right.  So I'm going to ask you a question, and this is always for me the more awkward one.  Do you have -- and you don't need to tell me what they are, but do you have any medical condition that interferes with your memory or ability to

coherently remember events or describe events?

A. No.

Q. Are you on any -- again, you don't have to tell me what they are. I'm not asking about your medical business -- at least not at this point in time -- but are you on any medications that would interfere with your ability to remember things or testify clearly today?

A. No.

Q. Great. We'll assume that you're in good health then. Congratulations. So if you don't have any questions for me, then we'll kind of get to the meat of things --

A. No questions.

Q. -- okay? None. All right. So have you ever been deposed before?

A. No, I have not.

Q. Okay. I always feel a little bad if I'm someone's first deposition. You deserve better. All right. Do you have -- can you describe your educational background as briefly as you can?

A. Sure. I graduated high school from Oak Hills in the west side of Cincinnati. I attended the University of Cincinnati. I have a bachelor's degree in community health education. And I have a

professional certification in entrepreneurship and small business management.

Q.    When did you graduate from Oak Hills?

A.    1995.

MR. MILLER-NOVAK:  I'm a 1995 graduate.

MR. WIEST:  I am, too.

MR. MILLER-NOVAK:  Are you?

MR. WIEST:  Yes.

MR. MILLER-NOVAK:  How about that. We've all got our 30th year anniversary coming up --

THE WITNESS:  We do.

MR. MILLER-NOVAK:  -- this year, don't we?  Bummer.

Q.    All right.  So if I remember right, Jason graduated in 1994 from --

A.    Correct.

Q.    Yeah.  Were you guys high school sweethearts?

A.    Well, we've been dating since I was 15 and he was 16.

Q.    Oh wow.  Congratulations.  How old were you when you got married?

A.    I believe I was 26.

Page 11

MR. WIEST: For clarity, are you saying you've been married 26 years?

THE WITNESS: No.

MR. PREM: She was 26.

THE WITNESS: I believe it was in --

MR. WIEST: Oh, you were 26?

THE WITNESS: I was 26 years old.

Q. Okay. What year was that?

A. Oh, good question. It was 2003 or 2004. I can't remember.

Q. Okay. So you said you started dating Jason when you were 15?

A. Correct.

Q. So it took you 11 years to figure out whether or not he was the right one?

A. Actually it would have taken longer, but I needed health insurance when my health insurance ran out at 26. I'm not going to lie.

Q. That's all right. So he's like your health insurance sugar --

A. I'm turning 26.

Q. Yeah.

A. We need to get this done.

Q. Health insurance sugar daddy.

A. That's right.

Q. That's funny. Were you kind of I guess dating or a couple that whole 11-year --

A. Yes.

Q. -- period? Okay.

A. We had lived together as well.

Q. Okay. And he was already working for the corrections department at that point in time -- Department of Corrections?

A. At what age? And not when we were 16.

Q. No. When you were 26.

A. Correct.

Q. Okay.

A. Yes.

Q. And you already had graduated from the University of Cincinnati?

A. Correct.

Q. Okay. And then Jason said on Tuesday that you do not currently work?

A. That's correct.

Q. He mentioned that you had some income, though; is that correct?

A. I do some studies for P & G. It's paid in the form of a prepaid card, not a paycheck. I'm not on their payroll.

Q. Is it like an independent contractor?

MR. WIEST:  Objection.

You can answer.

THE WITNESS:  Okay.

A.  It's -- I don't even believe it's that.  I will not get a 1099 from them.  It's just -- it's not much.  It's a prepaid gift card is what they put it on.  So if I test out a product for P & G like a mop or something, then they will give me compensation for testing a product or giving an opinion on a product.

Q.  Oh.  So you almost do like consumer reviews --

A.  Somewhat.

Q.  -- ish?

A.  Some of it is research, some of it is reviewing.

Q.  When did you start doing that?

A.  I honestly don't remember.  It's -- well, actually I can tell you when I started it.  It was when -- after my son was born, I was originally recruited by P & G to do diaper studies for my son.  So that had to have been 2004.  And once he was out of the diaper studies, then they asked if I wanted to do consumer studies.

Q.  Is this something that you ultimately have

to report on your tax returns?

A.   I believe there was a threshold if I made it.  But I have not always had a tax form from P & G.

Q.   So they don't always present you with something that you have to give to --

A.   No.

Q.   -- your tax preparer?

A.   No.

Q.   Yeah, it's okay.  Let me finish.  I said it would happen.  It's all right.  If it makes you feel any better, I'll accidentally cut you off later, too.  Jason had said that you were the owner of Gold Roof?

A.   Gold Top Dairy Bar.

Q.   Gold Top Dairy Bar.  Thank you.  When did you start that business?

        MR. WIEST:  Objection to form.

        You can answer.

A.   I believe I purchased it in 2003 or 2004. I'm not sure of the exact date.

Q.   Right around the time you got married?

A.   That's correct.

Q.   So you didn't start that dairy bar -- for lack of better word -- you purchased that business

from somebody else?

A.   That's correct.

Q.   Okay.  And then my understanding is is that -- did you sell it or just close it?

A.   I sold it in 2001.

MR. WIEST:  2001?

Q.   '21?

A.   I mean -- I'm sorry.  2021, after COVID. Sorry.

Q.   So it's still operating now?

A.   Correct.

Q.   Okay.  And why did you sell it?

A.   Maybe midlife crisis.  I have done it for almost 20 years.  I took the business as far as I could.  I owned the real estate.  Property values were up.  My books were clean.  It was a good time to sell according to my accountant.

Q.   How many employees did you have when you owned Gold Roof [sic]?

A.   Approximately 25 a season.  We were a seasonal business only open from March to October.

Q.   Okay.  I'm going to change the topic here a little bit.  So do you recall what year Jason began working as a patrol officer?

A.   I believe he was in the jail for about 12

years.  So 12 years after he started.  I'm not sure of the exact date he started.  I just know it was about 12 years after he had worked in the jail.

Q.   And have you been supportive of his career?

MR. WIEST:  Objection to form.

A.   I have.

Q.   So have you ever wanted him to do anything else besides public safety?

A.   No.

Q.   Do you consider yourself supportive of police officers in general?

A.   Yes.

Q.   Does Jason frequently talk to you about his job?

MR. WIEST:  Objection to form.

You can answer.

A.   Can you clarify about what part of his job?

Q.   Sure.  Does he ever talk to you about or tell you stories about what occurred during the day?

A.   Yes.

Q.   Okay.  Does he tell you stories about people he's arrested, for example?

A.   Yes, but never identifying people.

Q.   So he might tell you about an event without identifying a suspect's name or something like that?

A.   Correct.

Q.   Okay.  So he might tell you about how he pulled somebody over, maybe they were completely wasted while they were driving or something like that, but he wouldn't identify the human being, correct?

A.   Can you say that one more time?

Q.   Yeah.  Like he might just tell you a story like about the events, like describe a DUI or something?

A.   No.  He wouldn't describe an event.  He would say I had to sit on this accident for six hours today or something.  He would not want to tell me details of. . .

Q.   So sometimes he vents if he's had a bad day, for lack of a better description?

A.   Yes.

Q.   And then maybe sometimes he kind of celebrates if he's had a good day, correct?

A.   If there are good days, yes.

Q.   Does he talk to you about his coworkers at all?

MR. WIEST: Objection to form.

A.    Yes.

Q.    For lack of a better wording, does he ever discuss like office drama with you?

A.    No.  It's usually personal.

Q.    By personal can you tell me what you mean by that?

A.    Sure.  Like he plays football with some of the officers.  So he would -- if we were at a game, he would say that's so-and-so's wife.  They have three kids together.  I work with him in this department or he works for this department.

Q.    So he just keeps you kind of informed of what's going on in his friends' lives?

A.    Yes.

Q.    Okay.  And who was the sheriff when Jason first started in the Sheriff's Department?

A.    I believe it was Simon Leis.

Q.    Okay.  Who was the next sheriff; do you recall?

A.    Jim Neil.

Q.    And then?

A.    Charmaine McGuffey.

Q.    Did Jason ever discuss Sheriff Leis with you at all?

MR. WIEST: Objection to form.

A. I don't remember. It's been so long ago.

Q. What about Sheriff Neil?

A. Possibly, yes, but I cannot remember any specifics.

Q. Was Jason generally positive about Sheriff Neil?

A. Yes.

Q. Would you say that he liked Sheriff Neil?

A. I couldn't tell you one way or the other if he liked him or not.

Q. And do you understand that Sheriff McGuffey campaigned against Sheriff Neil?

A. Yes.

Q. Did Jason discuss that campaign with you at all?

A. I can't remember.

Q. Was he supportive of Sheriff McGuffey's campaign?

A. I can't tell you what -- if he did or not.

Q. Do you know if he was critical of Sheriff McGuffey at all?

A. I can't give you a specific instance.

Q. So at no time did he discuss Sheriff McGuffey's candidacy or character with you before

she was the sheriff?

A. I don't remember.

Q. Do you remember if he discussed Sheriff McGuffey at all before she was the sheriff?

A. Yes.

Q. Okay. And what would he say about Sheriff McGuffey before she was the sheriff?

MR. WIEST: Objection to form.

A. I remember there was an incident where she had tried to get him fired, and he explained that to me and. . .

Q. Was he upset by that?

MR. WIEST: Objection to form.

A. Yes.

Q. What, if any, opinions did you have about Sheriff McGuffey while she was campaigning?

A. Well, I guess I could say it was already unfavorable because of the interaction that my husband had had with her previously.

Q. Okay. So you had unfavorable opinions about Sheriff McGuffey -- well, then Candidate McGuffey?

A. Correct.

Q. We're going back in time. Are you registered to vote as a republican or a democrat?

MR. WIEST: Objection to form.

You can answer.

A. Honestly I don't remember, because I have been registered as both.

Q. You're not --

A. I have voted in both primaries, so I know I have been registered as a democrat and I have been registered as a republican. If I had to make a guess, I would say it's currently republican.

Q. In the most recent presidential primary did you vote for the republican primary or the democratic primary?

A. I believe it was republican -- wait a minute. I'm sorry. Was that the same primary where Jim Neil was running against Sheriff McGuffey; was that the same one?

MR. WIEST: No. It was before. Because '24 he ran in the general as a republican.

MR. MILLER-NOVAK: Well, but --

THE WITNESS: 2020 is --

MR. MILLER-NOVAK: We'll go off the record for a second.

THE COURT REPORTER: We're off the record.

(Off-the-record discussion.)

MR. MILLER-NOVAK:  So I think we're in general agreement, we're just not sure how you're registered to vote?

THE WITNESS:  Yes.

MR. MILLER-NOVAK:  Okay.  We had an off-the-record conversation and -- yes.

BY MR. MILLER-NOVAK:

Q.   All right.  Did you vote for Charmaine McGuffey or did you vote for Jim Neil in 2020?

A.   Jim Neil.

Q.   Okay.

A.   Oh -- yes.  Jim Neil.

Q.   Okay.  What about in 2024?

A.   Jim Neil.

Q.   Do you know Jim Neil at all?

A.   I have met him at a campaign event.  I have met him at my husband's football game.  And I believe those are the only times that we have met in person.

Q.   When Sheriff McGuffey won her election in 2020, did Jason have anything to say about it?

A.   Not to me.

Q.   I'm going to hand you what's marked Defendants' Exhibit 1.

A.   Okay.

Q.   So this is the complaint that you filed -- well, counsel, I guess, filed in this case.  Have you seen it before?

A.   Yes.

Q.   Okay.  Did you review this complaint before it was filed?

MR. WIEST:  Objection.

You can answer yes or no.

A.   Honestly I don't remember if it was before or after it was filed.

Q.   Okay.  But you have reviewed it?

A.   Correct.

Q.   Do you agree that the statements in here are true to the best of your understanding?

MR. WIEST:  Objection.  She's not a lawyer on any legal stance.  She can answer to the factual allegations.

A.   Yes, I have an idea of what's in the case.

Q.   Well, regarding the factual allegations, do you think any of them are untrue?

A.   No.  They're true.

Q.   Okay.  All right.  So I'm going to have you actually turn to Exhibit 1.  So if you kind of look at the page numbers, it would be technically

page 16 even though it's not titled 16, but there's 15 pages in the complaint.  So it's the first page afterward.

A.    Okay.

Q.    Okay.  You're there.  All right.  So have you seen this before?

A.    I have.

Q.    Okay.  So my understanding is -- and please correct me if I'm wrong -- is that these are comments that were kind of rolling on a stream that occurred on Facebook, which was Sheriff McGuffey's kind of like press conference; do you agree with that?

A.    Yes.

Q.    Okay.  And this Jennifer Patterson Davis shown here, that's your Facebook name?

A.    That's correct.

Q.    Okay.  So I think these maybe -- I don't know.  Do you know what these 21:04 is; do you understand what that is?

A.    If I had to guess, it would be at what -- maybe what point in the broadcast, like what time of the live feed that those comments appeared.

Q.    Okay.

A.    But that doesn't make sense, because

there's three seconds. So that would be incorrect. I do not know that.

Q. I don't either. I was just seeing if you did.

A. That's what I would have guessed, but it doesn't make sense when you look at the numbers.

Q. Right. Because they're out of order?

A. Correct.

Q. I agree. All right. We'll just chalk it up as no one here knows.

A. Okay.

Q. All right. But at the top it says, What a shit show; do you see that?

A. Yes.

Q. Okay. Did you post that?

A. Yes.

Q. So that is your comment?

A. Yes.

Q. And then below that it says, Your number one concern as sheriff is COVID. Where is my eyeroll emoji; do you see that?

A. Yes.

Q. Okay. Did you type that?

A. Yes.

Q. Why were you upset that she was concerned

about COVID?

MR. WIEST:  Objection to form.

MR. MILLER-NOVAK:  She's looking at you to see if she can answer.

MR. WIEST:  You can answer.  Unless I tell you not to answer, which I'm only going to do if he raises a privilege issue, you can answer everything today.

THE WITNESS:  Okay.

A.    As a wife of a law enforcement professional, I had other ideas of what were more important issues than COVID, and I would expect the top law enforcement professional to understand that and have the same ideas.

Q.    Okay.  And what do you -- I don't want to mischaracterize what you just said, but you said you had other ideas as a wife of a law enforcement official?

A.    Yes.

Q.    What were those ideas?

A.    Well, I had said, In a department which has -- oh, wait a minute, sorry.

My biggest health priority would be officers coming home safe to their families without a bullet in their head and not coming home with the

flu.  And then I --

Q.  And -- oh, I'm sorry.  Go ahead.  I thought you were done.

A.  And then I stated some facts about how many officers had died in the line of duty, how many officers had died from suicide that year, and that the COVID deaths were not even close to those numbers.  That's where I came up with my conclusion that there were more pressing health concerns.

Q.  When you just said that, it looks like you were kind of reading or referring to a post lower down on the page where it says, Yes, a priority for the entire community is to stay healthy; do you see that?

A.  Yes.  That was not mine.

Q.  That was not yours?

A.  No.  That was Elaine Moscovitz.  The reason why my name is highlighted is because she had tagged my name.

Q.  Oh.  Oh, okay.  Yeah, I see that.  The formatting is weird.  So it does say Elaine there.  And then it says Jennifer Patterson Davis.

A.  She was addressing me.

Q.  Because she was replying to you, so that highlights your name?

Page 28

A. Yes.

Q. Okay. So then underneath that you're replying to her, so it starts with Elaine Moscovitz, right?

A. Correct.

Q. And it says, number one priority, though? I didn't say it shouldn't be addressed, but my biggest health priority would be officers coming home safe to their families without a bullet in their head and not coming home with the flu; do you see that?

A. Yes.

Q. Okay. What do you mean by flu?

A. Her -- she said her priority was COVID. And I was equating COVID with a virus similar as the flu.

Q. Do you believe it's the same thing as the flu?

MR. WIEST: Objection to form.

A. I believe it's similar, yes.

Q. Okay. And do you believe that COVID is a separate disease?

MR. WIEST: Objection to form.

A. I believe that COVID and the flu are both viruses that create similar symptoms, so I believe

they're similar.

Q. Okay. You believe that they're similar, but you believe they're distinct viruses?

MR. WIEST: Objection to form.

A. I'm not an epidemiologist, but I'm sure there are differences in the way the virus is constructed.

Q. Okay. Let's turn to the next page, which is Exhibit 2 attached to the complaint. Does this look familiar to you?

A. Yes.

Q. Okay. And what is it?

A. It's a Facebook post that I posted on my personal page on January 4, 2021.

Q. And this was right after Sheriff McGuffey took office, correct?

A. It was the same day as the comments I posted on her live feed, her -- from the previous exhibit that we just went over. It was the same day.

Q. Okay. And did this happen after you were interacting to the live feed?

A. Yes.

Q. Okay. So not to try to get too much in your headspace, but you were kind of engaged in this

live feed conversation, correct?

A.   Yes.

Q.   And it kind of inspired this post to occur?

A.   Yes.

Q.   Okay.  Do you know how much longer after that live feed that you decided to do this post?

A.   I don't.

Q.   Okay.  Was it -- well, you know -- I mean, was it like immediate or was it some time had passed?

A.   Some time -- give me a time frame.  Hours, minutes?

Q.   Yeah, I would say more than an hour is some time.

A.   Probably more than an hour, but I'm not sure.  I couldn't -- I just know it was the same day.

Q.   Okay.  Did you discuss this post with Jason at all?

MR. WIEST:  Objection to form.

A.   I didn't.  He might have asked me about it.  But I never said anything to him before or. . .

Q.   What did he say to you about it?

A.   I don't remember.

Q. Well, let's go through the post.

A. Okay.

Q. Okay. It says, I really don't like seeing political posts continuously on Facebook because like they say, opinions are like assholes. Everybody has one and they probably stink. That is unless you are one of those weirdos that bleaches your asshole and does those colon cleanse things, but I digress. Are those your statements?

A. Yes.

Q. Okay. It says, I have one political opinion I need to get off my chest. In today's press conference our new -- and it says sheriff in quotations -- says her number one issue is going -- that she is going to tackle in her first weeks in office is COVID; do you see that?

A. Yes.

Q. Okay. So it says in today's press conference. As you said earlier you're referring to the live stream press conference, correct?

A. That's correct.

Q. All right. Why did you put sheriff in quotes here?

A. I don't believe that she's acting as a top law enforcement professional should and doesn't have

a grasp on what the needs are that I would expect from a real sheriff.

Q. Okay. Well, can you provide me a little bit more detail why you think she didn't have a grasp on the job?

A. To state that COVID is a number one priority as opposed to the other health concerns of law enforcement officers, that's why.

Q. I want to go a few sentences down. It says, This person is nothing more than a politician and is nowhere near qualified to be the sheriff; do you see that?

A. Yes.

Q. It says, If you voted for her because of her qualifications -- and it has a parenthetical -- it says not being a certified peace officer -- being fired from the department for being on the Brady list, then you have the IQ of a kumquat. Is that your sentence?

A. Yes.

Q. Okay. So in the parenthetical it says being fired. How did you know that she was fired?

A. I heard about the internal investigation on the news about her creating a hostile work environment.

Page 33

Q.   Were you aware if she had filed suit?

A.   At the time I learned of it, I'm not sure if that's what the news -- if that was connected with the news article or not.

Q.   Okay.  How did you know about her being on the Brady list?

A.   I have heard that on the news multiple times.  I believe I've heard it from other officers.

Q.   What other officers?

A.   I'm not sure.

Q.   When would you have heard it from other officers?

A.   It could have been at a football game or some type of social outing with other officers.

Q.   So sometimes when you're at social gatherings with officers, they kind of talk to you about things that are happening in the department?

A.   Not to me, just in general whoever -- usually we're in a group.  I'm never on a one-on-one situation.

Q.   So these are group conversations when you're with your husband at certain events?

A.   Well, usually I'm not with my husband at football games, because he's on the field.

Q.   Okay.

A.    It could be spouses.

Q.    Okay.  To continue it says, or thought it would be neat to see a gay woman as sheriff, then you are a twatwaffle.  Did you type that?

          MR. WIEST:  Objection to form.  That wasn't the whole sentence.

          You can answer.

A.    Yes.

Q.    Okay.  How do you define twatwaffle?

A.    An idiot.  There's a comment on that post that's a screenshot of the definition and that's what it says.  I know you can't see the comments on here.

Q.    I can't see the definition.  But you -- I don't know that -- that doesn't come from Webster's Dictionary, does it?

A.    I'm not sure.  I don't know if it's in. . .

Q.    Maybe Urban Dictionary?

A.    Maybe.  I'm not sure.  I didn't post the definition.  Somebody else did.

Q.    Okay.

A.    So I don't know where they got that from. But I would agree that's the definition.

Q.    So when you use the word twatwaffle,

you're calling someone an idiot or a fool or a moron --

A.   Yes.

Q.   -- right?  So to you the word twatwaffle is a way to make a derogatory statement towards someone's intelligence?

A.   Yes.

Q.   Okay.  So another way to read this part of the sentence is if someone thought it would be neat to see a gay woman as sheriff, then they are an idiot?

A.   If that was their only reason.  Not just because she was gay, but. . .

Q.   Okay.  Well, what would be wrong with wanting to see a gay woman advance to a position of leadership?

A.   Nothing.  As long as she had the qualifications.

Q.   Why did you bring up her sexual orientation?

A.   Because I believe she was voted in because of identity politics and not her merit.

Q.   Do you think that's the only reason people voted her in?

A.   I don't know what -- what other reasons.

Q.   I mean, could it be her political party by any chance?

A.   Her political party -- I know that identity politics is important, so those two could be connected possibly.

Q.   Are you aware that her lawsuit against the County for her termination was successful?

MR. WIEST:  Objection to form.

A.   I believe it was settled.

Q.   After summary judgment, correct?

MR. WIEST:  Objection to form.

A.   I'm not sure.

MR. MILLER-NOVAK:  Okay.  Let's set that aside.

(Defendants' Deposition Exhibit No. 11 was marked for identification.)

Q.   I've handed you what is now marked as Defendants' Exhibit 11.  Are you familiar with Donald Raymond Gilreath?

A.   I am not.  I do not know him personally.

Q.   Okay.  Are you aware that he died on February 12, 2021?

MR. WIEST:  Objection to form and foundation.

Go ahead.

A.   No.   Because I don't know who he is.

Q.   Okay.   If I were to hold out that he was a deputy who worked in the justice center, would you have any reason to disagree with that?

A.   No.

Q.   Are you aware that he died because of complications of COVID that he contracted while working?

MR. WIEST:   Objection to form and foundation.

You may answer.

A.   No.

MR. MILLER-NOVAK:   I wasn't done with the question.

THE WITNESS:   Oh, I'm sorry.

Q.   That he died as a result of COVID-19 that he contracted in the line of duty at the Hamilton County Justice Center?

MR. WIEST:   Objection to form and foundation.

A.   No, I did not.

Q.   Okay.   Do you know that he was the only death of a deputy in the year 2021 regarding the line of duty?

MR. WIEST:   Objection to form and

foundation.

Q. In Hamilton County. Sorry.

A. No, I did not.

Q. So you're unaware that in the year 2021 the only deputy that died in the line of duty died of COVID complications?

MR. WIEST: Objection to form and foundation.

A. No, I did not know that.

Q. Okay. Does that affect your opinion at all in your post that you typed a month earlier?

A. No, it doesn't.

Q. Okay. Why not?

A. One year of data doesn't make up for -- I don't know for sure, but I would imagine that if you looked at the other years, there would probably be more suicides or in-line -- in-duty deaths than COVID deaths; does that make sense?

Q. Sure. But COVID didn't exist in the year 2019, correct?

A. Correct.

Q. So that wouldn't be something that people would be concerned with in the year 2019, correct?

A. Correct.

Q. Or the year 2018, correct?

A.    Correct.

Q.    But it was a concern in the year 2020, correct?

A.    Correct.

Q.    It was a concern in the year 2021, correct?

A.    Correct.

Q.    As a matter of fact in the year 2021 it was 100 percent deputy deaths in Hamilton County, correct?

A.    Correct.  Can I ask a question?

Q.    Yeah, sure.

A.    Do you have the number of duty deaths in 2020 as opposed to COVID since COVID was in 2020?

Q.    I don't.  I have 2021.

A.    I would -- I would be interested before making a decision to hear 2020 when COVID was introduced.

Q.    Well, I would be, too.  But I don't have it with me today.

A.    Okay.

Q.    Sorry.

A.    It's okay.

Q.    Would you be concerned that deputies -- other deputies might see your post after Deputy

Donald Raymond Gilreath died and be bothered by it?

A.   No.

Q.   Okay.  Why not?

A.   Well, I think that most people know that you have a first amendment right to freedom of speech to say what you want.  I don't expect most people to be thin-skinned or to think that I'm something special that my opinion would have any bearing on them.

Q.   Does your husband ever get bothered by public comments about police officers?

A.   I don't know.  You would have to ask him.

Q.   Do you ever get bothered concerning public comments about police officers?

A.   That's a good question.  Give me a second to think about that.

Q.   Sure.

A.   I'm trying to think of current events. That's what immediately popped into my head.  I guess it bothers me.  It doesn't make me feel good, but it -- I believe they have a right to those opinions.

Q.   Would you agree with this statement, just because someone can say something doesn't mean they should?

MR. WIEST: Objection to form.

You may answer.

A. No. I think their rights outweigh any negative consequences in most situations.

MR. MILLER-NOVAK: You can hand me that back.

THE WITNESS: Absolutely.

MR. MILLER-NOVAK: Thanks. Are you okay; do you need a break or anything?

THE WITNESS: I'm great.

MR. MILLER-NOVAK: Holding up?

THE WITNESS: I'm doing fine.

MR. MILLER-NOVAK: All right.

THE WITNESS: Do you think we need a break?

MR. WIEST: I think -- no. As long as you're comfortable?

THE WITNESS: I'm good.

MR. WIEST: Okay.

BY MR. MILLER-NOVAK:

Q. Has Jason ever talked to you about the Facebook post that you have seen that are critical of police officers?

MR. WIEST: Objection to form.

You may answer.

Page 42

A.    I don't recall any.  Nothing specific.

Q.    Do you know who Caroline Adams is?

A.    Yes.

Q.    Who is she?

A.    She -- I have known her from Facebook to the pages that she runs, meme pages, satirical pages, all focusing on law enforcement, public service.

Q.    And the first word you used was meme?

A.    Meme.  Sorry.

Q.    Meme.

A.    M-e-m-e, meme.

Q.    M-e-m-e?

A.    Correct.

Q.    Okay.  And what's your opinion of Caroline Adams?

A.    Can you further elaborate on opinion of what, like as a person or -- I'm not sure what you're asking.

Q.    Well, let's start with as a person.

A.    Honestly I'm not sure.

Q.    You don't know her personally?

        MR. WIEST:  Objection to form.

A.    I wouldn't say that I know her very well personally.

Page 43

Q.   Have you interacted with her?

A.   Yes.  On Facebook.  I do like her posts.
I will comment on her posts.

Q.   So you've liked her posts and commented on
them?

A.   Yes.

Q.   Has she ever responded to you?

A.   Oh, I'm sure she has, because I've
responded -- I've made many comments and likes on
her posts.

Q.   Has she ever sent you like any -- I'm not
always the best at language here -- like the private
messages like through the Messenger thing?

A.   I would say she has.

Q.   So she has -- in addition to just kind of
like on a feed, she's also like directly messaged
you?

A.   Yes.

Q.   Do you still have those messages?

A.   I can look.  I probably do, but I'm not
sure.

Q.   Do you usually delete Facebook messages?

A.   I have.

MR. MILLER-NOVAK:  Okay.  Well,
please don't delete any that you have of

Page 44

hers now.  And if you have any still --

well, I'll send a follow-up, but obviously

we're going to request those.

MR. WIEST:  We reserve all

objections.

MR. MILLER-NOVAK:  Naturally.

Q.  All right.  So you've interacted with a few of her posts.  So do you tend to agree with her political viewpoints?

MR. WIEST:  Objection to form.

A.  Sometimes.

Q.  Okay.  Well, what type of posts has she kind of had that you've liked or agreed with?

A.  A lot of the things that affect police officers.

Q.  So you might not agree with all of her political opinions, but her opinions about police safety you generally agree with; is that fair?

A.  Yes.

Q.  Okay.  Would you agree that some of her memes or humor or whatever you've described can be rather edgy at times?

A.  Sure.

Q.  Have you ever seen any posts from her about Sheriff McGuffey?

A.   Yes.

Q.   Have you ever seen any posts from her about Sheriff McGuffey that kind of are degrading about her sexual orientation?

A.   Yes.

Q.   What have you seen?

A.   I know she calls her Chaz the Anti-Sheriff.  But I -- at this point I can't give you any specific meme that she's made.  But I do know there have been many.

Q.   And what does the phrase Chaz the Anti-Sheriff mean to you?

MR. WIEST:  Objection to form and foundation.

You may answer.

A.   I think she's criticizing her as a law enforcement professional, that she is -- she does the opposite of what you would expect a law enforcement professional to be.

Q.   By any chance did you see a meme that Caroline Adams had made that kind of was themed upon Brokeback Mountain?

MR. WIEST:  Objection to form.

A.   Do you have a copy of it that I can see?

Q.   I don't.

Page 46

A. I don't, but it wouldn't surprise me.

Q. Okay. Would you describe some of Caroline's posts as homophobic in nature?

MR. WIEST: Objection to form.

A. Sure. I can see that.

Q. Have you ever liked any of her posts that degraded Sheriff McGuffey's sexual orientation?

A. Oh, I'm not sure.

Q. You just don't recall?

A. I don't recall.

Q. I'm pretty sure the answer is no, but you've never met Caroline Adams in person?

A. I have.

Q. You have?

A. I have.

Q. Okay. And where have you met her in person?

A. At a bar on the west side of Cincinnati.

Q. What bar?

A. Fogarty's.

Q. Where is that?

A. Cheviot.

Q. There's eight gazillion bars on Cheviot Road, isn't there?

A. Yes.

Q. Which one is that by?

A. It's -- I guess it would be close to Hail Mary's. They're owned by the same people right off Harrison Avenue.

Q. Okay. And was there some kind of event going on at Fogarty's that night?

A. No. She invited people out -- just any of the west side people that were out, if they wanted to come grab a drink.

Q. And how did you know that the invite was -- did she invite people through Facebook?

A. Yes.

Q. So you saw like a Facebook post from Caroline Adams saying --

A. Yeah.

Q. I mean, was she just inviting like all of her Facebook friends?

A. Yes.

Q. How many people showed up?

A. Maybe four.

Q. Only four?

A. Yeah.

Q. That's probably about all the following I have, so I shouldn't really laugh at all. So you were --

Page 48

A.    I don't think a lot of people want to be associated with her.  I think they would be afraid to be retaliated against if they were seen with her.

Q.    By people you think would be afraid they would be retaliated against, who are you talking about?

A.    People in public safety that interact with her.

Q.    Well, why do you think they would be retaliated against?

A.    Because my husband was retaliated against because I interact with her.

Q.    When was this bar event?

A.    It was in the winter.  I know it was cold.  So it was either end of 2024 or beginning of 2025.

Q.    Oh.  So this is after Jason had already quit his job?

A.    Oh, yes.

        MR. WIEST:  Objection to form.

A.    Yes.

        THE WITNESS:  Sorry.

        MR. MILLER-NOVAK:  That's okay.  Did you get it?

        THE COURT REPORTER:  Yes.

Q.    Okay.  Did Jason go?

Page 49

A. No.

Q. Okay. So you were there. She was there. How many other people -- two more people, I guess?

A. Yeah, maybe three. I think there was three of us.

Q. And who were those people?

A. Honestly I've never met them before. There was a female. I think she was the sister of an officer. There was another older male there. I don't remember his name. I just -- the only conversation I had with him was he was telling me about a podcast that he created. And there was another young male there.

Q. Well, since you don't know any of their names, I'll assume you didn't form relationships with any of --

A. No.

Q. -- these people?

MR. WIEST: You got to let him finish asking.

THE WITNESS: All right. Sorry.

MR. WIEST: It's okay.

MR. MILLER-NOVAK: You're doing your best.

Q. All right. And what was the conversation

about?

MR. WIEST: Objection to form.

A. Politics. The female was involved in politics in Price Hill, so there was conversations about city issues. The gentleman -- he was talking about his podcast about city issues.

I had a conversation with Caroline about her husband. Since I didn't know her that well, I didn't know that her husband had died. He was in law enforcement. So that was the main conversation we had.

Q. What police force was -- what was his name?

A. I can't remember his first name. He was a ranger -- Hamilton County Park Ranger.

Q. Did he die in the line of duty?

A. No. He had a long, drawn-out -- he had a stroke and then he had a series of strokes after that. So it was a long, drawn-out illness.

Q. Have you had any other personal interactions with Caroline Adams besides that day?

A. No.

Q. Have you had any private interactions with her whether through Messenger or text message, email, or anything like that?

MR. WIEST: Objection to form.

A. When? Well, I told you --

Q. Yeah. After that meeting.

A. Oh, after that meeting. I did. I had -- the day that Larry Henderson died, I said, Is he -- you know, have you heard, is he gone? And she said Yes, he's passed. And she said that -- I told her I was sorry. And that she was supposed to meet up with him to celebrate his retirement at a pig roast on Memorial Day. And that was the last.

Q. Have you talked to her at all about this lawsuit in any form?

A. Oh, yes.

Q. When did you talk to her about this lawsuit?

A. I don't recall specifics.

Q. Through written communications?

A. It probably would have had to been, yeah, through Messenger.

Q. Through Messenger?

A. Uh-huh.

Q. Okay. What did you discuss with her?

A. I know she specifically wanted to know who my attorneys were.

Q. Who your attorneys were?

Page 52

A.   Yes.

Q.   Sorry.  He coughed right when you said that, so I missed that.  Anything else?

A.   I don't remember.

Q.   Okay.  Have you ever exchanged text messages with her at any point in time?

A.   I don't remember.  I don't believe so.

Q.   Okay.  So aside from kind of like interacting on her Facebook feed, the only other written communications you've ever had with Caroline Adams has been through Facebook Messenger?

A.   I have emailed her.  She asked for a copy of our complaint when it was filed.

MR. MILLER-NOVAK:  Okay.  Well, please preserve those.  And then, you know, we'll follow up with requests for that, Chris.

MR. WIEST:  We'll reserve all objections.

MR. MILLER-NOVAK:  What's that?

MR. WIEST:  We'll reserve all objections.

MR. MILLER-NOVAK:  Undoubtedly.

Q.   Have you communicated with -- off the subject, have you communicated with anybody else

about this lawsuit?

MR. MILLER-NOVAK:  Not attorneys.

MR. WIEST:  Thank you.

MR. MILLER-NOVAK:  Yeah.  I know that's what you were going to say.

A.    I know my father has asked.

Q.    Just kind of on the phone or verbally?

A.    Both.  How is it going.

Q.    Anything in writing?

A.    No.

Q.    So you're just giving him updates about the lawsuit?

A.    Yes.

Q.    Anybody else besides your father?

A.    Not that I recall.

MR. WIEST:  And, again, except counsel.  Thank you.  Not including counsel.

MR. MILLER-NOVAK:  Not including counsel.

Q.    As a going concern, you never need to tell me about conversations you have with these guys, okay?

A.    Okay.

MR. MILLER-NOVAK:  I would like to

Page 54

take a break.  We're probably going to change subjects.  I think this will be a good time.

THE COURT REPORTER:  Okay.  We're off the record.

(A brief recess was taken.)

BY MR. MILLER-NOVAK:

Q.    All right.  So are you familiar with what RENU is?

A.    Yes.

Q.    Okay.  What do you understand RENU to be?

A.    It's a specialized unit of Hamilton County Sheriff's Department focusing on narcotics investigations.

Q.    And you're aware that Jason had applied for RENU on two separate occasions?

A.    Yes.

Q.    Okay.  And do you recall when the first was?

A.    I don't.

Q.    If I said 2018 roughly, would you disagree with that?

A.    I wouldn't know.

Q.    Okay.  Do you know that he was denied the first time he applied?

A.    Yes.

Q.    Who was sheriff when that happened?

A.    What year did you say?

Q.    2018.

A.    Was that Jim Neil?  I'm not sure.

Q.    I believe so.

A.    Was Charmaine elected in 2020?

Q.    Yes.

A.    So yes, Jim Neil.

Q.    Okay.  Do you think that Charmaine McGuffey had anything to do with Jason not receiving his RENU promotion in 2018?

A.    I wouldn't know.

Q.    Okay.  Did Jason tell you that his application was denied?

A.    Yes.

Q.    Did he tell you why he believed it happened?

A.    No.

Q.    Okay.  Are you aware that in 20- -- at the end of 2022 -- or is it early 2023 -- that Jason had taken a test in terms of placement for promotion?

A.    For RENU or for corporal?

Q.    For corporal.

A.    Yes.

Q.   Okay.  So you're aware of the last time he took a test for corporal?

A.   Yes.

Q.   Are you aware of what his placement was on that test?

A.   Not exactly.  I know it was in the teens. But I do not know exactly.

Q.   Okay.  Did he talk to you about those results at all?

A.   The only thing that sticks out is that some of the people -- some of the people on the list had already made corporal's pay, so that -- all those people on the list were not going to be road corporals.

Q.   Okay.  So he talked to you about that?

A.   Yes.

Q.   Okay.  What you're referring to is some of those people would get different positions that would result in a bump in pay so they wouldn't necessarily get a promotion to corporal, correct?

MR. WIEST:  Objection to form and foundation.

A.   No.  My understanding is that those people were already at corporal level pay.  They just didn't have the stripes.

Page 57

Q.   Okay.  So you understood that there was no longer being ahead of him on the list, correct?

MR. WIEST:  Objection to form and foundation.

A.   Yeah.  I'm sorry.  Can you ask that in a different way?  I'm not sure.

Q.   Well, I'm trying to understand what your testimony is.  So you're saying that some of these people already had corporal pay without getting a bump to road corporal; is that --

A.   Just the -- just the designation as a corporal.

Q.   Okay.

A.   They were still at the same pay rate. They just didn't have a designation as a corporal.

Q.   Okay.

A.   Because they weren't all patrol.

Q.   And Jason told you that?

A.   Yes.

Q.   Okay.  And what significance does that have to you?

A.   I think it has to do with how many people they can promote till they need to get to someone that will be a road patrolman is what they're looking for -- I mean, a corporal -- a road corporal

is what they're looking for.

So sometimes they have to promote people because they're already at that level to get to the person they need for -- to get a road corporal.

Q. Okay. So Jason was kind of talking about when it might become his turn then, in other words?

A. No, not necessarily. Just how -- that there were different needs on the list.

Q. Okay. At any time while he was still employed at Hamilton County did Jason tell you that a corporal position had become available to him?

A. That he was offered a position as corporal; is that what you're saying?

Q. That one was available for his placement.

A. I'm not sure. I'm not sure if he knew everybody on the list and who was who and who was able to be a road corporal or who was just getting the official title since they were already at that pay rate. I don't know if he knew all of that.

Q. Okay. Well, you understand that the placement list -- the way it works is that as corporal positions come available, people higher up on the list have the priority for that promotion --

A. Yes.

Q. -- correct?

A.   Yes.

Q.   Okay.  So if I were to represent to you that Jason's placement was 19, do you have any reason to agree with that?

A.   No.  I believe it was in the teens.

Q.   Okay.  So essentially there's 18 people ahead of him, correct?

A.   Correct.

Q.   All right.  So as corporal positions become available, the 18 people ahead of him would essentially have priority over Jason then, correct?

MR. WIEST:  Objection to form.

A.   As far as being promoted to a road corporal?

Q.   Yes.

A.   No.  I think a lot of -- it could be possible that a lot of those people before him could get promoted to corporal but not have to go to road patrol.  They could stay in their -- whatever division they're in that was at corporal's pay.  So if you were in RENU, you could get promoted to corporal and still be in RENU and not be a road corporal.

Q.   Okay.  But you would understand that people ahead of him would get corporal promotions

before him most likely, correct?

A.   It would depend.

Q.   On what do you think it depends?

A.   What I heard in a deposition was the rule of three.  So they do have some discrepancy on how many they can skip.  They don't have to go in order.  So if you're number one, you could get passed up and they could pick number two, number three, or number four.  That would be my understanding.

Q.   Well, if you're number one, it would be number two and number three potentially, correct?

A.   Sure.

Q.   So essentially the rule of three still applies to the next three people on the list; do you understand that?

MR. WIEST:  Objection to form.

A.   Yes.

Q.   Okay.  Because it wouldn't be like number one, number 10, and number 12, correct?

A.   Correct.

Q.   It would be like number one, number two, and number three, correct?

A.   But it wouldn't have to be in order of one, two, three.  It could be one, two, four.  One, two, four, six.  I guess what I'm saying is it

doesn't have to be exactly chronologic order.

Q. Okay. But do you know at any time before Jason quit whether or not a position had come available to him that he would even be one of the three people in line?

MR. WIEST: Objection.

A. Oh, I'm not sure.

MR. WIEST: Go ahead.

A. I'm not sure.

Q. You're not sure?

A. No.

Q. Okay. So we did talk a little bit ago about Jason applying for RENU in the year 2018 and not receiving it, correct?

A. Yes.

Q. All right. So then he applied again in the year 2023, correct?

MR. WIEST: Objection to form.

A. I do not know the specific time he applied.

Q. Okay. Does January of 2023 sound correct to you?

A. I would take your word on it.

Q. Okay. Did he talk to you about applying before he applied?

A.    Yes.

Q.    Okay.  And what did he tell you?

A.    Just that he knew -- or he told me you know this is my dream, this is where I want to end my career.  He had -- since the first time he took -- or had applied for RENU, he took classes on his own.  He took classes that were paid for by the County.  Classes on his own that he paid for on his own.  And I knew that he was working towards this goal.  I knew that he was eventually going to apply for this again.

Q.    Is that all he told you about his application before it occurred?

A.    I can't recall.

Q.    Okay.  After he applied did he discuss his application for RENU with you anymore?

            MR. WIEST:  Objection to form.

A.    Yes.  I would say the only thing I remember him saying he thought he did well.

Q.    Okay.  And eventually did you learn that his application was rejected by Jay Gramke?

A.    Yes.  But I was also told that he had the position.  So I was told that after he was told he had the position that it was taken away by Jay Gramke.

Q.   Okay.  And what did he tell you about that?

A.   He had gotten a phone call.  And when the phone call ended, he said they just told me that they pulled me out of RENU because of your social media.  And the same person had called him back a few minutes later I guess to clarify what it was, and he said yes, it was indeed because of your wife's social media.

Q.   Okay.  Do you know who that person was?

A.   I believe it was Lieutenant Guy.

Q.   Did you know Lieutenant Guy at all before this phone call?

A.   No.

Q.   Okay.  Have you ever talked to Lieutenant Guy?

A.   No.

Q.   Have you ever talked to Lieutenant Guy since?

A.   No.

Q.   Do you know if Jason has talked to Lieutenant Guy since this lawsuit has been filed?

A.   I don't know.

Q.   So what social media post was -- do you understand they were referring to?

Page 64

A.    I assumed it was the one in the exhibits you showed me about her press conference when she was elected talking about COVID.  And then my personal post that same day.  I believe it was about those two.

Q.    Did Jason tell you why or how Lieutenant Guy supposedly knew that that was the reason?

A.    No.

Q.    When he told you that, what was your response to him?

A.    Honestly at first I didn't believe it was a possibility.  Yeah, I didn't believe it at first. I soon learned when he had the meeting with the Sheriff and Chief Deputy that that was in fact the case.

Q.    Did it affect -- when you heard that, did it affect your social media behavior at all?

A.    I don't believe so.

Q.    When you heard that, did you come to the conclusion that you wouldn't post any more critical things any longer?

A.    No.  My husband knows I'm too stubborn.

Q.    Did you continue to like Caroline Adams' posts after that?

A.    I'm not sure, but I would have.

Page 65

Q.   Did you continue to interact with Caroline Adams after that?

A.   Yes.

Q.   So it didn't affect your speech at all after you learned that, correct?

MR. WIEST:  Objection.

A.   Speech in which way, just social media?

Q.   Yes.

A.   I would say no.

Q.   Okay.  And it didn't affect your willingness to associate with Caroline Adams then, correct?

A.   Correct.

Q.   Did Jason tell you to stop posting online?

A.   No.

Q.   Did he talk to you about your online speech at all when he told you that?

A.   He said, I know you're going to do what you want to do, so I'm not going to tell you to not do something.

Q.   And you didn't offer or suggest that maybe you should not engage in the type of speech in the future?

A.   No, because I did nothing wrong.

Q.   Okay.  So at some point Jason decides that

he wanted to have -- you know, going back to his own testimony, he wanted to have a meeting with Sheriff McGuffey and Jay Gramke; do you understand that?

A. Yes.

Q. Okay. Did he talk to you about his desire to have that meeting at all?

A. Yes.

Q. Okay. What did he say to you?

A. He said I'm going to request a meeting with the Sheriff and Chief Deputy to find out if the -- if it is in fact true what they told me the reason why I was kicked off of the RENU assignment.

Q. Okay. In terms of being kicked off the RENU assignment, to the best of your understanding did he ever officially start serving as a RENU officer?

A. No. He told me that someone in RENU had said you're the pick, we already have cases that are going to be assigned to you.

Q. That were going to be assigned to him in the future?

A. Yes.

Q. Okay. So they kind of decided some cases that they would assign to him is your understanding, correct?

Page 67

A.   Yes.

Q.   But he didn't start working on any cases yet, correct?

A.   That's correct.

Q.   Because they gave him a start date, correct?

A.   I'm not sure.

Q.   Okay.  But at no time did he tell you that he was in fact a RENU officer yet, correct?

A.   I don't remember if he said that exact phrase.

Q.   So he said he wanted to request a meeting. Did he come to that conclusion the same day that he found out?

A.   No.

Q.   Okay.  When did he come to that conclusion?

A.   I'm not sure.

Q.   Was it very soon thereafter or weeks thereafter?

A.   I'm not sure.

Q.   Okay.  So he told you that he wanted to have a meeting with the Sheriff, correct?

A.   Correct.

Q.   And that he was requesting one?

Page 68

A. Correct.

Q. Okay. Do you know the process that he used to do that?

A. I believe it was a green letter, it's called.

Q. Okay.

A. That has to go up the chain of command to get an appointment to meet with them.

Q. Okay. So he told you he sent that green letter?

A. Yes.

Q. Okay. Did he tell you when the meeting was scheduled?

A. I'm sure he did. The only thing I remember is him saying it was quite a ways away. It wasn't going to be soon.

Q. Okay. If I were to tell you that the meeting happened on October 10, 2023, does that sound correct?

A. That sounds correct, yes.

Q. Okay. So do you know how long in advance roughly that you were aware that meeting was going to occur in October?

A. Not exactly. If I had to give an answer, I would say at least a month.

Page 69

Q.   Okay.  So it was scheduled a long time before it occurred?

A.   Yes, I believe so.

Q.   Okay.  Are you aware that Jason planned on recording that meeting?

A.   Yes.

Q.   Did he discuss with you his intent to record that meeting?

A.   Can you rephrase that or clarify that question?  I'm sorry.

Q.   Well, you're aware that he planned to record it, correct?

A.   Yes.

Q.   Okay.  Did he discuss with you why he wanted to record it?

A.   Yes.

Q.   What did he say?

A.   That she has had a history of dishonesty and she had tried to get him fired before.  And if he wouldn't have recorded that previous conversation, he probably would have been fired.  It saved him.  So from past experience that's why he wanted to record it.

Q.   Okay.  Did you encourage him to record the meeting?

A.   Yes.

Q.   Okay.  What did you say?

A.   That's a good idea.

Q.   Okay.  Just like that?

A.   Yeah.  I mean, you know, because he said about the past history.  And I'm like, well, that makes sense.  If she's been dishonest once, I would assume she would be dishonest again.

Q.   Do you know that he ordered a recorder that was shaped like a pen?

A.   Yes.

Q.   Did that happen before or after this conversation?

A.   I don't recall.

Q.   Did you help him order that pen?

A.   No.

Q.   Do you know where he ordered it from?

A.   I did not see an invoice or anything.  If I had to guess, it was probably online.

Q.   You don't know what site he ordered it from?

A.   If I would guess, it would be Amazon.  But I couldn't be 100 percent sure.

Q.   Do you know how much it cost?

A.   No.

Page 71

Q.   Did he tell you why he wanted to get a recorder that looked like a pen?

A.   No.

Q.   Did you see the recording device?

A.   Yes.

Q.   Did you see it before it was used?

A.   I don't recall.

Q.   Okay.  Do you still have the recorder pen?

A.   I don't know.

MR. WIEST:  Just objection to form and foundation.

Q.   Have you ever used that recorder at all?

A.   No.

Q.   Okay.  Well, let's fast-forward to October 10, 2023.  So right before he had the meeting, did you discuss what he would talk about during that meeting?

A.   No.

Q.   He didn't tell you any of the questions he had planned or prepared?

A.   No.

Q.   Well, you weren't in the meeting, correct?

A.   Correct.

Q.   All right.  So he came home and reported to you what happened in the meeting, correct?

A.  Correct.

Q.  Okay.  My understanding is is that he was not -- it was not a workday for him; is that correct?

A.  That's correct.

Q.  Okay.  Do you remember roughly what time he came home?

A.  I do not.

Q.  Was it in the morning?

A.  I don't know.

Q.  Okay.  You don't even have a general idea, like morning or after?

A.  I just remember I think his meeting was around eight o'clock-ish in the morning when people come in, you know, normal first-shifter people.

Q.  Okay.  To the best of your recollection did he come straight home after the meeting?

A.  I have no idea.

Q.  So when he got home after the meeting, what did he tell you?

A.  He -- in a shocked voice he said, It was because of you.

Q.  Okay.  Well, I'd imagine the conversation went on from there.  Can you do your best to recollect it?

A.   Sure.  What would you like to know?

Q.   Well, you said that -- whatever you just said.  What was your response?

A.   That's bullshit.

Q.   Okay.  And what was his response to that?

A.   I don't believe it either.

Q.   Okay.  Did you listen to the recording that day?

A.   No.

Q.   Did he tell you what the conversation was?

A.   Yes.

Q.   Okay.  What did he tell you?

A.   He said one of the first things Gramke said when I came in is I squashed you going to RENU, how did you not think there would be consequences for your wife's social media posts.  He said that the -- that multiple times in the conversation.  It was brought up about you, your social media, even the Sheriff agreed, you know.  She said, I don't care if your wife has a hundred opinions, but how do you think there's not going to be consequences for you.

Can I elaborate?  I did not listen to the recording until the next day when he told me that the Sheriff said that he needs to separate or cut

ties with me.

Q.   Okay.

A.   That's when I decided to listen to the tape the following day.

Q.   Did he say that the Sheriff used those exact words?

A.   Yes.

Q.   Okay.  Did you listen to the tape?

A.   I did.

Q.   Did the Sheriff use those exact words?

A.   Can I see a copy of it -- of the transcript?

Q.   I don't have it.

A.   It's not word for word, but after she told him the story about someone cohabitating with her, that she told her she had to leave because she was making her look bad, she then said, If I were you, I would cut ties with the people in my life that were hurting my career.

Q.   You agree people is a plural word, correct?

A.   Correct.

Q.   So that means more than one person, doesn't it?

A.   Correct.

Q.   Okay.  Do you have any idea who those other people might be?

A.   No.  Because I was the only one named in the meeting.

Q.   Well, didn't they also discuss folks at Anderson?

A.   I'm not sure.

Q.   Didn't they also discuss Caroline Adams in that meeting?

A.   Yes.

Q.   Okay.  Well, then you weren't the only person discussed in the meeting?

A.   But Caroline Adams doesn't cohabitate with my husband.

Q.   Well, neither do the folks at Anderson, correct?

A.   Correct.  That's why I believe it was about me; otherwise, why would she preface a story about people cohabitating with her making her look bad.

Q.   Okay.  Was the person she was discussing in that story her wife?

A.   I don't know.

Q.   Okay.  Didn't she say that it wasn't her wife?

A.    Possibly.

Q.    It was not even someone that she was in a relationship with?

A.    We don't know that.

Q.    Well, that's what she said in the conversation, correct?

A.    Well, she's also known for lying, so we don't know that.

Q.    Okay.  Do you have any reason to know that that was not true?

A.    I don't.

Q.    Okay.  I want to give you Exhibit 1 again --

A.    Okay.

Q.    -- which is the complaint.  Okay.  Go to page eight.  Sorry.  It took me a minute there.

A.    Okay.

Q.    All right.  See the little numbers on the left?

A.    Yes.

Q.    Okay.  All right.  So I want to go to paragraph 40.  Okay.  So it says, He went home and reported to Jennifer what Defendants had just told him, and she broke down in tears.  Jennifer told him that while she had always supported his law

enforcement career, she can no longer support him if he stayed at the Sheriff's Office; do you see that?

A.   Yes.

Q.   Okay.  Is that a true statement?

A.   Yes.

Q.   Did you say that?

A.   Yes.

MR. MILLER-NOVAK:  Okay.  I can take that back.  Thank you.

Q.   So after -- well, first, is it true, did you cry --

A.   Yes.

Q.   -- when he told you?  So you were upset?

A.   Yes.

Q.   Were you angry?

A.   Yes.

Q.   And you told him you couldn't support him any longer if he stayed there.  Did you want him to leave at that point?

A.   Yes.

Q.   Okay.  Why?

A.   It wouldn't be healthy for him to work in an environment where leadership is willing to punish you for your spouse's or your first amendment right to free speech.  That's not a culture that I want my

husband to work in.

Q.   Did you tell him at that point you wanted him to find another job?

A.   No.  I said I don't support you working there.

Q.   When did he tell you that he wanted to get another job?

MR. WIEST:  Objection to form.

A.   He didn't.

Q.   Okay.  Are you aware of whether or not Jason was ever disciplined after that meeting?

A.   I'm not aware.

Q.   Okay.  At any time after that meeting did he tell you that he thought he was about to be fired?

A.   No.

Q.   Did he ever discuss with you the possibility that he was going to be terminated?

A.   No.

Q.   Did he discuss with you any beliefs that he would never receive a promotion?

A.   Yes.

Q.   Okay.  What did he say about that?

A.   He said this was my -- I believe this was my last chance to go to RENU and that's never going

to happen now.

Q.   Okay.  So he was concerned that he would never advance after that?

A.   Correct.

Q.   Did he think he would just not advance to RENU?

A.   Or corporal.

Q.   Or corporal.  So he thought essentially he'd be stuck as a patrol officer for the rest of his time with the County?

A.   Yes.

MR. MILLER-NOVAK:  Okay.  I actually think this would be a good time to break for lunch.  Is that okay, guys?  It's noon.

(A lunch recess was taken.)

BY MR. MILLER-NOVAK:

Q.   All right.  So earlier we talked -- like before the break we did talk a little bit about you saying something along the lines of not supporting Jason being there any longer and that you wanted him to leave.  Your --

A.   Can I clarify something?

Q.   Sure.

A.   I believe I told him that I do not support

him working there anymore, but I could not make that decision for him.

Q.   Okay.  You knew that if he -- I mean, you said you had a business degree; is that right or --

A.   My degree is in education.

Q.   Education.  Okay.  But you would have known that, you know, if he would leave and take employment somewhere else, that that could affect his income, correct?

A.   Yes.

Q.   All right.  So it's possible that if he left and he got a job somewhere else, that he could end up making less money?

A.   Yes.

Q.   And he could end up having to maybe pay more for health insurance, correct?

A.   Yes.

Q.   And that it might even affect his retirement, correct?

A.   Yes.

Q.   But you still wanted him to leave?

A.   No.  I wanted him to make that decision. I would never tell him to leave.  I told him I didn't support him working at the Sheriff's Department.

Q.   Okay.  I'm going to hand you what was marked as Defendants' Exhibit 6.  Have you seen this before?

A.   Yes.  I wrote it.

Q.   Okay.  And when did you write that?

A.   Monday, October 16, 2023.

Q.   Okay.  So that would have been approximately six days after Jason met with the Chief and the Sheriff, correct?

A.   Correct.

Q.   Okay.  Why did you write this?

A.   Well, it was devastating that I was the reason why my husband had his promotion taken away.  And I wanted some answers as to why they thought it was okay to do this to my husband when he did nothing wrong and why they were trying to suppress my speech and my views and threaten my husband to continue his career with the department, that he would have to censor me or tell me to censor myself, I wanted some answers.

I guess one of the questions in there was -- you know, I am interested to know why my criticisms have such an important impact on the department and if they were so important, why wasn't this brought to his attention two years ago when the

Page 82

comments were made.

Q. Did you ever get a response?

A. No.

Q. Would you agree that this letter doesn't ask anything about divorce or them wanting you to get divorced from your husband?

MR. WIEST: Objection to form.

A. I wouldn't have written a letter if it didn't involve that. I didn't state it in here, but that's why I wrote the letter.

Q. Well, you asked about your speech, but you didn't ask anything about why they wanted you to get divorced; would you agree with that?

A. I would agree with that, yes.

Q. Okay. Well, why didn't you ask whether or not -- why they wanted you to get divorced?

A. Well, it was obvious. Charmaine McGuffey said if you want to further your career in this department, I would suggest cutting ties with the people that are holding you back.

Q. But she said people, right?

A. I believe so.

Q. Okay. She never said I suggest you divorce your wife; would you agree with that?

A. Yes.

Q.   Okay.  If you go to -- well, it's towards the bottom of the page.  It says, If I were going to lecture my husband; do you see that?

A.   Yes.

Q.   On who he should distance himself from in his profession, which I never would because he's a grown man -- you didn't mention anything about him distancing himself from you in that paragraph, correct?

MR. WIEST:  Objection to form.

A.   I'm sorry.  Could you state that question again?  I think I'm confused on who he is.

Q.   Jason would be the he.

A.   Okay.  Could you ask it again?  Sorry.

Q.   You don't mention anything about her suggesting that you should distance yourself from your husband or your husband should distance himself from you, correct?

A.   Correct.

Q.   You talk about him distancing himself on who he should distance himself from in his profession, correct?

A.   Correct.

Q.   You're not part of his profession, correct?

A. Correct. But that's not what I was -- I didn't say that in the sentence that she had told him in his profession. I was just making that as a general. She didn't say in his -- to separate himself in his profession. She had given a story about people cohabitating with her. And then you said you need to separate yourself from the -- or cut ties with the people holding you back. There was never -- she never said anything about profession. I just said that.

Q. Okay. Well, let's go to the paragraph above it.

A. Okay.

Q. It says, Hypocrisy was also at its finest during my husband's meeting. How could the sheriff lecture my husband about distancing himself from certain people while at the very same time one of her biggest supporters was being sentenced to 16 months in federal prison; do you see that?

A. Yes.

Q. Who are you referring to there?

A. It was the city councilman that had been found guilty and sentenced.

Q. How did you know that he was one of her biggest supporters?

Page 85

A.    There were pictures of them campaigning together and then holding -- him holding a sign for her and then posing for pictures together.

Q.    Okay.

A.    And I guess I correlated that, because I'm my husband's biggest supporter, you know, in our relationship.  So I guess I was correlating that with people that supported her.

MR. MILLER-NOVAK:  Okay.  Can you give me that back?

THE WITNESS:  Absolutely.

Q.    So you consider yourself your husband's biggest supporter?

A.    Maybe his momma, but I would say second.

Q.    Second to his mother?

A.    Uh-huh.

Q.    Okay.  So in terms of his profession you consider yourself one of his biggest supporters?

A.    Yes.

Q.    Next to his momma?

A.    Yes.

Q.    Okay.  So do you think that your support for his profession is extremely important to him?

A.    Yes.

Q.    So you wrote this letter.  It's fair to

say that you weren't really afraid to write this letter to Jay Gramke, correct?

A.    Correct.

Q.    I mean, you would agree that you didn't really hold back much in this letter, correct?

A.    Correct.

Q.    You stated your mind, correct?

A.    Correct.

Q.    It's rather critical?

A.    Correct.

Q.    Were you not concerned that Jason could be retaliated against further?

A.    He was already retaliated against.  I mean, it's already been done.

Q.    Okay.  You didn't think that this would result in him getting fired or something extreme like that, though?

A.    I would have no idea.

Q.    Okay.

A.    I just knew that he was already retaliated against.

Q.    So you didn't think this would make things worse?

A.    I wasn't sure.

Q.    Okay.  Did you care?

Page 87

A. Did I care?

Q. How this might impact things.

A. No.

Q. So you didn't consider at all what the consequences of this letter would be before you wrote it?

A. No. Because he's already faced the consequences of my speech.

Q. Okay. After you wrote this to the best of your knowledge, because he -- well, you know what, before I get there, just to create the time frame.

He resigned -- at least he turned in his resignation on January 9, 2024, correct?

A. Yes.

Q. Okay. But he didn't actually -- it was like the end of that month, like January 30th or something in 2024 is when he --

A. Yes.

Q. -- actually left?

A. Yes.

Q. Okay.

A. I think so.

MR. WIEST: Let him finish asking.

THE WITNESS: Sorry.

MR. MILLER-NOVAK: It's okay. We

took lunch.  We forgot the rules a little bit.  That's okay.  Getting a little bit rebellious now.

Q.  So between October 16, 2023, and he left finally -- we just said January 30, 2024 -- trying to do math -- a little over three months then, correct?

A.  Correct.

Q.  Okay.  Thank you.  In that entire time was he ever retaliated against?

MR. WIEST:  Objection to form.

A.  I don't know.

Q.  Okay.  Were you aware of him ever being disciplined after you wrote this letter?

A.  I was not aware.

Q.  Okay.  Were you aware -- did he tell you he was ever disciplined because of this letter?

A.  I don't believe so.

Q.  Did he ever tell you he was disciplined at all after you wrote this letter?

A.  No.

Q.  Okay.  Were you ever threatened or anything like that after you wrote this letter?

A.  No.

Q.  Did anybody ever -- did you ever talk to

Jay Gramke at all?

A. No.

Q. Have you ever talked to Jay Gramke ever?

A. No.

Q. So Jay Gramke has never contacted you?

A. No. He has only spoken about me to other people.

Q. Okay. So he didn't respond to this letter?

A. No.

Q. Has Sheriff McGuffey ever responded to this letter?

A. Not to me.

Q. Okay. Did she ever threaten you?

A. No.

Q. Have you ever felt like you had suffered some consequence for your speech?

A. I did suffer consequences because of my speech.

Q. What consequence?

A. My husband got denied promotions, both RENU and corporal. They stated it many times in the recording.

Q. What corporal position was he denied?

A. The corporal's list that he was on, that

he was eligible on, where you said he was number 19.

Q. Do you know if they ever had a corporal position open before he left?

A. I do not know.

Q. Okay. Well, you would agree that he couldn't have been refused the corporal position if one was not open that he was qualified for, correct?

A. That is correct. The reason why I believe that he was skipped is because Jay Gramke told him, you know I've done this before for the same reason.

Q. Okay. But you don't know whether or not that had happened yet?

A. I do not.

Q. Okay. Have you suffered any employment consequences of any of your speech?

A. Because he switched jobs, I haven't looked for full-time employment so that I can take care of things at home. Because he's now 11 to 11 -- 11 a.m. to 11:00 p.m., which means I couldn't work first shift. We have a dog that has cancer, so I need to be home. So I think that is probably preventing me from getting full-time employment currently.

Q. When did you sell the Gold Roof?

A. Gold Top Dairy Bar was sold in the fall of

Page 91

2021.

Q.   So you hadn't been employed since fall of 2021?

A.   No.  I did work -- I did have employment at Harrison High School for two school years until my son graduated in 2024.  That was part-time.

Q.   What were you doing at Harrison part-time?

A.   Working in the kitchen.  It was a three-hour-a-day position.

Q.   And when did you stop doing that?

A.   May of 2024 when my son graduated.  I took that job so that I could be available for all my son's events until he graduated.

Q.   But Jason started at Springfield -- no, Springdale, right -- is that where he works now, Springdale Police Department?

A.   Springdale, yes.  City of Springdale.

Q.   But he started there in February of 2024?

A.   Yes.

Q.   So for three months you still worked at Anderson, correct --

MR. WIEST:  Objection.

Q.   -- or Harrison?

A.   Yes.  Part-time during school hours, three hours a day.  I was never full-time.

Page 92

Q.   Okay.  So when he started at Springdale, you were still able to do the same job that you were doing before he went to Springdale?

A.   The part-time, correct.

Q.   Why haven't you just continued to work at Harrison?

A.   That's a good question.  I think I just wanted the extra time to support him.  He has -- you know, when he worked for the Sheriff's Department, he was top of seniority.  He could get off any day he needed for all of his events, he coaches, things like that.  And at Springdale he's low man on the totem pole, so it's hard for him to get off days for whatever.  So I just feel like it's easier if I hold down the fort at home by not working full-time.

Q.   But it's possible that you could have continued to work at Harrison?

A.   Sure.  Part-time.

Q.   Okay.

A.   It's possible.

Q.   So you just chose to no longer do it?

A.   Correct.

Q.   Okay.  And you blame that on Hamilton County?

A.   No.  I blame that on my husband's schedule

that I needed to be home.

Q.   Had he gotten the RENU promotion, how would you know what his schedule would have been if he went to RENU?

A.   Well, his brother is in RENU, so maybe his schedule would have been similar to his brother's.

Q.   Well, isn't part of your allegations that he would have had more overtime if he went to RENU?

A.   Can I see it in the. . .

MR. MILLER-NOVAK:  Sorry.  You can.
I don't mean to ignore you.  I'm just
seeing if I could find a place where it's
talked about so you're not hunting for it.
Andy found it for us.

THE WITNESS:  Thank you.

MR. PREM:  It was just already open.

MR. MILLER-NOVAK:  He got lucky.

Q.   All right.  It looks around 46, 47?

A.   Yes.

Q.   All right.  So it's possible his schedule would have changed in ways that would have affected your employment decisions anyways then, correct?

A.   Sure.

Q.   Okay.  So I'm not asking how you believe Jason was financially harmed.  I'm asking you.  How

do you believe you were financially harmed?

A.    Well, we share -- our incomes are shared, so anything that would have been damaging to him would have been damaging to me.

Q.    But I think you said that he's a grown man and he can kind of make his own decisions, correct?

A.    Correct.

Q.    Okay.  So he can make whatever income decision he wants, correct?

A.    Correct.

Q.    And he can make any employment decision he wants, correct?

A.    Correct.

Q.    Okay.  In addition, he could have also chosen to not quit his job at the Sheriff's Department, correct?

A.    I don't believe it was a choice because of the environment.  I don't think his health would have -- his mental health would have allowed him to stay.

Q.    But no one at the Sheriff's Department told him he had to quit, correct -- that you know of?

A.    No.  They did not tell him that he had to quit.

Q.   Okay.  And you would agree that he had other options available to him besides quitting, correct?

A.   No.

Q.   Okay.  So he couldn't -- you realize that part of what your suit is about is the failure to promote Jason, correct?

A.   Correct.

Q.   Okay.  So you've said that you've been damaged because they didn't give him the RENU position, correct?

A.   Correct.

Q.   And you've alleged that they failed to promote him to corporal, correct?

A.   Correct.

Q.   Well, he could have stayed there and filed suit and brought the same lawsuit -- he could have sued the County, he could have sued Sheriff McGuffey, and he could have sued Jay Gramke for the failure to promote him and continued to be employed there, couldn't he have?

A.   But in the meantime his mental health could have been so bad that he could have offed himself.  So in my mind, no, it wasn't an option for him to stay.

Q. Okay. You said could have. Do you know that those things would have happened?

A. No, I don't.

Q. Okay. So I'm not asking you to speculate right now.

A. Okay.

Q. I'm asking you to tell me what is possible mechanically, if you will. Are you aware that an option is to file suit while you continue to work at a place?

A. I agree.

Q. Okay. So that would have been an option to him?

A. Not a healthy option.

Q. Okay. You don't believe it would have been a healthy option. But it would have been a legal option available to you, correct?

A. Correct.

Q. Okay. Do you know whether or not he could have filed a grievance?

A. I'm not sure what his policies are on grievances.

Q. Did he ever talk to you about the possibility of filing a grievance?

A. I do not recall.

Q. Are you aware that he has a union contract?

A. Yes.

Q. Are you aware that sometimes in union contracts you have the ability to file grievances?

A. No. I've never been in a union, so I don't understand.

Q. Do you know if you ever met with somebody from the union?

A. I do not know.

Q. So earlier you said you could not support him staying at the County, correct?

A. Correct.

Q. Okay. Did you ever threaten to divorce him?

A. No.

Q. Did he ever threaten to divorce you?

A. No.

Q. You guys have been married for a very long time, correct?

A. Yes.

Q. And I think earlier we uncovered you were high school sweethearts, correct?

A. Yes.

Q. Been together since -- I'm trying to do

Page 98

the math -- sounds like 1993?

A. Yes.

Q. When the universe still meant something, correct?

A. Yes.

Q. All right. So at any point in time did you feel like your marriage was in danger of a divorce? I'm talking about after the meeting with Sheriff McGuffey.

A. I can't speak for him. I would -- the divorce wouldn't be an option for me, but I can't speak for him.

Q. Okay. So you had no intention of divorcing him?

A. Not at that time, no.

Q. Okay. At any other time in your marriage did you have an intention of divorcing him?

A. There were definitely days I would have liked to, but no.

Q. Well, that was two different answers to the same question.

A. Well, what wife doesn't think about that, this guy is on my nerves today.

Q. Okay.

A. Nothing serious, no.

Q. Okay. Do you want to take a minute to clarify the record? I mean, I'll give it to you.

A. Just ask it again and I'll. . .

Q. Okay. You've been frustrated with him sometimes, right?

A. Yes.

Q. And maybe wanted to hit him over the head with a frying pan or something like that?

A. Yes.

Q. Okay. But you never contacted, let's say, a family attorney?

A. No, I've never.

Q. You've never seriously contemplated divorce?

A. No.

Q. Okay. And for the record, you were just kind of being a little sarcastic then?

A. Yes.

Q. Okay. There you go. I helped you out. And has he ever threatened a divorce at any time in your relationship?

A. No.

Q. Okay. So you don't know of or don't feel that your marriage was actually threatened by the actions of either Sheriff McGuffey or Jay Gramke

then, correct?

MR. WIEST: Objection to form.

A. I couldn't say that. It's still an ongoing tension in our household, so I couldn't tell you in the future.

Q. Okay. What do you mean by it's an ongoing tension in your household?

A. He still has resentment towards me because he lost out on his dream job.

Q. Have you seen any counselor?

A. No.

Q. Okay. How do you know that he has resentment towards you?

A. Because he had told me that the reason why he lost his job was because of me.

Q. Has he said that since he initially told you that?

A. We've had conversations that he doesn't -- in his head he knows, you know, that I did -- I didn't do anything wrong to harm him, but it's still because of me that he has some resentment that he's never going to have his job.

Q. I'm trying to think how to word this, but do you believe that Sheriff McGuffey has any power -- and what I mean by power, I mean

governmental power -- to interfere with your marriage?

MR. WIEST: Objection to form.

A. She did interfere. Her actions did interfere with our marriage.

Q. I'm talking about does she have any police power, any governmental power to do anything that affects your legal relationship to your husband?

MR. WIEST: Objection to form.

A. I'm sorry. I don't understand the question. Can you rephrase?

Q. Well, she doesn't have any power to force you to get divorced, correct?

A. To force, no.

Q. Okay. So you could only get divorced if you choose to get divorced, correct?

A. Correct. But she did threaten my husband -- illegally she threatened him.

Q. Does Jay Gramke have any ability to force you to get divorced?

A. He shouldn't, no.

Q. So not long after Jason's meeting with the Sheriff and the Chief, he began employment at Springdale, correct?

MR. WIEST: Objection to form.

A.   Correct.

Q.   Okay.  I keep wanting to say Springfield. Are you aware that he was contacted by Chief Butler?

A.   Yes.

Q.   And that he didn't have to apply?

A.   Yes.

MR. WIEST:  Objection to form.

Q.   Well, he did have to apply, but Chief Butler contacted him first, correct?

A.   Correct.

Q.   Okay.  Do you know when that occurred?

A.   I do not.

Q.   But you would agree that finding new employment came rather easily to Jason, correct?

A.   No.  I think it was a very lucky circumstance that Tom Butler was the chief of that police department, because with the stigma that he had against him, I don't know if any -- who else would have hired him, except for somebody that knew his character like Tom Butler.  Tom Butler knew that Jason wasn't a malcontent.  He didn't do any of these -- you know, that I wasn't a problem.  So I don't know if rumors and reputation would have -- anybody else would have wanted to hire him.

Q.   You don't know whether or not that's the

case, do you?

A. I do not. It's my opinion.

Q. So it's just pure speculation then?

A. Yes.

Q. Okay. You've not actually had anybody tell you that they wouldn't hire Jason?

A. No.

Q. And Jason never applied anywhere and had his application denied?

A. No.

Q. Has anybody ever come up to you and said anything negative about Jason because of you?

A. Can you ask that one more time?

Q. Well, I mean, you know, you said something about his reputation. I mean, has anybody said anything to you about his reputation?

A. No.

Q. Okay. Has anybody come up to you unsolicited and talked to you about your relationship with Caroline Adams?

A. No.

Q. Has anybody come up to you unsolicited and talked to you about how you caused your husband to lose his promotion?

A. Yes.

Q.   Who?

A.   I believe there were some police wives that had made comments about how unfair it was.  And my friends, my family.

Q.   Okay.  So all these folks said how unfair it was?

A.   Yes.

Q.   So it's safe to say that they were on your side?

A.   Yes.

Q.   Okay.  So they didn't say anything negative about Jason, correct?

A.   Correct.

Q.   Okay.  So they didn't say anything that would suggest some sort of stigma then, correct?

          MR. WIEST:  Objection.

A.   Correct.

Q.   Kind of like the opposite, correct?

A.   And you're just talking about my supporters?

Q.   People that have talked to you about it.

A.   My supporters.  Correct.  They were on Jason's side.

Q.   Okay.  Has anybody said anything terrible about Jason related to it?

A.   On social media there were comments on the news article when the lawsuit came out that, you know, he should have kept his wife's mouth shut, he should have known that she couldn't have, shouldn't have said that, he deserves to be punished.  So there have been comments on social media, but I do not know who they are.

Q.   Okay.  But those only happened, if you will, because you filed the suit, correct?

A.   I don't know if they would say that if we didn't file the suit or not.  I don't know.

Q.   Okay.  Have you seen anything on social media talking about it before you filed the lawsuit?

A.   No.

Q.   Okay.  Do you know, did either of you contact the media when you filed the lawsuit?

A.   No.

Q.   Do you know if your counsel contacted the media after you filed the lawsuit?

            MR. WIEST:  Objection.  Don't discuss
        anything that you've discussed with
        counsel.

            If you can answer otherwise, fine.
        If not --

A.   I don't know.

Page 106

MR. WIEST: -- you're not going to answer.

Q. Do you know how the media found out about the lawsuit?

A. I don't know.

Q. Did anybody from any media company contact you for any comments after you filed the lawsuit?

A. No.

Q. Are you aware if anybody from the media contacted Jason about the lawsuit after it was filed?

A. I don't know.

Q. So other than these Facebook comments that you've seen that were related to the lawsuit, are you aware of any online comments at all about yourself or Jason related to your Facebook posts?

A. No.

Q. Have you been denied any employment as a result of your posts or negative criticisms of Sheriff McGuffey?

A. No.

Q. Are you aware of any relationships you've lost because of your post about Sheriff McGuffey?

MR. WIEST: Objection to form.

A. Relationships that aren't there anymore as

a result of him not working for the department. Like for an example would be other sheriff deputies' wives at social events, work events that I don't see anymore or keep in contact with, but -- only because he doesn't work there anymore.

Q. Work friends that are no longer work friends?

A. Correct.

Q. Okay. But they're kind of more -- but they weren't your friends, I guess, outside of work events; is that --

A. Some were. Some weren't.

Q. Okay.

A. But not seeing each other in, I guess, organized events or things make it less likely that we would communicate.

Q. Have you ever seen any mental health counselors or mental health therapists in your life?

A. Not mental health, no.

Q. It seemed like you were qualifying something. Is there someone you would see that you think is close to a mental health therapist?

A. Would a marriage counselor count as mental health?

Q. Yeah, I think so.

A.    Okay.

Q.    So you have seen a marriage counselor?

A.    Yes.

Q.    When?

A.    My son was probably three years old.  So 16 years ago.

Q.    Was this Jason and yourself that saw a marriage counselor?

A.    Correct.

Q.    Okay.  Why did you start seeing a marriage counselor?

A.    To try to make our marriage stronger. With a young child things got stressful, and we wanted to make sure there were no serious issues in the marriage.  We just wanted to make sure that we were taking care of any small problems before they became big problems.

Q.    When you mentioned big problems, is there ever a time in your marriage where you had had big problems?

MR. WIEST:  Objection to form.

A.    I believe this issue is the biggest issue we've faced in our marriage so far.

Q.    Okay.  So no other what you would consider in your marriage any -- nothing like infidelity?

A.    Absolutely not.

Q.    And no physical separation for some period of time or anything like that?

A.    None.

Q.    Okay.  And what was the name of the marriage counselor you saw; do you recall?

A.    I don't.  It was 16 years ago.

Q.    Do you remember where it was; was it like some kind of organization?

A.    I can tell you where it was located.  I know they're not there anymore.  But I do not remember the name.  I don't even remember the counselor's name.  It was in Harrison, Ohio.

Q.    Okay.  So other than this marriage counseling 16 years ago, you've never seen -- as an individual you've never seen any counselor?

A.    No.

Q.    Okay.  Have you ever taken any medication for anxiety or depression or anything like that?

A.    No.

Q.    Have you ever talked to your doctor about receiving medication for mental health at all?

A.    No.

Q.    Since the meeting with Gramke and McGuffey have you sought out any mental health therapy at all

since then?

A. No.

Q. Okay. And you haven't begun taking anything for anxiety or depression or anything like that?

A. No.

Q. Okay. Do you have any chronic physical conditions that you have to deal with?

A. Arthritis. I'm -- this week I'm going to be seen by a rheumatologist from -- sent from my primary doctor. I've recently had back surgery. And that's it.

Q. Okay. Nothing that's become worse --

A. No.

Q. -- since the meeting or anything like that?

A. No.

Q. Okay. Just normal joys of middle age --

A. Knocking on 50s, yes.

Q. Yeah. I'm sure everybody in this room, except for Andy, feels it. How old is your child?

A. He's 19.

Q. Okay. Is that your only son?

A. Only son, yes. Only child.

Q. And he has kind of a goofy nickname; is

Page 111

that right -- like Meatball or something like that?

A. Yes. Meatball.

Q. Okay. All right. When did he get that name? I just got to know.

A. When he was born, he had this little round head and he was bald and I said he looks like my little meatball, so that just stuck.

Q. It just stuck. Now he's Meatball. Is he okay with that?

A. Yes.

Q. Okay.

A. He embraces it.

MR. MILLER-NOVAK: Okay. Good for him. All right. Could we get a break so we can talk?

THE COURT REPORTER: We're off the record.

(A brief recess was taken.)

MR. MILLER-NOVAK: We're done.

(Plaintiffs' Deposition Exhibit No. 12 was marked for identification.)

DIRECT EXAMINATION

BY MR. WIEST:

Q. Ma'am, have you seen the transcript of the audio recording that your husband had with Sheriff

Page 112

McGuffey and Chief Gramke?

A.    Yes.

Q.    Is that what Exhibit 12 is?

A.    Yes.

MR. WIEST:   That's all I got.

(Witness excused.)

(Deposition concluded at 2:27 p.m.)

Page 113

A C K N O W L E D G E M E N T

STATE OF _____    :

COUNTY OF _____    :

     I, JENNIFER DAVIS, have read the transcript of my testimony given under oath on May 9, 2025.

     Having had the opportunity to note any necessary corrections of my testimony on the errata page, I hereby certify that the above-mentioned transcript is a true and complete record of my testimony.

_____
JENNIFER DAVIS

REPORTER'S CERTIFICATE

I, Kristina L. Laker, Court Reporter and Notary Public, do hereby certify:

That the witness named in the deposition, prior to being examined, was duly sworn;

That said deposition was taken before me at the time and place therein set forth and was taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

That said deposition is a true record of the testimony given by the witness and of all objections made at the time of the examination.

I further certify that I am neither counsel for nor related to any party to said action, nor in any way interested in the outcome thereof.

IN WITNESS WHEREOF I have subscribed my name and affixed my seal this 26th day of May, 2025.

/s/ Kristina L. Laker
_____
Kristina L. Laker
Notary ID 592345
My Commission expires: 12/21/25