IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT CINCINNATI

JASON DAVIS and                    :
JENNIFER DAVIS,
                                   :
          Plaintiffs,
vs.                                :   Case No. 1:24-cv:0202

CHARMAINE McGUFFEY, et al., :

          Defendants.              :

* * * * * * * *

DEPONENT:          Charmaine McGuffey

DATE:              May 5, 2025

* * * * * * * *

Kristina L. Laker

Court Reporter

BARLOW REPORTING & VIDEO SERVICES, LLC
620 Washington Street
Covington, Kentucky 41011
(859) 261-8440

The videotaped deposition of CHARMAINE McGUFFEY taken for the purpose of discovery and/or use as evidence in the within action, pursuant to notice, heretofore taken at the Hamilton County Prosecutor's Office, 230 East Ninth Street, Suite 4000, Cincinnati, Ohio, on May 5, 2025, at 9:00 a.m., upon oral examination, and to be used in accordance with the Federal Rules of Civil Procedure.

* * * * * * * *

APPEARANCES

REPRESENTING THE PLAINTIFFS:

Christopher Wiest, Esq.
CHRIS WIEST, ATTY AT LAW, PLLC
50 East Rivercenter Boulevard, Suite 1280
Covington, KY 41011

Thomas B. Bruns, Esq.
BRUNS, CONNELL, VOLLMAR & ARMSTRONG LLC
40 North Main Street, Suite 2010
Dayton, OH 45423


REPRESENTING THE DEFENDANTS:

Stephen A. Simon, Esq.
Matt Miller-Novak, Esq.
Andrew E. Prem, Esq.
HAMILTON COUNTY PROSECUTOR'S OFFICE
230 East Ninth Street, Suite 4000
Cincinnati, OH 45202


ALSO PRESENT:    Jason Davis, plaintiff
                 Jennifer Davis, plaintiff
                 Peter Stackpole, legal liaison
                 Connie Adkins-Ihle, videographer

                         I N D E X

                                                      Page

Cross-Examination by Mr. Bruns:                         5

                       E X H I B I T S

Plaintiffs' Deposition Exhibit No. 24          23

Plaintiffs' Deposition Exhibit No. 27         102

Plaintiffs' Deposition Exhibit No. 26         112

Plaintiffs' Deposition Exhibit No. 25         126

Plaintiffs' Deposition Exhibit No. 28         187

Plaintiffs' Deposition Exhibit No. 29         270

Page 4

THE VIDEOGRAPHER:  We are on videotape record.  Today is Monday, May the 5th, 2025.  The time is 9:08 a.m.

We're here today to take the deposition of Charmaine McGuffey in the case styled Jason Davis and Jennifer Davis versus Charmaine McGuffey, et al., in the United States District Court for the Southern District of Ohio, Western Division at Cincinnati, Case No. 1:24-cv-0202.

Would the attorneys now introduce themselves and state whom they represent.

MR. BRUNS:  Tom Bruns on behalf of Plaintiffs Jason and Jennifer Davis.

MR. WIEST:  Chris Wiest on behalf of the Davises.

MR. SIMON:  Steve Simon on behalf of the Defendants.

MR. MILLER-NOVAK:  Matt Miller-Novak on behalf of Defendants.

MR. STACKPOLE:  Peter Stackpole on behalf of the Sheriff.

MR. PREM:  Andy Prem on behalf of the Defendants.

THE VIDEOGRAPHER:  Would the court reporter please swear in the witness.

THE COURT REPORTER:  All right. Would you please raise your right hand.

THE WITNESS:  (Complies.)

THE COURT REPORTER:  Do you solemnly swear that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE COURT REPORTER:  Thank you.

CHARMAINE McGUFFEY, of lawful age, as having been duly sworn, as hereinafter certified, was examined and testified as follows:

CROSS-EXAMINATION

BY MR. BRUNS:

Q.  Sheriff, I introduced myself to you a minute ago.

A.  Uh-huh.

Q.  My name is Tom Bruns.  I have the pleasure of representing Jason and Jennifer Davis in the lawsuit against you.  And we're here today because this is our opportunity to take your deposition.  I assume you've given a deposition before?

A.    I have.

Q.    All right.  So I won't go through all the ground rules.  As you know, attorneys like to kind of educate witnesses on how to give a deposition.  I assume you've talked to your counsel about what -- you know, how to do this, so I won't go into it.

But have you ever testified in court before?

A.    I have.  It's been quite a while, so I couldn't tell you exactly the year.  But, yes, I have.

Q.    Okay.  And when you went into court, you were sworn in to tell the truth, you were under oath, correct?

A.    Correct.

Q.    And you understand you're under oath here today?

A.    Yes, I do.

Q.    All right.  And you understand you're being recorded today?

A.    Yes, I do.

Q.    All right.  Is there any reason that you're aware of as you sit here that you're unable to testify truthfully today?

A.    No.  No reason at all.

Q.   All right.  And, you know, there's different reasons, somebody could be on medication that would affect their ability to recall or perceive or things like that.

As you sit here you're unaware of any issue like that?

A.   Absolutely.

Q.   Great.  My purpose today is to end up when we're done --

A.   Uh-huh.

Q.   -- knowing what you know.  And I will tell you, that is an impossible task.  I've never achieved it, okay?

A.   Okay.

Q.   But I'm going to do my best and I -- and what that means is -- I'm going to apologize in advance, I'm not trying to be nosy --

A.   Uh-huh.

Q.   -- but I have to make sure I understand your testimony and --

A.   Of course.

Q.   -- I understand the extent of your knowledge about the events we're here to discuss, all right?

A.   Yes, sir.

Page 8

Q.    All right.  Great.  What's your full name?

A.    My full name is Sheriff Charmaine McGuffey.

Q.    And what's your business address?

A.    My business address is 900 -- 900 Sycamore Street.  ZIP code 45202.

Q.    And what's your business phone?

A.    My business phone is going to be my personal phone as well.  So it's 513-404-5424.

Q.    All right.  And you're the elected Sheriff of Hamilton County?

A.    I am.

Q.    And that means you are the top elected official in that department?

A.    Yes, sir.

Q.    Okay.  Is it fair to say the buck stops with you in the Hamilton County Sheriff's Department?

A.    Yes, sir.

Q.    All right.  When did you first get elected?

A.    I was first elected in November of 2020. I took office January 4th, 2021.

Q.    All right.  And how long have you been an employee of the Hamilton County Sheriff's

Department?

A.   I have been an employee 40 years.

Q.   All right.

A.   Give or take a month.

Q.   All right.

A.   Okay.

Q.   And that was all continuous except for a year or so?  Just tell me about that.

A.   So in 2009, on February 17, I was laid off with a number of people because of the 2008 crash -- economic crash.  And I was brought back on.  My first day was April 5, 2010.

Q.   Okay.  And then was there any other period of separation?

A.   I'm sorry.  April 1, 2010.

Q.   All right.  Was there any other period of separation from the Hamilton County Sheriff's Department in that 40-year period other than that?

A.   No, sir.

Q.   What did you do to -- what did you review to prepare today?

A.   So I read the complaint and -- I reviewed the complaint at various times.  I spoke to my representation.

MR. SIMON:  He doesn't want to know

that you spoke to us --

MR. BRUNS:  Yeah.

MR. SIMON:  -- or your attorneys.

MR. BRUNS:  So we're clear --

MR. SIMON:  He was asking you a different question.

MR. BRUNS:  Yeah.

BY MR. BRUNS:

Q.   So we're clear --

A.   Oh.

Q.   -- I specifically said what did you review to prepare --

A.   Okay.

Q.   -- all right?

A.   So I reviewed the complaint.

Q.   All right.  And just so you know, any question I ask you today --

A.   Uh-huh.

Q.   -- I'm not asking you to tell me something that your counsel told you.

A.   Oh, certainly.  Yes.

Q.   Okay.  All right.  So you read the complaint.  Did you read all of it, including the exhibits?

A.   I did, sir.

Q. Great. And you had read it before -- before prepping for your deposition; is that fair?

A. Yes, that's correct.

Q. Did you read it when it was initially filed?

A. When it was initially filed, it was given to me and I read it.

Q. All right. Did you review Deputy -- I'm going to call him Deputy Chief Gramke. How should I --

A. Chief Gramke is good.

Q. Okay.

A. It's a good title.

Q. All right. Did you review Chief Gramke's deposition transcript or any part of it?

A. No.

Q. All right. Other than your lawyers did you talk to anybody about his testimony, including Chief Gramke?

A. No, I did not.

Q. So you don't know -- you don't have an opinion on whether any or part of his testimony was truthful or untruthful?

A. I would have no idea.

Q. Okay. Other than your lawyer did you

communicate with any of your lawyers, your team here -- did you communicate with anyone regarding your deposition today?

A. No.

Q. You acknowledged previously that you understand you're under oath, correct?

A. Yes, sir.

Q. And you also testified that you understand that's no different than being in a courtroom, fair?

A. Of course.

Q. All right. And is it your understanding that being under oath means you're required to tell the truth, the whole truth, and nothing but the truth?

A. That's correct.

Q. All right. And you are a sworn law enforcement officer?

A. Yes, I am.

Q. All right. And I know you said you testified in court. How many times in your career do you think you testified in court?

A. Oh, man. You know, I would say in my recollection two -- I'd say two -- two is a pretty solid number, I'd say.

Q. Okay. You're sure about that; it might be

more?

A. It may be more. But I -- you know, I -- yeah. It may be more.

Q. Okay. And as far as at least two times you recall testifying in court, was it part of a criminal trial where there was a criminal defendant being charged?

A. In my recollection it more had to do with issues surrounding use of force. I was a use of force instructor in the academy, a trainer for many years. So my role in any court proceeding would have been in that to testify in that training arena of what we train, how we train.

Q. Okay. So you were there more as a fact witness about training methods, techniques, things like that, what was appropriate --

A. Absolutely.

Q. -- training on use of force?

A. Yes, sir.

Q. All right. And you're jumping on the end of my question. And I do that, too. So just let me get it out --

A. Oh, certainly.

Q. -- just so --

A. Okay. Sure.

Page 14

Q. I'm sure your lawyers will be happy that you don't answer yes to something unless you fully know the question, all right?

A. Sure.

Q. All right. So you don't recall testifying in court as like an arresting officer?

A. No, sir.

Q. Okay. But that's something that Hamilton County Sheriff's Deputies do all the time, fair?

A. Yes.

Q. Okay. And you would agree that whether you're testifying as a use of force fact witness or even an expert in a case --

A. Uh-huh.

Q. -- or you're testifying as an arresting officer --

A. Uh-huh.

Q. -- that the most important character trait for an employee of the Hamilton County Sheriff's Department is being honest and telling the truth; would you agree with that?

A. Yes, sir, I would.

Q. Okay. And that doesn't just apply to you as the sheriff, but all your employees; is that fair?

A.    Yes.

Q.    All right.  And you would agree that our entire system of justice is dependent upon sworn law enforcement officers telling the truth when they're under oath?

A.    Yes, sir.

Q.    All right.  Would you agree that if a law enforcement officer is proven to have lied under oath, that's fair for a jury not to believe any other of the officer's testimony?

A.    Makes sense.

Q.    All right.  Have you ever lied when you were under oath?

A.    No, sir.

Q.    Is it fair to say you understand that -- or do you have a recollection that you and Chief Gramke met with Jason Davis on October 10 of 2023 to discuss his career with him?

A.    Yes, sir, I do.

Q.    Okay.  And I could show you an exhibit, but there was a green card that Jason Davis had to fill out to request a meeting with you; is that fair?

A.    Yes, sir.

Q.    Okay.  And the copy that's been provided

Page 16

to us has a signature of Charmaine McGuffey; do you recall signing that?

A.   Yes, sir.

Q.   All right.  And did it have to go through a chain of command to get to you in terms of getting that meeting?

A.   Yes, it does.

Q.   Okay.  And what was the point of that, going up that chain of command?  Because the green card has signatures of various officers of the Hamilton County --

A.   Sure.

Q.   -- Sheriff's Department on it.

A.   So the purpose of chain of command in general is that it gives an officer a remedy for something that they have not gotten a satisfactory answer for or something that they don't still understand after talking to their immediate supervisor.  And then the supervisor -- as the employee expresses I want to go higher, that is what the chain of command is for.  And that is what that memo represents and documents.

Q.   Okay.  So does that memo with the signatures on it -- and it was marked previously as Exhibit 18 in Chief Gramke's deposition --

A.    Uh-huh.

Q.    -- does that memo reflect a series of meetings before it gets to you on October 10 of 2023?

A.    My understanding through chain of command and policy and procedure is that that employee who requested that meeting would have met with a series of supervisors leading up to a chief deputy and then the sheriff.

Q.    Okay.  All right.  And it's your belief that that happened with Jason Davis before you and Chief Gramke having the meeting on October 10?

A.    Absolutely.

Q.    Okay.  And so if it gets to you, it's your understanding that this is a -- this deputy has a significant serious concern, so serious and so significant he actually wants to talk to the boss about it?

A.    Yes.  Correct.

Q.    Okay.  And it was your understanding that the point of this meeting was Jason Davis's concerns about his future with the Hamilton County Sheriff's Department?

A.    I had no idea what Jason Davis had, you know, requested the meeting about in general.  But I

knew there was a memo requesting the meeting and so therefore we had the meeting.

Q.   All right.  Your counsel has a copy of Exhibit 18.  I'll just ask a question about that.

A.   Sure.

THE VIDEOGRAPHER:  We need to go off the record for a second.

MR. BRUNS:  Sure.

THE COURT REPORTER:  We are off the record.

(Off the record.)

THE VIDEOGRAPHER:  Back on the record, 9:21.

BY MR. BRUNS:

Q.   Sheriff, I'm going to hand you what's been marked as Exhibit 18 --

A.   Uh-huh.

Q.   -- Plaintiffs' Exhibit 18.

A.   Yes, sir.

Q.   And can you tell me, is that your signature on that document?

A.   Yes, it is.

Q.   Among others?

A.   Yes, it is.

Q.   Who all signed that document?

A.   So it appears Sergeant Viner, Lieutenant Downing.  I cannot read the other signature, but it's a Captain.  Major Chris Kettman.  Chief Jay Gramke.  And then myself.

Q.   All right.  And so with your signature on that document, it means you had the original of it and reviewed it before you signed it; is that fair?

A.   Yes.

Q.   Okay.  And then if you look at what the purpose of the meeting that you would have reviewed, what did it say?

A.   This was not on the document that was shown to me, this particular -- this is a Stick-Em note that someone put on there.  And when I was reviewing this, this was not on there.

Q.   Okay.  When you say this, you're talking about the note about RENU, correct?

A.   Yes.  Correct.

Q.   I'm not -- I apologize.  That's not my question.

A.   Sorry.

Q.   I'm talking about the preprinted --

A.   I'm sorry.

Q.   -- typed information from Jason --

A.   Oh, yes.

Q.    -- as to --

A.    Oh, here.

Q.    Hold on.

A.    Okay.

Q.    Let me just finish.  What Jason said, which is what you would have reviewed, the purpose --

A.    Uh-huh.

Q.    -- of this meeting.  Go ahead and read that.

A.    So the purpose of the meeting appears to be in regards to my future status with the department.

Q.    Okay.  So you understood that he had persisted through the entire chain of command to get to you because he had serious and significant concerns about his future status with the department; is that fair?

A.    It doesn't say anything about concerns. It says at your earliest convenience in regards to my future status with the department.

Q.    Is it fair to say that he had concerns about his future status, that's why he --

A.    I've met with many people with a letter that's worded very similar to this who simply want

to say, you know, how am I doing, you know, where can I go from here, I have an interest in this particular thing, how do I get there. There's lots of questions that people have when they request it.

Sometimes there are people that come and discuss prior discipline. There are people that come and discuss their personal lives and, you know, how they're moving forward. I mean, it's a whole array of things. I've met with many people with this similar wording.

Q. Okay. Regardless, when you did have the meeting, you learned pretty quickly that he had concerns -- serious and significant concerns about his future with the department; is that fair?

A. At that meeting pretty immediately that's what I understood.

Q. Thank you. Did you -- before actually having the meeting, did you discuss the meeting with anyone else in the department, like Chief Gramke, anybody?

A. No. In fact, I asked Chief Gramke because I was curious -- I said, What is this about? And his comment was about officers who were out at a district that Jason was assigned to that were malcontents -- and that's a phrase that goes way

back to Simon Leis that we're all familiar with --
and that he felt that the malcontents were
influencing Jason. That's what he said.

Q. Okay. Did he tell you anything else?

A. No, sir.

Q. Okay. You've read the complaint. You
have -- is it fair to say you understand that what
you and Chief Gramke said in that October 10 meeting
forms a basis of this lawsuit -- allegedly said,
fair?

A. Yes, sir.

Q. Okay. As sheriff have you ever lied to
any of your officers when you met with them to
discuss their careers or their future --

A. Absolutely not.

Q. -- with the department? All right. So
you've always told the truth to them when you've met
in those circumstances?

A. I tell the truth, yes, sir.

Q. Okay. Including when you met with Jason
Davis on October 10 of 2023?

A. Yes, sir.

Q. Okay. Did Chief Gramke when you went
through that meeting on October 10, 2023, with Jason
Davis and you --

A.   Uh-huh.

Q.   -- did Chief Gramke ever lie to Jason Davis?

A.   I would have no idea, sir.

Q.   From what you recall do you have any recollection that he said --

A.   I have no --

Q.   Let me just finish.

A.   Sorry.

Q.   Do you have any recollection that he said anything that you knew to be untrue?

A.   No, I don't.

(Plaintiffs' Deposition Exhibit No. 24 was marked for identification.)

Q.   Sheriff, I'm going to hand you what's been marked as Exhibit 24 -- Plaintiffs' Exhibit 24.

A.   Yes, sir.

Q.   And take a moment -- we can even go off the record while you do it -- I'm going to have a couple of questions for you initially.  And those questions initially are can you answer the question as to whether this is a true and accurate copy of your answers to my clients' discovery requests, minus the documents that were attached to it, and then also is all the information -- not the

objections, but the information you provided true and accurate.

So I want you to have a moment to review it so you're comfortable answering those questions, and then I'm going to have substantive questions about it as well, all right?

A. All right.

MR. BRUNS: So we can go off the record while you review it.

THE VIDEOGRAPHER: Off the record, 9:27.

(Off the record.)

THE VIDEOGRAPHER: Back on the record, 9:35.

BY MR. BRUNS:

Q. Sheriff, you had a moment to -- we were off camera, off record -- you had a moment to review the document, Exhibit 24. Are you able now to say that that -- with the exception of the documents that were attached to it and produced with it, are you able --

A. Uh-huh.

Q. -- to say that that is a true and accurate copy of your answers to my clients' interrogatories and requests for production of documents?

Page 25

A.   I am able to say that my recollection is very similar to what is stated in this document.  It was a long time ago now -- years, in fact.  And, you know, I don't know that I can say that word for word I remember each and every thing.

Q.   Okay.  Maybe you misunderstand my question.

A.   Okay.

Q.   My question simply was, is Exhibit 24 a true and accurate copy of your answers to my clients' interrogatories and document requests, not -- I'll get to the substance of what's in there.

A.   Okay.

Q.   I'm simply asking is that a true and accurate copy of the original?

A.   Oh, yes.  Absolutely.

Q.   Okay.

A.   Sure.

Q.   Thank you.

A.   Thank you.

Q.   And if you go to page 22 of that document --

A.   Uh-huh.

Q.   -- there's a verification that it purports to have your signature.

A.    Yes, sir.

Q.    All right.  Would you read that?

A.    It says, I, Charmaine McGuffey, swear that the answers I have given to the above interrogatories are true and based upon my personal knowledge.

Q.    All right.  And then whose signature is that?

A.    And then that is my signature dated 9/25/24.

Q.    Thank you.  All right.  And is it fair to say that we can rely upon the substance of the answers in here in terms of their truthfulness, just like the substance of your testimony today?

A.    I would say that's factual, yes.

Q.    All right.  And I know attorneys do the objections, so my questions aren't about objections, all right, but I'm going to have some questions about the substance.  So if you go to page 10.

A.    Yes.

Q.    All right.  What is RENU?

A.    So RENU is our regional narcotics unit.

Q.    And would you agree that making an officer who gets appointed or gets assigned to RENU, that would be, for instance, a promotion for a patrol

officer?

A. Well, it would be by virtue of the fact that our RENU officers make a -- they are now -- they're -- let me say it this way. Their pay grade is that of a corporal.

Q. Okay. And was that true back in 2023?

A. Yes, sir.

Q. Okay. If you go to Interrogatory -- or, I'm sorry, Request to Admit No. 3 on that page.

A. Okay. Yes.

Q. It says, Admit that during the October 10, 2023, meeting Chief Deputy Gramke told Jason Davis in your presence that, quote, I can tell you that I squashed you going to RENU, closed quotes. Did I read that accurately?

A. You read it accurately.

Q. Okay. And then your response was, I cannot admit or deny due to insufficient recollection.

A. That is correct, because --

Q. All right.

A. -- yeah.

Q. I'll get a question, I promise.

A. Okay. I know.

Q. I promise, Sheriff. All right. My

question to you is, do you recall Chief Deputy Gramke saying anything like that, similar to that, along those lines in that meeting?

MR. SIMON: Note my objection for the record. At the beginning of this lawsuit the Plaintiffs indicated they had a recording of this meeting. On behalf of the Defendants we sought that.

That issue was litigated before Judge Barrett. He issued a decision whereby we at the moment of your deposition -- Sheriff McGuffey's deposition we still don't have that recording. We object to questions asked about her recollection about that. I mean, obviously if she heard the recording, that would answer that.

But you can go ahead and answer the question.

MR. BRUNS: And just for the record, I'll give you a continuing objection on that basis to any questions that call for her recollection about the meeting.

MR. SIMON: Fair enough. Thank you.

MR. BRUNS: All right. So read my

Page 29

question back, if you would.

THE COURT REPORTER: Sure.

"My question to you is do you recall Chief Deputy Gramke saying anything like that, similar to that, along those lines in that meeting?"

A. Yes, I do.

Q. Okay. And what do you recall Chief Gramke saying about -- along the lines of him squashing Jason Davis going to RENU?

A. I remember him addressing the fact that he did not approve an assignment for Jason Davis going to RENU.

Q. Okay. And do you recall his reasoning for saying so?

A. Again, I don't have any recollection of his exact wording or how he -- you know, how he put that. I do know that he said I -- I -- you're not going to go to RENU in part. I mean, that's what I remember him saying.

Q. Okay. And just so you know, that wasn't my question, so I'm going to repeat my question. And I wasn't asking --

A. Of course.

Q. -- exactly what he did. My question was,

Page 30

do you have any recollection -- and I mean any --

A.    Uh-huh.

Q.    -- when I use those words -- so do you have any recollection of Chief Gramke telling Jason Davis why Chief Gramke pulled or squashed --

A.    I remember.

Q.    -- Jason Davis going to RENU?

A.    Thank you.  I remember Chief Gramke referencing Facebook and Facebook posts.

Q.    Okay.  Do you recall anything else?

A.    That's what he said, Facebook and Facebook posts that were negative.

Q.    Do you recall anything else that he said?

A.    That's it.

Q.    And did he discuss negative in what sense?

A.    Well, and I'm trying to recall, he -- what I understood is that he felt that the Facebook posts that he was referencing had negative effects on the Sheriff's Office at large.

Q.    Okay.  So it was multiple posts that had some sort of negative effect on the Sheriff's Office; that's what he referenced as far as your recollection?

A.    Yes, sir.

Q.    Do you recall anything else about his

comments?

A. That's what I recall.

Q. Okay. Did he have any discussion or say anything regarding whose Facebook posts were supposedly negative?

A. He referenced a -- I think he referred to her as the crazy lady --

Q. Okay.

A. -- Facebook posts and talked about responses to that Facebook post.

Q. Okay. And did you -- when he used the word crazy lady, did you have an understanding of who he was referring to?

A. Well, I thought that he was referring to a woman whose name has been told to me is Caroline Adams.

Q. Okay. And why did you think that?

A. Because she is a person who people have related to me at various times throughout my, you know, interactions with a number of people in the department that there's lots of negative posts out there related to her posting them.

Q. Okay. Negative posts related to what?

A. To our department in general.

Q. Okay. To your department in general or to

you?

A.   The department in general and disparaging remarks about me.

Q.   Okay.  And give me an example of one of those people and what they said.

A.   I -- first of all, I cannot -- so many people talk to me.  You're talking about 2023 here and beyond that, of course, before that.  And I -- you know, we talked about telling the truth here.  I can't honestly tell you someone's name if I'm not sure.  And I'm really not sure.

Q.   Did Chief Gramke before October 10, 2023, ever discuss with you posts by Caroline Adams regarding you?

A.   Not to my recollection.

Q.   Okay.  You said people, meaning plural. Do you recall the name of a single person who discussed negative posts about you that were posted by Caroline Adams?

A.   No.

Q.   You don't remember anybody?

A.   There were so many general discussions surrounding this.  And quite honestly, sir, I -- I just don't listen to that.  I mean, it's not -- it's not something that affects my day to day.  It's not

something I'm interested in. It's not something I need to know. And quite frankly, I generally just block it out. I don't even pay attention to it.

Q. All right. So if Chief Gramke brought up posts by the crazy lady in a meeting with Jason Davis about the future of his career with the department, were you wondering in your mind why the Chief is bringing up posts by Caroline Adams when Jason Davis is there to talk about his future?

A. No. No, I'm not. Because I'm listening. I'm not there to evaluate what the Chief knows or doesn't know. I take him at his -- at his word, which was what he said and he mentioned crazy lady. I assumed that it's the person everybody talks about.

Q. Okay.

A. So I said her name.

Q. All right. Let's assume he was talking about Caroline Adams, okay?

A. Okay.

Q. What connection could any post by Caroline Adams have to the future of Jason Davis with the Hamilton County Sheriff's Department; what connection could there possibly be?

A. I have no idea.

Q.   Okay.  Would you agree with me that if Caroline Adams is posting negative things about you or negative things about the department, that that should not have any impact on Jason Davis's career within the Hamilton County Sheriff's Department?

A.   It wouldn't occur to me at all that it would have an effect on anyone's career in the Sheriff's Department honestly.

Q.   And is it fair to say it shouldn't have an impact on his career; is that -- in other words, there shouldn't be any consequences to Jason Davis's career because of something Caroline Adams is posting on Facebook; is that fair?

A.   Jason Davis's career is based on our policy and procedure, our assessment of how officers follow policy and procedure, what their work histories are, and those are the things that we consider, yes, sir.

MR. BRUNS:  Would you read my question back.

THE COURT REPORTER:  Sure.

MR. BRUNS:  I want to make sure you answered my question.

THE WITNESS:  Sure.

THE COURT REPORTER:  "And is it fair

Page 35

to say it shouldn't have an impact on his career; is that -- in other words, there shouldn't be any consequences to Jason Davis's career because of something Caroline Adams is posting on Facebook; is that fair?"

A. I would say that any Facebook posts -- of which I'm unaware of anything, you know, specific -- should not influence our decisions as the Hamilton County Sheriff's Office.

Q. Right. There shouldn't be any consequences to Jason Davis's career because of something Caroline Adams is posting, fair?

A. I can tell you that I can't -- I can't answer that appropriately because I have no idea what she said, I have no idea what the post was, I -- at that moment in time I am first learning that the Chief Deputy said that he did not select Jason Davis for that post.

Q. That wasn't my question.

A. Okay.

Q. Caroline Adams is not and never has been an employee of the Hamilton County Sheriff's Department; is that correct?

A. To my knowledge.

Q.   Okay.  So Jason Davis, his career at the Hamilton County Sheriff's Department and his future at the department -- there's no connection between something as you call her the crazy lady posts on Facebook and Jason Davis's career; is that fair?

A.   I'm not going to say that, because I have no idea what she posted.  And if it were something about information, for instance, of a crime or something like that, that we would have to by due process investigate and so forth.

So it's just not accurate for me to say in general that we -- you know, that a Facebook post would apply in such a far-reaching way.

Q.   So let me give you -- I'm going to give you a predicate to my question and assume for purposes of my question it's true, so I want you to accept it.  Assuming for purposes of my question that Caroline Adams did not post any confidential information, okay, she didn't post anything that would have been some sort of, you know, disclosure of confidential information by someone in the Hamilton County Sheriff's Department, all right, what she posted was merely negative comments, criticism of you, okay -- none of those types of posts could impact -- would have any consequence to

Jason Davis's career; isn't that fair?

MR. SIMON: Objection to form of the question. Lack of foundation. You're asking the witness to speculate.

You can try to answer.

MR. BRUNS: Go ahead.

A. So, yes, hypothetically -- as you're speaking hypothetically, I would say the answer to that is it should -- it should not have any bearing on any deputy.

Q. Okay. And certainly shouldn't be a reason for any consequences to that person's career, correct?

A. As I stated, hypothetically it should not have any consequence or any bearing on any deputy's career.

Q. Thank you. All right. If you go to Request to Admit No. 5.

A. Uh-huh.

Q. That request says, Admit that after making the statement in Request for Admission No. 3, Chief Deputy Gramke then said the reason for squashing the RENU appointment was, quote, And that was due to some Facebook things between you and your wife and things that you said and did some time ago, closed

quote; do you see that?

A.   I do.

Q.   Do you recall anything like that being said -- I understand you don't remember that specifically, but do you recall anything like that being said in that meeting?

A.   I don't.

Q.   Okay.  The same questions for Request to Admit No. 6.  It says, Admit that after making the statement in Request for Admission No. 5, Chief Deputy Grampke then said, You put something about a football game.  It would have been nice if we would have been to a football, something about that your wife has made numerous comments to the crazy woman on Facebook.  There's been -- and then it's cut off.

A.   Uh-huh.

Q.   And your response was you couldn't admit or deny that due to insufficient recollection, correct?

A.   That's correct.  Yes.

Q.   All right.  And that was a truthful answer, fair?

A.   Yes, it is.

Q.   Okay.

A.   Uh-huh.

Q. Do you recall anything like that where Chief Deputy Gramke brought up the fact that Mr. Davis's -- Jason Davis's wife had made numerous comments to the crazy woman on Facebook; do you recall Chief Gramke bringing that up in any way?

A. What I recall that really sticks out in my memory is the football game reference, because when he mentioned that, I had no knowledge of that and that kind of seemed to me to come out of the blue, like what football game.

Q. Yeah, my question was about the comments about your wife has made numerous comments to the crazy woman on Facebook. Do you recall anything like that in terms of Chief --

A. Other --

Q. -- Gramke saying anything like that?

A. Other than the football reference, I don't.

Q. Okay. You would agree with me that -- just like you said before about the crazy lady and her postings --

A. Uh-huh.

Q. -- that if Jason Davis's wife is commenting on Caroline Adams' Facebook page or liking a post or something along those lines and it

Page 40

doesn't involve any sort of confidential information or, you know, information that can't be disclosed from the Hamilton County Sheriff's Department --

A.    Uh-huh.

Q.    -- if it just involves criticism or opinions of people like such as yourself, the Sheriff, you would agree that Jason Davis's wife's social media activity should have no bearing, no consequence to Jason Davis's career; is that fair?

MR. SIMON:  Objection to the form.

Lack of foundation.  Calls for

speculation.

You can try to answer.

A.    So, as I stated, hypothetically anyone who has made -- anyone who is making Facebook posts that are speculative or regarding someone in the Sheriff's Office, you know, in general should not, as I said, have any bearing on someone who -- someone's career per policy, procedure, et cetera.

Q.    And obviously shouldn't have a consequence -- any sort of negative consequence to their career, correct?

A.    Again, they should -- it should have no bearing on anything that -- any -- anything regarding decisions made upon someone's career.

Page 41

Q. All right. And certainly those would be consequences; decisions about someone's career are consequences, fair?

A. Well, not really, no. I don't agree with that. I think a consequence is very different than decision making about someone's career.

Q. If someone doesn't get a promotion because of a certain reason, then a consequence of that reason is they didn't get the promotion, fair? That's how I'm using it.

A. Well, the way that I understand consequence is like as a punishment. And we do not promote -- would not promote based upon that. We promote based upon the qualifications of that person, our policy and procedure, tests. There's a lot of results that are internal that someone submits to. And that is the way we promote and we choose the best candidate, period.

Q. All right. So when you use the word consequence, in your mind you think punishment, you equate those two; is that fair?

A. That's correct.

Q. All right. Thank you. If you could go to Request No. 8.

A. Uh-huh.

Q.    I'm sorry, Request No. 7.  It says, Admit that after Chief Deputy Gramke made the statement in Request for Admission No. 6, you interjected, quote, Caroline Adams.  And you said, I cannot admit or deny due to insufficient recollection.

My question to you is -- you've testified that in your mind when he talked about the crazy lady, you immediately thought of Caroline Adams.

A.    Uh-huh.

Q.    Do you recall ever mentioning her name in that conversation with Jason Davis?

A.    I remember mentioning her name.  I already stated that, yes.

Q.    You did say her name out loud?

A.    I said her name out loud, yes, sir.

Q.    Okay.  If you go to No. 8, it says, Admit after the interjection by you in Request for Admission No. 7, Chief Deputy Gramke then made the following statement.  Well, challenging us -- challenging us on Facebook -- challenging the administration on Facebook and then having your wife converse with a crazy person that makes lies up -- have you looked at the stuff that she writes about her?  Have you seen the crazy stuff that she writes, the terrible things, the vicious -- if that was your

mom, if that was your wife, if that was your sister, how would you feel about that?

Your response was you couldn't admit or deny that because you had insufficient recollection, correct?

A. Correct.

Q. And that was a truthful answer?

A. Yes, sir.

Q. All right. But what I read, I read that accurately, correct -- from that request?

A. I have no idea if it's accurate.

Q. No, no, no. I read it --

A. Oh, you mean --

Q. -- verbatim?

A. -- what's printed here?

Q. Yes.

A. The words printed here, sure.

Q. Okay. Do you have any recollection about Chief Gramke saying anything like that in the meeting?

A. I know that he referenced obviously the Facebook because of the football game. It was something about a football game reference and the fact that that wasn't accurate and that these -- and I believe he -- in my recollection what he was

Page 44

referencing is how damaging things can be to this department to individual people within the department when people post negative things on Facebook.

Q. Okay. Assuming for purposes of my question that Chief Gramke used the words terrible, vicious, or crazy things, okay, as it's stated in that quote -- and I think I have your answer for this, but I want to make it clear -- you would agree with me that even if Caroline Adams posted terrible, vicious, or crazy things about you on Facebook, that would have no impact, no consequence to Jason Davis's career, fair?

A. If hypothetically she did, I would have to say hypothetically it shouldn't make a difference to anyone's career.

Q. Thank you. And as you sit here today --

A. Uh-huh.

Q. -- do you have any personal knowledge that Jason Davis ever said anything that the Hamilton County Sheriff's Department would consider confidential, you know, information Jason Davis learned in the course of his working with the Hamilton County Sheriff's Department -- do you have any personal knowledge that he communicated any

confidential information ever to Caroline Adams?

A. Oh, I would have no idea of that.

Q. All right. And as you sit here today do you have any personal knowledge that Jason Davis communicated any such confidential information ever to his wife?

A. Again, I would have no -- no idea.

Q. And as you sit here today do you have any personal knowledge that Jennifer Davis, Jason's wife, ever communicated any sort of confidential information from the Hamilton County Sheriff's Department to Caroline Adams?

A. I have no idea.

Q. Have you ever reviewed any posts that were purported to be from Caroline Adams whether you looked at the Facebook page itself or someone printed one and showed you; have you ever seen one?

A. No.

MR. SIMON: Okay. Tom, we've been going about an hour; is this a good time?

MR. BRUNS: It's a great time.

THE VIDEOGRAPHER: We are off the record.

(A brief recess was taken.)

THE VIDEOGRAPHER: We are back on the

record.  This is Media 2 of today's

deposition.  The time is 10:17.

BY MR. BRUNS:

Q.  Sheriff, we're back on the record.  Do you understand that any time we take a break, you're still under oath?

A.  Yes, sir.

Q.  Okay.  Great.  When we took a break, I was going to go on to another question, but I wanted to follow up on two things.  When you -- you told me that when you had that meeting on October 10, 2023, there was this process with a green card.  Did you -- and you talked to Chief Gramke very briefly about it.

Did you do anything other than have the one conversation with Chief Gramke in advance of the October 10, 2023, meeting; did you do anything, talk to anyone else, review any documentation of anything before that meeting in terms of Jason Davis?

A.  No, I did not.

Q.  Okay.  So in terms of, you know, where he was on the promotion list for corporal or why -- or that he had applied to RENU and was -- you know, had a position but then it got pulled, like did you have any information like that in advance of the meeting?

A.    No.

Q.    Okay.  And then before we took a break, you had talked about consequences in your mind being the equivalent of punishment.  In my mind when I use -- if I use the word consequences or accountability, I would liken them the same way.  Do you liken them the same way, consequences and accountability?

MR. SIMON:  Objection to the form.

Q.    Do they generally -- do you use those words interchangeably?

MR. SIMON:  Objection to the form.

Vague and ambiguous.

You can try to answer.

A.    No, I don't.

Q.    When you use the word accountability, what do you mean?

A.    When I use the word accountability, I mean -- you know, oftentimes we coach employees to reflect on things that they may or may not have done regarding, you know, policy and procedure.  And things that -- there are lots of nuances in this business.  And when we talk about accountability, that simply means that an employee is coachable in that way, that you're able to coach an employee that

these are things that you didn't do according to policy, et cetera, and that employee -- it's important that they hear the message.  That's the part of accountability that they hear it and that they can then say to themselves, oh, yes, I see that and then in the future, you know, react differently or do things differently in the way of policy and procedure.

Q.   Okay.  I had asked you a number of questions about Caroline Adams' postings and --

A.   Sure.

Q.   -- any postings Jennifer Davis may have done --

A.   Uh-huh.

Q.   -- herself.  And, again, with the same caveat that assuming that what Jennifer Davis posted had no confidential or private information from the Hamilton County Sheriff's Department in it, right, it was just things --

A.   I have no idea what she posted.

Q.   I understand that.  For purposes of my question I want you to assume that whatever she did post had no confidential or secret information from the Hamilton County Sheriff's Department in it, okay -- assuming any of her posts didn't contain

that kind of information, then there would -- there wouldn't be any accountability to Jason Davis for anything his wife posted; is that fair?

MR. SIMON: Objection to the question. Lack of foundation. Calls for speculation.

You can try to answer.

A. I can't answer that because, you know, there's so many different nuances and circumstances regarding hypotheticals. Like I can't -- I can't answer that.

Q. Okay. Well, give me a hypothetical as to how there can be an accountability to Jason Davis at work -- there could be an accountability to him at work for something his wife posted if her postings did not contain anything confidential or secret or, you know, things that can't be disclosed from the Hamilton County Sheriff's Department if it was just her opinion?

MR. SIMON: Objection to the form of the question.

You can try to answer.

A. I can't do that. I wouldn't even know where to start on creating a hypothetical for anybody. A hypothetical is inserting things that

Page 50

aren't factual potentially. It's not taking into account that, you know -- again, there are lots of nuances to every situation. So, no, I can't do that.

Q. Okay. That wasn't my question. My question was, how could you as the sheriff hold Jason Davis accountable for something his wife posted?

A. Again, I would have no idea. I can't even imagine what circumstances you're talking about. I can't imagine what, you know, some made up for this purpose reason that I would have. I can't answer that, sir.

Q. So as you sit here today you can't think of any scenario, nothing can come to your mind where it would be appropriate for you as the sheriff to hold Jason Davis accountable for something his wife posted; is that fair?

MR. SIMON: Objection to the form of the question. It's argumentative.

You can try to answer.

A. It wouldn't be factual. It wouldn't be fair to me to try to make up something that he did or didn't do. That wouldn't be fair to anybody.

Q. I'm not asking you to make anything up.

I'm saying you as the sheriff, you would agree with me that as you sit here you can't think of any reason you would ever hold Jason Davis accountable for something his wife would have posted, assuming what she posted didn't contain confidential information of the Hamilton County Sheriff's Department?

MR. SIMON:  Objection to the form of the question.  Lacks foundation.

A.    Again --

MR. SIMON:  Calls for speculation.

A.    -- I don't deal in hypotheticals, sir.  I just don't.  And it's not appropriate.  It's not proper policy and procedure.  And, no, I -- you're asking me a question.  No, I cannot.

Q.    You can't think of anything, fair?

MR. SIMON:  Objection to the form.

Q.    Is that fair?

A.    No, I can't.

Q.    So it's fair as you sit here you cannot think of any, correct?

MR. SIMON:  Objection to the form of the question.  Asked and answered.

Argumentative.

You can try to answer, Sheriff.

Page 52

A.    I can't think of any hypothetical reason I would -- I just -- no, I can't make things up.  No.

Q.    What, if any, understanding did you have or knowledge of Jason Davis and his career before that meeting?

A.    I knew that Jason Davis had started his career inside the jail as a jail service officer.  I knew that at some point during that tenure of being a jail service officer he was connected to the union -- the jail service deputy union.

I was unaware that he had been promoted to road patrol, but, you know, obviously, you know, I -- yeah.  I just -- I didn't -- I'm looking at that green memo, because I'm like -- yeah, I had no idea what his status was after that.  I lost complete track of -- the things I knew is that he was still embedded in the jail.

Q.    Okay.  Did you know anything else other than what you've just testified to in advance -- about Jason Davis in advance of the October 10, 2023, meeting?

A.    What do you mean anything else?

Q.    About his -- who he was, his career with the Hamilton County Sheriff's Department.  I mean, the point of the meeting is -- as you've testified

to and as Exhibit 18 confirms, it was about his future with the department. And so I want to know what did you know about him in advance of that meeting. And you said I knew that he was an employee who had been in the jail for a period of time. He was a union rep of some sort. He was associated with the union.

A. Uh-huh.

Q. You said you didn't know that he had been promoted to patrol officer. Did you know anything else about him in advance of that meeting?

MR. SIMON: Object to the form.

Tom, are you saying in advance of the meeting before she talked to anybody or literally when the meeting started?

MR. BRUNS: Literally when the meeting started.

Q. Because I -- in addition -- you talked --

A. So when the meeting started --

Q. Let me just finish. Let me just finish. Because you've testified to something Chief Gramke told you in advance of the meeting --

A. Uh-huh.

Q. -- correct?

A. Uh-huh.

Q.   I'm including that in what you allegedly knew, so --

A.   So yeah.  When -- when I spoke to the Chief is when, you know, literally I found out he had been promoted to road patrol.  I mean, until that moment I had no idea where -- you know, that he was even outside of the jail.

Q.   Okay.  Did you know anything else in advance of the meeting other than what you've testified to, as you recall?

A.   Specifically anything, can you reference that?  I mean, as far as like what I knew of -- like in my mind Jason Davis was a -- when he worked in the jail, he was a good employee.

Q.   Okay.  That's what I'm asking.  Anything --

A.   Yeah.

Q.   -- you knew.

A.   I mean, I -- I recollect that he was a good employee, that he was very, you know, passionate about his job and did a good job.  That's my recollection.

Q.   All right.  Do you recall any other information you had about Jason Davis, whether it was from something somebody told you or you just had

from personal knowledge before that meeting;
anything else about him that you recall as you sit
here today?

A.   Before that meeting, those are the things
that I would recall if you asked me about Jason
Davis.

Q.   Okay.  Thank you.  If you could turn to
page 12 of the Exhibit 24.

A.   Sure.

Q.   And Request to Admit No. 10 --

A.   Uh-huh.

Q.   -- says that after -- admit that after
Jason Davis made the statement in Request for
Admission No. 9 you then made the following
statement.  And there's a lengthy statement that's
there.  And your answer was I cannot admit or deny
due to insufficient recollection.

And I would like for you to read the quote
in that question, in that Request No. 10 -- read
that out loud and then I have some questions for
you.

A.   The quote?

Q.   The long -- the body.

A.   Oh, the entire thing?

Q.   Yes, please.

Page 56

A.    I was looking for specific --

Q.    That's okay.

A.    -- quotes.

Q.    Yeah, go ahead and read it out loud.

A.    Sure.  Well, let me just put it in perspective for you.  And the Chief used the example of wife, sister, et cetera.  I'm the boss.  I'm the Sheriff.  And I've got to tell you, you know, when I came up under Sheriff Leis, around 26 years, and I worked very closely with him.  I ran some of his most prized programs.  Okay.  And, you know, if there was any kind of Facebook thing going around like that about Simon Leis when I worked for him, I would have done my best to squash it.  I would have done my best to kill it.  I would have certainly never participated in it.  Because you respect the boss, you know.  I mean, I wouldn't have done it under Jim Neil.

Now, here's the thing, you know, I get that your wife is -- you know, she's her own person. She has every right to say or do whatever she likes. I don't hold it personally against her.  And I'll give you an example.  When I was working for Sheriff Leis, there was an officer who worked here who had been, you know, a long-time kind of family friend,

et cetera, and she needed a place to stay and so I said, well, you know, I have a full basement and everything, you can stay there for a while.  Well, she stopped coming to work.  And I said, you know what, you can't live here if you don't go to work.  You just can't.  She wasn't even -- I wasn't married to her.  She wasn't related to me.  I just said, look, I am not going to be associated with someone who doesn't do their job.  You can't be that closely associated with me and not come to work.  And, you know, I hope you have a good life and everything, but you can't live here if you're going to do that.  And because -- and the reason I did that is because that reflects upon me, you know.  She's in my house.  She's just a roommate.  I mean, she's nobody close to me, but I was going -- I was not going to let someone be around me who would reflect negatively on me in any way because that's not the way I run my life.

And, you know, I think as much as your wife is -- she wants to be her own person, hey, I applaud that, you know.  Then there is an accountability, because you guys are associated.

Q.  And then your response to that request was, I cannot admit or deny due to insufficient

recollection.  And was that response a truthful statement by you?

A.    I would say yes.

Q.    Okay.  And just a quick question.  You read it, the statement about an anecdote from your life about a person who was living in your house. Is the information in the body of that, that you just read about you, is that true?

A.    About me?

Q.    Yes.  That there was a person who you worked with who was living in your house, they didn't come to work, the whole --

A.    Yes.

Q.    -- narrative?

A.    Yes.

Q.    That's all true, correct?

A.    That's correct.

Q.    Okay.  And do you recall saying anything like what you just read in Request to Admit No. 10 -- do you recall saying anything like that in the meeting on October 10, 2023?

A.    My answer here of I cannot admit or deny due to insufficient recollection simply -- and that is true.  I recall the circumstance that I lived here.  I cannot say for certain this is word for

word exactly what I said, but yes, I -- you know, as far as if you're asking me if the things I just related here are true to me, yes.

Q. My question was, do you recall saying anything like the substance of what's in Request to Admit No. 10; do you recall saying something like that, that substance in that meeting on October 10, 2023?

A. I recall using examples, yes.

Q. Okay. Do you recall saying anything else from that meeting other than what we've discussed so far?

A. No. I recall using examples. I recall, you know, attempting to explain to an employee perspectives of what we are all in there talking about. That's all I -- yeah. That's what I recall.

Q. Okay. Why would you bring up an anecdote -- I'm going to call it an anecdote, the story --

A. Sure.

Q. -- you relate here -- why would you bring up an anecdote about forcing someone out of your house because it reflected negatively on you at work -- why would you bring that up and then immediately talk about Jason Davis's wife and say

something along the lines that there's an accountability because you guys -- meaning he and his wife -- are associated; why would you do that?

MR. SIMON:  I'm going to note my objection again that you're asking her why did you say certain things at the meeting. Well, play her the recording and I'm sure she can better explain.

MR. BRUNS:  You have a continuing objection.

MR. SIMON:  And I want to make -- and I understand that, but based on that specific question.

If you can try to answer the question, go ahead.

MR. BRUNS:  I want the court reporter to read it back, please.

THE COURT REPORTER:  "Why would you bring up an anecdote about forcing someone out of your house because it reflected negatively on you at work -- why would you bring that up and then immediately talk about Jason Davis's wife and say something along the lines that there's an accountability because you guys -- meaning

he and his wife -- are associated; why
would you do that?"

Q.   Go ahead and answer the question.

A.   Again, I would have to understand the
entire context and flow of the conversation, which I
do not.  This is a piece of what's represented here
about what was said.  And if I were looking at the
entire conversation verbatim, then I may be able to
answer that question.  But I -- this is the example
apparently that I used.  And that's what I meant.

Q.   What did you mean?

A.   That these are examples of things that --
that can influence your life.  I mean, you know,
it's very hard for me to understand without seeing
the entire -- the entire conversation prior to and
after.  This is a small snapshot as I see it.

I can tell you in my mind that my goal in
any conversation is to talk about the job and what
the job actually means, what it means to work a
particular position or job, and I'm focused entirely
on the work at hand and what -- what might influence
our ability to follow policy and procedure and the
fact that we all are bound to policy and procedure.
And that -- in my mind, this is all about work and
the work that we do.

Q.    All right.  So when you talked about an accountability because Jason and his wife are associated, you were equating that to his work?

A.    I was -- I'm sorry.  Can you ask me that again?

MR. BRUNS:  Please read that back.

THE COURT REPORTER:  Sure.  "So when you talked about an accountability because Jason and his wife are associated, you were equating that to his work?"

A.    I was equating that statement to Jason Davis, period.

Q.    And his work at the Hamilton County Sheriff's Department, correct?

A.    I can't say that factually.  I can say that I was addressing Jason Davis and I was talking about Jason Davis in the context that he worked for us.

Q.    Thank you.  And do you have any personal knowledge that Jason Davis violated any policy or procedure of the Hamilton County Sheriff's Department on or before October 10, 2023?

A.    Prior to this?

Q.    Yes.

A.    Or hindsight?

Q.   No.  Prior.

A.   Prior to this, I do not.

Q.   Okay.  And in hindsight what policy or procedure do you believe Jason Davis violated?

A.   I don't have the policies and procedure in front of me, so it wouldn't be fair for me to factually state what that is, because there are lots of policies and procedures that I would need to be looking at and referencing the exact wording of.

Q.   As you sit here today you don't know of any; is that fair?

A.   Again, unless I had the policy and procedure in front of me, I would not be able to answer that question.

Q.   Because you don't know of any as you sit here, fair?  I mean, if you know of one, tell me. That's the implication of my question.  If you know of a specific policy or procedure violation in hindsight that you believe Jason Davis committed while he was an employee of the Hamilton County Sheriff's Department, I want to know.

A.   Without looking at the policies and procedures I cannot answer that.

Q.   All right.  And you've never seen any documentation as far as you're aware of Jason Davis

Page 64

violating any policy or procedure of the Hamilton County Sheriff's Department, correct?

MR. SIMON:  Objection.  Are you continuing through the time of this meeting?

MR. BRUNS:  Up to the time of the meeting.

MR. SIMON:  His conduct through the time of the meeting?

MR. BRUNS:  Yeah.  Correct.

A.    Through to the time of the meeting?

Q.    Including in the meeting itself.

A.    In the meeting itself?

Q.    Yes.

A.    I was not aware in the meeting itself of him violating any policy and procedure.

Q.    Before that, correct?

A.    Or before that.

Q.    All right.

A.    Correct.

Q.    All right.  And, in fact, if someone had knowledge that an officer in the Hamilton County Sheriff's Department violated a policy or procedure, they're supposed to document that, fair?

A.    Well, again, that's -- that lends itself

Page 65

to situations. And when you're saying someone had knowledge --

Q. A supervisor. Someone higher up than Jason Davis. If they had knowledge that he violated a policy or procedure, they're supposed to document it, correct?

A. Supervisors are supposed to document policy and procedure violations, yes.

Q. All right. And to go back to one of my earlier questions, other than you equating this anecdote that you told and forcing someone out of your house and equating it to Jason Davis's work because he's associated with her, his wife, and there has to be accountability, do you recall any other reason why you brought up that anecdote about someone living in your house and you literally forced them out of your house because it was reflecting negatively on you at work; do you recall any other reason why you brought that up?

A. First of all, I would just like to stipulate here, I don't see in my statement written here that I forced someone out of my house. Secondly, my example here is related to work and work only.

Q. Okay. So the answer to my question, you

can't think of anything else, fair -- any other reason why you brought it up?

A.   Other than -- other than work and work-related example, no.

Q.   All right.  And assuming -- you in your example from the meeting that you gave, assuming you actually used the words talking about this person who had been living with you, but you can't live here if you're going to do that, that's the sense I was using in forcing them out of your house, did you in fact ask the person to leave?

A.   No, I did not.

Q.   Okay.  How did that turn out; did they start coming to work and then you were okay with it?

A.   She lived there for another eight years, sir.

Q.   Okay.  Because she started coming to work?

A.   Yes.  That's correct.

Q.   All right.  Could you go to page 13 of the request to -- of the discovery responses, Exhibit 24.

A.   Oh, page 18?

Q.   Page 13.

A.   Oh.  13.

Q.   Yeah.

A.   Okay.  Sure.

Q.   All right.  The request to Admit No. 11 says, Admit that, at all times relevant to the meeting held between you, Chief Deputy Gramke, and Jason Davis on or about October 10, 2023, Chief Deputy Gramke was acting pursuant to authority conferred to him by law.  And your response says, I admit Chief Deputy Gramke was acting as Chief Deputy to the Hamilton County Sheriff.  Did I read that accurately?

A.   Yes.

Q.   All right.

A.   Uh-huh.

Q.   And when you say you admit he was acting as Chief Deputy, you would agree with me that he was acting pursuant to the legal authority conferred on him as Chief Deputy to the Hamilton County Sheriff, right?

A.   He was sworn as a Hamilton County Deputy, yes.

Q.   And he's in that meeting because he has authority conferred on him as Chief Deputy, fair?

A.   Yes.  Correct.

Q.   All right.  I just want to make sure.  And then the same thing with Request to Admit No. 13.

It was the same question relative to you.  You made the same answer relative to you that you did to Chief Gramke, but I want to make sure I understand your testimony.

Is it fair to say you admit that you were acting pursuant to the legal authority conferred on you as the elected Sheriff of Hamilton County?

A.   Yes.  I would say that's correct.

Q.   All right.  And then if you go to Request to Admit No. 15.

A.   Yes.

Q.   It says, Admit that you are, for purposes of employment, including assignments to RENU and promotions to corporal within the Sheriff's Department, the ultimate policy-making official for such actions pursuant to law.

And your answer was, I admit I am the elected Sheriff of Hamilton County.

Are you -- do you admit that for purposes of employment, including assignments to RENU and promotions to corporal within the Sheriff's Department that you are the ultimate authority on that, you're the ultimate policy-making official, the buck stops with you?

MR. SIMON:  Objection to the form of

the question.  Calls for a legal conclusion.

You can answer.

A.  I would say the word ultimate there is a very nuanced word because, again, there are people assigned in our organization, and they are given authority to make particular decisions, judgments, sign off on policies and so forth regarding those things.

So am I the Sheriff of Hamilton County? Yes.  Am I elected?  Yes.  Did I swear an oath to act as the Sheriff of Hamilton County duly elected? Yes.

Q.  Okay.  But in terms of, for instance, assignments to RENU and promotions to corporal, other people below you are involved in that decision-making process, correct?

A.  They are.

Q.  All right.  But the ultimate decision maker is you, you have the authority to say no, that person is not going to be promoted or yes, they are going to be promoted; the buck ultimately stops with you on the promotions issue, correct?

A.  As the Sheriff I am the -- I am the final decision maker for decisions that affect the

Sheriff's Office.

Q. All right. And that includes promotions to RENU and promotions to corporal, fair?

A. So it would include anyone that is employed with the Hamilton County Sheriff's Office and any of their tenure, be it -- yeah. Be it continuing a tenure or anything that would affect or be in effect of their employment, yes.

Q. Assignments, promotions?

A. Yes.

Q. All right.

A. Uh-huh.

Q. And if you disagreed with the decision of someone below you on the chain of command who was involved in the decision-making process, you could ultimately overrule it because you have the last word on it, fair?

A. I could, yes.

Q. Could you go to page 14?

A. Uh-huh.

Q. These are just some housekeeping questions I wanted to know.

A. Uh-huh.

Q. Page 14, where it says -- the No. 1 that's there, the first interrogatory, Excluding attorneys,

identify each person who provided information or documents; do you see that question?

A.   Yes, I do.

Q.   All right.

A.   Uh-huh.

Q.   Then there's an answer here about people who provided assistance with certain of the document requests and also Interrogatory No. 15; do you see that?

A.   Yes, sir.

Q.   Okay.

A.   Uh-huh.

Q.   Did you before verifying the answers to interrogatories -- did you also review the documents that you supplied as part of your answers to the document requests; did you review those?

A.   I don't recall.

Q.   Okay.

A.   I don't recall whether I did or not.  I just simply don't recall.

Q.   All right.  How do you know that what you provided in response to document requests was accurate?

A.   So, again, I would have reviewed material that of which I -- honestly I don't recall

specifically what I might have looked at.  But I answered the questions to the best of my ability truthfully, and that's what I can recall other than I -- I can't recall whether I did or didn't.  I may have.  I may have looked at these documents.  I don't -- I simply don't recall.

Q.   Okay.  How do you know -- since you swore that the information in these interrogatories -- and this is the very first one --

A.   Uh-huh.

Q.   -- you swore that the substantive information is true and accurate --

A.   Uh-huh.

Q.   -- how do you know that Jessica Kober, for instance, Administrative Manager -- how do you know she provided assistance with response to Interrogatory No. 15 and then those various requests for production of documents; how do you know that?

A.   Because Jessica Kober is the administrative manager.  And those are her job duties.  And she's been doing that job for almost 30 years now.  And Jessica provides this type of documentation routinely for lots of different reasons in the Sheriff's Office.  And I certainly trust that she has produced every document that has

been asked.

Q.   Okay.  And so you know her, that's her job duty to assemble those documents, and you trust that she does it accurately?

A.   It's one of her job duties, yes.

Q.   Okay.  Thank you.  I want to ask some questions about Interrogatory No. 2, but before we get on to that, I want to make sure I understand.  I think you've answered this question, so I'm going to apologize if I've belabored the point.

Do you recall saying anything else in that October 10, 2023, meeting with Jason Davis and Chief Gramke other than what you've testified to here today?

A.   I simply can't -- I can't recall -- I cannot recall or recall because I -- I mean, again, it was 2023.  It was a conversation that the three of us were having.  And it was a conversation.  So I can't answer that question that there were more things I said or didn't say.

Q.   Because you don't know?

A.   Because I don't know.  Yes, sir.

Q.   Thank you.  In answer to Interrogatory No. 2 it asked about witnesses.  One of the people disclosed was Jay Gramke.

A.    Uh-huh.

Q.    And it says knowledge of the meeting that is the subject of the Plaintiffs' complaint.  He was there, so obviously he has personal knowledge of what happened, fair?

A.    I would say yes, that's fair.

Q.    Okay.  Other than his knowledge of what transpired in the meeting, do you know of any other information he has relative to the subject of the complaint or your defenses or anything else? Because that was the question.

A.    So if I understand it, you're asking me if he has knowledge of anything other than what's printed here?

Q.    Yeah.  Other than what you answered, the question was -- let me just be clear.  The question was identify, right -- we wanted you to identify --

A.    Uh-huh.

Q.    -- anyone with knowledge of any of the allegations contained in the complaint and/or knowledge of any of the defenses alleged in your answer, including generally the subject matter of which they have knowledge, and your response was Jay Gramke, knowledge of the meeting that is the subject of Plaintiffs' complaint.

And so my question to you is, are you aware if he has any other knowledge beyond that?

A. I would have no idea.

Q. Okay. Chris Kettman. It says knowledge of the underlying reasons that Plaintiff Jason Davis was not promoted to corporal or given an assignment to RENU.

Did you ever talk to Chris Kettman about either of those issues?

A. No, I did not.

Q. All right. How do you know that Chris Kettman has knowledge of the underlying reasons with Plaintiff Jason Davis why he was not promoted to corporal or given an assignment to RENU?

A. Because any records request would have come through those chains of command. So Chris Kettman is the commander. He is the -- he was at the time the major who was in charge of those areas of road patrol.

Q. Okay.

A. So he would have knowledge.

Q. Okay. That's an assumption on your part, you didn't quiz him about his knowledge or --

A. No, sir.

Q. Is that correct?

A.    That's correct.

Q.    Okay.  And just I should -- just so we're clear and I don't forget to ask you --

A.    Uh-huh.

Q.    -- the RENU process, just from your knowledge give me the process of someone applying who is an employee of the Hamilton County Sheriff's Department when they want to go to RENU, what's the process they go through?

A.    Well, every process we have is very structured.  So that process would be you apply generally in writing.  It's posted that there is a -- some type of opening.  Deputies will apply.  And then those deputies will go through either for, you know, promotions of rank and so forth.

We have testing -- testing that's written by outside, you know, agencies who bring the test in to us.  And if it is sometimes like a preferred assignment, there will be interviews.  There will be an interview process.

Q.    RENU has that?

A.    To my knowledge they do.

Q.    Okay.

A.    And then the -- any employee who is applying for anything like that, their work history

would be assessed and selection would be -- I'm going to use the word suggested, because I can't think of any other word.  But their selection would be suggested by those people in the chain who had responsibility for that.

Q.   And who is in that chain -- at least back in, you know, when Jason Davis was an employee of the Hamilton County Sheriff's Department, who was in that chain?

A.   I would have no idea, sir.

Q.   I apologize.  Whether you have a name or just a rank, like a position, that's what I'm asking.

A.   Well, our ranks -- our ranks are structured as corporal, sergeant, lieutenant, captain, major, chief deputy, and then myself.  So people that were in the chain of command who held those ranks is who I would think would be in that process of interview.

Q.   Okay.  And how high does it get up to before someone actually recommends a candidate for RENU before there's a final decision; who actually -- how high does it go in the chain where there's a recommendation?

A.   Well, I would say that the captain and --

the captain who is -- who has purview over that unit.  And also then, of course, the major, who is -- who is command of that unit and many others would be the path that that would come through.

Q.   Okay.  And this process that you talked about for RENU --

A.   Uh-huh.

Q.   -- it's pretty formalized, structured, right?

A.   I wouldn't be able to answer that question accurately, because RENU is a very specific -- it's a very specific unit.  It has -- there's lots of different nuances to RENU because of the fact that it is also a unit that collaborates with Cincinnati Police Department.  Some of their members are also there.  There is a lot of collaboration with other agencies.

So it -- I can't say that to take RENU and compare it to a very standard, you know, structured unit inside the jail, let's say, because RENU is so very different in the way that they're conducting business, being on that first line of drug enforcement and so forth.

Q.   Well, let me ask you this then.  Who would know the answer to my question; would Chris Kettman

know the answer to my question?

A.    I would -- Chris Kettman is a major.  So logically he would be apprised of what's going on in that unit.

Q.    Sure.  My question was about the -- how this process to vet candidates for RENU -- what the process entails and how structured it is and formal and that kind of thing and the reasons behind it.

A.    Uh-huh.

Q.    Would Chris Kettman likely know the answers to those questions?

A.    I would assume that he would.

Q.    How about Matt Guy?

A.    It says here Matt Guy was an official within RENU.  So I would again assume yes.

Q.    Okay.  And in terms of this vetting process for candidates, it also includes officials from other law enforcement agencies; they're part of the vetting process?

A.    I would have no idea what part they take.

Q.    I thought you said that, but I misunderstood you.  So it's possible they're part of it, you don't know?

A.    I would have no idea.

Q.    You listed Dave Downing.  It says as

someone who has knowledge of Plaintiff Jason Davis and Plaintiff Jason Davis's employment with the Hamilton County Sheriff within Anderson Township.

What's your understanding of Dave Downing's role there?

A.    Just what it says here, that he's employed at the Anderson Township location for the Hamilton County Sheriff's Office.  I don't -- I would have no idea what process he would be involved in there.

Q.    Okay.  With the exception of Pete Stackpole, one of the attorneys who is involved in this case --

A.    Uh-huh.

Q.    -- did you talk to any of these folks at any time about the complaint, Jason Davis, any of his allegations, the October 10 meeting, any of that?

A.    No.  No, sir.

Q.    Okay.  So these responses are you're simply saying these are people -- other than Pete Stackpole -- these are people who might have some knowledge of the issues involved, fair -- because you didn't talk to them, so you don't really know what they know?

A.    Correct.

Q.   Okay.  You listed Tom Butler.  Did you -- who is Tom Butler?

A.   So Tom Butler was formerly at road patrol. He was a captain assigned to road patrol.  He -- when I came on, when I began as sheriff, my recollection is that we asked Tom Butler to be the commander -- the captain of court services.  So he moved to the court service location, served as captain of our court service division.

Q.   Okay.  And then it says he has knowledge of Plaintiff Jason Davis's current employment with Springdale Police Department.  How do you know that?

A.   Well, Tom Butler -- ultimately he was retired and was working on what we call PRE.  And during that tenure, which is a three-year window, he resigned and assumed the position of Chief of Police of Springdale Police Department.

Q.   All right.  And to your knowledge what is his reputation within the law enforcement community; is it good?

A.   I haven't heard anything to the negative about Tom Butler.

Q.   Okay.  As far as you're aware does he have a reputation for honesty?

A.   We all have a reputation for honesty.

Q.   Okay.  You've never heard anything negative about his reputation for honesty; is that fair?

A.   Not in my knowledge.

Q.   Okay.  You said on this list you didn't speak with anyone about any of these issues before disclosing them in this interrogatory.  You don't know what they know.

My question about Pete Stackpole -- and I know he's one of your attorneys in this case -- before -- at any time before the decision on Jason Davis was made about not getting the RENU spot --

A.   Uh-huh.

Q.   -- okay, did you consult with any lawyer -- in-house lawyer about that at any time?

A.   No, sir.

Q.   And Pete Stackpole is down the hall from you; you could -- there are lawyers available to you within the Hamilton County Sheriff's Department if you wanted to consult; is that fair?

A.   That's fair.

Q.   Could you go to page 17 of Exhibit 24.

A.   Uh-huh.

Q.   Interrogatory No. 6 says, Please state all reasons why you prevented, or permitted Chief Deputy

Gramke to prevent Jason Davis's reassignment to RENU in 2023.  And then the answer that you gave was, Chief Deputy Gramke made the decision to prevent Jason Davis's assignment to RENU.  I agreed with his decision.  And let me just stop there.

Ultimately if you had disagreed with his decision, you could have overruled Chief Deputy Gramke, correct?

MR. SIMON:  Objection.  Hypothetical. Lacks foundation.

You can try to answer.

A.   I would have the authority to, yes.

Q.   All right.  I'll continue reading.  You say, RENU is an elite unit within law enforcement that requires those assigned to it to protect sensitive information.  Trust, responsibility, and secrecy are necessary for RENU officers.  Jason Davis did not have the necessary qualities for RENU. Did I read that -- did I read your answer correctly?

A.   That is correct.

Q.   All right.  And when you say the final sentence there, Jason Davis did not have the necessary qualities for RENU, are you referring to the sentence beforehand, which is trust, responsibility, and secrecy?

A.   What I'm referring to is the Chief Deputy's decision and his assertion that Jason Davis didn't have the necessary qualities for RENU.  What we noted there with trust, responsibility, and secrecy are things that are unique to the unit of RENU.  And that applies to their day-to-day operations.

Q.   Okay.  My question was very simple.  When you wrote or stated and agreed with the statement that Jason Davis did not have the necessary qualities for RENU, what were the necessary qualities, if not trust, responsibility, and secrecy?

A.   Well, there are many different qualities that can be assessed in any type of interview or selection process.  So what we -- what I noted there is what I know personally to be parts of necessary, you know, qualifications for RENU.

But, again, that's not a complete list. So I would say that Jason Davis did not have the necessary qualities for RENU and, as I stated, Chief Gramke made the decision.

Q.   What necessary qualities for RENU did Jason Davis not have in terms of what you were referencing under oath in your response to

Page 85

Interrogatory No. 6; what necessary qualities are you saying I swear under oath I have personal knowledge he didn't have those necessary qualities -- what were you referring to?

A.   I was referring to the Chief Deputy's decision, that the Chief Deputy had made a decision that Jason Davis did not meet the requirements for RENU and that's what I was referring to.

Q.   So you don't have any -- other than something Chief Deputy Gramke told you, you don't have any personal knowledge that Jason Davis did not have the necessary qualities for RENU, fair?

A.   I would say that's a fair statement.

Q.   Okay.  And what did Chief Deputy Gramke tell you were the reasons or the substance to support your statement that Jason Davis did not have the necessary qualities for RENU; what did he tell you?

MR. SIMON:  Objection.  Asked and answered.

You can go ahead and answer again.

A.   Again, I honestly don't recall.  I don't recall exactly what the Chief told me regarding this -- Jason Davis's assignment to RENU.  I don't recall a specific list or anything specific that the

Chief Deputy told me as to why.

Q. Okay. Are you aware of any documents that support that conclusion that Jason Davis did not have the necessary qualities for RENU; are you aware of any documentation -- an email, a personnel record in a personnel file, you know, a summary of an interview -- any document, any writing that existed on or before October 10, 2023, that supports that conclusion; are you aware?

A. I'm not, no.

Q. Okay. If someone -- going back to this vetting process for RENU --

A. Uh-huh.

Q. -- if someone goes through that process, documents are generated as part of that process, correct -- there's different steps people -- candidates take to go through the process, correct?

A. There should be.

Q. Okay. And who would retain those documents; who within the Sheriff's Department should have copies of the documents that are generated as part of someone going through the process of applying for RENU?

A. I would not be able to answer that question, because one of the reasons is because it

is RENU and I do know that it's a very secretive situation there regarding who joins, the identities, things like that.  So I really would have no idea how they --

Q.   Sure.

A.   -- how they keep those.

Q.   So you don't know.  So my next question is who within the Hamilton County Sheriff's Department would know where such records are maintained?

A.   Well, I would think that -- I would think that the major who is in command of that unit --

Q.   Would know the answer to that?

A.   -- would know the answer to that.

Q.   Thank you.  And then in terms of the basis for your agreeing with Chief Gramke's decision, because you said I agreed with his decision --

A.   Uh-huh.

Q.   -- and of course the decision was to prevent Jason Davis's assignment to RENU -- in terms of you agreeing with him he told you that Jason Davis did not have the necessary qualities for RENU, correct?

A.   Well, I don't specifically recall him saying that, but I -- I trust the Chief Deputy.  The Chief Deputy is making a decision based on his

experience, the fact that he was actually a lieutenant in that unit or thereabouts, a sergeant, held rank in that unit, had worked in that unit for many years.  So when he says something like that to me, I certainly believe him.

Q.   You assume it's true?

A.   Well, I believe that it is true, yes.

Q.   Okay.  So in that sense he told you something, right -- he communicated some information to you, correct -- whether you recall the specifics of it or not, he communicated some information to you about preventing Jason Davis's assignment to RENU, right?

A.   He did.  That's right.

Q.   Okay.  And because you say I agreed with his decision, so he had -- he communicated --

A.   Uh-huh.

Q.   -- it to you in some way, right?

A.   And exactly the way he said it to me I do not recall, but what I do recall is his assertion that Jason Davis was not a good candidate for RENU.

Q.   Okay.  And based on that alone you agreed with him because of your knowledge of who Chief Gramke is and his experience; is that --

A.   I did --

Q.   -- correct?

A.   -- agree with him.  Yes.

Q.   Okay.

A.   Uh-huh.

Q.   In that sense you rubber stamped Chief Grampke's decision; is that fair?

MR. SIMON:  Objection to the form of the question.  Argumentative.

Q.   You didn't do any due diligence on your own to look into it, you just accepted his decision, correct?

A.   My due diligence was to vet Chief Deputy Jay Gramke before I selected him as my Chief Deputy. And I did so in great detail.  And what I understood and the reason Chief Deputy Jay Gramke was selected was because of his tenure, his record, his expertise, his ability to act as a commander in that high-level position with the Hamilton County Sheriff's Office.

So, yes, because of my diligence and homework in selecting my command staff I do have a great deal of confidence in their decisions.

Q.   Are you aware of any document that exists involving Chief Gramke's communication regarding why he prevented Jason Davis's assignment to RENU -- are

you aware of any document -- an email, a note, anything -- that discussed or concerned that issue?

A.   Not in my memory, no.

Q.   Who would know that?

A.   If there were an email or --

Q.   Such a thing.

A.   Whoever he sent it to.  And I would have no knowledge of who that would be.

Q.   All right.  Obviously Chief Gramke had the opinion that Jason Davis did not have the necessary qualities for RENU and you agreed, as you say, with his decision.

Do you know of anyone else within the Hamilton County Sheriff's Department who agreed with that decision?

A.   I didn't discuss it with anyone else.

Q.   That wasn't my question.  Do you know --

MR. SIMON:  She was still answering.

MR. BRUNS:  I know.  But just for the record, Sheriff, I apologize --

THE WITNESS:  Uh-huh.

MR. BRUNS:  -- but I think this is taking longer.  When I ask do you know of anyone, that's what I'm looking for.  So I just want --

THE WITNESS: Uh-huh.

MR. BRUNS: -- I didn't mean to cut you off, and I apologize, but --

THE WITNESS: Yeah.

MR. BRUNS: -- that's why I'm asking a specific question.

Q. Do you know of anyone within -- either today or back in October of '23 -- anyone within the Hamilton County Sheriff's Department who agreed or agrees with your and Chief Gramke's decision regarding Jason Davis?

A. And I'd just like to state that when I do expand on my answer, it's simply because I'm trying to jog my memory as to -- to make sure that I answer that correctly to my recollection. So the answer to that is no.

Q. Thank you. You made a point of saying trust, responsibility, and secrecy are necessary for RENU officers, correct?

A. Yes, I did.

Q. You would agree with me that trust, responsibility, and secrecy are necessary qualities for Hamilton County Sheriff's deputies in general?

A. That's a fair statement, yes.

Q. All right. And patrol officers on up,

corporal, all the way up, trust, responsibility, and secrecy are necessary to be employed at the Hamilton County Sheriff's Department, fair?

A. I'd say that's fair.

Q. All right. And before October 10 of 2023, including that date --

A. Uh-huh.

Q. -- were you aware of any -- did you have any knowledge that Jason Davis lacked the ability to be trusted, lacked the ability to be responsible, or he lacked the ability to maintain a secret; were you aware of any information like that?

A. No, I was not.

Q. Okay. And even including that day, October 10 of 2023?

A. Well, I was made aware of it there by the fact that the Chief Deputy stated that he didn't have the necessary qualities. So that is when I became aware that there was obviously some issues with this assignment.

Q. But as you've testified, Chief Gramke didn't elaborate, so you don't know if he was referring to trust, responsibility, and secrecy; you don't know --

A. Correct.

Page 93

Q.   -- if that's --

A.   No.

Q.   -- what he's referring to?

A.   Right.  No, I do not.

Q.   Okay.  So including that day, even after that meeting, you don't know if Jason Davis lacked the ability to be trusted, to be responsible, or to maintain secrets, correct?

A.   Just let me understand the question.  Even after that day?

Q.   Sure.

A.   Would that be when I became aware that he taped the meeting; is that. . .

Q.   Let's start with just that day --

A.   Okay.

Q.   -- okay?

A.   Okay.

Q.   Through that day, through October 10, 2023, you had no knowledge that he lacked any ability to be trusted, to be responsible, or to maintain secrets, correct?

A.   Not to my knowledge.

Q.   Okay.  And then you say subsequent to that day --

A.   Uh-huh.

Q.   -- you learned that he taped that meeting, correct?

A.   Yes.

Q.   All right.  And what did that information tell you?

A.   Well. . .

Q.   About Jason Davis.  Because I think that's where you were going, so that's why I'm asking.

A.   It's certainly a policy violation.  It is indicative of someone who is willing to violate policy.

Q.   Okay.  What policy exists -- existed on October 10, 2023, that was violated?

A.   So we specifically inserted in the policy that we were going to do away with the practice, which was pretty prevalent in the prior administration, of deputies secretly taping each other, you know, audiotape-taping each other.

Q.   Okay.

A.   I should say recording each other.

Q.   Okay.  During your tenure of the Hamilton County -- in the Hamilton County Sheriff's Department did you ever secretly record anyone else who was a member of the Hamilton County Sheriff's Department?

Page 95

A.   Never.

Q.   Okay.  Had anyone ever done that where you were one of the participants speaking but were unaware that you were being recorded?

A.   Multiple times.

Q.   Okay.  And you said we made the policy. Who is we?

A.   Myself and the Chief Deputy discussed changing that policy.  And we both agreed that for the betterment of the department to allow officers to -- really to just get along better and trust each other, we decided to insert that in the policy.

Q.   Okay.  If someone who didn't know they were being taped --

A.   Uh-huh.

Q.   -- was -- in fact was taped --

A.   Uh-huh.

Q.   -- and then denied that they said something that turns out they're lying because it's on the tape or they misremembered because regardless it's on the tape --

A.   Uh-huh.

Q.   -- then do you fault someone for taping?

MR. SIMON:  Objection to the form of the question.  Vague and ambiguous.

You can try to answer.

A.    There was no policy against it.  So people could do it if they wanted to and they did.

Q.    Okay.  When did you find out that Jason Davis taped that October 10, 2023, meeting?

A.    To my recollection he did an exit interview with -- then probably would have been maybe Marviette Johnson, who was our new HR person. And as I recall there was a mention in his exit interview that he had taped the meeting.

Q.    All right.  How did you find out that there was a mention in the exit interview?

A.    It was in -- it was -- I review the exit interviews and it was in writing there.

Q.    Okay.  Go to Interrogatory -- the policy that you say was violated, when was that enacted?

A.    We placed that in policy, as I recall, very early on.  I mean, it was one of our first discussions.

Q.    Do you know what policy number?

A.    I couldn't say.

Q.    Is it still the policy of Hamilton County Sheriff's Department?

A.    Oh, yes.

Q.    Okay.

A.    Uh-huh.

Q.    Is it something that you could look for and put your hands on?

A.    I assume.  Sure.

Q.    Okay.  If you go to Interrogatory No. 7 --

A.    Uh-huh.

Q.    -- it says, Please state all reasons why you prevented, or permitted Chief Deputy Gramke to prevent Jason Davis's promotion to corporal in 2023. And your answer, Neither Chief Deputy Gramke nor I prevented Jason Davis from a promotion to corporal. He did not stick around long enough and quit his employment with the Hamilton County Sheriff's Office.  Did I read that accurately?

A.    Yes.

Q.    Okay.  Is it your testimony that he was never prevented from a promotion to corporal and, in fact, it was just a matter of time that he would have been promoted?

A.    Yes.  He was on the list to be promoted to corporal.  And I don't know all the exact time frames of how much longer that list was in fact in effect.  I assume it was some time.  So yes, I would say that he was eligible to be promoted.

Q.    Okay.  Well, if he was the next one man up

Page 98

on the promotion list --

A.   Uh-huh.

Q.   -- at the time of this meeting on October 10 of 2023, it's your testimony that as long as that list was active --

A.   Uh-huh.

Q.   -- as soon as there was another spot that was open, Jason Davis would have gotten it but for the fact that he ended his employment?

A.   Well, he would have been able to compete for it.  We don't promise positions to people prior to the process.

Q.   Okay.

A.   I mean, we don't.

Q.   What else would he have had to have done other than pass the test, be on the promotion list, and then be the next man up for an available opening?

A.   So we have a rule of three that I -- that I instated -- initiated when I came on.  And the rule of three is you take the top three that are next on the list.  They -- they are then going through the process, interviews, et cetera, whatever that process is deemed to be.  And then that recommendation of who is next to be promoted out of

that three, the recommendation of the top performers would be given to the Chief Deputy and, you know -- and then the selection would be made.  So that would be the process of getting to that next person on the list.

Q.   All right.  So if Jason Davis was the next man up, he already would have been part of that process in your rule of three, correct?

A.   Correct.  Yes.

Q.   Who would have records of his interviews and things like that for potentially being promoted to corporal?

A.   So that would be the selection committee. And, again, I don't, you know, have day-to-day knowledge of that level of who is exactly doing what, but I can tell you that our process is to, of course, do some due diligence and interview people and allow people to compete for the position.

Q.   Who was in charge of the selection committee back then?

A.   I could not tell you, sir.

Q.   Was it Jay Gramke?

A.   When you say the committee, he would not have been sitting in on the committee.

Q.   Well, who was --

A.   He would have gotten -- he -- in his position the procedure is he would have gotten the recommendation from the committee --

Q.   Okay.

A.   -- as to who they -- and they would have ranked --

Q.   Sure.

A.   -- those three people.

Q.   Who maintains those records?

A.   Again, I'm not sure.  Someone in that -- someone in that process, likely the ranking person that's in the selection process.

MR. SIMON:  Tom, is this a good time for a break?  We've been going about an hour.

MR. BRUNS:  Yeah.  Yeah.  That works.

THE VIDEOGRAPHER:  Off the record, 11:24.

(A brief recess was taken.)

THE VIDEOGRAPHER:  We are back on the record.  This is Media 3 of today's deposition.  The time is 11:51 a.m.

BY MR. BRUNS:

Q.   Sheriff, we took another break and we're back on the record.  When we left off, you were

testifying about corporal promotions, even if you're at the top of the list, if an opening comes up --

A. Uh-huh.

Q. -- then you have a rule of three and the top three people on the list have to go through interviews and that kind of thing, right?

A. Correct. Yes, sir.

Q. Okay. And then the final decision maker or makers for who is selected from the three candidates --

A. Uh-huh.

Q. -- are you the final decision maker?

A. Typically I get the recommendation from the chief deputy. And unless there's any -- any issues brought to my attention as to why this wouldn't be a good selection, I say yes, that's good.

Q. Okay. So Chief Gramke is the final step in the chain below you --

A. Uh-huh.

Q. -- and you accept his recommendation unless you have some reason not to?

A. Correct. Yes.

Q. Okay. And when we left off last time, you were talking about a policy of the Hamilton County

Sheriff's Department about not recording conversations among Sheriff's Office personnel.

A.   Sure.

Q.   Is that contained in the rules and regulations and disciplinary process of the Hamilton County Sheriff's Office?

A.   I -- unless I read through that, I couldn't. . .

(Plaintiffs' Deposition Exhibit No. 27 was marked for identification.)

Q.   I'm going to give you what's now been marked Exhibit 27.

A.   Uh-huh.

Q.   Can you identify that document for the record?

A.   Yes.  Yes.  It's Rules, Regulations, and Disciplinary Process.  It names me as the current Sheriff of Hamilton County.  Yes.

Q.   Okay.  And is there anything in that document anywhere in there that specifically says that employees aren't supposed to record interactions with other employees?

A.   I need to go through it, so. . .

Q.   All right.  Do we need to go off the record; do you want to --

A.   Yeah.  Because I'm going to have to read through this whole thing if you're asking me what's in it.

MR. SIMON:  I mean, do you want me to point it out where it is?

MR. BRUNS:  Why don't -- I'll do it at -- if she wants to do it at a lunch break.  She's identified the document.

MR. SIMON:  Okay.

MR. BRUNS:  I'll come back to it.

MR. SIMON:  Okay.

MR. BRUNS:  All right.

Q.   And then Sheriff --

A.   Okay.

MR. WIEST:  I mean, if Counsel knows where it's at --

MR. BRUNS:  Sheriff, if you want to speed this process up, I'm okay with that.

MR. SIMON:  Section 1.25.

THE WITNESS:  Okay.  I found it.

Q.   Okay.  And that policy says, An employee may not record another employee in the workplace, including off duty details and while working remotely, without the consent of all parties present, unless the recording occurs during the

course of an official investigation approved by the Sheriff and/or the Chief Deputy.  This is inclusive of video recording and audio recording.  Did I read that correctly?

A.    Yes.

Q.    All right.

A.    Uh-huh.

Q.    And you and/or the chief deputy can give a waiver from this rule, correct?

A.    We could.

Q.    Okay.  So you and/or the chief deputy could record someone underneath you and not tell them because you've given yourself a waiver from the rule; is that fair?

A.    No.  No, we could not.  No.  That's not accurate.

Q.    Okay.

A.    We're bound by this policy as well.  And if we were going to record someone, we would need to set the recorder on the table, explain to the employee that they would be -- that they're being recorded so that, again, just as this states, everyone understands.

Q.    All right.  You had mentioned that in your career this was a somewhat frequent thing in the

Page 105

Sheriff's Department, that employees would do that. Had you ever had occasion where someone told you something and it turned out they weren't being truthful to you because somebody else had a recording proving that what they told you wasn't true; do you get what I'm saying?

A.   I think I do.  And not to my memory.

Q.   You don't recall any?

A.   State it again.

Q.   Sure.  Do you recall any situation where someone in the Sheriff's Department told you something --

A.   Uh-huh.

Q.   -- and it turns out that what they told you had actually been recorded by another employee and based on the recording what that person told you wasn't true, they had actually said the opposite in the recording?

A.   You know, as you ask that, I think -- yes. I think that there was a -- back when I was the major of the jail, I'm pretty sure that was a situation that occurred.

Q.   Sure.  Do you recall a situation where you were upset at Jason Davis for something that you believed he was saying inaccurately because another

employee you told -- another employee told you that he did not tell Jason Davis X and then Jason Davis was able to prove that yes, that employee actually had said it because Jason Davis had a recording of that other employee; do you recall anything like that?

A. Yeah. I wasn't upset at Jason Davis. I do recall the incident. It was regarding the weight, height, and fitness policy for the Hamilton County Sheriff's Office.

Q. Right.

A. And as I understand, it was -- it actually linked back to a Deputy Pritchard -- I think I have his last name correct -- who was the person that it originated with.

Q. Right.

A. It was not Jason Davis.

Q. Right.

A. So. . .

Q. But I guess my question to you is, do you recall that because Jason Davis had a recording, you were able to conclude that he had been truthful all along about what he was saying?

A. I never heard the recording. I was told there was one.

Q. Okay.

A. But I never listened to it. No.

Q. But is your recollection of that whole incident that Jason Davis had been truthful the whole -- through the whole process?

A. I didn't doubt that he was truthful, which is why I didn't have to listen to the recording.

Q. Okay. Thank you. During the course of your career as sheriff are you aware of anyone who has been disciplined for a violation of the no recording policy? I'm going to call it the no recording policy.

A. During my tenure as sheriff I'm not --

Q. Yes.

A. -- I don't recall that anyone was.

Q. All right. And are you aware of anyone ever having been disciplined by the Sheriff's Department as a result of a violation of that policy?

A. Not while I was tenured and not while it was in policy that you can't do it.

Q. Who would have knowledge of that?

A. Of someone being disciplined for a recording?

Q. Sure. And the consequences.

A.   Well, ultimately I would think I would. It would be something that was disciplinary, so it would come through the chain of command.

And, again, I'm going to, you know, remind you that I don't have an explicit memory of everything that comes across my desk regarding years of, you know, memos and so forth.

Q.   Okay.  In terms of any discipline for a violation of that policy, what would you expect the discipline would be for someone with no disciplinary history, first-time offender?

A.   Oh, it would be severe.  Yes, it would.

Q.   What's your basis for saying that?

A.   My basis for saying that is because we have witnessed -- I have and many others have witnessed the chaos that it -- that it begins and starts within the ranks.  You know, in a -- in any department or really any large organization you're always battling, you know, gossip and rumors and things that people -- you know, it destroys other people's lives, particularly when deputies, you know, record each other and then could possibly share that on Facebook.  And I do know that there were a number of disagreements among the staff.  And when I say disagreements, I mean like hurt feelings,

things like that.

And perhaps I'll just say it like this, it is extremely detrimental to morale of your organization. That's really the crux of it as I talk about it. It's extremely detrimental to the morale of your organization.

Q. Okay. And as you sit here today you don't recall ever disciplining anyone for such a violation?

A. I don't know that a violation occurred, except for the one that I became aware of with Jason Davis.

Q. My question was you don't recall ever disciplining anyone for a violation?

A. No, I don't. I don't.

Q. All right. In terms of any discipline, what's your understanding of what the collective bargaining agreement requires in terms of any progressive discipline or anything like that?

A. Yeah. And that's outlined. Progressive discipline is a Level 1, Level 2, Level 3, and Level 4. And Level 4 being the most severe in the simplest ways to describe it. Level 4 being the most severe and that will restrict you from promotions, special assignments, road patrol

academies, things like that. And Level 4 is certainly suspensions from work without pay. That's also encapsulated with Level 4. People can be demoted because they've reached a Level 4 discipline.

Q. Okay. But go back to my question, a violation of the no recording policy, an officer who has no prior history of discipline, what limits your ability to discipline under the collective bargaining agreement; would you have to start with a Level 1 discipline?

A. No. Discipline -- discipline at -- you know, choosing what level of discipline of a particular employee may be at -- you know, administration also has to take into account the severity of the action. As I stated, the -- you know, the -- you know, the fallout from whatever it is they did, how serious it is, what they did, what it can do to your organization, the way that it can seriously affect morale, or really even someone's personal decision to take their own life, and I think that because of that it's a very, very serious violation.

Q. Okay. So to you it would be a Level 4?

A. Yes, sir, it would.

Q.    Okay.  In terms of officers in the Hamilton County Sheriff's Department who are members of the union, they have a right to grieve a decision like that?

A.    Oh, they would.

Q.    Okay.  And ultimately who would have the last say on that?

A.    Well, I'm certain it would go to arbitration and so an arbitrator would really have the last say.

Q.    Okay.  Thank you.  In your experience has an arbitrator ever reduced the level of punishment that you imposed -- the level of discipline that you imposed?

A.    That I imposed?

Q.    Yeah.  Do you recall?

A.    Not to my knowledge.

Q.    All right.  But they can?

A.    Yeah.  They certainly have the authority to do that.

Q.    Okay.  Go to Interrogatory No. 9, page 17.  Yeah, back on Exhibit 24.  Sorry.

A.    Okay.  Sure.

        MR. BRUNS:  Oh, and just for housekeeping, let's do one more exhibit

Page 112

here.

(Plaintiffs' Deposition Exhibit No.

26 was marked for identification.)

Q.   I'm handing you what's been marked as Exhibit 26.  What is that?

A.   So this is a social media policy signed by Jim Neil.  And it says it's -- the effective date -- it went into effect February 4, 2014.

Q.   Okay.  That doesn't have anything to do with recording or not recording, that's just strictly about social media?

A.   Correct.

Q.   All right.  Thank you.  Go to Exhibit 24, page 17.

A.   Yes.

Q.   Interrogatory No. 9.  It says, Please state all reasons why you tried to get Jason Davis to regulate or attempt to regulate the online speech of Jennifer Davis.  And your answer to that was, I did not try to regulate anyone's speech.  I said she can do whatever she wants.  Did I read that correctly?

A.   That's right.

Q.   All right.  And putting aside the precise words about trying to regulate anyone's speech, did

you in any way suggest to Jason Davis that he should talk to his wife about her online social media activity?

A. We had a very far-reaching conversation, as I recall. And I do believe there were times in that conversation where his wife was referenced. And as I recall, referencing his wife to assess how happy he was on the job, you know, if he was satisfied with working for the Sheriff's Office, if he was happy there.

Q. I don't understand your answer. Ask his wife to assess --

MR. SIMON: I'm sorry, Mr. Bruns. I think she was still answering.

MR. BRUNS: Oh, I apologize. I didn't mean to cut you off.

A. So in that way, you know, if my memory serves me correctly, you know, I did state she can do whatever she wants. Now, that may not be the exact wording. But obviously she can -- you know, anybody's wife can do whatever they want. They're not an employee of the Hamilton County Sheriff's Office.

I do believe that his wife came up in the conversation regarding speech just because I said

are you happy -- I mean, are you happy here, does your wife support your employment -- I mean, because, you know, we run across guys that, you know, their wives are -- they don't want them working there because of third shift or lots of different reasons and, you know, they're never home and things like that. So I was assessing -- yeah. And in that conversation I'm certain I did say your wife has the ability to do whatever she likes.

Q. Okay. Maybe you misunderstood my question. I'm asking you specifically --

A. Yes.

Q. -- did you say anything along the lines of you need to talk to your wife or you need to have your wife tone down or not communicate on social media in the way she's been?

A. I have no recollection. I have no recollection of that because I don't recall. I don't recall.

Q. And there's no reason you would have said anything like that; is that fair?

A. Again, I don't recall. So I can't even speak to any reason I would have said or did not say that, so I don't recall.

Q. Okay. Let's go back to our conversation

that we had before.  What reason as Sheriff of the Hamilton County Sheriff's Department -- what reason would you ever have to tell a deputy tell your wife to stop posting on social media?

A.  First of all, again, I don't -- you know, I'm not going to make something up out of the air. I'm answering questions on a factual basis of what I said or didn't say, what my memory is of what I said or didn't say.  I cannot, you know, pick some hypothetical out of the air and say this is why or what.

Q.  Again, with the caveat that she's not posting anything confidential, learned in secrecy from the Hamilton County Sheriff's Department, you would have no reason to ever tell a deputy to be concerned about what their wife is posting on social media, fair?

MR. SIMON:  Object to the form of the question.  Asked and answered.

A.  You're asking me to hypothesize and I can't.  I simply can't.  I can't say what could be, what should be, what -- you know, in a hypothetical situation.  That's not something that I can -- that I can truthfully answer.

Q.  As you sit here today you cannot think of

a single situation, excluding the disclosure of confidential or secret information from the Hamilton County Sheriff's Department -- excluding that, you can't think of a single situation where you would tell a deputy you need to be concerned about what your wife is posting on social media, fair?

MR. SIMON: Objection to the form.

Asked and answered.

A. There may be a situation where I could say that. But at this point in time I'm not going to make something up. I mean, there may be a situation. But what that situation is, who it involves, when it would happen -- I mean, you know, you're asking me to state my opinion on a complete hypothetical, and I honestly cannot do that.

Q. All right. Go to Interrogatory No. 10 on page 18.

A. Yes.

Q. It says, With respect to Jason Davis's Facebook post about the football game, please state all reasons why you punished him for that post. Answer, Jason Davis was not punished for any post about a football game, true?

A. To my recollection, yes, that's true.

Q. And that's because nothing he said or did

about that football game merited him being punished; is that fair?

A.   So I didn't even understand what he was talking about about the football game.  I didn't have any idea.  I couldn't even understand why a football game would be an issue, what football game, where, when.  I mean, honestly that just hit me out of the blue.  I have no idea.

I recall him saying that obviously in the meeting being very adamant about it.  But I was completely surprised and unaware.  I didn't even know what he was talking about.

MR. BRUNS:  Read my question back.

THE COURT REPORTER:  Sure.

"And that's because nothing he said or did about that football game merited him being punished; is that fair?"

MR. SIMON:  Object to the form of the question.  You can show her the post.

MR. BRUNS:  I can ask the question as well and I did.

Q.   Sheriff, could you answer my question?

A.   Okay.  So. . .

Q.   As far as you're aware -- I'm only asking about your knowledge, right?

A. Okay. Right.

Q. You swore to tell the truth, fair?

A. Yes. Correct.

Q. And you're only to give me answers based on your personal knowledge, fair?

A. Correct.

Q. Okay. Based on your personal knowledge are you aware of anything Jason Davis said or did about that football game that merited punishment?

A. I didn't even know there was a football game, sir. So the answer to that would be not to my knowledge.

Q. Thank you. And in terms of the football game, is it your understanding that it was a charity event to raise money for families of fallen officers --

MR. SIMON: Objection to form.

Q. -- if you know?

MR. SIMON: Lack of foundation.

You can answer.

A. I had no knowledge of the football game. No knowledge surrounding it. I learned after the fact -- long after the fact of it being brought up in this meeting of what the football game was even about.

Page 119

Q.   And do you now have an understanding of --

A.   No, I don't.  I still don't.

Q.   Okay.  Could you go to page 23 of --

A.   Sure.

Q.   -- that document, Exhibit 24.  And do you see -- Document Request No. 3 says, Produce all documents that constitute evidence, tend to evidence, support, refute, tend to refute, refer to, or relate in any way to the claims made in the complaint or your answer or defenses raised thereto. And then the response was, See file entitled McGuffey Interrogatories and Request to Produce. Did I read that correctly?

A.   Yes.

Q.   All right.  And I'll represent to you that Exhibits 26 and 27 were not provided as a response to that, okay?  They were just provided to us just now --

A.   Oh, okay.

Q.   -- all right?

A.   All right.

Q.   Do you know if Exhibits 26 or 27 -- if either of those exhibits are documents that evidence or support any defense of the defendants in this case; do you know?

Page 120

MR. SIMON: Objection to form. That calls for a legal conclusion. She's not a lawyer.

Go ahead and answer.

A. Yeah, I really would have no idea. No, I do not know.

Q. All right. Thank you. Could you go to page 26 --

A. Yes.

Q. -- or actually 25 is the question.

A. Sure.

Q. It says, With the exception of communications with counsel covered by the attorney-client privilege, produce a copy of any text message, email, or other document that in any way reflects or relates to either of the Plaintiffs, the October 10, 2023, interaction between Plaintiff Jason Davis and Defendants McGuffey and Gramke, Jason Davis's RENU transfer in 2023, and/or Jason Davis's promotion to corporal in 2023. Did I read that accurately?

A. Yes.

Q. All right. And then in response you say, I do not have any text messages, emails, or other document that reflect or relate to either of the

Plaintiffs, the October 10, 2023, interaction between Plaintiff Jason Davis and Defendants McGuffey and Gramke, Jason Davis's RENU transfer in 2023, and/or Jason Davis's promotion to corporal in 2023. Did I read your answer correctly?

A. That's correct.

Q. All right. And what I noticed in the other answers to the other document requests, it generally says no document exists or no document was located, all right?

A. Uh-huh.

Q. And my question to you is, as I read your answer to Document Request No. 11 you personally don't possess any document responsive to that request; is that a fair characterization?

A. That would be correct, yes.

Q. All right. What did you do to have the proper person within the Hamilton County Sheriff's Department search in order to answer Document Request No. 11; what, if anything, did you do -- because you can answer for your own communications.

What did you have -- what did you do to have someone within Hamilton County Sheriff's Department search to see if any such documents exist, could be located?

A.    Well, what I do know of Jessica Kober's job -- again, that she has been long tenured in collecting documents and answering, you know, legal discovery things like this -- is that she -- and this is my knowledge, she can in emails -- you know, you can search by typing up particular words.

Then any emails that connect throughout the department would be -- you know, would be collected as far as text messages -- I mean, I did not work with Jessica personally on collecting these documents.  If I'm asked to produce, if I have a document, I would produce it.  If I don't, then I state just what I apparently stated here, which is I don't have anything like that.

Q.   All right.  So you didn't talk to Jessica about what she should do in order to locate documents responsive to Document Request No. 11; is that fair?

A.   Right.  No.  Yeah.

Q.   Okay.

A.   I would have no reason to do that.

Q.   And you didn't talk to anyone within the department about what they needed to do to attempt to locate documents responsive to Document Request No. 11; is that true?

A.    To my knowledge I -- that's my memory.

Q.    All right.  And then your response was specific.  In other answers it says no document was -- no documents were located, right?  Here it's I do not have.  You made it very specific.

Did you take any steps to ensure the accuracy of that statement, that you personally do not have any text messages, emails, or other document that reflect or relate to any of the categories that are listed?

A.    So I'm just -- if I may just go back to the actual question --

Q.    Sure.  Please do.

A.    -- on page 25.  With the exception of communications with counsel covered by the attorney-client privilege, produce a copy of any text message, email, or other document that in any way reflects or relates to either the Plaintiffs, the October 10, 2023, interaction between the Plaintiff Jason Davis and Defendants McGuffey and Gramke, Jason Davis' RENU transfer, or Jason Davis' promotion to corporal.

So it's asking me the question of -- it's asking me to produce that and --

Q.    Anything related --

A.    -- I didn't have anything to produce.

Q.    And my question was, what did you do to make that determination?

A.    Well, I would have checked my text messages of which there are none that refer to Jason Davis.  I know absolutely that I did not write any emails regarding Jason Davis.  Any document regarding Jason Davis that I read or had possession of is the -- after the fact with the exit interview, the -- and the complaint as I recall.

Q.    Okay.  Did you run a search on your email?

A.    No, I did not.  I don't know how to do that quite frankly.

Q.    Did you ask someone to do it for you?

A.    Jessica Kober would be doing the searches for the email.

Q.    Do you know -- well, number one, you told me you didn't talk to her about it.  So you didn't ask her to run the search appropriate to elicit documents responsive to Document Request No. 11; you did not ask her to do that on your email, fair?

A.    I don't manage Jessica Kober's day-to-day activity.  I'm not her direct supervisor.  We have an organization that's 900 strong.  My job is to communicate through the chain of command, through

the in-house attorney, Pete Stackpole, as to the collection of any inquiry --

MR. SIMON: Let me stop there. You mentioned Mr. Stackpole. I don't want you to disclose any attorney-client communication.

THE WITNESS: Thank you.

MR. SIMON: And I'd point out, Counselor, that is specifically excluded in No. 11. And you've repeatedly asked her if she talked to --

MR. BRUNS: Jessica.

MR. SIMON: She's identified Jessica, but then you've said have you talked to anybody --

MR. BRUNS: Again, I make -- for the record, so I'm clear, I'm not asking about conversations with counsel ever in any of my questions.

MR. SIMON: I understand. But you've repeatedly asked her, well, have you talked to anybody.

MR. BRUNS: Well, that wasn't even my question.

BY MR. BRUNS:

Q. My question was, did you have a discussion -- did you instruct Jessica to search your email for documents responsive to Document Request No. 11?

A. I personally did not, no.

Q. Okay. And so you don't know if she did that?

A. I can answer that question with a no, I do not know.

Q. All right. And in terms of any other document that might reflect or relate to the categories in Document Request No. 11, what efforts did you make to search for such documents?

A. As I said, I checked my text messages and, you know, that -- I didn't -- I know I didn't have any emails because I didn't -- I know I didn't. I didn't -- I would remember writing an email and having sent it off to someone had I done that, so -- but text messages referencing, et cetera, I don't have any.

MR. BRUNS: All right. This is just copies of the complaint.

(Plaintiffs' Deposition Exhibit No. 25 was marked for identification.)

Q. Sheriff, I'm going to hand you what's now

been marked as Exhibit 25 -- Plaintiffs' Exhibit 25.

A.   Uh-huh.

Q.   Take a moment and look in that and is that a copy of the complaint you reviewed?

A.   It appears to be.

Q.   All right.  And I'm going to go through this complaint with you, because I want to know your personal knowledge, all right?

A.   Uh-huh.

Q.   And so in paragraph No. 1 I'm not talking about any sort of conclusions.  I'm talking about a factual statement, for instance, where it says his wife, referring to Jason Davis -- his wife, Jennifer Davis, Jennifer, made public posts to social media critical of certain policies of Sheriff Charmaine McGuffey and liked certain social media posts made by Caroline Adams that were pro-law enforcement, but critical of certain policies of Sheriff McGuffey. Do you see where I read that in paragraph 1?

A.   I do.

Q.   Okay.  I'm talking about statements like that.  Do you have any personal knowledge that any of those factual statements in paragraph 1 are false?  And I'm not asking about things you say, well, I don't know one way or the other.  I'm saying

that you have personal knowledge that they're false.

A.    I don't have any personal knowledge --

Q.    Okay.

A.    -- that they're -- that they're false.

Q.    All right.  Go to paragraph 2.

A.    Okay.

Q.    It says, Jason then had a meeting with Gramke and McGuffey in October 2023 to address this retaliation.  Now, I'm going to assume that, again, retaliation is a conclusion.  You would disagree that there was any retaliation, fair?

A.    I would say that's fair.

Q.    Okay.  In terms of any factual statements in there, are you -- do you have any personal knowledge that any of those factual statements are false?

A.    Okay.  So you're asking me to review?

Q.    Paragraph 2.

A.    Paragraph 2.  Okay.  So give me a moment, please.

Q.    Sure.  Please take a moment.

        MR. SIMON:  You might give her a chance to review paragraph 1 as well.

A.    Yeah, I did not realize that paragraph 1 extended, by the way, to page two.  I just thought

it was completed there on page one.

Q.   All right.  Take your time.

A.   Okay.  I've read two.  I have not completed one.  Can we just address two and then I'm happy --

Q.   Sure.

A.   -- to go back to one?

Q.   Go ahead and address two.

A.   Okay.  So I've read it.

Q.   And is there any statement in paragraph two that you say I have personal knowledge that's false?

A.   Oh.  It's absolutely false that I specifically told Jason he needed to end his 20-year-plus marriage.  That's completely false.

Q.   Okay.  Anything else?

A.   And I did not tell Jason that the actions were solely based on some protected speech activities, you know, in specific, you know, mostly directed to his wife's media post.  I referenced them, I'm sure.  But I certainly did not tell Jason that because of his wife's -- which is what I gleaned from this, because of his wife's social media posts, I told him to specifically end his marriage.

Q.   Okay.

A.   I absolutely did not say that.

Q.   All right.  Did you say anything that would have implied that you -- he needed to consider cutting ties with his wife, dissociating himself from his wife; did you say anything like that or imply that?

MR. SIMON:  Object to the form of the question.  Vague and ambiguous.

You can try to answer.

A.   I absolutely did not intend to imply that he end his marriage, no.  I absolutely did not.

Q.   Or cut ties with his wife?

A.   Or cut ties with his wife.

Q.   All right.

A.   Correct.

Q.   If you could go to --

MR. SIMON:  Are we going back to paragraph one, Tom?

Q.   Oh, yeah.

A.   Yeah.  I didn't realize that there was a second page on that.

Q.   Sure.

A.   So give me a moment, please.

Q.   Yeah.  Take a moment.

A. Okay. What's the question about No. 1 then?

Q. Sure. I understand, you know, the conclusion of retaliation, you disagree with that, all right, but is there any factually false statement in paragraph two that you say I have personal knowledge and I know that is not a true statement as a factual matter?

A. So it is factual that I took no retaliatory measures against Jason because of a post that he would have made regarding the Remember the Fallen. It is a fact that I did not deny a promotion to him in retaliation for that post or anything surrounding that post.

And, in fact, I -- the -- I take issue with the -- it's not stated here, but the assumption that we were trying to create an early expiration date for the promotion list that he was currently on. So I take issue with that as well.

Q. You're saying factually that's not a true statement?

A. It's not a true statement.

Q. Okay. And just so we're clear, is it your testimony that at no time did you ever discuss with anyone in the Hamilton County Sheriff's Department

any sort of early termination of the promotion list that Jason Davis was on for the corporal position?

A. The current promotion list stood. The time frame that the current promotion list had been granted could not be changed and, in fact, should not be changed. What happened subsequent to this, to my knowledge, that I have knowledge of, is that we determined as an administration that we would negotiate with the union to reduce that list expiration date to one year is my knowledge, maybe a year and some months, but I believe it was like one year.

And the purpose of that had absolutely nothing to do with Jason Davis. His list was not considered a part of that. It wasn't a part of that negotiation. We negotiated that for reasons that our administration felt were important for the betterment of the organization.

Q. So at no point did you ever talk to anyone in the Hamilton County Sheriff's Department or the union -- anyone about shortening the lifespan for lack of a better word of the promotion list for corporal that Jason Davis was on?

MR. SIMON: Objection to the form of the question. I think it's vague and

ambiguous.

You can try to answer.

A.   I don't recall having any conversation about shortening a promotion list for Jason Davis.

Q.   Or a list that he was on?

A.   Or any -- or a list that he -- that I knew he was currently on, which was the promotion list for corporal.

Q.   Could you go to paragraph 10.

A.   Uh-huh.

Q.   Is there any statement in paragraph 10 that you say factually that's false?

A.   Oh, not page 10.  I'm sorry.

Q.   No.  Paragraph 10.

A.   Sorry.

Q.   I apologize if I said page 10.

A.   No, no, you didn't.  I just misunderstood. There's nothing in paragraph 10 that I would say is false.

Q.   Okay.

A.   So, yeah, to my knowledge, yes, these are things that are true.

Q.   All right.  Same question for paragraph 11.  I'm going to ask you the same question about the paragraphs we're going to go through.  So --

Page 134

A. Sure.

Q. -- if you have personal knowledge that something is false, that's what I want you to tell me.

A. Of course.

Q. Because that means you could be a witness to testify about it.

A. Yes. Yes. Okay. So I don't have any personal knowledge of No. 11.

Q. All right. How about No. 12?

A. Factual?

Q. Yes.

A. Yes. Yes.

Q. All right. I'm only asking is there anything that you would say is not a true statement, that's factually false. So there isn't anything that you can say I don't see anything that I would say is false.

A. Okay.

Q. All right. How about 13?

A. I don't see anything that is factually false.

Q. All right. How about paragraph 14?

A. I don't have any knowledge of it to say whether it's factual or not, so. . .

Q.   Okay.  Same for 15?

A.   I don't have any knowledge whether that's factual or not.

Q.   All right.  Paragraph 16, same question?

A.   So let me just qualify this answer, because I wouldn't know Caroline Adams if I bumped into her on the street, so -- but that is the name that has -- that I do know has been associated with criticism of me.  This direct criticism here that's quoted, I have no knowledge of that.

Q.   And you don't know -- you don't have any personal knowledge to say that it's not true, she doesn't go by Chaz the Anti-Sheriff or Itsa Krakken; as far as you know that's accurate, you don't know one way or the other?

A.   I don't.

Q.   Okay.  And that's what I'm looking for --

A.   Yeah.

Q.   -- if you can say nope, that's false, I know it's false, here's what's false --

A.   Right.

Q.   -- about it.  That's what I'm looking for.

A.   Okay.

Q.   Paragraph 17, same question, is there anything in here that you would say is absolutely

false and I know that because I have personal knowledge about it?

A.    So there's a number of false things in this paragraph.

Q.    Let's take them one by one.

A.    Sure.

Q.    What's the first false thing?

A.    So the first false thing is I object to her or whoever wrote this, the statement of irresponsibly.  I object to that statement.  It's false.

Q.    Okay.

A.    The next is --

Q.    Well, let's take them one by one.

A.    Okay.

Q.    Yeah, I'll move on.  But I have some questions since you say it's false, all right?

A.    Yes.

Q.    All right.  Do you agree that you left a loaded firearm in your car in 2021?

A.    I did.

Q.    All right.  And your firearm was stolen along with your county vehicle, correct?

A.    Correct.

Q.    All right.  And your firearm was left in

your glove compartment locked; is that true?

A.   Correct.

Q.   All right.  And it was in your driveway at home when it was stolen; is that true?

A.   That's correct.

Q.   All right.  So what do you -- what's your disagreement in terms of irresponsibly leaving your loaded firearm in your car; where do you say it was -- it's false, it was not irresponsible of me?

A.   First of all, there are policies that do allow people who carry firearms, particularly long guns and things like that, to have them locked in their vehicles, you know, stored in their vehicles in a locked way.  I was not irresponsible given the fact that it is my responsibility to make sure that no one, including children, would accidentally in some way get my firearm, put their hands on it.

So we -- I had had a call out just that evening.  I got home from my call out late.  My house -- we had -- we were moving literally.  It was like the second day of the move.  And my house was filled with family members and kids and people coming and going.  And I think even one or two of the moving people were still left doing a few things.  And I did not feel comfortable at all

bringing my firearm into that house. Of course things were set all about. My safe that I normally would, you know, put my firearm in is -- I'd have to find it, first of all. There's boxes and everything stacked all around.

So I determined that the best place to keep my firearm safe was to lock it inside my vehicle, and that is why I did that, because I just couldn't count on the fact that -- you know, I didn't want to walk into all that chaos and somehow set my firearm down or think I had put it up on something that the kids couldn't get to. It just was -- it just was not in the question. I could not bring it in the house.

Q. Well, let me ask you this. When you went to bed that night, were the movers still there?

A. The kids were still there.

Q. Okay. Were the movers still there?

A. No. They had left.

Q. Okay. And when you went to bed that night, you could have taken the time to locate your safe and put your loaded firearm in your safe; is that fair?

A. No. That's not fair at all.

Q. Why?

A. Because there was boxes and boxes of things piled around. Obviously I took my long guns -- my long guns, I took those and secured those at my nephew's house so there would literally be no weapons moved around in that house. So I emptied my gun safe that I have, which was the weapon I was wearing, and that got moved along with everything else. And I have no idea until I have some hours to go through and find it to make sure that I have it and it's secured and so forth.

So I was not going to sleep with my firearm under my pillow or strapped to my side. I was going to secure it in my car in the locked glove compartment as is allowed by policy.

Q. How big was your gun safe back then, the one that had the long guns?

A. Oh, the one for the long guns? I did not have those in a safe. That's why I took them to my nephew's house.

Q. Okay. Well, after this incident did you ever keep your loaded firearm locked in your glove compartment overnight?

A. No.

Q. You always made sure that it was put in a safe inside?

A. Well, because it's just myself and my wife, I typically don't have to lock it up. I'll put it on the bed stand next to me. That's the way I sleep.

Q. Okay. But you stopped leaving it in the locked glove compartment of your car after this incident; is that fair?

A. Well, I never did do that. That was a very unusual thing for me to do. I never stored my weapon in my car, in my vehicle ever. And I did it that night because, as I said, the circumstances were I felt that was the safest place for it and I knew that policy allowed it.

Q. So the one time in your life you did it, it was just bad luck, your car got stolen; is that your testimony?

A. Absolutely, sir.

Q. What was the next thing you said you disagreed with factually, because you have personal knowledge that it's not true?

A. So the reference to my spending time at a bar and -- not that, that was factual -- that I directed a statement you can suck my D at a Covington Police Officer. That is absolutely not factual. That is a lie.

Q.   Okay.  You never said anything like that -- those words?

MR. SIMON:  Let me just object to the line of questioning.  It's relevant -- not relevant.

You can go ahead and answer.

A.   I absolutely did not say it.

Q.   Okay.  Are you aware --

MR. SIMON:  Tom, can I just have a continuing objection if you're going to probe --

MR. BRUNS:  On relevance, you may, yes.

MR. SIMON:  -- on each of these incidents it sounds like you're going to ask her about in No. 17, yes.  Thank you.

Q.   Are you aware -- at any point did you become aware that it was alleged by the Covington Police Officer that you said words to that effect?

A.   Oh, I know it was alleged.  I understand it was alleged.  It doesn't make it true.  It didn't happen.

Q.   Okay.  So the officer was lying about you?

A.   Absolutely.  He lied about a number of things.

Page 142

Q. Okay. All right. Was there anything else in that paragraph that you say is factually false, not true?

A. So the reference to a September 20th incident in which I was alleged to have been drunk driving, that is a lie. Video supposedly I guess posted by this person -- and I don't know if it's -- if it's saying that the video posted is me alleged to have been drunk driving, but it's absolutely false.

Q. Okay. Do you know -- you're saying it's absolutely false I was not drunk driving; is that your testimony?

A. That's absolutely correct.

Q. But you're not disputing that body cam video of you was posted by Adams?

A. There was a body cam video that was posted because I got pulled over for speeding.

Q. All right. And you're not disputing that there were allegations -- you weren't charged in that incident, but people were saying you appeared drunk on the video?

A. That's absolutely ridiculous. I have to say it. It's absolutely false. It's a lie. There was never a dispute as to whether I was driving

drunk. That's -- it's a lie. It's an absolute lie.

Q. And no one alleged that?

A. No one alleged that.

Q. Okay. All right. What else, if anything?

A. So there's a reference here to some prior acts of dishonesty and my being on the Brady list. Those are false. And I guess we can take those.

Q. Sure. So first of all, a prior act of dishonesty.

A. Uh-huh.

Q. Is it your testimony that you never acted dishonestly in any way during your career with the Sheriff's Department?

A. That's 100 percent correct.

Q. Okay. And has anyone in the Sheriff's Department ever conducted any investigation where it was in fact determined that you had been dishonest?

A. It was never determined that I was dishonest. It was alleged.

Q. Well, I'm going to -- let's be specific. Was there ever a finding of you being dishonest -- a finding that was sustained?

A. No, there wasn't.

Q. Okay.

A. There was no hearing. There was no -- no

evidentiary, no fact-finding, no anything.

Q. Okay.

A. It was an allegation that was included among many allegations, and it is false.

Q. And no unit, agency, department of the Hamilton County Sheriff's Department, including Internal Affairs -- no one ever sustained a finding that you had been dishonest?

A. It was not sustained, because I was not given any due process. There was never any -- there was never any, you know, finding of that in any factual way. It was an assertion. It was a -- it was allegated. It was an allegation.

Q. And the allegation was based on interviews with a number of Hamilton County Sheriff employees who contradicted you and said that you were not being truthful, fair?

A. No, that's not fair. It was -- that allegation was made simply because the investigator that interviewed me made that assertion from an answer that I had regarding a conversation I had with a captain regarding -- hang on, I'll think of it -- oh, regarding a question I asked him. When I said he agreed, when I asked him is this okay, and he was recording me. He didn't state yes. He shook

Page 145

his head yes.  And that's what I testified to.  I said he shook his head yes.  He said yes.  But the investigator took issue with the fact that there was no yes from him on the recording.

Q.   Okay.  So as you recall it, the finding of dishonesty was never sustained by Internal Affairs and it was solely based on a dispute as to what you said to one other employee?

A.   Correct.

Q.   All right.  And then you said that it's also false that you were placed on the Brady list. You were never placed on the Brady list?

A.   My name appeared on the Brady list.  It was illegal.  It was unlawful.  And that was proven in my lawsuit subsequently.  There was no -- I met not one of the requirements.  There's a list of federal requirements to be on that Brady list, and not one of them applied to me.

Q.   Okay.  But it doesn't -- this allegation in paragraph 17 of the complaint doesn't say that you qualified for the Brady list, it just says there were posts about the fact that you were placed on the Brady list.  You, in fact, were placed on the Brady list for Hamilton County, correct?

A.   For political purposes, yes, I was.

Q.   Okay.  And then you say it was determined that you shouldn't have been put on the Brady list. Who made that determination?  Because when I hear that as a lawyer, I think a jury verdict or a judge.

Who made the determination that your inclusion on the Brady list for Hamilton County was improper?

A.   Joe Deters, the Prosecutor of Hamilton County.

Q.   Okay.  What did -- so he's not a judge or a jury, but what did he say that supports your testimony that you were improperly included on the Brady list?

A.   So I had filed suit.  There was a summary judgment by Judge Dlott -- in fact, a very significant one.  I believe it was 19 pages.  And Joe Deters, based on that finding, told my attorney that, one, they wanted to settle and, two, that I would be removed from the Brady list for lack of cause.

Q.   Okay.  So you said there was a determination.  Was it Judge Dlott's decision that determined it?

A.   Judge Dlott determined that there was -- that I had -- well, I won summary judgment on all

three counts, that I was targeted because I was a lesbian, that I -- that I -- I have to go back in my memory, but that I was similarly dismissed without just cause, and that I was falsely accused of the wrongdoing. It had to do with the substance of the internal investigation that was done.

Q. All right. And your testimony is that Judge Susan Dlott of the Southern District of Ohio made that determination in your favor as a matter of law, not that she said there's a question of fact about all that, she actually -- let me finish -- she actually determined it as a matter of law; is that your testimony?

MR. SIMON: I have multiple objections. First, we're asking a non-lawyer to interpret a decision by Judge Dlott many years ago. She's not qualified to do that.

And, Counselor, we are far afield from the allegations in your complaint and in your clients' claims. I would ask you just to move on.

MR. BRUNS: No. I want to know what her personal knowledge is. And if she has personal knowledge, I'm entitled to know.

Page 148

This is my opportunity.

MR. SIMON:  Her personal knowledge about what Judge Dlott said --

MR. BRUNS:  If that's what her basis is, then she's repeating hearsay.  I'm entitled to test what she actually has personal knowledge of.  I am.

A.  I can tell you that, again, I'm not an attorney.  I didn't go through the decision and parse every piece of it and understand all of the different legal jargon that's in there.

What I can tell you is I prevailed on three of the allegations that I had regarding my unjust being fired and so forth.  And after that the -- I can tell you the prosecutor's office approached us to settle.  That's what I can tell you factually.

Q.  Is there any other false statement of fact in paragraph 17?

A.  So we already broached the alleged drunk driving.  I want to make very, very sure that we all know that that is a lie in 17.

Q.  My question is, again --

A.  And I'm going through it.  I want to make sure that I have been very, very clear that the alleged drunk driving is a lie.  The acts of

dishonesty are a lie. The my being placed on the Brady list is based on a lie. Posts critical of jail safety where inmates regularly popped the locks on the cells -- inmates were popping locks on the cells, that's a fact. Other assorted criticisms, I don't -- I don't know what that entails.

Q. All right. Let's move on then. Paragraph 18.

A. Okay.

Q. Is there any factually false statement there?

A. Yes.

Q. What?

A. First of all, we did not -- myself and Chief Gramke -- did not engage with meetings of members of the Hamilton County Sheriff's Office in any way, shape, or form because of posts or criticism, particularly that were apparently posted by this Adams person. That's number one. Do you want to talk about that?

Q. Yeah. No -- just so we're clear --

A. Uh-huh.

Q. -- no such meeting ever occurred where either you or Chief Gramke in your presence or at your direction told any deputy, any Hamilton County

employee that -- not to associate in any way with Caroline Adams?

A. Well, that doesn't address what I just said. I want it known that we did not go out to each district, which we did do -- we went out to each district and we addressed the briefing, which is where deputies are, you know, coming on to shift, going off shift, et cetera, and we did that to talk about lots of things regarding the Sheriff's Office and how we were going to proceed on policy and procedure. We were answering questions regarding vests and beards, things like that, that deputies were asking.

It certainly was in no way, not even any way we went out there because of these posts and criticisms. That was not the reason that we addressed deputies at the briefings.

And then to be clear about the rest of the paragraph, I did not tell the deputies that they or their spouses were to not associate with this person or there would be consequences. I absolutely -- and I understand from rumor that this was somehow audiotaped. I absolutely did not say that.

Q. And you didn't say it or imply it that they shouldn't interact with her on social media

or -- you didn't say anything like that?

A. Well, you're asking me say or imply, so I did not say that.

Q. Okay. And you didn't imply that they shouldn't interact with her on social media or there would be consequences?

A. I don't know what -- the way they took what I said. What I'm telling you is I did not say that.

Q. Okay. Did you mention Caroline Adams in any of those meetings?

A. I believe I mentioned her as a troll. I don't believe -- I referred to her as a troll in my mind. I don't know that I actually said her name. I may have.

Q. Okay. Why would you have brought her up in one of those meetings?

A. Because I was talking about the fact that we are here to improve morale, you know. And we want deputies to get along with each other. And we want deputies to have a certain cohesion about the way they work together.

And we understand with the stress and strife of COVID and the change in leadership, which was pretty close to after I had gotten elected,

that -- you know, that there are negative things out there, that people do post negative things about the department, about people in the department. And I encouraged those officers not to pay attention to that. I encouraged them to look forward, to do their best.

And I certainly told them that I have absolutely no interest in what this person is posting personally, other than the fact that it is detrimental to morale and I'm asking them to consider that when they are interacting with each other, because I want our department to become the best department in the state of Ohio. That's what I said.

Q. Sure. But what -- you talked about them interacting with each other. Did you bring up them interacting with Caroline Adams?

A. No. No.

Q. Okay.

A. I did not.

Q. I just wanted to make sure. All right. Go to paragraph 19.

MR. SIMON: And on that note, I think we're a little late for a lunch break.

MR. BRUNS: All right. That's fine.

MR. SIMON: Thank you.

THE VIDEOGRAPHER: We're off the record. The time is 12:57.

(A lunch recess was taken.)

THE VIDEOGRAPHER: We are back on the record. This is Media 4 of today's deposition. The time is 2:07.

BY MR. BRUNS:

Q. Sheriff, we're back on the record. And when we took a break, we had been talking about the complaint. I do have a follow-up about that. I won't continue to go through the complaint, though.

Let me ask you this. You said you read the complaint when you first received it. Were you caught off guard or surprised by the lawsuit?

A. I was actually, yes.

Q. Okay. Something else we talked about before about policies and procedures. Let me ask you this. You agree that Jason Davis was covered by the collective bargaining agreement for the enforcement unit at the time of your meeting on October 10, 2023?

A. I do.

Q. All right. And do you know whether he was on duty during that meeting with you?

A.    I really would have no idea, because I don't -- I wouldn't know his schedule.

Q.    All right.  If he were to testify he was not on duty, you don't have any reason to dispute that?

A.    I wouldn't know if he was on duty or not.

Q.    All right.  What are general infraction guides?

A.    On our road patrol I think you're referring to the -- what they call GIG cards; is that right?

Q.    Okay.  Yes.

A.    Okay.  So they are things that supervisors use to, you know, enhance their memory and also coach employees.

Q.    Okay.  Are there any sort of disciplinary guidelines that are part of the collective bargaining agreement?

A.    There are lots of disciplinary guidelines in the collective bargaining agreement.

Q.    Okay.  All right.  Are they merely guidelines or are they mandatory?

A.    Well, you must follow them or you will lose in arbitration or the case could get thrown out.  I mean, there's time frames.

Page 155

Q. All right. Thank you. I had asked you earlier today during the questioning that -- about being trustworthy, being able to keep secrets, being responsible, and being a good team player.

A. Uh-huh.

Q. We were talking about RENU. But that -- those are important attributes for any Hamilton County Sheriff's Department employee, fair?

A. Yes.

Q. All right. And you would agree that it's a good employment practice if -- that the lack of any of those qualities on the job should be documented in an officer's annual employment evaluation?

A. That's our policy.

Q. All right. And likewise, if someone was complimented for any of those qualities or those qualities were essential to their performance as part of a complex law enforcement operation, you wouldn't be surprised that there would be some recognition of that that ended up in the officer's personnel file?

A. Correct.

MR. BRUNS: All right. Do you have Exhibit 11?

THE COURT REPORTER:  Here, I've got it.

MR. BRUNS:  We have it now.

MR. SIMON:  Oh, good.

THE COURT REPORTER:  Right here.

MR. BRUNS:  I guess we solved that.

MR. SIMON:  Nice.

MR. BRUNS:  Thank you.

THE COURT REPORTER:  You're welcome.

Q.   Sheriff, I'm going to hand you what was previously marked as Plaintiffs' Exhibit 11 --

A.   Uh-huh.

Q.   -- and represent to you that this document was produced in discovery as part of Jason Davis's employment file.  All right.  And I want to turn your attention to the third to last page of that document.

A.   Okay.  The one that's Operation Early Bird?

Q.   Yes.

A.   Okay.

Q.   It's a document addressed to you, Sheriff McGuffey.

A.   Uh-huh.

Q.   Take a moment to review that -- those last

Page 157

three pages, because I have some questions about it.

A.    Okay.

Q.    Just so you're familiar with it.

A.    Sure.

Q.    And just tell me when you're ready.

A.    Okay.  I'm ready.

Q.    Do you recognize this document as an interdepartmental correspondence directed to you?

A.    Yes.

Q.    All right.  And then you would have received this in the normal course of business?

A.    Yes.  Correct.

Q.    All right.  And it's dated November 18, 2021, from Captain Stapleton, right?

A.    Correct.

Q.    And what's your understanding of Captain Stapleton's reputation for honesty?

A.    I think Captain Stapleton is an excellent supervisor and employee.

Q.    All right.  And he's honest?

A.    Yes.  That's my knowledge.

Q.    All right.  And it says, Subject, Operation Early Bird.  Generally speaking, what was Operation Early Bird?

A.    Well, it appears to be a joint effort

where some individuals were targeted so that we could seize drugs, specifically fentanyl, firearms, et cetera.

Q. Okay. And it was a coordination between the Sheriff's Department, the FBI, the DEA, Cincinnati Police Department, and the United States Attorney's Office, right?

A. That's correct.

Q. All right. So that was a pretty complex high-level operation, right?

A. Yes.

Q. Okay. And you would agree with me that any time you're engaged in something like that, trust and secrecy are critical components for the folks who are involved in that?

A. Yes.

Q. And here the captain is writing to you to let you know how well the officers of the Hamilton County Sheriff's Department who were involved in this operation -- how well they performed and how critical they were to the success of the operation, fair?

A. Yes.

Q. Okay. And, in fact, he noticed that your marked units and detectives were a huge value added

to our element this morning. Please pass along our gratitude as appropriate.

A. Yes. Uh-huh.

Q. He also said, I will personally tell you that this operation would not have been possible or successful without the deputies that operated the forward command center at patrol headquarters, right?

A. Yes.

Q. Okay. And your understanding based on certainly that the third to the last page is that Jason Davis was one of the patrol officers who took part in this operation, correct?

A. His name appears, yes.

Q. All right.

A. Uh-huh.

Q. All right. And you're unaware of any information that he wasn't a part of the secrecy, trustworthiness, comradery that helped this become a successful operation, fair?

A. That's right.

Q. All right. And this operation is actually as sophisticated or even more sophisticated than what RENU does, fair?

A. It involves a lot of moving parts.

Q. All right. And if you go to the second page of that document --

A. Uh-huh.

Q. -- Captain Stapleton told you this was an extremely successful operation that involved many assets that your agency brought forward, including from patrol, right?

A. Yes.

Q. All right. And you don't have any information to contradict that, right?

A. No. No, I don't.

Q. Okay. And he said, It was a proud day to wear the Black and Gold, meaning to be a part of the Hamilton County Sheriff's Department, right?

A. Yes.

Q. All right. And then the folks who signed off on this in the chain of command included Chief Jay Gramke, correct?

A. Correct.

Q. And he -- do you recognize his handwriting on there, where it says -- his signature and it says amazing job by all and there's a date?

A. Yes.

Q. Okay.

A. Uh-huh.

Q.   And then you signed off on it as well, right?

A.   Yes, I did.

Q.   And you wrote, So very proud of all of the deputies who did such a great job.  This effort brings recognition to our office throughout the state.  And is that a truthful statement?

A.   Yes.  That's correct.

Q.   And did you mean that?

A.   Of course.

Q.   All right.  Do you have any personal knowledge that Jason Davis did anything less than this excellent work in any other similar operation that he was a part of?

MR. SIMON:  Objection to form.  Vague and ambiguous.

A.   Yeah, I --

MR. SIMON:  Try to answer.

Q.   If you don't know, you can say I don't know.

A.   I don't know.

Q.   All right.

A.   I don't know.

Q.   And it says on here a photocopy of this document has been placed in your personnel file.  So

everyone involved got a copy of this document in their personnel file, right?

A. Yes.

Q. And that included Jason Davis, correct?

A. Yes.

Q. You testified earlier that you recall that Chief Gramke called Jay -- called the officer -- some of the officers at the Anderson Township Office malcontents, right?

A. Correct.

Q. Okay. And do you recall that he used that word in the meeting against Officer Jason Davis; did he call Jason Davis a malcontent?

A. I have no memory of that.

Q. Okay. What does the word malcontent mean to you when it's used to label an officer of the Hamilton County Sheriff's Department?

A. As I said, it's a historic term that's been used in the Sheriff's Department for decades. It typically means someone who is very, very unhappy at work.

Q. Okay. Does it have any other connotation to you?

A. No.

Q. All right. Would you agree with me that a

malcontented officer is not a good officer?

A. No.

Q. So a malcontented officer can be very, very unhappy at work and still be a good officer?

A. I think an officer can still produce and be very, very unhappy at their job.

Q. Okay. That wasn't my question. My question was, is a malcontented officer a good officer?

A. I can't answer that question. First of all, it has no context as to who the officer is. There are many ways that officers are good officers and yet struggle with certain things about happiness and whether they like their job.

Q. Okay. What do you mean if you call someone a good officer; what does that mean to you?

A. Somebody that follows policy and procedure.

Q. Okay. What do you mean if you call someone a very good officer?

A. Somebody that follows policy and procedure.

Q. Okay. So you use them interchangeably, a good officer is also a very good officer?

A. Yeah.

Q. A very good officer doesn't mean any more to you, just merely that they follow policy and procedure?

A. Well, the nuances of the word. They're interchangeable for me. It's an officer who follows policy and procedure.

Q. Okay. Would you agree with me that if someone was a malcontented officer, that that's something that should come up in their yearly evaluation, particularly if -- if it was affecting their job performance?

MR. SIMON: Objection to the form. Lacks foundation. Calls for speculation.

A. And let me understand, are you saying the actual term --

Q. Yes.

A. -- malcontent?

Q. Yeah. If you -- if you or Chief Gramke labeled someone a malcontented officer --

A. Uh-huh.

Q. -- and you've told me what your understanding of that word is --

A. Uh-huh.

Q. -- if that actually was affecting that officer's work performance, then that's something

that should come up in their yearly evaluation, fair?

MR. SIMON:  Same objection.

A.  I would expect a supervisor to note that, yes.

Q.  Okay.  Do you have any personal knowledge that Jason Davis was ever a malcontented officer?

A.  I don't.

Q.  Sheriff, have you ever been convicted of a felony or a crime involving dishonesty?

A.  No, sir.

Q.  All right.  Generally speaking, what's your educational background?

A.  I have a bachelor's degree with the University of Cincinnati.

Q.  When did you obtain that?

A.  I obtained that in the early '80s, I believe.  I don't recall the exact date.

Q.  What was your major; what did you graduate with?

A.  Criminal justice.

Q.  Okay.  Do you have any higher education beyond that?

A.  No, sir.

Q.  What was your first job in law

enforcement?

A.    Hamilton County Sheriff's Office.

Q.    Okay.  What year did you first become employed?

A.    So I was hired on April 7, 1983.

Q.    All right.  And did you have to go through formal training as part of that?

A.    We had two weeks of training, yes.

Q.    Okay.  You did not go through the police academy?

A.    Not at that time, no.

Q.    All right.  So you had two weeks of training.  And that was for your entry level job in the department, fair?

A.    Yes.  Yes, sir.

Q.    And what was your first job?

A.    I was a jail service officer.

Q.    Okay.  And then at some point did you go through academy training -- police academy training to become a --

A.    Uh-huh.

Q.    -- sworn law enforcement officer?

A.    I did.  In 1982 -- or 1992.  I'm so sorry.

Q.    Okay.  And how did that come about?

A.    Well, we were allowed to request to go to

a peace officer academy that was run by the Sheriff's Office. And if the Sheriff approved your request, then you could enroll.

Q. How long did that training last?

A. At the time I believe that training was six months.

Q. Okay. Whether it was that period of time or in some other training that you've had -- have you had other training in addition to those two periods?

A. Oh, yes. I've attended other training.

Q. Sure. Whether it was that peace officer academy training or other training that you had --

A. Uh-huh.

Q. -- have you had training on clearly established rights -- constitutional rights?

A. No. I would not say I have.

Q. In other words, what the law would acknowledge as certain rights that are clearly established under the law, you've not had any training on that?

A. The only thing that I have had certification to teach would have been legal issues inside the jail, and that was very broad. We were just very much concerned about inmate rights.

Page 168

That's what we learned about.  You know, protection against cruel and unusual punishment.  That's the extent of it.

Q.    Okay.  Well, you do have some knowledge and understanding of what the Constitution requires of law enforcement, correct?

A.    Generally, I'd say.

Q.    Okay.  And requires of government employees in general, fair?

A.    In general.

Q.    All right.  In other words, for example, if you -- you're aware that if you violate someone's clearly established constitutional rights, that you could be personally held liable as a government employee?

MR. SIMON:  Objection --

A.    I --

MR. SIMON:  -- to the form of the question.  Calls for a legal conclusion.

A.    Yeah, I'm not an attorney.  I would not be able to speak to the nuances of what that means, no.

Q.    In your capacity as Sheriff of Hamilton County did you take an oath to support and defend the Constitution of the United States?

A.    It's in the oath, yes.

Q.   All right.  And when you took the oath, did you mean it?

A.   Of course I did.

Q.   All right.  And when you took the oath, did you promise to support and defend all of the Constitution or just parts of it?

A.   The oath does not stipulate parts of.  It says the Constitution, so yes.

Q.   Okay.  And so when you took that oath, did you understand it to be binding on every aspect of your performance and duties as Sheriff of Hamilton County?

A.   In whatever way it applies to me as a deputy, yes.

Q.   Well, and applies to you as the top decision maker, policy maker in the Hamilton County Sheriff's Department, right?

A.   I'm bound to -- as the elected Sheriff to -- yes, to swear to uphold the Constitution.

Q.   Including upholding the rights of employees of the Hamilton County Sheriff's Department and employees such as Jason Davis when he worked there?

A.   Well, that's not stipulated.  But, yes, I assume.

Q.    That's some of the rights you swore to uphold, that --

A.    Well, it's not in writing.  It says the Constitution, but yes.

Q.    Okay.  And that was your understanding when you took that oath?

A.    When I took the oath, it was the Constitution, my general knowledge of the Constitution, and I swore to that.

Q.    Okay.  Including upholding, not violating, the rights of government employees who you are responsible for in terms of their ultimate boss, fair?

MR. SIMON:  Objection.  Asked and answered.

A.    It doesn't say that.  It doesn't say that. So I'm not going to say that I have specific knowledge about what the entire -- entirety of the Constitution is, but to withhold the -- uphold the Constitution as I know it in the terms that -- in general terms, and that's what's in my mind.

Q.    Okay.  And as a government -- an agent of government you understand that the Constitution applied to you?

A.    I think it applies to everyone.  I'm not

Page 171

an attorney.  But I believe if you are a citizen of the United States, the Constitution applies.

Q.   All right.  And you were aware that in that -- at the time of that October 10, 2023, meeting and before that Jason Davis was a citizen of the United States; you knew that?

A.   I assumed that, yes.

Q.   All right.  And you knew that he was a government employee, correct?

A.   I knew he was an employee of the Hamilton County Sheriff's Office.

Q.   All right.  Were you aware on or before January 1, 2020, that all citizens have a First Amendment right to engage in free speech?

A.   Again, I have a very general knowledge of the Constitution.  If breaking it down in specifics is -- it's not my expertise, it's not what I was trained for, so I don't feel comfortable answering that question.

Q.   You didn't know that citizens of the United States had a right to engage in free speech under the First Amendment?

MR. SIMON:  Objection.

Argumentative.

A.   It's a generality that I know of.  But to

Page 172

say that I know specifics about that, no, I don't.

Q.   Okay.  Did you know that all citizens have a clearly established right under the First Amendment to engage in free speech by publicly criticizing elected officials?

MR. SIMON:  Objection.  Calls for a legal conclusion.

A.   Again, I know of generalities in the Constitution that address that.  Specifically I could not tell you what that says.

Q.   What are the generalities that you know?

A.   I know that the Constitution protects people's rights to a fair trial, to due process.  I know that the amendment applies -- the amendment of cruel and unusual punishment applies when someone is incarcerated.  You cannot, you know, abuse them.  I know those things.

Q.   Okay.  Well, in particular with respect to the First Amendment, what do you generally know?

A.   I just explained it.  You cannot use cruel and unusual punishment for anyone who is incarcerated, no matter what they may say to you or actually do in the environment.  Those are things I was trained in and I was trained specifically for incarceration.

Q. Okay. Were you aware -- and I'm going to keep asking these questions. You can tell me you don't know, okay?

A. Uh-huh.

Q. Were you aware on or before January 1, 2020, that all citizens have a clearly established right under the First Amendment to freely associate with others, including for purposes of criticizing government officials?

A. I have no --

MR. SIMON: Objection. Calls for a
legal conclusion.

A. -- no knowledge.

Q. All right. Were you aware on or before January 1, 2020, that all citizens have a clearly established right to not be retaliated against for engaging in protected speech and association activities?

MR. SIMON: Same objection.

A. No specific knowledge.

Q. Were you aware on or before January 1, 2020, that government employees have a clearly established right to not be retaliated against at work because of a family member's speech or associational activity?

MR. SIMON:  Same objection.

A.    Again, no clear understanding of that.

Q.    Well, what is your understanding of that, if any -- what understanding, if any, do you have?

A.    I don't.

Q.    Okay.  Were you aware on or before January 1, 2020, that government employees who are not on the clock have a clearly established right to criticize their employer regarding matters of public concern?

MR. SIMON:  Same objection.

A.    Again, I have no knowledge of that.

Q.    All right.  Were you aware on or before January 1, 2020, that government employees have a clearly established right to not be retaliated against for engaging in protected speech and association activities?

MR. SIMON:  Same objection.

A.    I have no clear knowledge of that.

Q.    All right.  Do you have any knowledge of that?

A.    Not in regards to the Constitution, sir.

Q.    All right.  Were you aware on or before January 1, 2020, that unlawful retaliation included withholding favorable assignments or withholding

Page 175

promotions if it's in retaliation for protected speech?

MR. SIMON: Same objection.

A. Again, I'm not an attorney. I don't intend to espouse an opinion on that because I don't know.

Q. All right. As Sheriff of Hamilton County have you ever made any false statement of fact to the media?

A. Not to my knowledge.

Q. All right. In your opinion as Sheriff in the interactions that law enforcement supervision at the Hamilton County Sheriff's Department has with employees under them --

A. Uh-huh.

Q. -- is it ever appropriate to lie to employees?

A. Again, our policy states that you will be truthful. And it's documented in many places that deputies -- anyone who is wearing this uniform and is taking the oath will be truthful.

Q. So the answer to my question is no, it's never appropriate for law enforcement supervision to lie to employees in their interactions with those employees?

A.    That sounds like the exact right answer.

Q.    Okay.  You would agree that you are an elected official who stands for election every four years, right?

A.    That's correct.

Q.    All right.  And that makes you a public figure, correct?

A.    Yes, it does.

Q.    All right.  And you talked about briefly -- or maybe not briefly, we talked about Caroline Adams and her criticisms of you.  And did you ever suggest directly, indirectly to any employee of the Hamilton County Sheriff's Department to monitor Caroline Adams' social media posts regarding you, regarding the Sheriff's Department, or for any reason?

A.    I told my staff that I wanted them to be mindful of social media in any way that I am physically threatened.  If someone threatens to shoot me, if someone threatens to harm me in that way, I would like to know about it immediately.  That's what I asked of them.

Q.    Okay.  Did you mention Caroline Adams by name when you had any such discussion with any of your staff?

A.  No.

Q.  Okay.  Or whether it was Caroline Adams, did you ever mention any of the names that Caroline Adams goes by on social media such as Itsa Krakken?

A.  I don't -- I don't recall that specifically how I -- I know that I asked my staff to monitor social media, period, if there was a specific threat to my safety.

Q.  Sure.  But you didn't tell them to monitor any specific person on social media or the name of anyone posting?

A.  Not that I am -- have a memory of, no.

Q.  Okay.  So you never told them to monitor Chaz the Anti-Sheriff posts?

A.  I didn't even know that existed, but no.

Q.  All right.  Or Signal 99?

A.  No.

Q.  All right.  Setting aside Caroline Adams' personal criticisms of you, are you -- do you have any personal knowledge that she is not supportive of law enforcement generally?

A.  I don't have any personal knowledge of her, period.

Q.  Okay.  And certainly you don't have any personal knowledge that she's not supportive of the

Hamilton County Sheriff's Department?

A.    I have no personal knowledge of her.

Q.    And I think you might have said this, but I want to make sure I understand.  When did you first become aware that this person named Caroline Adams or any of her handles was critical of you?

A.    I have no real memory of dates or times. As I stated, I don't even pay attention to that. And, in fact, I frequently tell people don't tell me.  They know what to tell me about.  That's why I stipulated that.  The only reason you need to tell me what's on social media is if there's a threat to my personal safety.

Q.    Okay.  Did you ever become aware of any posts from Caroline Adams or any -- under of the various names she posted under where she criticized you because of the incident where your loaded firearm was stolen and your vehicle was stolen?

A.    No.  I mean, no.

Q.    Okay.  Would you agree that that incident was -- caused public embarrassment for the Hamilton County Sheriff's Department?

A.    No, I would not.

Q.    Okay.  Would you agree that that incident created a threat to public safety?

A.    No, I would not.

Q.    Okay.  Why not?

A.    I was in my -- my absolute policy rights. I explained the situation as to why I secured my weapon.  And I was within my -- I was acting within my duties under the codes of what I was allowed to do policy and procedure-wise.  I was a victim of a crime.

Q.    Okay.  Sheriff, I'm going to hand you what's been marked as Exhibit 1 -- Plaintiffs' Exhibit 1.

A.    Uh-huh.

Q.    And I have some questions about that.

A.    Okay.

Q.    Take a moment to review it.

A.    All right.  Yes.  Okay.

Q.    For the record, this is a story by Channel 19 published June 20, 2021, regarding this incident where your car and the gun were stolen from your driveway, right -- is that correct?

A.    That's correct.

Q.    Okay.  And it says Sheriff McGuffey told Fox19, so you were interviewed as part of this story, correct?

MR. SIMON:  Note my objection to this

line of questioning. Can I have a continuing objection to relevance?

MR. BRUNS: Sure.

MR. SIMON: Thanks.

Q. You spoke -- you were interviewed by Fox19, correct?

A. I talked to multiple media interviews, yes.

Q. Okay. And then as a result of this interview, did you ever see the story?

A. No.

Q. You didn't -- you never followed up to see the coverage that came about it?

A. No. No, I didn't.

Q. Okay. And it says, Sheriff McGuffey told Fox19 that her car stolen from Columbia -- her Columbia Tusculum home was found near Kings Run Drive and Winnestee Avenue. Did I read that correctly?

A. You did, sir.

Q. All right. Is that a true statement?

A. That's what the police told me.

Q. Oh, no, but is -- did you tell Fox19 that?

A. They -- I said Kings Run Drive. I don't know anything about Winnestee Avenue. It's not in

my -- I remember saying Kings Run Drive because I know where that is, but the -- I may have said Winnestee Avenue, sure.

Q. All right. And then it says that the gun, however, was not found. Did you tell them that, that the gun wasn't found?

A. Correct. That's factual.

Q. That's factual. All right. And then it says, She says she responded to an incident involving a man barricading himself Friday night. When she got home, she parked her unmarked car in the driveway; is that a true statement?

A. Yes. That's correct.

Q. All right. And then it says, Sheriff McGuffey says, as is normal for her, she left her gun in a secured compartment in her locked car. Is that a true statement?

A. It's not accurate.

Q. Okay. Well, first of all, did you say that?

A. I don't recall saying that, no.

Q. Okay. If the article claims you said it, do you have a memory one way or the other whether you said it?

A. I said I don't recall saying it.

Q.   Okay.  It says in here that you left your gun in a secured compartment in your locked car and you -- that was the glove compartment; is that correct?

A.   Correct, sir.

Q.   Okay.  And is it your understanding that the thieves who stole your car were later on -- at some point they were able to remove that gun from your locked glove compartment?

A.   Obviously.

Q.   Okay.  All right.  There was a follow-up story by Channel 19 in 2023 when your gun was recovered by law enforcement; is that true?

A.   That's correct.

Q.   All right.  And it was recovered at a crime scene where the gun had been used to shoot someone during an armed robbery?

A.   No.  My knowledge is it was recovered from a traffic stop.

Q.   Okay.  And the gun ultimately was determined to have been used in an armed robbery, correct?

A.   That's correct.

Q.   And someone was shot with it, correct?

A.   Correct.  Well, that's what they report.

They have no -- the person refused to testify.

Q. All right. Exhibit 2. Sheriff, take a look at Exhibit -- Plaintiffs' Exhibit 2 --

A. Uh-huh.

Q. -- and review that for a moment, because I have some questions.

A. Sure.

MR. SIMON: Counselor, this is part of my continuing objection; is that understood?

MR. BRUNS: Sure.

MR. SIMON: Thanks.

A. Yes, I read it.

Q. Okay. Do you remember issuing a press release that this story is based on about the fact that your gun -- your stolen gun was found?

A. My information officer likely was the person who released this. She -- her responsibilities are to communicate with the press, so yes.

Q. Okay. And you would have approved any statement she issued on this?

A. Of course.

Q. All right. And the statement was that Hamilton County Sheriff announces her stolen gun was

Page 184

found, used in a robbery; that's accurate -- that actually happened, right?

A. Is that -- oh, this here at the top --

Q. Yeah.

A. -- of the page? Yes. Uh-huh. Yes.

Q. All right. And you would agree with me that this story is an incident of public concern, right -- an issue of public concern?

MR. SIMON: Objection. Calls for a legal conclusion.

A. I think it's of interest to the public certainly.

Q. Sure. And the public could be concerned about a sheriff who had a loaded weapon in her unmarked car at home, it got stolen, and then that weapon got used in various crimes; the public could be concerned about this, fair?

A. I don't pretend to know what the public thinks. I know that this would be a story of interest.

Q. All right. Well, this wasn't the only news story, there were other news stories about it, right?

A. Of course.

Q. Okay. All right. And things like this

that hit the media and there's stories about, the public have a right to be concerned about things that they -- are addressed by the media, fair?

MR. SIMON: Objection to the form of the question. Vague and ambiguous.

You can answer.

A. It's a story of interest.

Q. Okay. Were you personally embarrassed by any of these incidents?

A. As I said, I followed policy and procedure. I did exactly what I should do. I used good judgment in keeping my weapon away from an environment where children might have access to it and -- so that is how I feel about it.

Q. Okay. That didn't answer my question. Were you embarrassed by this incident getting out and people knowing what happened?

MR. SIMON: Objection.

Argumentative.

A. I'm the one that reported it. So I don't have any feeling about it one way or another, sir.

Q. All right.

A. It's a story. It happened. I don't have one feeling about it one way or the other.

Q. Okay. Part of what was discovered and

part of your statement from the Sheriff's Office explained that spent shell casings were recovered at three different locations, not including the robbery, right?

A. That's what it documents here, yes.

Q. All right. So that would indicate that your gun was fired at least in four different locations, fair?

A. That's how it reads, yes.

Q. All right. Did you believe you would be criticized for these incidents once it became public and got out in the media; did you think you would get some public criticism about this?

A. I knew that I would get -- that there would be publicity surrounding it. I knew there would be articles written about it. And I knew people would ask me for an explanation.

Q. Okay. If you weren't the sheriff but were a patrol officer, would what occurred here have been a reason not to promote you?

A. Again, I can't answer to hypotheticals. I just can't.

Q. Okay.

A. I can't answer to hypotheticals.

Q. All right. Did you as sheriff discipline

yourself over this?

MR. SIMON: Objection.

Argumentative.

A. There was no discipline that occurred in this situation.

Q. Okay. We talked about it briefly before, but you were involved in an incident when you weren't sheriff, you were an officer with the Hamilton County Sheriff's Department in 2010, you were involved in an incident in Covington, Kentucky correct?

A. That's correct.

Q. All right. And as a result of that incident it led to a five-day suspension from the department; is that accurate?

A. That's correct.

MR. SIMON: It looks like my continuing objection is continuing.

MR. BRUNS: It is continuing.

THE WITNESS: Could you get me some water?

MR. SIMON: Sure.

(Plaintiffs' Deposition Exhibit No. 28 was marked for identification.)

Q. Sheriff, take a moment to look at that.

That's Plaintiffs' Exhibit 28.

A.    Uh-huh.

Q.    Take a moment to review it, because I have some questions about it for you.

A.    I'm almost ready.

Q.    Yeah, tell me when you're ready.

A.    Close.  Okay.

Q.    Exhibit 28 is the summary of the disciplinary proceedings against you as a result of the Covington -- the incident with the Covington Police, correct?

A.    Correct.  Yes, sir.

Q.    All right.  And it says that you were -- that you have been guilty of conduct unbecoming a deputy sheriff, correct?

A.    That's what it states, yes.

Q.    All right.  And it specifically states that you, referring to Officer McGuffey -- you proceeded to explain how this event unfolded. That's what it states, correct?

A.    Yes.

Q.    And it says, After leaving a Covington sports bar, your friend, who had a beer in her hand, was approached by a police officer indicating he was going to arrest her.  You were instructed to go to

Page 189

your car.  As you did so you yelled an obscenity at the officers accusing them of targeting gay bars. The officers warned you about your behavior and consequences if you did not stop.  After your car pulled away, and stopping at a stop sign, you rolled down -- you rolled your window down and became loud and accused the officers of harassment.  At this time, the officer ordered the car to stop.  Thinking he wanted to speak to you, you attempted to get out of the car, but the officers quickly grabbed your hands, placed you on the ground, and were handcuffed.  You were then cited with disorderly conduct, public intoxication, and because you attempted to get out of the car, menacing.  Did I read that accurately?

A.    Yes, you did.

Q.    All right.  And is that something that you told Internal Affairs?

A.    This was 2010.  I cannot tell you that this is exactly what I said.  I can't.  I simply can't.  I know what happened.  I was there.  And obviously I was interviewed here by Major Bruce Taylor.  I couldn't testify to exactly these are my exact words or how he wrote this up.  I can't -- I don't know.

Q.   Okay.  You had a right to a hearing over this, correct?

A.   I did, sir.  Yes.

Q.   Yes.

A.   Uh-huh.

Q.   And it also says, And if so -- if you wanted to present your side of the story --

A.   Uh-huh.

Q.   -- because people were saying things that weren't true, you had a right to go to a hearing on it --

A.   I did.

Q.   -- true?  All right.  And it says you waived your right to a hearing, true?

A.   I did.

Q.   All right.  And if you go to the fourth page of this document --

A.   Oh, sorry.

Q.   Yeah.  Fourth page of the document.

A.   Yes.

Q.   Fifth paragraph down where it says Officer McGuffey was interviewed.

A.   These aren't numbered.  So is this the page you're talking about?

Q.   Yes, I am.

A. Okay.

Q. If you just count down --

A. So --

Q. -- the paragraph that says Officer McGuffey was interviewed; do you see that?

A. That's how the paragraph starts? I'm on April 7. The next paragraph is Chief Russo, Chief Russo. Next paragraph. Chief Russo.

Q. Oh, I see.

A. And then it says, The information --

Q. The fourth page of the document. Let me show you.

A. You're calling each one of these --

Q. Yeah, sorry. This page.

A. Oh, that's my fifth page.

Q. Okay. Go to the fifth page. I apologize.

A. Okay.

Q. Go to the fifth page.

A. All right.

Q. Officer -- with a paragraph that says Officer McGuffey was interviewed.

A. Oh, here. Okay. Officer McGuffey was interviewed in reference to how she felt, yes.

Q. About her actions --

A. Yes.

Page 192

Q. -- at which time she accepted responsibility for her actions. Do you recall that you did, in fact, accept responsibility for your actions?

A. I did.

Q. All right. Indicating that during the incident she became angry that the officers were, quote, targeting the bar, closed quote, and although she denied directing any comments toward the Covington Police Officers, admitted she was loud and was cursing.

A. Correct.

Q. Okay. And you would agree with me that the standards of personal conduct and the general rules and regulations that are listed there, your conduct violated those?

A. That's what I signed off on.

Q. Okay. And that was my next question. You signed off on it. You could have taken further steps if you disagreed with this, but you accepted it?

A. I did disagree with it, but I accepted it.

Q. Well, you agreed that you violated those standards by cursing, right?

A. I did accept it. I disagree with it.

Q.   Okay.  If you disagreed with it, you had steps you could have taken to undue this; is that fair?

A.   I could not undo it.  It happened.  But I disagreed with it and I chose not to take it to a hearing.

Q.   Okay.  Why did you not take it to a hearing?

A.   Because it involved other women that were with me who were also lesbians and I did not wish to out them.

Q.   Okay.  Well, would you at a hearing have to bring other people; you could simply testify yourself, right?

A.   I could be asked at the hearing who was with you.  There were other police officers with me in that group.  I could be asked that.  And I did not want to out other women.

Q.   But you agreed that you were yelling at these officers and, in fact, also cursing, using swear words, true?

A.   If I can be specific, I did use curse words.  I can tell you exactly what they were.  And, yes, I yelled over at the officers because they were some 40 feet away from us the entire incident.  They

were never, never in any proximity to myself or the women they targeted.

Q.   Okay.  And you understand that one of the officers alleged that you used the words you can suck my --

A.   And it's a lie.

Q.   Okay.  Did you use that phrase or some version of that phrase at all that night?

A.   Absolutely not.

Q.   All right.

A.   Women don't talk like that.  I'm sorry. But we just don't.

Q.   All right.  So you've never used any version --

            MR. SIMON:  Objection.

A.   -- of that phrase; is that fair?

            MR. SIMON:  Counselor, that question goes far beyond the scope of any relevance to something that happened 15 years ago.

            MR. BRUNS:  I'm asking at any time. So it's not 15 years ago.

            MR. SIMON:  Well --

A.   I don't use that phrase.

Q.   All right.  Okay.  Thank you.  I'm going to hand you what's been marked as Plaintiffs'

Page 195

Exhibit 3. Take a moment to look at that. Tell me when you're ready.

A. Just give me one more second here. Okay. Yes.

Q. All right. This is a story from The Enquirer in 2019 that in part covers that 2010 incident, correct?

A. Yes, it does.

Q. All right.

A. Uh-huh.

Q. And this story resurfaced when you had announced you would run for sheriff, right?

A. Correct.

Q. So you would agree that this is an issue of public concern?

A. It's an issue of public interest, of course.

Q. Yeah. And The Enquirer was reporting on it because people were going to consider details about this and whether to vote for you or not, fair?

MR. SIMON: Objection. Calls for speculation.

A. People can read it and decide what they like.

Q. All right. There were social media posts

about this incident, including a follow-up to The Enquirer article; are you aware of that?

A. No, sir.

Q. Okay. Did anybody ever tell you that there were critical social media posts?

A. It was mentioned to stay off social media. That's all that -- that's all that I was advised to do. And I'm old. I never got on social media anyway.

Q. Sheriff, I'm handing you what's been marked as Plaintiffs' Exhibit 6. If you could take a moment to look at that.

A. Sure. Yes, I see it.

Q. Okay. And I will tell you this was produced as the Brady list for Hamilton County for 2019 -- May of 2019. Have you seen --

A. Uh-huh. I see it.

Q. -- this document before?

A. I see the date, yes.

Q. And it's not the entire list, but if you look at page 19 and page 23, which are copied as part of that exhibit --

A. Uh-huh.

Q. -- do you recognize your name being on there twice?

A.    Oh, it's on here twice?

Q.    Yeah.

A.    Hang on.  I see it on page 23.

Q.    And then look at page 19.

A.    Oh, there it is.  Okay.  Yeah, page 19 as well.

Q.    And you would agree that the Brady list contains the identity of particular law enforcement officers and certain derogatory information about that officer's background that must be disclosed to defense attorneys in cases where that law enforcement officer is potentially going to testify, correct?

A.    That's the purpose of the Brady list, yes.

Q.    All right.  And would you agree with me that if an officer is on the Brady list and has to testify against a criminal defendant, it makes it less likely the defendant will be convicted based on that particular officer's testimony?

A.    That's my general understanding of the Brady list.

Q.    All right.  And you would agree with me that landing on the Brady list raises questions about an officer's trustworthiness?

MR. SIMON:  Objection.  Calls for a

legal conclusion. Speculation.

A. That's the purpose of the Brady list.

Q. All right. And you would agree that it raises question about the officer's honesty?

A. That's the purpose of the Brady list.

Q. And you would agree that it raises questions about the officer not being a responsible officer, correct?

A. That's the purpose of the Brady list.

Q. All right. And if you go to page 23 where -- Entry No. 109, it says Charmaine McGuffey, No. 549. What is 549; is that your badge number?

A. Yes, sir.

Q. Okay. HCS is Hamilton County Sheriff, correct?

A. Yes, sir.

Q. And then 4/26/17, that's the date of the determination in your Internal Affairs Case No. 0617; is that correct?

A. That's when they placed me on the Brady list.

Q. Okay.

A. Yes. That -- no. I'm sorry. I was just thinking of the dates in my mind. Yes, that's correct.

Q. All right. And that specific entry has to do with dishonesty, correct?

A. That's what it states.

Q. All right. And that was the -- what was the -- from that Internal Affairs investigation, correct?

A. Correct.

Q. All right. Sheriff, I'm going to hand you what's been marked as Plaintiffs' Exhibit 5. If you can take a moment to take a look at that.

A. Sure.

Q. I don't have many questions about this.

A. Well, I want to read the entirety of it.

MR. BRUNS: Yeah, why don't we take a break. We've been going for a little bit.

THE VIDEOGRAPHER: Off the record, 3:11.

(A brief recess was taken.)

THE VIDEOGRAPHER: Back on the record. Media 5 of today's deposition. The time is 3:25.

BY MR. BRUNS:

Q. Sheriff, we're back on the record. And you had time to review Plaintiffs' Exhibit 5. Did you do so?

A.   Yes, sir, I did.

Q.   All right.  Just a couple of brief questions.  This was a Fox19 article in October of 2019, correct?

A.   Yes.

Q.   Okay.  And this was about who is on the Brady list in the Tri-State and what's the Brady list, right?

A.   Yes.

Q.   All right.  And it says, A more than 50-year-old Supreme Court ruling requires prosecutors to seek and disclose evidence to defense attorneys and the accused that is material to his or her guilt or punishment.  This includes evidence about their untruthfulness.

Is that a true statement, that that's what the Brady list is about?

A.   I have no idea.  I don't -- I mean, there's a lot of nuances to the Brady list.  This is somebody who is summing it up, it appears.  So I wouldn't be able to comment on the truthfulness of that or accuracy of that statement.

Q.   Do you believe that an officer -- their background or history for truthful or untruthfulness is material to evidence in a criminal trial against

the criminal defendants?

MR. SIMON: Objection. That definitely calls for a legal conclusion.

A. Again, I wouldn't be able to comment on that. That's like a -- that's a legality that attorneys deal with and work with and so forth.

Q. Okay. If Joe Deters gave a statement to the media that removed -- he removed you from the Brady list as a courtesy, was that a true statement?

A. It's not.

Q. Okay. Are you aware that Caroline Adams posted criticism of you on social media as a result of the fact that you were on the Brady list and had two entries on it?

A. I -- I don't know.

Q. Do you --

A. I mean, I really don't know.

Q. Do you recall anyone telling you about that?

A. People told me lots of things about different posts. And as I told you, when people began to tell me things, I oftentimes would say don't tell me, I'm not interested in it, I don't care.

Q. Why did you call Caroline Adams a troll;

what did you mean by that?

A. So what I meant by that is when people were coming up to me after I was elected is when I became actually aware that there were things on social media, because people were telling me things. And I know that the common verbiage for someone like that is a troll. That's what the -- whatever the phrase we use now. And so, yeah, I referred to a troll.

Q. Okay. You would agree that having an employee end up on the Brady list would be publicly embarrassing to the Hamilton County Sheriff's Department?

A. I can't comment on that. I have -- I have no idea what's embarrassing to the Sheriff's Department. I mean. . .

Q. Let me ask you this. If -- as Sheriff of the Hamilton County Sheriff's Department, you're the sheriff --

A. Uh-huh.

Q. -- if one of your deputies ended up on the Brady list because of dishonesty --

A. Uh-huh.

Q. -- would you think that would reflect well on the Hamilton County Sheriff's Department?

Page 203

A.    I think there would be questions regarding that deputy, that deputy's tenure, what that deputy did.  I think most people, in my opinion, understand that one deputy doesn't represent an entire sheriff's office.

Q.    Would you agree that having an elected sheriff appear on the Brady list is an issue of public concern?

A.    Again, I can't comment because that's a hypothetical.  It didn't happen.

Q.    Well, you did appear on the Brady list, correct?

A.    Not when I was sheriff.

Q.    Okay.  So at no point -- when did you get elected -- first get elected?

A.    2020.

Q.    Okay.  So at no point from 2020 to the present have you ever been on the Brady list?

A.    No, sir.

Q.    Okay.  In June of 2023 you were pulled over by a Clermont County Sheriff's Deputy going 72 in a 55; is that correct?

MR. SIMON:  Can I have --

MR. BRUNS:  Yes.

MR. SIMON:  -- a continuing objection

continuing to the line of questioning?

MR. BRUNS: Go ahead.

A. Yes, I was.

Q. All right. Does going 17 miles per hour over the legal limit involve an issue of public safety?

A. I think there are speed limits for a reason. And that is the deputy's job. And those are the jobs of law enforcement to enforce those speed limits.

Q. All right. My question was, does going 17 miles per hour over the legal limit involve an issue of public safety?

A. Again, it's a broad question. I'm telling you that I -- it's a violation, I know that. And, yes, I violated the speed limit law.

Q. And that involved an issue of public safety, fair?

A. Again, you're asking me to -- to make broad statements that I cannot factually make. I can tell you that it's a law. I can tell you I violated that law clearly. And how the law was written, why it was written, and all of those things, I'm -- I can't comment on.

Q. All right. When that happened, that issue

was covered by local media, correct?

A.   It was.

Q.   All right.  I'm handing you what's been marked as Plaintiffs' Exhibit 4.

A.   Uh-huh.

Q.   Take a moment to read that and I have some questions for you.

A.   Uh-huh.  Okay.

Q.   All right.  Do you recall that The Enquirer reported on that incident when it happened?

A.   I hadn't read this.  But, yes, it appears to be The Enquirer reported on it.

Q.   Okay.  Well, the article actually quotes you, so --

A.   Oh, yes.  I was interviewed for it.

Q.   All right.  And the article reflects that you were traveling east on Ohio 32 toward Batavia Road just before 1:00 p.m.  You were pulled over doing 72 in a 55.  Is that all accurate?

A.   That's accurate.

Q.   Okay.  And then it says, McGuffey handed him her license and said she was the Sheriff of Hamilton County.  Is that accurate; did you do that?

A.   That's accurate.

Q.   All right.  And why did you tell him as

you were handing over your license for getting

pulled over for 72 in a 55 mile per hour zone -- why

did you tell him that you were the Sheriff of

Hamilton County?

A.   Because I was armed.  I was carrying a

firearm.

Q.   Okay.  You weren't telling him that in any

way, shape, or form to try and get out of the

ticket?

A.   No.  I was armed.

Q.   All right.  And then in the article it

says, quote, I'm not a superhero.  I'm a person just

like everyone else, closed quote, McGuffey said.  Do

you see that?

A.   I do see that.

Q.   Why did you say that to The Enquirer?

A.   Because it's true.  That's why.

Q.   Why did you bring up the context of I'm

not a superhero?

A.   I think that there are people who make

judgments about police officers in general.  And I

oftentimes like to remind people that police

officers are human just like everybody.

Q.   All right.  If this was perceived as an

issue of you breaking the law and then identifying

yourself as the sheriff in an effort to get out of the speeding ticket, you would agree that would be an issue of public concern?

A. Again, a hypothetical I cannot answer.

Q. All right. So you don't think the public should be concerned if their sheriff goes 72 in a 55 and then tries to get out of the ticket by telling the officer she happens to be the sheriff?

MR. SIMON: Objection. Lack of foundation. Argumentative. Totally irrelevant.

You can try to answer.

A. It's what you're saying.

Q. I'm saying you're -- I'm asking you, if that's the perception, you would -- that you were trying to get out of that ticket by telling the officer as you handed him your license I'm the Hamilton County Sheriff, if that's the public perception of you, then you would agree that is an issue of public concern?

MR. SIMON: Same objection.

A. If you're making up a hypothetical, which you are, I can't comment on that.

Q. Okay. So you have no opinion as to whether it would be appropriate for a sheriff to do

what I just said?

MR. SIMON: Same objection.

A. Your hypothetical example I have no opinion on because it didn't happen.

Q. I didn't ask whether it happened. I just asked, you have no opinion; is that true?

MR. SIMON: Objection. Let's move on, Counselor.

Q. Is that true?

A. Can you repeat it again?

Q. Sure. You have no opinion whether it would be appropriate for an elected sheriff who got pulled over doing 55 -- or 72 miles per hour in a 55 mile per hour zone to then tell the officer, hey, I'm a sheriff in an effort to get out of the ticket --

MR. SIMON: Objection.

Q. -- you have no opinion whether that's appropriate or not appropriate?

A. Because it's not based in reality, no, I don't have an opinion.

Q. All right. Have you ever communicated to anyone at the Hamilton County Sheriff's Department that you dislike Caroline Adams' criticisms of you?

A. Not to my knowledge.

Q.   All right.  Let me ask you generally just about Jason Davis.  We talked about your interaction with him in his career.  Other than what we talked about earlier today --

A.   Uh-huh.

Q.   -- do you have any recollection of interactions with him?

A.   When I first became the major, he came down to my office.  We were just, you know, talking about union business, things like that.  I noticed he -- his attendance pin, some of the stars had fallen off of it or whatever.  It seemed to be -- it was like in broken repair.  So I mentioned it to him.  And he said that the prior administration wouldn't give him a new one.  And I said, well, let's make sure we get you a new one.  And that's what we did.

Q.   Okay.  Do you remember any other interactions?

A.   No.

Q.   All right.  Sheriff, I'm handing you what's marked as Plaintiffs' Exhibit 9.

A.   Uh-huh.

Q.   And I just have a couple of questions about this.

A.   Okay.  Okay.

Q.   All right.  I'll represent to you that this was produced in discovery with your responses. And it's something from the personnel file of Jason Davis's or in the County's responses.  And it reflects a promotion to the enforcement division in October of 2014.

And just generally speaking, that is a promotion, correct?

A.   Uh-huh.  Yes.

Q.   Okay.  And then if you turn to the second page of that document --

A.   Uh-huh.  Okay.

Q.   -- it talks about job duties --

A.   Yes.

Q.   -- and then also minimum acceptable characteristics, right?

A.   Yes.

Q.   And then under the column for characteristics, the second paragraph, it says, Ability to develop and maintain a working relationship with associates, superiors, and general public.  Did I read that correctly?

A.   Yes.  Uh-huh.

Q.   It also says in there to exercise sound

judgment. Did I read that accurately?

A. Yes.

Q. Okay. And then at the bottom it also talks about prepare and present testimony in court, right?

A. Yes.

Q. Okay. And you would agree with me that collectively these job responsibilities involve issues of comradery and teamwork, fair?

A. Correct. I would think, yeah.

Q. Trustworthiness and honesty, fair?

A. That's implied, yes.

Q. And if an officer is lacking in any of those issues -- in any of those areas, I should say, that should be documented in his yearly evaluation, correct?

A. That would be my assumption, yes.

Q. Okay. And if you go to the next page --

A. Uh-huh.

Q. And was that your experience, that -- coming up through the Sheriff's Department, that's the kind of stuff that got covered in yearly evaluations, if you were lacking in those areas?

A. I mean, we have evaluations for a reason. And that is to document your ability to do these and

meet the standard or you're not doing them, quite frankly.

Q. Right. And that includes things like comradery, team work, responsibility, trustworthiness, and honesty?

A. I don't know that we measure comradery, but yes.

Q. Okay. And then if you go to that next page --

A. Okay.

Q. -- Jason Davis was on a 12-month probationary period, right, with his promotion?

A. Yes.

Q. Okay. And the purpose of that probationary period is to determine if he actually has the qualities that we discussed, those ones that are required for successful completion of the job?

A. Yes.

Q. Okay. And if he doesn't have those qualities after that 12-month probationary period, he should not be a Hamilton County Sheriff's Deputy, right?

A. Well, then the -- you know, at the time the sheriff can decide what he'd like to do about that.

Q. Okay. But if they don't have those qualities, that's not someone you would want working for you; is that fair?

A. Well, that's a very vague question. I'm just saying that if they don't pass their probationary period, there are options that the sheriff can take to retrain them up, extend their probation, send them back to their previous classification, so. . .

Q. All right. Ultimately Jason Davis was -- as we discussed, he was promoted to patrol, right -- that's the law enforcement --

A. Yes.

Q. -- promotion --

A. Here. It documents it, right. Yes.

Q. All right. And not everyone who comes from corrections and applies to patrol gets that promotion, correct?

A. Right. That's correct.

Q. All right. As a patrol officer Jason Davis did not act as any sort of official spokesperson for the Hamilton County Sheriff's Office?

A. Not to my knowledge.

Q. All right. And his assigned duties did

Page 214

not include acting as a spokesperson, correct?

A. Not to my knowledge.

Q. All right. And as a patrol officer he was not a direct report to you, correct?

A. Right. That's correct.

Q. And he didn't have a policy-making role for Hamilton County?

A. No. That's correct.

Q. Okay. Approximately how many employees does the Hamilton County Sheriff's Office employ?

A. Approximately 900.

Q. Okay. How has that changed over the last three years?

A. Well, we've had some -- I guess I'll call it, you know, fluctuating numbers.

Q. Sure. What's the range?

A. The -- oh, I wouldn't be able to tell you number-wise, but I can tell you that we've improved our recruiting, we've worked on those numbers. Law enforcement across the nation is having trouble recruiting, and we have -- we've really focused on that and worked on that, and our recruiting levels are very high.

Q. Sheriff, I'm going to hand you what's been marked as Plaintiffs' Exhibit 10.

A.    Okay.

Q.    And take a moment to look at that.

A.    Okay.  Okay.  It's an evaluation, yes.

Q.    All right.  And I had a couple of questions for you about that.

A.    Okay.

Q.    Did you play any role in his evaluations during -- at any time he was employed by the Hamilton County Sheriff's Department -- Jason Davis?

A.    When he was a jail service officer, I would have signed off on the final evaluations.

Q.    Okay.

A.    I mean, as they moved up the chain.

Q.    Okay.  So after 2014 you would have been uninvolved?  We just documented that's when he went to patrol.

A.    Oh, yeah.  Once he went to patrol, yeah, I would have no -- yeah.

Q.    All right.

A.    No.

Q.    And in the evaluations there's a scale or a score that's given.

A.    Uh-huh.

Q.    Is there any sort of rating scale in writing that documents the numerical score and what

Page 216

it means?

A. On this particular style of evaluation, I don't think -- you know what, there is a booklet that is a companion -- that was a companion to this when we very first moved to this type of evaluation that outlined, you know, each of these categories and what that meant.

Q. Sure. And then did the booklet also cover the range in terms of the scoring?

A. Oh, you mean shooting -- shooting range?

Q. No.

A. Oh.

Q. The range of scores in the sense of --

A. Oh, the -- yes, it did.

Q. Okay.

A. Uh-huh. Sure.

Q. And to your understanding what was that range of scores that someone could get? If you don't remember --

A. Yeah, I couldn't -- you know, I couldn't tell you what the highest score was.

Q. All right. Do you recall what -- generally speaking, what would be a good score versus a bad score?

A. In general I'd say -- you know, I've seen

scores as low as like nine, you know, ten.  I mean,

that's a super low score.  That's my memory.

Q.    Okay.

A.    So. . .

Q.    Beyond that -- who would know at the Hamilton County Sheriff's Department what those questions -- right, the -- what the categories entail, what the range of scores mean, why you would give a particular score versus another score; who would have that knowledge?

A.    Well, I would think the evaluators, the sergeant, the first-line supervisors for sure, and likely the lieutenants would need to have the knowledge of that.

Q.    All right.  We were not provided all of the rating periods --

A.    Okay.

Q.    -- for his tenure.  Do you have any idea why we didn't get them all?

A.    I would not know.

Q.    All right.  Are you personally aware of any time period when Jason Davis did not meet or exceed expectations for his job?

A.    I have no knowledge of that.

Q.    All right.  In Exhibit 10 --

Page 218

A.    Uh-huh.

Q.    -- okay, if you go to the eighth page in and at the top it should say Additional Comments.

A.    What does it begin with in the Comments; during this rating period?

Q.    During this rating period.

A.    Yes, I have it.

Q.    Okay.  You're there.  And it says, During this rating period, Enforcement Officer Davis received a divisional commendation for assisting coworkers during an incident with a subject with psychiatric issues and a gun.  Did I read that accurately?

A.    Correct.

Q.    What is a divisional commendation?

A.    So a divisional commendation is some -- well, we have two.  Squad commendation and divisional commendation.  So divisional commendation is a very high level commendation, because it means that for that entire division you have acted exceptionally.

Q.    Okay.  And here he got a divisional commendation.  It says, During this incident enforcement Officer Davis used great restraint and patience and was able to resolve the incident

peacefully.  And it was an incident involving someone with psychiatric issues and a gun, right?

A.  Uh-huh.  Yes.

Q.  Okay.  Do you know how many of those divisional commendations are awarded annually?

A.  Oh.  I wouldn't -- I wouldn't even be able to guess, because it fluctuates year to year.  I'm sorry.

Q.  Okay.  Do you know?

A.  No, I don't know.

Q.  All right.  Who might know that within the Hamilton County Sheriff's Department?

A.  Well, someone who researches and goes back through everyone's file to find out who got a divisional commendation.

Q.  Okay.  Who is the decision maker on divisional commendations?

A.  That is signed off by the sheriff ultimately.

Q.  Okay.  So the -- whoever the sheriff in 2019, that's when this one was --

A.  Uh-huh.

Q.  -- that's who signs off on it?

A.  Yes.  That's who ultimately signs off on it, yeah.

Q.   If Jay Gramke testified that there were approximately 15 per year over the entire department, do you have any reason to dispute that?

A.   Fifteen divisionals over --

Q.   No.

A.   -- the entire department?

Q.   Yeah.

A.   I would have -- I cannot verify that information.

Q.   Okay.  And then if you turn the page --

A.   Uh-huh.

Q.   -- from the page you were just at, the next page --

A.   Okay.  Yeah.  All right.  Got it. Additional Comments, right -- or no.  Wait a minute.

Q.   We were on Additional Comments.

A.   Yes.

Q.   Go to the next --

A.   Hold on.

Q.   -- page.

A.   That is an evaluation.

Q.   That's right.

A.   Okay.

Q.   And the date on that is 6/17/21; do you see that?

A.   I do see that.

Q.   All right.  And if you go down to the comments section --

A.   Uh-huh.

Q.   Well, first of all, his overall score is 17.

A.   Okay.

Q.   And would you agree with me that 17 is a pretty good score?

A.   I'd say it's -- you know, it's definitely not low.

Q.   Okay.  And in there, in the comments section, second sentence --

A.   Uh-huh.

Q.   -- Officer Davis is one of the more veteran officers on the squad and is often relied upon by his coworkers for guidance and assistance. Did I read that correctly?

A.   Yes.  Yes.

Q.   Who is responsible for that -- putting that in the comments?

A.   The sergeant here who graded this evaluation.  I can't read his name.  But that's a sergeant's signature.

Q.   Okay.

A.    I would assume.

Q.    And would you expect that's the person who knows Jason Davis best in terms of his work?

A.    His first-line supervisor, yes.

Q.    All right.  And then did you sign off on this?

A.    I did not.

Q.    Okay.  There is a line for a Chief Deputy and Sheriff on this form, and I don't see either signature.  Do you know why you didn't sign off on this one?

A.    I do.  So the Chief Deputy -- when we came on, he and I were in conversation regarding the flow of documents and paperwork and all the things that he signed and so forth.  And we decided to -- the Chief requested for me that he create a new model for that so that we were not bogged down with hundreds of these and not able to pay attention to all the other heavy lifting we did.

So what he explained to me is that he was going to put more of the responsibility on the division commanders for signing off on these evals.  Now, I'm not sure why he didn't sign it, if that was a part of his reorganization.  I assume that is or if it just somehow didn't get to him.  I don't know.

Q.   Okay.  Do you have any personal knowledge of any performance or job-related problems with respect to Jason Davis while he was a patrol officer with the Hamilton County Sheriff's Office?

A.   No, I do not.

Q.   Okay.  All right.  Sheriff, I'm handing you what's been marked as Exhibit 12 -- Plaintiffs' Exhibit 12.

A.   Uh-huh.

Q.   Do you recognize this as a personnel order issued by Jay Gramke?

A.   Yes.  Effective January 13, 2023.

Q.   All right.  And is this the promotional list for corporal that Jason Davis was on?

A.   It's a promotional list for corporal.  I -- it's the results of a corporal's test, it appears.

Q.   Sure.

A.   Yes.

Q.   And look at Rank No. 19.

A.   Oh.  Okay.  Jason Davis's name does appear.

Q.   Okay.  And does this list only come out when there are vacancies for corporal?

A.   Yes.  When we're anticipating vacancies,

we can give a test because, you know, all that stuff takes a long time, so yes.

Q. How long does this -- when this list was issued, it says effective date January 13, 2023.

A. Uh-huh.

Q. How long was this list effective for?

A. Two years is what I understand is our -- you know, our list -- our exam list.

Q. All right.

A. Promotion list, I meant to say.

Q. Was this list, in fact, kept for two years?

A. To my knowledge, yes.

Q. Okay. Do you personally -- do you have personal knowledge as to how many people off this list were promoted to corporal; in other words, who you recognize on this list?

A. Well, what I recognize on this list is -- are men and women who were already making corporals pay and working in assignments that were technically -- technically corporal assignments without carrying the actual rank.

Q. That wasn't my question. My question simply was, do you know who actually -- which of these folks were promoted to corporal?

A.    Many of them were by -- because we had a promotion ceremony.  And we did promote many of these people.  And as I said, the reason being they were already making the pay, et cetera.  We wanted them to have the chevrons, to have the rank to go with it.

Q.    And who do you see on this list who had already been promoted to corporal?

A.    So Caroline Kotlas I recall.  And, again, my memory -- I know I promoted a number of these people.  If not -- let's see.  When was this, '23.  So. . .

Q.    Let me ask you this way.

A.    I mean, I would say some of them I recognize, yeah.

Q.    Sure.  Let me ask you this way.  Do you recognize any names below 19; do you recognize any names below 19 -- so 20 down to 33, do you recognize any of those names who got promoted to corporal?

A.    I really -- I couldn't say.  I don't recall the actual events for any of these people.  So I'd have to look at a promotional list or -- you know, but I can't recall.

Q.    All right.  I'm going to hand you what's been marked as Exhibit 14 -- Plaintiffs' Exhibit 14.

A. Okay.

Q. Take a moment and look at that.

A. Uh-huh. Okay. Yes. Hang on. It appears to be Facebook remarks and so forth. And then this looks like a HCSO press conference Facebook, so -- okay.

Q. So my question to you is, have you ever seen this Facebook post that was done by Jason Davis on May 15 of 2022? I just handed it to you. Have you ever seen it before?

A. This one?

Q. Yes.

A. No, I have not seen this.

Q. All right. And the post reflects that Fox19 covered the charity football game that helped out families of first responders that Jason Davis organized, correct?

A. Okay. Yes. It appears, yeah.

Q. All right. And you would agree that media coverage around this game and participation of it was an issue of public concern, people were --

A. Again, I think --

MR. SIMON: Objection.

A. -- the public would be interested in it. Sure.

Page 227

Q. All right. And if Jason Davis contends or states that this post was made on his own time when he was off the clock, do you have any personal knowledge that that's not true?

A. I would have no idea.

Q. All right. And you would agree that this post is not an official Sheriff's Office account or post, correct?

A. Correct.

Q. All right. And if you look at the comments that were made on this post, one of the comments -- if you turn to the next page --

A. Uh-huh.

Q. -- it's a comment from Itsa Krakken; do you see that?

A. Hang on. Let me -- it's on the second page, you say?

Q. Yeah.

A. Oh. Yeah. Here it is.

Q. Okay.

A. Uh-huh.

Q. And part of that post says you guys all did an outstanding job, exclamation point, correct?

A. Yes. That's right.

Q. You would agree that that fundraiser

brought good will to the Hamilton County Sheriff's Department?

A. It appears so.

Q. In fact, the next comment was awesome event, great job to all involved, right?

A. Yeah. There's a lot of good comments about it.

Q. Okay. And then one of the comments was from someone named Paul Nabers, if you turn to the next page --

A. Okay.

Q. -- or Paul Naber. Do you know --

A. Yeah.

Q. -- Paul Naber?

A. I do.

Q. Okay. Who is Paul Naber?

A. He is now a lieutenant with our department.

Q. All right. And Paul Naber's comment was, Needs more advertising intradepartmental. Never knew about this game until now. Do you see that?

A. Yes.

Q. All right. And then do you see where lower down on that same page Jason Davis responded to Paul Naber?

Page 229

A.   I do, yes.

Q.   And the post was, Our department didn't support it.  No county items were used to advertise this game.  Flyers were taken down from briefing room.  Do you see that?

A.   I do see that.

Q.   Okay.  Do you have any personal knowledge that that isn't a true statement, what is posted there?

A.   I have no knowledge that that's factual at all.

Q.   Okay.  You don't know one way or the other?

A.   Right.

Q.   All right.  And then it says, Flyers were taken down from briefing rooms.  That's part of what you don't -- you don't have any knowledge whether that ever happened or didn't happen?

A.   No, I don't know.

Q.   All right.  If you had known that someone had taken down the flyers advertising that game from briefing rooms, would that -- would you have had a problem with that?

A.   Again, hypothetical, I have no idea where the flyers would have been posted in the briefing

room, if they were actually on the bulletin board, if they were taped to people's doors, if they were in the bathrooms.  I have no idea.

Q.   Okay.  I mean, do you have any problem with flyers being put up in the briefing room advertising intradepartmentally something like a Remember the Fallen charity football game?

A.   Well, what I can tell you is a very, very long time ago there was concern about managing bulletin boards in briefing rooms.  And I know -- and, again, I'm going back decades -- it was assigned to the sergeants to make sure that the bulletin boards were appropriate, to make sure that things were actually in line, and that sort of thing.  And that's really all I know about bulletin boards or the briefing room.

Q.   Once you found out about the charity football game and it was a fundraiser, why and who it was raising funds for, were you proud that Jason Davis had pulled that off?

A.   Well, I found out about the charity football game, but honestly I never understood it. I didn't -- I got bits and pieces of what it was mainly because Jay explained it to me, because I asked questions, what was it, when was it, why

Page 231

didn't we -- did we participate. I knew nothing about it. And then the answers I got were kind of, you know, sparse. So I still am not real clear except for what you tell me as to how that went.

Q. Okay. Well, if you look at the screenshot from Fox19 --

A. Uh-huh.

Q. -- it says, Charity Football Game Helping Out Families of First Responders. Let's assume that's true. If Jason Davis organized it, helped raise the funds for it, got the word out, pulled it off, right, the game happened and then got media coverage of it --

A. Uh-huh.

Q. -- wouldn't -- you as the Hamilton County Sheriff, would that make you proud that he did that?

A. I think it's a very good thing. I think it reflects -- I think it reflects well on our department. I'm proud of everything our deputies do that is in the positive.

Q. Okay. And in terms of the posts and particularly Jason Davis's post on his Facebook page in response to Paul Naber --

A. Uh-huh.

Q. -- you would agree that he wasn't airing

any sort of grievance about job -- his job conditions?

MR. SIMON:  Objection.  Vague and ambiguous.

You can answer.

A.    It appears what he is saying is is complaining about job conditions here, it appears.

Q.    Okay.  Sure.  So you don't like to speculate, so what are you saying that is about his job condition?

A.    Well, he is -- he states here our department didn't support it.

Q.    Okay.

A.    So. . .

Q.    And it's referring to a charity football game that he did on his own time?

A.    I assume.

Q.    Right.  So what job condition --

A.    Well, he then reflects that flyers were taken down from the briefing rooms.

Q.    Okay.

A.    So I -- those are -- that's a job condition that -- you're asking my opinion.  It sounds like he is very dissatisfied with the fact that at work we -- someone isn't -- isn't supporting

this -- this thing, this event that he's doing.

Q.   Okay.  But that wasn't a condition imposed by his employer, right?

A.   That he do that?

Q.   That any of that occur.

A.   Well, that he organized it.

MR. SIMON:  Objection.  Objection calls for a legal conclusion.  Vague and ambiguous.

A.   Yeah, we didn't --

MR. SIMON:  You can answer.

A.   We didn't tell him he had to organize it certainly.

Q.   Right.  And it wasn't a job condition that flyers be taken down, right?

MR. SIMON:  Objection.

Q.   Is that correct -- it wasn't a condition of his employment that any flyer he put up in a briefing room about a charity football game had to be taken down, right?

A.   Well, he -- he's complaining about it, so I don't know what you mean.  I mean, it's not -- we don't -- it's not in the policy and procedures that if there's a flyer up, we have to take it down from the briefing room, no.

Q. Right. That's not a condition of his job. And likewise, it's not a condition of his job that the department doesn't support charity functions that he engages in on his own time; that's not a condition of his job, right?

A. We are not -- yeah. We're not asking him to do that.

Q. All right. Is it fair to say that generally speaking Jason Davis's working relationships would have been with his immediate corporal and sergeant?

A. Yes. I'd say that's right.

Q. All right. And then other officers he encountered on shift?

A. Correct.

Q. Are you aware of anyone else Jason Davis had a working relationship with during his career at the Hamilton County Sheriff's Department as a patrol officer?

A. No, I'm not.

Q. Do you have any personal knowledge -- and I'm talking about this Facebook post by Jason Davis --

A. Uh-huh.

Q. -- do you have any personal knowledge that

his Facebook post meaningfully interfered with the performance of his duties at the Hamilton County Sheriff's Office?

MR. SIMON:  Objection.  Calls for a legal conclusion.

A.   I don't think it interfered with his duties.  It cast a -- it cast, you know, a negative light on the department in that.  When I read this, that's what I would think.

Q.   Do you know if anyone else drew that conclusion?

A.   I have no idea.

Q.   All right.  So you don't know how it would have been perceived departmentally?

A.   I don't.  Uh-uh.

Q.   Do you have any personal knowledge that Jason Davis's post -- his Facebook post undermined a legitimate goal or a mission of the Hamilton County Sheriff's Department?

MR. SIMON:  Objection.

A.   No, I don't have any knowledge of that.

Q.   All right.  Do you have any personal knowledge that Jason Davis's post caused any disruption in the operations of the Hamilton County Sheriff's Department?

A.    I have no knowledge of that.

Q.    All right.  Do you have any personal knowledge that Jason Davis's post created any disharmony amongst his fellow officers?

A.    I have no knowledge of that.

Q.    Do you have any personal knowledge that Jason Davis's post impaired the ability of his supervisors to discipline him?

A.    No knowledge of that.

Q.    All right.  Do you have any personal knowledge that Jason Davis's post impaired any working relationships within the Hamilton County Sheriff's Office?

A.    No knowledge of that.

Q.    All right.  And do you have any personal knowledge that Jason Davis's post impaired discipline and harmony?

A.    No knowledge of that.

Q.    Assuming Itsa Krakken is Caroline Adams and she posted on his Facebook page --

A.    Yes.

Q.    -- you're not saying that Jason Davis was associating with her because Itsa Krakken posted on his Facebook page, are you?

A.    I'm not saying anything about it, because

I didn't know about it until just now here looking at it.

Q. All right. And even knowing about it now, that doesn't mean he's somehow associated with her because she posted on his Facebook page?

A. Anybody, as I understand, can post on someone's Facebook page. So I think that stands to reason.

Q. All right. In fact, do you have any personal knowledge whether Jason Davis has ever communicated, interacted, associated with in any way Caroline Davis -- or Caroline Adams?

A. I have no knowledge of that.

Q. Take a moment to take a look at that.

A. Okay. Yes. All right.

Q. All right. And you -- at some point you had posted on the Hamilton County Sheriff's Office Facebook that the number one priority for the Sheriff's Office was COVID-19; is that -- do you recall that?

A. Yes. I believe that was -- we posted that after I actually had a press conference and said that.

Q. Okay. And the Facebook page was open to the public for comments --

A.    It was.

Q.    -- correct?

A.    Uh-huh.

Q.    All right.  Is that a yes?

A.    Yes.  Yes, it was.

Q.    Is it still open?

A.    No, it is not.

Q.    When was the decision -- when was it -- that changed, when?

A.    I made the decision to change that -- gosh, I'm going to say about two years ago, it might have been, somewhere in that ballpark.

Q.    And why; why did you make that decision?

A.    Because I think that there are lots of people out there who when they can hide behind, you know, the keyboard, they make lots of disparaging comments.  And sometimes they named deputies.  They make disparaging comments about them.  They'll -- you know, and it's very difficult for the people that work at our agency as police officers to work under that duress.  I think it creates -- I know it creates a great deal of angst.  And I think it affects morale.  So I stopped -- I stopped -- I stopped it.

Q.    Okay.  Assuming this is a screenshot of

Page 239

comments from Jennifer Patterson Davis about

COVID-19 being the number one priority of the

Sheriff's Office, are you aware of any other posts

by Jennifer Patterson Davis on the Hamilton County

Sheriff's Facebook page?

A.   I would have no knowledge.

Q.   Did you even know about these?

A.   No, I did not.

Q.   Okay.  Assuming Jennifer Patterson Davis

is my client, Jennifer Davis --

A.   Uh-huh.

Q.   -- and she's married and was married to

Jason Davis --

A.   Yes.

Q.   -- you would agree with me that the

comments that you see under that name --

A.   Uh-huh.

Q.   -- on this Exhibit 15 --

A.   Uh-huh.

Q.   -- she's entitled to voice those opinions?

A.   Yes.  I think anyone is entitled to their

opinion.

Q.   Okay.  And you would agree with me that

the priorities of the Hamilton County Sheriff's

Department are an issue of public concern?

Page 240

A. I think they are of interest to the public.

Q. All right. And certainly officer safety and the priority of officer safety in terms of gun deaths, suicide, exposure to COVID-19, that's all an issue for public concern, fair?

A. Oh. They're very high-ranking issues. Yes.

Q. All right. And certainly how the Sheriff's Department ranked them in terms of priority, that's a matter of public concern if the sheriff is prioritizing them appropriately or correctly or not in the public's opinion?

A. I think the public is interested, yes.

Q. All right. And one of the comments in here it says, In 2020, 304 officers died in the line of duty and 228 from suicide.

A. Uh-huh.

Q. That is not a higher health priority than the number of officers who died from COVID or a complication listed at 153. Did I read that right?

A. So hang on. Let me find that.

Q. Sure.

A. 2020, died in the line of duty, from suicide. That is not a higher health priority than

the number of officers who died from COVID or complications. Oh, and then there's a question mark. So that's not a statement. Okay. Listed at 153. Okay.

Q. Do you know if those stats are true, accurate; do you have any idea?

A. I would have no idea.

Q. Jennifer Davis, to your knowledge, was never an employee of the Hamilton County Sheriff's Department, correct?

A. Not that I know of.

Q. All right. And you would agree that nothing on Plaintiffs' Exhibit 15 involves directing any threats or calls for violence against the sheriff, correct?

A. Against me personally, no.

Q. All right. All right. Sheriff, I'm handing you what's been marked as Exhibit 17. Take a moment to review that. It's a two-page document.

A. Uh-huh. Okay.

Q. All right. When you're ready, I have just a couple of questions.

A. Sure.

Q. Have you ever seen this document or the original, any posts like this before?

A.   I reviewed it as an exhibit, I think. Isn't it an exhibit that's included in our. . .

Q.   All right.  But that was the first time you saw it?

A.   Yes.  Uh-huh.

Q.   All right.  And then it says, Apparently -- do you see where -- take a look at --

A.   Uh-huh.

Q.   -- the first paragraph.

A.   Yes.

Q.   It says, Apparently, there was a morale survey that went out through the Hamilton County Sheriff's Office and the results were so terribly horrific that Sheriff Chaz and her trusty Chief Deputy decided to tour the netherworlds that we all call the districts to see if they could try and get a handle on the awful morale issue plaguing the Hamilton County Sheriff's Office.  Did I read that correctly?

A.   Yeah.  That's correct.

Q.   Was there ever any sort of morale survey that went out through the Hamilton County Sheriff's Office?

A.   There was a survey.  And I believe it was Captain Tony Orue had put a survey out to kind of

get -- it was early, early on in our tenure -- to kind of get a temperature of where we were starting from with deputies' opinions, et cetera.

Q.   What was the form of the survey?

A.   I have no -- I didn't take it.  I didn't see it.  I just know that it went out.

Q.   Who sent it out or who prepared it?

A.   Well, I think, again, that it was administered by Captain Tony Orue, I think.

Q.   Okay.  And did you ever see the results of the survey?

A.   No, I did not.

Q.   All right.  Do you know if he got the results?

A.   I assume he did.

Q.   Okay.  The comment that is on this Facebook post is that the results -- I'm paraphrasing here -- were terrible, okay?

A.   Uh-huh.

Q.   Did you ever get any feedback that the results from the survey weren't good, they were bad?

A.   No.  In fact, what I was told by the Chief Deputy is it was just as we thought.  Under the past administration many things had deteriorated.  The deputies were very unhappy with the way things had

been run in the last -- what was that -- eight years, and that we had a good base to start from now.

Q.   Okay.  Who at the Hamilton County Sheriff's Department would have the results of this survey?

A.   I assume Captain Orue, who is now a major.

Q.   Okay.  If you go down in that post, third paragraph, In true Chaz fashion; do you see --

A.   Uh-huh.

Q.   -- where it says that?

A.   I do.

Q.   It says, She informed the peasants that they were forbidden from having any contact with Itsa Krakken.  Zero.  In addition, those or their significant others that had the poor judgment to like or comment on Itsa Krakken's posts would continue to be properly punished.  Do you see that?

A.   I do.

Q.   All right.  First of all, I think we covered this, but you never said anything in -- Chief Gramke never said anything like that at any of the meetings in any of the districts?

A.   I don't have any memory of that particular -- you know, what is said there being

said.  None.

Q.   So it never happened; you never said it?

A.   No.

Q.   All right.  And then it says, Allow me to quote a part of Sheriff Chaz's speech given at one of the districts.  Quote, Itsa Krakken is a fat troll who sits naked in the dark and makes derogatory comments.  I do not read these comments. I have people that read them for me.  I get tired of hearing about her comments, so I turned them all off and I don't care that I'm not allowed to do that. She can go ahead and sue me over it, closed quotes.

First of all, did I read that statement accurately?

A.   Yes, you did.

Q.   All right.  Did you say -- since it's a quote that allegedly is attributed to you in one of these meetings -- did you say -- ever say anything like that?

A.   I said exactly that.

Q.   Okay.  And you remember it?

A.   Oh, I do.

Q.   Okay.  Do you know if any -- these meetings that are out in the districts, were they mandatory meetings, like was there some -- any kind

Page 246

of notice that, hey, we want all the patrol officers present because the sheriff is coming?

A.   No.  We decided to go out to the districts.  So whenever you do that, you're really going to kind of get a hit or miss when you're going to get the guys on duty.  I don't want to make guys get up and come in for a briefing when they're off.

So, you know -- I mean, that's just a -- it's just the way it is, try to -- you know, we try to get as many people there, letting them know we're coming so that they in -- you know, in case they are going to skip a briefing, that that might be one they want to attend.  But we don't certainly go around and ask who is there or who is not.

Q.   Yeah, was it like at a shift change so you'd have --

A.   Yeah.  Yeah.  There were shift changes. Uh-huh.

Q.   Okay.  And that was by design so you'd get the most amount of people there?

A.   Yeah.

Q.   All right.

A.   Uh-huh.

Q.   Sheriff, I'm handing you what's been marked as Plaintiffs' Exhibit 16.

A.   Uh-huh.

Q.   Take a moment to read that.

A.   Okay.

Q.   And the same questions as before.  First of all, had you ever seen this post before?

A.   Just when I reviewed the exhibits.

Q.   Okay.  And in terms of Jennifer Patterson Davis making this post, she's entitled to her opinions, correct?

A.   Uh-huh.  Of course.

Q.   Okay.  And there's no consequence or accountability to Jason Davis because his wife made a post, fair?

A.   I'd say that's a fair statement.

Q.   And, of course, the post is over things involving the priorities of the Sheriff's Department in 2021, correct?

A.   Yes, it appears so.

Q.   All right.  Did anyone ever inform you that Jason Davis's wife had been posting?

A.   No.

Q.   Chief Gramke never told you that?

A.   No.  I had no -- I had no knowledge of that.  If somebody told me, I don't remember it.

Q.   The Hamilton County Sheriff's Department

social media policy does not apply to spouses of employees, correct?

A.   Correct.

Q.   And it only applied to official accounts, not personal accounts, correct?

A.   Official, personal -- I'm a little confused there.

Q.   Well, let me ask you this.  To your knowledge Jason Davis never violated the social media policy of the Hamilton County Sheriff's Department while --

A.   I had no knowledge --

Q.   -- he was employed there?

A.   -- of it, no.

Q.   All right.  I'm jumping around here a little bit, because we've talked about a lot --

A.   Uh-huh.

Q.   -- already.

A.   Sure.

Q.   The RENU position, are you aware of whether or not it involves significant overtime?

A.   I know there was some overtime.  I don't know what -- how much of that is --

Q.   Okay.  Were you --

A.   I'm sorry.  That's okay.  I just don't

Page 249

know.

Q.    Were you aware that it involved a take-home cruiser or a car?

A.    I don't know what positions are associated with that, that policy.  I don't -- I mean, there may be positions there where guys do that.  I think -- I know there are.  But I don't know if that applies to everybody.

Q.    Okay.  Who is Kevin Manos?

A.    Oh, Kevin Manos is an employee.  He's a deputy.  In my memory I -- he may be a supervisor as well.

Q.    All right.  Do you know whether Kevin Manos is a credible and honest officer?

A.    I would assume so.

Q.    You don't have any reason to say otherwise, fair?

A.    No.  Correct.

Q.    Okay.  We have discussed everything you remember about the October 10, 2023, meeting with Jason Davis; is that fair?

A.    So far.

Q.    All right.  And you have given me every reason why Jason Davis wasn't promoted to RENU, correct?

Page 250

A. Well. . .

Q. That you're aware of?

A. I've given you my opinion as to how I determined that, yes.

Q. Yeah. You don't have any personal knowledge other than what you've told me?

A. Correct.

Q. All right. And then your only personal knowledge about corporal is he was never denied a promotion to corporal, he just -- if he had stayed, he would have been available --

A. Yeah.

Q. -- for the next promotion?

A. I believe so. Uh-huh.

Q. All right. Do you agree that Jason Davis always worked really hard in the Hamilton County Sheriff's Department?

A. To my knowledge, yes.

Q. All right. Do you agree that as of October 10, 2023, you always considered him a really good officer?

A. Yes. I'd say that's true.

Q. All right. And did you ever tell Jason Davis that I think you do a great job?

A. That's very possible.

Q. All right. And do you agree that you always have a purpose for everything you do as sheriff?

A. Certainly.

Q. All right. I understand your knowledge of -- is limited regarding the Constitution and things like that. We talked about some of it.

A. Yes, we did.

Q. But is it fair to say that you knew as Hamilton County Sheriff that you could not retaliate against one of your employees in terms of promotions or job positions, things like that; you could not retaliate against your employees for things that their spouse posted on Facebook?

A. What I know is we can't retaliate, period.

Q. Okay. And that's not something you would ever do, correct?

A. No. Correct.

Q. All right. And if you knew that someone under you, such as your chief deputy --

A. Uh-huh.

Q. -- was retaliating against one of your officers because of something that officer's wife put on Facebook, you would stop that from happening --

MR. SIMON:  Objection.

Q.  -- is that fair?

MR. SIMON:  Objection.  Lack of foundation.  Hypothetical.

A.  Again, it's a hypothetical.  So I -- I don't feel comfortable answering that.

Q.  Well, I'm going to -- as part of your responsibility as sheriff, if you -- you just said that you would never retaliate against one of your officers for something their spouse put on Face- -- on social media and you said you can't do that, so my question is very simple.

If you know you can't do it and you wouldn't do it, if you were aware that one of your officers underneath you, such as your chief deputy -- if he was doing that, you would put a stop to it; is that fair?

MR. SIMON:  Same objection.

A.  Again, you're talking in hypotheticals of that I -- it's not factual.  I can't answer that. There's so many nuances to if, if, if.

Q.  Okay.  Was it your -- as sheriff you set policy, correct, ultimately?

MR. SIMON:  Objection.  Calls for a legal conclusion.

A.    I sign policy.  Policy is written in -- you know, in various ways with -- conjunction with different experts of various subject matter, so yes.

Q.    Right.  The buck stops with you in terms of --

A.    Yes.

Q.    -- approving the --

A.    I sign off on the policy.

Q.    All right.  And do you have a policy at the Hamilton County -- and did you have a policy at the Hamilton County Sheriff's Department of preventing or stopping violations of the Constitution if they're being carried out by folks underneath you, or do you have a policy of allowing them to violate the Constitution; is there a policy one way or the other?

MR. SIMON:  Objection.

A.    Policies --

MR. SIMON:  Objection to the form --

A.    -- are designed --

MR. SIMON:  -- of the question.  Go ahead and answer.

A.    Policies are signed to prevent people from acting outside of their scope and outside of what the law says, the Constitution.  And, again, those

policies are written by attorneys.  They're written by people with expert knowledge of those things.

Q.    And you approve those policies?

A.    I sign off on them, yes.

Q.    All right.  And so you had a policy that if someone was, for instance, retaliating --

A.    Uh-huh.

Q.    -- against Hamilton County Sheriff's Deputy for something that the Sheriff's Deputy's wife posted -- if they -- if one of your supervisors or officers was retaliating against an underling for that, that would violate your policy?

MR. SIMON:  Same objection.

A.    Once again, I do not have the policy in front of me.  I don't know exactly how it reads.  I don't know what circumstance it is you're applying to, who the supervisor would be, who the employee would be.  So, no, I can't answer that.

Q.    I'm not asking a specific anyone.  I'm saying you have a policy that your folks in the Hamilton County Sheriff's Department do not have authority to violate the First Amendment; is that fair?

A.    There's so many nuances.  I will point to anything in the policy that applies to that, and

that's how I would answer that question if I had the policy in front of me.

Q.   So you simply can't answer that question without the policy in front of you?

A.   I need the policy in front of me.

Q.   All right.  Would you ever tell Officer Davis -- Jason Davis -- when he was an officer with the Hamilton County Sheriff's Department, would you ever tell him that his wife can have a hundred opinions if that's what she wants, but there will be consequences to Jason Davis if she does?

MR. SIMON:  Objection.  Let me note my objection.  This may be a quote from the recording.  Again, same objection as before.

MR. BRUNS:  I'm going to object to the speaking objections.  You can object to form and that's it.  That's it.

MR. SIMON:  Well, I'm objecting -- I'm repeating an objection I gave earlier in the deposition.

MR. BRUNS:  And I've told you you have a continuing objection.  So I'm going to -- I object to that characterization.  But go ahead.

Page 256

A.   So without the recording in front of me or the transcript of the recording, I can't with certainty say that's exactly what I said.

Q.   I'm not asking if -- I said you would never tell Officer Davis that his wife can have a hundred opinions if she wants, but there will be consequences to Jason Davis if she does; you would never say anything that like, fair?

MR. SIMON:  Same objection.

A.   I don't even understand that question.

Q.   Sure.

A.   I -- because, again, you're asking me to answer a question that is hypothetical.  I mean, I -- you know, I just -- I don't understand the question.  My answer to the question is just what I said, I -- if I had the transcript in front of me of the recording, then I could perhaps remember what I said.  But to comment on whether I would never, always, sometimes do things, I don't feel comfortable saying yes or no to any of that.

Q.   Did you tell Jason Davis ever that his wife can have a hundred opinions if she wants, but -- quote, but there will be consequences, unquote, to him if she does; did you ever tell him anything like that ever?

MR. SIMON:  Same objection.

A.    I don't recall.

Q.    Okay.  Why would you ever say something like that to him?

A.    I don't recall saying it.

Q.    I understand that.  And my question is in follow up.  Why would you ever say anything like that to him?

MR. SIMON:  Objection.  Lack of foundation.  You're asking the witness to speculate.

Go ahead and try to answer.

A.    You're asking me to affirm something that I have no idea if it was said or not said.  So, again, dealing in the what-ifs, the hypotheticals, I can't answer that.

Q.    As you sit here today can you think of any legitimate reason why you as the Sheriff of the Hamilton County Sheriff's Department would say -- ever say anything like that to Jason Davis; can you think of any legitimate reason for you to do that?

A.    I can't even comment --

MR. SIMON:  Same objection.

A.    -- because it's hypothetical and I would have to have factual parameters to comment.

Page 258

Q.   So the answer to my question is no, as you sit here you can't think of a single legitimate reason for doing that?

MR. SIMON:  Objection.

Argumentative.

A.   The answer to your question is you're asking me to apply my imagination to a situation, and I simply don't feel comfortable doing that.  And so the answer is I can't answer that question.

Q.   Okay.  Did you ever tell Jason Davis that he needed to tell someone in his life he's close to who doesn't like you, the sheriff, to, quote, get in line, unquote, because they're hurting his career --

MR. SIMON:  Same objection.

Q.   -- did you ever say anything like that to Jason Davis?

A.   No memory --

MR. SIMON:  Same objection.

A.   I have no memory of that.

Q.   What legitimate purpose would you ever have as the Hamilton County Sheriff to say something like that to Jason Davis?

A.   Again --

MR. SIMON:  Objection.  Lack of foundation.  Calls for speculation.

Page 259

A.   Again, I don't know that I said it or didn't say it.  And I'm not going to comment on something that is someone's imagination.  I can't do that.

Q.   I'm not asking you to comment on anyone's imagination.  I'm asking you as the sheriff what reason would you ever have to tell one of your officers that?

MR. SIMON:  Same objection.  Asked and answered.

MR. BRUNS:  And if you refuse to answer, you can refuse.

A.   I'm --

MR. SIMON:  Hold on a second.  She's not refusing to answer.

MR. BRUNS:  She is.

MR. SIMON:  She's telling you that she can't answer because it's a hypothetical and doesn't know how to formulate an answer.  That's not a refusal.

Go ahead, Sheriff.

A.   So I can't answer, because it's a hypothetical situation.  And I am not comfortable trying to apply some factual answer to a

Page 260

hypothetical situation that I don't know occurred or didn't occur.

Q. Did you ever tell Jason Davis that such a person, someone who is close to him who doesn't like you, has got to go, bye, that's how it is?

MR. SIMON: Same objection.

A. No idea. Can't remember.

Q. Okay. Would you ever allow your chief deputy to impose consequences against a Hamilton County Officer for something that the officer's wife posted on Facebook?

A. Again, I don't know that that happened. And, again, it's a hypothetical. And I cannot answer that question.

Q. Okay. Did you ever in your presence hear your chief deputy tell Jason Davis that if Jason Davis's wife was going to, quote, bad mouth us, then does Officer Davis think, quote, we're going to promote you.

Did you ever hear Chief Gramke say anything like that?

MR. SIMON: Same objection.

A. I don't recall.

Q. If Chief Gramke said that to Jason Davis, would you correct Officer -- or Chief Gramke and

tell him no, that we don't withhold promotions because someone's wife says things on Facebook?

MR. SIMON: Objection. Lack of foundation. Calls for speculation.

A. I don't know that Chief Jay Gramke said that. So, again --

Q. Assume for purposes of my question he did.

MR. SIMON: Well, that's the problem. But lack of foundation. Calls for speculation.

Q. Assume for purposes of my question that Chief Gramke said that.

A. Assuming is not a factual situation for me, and I do not feel comfortable assuming things that I don't know are real.

Q. Did you ever hear Chief Gramke say anything like that to Jason Davis?

A. I don't recall.

Q. Did you ever hear Chief Gramke say anything along these lines to Jason Davis, does she realize her actions are hurting you; did you ever hear Chief Gramke say anything like that?

A. I don't recall.

Q. Okay. And if you did hear Chief Gramke say something like that, would you have corrected

Page 262

him to say no, what your wife posts -- what his wife posts on Facebook is not going to hurt him at his career in terms of promotions or assignments?

MR. SIMON: Same objection.

A. Again, the word if speaks to a hypothetical, and I don't feel comfortable answering that.

Q. Okay. Did you ever ask Officer Davis if he understood that his wife was hurting him with her behavior of posting on Facebook?

A. I don't recall.

Q. Why would you ever say that to him?

A. I don't know that I did or didn't.

Q. Assume you did; why would you ever say it?

A. Again --

MR. SIMON: Same objection.

A. Again, hypothetical, I don't feel comfortable answering that.

Q. Because as you sit here today you cannot think of a legitimate reason, a lawful reason why you would ever say that; is that fair?

MR. SIMON: Objection.

A. I don't even understand that question. It's a hypothetical. As I sit here today I told you I don't recall.

Page 263

Q. Did you ever hear Chief Gramke tell Jason Davis, quote, if we promoted you after what your wife had done and said and what you had done and said, do you think we'd open the floodgates of hell to anybody that wants to be critical over this administration; did you ever hear him say anything like that?

A. I don't recall.

Q. Have you ever publicly criticized the Hamilton County Sheriff's Department at any time in your career?

A. I don't recall.

Q. Sheriff, I'm going to hand you what's been marked as Exhibit 22 -- Plaintiffs' Exhibit 22 --

A. Sure.

Q. -- and ask -- take a moment --

A. Uh-huh.

Q. -- to read that.

A. Okay.

MR. SIMON: I think we're getting pretty close, aren't we?

MR. BRUNS: That's fine. I probably -- I don't have a whole lot, but, yeah, we can take a short break.

MR. SIMON: Okay.

Page 264

MR. BRUNS: And she can review that -- no, no, take it with you.

MR. SIMON: Take it with us?

MR. BRUNS: Yes.

MR. SIMON: Okay.

THE VIDEOGRAPHER: Off the record, 4:40.

(A brief recess was taken.)

THE VIDEOGRAPHER: We are back on the record. This is Media 6 of today's deposition. The time is 4:48.

BY MR. BRUNS:

Q. Sheriff, you've had a moment to -- off camera to review Exhibit 22.

A. I have.

Q. Had you ever seen that before?

A. No.

Q. Did Chief Gramke ever speak to you about this letter?

A. No.

Q. And obviously he never showed it to you, fair?

A. No, he didn't. Uh-uh.

Q. Okay. You understand Jason Davis resigned from his employment at the Hamilton County Sheriff's

Department, correct?

A.   I do understand that, yes.

Q.   Did you ever learn that prior to his resignation he had been looking for another position in law enforcement?

A.   No.

Q.   No one talked to you further about him --

A.   No.

Q.   -- is that correct?

A.   Yeah, that's correct.

Q.   Okay.  When Jason Davis resigned, he gave two weeks' notice, correct?

A.   I don't know --

Q.   You don't have any reason to dispute that --

A.   -- because I don't know -- yeah, I don't -- I don't know the dates, but. . .

Q.   All right.  If he resigned on January 8, 2024, with an effective date of January 22, 2024, you don't dispute that?

A.   I don't have any knowledge of it, but I don't have any reason to dispute it.

Q.   All right.  If he claimed that his resignation, as he does in the lawsuit, was because he had been retaliated against for in violation of

Page 266

his First Amendment rights because his promotions were squashed and denied because of things his wife had posted, okay, and he was told that -- if that's his position, I'm saying, all right, which the complaint makes clear it is, was he simply mistaken about that; was it just a misunderstanding?

A. I do. I do think that -- well, what I can comment on is this. Jason Davis left the department prior to that corporal list expiring. And it is my assertion that had he stayed to see that out, it's my opinion that there could have been a good outcome for him on that corporals list.

Q. And what do you mean by a good outcome; he would have been promoted?

A. Yeah. Yes.

Q. Okay. But clearly his understanding is reflected in the allegations of the complaint was that was a dead letter, RENU, the corporal promotion, both of them got pulled because of posts that other people had made and one post he made on Facebook, that there was retaliation for that.

And my question to you is -- and you agree -- that that's just a misunderstanding; he is wrong about that, fair?

A. I think that -- again, I can't speak to

what Jason Davis thought, said after he walked out of that office.  What I can speak to is his name stayed current on that list, and because it was current on that list there was absolutely an opportunity for him to be promoted to corporal.

Q.  Well, you read his exit interview.  You told me that.  You reviewed his exit interview?

A.  It was like three lines.

Q.  Okay.  But you had an understanding that he was just mistaken about his future with the department?

A.  He didn't say that in the exit interview. The thing I remember from the exit interview is just that he had recorded the conversation.  He made a remark about -- if I remember correctly -- that how badly supervised officers were or something like that.  That's what I remember reading.

Q.  Okay.  You were -- Chief Gramke retired recently, correct?

A.  Yes, he did.  Uh-huh.

Q.  Okay.  And you were a part of his retirement party?

A.  I was.  Yes, sir.

Q.  Was that special for you to be there to watch someone you had worked with for many years in

the Hamilton County Sheriff's Department achieve retirement from the department?

A. I think it's special for all of us, yes.

Q. Okay. And you would agree that a full career at the Hamilton County Sheriff's Department has deep meaning?

A. Of course, yes.

Q. All right. And what does it mean to you to have worked at the Hamilton County Sheriff's Department your whole life; what does it mean to you?

A. Well, I always tell people when they reach retirement, it's -- you know, it's no small effort, you know. I like to use the example that we've all -- all of us like to stick around that long, to stay healthy for retirement, which we can never predict. We've all put our blood, sweat, and tears into this business. And we've all experienced things that were challenging and, you know, sometimes emotional and so forth, but we soldiered through, and now you have made it healthy, thank God, to retirement.

Q. Okay. Could you ever put a price on a full career at the Hamilton County Sheriff's Department?

A. I don't think in terms of a -- when you

say a price, I don't know what that means.

Q. Okay. What I mean is that someone hands you a sum of money and you would forego the career you've had as a member of the Hamilton County Sheriff's Department.

A. I couldn't put a price on someone's tenure at the department.

Q. And certainly not your career?

A. I -- still, again, I don't understand the question.

Q. I just explained it.

A. I don't understand the whole notion of money. That's not what I referred to. It's not what I think about. It's not what I have knowledge of regarding how people retire and what their financial situations are.

Q. So to you the value of your career at the Hamilton County Sheriff's Department has been priceless; is that fair?

A. That's your terminology. I would use a different one. I think it's been rewarding. I think it's something that I can remember and that I have a very heartfelt connection to.

Q. All right. And nobody can give you any sum of money that you would trade for the career

you've had at the Hamilton County Sheriff's Office; is that fair?

A.  Well, I don't know.  Tell me what the sum of money is.

Q.  Five million dollars.

MR. SIMON:  Objection.

MR. BRUNS:  Well, she asked and I'm answering.

Q.  Five million dollars.

A.  I mean, I might consider that, you know. I don't know.  I might consider that.

Q.  Okay.

A.  That's a pretty large sum of money.

(Plaintiffs' Deposition Exhibit No. 29 was marked for identification.)

Q.  All right.  I'm going to represent to you that this was produced in discovery in this case.

A.  Okay.

Q.  Yeah.  And it was represented to us that this is the file from the Internal Affairs investigation --

MR. WIEST:  Tom, can you identify the number, please?

MR. BRUNS:  Yeah.  Exhibit 29. Sorry.

Page 271

Q.   That this is the file from the Internal Affairs investigation of you when you were -- when you were Major Charmaine McGuffey.  And we talked about the incident that Internal Affairs investigated, right -- the matter they investigated?

A.   Yes.  Yes.  This represents that certainly.

Q.   Okay.  And this was produced as the file from that investigation --

A.   Uh-huh.

Q.   -- and a lot of it was redacted.  And my question to you is, why were things redacted; do you know?

MR. SIMON:  Objection.  You can answer.

A.   It's interesting.  That was my same question when they gave me the first copy of it and it was redacted.  And then, in fact, they gave me the unredacted copy, so. . .

Q.   So you've seen both?

A.   I have the unredacted copy, yes, sir.

Q.   Yeah.  My question to you is, do you know why the copy that was produced in discovery has all these redactions; do you know why?

A.   I believe it was a strategy from the

Page 272

prosecutor's office, if I was going to guess.

Q.   Okay.  You don't know why?

A.   No.

MR. SIMON:  Are you talking --

A.   I mean. . .

MR. SIMON:  He's asking about -- this was produced in this case.

MR. BRUNS:  Yes.

THE WITNESS:  Oh, you mean redacted for this case?

MR. BRUNS:  Yeah.

THE WITNESS:  Oh.

Q.   Why are all these redactions in here?

A.   There were redactions throughout.  And these look very similar to what they were to the original.  So I would imagine they gave you the original redacted copy.

Q.   Well, no, the original doesn't have redactions.  Redactions are added; you would agree?

A.   Well, they were added when they handed it to me the very first time.

Q.   Right.  But you've also -- you just testified you saw an unredacted version --

A.   And then I --

Q.   -- which is the original, right?

A. Right. And then I insisted they give me the original. They at first denied it to me, et cetera, et cetera. But they gave it to me. And I would assume what you got is what they would give out to the public at large, whoever would ask for this document.

Q. I understand. I'm simply asking, do you know why --

A. I'm telling you why --

Q. -- these redactions --

A. -- because -- well, and then you asked me why the redactions occurred. And I'm going to say --

Q. If you don't know, you can tell me I don't know.

A. Well, I'm telling you to the best of my knowledge it had to be a strategy by the prosecutor's office.

Q. Okay. Thank you.

A. Because I -- they wouldn't -- they certainly wouldn't make me privy as to why they did all the things they did.

Q. Okay. Thank you. And then could you go to page 107 of this document.

A. Sure. Yes.

Q. And read that page because I'm going to have some questions for you about it.

A. Okay. Go ahead.

Q. All right. So at the top of the page, the first full paragraph, it says, This investigation clearly shows that Major McGuffey created a hostile work environment within the Sheriff's Office by abusing her power as a major. Major McGuffey used bullying techniques such as belittling, cursing, yelling, and screaming at employees. Did I read that correctly?

A. Yes. That is what it says.

Q. All right. Do you disagree with all of that, you never did any of that?

A. Of course I disagree with that.

Q. And you never did any of it; is that correct?

A. No, I did not.

Q. Is that correct?

A. Yes. That's correct.

Q. Okay. And it says, There is evidence that she used her position to retaliate against employees, as well as engaged in favoritism. Did I read that correctly?

A. Yes, you did.

Q.   Do you disagree with that, that's a false statement, that never happened?

A.   That is a false statement.

Q.   All right.  And then it says, Through the course of this investigation, Major McGuffey was dishonest when answering many questions during the Internal Affairs interview.  Did I read that correctly?

A.   You did.

Q.   Okay.  Is that a false statement; none of that --

A.   It's a lie.

Q.   -- is true?  It's a lie?

A.   Yes, sir.

Q.   And then it says, The allegations of creating a hostile work environment and dishonesty are sustained, in bold; do you see that?

A.   I see that.

Q.   Okay.  Did the Internal Affairs investigators sustain the findings of hostile work environment and dishonesty -- to sustain those findings against you?

A.   I will give you that they believe what they wrote here.  To have a sustained judgment you need a hearing.  You need due process.  And I was

Page 276

not given that.

Q.   Okay.  Do you see the next page, 108, where it says, I request that this case be closed as sustained; did you see that?

A.   Yes, I did.  I see it.

Q.   And is it your understanding that that's what happened, it was closed as sustained?

A.   They made the opinion that it was sustained.  That was someone's opinion.  I believe Lieutenant Steve Minnich at the time.

Q.   Okay.  And ultimately the sustained finding of being dishonest was what allegedly landed you on the Brady list, correct?

A.   That is the excuse they used.  You're right.  Yes.

MR. BRUNS:  All right.  We'll just take a quick break and see if there's more.  There might be just a couple.  I apologize.

MR. SIMON:  Okay.

MR. BRUNS:  But let's have that discussion.

THE VIDEOGRAPHER:  Off the record, 5:02.

(A brief recess was taken.)

Page 277

THE VIDEOGRAPHER: We are back on the record, 5:09.

BY MR. BRUNS:

Q. Sheriff, we took another break.

A. Uh-huh.

Q. Just some wrap-up questions. We were talking about the Internal Affairs investigation where there was a sustained finding against you in part for dishonesty. You disagree with the merits of that.

A. Uh-huh.

Q. What was the consequence to you as a result of that sustained finding of dishonesty by Internal Affairs?

A. I received a constructive firing by Sheriff Jim Neil.

Q. What do you mean by constructive firing; what happened?

A. Jim Neil called me in on May 5th, 9:00 a.m., 2017, and presented me with this report that I had never laid eyes on, seen -- ever. He didn't hand it to me. He just showed it to me. And he said, If you want to stay with this department, you can work as an inmate liaison, I think they called it. And they didn't have any parameters for

what that would be, simply I think saying you'll communicate with inmates and then communicate with security.

Q. Okay.

A. So that's what I was told.

Q. All right. And you rejected that offer to stay with the Hamilton County Sheriff's Department?

A. I refused that offer, yes.

Q. Okay. And then you resigned. And in your mind you call that a constructive firing; is that fair?

A. I didn't resign.

Q. What happened?

A. No, sir. I never signed a resignation. I did not resign. I was fired. Jim Neil gave me approximately -- he said, Well, I love to hear you speak and you're scheduled to speak at Xavier, so I don't want to fire you -- he said, so I don't want you to do anything until after this date that's on this flyer advertising you are the presenter, because I would like to attend. Therefore, I will give you till June to make a decision.

And my decision was the same exact decision that I just said when I was sitting there in front of him.

Page 279

Q. Okay. That was nine -- approximately nine years ago, correct?

A. I think that's probably correct.

Q. All right. And I could be wrong, but it sounds like you remember that conversation pretty clearly, correct?

A. Oh, yes, sir, I do.

Q. All right.

A. Uh-huh.

Q. Do you remember that conversation so clearly because it affected your career?

A. I remember it clearly because it absolutely blind-sided me and I really couldn't believe what I was hearing. And I certainly couldn't believe that a report like this would be created and verified as sustained without any due process. That's why I remember the conversation.

Q. And it obviously -- it affected your career, correct -- drastically?

A. Well, I'm the Sheriff of Hamilton County.

Q. At the time it drastically affected your career, correct?

A. I was fired, yes.

Q. And that's part of the reason why you remember those conversations so clearly, fair?

Page 280

A. Well, I would say anybody that's fired remembers the conversation.

Q. All right. You filed a lawsuit over that, correct?

A. I certainly did.

Q. All right. And you filed a lawsuit for retaliation, correct?

A. I'm trying to think if that was one of my points. Yes, it -- yes. I -- we had three -- three points that Judge Dlott ruled on. And I'd have to actually look at them to know, but I believe it was -- it was surrounding discrimination.

Q. Okay.

A. Not retaliation.

Q. One of the claims was for retaliation, correct?

A. I don't know that, sir.

Q. Regardless, when you filed that lawsuit eventually, did you make a demand on the County to settle -- asked them for something to settle?

A. They approached --

MR. SIMON: Objection to this line of questioning.

MR. BRUNS: Go ahead. You can object. I'm going to ask.

MR. SIMON:  All right.

A.  So we --

MR. SIMON:  Just continuing objection so I don't have to keep saying it.

MR. BRUNS:  Sure.

MR. SIMON:  Thank you.

A.  We won summary judgment on each point that we -- that we made allegations regarding.  The -- to my knowledge, the prosecutor's office approached us.

Q.  Okay.  And did you make a demand; did you tell them what it would take to settle?

A.  My attorneys negotiated with them and then talked to me.  And through those conversations we eventually landed on a number.

Q.  Okay.  What did you want to settle?  I don't -- I'm not talking about what you told your attorneys.  I just want to know what you wanted to settle with the County.

A.  What I wanted?

Q.  Yes.

A.  I wanted to be exonerated.

Q.  Okay.

A.  That's what I wanted.  100 percent exonerated.

Q.  All right.  And you wanted money as well,

correct?

A.   Well, I agreed to take money and I certainly think I was owed money, so yes.  But if you're asking me what I -- my main thing that I absolutely wanted was to be exonerated.

Q.   That wasn't my question.  My question was, you wanted money, correct?

A.   Well, yes.  If you ask it in the simplest of terms --

Q.   I am.

A.   -- sure, I wanted to be compensated for -- for having been fired unjustly.

Q.   All right.  And how much money did you want?

A.   I don't remember.  I couldn't even tell you what the settlement was for now honestly.

Q.   Okay.  All right.  You were then sued as Sheriff by Mark Schoonover; is that correct?

A.   Yes, I was.

Q.   All right.  And that suit -- the case number we have is 1:22-cv-6- -- or 767 filed in the Southern District of Ohio.  Do you recall that you were sued in 2022?

A.   Yes, I do.

Q.   All right.

A. Uh-huh.

Q. And that case involves claims of First Amendment retaliation, correct?

A. My knowledge was that he said he was discriminated against because he was an older white man.

Q. If that lawsuit specifically includes claims of First Amendment retaliation, you don't dispute that?

A. I have no idea what you're talking about there, sir. I can tell you what I was told about the lawsuit was that he was --

MR. SIMON: Hold on one second.

MR. BRUNS: I'm not asking what any attorney told you.

MR. SIMON: Yeah. But she just said what I was told about it. And I -- if she's about to say what her -- what the attorneys told her, then I don't want her to answer that question.

THE WITNESS: Thank you.

A. So what I knew is that he was suing because he was discriminated against because he was an older white male.

Q. Okay.

A. That's what I knew.

Q. Did you read that lawsuit when you received it?

A. I don't recall reading it. I may have read it. I really don't recall.

Q. All right. You agree that lawsuit was pending -- it was an existing lawsuit as of October 10, 2023, correct?

A. I don't have any real knowledge of it, but I'll -- I think it's still pending.

Q. Yeah. Once it got filed, it's never been dismissed, it's still existing --

A. Okay. So --

Q. -- fair?

A. -- yeah. So I would agree with that. I don't -- nobody has told me otherwise.

Q. All right. Once you got sued in 2022 did you do anything to educate yourself on the legal claims that were made against you?

A. By Mark Schoonover?

Q. Those legal claims in that lawsuit by Mark Schoonover --

A. Uh-huh.

Q. -- did you do anything to educate yourself on the law?

A. No.

MR. SIMON: I'm just going to object. I don't want you to answer anything that involves attorney-client communication.

MR. BRUNS: She answered it, so. . .

Q. If there's a public record that you settled with the County for $475,000, does that refresh your recollection?

A. It sounds about right.

MR. BRUNS: Okay. That's all.

THE WITNESS: Okay.

MR. SIMON: We have no questions. We will not waive signature.

THE VIDEOGRAPHER: We are off the record. The time is 5:18.

(Witness excused.)

(Deposition concluded at 5:18 p.m.)

Page 286

A C K N O W L E D G E M E N T

STATE OF _____  :

COUNTY OF _____  :

I, CHARMAINE McGUFFEY, have read the transcript of my testimony given under oath on May 5, 2025.

Having had the opportunity to note any necessary corrections of my testimony on the errata page, I hereby certify that the above-mentioned transcript is a true and complete record of my testimony.

_____

CHARMAINE McGUFFEY

Page 287

REPORTER'S CERTIFICATE

I, Kristina L. Laker, Court Reporter and Notary Public, do hereby certify:

That the witness named in the deposition, prior to being examined, was duly sworn;

That said deposition was taken before me at the time and place therein set forth and was taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

That said deposition is a true record of the testimony given by the witness and of all objections made at the time of the examination.

I further certify that I am neither counsel for nor related to any party to said action, nor in any way interested in the outcome thereof.

IN WITNESS WHEREOF I have subscribed my name and affixed my seal this 20th day of May, 2025.

/s/ Kristina L. Laker

_____
Kristina L. Laker
Notary ID 592345
My Commission expires: 12/21/25