IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT CINCINNATI


JASON DAVIS and                    :
JENNIFER DAVIS,
                                   :
          Plaintiffs,
vs.                                :   Case No. 1:24-cv:0202

CHARMAINE McGUFFEY, et al., :

          Defendants.              :




* * * * * * * *

DEPONENT:            Hamilton County, Ohio

                    Volume II

DATE:               August 20, 2025

* * * * * * * *




Kristina L. Laker

Court Reporter



BARLOW REPORTING & VIDEO SERVICES, LLC
620 Washington Street
Covington, Kentucky 41011
(859) 261-8440

1      The deposition of HAMILTON COUNTY, OHIO, taken

2  for the purpose of discovery and/or use as evidence

3  in the within action, pursuant to notice, heretofore

4  taken at the Hamilton County Prosecutor's Office,

5  230 East Ninth Street, Suite 4000, Cincinnati, Ohio,

6  on August 20, 2025, at 12:35 p.m., upon oral

7  examination, and to be used in accordance with the

8  Federal Rules of Civil Procedure.

9                    * * * * * * * *

10                     APPEARANCES

11  REPRESENTING THE PLAINTIFFS:

12  Christopher Wiest, Esq.
    CHRIS WIEST, ATTY AT LAW, PLLC
13  50 East Rivercenter Boulevard, Suite 1280
    Covington, KY 41011
14
    Thomas B. Bruns, Esq.
15  BRUNS, CONNELL, VOLLMAR & ARMSTRONG LLC
    40 North Main Street, Suite 2010
16  Dayton, OH 45423

17  Zachary Gottesman, Esq.
    GOTTESMAN & ASSOCIATES, LLC
18  9200 Montgomery Road
    Building E, Suite 18B
19  Cincinnati, OH 45242

20  REPRESENTING THE DEFENDANTS:

21  Matt Miller-Novak, Esq.
    Andrew E. Prem, Esq.
22  HAMILTON COUNTY PROSECUTOR'S OFFICE
    230 East Ninth Street, Suite 4000
23  Cincinnati, OH 45202

24  ALSO PRESENT:  Jason Davis, plaintiff
                   Jennifer Davis, plaintiff
25

```
 1                         I N D E X

 2                                              Page

 3   Cross-Examination by Mr. Wiest:            110

 4

 5

 6                    E X H I B I T S

 7   Plaintiffs' Deposition Exhibit No. 47      114

 8   Plaintiffs' Deposition Exhibit No. 49      119

 9   Plaintiffs' Deposition Exhibit No. 50      119

10   Plaintiffs' Deposition Exhibit No. 51      120

11   Plaintiffs' Deposition Exhibit No. 52      123

12   Plaintiffs' Deposition Exhibit No. 53      125

13   Plaintiffs' Deposition Exhibit No. 54      129

14   Plaintiffs' Deposition Exhibit No. 55      129

15   Plaintiffs' Deposition Exhibit No. 56      132

16   Plaintiffs' Deposition Exhibit No. 57      133

17   Plaintiffs' Deposition Exhibit No. 58      134

18   Plaintiffs' Deposition Exhibit No. 59      135

19   Plaintiffs' Deposition Exhibit No. 60      142

20   Plaintiffs' Deposition Exhibit No. 61      146

21   Plaintiffs' Deposition Exhibit No. 62      152

22   Plaintiffs' Deposition Exhibit No. 43-A    154

23   Plaintiffs' Deposition Exhibit No. 63      156

24   Plaintiffs' Deposition Exhibit No. 64      156

25   Plaintiffs' Deposition Exhibit No. 65      162
```

Page 109

 1    Plaintiffs' Deposition Exhibit No. 66        167

 2    Plaintiffs' Deposition Exhibit No. 67        173

 3    Plaintiffs' Deposition Exhibit No. 68        186

 4    Plaintiffs' Deposition Exhibit No. 69        193

 5    Plaintiffs' Deposition Exhibit No. 70        208

 6    Plaintiffs' Deposition Exhibit No. 71        209

 7    Plaintiffs' Deposition Exhibit No. 72        213

 8    Plaintiffs' Deposition Exhibit No. 73        213

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    PETER J. STACKPOLE,

2    of lawful age, as having been duly sworn, as

3    hereinafter certified, was examined and testified as

4    follows:

5                    CROSS-EXAMINATION

6    BY MR. WIEST:

7         Q.    Sir, could you state your name.

8         A.    I'm Peter Stackpole.

9         Q.    What is your current job title?

10        A.    Legal liaison.

11        Q.    For who?

12        A.    For the Hamilton County Sheriff's Office.

13        Q.    Okay.  How long have you held that role?

14        A.    Since sometime in late March of '21.

15        Q.    Would it be fair to say that you're

16   effectively the lawyer for the sheriff's office?

17        A.    Well, the statutory counsel is the

18   prosecutor's office.  I'm in-house counsel.

19        Q.    Okay.  You've been designated today to be

20   a representative for certain topics for the Hamilton

21   County organization, correct?

22        A.    That is correct.

23        Q.    I want to go through those topics.  You've

24   got a topic list in Exhibit 32.  I think I see

25   you've got another --

1          A.    I do.

2          Q.    -- list that you've annotated.  I'll tell

3    you I've got my own cheat sheet that I've annotated.

4    But you've been designated to speak for Topics 5 --

5    actually Topic 1 --

6          A.    Sure.

7          Q.    -- is the discovery responses.

8          A.    Right.

9          Q.    1, 5, 6, 7, 8, 10, 11, 12, 13, 14, 15, 16,

10   18, 19 --

11         A.    17.

12         Q.    17 also.  Yep.  16, 17, 18, 19, 20, 23,

13   24, 25, 26, 28, 29, 30, 31, 32, 33, 34, 35, and 36,

14   correct?

15         A.    Correct.

16         Q.    What have you done to be prepared to

17   testify to those topics today?

18         A.    I reviewed the discovery responses.  I met

19   with counsel, of course, several times.  I won't

20   tell you anything that I talked about with them.  I

21   met with many employees of the sheriff's office to

22   try and get as much information and documents that

23   were relevant to the topics so that I could review

24   them.  A lot of the topics are -- overlap the

25   discovery responses.  So I reviewed the discovery

1  responses very carefully.  I reviewed the partial

2  MSJ that was filed and later withdrawn for the

3  defenses.

4            I can tell you that I've spoken with

5  obviously Chief Gramke, the Sheriff, Chief Ketteman,

6  Captain Stapleton, Jessica Kober, Captain Carroll,

7  Major Schuler.  I'm sure that there are others.  I

8  talked with the whole -- a lot of people.

9            Obviously with this many topics of

10  interest for you with the level of breadth of the

11  topics, I tried to speak with as many people as I

12  possibly could to get as thoroughly prepared as I

13  could.  And obviously with a thousand pages of

14  discovery responses, you know, I did the best as I

15  could to get familiar with all of these topics.  And

16  that is what I did to prepare.

17       Q.   Okay.  You've got some discovery -- you

18  mentioned discovery responses.  You've got Exhibit

19  33 in front of you.  Those are the discovery

20  responses from Hamilton County, correct?

21       A.   Yes.

22       Q.   And as I understand it, you were involved

23  in helping prepare those responses, correct?

24       A.   I was.

25                 MR. WIEST:  I will tell you that

1               there was no verification to the

2               interrogatories.

3                     MR. MILLER-NOVAK:  Whoops.  Sorry.

4                     MR. WIEST:  Well, I'm going to get it

5               now from him.

6        Q.   Do you agree that those are true and

7   accurate, either based on personal knowledge or

8   based on reasonable investigation?

9        A.   I do.

10                    MR. MILLER-NOVAK:  And if you follow

11              up -- I'm sorry.  It was an oversight.

12              And we'd be happy to send you --

13                    MR. WIEST:  I got what I need.

14                    MR. MILLER-NOVAK:  Okay.  If you're

15              satisfied with that, that's great.

16       Q.   Do you want me to call you Pete?

17       A.   Sure.  That's fine.

18       Q.   We've known each other for, what, 20-plus

19   years now, so --

20       A.   I think I went to your wedding, so. . .

21       Q.   You did go to my wedding.  I think you

22   actually taught me to practice law, so you're

23   responsible for all of it.

24       A.   Great.

25                    MR. WIEST:  One of the topics today

1          is the initial disclosures from Hamilton

2          County, and I wanted to go over those with

3          you.

4               (Plaintiffs' Deposition Exhibit No.

5               47 was marked for identification.)

6     Q.    There's some discovery responses that

7  reference initial disclosures.  Were you involved at

8  all in helping to prepare these initial disclosures?

9     A.    I was.

10    Q.    Okay.  What was done to discern

11 individuals likely to have discoverable information?

12    A.    Well, I tried to determine what the claims

13 were and what our defenses would be.  And then we

14 decided that the people who were most likely to have

15 discoverable information would be the people who

16 attended the meeting and then probably the people

17 who were involved in RENU and the promotion

18 selection.  People who were in his chain of command

19 at the district and in patrol and -- you know, that

20 was -- that was what we came up with at that early

21 stage.

22    Q.    Okay.  Has Exhibit 47 ever been

23 supplemented to your knowledge?

24    A.    No, not to my knowledge.

25    Q.    Okay.  Is it still accurate?

1        A.    I think everything here is accurate to the

2    best of my knowledge.    There are probably -- you

3    know, as we've gone through the discovery, depending

4    on what topics you're interested in, there are many

5    people at the sheriff's office who have information

6    on some of these things that were not identified

7    here.    For instance, like payroll information.    Our

8    fiscal officers -- like these individuals would not

9    have any information on that.

10        Q.    Okay.    Would it be fair to say that the

11    list of individuals may have knowledge as to what I

12    would call liability or defense issues --

13        A.    Correct.

14        Q.    -- but maybe not damage issues?

15        A.    That's fair.

16        Q.    All right.    If you look at Interrogatory

17    No. 9.    It starts on page nine of the discovery.

18    These are transfers in and out of RENU.    How was

19    that list determined?

20        A.    I reached out to Captain Schoonover.    And

21    I asked for the information on the people who were

22    transferred in and out of RENU.    And he provided me

23    with an email that basically was a table of the

24    information.

25        Q.    Okay.

1        A.   And I believe we provided that in

2    discovery.

3        Q.   I think we looked at that earlier with the

4    other 30(b)(6) witness; is that correct?

5        A.   Yes.

6        Q.   Okay.  All right.  A number of other

7    questions rely on document production; for instance,

8    No. 10, 11, 12, 13.  You would agree that that was

9    what was responsive to those, correct?

10       A.   That what was responsive to those?

11       Q.   That you provided documents to respond to

12   those interrogatories.  Because they all say without

13   waiving these objections see attached.

14       A.   Yes.

15       Q.   Okay.  We'll go back to the open records

16   questions and the recording questions at 14 and 15.

17   Later we'll talk about that.

18            How did you go about responding to the

19   requests for production; how was that process

20   conducted?

21       A.   I looked at the questions.  And then I

22   went to the people who I believed would have the

23   best information.

24       Q.   Okay.

25       A.   And I asked them to provide me with the

1  documents so that I could then assemble them and

2  provide them to counsel.

3       Q.   Okay.  All right.  I may have some more on

4  this later, but I think I'm done with the discovery

5  for now.  Let's look at -- I'm going to start kind

6  of where I left off with Major Ketteman.  If you

7  could look at -- I believe you've got an exhibit in

8  front of you that's got the social media policy.

9  It's 45.  This is the social media policy that I

10 think we've established was in place from February 4

11 of 2014 through perhaps March of 2024 at the

12 sheriff's office.

13      A.   March 15 -- March 14 really of 2024.

14      Q.   Okay.  Would you agree with me that

15 nothing in this policy governs the social media of

16 spouses of employees?

17      A.   I agree.

18      Q.   And in terms of personal uses of social

19 media, that is governed within 701.05, correct?

20                MR. MILLER-NOVAK:  Give us a page

21           number.

22                MR. WIEST:  Well, Hamilton County 44

23           is the Bates stamp number --

24                MR. MILLER-NOVAK:  Thanks.

25                MR. WIEST:  -- is where it starts.

1     A.   Could you please repeat the question?

2     Q.   In terms of personal use of social media,

3  that is governed by 701.05 that starts at Bates

4  Hamilton County 44?

5     A.   That is the policy that governs the

6  personal use of social media.  We also have rules

7  and regulations that would apply as well.  But, yes,

8  this is the policy that was in place.

9     Q.   What rules or regulations apply to social

10  media as well?

11     A.   So the sheriff's office had rules and

12  regulations from, you know, Article I to Article

13  III.  I don't really remember all of them and don't

14  remember which dealt specifically with social media.

15          But there were things in those rules and

16  regulations that supervisors would -- you know, if

17  they identify conduct that is outside of the rules,

18  that is what they would cite when they're issuing

19  discipline.

20     Q.   Okay.

21     A.   And some of those rules deal with, you

22  know, harming the agency through many different

23  ways.

24              (Plaintiffs' Deposition Exhibit No.

25              49 was marked for identification.)

1      Q.   I have handed you an exhibit that we have

2  been provided by Hamilton County.  It's Bates

3  Hamilton County 49 marked as Exhibit 49

4  coincidentally.  And it's got a list of social media

5  violations or postings and past discipline; do you

6  see that?

7      A.   I do.

8      Q.   Let me start here.  How was this list

9  determined; is this in some database?

10     A.   Yes.  The sheriff's office has something

11 called PeopleTrack, which is a database of various

12 personnel actions, including discipline.

13               MR. WIEST:  I'm going to mark this as

14          50.

15               (Plaintiffs' Deposition Exhibit No.

16               50 was marked for identification.)

17     Q.   You had Laetitia Schuler provide a listing

18 with some more detail of certain of those

19 incidences; is that fair?

20     A.   Yes.

21     Q.   Was that Laetitia going in and pulling --

22 and we're going to look at them in a minute -- the

23 individual discipline within this list to see how it

24 was disposed of?

25     A.   I don't know how Major Schuler came by

1    this list.  I just asked for the information on what

2    violations we had in our records.

3         Q.   And how they were disposed?

4         A.   Yes.

5         Q.   And when she's got Level 2 and Level 3 --

6    or I think there might be some Level 1, there is --

7    that's referring to level of discipline within the

8    collective bargaining agreement, correct?

9         A.   That is my understanding.

10                   MR. WIEST:  Okay.  We're going to go

11              through a couple of these.

12                   (Plaintiffs' Deposition Exhibit No.

13                   51 was marked for identification.)

14        Q.   Pete, 51 was the discipline for William

15   Bechmann who is first on Exhibit 49.  He's the first

16   up.  And he got a Level 2 warning written reprimand

17   for a social media post, correct?

18        A.   I don't know, and that is because Deputy

19   Bechmann has had an additional more recent social

20   media violation.  So I don't know if this is -- I

21   don't know if this one is -- I don't know how this

22   list is -- if it's chronological.  I don't know if

23   in Exhibit 49 Bill Bechmann is referring to this

24   social media violation or the one that occurred very

25   recently.

1    Q.   Well, let me suggest to you this was 2024

2  --

3    A.   Okay.

4    Q.   -- right?

5    A.   Yes.

6    Q.   And if I look at Major Schuler's Exhibit

7  50, that also indicates that Bechmann got a Level 2

8  in 2024.  I don't know if that helps.

9    A.   No, I know.  But the PeopleTrack was

10 retrieved on July 29 of '25.

11   Q.   Okay.

12   A.   So I can agree with you that this is Bill

13 Bechmann's write-up.  I don't know much more about

14 it.

15   Q.   Okay.  And Bill Bechmann was given a Level

16 2 warning written reprimand for posting on

17 Commissioner Reece's Facebook, quote, If our country

18 is so damn strong, why do you and your fellow county

19 commissioners fail to support the Hamilton County

20 Sheriff's Office?  During our current contract

21 negotiations, you and your office refused to pass a

22 decent pay raise to the Hamilton County Enforcement

23 and Court Services Division Deputies.  Throughout my

24 30-year career, the Hamilton County Commissioners

25 Office, Republicans or Democrats, has consistently

1   screwed my fellow deputies.  Please quit talking out

2   of both sides of your mouth and support the Hamilton

3   County Sheriff's Office Deputies.  Respectfully

4   Submitted, a Hamilton County Taxpayer.

5            If you look, we can actually see the post.

6   It's on the last page of this exhibit.  And then it

7   looks like he copied it to the Support the Blue in

8   Cincy Facebook group as well, correct?

9        A.   Yes.

10       Q.   Do you know why -- by the way, if you look

11  at his response, it looks like he deleted it -- he

12  deleted the Facebook post.  That's part of his

13  response; do you see that?

14       A.   Sure.  What page?

15       Q.   Yeah.  It's about three pages back.

16       A.   Okay.

17       Q.   Do you agree that what he is talking about

18  in terms of pay raises documents the activities of

19  the sheriff's office?

20       A.   No.

21       Q.   You don't think whether or not somebody is

22  getting a pay raise documents the activities of the

23  sheriff's office?

24       A.   No.  I think he's talking about

25  negotiations that were going on between the --

1   essentially the board of county commissioners and

2   the bargaining unit.

3        Q.   Okay.  Does that document the activities

4   of the sheriff's office?

5        A.   I don't believe so.

6        Q.   Okay.  And for that speech he was given,

7   it looks like, a written reprimand, correct?

8        A.   Yes.

9             MR. WIEST:  Okay.  I'm marking this

10           as 52.

11           (Plaintiffs' Deposition Exhibit No.

12           52 was marked for identification.)

13       Q.   This is Lawrence Briggs, who is the second

14  one on Exhibit 49.

15       A.   Yes, I see that.

16       Q.   It's not clear to me what the final

17  discipline was.  And I'll tell you the reason I say

18  that is it looks like Jay Gramke signed off on a

19  Level 4 suspension for 36 hours was his

20  recommendation.  And then underneath the Sheriff

21  indicated, See attached memo outlining additional

22  findings on letter head that mitigated this

23  discipline.  Verbal counseling.

24           And obviously I think the Sheriff may have

25  a date issue there, because I'm assuming that that

1  was not in fact done in 2026.

2          Do you know what the final discipline was

3  on this?

4     A.   All I can say is what I see here on the

5  memo, which is that the Sheriff reduced it to a

6  verbal counseling.

7     Q.   Okay.  Among other things it looks like

8  Deputy Briggs made multiple posts on social media

9  while at work on December 8; do you see that?

10    A.   I do.

11    Q.   His personal Facebook page projects him as

12  a sheriff's deputy and he posted comments about

13  management and leadership, criticizing them

14  negatively, including statements like lead by

15  example, funny how the ones questioning your

16  standards lack them, feelings hurt with a picture

17  attached of an overweight male, if disrespectful

18  insubordinate and my feelings had a look with

19  multiple rainbows and crying laughing emojis, and a

20  picture of what appears to be a man dressed as a

21  woman.  Also shared images that have the statement

22  of when the office is down three employees because

23  everyone finally discovered management is

24  incompetent and got sick of this BS and attached

25  crying laughing emojis.  And another one that says

1  me when my favorite coworker finally goes off on our

2  manager.

3          This was done while he was on the job and

4  on the clock, correct?

5     A.   It would appear to be the case.

6     Q.   Do you or does the sheriff's office -- do

7  they attach, to your knowledge, any significance to

8  the rainbows that were in the post?

9     A.   I don't have any personal knowledge of

10 this.  I wasn't involved.

11    Q.   Okay.

12    A.   So all I can do is go based upon what's

13 written here.  And I don't -- I think that they've

14 written what was the basis of the discipline.

15    Q.   Okay.  All right.  Which appears to be a

16 verbal counseling on this one, correct?

17    A.   Correct.

18            MR. WIEST:  I'm going to hand you 53.

19            (Plaintiffs' Deposition Exhibit No.

20            53 was marked for identification.)

21    Q.   53 is Deyhle, which is the third one on

22 Exhibit 39.  It's Exhibit 53, discipline.  And I'll

23 tell you what follows.  The second page is Harris.

24 So there's actually two disciplinary measures on

25 this one.

1             If we look at the facts in Devin Deyhle,

2    this was a photograph posted on social media while

3    on duty in uniform within a secured facility on, it

4    looks like, Christmas Day 2023, correct?

5         A.   Yes.  That's what this says.

6         Q.   And the supervisor indicates he noticed

7    all officers assigned to work units, including

8    rovers and medical, were all identified in the

9    photograph, correct?

10        A.   Yes, that's what it says.

11        Q.   It also says that Deputy Kincannon handed

12   her cell phone to her floor porter to take the

13   picture.  Floor porter is an inmate, correct?

14        A.   That is correct.

15        Q.   And that's the reference to contraband

16   being given to that inmate to record herself with

17   the incident, correct?

18        A.   Yes.

19        Q.   Would you agree that this is documenting

20   the activities of the Hamilton County Sheriff's

21   Office?

22        A.   Yes.  It's disciplined within the

23   sheriff's office.

24        Q.   Okay.  Well, and not just that, but the

25   actual --

1      A.   Yes.  The activity.

2      Q.   The social media being recorded is an

3  activity within the jail, correct?

4      A.   I mean, you know -- yes, it occurred in

5  the jail.

6      Q.   Did anyone within the sheriff's office in

7  response to this incident -- and we'll see several

8  of these disciplinary charges coming out of the same

9  incident -- it wasn't just Devin Deyhle.  It was

10  Jeaneaka Harris and I think there were a couple of

11  others -- my review of the discipline.

12           Did anyone record or preserve those

13  recordings as open records or public records within

14  the sheriff's office; do you know?

15      A.   I have no personal knowledge of that.

16      Q.   Did anyone consider any discipline for

17  recording this incident -- the public activity of

18  the sheriff's office and then the deputies removing

19  it from the jail on their personal devices?

20      A.   I don't have any personal knowledge of

21  that.

22      Q.   Okay.  You don't dispute that that

23  occurred, though, correct?

24      A.   That what occurred?

25      Q.   That there was a recording taken on a

1  personal device within the jail recording the

2  activities of the sheriff's office, and then people

3  leaving with that device -- leaving the jail unit

4  with that device.

5       A.   I can't tell based upon this document what

6  happened to the recording on the personal device.

7       Q.   Are you aware of anybody that followed up

8  on that?

9       A.   I have no personal knowledge of that.

10      Q.   Okay.  If you turn to the second page of

11  this document, it's the same discipline.  This one

12  is to Jeaneaka Harris, who I am presuming was one of

13  the other deputies that were recorded or videoed

14  within the photograph, correct?

15      A.   I don't know, but I would assume so.

16      Q.   Do you know why Jeaneaka Harris got a

17  Level 1 warning and Devin Deyhle got a Level 2

18  warning?

19      A.   I don't have personal knowledge of it.  I

20  wasn't involved in the discipline or meting it out.

21      Q.   Okay.  The date, it looks like, of the

22  incident -- it looks like it was, like I said,

23  Christmas, but it looks like discipline was done in

24  early 2024 -- January 11th of 2024?

25      A.   Yeah, that's fair.

1          MR. WIEST:  Okay.  I'm going to hand

2      you 54.

3              (Plaintiffs' Deposition Exhibit No.

4              54 was marked for identification.)

5      Q.   54 is for Megan Sparks and Brianna

6  Kincannon.  It looks like it's the same -- no, Megan

7  Sparks is a different incident.  Sorry about that,

8  Pete.

9      A.   It's all right.

10     Q.   54 is for Brianna Kincannon.  I'll

11  separately mark as 55 the Sparks.  This was the same

12  incident, the Christmas incident of 2023 and the

13  recording of deputies posted on social media,

14  correct?

15     A.   Yes.

16     Q.   Okay.  Also a Level 2 warning?

17     A.   That's correct.

18          MR. WIEST:  I've handed you Exhibit

19      55.

20              (Plaintiffs' Deposition Exhibit No.

21              55 was marked for identification.)

22     Q.   This is the Megan Sparks incident.  It

23  looks like it occurred in 2017; do you see that?

24          MR. MILLER-NOVAK:  I don't think I

25      got Sparks.

1              MR. WIEST:  Go back to the last

2         exhibit.  It's the last couple of pages.

3              MR. MILLER-NOVAK:  Oh.

4              MR. WIEST:  We split them.

5              MR. MILLER-NOVAK:  Okay.

6    A.   I'm sorry, could you repeat the question?

7    Q.   Yeah.  The question is this was another

8  social media violation this time in 2017, also a

9  Level 2 warning, transmitting an image over Snapchat

10 of fingerprints with a clear ridge detail the

11 overall quality of to make a determination of a

12 subject identity with the comment crack is wack,

13 mmmmmkay which violates LEADS Policy 4.3.

14         It's identifying information -- it looks

15 like it was the subject of -- or somebody was the

16 subject of some sort of incident; do you agree?

17 A.   I do.

18 Q.   Do you agree that because this occurred,

19 it looks like, in relation to what was occurring

20 within the jail, that this documented the activity

21 of the sheriff's office?

22 A.   Yes.

23 Q.   Are you aware of any steps to --

24 A.   Well, let me clarify.  I mean, clearly the

25 DEO II, Megan Sparks, obtained the information in

1    the course of her duties.  I have no idea when she

2    published it on Snapchat.

3         Q.   No, that's fair.  But what she was

4    publishing was the activities of the sheriff's

5    office?

6         A.   Absolutely, yes.

7         Q.   Are you aware of any steps anyone at the

8    sheriff's office took to save that information as a

9    public record?

10        A.   So I'm not good at social media, but my

11   understanding is that Snapchat stuff goes away.  I

12   don't really know.

13                 MR. MILLER-NOVAK:  I believe it goes

14            away.

15        Q.   Well, my question, regardless of how long

16   it was there or not there -- obviously it was there

17   long enough for somebody to discover it, correct?

18        A.   It seems so.

19        Q.   Are you aware of any steps that anyone

20   took to treat that record as an open record -- or

21   public record?

22        A.   I don't have any personal knowledge of

23   that.  I just don't know one way or the other.

24                 (Plaintiffs' Deposition Exhibit No.

25                 56 was marked for identification.)

Page 132

1      Q.    Okay.  This is the Chastity McCowan

2  discipline.  She's also on the list of Exhibit 49.

3  This was discipline from 2021.  And it looks like

4  she was given a Level 1 warning for posting a TikTok

5  video on duty.  The video had another officer

6  sitting inside of L-12 in uniform reacting to a

7  video.  Her reaction was recorded and then posted to

8  Deputy McCowan's TikTok page.  The video had several

9  curse words and it clearly violates our social media

10  policy; do you see that?

11      A.    I do.

12      Q.    Do you know whether or not the other

13  deputy being recorded was aware that Deputy McCowan

14  had been recording her?

15      A.    I don't know.

16      Q.    You would agree that if the deputy was

17  unaware, that would also violate the Sheriff's

18  recording policy, correct?

19      A.    Yes.

20      Q.    This recording of somebody performing

21  their job on duty, that records the functions within

22  the sheriff's office, correct?

23      A.    It does.

24      Q.    Are you aware of any steps anyone took

25  within the sheriff's office to preserve that TikTok

1    video as a public record?

2        A.   I have no personal knowledge one way or

3    the other.

4        Q.   Are you aware of any steps anyone took

5    within the sheriff's office that disciplined Deputy

6    McCowan for destroying a public record if she

7    deleted the TikTok video?

8        A.   I have no personal knowledge of that.

9             MR. WIEST:  All right.  I'm going to

10            hand you what I've marked as 57.

11            (Plaintiffs' Deposition Exhibit No.

12            57 was marked for identification.)

13       Q.   Pete, I'm not going to belabor the point.

14   57 are another two deputies that were apparently

15   involved in the Christmas incident in 2023 --

16       A.   Oh.  Gotcha.

17       Q.   -- correct?

18       A.   Yes.

19       Q.   Sainz and Salvatore?

20       A.   Yes.

21       Q.   And we've talked about what that was, but

22   Sainz got a Level 1 warning, Salvatore got a Level 1

23   warning?

24       A.   Yes.

25            MR. WIEST:  Okay.  All right.  58.

Page 134

1                    (Plaintiffs' Deposition Exhibit No.

2              58 was marked for identification.)

3       Q.   58 is another social media violation where

4   a deputy was discussing in detail on Facebook the

5   particulars of a tasing incident that occurred on

6   June 30, 2016, in the justice center with respect to

7   an inmate, correct?

8       A.   Correct.

9       Q.   Deputy Warman explained the entire

10  situation in detail, correct?

11      A.   That's what this says.

12      Q.   Okay.  If you look, by the way, Major

13  McGuffey was actually involved in signing off on

14  that Level 1 warning --

15      A.   Yes, she was.

16      Q.   -- on the second page.  Do you agree that

17  his discussion of the incident documented the

18  activities of the sheriff's office?

19      A.   I mean, I don't know the contents of the

20  discussion.  And I don't really want to speculate.

21  They disciplined him for it.  I can say that.

22      Q.   Okay.  And he got a Level 1 warning for

23  that, correct?

24      A.   Correct.

25                    MR. WIEST:  Okay.  59.

 1                    (Plaintiffs' Deposition Exhibit No.

 2                    59 was marked for identification.)

 3         Q.    Exhibit 59 is discipline for CSO James

 4    York related to posts he made on social media about

 5    hating Muslims and other statements about anger

 6    problems, correct?

 7         A.    Yes.

 8         Q.    His Facebook profile indicates that he

 9    works for the Hamilton County Sheriff's Office and

10    he saved photos to his account with photos of him

11    wearing the deputy sheriff's uniform, correct?

12         A.    Yes.

13         Q.    For that he was given a Level 1 warning,

14    correct?

15         A.    That is correct.  Under Jim Neil.

16         Q.    Do you think the discipline would have

17    been different under Sheriff McGuffey?

18         A.    I don't know.

19         Q.    Okay.  All right.

20         A.    I should clarify.  I'm not involved in

21    discipline.

22         Q.    Okay.

23         A.    I advise, but I'm not the person who makes

24    that call.

25         Q.    Okay.  I mean, you are the designee to

1    talk about social media discipline, though, correct?

2         A.    Certainly.

3         Q.    Okay.  Do you have reason to believe that

4    it would be different under Sheriff McGuffey?

5         A.    I think that the remarks are deeply

6    troubling, so. . .

7         Q.    Because they're racist?

8         A.    Yeah.  I would hope so.  I would hope that

9    there would be different discipline.

10                   MR. WIEST:  Thank you.

11                   MR. MILLER-NOVAK:  Clarify the

12             record.  He did not say --

13                   MR. WIEST:  That he was hopeful that

14             they were racist.

15                   MR. MILLER-NOVAK:  Yes.  Yes.

16                   MR. WIEST:  Okay.  I was just --

17                   MR. MILLER-NOVAK:  I think he meant

18             -- off the record.

19                   (Off-the-record conversation.)

20    BY MR. WIEST:

21         Q.    Pete, if we go back to the social media

22    policy --

23         A.    Yes.

24         Q.    -- it talks about -- and I will pull it

25    back out.  You've got it in front of you.  There it

1    is.  Exhibit 45, I believe.

2         A.   Yes.

3         Q.   Will you look at 701.05 where it talks

4    about the personal use of social media?

5         A.   Yes.

6         Q.   It indicates that the sheriff's office

7    personnel are free to express themselves as private

8    citizens on social media sites to the degree that

9    their speech does not impair working relationships

10   with the Hamilton County Sheriff's Office, impede

11   the performance of duties, impair discipline and

12   harmony, or negatively affect the public perception

13   of the sheriff's office.

14        Let me start with this question.  You

15   would agree that each of those instances of

16   discipline that we just looked at either impaired

17   working -- well, some of them were done on the job,

18   right -- we looked at some of those, correct?

19        A.   Yes.

20        Q.   Otherwise, they would impair working

21   relationships, they may impede the performance of

22   duties, impair discipline, or negatively affect the

23   public perception of the sheriff's office in each of

24   those instances, correct?

25        A.   Yes.

1      Q.   Okay.  If you look, you've got in front of

2   you in this list of exhibits -- I'm going to find

3   it.  That's not it.

4           Jason Davis's Facebook post, have you seen

5   that before?

6      A.   Probably.

7      Q.   All right.

8      A.   I don't know if I looked at it carefully.

9      Q.   Is that Exhibit 14?

10     A.   Yeah.

11     Q.   Does his football post impair working

12  relationships with his supervision within the

13  Hamilton County Sheriff's Office that you're aware

14  of?

15     A.   I mean, the post itself, no.  It seems to

16  be talking about the charity football game.

17     Q.   You would agree that wasn't anything he

18  was doing pursuant to his duties with the Sheriff's

19  Office, right?

20     A.   No.  It looks like it was a charity

21  football game to help families of first responders.

22     Q.   Okay.  Jason was never disciplined for

23  that post or his comments on that, was he?

24     A.   Not to my knowledge.

25     Q.   Okay.  All right.  Is the position of the

1    sheriff's office that his post or the comments

2    violated the social media policy?

3         A.   He was not disciplined for it, so. . .

4         Q.   Okay.  I want to look -- we're going to

5    spend just a little bit of time -- because you're

6    the guy that's going to speak to Jason's performance

7    and personnel records, correct, I believe?

8         A.   Yes.

9              MR. WIEST:  You've got in front of

10             you -- it's an older exhibit, we've used

11             it before -- Exhibit 11.

12             Matt, I know you've seen it, but I've

13             got another copy if you want it.

14             MR. MILLER-NOVAK:  You're okay.

15             Don't worry about it.

16             MR. WIEST:  Okay.

17             MR. MILLER-NOVAK:  Just keep the

18             train moving.

19             (Off-the-record discussion.)

20    BY MR. WIEST:

21         Q.   Okay.  There's no dispute that Jason had a

22    number of -- I'm going to call them attaboys,

23    division commendations, et cetera, in his personnel

24    record, correct?

25         A.   There is no dispute.

1      Q.   At Exhibit 11, right?

2      A.   Yes.

3      Q.   Okay.  If we look at -- by the way, at

4  Exhibit 10 --

5           MR. MILLER-NOVAK:  He's asking if we

6           dispute that.  I just want the record to

7           be clear.

8           MR. WIEST:  The documents speak for

9           themselves.  Sure.

10          MR. MILLER-NOVAK:  Yeah.  Okay.  I

11          think he was asking you to confirm a

12          negative.  I just want to be sure --

13          MR. WIEST:  Right.

14          MR. MILLER-NOVAK:  -- that's what --

15          THE WITNESS:  Okay.  Why don't you

16          tell me that question again.

17          MR. MILLER-NOVAK:  Can you repeat the

18          question?

19  BY MR. WIEST:

20     Q.   Exhibit 11 reflects a number of what I'm

21  going to call attaboys for Jason Davis up to and

22  including division commendations, correct -- from

23  2015 I think through 2021, correct?

24     A.   That's what this document appears to show.

25     Q.   Okay.  Exhibit 11, I just -- I'm sorry,

1    Exhibit 10 is his -- Jason Davis's performance

2    reviews, correct?

3         A.    Yes.

4         Q.    And those also reflect satisfactory

5    performance or above satisfactory performance,

6    correct?

7         A.    Yes.  Satisfactory.

8         Q.    Or above, right?

9         A.    Well, I don't really know.  It's -- I

10   mean, I am not -- I never used the rating system.

11        Q.    Okay.

12        A.    I know it goes up to 25.  He starts at 12

13   and he goes to 17, I think.

14        Q.    Okay.

15        A.    And the 17 was in '21, I believe.  So I'm

16   not really in a position to be able to give you an

17   answer as to whether -- I know that they -- I mean,

18   this is not going to fail probation.

19        Q.    Okay.

20        A.    These are decent scores, but. . .

21        Q.    Okay.  Let me ask.  Do you know why

22   there's no evaluation for 2022?

23        A.    I don't know.

24        Q.    Okay.

25        A.    I can tell you that I've searched.  I've

1   spoken with Sergeant Viner, his direct supervisor.

2   I spoke with Karen Buckner at the patrol

3   headquarters.  We -- I attempted to find every

4   evaluation, whether it was in final form or draft,

5   and I provided you what I was able to obtain.

6        Q.   Did Viner say that he had a draft 2022

7   evaluation or not?

8        A.   He said that he did one, but I could never

9   find it, not electronically and not in paper form.

10       Q.   Okay.  Did he express to you what that

11  evaluation reflected?

12       A.   He said it was a positive evaluation.

13       Q.   Okay.  All right.  I think that's it on

14  the evals.  I'm organizing as I go, I apologize.

15       A.   No, that's all right.

16            MR. WIEST:  I want to talk about --

17            and it looks like this is all going to be

18            one exhibit.

19            THE WITNESS:  Okay.

20            MR. WIEST:  Let me put them together.

21            I'm going to hand you Exhibit 60.

22            (Plaintiffs' Deposition Exhibit No.

23            60 was marked for identification.)

24       Q.   Pete, Exhibit 60, if you look, is -- it

25  looks like they're overtime records.

1          A.    No, that's not true.

2          Q.    Okay.  What are they?

3          A.    I believe this reflects regular pay,

4    overtime pay -- or overtime hours and overtime

5    amount.  I mean, if you look at the top of the

6    spreadsheet, it identifies individuals' regular

7    hours, what the pay was, overtime hours -- I mean,

8    I'm just -- it's broader than what you said.

9          Q.    Okay.  So it does reflect overtimes hours,

10   but it also has regular pay, the amounts of pay,

11   overtime pay --

12         A.    Correct.

13         Q.    Do you know if this is all -- the

14   individuals within this report is RENU?

15         A.    So within Exhibit 60 you have the first

16   one, two -- well, the ones that don't say corporal

17   on top, those are all RENU.

18         Q.    And so let's do this for the record.

19   Bates Nos. 549, 550, 551, 552, and 553 are RENU?

20         A.    Correct.

21         Q.    Okay.  And then 554 it looks like through

22   561, those are corporal?

23         A.    Correct.  Which may also include RENU.

24         Q.    If they're RENU corporal?

25         A.    Yes.

1      Q.   Okay.  And so I'm assuming these were

2  queries of perhaps the same database with different

3  parameters; in other words, we were looking just at

4  RENU for the ones we identified as RENU and then we

5  were looking at just corporals for the ones we

6  identified as corporal?

7      A.   We tried to be responsive to your

8  requests.

9      Q.   We appreciate that.  And so this would

10  reflect actual overtime hours, actual overtime pay

11  for each of these individuals, correct?

12      A.   That is correct.

13      Q.   The question that I've got, if you look at

14  the corporal list, Pete --

15      A.   Yes.

16      Q.   -- and you go back to, for instance, 556,

17  okay?

18      A.   Okay.

19      Q.   Where we've got 2022 corporal numbers?

20      A.   Yes.

21      Q.   In some instances there are multiple

22  queries for the same person.

23      A.   That's correct.

24      Q.   In other words, you know, I've got Greg

25  Burke there, and I've got one, two, three -- four

1    lines for Greg Burke.  Do you know why that is?

2        A.   I asked about that.  And I was told from

3    our fiscal section that -- I think these reflect

4    working in different areas.  They're RENU, so

5    sometimes they may be working in a district or this

6    district.  And I think it comes out of a budget.

7        Q.   Okay.

8        A.   So I think it has -- it has to do with

9    accounting purposes and making sure that -- I don't

10   fully understand it, but I believe it is an

11   accounting issue for our budgeting purposes.

12       Q.   Okay.  And is that why there's different

13   org codes next to each --

14       A.   Exactly.

15       Q.   -- of these lines?

16       A.   That's correct.

17               MR. WIEST:  Okay.  That is helpful.

18               MR. GOTTESMAN:  Off the record.

19               (Off-the-record discussion.)

20   BY MR. WIEST:

21       Q.   And so if I wanted to ascertain total

22   overtime hours for an individual for the year, I

23   would need to add up all the lines for that person,

24   for instance, correct -- in other words, we talked

25   about Greg Burke.  I would need to add up for him

1   the 329 in overtime, the 10 and the 8 in overtime,

2   correct -- to get all --

3       A.   I'm sorry.  I don't see Greg Burke.

4       Q.   Go to Hamilton County 554.

5       A.   Sorry about that.

6       Q.   Go to 554.

7       A.   All right.  Greg Burke.  Yeah, you'd want

8   to -- you'd want to add up the regular amount.

9       Q.   Well, the regular amount -- if I just

10  wanted his overtime hours?

11      A.   Oh, if you just want his overtime, then

12  yes.

13      Q.   329, 10, and 8, right?

14      A.   Yeah.  Those are his overtime hours.  And

15  then the money that that amounts to is reflected in

16  the overtime amount.

17              MR. WIEST:  Okay.  I think that is

18          all I needed on that.

19              This may be duplicative.  I'll hand

20          it to you anyways.  Exhibit 61.

21              (Plaintiffs' Deposition Exhibit No.

22              61 was marked for identification.)

23      Q.   We got produced to us in this case, Pete,

24  if you look at the first page, Year, Corporal FTE,

25  Hourly Rate Min, and Hourly Rate Max.  And it's

1    analyzed.  Do you know what this reflects?

2        A.   This is to the best of my knowledge -- I

3    believe that I spoke with Stephen Hykle about this.

4    He's a fiscal officer.  And if I remember correctly,

5    the corporal FTE by year is the maximum authorized

6    FTE figure.

7        Q.   Okay.

8        A.   Not what we actually filled.  And then the

9    Hourly Min and the Hourly Rate Max and then the

10   Annual Min and the Annual Max reflect the collective

11   bargaining agreement wages.

12       Q.   Okay.  And those are base rates, correct

13   --

14       A.   Correct.

15       Q.   -- not overtime rates?  Okay.  And then

16   we've got the overtime rates underneath that,

17   correct?

18       A.   That's correct.

19       Q.   All right.  And then underneath that

20   there's a total hours worked overtime -- I'm sorry.

21   Underneath there's a total overtime hours worked for

22   each year, correct?

23       A.   Yes, that's correct.

24       Q.   And I'm assuming the overtime hours per

25   corporal is just the hours worked divided by the

1   FTEs authorized?

2        A.   I'm sorry, I don't know.

3        Q.   Okay.

4        A.   I don't know.

5        Q.   You would agree with me that not every

6   corporal was working the same overtime?

7        A.   Yes, that's correct.

8        Q.   Okay.  So it's got to be some sort of

9   average, that OT hours divided by corporal.  You

10  don't know?

11       A.   I really don't know.

12       Q.   Okay.  OT dollars, is that overtime

13  dollars -- the total?

14       A.   Yeah.  And actually now that I look at

15  this, I'm wondering if -- I may be wrong about the

16  corporal FTE.  I don't know if that's the maximum

17  amount or if that's what we actually had.  It may be

18  the number that we actually had, because it would

19  make more sense to divide it by the number we

20  actually had to get the actual averages.

21       Q.   Okay.

22       A.   And, yeah, the overtime dollars.

23       Q.   Here's what I'd like to do, because if you

24  don't know, I want the answers to the questions and

25  I don't necessarily need --

1        A.    Sure.

2        Q.    -- them here now.  Your counsel could

3   follow up by letter to us to get us the information

4   would be fine.  I want to know whether the overtime

5   hours worked is the total.  I want to know whether

6   the OT hours divided by -- I want to know the

7   corporal FTE, whether that is authorized or whether

8   that was actual.  I want to know the OT dollars, if

9   that's the total OT dollars.  And then again how

10  that OT dollars for corporal was derived.

11       A.    Okay.

12              MR. MILLER-NOVAK:  I'm going to ask

13          that you send a follow-up email.  I mean,

14          I don't have --

15              MR. WIEST:  That's fine.

16              MR. MILLER-NOVAK:  -- a problem with

17          that.  I mean, you know, I'm going to

18          guess because corporals are in different

19          duties, that that does have a bearing

20          maybe, too.

21              MR. WIEST:  Well, I just want to know

22          how these numbers on the first page of

23          this exhibit -- what they represent and

24          how we got there.

25              MR. MILLER-NOVAK:  Yeah.  Give us

1           that.  And then we'll talk to fiscal.

2                 THE WITNESS:  Stephen Hykle.  He's

3           the one who gave that to me.

4                 MR. MILLER-NOVAK:  We'll figure out

5           what form you want it in, you know.

6                 MR. WIEST:  Okay.

7                 THE WITNESS:  I mean, I don't think

8           that you're going to get --

9                 MR. MILLER-NOVAK:  Just send us a

10          supplemental -- or we can supplement.  But

11          I think there's an interrogatory that's

12          probably on point -- we can make one on

13          point.

14                MR. WIEST:  I mean, it's a 30(b).

15          It's within the scope of the 30(b).  I

16          think we're entitled to it.

17                MR. MILLER-NOVAK:  Yeah.  I just --

18          I'm sure you want something sworn rather

19          than just a generic email, I'm assuming?

20                MR. WIEST:  Yeah, that would be fine

21          or a follow-up declaration or something.

22                MR. MILLER-NOVAK:  Yeah, or a

23          supplemented interrogatory response we'll

24          provide you the information.  That will

25          work.

1          MR. WIEST:  Okay.

2          MR. MILLER-NOVAK:  All right.

3    BY MR. WIEST:

4        Q.   There's some follow-up data, Pete, that

5    follows if you look on the second page of that

6    exhibit.

7        A.   All right.

8        Q.   And it starts on the second page.  And I

9    have the same questions, you know, what does true

10   annual salary mean, what does previous pay rate and

11   pay rate mean.  If you know, you can tell me now.

12   I'm assuming the OT rate is the 1.5 hourly rate?

13       A.   Right.

14       Q.   If you could just let me know what that --

15   like the true annual salary, what that means, is

16   that what actually got paid to them inclusive of

17   overtime or not.  Those are the questions that I've

18   got.

19       A.   I'll have to get with the fiscal officer.

20          MR. WIEST:  Okay.  We'll follow up on

21          Exhibit 61.  I'll get a letter on that.

22          That's fine.

23          MR. MILLER-NOVAK:  Thank you.  I

24          think part of the issue is -- and I just

25          want to be clear -- we specially generated

```
 1              these, right -- this isn't like our normal
 2              --
 3                   THE WITNESS:  Oh, gosh, no.  Yeah,
 4              this is --
 5                   MR. MILLER-NOVAK:  Otherwise, we
 6              would to have given you like bankers boxes
 7              and stuff.  So I think --
 8                   THE WITNESS:  It's summary-type
 9              stuff.
10                   MR. MILLER-NOVAK:  So --
11                   MR. WIEST:  Right.
12                   MR. MILLER-NOVAK:  -- yeah.  That's
13              why we're a little --
14                   MR. WIEST:  Sure.
15                   MR. MILLER-NOVAK:  So we'll do what
16              we need to do to clarify what the
17              information is.
18                   (Plaintiffs' Deposition Exhibit No.
19                   62 was marked for identification.)
20  BY MR. WIEST:
21       Q.   Pete, I think all I need on this -- I'm
22  going to hand you Exhibit 62 -- is just an
23  authentication.  This contains the --
24       A.   W-2s.
25       Q.   -- Jason Davis's W-2s while he was working
```

1    at the County.  And it looks like it's 2021 through

2    2024, I believe -- 2020 through 2024 or -- I'm

3    sorry, 2019 through 2024.

4         A.    Yeah.

5         Q.    You would agree, right?

6         A.    I do.

7         Q.    Okay.  You've got in front of you a big,

8    fat Exhibit 43, which is the collective bargaining

9    agreement, correct?

10        A.    Yes.

11        Q.    You would agree that specialty assignment

12   and corporal pay is all governed by -- and frankly

13   deputy pay is all governed by the collective

14   bargaining agreement with the Hamilton County

15   Sheriff's Office, correct?

16        A.    Deputy pay is.  Corporal pay is.  There

17   are articles on -- I mean, everything that the

18   bargaining unit bargained for, so. . .

19        Q.    Okay.

20        A.    And it's effective through December 31 of

21   2023.

22        Q.    Okay.  There were also some amendments to

23   that with respect to pay.  Give me one second.

24              MR. MILLER-NOVAK:  I don't think it's

25              attached to that.

```
 1              MR. WIEST:  It's not.  I'm going to
 2         do it separately.
 3              MR. MILLER-NOVAK:  All right.
 4              MR. WIEST:  This one was a Chris
 5         error, so I'm going to fix that.
 6              I'm going to mark this as 43-A.
 7              (Plaintiffs' Deposition Exhibit No.
 8              43-A was marked for identification.)
 9    Q.   So, Pete, 43-A begins with what I'm going
10    to call the initial contract pay scale.  And then if
11    you go back to what's been Bates stamped Davis 72,
12    there was an amendment dated December 21, 2022,
13    correct?
14              MR. MILLER-NOVAK:  Hang on a sec.  I
15         just want this to be clear, so -- because
16         we have what was 7 and 7-A.  I think the
17         only thing is the amendment is 7-A --
18              MR. WIEST:  No, that's right.  So it
19         begins --
20              MR. MILLER-NOVAK:  I think 7 was an
21         excerpt --
22              MR. WIEST:  Yeah.
23              MR. MILLER-NOVAK:  -- of the large
24         collective bargaining agreement.
25              MR. WIEST:  That's exactly right.
```

1              MR. MILLER-NOVAK:  Okay.

2              MR. WIEST:  So let's just be clear --

3         I'll be clear for the record.

4         Q.   Exhibit 43-A, which started as Jason Davis

5    Exhibit 7 and is marked Davis 7 through Davis 60,

6    are excerpts of the initial bargaining agreement

7    reflecting the pay provisions, correct?

8         A.   Yes.

9         Q.   And then 7-A, which starts at Davis 72 and

10   runs through Davis 74, which is marked as 7-A, is

11   the mid contract revision amending the pay scale,

12   correct?

13        A.   Yes.  It was the result of a reopener.

14        Q.   And that would govern pay beginning

15   January 1st of 2023, correct?

16        A.   Yes.

17        Q.   Okay.  And did that run through the end of

18   the contract term, that reopener?

19        A.   Yes.

20        Q.   Okay.  And then there was a new contract

21   that's available on the sheriff's website now that

22   governed January 1, 2024, through the present,

23   correct?

24        A.   Yes.

25              MR. WIEST:  This is Exhibit 63.

1                    (Plaintiffs' Deposition Exhibit No.

2                    63 was marked for identification.)

3         Q.   Pete, this is the pay provision from the

4    current collective bargaining agreement, correct,

5    that I just handed you, Exhibit 63, the one that

6    began January 1st of 2024?

7         A.   That is what it reflects, yes.

8         Q.   Okay.  And it also reflects increases

9    effective January 1st, 2025, and then increases

10   January 1st, 2026, right?

11        A.   Yes.

12                   MR. WIEST:  Okay.  Pete, I'm going to

13            hand you 64.

14                   (Plaintiffs' Deposition Exhibit No.

15                   64 was marked for identification.)

16                   (Off-the-record discussion.)

17   BY MR. WIEST:

18        Q.   Pete, is Exhibit 64 the public records

19   policy for the Hamilton County Sheriff's Office

20   effective January 25, 2023?

21        A.   Yes, it is.

22        Q.   You would agree that there's an overview

23   on page two --

24        A.   I'm sorry.  Starting at Hamilton County

25   Bates stamp 74 is the --

1     Q.   The old one?

2     A.   Yeah.

3     Q.   That's fair.

4     A.   Just making. . .

5     Q.   So for the record, the current iteration

6  of this is -- what is not Bates stamped and starts

7  with the one -- the policy signed by Sheriff

8  McGuffey on the second page of this exhibit and runs

9  until we get to the Bates stamps at 74.

10    A.   That's very close.  There's actually a --

11  the Lexipol has a public records policy as well,

12  which isn't here, but that's Policy 807 in Lexipol.

13    Q.   And so this policy that we see starting on

14  the second page of this exhibit would have been

15  applicable through March of 2024?

16    A.   Yes.

17    Q.   And the current policy is in Lexipol?

18    A.   Yes.

19    Q.   Okay.

20    A.   So as of March 15, 2024, there's a Lexipol

21  policy.  Prior to that would be --

22    Q.   What starts on the second page --

23    A.   -- the second page of 64, correct.

24    Q.   Exhibit 64, starting at the second --

25    A.   Yes.

1      Q.    -- page of the exhibit?

2      A.    Yes.

3      Q.    Okay.  Through the Bates stamp 74, which

4   is the old policy?

5      A.    Correct.

6      Q.    Okay.  Well, let's use the current

7   policy -- or, I'm sorry, not the current policy.

8   Let's use the policy that was in effect through

9   March of 2024 starting on January of 2023.

10      A.    Okay.

11      Q.    There's a definition -- there's an

12   overview about what a public record is; do you see

13   that?

14      A.    What page are you on?

15      Q.    The third page of the exhibit, 404.01.1.A.

16      A.    Defining records?

17      Q.    Yes.

18      A.    Yes, I see that.

19      Q.    Any document -- paper, electronic

20   (including, but not limited to email), or other

21   format -- that is created or received by, or comes

22   under the jurisdiction of a public office that

23   documents the organization, functions, policies,

24   decisions, procedures, operations, or other

25   activities of the office, correct?

1      A.   Correct.

2      Q.   Are you aware of any court decisions that

3  interpret documents that are created or received by

4  or come under the jurisdiction of a public office?

5      A.   Yes.  I mean, not generally I am.  I'm not

6  aware of any specific cases.

7      Q.   Okay.

8      A.   I'm not -- maybe you should rephrase your

9  question.

10      Q.   Let me ask it more specifically.  Are you

11  aware that the Ohio Supreme Court in June of this

12  year determined that recordings and other emails and

13  such that are created on a private device or private

14  account is not a public record?

15      A.   I'm not aware of that.

16      Q.   Okay.  Other than in this case are you

17  aware of any instance where the Hamilton County

18  Sheriff's Office has taken the position that a

19  recording created on a private device by an employee

20  who is not on duty is a public record?

21      A.   I'm not aware of any specific case like

22  that.

23      Q.   Okay.  If you go back to the written

24  discovery.  We looked at it earlier.

25      A.   Okay.

1      Q.    Exhibit 33.

2      A.    I have it.

3      Q.    I want to go to Interrogatory No. 15.

4      A.    Okay.

5      Q.    We asked from January 1, 2021, to the

6   present, identify and describe fully any and all

7   discipline (including informal discipline) imposed

8   by or within, or sought to be imposed by or within,

9   the Hamilton County Sheriff's Office for violating

10  the Open Records Act.  This identification

11  requirement includes, at a minimum, the person who

12  imposed the discipline -- who discipline was imposed

13  against or threatened to be imposed against; the

14  date of the discipline and date of alleged offense;

15  the specific discipline imposed (including for any

16  suspension whether it is a paper suspension and

17  number of days); whether the person had previous

18  offenses under progressive discipline; and if the

19  discipline was reduced at either arbitration or a

20  hearing, what the discipline was reduced to.

21          And there's some objections, but there's a

22  response that says, Without waiving this objection,

23  Hamilton County can state that it is not currently

24  aware of another deputy who secretly recorded any

25  conversations in violation of County policy then

1    refused to turn over the public record he created

2    after he was no longer employed with Hamilton

3    County.  Defendant Hamilton County has not needed to

4    ever discipline another employee for secretly

5    recording other employees in violation of policy

6    then refusing to turn over the record he created

7    after leaving the County.  However, the County has

8    disciplined other employees for taking County

9    property, such as toilet paper or blankets home,

10   which has led to termination and even prosecution in

11   the past.  Nicholas Diehl was both terminated and

12   prosecuted for taking County property.  It is

13   believed another deputy was once disciplined for

14   using County blankets at home.  Do you see that?

15       A.   I do.

16       Q.   Is it the position of Hamilton County and

17   the sheriff's office that Jason Davis committed what

18   is tantamount to theft in office for taking the

19   recording and retaining it?

20       A.   No.

21       Q.   Why then would this interrogatory response

22   mention prosecution in the past?

23       A.   So my -- in preparing this interrogatory,

24   I searched for any -- anything that related to the

25   Open Records Act, any discipline.  And I spoke with

1  professional standards.  I spoke with our jail

2  major, Major Ems.  And I couldn't find anything that

3  referred to the Open Records Act, so -- but Major

4  Ems mentioned, well, we did have this guy who took

5  blankets and used them to like wrap his pipes in the

6  winter or something and got caught and he got

7  disciplined for that.  There was somebody who sold

8  toilet paper and that person was prosecuted.  And

9  then there was -- I think it was Michael Esposito

10  was using County property and selling it.  And he

11  got in trouble and prosecuted for it, so -- I mean,

12  I don't think there's anyone who has ever been

13  disciplined or prosecuted.  We've never observed

14  that for open records.

15          But I was trying to in an abundance of

16  caution provide everything that could be possibly

17  related.  I don't think it's related.

18      Q.   Okay.  Well, let's talk about some of

19  those instances, because I think it would be

20  helpful.

21      A.   Okay.

22              MR. WIEST:  Here is 65.

23              (Plaintiffs' Deposition Exhibit No.

24              65 was marked for identification.)

25      Q.   If you look at 65, we start with Esposito.

1  It's some past discipline that Esposito had.  And

2  then we get -- if you go a few pages back, Hamilton

3  County 156, we get Esposito's leave of absence

4  without pay in February of '13, correct?

5       A.   Yes.

6       Q.   There's an Arrest and Investigation Report

7  that's at 157, 158, 159.

8       A.   I can see them, yes.

9       Q.   Okay.  And then Esposito retires and

10  resigns in April of 2013, correct -- in light of the

11  criminal investigation, right?

12       A.   I'm sorry, what date did you say?

13       Q.   If you look, he resigns April 3rd of

14  2013 -- or retires?

15       A.   Yes.  That's correct.

16       Q.   Okay.  I undertook to figure out what was

17  going on with Esposito.  I actually got on the

18  Court's website and I pulled his actual information

19  that he was charged with that follows; do you see

20  that -- the State of Ohio versus Michael Esposito,

21  Allison Esposito, and Adam Fintak?

22       A.   Yes, I do.

23       Q.   Michael Esposito was also charged with not

24  just -- I think taking jewelry that was in the

25  property room -- that was one of the charges -- but

1  also drug trafficking, among other charges, correct?

2       A.   Yeah.  It was conveyed to me that he used

3  the property room as his, you know, personal fiefdom

4  and was selling stuff, so --

5       Q.   So it wasn't just jewelry; it was drugs,

6  it was anything --

7       A.   Yeah.

8       Q.   -- in the property room?

9       A.   But I wasn't here.  That's just what I was

10  able to obtain -- discover.

11       Q.   And then I've got included in this a press

12  release -- this was actually in Hamilton County's

13  production -- the press release about his conviction

14  for -- among other things -- two counts of

15  aggravated trafficking, including one count of

16  trafficking of drugs, one count of theft of drugs,

17  one count of theft.  And I've got his judgment entry

18  of conviction that follows.

19            I mean, you would agree with me, I

20  think -- I hope -- that Jason Davis taking a

21  recording on a private device when he's off the

22  clock isn't -- it's apples and oranges with what

23  Michael Esposito did?

24       A.   Absolutely.

25       Q.   Okay.  Let's look at Nick Diehl.  He's

1    next.

2         A.   Okay.  All right.

3         Q.   It's the same packet.  He starts -- it's

4    not nearly as thick as Esposito.  Hamilton County

5    325.  It's towards the back.  It's after the

6    judgment entry of Esposito.  Same exhibit.

7         A.   Yeah.  The toilet paper, right?

8         Q.   This is the toilet paper incident?

9         A.   That's my understanding.

10        Q.   Okay.  He physically took toilet paper --

11   you would agree with me the sheriff's office pays

12   for toilet paper, correct?

13        A.   Sure.  It's county property.

14        Q.   It's county property.  I will tell you I

15   tried to pull the misdemeanor charges that he was

16   convicted of, and I couldn't find them.  I'm

17   assuming he got them sealed.

18        A.   I would assume.

19        Q.   Okay.  Do you know what the value is of

20   what he took?

21        A.   I do not.

22        Q.   Okay.

23        A.   I mean, it's toilet paper.  I have no

24   idea.  I don't know how extensive that was.

25                  MR. MILLER-NOVAK:  It depends what

 1          year.

 2                 THE WITNESS:  Yeah, that's right.

 3          Was it 2020?  I don't know.

 4     Q.   I think it was 2006 --

 5                 MR. MILLER-NOVAK:  Okay.

 6     Q.   -- that he was charged with theft in

 7  office, so a felony five and it was dropped to a

 8  misdemeanor.  Are you aware of that?

 9     A.   Yes.

10     Q.   Okay.  He resigned as well?

11     A.   In lieu -- yes.

12     Q.   In lieu of conviction?

13     A.   Correct.

14     Q.   Okay.  Is it the position of the Sheriff's

15  Office or the County that what Jason Davis did in

16  taking a private recording on a private device off

17  the clock is somehow tantamount to theft of physical

18  property that has a value associated with it?

19     A.   Again, no.

20     Q.   Okay.

21     A.   My job in creating the discovery and

22  trying to gather everything was to get anything

23  remotely that could be useful in litigation, so --

24  to you and for everyone.

25     Q.   Okay.  All right.  One of the questions

1  that we had dealt with contract negotiations and

2  eligibility list extensions.

3       A.   Sure.

4            (Plaintiffs' Deposition Exhibit No.

5            66 was marked for identification.)

6       Q.   Pete, I went and looked -- if you go back,

7  there are, it looks like, what Brent Geary sent to

8  you.  As an aside, was Mr. Geary involved in the

9  negotiations?

10      A.   Yes.  He's the lead negotiator for

11 Hamilton County Sheriff's Office in that -- well,

12 really all relevant years.

13      Q.   Okay.  So he is contracted by the

14 sheriff's office to help do collective bargaining

15 negotiations?

16      A.   That's correct.

17      Q.   Representing the employer?

18            MR. MILLER-NOVAK:  I'm sorry.  I just

19       want to --

20      A.   It's by the board -- it's by the county.

21 Excuse me.

22      Q.   Okay.  Said another way --

23            MR. MILLER-NOVAK:  Sorry.  We just

24       don't want to --

25            THE WITNESS:  I don't want to give

1           you --

2      Q.   The confusion here or the discussion is

3  who the -- who he actually is representing, whether

4  it's the board of commissioners, the county, or --

5                MR. MILLER-NOVAK:  Who contracts with

6           them.

7      A.   So --

8                MR. MILLER-NOVAK:  He doesn't just do

9           the sheriff's department.

10               THE WITNESS:  Yes.

11               MR. MILLER-NOVAK:  We can say that.

12               THE WITNESS:  That's correct.  And

13          you're right.

14     Q.   So he does CBA negotiations for employee

15  units beyond the sheriff's department?

16               MR. MILLER-NOVAK:  A number of units.

17     A.   Yes.

18               MR. MILLER-NOVAK:  Sorry, I don't

19          mean to --

20     A.   County wide.

21               MR. MILLER-NOVAK:  Yeah.

22     Q.   Fair enough.  In any event with respect to

23  negotiations with the HCSA, he's representing the

24  sheriff as the employer of the county?

25     A.   Yes.  I mean, yes.  I don't want to

1   oversimply it, because he's working with county HR

2   on some aspects of it.  He's working with the

3   sheriff's office.  Because when you're bargaining,

4   of course, there's work conditions, there's pay.

5        Q.   Sure.

6        A.   The board of county commissioners, they

7   have to, you know. . .

8        Q.   So my point, though, is -- I mean, he is

9   representing the sheriff -- because if you go back

10  and you look at the CBA, for instance, in Exhibit 7,

11  the parties to that agreement are the sheriff and

12  the HCSA?

13       A.   Yes.

14       Q.   Okay.  In any event, rather than getting

15  mired in those weeds --

16       A.   Yes.

17       Q.   -- there are back-and-forth proposals that

18  follow on this exhibit, Exhibit 66, that have both

19  the employer's proposals and it looks like there's

20  actually two different employer proposals, one dated

21  November 27, 2023, the second dated December 7,

22  2023, reflecting back and forth with --

23       A.   Yes.

24       Q.   -- the bargaining unit?

25       A.   That's correct.

1     Q.   Okay.  If you look at 543, there's a

2   change to 14.7 that says change promotional

3   eligibility list lifespan from two years to one year

4   in the November 27, 2023, proposal, correct?

5     A.   Yes.

6     Q.   And then that is carried over.  And it is

7   also contained in the December 7, 2023, proposal,

8   correct?

9     A.   I'm sure it is.  I just --

10     Q.   Look at 545.

11     A.   -- don't see it.

12     Q.   Bates 545.

13     A.   I'm not seeing it.

14     Q.   Bates -- you don't have 545; is this

15   another associate problem?  It could be.

16     A.   I have 544 and 546.  I'm sorry.

17     Q.   I'm going to give you my copy --

18     A.   All right.

19     Q.   -- because I know that there's a 545.

20          MR. MILLER-NOVAK:  Do you want me to

21          make a copy?

22     A.   I see it.

23          MR. MILLER-NOVAK:  I have no problem

24          doing it.

25          MR. WIEST:  No.

Page 171

1       A.    But, yes, it's in there.  Yes.

2             MR. WIEST:  No.  Because I want to

3             make sure we have the correct exhibit.

4             MR. MILLER-NOVAK:  Okay.  Because, I

5             mean, the copy room is right kind of down

6             the hallway.

7             MR. WIEST:  I've got like two

8             questions on this.  I didn't want to spend

9             a lot of time --

10            MR. MILLER-NOVAK:  Okay.

11      A.    So on page 545 I see 14.7, Change

12  promotional eligibility list lifespan from two years

13  to one year.

14      Q.    Okay.  Do you know whether or not the

15  language would affect in place eligibility lists?

16      A.    It would not.  It was prospective.

17      Q.    Okay.  How do you know that?

18      A.    I was involved in the negotiations.

19      Q.    Did anyone mention that it could be

20  retroactive to existing lists?

21      A.    Not in my presence.

22      Q.    Okay.

23      A.    And that was never contemplated.

24      Q.    Okay.  Was it mentioned at all whether it

25  would be prospective only, or was it just -- were

1    people quiet about it?

2         A.   I don't think -- I mean, we had an

3    existing list, so I think that that would impact

4    those people.  So, no, we -- we knew that it would

5    have to be prospective.

6         Q.   Okay.

7         A.   I think it was assumed.  I don't know --

8    it wasn't specifically mentioned, but I think it was

9    assumed because everyone knew.

10        Q.   Do you know if that was ever clarified in

11   the final CBA?

12        A.   Oh, yeah.

13        Q.   It was prospective only?

14        A.   It's prospective only.  The existing list

15   would expire.  And then the promotional lists went

16   from two to one.  And we tried to do that across all

17   bargaining units.

18        Q.   Right.  And the final CBA actually

19   indicated that it was prospective only, correct?

20        A.   Correct.

21        Q.   It was not mentioned, though, in those

22   terms, correct?

23        A.   That's correct.

24        Q.   Okay.  Do you remember when that

25   clarification was brought up and by whom?

1      A.   I do not.

2      Q.   Okay.

3      A.   But, I mean, it was always the intent from

4  our side that this would be a prospective

5  limitation.  We wanted to across the board for all

6  of our bargaining units go from a two-year

7  eligibility list to a one-year eligibility list,

8  because we wanted more frequent examinations and

9  better supervisors.

10              (Plaintiffs' Deposition Exhibit No.

11              67 was marked for identification.)

12     Q.   Okay.  Pete, Exhibit 67 are a number of

13 exhibits that were produced relative to Carolyn

14 Adams.  And then I know you've got this -- because

15 we sent it to Mr. Miller-Novak I think either last

16 week or somewhere around there -- the actual run of

17 LEADS on Carolyn Adams on July 7 of 2022.

18              Let me start here.  Are you aware that

19 Deputy Curtis Taylor ran Ms. Adams on LEADS July 7,

20 2022?

21     A.   I am aware.

22     Q.   Do you know why that occurred?

23     A.   I do not know why that occurred.

24     Q.   Did anyone direct him to do that that

25 you're aware of?

1       A.    No.   It was self-directed activity.   He

2  has been asked and he has said that he wasn't doing

3  it at the behest of anyone.   We are actually

4  investigating this.   So I don't want to get into it.

5       Q.    Okay.

6       A.    But I'm kind of -- we're concerned that --

7  about it, so. . .

8       Q.    Okay.   Were you aware that he had actually

9  run her before I gave you the LEADS run?

10       A.    Well, I was because Jessica Kober received

11  the public record request.

12       Q.    Okay.

13       A.    So whenever that came in, she probably

14  brought it to my attention.   And so we started

15  trying to find information.

16       Q.    It looks like that came in in August of

17  2024, a year ago.

18       A.    Right.   We -- I'm sorry.   What's your

19  question?

20       Q.    Yeah.   So the sheriff's office has been

21  investigating this for a year?

22       A.    No.

23       Q.    Oh.

24       A.    No.

25       Q.    When was the investigation opened on this?

1      A.    I think we asked -- PSD has sat down with

2  Curtis Taylor to find out why he ran Carolyn Adams.

3      Q.    Do you know when that occurred?

4      A.    I believe it's this week, so --

5              MR. MILLER-NOVAK:  Well, for the

6          record, when the run happened or when he

7          found out about it?

8              MR. WIEST:  When he found out that

9          the run occurred.

10     A.    When I found out that the run --

11     Q.    When did you find out that Curtis Taylor

12  ran Carolyn Adams on LEADS?

13     A.    Well, I never found that out.  I mean, I

14  received -- we received a public record request from

15  the Finney Law Firm.  And then Jessica Kober

16  attempted to find records.

17              So I didn't really know one way or the

18  other.  And I don't think that she could find

19  anything relevant to that.

20     Q.    Okay.  Because her response was that they

21  could not find anything responsive, right?

22     A.    Right.

23     Q.    Okay.

24     A.    But obviously -- well, I'll let you ask

25  the question.

Page 176

1    Q.   Well, I gave you a copy of the LEADS run,

2    correct?

3    A.   Yes.

4    Q.   Was the sheriff's office aware that LEADS

5    had been run definitively prior to my providing that

6    to you?

7    A.   No.  To my knowledge, no.

8    Q.   Okay.

9    A.   I think once we found that, it was -- you

10   know, we wanted to make sure that we could say that

11   this was not directed by anyone in leadership.

12   Q.   Okay.

13   A.   And so we asked Curtis Taylor about it.

14   He said it was self-directed.  And now we're

15   investigating it further.

16   Q.   Okay.  If you go back in this exhibit to

17   877, there's a Bates stamp that starts at 877.  It's

18   near the back.

19   A.   Okay.  Yes.

20   Q.   There's communications between Kyla Woods

21   and Major Schuler --

22   A.   Yes.

23   Q.   -- relative to Carolyn Adams.

24   A.   Yes.

25   Q.   Do you know whether or not -- well, let me

1  start here.  How was Kyla Woods aware of Carolyn

2  Adams' posts?

3      A.   Kyla Woods is our public information

4  officer.  She's, you know, now the director of

5  public engagement -- I think is her title.  But her

6  job is basically to be aware of social media and to

7  provide the government message what the Hamilton

8  County Sheriff wants to disseminate and -- so I

9  don't know how she became aware of this, but clearly

10 she did.

11     Q.   Do you know whether she has ever been

12 tasked with tracking Carolyn Adams' posts?

13     A.   I know she has not.

14     Q.   How do you know that?

15     A.   Because I've spoken with the Sheriff.

16 I've spoken with Chief Gramke.  I've spoken with

17 Major Schuler.  And I know that she has not -- I

18 know no one has.

19     Q.   Okay.  It looks like these posts were

20 actually made on -- by Adams on the Sheriff's page,

21 though, correct?  Because she says you may have

22 already seen these comments on our FB page.

23     A.   It does look like that.

24     Q.   Okay.  Do you have any reason to believe

25 that that's not the case?

```
 1       A.   No.

 2       Q.   Okay.  Are you aware of anyone within the

 3  Hamilton County Sheriff's Office who has been tasked

 4  with tracking Carolyn Adams or people interacting

 5  with her?

 6       A.   I am not.  And I don't believe anyone is.

 7            MR. MILLER-NOVAK:  Are you done with

 8       this?  I'm sorry.

 9            MR. WIEST:  I think so.  Let me make

10       sure.  Why don't we take a -- if it's

11       okay, why don't we take five minutes.

12            (A brief recess was taken.)

13  BY MR. WIEST:

14       Q.   Pete, you've got in front of you a big,

15  thick CBA that we've marked earlier today as Exhibit

16  43.

17       A.   Correct.

18       Q.   It was marked in Jason Davis's depo I

19  think as Exhibit 7, but it's Exhibit 43 in this

20  deposition.  And I've got a couple of questions

21  about it.  One question that I've got deals with the

22  rule of three, and that was Topic 8 on your list.

23  And if you can, I'd like to go back to Section 14.8

24  at page 20.

25       A.   Yes.
```

1      Q.   Tell me when you're there.  Let me start

2  with the basics.  14.8 is the rule of three

3  provision, correct?

4      A.   That's correct.

5      Q.   And the rule of three provision reads,

6  quote, Promotions may be offered to any one of the

7  top three scorers on an examination if more than

8  three pass the examination, or to any employee who

9  passes the examination if three or less take the

10  examination.  Employees passed over retain their

11  standing on the eligibility list.

12          And so that allows the sheriff for any

13  vacancy to look at an eligibility list and say who

14  is the next three and I have to take one of them,

15  correct?

16      A.   Yes.

17      Q.   And if the sheriff wanted, for instance,

18  to continue to pass over the same person, the

19  sheriff could do that, correct?

20      A.   It wouldn't be the sheriff, but yes.

21      Q.   Okay.  Are you suggesting that the sheriff

22  doesn't retain ultimate authority over promotions

23  within the sheriff's office?

24      A.   Currently that -- I mean, she obviously is

25  the sheriff.

Page 180

1      Q.   Right.

2      A.   But the chief deputy is the person who
3 runs the promotions up to the level of basically
4 captain, so. . .

5      Q.   Okay.  It's all ultimately subject to the
6 sheriff's approval, correct?

7      A.   Yes.

8      Q.   Okay.  And I know that we've got Jason
9 Davis's eligibility list.  It's been previously
10 marked as Plaintiffs' 12, I think.  I think it was 3
11 by you folks in his depo that I just handed you.
12 But, for instance, on the rule of three -- and I
13 just want to go through how that works.

14         Let's say that the decision was made not
15 to promote Von Hertsenberg who was No. 1 on the
16 list.  If there's -- the initial vacancy the sheriff
17 could pick Ritter or Enderle instead of Von
18 Hertsenberg, correct?

19      A.   Yes.

20      Q.   And then Hoover, who was fourth -- he
21 would then move up after that vacancy was filled,
22 correct?

23      A.   Do you mean into the group of three?

24      Q.   Into a group of three, correct?

25      A.   Yes.

1     Q.   Okay.  And then, again, Von Hertsenberg

2   could be passed over at the sheriff's discretion.

3   And that could continue -- there's no limit to how

4   many times somebody could be passed over under

5   Section 14.8, correct?

6     A.   So I don't know that that provision has

7   been tested in that way.  That's never happened.

8   I'm questioning the last sentence, which is

9   employees passed over shall retain their standing on

10   the eligibility list.  I'm sure that the union would

11   grieve it if somebody was just repeatedly passed

12   over and they're number one on the list or anywhere

13   on the list, but I just haven't seen that.

14     Q.   Okay.  You agree, though, that at least

15   according to the language of 14.8 there's only a

16   requirement for the sheriff to take the one out of

17   the top three on the list for any given vacancy,

18   correct?

19     A.   Yes.

20     Q.   Okay.  Has there been any directives of

21   any monitoring or investigations of Jason Davis or

22   Jennifer Davis from January 4, 2021, to the present

23   --

24     A.   No.

25     Q.   -- within the sheriff's office?

Page 182

1        A.    No.

2        Q.    And your testimony, just to make sure that

3   I've covered Topic 11, is there's been no

4   investigations or directives to investigate Carolyn

5   Adams or any of her various aliases?

6        A.    Correct.

7        Q.    Okay.  Has there been any emails that

8   you're aware of from the sheriff or anyone else

9   concerning Carolyn Adams other than what's been

10  produced in discovery in this case?

11       A.    I think we saw the one from Kyla.

12       Q.    Right.

13       A.    And I think that -- concerning Carolyn

14  Adams?

15       Q.    Yes.

16       A.    I think that's it.

17       Q.    Okay.

18       A.    That's all I'm aware of.

19       Q.    Pete, I want to go back to -- there's a

20  discipline provision within this policy.

21       A.    Okay.

22              MR. MILLER-NOVAK:  What policy?

23              MR. WIEST:  I'm sorry.  The CBA.

24              MR. MILLER-NOVAK:  Okay.

25              MR. WIEST:  Thank you for that.

Page 183

1      Q.   And it starts on page 11.

2      A.   All right.

3      Q.   And it outlines the forms of discipline.

4  It's got the different levels; do you see that?

5      A.   Sorry.  I was on Bates 11.  Okay.  Got it.

6  Yeah.

7      Q.   Page 11.  And it's got Level 1 through

8  Level 4 and then discharge, correct?

9      A.   That's correct.

10     Q.   And there's a restriction on that.  It

11  says, The employer may take this type of action for

12  actions occurring while the employee is on duty, or

13  working under the colors of the employer, or in

14  instances where the employee's conduct violates his,

15  slash, her oath of office; do you see that?

16     A.   I do.

17     Q.   I mean, you agree that determining whether

18  somebody is on duty is determined whether or not

19  they're being paid, correct; in other words, are

20  they on the clock?

21     A.   That is my understanding.

22     Q.   Okay.  How does the sheriff's department

23  determine whether somebody is working under the

24  colors of the employer?

25     A.   If they're uniformed.

1        Q.    Okay.

2        A.    And if they're -- obviously we have

3    plainclothes employees as well.

4        Q.    That's where I was going.

5        A.    They would be working under the colors.  I

6    mean, you have to be working for -- doing the work

7    of the sheriff's office in some capacity when you're

8    acting under color.

9        Q.    You might be on an off-duty detail in

10    uniform, you might be --

11        A.    You might be deep undercover.

12        Q.    -- deep undercover?  Okay.  Not sitting on

13    your couch in your living room?

14        A.    Right.

15        Q.    And then --

16               MR. MILLER-NOVAK:  I'm sorry.

17               MR. WIEST:  Go ahead.

18               MR. MILLER-NOVAK:  I just want to

19          make sure.

20        Q.    Okay.  And then we'd want to look at the

21    oath of office to determine if somebody violated it,

22    correct?

23        A.    I mean, I think it's broader than that.  I

24    think the oath of office is basically saying, you

25    know, I agree to discharge my duties, but in that

1    encompasses the policies, the procedures, the rules

2    and the regulations of the sheriff's office.  So

3    it's not simply you violated your oath.

4        Q.   Okay.  Does the oath require any sort of

5    promise to strictly comply with every policy?

6        A.   The oath does not specifically set that

7    forth.  I think that's an understanding and a custom

8    in the sheriff's office that our deputies -- when

9    they make that oath and they swear to discharge

10   those duties faithfully, it is the custom of the

11   sheriff's office that that would include all the

12   policies, all the procedures, all the rules and

13   regulations of the sheriff's office, and -- yeah.

14       Q.   Okay.  Where is that in writing?

15       A.   Well, it's a custom.  I don't know that

16   that is in writing, but I -- obviously we have

17   policies and procedures for a reason and -- just

18   like every other law enforcement agency.  And those

19   are typically the things that result in discipline,

20   because we want our officers to adhere to the

21   Constitution and the laws of the state and so forth.

22   But part of the reason why we have policies and

23   procedures is to ensure that that happens.

24       Q.   Are there policies and procedures that

25   govern deputies' conduct off duty?

1       A.    Yes.   There -- the rules and regulations

2  cover off-duty conduct.   And we expect -- I mean,

3  just broadly, I'm not speaking to any specific

4  policy, but broadly we expect deputies to represent

5  the sheriff's office whether they're on duty or off

6  duty with good conduct and good behavior.

7                MR. WIEST:  Okay.  All right.  Let's

8            go through the rules of conduct.

9            (Plaintiffs' Deposition Exhibit No.

10           68 was marked for identification.)

11      Q.    I'm going to hope that we have all the

12  pages, but, you know, we'll see.

13      A.    Okay.

14      Q.    All right.  Would you agree with me,

15  Pete -- and I think we've got all the Bates numbers

16  -- we do, it appears.  If you see any Bates pages

17  that are missing, let me know.  I just checked.  It

18  doesn't appear to be.  I think we got this one

19  right.

20      A.    I'm missing 105 on first glance.  Let me

21  see if there's any others.

22      Q.    Fair enough.  I'm going to give you my

23  copy, because I know that the original is clean and

24  appropriate.

25      A.    Okay.

1      Q.   I'll take that one back.

2      A.   Yeah.

3      Q.   I'm going to call them the standards or

4  the substantive rules are 1 through 1.25 and 2

5  through 2.56, and then 3 through 3.27 that's the

6  procedures on how this one is going to be handled;

7  would you agree?

8      A.   I would agree.

9      Q.   Okay.  Let's look at the 1.25.  That's the

10  recording policy, correct?

11      A.   Yes.

12      Q.   And it says, An employee may not record

13  another employee in the workplace, including

14  off-duty details and while working remotely, without

15  the consent of all parties present, unless the

16  recording occurs during the course of an official

17  investigation approved by the Sheriff and/or the

18  Chief Deputy.  This is inclusive of video recording

19  and audio recording.

20           Does it apply if an employee is off the

21  clock?

22      A.   Yes.  An employee may not record another

23  employee in the workplace.

24      Q.   Okay.  So it doesn't matter whether the

25  person that's doing the recording is on or off the

1   clock?

2       A.   Correct.

3       Q.   Where does it say that in the policy

4   itself?

5       A.   Well, it says an employee may not record

6   another employee in the workplace, including

7   off-duty details and while working remotely, without

8   the consent of all parties present.

9       Q.   Why would it be necessary to mention

10  off-duty details or working remotely if there was a

11  need to -- if it applied regardless if somebody was

12  on or off the clock?

13               MR. MILLER-NOVAK:  Objection.

14      A.   I can't tell you.  I can just tell you

15  what's written here.  But by its terms it says that

16  an employee may not record another employee in the

17  workplace without the consent of all parties

18  present.  I didn't write this policy.

19      Q.   Sure.  Does it say whose workplace is

20  involved; is it the employee doing the recording or

21  is it any workplace?

22      A.   It says in the workplace.

23      Q.   Right.

24      A.   Which I can only infer would mean the

25  Hamilton County Sheriff's Office.

1      Q.   In terms of how these policies are

2  interpreted if they're ambiguous -- have you ever

3  dealt with ambiguities in the sheriff's office

4  policies?

5      A.   No.

6      Q.   Okay.  Is it your position the sheriff's

7  office -- the recording policy is unambiguous?

8      A.   I don't have a position on that.

9      Q.   Okay.  By the way, who drafts these

10 policies?

11     A.   I don't know who drafted these policies.

12 These were probably in place with -- under Simon

13 Leis.

14     Q.   Okay.  There was a revision on 6/8/2021.

15 Do you see that on the first page?

16     A.   Sure.

17     Q.   You would agree that in any event the

18 policies -- these policies are drafted by the

19 employer, the sheriff ultimately -- regardless of

20 what sheriff or who within the sheriff's office,

21 it's the employer doing the drafting, correct?

22     A.   Yes.  It's the employer doing the

23 drafting.

24     Q.   Okay.  If an employee is at, let's say, a

25 public event on Fountain Square and there's

1   sheriff's office present and there's a concert going

2   on, do they have to get permission of all the

3   deputies present to record the concert if they're

4   there on their own time?

5       A.   I've never encountered that.  I don't

6   know.

7       Q.   Is that their workplace because there's

8   off-duty details going on?

9       A.   Well, it's -- they should not -- I mean,

10  by the terms of this policy, if they record another

11  employee in the workplace, including off-duty

12  details, without the consent of all parties present,

13  that would be a violation.

14      Q.   Okay.  If a supervisor were to see a

15  deputy acting inappropriately, would it violate the

16  policy for the supervisor to record that employee

17  without that employee's consent?

18      A.   Unless the recording occurred during the

19  course of an official investigation approved by the

20  sheriff and/or the chief deputy.

21      Q.   Okay.  Has anyone ever been disciplined

22  under this Section 1.25?

23      A.   May I see this?

24      Q.   Yes.

25      A.   No one to my knowledge has been

1   disciplined under it from January 4 of 2021 until

2   present.

3       Q.   Okay.  And we've looked at other

4   recordings that may have occurred without the

5   knowledge of employees on some of the social media

6   violations.  You're not aware of anybody being

7   charged of a 1.25 violation for that, correct?

8       A.   That's correct.  I think the supervisors

9   have some discretion on what charges they bring.

10  And why they didn't do that, I don't know.

11              MR. MILLER-NOVAK:  Could I talk to my

12              client for a couple of minutes?

13              MR. WIEST:  Sure.

14              (A brief recess was taken.)

15              MR. WIEST:  We had an off-the-record

16              discussion that defendants do not intend

17              to assert any kind of after-acquired

18              evidence defense in this matter which

19              would make relevant comparative conduct,

20              et cetera, and defendants have indicated

21              they are willing to stipulate to that.

22              MR. MILLER-NOVAK:  Right.  For

23              clarity, for what we currently know.  So

24              we would not -- we're not -- we don't

25              intend to make an after-acquired evidence

1        defense related to the recording of the

2        conversation I think is what we were

3        currently on or removal of a recording as

4        a public record or something like that.

5        Does that cover --

6             MR. WIEST:  Yeah.

7             MR. MILLER-NOVAK:  -- the two things

8        I think that you're trying to do discovery

9        on?

10            MR. WIEST:  I think so.  Yeah, I

11       think so.

12            MR. MILLER-NOVAK:  Yeah.  And we're

13       just going to do that.  We're going to

14       save time.

15            MR. WIEST:  Yeah.

16            MR. MILLER-NOVAK:  That way we don't

17       have to go through --

18            MR. WIEST:  All the rules and regs

19       and everything else.

20            MR. MILLER-NOVAK:  Yeah.

21            MR. WIEST:  Okay.

22            MR. MILLER-NOVAK:  We're not

23       presenting the defenses regarding the

24       recording or handling of the recording.

25            MR. WIEST:  Okay.

1          MR. MILLER-NOVAK:  So having said

2          that, we still just -- under regular Rule

3          37 any recordings you do have, we do

4          expect those to be maintained.  That's

5          all.

6          MR. WIEST:  We understand.

7          MR. MILLER-NOVAK:  All right.  Okay.

8     Great.

9          MR. WIEST:  All right.

10          (Plaintiffs' Deposition Exhibit No.

11          69 was marked for identification.)

12   BY MR. WIEST:

13     Q.   Pete, one of the topics was training and

14   procedures related to First Amendment rights.  And

15   there was some training that was provided generally

16   on constitutional rights.  I think it related to the

17   Fourth Amendment, unreasonable search and seizure.

18   I don't think we have any search and seizure in this

19   case.  I want to focus in really on the First

20   Amendment.

21          And there was this inquiry that I think

22   you made with -- I'm not sure if it's Ruth Fritz or

23   --

24     A.   It is.

25     Q.   -- Kristy Fritz or maybe she goes by Ruth

1   and her real name is Kristy.  I don't know.

2        A.   I just call her corporal.

3        Q.   Okay.  Corporal Fritz?

4        A.   Yes.

5        Q.   And she identifies some topics.  I did not

6   see any of them, though, that dealt with First

7   Amendment issues; would you agree?

8        A.   No.  So. . .

9        Q.   Were you aware of any First Amendment

10  training?

11       A.   I am.  I mean, I know that there was First

12  Amendment audit training in 2023.  Corporal Fritz

13  suggested that.  I know that we have had legal

14  updates in '23, '24, and '25.  All of these are

15  through OPOTA.

16       Q.   Okay.

17       A.   So part of the problem with obtaining

18  documents related to this is that they're OPOTA

19  online courses.  Now, I asked for syllabi.  I asked

20  for whatever I could get.  And I provided you what I

21  could get.

22       Q.   Okay.

23       A.   But if OPOTA CPT in those years covered

24  First Amendment topics, which I believe that they

25  did, then that's the First Amendment training that

1  they would have had.

2      Q.   Okay.

3      A.   And they've been doing these OPOTA

4  updates -- you know, every cop every year has an

5  annual CPT requirement.  And OPOTA sets those

6  standards.  We follow OPOTA.  And so they would get

7  that training.  But they don't have the actual

8  syllabi or the documents for it.

9      Q.   Okay.  And you said there was one for

10  First Amendment audits.  Anything else on the First

11  Amendment other than the auditors?  We'll talk about

12  those in a minute.

13      A.   That's really all I could find.

14      Q.   The auditors -- I actually got a case with

15  an auditor right now -- are individuals who go out

16  and record police stations and have -- try and

17  generate other interactions with law enforcement to

18  generate law enforcement activity directed towards

19  them for recording in public places; would you

20  agree?

21      A.   I would.

22      Q.   That's not kind of First Amendment

23  retaliation-type activity where somebody is engaged

24  in some sort of critical speech and there's some

25  governmental action that follows; would you agree?

1        A.    I agree with that.

2        Q.    Okay.  Maybe it's retaliation in the sense

3   that the recording could be --

4        A.    Sure.

5        Q.    But I will tell you -- I mean, I am

6   personally aware of this that there's no law in the

7   Sixth Circuit that says that there's a clearly

8   established right to record law enforcement.  In

9   five other circuits there is, but not in the Sixth

10  Circuit.  Anyways --

11       A.    I'll keep that in mind for 1983 work.

12       Q.    Okay.  All right.  So is that the only

13  training that you're aware of?

14       A.    So there's also weekly briefings.

15  There's -- you know, they have, you know, daily

16  reports.  And I have -- personally have not

17  participated in those, because I don't go to either

18  daily or weekly briefing.  I know they have weekly

19  updates.  Our corrections -- I mean, you're probably

20  only talking about enforcement, right?

21       Q.    Yes.

22       A.    Okay.  So with enforcement -- yeah.  They

23  have -- sergeants may provide information to

24  officers that are on -- relevant information.  But

25  to tell you right now that someone covered First

1 Amendment retaliation during that, I don't know.

2 　　　Q.　Okay.

3 　　　A.　I just know that -- you know, the general

4 question is what training exists.

5 　　　Q.　Right.

6 　　　A.　And, you know, we have a field training

7 officer.　When somebody is brand new at the -- in

8 the job, they sit with another person and they're

9 coached in that regard.　We have the weekly

10 briefings.　We have legal updates that come out.

11 You know, so there's a host of different things.

12 But I do not provide the legal updates.

13 　　　Q.　Okay.

14 　　　A.　They come from either -- our training

15 section typically gets them through either like --

16 you know, sometimes it's from PoliceOne, sometimes

17 it's from OPOTA.

18 　　　Q.　Or the current -- you told me the policy

19 and procedure manual was through Lexipol.　Sometimes

20 they do some of that?

21 　　　A.　Correct.　They do.　They -- we have daily

22 training bulletins.　If there's an update to a

23 policy generated by a change in law, they will

24 provide us with a little summary of the change to

25 the policy and the reason for the change.　And

Page 198

1    they'll cite law, so. . .

2         Q.   Okay.  Former Chief Deputy Mark Schoonover

3    has sued the sheriff's department as you're aware.

4         A.   Yes, that's correct.

5         Q.   One of his claims is First Amendment

6    retaliation.

7         A.   Yes.

8         Q.   Are you aware of that?

9         A.   I am.

10        Q.   And that lawsuit, by the way, preceded --

11   well, that lawsuit happened not long after --

12   scratch all that.  I'm going to get the chain of

13   events correct.

14             Sheriff McGuffey was elected and took

15   office in January of 2021, correct?

16        A.   Yes.

17        Q.   When she took office, the chief deputy at

18   the time was Mark Schoonover, correct?

19        A.   I don't believe that that's correct,

20   because I think that she issued correspondence to

21   then Chief Deputy Schoonover prior to her first day

22   of election, indicating that -- you know, thanking

23   him for his service, but he would no longer be part

24   of the command staff.

25        Q.   Okay.

Page 199

1       A.   So I don't believe -- I think he left

2  office before January 4, but. . .

3       Q.   He's like I know I'm on the way out, you

4  don't need to fire me?

5       A.   I think so, yeah.

6       Q.   Okay.  In any event she indicated that his

7  services would no longer be necessary --

8       A.   Correct.

9       Q.   -- and he was shown the door?

10      A.   Yes.

11      Q.   As a consequence of that in his lawsuit,

12 was there any policy change or practice change or

13 briefing that you're aware of within the sheriff's

14 office concerning First Amendment retaliation?

15      A.   No.  It's always been the case that any

16 time there's an election and a new sheriff, they're

17 entitled to form their own cabinet, command staff

18 essentially.  And I think that that is a practice

19 that has existed for decades.  And I think that

20 that's something that a sheriff has the discretion

21 to have who she wants as her close advisors, so -- I

22 mean, I believe that that -- those claims are

23 meritless and I believe we will win in court.

24      Q.   Because Mark Schoonover was in a

25 confidential policy meeting role?

1      A.   Correct.

2      Q.   There's no exception for First Amendment

3   retaliation for that role?

4      A.   I would speak to the exceptions, but I

5   think that --

6      Q.   Okay.  Fair enough.

7      A.   -- you know, we were well within our

8   rights to --

9      Q.   I'm aware of that.

10              MR. MILLER-NOVAK:  He's trying to

11          help you.

12     A.   Yeah, I hear you.

13              MR. MILLER-NOVAK:  Just in case you

14          missed it.

15              MR. WIEST:  Yeah, I'm aware of that.

16     Q.   Okay.  But there was no policy change

17   after that lawsuit came in, correct?

18     A.   No.

19     Q.   Okay.  Are there any agreements between

20   Hamilton County and Charmaine McGuffey or Jay Gramke

21   concerning indemnity in this case?

22     A.   There's no agreements.  Obviously defense

23   indemnity is required under Ohio Revised Code

24   2744.07, I think --

25     Q.   Yeah.

1      A.    -- and -- but, no, there's no agreements

2   for indemnification.

3      Q.    Is there any insurance policy that covers

4   the claims in this matter?

5      A.    There are not.  I reached out to Starr

6   Markworth, who is our county risk manager, to find

7   out.  There are not.

8      Q.    Okay.  All right.  Topic 35 asks about any

9   investigation of this lawsuit or communications

10  involving the October 10, 2023, interaction between

11  Jason Davis and McGuffey and Gramke.  And I think I

12  am well aware of kind of the lead-up to that

13  October 10 meeting.

14         Is there any investigation that followed

15  the meeting, including Jason's departure -- and I

16  want to be clear here.  I'm not interested in

17  attorney work product investigation.  The suit comes

18  in and the prosecutor's office gets involved in

19  their investigation.  But I'm asking about within

20  the sheriff's department itself, non-privileged --

21     A.    No.

22     Q.    -- anything out there?

23     A.    No.

24     Q.    Other than what we've been given in

25  discovery, are there any communications you're aware

1    of within the Hamilton County Sheriff's Office

2    concerning Jason -- and, again, I'm not looking for

3    privileged information, including work product --

4    the lawsuit, Jason's promotion to corporal, his

5    assignment at RENU, or his departure from the office

6    that we haven't talked about already?

7        A.    There was an email received by Chief

8    Gramke shortly after October 23rd meeting that was

9    sent by Jennifer Davis.

10       Q.    Yes.

11       A.    And I think that Chief Gramke sent that

12   email to -- maybe it was Major Ketteman, myself -- I

13   don't know if anyone else.  And he just said can you

14   believe this or something like that.  I don't

15   remember what he specifically said.  But it was just

16   like, you know, kind of like -- that's it.

17       Q.    Okay.  Was there any follow-up, was there

18   a chain that was generated, or anything like that?

19       A.    No.

20       Q.    All right.  We've had a big fight in

21   recent weeks about who can bind the County on issues

22   of legal liability concerning this matter, who are

23   the agents.  And I am aware that there are certain

24   people that I think are agents beyond dispute, the

25   sheriff, the chief deputy, you've been designated as

1    a 30(b)(6) witness.  Anyone else?

2         A.   Well, I mean, fiscally the board of county

3    commissioners can bind the agency, I suppose.

4         Q.   Okay.

5         A.   Beyond operations, you've already

6    identified the sheriff and the chief.  I think for

7    personnel decisions, probably anyone involved in the

8    promotional process, like unit commander and above.

9    Unit commanders are usually lieutenants if they were

10   involved in that process.

11        Q.   How are they agents for the County in that

12   process?

13        A.   Well, they're involved in selecting the

14   person.  They're involved in making a

15   recommendation, going up the chain, but. . .

16        Q.   You would agree they're not actually

17   making an assignment or promotional decision?  I

18   think we heard Major Ketteman say --

19        A.   Recommendation.

20        Q.   -- that's being done at the major level

21   and above, correct?

22        A.   Yes.  They make recommendations.

23        Q.   Okay.

24        A.   But, I mean, to someone outside the

25   system, they may have apparent authority.  I don't

1   know.  And there's -- you know, it depends on the

2   context.  We have a lot of contracts.  If you're

3   looking specifically at this issue, is that --

4        Q.   Yes.  The Jason Davis lawsuit.

5        A.   Okay.  Then, yeah, I would say probably

6   the lieutenant -- lieutenants and above that are in

7   that promotional process.

8        Q.   Why are the -- and let me be clear.

9        A.   If they did something wrong, right, if

10  they did something -- like you're asking me if they

11  could bind the -- I mean, this is kind of

12  speculative.  I don't think there was anything in

13  this particular case.

14       Q.   I mean, no one has ever alleged that

15  anyone at the captain level or below ever did

16  anything wrong in this case, correct?

17       A.   Correct.

18       Q.   They're not defendants in the lawsuit,

19  right?

20       A.   You asked me who could.  And I'm telling

21  you who could.

22       Q.   Okay.  I understand.  All right.  And that

23  would be if somehow somebody did something wrong.

24  Is there any indication that anyone did anything

25  wrong by recommending Jason for promotion either to

1    RENU or to corporal?

2         A.   No.

3         Q.   Okay.  All right.  We've looked at the

4    exit interview today.  We can pull it back up.  It's

5    in the pile that's in front of you, Pete.

6         A.   Sure.

7         Q.   Jason indicates in that exit interview

8    that he had recorded the conversation.  When were

9    you made aware of that?

10        A.   At the -- well, after the lawsuit.

11        Q.   Post-lawsuit filing?

12        A.   Yes.

13        Q.   Did you learn that anyone had reviewed

14   that exit interview prior to that?

15        A.   When I had to look into this, I spoke with

16   Marviette Johnson, our director of human resources,

17   and she explained the process by which we have exit

18   interviews, and that they are intended to be

19   anonymous.  In this case the exit interview went to

20   Jason's brother, who is in RENU.  And he was like,

21   you know, is there something I need to know.

22             And so somehow it went back to HR.  And I

23   really don't know -- there was some exchange between

24   Jason Davis and Major Ketteman at the time about the

25   exit interview.  But that's as far as I know.

1      Q.   Okay.  Nobody picked up on the recording

2  aspect of it that he had admitted in that exit

3  interview until post-lawsuit; is that fair?

4      A.   Correct.

5      Q.   Okay.  It was there, but nobody had like

6  --

7      A.   Yes.

8      Q.   -- focused on it?

9      A.   I don't dispute that.

10      Q.   Okay.  All right.  I think we talked

11  already about the discovery responses and 15 in

12  particular that we took as being a threat of

13  prosecution towards Jason.  It's your testimony

14  today that wasn't the intent?

15      A.   Absolutely not.

16      Q.   Okay.  Are you aware after Jason left the

17  county that Chief Deputy Gramke had interactions

18  with Chief Butler at Springdale encouraging Chief

19  Butler, you know, not to hire Jason or engaging in

20  derogatory information about Jason?

21           MR. MILLER-NOVAK:  I'm going to

22           object.  And the reason for being is I

23           don't know how that's the county's -- you

24           know what I mean, like I know he's a

25           defendant, but we have to

```
 1          compartmentalize.
 2               MR. WIEST:  Okay.
 3               MR. MILLER-NOVAK:  I mean, I think he
 4          can tell you what he knows.  But I want to
 5          be clear, I think we would object at this
 6          point in time that we would -- just
 7          because we might testify on this that we
 8          necessarily would concede the fact that
 9          his -- because we don't know when those
10          conversations happened, that those
11          conversations were done in his official
12          duty.
13               MR. WIEST:  I think he was in uniform
14          at an event when it happened, but okay.
15          We'll get into it.
16               MR. MILLER-NOVAK:  We don't know, but
17          -- I mean --
18               MR. WIEST:  We'll develop that.
19               MR. MILLER-NOVAK:  Well, we're still
20          going to argue we don't really know at
21          this point in time.
22               MR. WIEST:  Sure.  Okay.
23     BY MR. WIEST:
24          Q.   I mean, you don't dispute the Chief Deputy
25     can bind the sheriff's office, right?  We just
```

1    talked about that.

2         A.   I mean, if -- yeah.  No, I don't dispute

3    that.

4         Q.   And if he engaged with Chief Butler in

5    uniform at an event, that certainly would appear to

6    be under the color of employer, right?

7         A.   So I don't know that this happened.

8         Q.   Okay.

9         A.   I have no information on it.  It's beyond

10   the scope of my preparation for a 30(b)(6)

11   deposition.

12             MR. WIEST:  Okay.  And maybe we just

13        need to wait for Chief Butler's deposition

14        to develop that, which is fine.  Okay.

15             Let me do two more.  And we'll do

16        them quick.

17             (Plaintiffs' Deposition Exhibit No.

18             70 was marked for identification.)

19        Q.   I'm going to hand you what I've marked as

20   70.  Are you familiar with Ohio Revised Code Section

21   311.04, which gives the sheriff the power to appoint

22   deputies generally?

23        A.   Generally.

24        Q.   Okay.  Unless they're felons?

25             MR. MILLER-NOVAK:  Wait a minute.  Or

1                  a misdemeanor, is that what it says?

2                       MR. WIEST:  Some misdemeanors.  It's

3                  got to be a misdemeanor negotiated on a

4                  felony charge.

5                       MR. MILLER-NOVAK:  Oh.  So if it's

6                  like you plead down to a misdemeanor after

7                  a felony charge?

8                       MR. WIEST:  Yes.

9                       MR. MILLER-NOVAK:  Like the toilet

10                 paper guy?

11                      MR. WIEST:  Yes.

12                      MR. MILLER-NOVAK:  Oh, we're still on

13                 the record?  Whoops, I didn't mean to be.

14                      MR. WIEST:  Yeah.  Negotiated plea

15                 agreement.

16                      MR. MILLER-NOVAK:  Okay.

17     BY MR. WIEST:

18         Q.   Pete, one of the topics today for you were

19     the County's affirmative defenses.

20         A.   Sure.

21                      (Plaintiffs' Deposition Exhibit No.

22                 71 was marked for identification.)

23         Q.   71 is the answer that was filed in this

24     case, correct?

25         A.   Yes.

1      Q.   And we see the defenses.  Some of them are

2    straightforward that I don't really have questions

3    about.  The sixth defense, paragraph 73, is the

4    County aware of any facts or circumstances that

5    would allow a state to immunize itself by passing a

6    law from federal liability?

7      A.   The County would rely on its county

8    prosecutor to assert affirmative defenses under this

9    chapter, so. . .

10     Q.   Okay.

11     A.   Yeah.

12          MR. MILLER-NOVAK:  Can you repeat the

13          question?

14     Q.   Is the County aware of any circumstance or

15   facts that would allow a state to immunize itself

16   against federal liability by -- through the passage

17   of state law immunities?

18          MR. MILLER-NOVAK:  Well, I mean, if

19          you're -- just for clarity on this, we --

20          this is a joint answer, right?

21          MR. WIEST:  Sure.

22          MR. MILLER-NOVAK:  I wouldn't think

23          that --

24          THE WITNESS:  Yeah.

25          MR. MILLER-NOVAK:  -- the County is

 1                -- we're not asserting -- I don't believe

 2                this asserts that the County is suggesting

 3                that it's immune.

 4                     MR. WIEST:  Okay.

 5                     MR. MILLER-NOVAK:  It's got its

 6                defenses.  Because you have Count I and

 7                Count II.  And I think what this is noting

 8                is that there's two individuals that are

 9                named in Count II.  2744 applies to state

10                claims.

11                     MR. WIEST:  Sure.

12                     MR. MILLER-NOVAK:  That's the point,

13                just for clarity.

14                     MR. WIEST:  That makes sense.

15    BY MR. WIEST:

16        Q.   Which of the defenses, Pete, are you aware

17    that the County is asserting on -- let's start with

18    the second defense through the 16th defense on page

19    -- from pages eight to ten?

20        A.   Well --

21        Q.   Ignore the second offense, because that's

22    just the general --

23        A.   Well, I was going to say -- yeah.

24        Q.   Yeah.

25        A.   Third defense.

Page 212

1      Q.   Okay.

2      A.   Not really, but I don't -- fifth offense.

3      Q.   Okay.

4      A.   Eighth defense would be County.

5      Q.   Okay.

6      A.   Not qualified immunity, but perhaps

7  absolute.

8      Q.   Okay.

9      A.   Tenth defense.

10     Q.   Okay.

11     A.   11th.

12     Q.   Okay.

13     A.   12th.

14     Q.   Okay.

15     A.   13th.

16          MR. MILLER-NOVAK:  I mean, sorry, I

17          don't mean to do this, but --

18          THE WITNESS:  Oh, yeah.

19     A.   14.  And you know, counsel wrote this.

20     Q.   Okay.

21     A.   I did not.  So I'm not as familiar with

22  the county defenses as I'm with what a city would

23  defend.  But I think the 11th Amendment is a county

24  defense.

25     Q.   Okay.  U.S. Supreme Court disagrees, but

 1   we'll deal with that later.

 2                   MR. MILLER-NOVAK:  I didn't write it.

 3        A.   I mean, I have not --

 4                   MR. MILLER-NOVAK:  Look at the name

 5             of the prosecutor on there.

 6        A.   Yeah.  I'm doing the best I can.

 7                   MR. MILLER-NOVAK:  It's Melissa

 8             Powers.

 9        A.   Okay.  Yeah.  And then the -- I mean, you

10   know -- sure.  The County intends to rely on any and

11   all defenses that become --

12                   MR. MILLER-NOVAK:  I don't mind

13             saying you've seen our partial motion for

14             summary judgment.  We're not making an

15             11th Amendment argument in that.  So I

16             don't mind -- spoiler alert.  It was

17             drafted by prior counsel.

18                   (Plaintiffs' Deposition Exhibit Nos.

19                   72 and 73 were marked for

20                   identification.)

21        Q.   All right.  Pete, I'm handing you 72 and

22   73.  We're now on current events.

23                   MR. MILLER-NOVAK:  All right.  So 72

24             is --

25                   MR. WIEST:  The offer.  73 is the

Page 214

```
 1              tentative response or whatever you want to
 2              call it.
 3         Q.   Let me start here.  Did Chief Ketteman --
 4    was he the one that decided to extend this letter,
 5    Exhibit 72?
 6         A.   Yes.
 7         Q.   Why did he choose -- or do you know why he
 8    chose to extend that letter?
 9                   MR. MILLER-NOVAK:  Objection.  It's
10              privileged.
11                   MR. WIEST:  Okay.
12         Q.   Do you know whether -- other than advice
13    of counsel is there any other information you're
14    aware of as to why Exhibit 72 was extended?
15         A.   Yes.
16                   MR. MILLER-NOVAK:  Well, hang on.
17              Hang on.
18                   THE WITNESS:  Okay.
19                   MR. MILLER-NOVAK:  It's just -- we
20              got to make sure it's not privileged.
21                   THE WITNESS:  It's not privileged.
22                   MR. MILLER-NOVAK:  Let me talk to
23              him.
24                   MR. WIEST:  Okay.
25                   MR. MILLER-NOVAK:  Yeah, I just --
```

1          obviously we had a lot of conversations as

2          a team.

3               (A brief recess was taken.)

4               MR. WIEST:  Please read the question

5          back.

6               THE COURT REPORTER:  "Do you know

7          whether -- other than advice of counsel is

8          there any other information you're aware

9          of as to why Exhibit 72 was extended?"

10     A.    We're short on staffing.  And by all

11 accounts, Deputy -- then Deputy Davis had very good

12 numbers.  He was a productive deputy in that

13 district, so. . .

14 BY MR. WIEST:

15     Q.    Okay.  Why was the decision made to

16 provide him only four days to respond?

17               MR. MILLER-NOVAK:  You don't have to

18          answer that one.  We're just going to

19          object.  Privilege.  I'm going to instruct

20          him not to answer.

21     Q.    Other than advice of counsel is there any

22 other reason you're aware of why only four days was

23 provided to Deputy Davis to be able to respond?

24     A.    No.

25     Q.    Okay.  How does the County or the

1  Sheriff's Office reconcile Exhibit 72 with other

2  positions it's taken in this case relative to

3  violations of the recording policy or violations of

4  the Open Meetings Act [sic] or other allegations

5  that have been directed towards Jason Davis both in

6  the County's written discovery responses and in

7  questions to Mr. Davis during his deposition?

8          MR. MILLER-NOVAK:  I'm just going to

9          object for a second because, again, we're

10         probably walking into some privileged

11         communications.

12          MR. WIEST:  Okay.

13          MR. MILLER-NOVAK:  All right.

14          MR. WIEST:  Can you read that back?

15          THE COURT REPORTER:  "How does the

16         County or the Sheriff's Office reconcile

17         Exhibit 72 with other positions it's taken

18         in this case relative to violations of the

19         recording policy or violations of the Open

20         Meetings Act or other allegations that

21         have been directed towards Jason Davis

22         both in the County's written discovery

23         responses and in questions to Mr. Davis

24         during his deposition?"

25          MR. WIEST:  And for clarity, I did

1                not mean Open Meetings Act.  I meant

2                Public Records Act.

3                     MR. MILLER-NOVAK:  People do that all

4                the time.

5          A.    The County doesn't have a position that he

6      violated those policies.  It's -- yeah.

7          Q.    Okay.  All right.  73 is a letter that

8      Jason penned back to the Sheriff and Chief Deputy

9      Ketteman.

10                    MR. MILLER-NOVAK:  I'm going to

11               object on this one.  In the sense that I

12               don't -- you can ask questions.  I just

13               want to -- you know, for the record, this

14               topic was given to us with no time to even

15               evaluate and to draft a formal objection.

16               I think we got this topic Monday or

17               something.

18                    THE WITNESS:  Monday.

19                    MR. WIEST:  So here's what I think we

20               can do on this.  We can leave the 30(b)(6)

21               open as to Topic 36 and give you

22               additional time and we'll schedule a

23               follow-up.  That's fine.  I don't think

24               it's a long follow-up, but it would be

25               limited to 72 and 73.

 1                    MR. MILLER-NOVAK:  I mean, we

 2          might -- I'm not saying that I'm not going

 3          to let him answer.  I just want to put it

 4          on the record that --

 5                    MR. WIEST:  Well, Matt, here's my

 6          issue, right?  I am not here to unfairly

 7          surprise anyone.  If you folks feel like

 8          you need additional time to address Topic

 9          36, which we gave to you on Monday -- to

10          be fair, all of these events I think

11          occurred Friday like over the weekend and

12          like -- it is very, very -- or between

13          Thursday and today -- although Thursday we

14          were tied up in a deposition.

15                    Here's what I don't want to do.  I

16          don't want to have this be shut down and,

17          you know, objections raised because of the

18          timeliness of it, us not be able to

19          explore it.  I mean, I just would as soon

20          as come back if that's the position or we

21          can talk substantively about it.  But I

22          don't want there to be timely objections.

23          Either we're prepared to address it today

24          or we're not.

25                    And if we're not, that's fine.  We'll

1          keep it open and we'll just -- we'll

2          coincide a follow-up, which is probably

3          not more than 30 minutes, with some other

4          depo we got scheduled in this case for

5          scheduling purposes so we can all just

6          wrap this up, you know, in the next couple

7          of weeks if you need more time.  If you

8          want to talk, that's fine.

9                MR. MILLER-NOVAK:  We might need to

10          consider that.

11                MR. WIEST:  Why don't we go off the

12          record.

13                (A brief recess was taken.)

14                MR. WIEST:  We have agreed to leave

15          open solely as to Topic 36 the 30(b)(6)

16          deposition.  We'll follow up with

17          Mr. Stackpole and continue that probably

18          on one of the days we've got other

19          depositions in this case next week.

20          Agreed?

21                MR. MILLER-NOVAK:  Oh.  Yes.  Yes.

22          We stipulate to that.  We'll figure out

23          which day.

24                MR. WIEST:  Okay.  Just let us know.

25          (Deposition concluded at 3:32 p.m.)

Page 220

1                 A C K N O W L E D G E M E N T

2

3    STATE OF _____    :

4    COUNTY OF _____    :

5

6         I, PETER J. STACKPOLE, have read the

7    transcript of my testimony given under oath on

8    August 20, 2025.

9         Having had the opportunity to note any

10   necessary corrections of my testimony on the errata

11   page, I hereby certify that the above-mentioned

12   transcript is a true and complete record of my

13   testimony.

14

15

16        _____

17                        PETER J. STACKPOLE

18

19

20

21

22

23

24

25

Page 221

1                    REPORTER'S CERTIFICATE

2          I, Kristina L. Laker, Court Reporter and

3    Notary Public, do hereby certify:

4          That the witness named in the deposition,

5    prior to being examined, was duly sworn;

6          That said deposition was taken before me

7    at the time and place therein set forth and was

8    taken down by me in shorthand and thereafter

9    transcribed into typewriting under my direction and

10   supervision;

11         That said deposition is a true record of

12   the testimony given by the witness and of all

13   objections made at the time of the examination.

14         I further certify that I am neither

15   counsel for nor related to any party to said action,

16   nor in any way interested in the outcome thereof.

17         IN WITNESS WHEREOF I have subscribed my

18   name and affixed my seal this 1st day of September,

19   2025.

20

21                    /s/ Kristina L. Laker
                      _____
                      Kristina L. Laker
22                    Notary ID 592345
                      My Commission expires: 12/21/25
23

24

25