**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | | |
|---|---|---|---|
| **JASON DAVIS** | : | **Case No.** | **1:24-cv-00202** |
| **and** | | | |
| **JENNIFER DAVIS** | : | | |
| | | | |
| **Plaintiffs,** | : | | |
| | | | |
| **v.** | : | | |
| | | | |
| **CHARMAINE McGUFFEY, et al.,** | : | | |
| | | | |
| **Defendants.** | : | | |

<u>**PLAINTIFFS' COMBINED MEMORANDUM IN OPPOSITION TO DEFENDANTS'**</u>
<u>**MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFFS'**</u>
<u>**MOTION FOR PARTIAL SUMMARY JUDGMENT WITH DECLARATIONS OF**</u>
<u>**JASON DAVIS, JENNIFER DAVIS, AND THOMAS BUTLER IN SUPPORT**</u>

Plaintiffs, through Counsel, provides this combined Memorandum in Opposition to

Defendants' Motions for Summary Judgment (Doc. 43; Doc. 44) and in support of Plaintiffs'

Motion for Partial Summary Judgment.

Respectfully Submitted,

/s/Zachary Gottesman
Zachary Gottesman (0058675)
Gottesman & Associates, LLC
9200 Montgomery Road
Building E, Suite 18B
Cincinnati, Ohio 45242
513/651-2121
zgottesman@gmail.com

/s/ Thomas B. Bruns
Thomas B. Bruns (KBA #84985)
Bruns, Connell, Vollmar & Armstrong
4555 Lake Forest Dr., Ste. 330
Cincinnati, OH 45242
(513) 326-0274
(513) 800-1263 (fax)
tbruns@bcvalaw.com
***Attorneys for Plaintiffs***

/s/ Christopher Wiest
Christopher Wiest (Ohio 0077931)
Chris Wiest, Atty at Law, PLLC
50 E. Rivercenter Blvd, Suite 1280
Covington, KY 41011
513/257-1895 (v)
859/495-0803 (f)
chris@cwiestlaw.com

## TABLE OF CONTENTS

TABLE OF CONTENTS.....................................................................................................ii

TABLE OF AUTHORITIES...........................................................................................iv

Statement of the issues to be decided...........................................................................x

Summary of the Argument.............................................................................................x

COMBINED MEMORANDUM IN OPPOSITION AND SUPPORT...................................1

    I.      STANDARD OF REVIEW ............................................................................ 1

    II.     FACTS ......................................................................................................... 1

          A.     Jason's employment history with the Hamilton County Sheriff's Office and his performance ratings by those in his Chain of Command ................... 1

          B.     Carolyn Adams, her social media activity and the election of McGuffey as Sheriff and McGuffey's checkered past ........................................... 3

          C.     The roles and final/policy-making decision-makers at the HCSO ....... 4

          D.     Training, or lack thereof, on First Amendment issues at the HCSO.... 5

          E.     Corporal and RENU positions at HCSO and the process to obtain them........................................................................................................ 6

          F.     Jennifer and Jason's social media activity................................................ 8

          G.     Jason applies for RENU in 2022, is selected as the top candidate by RENU staff, but then is rejected by McGuffey and Gramke, and he tests for corporal........................................................................................... 10

          H.     The 2022 Supervisor Training at the Hard Rock Casino and interactions concerning Jason........................................................... 12

          I.     HCSO corporal selections and vacancies in 2022-2024........................ 12

          J.     The October 10, 2023, meeting ................................................. 13

          K.     The aftermath of the October 2023 meeting: Jennifer is devastated and Jason, who realizes he must choose between his marriage and his career, resigns, while Gramke continues to take steps to hurt Jason........................ 18

          L.     Defendants *post-hoc* litigation reinstatement offers and Jason's response thereto................................................................................. 21

ii

**III. LAW AND ARGUMENT**...................................................................... **22**

    **A. Qualified Immunity**........................................................ **22**

    **B. Plaintiffs' First Amendment Retaliation Claim**.................................. **25**

        1. Jason and Jennifer engaged in First Amendment Protected Activity..... 25

        2. Jason and Jennifer's Association Claims.............................................. 28

        3. Adverse action: the RENU retaliation, failure to promote Jason to corporal, there must be "consequences" statements, the directives to silence Jennifer or cut her out of Jason's life, and the constructive discharge, are all adverse actions under First Amendment retaliation caselaw…………..... 30

        4. There is at least a genuine issue of fact on constructive discharge and, as a matter of law, there is no "immunity" from damages........................... 32

        5. Plaintiffs have established the causation prong of First Amendment retaliation, including with a smoking gun recording................................. 38

        6. McGuffey equally is liable, including under supervisory liability, for her personal participation in the failure to assign to RENU, the non-promotion to corporal, and constructive discharge, or at least a genuine issue of material fact exists....................................................................... 39

    **C. Hamilton County, Ohio is liable under Monell for the federal constitutional violations**..................................................................... **42**

    **D. Jennifer has Standing to sue**.................................................... **45**

    **E. Defendants are liable for criminal act damages under Ohio law** .... **47**

**IV. CONCLUSION**.......................................................................... **50**

**CERTIFICATE OF SERVICE**.......................................................... **50**

## TABLE OF AUTHORITIES

**Cases**

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).......................................................... 43

*Adkins v. Bd. of Educ.*, 982 F.2d 952 (6th Cir. 1993).... ......................................... 29, 43

*Alexander v. United States*, 509 U.S. 544 (1993) .......................................................... 36

*Anderson v. City of Massillon*, 134 Ohio St. 3d 380, 983 N.E.2d 266, 273 (Ohio 2012).............. 49

*Anders v. Cuevas*, 984 F.3d 1166 (6th Cir. 2021).......................................................... 39

*Anderson v. Creighton*, 483 U.S. 635 (1987)................................................................ 23

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)..................................................... 1

*Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988 (6th Cir. 2017)................................... 43

*Ashford v. Univ. of Mich.*, 89 F.4th 960 (6th Cir. 2024)....…………………………………….26, 28

*Bales v. Morgan County*, 2010 U.S. Dist. LEXIS 16372 (EDTN, February 24, 2010)............... 35

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963)....................................................... 36

*Barrett v. Harrington*, 130 F.3d 246 (6th Cir. 1997)..............................................25, 26

*Bell v. Johnson*, 308 F.3d 594 (6th Cir. 2002)..............................................................30

*Benison v. Ross*, 765 F.3d 649 (6th Cir. 2014)............................................................. 30

*Bloch v. Ribar*, 156 F.3d 673 (6th Cir. 1998).............................................................. 24

*Bryant v. City of Cayce*, 332 Fed. Appx. 129 (4th Cir. 2009)....................................... 23

*Buddenberg v. Weisdack*, 939 F.3d 732, 741 (6th Cir. 2019).................................. 25, 27

*Buddenberg v. Weisdack*, 161 Ohio St. 3d 160, 2020-Ohio-3832,
      161 N.E.3d 603 (Ohio 2020)........................................................................ 48

*Campbell v. City of Springboro, Ohio*, 700 F.3d 779 (6th Cir. 2012)......................................... 41

*Caruso v. State*, 136 Ohio App.3d 616, 620-21, 737 N.E.2d 563 (10th Dist. 2000)................... 49

iv

*Chappel v. Montgomery Cnty. Fire Prot. Dist. No. 1*, 131 F.3d 564 (6th Cir. 1997)................ 25

*Coley v. Lucas County*, 799 F.3d 530 (6th Cir. 2015)............................................. 41, 42

*Connick v. Myers*, 461 U.S. 138 (1983)................................................................. 25

*Davignon v. Hodgson*, 524 F.3d 91 (6th Cir. 2008)............................................... 39

*Decrane v. Eckart*, 12 F.4th 586 (6th Cir. 2021)................................................. 27

*DeVooght v. City of Warren*, 157 F.4th 893 (6th Cir. 2025)................... 25, 31, 38, 44

*DiMarco-Zappa v. Cabanillas*, 238 F.3d 25 (1st Cir. 2001)................................ 23

*Dye v. Office of the Racing Comm'n*, 702 F.3d 286 (6th Cir. 2012)....……..………………………..39

*Edelstein v. Stephens*, 2024 U.S. Dist. LEXIS 35217 (SDOH 2024)....………..……………… 37

*Enoch v. Hamilton Cnty. Sheriff*, 588 F. Supp. 3d 806 (S.D. Ohio 2022)....................... 5

*Fakhoury v. O'Reilly*, 837 Fed. Appx. 333 (6th Cir. 2020)................................26, 32, 39

*Fritz v. Charter Township of Comstock*, 592 F.3d 718 (6th Cir. 2010)................... 30, 31

*Frost v. R.R. Comm'n*, 271 U.S. 583 (1926)...................................................... 22

*Garcetti v. Ceballos*, 547 U.S. 410 (2006)..................................................... 27

*Gillis v. Miller*, 845 F.3d 677 (6th Cir. 2017)........…………………………………….... 28

*Gratsch v. Hamilton County*, 12 Fed. Appx. 193 (6th Cir. 2001)....………..………………….... 5

*Green v. Brennan*, 578 U.S. 547 (2016).... …………………………………………… 33

*Handy-Clay v. City of Memphis*, 695 F.3d 531 (6th Cir. 2012)....……..…….………… 31, 32

*Harris v. Butler Co.*, 344 F. App'x 195 (6th Cir. 2001)....………… ………..………..……… 29

*Hartman v. Moore*, 547 U. S. 250 (2006).... …………..………………………….…25

*Heffernan v. City of Paterson*, 578 U.S. 266 (2016)...……… ……..………..…………… 26

*Henley v. Tullahoma City Sch. Sys.*, 84 F. App'x 534 (6th Cir. 2003)....………..………… 26, 29, 32

*Hill v. Marshall*, 962 F.2d 1209 (6th Cir. 1992)...……..…………..…….…..……………… 42

*Holzemer v. City of Memphis*, 621 F.3d 512 (6th Cir. 2010)...……..… .…….…..…………… 25

*Hope v. Pelzer*, 536 U.S. 730 (2002)...……..…… .……..…………… .……..…………… 24

*Jacobson v. Kaforey*, 149 Ohio St.3d 398, 2016-Ohio-8434, 75 N.E.3d 203 (Ohio 2016).…...… 49

*Kauffman v. Anglo–Am. School of Sofia*, 28 F.3d 1223 (D.C. Cir. 1994)...……..…………… 23

*Kent v. Oakland County*, 810 F.3d 384 (6th Cir. 2016)...……..… .…….…..……..………… 24

*King v. Zamiara*, 788 F.3d 207 (6th Cir. 2015)...……..……..…………….…..… 49

*Kubala v. Smith*, 984 F.3d 1132 (6th Cir. 2021)...……..…… ………..………………… 30

*Lane v. Franks*, 573 U.S. 228 (2014)...……..…… ………..…………………… 27

*Laster v. City of Kalamazoo*, 746 F.3d 714 (6th Cir. 2014)…………..……………….…..… 37

*Latits v. Phillips*, 878 F.3d 541 (6th Cir. 2017)...……………………………..…. 1, 13

*Logan v. Denny's*, 259 F.3d 558 (6th Cir. 2001).................................................. 33

*Lozman v. City of Riviera Beach*, 585 U.S. 87 (2018)...……..…………………….…..… 25

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992).... …..…………………….…..…….…… 46

*Lulaj v. Wackenhut Corp.*, 512 F.3d 760 (6th Cir. 2008)...……. …………………….… 37

*Lyng v. Castillo*, 477 U.S. 635, 638 (1986)...……..………………………….…..… 29

*Marquardt v. Carlton*, 971 F.3d 546 (6th Cir. 2020).................................................. 27

*Matulin v. Village of Lodi*, 862 F.2d 609 (6th Cir. 1988)...……..……………………….…..… 27

*Mayhew v. Town of Smyrna, Tenn.*, 856 F.3d 456 (6th Cir. 2017).. …..………………… 27

*McGuffey vs HCSO et. al.*, 1:18-cv-00322-SJD (S.D. Ohio 2018).. …..……………….... 5

*Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516 (6th Cir. 2008).... …..…………………… 39

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)...……..……………….…..…… 42, 43, 44, 45

*Mosholder v. Barnhardt*, 679 F.3d 443 (6th Cir. 2012)... …..……………………….…..…... 28

*Muldrow v. City of St. Louis*, 601 U.S. 346 (2024)...…..…………………………….…..… 35

*Myers v. City of Centerville*, 41 F.4th 746 (6th Cir. 2022)...…..………………….…..…... 28

*Nailon v. Univ. of Cincinnati*, 715 F. App'x 509 (6th Cir. 2017)...…. ……………….…..… 26, 32

*Novak v. City of Parma*, 932 F.3d 421 (6th Cir. 2019). ………..……………………….…..… 36

*NRA of Am. v. Vullo*, 602 U.S. 175 (2024).... …………………………….………………..… 29, 30

*Nieves v. Bartlett*, 587 U.S. 391 (2019).. …………………………….………..…………….…..… 25

*Noble v. Cincinnati & Hamilton Cnty. Pub. Libr.*, 112 F.4th 373 (6th Cir. 2024)………... 27, 28

*Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998)..……………………….…..… 35

*Outlaw v. City of Hartford*, 884 F.3d 351 (2d Cir. 2018).... ………………………..……...…23

*Pearson v. Callahan*, 555 U.S. 223 (2009)... ……………………………………………..… 23

*Peatross v. City of Memphis*, 818 F.3d 233 (6th Cir. 2016)...……… …………………….…..…41

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986)..……………………………….…..… 43, 44

*Perry v. Sindermann*, 408 U.S. 593 (1972).. ……………………..………………….…..… 22

*Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563 (1968)..................... 27, 28

*Pippin v. Hamilton Cnty. Sheriff*, 2014 U.S. Dist. LEXIS 185037 (S.D. Ohio 2014)................... 5

*Pierce v. United States*, 718 F.2d 825 (6th Cir. 1983)........................................................ 37

*Reiff v. Marks*, No. 08–CV–5963, 2011 WL 666139
(E.D. Pa. Feb. 23, 2011), aff'd., 511 Fed. Appx. 220 (3d Cir. 2013)............................... 23

*Reuber v. United States*, 750 F.2d 1039 (D.C.Cir.1984)........................................................ 23

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984)....................................................... 28, 29

*Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47 (2006)............................... 29

*Rutan v. Republican Party of Ill.*, 497 U.S. 62, 75 (1990)............................................ 31

*In re Sofamor Danek Group, Inc.*, 123 F.3d 394 (6th Cir. 1997)....................................................... 1

*Saucier v. Katz*, 533 U.S. 194 (2001)........................................................................................ 23

*Savel v. MetroHealth Sys.*, 96 F.4th 932 (6th Cir. 2024)................................................................ 36

*Schoonover v. Hamilton County et. al.*, 1:22-cv-00767-MWM (S.D. Ohio 2022)........................ 5

*Scott v. Harris*, 550 U.S. 372 (2007)............................................................................ 1, 13, 38

*Sigler v. City of Englewood*, 424 Fed. Appx. 449 (6th Cir. 2011)................................................ 29

*Singfield v. Akron Metro. Housing Auth.*, 389 F.3d 555 (6th Cir. 2004)...................................... 39

*Slater v. Deasey*, 789 Fed. Appx. 17 (9th Cir. 2019)................................................................... 23

*Sowards v. Loudon Cty.*, 203 F.3d 426 (6th Cir. 2000)........................................................... 29, 46

*St. John v. Hickey*, 411 F.3d 762 (6th Cir. 2005).......................................................................... 25

*Taylor v. Michigan Department of Corrections*, 69 F.3d 76 (6th Cir. 1995)……………………... 42

*Taylor v. Riojas*, 592 U.S. 7 (2020)............................................................................................ 24

*Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805 (6th Cir. 2020)............................................ 33

*Teramano v. Teramano*, 6 Ohio St. 2d 117, 118, 216 N.E.2d 375 (Ohio 1966)........................... 49

*Thaddeus-X v. Blatter*, 175 F.3d 378 (6th Cir. 1999) (en banc)........................................... *passim*

*Tindle v. Enochs*, 420 Fed. Appx. 561 (6th Cir. 2011).................................................................. 24

*Toth v. Yoder Co.*, 749 F.2d 1190 (6th Cir. 1984)........................................................................ 37

*United States v. Chi.*, M., St. P. & P.R. Co., 282 U.S. 311 (1931)................................................ 22

*Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703, 711 (6th Cir. 2001)...................................... 29

*Venema v. West*, 133 F.4th 625 (6th Cir. 2025)...................................................................... 41, 42

*Wallace v. Coffee Cty.*, 852 Fed. Appx. 871 (6th Cir. 2021)……………………………………... 43

*Ward v. Athens City Bd. of Ed.*, 1999 U.S. App. LEXIS 22766 (6th Cir. 1999)............... 26, 29, 32

*Weatherford v. Hamilton County Sheriff*, 2010 U.S. Dist. LEXIS 84374 (S.D. Ohio 2010)........ 5

*Wenk v. O'Reilly*, 783 F.3d 585 (6th Cir. 2015).................................................................. 24

*Williams v. Mehra*, 186 F.3d 685 (6th Cir. 1999)........................................................... 1

*Wilson v. Layne*, 526 U.S. 603 (1999).......................................................................... 24

*Winkler v. Madison Cnty.*, 893 F.3d 877 (6th Cir. 2018).............................................. 42

*Wright v. City of Euclid*, 962 F.3d 852 (6th Cir. 2020)............................................... 43

*Wurzelbacher v. Jones-Kelley*, 675 F.3d 580 (6th Cir. 2012)...................................... 30

*Zilich v. Longo*, 34 F.3d 359 (6th Cir. 1994)............................................................... 25

**Statutes**

18 U.S.C. § 241 .......................................................................................................... 36

18 U.S.C. § 242 .......................................................................................................... 36

R.C. 2307.60............................................................................................................ 47, 48, 50

R.C. 2744.03............................................................................................................ 49, 50

R.C. 2921.45............................................................................................................ 48

**Rules**

FRCP 56..........................................................................................................................1

**Statement of the issues to be decided**:

    (1) Whether Defendants are entitled to summary judgment on Plaintiffs' claims?

    (2) Whether Individual Capacity Defendants are entitled to Qualified Immunity?

    (3) Whether Hamilton County, Ohio is liable under *Monell*?

    (4) Whether Plaintiff, Jennifer Davis, has standing to sue?

    (5) Whether Defendants are liable for criminal act damages?

    (6) Whether Plaintiffs are entitled to partial summary judgment on liability?

**Summary of the argument**:

Defendants are not entitled to summary judgment on Plaintiffs' claims. On the contrary, and crediting the October, 2023, recording containing stunning admissions against interest by Defendants Charmaine McGuffey ("McGuffey") and Jay Gramke ("Gramke"), Plaintiffs are entitled to summary judgment on most of their claims. In the alternative, the factual record, when viewed in the light most favorable to Plaintiffs, establishes genuine issues of material fact on all claims. Simply put, the record confirms that as a result of Jennifer Davis' ("Jennifer") protected speech, Defendants retaliated against Jason Davis ("Jason") by denying him promotions and assignments, culminating in his constructive discharge. Qualified immunity is inapplicable because the rights at issue were clearly established. And the County is liable under *Monell* due to McGuffey and Gramke's policymaking authority and the custom of retaliation.

**Principal arguments and primary authority:**

**I. Standard of Review (p. 1)** Summary judgment is appropriate only where there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must view the record in the light most favorable to the non-movant and leave credibility determinations to the jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). Where an audio/video recording plainly resolves a factual dispute, the Court need not credit contrary testimony. *Scott v. Harris*, 550 U.S. 372 (2007).

**II. Statement of Facts (pp. 1–22)**    The record shows (1) command-level directives and briefing-level messaging tying deputies' career opportunities, and "consequences" to their careers, to their spouses'/associates' social-media activity; (2) Jason's selection for, and then removal from, the RENU opportunity; (3) the October 10, 2023 meeting (and recording of same) in which Defendants explicitly linked "consequences" for Jennifer's protected speech/association to Jason's career opportunities; and (4) the Sheriff's final authority over promotions/assignments and the absence of meaningful First Amendment training.

**III.A. Qualified Immunity (pp. 22–25)**    Qualified immunity turns on (1) whether the facts make out a constitutional violation and (2) whether the right was clearly established. *Saucier v. Katz*, 533 U.S. 194 (2001); *Pearson v. Callahan*, 555 U.S. 223 (2009). The right to criticize public officials and to be free from retaliation for protected speech (including retaliation directed at a spouse) was clearly established well before the events here, and the record supports personal involvement/ratification sufficient to defeat immunity at summary judgment. *See Anderson v. Creighton*, 483 U.S. 635 (1987); *Hope v. Pelzer*, 536 U.S. 730 (2002).

**III.B. First Amendment Retaliation (pp. 25–42)**    First Amendment retaliation claims are governed by *Thaddeus-X v. Blatter*, 175 F.3d 378 (6th Cir. 1999) (en banc): protected activity, adverse action, and causation. (1) Protected activity: Jennifer's public criticism of the Sheriff and her interactions relating to matters of public concern are protected. *Connick v. Myers*, 461 U.S. 138 (1983); *Lozman v. City of Riviera Beach*, 585 U.S. 87 (2018); *Barrett v. Harrington*, 130 F.3d 246 (6th Cir. 1997). Sixth Circuit and Supreme Court authority recognizes retaliation claims based on a relative's protected speech/association. *Ward v. Athens City Bd. of Educ.*, 187 F.3d 639 (6th Cir. 1999); *Henley v. Tullahoma City Sch. Sys.*, 84 F. App'x 534 (6th Cir. 2003); *Nailon v. Univ. of Cincinnati*, 715 F. App'x 509 (6th Cir. 2017); *Heffernan v. City of Paterson*, 578 U.S. 266

(2016). (2) Adverse action: Denial of RENU placement, interference with promotion opportunities, threats/conditions aimed at silencing protected speech, and the resulting employment consequences constitute adverse actions because they would chill a person of ordinary firmness. *Benison v. Ross*, 765 F.3d 649 (6th Cir. 2014). (3) Causation: The timeline and meeting admissions/recorded statements, at minimum, create a genuine dispute as to whether protected speech/association was a substantial or motivating factor. *Thaddeus-X*, 175 F.3d at 399. Defendants' post-hoc "offers" do not cure retaliation where they leave unconstitutional conditions intact; the government may not condition employment benefits on the relinquishment of constitutional rights. *Frost v. R.R. Comm'n*, 271 U.S. 583 (1926); *United States v. Chi., M., St. P. & P.R. Co.*, 282 U.S. 311 (1931). And there is a separate violation here of the right of intimate association that was violated by Defendants. *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984); *Sowards v. Loudon County*, 203 F.3d 426 (6th Cir. 2000)

**III.C. Monell Liability (pp. 42–45)** Hamilton County can be liable under § 1983 where a policy/custom, ratification by a final policymaker, failure to train/supervise, or a custom of tolerance caused the constitutional injury. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978); *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988 (6th Cir. 2017). Here, the record establishes municipal liability through policymaker decisions/ratification and failure-to-train/custom theories. *Adkins v. Bd. of Educ. of Magoffin County, Ky.*, 982 F.2d 952 (6th Cir. 1993); *Wallace v. Coffee Cty.*, 852 F. App'x 871 (6th Cir. 2021); *Wright v. City of Euclid*, 962 F.3d 852 (6th Cir. 2020).

**III.D. Jennifer Davis's Standing (pp. 45–47)** Jennifer has Article III standing because she alleges concrete injury (including chilled speech and other direct harms), traceable to Defendants' conduct and redressable by this Court. *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992).

In First Amendment cases, chilled speech is a concrete injury. *Thaddeus-X*, 175 F.3d at 396. Sixth Circuit authority recognizes standing based on harm flowing to family relationships from conduct traceable to defendants. *Sowards v. Loudon Cnty.*, 203 F.3d 426 (6th Cir. 2000).

**III.E. Ohio "Criminal Act" Civil Damages (pp. 47–50)** Ohio law authorizes civil recovery for injuries caused by criminal acts. R.C. 2307.60(A)(1). Plaintiffs' theory is grounded in the Ohio offense of deprivation of rights under color of office. R.C. 2921.45. On this record, Defendants are not entitled to summary judgment on Plaintiffs' request for civil damages available for criminal acts.

**IV. Relief Requested (p. 50)** Because the record and governing law show triable issues on every defense theory and, on key liability elements, establish Plaintiffs' entitlement to judgment as a matter of law, the Court should deny Defendants' motions for summary judgment and grant Plaintiffs' motion for partial summary judgment as set forth in the Conclusion.

<u>**COMBINED MEMORANDUM IN OPPOSITION AND SUPPORT**</u>

**I.     STANDARD OF REVIEW**

Summary judgment is appropriate only if "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). All evidence

and reasonable inferences must be viewed in the light most favorable to the non-moving party.

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986). Credibility determinations are reserved

for the jury. *Id*., at 255. In considering a motion for summary judgment, courts view the factual

evidence in favor of the non-moving party and draw all reasonable inferences in the non-moving

party's favor. *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999) (en banc). However, courts

do not credit any testimony that is "blatantly contradicted" by a recording. *Scott v. Harris*, 550

U.S. 372, 380 (2007). In that instance, courts view "the facts in the light depicted by the"

recording. *Id.* at 380-381. But, "[t]o the extent that facts shown in videos can be interpreted in

multiple ways or if videos do not show all relevant facts, such facts should be viewed in the light

most favorable to the non-moving party." *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017).

Finally, courts do not accept as true "legal conclusions or unwarranted factual inferences." *In re*

*Sofamor Danek Group, Inc.*, 123 F.3d 394, 400 (6th Cir. 1997) (internal quotation omitted).

**II.     FACTS**

 **A. Jason's employment history with the Hamilton County Sheriff's Office and his performance ratings by those in his Chain of Command**

Jason began employment with the Hamilton County Sheriff's Office ("HCSO") in 2002,

as a deputy in the jail. (Depo. Gramke, Doc. 51 at 74, PageID#2580; Exhibit 7, Doc. 51-7,

PageID#2751). He later was promoted to patrol. (*Id.* at 76, PageID#2582; Exhibit 9, Doc. 51-9,

PageID#2755-2758), and was assigned to District 5, which covers Anderson Township. *Id.* at 94;

PageID#2600.

Jason's performance as a patrol officer was described in performance reviews as "pretty solid," "good," "continues to shine as an aggressive officer," "Davis' work is commendable," and he was praised as "quick to assist others, and he is a positive force on the morale of his squad … is a solid employee who takes his position and enforcement duties to heart," a "proactive officer … always willing to assist his squad members … [h]e has a positive attitude which, in turn, creates an easy going yet professional environment." *Id.* at 81-85, 87, PageID#2587-2591, 2593; Exhibit 10, Doc. 51-10, PageID#2759-2768.

Jason's immediate supervisor, Sgt. Viner, testified that Jason did his job, maintained uniform standards, was proactive, professional, and willing to assist others. (Depo. Viner, Doc. 59, at 11-12, PageID#4190-4191). Sgt. Viner supervised a squad of six deputies; Jason was his top performer, and Sgt. Viner told his supervisors that Jason was Sgt. Viner's top performer, which remained the case into early 2024. *Id.* at 14-17, 21-22; PageID#4193-4196, 4200-4201. Lt. Dan McElroy, who was above Sgt. Viner and was for several years the District 5 (Anderson Township) commander, testified that Jason was a "very good deputy" and was someone Lt. McElroy would have provided favorable references for if asked. (Depo. McElroy, Doc. 54, at 6-8, 25-26; PageID#3415-3417, 3434-3435).

Prior to Lt. McElroy, Lt. Matt Guy supervised District 5, and he testified that Jason was a good deputy who exhibited discipline, a work ethic, teamwork, and integrity. (Depo. Guy, Doc. 53, at 20-21, 24-28; PageID#3351-3352, 3355-3359). Next up the chain, Captain Tory Smith, who was in Jason's chain of command from 2021-2023, testified that Jason was a consistent performer above the average and was an asset to the HCSO. (Depo. Smith, Doc. 59, at 6-7, 10-13, PageID#4185-4192). Consistent with all this testimony was the fact that Jason had been the recipient of multiple awards and commendations, including a prestigious "Divisional

Commendation" for lifesaving action. (Depo. Gramke, Doc. 51, at 85-86, 99-101, PageID#2591-2592, 2605-2607; Exhibit 11, Doc. 51-11, PageID#2769-86).

### B. Carolyn Adams, her social media activity and the election of McGuffey as Sheriff and McGuffey's checkered past

McGuffey was elected Sheriff and she took office on January 4, 2021. (Depo. Gramke, Doc. 51 at 26, 35, PageID#2352, 2541).

Carolyn Adams ("Adams"), who has gone by a number of online monikers, such as "Itsa Kracken," "Signal 99," and "Chaz the Anti-Sheriff," is a prolific online critic of McGuffey as Sheriff. *Id.* at 47-63, PageID#2553-2569. Frequently, her criticisms were in connection with publicly reported controversies involving McGuffey. *Id.* And her criticisms of McGuffey were described as a "flood" of criticism. *Id.* at 47; PageID#2553. For instance, Adams criticized McGuffey for leaving her loaded service weapon in her vehicle, which was then stolen. *Id.* at 49-50; PageID#2555-6; Exhibit 1, Doc. 51-1, PageID#2734. And Adams engaged in another round of criticism when it was reported that the weapon was recovered after having been used in the commission of a felony. *Id.* at 50-52, PageID#2556-2558; Exhibit 2, Doc. 51-2, PageID#2735.

Adams' criticisms also included McGuffey's run-in with Covington, Kentucky law enforcement outside a bar. *Id.* at 52-54, PageID#2558-2560; Exhibit 3, Doc. 51-3, PageID#2736-40. Adams also criticized McGuffey when, in 2023, McGuffey was pulled over for speeding and was quick to identify herself as "the Sheriff" at the beginning of that interaction. *Id.* at 55-58, PageID#2561-2564; Exhibit 4, Doc. 51-4, PageID#2741. And Adams made truthful posts that McGuffey was on the *Brady* list, which is a list of law officers who have lied, and is turned over in discovery in a criminal case so that the officer's credibility can be impeached. *Id.* at 58-62; PageID#2564-2568; Exhibits 5 and 6, Doc. 51-5, PageID#2742-7; Doc. 51-6, PageID#2748-50.

Adams also criticized McGuffey for conditions at the jail, including the fact inmates could pop the locks on cells and walk freely about the pods. *Id.* at 62-63; PageID#2568-2569.

McGuffey and Gramke, her Chief Deputy, did not appreciate Adams' criticisms of McGuffey and McGuffey referred to Adams as a "crazy lady". *Id.* at 63; PageID#2569. These criticisms and incidents were matters of public concern and the subject of substantial press coverage. *Id.* at 47-63, PageID#2553-2569. And both McGuffey and Gramke admitted they regularly referred to Adams in derogatory terms. *Id.* at 63-64, 69-70; PageID#2569-2570, 2575-2576; Depo. McGuffey, Doc. 52, at 151, 201-202, 245, PageID#3000, 3050-3051, 3094.

At one point, in 2023, McGuffey gave a directive, at least in District 5, that deputies and their spouses should stay off social media and not associate with Adams. (Depo. Jason Davis, Doc. 49, at 64-68, 71, PageID#1947-1951, 1954).[1] During the briefing discussing this directive, both McGuffey and Gramke looked directly at Jason, not anyone else, when they discussed repercussions for officers' spouses engaging in protected speech. *Id.* at 71, PageID#1954.

### C. The roles and final/policy-making decision-makers at the HCSO

In terms of promotions to corporal within the HCSO, the top decision-makers are the Sheriff and Chief Deputy within the HCSO. (Depo. Gramke, Doc. 51, at 27-28, 106, PageID#2533-2534, 2612). Assignments, including to RENU, and promotions, including to Corporal, had to be signed off via personnel actions that explicitly stated that the Sheriff approved the assignment decisions, and there is no dispute that the Sheriff had ultimate authority regarding

---

[1] This may be an issue of fact, as Gramke denies it occurred. (Depo. Gramke, Doc. 51, at 64, 69-70; PageID#2570, 2575-2576). As did McGuffey. (Depo. McGuffey, Doc. 52, at 149-152, PageID#2998-3001). In contrast, Major, now Chief Deputy, Ketteman, as the 30(b)(6) witness for Hamilton County, testified that there were town halls where Adams and her aliases were discussed, and there were instructions to deputies to not to follow her or do much on Facebook. (30(b)(6) Depo. Ketteman, Doc. 55, at 98-101, PageID#3550-3553).

assignments and promotions.  (30(b)(6) Depo. Ketteman, at 34, 94-95, PageID#3486, 3546-3547; Exhibit 36, PageID#3601-3606; Depo. McGuffey, Doc. 52, at 8, 68-70, 100-101, PageID#2858, 2917-19, 2949-50).[2]  In that regard, while the Sheriff may delegate day-to-day responsibilities to the Major or Chief Deputy, she retains the ability to overrule any decisions they make because "the buck stops with her."  *Id.*

### D.  Training, or lack thereof, on First Amendment issues at the HCSO

Defendants' witnesses all testified that within the HCSO, either (i) there is no training on clearly established rights; (ii) such training is limited to searches and seizures and uses of force/excessive force; or (iii) training on the First Amendment consisted of a single OPATA course on First Amendment auditors.[3]  (Depo. McGuffey, Doc. 52 at 167-175, PageID#3016-3024; Depo. Gramke, Doc. 51 at 38-44, PageID#2544-2550; 30(b)(6) Depo. Stackpole, Doc. 56 at 193-197, PageID#3785-3789).  However, none of that training dealt with First Amendment retaliation or the First Amendment rights of employees and/or their spouses.  *Id.*

That lack of training is legally relevant because the HCSO has been the subject of a number of First Amendment Retaliation lawsuits in the ten years preceding the present First Amendment Retaliation lawsuit, including a First Amendment Retaliation lawsuit brought both by, and against, now-Sheriff McGuffey, all of which preceded the events at issue.  (Depo.

---

[2]  With respect to the extent McGuffey was involved in assignment decisions, including to RENU and promotions to Corporal – the contemporaneous promotional and assignment orders themselves document that she made the appointment and approvals; but Defendants' witnesses say that these were actually made by the Chief Deputy and/or possibly the Major.  (Depo. Gramke, Doc. 51, at 114-115, PageID#2620-2621; 30(b)(6) Depo. Ketteman, Doc. 55, at 26, 30-34, 49, 54, PageID#3498, 3482-3488, 3501, 3506).  However, McGuffey's testimony was that the "buck stops with her" within the department, and that although Gramke made the decision to prevent Jason's assignment to RENU, she agreed with his decision.  (Depo. McGuffey, Doc. 52 at 8, 82-83, PageID#2858, 2932-33; Exhibit 24, Doc. 52-1, Interrog. No. 6 response, at PageID#3153).

[3] See https://www.nhmunicipal.org/town-city-magazine/new-hampshire-town-and-city-julyaugust-2023/first-amendment-audits-what-are-they

Gramke, Doc. 51-20, at Exhibit 20, PageID#2837-43; *see, also*, *Charmaine McGuffey vs HCSO et. al.*, 1:18-cv-00322-SJD (S.D. Ohio 2018); *Schoonover v. Hamilton County et. al.*, 1:22-cv-00767-MWM (S.D. Ohio 2022); *Enoch v. Hamilton Cnty. Sheriff*, 588 F. Supp. 3d 806 (S.D. Ohio 2022); *Pippin v. Hamilton Cnty. Sheriff*, 2014 U.S. Dist. LEXIS 185037 (S.D. Ohio 2014); *Weatherford v. Hamilton County Sheriff*, 2010 U.S. Dist. LEXIS 84374 (S.D. Ohio 2010); *Gratsch v. Hamilton County*, 12 Fed. Appx. 193 (6th Cir. 2001).

### E. Corporal and RENU positions at HCSO and the process to obtain them

RENU: RENU is the regional narcotics unit. (Depo. Gramke, Doc. 51, at 21, PageID#2527). RENU is a multi-jurisdictional drug task force that is comprised of narcotics agents from the HCSO, Cheviot Police Department, Green Township Police Department, as well as Sycamore and Anderson Townships. *Id.* The unit is designed to investigate criminal organizations and individuals primarily responsible for the illegal trafficking of controlled substances in the Greater Cincinnati area, and it does this by operating programs including, but not limited to, drug intelligence, drug interdiction, and undercover operatives. *Id.* at 22-23; PageID#2528-2529. RENU targets mid-to-large drug trafficking in the area and often works with other agencies. (Depo. Guy, Doc. 53 at 33-37, PageID#3364-68).

RENU positions are coveted, preferred assignments within the HCSO. (Depo. Ketteman, Doc. 58, at 11, PageID#58). RENU officers receive corporal pay if they have not already been promoted to corporal. (Depo. Gramke, Doc. 51, at 109, PageID#2615; Depo. Guy, Doc. 53 at 18, PageID#3349). That pay is eight percent higher than a patrol deputy. (Depo. Gramke, Doc. 51 at 107-108, PageID#2613-2614; Depo. Ketteman, Doc. 58 at 57, PageID#4115). The position is perceived by some as a promotion, involves bragging rights, is viewed as a good assignment, and has significant perks such as a take home vehicle, and additional training opportunities. (Depo.

6

Guy, Doc. 53 at 18-19, 50-51, PageID#3349-50, 3381-3382). RENU often involves significant overtime opportunities, though this can ebb and flow depending on investigative demands. (Depo. Gramke, Doc. 51 at 110, PageID#2616). Records produced from Defendants reveal RENU officers had hundreds of overtime hours in the 2022-2025 timeframe. (30(b)(6) Stackpole, Doc. 56 at 142-148, PageID#3734-3740; Exhibit 60, Doc. 56-13, PageID#3848-61).

RENU looks for officers with strong personalities, who are competitive, hard workers, and able to keep secrets. (Depo. Guy, Doc. 53 at 38-39, PageID#3669-70). Captain Stapleton testified that RENU also looks for officers with dedication, honesty, loyalty, and a strong work ethic. (Depo. Stapleton, Doc. 61, at 14-15, PageID#4256-4257). The Collective Bargaining Agreement ("CBA"), Article 45, provides that preferred assignments such as RENU are based on seniority, particular experience, merit, and fitness, and provides that the HCSO will not use retaliatory or discriminatory processes for preferred assignments. (30(b)(6) Depo. Ketteman, Doc. 55, at 83-84, PageID#3535-36; Exhibit 43, Doc. 55-12, PageID#3679).

The process for RENU begins with a posting for the position, such as the posting for RENU positions in 2022, which was posted on September 22, 2022. (30(b)(6) Depo. Ketteman, Doc. 55, at 23-24, PageID#3475-3476; Exhibit 35, Doc. 55-4, PageID#3600). The posting reflected that three years of prior experience were required and interested applicants had to provide written notice to the Major in charge of enforcement within 10 days of the posting. *Id.* After that, the RENU sergeants and the Lieutenant, who commands RENU (in 2022 this was Matt Guy), engaged in a thorough vetting and interview process, including a personnel file review that looks at performance history, disciplinary history, training history, and immediate supervisor evaluations, all to determine the best candidate for the position they were looking to fill. (30(b)(6) Depo. Ketteman, Doc. 55 at 25-26, PageID#3477-3478; Depo. Guy, Doc. 53, at 40-45, PageID#3371-

7

3376; Depo. Stapleton, Doc. 61, at 20-24, PageID#4262-4266).  The result of that process is an eligibility list, which (other than in 2022) has always been in rank order preference.  (Depo. Guy, Doc. 53 at 40, 44-47, PageID#3371, 3375-3378; Depo. Stapleton, Doc. 61 at 28-30, PageID#4270-4272).

Corporal: There is a competitive testing and interview process for corporal promotions, resulting in an eligibility list.  (Depo. Gramke, Doc. 51, at 25-27, PageID#2531-2533).  The pay is eight percent higher than a patrol deputy.  (Depo. Gramke, Doc. 51 at 107-108, PageID#2613-2614; Depo. Ketteman, Doc. 58 at 57, PageID#4115).  There is discretion regarding whether and when to make corporal promotions, and it is not the case that just because a corporal leaves, retires, or is promoted that the next person will be selected – there was a desire to handle those promotions in groups and there was the ability to exceed authorized complement for a short period to anticipate vacancies.  (30(b)(6) Depo. Ketteman, Doc. 55 at 44-47, PageID#3496-3499).  Corporal is seen as a necessary step towards promotion into supervision and eventually a sergeant promotion.  *Id.* at 44-45, PageID#3496-97).

Two provisions of the CBA are applicable to these promotions: Article 14 and 14.8, which is the "Rule of 3."  (*Id.* at 76-82, PageID#3528-3534; Exhibit 43, Doc. 55-12, PageID#3627-3680).  Generally, that means that the HCSO, and specifically those making the promotion decisions, need not take the top person on the eligibility list, but instead there is the discretion to take any of the top 3 on that list.  (*Id.* at 39-40; PageID#3491-3492).  In that regard, those making the decision can continue to skip the top person on the list.  (30(b)(6) Depo. Stackpole, Doc. 56, at 178-179, PageID#3370-3371).

**F.  Jennifer and Jason's social media activity**

8

Jennifer made, or participated, in certain social media posts that were critical of McGuffey's policies, leadership and qualifications. Specifically, she made two posts on or about January 4, 2021, one posted on the HCSO's website criticizing the department's priorities that McGuffey discussed in a press conference and another on her personal Facebook page also critical of McGuffey. Then, she liked a post made by Adams in April 2023, which also was critical of McGuffey. (Decl. Jennifer Davis, attached hereto; Depo. Gramke, Doc. 51, at 124-135, PageID#2630-2641; Exhibits 15, 16, 17, Doc. 51-15, 51-16, 51-17, PageID#2801-2804; Depo. McGuffey, 225-248, PaegID#3074-3097).

As far as Jason is concerned, he made a post about a charity football game that he had organized for the benefit of fallen first responders and which received local news coverage. (Decls. Jason and Jennifer, attached hereto; Depo. Gramke, Doc. 51, at 116-124, PageID#2622-2630; Exhibit 14, Doc. 51-14, PageID#2798-2800). Specifically, Jason's post contained a truthful answer by Jason, posted on his own Facebook page, and in response to a co-worker's question that had been posted on the HCSO's Facebook page and concerned the lack of promotion for the game within the HCSO, where Jason stated that the HCSO did not support the game and took down flyers in the break room about it. *Id.*

In terms of Jason's post on his private Facebook page, it was made on his own time, off the clock, and not pursuant to any job duties Jason had with the HCSO, and it did not violate any HCSO policy, did not interfere with the performance of Jason's duties, did not disrupt the operations of the HCSO, did not impair the ability of Jason's supervisors to discipline him, and did not impair working relationships within the HCSO. (Decl. Jason Davis, attached hereto at ¶4; Depo. Gramke, Doc. 51, at 122-124, PageID#2628-2630; Depo. McGuffey, Doc. 52 at 225-237, PageID#3074-3086). And as a patrol deputy, Jason was not in a confidential, policy-setting, or

9

spokesperson role for the HCSO. (Depo. Gramke, Doc. 51, at 96-98, PageID#2602-2604; Depo. McGuffey, Doc. 52, at 213-214, PageID#3062-3063). Defendants also admit they do not know if Jason's post was truthful, and they also admit there actually was no official support for the charity football game in 2022. (Depo. Gramke, Doc. 51, at 119, PageID#2625).

### G. Jason applies for RENU in 2022, is selected as the top candidate by RENU staff, but then is rejected by McGuffey and McGuffey, and he tests for corporal

<u>RENU</u>: Jason applied for RENU in 2022, went through their interview and vetting process, and consequently he was the top selection for RENU. (Depo. Guy, Doc. 53, at 40-45, PageID#3371-3376; Depo. Stapleton, Doc. 61 at 20-21, 26-27, PageID#4262-4263, 4268-4269). RENU supervision knew that Jason had all of the traits desired for RENU, a strong personality, competitive spirit, hard worker, and he was able to keep secrets. (*Id.* at 38-39, PageID#3369-3370). RENU supervision also knew that Jason had strong performance as a patrol officer, was proactive, and was making drug and gun arrests. (*Id.* at 47-48, PageID#3378-3379).

RENU sent a rank order eligibility list up the chain of command, just as it always had done in the past, with Captain Stapleton telling Major Ketteman that RENU wanted Jason as the top candidate. (Depo. Stapleton, Doc. 61 at 20-21, 26-27, PageID#4262-4263, 4268-4269). However, the eligibility list was changed to an alphabetical order list because of Jason's position at the top of the list, with Major Ketteman telling Stapleton that RENU would not get Jason. *Id.* at 28-29, PageID#4270-4271). Thus, an alphabetical eligibility list was issued. (Depo. Guy, Exhibit 30, Doc. 53-1, PageID#3408). Captain Stapleton testified he had never seen an alphabetical list before. (Depo. Stapleton, Doc. 61 at 28-30, PageID#4270-4272). In fact, and as far as Lt. Guy was aware, this was the first time in 34 years where RENU did not receive its top selected candidate. (Depo. Guy, Doc. 53, at 45-46, PageID3376-3377).

Major Ketteman testified that Jason not being selected for RENU had nothing to do with Jason's performance, but instead, as Gramke told him, had to do with a lack of support by Jason for the agency.  (30(b)(6) Depo. Ketteman, Doc. 55 at 29, PageID#3481).  And Gramke's position about a "lack of support" by Jason was based on the fact that Gramke, as Lt. Guy testified, had a problem with Jennifer's social media.  (Depo. Guy, Doc. 53 at 58-59, PageID#3389-3390).  In fact, Lt. Guy told Jason that Gramke vetoed Jason's selection to RENU because of Jennifer's social media activity.  *Id.* at 65-67, PageID#3396-3398.

Jason testified that he was narrowed to three finalists for RENU and then was selected in late January or early February 2023, as he ranked in first place among the three.  (Depo. Jason Davis, Doc. 49, at 90-91, PageID#1973-1974).   In February of 2023, Lt. Guy informed Jason that everyone had signed off on the assignment, but then approximately an hour later called back to say Gramke overrode the selection "because of [Jason's] wife's social media posts."  (*Id.* at 91, 138-139, PageID#1974, 2021-2022).

As for Gramke's testimony, he admitted he personally interfered with Jason's RENU selection, as he "made the decision right there and then.  [He] said who is next.  And whoever that was, [he] said that's a better candidate."  (Depo. Gramke, Doc. 51, at 138, PageID#2644).  Gramke did this despite never having checked with Jason's supervisors about Jason's performance.  (*Id.*).

Gramke testified that he first informed McGuffey about what he did to Jason and pulling Jason's RENU assignment, at some point prior to the October, 2023 meeting they were to have with Jason.  (Depo. Gramke, Doc. 51, at 115, PageID#2621).  McGuffey testified that "Chief Deputy Gramke made the decision to prevent Jason Davis's assignment to RENU.  I agreed with his decision."  (Depo. McGuffey, Doc. 52 at 82-83, PageID#2932-33; Exhibit 24, Doc. 52-1,

Interrog. No. 6 response, at PageID#3153). Thereafter, at least three RENU vacancies were filled from the 2022 RENU eligibility list (none of which were Jason). (30(b)(6) Depo. Ketteman, Doc. 55 at 21-23, PageID#3473-3475; Exhibit 36, Doc. 55-5, PageID#3601-3606).

Corporal: Jason also applied for corporal in 2022, and after that process was placed 19th on the eligibility list, dated January 13, 2023, which was good for two years, or until January 13, 2025. (Depo. Gramke, Doc. 51, at 103-106, PageID#2609-2612; Exhibit 12, Doc. 51-12, PageID#2787; Depo. Jason Davis, Doc. 49, at 87-88, PageID#1970-1971).

### H. The 2022 Supervisor Training at the Hard Rock Casino and interactions concerning Jason

Lt. Guy, the RENU commander, confronted Gramke in late 2022 at a supervisor retreat/training at the Hard Rock Casino, over Jason's status as the number one selectee for assignment to RENU. (Depo. Guy, Doc. 53, at 53-54, PageID#3384-3385). In response Gramke stated, "not going to happen." *Id.* Gramke called Jason a "malcontent," which was the first time Lt. Guy had ever heard that term in connection with Jason, so Lt. Guy asked Gramke where Gramke got his information. *Id.* at 55-57, PageID#3386-3388. In response, Gramke called over Lt. McElroy, the District 5 commander, but he informed Gramke that he, Lt. McElroy, did not know where that came from because Jason had the best numbers in the division. Unhappy with that response, Gramke then called over Captain Tory Smith, who confirmed that Jason was not a malcontent and he put up great numbers. *Id.* Gramke then gave up and said, "forget what I said," waved his hands, and walked out. *Id.* Captain Tory Smith, and Lt. McElroy have similar recollections about that meeting. (Depo. Smith, Doc. 60, at 14-16, PageID#4229-4231; Depo. McElroy, Doc. 54, at 26-29, PageID#3435-3438).

### I. HCSO corporal selections and vacancies in 2022-2024

As of August 3, 2023, the top 17 from the corporal list had been promoted.  (30(b)(6) Depo. Ketteman, Doc. 55, at 38-47, PageID#3490-3499; Exhibit 36, Exhibit 38, Doc. 55-5, Doc. 55-7, PageID#3608-9).  There were 65 of 69 corporal positions filled within the HCSO, leaving 4 vacancies.  *Id.* at 48, PageID#3500.  Next on the list were Shannon Cunningham, Jason, and Shane Wiseman.  *Id.* at 49-50, PageID#3501-3502.  Wiseman was already receiving corporal pay as a K-9 officer.  *Id.* at 50, PageID#3502.  Cunningham was out on medical leave, and ultimately resigned in January, 2024.  *Id.* at 44, PageID#3496.

### J.  The October 10, 2023, meeting[4]

In August 2023, Jason was informed by other officers, including his supervision, that he was being skipped for corporal, and that McGuffey was even attempting to expire the corporal eligibility list early to ensure Jason would not be promoted.  (Depo. Jason Davis, Doc. 49, at 100-108, PageID#1983-1991).  In light of what happened to his RENU assignment (including what he had been told by Lt. Guy), and in light of what he heard about his corporal promotion, Jason requested a meeting with McGuffey and Gramke via a green letter internal memo process he submitted to discuss his "future status" with the HCSO, which worked its way up the chain of command.  (Depo. Gramke, Doc. 51 at 151-154, PageID#2657-2660; Exhibit 18, Doc. 51-18, PageID#2805).

The meeting was scheduled for and occurred on October 10, 2023.  (Depo. Jason Davis, Doc. 49 at 68, PageID#1951).  Wisely, Jason brought a recording device to that meeting and recorded it.  (*Id.* at 119, PageID#2002; see, also, Decl. Davis, attached hereto at ¶¶ 2-3, authenticating recording filed conventionally at Doc. 62; Depo. Gramke, Doc. 51 at 171-205,

---

[4] Gramke and McGuffey gave testimony that arguably conflicts with the reasons or basis of the RENU and corporal non-selection, yet this Court can, and should, credit the recording of the meeting and not the self-serving, *post-hoc* testimony.  *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017).

Exhibit 21, PageID#2677-2711).  That audio has been transcribed and is also filed of record. (Decl. Davis, attached hereto and at Doc. 50-2).

Almost immediately in the meeting, Gramke admitted, as it pertains to blocking Jason's reassignment to RENU and the hold on his corporal promotion, that it was due to something Jason had posted on Facebook, on his own time, about a charity football game Jason organized, and also because of "numerous comments" and postings made by Jennifer on Facebook.  (Transcript, Doc. 50-2, p. 8-9, PageID#2441-2442).  Neither Gramke nor McGuffey offered any other reason for denying Jason's assignment to RENU.  *Id*.

More specifically, Jennifer' social media activity and interactions with Adams took center stage in the meeting.  *Id.* at p. 8-9, 11-12, PageID#2441-2442, 2444-2445.  When Jason pointed out that his wife was her own person, McGuffey stated that previously, she had someone living with her who was not "married to her" and was not showing up to work, but McGuffey would not let anyone live with her who was going to "reflect negatively" on her at work, and so this person "***had to go***."  *Id.* at p. 12-14, PageID#2444-2445.  Leaving no room for doubt, McGuffey then brought her analogy back to the topic of Jennifer and stated "***she wants to be her own person, hey, I applaud that, you know. Then there is an accountability, because you guys are associated. You're working for us***."  *Id.*  McGuffey explicitly stated that "they" could not have anything on "Facebook" by someone who lives in the "same household" as Jason.  *Id.* at 15, PageID#2448.

McGuffey then stated that it was an "officer's market" for hiring if someone wanted to go elsewhere to work, and that the Department had spent money promoting and growing people, but only if they were on the "ball team" and supported the "team."  *Id.* at 18-20, PageID#2451-2453. And McGuffey made clear that if someone did not support the team, then "***they***" would say "***you're***

***not playing on this team***.”  *Id.*  She then stated that being a team player had to encompass everything – not only support while on the job, but also who Jason chose to marry.  *Id.*

McGuffey also talked about her personal efforts to look good in the community, and she talked about criticisms of her lodged by Adams.  *Id.* at 20-22, PaegID#2453-2455.  McGuffey then brought it back to Jennifer and said: ***“[s]o, you know, hey, your wife can have 100 opinions if she wants.  I – you know, she really can.  I don't care.  But there will be consequences for you***.”  *Id.* at 22, PageID#2455.  McGuffey immediately followed that up with an acknowledgement that Jason had done a very good job: “You have worked really hard in this agency.  I've always considered you a good officer, a really good officer, I always have, you know.  And it wasn't until it was brought to my attention all of that other craziness that I even had any doubt, you know.”  *Id.*  And then McGuffey stated: “So I don't know what the remedy is, but it's not going to happen here when we have an entire department to represent.”  *Id.*  This evidence, including her approval of the adverse consequences to Jason and the fact the buck stops with her, permits a jury to infer her personal participation.

McGuffey then asked Jason what should happen with his career at the HCSO.  *Id.* at 23, PageID#2456.  Jason responded that he wanted a chance to prove himself at RENU.  *Id.*  McGuffey made clear that her administration did not view Jason as a malcontent.  *Id.* at 23-24, PageID#2456-2457.  Gramke then made another reference to Adams as the “crazy lady.”  *Id.* at 35, PageID#2468.

Significantly, Gramke then told Jason to “get on board,” with Jason responding that he was never off board, to which Gramke then dropped any remaining pretense, and while in McGuffey's presence, said: “***Tell your wife to stay off the social media.*** I wouldn't do – my wife would – in a million years, would not put something negative towards this agency because, you know what, it also feeds her.  It's fed my kids.  It's put my kids in school.  It will put my kids through college.

15

That's why my wife won't badmouth this place." *Id.* at 36, PageID#2469. In other words, Gramke admitted his knowledge that his actions against Jason were *also* intended to go further, not just against Jason, but also against Jennifer – ultimately threatening Jason's job and Jennifer's ability to be fed, her ability to feed her kids, her ability to put her kids in school, her ability to put her kids through college, and other consequences. (Transcript, Doc. 50-2, at 36, PageID#2469).

The conversation then came back again to comments on social media and Adams. *Id.* at 38-40, PageID#2471-2473. Gramke pointed out that Adams' comments bothered him because his daughter saw them. *Id.* at 39, PageID#2472. Gramke then asked if Jason wanted his son to see that sort of content. *Id.* McGuffey then spoke up, and also dropped any remaining pretense as to her involvement and approval, and said "[i]f your wife is on Facebook with, I don't even know, okay? It makes it look like you are saying these things. It makes it look like you do not respect us, you don't want to get on board, you don't like it here. I think you do like it here." *Id.* at 40-41, PageID#2473-2474.

Ultimately, McGuffey admitted that the rumors were **<u>true</u>** that Jason had been passed over for RENU **<u>and corporal</u>** and then she stated that they did not have a corporal's position open right then. *Id.* at 42-43, PageID#2475-2476. Gramke reiterated that "***there's going to be consequences for people***" (Jason and Jennifer) "***talking to crazy people, badmouthing us and stuff***." *Id.* Gramke doubled down, again with McGuffey present, and told Jason that "***there's going to be consequences, you know. I mean we – <u>there was consequences for these actions. We're not going to have people talking, you know, to crazy people, badmouthing us and stuff like that</u>. … You know what I'm saying. So I'm not telling you that you're going to get to make corporal. We're going to see how things go.***" *Id.* at 42-43, PageID#2475-2476.

16

McGuffey then bragged that she knew a lot more than people thought she knew, that she has never taken any action without a purpose, that she knows exactly "who is who," that she is very well versed, and that she strategizes around that knowledge. *Id.* at 44-45, PageID#2477. And once Jason told McGuffey that he was not getting any younger, McGuffey responded that she knew he wanted to go to RENU and to be promoted, so she recommended "***some conversations in your future with people who you are close to and surrounded by***," and that if someone was hurting his career, he should "***cut them loose.***" *Id.* at 45-46, PageID#2478-2479. McGuffey then threatened that if associating with certain people hurt her career, it would cause her to say "***You got to go. Bye.***" *Id.* at 46, PageID#2479. Again, leaving no doubt about why Jason was being denied his hard-earned promotions and preferential assignments, McGuffey stated once again that she thought Jason did a great job. *Id.* at 46, PageID#2479. Gramke also stated that he knew Jason did a good job, but there had to be "consequences" and "they" could not have someone who had badmouthed "us," and had a wife who had badmouthed "us" receive any sort of promotion or preferential assignment. *Id.* at 46-47, PageID#2479-2480.

There was additional discussion about Jason getting on board (to which he responded that he was), followed by the statement from McGuffey that "Not – not when your household is on the other end. That's black and white, right? Not when your household is on the other end saying -- doing, all of these things that are, one, not vetted, not true, not this, not that, and it hurts the agency, in my opinion." *Id.* at 49-50, PageID#2482-2483. Jason reiterated his statement that his wife was her own person, to which McGuffey asked the question (made an admission) regarding Jennifer asking if she liked that Jason was doing this job and: "***Does she realize that her actions are hurting you?***" *Id.* at 50-51, PageID#2483-2484. McGuffey then made it clear that Jennifer had to change her behavior and stated that "if she knows and she's aware that these actions are voluntary, okay,

17

on her part hurt you." *Id.* at 52, PageID#2485. McGuffey again asked if Jennifer was supportive of Jason's job. *Id.*

This was followed by additional questions and statements from McGuffey about whether Jennifer supported Jason's career with McGuffey saying that Jennifer was hurting Jason's career by being online. *Id.* at 57-60, PageID#2490-2493. Gramke then made the statement that the next person on the RENU list did not have his wife making statements on social media and there has "***got to be consequences***"[5] and that Jennifer benefits from Jason having the job. *Id.* at 60, PageID#2493. And then Gramke again referred to Jennifer's association with Adams as an "F-you to us." *Id.* at 61-62, PageID#2494-2495. This was followed by a statement by Gramke that if they promoted Jason after "***what your wife had done and said and you had done and said, do you think we'd open the floodgates of hell to anyone who wants to be critical of this administration?***" *Id.* at 62, PageID#2495. And thus "***there has be consequences, there has to be. We can't promote you after what's been done***." *Id.*

McGuffey then made another statement about "your household" "reflecting upon you" and that McGuffey had to ***"release some people"*** so they wouldn't be associated with her, followed by the statement that "I hope your wife will support your career." *Id.* at 63- 64, PageID#2496-7. The conversation then ended with Gramke telling Jason that "***I've said my piece. I think you understood. I think you know what to do,***" followed by the statement that Gramke had a guy right behind Jason who ***"does have a wife who doesn't go on Facebook and talk to crazy people that make horrible memes about the sheriff."*** *Id.* at 65-66, PageID#2498-2499.

Jason adds to this in his declaration: "during that meeting, Sheriff McGuffey was repeatedly nodding to the things that Chief Deputy Gramke was saying and vice versa." (Decl.

---

[5] McGuffey testified that, as she uses the term, "consequences" were the same as "punishments." (Depo. McGuffey, Doc. 52, at 36-37, 40-41, PageID#2885-66, 2889-90).

Jason Davis).    "In the same vein, when Chief Deputy Gramke indicated that he squashed my RENU appointment, Sheriff McGuffey smirked, indicating that she knew of, and approved of that action at the time."  *Id.*  "It was readily apparent that each was fully apprised of, and was fully on board with, approved, and endorsed, the statements and actions of the other."  *Id.*

### K. The aftermath of the October 2023 meeting: Jennifer is devastated and Jason, who realizes he must choose between his marriage and his career, resigns, while Gramke continues to take steps to hurt Jason

Jason left the meeting believing he would never advance unless Jennifer stopped her protected speech, or they divorced.  (Depo. Jason Davis, Doc. 49, at 175-188, PageID#2058-2071; Depo. Jennifer Davis, Doc. 50, at 72, PageID#2389).  This was because McGuffey spoke of consequences for social media activity, and Gramke had agreed.  (Depo. Jason Davis, Doc. 49, at 179-180, PageID#2062-2063).   Stunned and devastated, Jason went home and reported the awful news to Jennifer, including McGuffey's statements to cut loose (i.e. divorce himself from) anyone in his life who was holding him back at work.  *Id.* at 196-198, PageID#2079-2081.

Jennifer was devastated upon hearing the news, and she broke down in tears and told Jason that she could no longer support his career at the HCSO.  *Id.*  Jason was 100% sure he was faced with a demand to divorce his wife or lose any chance of advancement.  *Id.* at 183-184, PageID#2066-2067.  And Jennifer was clear that she no longer could support him working for the HCSO as a result.  *Id.* at 198, PageID#2081.  Jason needed and wanted his wife's support to perform the duties required of him at the HCSO.  *Id.* at 201-202, PageID#2084-5.  Jason admitted that the meeting with McGuffey and Gramke put a lot of stress on him, Jennifer, and their marriage. *Id.* at 237-238, PageID#2120-21.  Given the history of retaliation for protected First Amendment activity by McGuffey and Gramke, Jason also knew that he intended to file suit over the issue, and there was no way that he would remain employed at the HCSO after suing the Sheriff and Chief

Deputy, and that they had a lot of ways to retaliate and drive someone out. *Id.* at 227-229, PageID#2110-2.

Jennifer acknowledged being very upset and angry, including because she perceived "cutting ties" as a demand for Jennifer to divorce Jason. (Depo. Jennifer Davis, Doc. 50, at 73-77, PageID#2390-4). A few days after the meeting with McGuffey and Gramke, Jennifer wrote an email to Gramke, chastising him for the meeting. *Id.* at 81-82, PageID#2398-9; Exhibit 6, Doc. 49-6, PageID#2201. She wrote it because McGuffey and Gramke had suggested that Jennifer divorce Jason. *Id.* In doing so they interfered with her marriage. *Id.* at 101, PageID#2418. And all of this put a strain on and threatened a multi-decade marriage, a relationship that had begun with Jason and Jennifer being high school sweethearts. *Id.* at 97-101, PageID#2414-8. Given the history of retaliation by McGuffey and Gramke, Jennifer was unsure if that email might get Jason fired. (*Id.* at 85-86, PageID#2402-2403).

Jennifer testified that Jason's mental health suffered after the meeting with McGuffey and Gramke, and that his situation at work was so intolerable that she was afraid he might "off" himself. *Id.* at 94-95, PageID#2411-12. And Jason testified he was constructively discharged. (Depo. Jason Davis, Doc. 49, at 224-225, PageID#2407-8). Then Major, but now Chief Deputy, Ketteman admitted that if anyone ever conditioned his own advancement on silencing his spouse, he would not put up with it and that would create an intolerable working environment. (Depo. Ketteman, Doc. 58, at 72-74, PageID#4130-4132).

Faced with the Hobson's choice of his mental health and continuation of his own marriage or his job, Jason began looking for alternative work and resigned in January 2024 to start work as a police officer at Springdale Police Department. (Depo. Jason Davis, Doc. 49 at 198-200, PageID#2081-3). As Jason was completing his processing with Springdale, Gramke approached

20

Springdale Chief of Police Thomas Butler and asked when Springdale was taking Jason. After Chief Butler responded, Gramke stated "you can have that piece of shit." (Decl. Butler, attached hereto).

In his exit interview, Jason's mindset is made clear: that he was told to separate himself from his wife, that he was spoken to by the Sheriff as if he was worthless, that he was subject to a hostile work environment by the Sheriff and Chief Deputy, that both crossed a line by bringing his family into the situation and that he "was no longer able" to work at the HCSO, and that his wife was devastated. (30(b)(6) Depo. Ketteman, Exhibit 41, Doc. 55-10, PageID#3618-3625).

As a result of his constructive discharge, Jason and Jennifer suffered financial consequences, including lost years in his retirement system by switching jobs, loss of a promotion pay increase, and higher insurance costs at his new position, despite a higher hourly wage. (Jason Davis Depo., Doc. 49, at 237, 250-253, PageID#2120, 2133-6). Jason had 21 years at the HCSO, but felt compelled to resign before vesting fully, forgoing the option to double dip by retiring and starting a new job while collecting OPERS benefits. *Id.*, at 251-253, PageID#2134-6.

### L. Defendants *post-hoc* litigation reinstatement offers and Jason's response thereto

On August 15, 2025, now-Chief Deputy Ketteman made an offer for reinstatement to Jason but only gave him less than a week to respond. (30(b)(6) Depo. Stackpole, Exhibit 72, Doc. 56-25, PageID#3997). Jason responded in writing four days later and asked questions, including whether the offer was legal in light of union obligations, and whether previous directives concerning Jennifer ceasing social media activity were rescinded as part of the offer, and he also asked for additional time to assess the retirement financial implications of the offer. *Id.* at Exhibit 73, Doc. 56-26, PageID#3998-4000. Rather than respond to Jason's questions, Defendants merely made another offer, this time on less favorable terms, and also on a tight

timeframe. *Id.* at Exhibit 74, Doc. 56-27, PageID#4001-4002. As Jason's declaration hereto reveals, these offers did not include rescinding prior unconstitutional directives to censor Jennifer as a condition of employment, nor did they address his questions regarding significant retirement consequences. (Decl. Jason Davis, attached hereto, at ¶¶ 5-6). Significantly, Defendants' own FRCP 30(b)(6) witness acknowledged that nothing in the Exhibit 72 and 74 letters rescinded earlier directives given to Jason concerning Jennifer's social media activity. (30(b)(6) Depo. Stackpole, Doc. 56, at 246-250, 254-260, PageID#4028-4032, 4036-4042).

That of course shows that these offers are legally meaningless, as they run right against the unconstitutional conditions doctrine. The Supreme Court recognized this doctrine many decades ago to ensure that the government cannot leverage its allocation of benefits to "manipulate[]" constitutional rights "out of existence." *Frost v. R.R. Comm'n*, 271 U.S. 583, 594, (1926). Generally speaking, "the state, having power to deny a privilege altogether, may grant it upon such conditions as it sees fit to impose." *Id.* at 593. The state's power, however, "in that respect is not unlimited; and one of the limitations is that it may not impose conditions which require the relinquishment of constitutional rights." *Id.* at 593-94. "Broadly stated, the rule is that the right to continue the exercise of a privilege granted by the state cannot be made to depend upon the grantee's submission to a condition prescribed by the state which is hostile to the provisions of the federal Constitution." *United States v. Chi., M., St. P. & P.R. Co.*, 282 U.S. 311, 328-29 (1931). Thus, "even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons," the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

## III.    LAW AND ARGUMENT

Defendants are not entitled to summary judgment on any of their claims, and Plaintiffs are entitled to partial summary judgment as to liability on their claims.

### A.  Qualified Immunity

Individual Defendants argue that they are entitled to qualified immunity. There is a two-step sequence for resolving a government official's claim to qualified immunity announced in *Saucier v. Katz*, 533 U.S. 194 (2001) and *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). First, a court must decide whether the facts that a plaintiff has alleged in his/her complaint, or shown to date, make out a violation of a constitutional right. *Id.* Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was "clearly established" at the time of defendant's misconduct. *Id.* To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

In the Sixth Circuit, Plaintiffs bear the burden of proof[6] to show that Defendants are not entitled to qualified immunity by demonstrating both that, viewing the evidence in the light most

---

[6]  Five circuits have ruled that the burden of proof on the qualified immunity issue rests with the Defendants. *See DiMarco-Zappa v. Cabanillas*, 238 F.3d 25, 35 (1st Cir. 2001) ("Qualified immunity is an affirmative defense, and thus the burden of proof is on defendants-appellants."); *Outlaw v. City of Hartford*, 884 F.3d 351, 368 (2d Cir. 2018) (same); *Reiff v. Marks*, No. 08–CV–5963, 2011 WL 666139 at *5 (E.D. Pa. Feb. 23, 2011) (same), *aff'd.*, 511 Fed. Appx. 220 (3d Cir. 2013); *Slater v. Deasey*, 789 Fed. Appx. 17, 21 (9th Cir. 2019) (same); *Reuber v. United States,* 750 F.2d 1039, 1057, n. 25 (D.C.Cir.1984), *overruled on other grounds, Kauffman v. Anglo–Am. School of Sofia,* 28 F.3d 1223 (D.C. Cir. 1994) *(same)*. Additionally, the Fourth Circuit holds that Defendants bear the burden of proof on the second issue in *Pearson,* of Plaintiff's constitutional rights not being clearly established at the time of Defendants' misconduct. *Bryant v. City of Cayce,* 332 Fed. Appx. 129, 132 (4th Cir. 2009).

Plaintiffs should prevail here regardless of which party bears the burden of proof on Defendant's affirmative defense of qualified immunity. Nevertheless, Plaintiffs respectfully contend that the cases cited above are the better-reasoned decisions on the issue. They raise this issue now for preservation purposes for appeal.

favorable to the Plaintiffs, constitutional rights were violated by Defendants and that the rights violated were clearly established at the time of the violation. *Tindle v. Enochs*, 420 Fed. Appx. 561, 563 (6th Cir. 2011). A plaintiff overcomes qualified immunity by citing to "cases of controlling authority in their jurisdiction at the time of the incident" or "a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617 (1999); *Kent v. Oakland County*, 810 F.3d 384, 395 (6th Cir. 2016). That said, "officials can still be on notice that their conduct violates established law even in novel factual circumstances" if "the state of the law . . . gave [the government officials] fair warning that their alleged [conduct] . . . was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Moreover, even without citation to a particular case, plaintiffs can overcome qualified immunity if the facts are "particularly egregious." *Taylor v. Riojas*, 592 U.S. 7, 9-10 (2020).

Within each aspect of the unconstitutional conduct in this case, we have cited to case law that demonstrates Defendants violated Plaintiffs' rights – with cases that had been decided before the time of the misconduct at issue (or other cases decided after that time that held that the conduct at issue was clearly established at the time, demonstrating no qualified immunity). Moreover, the Sixth Circuit has "repeatedly held that '[a]n act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper.'" *Wenk v. O'Reilly*, 783 F.3d 585, 595 (6th Cir. 2015) (alteration in original) (emphasis omitted) (*quoting Bloch v. Ribar*, 156 F.3d 673, 681-82 (6th Cir. 1998)).

The cases we cite herein are decisions of the Sixth Circuit on each of the prongs, and each decided prior to the date of the activities complained of, establishing clearly established rights, and

the corresponding denial of qualified immunity. *St. John v. Hickey*, 411 F.3d 762, 774 (6th Cir. 2005). Moreover, some circuit cases suggest the qualified immunity inquiry extends ***only*** to the protected conduct/speech prong, because it is clearly established that public officials cannot retaliate against citizens for engaging in such speech. *Holzemer v. City of Memphis*, 621 F.3d 512, 520 (6th Cir. 2010); *See, also, Zilich v. Longo*, 34 F.3d 359, 365 (6th Cir. 1994). Without question, and well before the conduct by Defendants here, the Sixth Circuit has "repeatedly held that a public employee's right to engage in protected speech without retaliation is clearly established for purposes of qualified immunity." *DeVooght v. City of Warren*, 157 F.4th 893, 903 (6th Cir. 2025) (*citing Buddenberg v. Weisdack*, 939 F.3d 732, 741 (6th Cir. 2019)). "'All public officials have been charged' with knowledge of that right." *Id.* (*citing Chappel v. Montgomery Cnty. Fire Prot. Dist. No. 1*, 131 F.3d 564, 580 (6th Cir. 1997).

### B. Plaintiffs' First Amendment Retaliation Claim

First Amendment retaliation cases are governed by *Thaddeus-X v. Blatter*, 175 F.3d 378, 386 (6th Cir. 1999) (en banc). That claim requires (i) protected activity; (ii) adverse action; and (iii) causation. *Id.* No one can seriously question that, "[a]s a general matter," the First Amendment prohibits government officials from subjecting individuals to "retaliatory actions" after the fact for having engaged in protected speech. *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (internal quotation marks omitted); *see also Hartman v. Moore*, 547 U. S. 250, 256 (2006); *Lozman v. City of Riviera Beach*, 585 U.S. 87 (2018).

#### 1. Jason and Jennifer engaged in First Amendment Protected Activity

Criticizing public officials is plainly and clearly established as protected activity. *Lozman*, 585 U.S. 87; *Connick v. Myers*, 461 U.S. 138, 148 (1983); *Holzemer*, 621 F.3d 512, 520; *Barrett v. Harrington*, 130 F.3d 246, 264 (6th Cir. 1997) ("[T]he First Amendment right to criticize public

officials is well-established . . . Furthermore, it is well-established that a public official's retaliation against an individual exercising his or her First Amendment rights is a violation of § 1983.").

There is no dispute that Jennifer engaged in clearly established protected speech, because she made posts criticizing public officials. *See* § II F, pp. 8-10, *supra*. That is equally true of her interactions regarding Adams' posts, all of which also involved matters of public concern and public interest. See § II B, pp. 3-4, *supra*. These protections run to the speech of relatives (and the prohibition against retaliation for such speech). *Nailon v. Univ. of Cincinnati*, 715 F. App'x 509 (6th Cir. 2017), *Henley v. Tullahoma City Sch. Sys.*, 84 F. App'x 534 (6th Cir. 2003), and *Ward v. Athens City Bd. of Educ.*, 1999 U.S. App. LEXIS 22766 (6th Cir. 1999) clearly establish that a plaintiff may bring a First Amendment retaliation claim because retaliation has occurred as a consequence of a relative's protected speech. *See, also*, *Fakhoury v. O'Reilly*, 837 Fed. Appx. 333 (6th Cir. 2020); *Ashford v. Univ. of Mich.*, 89 F.4th 960 (6th Cir. 2024).

*Nailon* noted that this law was clearly established by 2017 (actually as of 1999), well before the actions of Defendants here. 715 F. App'x 509. *Heffernan v. City of Paterson*, 578 U.S. 266 (2016) makes clear that retaliation is prohibited for relatives' speech. There, the U.S. Supreme Court determined it was the motive of the governmental actor – whether that motive was retaliatory in light of the government actor's intent to punish free speech activities – and not whether a particular plaintiff engaged in protected activities that mattered to establish liability. *Id.* "To win, the [person retaliated against] must prove an improper [government] motive." *Id.* at 274. And the constitutional harm is suppressing protected activities – sending a message that dissent, and protected activities will not be tolerated: that taking action against "one tells the others that they engage in protected activity at their peril." *Id.* at 273.

26

As for Jason's football post, *See* § II F, pp. 8-10, *supra*, that post also is clearly established protected speech.  A court determines as matter of law whether a public employee's speech is constitutionally protected. *See Mayhew v. Town of Smyrna, Tenn.*, 856 F.3d 456, 464 (6th Cir. 2017). To be protected, the employee must have spoken as a "private citizen" and addressed a "matter of public concern." *Id.* at 462.  A public employee speaks as a private citizen when his speech does not relate to his "official duties." *See Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). Speech addresses a public concern, in turn, when it relates to "***any*** matter of political, social, or other concern to the community," or when it is a "subject of general interest." *Lane v. Franks*, 573 U.S. 228, 241 (2014) (emphasis added); *See, also, Noble v. Cincinnati & Hamilton Cnty. Pub. Libr.*, 112 F.4th 373 (6th Cir. 2024) (speaking on issues covered in the media are issues of public concern).

As articulated in § II F, pp. 8-10, *supra*, Jason's post was made off the clock, not on any official page, and not pursuant to Jason's job duties.  *Garcetti*, 547 U.S. 410, 421-22; *Decrane v. Eckart*, 12 F.4th 586 (6th Cir. 2021).  And the fact that the post concerned a charity event that raised money for first responders, which had been reported on by the media, and articulated that the Sheriff's office did not support it, potentially constituting allegations of maladministration, meets the broad public concern test.  *Lane*, 573 U.S. 228, 241; *See, also, Noble*, 112 F.4th 373; *Marquardt v. Carlton*, 971 F.3d 546, 548 (6th Cir. 2020) (Facebook post was matter of public concern); *Buddenberg*, 939 F.3d 732, 739.  In fact, responding to questions from others, as Jason did, is evidence that a matter is of "public concern."  *Matulin v. Village of Lodi*, 862 F.2d 609, 613 (6th Cir. 1988).

Where the speech involved is a matter of public concern, courts then apply the *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205,* 391 U.S. 563, 568 (1968) balancing test "to determine

if the employee's free speech interests outweigh the efficiency interests of the government as employer." *Gillis v. Miller*, 845 F.3d 677, 684 (6th Cir. 2017). However, the Sixth Circuit has also stated that "public safety employers [do not] have a greater weight placed on their interests in order and discipline than other employers have in their institutional interests." *Mosholder v. Barnhardt*, 679 F.3d 443, 451 (6th Cir. 2012). Therefore, here, as in *Noble*, 112 F.4th 373, 382, the general content and context support protection of Jason's speech: here we have a comment about an issue that received news reporting and was "made on his private Facebook page while he was at home and not working." *Id.*

Finally, courts consider whether a plaintiff's speech "(1) impairs discipline by superiors or harmony among co-workers, (2) has a detrimental impact on close working relationships for which confidence and personal loyalty are necessary, (3) impedes the performance of [Jason's] duties or interferes with regular operations of the enterprise, or (4) undermines the [HCSO's] mission." 112 F.4th 373, 382-383. Here, Defendants admit that Jason's Facebook post did not interfere with the performance of his duties, did not disrupt the operations of the HCSO, did not impair the ability of Jason's supervisors to discipline him, did not impair working relationships within the HCSO, and did not violate any particular HCSO policy. (Decl. Jason Davis, attached hereto at ¶4; Depo. Gramke, Doc. 51, at 122-124, PageID#2628-2630; Depo. McGuffey, Doc. 52 at 225-237, PageID#3074-3086). Jason's post was thus clearly established protected speech. *Noble*, 112 F.4th 373, 382-5; *Ashford*, 89 F.4th 960; *Myers v. City of Centerville*, 41 F.4th 746 (6th Cir. 2022).

### 2. Jason and Jennifer's Association Claims

Plaintiffs have the right to intimate association with each other as spouses. *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984). There, the Supreme Court held that the choice "to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the

28

State[.]" *Id.* at 617-18. Cases in this circuit look at the right under the First Amendment. *See Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703, 711 (6th Cir. 2001); *Sowards v. Loudon Cty.*, 203 F.3d 426, 432 (6th Cir. 2000); *Adkins v. Bd. of Educ.*, 982 F.2d 952, 955-56 (6th Cir. 1993).

Further, an individual exercises his right to speak most effectively by combining his voice with the voices of others. *Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47, 68 (2006). And if the government could restrict an individual's right to join others to speak, then it could silence the views that the First Amendment is intended to protect. *Id.* For those reasons, the expressly guaranteed right to speak implicitly protects "the right to associate for the purpose of speaking[.]" *Id. see, also, NRA of Am. v. Vullo*, 602 U.S. 175 (2024) (association claims and forced disassociation stated a separate claim under First Amendment)

In *Sigler v. City of Englewood*, 424 Fed. Appx. 449 (6th Cir. 2011), the Sixth Circuit denied qualified immunity to police officials who took action against an officer for his wife's criticisms of the department. The Court found that *Adkins*, 982 F.2d 952, and *Sowards*, 203 F.3d 426 clearly established the right not only not to have a marriage not threatened, but to not even be interfered with by government officials. Here McGuffey and Gramke did far worse than the officials in *Sigler, Adkins,* and *Sowards* – they implicitly required Jason to divorce his wife, if he could not silence her, in order to advance at work. That reprehensible, criminal misconduct runs afoul of the foregoing clearly established law protecting intimate relationships from undue governmental intrusion.

Defendants assert that these separate claims are somehow duplicative of the First Amendment retaliation speech claims and do not warrant separate analysis, *citing Ward*, 1999 U.S. App. LEXIS 22766, *Henley*, 84 Fed. Appx. 534, and *Harris v. Butler Co.*, 344 F. App'x 195 (6th Cir. 2001). Yet, none of those cases dealt with an employer who threatened someone's marriage

because of the spouse's speech – activity that posed a direct and substantial limitation on Jason's employment and intrusion on his marriage. *Lyng v. Castillo*, 477 U.S. 635, 638 (1986). And on that front, the intimate associational claim here is distinct from the speech retaliation claim, and the undue intrusion by Defendants is equally forbidden. These contentions also appear to be contrary to *NRA*, 602 U.S. 175.

> 3. Adverse action: the RENU retaliation, failure to promote Jason to corporal, there must be "consequences" statements, the directives to silence Jennifer or cut her out of Jason's life, and the constructive discharge, are all adverse actions under First Amendment retaliation caselaw

An adverse action in the First Amendment retaliation context is an action that "would chill or silence a person of ordinary firmness from future First Amendment activities." *Benison v. Ross*, 765 F.3d 649, 659 (6th Cir. 2014) (quotation omitted). "It is well established that government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." *Thaddeus-X*, 175 F.3d 378, 386. And any adverse actions, other than "those that create only *de minimis* negative consequences," can "offend the Constitution." *Kubala v. Smith*, 984 F.3d 1132, 1139 (6th Cir. 2021). Moreover, the adverse nature of a particular action "will depend on context." *Bell v. Johnson*, 308 F.3d 594, 602-03 (6th Cir. 2002) (*quoting Thaddeus-X*, 175 F.3d at 388).

The adverse-action inquiry is almost always question of fact. *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 583-84 (6th Cir. 2012). As a result, retaliation claims based on all but genuinely "inconsequential" official actions typically "should go to the jury." *Bell*, 308 F.3d at 603.

The case of *Fritz v. Charter Township of Comstock*, 592 F.3d 718, 724 (6th Cir. 2010) is instructive. As the Court held there, "[a] person of ordinary firmness would be deterred from

engaging in protected conduct, if as a result, a public official encouraged [his] employer to ... have [him] change [his] behavior." *Fritz*, 592 F.3d at 726. The public official's ability to terminate employment is not dispositive. *Id.* The "power to substantially affect" a public employee's livelihood can be enough to establish an adverse action. *Id.* Similarly, actions "designed to threaten" a person's "economic livelihood" are likely to deter a person of ordinary firmness from engaging in protected speech. *Id.* at 728. Simply put, "a credible threat to the nature and existence of one's ongoing employment is of a similar character to the other recognized forms of adverse action—termination, refusal to hire, etc.—even if perpetrated by a third party who is not the employer." *Id.*

Would threatening an employee with "consequences" at work if he didn't "cut loose" (i.e. divorce) his spouse be sufficiently adverse to chill speech? That was the Defendants' admitted intention. What about repeated statements promising "consequences" as a result of a spouse's protected speech, or asking whether the employee's spouse supports their employment, or the numerous other statements made in that October, 2023 meeting? No reasonable factfinder could conclude otherwise.

As the *en banc* Sixth Circuit noted, examples of "adverse action" that would chill a person of ordinary firmness from engaging in protected conduct "include discharge, demotions, refusal to hire, nonrenewal of contracts, and failure to promote." *Blatter*, 175 F.3d 378, 396; *see also Rutan v. Republican Party of Ill.*, 497 U.S. 62, 75 (1990).

Moreover, "[t]he term adverse action has traditionally referred to actions such as discharge, demotions ... and failure to promote." *DeVooght*, 157 F.4th 893, 901 (*citing Handy-Clay v. City of Memphis*, 695 F.3d 531, 545 (6th Cir. 2012). Here, the adverse actions include denial of the RENU assignment, which, as explained in § II. E., *supra*, at pp. 6-8, includes substantial monetary

benefits including a pay raise and overtime, and Defendants' refusal to promote Jason Davis to corporal[7] when he was next on the list, clearly qualified, and completely absent of disciplinary history. *Handy-Clay*, 695 F.3d, at 545. And both McGuffey and Gramke participated in the briefings that targeted the speech of deputies' spouses and chilled protected association; (Depo. Jason Davis, Doc. 49, at 64-68, 71, PageID#1947-1951, 1954; Depo. McGuffey, Doc. 52, at 150-152, PageID#2999-3001), and both participated in the ultimate constructive discharge of Jason. *See* § 2.J., *supra*, at 13-18; § 2 K, *supra*, at 18-21.

While Defendants speciously argue that Jennifer lost nothing and had no adverse actions taken against her, the record is unrebutted that her husband was told to silence her, or else, and she suffered substantial emotional distress as a consequence – all of which gives her redressable standing and a claim against Defendants. *Nailon*, 715 F. App'x 509; *Henley*, 84 F. App'x 534, and *Ward*, 1999 U.S. App. LEXIS 22766; *Fakhoury*, 837 Fed. Appx. 333. Indeed, Defendants sent Jason out of the October meeting with the intention that he inform her that she ruined his career and with the intention to further silence her. *See* § 2.J., *supra*, at 13-18; § 2 K, *supra*, at 18-21. That is adverse action directed <u>*at Jennifer*</u>.

### 4. <u>There is at least a genuine issue of fact on constructive discharge and, as a matter of law, there is no "immunity" from damages</u>

A claim in this case, which goes solely to the issue of the amount of damages, and not Defendants liability, is that Jason was constructively discharged. Defendants assert that Jason cannot meet this standard, including because he cannot prove that McGuffey and Gramke intended

---

[7] We recognize that there may be an issue of fact on the corporal promotion: McGuffey stated that the rumors were true that the promotion was denied to Jason, (Transcript, Doc. 50-2 at 42-43, PageID#2475-2476). That admission, along with the discretion on how many to select for corporal, as explained in § 2.E. *supra*, at pp. 6-8, leads to the inference that the promotions in August, 2023 stopped before Jason was promoted in further retaliation. Other witnesses stated that Jason was only at the top of the list and not skipped over.

to cause his resignation. (Doc. 44 at 18-24). That typically arises in a Title VII or ADA claim, not a First Amendment retaliation claim. And the law on that front has evolved substantially in recent years. Tellingly, Defendants fail to cite to or address *Green v. Brennan*, 578 U.S. 547 (2016) (constructive discharge exists where the employer creates a situation so intolerable that a reasonable person would resign); *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805 (6th Cir. 2020) (discussion that requiring an employer to have a subjective intent to induce a resignation may be invalid in light of the Supreme Court's decision in *Green*).

Even under older case law, however, Jason met some of the Sixth Circuit factors for constructive discharge, including the fact that a younger corporal was assigned to his district to supervise him (Depo. Jason Davis, Doc. 49, at 209, PageID#2092), and that Defendants offered to continue his employment on less-favorable terms than previously – namely that he had to get on the team and keep his wife off social media (see, § II. J, *supra*, at 13-18), or that he would not be considered for advancement *ever*, and there would be other consequences, meaning punishments not merely withholding advancement.[8] *See, e.g. Logan v. Denny's*, 259 F.3d 558 (6th Cir. 2001) (two factors that favor a finding of constructive discharge are assignment to a younger supervisor, and continued employment under less favorable conditions, both of which are present in this case).

True, Sixth Circuit case law used to require evidence that an employer had a subjective intent to induce a resignation. *Tchankpa*, 951 F.3d 805. But there is such evidence here, or at least sufficient evidence to create an issue of fact on that front. Recall that the entire October, 2023 meeting occurred because Jason wanted to discuss his "future status" with the HCSO. (Exhibit 18, Doc. 51-18, PageID#2805). Specifically, knowing Jason wanted to discuss his future status with the HCSO, McGuffey stated early in the October 2023 meeting that it was an "officer's

---

[8] McGuffey testified that "consequences" did not involve a lack of promotion or favorable assignment, but were "punishments." (Depo. McGuffey, Doc. 52, at 36-37, 40-41, PageID#2885-66, 2889-90).

market" for hiring if someone wanted to go elsewhere to work, and that the Department had spent money promoting and growing people, but only if they were on the "ball team" and supported the "team." (Transcript, Doc. 50-2, at 18-20, PageID#2451-2453). McGuffey also made clear that if someone did not, then "they" would say "you're not playing on this team." *Id.* And the statement that the department feeds Jason's family and wife. (*Id.* at 36, PageID#2469). That, of course, all creates a factual inference of an intent to force Jason to resign if he could not silence his wife. McGuffey then stated that being a team player had to encompass everything – not only support while on the job, but also in regard to whom Jason chose to remained married. (*Id.*). Jason also intended to file suit over the issue, and there was no way that he would remain employed at the HCSO after suing the Sheriff and Chief Deputy, and they had a lot of ways to retaliate and drive someone out. (Depo. Jason Davis, Doc. 49, at 227-229, PageID#2110-2).

Of course, Gramke's ongoing malice towards Jason even extended to badmouthing him to Springdale during the period he was applying for alternative employment (Decl. Thomas Butler, attached hereto), and to fabricating that Jason was a malcontent and then abandoning that lie when no one in Jason's chain of command would support it. *See* § II.H., *supra* at 12. And finally current Chief Deputy Ketteman's admission that if someone ever conditioned his advancement on silencing his spouse, he would not put up with it because it would create an intolerable working environment. (Depo. Ketteman, Doc. 58, at 72-74, PageID#4130-4132). Of course, Chief Deputy Ketteman is not the only person who finds the employment situation Defendants' created intolerable, a reasonable jury would as well, but his recognition of the intolerable nature of the situation created by McGuffey and Gramke is further evidence of not only the intolerable working conditions, but also the intent to cause Jason to resign by forcing the choice to begin with.

Regardless, threatening someone's career and admonishing them to divorce their spouse, in a manner that created a mental health crisis for Jennifer to be concerned about Jason "offing" himself plainly fits the bill such that a reasonable person would resign. (Depo. Jennifer Davis, Doc. 50, at 94-95, PageID#2411-12), *see, also*, §§ II. J, *supra* at 13-18, II. K., *supra*, at 18-20. In his exit interview, Jason's mindset is made apparent: that he was asked to separate himself from his wife, that he was spoken to by the Sheriff as if he was worthless, that he was subject to a hostile work environment by the Sheriff and Chief Deputy, that both crossed a line by bringing his family into the situation and that he "was no longer able" to work at the HCSO, and that his wife was devastated. (30(b)(6) Depo. Ketteman, Exhibit 41, Doc. 55-10, PageID#3618-3625). There is at least a genuine issue of material fact on constructive discharge.

In all events, *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024) has lowered the bar on what is adverse action. In a civil rights context, all that has to be shown to establish adverse action is "some 'disadvantageous' change in an employment term or condition." *Id.* at 347 (*citing Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998)). Even before the threshold for constructive discharge was substantially lowered in favor of a plaintiff, federal courts have held that employment conditions that place an undue burden on a family relationship amounts to constructive discharge. *Bales v. Morgan County*, 2010 U.S. Dist. LEXIS 16372, at *18-19 (EDTN, February 24, 2010). Again, resignation does not have to be the intent of the employer for constructive discharge to be established. *Tchankpa*, 951 F.3d 805; *see also, Green*, 578 U.S. 547 (constructive discharge exists where employer creates a situation so intolerable that a reasonable person would resign). Defendants specifically, in no uncertain terms, told Jason to cut loose his wife, the one to whom he took a lifelong vow, in order to advance his career. Under *Bales*, no such requisite was ever made, but an employee was simply moved to night shift, causing a strain

35

on that plaintiff's family life. The facts here are significantly more egregious, as McGuffey and Gramke used their positions of authority over Jason to force him to divorce his wife. That is an intolerable work condition and why Jason resigned.

Equally, McGuffey and Gramke's directives to Jason to silence Jennifer, or else, constitute prior restraint – something that is presumptively and highly illegal. *Alexander v. United States*, 509 U.S. 544, 550 (1993); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963); *Novak v. City of Parma*, 932 F.3d 421 (6th Cir. 2019). Does directing a sworn law enforcement officer to violate the constitutional rights of his spouse (which constitutes the commission of a federal crime, *see* 18 U.S.C. §§ 241, 242), as a condition of employment, all in violation of that law enforcement officer's oath of office, create an intolerable work environment? Would anyone looking at such egregious action assume that the employer in that instance has any intent other than forcing the employee to resign? Particularly after the entire predicate of the conversation was to discuss Jason's "future status" with the HCSO? To ask these questions is to answer them.

The Sixth Circuit, in *Savel v. MetroHealth Sys.*, 96 F.4th 932, 940-942 (6th Cir. 2024), explained in an employment case that "[i]f the defendant forced the plaintiff's hand, and the plaintiff was left with no choice but to give up something of value or suffer an unpleasant consequence, we may recognize that the defendant caused the plaintiff an injury." Here, of course, the thing of value Defendants attempted to coerce Plaintiffs to give up were Jennifer's (and Jason's) First Amendment rights. Similarly, in *Saroli v. Automation & Modular Components, Inc.*, 405 F.3d 446 (6th Cir. 2005), the Court found a genuine issue of material fact as to constructive discharge where, as here, the employer made allegations about pretextual work performance following protected activities (*see* Depo. Gramke, Doc. 51 at 72-74, PageID#2578-2580), the employer suggested additional adverse consequences (here, never advancing in his career), and

36

the employer interfered with protected rights (there, it was the exercise of maternity leave – here, it is the exercise of First Amendment rights, including directing a sworn law enforcement officer to potentially criminally violate the constitutional rights of his spouse).

Regardless, constructive discharge is not a prerequisite in a First Amendment retaliation claim. As it turns out, constructive discharge is not a requirement in a retaliation claim under Title VII either. *Laster v. City of Kalamazoo*, 746 F.3d 714 (6th Cir. 2014). As explained above, adverse action includes threats to employment, failures to promote, and the like. *Blatter*, 175 F.3d 378, 396; *Fritz*, 592 F.3d 718, 724-728. Generally, foreseeability and proximate causation are issues for a jury. *See Toth v. Yoder Co.*, 749 F.2d 1190, 1196 (6th Cir. 1984) ("Proximate causation, or the lack of it, is generally a question of fact to be decided by a jury."); *Pierce v. United States*, 718 F.2d 825, 829 (6th Cir. 1983) ("Unless the evidence is such that a reasonable person could reach only one conclusion, proximate cause is a question of fact."). Here, on these facts, it was foreseeable that anyone in Jason's shoes would begin looking for work rather than put his marriage in jeopardy and potentially commit a federal crime, all by telling his wife to "stay off social media" and then stay at a place where his future promotional prospects were non-existent because he failed to "cut her loose."

Defendants argue under *Lulaj v. Wackenhut Corp.*, 512 F.3d 760, 767 (6th Cir. 2008) and *Edelstein v. Stephens*, 2024 U.S. Dist. LEXIS 35217 (SDOH 2024) (and other cases) that Jason's resignation cuts off all damages. (Doc. 44 at 16-18). First, *Lulaj* is not a First Amendment retaliation case <u>*at all*</u>, and it made clear that there was a finding of no constructive discharge by the jury after trial. Second, *Edelstein* involved this Court cutting off damages when the employee resigned from the subsequent employer – but here Davis is still employed by Springdale. Likewise, the other cases Defendants cite do not involve First Amendment retaliation at all.

Moreover, this is not merely the case of a disappointed applicant for a promotion or assignment and then a resignation, as Defendants posit. This outrage involves an ongoing effort to block any advancement whatsoever and other threats, all in furtherance of a directive to an employee to violate the constitutional rights of the employee's spouse and interfere with their marital relationship, and, in a discussion with the employer about it, not only is that fact acknowledged, but so is the need to "cut loose" the person holding him back, i.e. his wife. *See, e.g.* § 2.J., *supra*, at 13-18. No one does that to an employee they want to retain, even if they pay lip service to the contrary – and no employee puts up with that sort of threat to their spouse and marriage and remains employed by an employer, in law enforcement no less, who engages in that sort of outrageous, criminal misconduct. The employment situation became intolerable following the October 2023 meeting, and a reasonable jury can find constructive discharge on these facts.

### 5. Plaintiffs have established the causation prong of First Amendment retaliation, including with a smoking gun recording

Causation must only be "motivated *in part* by protected speech." *DeVooght*, 157 F.4th 893, 903 (citing *Hoover v. Radabaugh*, 307 F.3d 460, 469 (6th Cir. 2002). Here, it was all motivated by protected speech. With respect to causation, there exists smoking gun evidence (Transcript, Doc. 50-2, *see* § 2.J., *supra*, at 13-18), that Jennifer Davis' posts and Jason's post was the reason for the adverse actions taken against Jason Davis, and as a result Jennifer Davis. Federal courts do not credit any testimony that is "blatantly contradicted" by recording. *Scott*, 550 U.S. 372, 380. Rather, courts view "the facts in the light depicted by the video tape." *Id.* at 380-381. Gramke and McGuffey's admissions, contained in the recording, and recounted in § II. J., *supra*, at 13-18, that plainly establish causation.

Further, sufficiently close temporal proximity between protected activity and adverse action, by itself, establishes the requisite causation. Causation is almost always a factual question

38

for a jury. *Fakhoury*, 837 Fed. Appx. 333 at 340; *Davignon v. Hodgson*, 524 F.3d 91, 101 (6th Cir. 2008). And temporal proximity between protected activity and adverse action can, by itself, establish the requisite causation. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008); *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 306 (6th Cir. 2012). Evidence of up to a four-month gap between the protected speech and the initial adverse action, without more, is sufficient evidence of causation. *Id.*; *Anders v. Cuevas*, 984 F.3d 1166, 1177-1178 (6th Cir. 2021) (four months sufficient); *Dye*, 702 F.3d 286, 306 (two months sufficient); *Singfield v. Akron Metro. Housing Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (three months is sufficient).

Here, while timing alone is not sufficient for causation, the fact that multiple witnesses confirmed that the basis of the RENU non-selection, along with the admissions in the October, 2023 meeting, were all because of Jennifer's posts and speech, and Jason's post, all confirm causation as a matter of law. *See*, II. G., *supra*, at 10-12; II. J., *supra* at 13-18. Add to that the fact that at one point, in 2023, the Sheriff gave a directive, at least in District 5, that deputies and their spouses should stay off social media and not associate with Adams. (Depo. Jason Davis, Doc. 49, at 64-68, 71, PageID#1947-1951, 1954).[9] Gramke and McGuffey, during the briefing looked directly at Jason as they discussed repercussions for officers' spouses engaging in protected speech, and did not look at anyone else. (*Id.* at 71, PageID#1954). These undisputed facts are more than sufficient for causation. *Thaddeus-X*, 175 F.3d 378.

> 6. McGuffey equally is liable, including under supervisory liability, for her personal participation in the failure to assign to RENU, the non-promotion to corporal, and constructive discharge, or at least a genuine issue of material fact exists

---

[9] This may be an issue of fact, as Defendant Gramke denies it occurred. (Depo. Gramke, Doc. 51, at 64, 69-70; PageID#2570, 2575-2576). As did Defendant McGuffey. (Depo. McGuffey, Doc. 52, at 149-152, PageID#2998-3001). Major Ketteman, as the 30(b)(6) witness for the county testified that there were town halls where Adams and her aliases were discussed and there were instructions not to follow her or do much on Facebook. (30(b)(6) Depo. Ketteman, Doc. 55, at 98-101, PageID#3550-3553).

Defendants also attempt to maintain that, due to their own self-serving testimony, that McGuffey cannot be held liable as she allegedly played no role in the decision to retaliate against Jason for the RENU assignment. There may be an issue of fact about whether, or at least the degree to which, the Sheriff in fact was involved in assignment decisions, including to RENU and promotions to Corporal – on that score the contemporaneous promotional and assignment orders themselves say that the Sheriff made the appointment and approvals; Defendants' witnesses say that these were actually made by the Chief Deputy and/or possibly Major. (Depo. Gramke, Doc. 51, at 114-115, PageID#2620-2621; 30(b)(6) Depo. Ketteman, Doc. 55, at 26, 30-34, 49, 54, PageID#3498, 3482-3488, 3501, 3506). The Sheriff's testimony was: "Chief Deputy Gramke made the decision to prevent Jason Davis's assignment to RENU. I agreed with his decision." (Depo. McGuffey, Doc. 52 at 82-83, PageID#2932-33; Exhibit 24, Doc. 52-1, Interrog. No. 6 response, at PageID#3153).

Again, however, statements were also made in the October, 2023 meeting, *see* § II. J., *supra* at 13-18, that undermine Defendants' contentions about McGuffey's involvement. McGuffey's statements, including the statements about knowing more than she admits, demonstrated her involvement in these decisions and, at a minimum, affirmed the decision to negatively impact Jason's career as a result of the constitutionally protected speech of a family member. The Sheriff immediately followed that up with an acknowledgement that Jason had done a very good job but there was an issue with Jennifer' speech. (Transcript, Doc. 50-2 at 22, PageID#2455). McGuffey then admitted that she knew a lot more than people thought she knew, and that she has never taken any action without a purpose, knows exactly "who is who," and strategizes around that. (*Id.* at 44-45, PageID#2477-2478). And she admitted that the rumor was true that Jason had been passed over for corporal. (*Id.* at 42-43, PageID#2475-2476). That leads to the plain conclusion that

40

McGuffey was involved in the corporal selection and there is no dispute that she participated in the October, 2023 meeting that led to Jason's constructive discharge.

The record is clear.  McGuffey knew about the decision to retaliate Jason Davis for his wife's speech, ratified the decision to retaliate against him, and stood by the decision.  McGuffey own words *at least* create the inference that she personally participated in the decision, and a reasonable jury could find she did so, and is therefore liable.

Regardless of her participation in RENU selection at the outset, McGuffey is liable as a matter of law under a supervisory liability theory, including as that theory has been articulated in cases such as *Campbell v. City of Springboro, Ohio*, 700 F.3d 779, 789-790 (6th Cir. 2012).  That requires the Plaintiff to demonstrate that these McGuffey "implicitly authorized, approved, or knowingly acquiesced in the conduct" of Gramke.  *Id.*  Recently, in *Venema v. West*, 133 F.4th 625 (6th Cir. 2025),  the Sixth Circuit addressed the supervisory liability theory and analyzed two prior cases, *Peatross v. City of Memphis*, 818 F.3d 233 (6th Cir. 2016), and *Coley v. Lucas County*, 799 F.3d 530 (6th Cir. 2015), and observed in both cases "that supervising police officers could be liable for violations of a deceased's constitutional rights when complaints plausibly alleged that the supervisor-defendant had failed to train and supervise subordinate officers against engaging in the conduct that caused the death."  *Vanema*, 133 F.4th 625, 634.

In *Coley*, the estate plead the sheriff's failure to train and supervise his subordinate officers, coupled with the sheriff's knowledge of his subordinates' constitutional violations.  799 F.3d 530 at 542.  Specifically, the *Coley* complaint alleged that the sheriff "failed to train and supervise staff regarding the proper use of force," including "the use of a chokehold and the injuries derived therefrom," which caused the detainee's death.  *Id.*  And the "[p]laintiffs also allege[d] that [the

sheriff] had 'full knowledge of the assault on [deceased] . . . but nonetheless intentionally and deliberately made false statements . . . about [his] knowledge.'" *Id.*

And in *Vanema*, the theory was met where the supervisor "failed to train and supervise her subordinate officers to prevent constitutional violations, in this instance by failing to train officers …" 133 F.4th 625. Rather, "a plaintiff must plead [here prove] a supervisor's knowledge of subordinates' constitutional violations in order to hold that supervisor liable for implicit authorization, approval, or knowing acquiescence in those violations." *Id.* As respects the RENU denial, that is unquestionably the case: McGuffey sat in the very meeting where Gramke admitted denying Davis the RENU position because of protected First Amendment activity.

In fact, "a defendant-supervisor knowingly acquiesces in unconstitutional conduct when she "abandons the specific duties of [her] position in the face of actual knowledge of a breakdown in the proper workings of the department." *Id., citing Winkler v. Madison Cnty.*, 893 F.3d 877, 898 (6th Cir. 2018) (cleaned up); *see, also, Taylor v. Michigan Department of Corrections*, 69 F.3d 76, 84 (6th Cir. 1995); *Hill v. Marshall*, 962 F.2d 1209, 1213 (6th Cir. 1992) (holding a supervisor liable under § 1983 where he personally referred inmates' complaints of not getting their medication to a head nurse, who he knew was altering or destroying inmates' prescriptions). McGuffey is also liable for the First Amendment retaliation.

### C. Hamilton County, Ohio is liable under *Monell* for the federal constitutional violations

Hamilton County, Ohio is not entitled to summary judgment on the Davises' *Monell* claims; rather Plaintiff is entitled to summary judgment on liability as to this claim. A municipality including a county is a "person" under 42 U.S.C. § 1983, and so can be held liable for constitutional injuries for which it is responsible. *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690 (1978). A municipality may become liable under a §1983 claim if the alleged federal violation occurred

42

because of a municipal policy or custom, *Monell,* 436 U.S. 658, 694, and for harms caused by employees for whom the municipality has failed to provide adequate training, *see Arrington-Bey v. City of Bedford Heights,* 858 F.3d 988, 995 (6th Cir. 2017).

A municipality may be sued for having caused a constitutional tort through "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Adkins*, 982 F.2d 952, 957. Since such bodies can act only through natural persons, the critical question is whether the person committing the act did so pursuant to official policy. *Id.* A formally adopted policy is not required; established usage or custom may be sufficient. *Id.*

To demonstrate *Monell* liability, a Plaintiff must (1) identify the policy or custom that injured him; (2) connect the policy to the city or county; and (3) show that his particular injury was incurred due to execution of that policy or custom. *Id.* There are four methods of proving an unlawful policy or custom: (1) showing an illegal official policy or legislative enactment; (2) "official ratification of the constitutional violation;" (3) showing a policy of inadequate training or supervision; or (4) demonstrating a custom of tolerance of or acquiescence to federal rights violations. *Wallace v. Coffee Cty.*, 852 Fed. Appx. 871, 875 (6th Cir. 2021); *Wright v. City of Euclid*, 962 F.3d 852, 880 (6th Cir. 2020). All of those methods are present here.

"[A] city may be liable under *Monell* for a policy of permitting constitutional violations regardless of whether the policy is written." *Id.* at 830; *see Monell*, 436 U.S. at 691 ("Congress included customs and usages [in § 1983] . . . . Although not authorized by written law, such practices . . . could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law." (*quoting Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970))). When proceeding under the first theory of *Monell* liability, a plaintiff must show that there were "formal rules or understandings—often but not always committed to writing—that [were] intended to, and

43

[did], establish fixed plans of action to be followed under similar circumstances consistently and over time." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986). And further, "municipal liability attaches to actions committed by only those employees 'whose edicts or acts may be fairly said to represent official policy.'" *DeVoot*, 157 F.4th 893, 901 (citing *Monell*, 436 U.S., at 694). "An employee's act can make the [municipality] liable only if the 'official ha[s] final policymaking authority' specifically 'with respect to the subject matter in question." *Id*. (*citing Pembaur*, 475 U.S., at 483). To the extent that Defendants maintain that Gramke had final decision on assignments and corporal promotions, he plainly was involved in the decisions herein, rendering Hamilton County liable; and to the extent that Defendants maintain it was the Sheriff, she was involved as well.

First, Hamilton County has adopted a custom of retaliating against critics that ultimately resulted in the retaliation Jason and Jennifer Davis face, and in fact Gramke and McGuffey went so far as to conduct a briefing warning deputies not to have their wives on social media. (Depo. Jason Davis, Doc. 49, at 64-68, 71, PageID#1947-1951, 1954). Defendant McGuffey and Gramke, as final policymakers, participated in the spouse-targeting briefing, Gramke made the retaliatory RENU assignment decision, and both were involved in the corporal decision, and the constructive discharge actions. That custom is confirmed given prior lawsuits over First Amendment retaliation. *See* § II. D., *supra*, at pp. 5-6.

In addition, Defendant McGuffey, who participated in the briefing regarding spousal speech, the October 2023 meeting with Jason Davis, and ratified the decision of Gramke to block Jason Davis's assignment to RENU and skipping over him for promotion to corporal, admits that she is the final policymaking official regarding employment. (Depo. McGuffey, Doc.52 at 68-69, PageID#2917-2918), *see, also*, § II.C., *supra*, at 4-5. And "Chief Deputy Gramke made the

44

decision prevent Jason Davis's assignment to RENU. I agreed with his decision." (*Id*. at 83, PageID#2932). Defendant McGuffey further admits that she would have had the authority to overrule Gramke if she disagreed with his decision. (*Id*.). This is a plain admission that McGuffey, the final decisionmaker as it pertains to promotions in the HCSO, ratified the decision to retaliate against the Davises due to Jennifer Davis's social media activity.

And further, the final decisionmaker directly participated in the decision to create the conditions that resulted in Jason Davis's constructive discharge. On October 10, 2023, Jason met with Sheriff McGuffey and Chief Deputy Gramke. The conversation left Jason believing he would never advance unless Jennifer stopped her protected speech or they divorced, and McGuffey and Gramke referenced consequences for social media activity, and Gramke agreed. *See* § II.J., *supra*, at 4-5; II. K., *supra*, at 18-21.

As documented in § II. D., *supra*, at pp. 5-6, there is plainly inadequate training on the issue of First Amendment retaliation, and, on that front, those failures led to the violations herein, also leading to *Monell* liability.

Finally, on the custom of tolerance, both § II. D., *supra*, at pp. 5-6, and the Sheriff's personal participation and approval of everything done to Jason Davis suffices here. It is stunning that the Hamilton County Sheriff herself would engage in threatening someone's marriage over a spouse's social media post. Yet she did. And that brazen misconduct simply underscores the custom of tolerance of unconstitutional First Amendment retaliation.

The record is clear. McGuffey knew about the decision to retaliate Jason Davis for his wife's speech, ratified the decision to retaliate against him, and could have overruled the decision, but chose not to. Defendant Hamilton County, Ohio is liable under *Monell*.

### D. Jennifer has Standing to sue

Defendants contend that Jennifer was not harmed and therefore lacks standing to sue. Article III standing requires (1) injury in fact that is concrete and particularized, actual or imminent; (2) causation by defendant's conduct; (3) redressability by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). In First Amendment retaliation cases, chilled speech is a concrete injury. *Thaddeus-X*, 175 F.3d 378, 396. In addition, indirect harms through family members can confer standing if traceable to defendants' actions. *Sowards*, 203 F.3d 426, 433.

Jennifer suffered significant emotional distress and humiliation at the hands of the Defendants, for her social media activity; and Defendants were clear in the meeting with Jason Davis that they wanted him to discuss her social media activity and silence her, potentially with the threat of divorce.

Having your spouse's employment (and your marriage) threatened for your protected speech, all to chill that speech, gives rise to both a rights violation and standing. When Jennifer learned of Defendant McGuffey and Defendant Gramke's urging of Jason to divorce her in order to resume his career advancement, and that the reason he was denied RENU and corporal promotion was "because of [Jennifer Davis]," she felt "angry." (Depo. Jennifer Davis, Doc. 50, at 72, 77, PageID#2389, 2394). Jennifer was devastated at the prospect that her constitutionally protected speech was injuring her husband's career. (*Id.* at 81, PageID#2398). Jennifer further testified that Defendants' actions put a strain on her marriage with Jason. (*Id.* at 97-101, PageID#2414-2418).

Defendants' actions have also harmed Jennifer financially. As a result of his constructive discharge, Jason and Jennifer suffered financial consequences, including lost years in his retirement system by switching jobs, loss of a promotional pay increase, and higher insurance costs

at his new position, despite a higher hourly wage.  *See* § II.K., supra at 18-21.  He had 21 years at Hamilton County, but chose to resign before vesting fully, foregoing the option to double dip by retiring and starting a new retirement while collecting OPERS benefits.  (*Id.*).  This was the entire plan of Defendants.  At the October 2023 meeting, Gramke told Jason to "get on board" and Jason responded that he was never off board, to which Gramke then dropped any remaining pretense and said: "Tell your wife to stay off the social media. I wouldn't do – my wife would – in a million years, would not put something negative towards this agency because, you know what, it also feeds her. It's fed my kids.  It's put my kids in school.  It will put my kids through college.  That's why my wife won't badmouth this place." (Transcript, Doc. 50-2, at 36, PageID#2469).  Here, Gramke admits his knowledge that his actions against Jason were *also* intended as adverse action including threats, not just against Jason, but also were threats directed against Jennifer – her ability to be fed, her ability to feed her kids, her ability to put her kids in school, her ability to put her kids through college, and any other financial pain she may experience as a result.  Defendants harmed Jennifer through their retaliation.

These injuries are concrete, particularized, and actual.  All of the harms Jennifer has experienced are directly caused by Defendants' conduct, and a favorable decision would address the harms.  Jennifer has standing.

### E.  Defendants are liable for criminal act damages under Ohio law

Defendants maintain that there is no civil remedy for criminal act damages.  They are wrong.  R.C. 2307.60(A)(1) states: "Anyone injured in person or property by a criminal act has, and may recover full damages in, a civil action unless specifically excepted by law, may recover the costs of maintaining the civil action and attorney's fees if authorized by any provision of the Rules of Civil Procedure or another section of the Revised Code or under the common law of this

47

state, and may recover punitive or exemplary damages if authorized by section 2315.21 or another section of the Revised Code."

In relevant part, R.C. 2921.45(A) states, in relevant part "No public servant, under color of the public servant's office, employment, or authority, shall knowingly deprive, or conspire or attempt to deprive any person of a constitutional or statutory right." And R.C. 2921.45(B) makes such a violation a crime.

Here, of course, Gramke admitted that he was aware of the right not to be retaliated against for speech, including speech that criticized public officials. (Depo. Gramke, Doc. 51, at 40-44, PageID#2546-2550). And McGuffey likewise testified that she was aware of the First Amendment. (Depo. McGuffey, Doc. 52, at 171-172, PageID#3020-3021). McGuffey likewise was candid that Jennifer had the right to criticize her in the October 2023 meeting (but then she punished Jennifer and Jason for it with "consequences"). *See* II. J., *supra*, at 13-18.

These actions, on the part of McGuffey and Gramke, constituted public servants, under color of their respective offices or authority, knowingly depriving and/or conspiring with each other to deprive Jason and Jennifer of their constitutional rights, in violation of R.C. 2921.45(A). That, in turn, subjected them both to damages actions under 2307.60(A)(1).

In *Buddenberg v. Weisdack*, 161 Ohio St. 3d 160, 2020-Ohio-3832, 161 N.E.3d 603 (Ohio 2020) the Ohio Supreme Court made clear that R.C. 2307.60 authorizes a civil action for damages caused by criminal acts, and that the plain language of the statute does not require proof of an underlying criminal conviction. *See, also, Jacobson v. Kaforey*, 149 Ohio St.3d 398, 2016-Ohio-8434, 75 N.E.3d 203 (Ohio 2016). The central holding of *Buddenberg* is that under plainly established Ohio law, one may be sued for both compensatory and punitive damages if they suffer damages as a result of the criminal actions of a Defendant, and no criminal conviction is required.

48

Nor does McGuffey (or Gramke) have immunity for these claims. Both R.C. 2744.03(A)(6)(b) (providing that there is no immunity if the "employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner") and R.C. 2744.03(A)(6)(c) ("Civil liability is expressly imposed upon the employee by a section of the Revised Code") apply.

Malice, of course, is "the willful and intentional design to do injury, or the intention or desire to harm another, usually seriously, through conduct that is unlawful or unjustified." *Caruso v. State,* 136 Ohio App.3d 616, 620-21, 737 N.E.2d 563 (10th Dist. 2000); *Teramano v. Teramano*, 6 Ohio St. 2d 117, 118, 216 N.E.2d 375 (Ohio 1966). Bad faith, which is "the opposite of good faith, generally implying or involving actual or constructive fraud or a design to mislead or deceive another." *Id.*

In addition to malice and bad faith, recklessness is also an exception to immunity, in the sense that his proceeding to conduct a prosecution with an improper motive to pad statistics plainly demonstrates a "conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Anderson v. City of Massillon*, 134 Ohio St. 3d 380, 388, 983 N.E.2d 266, 273 (Ohio 2012).

In this analysis, it bears noting that the Sixth Circuit has found the sort of conduct engaged in by McGuffey and Gramke herein – First Amendment retaliation – warrants automatic submission to a jury of the question of punitive damages. *King v. Zamiara*, 788 F.3d 207, 216-217 (6th Cir. 2015) (a defendant who has been found liable for First Amendment retaliation has engaged in conduct that warrants consideration of an award of punitive damages").

Here, of course, McGuffey and Gramke undertook to threaten Jason and his wife and their marriage, with general knowledge of the illegality of their actions, over his wife's social media posts among a bevy of other shocking statements. *See* § II. J., *supra*, at 13-18. There is no immunity for such egregious misconduct, which is malicious, in bad faith, and unquestionably reckless.

And in all events, R.C. 2307.60 expressly imposes the liability herein, also meeting the R.C. 2744.03(A)(6)(c) requirements.

As shown, *supra*, the actions of Defendants McGuffey and Gramke, all taken in the scope of their public service, employment, and authority, were a breach of the First Amendment rights of both Jason and Jennifer. Summary Judgment should be denied, and a jury should determine whether Defendant violated R.C. 2307.60 and R.C. 2921.45.

## IV.    CONCLUSION

Defendants' Motions for Summary Judgment should be denied. Plaintiffs should be granted partial summary judgment on the issue of liability.

Respectfully submitted,

/s/ Christopher Wiest                                    /s/Thomas B. Bruns
Christopher Wiest (Ohio 0077931)          Thomas B. Bruns (Ohio 0051212)
Theodore J. Roberts (Ohio 103561)         Bruns, Connell, Vollmar, & Armstrong
Chris Wiest, Atty at Law, PLLC               4555 Lake Forrest Dr., Suite 330
50 E. Rivercenter Blvd., Ste. 1280           Cincinnati, OH 45242
Covington, KY 41011                               513-312-9890 (v)
513/257-1895 (v)                                      tbruns@bcvalaw.com
chris@cwiestlaw.com
**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

I certify that I have served a copy of the foregoing Memoranda upon all counsel of record, this 23 day of January, 2026, via filing same with the Court's CM/ECF system.

/s/Christopher Wiest