**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT CINCINNATI**

| | |
|---|---|
| **JASON DAVIS** and **JENNIFER DAVIS,** | : Case No. 1:24-cv:0202 |
| Plaintiffs | : Judge: Barrett |
| | : |
| v. | : |
| **CHARMAINE McGUFFEY**, et. al. | : **Oral Argument Request** |
| Defendants, | : |

**DEFENDANT HAMILTON COUNTY'S AND JAY GRAMKE'S REPLY IN SUPPORT**
**OF MOTION FOR SUMMARY JUDGMENT**

## I.     INTRODUCTION

Sometimes, an accusation is just a confession.  Plaintiffs Jason Davis ("Davis") and Jennifer Davis ("Jennifer") (collectively "Plaintiffs") spend over sixty pages trying to convince this Court that Defendants Sheriff McGuffey ("McGuffey"), Jay Gramke ("Gramke"), and Hamilton County ("County") (collectively "Defendants") constructively discharged Davis because they conditioned his employment on his marriage. However, the irony here is that the evidence shows that the only person who unequivocally conditioned Jason Davis's marriage on his employment was his wife, Plaintiff Jennifer Davis.  Plaintiffs admitted in sworn testimony that Jennifer Davis expressly told Jason Davis that she could no longer support him if he stayed with the County.  Jason Davis further admitted that it was his wife's ultimatum that "started the process" of his decision to leave the County.  Thus, the real culprit who used a marital ultimatum to drive Jason Davis from the County was his wife.

Because Plaintiffs seemingly have buyers' remorse for their impulsive decisions, they are trying to pin Jennifer Davis's marital ultimatum on Defendants.  To this end, Plaintiffs employ

1

hyperbole, melodramatic interpretations of vague anecdotes, and speculation about future hypothetical scenarios to argue that Jason Davis had no other option than quitting his job. However, the evidence shows that: (1) Jason Davis's daily work environment was free of any rancor whatsoever, let alone objectively unbearable; and regardless, (2) Davis's Collective Bargaining Agreement ("CBA") eviscerates his constructive discharge claim because he had significant protections from future adverse employment decisions in the CBA.   Under the CBA, Defendants could not demote, discipline, reduce pay, or terminate Davis without "just cause," hearings, grievances, and arbitrations.[1]

Jason Davis did not quit because he had no other options.  Jason Davis quit because his wife wanted him to quit.  Therefore, Jason Davis's resignation is not an adverse employment action or constitutional violation as a matter of law.

### A.  Davis had robust Union protection under his CBA.

Jason Davis was not "at-will," and he had options other than quitting. Jason Davis had robust protection under his CBA against *potential* future adverse actions about which Plaintiffs now want to speculate.

Under the CBA, Defendants can only "suspend, discipline, demote, or discharge [employees] for just cause."  (Exhibit 1 at 6).  Davis had protections for "using the grievance procedure" or even "seeking information relative to any grievance." (Id.)   Under the discipline section of the CBA, Davis had a structured progressive discipline process, and it was not possible for Defendants to discipline or terminate Davis without "just cause."  (Id. at 11).  Defendants could not reduce Davis's pay or terminate him without first providing Davis with a hearing.  (Id. at 12).

---

[1] Although this Reply will focus on issues related to Plaintiff's self-inflicted harms, constructive discharge, and standing, Defendants do not concede any other claims argued in their Partial Motion for Summary Judgment, and they reincorporate those arguments, as well as other arguments in Defendants' briefing here.

Adverse actions are appealable through the grievance process with potential arbitration rights.  (Id. at 12).  Davis would have the right for representation during any investigations the Defendants could have advanced in the future. (Id. at 13).

Most importantly here, under Section 45.3, the CBA expressly states that the employer "shall not use retaliatory or discriminatory practices during the evaluation process for any preferred assignment [like RENU]," so Davis would have had grievance rights for any future preferred assignment he believed that he was denied because of "discrimination" or "retaliation." (Id. at 51). The grievance procedure in the CBA also does not operate to preempt an employee's right to pursue rights under statutory or constitutional laws, so an employee can utilize grievances or civil actions for certain adverse actions under the CBA.  (Id. at 7).

Therefore, concerning the conclusory and inflammatory hypotheticals raised in Plaintiffs' Response, the CBA eviscerates them all.  Jason Davis had numerous options other than quitting. Davis could have remained with the County and filed suit with protection from retaliatory actions under the CBA.  Davis just quit because his wife wanted him to quit.

**B.  Davis's work environment was not unbearable.**

It is not contested that Davis applied for the Regional Enforcement Narcotics Unit ("RENU"), and Gramke overrode Davis's application for the RENU position.  The Parties disagree about whether the viewpoints of Jennifer's speech were the reason Davis did not receive the RENU position.  Regardless, Jason Davis's day-to-day work environment was neither hostile nor remarkable in his final months with the County.

> **Q**. So in other words, there's really no possibility for you to be demoted, correct?
>
> **Jason Davis**. Correct.
>
> **Q**. Okay. And you don't think that you're going to be fired because you're married?

3

**Jason Davis**. No.

> (Doc#23, Davis Depo. at 191:1-6).

***

**Q**. Were you in any way reassigned to different job duties after that meeting?

**Jason Davis**. No.

**Q**. Were you assigned to more menial tasks after that meeting?

Jason Davis. No.

**Jason Davis**. Did anybody threaten you in any way after that meeting?

**A**. No.

> (Id. at 210: 1-9)

***

**Q**. Did they badger you in any way after that meeting?

**Jason Davis**. No.

**Q**. Were you demoted after that meeting?

**Jason Davis**. No.

**Q**. Was your salary ever reduced after that meeting?

**Jason Davis**. No.

> (Id. at 207: 13-20)

Thus, Davis was never demoted, disciplined, reassigned, badgered, or threatened with termination during his employment in the County.  He also had ample protection from such actions under the CBA.

4

**C. Nobody told Davis to divorce his wife.**

The Plaintiffs have advanced creative interpretations of a vague anecdote to argue that Defendants told him he needed to divorce his wife. However, Defendants never expressly told Davis to divorce his wife, and Davis admitted this. (Id. at 193: 1-4). In fact, Jason Davis admitted that his allegations rely on his own interpretations capable of other interpretations.

> **Q**. All right. Because we are dealing with what are your beliefs about implications, correct?
>
> **Jason Davis**. Correct.
>
> **Q**. So when we believe about implications, then sometimes we're wrong, correct?
>
> **Jason Davis**. Correct.
>
> **Q**. You would agree that sometimes you believe someone meant something when they said something and you weren't correct in your belief, correct?
>
> **Jason Davis**. Correct.
>
> (Id at 194: 15-24).

Sheriff McGuffey told a vague story about a former, lazy roommate (whom she was not romantically involved with). (See Doc#62 Notice of Conventional Filing, Audio Recording at 24:00-25:15). Before telling the story, Sheriff McGuffey told Davis that his wife was entitled to her opinions, and she did not hold those opinions against her. (Id.) Immediately after telling the story, Sheriff McGuffey discussed problems with a RENU agent sharing information at home that could harm RENU investigations. (See Id. at 25:45-27:00). Sheriff McGuffey expressly explained that RENU is "very specialized" and "secretive." (Id.). She said that the Department must "know that men and women over there are going to keep a closed lid until we get shit done." (Id.) McGuffey continued that Jennifer Davis was entitled to her opinions, but she expressed concerns that a RENU agent could leak information to a family member that "could screw up a case." (Id.)

5

Therefore, McGuffey's story in full context was intended as an anecdote to explain that members of secretive, investigative units could harm investigations if they share too much information with the people they live with.  Defendants had no intent to divorce Davis.

> **Sheriff McGuffey**: I absolutely did not intend to imply that he end his marriage, no. I absolutely did not.
>
> **Q**. Or cut ties with his wife?
>
> **Sheriff McGuffey**. Or cut ties with his wife.
>
> **(**McGuffey Depo. at 130:11-15)

Furthermore, the meeting ended with Sheriff McGuffey expressing Davis's ability to advance in the future. (See Doc#62, Recording at 1:12:10- 1:16:10).  Sheriff McGuffey told Davis that the "message [he was] leaving here with" is that they wanted Davis to "do well."  (Id.).  Sheriff McGuffey also expressly told Davis at the end of the meeting that she wanted to "get [him] moving."  (Id.)  Jay Gramke told Jason that he was not blackballed.  (Id.)  Sheriff McGuffey also told Davis that she was happy to talk to him again before the next corporal position became available.  (Id.)   Every concluding statement at the end of the impromptu meeting from Sheriff McGuffey suggested future advancement possibilities for Jason Davis.[2]  (Id.)  And Jason Davis left the meeting with no threat to his job security.

> **Q**. Did you think they were going to fire you if you stayed married?
>
> **Jason Davis**. No.
>
> (Doc# 23, Jason Depo. at 189: 18-20).

***

---

[2] Plaintiffs try to argue and speculate these positive statements were just lip-service.  However, Davis was secretly recording the meeting, and Defendants did not know this.  It is nonsensical that Defendants' positive statements were performing for a recording they had no knowledge was occurring.  Defendants intended the positive end to the meeting.

**Jason Davis**. No. They both said great things about my work performance and how well and how good of an officer I am in my reviews and that ***they wanted me to stay***.

(Id. at 199: 1-9) (Emphasis added).

Jason Davis remained employed with the County for months after that meeting without incident, and he knew he was not facing a true threat to his livelihood.

### D.  Jennifer Davis is the actual reason Jason Davis quit.

Plaintiffs rely on their inflammatory interpretations of vague statements to claim that Defendants imposed a marital ultimatum on Davis. But the irony here is that Jennifer Davis explicitly imposed the precise ultimatum Plaintiffs want to pin on Defendants.  Jason Davis even unwittingly admitted under oath that Jennifer Davis was the actual cause of his resignation.

**Q**. So she expressly told you she can no longer support you if you stayed there?

**Jason Davis**. Correct.

(Doc# 23, Jason Depo. at 198:10-12).

\*\*\*

**Q**. When did you decide that you wanted to leave the department?

**Jason Davis**. I -- honestly I can't recall.

**Q**. Was it when Jennifer told you that she couldn't support you any longer?

**Jason Davis**. **That started the process**.

(Id. at 200: 14-19) (emphasis added).

\*\*\*

**Jason Davis**. Correct. Well, yes and no. **I really did not know how I was going to continue to work there if my wife did not support me to work there**.

**Q**. Okay. So it wasn't that you believed that McGuffey or Gramke would fire you, you believed that you couldn't continue to be a patrol

7

> officer because you don't know how you could do that if your wife wouldn't support you as a husband continuing to work as a patrol officer, correct?
>
> **Jason Davis**. Correct. . .
>
> (Id. at 201: 20-25 – 202: 1-4) (emphasis added).

Thus, it was not the RENU position that "started the process" of Davis quitting. It was not the meeting with Jay Gramke and Sheriff McGuffey that "started the process" of him quitting. Instead, it was Jennifer Davis's marital threat that "started the process" of Davis quitting. Jennifer Davis is consequently the actual cause of Davis's resignation according to Davis's sworn testimony.

## II.     LAW AND ARGUMENT

Plaintiffs' constructive discharge claim fails, and Jennifer Davis lacks standing.[3] There are no issues of material fact. Davis's decision to quit was unreasonable because he had other options. Davis's daily environment was not objectively unbearable, and his Union agreement eviscerates his inflammatory hypotheticals about potential adverse actions that had not even occurred. Davis could have just stayed with the County, filed suit, and availed himself of numerous protections within his CBA. Instead, Davis quit because his wife wanted him to do so.

### A.   Plaintiffs' resignation was voluntary, and it did not result from any adverse action or constitutional harm as a matter of law.

Plaintiffs alleged different adverse employment actions. Plaintiffs alleged that Jason Davis was denied a promotion.[4] Plaintiffs also alleged that Defendants "constructively discharged" Jason Davis in their Complaint. (See Dcoc#1, Complaint at ¶¶43-5). Thus, Plaintiffs are alleging that

---

[3] This Reply will focus on constructive discharge and standing. To avoid redundancy, this Reply reincorporates the arguments on other matters advanced in their initial Partial Motion for Summary Judgment.

[4] In addition to RENU, Plaintiffs allege that Davis was denied a promotion to corporal. However, there was no promotion to corporal available before he quit, and Davis provides no admissible evidence showing otherwise. Instead, Plaintiffs relied upon a mistake in a transcript to try to create an issue of material fact where none exists. Defendants will address this issue in a separate Motion to Strike Evidence.

Jason Davis's voluntary resignation was an adverse employment action related to protected speech. (Id.). Because Plaintiffs must realize that their ship is sinking, Plaintiffs advance contradictory arguments suggesting that constructive discharge does not exist in this case even though they pled constructive discharge, and they have spent this entire case trying (and failing) to prove it.

Despite Plaintiffs' contradictory retreat from their own Complaint, different claimed adverse actions may indeed end with different fates. The Sixth Circuit has held that summary judgment is proper concerning constructive discharge claims even when a failure to promote claim is potentially present. See *Funk v. City of Lansing*, 821 F. App'x 574, 580 (6th Cir. 2020) (concluding that unlike the failure to promote claim, a public employee could not establish his constructive discharge claim as matter of law because he could not establish that adverse employment action). It is well established in the Sixth Circuit that an employer's liability is eliminated as a matter of law when an employee quits his job. *Lulaj v. Wackenhut Corp.*, 512 F.3d 760, 767 (6th Cir. 2008). This is simple logic. Clearly, if an employee quits, that is not an adverse action the employer caused, and the employer is not liable for alleged loss thereafter as a matter of law. *See*, *King v. Lazer Spot*, *Inc.*, No. 2:22-cv-2924, 2024 U.S. Dist. LEXIS 130708, at *31 (S.D. Ohio July 24, 2024) (where this Court held that an employer was not liable for the employee's damages as a matter of law because the employee quit and was not constructively discharged); *Mitchell v. Runyon*, Case No. 94-CV-70084-DT, 1996 U.S. Dist. LEXIS 7984, at *24-25 (E.D. Mich. Apr. 30, 1996) (holding that an employee was not entitled to any damages because she voluntarily resigned from her position).

Plaintiffs, without any supporting case law, seem to argue that this very simple logic functions differently in First Amendment cases for public employees. However, Judge Barrett recently analyzed backpay damages in a First Amendment employment claim in *Edelstein v.*

*Stephens*, 2024 U.S. Dist. LEXIS 35217, *12 (S.D. Ohio 2024), and this Court established that employees' own actions do terminate employer liability for backpay claims.  In that case, this Court eliminated backpay liability after a jury trial because the employee was the cause of her own backpay damages when she was terminated from her subsequent employment.  Plaintiffs try to distinguish this case and argue that Davis is different because a subsequent employer did not terminate him.  But this is a distinction without a difference.  In fact, Davis's claim here is much weaker than *Edelstein.* Unlike the employee in *Edelstein*, Davis was never terminated from any job.  He instead consciously decided to quit, and he willfully chose to cause his alleged economic loss.

There are no issues of material facts here about who caused Plaintiffs' economic damage after Davis quit.  Davis did.  Davis missed out on one preferred assignment in RENU.  Davis could have stayed with the County and filed a failure-to-promote claim.  Instead, Davis willfully decided to take a different job to appease his wife, and Plaintiff argues that his own impulsive choice was an "adverse action" related to his speech. This Court should grant Defendants' Partial Motions for Summary Judgment because Davis's resignation was neither a constitution violation nor an adverse action.  It was just Davis's own impulsive decision.

**B. Davis was not constructively discharged.**

1. <u>There is no objective evidence that Davis's workplace was unbearable.</u>

Davis's CBA and Union protection eviscerate his constructive discharge claim.  Jason Davis was not "at-will," and he had a Union and CBA with a robust grievance and progressive disciplinary process.  It is very unlikely Defendants could effectively just demote, discipline, cut pay, retaliate, or terminate Davis without "just cause" merely because Davis remained married in the future.  In fact, instead of quitting impulsively here, Davis could have just stayed and filed his

suit and/or a grievance for not receiving the RENU position in the first place. Courts have held that such union protections eviscerate constructive discharge claims. *See Silverman v. City of N.Y.*, 216 F. Supp. 2d 108, 116 (E.D.N.Y. 2002) (concluding **that the fact an employee could have sought a hearing before being terminated eviscerates his claim that threats of termination created an intolerable situation which left him with no other choice than resignation**); *Stembridge v. City of N.Y.*, 88 F. Supp. 2d 276, 285 (S.D.N.Y. 2000) (holding that there was no constructive discharge when an employee did not pursue a hearing available under a union agreement).

Even without robust Union protections, it is still a very high bar to establish a constructive discharge, and it requires a greater degree of severity and pervasiveness than a hostile work environment claim. *Collette v. Stein-Mart, Inc.*, 126 F. App'x 678, 682 (6th Cir. 2005); *see also*, *Benningfield v. City of Hous.*, 157 F.3d 369, 378 (5th Cir. 1998). Constructive discharge is a "tough row to hoe," and it is "hard to prove." *Edwards v. City of Cincinnati*, No. 23-3083, 2023 U.S. App. LEXIS 22057, at *5 (6th Cir. Aug. 21, 2023), *see also, O'Donnell,* 2015 U.S. Dist. LEXIS 30036, at *16 (rejecting a constructive discharge claim because it is unreasonable for employees to assume the worst and impulsively jump to conclusions). In determining whether a reasonable employee would have felt compelled to quit, the Sixth Circuit has provided seven factors for courts to evaluate. *Laster v. City of Kalamazoo*, 746 F.3d 714, 728 (6th Cir. 2014). Courts should consider whether the employee: (1) was demoted; (2) suffered a reduced salary; (3) had his current duties reduced; (4) was reassigned to degrading or menial work; (5) was reassigned to work under a younger supervisor; (6) was badgered or harassed in a manner calculated to force him to quit; or (7) was offered early retirement. *Id.*

Here, under Davis's CBA, Defendants could not demote Davis without cause, and Davis could have grieved it if they tried. (Exhibit 1). Defendants could not reduce Davis's salary without just cause. (Doc# 23, Jason Depo. at 207: 18-20; Exhibit 1). Davis's duties were never reduced. (Id. at 209). Defendants did not reassign Davis to menial work. (Id. at 210: 4-6). Davis was not reassigned to work under a different supervisor. (Id. at 209). McGuffey and Gramke did not interact with Davis or badger him. (Id. at 207: 13-15). Defendants did not suggest that Davis should retire early. (Id. at 210: 10-15). Defendants also could not fire Davis without just cause. (Exhibit 1). Plaintiffs argue erroneously that Davis was constructively discharged because his entire department was assigned a new supervisor. (See Doc#66, Ps' Response at 33). However, the Sixth Circuit's factors asks whether the plaintiff was "reassigned" to a different supervisor. The factors do not ask whether an employee's current department "receives" a new supervisor.

Thus, Plaintiffs have proffered nothing that establishes a single objective factor exhibiting an unbearable work environment.

2.  <u>Plaintiffs cannot support their constructive discharge claim with their retroactive, subjective feelings and speculative hypotheticals.</u>

Because Plaintiffs have no actual evidence addressing a single *objective* factor, Plaintiffs instead just advance their subjective emotional reactions, speculation, and far-reaching inferences that are easily eviscerated with Davis's CBA. See e.g., *Silverman*, 216 F. Supp. 2d at 116 (concluding that the fact an employee could have sought a hearing before being terminated eviscerated his constructive discharge claim). As one example, Plaintiffs allege that Davis had to leave because he was going to file suit, but there was no way he could stay because the Defendants "had a lot of ways to retaliate." (Id. at 34). First, this is just speculation. More importantly, Davis had the ability to challenge these *speculative* and *hypothetical* adverse actions under the CBA.

Davis makes another conclusory argument that he had to quit because Defendants were trying to force him to commit a "federal crime" related to silencing his wife's social media speech, which Plaintiffs claim is "presumptively and highly" illegal. (Id. at 36).[5] This is inflammatory, conclusory, and unsupportable. The Defendants had no power to discipline Davis or terminate him if he refused to commit a "federal crime." Under the CBA, Davis (and every other deputy) had every right to refuse to commit any crime and contest any punishment resulting from his refusal to commit a crime. Davis was protected against adverse actions without just cause. If Davis believed that he was unjustly punished for refusing to commit a federal crime, he could have availed himself of the grievance, hearing, or arbitration rights under the CBA.

Plaintiffs try to also support this inflammatory allegation with *Savel v. MetroHealth Sys*., 96 F.4th 932, 940 (6th Cir. 2024). However, *Savel* is inapplicable to this case because: (1) it addressed constructive discharge in the context of an unequivocal and express "forced resignation;" and (2) the employees in that case were at-will and enjoyed no CBA with "just cause" termination, hearing rights, or grievance protection. *See, id.*, *generally.* In that case, the employer expressly communicated that the employees would face "termination" if they did not submit to vaccinations. *Id.* at 940. The employer also expressly informed the employees that there was no reason to even wait for termination before finding other jobs. *Id.* Thus, the employees had standing because they exhibited that the "axe was about to fall" and "termination" was imminent. *Id.* Here, Jason Davis admitted in deposition that he knew he was in no danger of termination, and Defendants wanted him to stay. More importantly, Davis could not have faced a "forced

---

[5] To state the obvious, it is very dubious to suggest that an officer debating social media behavior with his own wife constitutes a federal crime. Plaintiffs advance this far-fetched allegation without any case showing any officer was ever prosecuted with criminal liability for such conduct. At a minimum, it is unlikely that such debate between officers and their spouses would constitute a government action under the color of law.

13

resignation" in any regard when he was not "at-will." Davis had a progressive discipline process, grievance protection, and arbitration rights. This eviscerates his argument.

Jason Davis also cannot support his constructive discharge claim with his blanket allegation that he would never receive other future opportunities. That allegation is just speculation, and the CBA provided Davis with remedies regarding potential "hypothetical" scenarios in the future.[6] See, *Bare v. Cardinal Health, Inc*., No. 22-5557, 2023 U.S. App. LEXIS 2195, at *7 (6th Cir. Jan. 25, 2023), *quoting*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401, 133 S. Ct. 1138, 185 L. Ed. 2d 264 (2013) (rejecting an employee's standing that was "contingent on future events that may never come to pass, which is a much 'too speculative' state of affairs 'to satisfy the well-established requirement that threatened injury must be 'certainly impending.'"); *see also*, *Thompson-Mooney*, 2022 U.S. Dist. LEXIS 141431, at *31 (holding that an employee who quits a job in apprehension that conditions may occur later is not constructively discharged because "the employee is obliged not to assume the worst, and not to jump to conclusions too fast.").

Plaintiffs also try to claim that Davis was constructively discharged because Jennifer Davis had a "mental health" crisis, and she was concerned about Jason Davis "offing" himself. However, it was Jennifer Davis (not the Defendants) who threatened to withhold support if Davis stayed, and the Plaintiffs' own retroactive emotional responses cannot support a constructive discharge claim. See *Tchankpa v. Ascena Retail Grp., Inc.,* 951 F.3d 805, 815 (6th Cir. 2020); *see also*, *Savage v.*

---

[6] This is the inherent failure with Plaintiffs' Response concerning constructive discharge. Most of Jason Davis's allegations rely on a sea of possibilities that never actually happened, might have never happened, and could have ended in much more positive manners than Davis's self-serving predictions. If Defendants engaged in the same conclusory, self-serving behavior, they could just as easily argue that Jason Davis would have risen to Chief Deputy before he retired. Unlike Plaintiffs, Defendants are instead relying on admissible evidence and the applicable law.

*Gee*, 665 F.3d 732, 739-40 (6th Cir. 2012) (rejecting a constructive discharge claim stemming from an employee's negative response).

Davis's decision to quit was unreasonable because he had plenty of other options available to him. Davis could have stayed and filed this suit and/or a grievance under the CBA. Davis was not at-will, and he had significant protection from discipline and termination under the CBA. After stripping away all the subjective speculation and hyperbole, the evidence shows that Davis just quit because his wife wanted him to quit.

3.  The Sixth Circuit still requires evidence showing intent to cause an employee's resignation, and Davis admitted that Defendants did not intend to force him out.

Plaintiffs' Response incorrectly presents the Sixth Circuit's current precedent on constructive discharge. The Sixth Circuit currently requires Plaintiffs to establish two elements in a constructive discharge claim. First, an employee must show that the employer deliberately created what a reasonable person would consider intolerable working conditions. *Funk,* 821 F. App'x at 580. Second, the employee must also show that the "**the employer did so with the intention of forcing the employee to quit**." *Id.* Consequently, it is not enough to show that conditions were intolerable. The employee must also show the employer acted "with the specific intention" of forcing the employee to leave. *Id.*

Plaintiffs' Response mishandles the Sixth Circuit's opinion in *Tchankpa v. Ascena Retail Grp.*, *Inc*., 951 F.3d 805, 809 (6th Cir. 2020). According to Plaintiffs, the Sixth Circuit's case law "used to require" evidence that an employer had a subjective intent to induce resignation until that case. (Doc#66, Response at 33). However, the Sixth Circuit has never eliminated the subjective intent requirement for constructive discharge. On the contrary, the Sixth Circuit expressly rejected a request to eliminate that requirement in *Tchankpa*. In that case, an employee claimed construction discharge because he did not receive accommodation to work from home. *Tchankpa,*

15

951 F.3d at 814-815.  Like Plaintiffs here, the employee in *Tchankpa* argued that the intent element for constructive discharge was abrogated in *Green v. Brennan*, 136 S. Ct. 1769, 195 L. Ed. 2d 44 (2016).  *Id.*  The Sixth Circuit only considered this argument in *dicta*. *Id.*  Although the Sixth Circuit momentarily wondered if *Green* may have eliminated the intent requirement, the Sixth Circuit also countered that "it's unclear whether the pertinent language in *Green* applies to the substantive elements of constructive discharge rather than clarifying when the clock starts for statute of limitations purposes." *Id.* at 816.  The Sixth Circuit further pushed back that it is "unclear whether the language in *Green* is dicta or a binding holding."  *Id*.  "After all, it would be strange for the Supreme Court to reconfigure the constructive discharge test without directly telling" the lower courts.  *Id.*  Ultimately, the Sixth Circuit expressly "**decline[d] to answer this question of first impression**," and it rejected the employee's constructive discharge claim "**without deciding the *Green* question**."  *Id.*  (emphasis added).[7]

In fact, only several months after *Tchankpa*, the Sixth Circuit again applied the subjective intent element in another opinion addressing constructive discharge.  In *Funk v. City of Lansing*, 821 F. App'x 574, 580 (6th Cir. 2020), the Sixth Circuit rejected an employee's claim in part because the employee could not offer evidence showing that the defendant took any measure with the "specific intention" of forcing him to quit.  *Id.*  Additionally, other district courts in the Sixth Circuit have continued to apply the intent element in constructive discharge claims after *Tchankpa*.  *See*, *Lisy v. Cuyahoga Cnty.*, No. 1:20 CV 1416, 2021 U.S. Dist. LEXIS 159199, at *26 (N.D. Ohio Aug. 23, 2021) (where the court rejected a constructive discharge claim because the employee

---

[7] The Sixth Circuit's dicta is not binding precedent. See *Scarber v. Palmer*, 808 F.3d 1093, 1096 (6th Cir. 2015). Nonetheless, Plaintiffs' Response repeatedly presents this case as precedent of a holding the Sixth Circuit expressly refused to make.  Consequently, Plaintiffs' arguments on constructive discharge crumble under their own misapplication of the law in this Circuit.

did not exhibit the employer took any actions "with the intent to force plaintiff to quit."); *see also*, *Thompson-Mooney v. Metro. Sec. Servs*., Civil Action No. 5: 21-194-DCR, 2022 U.S. Dist. LEXIS 141431, at *31 (E.D. Ky. Aug. 9, 2022) (stating that an employee must establish that an employer created intolerable conditions "with the intention of forcing the employee to quit.").

Therefore, the Plaintiffs are wrong to suggest that the Sixth Circuit "used to require" evidence that an employer had the subjective intent to cause an employee to quit his job. The Sixth Circuit has not eliminated this element, it is still the law in the Sixth Circuit, and this Court must still apply this element. The Plaintiffs' misapplication of precedent is quite consequential because they have no evidence that any Defendant subjectively intended to drive Davis out. On the contrary, Davis admitted in sworn testimony that he believed that the Defendants wanted him to stay.

> **Q**. Okay. So you're not aware of them taking any steps **or having any intent** to fire you before you left?
>
> **Jason Davis**. No.

> (Id. at 211:10-13) (Emphasis added).

> ***

> **Jason Davis**. No. They both said great things about my work performance and how well and how good of an officer I am in my reviews and that ***they wanted me to stay***.

> (Id. at 199: 1-9) (Emphasis added).

Therefore, Davis's own deposition testimony is fatal to his constructive discharge claim under the Sixth Circuit's actual current precedent on the issue.

4. <u>A failure-to-promote cannot support a constructive discharge claim as a matter of law.</u>

Plaintiffs ignore the numerous cases holding that Davis cannot support his constructive discharge claim merely because he claims he was unlawfully rejected from a promotion. In *Hall*

*v. Associated Doctors Health & Life Ins. Co*., 1993 U.S. App. LEXIS 7568, at *11 (6th Cir. Mar. 29, 1993), the Sixth Circuit Court of Appeals expressly held that **while a denial of a promotion is disappointing, it is not "grounds for a reasonable person to resign or something which an employer reasonably should have foreseen would lead the employee to that point**. (emphasis added). In *O'Donnell v. Genzyme Corp*., 2015 U.S. Dist. LEXIS 30036, at *16 (N.D. Ohio Mar. 11, 2015), the Northern District of Ohio held that other alleged forms of retaliation like failures to promote "do not suffice" to establish constructive discharge because an employee is not reasonable when he jumps to conclusions too fast, like Davis did here. In *Davis v. Pioneer Screw & Nut Co*., 706 F. Supp. 547, 549 (E.D. Mich. 1989), the court held that losing two promotions was not a constructive discharge even when those promotions were previously promised to the employee. In *Harris v. Postmaster Gen*., No. 5:05-cv-1611, 2006 U.S. Dist. LEXIS 41038, at *13 (N.D. Ohio June 20, 2006), the court held that not receiving a promotion cannot support a claim for constructive discharge when an employee cannot show that there is a material change in his working environment. *See also*, *Thompson-Mooney v. Metro. Sec. Servs.*, 2022 U.S. Dist. LEXIS 141431, at *31 (E.D. Ky. Aug. 9, 2022) ("**An employee who quits a job in apprehension that conditions may deteriorate later is not constructively discharged**" because "**the employee is obliged not to assume the worst**, **and not to jump to conclusions too fast**.") (emphasis added). *Brown v. Kinney Shoe Corp*., 237 F.3d 556, 566 (5th Cir. 2001) (repeated denials of promotion cannot support a constructive discharge claim); *see also*, *e.g.*, *Petrosino v. Bell Atl*., 385 F.3d 210, 231 (2d Cir. 2004) (where the court rejected a constructive discharge claim based on employee's reduced promotion opportunities, where employee retained her job title, pay, and seniority).

Thus, Plaintiffs cannot maintain a constructive discharge claim because they allege Davis was unlawfully refused one promotion to RENU in retaliation for speech.

5. <u>Jason Davis unwittingly admitted his wife was the actual cause of his resignation</u>.

It is common sense that people cannot impulsively cause their own financial harm and then ask for others to pay for their unwise decisions. See *Savel v. MetroHealth Sys*., 96 F.4th 932, 940 (6th Cir. 2024) (a person cannot use their own actions to manufacture a case and then blame someone else for the fallout); *see also*, *O'Donnell*, 2015 U.S. Dist. LEXIS 30036, at *16 (rejecting a constructive discharge claim because it is unreasonable for employees to assume the worst and impulsively jump to conclusions after losing promotions).

In a nutshell, Plaintiffs' constructive discharge claim is just a self-inflicted wound. Jason Davis admitted at his deposition that he "started the process" of quitting because his wife expressly told him she wouldn't "support [him] any longer if he stayed." (Doc# 23, Jason Depo. at 200-201). Davis admitted under oath that he really quit because he "really did not know how [he] was going to continue to work there if [his] wife did not support [him] to work there." (Id.)

Plaintiffs' Response advances over sixty pages of inflammatory accusations and self-serving predictions to try to mask the reality that Jason Davis quit because his wife wanted him to quit. Davis's sworn admission eviscerates his constructive discharge allegations because he admitted that the cause of his resignation was his wife's threats—not the Defendants' actions.

**C. Jennifer Davis has no standing for any claim**.

Jennifer Davis cannot rely on her husband's alleged economic damage, her alleged retroactive distress, or her self-inflicted wounds for standing. See *Bakari v. May*, No. 3:10-cv-250, 2011 U.S. Dist. LEXIS 52415, at *14-15 (S.D. Ohio May 6, 2011) (rejecting standing based on the rights of a plaintiff's son); *Jenkins v. Carruth*, 583 F. Supp. 613, 616 (D.C. Tenn. 1982) (concluding that a husband did not have standing to assert claims under § 1983 for the alleged "deprivation by a third party of the civil rights of his wife"). Plaintiffs claim that Jennifer Davis

has standing because she was "angry," "devastated," and suffered "emotional distress" when she heard that her husband did not receive a promotion. This is not a concrete injury concerning standing. The Sixth Circuit has expressly held that "neither the retrospective distress nor the possibility of prospective denial amounts to an injury in fact for standing purposes." *Savel v. MetroHealth Sys*., 96 F.4th 932, 939 (6th Cir. 2024). Finally, a person may not rely upon their own actions to manufacture standing. *Id.* at 940.

Here, Jennifer Davis told her husband she would not support him any longer if he stayed, and she understood the economic consequences if he left. She cannot credibly claim standing because of the economic consequences her own ultimatum set in motion.

## III. CONCLUSION

Plaintiffs' accusations are just a confession. Plaintiffs are here trying to pin their own self-inflicted wounds on the Defendants. Jason Davis quit because his wife threatened to withhold her support if he stayed, so she is the actual cause of Davis's resignation according to his own sworn testimony. However, Plaintiffs have failed to produce any evidence establishing a single objective factor showing an unbearable environment. And Davis's CBA eviscerates all Plaintiffs' attempts to support their constructive discharge claim with their own subjective feelings, inflammatory speculation, and self-serving hypotheticals.

Accordingly, Gramke and the County are entitled to Partial Summary Judgment for the reasons stated in their Motion for Summary Judgment, as well as those stated in this Reply in Support.

Respectfully submitted,

CONNIE PILLICH
PROSECUTING ATTORNEY
HAMILTON COUNTY, OHIO

/s/*Matt Miller-Novak*
Matt Miller-Novak, 0091402
Stephen A. Simon, 0068268
Andrew E. Prem, 100861
Assistant Prosecuting Attorneys
Hamilton County, Ohio
230 E. Ninth Street, Suite 4000
Cincinnati, OH 45202
DDN:  (513) 946-3219 (Miller-Novak)
DDN:  (513) 946-3289 (Simon)
DDN:  (513) 946-3285 (Prem)
FAX:  (513) 946-3018
*TRIAL ATTORNEYS FOR DEFENDANTS*

## CERTIFICATE OF SERVICE

I certify that this Motion for Summary Judgment was served on Plaintiffs' Counsel using this Court's electronic filing system on this 20th day of February 2025.

/s/ *Matt Miller-Novak*

21