**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT CINCINNATI**

| | |
|---|---|
| **JASON DAVIS** and **JENNIFER DAVIS,** | : Case No. 1:24-cv:0202 |
| Plaintiffs | : Judge: Barrett |
| | : |
| v. | : |
| | : **Oral Argument Request** |
| **CHARMAINE McGUFFEY**, et. al. | : |
| Defendants, | : |

**DEFENDANTS' JOINT RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT**

## I.    INTRODUCTION

This is a case about a deputy who quit his job because his wife wanted him to quit. Plaintiffs Jason Davis ("Davis") and Jennifer Davis ("Jennifer") (collectively "Plaintiffs") are not entitled to summary judgment against Hamilton County ("County"), Jay Gramke ("Gramke"), or Sheriff Charmaine McGuffey ("Sheriff McGuffey").  Plaintiffs' Motion for Summary Judgment ("MSJ") is conflated and meritless.  When a plaintiff files a Section 1983 claim against multiple government officials for multiple actions, that plaintiff must "separately analyze the constitutionality of the individual actions of each defendant because government officials are personally liable for damages only for their own unconstitutional behavior." *Carney v. Columbus City Sch. Bd. of Educ.*, No. 2:18-cv-250, 2020 U.S. Dist. LEXIS 69767, at *12 (S.D. Ohio Apr. 21, 2020).  Here, under Count I, Plaintiffs alleged that all three Defendants denied Davis an assignment to the Regional Enforcement Narcotics Unit ("RENU"), all Defendants denied Davis a promotion to corporal, all Defendants chilled Davis's speech in a meeting, all three Defendants interfered in Davis's marital association, and that Davis's own voluntary resignation was a government action.

1

Consequently, Count I alleged five different government actions involving three different legal theories against three different defendants. Count I is shotgun pleading and inappropriately conflated. Regarding their MSJ, Plaintiffs needed to establish every claim separately. Plaintiffs have failed because they continue to conflate their claims.

The evidence shows that Gramke did not unlawfully deny Davis the RENU position because Gramke determined that Davis's conduct was not conducive to RENU's mission. Sheriff McGuffey was not involved in Davis's RENU application, and she was not aware Davis was rejected from RENU until roughly six months later. There was no corporal position available before Jason Davis quit. Because Jason Davis quit, his resignation was not even a government action. This Court should deny Plaintiffs' MSJ because they are not entitled to summary judgment.

## II. BACKGROUND FACTS

### A. Jason Davis made inaccurate public statements on Facebook about the Department.

In 2021, Davis organized a football event called, "Remember the Fallen" (the "Event"). Davis did not discuss the Event with Sheriff McGuffey or Chief Gramke to see if the County would support the Event. Instead, Davis only sent an administrative assistant a single message through Facebook Messenger. (Doc# 23, Jason Depo at 72: 10-18). McGuffey never received the message from the assistant, so she had no knowledge of the event. (Doc #26, McGuffey Depo. at 118-9). Davis was never told that Sheriff McGuffey or Gramke received the message, so he was never told they refused to support the Event. (Doc#23, Jason Depo. at 74). Jason Davis had no information that the Defendants ever instructed anyone to remove his flyers from those boards. (Id. at 76: 15-22). Nonetheless, Jason Davis later publicly claimed that the Defendants did not support his Event, and the Defendants tore his flyers down from briefing rooms. (Exhibit 1). These statements were not true.

**B. Jennifer Davis engaged in online speech that degraded Hamilton County citizens.**

When Sheriff McGuffey won her election, Jennifer Davis took offense with Sheriff McGuffey's Covid-19 safety policies and Sheriff McGuffey's sexual orientation. Jennifer Davis degraded sexual orientation in a Facebook post. (Exhibit 2). Jennifer Davis began her post stating that opinions are like "assholes," and that they "probably stink" unless "you are one of those weirdos that bleaches your asshole and does that colon cleanse thing." (Id.) Jennifer Davis then suggested people only elected Sheriff McGuffey because they wanted to see a "gay woman" advance to Sheriff. (Id). Jennifer Davis referred to any person who supports advancing a gay woman in this manner as a "twatwaffle." (Id.) Jennifer Davis defines "twatwaffle" as an "idiot." (Doc#25, Jennifer Depo. at 34: 9-10). Thus, Jennifer Davis publicly stated that Hamilton County citizens are idiots for voting for a gay sheriff.

**C. Sheriff McGuffey did not retaliate against Plaintiffs' speech.**

Sheriff McGuffey is not involved in reviewing RENU applications or selection. Sheriff McGuffey instead relies upon RENU's leaders and her Chief Deputy to make those decisions. Current Chief Deputy Chris Ketteman ("Ketteman") was the Patrol Division Commander during 2023, so he oversaw RENU. (Ketteman Affidavit at ¶4). Ketteman was involved in Jason Davis's RENU application process. (Id. at ¶¶4-5). Ketteman has testified that Sheriff McGuffey was not involved in the RENU application process or the decision to reject Jason Davis's RENU application. (Id. at ¶13). Gramke testified that he did not tell Sheriff McGuffey that he decided to reject Davis's RENU placement until long after it had already happened. (Doc# 24, Gramke Depo. at 154: 15-22). Additionally, Sheriff McGuffey had no personal knowledge about Jennifer Davis's posts online before Gramke rejected Davis's RENU application. (Doc #26, McGuffey Depo. at 239: 7-9; 247: 19-24). Plaintiff has not cited any testimony showing that Sheriff McGuffey was

3

involved in deciding whether Jason Davis was selected for RENU. She was not. Therefore, Sheriff McGuffey did not retaliate against Davis.

### D. Defendants were concerned with protecting RENU's mission.

Plaintiffs allege that Jason Davis was denied RENU placement to retaliate against Jennifer Davis's speech. This is not the case. Additionally, Defendants never told Davis to divorce his wife, and Davis admitted this. (Id. at 193: 1-4). Sheriff McGuffey merely told a vague story about a former, lazy roommate (whom she was not romantically involved with). (See Doc#62 Notice of Conventional Filing, Audio Recording at 24:00-25:15). Before telling the story, Sheriff McGuffey told Davis that his wife was entitled to her opinions, and she did not hold those opinions against her. (Id.) Immediately after telling the story, Sheriff McGuffey discussed problems with a RENU agent sharing information at home that could harm RENU investigations. (See Id. at 25:45-27:00). Specifically, Sheriff McGuffey stated that "the likelihood is that information she receives about this department probably comes from you." (Id at 25:50.) Sheriff McGuffey expressly explained that RENU is "very specialized" and "secretive." (Id.). She said that the Department must "know that men and women over there are going to keep a closed lid until we get shit done." (Id.) McGuffey continued that Jennifer Davis was entitled to her opinions, but "to have any lingering thought that, you know, oh we might see a little bit of this on Facebook from the person who lives in the same household as this individual, that's a risk that we don't want to take . . . because you could screw up a case." (Id. at 26:37) Therefore, McGuffey's story in full context was intended as an anecdote to explain that members of secretive, investigative units could harm investigations if they share too much information with the people they live with. Defendants had no intent to divorce Davis. **(**Doc #26, McGuffey Depo. at 130:11-15)

Furthermore, the meeting ended with Sheriff McGuffey expressing Davis's ability to advance in the future. (See Doc#62, Recording at 1:12:10- 1:16:10).  Sheriff McGuffey told Davis that the "message [he was] leaving here with" is that they wanted Davis to "do well." (Id.).  Sheriff McGuffey also expressly told Davis at the end of the meeting that she wanted to "get [him] moving." (Id.)  Jay Gramke told Jason that he was not blackballed.  (Id.)  Sheriff McGuffey also told Davis that she was happy to talk to him again before the next corporal position became available.  (Id.)   Every concluding statement at the end of the meeting from Sheriff McGuffey suggested future advancement possibilities for Jason Davis.[1]  (Id.)  Jason Davis left the meeting with no threat to his job security, and he admitted that he knew that he was not facing termination. (Davis Depo. at 199: 1-9) (Emphasis added).

### E.  Jason Davis was not denied a corporal position.

Jason Davis alleges that he was denied a corporal position.  However, there was not any intent to post a corporal position before Jason Davis quit, so it is not possible that any Defendant denied Davis this promotion to retaliate.  (Ketteman Declaration at ¶8). Davis has not submitted any admissible evidence establishing that a corporal position needed filled while Davis was there, let alone that he was denied a corporal position to retaliate against his speech.[2]  Plaintiffs claim that because the County had filled only 65 of 69 corporal positions in 2023, that there is evidence

---

[1] Plaintiffs try to argue and speculate these positive statements were just lip-service.  However, Davis was secretly recording the meeting, and Defendants did not know this.  It is nonsensical that Defendants' positive statements were performing for a recording they had no knowledge was occurring.  Defendants intended the positive end to the meeting.

[2] In Plaintiffs' MSJ, they claim that there were "rumors" in the County that Davis was denied a corporal promotion.  Plaintiffs further claim that Sheriff McGuffey admitted that those rumors were true in her meeting with Davis.  This is a misrepresentation.  Plaintiffs cited a transcript of the recording of the meeting. The Court Reporter they hired botched the Transcript.  Sheriff McGuffey instead told Jason Davis the rumors were untrue.  Defendants filed a motion to strike the Transcript, as well as portions of Plaintiffs' Response/MSJ that relied on the botched transcript.  (See Doc#70, Ds' Motion to Strike).  Plaintiffs have since admitted that this transcript was incorrect.

that Defendants denied Davis promotion to corporal. Plaintiffs fail to mention that in 2022, only 59 of 64 authorized corporal positions were filled, and in 2024, after Davis quit, only 67 of 72 corporal positions were filled. (Doc#55, Ketteman 30(b)(6) Depo, at pg. 49.)  Thus, although the County typically has "vacancies" listed on the Roster, the County never fills all these vacancies as a normal course of business because of budget or lack of necessity. (Id.)  The Defendants had no duty to promote Davis to a vacancy they had no need to fill.  Here, Plaintiffs needed to show that there was a need for a corporal position, that position was posted, and Defendants denied Davis that position.  Plaintiffs failed.

### F.  Jason Davis quit because his wife wanted him to quit.

Jason Davis voluntarily quit, so his resignation was not a government action.   Plaintiffs' Complaint expressly states that Jennifer Davis told Jason Davis that she "**could no longer support him if he stayed at the Sheriff's Office**."  (Complaint at ¶40) (emphasis added).  In deposition, Jason Davis confirmed that he quit because Jennifer Davis wanted him to quit.

> **Q**. When did you decide that you wanted to leave the department?
>
> **Jason Davis**. I -- honestly I can't recall.
>
> **Q**. Was it when Jennifer told you that she couldn't support you any longer?
>
> **Jason Davis**. That started the process.
>
> (Doc#23, Davis Depo: 14-19)

Therefore, Jason Davis's resignation was not an adverse government action.  Jason Davis's resignation was just a marital decision.

6

### III.    LAW AND ARGUMENT

#### A.  Plaintiffs are not entitled to summary judgment under Count I.

Plaintiffs' Count I was an inappropriate shotgun pleading, and as a result, Plaintiffs' MSJ speciously conflates multiple claims against multiple parties for multiple events. For example, Plaintiffs inappropriately conflated both 1st Amendment association and 1st retaliation into Count I even though they are separate legal theories. In addition, in their Motion for Summary Judgment, Plaintiffs conflate numerous alleged government actions against three defendants. However, the law does not work in this manner. Plaintiffs cannot successfully allege that Jason Davis's voluntary resignation was an unconstitutional government action merely because he was denied a single promotion nine months earlier. See *Carney v. Columbus City Sch. Bd. of Educ.*, No. 2:18-cv-250, 2020 U.S. Dist. LEXIS 69767, at *12 (S.D. Ohio Apr. 21, 2020) (a district court "must separately analyze the constitutionality of the individual actions of each defendant," because government officials are only liable for their own governmental actions).

When a single count in a complaint fails to separate causes of action, it is a "shotgun pleading" that violates Rule 10(b). *Lee v. Ohio Educ. Ass'n*, 951 F.3d 386, 393 (6th Cir. 2020), *citing*, *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 947 (7th Cir. 2013) (holding that one count of complaint, which raised five causes of action, was impermissible "kitchen sink" pleading). Concerning qualified immunity to Section 1983 claims, courts must separately analyze the allegation against each defendant. *Reilly v. Vadlamudi*, 680 F.3d 617, 624 (6th Cir. 2012). This is particularly important when analyzing the subjective intent of each government official. *Taylor v. Davidson Cnty. Sheriff's Dep't*, 832 F. App'x 956, 959 (6th Cir. 2020).

A prima facie case of First Amendment retaliation requires that an employee establish that: "(1) he engaged in constitutionally protected speech or conduct; (2) the employer took an adverse

7

action against him that would deter an ordinary person from engaging in that conduct; and (3) the protected speech was a substantial or motivating factor in the adverse action." *Funk v. City of Lansing*, 821 F. App'x 574, 581 (6th Cir. 2020). If the employee establishes a *prima facie* case, the burden then shifts to the employer to demonstrate that the employer would have made the same employment decision absent the protected conduct. *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012).

1. The Defendants had a legitimate interest in addressing speech that is disruptive to the County's mission.

Government employees enjoy less speech protection than members of the public. *Amalgamated Transit Union Local 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 103 (3d Cir. 2022). The Supreme Court has created a general framework that courts use to balance employees' speech against governments' interest in avoiding disruption and maintaining disruption. *See generally, Pickering v. Bd. of Educ.*, 391 U.S. 563, 88 S. Ct. 1731 (1968). When a public employee engages in speech related to his job duties, he is generally not speaking as a private citizen. *Garcetti v. Ceballos*, 547 U.S. 410, 421, 126 S. Ct. 1951, 1960 (2006). An employee's speech enjoys protection when it does not owe its existence to his duties. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 530, 142 S. Ct. 2407, 2424 (2022). However, an employee's job description does not always limit what is considered related to that employee's duties. *Phillips v. City of Dawsonville*, 499 F.3d 1239, 1242 (11th Cir. 2007). If a court determines that an employee's speech is not related to his duties, the court must still balance the speech against the government's interest as the employer. *Marquardt v. Carlton*, No. 21-3832, 2023 U.S. App. LEXIS 2182, at *8 (6th Cir. Jan. 25, 2023). Courts evaluate whether an employee's speech: (1) impairs discipline or harmony among co-workers; (2) has a detrimental impact on close working relationships for which

8

confidence and personal loyalty are necessary; (3) impedes the employee's duties or interferes with the government's regular operations; or (4) undermines the government's mission. *Id.* at *8-9.

In *Kirkland v. City of Maryville,* 54 F.4th 901, 909 (6th Cir. 2022), the Sixth Circuit upheld summary judgment dismissing an officer's speech claim based on the *Pickering* test.  *Id.*  In that case, the city argued that an officer threatened to undermine the city's working relationship with the county sheriff. *Id.*  Courts give substantial deference to a government's view of its legitimate interests. *Id.*  The Sixth Circuit noted that the "heightened need for order, loyalty, and efficiency in law enforcement agencies means they will often "have legitimate and powerful interests in regulating speech by their employees."  *Id.*  Because the officer's critical Facebook post in that case "threatened to undermine" the city's working relationship with the county sheriff, the Sixth Circuit determined that the officer's termination was justified.  *Id.*

In *Weisbarth v. Geauga Park Dist*., 499 F.3d 538, 542 (6th Cir. 2007), a park ranger made disparaging comments about her coworkers and department morale to a third party.  Her employer terminated her for her comments, and the park ranger filed a grievance. *Id.*  The park ranger won her arbitration, and the arbiter determined she was fired without cause. *Id.* The ranger filed suit, claiming her employer violated her First Amendment rights. *Id.*  The court determined that the ranger's speech about morale and performance problems in the department were not protected because they related to her employment. *Id.* at 542-7.  Even though her termination may have provided a labor-contract claim, it did not violate the First Amendment.  *Id.*, *see also*, *Marquardt v. Carlton*, No. 21-3832, 2023 U.S. App. LEXIS 2182 (6th Cir. 2023) (holding that an EMS employee was appropriately terminated for making insensitive comments about Tamir Rice because a government does not always have to show an actual disruption if it can reasonably predict that the employee's speech would cause disruption).

9

Here, Defendants did not terminate or demote Jason Davis.  Instead, Jay Gramke overrode Davis's RENU placement because he believed that Jason Davis did not possess the characteristics required to serve in RENU.  Gramke cited that he believed Davis was a malcontent.  Additionally, Gramke did refer to certain Facebook posts where Jason Davis misrepresented the County's decision to not support his "Remember the Fallen" event, as well as certain Facebook posts from Davis's wife that reflected a disgruntled Deputy.  In the meeting, the Defendants informed Davis that RENU was a specialized force that requires secrecy, rather than gossip from disgruntled agents, who overshare at home.  As they stated, if an agent shares too much at home, and his family posts these matters online, that agent may ruin an investigation.  The Sixth Circuit has noted that law enforcement agencies require greater loyalty and order.  *Kirkland*, 54 F.4th 901, 909.  RENU is an investigative unit that Defendants contend requires much greater loyalty, secrecy, and order.  Thus, Defendants should enjoy the right to reject applicants to RENU when they believe that a deputy's speech reflects disgruntled gossip about the workplace.  *Weisbarth*, 499 F.3d at 542 (holding that a park ranger's speech about morale and performance in the workplace to a third party is not protected speech under the First Amendment).

> 2.  <u>Defendants did not deny Davis a promotion.</u>

The purpose of summary judgment is to save an expense at trial, and to dispose of claims where there are no issues of material fact.  *Bland v. Norfolk & S. R. Co.*, 406 F.2d 863, 866 (4th Cir. 1969).  Under FRCP 56(c), Plaintiffs must submit some admissible evidence that there was a promotion to corporal available, one of the Defendants denied Davis the promotion, and that Davis was denied a corporal promotion because of his speech.  There is no issue of material fact here.  Davis has not even produced any evidence that Defendants had any need for another corporal before he quit.  The evidence instead shows that Defendants did not need a corporal, they had not posted a promotion to corporal, and Davis was never denied a promotion to corporal.  Plaintiffs

10

essentially cite Davis's own self-serving testimony that there were "rumors," and they relied upon an inaccurate transcript that misrepresented Sheriff McGuffey's statements about those rumors. Defendants were forced to file a Motion to Strike this misrepresentation, and Plaintiffs had to ultimately concede that they supported their MSJ with inaccurate information regarding this claim.[3]

### 3. Sheriff McGuffey was not involved in any adverse actions.

Plaintiffs still cannot articulate how Sheriff McGuffey was involved in denying Davis any promotion. In the Sixth Circuit, supervisor liability does not attach when it is premised on a "mere failure to act." *Greene v. Barber*, 310 F.3d 889, 898 (6th Cir. 2002). Plaintiffs must base their claims against supervisors based on their "active" unconstitutional behavior. *Id.* "An individual-capacity claim is distinct from a claim against a defendant in his official capacity." *Essex v. Cnty. of Livingston*, 518 F. App'x 351, 354 (6th Cir. 2013). A claim against a sheriff can cause confusion because she is a policymaker, and "an individual-capacity claim may appear indistinguishable from an official-capacity or municipal claim." *Id.* But failure-to-train cases fall on different principles. For "individual liability" on a "failure-to-train" case, even the actual failure for a policymaker to train subordinates does not impose "individual" liability on the sheriff. Even when harms occur according to an "official capacity liability for the entity," an individual supervisor is not personally liable for others' actions. *Id.* A plaintiff must instead establish that the sheriff "directly participated" in the conduct or authorized it. *Id.* "A mere failure to act" does not account as personal involvement to create personal liability. *Id.* A sheriff is not liable because she merely has a right to control employees. *Id.* at 355. And liability against a sheriff cannot lie on allegations

---

[3] Although it was most likely inadvertent, Plaintiffs' court reporter negligently misrepresented Sheriff McGuffey's statements. Sheriff McGuffey expressly told Jason Davis that rumors about the corporal position were untrue, and Davis was told that no corporal position existed during that meeting. Defendants incorporate their Motion to Strike at Doc#66 here.

of a sheriff's "simple negligence" concerning her supervisory role. *Id.* A plaintiff must instead point to some conduct "that is **directly correlated** with the plaintiff's injury." *Id.* (emphasis added).

Additionally, failure to intervene or remedy past retaliatory behavior should not expose supervisors to individual liability. See, *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999); *see also*, *Lucas v. Chalk*, 2021 U.S. Dist. LEXIS 38135, at *22 (W.D. Tenn. Mar. 2, 2021) (allegations of pattern and practice without deliberate action or involvement in the actions do not expose a supervisor to individual liability). If a supervisor's inaction did not cause a plaintiff's harm because the plaintiff would have suffered the harm regardless, then the supervisor is not liable for the harm. *Lynn v. City of Detroit*, 98 F. App'x 381, 387 (6th Cir. 2004).

Sheriff McGuffey was not involved in Davis's RENU application. Sheriff McGuffey did not even know about Davis's RENU application until months after he was rejected. Sheriff McGuffey did not deny Davis a promotion to corporal. In fact, there is not even any admissible evidence in the record that any corporal position was available before Davis quit to appease his wife. Sheriff McGuffey did not terminate Davis. Davis's resignation was voluntary. Sheriff McGuffey never told Davis to get a divorce, and she never took an adverse action against him, so she did not interfere in Plaintiffs' marriage. Plaintiffs have only produced evidence of their own political animosity. They have produced nothing exposing Sheriff McGuffey to individual liability.

    4. <u>Defendants did not constructively discharge Jason Davis</u>.

      *a. Jason Davis had options other than quitting, and there is no objective evidence that Davis's workplace was unbearable.*

Constructive discharge is a "tough row to hoe," and it is "hard to prove." *Edwards v. City of Cincinnati*, No. 23-3083, 2023 U.S. App. LEXIS 22057, at *5 (6th Cir. Aug. 21, 2023), *see also,*

12

*O'Donnell,* 2015 U.S. Dist. LEXIS 30036, at \*16 (rejecting a constructive discharge claim because it is unreasonable for employees to assume the worst and impulsively jump to conclusions). Instead of quitting impulsively, Davis could have stayed and filed his suit and/or a grievance for not receiving the RENU position in the first place. (See Exhibit 3, Davis CBA).  Courts have held that union protections eviscerate constructive discharge claims.  *See Silverman v. City of N.Y.*, 216 F. Supp. 2d 108, 116 (E.D.N.Y. 2002) (concluding **that the fact an employee could have sought a hearing before being terminated eviscerates his claim that threats of termination created an intolerable situation which left him with no other choice than resignation**); *Stembridge v. City of N.Y.*, 88 F. Supp. 2d 276, 285 (S.D.N.Y. 2000) (holding that there was no constructive discharge when an employee did not pursue a hearing available under a union agreement).  In determining whether a reasonable employee would have felt compelled to quit, the Sixth Circuit has provided seven factors for courts to evaluate. *Laster v. City of Kalamazoo*, 746 F.3d 714, 728 (6th Cir. 2014).  Courts should consider whether the employee: (1) was demoted; (2) suffered a reduced salary; (3) had his current duties reduced; (4) was reassigned to degrading or menial work; (5) was reassigned to work under a younger supervisor; (6) was badgered or harassed in a manner calculated to force him to quit; or (7) was offered early retirement.  *Id.*

Claims based on contingent future events that might never come to pass cannot support discharge because they are too speculative to establish that the threatened injury if "certainly impending." *Bare v. Cardinal Health, Inc.*, No. 22-5557, 2023 U.S. App. LEXIS 2195, at \*7 (6th Cir. Jan. 25, 2023), *quoting*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401, 133 S. Ct. 1138, 185 L. Ed. 2d 264 (2013).  Plaintiffs' own retroactive emotional responses cannot support a constructive discharge claim.  See *Tchankpa v. Ascena Retail Grp., Inc.,* 951 F.3d 805, 815 (6th Cir. 2020); *see also*, *Savage v. Gee*, 665 F.3d 732, 739-40 (6th Cir. 2012) (rejecting a constructive

discharge claim stemming from an employee's negative response).  In *Hall v. Associated Doctors Health & Life Ins. Co.*, 1993 U.S. App. LEXIS 7568, at \*11 (6th Cir. Mar. 29, 1993), the Sixth Circuit Court of Appeals expressly held that **while a denial of a promotion is disappointing, it is not "grounds for a reasonable person to resign or something which an employer reasonably should have foreseen would lead the employee to that point**. (emphasis added).

Here, under Davis's CBA, Defendants could not demote Davis without cause, and Davis could have grieved it if they tried. (Exhibit 3).  Defendants could not reduce Davis's salary without just cause. (Doc# 23, Jason Depo. at 207: 18-20; Exhibit 3).  Davis's duties were never reduced. (Id. at 209).  Defendants did not reassign Davis to menial work. (Id. at 210: 4-6).  Davis was not reassigned to work under a different supervisor. (Id. at 209).  McGuffey and Gramke did not interact with Davis or badger him. (Id. at 207: 13-15).  Defendants did not suggest that Davis should retire early. (Id. at 210: 10-15).   Defendants also could not fire Davis without just cause. (Exhibit 3).   Plaintiffs argue erroneously that Davis was constructively discharged because his entire department was assigned a new supervisor.  (See Doc#66, Ps' Response at 33).  However, the Sixth Circuit's factors asks whether the plaintiff was "reassigned" to a different supervisor. The factors do not ask whether an employee's current department "receives" a new supervisor.

Davis's CBA and Union protection eviscerate his constructive discharge claim.  Jason Davis was not "at-will," and he had a Union and CBA with a robust grievance and progressive disciplinary process.  It is very unlikely Defendants could effectively demote, discipline, cut pay, retaliate, or terminate Davis without "just cause" merely because Davis remained married in the future.  Davis's entire constructive discharge claim is about one rejection and matrimonial mollification.  Instead of impulsively quitting, Davis could have stayed and filed his suit and/or a grievance for not receiving the RENU position, and he would have had Union protection.

14

> b. *The Sixth Circuit still requires evidence showing intent to cause an employee's resignation, and Davis admitted that Sheriff McGuffey did not intend for Davis to quit.*

Plaintiffs' Response incorrectly presents the Sixth Circuit's current precedent on constructive discharge. The Sixth Circuit currently requires Plaintiffs to establish two elements in a constructive discharge claim. First, an employee must show that the employer deliberately created what a reasonable person would consider intolerable working conditions. *Funk,* 821 F. App'x at 580. Second, the employee must also show that the "**the employer did so with the intention of forcing the employee to quit**." *Id* (emphasis added). Consequently, it is not enough to show that conditions were intolerable. The employee must also show the employer acted "with the specific intention" of forcing the employee to leave. *Id.*

Plaintiffs' Response mishandles the Sixth Circuit's opinion in *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 809 (6th Cir. 2020). According to Plaintiffs, the Sixth Circuit's case law "used to require" evidence that an employer had a subjective intent to induce resignation until that case. (Doc#66, Response at 33). However, the Sixth Circuit has never eliminated the subjective intent requirement for constructive discharge. On the contrary, the Sixth Circuit expressly **<u>rejected</u>** a request to eliminate that requirement in *Tchankpa*. In that case, an employee claimed construction discharge because he did not receive accommodation to work from home. *Tchankpa*, 951 F.3d at 814-815. Like Plaintiffs here, the employee in *Tchankpa* argued that the intent element for constructive discharge was abrogated in *Green v. Brennan*, 136 S. Ct. 1769, 195 L. Ed. 2d 44 (2016). *Id.* The Sixth Circuit only considered this argument in *dicta*. *Id.* Although the Sixth Circuit momentarily wondered if *Green* may have eliminated the intent requirement, the Sixth Circuit also countered that "it's unclear whether the pertinent language in *Green* applies to the substantive elements of constructive discharge rather than clarifying when the clock starts for

15

statute of limitations purposes." *Id.* at 816.  The Sixth Circuit further pushed back that it is "unclear whether the language in *Green* is dicta or a binding holding."  *Id*.  "After all, it would be strange for the Supreme Court to reconfigure the constructive discharge test without directly telling" the lower courts.  *Id.*  Ultimately, the Sixth Circuit expressly "**decline[d] to answer this question of first impression**," and it rejected the employee's constructive discharge claim "**without deciding the *Green* question**."  *Id.*  (emphasis added).[4]

In fact, after *Tchankpa*, the Sixth Circuit again applied the subjective intent element in another opinion addressing constructive discharge.  In *Funk v. City of Lansing*, 821 F. App'x 574, 580 (6th Cir. 2020), the Sixth Circuit rejected an employee's claim in part because the employee could not offer evidence showing that the defendant took any measure with the "specific intention" of forcing him to quit. *Id.*  Additionally, other district courts in the Sixth Circuit have continued to apply the intent element in constructive discharge claims after *Tchankpa*.  *See*, *Lisy v. Cuyahoga Cnty.*, No. 1:20 CV 1416, 2021 U.S. Dist. LEXIS 159199, at *26 (N.D. Ohio Aug. 23, 2021) (where the court rejected a constructive discharge claim because the employee did not exhibit the employer took any actions "with the intent to force plaintiff to quit."); *see also*, *Thompson-Mooney v. Metro. Sec. Servs.*, Civil Action No. 5: 21-194-DCR, 2022 U.S. Dist. LEXIS 141431, at *31 (E.D. Ky. Aug. 9, 2022) (stating that an employee must establish that an employer created intolerable conditions "with the intention of forcing the employee to quit.").

Plaintiffs erroneously suggest that the Sixth Circuit "used to require" evidence that an employer had the subjective intent to cause an employee to quit his job.  The Sixth Circuit has not

---

[4] The Sixth Circuit's dicta is not binding precedent. See *Scarber v. Palmer*, 808 F.3d 1093, 1096 (6th Cir. 2015). Nonetheless, Plaintiffs' Response repeatedly presents this case as precedent of a holding the Sixth Circuit expressly refused to make.  Consequently, Plaintiffs' arguments on constructive discharge crumble under their own misapplication of the law in this Circuit.

16

eliminated this element. It is still the law in the Sixth Circuit, and this Court must still apply this element. The Plaintiffs' misapplication of precedent is consequential because they have no evidence that any Defendant subjectively intended to drive Davis out. On the contrary, Davis expressly admitted in sworn testimony that he knew the Defendants wanted him to stay. (Doc#49, Davis Depo at 211:10-13; 199: 1-9). Therefore, Davis's own deposition testimony is fatal to his constructive discharge claim under the Sixth Circuit's actual current precedent on the issue.

> c. *Davis admitted he quit because his wife wanted him to quit.*

It is common sense that people cannot impulsively cause their own financial harm and then ask for others to pay for their unwise decisions. See *Savel v. MetroHealth Sys.*, 96 F.4th 932, 940 (6th Cir. 2024) (a person cannot use their own actions to manufacture a case and then blame someone else for the fallout); *see also*, *O'Donnell*, 2015 U.S. Dist. LEXIS 30036, at *16 (rejecting a constructive discharge claim because it is unreasonable for employees to assume the worst and impulsively jump to conclusions after losing promotions). In a nutshell, Plaintiffs' constructive discharge claim is just a self-inflicted wound. Jason Davis admitted at his deposition that he "started the process" of quitting because his wife expressly told him she wouldn't "support [him] any longer if he stayed." (Doc# 23, Jason Depo. at 200-201). Davis admitted under oath that he really quit because he "really did not know how [he] was going to continue to work there if [his] wife did not support [him] to work there." (Id.)

Thus, Davis's resignation was not a "government action." Davis's resignation was just his own matrimonial mollification.

> 5. <u>Defendants did not interfere in Plaintiffs' association.</u>

Plaintiffs' association claim struggles because it is ultimately just repeating his retaliation claim, and nobody tried to force Davis to get divorced. *Harris v. Butler Cnty.*, 344 F. App'x 195, 200-01 (6th Cir. 2009). The Sixth Circuit has held that it is not protected speech for an officer to

harm a department's relationships in the community.  *Kirkland*, 54 F.4th 901.  The Sixth Circuit has held that language that exhibits bigotry or offensive commentary towards minority populations is not protected speech for emergency responders.  *Marquardt*, 2023 U.S. App. LEXIS 2182.  And the Sixth Circuit has held that it is not protected speech for a park ranger to complain about morale and performance to third parties.  *Weisbarth*, 499 F.3d 538, 542.

Davis did not receive the RENU position because it is a secretive unit, and Defendants believed that Davis was disgruntled and overshared at home.  These decisions were focused on the mission of the County.  They were not focused on Davis's marriage.  Nobody intended or expected Davis to get a divorce.  Plaintiffs' allegations in this regard are speculation based on inflammatory interpretations of vague anecdotes.

**A. This Court should dismiss Count II of Plaintiffs' Complaint because it fails as a matter of law.**

    1.   <u>Defendants did not violate R.C. § 2921.45 because they did not knowingly deprive Davis of his rights.</u>

R.C. § 2921.45 only criminalizes officials when they "knowingly" violate a person's constitutional rights.  1974 Committee Comment to H 511 noted the General Assembly intended to protect public officials who acted with the belief that they were authorized under law regardless of a later determination that their actions were not.  *Id.*, *see also*, *Maynard v. Smith,* 47 Ohio Misc. 47, 49, 354 N.E.2d 722, 724 (Mun. Ct. 1975).  The very nature of the *Pickering* balancing test makes public employment speech cases antithetical to the "knowingly" standard required under this criminal statute because judges have discussed the subjective and inconsistent nature of the *Pickering* balancing test.

For example, in *Turner v. Metro. Gov't of Nashville & Davidson Cnty.*, No. 3:21-cv-00042, 2023 U.S. Dist. LEXIS 166286, at *9 (M.D. Tenn. Sep. 19, 2023), the court stated the following:

> The Court would be remiss if it did not comment on the inherently subjective nature of this balancing test and the resulting reality that its outcome in a particular case well may be judge-specific. In many cases, different judges reasonably could reach opposite conclusions as to the outcome of that balancing test.

Additionally, in Judge Murphy's concurring opinion in *Bennett v. Metro. Gov't of Nashville & Davidson Cnty.*, 977 F.3d 530, 553 (6th Cir. 2020), he spent considerable time discussing the problems of the open-ended balancing under *Pickering* causing difficulties. Indeed, Judge Murphy noted that *Pickering* causes courts to "compare incomparable interests." In fact, Judge Murphy explained that because *Pickering* requires such a comparison of incommensurate interests, the proper outcome is bound to be in the "eye of the beholder." *Id.* at 554.

The Sixth Circuit has held that it is not protected speech for an officer to harm a department's relationships in the community. *Kirkland*, 54 F.4th 901. The Sixth Circuit has held that language that exhibits bigotry or offensive commentary towards minority populations is not protected speech for emergency responders. *Marquardt*, 2023 U.S. App. LEXIS 2182. And the Sixth Circuit has held that it is not protected speech for a park ranger to complain about morale and performance to third parties. *Weisbarth*, 499 F.3d 538, 542.

According to Plaintiffs, if a public employer believes that he may take adverse action against an employee's speech, and he gets it wrong, then that official will face criminal liability. Plaintiffs' arguments would cripple public employment decisions because it would demand that public employers grapple with a balancing test that judges struggle with applying. This is clearly not the outcome the Ohio Generally Assembly intended when it added the "knowingly" standard to protect public officials against criminal liability for their mistakes. This Court should refuse to construe this statute in manner that criminalizes employer's decisions regarding speech in the workplace because: (1) the relevant analysis is too subjective to impose criminal liability; and (2) imposing criminal liability on employment decisions would stymie public employers.

19

2. This Court should not exercise jurisdiction over Count II under 28 U.S.C. § 1367.

Under 28 U.S.C.S. § 1367, a district court may decline to exercise jurisdiction over a "claim raises a novel or complex issue of State law."  The Northern District of Ohio recently declined to exercise jurisdiction over R.C. § 2921.45 because it determined that the statute was too "underdeveloped," and that its development was better suited to state courts. *Frenchko v. Monroe*, 672 F. Supp. 3d 421, 470 (N.D. Ohio 2024).

Here, Plaintiffs are attempting to criminalize public employment decisions.  It does not appear that any Ohio court has ever determined that a public supervisor is subject to criminal liability if he makes the wrong call concerning an employment decision.  Additionally, Plaintiffs also advance that even directives that only "chill" speech should subject officials to criminal liability.  Plaintiffs also seemingly argue that the statute even applies criminal liability to supervisors on a theory of mere acquiescence.  These arguments are reckless because a directive that merely "chills" speech is not necessarily an active deprivation of a person's rights, and criminal liability could extend to supervisors for failing to discipline subordinates.  Plaintiffs' application of this statute here could criminalize an overly broad sign ordinance or an overly forgiving boss.  This case presents too many novel issues concerning an already "underdeveloped" criminal statute.  This Court should decline to exercise its jurisdiction over this state law concerning such novel circumstances that could result in widespread havoc the General Assembly never intended.

## IV.    CONCLUSION

Plaintiffs have failed to establish they are entitled to summary judgment as a matter of law.  Instead, the County and Gramke are entitled to judgment under their Second Partial Motion for

Summary Judgment because Davis has no evidence of a corporal position, and Plaintiffs' Count II fails as a matter of law.

Respectfully submitted,

CONNIE PILLICH
PROSECUTING ATTORNEY
HAMILTON COUNTY, OHIO

/s/*Matt Miller-Novak*
Matt Miller-Novak, 0091402
Stephen A. Simon, 0068268
Andrew E. Prem, 100861
Assistant Prosecuting Attorneys
Hamilton County, Ohio
230 E. Ninth Street, Suite 4000
Cincinnati, OH 45202
DDN:  (513) 946-3219 (Miller-Novak)
DDN:  (513) 946-3289 (Simon)
DDN:  (513) 946-3285 (Prem)
FAX:  (513) 946-3018
*TRIAL ATTORNEYS FOR DEFENDANTS*

## CERTIFICATE OF SERVICE

I certify that this Motion for Summary Judgment was served on Plaintiffs' Counsel using this Court's electronic filing system on this 16th day of March 2026.

*/s/ Matt Miller-Novak*