**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT CINCINNATI**

| | | |
|---|---|---|
| JASON DAVIS, et. al. | : | Case No. 1:24-cv-0202 |
| **Plaintiffs** | : | |
| v. | : | |
| CHARMAINE McGUFFEY, et. al. | : | |
| **Defendants,** | : | |

**PLAINTIFFS' REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs, through Counsel, provide this Reply in support of their motion for summary judgment (Doc. 67) which responds to Defendants' Opposition (Doc. 73). In their Opposition, Defendants engage in a fanciful exposition of the "facts" in an "Introduction" devoid of evidentiary support, misconstrue or ignore material facts in their "Background Facts," and misapply the law (where they do not ignore it altogether) in their "Law And Argument."

**I.      RESPONSE TO DEFENDANTS' "FACTS"**

First, Defendants assert that because McGuffey and Gramke did not know about the Remember the Fallen event in 2021, that makes Jason's statements, regarding the Hamilton County Sheriff's Office not supporting the event, "not true." (Response, Doc. 73 at 2). Jason's actual statements were that "our department didn't support it. No county items were used to advertise this game. Flyers were taken down in the briefing room." (Decls. Jason and Jennifer, Doc. 66-1, ¶4, 66-2, PageID#4366-4367, 4454; Depo. Gramke, Doc. 51, at 116-124, PageID#2622-2630; Exhibit 14, Doc. 51-14, PageID#2798-2800). And Jason's unrebutted testimony is that the flyers were taken down and there was no advertising by the county. (Depo. Davis, Doc. 49 at 76, PageID#1959). Moreover, neither McGuffey nor Gramke testified they have any basis to dispute Jason's testimony. (Depo. Gramke, Doc. 51, at 119-120,

1

PageID#2625-2626; Depo. McGuffey, Doc. 52, at 229, PageID#3078). This combination of Jason's assertions and McGuffey and Gramke not knowing does not make his statements false.

Defendants also take issue with Jennifer's speech. (Response, Doc. 73 at 3). Obviously, their dislike of her speech is the reason we are here. In terms of the content of her speech, it does not mean what Defendants think it means. If anything, Defendants disagreement with the content of her speech underscores their liability as a result of targeting Jennifer for expressing opinions they do not like. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1942).

Next, Defendants claim that only Gramke, and not McGuffey, was involved in the RENU non-selection process on Jason. (Response, Doc. 73 at 3). As noted in our opening motion and brief, see Doc. 66 at pp.40-41, PageID#4355-4356, there may be an issue of fact on the degree to which McGuffey was involved with initially making the assignment decisions to RENU.[1] However, there is no dispute that the facts here are sufficient to hold McGuffey liable for supervisory liability on that claim.

Once again, McGuffey made admissions against interest in the October 2023 meeting, *see* § II. J., at Doc. 66, at pp. 13-19, PageID#4328-4334, that undermine Defendants' contentions about

---

[1] There may be an issue of fact about the degree to which McGuffey was involved in initially making the assignment decisions, including to RENU and promotions to Corporal – on that score the contemporaneous promotional and assignment orders themselves document that McGuffey made the appointment and approvals; while Defendants' witnesses say these decisions actually were made by the Chief Deputy and/or possibly Major. (Depo. Gramke, Doc. 51, at 114-115, PageID#2620-2621; 30(b)(6) Depo. Ketteman, Doc. 55, at 26, 30-34, 49, 54, PageID#3498, 3482-3488, 3501, 3506). However, and in addition to the contemporaneous documentary evidence, McGuffey's testimony was that the "buck stops with me" within the department, and "Chief Deputy Gramke made the decision to prevent Jason Davis's assignment to RENU. I agreed with his decision." (Depo. McGuffey, Doc. 52 at 8, 82-83, PageID#2858, 2932-33; Exhibit 24, Doc. 52-1, Interrog. No. 6 response, at PageID#3153).

McGuffey's alleged non-involvement.  McGuffey's admissions, including her statements about knowing more than she admits, and her testimony that the buck stops with her, demonstrate her involvement in these decisions, particularly where she stood there and doubled down when the unconstitutional bases for the decisions were disclosed to Jason in the October 2023 meeting.   At a minimum, the evidence is unrebutted that she affirmed the illegal decision to negatively impact Jason's career as a result of the constitutionally protected speech of a family member.

Again, in the October 2023 meeting McGuffey admitted that Jason had done a very good job but there was an issue with Jennifer's speech.  (Transcript, Doc. 50-2 at 22, PageID#2455). McGuffey then admitted she knew a lot more than people thought she knew, and she admitted she has never taken any action without a purpose, knows exactly "who is who," and strategizes around that.  (*Id.* at 44-45, PageID#2477-2478).  That leads to the plain conclusion that McGuffey, as Gramke's supervisor in the October 2023 meeting, was the final word in Jason's non-selection for both RENU (and for corporal), and the unconstitutional condition on continued employment that led to Jason's constructive discharge.

Consequently, in terms of summary judgment for Plaintiffs, regardless of McGuffey's participation at the outset in Jason's non-selection for RENU and corporal, McGuffey is liable as a matter of law under a supervisory liability theory, including as that theory has been articulated in cases such as *Campbell v. City of Springboro, Ohio*, 700 F.3d 779, 789-790 (6th Cir. 2012).  In fact, *Campbell* merely requires Plaintiffs to demonstrate that McGuffey "implicitly authorized, approved, or knowingly acquiesced in the conduct" of Gramke.  *Id.*  We discuss this law in further detail below.

Next, Defendants argue that the reason they engaged in First Amendment retaliation was because they were concerned with protecting RENU's mission.  (Doc. 73 at 4-5).  In order to craft

3

that pretext, Defendants take liberty with Jason's deposition testimony regarding Defendants' demand of divorce– as a review of the cited passage reveals Jason actually testified that Defendants strongly implied he had to divorce his wife to have a future in the HCSO.  (Depo. Davis at pp. 193).  Without question, the transcript of the October 2023 meeting reflects Defendants plainly stating that Jason's wife was "hurting" his career (Transcript, Doc. 50-2, at 50-51, PageID#2483-2484), that if someone was hurting Jason's career, he should "cut them loose," (*id.* at 45-46, PageID#2478-2479), and to leave no doubt, McGuffey added that if associating with certain people hurt her career, it would cause her to say "You got to go. Bye." (*Id.* at 46, PageID#2479).  And both McGuffey and Gramke directly refute this false pretext as both testified they had no information that Jason had ever shared any confidential or sensitive information with his wife. (Depo. Gramke, Doc. 51, at 148-150, PageID#2654-2656; Depo. McGuffey, Doc.52, at 44-45, 92, PageID#2893-2894, 2941).

Defendants then finish by arguing that they ended the October 2023 meeting by telling Jason they wanted to get him moving in his career, and that their encouragement, somehow, solves the issues in this case. (Response, Doc. 73 at 5).  Defendants are wrong.  When coupled with the fact Defendants told Jason his wife was hurting his career, that there had to be consequences for him at work for things Jennifer said on social media, all of which Defendants ignore, their encouragement to him that his career would advance if he got with the program also was a violation of the law.  Simply put, McGuffey and Gramke's directives to Jason to silence Jennifer, or else, constitute prior restraint – constitute a federal felony.  *See* 18 U.S.C. §§ 241, 242  *Alexander v. United States*, 509 U.S. 544, 550 (1993); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963); *Novak v. City of Parma*, 932 F.3d 421 (6th Cir. 2019).

Next, whether Defendants denied Jason a corporal position is a genuine issue of material fact, and thus not appropriate for summary judgment in Jason's favor. *See, also*, Opposition, Doc. 81, at pp. 1-9, PageID#4920-4928.

Finally, Defendants contend that somehow the constructive discharge was nothing more than a voluntary resignation. (Doc. 73 at 6). Of course, Defendants ignore current Chief Deputy Ketteman's admission that if someone ever conditioned his advancement on silencing his spouse, he would not put up with it because it would create an "intolerable" working environment. (Depo. Ketteman, Doc. 58, at 72-74, PageID#4130-4132). Regardless, threatening someone's career and strongly encouraging them to divorce their spouse or not see any career advancement, which unquestionably created a mental health crisis for Jennifer to be concerned about Jason "offing" himself, plainly fits the bill where any reasonable person would feel forced to resign. (Depo. Jennifer Davis, Doc. 50, at 94-95, PageID#2411-12). In fact in his exit interview, Jason's mindset is apparent: he was asked to permanently separate from his wife, he was spoken to by the Sheriff as if he was worthless, he was subject to a hostile work environment by the Sheriff and her Chief Deputy, both of whom crossed a line by bringing his family into the situation, and he "was no longer able" to work at the HCSO and his wife was devastated. (30(b)(6) Depo. Ketteman, Exhibit 41, Doc. 55-10, PageID#3618-3625).

## II.    LAW AND ARGUMENT

### A.  Plaintiffs are entitled to summary judgment on Count I as to each Defendant

Defendants wrongly contend that the First Amendment retaliation claim is somehow multiple claims, by citing a case that involves truly distinct claims. *Lee v. Ohio Educ. Assoc.*, 951 F.3d 386, 393 (6th Cir. 2020). In all events, this is not currently a pleading case, it is now a summary judgment case.

5

Next, Defendants assert that the speech at issue is not subject to protection under the *Garcetti*/*Pickering* test.  (Doc. 73 at 8-10).  Then they improperly impute Jennifer's speech to Jason.  (*Id.* at 9).  Defendants are wrong again as the *Garcetti*/*Pickering* test does not apply to non-employees or even the spouses of employees. *Nailon v. Univ. of Cincinnati*, 715 Fed. Appx. 509, 514 (6th Cir. 2017), and cases cited therein.

In their depositions, Defendants admitted that Jennifer was not an employee of the Sheriff's department, and in the October 2023 meeting Defendants admitted that Jennifer had every right to say whatever she wanted on social media.  (Transcript, Doc. 50-2, at p. 13, PageID#2446; Depo. McGuffey, Doc. 52, at p. 113, PageID#2962; Depo. Gramke, Doc. 51, at p.131, PageID#2637).  In fact, Gramke admitted in his deposition that both he and the Sheriff knew about clearly established rights to criticize public officials.  (Depo. Gramke, Doc. 51 at pp. 42-44, PageID#2548-2550).

As far as Jason is concerned, he merely made a post about a charity football game he had organized for the benefit of fallen first responders which received favorable local news coverage.  (Decls. Jason and Jennifer, Doc. 66-1, ¶4, 66-2, PageID#4366-4367, 4454; Depo. Gramke, Doc. 51, at 116-124, PageID#2622-2630; Exhibit 14, Doc. 51-14, PageID#2798-2800).  Jason's post contained a truthful statement that the HCSO did not support the game and took down flyers in the break room about it.  *Id*.  Jason's post was on his private Facebook page, was made on his own time while off the clock, was not made pursuant to any job duties Jason had with the HCSO, did not violate any HCSO policy, did not interfere with the performance of Jason's duties, did not disrupt the operations of the HCSO, did not impair the ability of Jason's supervisors to discipline him, and did not impair working relationships within the HCSO.  (Decl. Jason Davis, attached hereto at ¶4; Depo. Gramke, Doc. 51, at 122-124, PageID#2628-2630; Depo. McGuffey, Doc. 52

6

at 225-237, PageID#3074-3086).  And as a patrol deputy, Jason was not in a confidential, policy-setting, or spokesperson role for the HCSO.  (Depo. Gramke, Doc. 51, at 96-98, PageID#2602-2604; Depo. McGuffey, Doc. 52, at 213-214, PageID#3062-3063).  Moreover, Defendants admit they do not know if Jason's post was truthful, and they admit there actually was no official support for the charity football game in 2022.  (Depo. Gramke, Doc. 51, at 119, PageID#2625).

The law is clear: "[a]s a general matter," the First Amendment prohibits government officials from subjecting individuals to "retaliatory actions" for having engaged in protected speech. *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (internal quotation marks omitted); *see also Hartman v. Moore*, 547 U. S. 250, 256 (2006); *Lozman v. City of Riviera Beach*, 585 U.S. 87 (2018).  And criticizing public officials is plainly and clearly established as protected activity. *Lozman v. City of Riviera Beach*, 585 U.S. 87 (2018); *Connick v. Myers*, 461 U.S. 138, 148 (1983); *Holzemer*, 621 F.3d 512, 520; *Barrett v. Harrington*, 130 F.3d 246, 264 (6th Cir. 1997).

Here, there is no dispute that Jennifer engaged in clearly established protected speech, because she made posts criticizing public officials, including her interactions regarding Carolyn Adams' posts, all of which involved matters of public concern and public interest.  And without question, constitutional protections run to the speech of relatives (and the prohibition against retaliation for such speech).  *Nailon v. Univ. of Cincinnati*, 715 F. App'x 509 (6th Cir. 2017), *Henley v. Tullahoma City Sch. Sys.*, 84 F. App'x 534 (6th Cir. 2003), and *Ward v. Athens City Bd. of Educ.*, 1999 U.S. App. LEXIS 22766 (6th Cir. 1999) clearly establish that a plaintiff may bring a First Amendment retaliation claim where retaliation has occurred as a consequence of a relative's protected speech. *See, also*, *Fakhoury v. O'Reilly*, 837 Fed. Appx. 333 (6th Cir. 2020); *Ashford v. Univ. of Mich.*, 89 F.4th 960 (6th Cir. 2024).

*Nailon* acknowledged that this law was clearly established by 2017 (actually as of 1999), well before the retaliatory actions of Defendants here.  715 F. App'x 509.  *Heffernan v. City of Paterson*, 578 U.S. 266 (2016) makes clear that retaliation is prohibited for relatives' speech. **Thus, the *Pickering* test, and Defendants' entire argument cannot apply to Jennifer.**

As for Jason's post regarding the charitable fundraiser football game, it also is clearly established protected speech.  A court determines as matter of law whether a public employee's speech is constitutionally protected. *See Mayhew v. Town of Smyrna, Tenn.*, 856 F.3d 456, 464 (6th Cir. 2017). To be protected, the employee must have spoken as a "private citizen" and addressed a "matter of public concern." *Id.* at 462.  A public employee speaks as a private citizen when his speech does not relate to his "official duties." *See Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).  Speech addresses a public concern when it relates to "*any* matter of political, social, or other concern to the community," or when it is a "subject of general interest." *Lane v. Franks*, 573 U.S. 228, 241 (2014) (emphasis added); *See, also, Noble v. Cincinnati & Hamilton Cnty. Pub. Libr.*, 112 F.4th 373 (6th Cir. 2024) (speaking on issues covered in the media are issues of public concern).

As articulated above, Jason's post was made off the clock, not on any official page, and not pursuant to Jason's job duties.  *Garcetti*, 547 U.S. 410, 421-22; *Decrane v. Eckart*, 12 F.4th 586 (6th Cir. 2021).  And the fact that the post concerned a charity event that raised money for first responders, which had been favorably reported on by the media, and articulated that the Sheriff's office did not support it, potentially constituting allegations of maladministration, meets the broad public concern test.  *Lane*, 573 U.S. 228, 241; *See, also, Noble*, 112 F.4th 373; *Marquardt v. Carlton*, 971 F.3d 546, 548 (6th Cir. 2020) (Facebook post was matter of public concern); *Buddenberg*, 939 F.3d 732, 739.  In fact, merely responding to questions from others, as

8

Jason did, is evidence that a matter is of "public concern." *Matulin v. Village of Lodi*, 862 F.2d 609, 613 (6th Cir. 1988).

Where the speech involved is a matter of public concern, courts then apply the *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205,* 391 U.S. 563, 568 (1968) balancing test "to determine if the employee's free speech interests outweigh the efficiency interests of the government as employer." *Gillis v. Miller*, 845 F.3d 677, 684 (6th Cir. 2017). In that regard, the Sixth Circuit has stated that "public safety employers [do not] have a greater weight placed on their interests in order and discipline than other employers have in their institutional interests." *Mosholder v. Barnhardt*, 679 F.3d 443, 451 (6th Cir. 2012). Therefore, here, as in *Noble*, 112 F.4th 373, 382, the general content and context support protection for Jason's speech: here we have a comment about an issue that received widespread news reporting, and which was "made on his private Facebook page while he was at home and not working." *Id.*

Finally, courts consider whether a plaintiff's speech "(1) impairs discipline by superiors or harmony among co-workers, (2) has a detrimental impact on close working relationships for which confidence and personal loyalty are necessary, (3) impedes the performance of [Jason's] duties or interferes with regular operations of the enterprise, or (4) undermines the [HCSO's] mission." 112 F.4th 373, 382-383. And here, **Defendants admit** that Jason's Facebook post did not interfere with the performance of his duties, did not disrupt the operations of the HCSO, did not impair the ability of Jason's supervisors to discipline him, did not impair working relationships within the HCSO, and did not violate any particular HCSO policy. (Decl. Jason Davis, attached hereto at ¶4; Depo. Gramke, Doc. 51, at 122-124, PageID#2628-2630; Depo. McGuffey, Doc. 52 at 225-237, PageID#3074-3086). Thus, Jason's post constitutes clearly established protected speech. *Noble*,

9

112 F.4th 373, 382-5; *Ashford*, 89 F.4th 960; *Myers v. City of Centerville*, 41 F.4th 746 (6th Cir. 2022).

Nor does *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538 (6th Cir. 2007) aid Defendants, where the employee there was fired for internal, non-public speech made to a consultant, that occurred while the employee was on the clock, which the Court held was made pursuant to the employee's job duties, and did not involve, as this case does, a public posting on an employee's private time and made about a public matter contained in the news.

### B. The Corporal non-promotion

While we disagree with Defendants about the Corporal position (Doc. 73 at 10-11), our position is that whether Defendants denied Jason a Corporal position is a genuine issue of material fact, and thus not appropriate for summary judgment in Jason's favor.  *See, also*, Opposition, Doc. 81, at pp. 1-9, PageID#4920-4928.

### C. McGuffey's liability

Defendants argue that only Gramke, and not McGuffey, was involved in the RENU non-selection of Jason.  (Response, Doc. 73 at 3).  Defendants ignore the record when making this argument.  Elsewhere, Plaintiffs have addressed why there may be an issue of fact on the degree to which McGuffey was involved with initially making the assignment decisions to RENU.[2]  See Doc. 66 at pp. 4-5, 13-19, 39-41, PageID#4319-4320, 4328-4334, 4354-4356.

---

[2]There may be an issue of fact about the degree to which McGuffey was involved in initially making the assignment decisions, including to RENU and promotions to Corporal – on that score the contemporaneous promotional and assignment orders document that McGuffey made the appointment and approvals; while Defendants' witnesses say that these were actually made by the Chief Deputy and/or possibly Major.  (Depo. Gramke, Doc. 51, at 114-115, PageID#2620-2621; 30(b)(6) Depo. Ketteman, Doc. 55, at 26, 30-34, 49, 54, PageID#3498, 3482-3488, 3501, 3506).  However, and in addition to the contemporaneous documentary evidence, McGuffey's testimony was that the "buck stops with me" within the department, and "Chief Deputy Gramke made the decision to prevent Jason Davis's assignment to RENU.  I agreed with his decision."  (Depo. McGuffey, Doc. 52 at 8, 82-83, PageID#2858, 2932-33; Exhibit 24, Doc. 52-1, Interrog. No. 6 response, at PageID#3153).

However, it is undisputed that assignments, including to RENU, and promotions, including to Corporal, had to be signed off via personnel actions that explicitly stated that the Sheriff approved the assignment decisions, and there is no dispute that the Sheriff had ultimate authority regarding assignments and promotions. (30(b)(6) Depo. Ketteman, at 34, 94-95, PageID#3486, 3546-3547; Exhibit 36, PageID#3601-3606; Depo. McGuffey, Doc. 52, at 8, 68-70, 100-101, PageID#2858, 2917-19, 2949-50). McGuffey's testimony on the RENU assignment was: "Chief Deputy Gramke made the decision to prevent Jason Davis's assignment to RENU. I agreed with his decision." (Depo. McGuffey, Doc. 52 at 82-83, PageID#2932-33; Exhibit 24, Doc. 52-1, Interrog. No. 6 response, at PageID#3153).

Consequently, there is no dispute that the facts are sufficient to hold McGuffey liable for supervisory liability on that claim. Defendants suggest that a mere failure to act is insufficient to hold a supervisor liable, *citing Greene v. Barber*, 310 F.3d 889, 898 (6th Cir. 2002). That same case observed that there was "no showing here that Chief Hegarty engaged in any active unconstitutional behavior." *Id.* Unquestionably, that is **not** the case for McGuffey. First, she testified she agreed with the decision not to assign Jason to RENU. (Depo. McGuffey, Doc. 52 at 82-83, PageID#2932-33; Exhibit 24, Doc. 52-1, Interrog. No. 6 response, at PageID#3153). And the test for supervisory liability is that McGuffey "implicitly authorized, approved, or knowingly acquiesced in the conduct" of Gramke. *Campbell v. City of Springboro, Ohio*, 700 F.3d 779, 789-790 (6th Cir. 2012). In *Campbell*, the Chief of Police was not present on the scene of the K-9 attack but allowed the K-9 in the field after training lapsed, failed to establish a policy after incidents, and failed to act after prior incidents. That was sufficient for supervisory liability.

11

Recently, in *Venema v. West*, 133 F.4th 625 (6th Cir. 2025), the Sixth Circuit addressed supervisory liability by analyzing two prior cases, *Peatross v. City of Memphis*, 818 F.3d 233 (6th Cir. 2016), and *Coley v. Lucas County*, 799 F.3d 530 (6th Cir. 2015), and observed in both cases "that supervising police officers could be liable for violations of a deceased's constitutional rights when complaints plausibly alleged that the supervisor-defendant had failed to train and supervise subordinate officers against engaging in the conduct that caused the death." *Vanema*, 133 F.4th 625, 634. In *Venema*, the Sixth Circuit also explained that the supervisor's knowledge and acquiescence is established by showing that it was the supervisor's practice to engage in or support the constitutional violations, including through policy. *Id.* at 635.

In fact, "a defendant-supervisor knowingly acquiesces in unconstitutional conduct when she "abandons the specific duties of [her] position in the face of actual knowledge of a breakdown in the proper workings of the department." *Id.* at 634, *citing Winkler v. Madison Cnty.*, 893 F.3d 877, 898 (6th Cir. 2018) (cleaned up); *see, also, Taylor v. Michigan Department of Corrections*, 69 F.3d 76, 84 (6th Cir. 1995); *Hill v. Marshall*, 962 F.2d 1209, 1213 (6th Cir. 1992) (holding a supervisor liable under § 1983 where he personally referred inmates' complaints of not getting their medication to a head nurse, who he knew was altering or destroying inmates' prescriptions). Here, McGuffey's admitted "approval" of Gramke's decision to deny the RENU appointment to Jason, while knowing the decision was made as an adverse consequence for Jennifer's constitutionally protected speech, is sufficient to hold McGuffey liable as a matter of law on supervisory liability for that illegal conduct.

Here, Defendants don't even attempt to distinguish *Campbell*, *Vanema*, *Peatross*, or *Coley*, even though they all are published binding cases, and Defendants also don't address the unrebutted evidence of a serious lack of training within the HCSO despite a number of prior incidents of First

12

Amendment retaliation where McGuffey also failed to act. *See, also*, Doc. 66 at 5-6, PageID#4320-4321. Likewise, Defendants fail address **McGuffey's testimony that she in fact approved** of what Gramke did here. (Depo. McGuffey, Doc. 52 at 82-83, PageID#2932-33; Exhibit 24, Doc. 52-1, Interrog. No. 6 response, at PageID#3153). Without question, in the October 2023 meeting McGuffey doubled down on the policy and practice of retaliation and emphasized her approval of the decision to deny Jason a position within RENU as a consequence for what his wife posted on-line. *See* Doc. 66, pp. 13-19, PageID#4328-4334

In response to all the above, McGuffey argues that *Shehee v. Lutrell*, 199 F.3d 295, 300 (6th Cir. 1999) assists here, but in that case, there was no evidence that the supervisor in question authorized the misconduct (and later participated in a furtherance of it), as is the case here. Similarly, *Lynn v. City of Detroit*, 98 Fed. Appx. 381, 387 (6th Cir. 2004) does not aid McGuffey, because had she stopped the unconstitutional conduct, rather than encouraged, approved and agreed with it, the misconduct would not have occurred because, as she readily admitted, the buck stopped with her. (Depo. McGuffey, Doc. 52 at 8, 82-83, PageID#2858, 2932-33; Exhibit 24, Doc. 52-1, Interrog. No. 6 response, at PageID#3153).

### D. Plaintiffs established the constructive discharge of Jason and the October, 2023 meeting was otherwise adverse action in and of itself[3]

Defendants contend that there was no constructive discharge. (Doc. 73 at 12-17). Let us begin here: the October 2023 meeting and the discussion directed towards Jason: gag your wife or else, was itself an adverse action. Any adverse actions, other than "those that create only de minimis negative consequences," can "offend the Constitution." *Kubala v. Smith*, 984 F.3d 1132, 1139 (6th Cir. 2021). And *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024) has lowered the bar

---

[3] Here, the facts are so damning here that reasonable minds can only conclude no reasonable person would remain employed after what Jason was told by the two top officers of the HCSO in October 2023.

on what is adverse action. In a civil rights context, all that has to be shown to establish adverse action is "some 'disadvantageous' change in an employment term or condition." *Id.* at 347 (*citing Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998)).

The meeting plainly fits that bill. And that meeting set in motion an inevitable resignation from Jason. That is sufficient causation, even if Jennifer's reaction to the threats and meeting were also a cause of the resignation. Consistent with First Amendment retaliation case law (as opposed to Title VII law), this Court must look to whether the resignation was a reasonably foreseeable consequence of Defendant's decisions to threaten Jason's marriage, and they were. *See Paige v. Coyner,* 614 F.3d 273, 280 (6th Cir. 2010). But "[e]ven if an intervening third party is the immediate trigger for the plaintiff's injury, the defendant may still be proximately liable, provided that the third party's actions were foreseeable." *Powers v. Hamilton Cnty. Pub. Defender Comm'n,* 501 F.3d 592, 609 (6th Cir. 2007).

Further, the Supreme Court has made clear that an employer's intent to cause the employee to resign simply is not part of the constructive discharge analysis:

> The whole point of allowing an employee to claim "constructive" discharge is that in circumstances of discrimination so intolerable that a reasonable person would resign, we treat the employee's resignation as though the employer actually fired him. We do not also require an employee to come forward with proof—proof that would often be difficult to allege plausibly—that not only was the discrimination so bad that he had to quit, but also that his quitting was his employer's plan all along.

*Green v. Brennan*, 578 U.S. 547, 560 (2016). *See, also*, *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805 (6th Cir. 2020)[4] (discusses that requiring an employer to have a subjective intent to induce a resignation may be invalid in light of the Supreme Court's decision in *Green*).

---

[4] Defendants misread *Tchankpa* at Doc. 73, pp. 15-16. *Tchankpa* was clear that the Plaintiff in that case invited the subjective intent test, and that *Green* "conflicts with the subjective intent requirement still used by this Circuit," 951 F.3d 805, 814, 816. And, in reference to *Green*, the Sixth Circuit noted that "a controlling Supreme Court case trumps our precedent, even if we published conflicting opinions after the Supreme Court decision." *Id.* at 815-816.

14

Current Chief Deputy Ketteman's admission that if someone ever conditioned his advancement on silencing his spouse, he would not put up with it because it would create an intolerable working environment is dispositive on this point against Defendants.  (Depo. Ketteman, Doc. 58, at 72-74, PageID#4130-4132).  Threatening someone's career and admonishing them to divorce their spouse, in a manner that created a mental health crisis for Jennifer to be concerned about Jason "offing" himself, plainly fits the bill such that any reasonable person would resign.  (Depo. Jennifer Davis, Doc. 50, at 94-95, PageID#2411-12).  As noted, in his exit interview, Jason's mindset is made apparent: he was asked to separate himself from his wife, he was spoken to by the Sheriff as if he was worthless, he was subject to a hostile work environment by the Sheriff and Chief Deputy, both of whom crossed a line by bringing his family into the situation, and he "was no longer able" to work at the HCSO and his wife was devastated.   (30(b)(6) Depo. Ketteman, Exhibit 41, Doc. 55-10, PageID#3618-3625).  Consequently, constructive discharge is proven on these facts and reasonable minds cannot differ.

Regardless, *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024) lowered the bar on what is adverse action – in other words, constructive discharge is not the sole test for adverse action.  In a civil rights context, all that must be shown to establish adverse action is "some 'disadvantageous' change in an employment term or condition."  *Id.* at 347 (*citing Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998)).  Even before *Muldrow*, federal courts held that employment conditions that place an undue burden on a family relationship amount to constructive discharge. *Bales v. Morgan County*, 2010 U.S. Dist. LEXIS 16372, at \*18-19 (EDTN, February 24, 2010).  And here, Defendants specifically, in no uncertain terms, told Jason to "cut loose" his wife, the one to whom he took a lifelong vow, in order to have an opportunity to advance in his career.

Under *Bales*, no such monstrous requirement was ever made, but rather that plaintiff merely was moved to the night shift, thus causing a strain on his family life.  As noted, the facts here are several orders of magnitude more egregious, as McGuffey and Gramke used their positions of authority over Jason to force him to choose between his wife and any advancement in his career.  That is an intolerable work condition to any "reasonable person" and it is the unrebutted reason why Jason resigned.

Equally, McGuffey and Gramke's directives to Jason to silence Jennifer, or else, constitute prior restraint – and are a federal felony.  *Alexander v. United States*, 509 U.S. 544, 550 (1993); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963); *Novak v. City of Parma*, 932 F.3d 421 (6th Cir. 2019).  Does directing a sworn law enforcement officer to violate the constitutional rights of his spouse (which constitutes the commission of a federal crime, *see* 18 U.S.C. §§ 241, 242), as a condition of employment, in violation of that law enforcement officer's oath of office, create an intolerable work environment?  Would anyone considering that monstrous demand conclude that the employer has any intent other than forcing the employee to resign?  Particularly after the entire predicate of the conversation was to discuss Jason's "future status" with the HCSO?  Can Defendants condition Jason's continued employment and advancement upon his willingness to submit to and join in an ongoing violation of his and his wife's constitutional rights?  To ask these questions is to answer them.

Defendants argue that merely denying Jason a promotion or an assignment is not sufficient to establish liability.  But that is not these undisputed facts.  These undisputed facts are that Defendants threatened Jason to silence his wife's protected speech or else never advance at work – to join them in a conspiracy to commit a federal felony against Jennifer's civil rights – and that if Jason could not gag Jennifer's speech, he needed to cut her loose.  Defendants wholly ignore

those undisputed facts – and for good reason – no law enforcement officer would join Defendants in committing a federal felony against that officer's spouse as a condition of continued employment.  That Defendants appear to embrace this criminality as a matter of HCSO office policy and practice under McGuffey, merely underscores the *Monell* liability for the county and McGuffey's individual liability.

The Sixth Circuit, in *Savel v. MetroHealth Sys.*, 96 F.4th 932, 940-942 (6th Cir. 2024), explained in an employment case that "[i]f the defendant forced the plaintiff's hand, and the plaintiff was left with no choice but to give up something of value or suffer an unpleasant consequence, we may recognize that the defendant caused the plaintiff an injury."  Here, of course, the thing of value Defendants attempted to coerce Plaintiffs to give up were Jennifer's (and Jason's) First Amendment rights, and their marriage.  Similarly, in *Saroli v. Automation & Modular Components, Inc.*, 405 F.3d 446 (6th Cir. 2005), the Court found constructive discharge in similar circumstances.

### E.  Defendants interfered with Plaintiffs' association

Plaintiffs have the right to intimate association with each other as spouses.  *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984).  There, the Supreme Court held that the choice "to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State[.]" *Id.* at 617-18.  Cases in this circuit look at the right under the First Amendment. *See Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703, 711 (6th Cir. 2001); *Sowards v. Loudon Cty.*, 203 F.3d 426, 432 (6th Cir. 2000); *Adkins v. Bd. of Educ.*, 982 F.2d 952, 955-56 (6th Cir. 1993).

Further, an individual exercises his right to speak most effectively by combining his voice with the voices of others. *Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47, 68 (2006). And if the government could restrict an individual's right to join others to speak, then it

17

could silence the views that the First Amendment is intended to protect. *Id.* For those reasons, the expressly guaranteed right to speak implicitly protects "the right to associate for the purpose of speaking[.]" *Id. see, also, NRA of Am. v. Vullo*, 602 U.S. 175 (2024) (association claims and forced disassociation stated a separate claim under First Amendment)

In *Sigler v. City of Englewood*, 424 Fed. Appx. 449 (6th Cir. 2011), the Sixth Circuit denied qualified immunity to police officials who took action against an officer for his wife's criticisms of the department. Here McGuffey and Gramke did far worse than the officials in *Sigler, Adkins,* and *Sowards* – they required Jason to silence his wife or "cut loose" his wife if he could not silence her, in order to advance at work. Here, Defendants plainly stated that Jason's wife was "hurting" his career (Transcript, Doc. 50-2, at 50-51, PageID#2483-2484), that if someone was hurting Jason's career, he should "cut them loose," (*id.* at 45-46, PageID#2478-2479), and Defendant McGuffey then doubled down and stated that if associating with certain people hurt her career, it would cause her to say "You got to go. Bye." (*Id.* at 46, PageID#2479).

That reprehensible, criminal misconduct runs afoul of the foregoing clearly established law protecting intimate relationships from "undue" governmental intrusion.

Defendants assert that these separate claims are somehow duplicative of the First Amendment retaliation speech claims and do not warrant separate analysis, *citing Ward*, 1999 U.S. App. LEXIS 22766, *Henley*, 84 Fed. Appx. 534, and *Harris v. Butler Co.*, 344 F. App'x 195 (6th Cir. 2001). Yet, none of those cases dealt with an employer who threatened someone's marriage because of their spouse's speech – activity that posed a direct and substantial limitation on Jason's employment and intrusion on his marriage. *Lyng v. Castillo*, 477 U.S. 635, 638 (1986). And on that front, the intimate associational claim here is distinct from the speech

18

retaliation claim, and the undue intrusion by Defendants is equally forbidden. These contentions also appear to be contrary to *NRA*, 602 U.S. 175.

### F. The Count II claim

Plaintiffs thoroughly addressed this (including supplemental jurisdiction) in their Opposition, Doc. 81, at pp. 9-20, PageID#4928-4939. That exposition need not be repeated here, and we expressly incorporate it by reference. The proof is that Defendants knew the law, and knowingly violated it, and citation to decisions where *Pickering/Garcetti* factors are at issue are not relevant here, where Defendants admitted under oath that all of those factors protected the free speech at issue here (and that Jennifer's speech is not employee speech at all).

As ***Defendants' admit under oath***, Jason's post on his private Facebook page was made on his own time, off the clock, and not pursuant to any job duties Jason had with the HCSO, and it did not violate any HCSO policy, did not interfere with the performance of Jason's duties, did not disrupt the operations of the HCSO, did not impair the ability of Jason's supervisors to discipline him, and did not impair working relationships within the HCSO. (Decl. Jason Davis, attached hereto at ¶4; Depo. Gramke, Doc. 51, at 122-124, PageID#2628-2630; Depo. McGuffey, Doc. 52 at 225-237, PageID#3074-3086).

Defendants' contentions that there is no evidence that they knew that they were violating Plaintiffs' rights is belied by their admissions of record. And, Defendants cannot claim ignorance of the law when the HCSO has been the subject of a number of First Amendment Retaliation lawsuits in the ten years preceding the present First Amendment Retaliation lawsuit, including a First Amendment Retaliation lawsuit brought both by, and against, now-Sheriff McGuffey, ***all of which preceded the events at issue***. (Depo. Gramke, Doc. 51-20, at Exhibit

20, PageID#2837-43; *see, also*, *Charmaine McGuffey vs HCSO et. al.*, 1:18-cv-00322-SJD (S.D. Ohio 2018); *Schoonover v. Hamilton County et. al.*, 1:22-cv-00767-MWM (S.D. Ohio 2022).

Once again, Defendant Gramke admitted that "they" knew about clearly established rights of public employees to criticize employers in non-work speech in matters of public concern and the right of non-employees to criticize government personnel.  (Depo. Gramke, Doc. 51 at pp. 42-44, PageID#2548-2550).

Further, McGuffey and Gramke do not have any sort of statutory immunity for these claims: R.C. 2744.03(A)(6)(b) denies immunity to political-subdivision employees who act "with malicious purpose, in bad faith, or in a wanton or reckless manner."  "Ohio courts have defined malice as the willful and intentional design to do injury or the intention or desire to harm another, usually seriously, through conduct which is unlawful or unjustified." *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 315 n.15 (6th Cir. 2005).  And bad faith "involves a dishonest purpose, conscious wrongdoing, the breach of a known duty through some ulterior motive or ill will, as in the nature of fraud, or an actual intent to mislead or deceive another." *Caton v. Salamon*, 2025 U.S. App. LEXIS 26546 at *24 (6th Cir. 2025) *citing Cook v. Cincinnati*, 103 Ohio App. 3d 80, 658 N.E.2d 814, 821 (Ohio Ct. App. 1995).  And *Caton* establishes that engaging in a motive to violate the constitution, as is the case here with Defendants, fits neatly within this exception.

### III.    CONCLUSION

Plaintiffs should be granted partial summary judgment as to liability.

Respectfully Submitted,

/s/Zachary Gottesman                        /s/ Christopher Wiest
Zachary Gottesman (0058675)           Christopher Wiest (Ohio 0077931)
Gottesman & Associates, LLC            Chris Wiest, Atty at Law, PLLC
9200 Montgomery Road                50 E. Rivercenter Blvd, Suite 1280
Building E, Suite 18B                  Covington, KY 41011
Cincinnati, Ohio 45242               513/257-1895 (v)
513/651-2121                           859/495-0803 (f)
zgottesman@gmail.com               chris@cwiestlaw.com
/s/ Thomas B. Bruns
Thomas B. Bruns (0051212)
Bruns, Connell, Vollmar & Armstrong
4555 Lake Forest Dr., Ste. 330
Cincinnati, OH 45242
(513) 326-0274
(513) 800-1263 (fax)
tbruns@bcvalaw.com
Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I certify that I have served a copy of the foregoing upon all Counsel of record, this 7 day of May

2026 via CM/ECF.

/s/ Christopher Wiest
Christopher Wiest (Ohio 0077931)

21